*One Wisconsin Institute, Inc. et al.*
*v.*
*Judge Gerald C. Nichol, et al.*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
Case No.: 15-cv-324

**December 10, 2015**

**EXPERT REPORT: INTENTIONAL DISCRIMINATION**

**ALLAN J. LICHTMAN**

-------------------------------------------------
Allan J. Lichtman

## I.   STATEMENT OF PURPOSE

I have been asked to consider whether a series of laws adopted by the Wisconsin State Legislature that affects access to voting and registration was enacted with the *intent* to discriminate against African American and Hispanic voters and would-be voters. My expected fee in this matter is $400 per hour. I have enclosed an updated CV and a table of cases in which I have provided written or oral testimony.

In particular this report will examine the following enactments regarding voting and registration in Wisconsin since 2011:

### 1. Act 23 (2011)

- Imposed a photo voter identification requirement.
- Reduced the early voting period from 30 to 12 days.
- Eliminated one person's vouching for the residence of another to prove residence for the purpose of registering to vote (corroboration).
- Limited the opportunity for students to use a college ID as proof of residence for registering to vote.
- Increased the in-state residency requirement for voting for offices other than president and vice president from 10 to 28 days before an election, and required that persons who move within the state later than 28 days before an election vote at their previous ward or election district.
- Eliminated straight-ticket voting on the official ballot.
- Eliminated the Government Accountability Board's authority to appoint special registration deputies with the authority to register voters on a statewide basis.

### 2. Act 75 (2011)

- Eliminated the faxing and emailing of absentee ballots to all absentee voters except statutory overseas and military voters.

### 3. Act 227 (2011)

- Limited the circumstances in which municipal clerks can return to voters absentee ballots to fix mistakes.
- Required a copy of a photo ID for absentee ballots.

### 4. Act 240 (2011)

- Eliminated the requirement that special registration deputies be appointed at public high schools.

1

**5. Act 76 (2013)**

- Overturned a city ordinance in Madison that required landlords to provide voter registration forms to new tenants.

**6. Act 177 (2013)**

- Required that observation areas be placed between three and eight feet from the table at which voters provide their name and address for ballots and register to vote.

**7. Act 182 (2013)**

- Required all voters other than overseas and military voters to provide documentary proof of residence for registration. This changed the prior law which required only those who registered less than 20 days before an election to present documentary proof.

**8. Act 146 (2014)**

- Eliminated early voting on weekends.
- Limited the times for early voting to the period from 8 a.m. to 7 p.m.

The report will also consider bills that the majority in the state legislature rejected relating to voting and registration from 2011 to 2015.

## II.    QUALIFICATIONS

This study draws on my experience in voting rights litigation and expertise in political history, political analysis, and historical and statistical methodology. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 42 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my B.A. in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data. My areas of expertise include political history, electoral analysis, and historical and quantitative methodology.

I am the author of numerous scholarly works on quantitative and qualitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, *Journal of Applied Forecasting*, and *Social Science History*, as well as my co-authored book, *Historians and the Living Past*. In addition, I have coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation*

*Review*, *Journal of Legal Studies*, and *National Law Journal*. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies published in such academic journals as *The Proceedings of the National Academy of Sciences*, *The American Historical Review*, *The International Journal of Forecasting*, *The International Journal of Information Systems & Social Change*, and *The Journal of Social History*. Quantitative and historical analyses also ground my books, *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman).

My book, *White Protestant Nation*, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America in 2008. My most recent book, *FDR and the Jews*, was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the *New York Times* in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, the winner of the Tikkun Olam Award in Holocaust Studies, and a finalist for the Los Angeles Times Book Prize in history.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than eighty voting and civil rights cases. These include several cases in the State of Wisconsin. In the U.S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work. I have testified several times for plaintiffs and defendants on the issues of intentional discrimination in the adoption of state redistricting plans and photo identification laws. A three-judge panel in litigation challenging the 2011 State of Illinois redistricting plan also cited my work on behalf of defendants in support of the panel's *rejection* of plaintiffs' claim that the plan intentionally discriminated against minority voters in *Committee for a Fair and Balanced Map v. Illinois State Board of Elections*, 2011 U.S. Dist. Lexis 117656 (N.D. Ill. Oct. 12, 2011).

## III.   EVIDENCE, METHODOLOGY, AND SUMMARY OF OPINIONS

My analysis draws upon the Wisconsin Government Accountability Board's (GAB) database. The report additionally draws upon other sources standard in historical and social scientific analysis. These include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic and socio-economic information; election returns; voter registration and turnout data; court opinions, briefs, and reports; government and organizational documents; and scientific surveys and studies. These sources of information will be used both for analyses within Wisconsin and for comparisons with other states.

The report closely follows the methodological guidelines of the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In *Arlington Heights*, the Court focused on five distinct factors that are relevant to ascertaining intentional discrimination: (1) discriminatory impact; (2) historical background; (3) the sequence of events leading up to the challenged action; (4) procedural or substantive

deviations from the normal decision-making process; and (5) contemporaneous viewpoints expressed by the decision-makers.

The purpose of this report is not to make legal conclusions, but to establish substantive findings about discriminatory intent. The *Arlington Heights* methodology is consistent with standard causal analysis in history, which I have followed in my substantive scholarship and written about in my theoretical work (*see* Section II, above).

My major opinions are summarized briefly below:

- Wisconsin has a history of discrimination against African Americans and Hispanics that is reflected in current racial disparities on such socio-economic measures as income, unemployment, poverty, education, housing, the availability of vehicles and telephones, and health.

- This information was available to the legislature at the time of the enactment of the voting and registration measures analyzed in this report.

- Wisconsin is one of the most unequal states in the nation as gauged by disparities between African Americans and whites on socio-economic measures.

- Socio-economic disparities have implications for the opportunities of minorities relative to whites to vote and register in Wisconsin.

- The increase in the minority share of the vote in Wisconsin threatens Republicans' electoral prospects.

- Absent any prospects of expanding the relative position of whites in the electorate, the Republican majority in the state legislature intentionally and deliberately through some 15 restrictive measures sought to impede the opportunities for African Americans and Hispanics to fully participate in the political process in Wisconsin and elect candidates of their choice.

- The majority adopted these measures even though at the time Wisconsin had an exemplary electoral system. It was a national leader in voter turnout and the administration of elections.

- The voter photo ID provision adopted in 2011 in Wisconsin was the most restrictive identification law in the nation at that time.

- The Republican majority adopted this legislation despite information presented regarding the disparate impact of the law on minorities and despite a virtual absence of voter impersonation in the state.

4

- The legislature rejected all amendments designed to alleviate the disparate burdens of the voter photo ID law on minorities, including provisions in place in other voter photo ID states.

- Other actions taken by the legislature further indicate the discriminatory intent of the voter photo ID law.

- The legislature adopted numerous other restrictions on registration and voting in Wisconsin, such as limitations on early voting and tightened residency requirements, that based on information available at the time would most likely have a disparate impact of African American and Hispanic voters and potential voters.

- Wisconsin's adoption of a voter photo ID law in 2011 was consistent with decision-making by Republicans in other states faced with similar problems of declining white voter strength and racial polarization in the voting of whites and minorities.

- Wisconsin, however, exceeded all other states in the number of new restrictive voting and registration measures enacted between 2011 and 2014.

- There is rare direct evidence from a Republican decision-maker who initially voted for Act 23 that his Republican colleagues enacted this law and other measures discussed in this report to limit the voting opportunities for minorities in Wisconsin.

- Other justifications for this legislation presented by decision-makers are misleading, contradictory, and pretextual.

- Based on considerable evidence, and following the *Arlington Heights* procedures and standard historical causal analysis, I conclude that the majority Republicans deliberately and knowingly enacted a voter photo ID requirement and numerous other legislative measures that placed disparate burdens on the opportunities for African Americans and Hispanics to register and vote in Wisconsin.

## IV. IMPACT OF HISTORIC DISCRIMINATION AGAINST AFRICAN AMERICANS IN WISCONSIN

The State of Wisconsin has a long and well-acknowledged history of discrimination against African Americans, much of which has substantially impacted the opportunity for African Americans to participate fully in the political process and elect candidates of their choice. This history is well documented in the Expert Report of Dr. Barry Burden submitted in this litigation.

The lingering effects of the history of discrimination are apparent today in the substantial socio-economic disparities between non-Hispanic African Americans, Hispanics, and non-Hispanic whites in Wisconsin. As will be demonstrated below, these disparities have a significant impact on the relative ability of African Americans and Hispanics as compared to whites to participate in the

5

electoral process.

Based on information available at the time of decision-making by the Wisconsin Legislature and governor, Table 1 and Charts 1 and 2 demonstrate a wide gap between African Americans and Hispanics as compared to whites in Wisconsin on measures of income, poverty, and unemployment. The median household income of whites is nearly double that of African Americans and 44% higher than the median household income of Hispanics. The per capita income of African Americans and Hispanics is less than half the per capita income of whites. The poverty rate for African American families is more than five times the poverty rate for white families and the poverty rate for Hispanic families is more than four times the rate for white families. The poverty rate for African American persons is nearly four times the poverty rate for white persons and the poverty rate for Hispanic persons is more than two and a half times the rate for white persons. The unemployment rate for African American persons is nearly triple the unemployment rate for whites and the unemployment rate for Hispanics is nearly double the rate for white persons.

**TABLE 1**
**INCOME, POVERTY, AND UNEMPLOYMENT MEASURES BY RACE, WISCONSIN,
US CENSUS, 2010 AMERICAN COMMUNITY SURVEY, 3-YEAR ESTIMATES**

| Measure | NH Black | Hispanic | NH White |
|---|---|---|---|
| | | | |
| MEDIAN HOUSEHOLD INCOME | $27,425 | $36,751 | $53,062 |
| | | | |
| PER CAPITA INCOME | $13,482 | $13,271 | $28,540 |
| | | | |
| POVERTY RATE FOR PERSONS | 35.8% | 24.6% | 9.1% |
| | | | |
| POVERTY RATE FOR FAMILIES | 32.4% | 23.2% | 5.7% |
| | | | |
| UNEMPLOYMENT RATE | 18.4% | 11.8% | 6.3% |
| | | | |
| | | | |

**CHART 1**
**MEDIAN HOUSEHOLD AND PER CAPITA INCOME BY RACE, WISCONSIN, DATA FROM TABLE 1**



**CHART 2**
**POVERTY, UNEMPLOYMENT & ASSET POVERTY RATE BY RACE, WISCONSIN, DATA FROM TABLE 1**



Table 2 and Charts 3 and 4 demonstrate substantial racial differences on education measures. The percentage of whites graduating high school is 16 percent higher than the African American percentage and 53 percent higher than the Hispanic percentage. The percentage of whites graduating college is 92 percent higher than the African American percentage and more than double the Hispanic percentage. The percent of African Americans falling below basic proficiency in 8th grade math scores is nearly four times greater than the white percentage and the percent of Hispanics falling below basic proficiency is more than two and a half times greater than the white percentage. The high school graduation rate for whites is 45 percent higher than the rate for African Americans and 22 percent higher than the rate for Hispanics. The high school dropout rate is six times higher for African Americans than for whites and nearly four times higher for Hispanics than for whites.

**TABLE 2**
**EDUCATIONAL ATTAINMENT FOR AFRICAN AMERICANS, HISPANICS, AND WHITES, WISCONSIN**

| Measure | NH Black | Hispanic | NH White |
|---|---|---|---|
| | | | |
| **HIGH SCHOOL GRADUATES AGE 25+ *** | 79.3% | 60.2% | 92.0% |
| | | | |
| **BACHELOR'S DEGREE OR MORE AGE 25+ *** | 14.0% | 11.1% | 26.9% |
| | | | |
| **PERCENT BELOW BASIC, 8TH GRADE MATH \*\*** | 57% | 40% | 15% |
| | | | |
| **GRADE 9-12 GRADUATE RATE \*\*\*** | 66.0% | 78.1% | 95.6% |
| | | | |
| **GRADE 9-12 DROPOUT RATE \*\*\*** | 7.5% | 4.6% | 1.2% |
| | | | |
| * US Census, 2010 American Community Survey, 3-Year Estimates; ** National Center for Educational Statistics, Mathematics, 2011, http://nces.ed.gov/nationsreportcard/pdf/main2011/2012458.pdf; *** National Center for Educational Statistics, State Dropout and Completion File, 2009-2010, https://nces.ed.gov/ccd/drpcompstatelvl.asp. | | | |

8

**CHART 3**
**EDUCATIONAL ATTAINMENT BY RACE, WISCONSIN, DATA FROM TABLE 2**



**CHART 4**
**EDUCATION MEASURES, BY RACE, WISCONSIN, DATA FROM TABLE 2**



9

Table 3 and Charts 5 and 6 demonstrate considerable differences between African Americans and Hispanics as compared to whites in Wisconsin on home ownership, home values, and vehicles and telephones available in households. The white percentage of home owners is more than double the African American percentage and 64 percent higher than the Hispanic home ownership percentage. The value of white owned homes is 42 percent higher than the value of African American owned homes and 23 percent higher than Hispanic owned homes. African American households are more than four times more likely than white households to lack an available vehicle and Hispanic households are 58 percent more likely than white households to lack an available vehicle. African American households are 65 percent more likely than white households to lack telephone service and Hispanic households are 82 percent more likely than white households to lack telephone service.

**TABLE 3**
**HOUSING CHARACTERISTICS BY RACE, WISCONSIN, US CENSUS, 2010**
**AMERICAN COMMUNITY SURVEY, 3-YEAR ESTIMATES**

| Measure | NH Black | Hispanic | NH White |
|---|---|---|---|
| | | | |
| **PERCENT OWNER OCCUPIED** | 32.2% | 44.5% | 73.0% |
| | | | |
| **MEDIAN HOME VALUE** | $121,700 | $140,800 | $173,300 |
| | | | |
| **PERCENT WITH NO VEHICLE AVAILABLE** | 23.1% | 8.7% | 5.5% |
| | | | |
| **PERCENT WITH NO TELEPHONE SERVICE** | 2.8% | 3.1% | 1.7% |

10

**CHART 5**
**MEDIAN HOME VALUE BY RACE, WISCONSIN, DATA FROM TABLE 3**



**CHART 6**
**HOME OWNERSHIP, VEHICLE AND TELEPHONE AVAILABILITY BY RACE, WISCONSIN, DATA FROM TABLE 3**



11

Table 4 and Charts 7 and 8 demonstrate considerable differences between African Americans and whites on health measures, with a more mixed picture for Hispanics. The percentage of African Americans without health insurance is 78 percent higher than the white percentage, and the Hispanic percentage is more than triple the white percentage. The life expectancy of African Americans is six years lower than the white life expectancy, whereas the Hispanic life expectancy is 5.7 years higher. The low birth weight rate of African American infants is more than double the white rate, whereas the Hispanic rate is the same as the white rate.  The infant death rate for African American infants is more than double the white rate, and the infant death rate for Hispanic infants is 19 percent higher than the white rate.

### TABLE 4
### HEALTH INDICATORS BY RACE, WISCONSIN

| Measure | NH Black | Hispanic | NH White |
|---|---|---|---|
| | | | |
| **PERCENT WITH NO HEALTH INSURANCE*** | 13.2% | 26.8% | 7.4% |
| | | | |
| **LIFE EXPECTANCY IN YEARS**** | 74.0 | 86.0 | 80.3 |
| | | | |
| **LOW WEIGHT BIRTHS PER 1,000 BIRTHS***** | 13.0 | 6.3 | 6.3 |
| | | | |
| **INFANT DEATH RATE PER 1,000 BIRTHS***** | 13.8 | 7.0 | 5.9 |
| | | | |
| Sources: *US Census, American Community Survey, 2010, 3-Year Estimates; **Kaiser Family Foundation, Life Expectancy at Birth, by State, 2010, http://kff.org/other/state-indicator/life-expectancy-by-re/; ***Wisconsin Department of Health Services, "Births and Infant Deaths," November 2009, https://www.dhs.wisconsin.gov/publications/p4/p45364-08.pdf. | | | |

**CHART 7**
**LIFE EXPECTANCY IN YEARS BY RACE, WISCONSIN, DATA FROM TABLE 4**



**CHART 8**
**HEALTH INSURANCE, LOW BIRTH WEIGHT, & INFANT DEATH RATE BY RACE, WISCONSIN, DATA FROM TABLE 4**



13

Table 5 reports the results of a study that ranks the states according to the black-to-white ratio of various socio-economic measures. On most measures Wisconsin ranks at or near the bottom of the states. Wisconsin is worst in black/white disparities in high school dropout rates, and second worst in high school graduation percentages, 8th grade math scores, and family poverty rates. It is third worst in black/white disparities in high school graduation rates and in unemployment. It is fifth worst in median incomes and ninth worst in insurance coverage.

**TABLE 5**
**SOCIO-ECONOMIC DISPARITIES, BLACK AND WHITE, WISCONSIN RANK AMONG STATES**

| Measure | Rank, First Is Worst |
|---|---|
| MEDIAN HOUSEHOLD INCOME | 5 |
| POVERTY RATE, FAMILIES | 2 |
| UNEMPLOYMENT RATE | 3 |
| PERCENT HIGH SCHOOL GRADUATES | 2 |
| AVERAGE EIGHTH GRADE MATH SCORES | 2 |
| GRADES 9-12 GRADUATION RATES | 3 |
| DROPOUT RATES | 1 |
| INDIVIDUALS WITH NO HEALTH INSURANCE | 9 |
| Source: Center on Wisconsin Strategy (COWS), University of Wisconsin Madison, "Wisconsin's Extreme Racial Disparity," December 2013, http://www.cows.org/_data/documents/1571.pdfhttp://www.cows.org/_data/documents/1571.pdf. | |

## V.      SEQUENCE OF EVENTS

### A.      The Fall of White Voting Strength in Wisconsin

Critical to understanding the sequence of events leading to policies adopted and not adopted in Wisconsin during the last several years is the declining voting strength of non-Hispanic whites relative to African Americans and Hispanics. It is Republicans in Wisconsin who are disadvantaged by this shift in the relative voting strength of whites and minorities and would therefore benefit from limitations on minority voting, especially African Americans and Hispanics who constitute the largest minority voting blocs in Wisconsin and are well-documented Democratic voters. These features of turnout and voting patterns in Wisconsin help explain the panoply of restrictive voter legislation enacted by the Republican-controlled legislature and the Republican governor after the elections of 2010 in Wisconsin. Given the high degree of electoral competition in Wisconsin, even small changes in the relative turnout of whites and minorities can influence the outcomes of elections.

As indicated in Table 6, the white share of turnout in Wisconsin in recent presidential election years fell by 4 percentage points from 90 percent in 2004 to 86 percent in 2012. During the same period both the African American and Hispanic share of turnout in Wisconsin rose by 2 percentage points. Thus, the white share of the voter turnout is declining, whereas the African American and Hispanic share of the turnout is rising. Population changes in Wisconsin further demonstrate that white voting strength is likely to decline even more in future years. According to US Census data, from 2010 to 2014 the white percentage of the voting age population in Wisconsin had already declined by -1.3 percent, for a -1.1 percentage point decline in just 4 years. The African American percentage of the voting age population during this period increased by +3.5 percent, for a +0.2 percentage point increase. The Hispanic percentage of the voting age population during this period increased by +8.7 percent, for a +0.4 percentage point increase. According to population projections for Wisconsin, this falling white voting age population percentage and rising minority percentage is expected to continue well into the future of the state.[1]

---

1 Urban Institute, "Wisconsin, 2010 to 2030," http://apps.urban.org/features/mapping-americas-futures/#map.

**TABLE 6**
**COMPOSITION OF VOTER TURNOUT BY RACE AND ETHNICITY, WISCONSIN,**
**PRESIDENTIAL ELECTIONS 2004 – 2012**

| Election | White | Black | Hispanic | Others |
|---|---|---|---|---|
| **2004 President, Kerry (WD) v. Bush (WR)** | 90% | 5% | 2% | 3% |
| **2008 President, Obama (BD) v. McCain (WR)** | 89% | 5% | 3% | 3% |
| **2012 President, Obama (BD) v. Romney (WR)** | 86% | 7% | 4% | 3% |
| WD = White Democrat, WR = White Republican, BD = Black Democrat. Exit polling conducted after each election by Edison Research, http://www.edisonresearch.com/election-polling/, available through CNN, television networks and New York Times. | | | | |

**TABLE 7**
**RACIAL GROUP PERCENTAGE OF VOTING AGE POPULATION,**
**CHANGE 2010 TO 2014, WISCONSIN, US CENSUS DATA**

| Population | NH Whites | NH Blacks | Hispanics |
|---|---|---|---|
| **2010 Voting Population Percent** | 86.3% | 5.7% | 4.6% |
| **2014 Population Estimate** | 85.2% | 5.9 % | 5.0% |
| **Percent Change** | -1.3% | +3.5% | +8.7% |
| **Percentage Point Change** | **-1.1 Percentage Points** | **+0.2 Percentage Points** | **+.4 Percentage Points** |
| Source: US Census, Complete Enumeration 2010, American Community Survey, 2014, 1-Year Estimates. | | | |

Exit poll data demonstrates that Republican electoral success in Wisconsin turns in part on the white voter turnout relative to minority turnout. As indicated in Table 8, there is a 41 percentage point gap between the mean 51 percent white voter support for Republican statewide candidates and the mean 10 percent black voter support for these candidates. There is also a 14 percentage point gap between the mean 51 percent white voter support for Republican statewide candidates and the mean 37 percent Hispanic voter support for these candidates. As additionally indicated in Table 9, the black/white racial disparity in Republican voting is far larger than disparities represented by other demographic and socio-economic factors such as gender, age, income, and education. The Hispanic/white disparity is larger than all other disparities with the exception of income.

Thus, demographic shifts in the Wisconsin voter base and projections of sharply declining white population relative to minority population in Wisconsin, combined with racially polarized voting, indicate that Republicans had much to gain by limiting black and Hispanic voting relative to white voting. No other demographic shift in voter turnout would have nearly the same impact on prospective political gains for the Republican majority in Wisconsin.

17

**TABLE 8**
**PERCENTAGE VOTE FOR REPUBLICAN CANDIDATES BY RACE, WISCONSIN,**
**STATEWIDE ELECTIONS 2004 – 2014, EXIT POLL RESULTS**

| Election | White | Black | Hispanic | Republican Victory in State |
|---|---|---|---|---|
| **2004 President, Kerry (WD) v. Bush (WR)** | 52% | 14% | 47% | NO |
| **2004 US Senate, Feingold (WD) v. Michels (WR)** | 47% | 17% | NA | NO |
| **2006 Governor, Doyle (WD) v.Green (WR)** | 46% | 8% | NA | NO |
| **2008 President, Obama (BD) v. McCain (WR)** | 45% | 9% | NA | NO |
| **2010 US Senate, Feingold (WD) v. Johnson (WR)** | 55% | 14% | NA | YES |
| **2010 Governor, Barrett (WD) v. Walker (WR)** | 55% | 13% | NA | YES |
| **2012 President, Obama (BD) v. Romney (WR)** | 51% | 6% | 31% | NO |
| **2012 US Senate, Baldwin (WD) v. Thompson (WR)** | 50% | 7% | 33% | NO |
| **2012 Governor Recall, Barrett (WD) v. Walker (WR)** | 57% | 5% | NA | YES |
| **2014 Governor, Burke (WD) v. Walker (WR)** | 56% | 10% | NA | YES |
| **Mean All Elections** | **51%** | **10%** | **37%** | |

Exit polling conducted after each election by Edison Research, http://www.edisonresearch.com/election-polling/, available through CNN, television networks and New York Times.

18

**TABLE 9**
**SUPPORT FOR REPUBLICAN CANDIDATES BY NON-RACIAL DEMOGRAPHY, EXIT POLLS, WISCONSIN, 2004 – 2014**

| Election | Women | Men | 18-29 | 65+ | High School Only | College Grad | Income 50k- | Income 100k+ |
|---|---|---|---|---|---|---|---|---|
| **2004 President** | 46% | 52% | 50% | 46% | NA | NA | 44% | 60% |
| **2004 Senate** | 42% | 48% | 42% | 43% | NA | NA | 41% | 53% |
| **2006 Governor** | 40% | 48% | 38% | 43% | 44% | 40% | 34% | 48% |
| **2008 President** | 39% | 46% | 35% | 50% | 39% | 42% | 35% | 51% |
| **2010 US Senate** | 48% | 56% | 46% | 54% | 55% | 47% | 46% | 61% |
| **2010 Governor** | 48% | 57% | 45% | 56% | 56% | 48% | 48% | 57% |
| **2012 Governor Recall** | 47% | 59% | 47% | 56% | 55% | 49% | 43% | 63% |
| **2012 US Senate** | 41% | 51% | 39% | 50% | 46% | 45% | 36% | 59% |
| **2012 President** | 42% | 51% | 37% | 52% | 44% | 46% | 37% | 59% |
| **2014 Governor** | 45% | 60% | 47% | 53% | 54% | 50% | 45% | 60% |
| **Mean All Elections** | 44% | 53% | 43% | 50% | 49% | 46% | 41% | 57% |
| **Mean Difference** | -9% REP | | -7% REP | | +3% REP | | -16% REP | |
| Exit polling conducted after each election by Edison Research, http://www.edisonresearch.com/election-polling/, available through CNN, television networks and New York Times. | | | | | | | | |

19

## B.    Decision-Making: Voter Identification

The sequence of events leading to Wisconsin's adoption in 2011 of a voter photo ID bill and numerous other measures limiting access to voting extends back more than a decade. Of critical importance in understanding the 2011 legislation are efforts by Republicans to enact a voter photo ID bill after John Kerry defeated George W. Bush in the 2004 presidential election in Wisconsin. In the wake of Kerry's Wisconsin victory, Republicans charged that the election in Wisconsin had been fraught with voter fraud.[2] Immediately after the election Republican Assembly Speaker John Gard charged that Milwaukee Mayor Tom Barrett "has got to be embarrassed about what happened in Milwaukee. You've got thousands of addresses they know don't exist." The Speaker said that "Democrats and Republicans alike should be concerned about the incredible problems we had across this state."[3]

Yet even before investigators for the U.S. Attorney and the FBI had the opportunity to confirm or refute charges of rampant fraud, Republicans in the Wisconsin State Legislature pushed ahead and passed a voter photo ID bill on June 24, 2005. Democratic Governor Jim Doyle then vetoed the legislation on August 12, 2005.[4]

By the end of 2005 investigators had debunked charges of widespread voter fraud in the 2004 presidential election in Wisconsin. In a letter to Rick Riley, Executive Director of the Republican Party of Wisconsin, U.S. Attorney Steven N. Biskupic reported that all nine referrals of alleged double voting in Milwaukee and in other states had been found to be of no merit. Six of the nine individuals named did not vote in Milwaukee, and the other three only voted in Milwaukee.[5]  Ultimately in 2005 only 14 out of 2.9 million voters in the 2004 general election were charged with voter fraud. *None involved voter impersonation at the polls, the only type of voter fraud targeted by voter identification laws.* Ten of the 14 cases involved illegal voting by felons and the remaining 4 involved double voting. None of the double-voting cases resulted in a conviction.[6] Nonetheless Republicans in the State Legislature continued their push for voter photo ID requirements. In March of 2006 the State Legislature passed Assembly Joint Resolution 36, a constitutional amendment that required a photo ID for voting.[7] However, to take effect it needed to pass in another session and then be passed by the voters, which did not occur.[8]

---

2 In 2003 Republicans had pushed through the legislature a voter photo ID bill that the governor successfully vetoed. Government Accountability Board, "A Brief History of Recent Voter ID Legislation in Wisconsin," http://www.gab.wi.gov/node/1590.

3 Steve Schultze,"GOP Wants to Tighten Voter Laws," *Milwaukee Journal Sentinel*, 4 November 2004, http://freerepublic.com/focus/f-news/1270231/posts.

4 Wisconsin State Legislature, 2005-2006, Senate Bill 42, http://docs.legis.wisconsin.gov/2005/proposals/sb42.

5 Letter from Steven N. Biskupic (by Richard G. Frohling, Deputy Criminal Chief & District Election Officer) to Rick Riley, Executive Dir. of Republican Party of Wis., 22 August 2005, http://www.wispolitics.com/1006/050822dblvoting.pdf.

6 Steven H. Huefner, Daniel P. Tokaji, Edward B. Foley, and Nathan A. Cemenska, *From Registration to Recounts: The Election Ecosystems of Five Midwestern States* (The Ohio State University Moritz College of Law: 2007), p. 121, http://moritzlaw.osu.edu/electionlaw/projects/registration-to-recounts/book.pdf.

7 Wisconsin State Legislature, 2005-2006, Assembly Joint Resolution 36, http://docs.legis.wisconsin.gov/2005/proposals/ajr36.

8 Fair Elections Wisconsin, AJR 36, http://www.fairelectionswi.com/legislation/leg2005-6.html.

The next sequence of events leading to Wisconsin's adoption of measures limiting access to voting begins in 2008 when Democratic presidential candidate Barack Obama defeated Republican candidate John McCain in Wisconsin. As compared to George W. Bush's 14 percent share of the African American vote in Wisconsin in 2004, McCain's share of the African American vote slipped to 9 percent. In 2004 Bush had won 47 percent of the Hispanic vote in Wisconsin, close to his national average of 44 percent. Although exit poll data on Hispanic voting is not available for Wisconsin in 2008, nationally McCain won only 31 percent of the Latino vote, down 13 percentage points from Bush in 2004.[9]

Then in 2010, a good Republican year nationally, Republicans gained control over the governorship and State Legislature in Wisconsin. Faced with the political realities described above, the Republican majority in 2011 adopted a new strict voter identification law along with some 10 other new laws or provisions that limited access to voting and registration. In 2013 and 2014 Wisconsin adopted 4 additional measures that further limited access to voting and registration.

These 15 measures cannot be justified by any objective change in the occurrence of voter fraud or in the administration of elections in Wisconsin. The only change was unified Republican control over government that enabled the party to enact and implement legislation that politically benefitted Republicans regardless of Democratic opposition. Wisconsin's electoral system was not broken and in need of repair in 2011. *To the contrary, the system was functioning extremely well with essentially no voter impersonation, high turnout rates, and efficient administration of elections.*

Wisconsin had not experienced problems with voter impersonation prior to 2011. As indicated in the discussion of 2004 above, the lack of documented cases of voter impersonation was not for a lack of effort to uncover such fraud. According to a 2007 report by researchers at the Ohio State University Law School that examined voter fraud in Wisconsin and four other Midwestern states, "There are few states in which allegations of voter fraud have received greater scrutiny than Wisconsin – and few municipalities in which they have received greater attention than the City of Milwaukee."[10] After discussion with the Milwaukee District Attorney and state and local election officials, the researchers found: "State prosecutors in Milwaukee have documented *no case* of anyone going to the polls pretending to be someone else, and no prosecutions on these grounds appear to have been brought anywhere in the state in recent memory. There is no evidence from which to conclude that Wisconsin faces a widespread or concerted effort to commit voting fraud."[11] Of the voter fraud cases filed after this 2007 report and before 2011 – so the cases would be available to the legislature prior to its 2011 session – *only one involved a charge of voter impersonation.*[12]

---

9 In the 2012 presidential election, the Republican candidate Mitt Romney won only 31 percent of the Hispanic vote in Wisconsin and in the 2012 senatorial election in Wisconsin the Republican candidate Tommy Thompson won only 33 percent of the Hispanic vote. These results also closely paralleled national averages for Hispanic voters.
10 *Op Cit.*, fn. 6, p. 120.
11 *Ibid.*, p. 121 (emphasis added).
12 News21, "Election Fraud in America: Wisconsin," 21 August 2012, http://votingrights.news21.com/interactive/election-fraud-database/index.html; Republican National Lawyer's

In a December 2006 public report available to the legislature, the United States Election Assistance Commission explained why voter impersonation at the polls is so rare. Among authorities in the field, the Commission found, "Many asserted that impersonation of voters is probably the least frequent type of fraud because it is the most likely type of fraud to be discovered, there are stiff penalties associated with this type of fraud, and it is an inefficient method of influencing an election."[13] To cast a single vote at the polls, the impersonator would risk being apprehended if the impersonated voter has already voted or is recognizable to any local election official. This latter point is not insignificant. According to the 2008 Survey of the Performance of American Elections (SPAE), a standard source for political analysis that was available at the time of the adoption of the 2011 photo voter ID law, 19.5 percent of voters in Wisconsin (nearly 1 out of 5 voters) said that they knew the person who checked them in at the polls.

In recent elections prior to 2011 Wisconsin was a national leader in the turnout of voters. As indicated in Chart 9, based on calculations from the National Election Project,[14] in each general election year from 2000 to 2008 the percentage of potentially eligible adult citizens in Wisconsin participating in the election far exceeded national averages. In each of those presidential election years, Wisconsin ranked among the top three states in voter turnout.

Similarly, in recent years Wisconsin has achieved an exemplary record in the administration of elections. In 2008 and 2010 the Pew Charitable Trusts ranked the states on 17 indices of electoral performance. In 2008 Wisconsin ranked second best among all states and in 2010 it ranked fourth best.[15] A Big Ten Battleground Poll following the 2008 election found that voters in Wisconsin were more satisfied with their voting experience than voters in other states. Poll results demonstrated that 90 percent of Wisconsin voters were very satisfied with their voting experience compared to 85 percent in other Big Ten states, a difference that is statistically significant at the stringent .01 level. Only 2 percent of Wisconsin voters were "not too satisfied" or "not satisfied at all."[16]

---

Association, *Voter Fraud Survey*, http://www.rnla.org/survey.asp#wi.
13 U.S. Election Assistance Commission, *Election Crimes: An Initial Review and Recommendations for Additional Study*, December 2006, p. 9, http://www.eac.gov/assets/1/workflow_staging/Page/57.PDF.
14 Potentially eligible adults is the number of US citizens not statutorily barred from voting (ineligible felons). Data obtained from United States Election Project, "State Turnout Rates, 2000-2014,"
http://www.electproject.org/home/voter-turnout/voter-turnout-data.
15 http://www.pewtrusts.org/en/multimedia/data-visualizations/2014/elections-performance-index#state-WI.
16 For poll results see Barry C. Burden, Wisconsin Voter Experiences in the 2008 General Election,"
http://electionadmin.wisc.edu/btpsummary.pdf.

**CHART 9**
**PERCENT OF ELIGIBLE ADULTS TURNING OUT TO VOTE IN PRESIDENTIAL GENERAL ELECTIONS, WISCONSIN COMPARED TO THE UNITED STATES, 2000-2008**



Despite the lack of voter impersonation fraud and exemplary voter turnout and election administration, Republicans in 2011 enacted a strict voter photo ID law and, through 2014, 14 other measures that limited citizens' opportunities to vote and register in Wisconsin. Based on information available at the time of enactment, it was clear that many of these measures would have a disparate impact on minority opportunities to vote and register relative to opportunities for whites.

The first and most far-reaching of these new laws was Act 23, enacted by the legislature and signed by the governor in May 2011. Enactment followed closely along party lines, although 3 white Democrats joined the Republican majority in voting for the bill. Among other provisions, Act 23 established a photo identification requirement for voting. Prior to enactment of Act 23, a voter at the polls only had to provide proof of residence, which could be satisfied by a photo or non-photo ID. In addition, a registered voter unable to provide such documentation could still vote if her or his registration information was corroborated by another qualified elector residing in the same municipality.[17]

Act 23 eliminated the option to present a non-photo ID at the polls and the option to vote through corroboration of registration information by another qualified elector. The photo ID requirement extends beyond voting at the polls. Voters requesting an absentee ballot must provide a copy of a photo identification. Under this legislation, with certain exceptions, voters must verify their identity by presenting one of the following types of photo identification:

IDs that must be unexpired or expired after the date of the last general election:

     o A Wisconsin DOT-issued driver's license, even if driving privileges are revoked or suspended;

     o A Wisconsin DOT-issued identification card;

     o Military ID card issued by the U.S. Uniformed Services; and

     o A U.S. passport book or card

IDs that must be unexpired:

     o A certificate of naturalization (that was issued not earlier than two years before the date of the election);

     o An identification card issued by a federally recognized Indian tribe in Wisconsin;

     o A driver's license receipt issued by Wisconsin DOT (valid for 45 days from

---

17 BallotPedia, Wisconsin Voter ID Requirements and History, http://ballotpedia.org/Wisconsin_Voter_ID_requirements_and_history.

date issued);

    o An identification card receipt issued by Wisconsin DOT (valid for 45 days from date issued); and

    o A photo identification card issued by a Wisconsin accredited university or college that contains the date of issuance, a signature of the student, and an expiration date no later than two years after date of issuance. The university or college ID must be accompanied by a separate document that proves enrollment.[18]

Such IDs must be presented at the polls for voting or, under later legislation, a copy submitted with an application for an absentee ballot. Active military and permanent overseas voters can vote by absentee ballot without submitting a photo ID, but must present an acceptable photo ID if voting in person. Other registered voters exempted from the photo ID requirement include "confidential electors" who "have presented a court order, a letter from law enforcement, a letter from the staff of a domestic abuse shelter, or the staff of an agency assisting victims of domestic abuse," and "indefinitely confined voters or voters in special care facilities." Persons with a genuine religious objection to being photographed can vote with a non-photo ID card issued by the Wisconsin Department of Transportation. Voters who have surrendered their driver's licenses due to a citation or notice of intent to revoke or suspend the license who present a copy of the citation or notice are also exempted.[19]

Individuals who lack an acceptable photo ID for voting under Act 23 can apply for a Wisconsin state ID card at the Wisconsin Division of Motor Vehicles ("DMV"). Although the cost for such cards is $18.00, individuals can request on the application that the card be issued free for voting purposes. To obtain such a card the applicant must appear in person at a DMV service center to submit an application and be photographed. The applicant must also provide original identifying documents including:

- Proof of name and date of birth, for example, a certified U.S. birth certificate, valid passport or certificate of naturalization. (See Document Verification Petition Process if fees arise in order to obtain free ID card for voting).
- Proof of identity (usually a document with a signature or photo).
- Proof of Wisconsin residency.
- Proof of U.S. citizenship, legal permanent resident status, legal conditional resident status or legal temporary visitor status.
- Social security number.[20]

---

18 Wisconsin, Government Accountability Board, "Wisconsin Act 23,"
http://www.gab.wi.gov/sites/default/files/publication/137/voter_id_complete_packet_10_24_11_pdf_75187.pdf.
19 *Ibid*.
20 Wisconsin Department of Transportation, "Obtaining an Identification (ID) Card,"
http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/id-card.aspx.

The photograph on an ID used for voting "must reasonably resemble the elector," and "the elector's name must conform to the name on their voter registration; conform does not mean that the name must be identical to the name on the voter registration." The ID need not include the elector's current address.[21]

In enacting Act 23, the Wisconsin Legislature established a "strict" photo identification law. According to the National Conference of State Legislatures, in some non-strict states voters without an acceptable photo identification may still be able to cast a regular ballot by signing "an affidavit of identity, or poll workers may be permitted to vouch for the voter." In other non-strict states, "voters who do not show required identification may vote on a provisional ballot. After the close of Election Day, election officials will determine (via a signature check or other verification) whether the voter was eligible and registered, and therefore whether the provisional ballot should be counted. *No action on the part of the voter is required.*"[22]

In contrast, in strict photo identification states like Wisconsin, "voters without acceptable identification must vote on a provisional ballot and also take additional steps after Election Day for it to be counted."[23] In Wisconsin voters must present an acceptable photo ID "to the poll workers by 8:00 p.m. on Election Day or the municipal clerk by 4:00 p.m. of the Friday following the election."[24]

The Wisconsin State Legislature enacted this voter photo ID law in 2011 despite considerable evidence at the time that the law would have a disparate impact on African Americans and Hispanics in Wisconsin. The evidence showed that African Americans and Hispanics were less likely than whites to possess the two most common forms of photo identification under Act 23: driver's licenses and passports.

A 2005 study by John Pawasarat of the Employment and Training Institute, University of Wisconsin-Milwaukee, found that in Milwaukee County for voting age females, 74 percent of whites possessed a Wisconsin driver's license compared to 56 percent of African Americans and 40 percent of Hispanics. In the rest of the state for voting age females he found that 87 percent of whites had Wisconsin driver's licenses compared to 71 percent of African Americans and 48 percent of Hispanics. For voting age males he found that in Milwaukee County 80 percent of whites possessed a Wisconsin driver's license compared to 61 percent of African Americans and 59 percent of Hispanics. In the rest of the state for voting age males he found that 91 percent of whites had Wisconsin driver's licenses compared to 59 percent of African Americans and 70 percent of Hispanics.[25] He additionally found that "Statewide, an estimated 11 percent of African

---

21 Wisconsin, Government Accountability Board, "Wisconsin Act 23," http://www.gab.wi.gov/sites/default/files/publication/137/voter_id_complete_packet_10_24_11_pdf_75187.pdf.
22 National Conference of State Legislatures, *Voter Identification Requirements*, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx (emphasis added).
23 *Ibid*.
24 Wisconsin Government Accountability Board, "Provisional Voting," http://www.gab.wi.gov/clerks/provisional-ballots.
25 John Pawasarat, "The Driver License Status of the Voting Age Population in Wisconsin," pp. 6-7,

American adults and 8 percent of Hispanic adults have a license with a current revocation or suspension, compared to 4 percent of whites."[26] Although under Act 23 electors can still vote with a revoked or suspended license or proof of suspension or revocation, such licenses cannot be renewed (and thus meet the expiration date requirements of Act 23) without the holder's paying all fines and fees. If drivers fail to renew their licenses and the licenses remain expired for more than a year, the license cannot be used for voting in Wisconsin. This poses a disparate burden on African Americans and Hispanics given their much lower incomes and much higher poverty rates as compared to whites in Wisconsin.

Pawasarat's study received widespread publicity in Wisconsin prior to adoption of Act 23. Among other things, Governor Jim Doyle cited the findings of the study on the limited possession of driver's licenses by elderly residents as part of his message in vetoing the 2005 voter photo identification law passed by the General Assembly.[27]

Additional data available at the time of adoption of Act 23 similarly shows racial disparities in the possession of driver's licenses. As indicated in Table 10's results from the 2008 SPAE, available at the time of the enactment of Act 23, white registered voters have substantially higher rates of driver's license possession than African Americans and Hispanics.[28] Nationwide, 96.9 percent of white registered voters reported that they possessed driver's licenses, compared to 87.9 percent of African American and Hispanic registered voters, for a disparity of -9.0 percentage points. In Wisconsin and bordering states the racial disparities in driver's license possession are larger yet. For these states, 96.2 percent of white registered voters reported that they possessed driver's licenses, compared to 77.6 percent of African American and Hispanic registered voters, for a disparity of -18.6 percentage points. Both of these results are statistically significant at the stringent .01 level.

---

http://www.brennancenter.org/sites/default/files/legacy/d/download_file_50902.pdf.
26 *Ibid*., p. 3.
27 Governor Jim Doyle, Veto Message, SB 42, 12 August 2005,
https://docs.legis.wisconsin.gov/2005/related/veto_messages/sb42.pdf.
28 Survey available at https://dataverse.harvard.edu/dataverse/SPAE.

**TABLE 10**
**DRIVER'S LICENSE POSSESSION OF REGISTERED VOTERS, SURVEY OF THE**
**PERFORMANCE OF AMERICAN ELECTIONS, 2008**

| NATIONWIDE | | | |
|---|---|---|---|
| Possess Driver's License | Whites | African Americans & Hispanics | Difference With Whites |
| | 9738 of 10,051 **96.9%** | 1136 of 1292 **87.9%** | **-9.0 Percentage Points \*** |
| | | | |
| WISCONSIN AND BORDERING STATES | | | |
| | | | |
| Possess Driver's License | Whites | African Americans & Hispanics | Difference With Whites |
| | 1032 of 1073 **96.2%** | 66 of 85 **77.6%** | **-18.6 Percentage Points \*** |
| | | | |
| *Statistically significant at .01 level. | | | |

Other studies available at the time also demonstrated substantial racial disparities in the possession of the second most common form of identification under the 2011 law, US passports. As indicated in Table 11's results from the 2008 SPAE, white registered voters are far more likely to possess US passports than African Americans and Hispanics. Nationwide, 44.6 percent of white registered voters reported that they possessed US passports, compared to 29.9 percent of African American and Hispanic registered voters, for a disparity of -14.7 percentage points. In Wisconsin and bordering states, passport possession was lower for both whites and minorities but the disparities were slightly larger. In these states, 40.2 percent of white registered voters reported that they possessed US passports, compared to 18.8 percent of African American and Hispanic registered voters, for a disparity of -21.4 percentage points. Both these results are statistically significant at the stringent .01 level.

**TABLE 11**
**PASSPORT POSSESSION OF REGISTERED VOTERS SURVEY OF THE**
**PERFORMANCE OF AMERICAN ELECTIONS, 2008**

| NATIONWIDE | | |
|---|---|---|
| Possess US Passport | Whites | African Americans & Hispanics | Difference With Whites |
| | 4,476 of 10,029 **44.6%** | 384 of 1,285 **29.9%** | **-14.7 Percentage Points \*** |
| | | | |
| **WISCONSIN AND BORDERING STATES** | | |
| | | | |
| Possess US Passport | Whites | African Americans & Hispanics | Difference With Whites |
| | 431 of 1073 **40.2%** | 16 of 85 **18.8%** | **-21.4 Percentage Points \*** |
| | | | |
| *Statistically significant at .01 level. | | | |

The State Legislature also enacted the strict voter photo ID provisions of Act 23 despite information available at the time that, as compared to whites, African Americans and Hispanics were substantially more likely to be deterred from voting because they lacked the requisite identification. As indicated in Table 12, 18.4 percent of African American and Hispanic registrants reported not voting in the 2008 general election because they lacked the right kind of identification, more than double the 8.0 percent of white registrants who reported this reason for not voting, for a difference 10.4 percentage points. These results are statistically significant at the stringent .01 level.

**TABLE 12**
**REGISTERED VOTERS WHO REPORTED NOT VOTING BECAUSE THEY BELIEVED THEY LACKED THE RIGHT KIND OF IDENTIFICATION, SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008**

| NATIONWIDE | | | |
|---|---|---|---|
| **Believed They Lacked Right ID** | **Whites** | **African Americans & Hispanics** | **Difference With Whites** |
| | 36 of 448 **8.0%** | 18 of 98 **18.4%** | **+10.4 Percentage Points\*** |
| | | | |
| \*Statistically significant at .01 level. Includes respondents who cited a lack of ID as a major or minor factor. | | | |

Voter confusion about ID laws and the required identification has an important deterrent effect on voting. Researchers from Rice University, for example, studied non-voting by registered voters in the 2014 general election in Congressional District 23 in Texas. This is a majority Hispanic district and one of a very few competitive congressional districts in the state, and it featured a tight contest in 2014 that typically draws a high voter turnout. The researchers found that 5.8 percent of 400 registered voters studied gave as their principal reason for not voting a lack of acceptable identification under Texas' voter photo ID law which had been in place since 2013. A larger 12.8 percent cited a lack of acceptable ID as one reason for non-voting. Yet the researchers found that based on what they reported to the survey takers, the vast majority of these non-voters actually possessed an acceptable photo ID under Texas law and that confusion about the law's requirements accounted for their non-voting. The researchers concluded:

"This study suggests that the most significant impact of the Texas voter photo ID law on voter participation in CD-23 in November 2014 was to discourage turnout among registered voters who did indeed possess an approved form of photo ID,

30

but through some combination of misunderstanding, doubt or lack of knowledge, believed that they did not possess the necessary photo identification."[29]

Information about racial disparities in photo ID possession was presented to the legislature through a January 4, 2011 letter to GAB Director and General Counsel Kevin J. Kennedy from four professors at the UW-Madison Department of Political Science and La Follette School of Public Affairs. The professors wrote that, "The most consistent finding from academic studies is that voter ID requirements disproportionately affect several subpopulations: ethnic and racial minorities, high school and college students, senior citizens and disabled, women, and those with low incomes. Minority groups are at particular risk for not having ID." The professors additionally noted that, "[a]lthough most studies find that overall voter turnout is little affected by voter ID, vulnerable populations such as those with lower incomes are less likely to participate when voter ID is implemented. As a consequence, African American, Latinos, and other groups with lower incomes are less apt to vote under voter ID."[30]

The Wisconsin GAB also presented to the legislature an extensive critique of the proposed photo voter ID legislation. According to election law expert and Ohio State University Law School professor Daniel P. Tokaji, for overseeing elections, "The best American model is Wisconsin's Government Accountability Board, which consists of retired judges selected in a way that is designed to promote impartiality."[31]

In testimony submitted to the legislature in January 2011, and in a subsequent May 2011 letter submitted to members of the Assembly Committee on Elections and Campaign Reform, Director Kennedy provided an extensive critique of the proposed voter ID bill. In his January testimony Director Kennedy noted that only three other states, Georgia, Indiana, and Oklahoma, required picture IDs for voting at the polls and that "based on our research, it appears that no state requires an absentee voter, who casts a ballot by mail to provide a copy of any required photo identification." He critiqued the proposed bill for a too restrictive list of photo IDs and warned that it will be very difficult for election clerks to inform absentee voters in a timely manner that their ballots must be counted as provisional if a copy of proper ID was not included with the ballot. He further noted the difficulty of obtaining a free photo voter ID to correct a provisional ballot on or shortly after Election Day because "there are very few DMV offices open full-time outside large population centers." Kennedy also said that the availability of DMV offices poses a more general problem for persons seeking free photo IDs given his understanding that in a state of 72 counties "approximately 30 DMV branches are open five days a week throughout the State, and that the remainder of the State is served by travel teams that serve

---

29 University of Houston, Hobby Center for Public Policy and Rice University, Baker Institute for Public Policy. "The Texas Voter ID Law and the 2014 Election: A Study of Texas's 23rd Congressional District," August 2015, quotation on p. 1, http://www.uh.edu/class/hcpp/_docs/voteridcd23.pdf.
30 Letter from Professors Barry C. Burden, David T. Canon, Kenneth R. Mayer, Donald P. Moynihan to Kevin J. Kennedy, 4 January 2011, Re: Research on Voter Identification Laws, http://www.gab.wi.gov/sites/default/files/story/uw_voter_id_memo_pdf_15200.pdf (footnote omitted).
31 Wisconsin Government Accountability Board, "Introduction to the G.A.B.," http://www.gab.wi.gov/about/introduction.

counties or regions on a regular schedule, such as once a week or once a month."[32]

In a May 2011 letter to members of the Assembly Committee on Elections and Campaign Reform, Kennedy additionally noted that although the legislature had modified its legislation to include student photo IDs, it had adopted criteria for such forms of identification such that "Presently no student identification card meets the standards proposed in the bill: current address, date of birth and signature of the student. It is highly unlikely that universities and colleges will adopt these standards because of student security concerns."[33]

In his January and May 2011 communications to the legislature, Director Kennedy, on behalf of the GAB, made many recommendations that the legislature failed to adopt in its final photo voter identification legislation, including the following:

1. Eliminate the requirement for providing a copy of photo identification or a signed statement for absentee voting by mail or through special voting deputies;

2. Use an affidavit of identity for voters without the required identification instead of provisional ballots;

3. Address the issues related to the Department of Transportation (e.g, problems arising from lack of access to DMV offices explained in the GAB submissions to the legislature);

4. Authorize the use of other identification cards issued by the Wisconsin government, a Wisconsin governmental subunit or the United States government.

5. Authorize the use of a benefits card issued to armed services veterans by the U.S. Department of Veteran Affairs.

6. Conform the requirements of student ID cards to fit the actual cards issued by public universities in the state.

All of these recommendations would have eased the burdens on minorities who, as the professors' letter and the above-cited studies indicated, were disproportionately impacted by voter photo ID requirements. In failing to follow these recommendations the Wisconsin State Legislature adopted a voter photo identification bill that was more restrictive than the laws in Indiana, Georgia, or Oklahoma. The greater the restrictions, the greater the burdens on minorities

---

32 Remarks by Kevin J. Kennedy, to Wisconsin Senate Committee on Transportation and Elections, 26 January 2011,
http://www.gab.wi.gov/sites/default/files/publication/65/kennedy_senate_committee_testimony_1_26_11_pdf_1214 1.pdf
33 Kevin J. Kennedy, Letter to Members of the  Assembly Committee on Elections and Campaign Reform, 3 May 2011, p. 1,
http://www.gab.wi.gov/sites/default/files/publication/65/letter_to_assembly_elections_committee_5_3_11_pdf_186 42.pdf.

who relative to whites are less likely to possess the two most common forms of photo identification, driver's licenses and passports. Unlike the laws in these three other states, Wisconsin's law did not generally authorize the use of photo identification issued by governmental entities in the state or the federal government. Wisconsin imposed more restrictions on the use of student identification cards issued by public institutions than did the three other states. And unlike Oklahoma, Wisconsin did not permit a provisional ballot to be verified by a statement of identity.[34]

Minority members of the State Legislature and representatives of advocacy groups also presented to decision-makers the adverse effects of Act 23 on African Americans and Hispanics in Wisconsin. For example, Representative Tamara Grigsby, an African-American Representative from Milwaukee (18th Assembly Dist.), said at one hearing that, "[t]o be candid, this bill targets people like me and the constituents I represent." She added, "Everyone sitting in this room knows what this bill does and knows who it will harm."[35] Testimony presented by the Milwaukee Branch of the NAACP noted that, "[t]here is no dispute of the fact that the number of African Americans who lack a valid Wisconsin driver's license is very disproportionate to the percentage of African Americans in the population. So, based on statistics, it is certain that the law will have a disproportionate impact on minority populations."[36]

Proponents of Act 23 enacted the voter photo ID provision despite additional available information from the 2008 SPAE that nationally "2.2 million registered voters were excluded [from voting] for lack of voter identification."[37] As documented above, minorities were much more likely than whites to report the lack of such identification.

Five other elements of decision-making on photo voter identification provide additional indications of discriminatory intent by the legislature. First, the Republican majority in the State Legislature rejected all amendments designed to alleviate the effects of the voter ID law on African Americans and Hispanics. These included, for example, amendments to expand authorized IDs to include "any document issued by the United States, this state, or a local governmental unit" (Substitute Amendment 2 by Democratic Representative Peter Barca), to allow voting by affidavit, to waive fees for birth certificates, and to provide extended hours for DMV offices. Yet the legislature did adopt amendments to alleviate the effects of Act 23 on other groups such as seniors who live in nursing homes.[38]

Second, with respect to the availability of free voter identification cards under Act 23, the

---

34 National Conference of State Legislatures, "Voter Identification Requirements," http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx#Ftn 4.
35 Tamara Grigsby, Testimony Before the Senate Committee On Transportation and Elections (Jan. 26, 2011).
36 Testimony of NAACP-Milwaukee Branch in Opp'n of S. Bill 6 at 1 (Jan. 26, 2011), https://legis.wisconsin.gov/lc/comtmats/old/11files/sb0006_20110127104538.pdf at 16-17).
37 R. Michael Alvarez, et al., *2008 Survey of the Performance of American Elections: Final Report*, p. 59, http://votingtechnologyproject.org/sites/default/files/Final%20report20090218.pdf.
38 See, for legislative history, Wisconsin State Legislature, Assembly Bill 7, https://docs.legis.wisconsin.gov/2011/proposals/ab7. See also, the trial testimony of Hispanic Democratic Representative Jocasta Zamarripa, *Frank v. Walker*, Transcript of Court Trial, 11/4/2013, esp. pp. 787-795.

documentation required for such cards imposed costs on voters lacking such documents as birth certificates to prove citizenship. These costs imposed a disparate burden on minorities who have substantially lower income and assets and much higher poverty rates than whites as documented in Table 1. Based on information available at the time, African Americans lagged behind whites in their possession of US passports and birth certificates. According to a 2006 survey, 8.9 percent of adult African Americans lacked either a US passport or a birth certificate, compared to 5.5 percent of whites. Adults with low incomes or limited education – which correlate with race for African Americans and Hispanics – were also relatively unlikely to possess either a birth certificate or US passport. The survey found that 8.1 percent of respondents with incomes below $25,000 lacked either document, compared to 4.6 percent of respondents with incomes above $25,000. It also found that 9.2 percent of non-high school graduates lacked either document, compared to 5.1 percent of respondents who had graduated high school.[39]

It is telling that Wisconsin only provided a mechanism by which voters can obtain a "free" photo ID in 2014 after being forced to do so by a Wisconsin Supreme Court decision that made no-cost documentation a condition of the implementation of the voter photo ID law.[40] Under the new rules prompted by the Supreme Court decision, a voter without the required documentation could obtain a free ID card through a "Document Verification Petition Process" which is available if:

1. The applicant is unable to provide documents for proof of name and date of birth as required by Wis. Admin. Code § Trans 102.15(3)(a) but which require a fee to a government agency to obtain. This includes documentation needed for proof of legal name change; or
2. The applicant is unable to provide documents for proof of United States citizenship as required by Wis. Admin. Code § Trans 102.15(3m) but which require a fee to a government agency to obtain.

Applicants using this process to obtain an ID must:

- Apply at a DMV customer service center;
- Complete a Wisconsin Identification Card Application form MV3004 and include their social security number on that application;
- Complete a Document Verification Process (DMV Administrator Petition) form MV3012; and
- Present documents to prove identity and Wisconsin residency (where the applicant lives in Wisconsin).[41]

---

39 Survey commissioned by the Center on Budget and Policy Priorities, conducted by the Opinion Research Corporation, http://www.cbpp.org//archiveSite/1-26-06health.pdf.

40 Marge Pitroff, "Walker Approves New Rules for Obtaining Voter ID, While Court Considers Law's Status," *WUVM Milwaukee*, 12 September 2014, http://wuwm.com/post/walker-approves-new-rules-obtaining-voter-id-while-court-considers-laws-status#stream/0.

41 Wisconsin Department of Transportation, "Document Verification Petition Process for A Wisconsin Identification Card for Voting Purposes," http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/petition-

Third, the Wisconsin Assembly's recent passage of a comparable photo ID requirement for FoodShare recipients, and its refusal to authorize the use of that ID for voting, further demonstrates the pretextual character and discriminatory intent of the voter ID requirement. Assembly Bill 222 was introduced in May 2015 by a sponsoring group of some two dozen Republican members of the State Assembly to require photos on the identification used for the receipt of FoodShare benefits. (FoodShare is the food assistance program in Wisconsin. FoodShare benefits are federally funded and the program is included under the federal supplemental nutrition assistance program (SNAP).[42]) The sponsors of this bill have offered the same rationale regarding system integrity that has been used for the voter ID requirement. According to Republican Representative Jesse Kremer, one of the sponsors of AB 222, "We're trying to maintain integrity of the [FoodShare] system."[43] Moreover, the proof requirements for qualifying for FoodShare and obtaining a card from which to draw benefits are more stringent than for driver's licenses in Wisconsin.

Given that the articulated purposes of the FoodShare photo ID and the voter photo ID are identical and that the requirements for obtaining FoodShare benefits are stricter than those for obtaining a driver's license, we would expect—if the rationale offered for the voter ID law is not pretextual—that the State Assembly would approve the use of FoodShare IDs for voting. And in fact, Democratic representative Andy Jorgenson introduced an amendment that would have allowed precisely that. Yet Republicans in the State Assembly voted the amendment down along party lines before going on to pass the FoodShare photo ID requirement (which is not pending in the State Senate).[44]

The distinguishing feature of FoodShare IDs, as compared to other photo IDs that are authorized for voting, reveals the legislative majority's discriminatory intent. Food benefits are limited to low income persons,[45] and are disproportionately received by minorities by overwhelming margins. Table 13 and Chart 10 show that, based on Census data available at the time the legislature rejected the amendment to authorize the use of FoodShare photo IDs for voting, 45.6 percent of African American households received food aid in Wisconsin, more than four times greater than the 9.8 percent of white households receiving such assistance, for a gap of 23.6 percentage points. In addition, 33.4 percent of Hispanic households received food aid in Wisconsin, more than four and a half times greater than the 9.8 percent of white households receiving such assistance, for a gap of 35.8 percentage points. Thus, the program includes large numbers of persons in Wisconsin, especially minorities. Low income minority persons are also

process.aspx.

42 Wisconsin Legislative Fiscal Bureau, "FoodShare Wisconsin," January 2013, p. 1, http://legis.wisconsin.gov/lfb/publications/Informational-Papers/Documents/2013/52_FoodShare%20Wisconsin.pdf.

43 Amy Beck, "Assembly Backs Off Requiring FoodShare Recipients to Show Photo ID to Buy Food," *Wisconsin State Journal*, 16 September 2015, http://host.madison.com/wsj/news/local/govt-and-politics/assembly-committee-backs-off-requiring-foodshare-recipients-to-show-photo/article_eb975061-972b-5aab-9967-9a5a5c9d0da5.html. As this article explains, Wisconsin cannot under federal law require food aid recipients to show a photo ID to buy food without obtaining a special waiver.

44 Wisconsin State Legislature, Assembly Bill 222, http://docs.legis.wisconsin.gov/2015/proposals/ab222.

45 Income limits are $48,500 for a family of four, Benefits.gov, "FoodShare Wisconsin," http://www.benefits.gov/benefits/benefit-details/1592.

less likely than other persons to have other forms of authorized IDs.

**TABLE 13**
**PERCENT HOUSEHOLDS RECEIVING FOOD ASSISTANCE BY RACE,**
**WISCONSIN, 2013 US CENSUS, AMERICAN COMMUNITY SURVEY, 3-YEAR**
**ESTIMATES**

| Group | Percent Households With Food Assistance | Percent Difference With Whites | Percentage Point Difference With Whites |
|---|---|---|---|
| NH BLACK | 45.6% | **365% HIGHER** | **+35.8 PERCENTAGE POINTS** |
| | | | |
| HISPANIC | 33.4% | **241% HIGHER** | **+23.6 PERCENTAGE POINTS** |
| | | | |
| NH WHITE | 9.8% | **NA** | **NA** |

**CHART 10**
**PERCENT HOUSEHOLDS RECEIVING FOOD ASSISTANCE BY RACE,**
**WISCONSIN, DATA FROM TABLE 13**



36

Fourth, rather than acting affirmatively to help voters obtain free IDs cards, DMV official Steve Krieser, then DMV's operations chief for field services, told employees not to alert voters to this opportunity. "While you should certainly help customers who come in asking for a free ID to check the appropriate box [on a DMV form], you should refrain from offering the free version to customers who do not ask for it," Krieser wrote shortly after adoption of Act 23 in a memo obtained by the *Milwaukee Journal Sentinel*. Republican State Representative Jeff Stone, a leading sponsor of the voter photo ID law defended this 'don't tell' policy. "This is an attempt to try to make an issue out of nothing," he said. "All they have to do [to get a free ID] is ask for it and it's given to them."[46]

Fifth, although allowing photo student IDs from institutions of higher education, Act 23 imposed important restrictions on the use of such IDs. As indicated above, the student ID card must be issued by a Wisconsin accredited university or college that contains the following: -- Date of Issuance -- Signature of Student -- Expiration date no later than two years after date of issuance. The card must not be expired and the university or college ID must be accompanied by a separate document that proves enrollment. The legislature imposed these requirements even though most Wisconsin student IDs did not conform to these standards, which were not present in any other state voter photo ID law at the time. Act 23 also does not include IDs from the state's technical colleges.

The practical obstacles to using a student ID for voting have the greatest impact on African Americans and Hispanics in Wisconsin, who are less likely than whites to possess other forms of identification. African Americans, moreover, are more likely than whites to be enrolled in postsecondary institutions in Wisconsin. As indicated in Table 14, 12.5 percent of voting age African Americans were enrolled in postsecondary institutions, 39 percent higher than the percentage of voting age whites enrolled. The percentage of enrolled Hispanics was 3 percent less than the percentage of enrolled whites, for a difference of 0.3 percentage points.

### TABLE 14
### ENROLLMENT BY RACE IN WISCONSIN COLLEGES AND UNIVERSITIES, PERCENT OF VOTING AGE POPULATION ENROLLED

| Racial Group | Percent Difference With Whites | Percentage Point Difference With Whites |
|---|---|---|
| Whites | | |
| 9.0% | NA | NA |
| African Americans | | |
| 12.5% | +39% | +3.5% |
| Hispanics | | |
| 8.7% | -3% | -0.3% |
| Source: Postsecondary enrollment from US Census, American Community Survey, 2010, 3-year estimates. Voting age population from US Census, Complete Population, 2010. | | |
| | | |

---

46 Patrick Marley, "DMV employees told not to volunteer information on free IDs," *Milwaukee Journal Sentinel*, 7 September 2011, http://www.jsonline.com/news/statepolitics/129400013.html.

The exclusion of postsecondary technical schools is particularly burdensome for African Americans and Hispanics who are disproportionately represented in technical school enrollment in Wisconsin. As indicated in Table 14A, the white enrollment in technical colleges was 7 percent below the white percentage of the Wisconsin voting age population, for a difference of -6.3 percent points. The African American enrollment in technical colleges was 58 percent above the African American percentage of the voting age population, for a difference of 3.3 percentage points. The Hispanic enrollment in technical colleges was 9 percent above the Hispanic percentage of the voting age population, for a difference of 0.4 percentage points.

**TABLE 14A**
**TECHNICAL COLLEGE ENROLLMENT IN WISCONSIN BY RACE, 2010**

| Percent of Racial Group Among Technical College Students | Voting Age Population Percentage | Percent Difference | Percentage Point Difference |
|---|---|---|---|
| Whites | | | |
| 80% | 86.3% | **-7%** | **-6.3%** |
| African Americans | | | |
| 9% | 5.7% | **+58%** | **+3.3%** |
| Hispanics | | | |
| 5% | 4.6% | **+9%** | **+.04%** |
| | | | |
| National Alliance for Partnership in Equity, Wisconsin, Career Technical Education Profile, FY 2012, http://www.napequity.org/nape-content/uploads/Wisconsin-2014-Fact-Sheet_Final_3-28-14.pdf. | | | |

### C.   Decision-Making: Voter Registration

In 2011 and 2013 the state legislature adopted and the Republican governor signed a series of measures that created new barriers to the registration of voters. Information available at the time these measures were enacted demonstrated that they imposed a disparate burden on potential African American and Hispanic voters relative to potential white voters in Wisconsin. These measures are detailed below.

### Act 23 (2011)

- Eliminated one person's vouching for the residence of another to prove residence for the purpose of registering to vote (corroboration).
- Limited the opportunity for students to use a college ID as proof of residence for registering to vote.

38

- Eliminated Government Accountability Board's authority to appoint special registration deputies with the authority to register voters on a statewide basis.

**Act 240 (2011)**

- Eliminated the requirement that special registration deputies be appointed at public high schools.

**Act 182 (2013)**

- Required all voters other than overseas and military voters to provide documentary proof of residence for registration. This changed the prior law which required only those who registered less than 20 days before an election to present documentary proof.

**Act 76 (2013)**

- Overturned a city ordinance in Madison that required landlords to provide voter registration forms to new tenants.

Taken together these many restrictions on options to register to vote impose disproportionate burdens on African Americans and Hispanics who as compared to whites are less affluent, less well educated, less healthy, have less access to automobiles, and move more frequently (see Table 15 below). The following are examples of specific disparate impacts on potential African American and Hispanic voters from particular measures.

The measure eliminating corroboration had a significant impact on the opportunity for citizens to register to vote in Wisconsin. Until abolished in Act 23 corroboration provided a substantial number of Wisconsin citizens the opportunity to register to vote. According to internal GAB emails, a total of 35,332 Wisconsin citizens had registered through corroboration from 2006 through October 2012.[47] Although statistics are not available by race, corroboration is most likely to benefit homeless persons and persons who recently moved and may not yet have the documentation necessary to prove residence. Homelessness is correlated with socio-economic status which in turn is correlated with race as demonstrated in Tables 1 to 3 above. In addition, African Americans and Hispanics in Wisconsin have higher mobility rates than whites. As indicated in Table 15, 26.2 percent of African Americans lived in a different house from the prior year, more than double the 12.5 percent of whites who lived in a different house, for a difference of 13.7 percentage points. As also indicated in Table 15, 19.5 percent of Hispanics lived in a different house from the prior year, 56 percent greater than the white percentage, for a difference of 7.0 percentage points.

---

[47] David J. Meyer to Ann Oberle, Sarah Whitt, and Brian Bell, October 18, 2012.

**TABLE 15**
**ONE-YEAR MOBILITY RATES BY RACE, WISCONSIN, US CENSUS, 2010**
**AMERICAN COMMUNITY SURVEY, THREE YEAR ESTIMATES**

| PERCENT LIVING IN DIFFERENT HOUSE PRIOR YEAR | | |
|---|---|---|
| Whites | Percent Difference With Whites | Percentage Point Difference With Whites |
| 12.5% | **NA** | **NA** |
| African Americans | | |
| 26.2% | **+110%** | **+13.7** |
| Hispanics | | |
| 19.5% | **+56%** | **+7.0%** |
| | | |

Act 182 passed in 2013 makes more onerous the elimination of corroboration by expanding the universe of potential voters required to present proof of residence when voting. As explained by the Wisconsin Legislative Council, this Act "eliminates the exemption for voters who register prior to the close of registration from having to provide proof of residence. Under prior law, a voter who registered before the close of registration (third Wednesday preceding an election) generally was not required to provide proof of residence when registering to vote. Act 182 requires all voters, except a military or overseas voter, to provide such proof of residence when registering. Under the Act, the requirement to provide proof of residence no longer depends upon the date an individual registers to vote."[48]

The elimination of the requirement that special registration deputies be appointed at public high schools likewise has a specific disparate impact on potential African American and Hispanic voters. As indicated in Table 16, given their younger ages and lower incomes, members of these minority groups have a higher enrollment in public high schools in Wisconsin than do whites. According to Table 16, 77.2 percent of Wisconsin public high school students were white, 7 percent and 6.1 percentage points lower than the white percentage of the population. In contrast, 10.1 percent of Wisconsin public high school students were African American, 49 percent and 3.3 percentage points higher than the African American percentage of the population. Likewise, 7.1 percent of Wisconsin public high school students were Hispanic, 20 percent and 1.2 percentage points higher than the Hispanic percentage of the population.

---

48 Wisconsin Legislative Council, 2013 Wisconsin Act 182,
http://docs.legis.wisconsin.gov/2013/related/lcactmemo/act182.

**TABLE 16**
**PUBLIC HIGH SCHOOL ENROLLMENT IN WISCONSIN BY RACE, 2010, PERCENT OF STUDENT ENROLLMENT**

| Percent of Racial Group Among All Public HS Students | Total Population Percentage | Percent Difference | Percentage Point Difference |
|---|---|---|---|
| Whites | | | |
| 77.2% | 83.3% | **-7%** | **-6.1%** |
| African Americans | | | |
| 10.1% | 6.8% | **+49%** | **+3.3** |
| Hispanics | | | |
| 7.1% | 5.9% | **+20%** | **+1.2%** |
| | | | |
| US Census, American Community Survey, 2010, 5-Year Estimates; US Census 2010, Complete Enumeration. | | | |

In addition, restrictions on registration by college and university students have a specific disparate impact on potential African American voters. As indicated in Table 14 above, African Americans are overrepresented among college and university students.

Also, the abrogation of the ordinance in Madison for distributing registration forms to renters has a disparate impact on African Americans and Hispanics. According to Table 17, the percentage of African Americans renting rather than owning homes in Madison was 85 percent higher than the percentage of white renters, for a difference of 36.2 percentage points. The percentage of Hispanics renting rather than owning homes in Madison was 46 percent higher than the percentage of white renters, for a difference of 19.5 percentage points.

**TABLE 17**
**PERCENT RENTERS BY RACE, MADISON WISCONSIN, AMERICAN COMMUNITY SURVEY 2010, 5-YEAR ESTIMATES**

| Racial Group | Percent Difference With Whites | Percentage Point Difference With Whites |
|---|---|---|
| Whites | | |
| 42.7% | **NA** | **NA** |
| African Americans | | |
| 78.9% | **+85%** | **+36.2%** |
| Hispanics | | |
| 62.2% | **+46%** | **+19.5%** |
| | | |

41

### D.    Decision-Making: Early Voting

### Act 23 (2011)

- Reduced the early voting period from 30 to 12 days.

### Act 146 (2014)

- Eliminated early voting on weekends.

Wisconsin provides a particular form of early voting, authorizing no-excuse absentee voters to cast their votes in person during an early voting period prior to Election Day. Such early voting is a significant component of Wisconsin's elections. According to GAB data, 514,398 absentee votes were filed in election offices in 2012, 17 percent of the total voter turnout that year.[49] Wisconsin enacted these new restrictions on early voting despite evidence that early voting was used disproportionately by African Americans and Hispanics. SPAE and CCES surveys between 2008 and 2012 asked whether respondents voted early. As indicated in Table 18, summing the results to increase sample size, the combined surveys show that 22.4 percent of African American and Hispanic Wisconsin voters voted early, 41 percent and 6.5 percentage points higher than the 15.9 percent of whites who voted early. The results are statistically significant at the standard .1 level. Also, all of the individual surveys beginning in 2008 found a similar pattern of differences in early voting between whites and the two minority groups, although the minority samples are small. In addition, the SPAE researchers in their report on the 2008 survey concluded that nationwide more African Americans and Hispanics availed themselves of early voting than did whites.[50]

### TABLE 18
### PERCENT OF EARLY VOTERS BY RACE WISCONSIN, SPAE 2008, 2012 AND CCES 2008, 2010 AND 2012, SURVEYS COMBINED

| PERCENT OF VOTERS VOTING EARLY | | |
|---|---|---|
| Whites | Percent Difference With Whites | Percentage Point Difference With Whites |
| 15.9%<br>(396 of 2,485) | NA | NA |
| African Americans & Hispanics | | |
| 22.4%<br>(28 of 125) | +41% | +6.5% |
| Results statistically significant at .1 level. | | |

---

49 Wisconsin GAB, Post-Election Update, http://www.gab.wi.gov/node/3451.
50 R. Michael Alvarez, et a.., "2008 Survey of the Performance of American Elections: Final Report," http://votingtechnologyproject.org/sites/default/files/Final%20report20090218.pdf.

Act 146 in 2014 (Senate Bill 324), which eliminated early voting on weekends, passed the legislature in a form that was even more restrictive than the enacted version. It included a provision to limit the total amount of time for early voting to 45 hours in any given city. The legislature also rejected legislation that would allow Milwaukee and other municipalities more than a single voting center for early voting. Milwaukee with some 310,000 registered voters had only one early voting center as did municipalities with just a very small fraction of Milwaukee's registered voter numbers.[51]

The failure to deal with electoral issues in Milwaukee is especially significant given that voters in Milwaukee County, which includes a substantial share of the state's minority population, have experienced much longer waiting times at the polls than the rest of the state. In addition, African American and Hispanic voters across Wisconsin have experienced much longer waiting times than white voters. The 2008 and 2012 CCES surveys include results for Milwaukee County, although not for the city separately. As indicated in Table 19, for the 2008 and 2012 general elections combined, 15.5 percent of Milwaukee County voters experienced wait times of 31 minutes or more, 260 percent higher than the non-Milwaukee percentage of 4.3 percent, for a difference of 11.2 percentage points. Similar patterns apply for the 2008 and 2012 surveys individually. The difference is statistically significant at the .01 level. As indicated in Table 20, for the 2008 and 2012 general elections combined, 16.4 percent of African American and Hispanic voters experienced wait times of 31 minutes or more, 215 percent higher than the white percentage of 5.2 percent, for a difference of 11.2 percentage points. Similar patterns apply for the 2008 and 2012 surveys individually. The difference is statistically significant at the .01 level. The elimination of straight-ticket voting in Act 23 also has an adverse impact on waiting time since it makes voting lengthier for those who would otherwise use this option.

---

51 Jason Stein and Don Walker, "Scott Walker signs early-voting bill; partial veto extends voting hours," *Milwaukee Wisconsin Journal Sentinel*, 27 March 2014, http://www.jsonline.com/news/statepolitics/scott-walker-signs-asbestos-lawsuit-bill-b99234687z1-252672541.html; Wisconsin State Legislature, 2013-2014, Senate Bill 324, https://docs.legis.wisconsin.gov/2013/proposals/sb324.

**TABLE 19**
**WAITING TIMES AT POLLS IN MILWAUKEE COUNTY COMPARED TO REST OF THE STATE COOPERATIVE CONGRESSIONAL ELECTION STUDY (CCES), 2008 AND 2012, WISCONSIN**

| 2008 General Presidential Election | | | | |
|---|---|---|---|---|
| Total Milwaukee Respondents | Milwaukee Voters Waiting 31 Minutes+ | % Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 70 | 14 | **20.0%** | **+14.8 Points *** | **+285%** |
| Total Non-Milwaukee Respondents | Non-Milwaukee Voters Waiting 31 Minutes+ | % Non- Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 427 | 22 | **5.2%** | **NA** | **NA** |
| 2012 General Presidential Election | | | | |
| Total Milwaukee Respondents | Milwaukee Voters Waiting 31 Minutes+ | % Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference  With Non-Milwaukee Voters |
| 124 | 16 | **12.9%** | **+9.2 Points *** | **+249%** |
| Total Non-Milwaukee Respondents | Non-Milwaukee Voters Waiting 31 Minutes+ | % Non- Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 672 | 25 | **3.7%** | NA | NA |
| 2008 & 2012 General Presidential Elections Combined | | | | |
| Total Milwaukee Respondents | Milwaukee Voters Waiting 31 Minutes+ | % Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 194 | 30 | **15.5%** | **+11.2 Points *** | **+260%** |
| Total Non-Milwaukee Respondents | Non-Milwaukee Voters Waiting 31 Minutes+ | % Non-Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 1,099 | 47 | **4.3** | NA | NA |
| * Statistically Significant at the .01 level. | | | | |

**TABLE 20**
**WAITING TIMES AT POLLS BY RACE, COOPERATIVE CONGRESSIONAL ELECTION STUDY (CCES), 2008 AND 2012, WISCONSIN,**

| 2008 General Presidential Election | | | | |
|---|---|---|---|---|
| Total Black & Hispanic Respondents | Black & Hispanic Voters Waiting 31 Mins+ | % Black & Hispanic Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 18 | 4 | **22.2%** | **+15.9 Points \*** | **+252%** |
| Total White Respondents | White Voters Waiting 31 Mins+ | % White Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 462 | 29 | **6.3%** | **NA** | **NA** |
| 2012 General Presidential Election | | | | |
| Total Black & Hispanic Respondents | Black & Hispanic Voters Waiting 31 Mins+ | % Black & Hispanic Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 49 | 7 | **14.3%** | **+9.8 Points \*** | **+218%** |
| Total White Respondents | White Voters Waiting 31 Mins+ | % White Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 727 | 33 | **4.5%** | NA | |
| 2008 and 2012 General Presidential Elections Combined | | | | |
| Total Black & Hispanic Respondents | Black & Hispanic Voters Waiting 31 Mins+ | % Black & Hispanic Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 67 | 11 | **16.4%** | **+11.2 Points\*** | **+215%** |
| Total White Respondents | White Voters Waiting 31 Mins+ | % White Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 1,189 | 62 | **5.2%** | **NA** | **NA** |
| *Statistically Significant at .01 level. | | | | |

45

### E. Decision-Making: Residency Requirements

**Act 23 (2011)**

- Increased the in-state residency requirement for voting for offices other than president and vice president from 10 to 28 days before an election and required persons who move within the state later than 28 days before an election to vote at their previous ward or election district.

This increase in the residency requirement has a disparate effect on African Americans and Hispanics, who are more likely than whites to move into Wisconsin from another state. As indicated in Table 21, 2.1 percent of African Americans moved into Wisconsin from another state during the prior year, 31 percent and 0.5 percentage points higher than the 1.6 percent of whites moving into the state. For Hispanics, 2.4 percent moved into Wisconsin from another state during the past year, 50 percent and 0.8 percentage points higher than the 1.6 percent of whites moving into the state. Similarly, the greater mobility of African Americans and Hispanics as compared to whites also indicates that the requirement that recent movers must only vote at their previous ward or election district places a disparate burden on members of these minority groups.

**TABLE 21**
**PERSONS MOVING INTO WISCONSIN FROM ANOTHER STATE BY RACE,
WISCONSIN, US CENSUS, 2010 AMERICAN COMMUNITY SURVEY, 3-YEAR
ESTIMATES**

| Percent Living In Different House Prior Year | | |
|---|---|---|
| Whites | Percent Difference With Whites | Percentage Point Difference With Whites |
| 1.6% | NA | NA |
| African Americans | | |
| 2.1% | +31% | +0.5% |
| Hispanics | | |
| 2.4% | +50% | +0.8% |
| | | |

### F.   Decision-Making: Absentee Ballots

**Act 227 (2011)**

- Limited the circumstances in which municipal clerks can return absentee ballots to voters to fix mistakes.

By limiting options to correct an absentee ballot, Act 227 also places a disparate burden on African American and Hispanic voters, who have much lower levels of education and educational attainment in Wisconsin than do whites, as indicated in Table 2 above. This problem is especially acute for Wisconsin Hispanics. According to the US Census American Community Survey 2010, 3-Year Estimates, 33.2 percent of Hispanics in Wisconsin speak English "less than very well."

## VI.   PROCEDURAL AND SUBSTANTIVE DEVIATIONS

Given unified Republican control of the legislature and governorship from 2011 to 2014 Republicans did not have to violate procedural rules to enact the many limitations on voting described and analyzed above. Nonetheless along with the many substantive changes in voting and registration analyzed above, procedural deviations have occurred.

First, Republicans in the legislature introduced legislation late in sessions with little time for debate, discussion, and analysis. In its letter to the State Assembly regarding Act 23 in 2011 the GAB reported that, "This draft [of the bill] was first available for review late on Friday of last week. There has been no time for the careful evaluation and vetting needed to ensure the best options for voters and election officials are enacted."[52] Republican State Senator Dale Schultz, a legislator for several decades and former Republican leader in the Senate, said in 2014 of the election bills, "These bills came up rather swiftly at the end of the session here. I don't think we gave people adequate opportunity to comment on them."[53]

Examination of transcripts for State Assembly and State Senate sessions also indicates that there was very little debate on these measures which affected the fundamental right to vote. For the most part Republicans in the legislature let Democrats express their opposition while very rarely engaging in substantive debate.

Second, the sheer magnitude of 8 Acts and some 15 measures limiting access to registration and voting is unprecedented nationwide. This spate of legislation exceeds in magnitude even of the voting and registration legislation adopted by North Carolina in 2013 that made national headlines.[54] Unlike Wisconsin, moreover, North Carolina revised its voter photo

---

52 Op Cit., fn. 33, p. 2.

53 Interview with Radio 92.1, audio at http://www.themic921.com/onair/the-devils-advocates-47215/state-senator-dale-schultz-on-sd-12150295/.

54 For a summary of North Carolina's legislation see Democracy North Carolina, "Summary of NC's New Voting Law," http://www.democracy-nc.org/downloads/NewVotingLawSummaryAug2013.pdf.;  Ari Berman, "North Carolina Passes Country's Worst Voter Suppression Law," *The Nation*, 28 July 2013,

ID from strict to non-strict by providing voters lacking an acceptable photo ID the opportunity to vote through an affidavit citing a "reasonable impediment" to obtaining such identification.[55]

Third, the key event leading Wisconsin to the adoption of a new photo ID law and numerous other measures was the midterm election of 2010, which gave Republicans unified control of state government. Nationwide Republicans also gained ground in state government in the 2010 midterms. In addition, the decline in white voting strength documented for Wisconsin is a national phenomenon. Thus not just Wisconsin but other Republican controlled states in 2011 adopted new electoral measures that limited opportunities to register and vote, notably new voter photo ID laws, which previously had been limited to a very few states.  As demonstrated by the national data shown in Chart 11, in midterm elections, the white share of the electorate declined from 82 percent in 2002 to 78 percent in 2010 and 77 percent in 2014. In presidential elections the white share of the electorate declined from 79 percent in 2004 to 76 percent in 2008 and 74 percent in 2012. Likewise the nationwide exit polls reported in Table 22 for the past two presidential elections demonstrate that Republicans nationally are dependent on white voters, with polarization numbers similar to those found in Wisconsin.[56] As in Wisconsin, the polarization was not limited to elections in which Barack Obama competed, but was also evident in the 2004 presidential election, which involved two white candidates.

---

http://www.thenation.com/article/north-carolina-passes-countrys-worst-voter-suppression-law/.
55 General Assembly of North Carolina, 2015 Session, SESSION LAW 2015-103 HOUSE BILL 836,
http://www.ncleg.net/EnactedLegislation/SessionLaws/PDF/2015-2016/SL2015-103.pdf.
56 Reliable national data on voter polarization is available only for presidential elections given that all states do not have comparable races in midterm years.

**CHART 11**
**CHANGES IN THE WHITE COMPONENT OF VOTERS, UNITED STATES**
**ELECTION PROJECT**
**(http://www.electproject.org/home/voter-turnout/demographics)**



**TABLE 22**
**SUPPORT FOR REPUBLICAN CANDIDATES BY RACE AND ETHNICITY, UNITED STATES PRESIDENTIAL ELECTIONS, EXIT POLLS, 2004 – 2012**

| Election | Racial Group | | | | |
|---|---|---|---|---|---|
| | White | Black | Hispanic | Asian | Others |
| | | | | | |
| **2004 President** | 58% | 11% | 44% | 44% | 40% |
| | | | | | |
| **2008 President** | 55% | 4% | 31% | 35% | 31% |
| | | | | | |
| **2012 President** | 59% | 6% | 27% | 26% | 38% |
| | | | | | |
| **Mean** | **57%** | **7%** | **34%** | **35%** | **36%** |
| | | | | | |
| **Mean Difference With Whites** | **NA** | **-50 Percentage Points** | **-23 Percentage Points** | **-22 Percentage Points** | **-21 Percentage Points** |
| | | | | | |
| Exit polling conducted after each election by Edison Research, http://www.edisonresearch.com/election-polling/, available through CNN, television networks and New York Times. | | | | | |

Consistent with the fall in relative white turnout and the dependence of Republicans on white votes, not only Wisconsin but other Republican controlled states enacted new voter photo ID laws from 2010 to 2013. As indicated in Table 23, in 2011 and 2013 some 13 states adopted new voter photo identification laws. As also indicated in Table 23, Republicans controlled the state legislature and the governorship in 9 of the 13 states. In two of the four remaining states – Arkansas and New Hampshire – Republican legislators enacted the voter photo ID laws by overriding the veto of a Democratic governor. In another state – Mississippi – voters enacted the voter photo ID law in a statewide referendum backed by Republicans. That leaves only the State of Rhode Island, which enacted a voter photo ID law with a Democratic legislature and an independent governor.

**TABLE 23**
**PARTISAN CONTROL OF STATES ADOPTING VOTER PHOTO ID LAWS 2011-2013**

| State | State Legislature | Governor |
|---|---|---|
| ALABAMA 2011 | REPUBLICAN | REPUBLICAN |
| ARKANSAS 2013 | REPUBLICAN | DEMOCRATIC |
| KANSAS 2011 | REPUBLICAN | REPUBLICAN |
| MISSISSIPPI 2011 | DEMOCRATIC | REPUBLICAN |
| NEW HAMPSHIRE 2012 | REPUBLICAN* | DEMOCRATIC |
| NORTH CAROLINA 2013 | REPUBLICAN | REPUBLICAN |
| PENNSYLVANIA 2012 | REPUBLICAN | REPUBLICAN |
| RHODE ISLAND 2011 | DEMOCRATIC | INDEPENDENT |
| SOUTH CAROLINA 2011 | REPUBLICAN | REPUBLICAN |
| TENNESSEE 2011 | REPUBLICAN | REPUBLICAN |
| TEXAS 2011 | REPUBLICAN | REPUBLICAN |
| VIRGINIA 2013 | REPUBLICAN | REPUBLICAN |
| WISCONSIN 2011 | REPUBLICAN | REPUBLICAN |
|  |  |  |
| National Conference of State Legislature, "Voter ID History," http://www.ncsl.org/research/elections-and-campaigns/voter-id-history.aspx; NCSL, "State Partisan Composition, http://www.ncsl.org/research/about-state-legislatures/partisan-composition.aspx#Timelines. Individual state websites. | | |

## VII.   CONTEMPORANEOUS VIEWPOINTS BY DECISION-MAKERS AND OTHER RELEVANT PARTIES

As recognized by the Supreme Court in the *Arlington Heights* case, unambiguous statements of discriminatory intent are rare. However, long-serving Republican State Senator Dale Schultz, who had earlier voted for Act 23, later said that this Act and other measures limiting voting and registration adopted by his Republican colleagues were aimed at suppressing votes not deterring fraud or serving any other good-government purpose. In a March 2014 interview on Radio 92.1, Schultz said, "In the spirit of the champion of the 1957 Voting Rights Act, I have been trying to send a message that we are not encouraging voting, we are not making voting easier in any way, shape or form with these bills. Back in 1957 with the leadership of Dwight Eisenhower, Republicans were doing that. And that makes me sad, frankly." He said, "I'm just not willing to defend them anymore … It's just sad when a political party has so lost faith in its ideas that it's pouring all of its energy into election mechanics. We should be pitching as political parties our ideas for improving things in the future rather than mucking around in the mechanics and making it more confrontational at the voting sites and trying to suppress the vote."[57]

---

[57] Op Cit., fn. 53.

With respect to the voter photo ID bill for which he had voted, Schultz said, "It's all predicated on some belief there is a massive fraud or irregularities, something my colleagues have been hot on the trail for three years and have failed miserably at demonstrating."[58]

Statements by Republican backers of Act 23 and other voting and registration legislation are also misleading, contradictory, and pretextual. Examples follow below.

### A.    The Common Sense Argument

Proponents of the voter ID bill in Wisconsin claimed that it just brought voting in line with other activities that require a photo ID. According to Republican Senator Frank Lasee, "Well, in today's society, what do we need a photo identification for today? Check out a library book in Milwaukee County, to rent a movie, to buy beer or liquor, to fly in an airplane, to get married, drive a car, sign a contract, cash a check, apply for welfare benefits."[59]

This claim does not withstand scrutiny. Even though voting, unlike these other activities, is a fundamental right, the 2011 photo voter ID law in Wisconsin actually makes it far more difficult to vote than to conduct any of these other activities. All of the alleged photo ID requirements listed by Senator Lasee could be satisfied for example with various forms of government-issued photo IDs that are not acceptable for voting in Wisconsin such as a veteran's benefits card or a government employee ID.

In addition, nearly all the activities listed by Senator Lasee could be conducted without any form of photo ID:

- **Checking out a book in a Milwaukee County library**. To obtain full library privileges an individual must present IDs that establish name and address. However, these can be non-photo IDs such as a signed social security card, a birth certificate, a rental lease agreement, a utility bill, postmarked mail, a paycheck stub, a recent school report card or school schedule, a pre-printed personal check, or a vehicle registration.[60]

- **Renting a movie**. There are numerous Redbox locations throughout Wisconsin where you can rent a movie without an ID. You can also sign up online for a Redbox account.[61]

- **Buying beer or liquor**. IDs are required only if a purchaser appears to be under the legal drinking age of 21.[62]

---

58 *Ibid*.
59 Transcript of State Senate Meeting, 19 May 2011, p. 27, lns. 4-11.
60 Milwaukee, CountyCat Help Center, Getting a Library Card, https://countycat.mcfls.org/help#.
61 http://www.redbox.com/locations/wisconsin; http://www.wikihow.com/Rent-Movies-from-Redbox; https://www.redbox.com/Register?ReturnUrl=%2faccount.
62 Wisconsin Department of Revenue, "Wisconsin Alcohol Beverage and Tobacco Laws for Retailers," p. 7, http://www.darlingtonwi.org/Pub_302_Guide_For_Wisc._Alcohol_Bev.pdf.

- **Flying in an airplane.** Unlike Wisconsin's strict voter photo ID law, the Transportation Safety Administration (TSA) makes accommodation so that persons can board an airplane *without* photo identification. As the following statement of TSA policy makes clear, alternative identification can be accepted in lieu of a valid photo ID:

  > "In the event you arrive at the airport without proper ID, because it is lost or at home, you may still be allowed to fly. By providing additional information, TSA has other ways to confirm your identity, like using publicly available databases, so you can reach your flight."[63]

  Moreover, other TSA accommodations enable passengers to board aircraft without *any* form of identification in their possession. The TSA explains as follows:

  > "In the event you arrive at the airport without valid identification, because it is lost or at home, you may still be allowed to fly. The TSA officer may ask you to complete a form to include your name and current address, and may ask additional questions to confirm your identity. If your identity is confirmed, you will be allowed to enter the screening checkpoint. You may be subject to additional screening."[64]

- **Getting married**. Although county practices may vary, under Wisconsin state law a birth certificate, but not a photo ID, is required for obtaining a marriage license.[65]

- **Signing a contract**. There is no legal requirement in Wisconsin for a photo ID to sign a contract. Consumers sign contracts all the time without presenting photo ID. As indicated above even a marriage contract does not require a photo ID. A person with power of attorney can sign a contract for another person; a contract may be executed and signed electronically.[66]

- **Cashing a check**. Individuals can cash a check at payday check cashing services in Wisconsin without photo ID and even without an ID through their verification process.[67]

- **Applying for welfare benefits**. As indicated above an applicant for FoodShare in Wisconsin need not submit a photo ID and FoodShare benefit cards do not (currently) include a photo. The Social Security administration also indicates that an applicant for Social Security/Medicare need not submit a photo identification in order to receive benefits.[68]

---

63 Transportation Security Administration, *Frequently Asked Questions*, https://www.tsa.gov/travel/frequently-asked-questions.
64 Transportation Security Administration, *Acceptable IDs*, http://www.tsa.gov/traveler-information/acceptable-ids.
65 Wisconsin Statutes, 765.08, http://docs.legis.wisconsin.gov/statutes/statutes/765/08.
66 Wisconsin Statutes, Subchapter II, 137.11-26.
67 http://www.paydaycheckcashingwi.com/payday-advance-services.
68 Social Security, Official Social Security Website, "Retirement Planner: What Documents Will You Need When You Apply?" https://www.ssa.gov/planners/retire/applying5.html.

### B.      Election Integrity and Confidence

Absent documented examples of voter impersonation at the polls, backers of Wisconsin's voter photo ID law said that the bill was needed to uphold voter confidence in the integrity of the ballot in Wisconsin. In support of Act 23, Republican State Senator Joe Leibham said, "the reason behind this photo ID bill and the bill in general is to move forward constitutionally sound provisions relating to photo ID and other election reform measures that are going to do just that. They are going to add additional reasonable safeguards to our election process that will ensure the integrity of the votes that take place here in the state of Wisconsin while instilling a greater degree of confidence in the state of Wisconsin."[69]

Yet neither Senator Leibham nor any other backer of Act 23 could cite a crisis of confidence regarding elections in Wisconsin or a lack of election integrity. To the contrary, as indicated above, Wisconsin was a national leader in voter turnout and the administration of elections. As indicated above, the post-2008 Battleground poll found near universal satisfaction among Wisconsin voters about their voting experience. The poll also showed that 87 percent of Wisconsin voters were very confident that their ballot was counted as intended, compared to 82 percent in other Big Ten states (statistically significant at .01). Only 2 percent of Wisconsin respondents were not too confident or not confident at all about the integrity of their vote.[70]

Backers of Act 23 also failed to show a relationship between the enactment of such laws and public confidence in ballot integrity. To the contrary, a study by then-MIT professor Stephen Ansolabehere and then-Columbia University professor Nathaniel Persily – available at the time of enactment of Wisconsin's voter photo ID law – found that there was no relationship between the adoption of stricter voter ID laws and public beliefs about the existence of fraud in the election system. The two analysts concluded that:

> "The use of photo identification requirements bears little correlation to the public's beliefs about the incidence of fraud. The possible relation of such beliefs to participation appears even more tenuous. This lack of empirical support leads us to conclude that, at least in the context of current American election practices and procedures, public perceptions do not provide a firm justification for voter identification laws."[71]

Indeed, far from building public confidence in the integrity of Wisconsin's electoral process, there are good reasons to believe the photo voter ID requirement has precisely the opposite effect. African Americans, Hispanics, students, the poor, and other groups who are disproportionately burdened by the ID requirement and in many instances deterred from voting as a result are likely to have less rather than more confidence in the fairness of Wisconsin

---

69 Transcript of State Senate Meeting, 9 May 2011,   p. 36, lns. 20-22, p. 37, lns. 1-7.
70 Op Cit., fn. 16.
71 Stephen Ansolabehere and Nathaniel Persily, "Vote Fraud in The Eye Of The Beholder: The Role of Public Opinion in The Challenge to Voter Identification Requirements," *Harvard Law Review* 121 (2008). p. 1760, http://www.harvardlawreview.org/wp-content/uploads/pdfs/ansolabehere_persily.pdf.

elections. Moreover, the unjustified claims of widespread voter fraud used to justify the voter ID requirement are likely to cause voters to distrust the integrity of the election system when there is no basis for doing so. In response to claims by some Wisconsin legislators of significant voter fraud, GAB Director and General Counsel Kevin Kennedy emphasized that, "Speaking frankly on behalf of our agency and local election officials, absent direct evidence, I believe continued unsubstantiated allegations of voter fraud tend to unnecessarily undermine the confidence that voters have in election officials and the results of the election. I hope that, as elected officials, you would agree that there is little benefit in promoting unsupported allegations questioning the credibility of the election process and the work of local clerks and election inspectors."[72]

Historically, calls for "election integrity" or "ballot security" have been closely tied to efforts to discourage voting by minorities. In the presidential election of 1964, Republicans introduced the so-called "ballot security" program ostensibly designed to discourage voter fraud, but in practice aimed at diminishing turnout in heavily Democratic minority neighborhoods. The purported goal of the program, dubbed "Operation Eagle Eye" after a similar effort in Arizona, was to dispatch some 100,000 poll watchers to precincts in 35 selected cities to discourage balloting by more than a million potentially fraudulent voters. In Houston, for instance, handbills circulated in heavily black neighborhoods warned that persons with outstanding parking tickets or convictions for traffic offenses could be arrested if they tried to vote in the election.[72]

This practice of voter suppression became sufficiently widespread that in response to lawsuits in 1982 and again in 1987, the National Republican Party agreed to consent decrees in federal court that prohibited the national party from engaging in anti-fraud activities that targeted minority voters. In 2009, federal Judge Dickinson Debevoise, who had presided over the 1980s lawsuits, denied a Republican National Committee motion to end the consent decree, although he added a presumptive expiration date of seven years hence unless violations were proven. The U.S. Court of Appeals for the Third Circuit upheld his ruling. "Minority voters continue to overwhelmingly support Democratic candidates," Judge Debevoise wrote in his decision. "As long as that is the case, the RNC and other Republican groups may be tempted to keep qualified minority voters from casting their ballots, especially in light of the razor-thin margin of victory by which many elections have been decided in recent years." After reviewing all evidence of alleged voter fraud presented by the Republican National Committee he found that, "In fact, even a cursory investigation of the prevalence of voter intimidation demonstrates that ballot security initiatives have the potential to unfairly skew election results by disenfranchising qualified voters in far greater numbers than the instances of in-person fraud that may occur during any given race."[73]

In light of this history, it is worth noting that in 2013 the legislature and governor expanded the capacity for persons to challenge voters at the polls. Under Act 177 the state required an area for election observers to be set within three to eight feet of the table where persons sign in and obtain their ballots. Prior to this law, observers were required, pursuant to

---

GAB policy, to maintain a six-foot distance from voters. In a flier on "Voter Rights and Responsibilities" issued in July 2012, shortly after the Wisconsin gubernatorial recall election, GAB Director Kevin Kennedy noted, "Our system of open, transparent elections depends on members of the public serving as observers at polling places. . . . However, in recent elections we have received disturbing reports and complaints about unacceptable, illegal behavior by observers. Voters expect a calm setting in which to exercise their right to vote."[74]

### C.    Public Support

Legislative backers of voter ID claimed substantial public support for this measure. According to Republican State Representative Robin Vos (later voted Speaker), "I think this is common sense … this is a 75 to 80 percent issue and I think it's about time that Wisconsin finally says in order to vote you just got to prove who you are and specially in this amendment say that you are a citizen."[75] Yet the photo ID bill does not establish citizenship since some forms of authorized IDs such as driver's licenses can be possessed by non-citizens. Moreover, polls showing public support for voter ID bills reference generically government-issued photo identification, not the very restrictive list of photo IDs that are included in Act 23.

This public support justification is also inconsistent because legislators cannot claim public support by the electorate for other measures adopted, including restrictions on registration, the curtailment of early voting to 12 days, and the elimination of weekend voting. According to the 2012 SPAE 75.5 percent of registered voters in Wisconsin favored greatly expanding voter registration by automatically registering all citizens when they turn 18 years of age. This is actually higher than the 68.5 percent of Wisconsin registered voters who favored a voter photo ID requirement in the poll. The SPAE survey also found that rather than making it more difficult for voters who moved to vote, 70.5 percent of registered voters in Wisconsin favored making "it so that when a registered voter moves, he or she is automatically registered to vote at the new home." A Marquette Law School Poll in March 2014 conducted after the state restricted early voting to 12 days and then eliminated weekend early voting found that 66 percent supported a two or three week period of early voting with at least one weekend of early voting.[76]

### D.    Burdens on Election Officials

In attempting to justify the elimination of the requirement for registration at high schools, one of the backers of this measure, Republican State Representative Patricia Strachota (later elected Assembly Majority Leader) said, "I just wanted to inform the body that the reason that this bill came forward was that I was -- became a co-sponsor of this bill is because when I was doing office hours in my district, one of the town clerks came to me and, basically, said that they were required now to go into each of the high schools and register a designated person to register

---

74 "GAB Issues Flier on Voter Rights and Responsibilities," 12 July 2012, http://www.gab.wi.gov/node/2437.
75 Transcript of State Assembly Meeting, 9 May 2011,  p. 5, lns. 15- 20.
76 Marquette Law School Poll, 26 March 2014, https://law.marquette.edu/poll/wp-content/uploads/2014/03/MLSP20Toplines.pdf.

voters in that high school and she thought it was going to be a very cumbersome process."[77] This explanation is pretextual because in many other measures the Republican majority actually increased the burdens on election officials. Under new measures election officials also have to verify that an increased number of late movers are voting at the prior precinct and not at their new precinct and officials no longer have the option of faxing or emailing absentee ballots to most voters. A new measure also eliminates the exemption for voters who register prior to the close of registration from having to provide proof of residence, placing yet another requirement on election officials. (Acts 23, 211, 182).

In addition, Republicans enacted a complex photo voter ID bill with particular kinds of government-issued photo IDs – such as student IDs that do not meet particular criteria and government employee IDs – not permitted for voting. The law also requires election officials to issue provisional ballots to voters who lack the requisite IDs. As the GAB warned prior to enactment of Act 23, "The expanded use of provisional ballots for individuals lacking the required identification also places an unnecessary strain on the administration of elections. Provisional voting delays the resolution of elections and will require changing the meeting dates of county and local canvassing boards."[78] Although the GAB noted that the draft of Act 23 was introduced so late that it did not have time for a full evaluation, it concluded that in addition to issues with voter IDs and provisional ballots, "There are numerous other provisions in the bill which will significantly alter the administration of elections and put additional stress on an already overburdened system."[79] Later in 2012 after the state enacted Act 23 and other new measures, the GAB concluded, "These fundamental changes have already caused, and will continue to cause, increased responsibilities for all of us. The significance of these legislative changes have strained your and our limited resources and resulted in more frequent communications from the G.A.B., revised or created new procedures, revised forms, revised manuals, new training, teleconferences, and webinars in an effort to support all of us."[80]

### E.    Conformity With Other States

Decision-makers insisted many times that with respect to reducing early voting from 30 to 12 days they were simply bringing Wisconsin into conformity with practices in most other states of the union. Yet Wisconsin had achieved distinction in voter turnout and election administration by not simply conforming to practices in other states. For example, Wisconsin was one of very few states at the time to provide voters the option for same day registration. In addition, Wisconsin's new voter photo ID law brought the state far out of line with every other state in the nation. At the time of Wisconsin's enactment of its voter photo identification law, only two other states had in place strict voter ID measures – Georgia and Indiana. In addition, unlike Georgia and Indiana, Wisconsin in 2011 did not broadly authorize for voting the use of government issued IDs. Instead, it excluded or restricted various categories of government-issued IDs, such as government employee IDs, making it unique among all states. In addition, at

---

77 Transcript of Wisconsin State Assembly Meeting, 14 March 2012, p. 9, l. 13-22.
78 Op Cit., fn. 33.
79 *Ibid.*, p. 2.
80 Wisconsin GAB, "Acts 227 and 240," 20 April 2012, http://www.gab.wi.gov/node/2335.

the time of its adoption of the 2011 law no other state had in place a requirement that a copy of a photo identification must be submitted with an absentee ballot application.[81]

Backers of legislation that eliminated weekend early voting and restricted voter hours in early voting claimed that this was an effort to achieve uniformity given that small municipalities lacked the resources to provide such opportunities. "This bill is equality across the state," said its Assembly author, Representative Duey Stroebel.[82] However, such opportunity could have been provided by giving the small municipalities the resources to maintain larger early voting opportunities rather than imposing new restrictions. In addition, this argument ignores the fact that large cities serve vastly more voters than small municipalities and the alleged uniformity actually creates significant inequities. As noted in Table 19 above, voters in Milwaukee face significantly greater waiting times at the polls than do voters elsewhere in the state.

The author of the bill restricting the number of days of early voting, Republican State Senator Glenn Grothman, also indicated that the intent was not to achieve uniformity but to make sure that opportunities available in Milwaukee and Madison did not spread to other areas. Grothman declared he wanted to "nip this in the bud" before extended early voting made available in Milwaukee and Madison spread elsewhere.[83]

## VIII.   CONCLUSIONS

The history of discrimination against African Americans and Hispanics in Wisconsin has its legacy today in major socio-economic disparities between these minority groups and white residents of the state. These socio-economic disparities have important implications for the measures analyzed in this report, which make it more difficult than it was before the enactment of those measures for those of lower socio-economic standing to register and vote in Wisconsin. In recent years minority voting strength and grown in Wisconsin, corresponding to a decline in white voting strength. This shift in the composition of the electorate poses challenges to Republicans in this competitive state. African Americans in Wisconsin vote overwhelmingly for Democratic candidates and Hispanics vote in large measure for Democratic candidates. Thus Republican rely upon the voting strength of whites in Wisconsin.

Prior to 2011 Wisconsin was a national leader in voter turnout and the excellent administration of elections. Charges of widespread voter impersonation in the state proved unfounded despite vigorous investigations, a finding confirmed by outside studies that included an analysis conducted by the Republican National Lawyers' Association. Yet when Republicans gained unified control of government they enacted the most stringent voter photo identification bill in the nation at that time, while rejecting all amendments to ameliorate its effects on minority voters. Republicans in the State Assembly also rejected an amendment that would make food assistance IDs eligible for voting under pending legislation to add photographs to FoodShare

---

81 Long Distance Voter, "2015 Voter ID Laws," http://www.longdistancevoter.org/voter-id-laws#.VmTdSriDGko.
82 Bob Hague, "Mayors Seek Voting Restrictions Veto," *Wisconsin Radio Network*, 24 March 2014, http://www.wrn.com/2014/03/mayors-seek-voting-restrictions-veto/.
83 *Ibid*.

IDs. Unlike IDs authorized for voting under Act 23, African Americans and Hispanics disproportionately possessed FoodShare IDs by overwhelming margins.

The voter photo ID provision of Act 23 and numerous other measures in Act 23 and other legislation enacted through 2014 restricted access to voting and registration in Wisconsin, especially for minorities. Taken together these many laws, some with multiple provisions, comprised the largest set of restrictive electoral measures enacted anywhere in America in recent years. The adoption of these measures cannot be attributed to any objective change in Wisconsin's voter turnout, the administration of elections, or voter impersonation.

The plausible explanation for these many restrictive measures is the partisan gains that Republicans can achieve through provisions that disproportionately burden African American and Hispanic voters and potential voters. Virtually every measure enacted from 2011 to 2014 directly impeded African American and Hispanic opportunities to register and vote as compared to white opportunities. As Republican State Senator Dale Schultz, a former Senate Republican leader who voted for Act 23 said, "We [Republicans] should be pitching as political parties our ideas for improving things in the future rather than mucking around in the mechanics and making it more confrontational at the voting sites and trying to suppress the vote" (quoted above).

Alternative explanations offered by decision-makers for Act 23 and other measures analyzed here were misleading, contradictory, and pretextual, including claims that a photo ID was necessary for such commonplace activities as boarding a plane, checking out a library book, or renting a movie.

In sum, based on standard historical methods of analysis, the analysis of quantitative information, and my 45 years of experience in analyzing voting and elections, I reach the following conclusion:  After Republicans achieved unified control of Wisconsin state government in 2011, the majority in the legislature enacted Act 23 and other measures relating to voting and registration with the intent and purpose of achieving partisan advantage through the limitation of African American and Hispanic voting and registration opportunities as compared to opportunities for whites in Wisconsin.