# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| **ONE WISCONSIN INSTITUTE,** *et al.***,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 3:15-CV-324** |
| **NICHOL,** *et al.***,** | |
| **Defendants.** | |

## <u>EXPERT REPORT OF M.V. HOOD III</u>

I, M.V. Hood III, do hereby declare the following:

## I. INTRODUCTION AND BACKGROUND

My name is M.V. (Trey) Hood III, and I am a tenured professor at the University of Georgia with an appointment in the Department of Political Science. I also serve as the Director of Graduate Studies for the Department. I have been a faculty member at the University of Georgia since August of 1999. I am an expert in American politics, specifically in the areas of electoral politics, racial politics, election administration, and Southern politics. I teach courses on American politics, Southern politics, and research methods and have taught graduate seminars on the topics of election administration and Southern politics.

I have received research grants from the National Science Foundation and the Pew Charitable Trust. I have also published peer-reviewed journal articles specifically in the areas of election administration, early voting, and voter ID. My academic publications are detailed in a copy of my vita that is attached to the end of this document. Currently, I serve on the editorial boards for *Social Science Quarterly* and *Election Law Journal*. The latter is a peer-reviewed academic journal focused on the area of election administration.

During the preceding four years, I have offered expert testimony in ten cases, *State of Florida v. United States* (No. 11-1428, D.D.C.), *NAACP v. Walker* (11-CV-5492, Dane County Circuit Court), *Jones v. Deininger* (12-CV-00185-LA, E.D.Wis.), *Frank v. Walker* (2:11-CV-01128-LA, E.D.Wis.), *South Carolina v. United States* (12-203, D.D.C), *Rios-Andino v. Orange County* (6:12-cv-1188-Orl-22KRS), *Veasey v. Perry* (2:13-cv-193, NGR), *United States v. North Carolina* (1:13-CV-861), *Bethune-Hill v. Virginia State Board of Elections* (3:14-cv-00852-REP-GBL-BMK), and *The Ohio Democratic Party v. Husted* (2:15-cv-1802). In assisting the defendants in analyzing Wisconsin's voting laws, I am receiving $300 an hour for this work and $300 an hour for any testimony associated with this work.  In reaching my conclusions, I have drawn on my training, experience, and knowledge as a social scientist who has specifically conducted research in the areas under examination in this expert report.

## II. SCOPE AND OVERVIEW

I have been asked by counsel for the State of Wisconsin to respond to challenges plaintiffs have brought against various aspects of Wisconsin's election system. Section III provides a description for the process of voting in Wisconsin and Section IV follows with a description of the general election climate in the state. Section V examines issues related to the in-person absentee voting system and Section VI specifically analyzes changes to the state's by-mail voting procedures. This is followed by Section VII that examines voter registration and residency requirements. Section VIII covers the voter identification component of Act 23. The remaining sections of this report are devoted to specific points of rebuttal to the plaintiffs' experts: Professor Burden (X), Professor Mayer (XI), Professor Lichtman (XII), and Professor Minnite (XII). The final section of my report (XIII) provides a synopsis of my overall conclusions in this case.

## III. THE PROCESS OF VOTING IN WISCONSIN

Elections are administered by Wisconsin's 1,853 municipal clerks. Voters in Wisconsin can choose one of three methods for casting a ballot: in-person absentee, absentee by mail, or at the polling place on election-day. Beginning in 2000 Wisconsin implemented what is termed *no-excuse* absentee balloting (either in-person or through the mail).[1] In addition, qualified citizens have the option to register (or change their registration) during the in-person absentee voting period or on election-day. Wisconsin has then what is termed SDR (same-day registration during the in-person absentee period) and EDR (registration on election-day).

In Wisconsin in-person absentee voting and absentee voting by mail are both considered forms of absentee voting, distinct from other forms of early in-person voting. Either method in Wisconsin, therefore, requires voters to fill out an absentee ballot application. Upon receiving and completing their ballot it must then be placed in an absentee ballot envelope which must be signed by the voter and witnessed. These absentee ballots are then stored by the municipal clerk in a secure location until they are transported to the location where ballots will be tabulated on election-day. This form of voting is distinct from some states where early in-person voting does not require the steps normally associated with absentee balloting and where the voter's ballot would be completed and cast at the same time (e.g. a voter casting a ballot on a DRE machine during the early voting period).[2]

*Comparing Wisconsin's Election Context to Other States*
How does the election environment in Wisconsin compare to that in other states? First, in terms of states that offer some form of early in-person voting Wisconsin joins thirty-five other states and the District of Columbia.[3] Conversely, 15 other states offer no form of in-person, no-excuse absentee/early balloting.[4] Table 1 below details information collected on states (and the District of Columbia) that allow same-day and/or election-day registration.[5] Three states currently offer, or will be offering in the future the same-day registration option. Five states and the District of Columbia offer election-day registration. Seven states offer both same-day and election-day registration. In the future, two additional states, California and Hawaii, will also fall into this category. Eighteen percent of states, including Wisconsin, offer (or will offer) both the SDR and EDR option to citizens. Two-thirds of states (65%) do not offer SDR, EDR, or a combination of the two. Offering both SDR and EDR, therefore, places Wisconsin within a fairly small minority of states.

---

[1] See 1999 Wisconsin Act 182 which amended Wisconsin Statute § 6.85.
[2] *An Examination of Early Voting in Wisconsin*. Wisconsin Government Accountability Board Report. January 2010.
[3] In this section the term *in-person early voting* includes any state that offers any form of no-excuse, in-person absentee voting.
[4] I conducted an in-depth analysis of this question in a previous expert report. For reference see Declaration of M.V. Hood III. *The Ohio Democratic Party v. Husted* (2:15-cv-1802). September 18, 2015. Pages 17-19.
[5] Source: *The Book of the States*, Table 6.6 (http://knowledgecenter.csg.org/kc/category/content-type/bos-2015).

Table 1. States Categorized by the Presence of Same and Election-Day Registration

| Same-Day Registration | Election-Day Registration | Both |
|---|---|---|
| MD, IL, VT [2,3] | DC, CT, IA, ID, NH, RI [6] | CA, CO, HI, ME, MN, MT, ND, WI, WY [7,9] |

Note: Underlined states have yet to implement the specified change.

In terms of the types of voting and registration options available, Wisconsin's citizens have an expansive set of options, especially when compared to other states. For example, neighboring state Michigan offers electors no early in-person voting and, as a consequence, there is also no SDR option available. Michigan voters cannot register on election-day, instead they must be registered 30-days prior to the date of the general election. Absentee balloting is available, but these voters must have an excuse. As a consequence, most voters in Michigan must cast their ballot in-person at their polling place from 7:00 am to 8:00 pm on election-day. Compared to Wisconsin, the electoral environment for Michigan voters is extremely limited.

In regard to the basic structure of Wisconsin's electoral system I think it is critical to note that nothing has changed. Voters can still cast an absentee ballot, without excuse, in-person or through the mail. For citizens who need to register the same-day and election-day options are still available. Balloting at one's polling place on election-day remains a choice for casting a ballot as well.

Two of the plaintiff's experts, Professors Burden and Mayer, have published research comparing the electoral environment of the states in regard to voter turnout.[6] A synopsis of their findings is as follows: *despite being a popular election reform, early voting depresses net voter turnout. The only consistent way to increase turnout is to permit Election Day registration.…*The *depressant effect* [of early voting] *is only partially offset if SDR is present or if EDR offers a vehicle for the last-minute mobilization of marginal voters. This result upends the conventional view that anything that makes voting easier will raise turnout*.[7] States offering an early in-person voting option alone, therefore, will have lower relative levels of voter turnout. Only election-day registration or a combination of same-day registration and election-day registration offers the possibility of countering the negative effect on turnout produced by early voting. As documented, Wisconsin offers both SDR and EDR and these provisions will continue to remain in place. According to the research referenced here, Wisconsin's electoral environment is already configured in such a way as to ensure maximum turnout.

---

[6]Barry C. Burden, David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan. 2014. "Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science* 58(1): 95-109.

[7]Burden et al. (2014: 108).

## IV. THE ELECTION CLIMATE IN WISCONSIN

In this section I will examine Wisconsin's recent electoral history and make a number of comparisons to other states as well. One place to begin would be to examine voter turnout in Wisconsin over the past four federal election cycles, from 2008 to 2014. There are different methods for gauging turnout. One way is to use the population of eligible voters as the denominator. Examining turnout as a percentage of the voting eligible population also allows for comparisons to be made between Wisconsin and other states. Turnout results for Wisconsin are located in Figure 1 below. Comparing midterm elections to other midterms, turnout increased 4.5-points from 2010 to 2014. For presidential elections turnout rose by 0.5% from 2008 to 2012. Across the election cycles that saw the implementation of many of the election provisions under challenge in this case, turnout actually increased. Compared to other states and the District of Columbia, Wisconsin's turnout rate in 2008 placed it second, seventh in 2010, second in 2012, and again second in 2014. For the post-implementation presidential and midterm election-cycles Wisconsin's turnout rate was second to only one other state.[8]

Using the voting age population as the denominator a similar patterns emerges. Across presidential election-cycles turnout increases by 0.2% from 2008 to 2012. Comparing midterm elections turnout increased 4.2 points, from 49.7% in 2010 to 53.9% in 2014. Finally, using registered voters as the denominator one may note that turnout increased across both presidential and mid-term cycles. From 2008 to 2012 turnout among registered voters increased 3.9-points and from 2010 to 2014 by 2.9-points.[9]

---

[8]Source for voting eligible turnout, voting age turnout, and state comparisons: United States Election Project (www.electproject.org/home/voter-turnout/voter-turnout-data).

[9]Registration figures reported in GAB-190 documents reflect both new registrations and registration changes. As such, these figures do not represent the actual pool of registrants available to vote in a specific election. Registration numbers are therefore derived from the figures reported following the election in question. For example, the January 2015 registration figure is used for calculations involving the 2014 midterm election. Source: Wisconsin Government Accountability Board (http://www.gab.wi.gov/publications/statistics/registration).



Whether one examines turnout using the voting age population, voting eligible population, or the pool of registrants, the same pattern emerges. Across the election cycles (2012 and 2014) in which the challenged provisions were implemented, voter turnout in Wisconsin increased. Second, comparing turnout among the fifty states and the District of Columbia one finds that in 2012 and 2014 Wisconsin had the second highest turnout rate. These two facts alone should give some pause to the claims made by the plaintiffs that the election changes undertaken by the state will depress turnout in the 2016 presidential election. The challenged provisions have already been implemented and a very straightforward before and after examination of turnout rates fails to demonstrate any adverse consequences. In the next section I will continue my examination by analyzing the potential impact in relation to in-person absentee voting in Wisconsin.

## V. IN-PERSON ABSENTEE VOTING IN WISCONSIN

### A. Changes to In-Person Absentee Voting in Wisconsin

At issue in this case are a number of provisions related to in-person absentee voting in Wisconsin. Prior to 2011, in-person absentee voting could begin when ballots were made available to municipal clerks. As defined in statutory law, ballots were to be made available 30

days prior to the date of a general election.[10] Although in-person absentee voting could, therefore, technically start 30 days prior to the date of an election it should be noted that this was not mandated in statute. The start time for in-person absentee voting varied between municipalities, as did the hours offered which were typically based on the office hours for the municipal clerk. As such, prior to the 2012 election-cycle there was little in the way of uniformity for in-person absentee days and times across municipalities.

Following the passage of Act 23 in 2011, the in-person absentee voting period was shortened to two weeks. More specifically, the in-person absentee voting period started the third Monday before the election and ended the Friday before election-day.[11] In 2013, Act 146 eliminated in-person absentee voting on weekends and set the hour-range that municipalities could offer in-person absentee voting during the week from 8:00 a.m. to 7:00 p.m.[12] Following implementation of Act 146 municipalities can now offer a maximum of 110 hours of in-person absentee voting. Through these statutory changes the State of Wisconsin has established **uniform** day and hour limits for in-person absentee voting throughout municipalities in the state.

In order to better illustrate the changes to in-person absentee voting and because some factors may still vary slightly between voting units I will use Wisconsin's largest municipality, the City of Milwaukee, as an example. Table 2 below details in-person absentee voting for the City of Milwaukee from 2008 through 2014 for a number of different factors. In 2008 the in-person absentee voting period was 200 hours over a 17-day period and included weekends and after-business hours. In 2010 the in-person absentee period was increased by four days to 21. The number of available hours was 164 and included one Saturday, but no after-business hours during the week. With the implementation of Act 23 prior to the 2012 general, Milwaukee's in-person absentee voting period spanned a total of 121 hours over 12 days. During the 2012 cycle there was one weekend available (Saturday and Sunday) along with extended hours during weekdays. Act 146, put in place prior to the 2014 general, cut the in-person absentee period to 110 hours over a 10-day period. Act 146 eliminated weekend days from the in-person absentee period, however, the City of Milwaukee did maintain extended hours until 7:00 pm during the week. Again, I am using the City of Milwaukee as an example because the information necessary to reconstruct the specific days and times for each election was available.[13]

It should be noted that before 2014 the days and times offered by municipality varied considerably. Acts 23 and 146 have reduced the differences across municipalities considerably to create uniform dates for beginning and ending the 10-day in-person absentee weekday period. Within these parameters municipal clerks are allowed to offer extended hours beginning at 8:00 am and ending at 7:00 pm Monday through Friday.[14]

---

[10]On this point see Wisconsin Statutes § 7.10(3) and 7.15(1)(cm).

[11]See 2011 Wisconsin Act 23. Enacted: May 25, 2011. Act 23 amended Wisconsin Statute § 6.86 (1)(b).

[12]Municipalities can choose to offer fewer hours than the eleven-hour daily maximum. See 2013 Wisconsin Act 146 2013. Enacted: March 27, 2014. Act 146 amended Wisconsin Statute § 6.86 (1)(b).

[13]Information for the 2010, 2012, and 2014 election-cycles for Milwaukee from Type-E Notices. Information for the 2008 election from the Wisconsin GAB.

[14]See 2011 Wisconsin Act 23. Enacted: May 25, 2011. Act 23 amended Wisconsin Statute § 6.86 (1)(b).

There are advantages to a uniform schedule for in-person absentee voting in Wisconsin. Uniformity helps to ensure first and foremost that every registrant has the same opportunity, regardless of the municipality in which they reside, to vote in-person absentee. In addition, misunderstandings among voters concerning exactly when they can vote in-person absentee should be greatly diminished. The fact that all of Wisconsin's municipalities have standardized days for in-person absentee voting would allow the GAB to produce public service messages that could be used to blanket the state.

Table 2. In-Person Absentee Voting Characteristics, City of Milwaukee, 2008-2014

| Election | Start | Stop | Hours | Weekends Permitted | Days Available | Total Hours |
|----------|-------|------|-------|--------------------|----------------|-------------|
| 2008 General | 10/13 | 11/3 | 8:00 am-8: pm, M-F; 9:00 am-5:00 pm, Sat. | Yes | 17 days | 200 |
| 2010 General | 10/5 | 11/1 | 8:30 am-4:30 pm, M-F; 8:30 am-12:30 pm, Sat. | Yes | 21 days | 164 |
| →Act 23 | | | | | | |
| 2012 General | 10/22 | 11/2 | 8:30 am-7:00 pm, M-F; 9:00 am-5:00 pm, S-S | Yes | 12 days | 121 |
| →Act 146 | | | | | | |
| 2014 General | 10/20 | 10/31 | 8:00 am-7:00 pm, M-F | No | 10 days | 110 |

## B. Analysis of In-Person Absentee Voting in Wisconsin

### In-Person Absentee Turnout in Wisconsin

In this section of my report I will compare in-person absentee voting turnout rates for general election cycles for which data are available. I was able to collect complete data for the 2010, 2012, and 2014 general elections.[15] The Government Accountability Board estimated in-person absentee turnout for the 2008 general election.[16] Prior to 2008 there are no statistics (or estimates) by which to study in-person absentee usage in Wisconsin.

None of the changes under challenge by the plaintiffs related to in-person absentee voting were implemented prior to the 2012 general election. Two elections, the 2010 midterm and the 2008 presidential are available to study in-person absentee usage prior to the alterations under

---

[15]Data for early in-person voting come from the 2010, 2012, and 2014 GAB-190 Election Voting and Registration Statistics Reports. Available at: http://www.gab.wi.gov/elections-voting/statistics.

[16]The GAB estimated that between 64% and 75% of absentee ballots in the 2008 general election were cast in-person. For the estimate of in-person absentee voting in 2008 I use the top-end estimate of 75% (which equates to 475,649 in-person absentee votes). Source: "An Examination of Early Voting in Wisconsin, An In-Depth Review and Analysis." Wisconsin Government Accountability Board." (http://elections.state.wi.us/docview.asp?docid=16760). Note also that the 2008 early in-person figures for the Cities of Milwaukee and Madison found in Figures 4 and 5 are not estimates.

challenge. Two companion elections, the 2014 midterm and the 2012 presidential occurred following changes to Wisconsin's statutes involving in-person absentee voting. As in other states, turnout for midterm (off-year) elections in Wisconsin demonstrate an entirely different pattern from presidential election years. As such, the most apt comparison points are to analyze in-person absentee turnout for the 2008 and 2012 presidential elections and the 2010 and 2014 midterm elections. Comparing the 2014 midterm to the 2010 midterm actually provides the most stringent test of any potential negative effects as the provisions of both Act 23 and Act 146 were fully implemented in the 2014 election-cycle.

Figure 2 examines voter turnout in Wisconsin by voting method: in-person absentee; absentee by mail; or at the polling place on election-day.[17] From the figure one may note the overwhelming majority of Wisconsin voters cast a ballot at their polling place on election-day. For presidential elections this figure is just below 80% and for midterm elections the comparable figure is between 85% and 90%. The second most prevalent method is in-person absentee voting which is used at slightly higher rates during presidential election cycles as compared to midterm elections. Of the years available for analysis, in-person absentee turnout ranges from 5.6% in 2010 to 16.7% in 2012. Finally, in any given general election-cycle an average of 5.0% of Wisconsin's electorate will vote absentee by mail.

---

[17]Note: Figures do not sum to 100% because the small number of military and overseas absentee by mail ballots are not shown.



The next figure (Figure 3) provides a closer examination of in-person absentee turnout in Wisconsin from 2008 to 2014. Presidential elections and mid-term elections are grouped together for comparison. EIP turnout was 15.87% in 2008 and 16.67% in 2012, producing an increase of 0.80-points. In the 2010 midterm 5.62% of total turnout was comprised of in-person absentee voting, as compared to 10.86% in 2014. From 2010 to 2014 in-person absentee turnout almost doubled, increasing 5.24-points. Again, the mid-term election cycle comparison provides the best test of any detrimental effects on in-person absentee turnout given both the shortened voting period and elimination of weekend days were in place in 2014, but not 2010. The results of this straightforward test indicate that across a presidential election-cycle that saw a shortened in-person absentee voting period and again across a midterm election-cycle which saw both a shortened period and the elimination of weekend days, the in-person absentee turnout rate did not decrease.



I also provide some additional data from Wisconsin's two largest municipalities, the Cities of Milwaukee and Madison. Figure 4 tracks in-person absentee turnout for the City of Milwaukee from 2008 through 2014. Across the two presidential election cycles in-person absentee turnout for the City of Milwaukee increased by 0.9-points, from 11.6% to 12.6%. Looking back at Table 2 we can compare the in-person absentee periods in Milwaukee across these two election cycles. From 2008 to 2012 the number of hours available during the in-person absentee period decreased by 40%, from 200 total to 121, and the voting period in terms of days was diminished by 29%, from 17 to 12. In-person absentee turnout across the two midterm elections examined, at over 5-points, is even more pronounced. Again, the 2014 election-cycle should offer an even more stringent examination of altering the in-person absentee voting period. In 2014 there were no weekend days available in Milwaukee to vote in-person absentee and the total number of hours and days available had also been constricted. Comparing the 2014 election-cycle to the 2010 election-cycle there were a 11 fewer days (52% less) and 54 fewer hours (33% less) available during the in-person absentee voting period. Despite a shorter in-person absentee voting period, fewer days and hours available to vote early, and the elimination of weekends from the voting

11

calendar, the rate of in-person absentee voting in the City of Milwaukee actually increased presidential election to presidential election and midterm to midterm.



Figure 4. City of Milwaukee In-Person Absentee Turnout, 2008-20114

Figure 5 documents a similar pattern for Wisconsin's second largest municipality, the City of Madison. Across the two presidential elections analyzed, in-person absentee turnout increased one-quarter of a percentage point, from 12.2% to 12.5%. In-person absentee turnout in the 2010 midterm, at 5.1%, increased just over two-points in 2014 to 7.2%. Again, as in the City of Milwaukee and the state at large, in-person absentee turnout for the City of Madison increased over the election cycles that saw reductions in the number of days and hours available. In summary, the in-depth analysis of in-person absentee turnout in Wisconsin from 2008 to 2014 fails to produce any deleterious results relating to the changes implemented by Acts 23 or 146.



*In-Person Absentee Voting Sites*
Under the current election code each municipality in Wisconsin is allowed to operate one in-person absentee voting site. Typically, this site is analogous to the municipal clerk's office. In 2005 legislation was passed that allowed municipalities to establish an alternative site for in-person absentee voting.[18] Municipalities, however, may not offer more than one in-person absentee voting site. As with days and hours Wisconsin has also established uniformity in regard to the number of in-person absentee sites throughout the state.

Another state in the Great Lakes region, Ohio, is likewise uniform on this metric. In Ohio, however, in-person absentee voting is administered at the county-level. Therefore, there are a total of 88 in-person absentee voting sites in Ohio, compared with 1,853 sites in Wisconsin. Wisconsin has more than twenty-one times the number of in-person absentee voting sites as does Ohio. Ohio also has a larger population base as compared to Wisconsin. Using figures on the registrant population in Ohio and Wisconsin from the 2014 general, the ratio of registrants to in-person absentee sites in Ohio is 1:88,048.[19] In Wisconsin, the ratio is 1:1,883.[20]

*Response to Professor Burden's Opinion on Uniform In-Person Absentee Sites*
Professor Burden's expert report says little about the issue of in-person absentee sites. In fact, he devotes just one paragraph to this topic and conducts no analysis of his own. Professor Burden

---

[18]See 2005 Wisconsin Act 451 which added § 6.855 to the election code.
[19]Calculated as: 7,748,201 / 88. Data on registrants found at: www.sos.state.oh.us/SOS/elections/Research/electResultsMain/2014Results.aspx.
[20]Calculated as: 3,488,772 / 1,853. Data on registrants found at: www.gab.wi.gov/elections-voting/statistics.

notes that the size of municipalities in Wisconsin varies greatly. He then cites a published study that found the density of early voting sites is related to overall turnout. More specifically, the study found a positive relationship between sites per person (measured by the voting age population in a county) and the overall turnout rate.[21] I should note that the study cited is not specific to Wisconsin and does not analyze early in-person turnout, which is the more appropriate metric in this case.

The degree to which the number of sites may be related to in-person absentee turnout in Wisconsin can be tested empirically. I have used similar measures of convenience to study early voting.[22] A ratio measure can be constructed which takes into account the number of in-person absentee sites per registered voters. Again, in the case of Wisconsin there is one in-person absentee site per municipality, making the numerator one in all cases. The denominator is equivalent to the number of registered voters in the municipality at the time of the election. This ratio can be expressed as follows for each municipality:

In-Person Absentee Site Density = 1 / Number of Registered Voters

This measure is bounded on the upper end at 1 which would equate hypothetically to a municipality with one registrant. As the number of registered voters in a municipality grows, the sites density ratio would move toward zero. For example, the ratio for a municipality with 10,000 registrants would be .0001. Using this measure one would hypothesize that the site density ratio should be positively related to in-person absentee turnout for a given municipality. Stated differently, as the number of registrants decreases (higher values on site density ratio), the percentage of electors voting in-person absentee should increase.

In order to test this hypothesis I constructed a statistical model where the dependent variable is the percentage of voters within a municipality casting an in-person absentee ballot.[23] The independent variable is the site density ratio described above. I was able to collect data at the municipal-level for the 2010, 2012, and 2014 general elections using GAB-190 detailed reports. The models presented below are estimated using OLS regression.[24]

---

[21]See Expert Report of Barry C. Burden. *One Wisconsin v. Nichol*. December 10, 2015. Page 25.
[22]See M.V. Hood III and Charles S. Bullock, III. 2011. "An Examination of Efforts to Encourage the Incidence of Early In-Person Voting in Georgia, 2008." *Election Law Journal* 10(2): 103-113.
[23]For each municipality, calculated as: in-person absentee votes / total votes cast.
[24]Models estimated in Stata 14. Results weighted by total registration are statistically and substantively the same as those presented (which are not weighted).

Table 3. The Relationship between In-Person Absentee Turnout and Site Density (All Municipalities)

|  | 2010 | 2012 | 2014 |
|---|---|---|---|
| Constant | .032[***] | .080[***] | .051[***] |
|  | (.001) | (.002) | (.001) |
| Sites Density Ratio | -.274[***] | -2.932[***] | -.643[***] |
|  | (.000) | (.361) | (.201) |
| $R^2$ | .01 | .04 | .06 |
| *N* | 1,812 | 1,820 | 1,821 |

Notes: [***]p<.001

What does Table 3 tell us about the relationship of in-person absentee usage and the density of in-person absentee sites in Wisconsin? Contrary to what was hypothesized, the relationship between these two measures is actually negative, not positive. This fact is evidenced by the minus sign on the coefficient for the *Sites Density Ratio* coefficient. This coefficient is negative and statistically significant across all three of the election-cycles analyzed. In-person absentee turnout in Wisconsin is, therefore, not related to convenience (measured in this manner). Municipalities with greater in-person absentee access, as defined by fewer registrants per site, actually have lower rates of in-person absentee turnout.

As an additional robustness check I limited the sample of municipalities to those with more than 1,000 registrants and re-estimated the models above.  The results can be found in Table 4 below. The results for municipalities with more than 1,000 registrants reveal an even stronger, negative relationship between convenience and in-person absentee turnout. The coefficient for the *Sites Density Ratio* is again negative and statistically significant. As with the models for all municipalities found in Table 3, access defined by the fewer registrants per site is not related to higher rates of in-person absentee turnout. This relationship can be viewed graphically by examining the provided scatterplots and accompanying least squares prediction lines. Figures 6, 7, and 8 plot in-person absentee turnout for the 2010, 2012, and 2014 general elections for municipalities with more than 1,000 registrants. The *best-fit* lines as predicted from the models in Table 4 clearly slope downward, an indication that as the sites density ratio increases the level of in-person absentee voting is predicted to decrease.

In summary, the statistical analyses presented clearly refute the idea that simply increasing in-person absentee sites in a given municipality will increase in-person absentee turnout. An examination of the last three general elections indicates that convenience (density) is actually inversely related with the percentage of voters in a given municipality choosing to cast an in-person absentee ballot.

Table 4. The Relationship between In-Person Absentee Turnout and Site Density (Municipalities with more than 1,000 Registrants)

|  | 2010 | 2012 | 2014 |
|---|---|---|---|
| Constant | .083*** (.002) | .262*** (.006) | .174*** (.004) |
| Sites Density Ratio | -67.553*** (4.304) | -237.192*** (10.933) | -158.862*** (7.656) |
| $R^2$ | .31 | .44 | .43 |
| $N$ | 563 | 611 | 575 |

Notes: ***p<.001

Figure 6. Percent  In-Person Absentee Turnout by Early Voting Sites Density, 2010 General



16



Figure 7. Percent In-Person Absentee Turnout by Early Voting Sites Density, 2012 General





Figure 8. Percent In-Person Absentee Turnout by Early Votes Sites Density, 2014 General

I would also like to point out that although there is one in-person absentee site per municipality in Wisconsin, this fact does not mean that the resources deployed to these single sites are equivalent across municipalities. The resources (i.e. number of poll workers) deployed to support in-person absentee voting will vary based on the size of the electorate. The more pertinent question is not necessarily how many sites are being utilized, but are the resources deployed by municipalities during in-person absentee period adequate to handle voter demand. In addition, adding additional in-person absentee sites within a municipality might increase geographic access, but could exacerbate resource issues. For example, imagine a municipality using 20 poll workers to staff a single in-person absentee voting site. If forced to open an additional site these workers might simply be split with ten at each site. In short, more sites does not always equate to more voter access/convenience.

## VI. ABSENTEE BY-MAIL BALLOTING IN WISCONSIN

In addition to the in-person absentee option, voters in Wisconsin can also cast an absentee ballot by mail without an excuse. In regard to this form of voting plaintiffs are challenging the elimination of ballot transmission via fax or e-mail. It should be noted that an elector may still request an absentee ballot from their municipal clerk using fax or e-mail.[25] The actual ballot, however, must be transmitted through U.S. mail.

In response to this challenge I can state from an election administration standpoint there are a number of common sense reasons for no longer allowing the transmission of absentee ballots via fax or e-mail. If an elector receives an absentee ballot by fax or e-mail they will, of course, need to print the ballot and fill it out. The ballot in this form, however, cannot be read into the tabulation machine. An employee in the municipal clerk's office, therefore, has to take the voter's preferences and record these on a regulation ballot. This process can lead to the introduction of unintended errors and also reduces voter privacy. Second, voters who receive a ballot by fax or e-mail sometimes forward it to others. The issue is that ballots can sometimes vary greatly, even within the same municipality. For example, voters living in Milwaukee are not all in the same state legislative districts for example. For these reasons, limiting the transmission of ballots to voters through the mail helps to reduce errors associated with the process of absentee voting or even the possibility of having their absentee ballot altogether disqualified.[26]

Plaintiffs also challenge changes to Wisconsin's election code that reduce the number of reasons permitted for which a clerk may return an absentee ballot to a voter for correction. The election code does allow a clerk to return an absentee ballot in the event that the ballot is not accompanied by a certificate or the certificate is not properly completed.[27] Otherwise, the

---

[25]See http://www.gab.wi.gov/voters/absentee.
[26]See Declaration of Susan Westerbeke. *One Wisconsin Institute v. Nichol*. January 5, 2016. Page 5; Declaration of Tim McCumber. *One Wisconsin Institute v. Nichol*. January 5, 2016. Page 4; Declaration of Diane Hermann-Brown. *One Wisconsin Institute v. Nichol*. January 8, 2016. Page 6; and the Declaration of Constance K. McHugh. *One Wisconsin Institute v. Nichol*. January 5, 2016. Pages 3-4.
[27]See Wisconsin Statute § 6.87 (9) altered by 2011 Wisconsin Act 277. Note: These provisions also apply for absentee voters returning a ballot in-person to the clerk.

responsibility rests with the voter to request a replacement ballot in the event that the ballot is spoiled or mistakes made on the ballot require correction. While the burden to obtain a replacement ballot rests with the voter, the fact that a replacement ballot can be requested is clearly laid out in the required uniform instructions for absentee electors.[28] Contrary to the opinion proffered by the plaintiffs then, these provisions still allow clerks to return ballots to electors for corrections to the certificate, while maintaining the privacy of the ballot itself.

In terms of evidence, there are some data collected by the GAB on absentee ballot rejection rates.[29] If the plaintiffs are correct, the provisions under discussion relating to absentee ballots should cause an increase in the absentee ballot rejection rate. I was able to collect data for this metric for the 2008, 2010, 2012, and 2014 general elections.[30] These provisions were implemented prior to the 2012 election-cycle, so we should see a spike in rejection rate in 2012 and 2014. Figure 9 measures the rejection rate as the number of absentee ballots rejected as a percentage of the total number of absentee ballots returned. In 2008, just over nine percent (9.24%) of all absentee ballots were rejected. This figure fell substantially, to 1.24% in 2010. Following the implementation of Act 227 (2011), the absentee rejection rate fell to just 0.53% in 2012. In 2010, this figure dropped again to 0.31%. Using 2010 as a comparison point, the absentee ballot rejection rate was more than cut in half in 2012. In 2014, the rejection rate was only a quarter of the 2010 figure.



Figure 9. Absentee Ballots Rejected as a Percentage of Total Absentees Returned

---

[28]See Wisconsin Statute § 6.869.

[29]Data for absentee balloting come from the 2010, 2012, and 2014 GAB-190 Election Voting and Registration Statistics Reports. Available at: http://www.gab.wi.gov/elections-voting/statistics.

[30]Absentee ballots rejected includes both in-person and by-mail. I was unable to obtain data that separated the rejection rate by in-person and by-mail.

Figure 10 below measure the absentee ballot rejection rate as a percentage of total votes cast in the election. Again, one may note a similar pattern as uncovered in Figure 9. As a percentage of total ballots cast, the absentee ballot rejection rate was two percent in 2008. This figure fell to about one tenth of percentage point in 2010 (0.13%) and 2012 (0.12%) and one twentieth of a percentage point in 2014 (0.05%). Again, the absentee ballot rejection rate falls each election cycle from 2008 to 2014 and this decline continues even following implementation of the changes brought about by Act 227. In conclusion, examination of the absentee ballot rejection rate provides no evidence that Act 227 caused the number of absentee ballots being rejected to increase.



*Response to Professor Burden's Absentee Ballot Analysis*
Professor Burden has also offered an opinion on changes to statutes affecting absentee balloting in Wisconsin. In offering his opinion he performs a number of statistical analyses that examine the proportion of absentee ballots that went uncounted out of the total number issued. Professor Burden concludes that the rate of uncounted absentee votes is positively associated with the percentage of blacks or Hispanics in the geographic reporting area.[31]

I would argue that the analysis that Professor Burden presents, however, tells us very little about the effects of changes recently implemented that relate to absentee balloting. The issue with Professor Burden's analyses, and subsequent opinion, relates to the metric he chooses to examine potential effects. There are a multitude of reasons why the number of absentee ballots requested by voters does not equal the number of absentee ballots counted in the end. A certain number of electors will request an absentee ballot and never return it. Some may return their absentee

---

[31]See Expert Report of Barry C. Burden. *One Wisconsin v. Nichol*. December 10, 2015. Pages 26-31.

ballot, but miss the deadline by which it must be received by the clerk. Some absentee voters (or potential absentee voters) actually die prior to the date of the election. In other cases an absentee ballot is requested and mailed, but the postal service is unable to deliver it to the given address.

Some reasons why an absentee ballot may not be counted do involve voter error (e.g. failure to sign one's ballot or obtain a witness signature). As previously discussed, plaintiffs' contend that Act 227 will cause the number of absentee ballots rejected to increase. Given that the GAB actually reports the absentee ballot rejection rate, this would be the appropriate measure for examining the effects of Act 227, not the rate at which absentee ballots are counted (of which the rejection rate is only a subset). Again, only a small fraction, 0.31%, of absentee ballots actually returned were rejected (see Figure 9) and the calculated rejection rate has fallen in each election beginning in 2008. Professor Burden's inferences about race and the rate at which absentee ballots are not counted tell us little about the effects of Act 227. In short, the wrong metric was used to gauge the effects of changes to absentee balloting.


## VII. REGISTRATION AND RESIDENCY REQUIREMENTS IN WISCONSIN

The plaintiffs in this matter also object to a number of requirements related to registration and residency. Specifically, Act 182 requires those registering to vote or altering their voter registration record to provide documentary evidence of proof of residency.[32] Prior to passage of Act 182 proof of residency was required only for late registrants, those registering or altering their record after the close of the regular registration period. Act 182 expanded this requirement to include any Wisconsin citizen registering to vote.

There are many types of documents under Wisconsin statute which suffice for establishing proof of residency. Some examples include a current and valid Wisconsin driver's license or state ID card; an identification card issued by the State of Wisconsin or a sub-governmental unit thereof; an employee identification card; a university or technical college ID; a utility bill; a bank statement; a paystub; a residential lease; notices or correspondence from a government agency (e.g. these programs may include Medicare, Medicaid, Social Security, SNAP, and SSI); and correspondence from a Wisconsin Native American Tribe.[33]

The above list is quite extensive, but does not include all possible proof of residence documents. Most Wisconsinites are in possession of one or more these documents. In addition, for a citizen registering during the in-person absentee voting period or on election-day a number of these documents will also serve as proof of identification. Proof of identification is not required to register to vote (only proof of residency); however, for those electors who wish to both register and vote at the same time proof of identification is required to cast a ballot. Some examples of

---

[32]See 2013 Wisconsin Act 182, Section 2H.
[33]See Wisconsin Statute § 6.34 (3)(a) for an exhaustive list of documents to satisfy the proof of residency requirement. See also Proof of Residence for Voter Registration at www.gab.wi.gov/sites/default/files/publication/154/proof_of_residence_pdf_29621.pdf. A proof of residency document must contain name and current address. See Wisconsin Statute § 6.34 (3)(b). Military and overseas electors are not subject to the proof of residence requirement. See Wisconsin Statute § 6.34 (2).

documents that can act as both proof of residence and identity are a Wisconsin driver's license, state ID card or a university identification card. In fact, in order to apply for a free state ID card under the voter ID law an applicant must provide documentary evidence to establish residency.[34] Any Wisconsinite who possesses proof of identity for the purpose of voting, therefore, should already possess proof of residency.

In the past a citizen registering to vote who was unable to provide documentary evidence of residency was allowed to establish residency under corroboration by another registrant from the same municipality. In this case said registrant would sign a statement attesting to the residency of the registrant who lacked a proof of residency document. Act 23 altered several sections of Wisconsin's statutory code by eliminating the use of corroboration for proof of residency in the voter registration process.[35] By eliminating this mechanism to establish proof of residency Act 23 establishes a fair and consistent standard across all electors. The fact that all registrants must provide documentary evidence also establishes a higher standard of proof for this requirement. As demonstrated above, given the wide range of acceptable documents which could be used to establish residency, this requirement should not create a burden to electors in Wisconsin.  As well, making the proof of residence requirement applicable to any registrant (i.e. Act 182) and not just a citizen registering during a specified date range also creates a consistent standard in this regard.

The plaintiffs also object to the State of Wisconsin having increased the residency requirement from 10 days to 28 days under Act 23.[36] Is the 28 day residency requirement unusual? All states have some type of residency requirement. Twenty-five states and the District of Columbia indicate a specific number of days required to establish residency.[37] Figure 11 below compares Wisconsin to those states (and the District of Columbia) which also have a specific residency requirement.[38] Across these states the average residency requirement in days is 28.8. The most frequently occurring (mode) number of days required is 30. I fact, for twenty of these 26 states (77%) the requirement is 30 days. Wisconsin's 28 day requirement is just slightly below the mean value and less the median and modal values at 30 days each. Viewed in this context the twenty-eight day residency requirement is certainly not out of line with most other states.

---

[34] See "How Do I get a Free State ID Card?" found at http://bringit.wisconsin.gov/how-do-i-get-free-state-id-card.
[35] See 2011 Wisconsin Act 23, Sections 17, 29, and 40-41.
[36] See 2011 Wisconsin Act 23, Sections 10-12 which amended Wisconsin Statute § 6.02 (1) and (2).
[37] This number is distinct from the number of days before the close of registration.
[38] Information on residency requirements from "Table 6.6, Voter Registration Information." *The Book of the States 2015*. Found at http://knowledgecenter.csg.org/kc/category/content-type/bos-2015.



Requiring all registrants to provide documentary proof of residency, eliminating corroboration as an alternative method for establishing proof of residency, and increasing the residency requirement to 28 days in my opinion should not act to create an unfair burden on any Wisconsin elector. Instead, these measures standardize a set of fair and consistent practices for all registrants in the state.

## VIII. WISCONSIN'S VOTER ID STATUTE

### Matching the Voter Registration and DOT Databases

In this section of my report I attempt to determine the number registrants in Wisconsin who do possess a driver's license or state identification card issued by the Department of Transportation.

*Data Sources*

I was provided with data by the Wisconsin Department of Justice that originated from two sources: The Government Accountability Board and the Department of Transportation, Division of Motor Vehicles.[39] From the Division of Motor Vehicles I received a set of data files that contained a list of Wisconsin residents who had been issued a driver's license and a second file that detailed Wisconsin residents who had been issued a state identification card. Hereafter, I will

---

[39]The copy of the voter registration database from the Government Accountability Board was created on October 20, 2015.

refer these as the DMV databases. Both these data files contained a unique identification number (customer ID), full Social Security number, and a driver's license number which is also referred to as a state Identification number. In addition, both these files contained information on race/ethnicity, gender, date of birth, residential address, and name (defined as first name, middle initial, last name, and name suffix). There were a total of 594,410 records in the State ID card database and 4,461,901 records in the driver's license database.

From the Government Accountability Board I received a copy of the current Wisconsin voter registration database which contained a record of all registrants who were classified as *Active*.[40] Along with a unique identification number for each registrant (voter registration number) the database contained a state identification number (analogous to a driver's license number).[41] This file also contained information on date of birth, name (defined as first name, middle name, last name, and name suffix), residential address, and a partial Social Security number (last four digits) for some records. The voter registration number does not include any information on the race or ethnicity of registrants in Wisconsin. There were a total of 3,338,332 unique records in the voter registration database.[42]

Before attempting to match (link) records across these databases I undertook a number of standard data cleaning processes. For example, all extra spaces and hyphens were removed from name fields. The last name field for the DMV databases also contained a name suffix (e.g. III), while this information was in separate fields in the voter registration database. In order to make these data fields comparable, I combined the last name and suffix fields in the voter registration database. The state ID number fields were also standardized across all databases (i.e. hyphens removed). All numeric fields to be used for matching (i.e. date of birth, SSN, zip code) were also converted to text fields and standardized across databases. For example, because the DMV databases contained nine-digit Social Security numbers I created a new field to house only the last four digits. All values in date of birth fields were likewise standardized as text strings (e.g. the date 01/01/1970 is translated to 01011970). These steps help to ensure consistency in values between databases and also aid in the creation of match strings discussed in the section labeled *Record Matching*.

---

[40]The copy of the voter registration database from the Government Accountability Board was created on September 25, 2015.

[41]Prior to January 1, 2006 registrants were not required to provide their driver's license or state ID card number when registering to vote (Wisconsin Act 256, Section 49b amended Wisconsin Statute s.6.33(1)).

[42]I removed a total of 6 duplicate cases, based on the voter registration number, from the voter registration database.

*Known Issues with Record Linkage in Wisconsin*

There are a number of issues that make an exact rendering of the number of Wisconsin registrants who lack valid Act 23 identification extremely problematic to produce. These issues will result in an undercount of registrants who possess Act 23 ID and, consequently, an inflated no-match rate. Below, I outline these known issues.

<u>There is no unique and permanent identifier between the two databases.</u>

The state identification number generated by the Division of Motor Vehicles in Wisconsin is a unique identifier at a given point in time. It is based on an individual's name, sex, and date of birth. Any modifications to these factors will generate a new state identification number which will then become attached to the individual in question. A name change, a correction to an incorrect date of birth, or even the addition of a full middle name in place of a middle initial will alter one's state identification number in Wisconsin.[43]

While the DMV certainly updates a product holder's state identification number in their database, there is no clear mechanism whereby a registrant in the voter registration database would have this same field updated. A copy of the DMV database and a copy of the voter registration database produced in very close temporal proximity will, therefore, contain some unknown number of registrants whose state identification number varies from their identification number in the DMV database. This issue not only affects the ability to match individuals through their state ID number, but also by other fields as well (e.g. name and date of birth). Just as alterations to one's name or date of birth produce a new state identification number that may not be reflected in the voter registration database, these same underlying changes will also make it impossible to match registrants using these fields as the name or date of birth change will also not be immediately reflected in the voter registration database.

In contrast to Wisconsin's state identification number, full Social Security numbers would be an example of a unique and permanent identifier for an individual. Unfortunately, the voter registration database does not contain an individual's full Social Security number.[44]

<u>The voter registration database field for state identification numbers is not fully populated.</u>

As previously noted, before January 1, 2006 citizens in Wisconsin were not required to provide their state identification number when registering to vote. As a consequence, 884,924 registrant records contain no state identification number.[45] This figure amounts to over a quarter (26.2%) of total registrants. The fact that the state identification number field is missing for more than a quarter of registrants increases the difficulty in matching these individuals back to the DMV database.

---

[43]Wisconsin Department of Transportation. Driver's License Manual. Section 220: Driver Records. Appendix I: Coding of a Driver's License.

[44]The GAB voter registration database did contain partial (last four digits) Social Security numbers for some records.

<u>The voter registration database and the DMV database contain inconsistent data within fields.</u>
If available, using a unique identifier for matching is always preferable to using other fields such as name and date of birth. Because of the problems noted with state identification numbers, I have had to rely on additional fields to conduct my matching analysis. Relying on such fields, however, will certainly lead to an undercount of the true number of matches. Why? Any difference, however slight, for any of the fields being utilized in the matching query will result in a non-match. For example, for the same individual one database might include a name suffix (e.g. III), while another may not.

<u>The voter registration database field for partial Social Security numbers is not fully populated.</u>
Registrants in Wisconsin are not required to provide their full Social Security number and are only required to provide the last four digits of their Social Security number in the event that they do not have a Wisconsin driver's license or State ID number.[46] Although partial Social Security numbers are not capable of uniquely identifying an individual, they can be used in conjunction with other information fields to create match strings. Partial Social Security numbers were only available for 1,182,275, or 35.0%, of the records in the voter registration database. Two-thirds of the records in the voter registration database did not contain even a partial Social Security number, making any matching exercise all the more difficult. One-fifth (20.4%) of all records in the voter registration database do not contain either a partial Social Security number or a state identification number.

<u>These data sources do not take into account other forms of identification which meet the requirements for Act 23.</u>
Act 23 allows Wisconsin registrants to use seven other forms of identification in addition to a driver's license or state ID card. The other forms of identification are a military ID, a passport, a certificate of naturalization, a DOT identification card receipt, a tribal ID, a university or college ID, and a driving receipt issued by the Division of Motor Vehicles.[47] I was not given access to data related to these forms of identification. As a result, I was unable to take any of these other seven forms of identification into account when producing my estimates of Wisconsin registrants who lack valid identification under Act 23. Not being able to take these other forms of identification into account will produce an undercount of the number of registrants who lack Act 23 identification.

In North Carolina, Professor Charles Stewart found 33.3% of registrants had a passport and 4.9% possessed a military ID.[48] In Texas, Professor Stephen Ansolabehere reported 42.3% of registrants had a passport while 4.7% had a military ID. Of course, many registrants may have multiple forms of identification. Professor Stewart's North Carolina report does allow one to infer the number of registrants who may have a passport alone.[49] After initially matching the North Carolina registration database to anyone who possessed a North Carolina driver's license

---

[45]This figure only denotes the presence of a value in the State ID number field. Not all of the records in the voter registration database contain a <u>valid</u> state identification number.
[46]See Wisconsin voter registration application at:
www.gab.wi.gov/sites/default/files/gab_forms/4/2gab_131_voter_registration_app_rev_2014_05_filla__19781.pdf
[47]2011 Wisconsin Act 23 and "Wisconsin Legislative Council Act Memo, Changes to Election Laws." Wisconsin Governmental Accountability Board. (http://legis.wisconsin.gov/lc/publications/act/2011/act023-ab007.pdf).
[48]Declaration of Stephen D. Ansolabehere. *Veasey v. Perry* (2:13-cv-263 NGR). June 27, 2014. Table V.2.
[49]Declaration of Charles Stewart III. *U.S. v. North Carolina* (1:13-CV-861). February 12, 2014.Table 5.

or state ID card Professor Stewart then added any registrant who matched on a passport, decreasing the no-match percentage by 2.6%. The inference that can be drawn then is that 2.6% of North Carolina registrants possessed a U.S. passport, but not a driver's license or state ID card. Any registrant who possessed a military ID was then added, reducing the no-match rate by another 0.3%. The implication of this finding is that 0.3% of registrants in North Carolina had a military ID, but not a driver's license, state ID, or passport. The addition of passports and military IDs reduced the overall no-match rate by 2.9% in North Carolina. After an initial match on driver's license and state ID in South Carolina I was able to match an additional 2.5% of registrants who possessed a passport or military ID.[50]

There are an estimated 153,322 registrants in Wisconsin (4.5%) who did not match to a record in the driver's license or state ID card databases. Having access to the U.S. State Department and the Department of Defense databases would have allowed matching for passports and military IDs to have been conducted. Some subset of these 153,322 registrants would have a passport or military ID, but not a Wisconsin driver's license or state ID card. Logically, from these examples above if data on passports and military IDs were available the no-match rate in Wisconsin would fall below the 4.5% figure I have calculated. Based on these examples from other states the no-match rate Wisconsin should conservatively fall below 3.0%.

<u>The DMV database does not contain driver's licenses or state ID cards which have recently expired.</u>

Act 23 allows one to vote with an acceptable form of identification that has expired since the date of the last general election. In the present case, any Wisconsin registrant with a driver's license or state ID card that has expired since November 4, 2014 would still be able to use these forms of identification to vote under Act 23. The DMV database does not include any driver's license or state ID card that expired prior to October 19, 2015. Registrants with a license or ID card that had expired between November 4, 2014 and October 18, 2015 would not be able to be matched back to the DMV database. This fact would result in an undercount of the actual number be Wisconsin registrants with valid Act 23 identification. Additionally, any registrant with a U.S. passport or military ID (see point above) which had expired since the date of the last general election would also be able to use such identification for purposes of voting under Act 23.[51]

---

[50]Supplemental Declaration of M.V. Hood III. *South Carolina v. U.S.* (12-203 CKK-BMK-JDB). July 28, 2012. Table 3.

[51]For the small number of cases (3.5% of the total registration database) I sent to the Department of Transportation for additional matching, information on licenses that had expired since the date of the last general election was available.

*Record Matching*

In order to link records between the voter registration and DMV databases, I created sets of match strings by concatenating information from the specific fields listed in Table 5.

Table 5. Strings Used to Match Records between the DMV and Voter Registration Databases

| Match String | Fields Used to Create String |
|:---:|:---|
| 1 | State ID Number |
| 2 | Last Name, Date of Birth, SSN (last four) |
| 3 | Last Name, First Name, Date of Birth |
| 4 | Last Name, First Name, Date of Birth, Zip Code |
| 5 | Last Name, First Name, Middle Initial, Date of Birth |

Five separate matches were conducted between the DMV databases and the voter registration database.[52] For each match, any record in the voter registration database with an equivalent match string in one of the DMV databases would be denoted as having qualifying Act 23 identification.[53] For instance, the hypothetical example below using Match String 2 would result in a match between the DMV and voter registration databases:

| DMV Database | | Voter Registration Database |
|:---:|:---:|:---:|
| <Smith012819760899> | ⬅➡ | <Smith012819760899> |

*Findings*

The results of the matching queries used to link records across the voter registration and DMV databases are presented in Table 6. The table lists the number of records linked (matched) using the five matching strings by each of the two DMV databases. The next to last row displays the number of total <u>unique</u> matches produced. Using the DMV database I was able to match 88.97% of the cases in the voter registration database, while the state ID card database matched to 6.23% of the registrant records.

---

[52]Technically this equated to ten separate matches, five for the driver's license database and five for the state ID card database. Voter registration records could be linked by more than one match string.

[53]The relationship between the voter registration and DMV databases was specified as one-to-many. What this means in practical terms is a record in the voter registration database could match to multiple records in the DMV databases. This is a conservative approach to record linkage as multiple unique records with identical match strings in the DMV databases will only be counted as a single match back to the voter registration database.

28

Table 6. Matching Voter Registration Records to DMV Records

| | Number of Records | | Percent of Total Registrants | |
|---|---|---|---|---|
| | Driver's License | State ID Card | Driver's License | State ID Card |
| Match 1 | 2,215,598 | 165,703 | 65.54% | 4.90% |
| Match 2 | 965,146 | 115,587 | 28.55% | 3.42% |
| Match 3 | 2,920,163 | 199,751 | 86.39% | 5.91% |
| Match 4 | 2,590,972 | 147,815 | 76.65% | 4.37% |
| Match 5 | 2,805,716 | 189,129 | 83.00% | 5.59% |
| Total Unique Matches | 3,007,452 | 210,586 | 88.97% | 6.23% |
| Total Registrants | 3,380,332 | ---- | ---- | ---- |

The next table combines the results from Table 7 into an overall match and no-match rate. A total of 3,137,939 records, or 92.83%, of voter registration records were matched to either of the two DMV databases. This leaves 242,393, or **7.17%**, of voter registration records that were unmatched to a DMV record.

Table 7. Results of DMV Record Match

| | Number of Records | Percent of Total Registrants |
|---|---|---|
| Record Matched to <u>either</u> the DL or State ID Database | 3,137,939 | 92.83% |
| No Match | 242,393 | **7.17%** |
| Total Registrants | 3,380,332 | ---- |

After the initial match effort displayed above, I noted there were a total of 119,421 unmatched voter registration records that contained a value in the state ID number field. This equates to just under half (49.3%) of the total number of unmatched records. Given the issues documented above concerning the use of state identification numbers, I sent these unmatched records to the Department of Transportation. Having access to the full DMV database would allow DOT to determine if the state identification numbers associated with these unmatched records are related to a different state identification number in the DMV records. The results of what I will refer to as the DOT secondary match can be found in Table 8.

Table 8. DOT Secondary Match Results

|  | Number | Percent of Total |
|---|---|---|
| Unable to Match | 6,604 | 5.53% |
| Matched | 112,817 | 94.47% |
|     Associated with an Invalid Act 23 Product | 23,740 | 19.88% |
|     Current DL or State ID Card | 89,077 | **74.59%** |
| Total Records | 119,421 | ---- |

This table indicates that the DOT was able to match just under 95% of these records. The remaining unmatched records may have contained invalid or incomplete data in the state identification number field (e.g. a mistake resulting from a data entry error). Of the records that DOT was able to match, 19.88% were associated with a DMV record for a product that would not be valid for complying with Act 23.[54] Although these individuals are not in possession of valid Act 23 identification, as prior holders of such identification the process to obtain a current no-cost state identification card is straightforward. One would simply need to provide proof of identification (which could include the expired driver's license or state ID card).[55] Given this process, another 23,740 registrants could easily become compliant with Act 23 if they are not already in possession of another qualifying form of identification such as a U.S. military ID. The remaining 74.59% of these records did match to an Act 23 compliant driver's license or state identification card. These 89,077 matches are added to the existing 3,137,939 matches in Table 9, bringing the total number of matches to 3,227,016. Notwithstanding the issues I have discussed with matching records in Wisconsin, the final number of no-match records stands at 153,322, bringing the percentage of unmatched registrants from 7.17% down to 4.54%.[56] Given known data issues (see section above) and the fact that an individual may possess other types of qualifying Act 23 identification (e.g. U.S. passport), I feel confident the actual percentage of registrants in Wisconsin without Act 23 identification is below the 4.54% rate I calculated.

---

[54] The product in question had expired prior to the date of the last general election (i.e. before November 4, 2014).

[55] For an explanation of this process see: http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/id-card.aspx.

[56] Any large government database comprised of individuals is temporally dynamic and, as such, is constantly experiencing some degree of *churn*. In the case of the voter registration database some registrants *exit* through death, felony disenfranchisement, or by moving out of state. At the same time other individuals who reach voting age or who move to Wisconsin from another state *enter* and are added to the voter rolls. Out of an abundance of caution I also replicated the figures in Table 9 after utilizing additional data fields in the DMV databases. These fields denote whether a license holder is deceased or has moved out of the State of Wisconsin. Removing such individuals slightly reduces the overall pool of registrants. The number of no-matches will remain unchanged because only those registrants matched from the DMV databases to a voter registration record can be removed. Consequently, the no-match rate will rise. Even so, the overall no-match rate increases only 0.09-points, from 6.05% to 6.14%.

Table 9. Final Results of DMV Record Match

|  | Number of Records | Percent of Total Registrants |
|---|---|---|
| Initial Record Match | 3,137,939 | 92.83% |
| DOT Secondary Match | 89,077 | 2.64% |
| Total Matches | 3,227,016 | 95.46% |
| No Match | 153,316 | **4.54%** |
| Total Registrants | 3,380,332 | ---- |

The final table in this section (Table 10) compares my no-match rate to that of Professor Mayer. Professor Mayer's final no-match percentage, at 8.38%, was 3.84-points higher than the no-match rate I calculated. As such, Professor Mayer's no-match list is certain to contain individuals who are actually in possession of Act 23 identification. As a result, any analyses where Professor Mayer uses the no-match categorization will likewise be rendered as potentially inaccurate.

Table 10. Comparing DMV Record Match

|  | Number of Records | Percent of Total Registrants |
|---|---|---|
| Mayer-No Match | 283,346 | 8.38% |
| Hood-No Match | 153,316 | 4.54% |
| Difference | **(-)130,030** | **(-)3.84%** |

*The Free ID Program*
One factor that is mitigating any negative effects of Act 23 is a program administered by the Wisconsin Department of Transportation. Under this program any citizen can obtain a state ID card at no-cost for the purpose of voting.[57] From July 2011 through November of 2015 the Wisconsin Division of Motor Vehicles has issued a total of 413,342 no-cost state ID cards.[58] Wisconsinites seeking to obtain a free state ID must fill out DOT form MV3004. This form clearly states that *all ID cards used for voting are FREE* by simply checking a box on the form.[59] The inference that can be drawn then is that since its inception, more than a four hundred thousand Wisconsin citizens have taken advantage of this program and have applied for a free identification card for the purpose of voting. In addition, by examining the racial breakdown of

---

[57]Wisconsin Statute § 343.50(5)(a)3. For more information on applying for a no-cost State ID see http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/petition-process.aspx.
[58]This figure includes both original issuances as well as renewals and duplicates. Source: Wisconsin DOT Document labeled "Monthly Free ID Stats".
[59]Form MV3004 located at: http://www.dot.wisconsin.gov/drivers/forms/mv3004.pdf.

those Wisconsin residents who have obtained a free ID card for voting it is clear that racial and ethnic minorities comprise a disproportionate share of this group.[60]

As indicated by Table 11, the percentage of blacks and Hispanics taking advantage of the free ID program far exceeds their share of the voting age population. This is especially the case for blacks who constitute 5.6% of the voting age population in Wisconsin, but who make up 35.6% of those taking advantage of the free ID program. Likewise, the Hispanic share of free ID's issued, at 8.3%, exceeds their share of the citizen voting age population at 3.3%. To the degree that a racial gap in ID possession may exist in Wisconsin, it is clear that the no-cost state ID program is acting to alleviate any such disparity.

Table 11. Racial/Ethnic Breakdown for No-Fee State ID Cards Issued by Wisconsin DMV

| Race/Ethnicity | Frequency | Percentage |
| --- | --- | --- |
| White | 139,696 | 52.0% |
| Black | 95,677 | 35.6% |
| Hispanic | 22,273 | 8.3% |
| Asian | 4,457 | 1.7% |
| American Indian | 6,740 | 2.5% |
| Total | 268,843 | 100% |

Source: Wisconsin Department of Transportation state identification card database.

*Underlying Documentation*
In addition to the free state ID program which was implemented with the passage of Act 23, a subsequent opinion of the Wisconsin Supreme Court has also provided another point of mitigation to the State's voter ID law. In order to obtain an <u>original</u>, no-cost state ID one must provide proof of name and date of birth and proof of citizenship. For most citizens born in the United States these factors could be documented using a birth certificate. In *NAACP v. Walker* the Wisconsin Supreme Court ruled that any citizen applying for no-fee state ID card should not be required to pay for documentary evidence, such as a birth certificate.[61] In order to comply with this opinion, the Department of Transportation created a *petition process* for citizens who lacked documentary evidence to obtain a no-cost state ID card.[62] In such instances the applicant would fill out DOT Form MV3012 and the DOT would attempt to verify said applicant's identity

---

[60]These figures are calculated by author from the Wisconsin DMV state identification card database. The DMV does record the race/ethnicity of license or State ID holders.

[61]See Paragraph 70 of *Milwaukee Branch of the NAACP v. Walker*, 851 N.W.. 2d 262 (Wis. 2014).

[62]This process was initially put in place by means of an emergency administrative rule implemented on September 15, 2014. See Declaration of Kristina H. Boardman. *Frank v. Walker* (11-CV-1128). April 23, 2015. A permanent rule titled "Extraordinary Proof of Name, Date of Birth, or U.S. Citizenship" can be found in the Wisconsin Administrative Code. Department of Transportation. Chapter 102.15(5m).

by contacting government agencies such as the Wisconsin Department of Health Services.[63] If verification is not attained, the DOT is authorized to rely on secondary documentation, termed *extraordinary proof*, such as a baptismal certificate or Census record to establish proof of name, date of birth or U.S. citizenship.[64]

I obtained some statistics from the Wisconsin Department of Transportation regarding the petition process for the no-cost state ID card.[65] In just over a year, from September 15, 2014 through November 30, 2015, the DOT has issued 51,160 original, no-cost state ID cards. Of these original issuances 1,022 lacked qualifying documentation and relied on the petition process. This equates to only 2.0% of the original issuances under examination. Breaking these 1,022 cases down further, 814 (80%) have been resolved through adjudication. Only 6% (72) of these cases were classified as still pending when this report was filed.[66] Finally, of the total number of petitions, only 3.0% were issued using *extraordinary proof*. This would equate to only 0.06% of all original ID issuances detailed in this report.

*The Plaintiffs' Voter ID Objections*
As of this date two claims are still active in regard to the present case. In this section I will provide a response to these objections based on the information I have collected and analyses conducted.

Claim 1: Partisan Fencing
The plaintiffs claim *Democratic voters are disproportionately likely not to have a qualifying ID.* From this, the plaintiffs further contend that this will result in the disproportionate suppression of the Democratic vote in Wisconsin.[67] Experts for the plaintiffs, however, provide **no** empirical support for this claim. Wisconsin is an open primary sate and, consequently, does not require registrants to claim a political party affiliation. As such, any information relating to the partisanship of voters must be estimated. Neither Professor Mayer nor Professor Burden provides any such estimate in their reports. In fact, Professor Mayer had Catalist append partisanship data onto the voter registration file.[68] His report, however, makes no use of these data.

Professor Mayer claims there is a racial gap in ID possession in Wisconsin in that blacks and Hispanics have a higher non-possession rate than whites. Again, I dispute this is necessarily the case, but even if this were so it would not necessarily translate into a partisan disparity. Why? Although minorities are more likely than non-Hispanics whites to identify as Democrats, one would still need to take into account the racial composition of the Republican and Democratic Parties in Wisconsin in order to answer this question.[69] Since Wisconsin does not have

---

[63]The DOT is also authorized to contact government agencies in other states as well (e.g. for an out-of-state birth certificate). DOT Form MV 3012 can be accessed here: http://wisconsindot.gov/Pages/global-footer/formdocs/default.aspx.

[64]See Wisconsin Administrative Code. Department of Transportation. Chapter 102.15(5m)(3).

[65]"Petition Record Process Voter ID Monthly Report." Wisconsin Department of Transportation. Report received from counsel.

[66]Another 57 cases were canceled by the customer, 64 were suspended after the customer failed to respond, and the remaining 15 cases were denied.

[67]Complaint. *One Wisconsin Institute v. Nichol* (3:15-cv-00324). May 29, 2015.

[68]See Expert Report of Yair Ghitza. *One Wisconsin Institute v. Nichol* (3:15-cv-00324). December 10, 2015.

[69]If this were an analysis examining an issue of racial impact, calculation of rates by racial group would be sufficient (i.e. to examine the question of how a voter ID law could affect racial and ethnic groups one might calculate the rate of ID non-possession for each group) One would not need to take into account the overall size of the racial groups in

registration by political party, I make use of a large-scale public opinion survey to determine the racial/ethnic breakdown of the Republican and Democratic Parties in the state.[70] The Cooperative Congressional Election Study (CCES) allows one to draw state-level inferences, including estimates of party identification.[71] Using the Wisconsin sample, the racial breakdown of the two-party system is described in Table 12 below. The table indicates the percentage of each racial/ethnic group that identifies with each party. For example, 37.9% of whites identify as Democrats and 43.9% identify as Republicans.

Table 12. Two-Party Breakdown by Race for Wisconsin

| Party | White | Black | Hispanic |
|-------|-------|-------|----------|
| Democrat | 37.9% | 59.2% | 71.4% |
| Republican | 43.9% | 24.5% | 14.3% |

Source: 2014 CCES

Next, I gathered data on the racial/ethnic breakdown of Wisconsin's citizen voting age population from the Census Bureau.[72] The results are as follows:

Table 13. Citizen Voting Age Population by Race/Ethnicity for Wisconsin

| Group | Percent CVAP | Number |
|-------|--------------|--------|
| Non-Hispanic White | 87.97% | 879.7 |
| Black | 5.56% | 55.6 |
| Hispanic | 3.25% | 32.5 |

Source: U.S. Census Bureau

The column to the far right of Table 13 partitions a hypothetical electorate of 1,000 registrants by race/ethnicity based on the above percentages. For example, since whites comprise 87.97% of the citizen voting age population in Wisconsin, of the 1,000 hypothetical registrants 879.7 would be white.

The next step in this estimation process is to partition the hypothetical electorate by partisan affiliation (these estimates are found in Table 14). This can be accomplished by multiplying the estimated number in each racial/ethnic CVAP category (Table 13) by the partisan breakdown for each of these two groups (Table 12). For example, the estimate for the number of white Democrats would be 333.4 [879.7*.379].

---

the electorate. To examine the question of whether Act 23 produces a partisan effect, however, it is necessary to take into account both rates by race/ethnicity as well as the racial composition of the parties.

[70]As a proxy for party registration I am relying on individual-level party identification. Republican *leaners* are coded as Republicans and Democratic *leaners* as Democrats.

[71]For more information see: http://projects.iq.harvard.edu/cces/home.

[72]U.S. Census Bureau. Tables B05003[B,H,I]. "Sex by Age by Nativity and Citizenship Status (Total Population, Hispanic or Latino, White Alone, Black or Africa American Alone)." 2010-2014 American Community Survey 5-Year Estimates.

Table 14. Distribution of Hypothetical Wisconsin Electorate into Two Major Parties

| Party | White | Black | Hispanic |
|---|---|---|---|
| Democrat | 333.4 | 32.9 | 23.2 |
| Republican | 386.2 | 13.6 | 4.6 |

Finally, I will use Professor Mayer's estimates of non-possession by race to determine the numbers of Republicans and Democrats who may not possess Act 23 identification. Taking the 333.4 white Democrats and multiplying by .083 would yield a figure of 27.7. This is the estimate of white Democrats who lack Act 23 identification. These calculations are repeated for each combination of race and party in Table 15. Next, these figures are summed within party to produce a total estimate of Democrats and Republicans in Wisconsin who may be affected by Act 23. In the end, 33.9 Republicans versus 33.5 Democrats are estimated to lack identification—a virtual wash.

Table 15. Estimating the Number of Wisconsin Partisans without Identification

| Race/Ethnicity | Non-Possession Rate[73] | Democrat | Republican |
|---|---|---|---|
| White | .083 | 27.7 | 32.1 |
| Black | .098 | 3.2 | 1.3 |
| Hispanic | .111 | 2.6 | 0.5 |
| Total without ID | | **33.5** | **33.9** |

This exercise demonstrates that Act 23 will not necessarily lead to a partisan advantage for the Republican Party in Wisconsin. I should note this finding holds even relying on the plaintiffs' expert calculations of ID non-possession which I do not accept as accurate (see again my previous discussion of the issues in producing an accurate no-match rate). Not only are these non-possession rates inflated, one would also have to make the heroic assumption that none of the partisans lacking identification would be unable to obtain a qualifying form of identification and vote. This is also certainly, as well, not the case (see discussion of free State ID program). In summary, even under these unrealistic assumptions, I fail to find evidence for any claim of partisan fencing associated with Act 23.

Claim 2: Exclusion of Certain Types of IDs
The plaintiffs claim the exclusion of certain types of identification does not *serve any state interest and is not rational*. Specifically, the plaintiffs object to the exclusion of technical college IDs, non-Wisconsin driver's licenses, and expired IDs.[74]

---

[73]Expert Report of Professor Kenneth Mayer. *One Wisconsin Institute v. Nichol* (3:15-cv-00324). December 10, 2015. Table 3.
[74]Complaint. *One Wisconsin Institute v. Nichol* (3:15-cv-00324). May 29, 2015.

Table 16. Types of Identification Allowed to Vote by State

| | Wisconsin[75] | North Carolina | Texas | Georgia | South Carolina |
|---|---|---|---|---|---|
| Drivers' License | X | X | X | X | X |
| State ID Card | X | X | X | X | X |
| U.S. Passport | X | X | X | X | X |
| U.S. Military ID | X | X | X | X | X |
| Free Photo ID for Purposes of Voting | X[76] | X | X | X | X |
| Veteran's Affairs ID | | X | X | [77] | |
| U.S. Citizenship Certificate | X | | X | | |
| Concealed Weapons Permit | | | X | | |
| Tribal ID | X | X | | X | |
| Federal/State/Local Government Employee ID | | | | X | |
| University/College ID | X | | | X | |

The table above compares Wisconsin to a number of other states which have passed government-issued photo identification laws based on the types of allowable identification. In terms of permissible identification, all five states allow a driver's license, state identification card, U.S. passport, U.S. military ID, or a free photo ID card issued for the purpose of voting. Beyond that, Wisconsin, North Carolina, Texas and Georgia offer additional forms of identification, although these vary. Under the Wisconsin, North Carolina, and Georgia statutes a tribal ID is allowed. The final category listed in Table 16 for Georgia technically includes any *valid photo ID from any branch, department, agency, or entity of the U.S. Government, Georgia, or any county,*

---

[75]In addition to these categories identified in Table 16 Wisconsin also allows the following to be used as valid Act 23 identification: a driving or identification card receipt issued by DOT (valid for 45 days) or a notice of suspension or revocation of driver's license (within 60 days of election of issuance). For detailed documentation on Act 23 identification see 2011 Wisconsin Act 23. Section 1. Enacted: May 25, 2011 or http://bringit.wisconsin.gov/do-i-have-right-photo-id.

[76]In Wisconsin the free photo ID is a no-cost version of the State ID Card issued by the Department of Transportation.

[77]While there is not an explicit category for VA Identification cards in Georgia, this type of identification would be permitted under the category of a valid federal government ID with photo.

*municipality, board, authority or other entity of this state.*[78, 79] Among these states only Wisconsin and Georgia include identification cards issued by state universities or colleges and only Texas and Wisconsin allow the use of a U.S. citizenship certificate. In comparison to other states the mix of acceptable types of photo identification required by Act 23 does vary, but is also characterized by a heavy degree of overlap, especially among the most predominant forms of identification (i.e. driver's license).

On the issue of technical college IDs the Government Accountability Board has ruled that that these IDs are equivalent to university or college IDs for the purpose of voting and, therefore, acceptable as Act 23 identification for the purpose of voting. This interpretation has been codified in the form of Emergency Rule SS 038-15.[80] This emergency rule was approved by the GAB on April 29, 2015. This rule was also noted by Judge Adelman in his final decision and order for *Frank v. Walker*.[81] A permanent rule allowing the use of technical college IDs will be published in the Wisconsin Administrative Register on February 1, 2016.[82] This fact would appear to make this claim by the plaintiffs moot.

As to the question of accepting out-of-state driver's licenses for the purpose of voting only Georgia and North Carolina permit this form of identification. In North Carolina the use of an out-of-state license, however, is limited to those who have registered to vote within 90 days of an election. Wisconsin, South Carolina, and Texas do not allow voters to use an out-of-state license. Given the fact that a licensed driver who moves to Wisconsin from another state must obtain a Wisconsin driver's license within 60 days of establishing residency, allowing the use of out-of-state licenses for voting would be of limited utility to most voters.[83] In addition, this exclusion is consistent in that the only non-Wisconsin forms of identification acceptable under Act 23 are issued by the federal government (e.g. U.S. passport or military ID).

In South Carolina all forms of ID must be valid and current. In Georgia, the driver's license, if valid, can be expired. In Texas, with the exception of the U.S. Citizenship Certificate that has no expiration date, identification cannot be expired for more than 60 days from the date of the election. North Carolina recently amended its statute to allow expired driver's licenses for up to four years. Otherwise, with the exception of military ID's or VA cards, identification must be unexpired.[84] In Wisconsin the driver's license, state ID card, U.S. passport, and U.S. military ID may be expired after the date of the most recent general election. Other forms of Act 23 ID must be unexpired. Wisconsin does allow the most prevalent forms of identification to be expired for up to two years (since the date of the last general election). With the exception of Georgia which does not appear to set a time limit and North Carolina, this exception in Act 23 is more generous than the Texas exception of 60 days and South Carolina where identification must be unexpired.

---

[78]Georgia Secretary of State website:
http://sos.ga.gov/index.php/elections/georgia_voter_identification_requirements2 and O.C.G.A. § 21-2-417 (2015).
[79]North Carolina electors may present an out-of-state driver's license or state-issued identification card if they have registered to vote within 90 days of an election.
[80]Source: https://docs.legis.wisconsin.gov/code/register/2015/712A2/register/ss/ss_038_15/ss_038_15.
[81]See Opinion and Order. *Frank v. Walker* (2:11-cv-01128-LA). October 19, 2015. Pages 5-8.
[82]Declaration of Michael Haas. *One Wisconsin Institute v. Nichol* (15-CV-324). January 7, 2016. Page 2.
[83]See http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/ooslicense.aspx.
[84]In North Carolina an exception does allow those 70 years of age and older to present an expired driver's license or state-issued identification card as long as these forms of identification were current on the registrant's 70th birthday.

For those Wisconsinites who possess a DMV product that is expired, the process to obtain a current state identification card is simple and straightforward. Any citizen in possession of a driver's license (or state ID card) that is not more than eight years expired could obtain a current state ID card, including the free variant, by simply providing proof of identity.[85] The expired license or state ID would constitute proof of identity.[86] Given the ease with which a state ID can be renewed, the two-year grace period for voting with an expired card is more than reasonable.

In summation, any state that implements a government-issued photo identification law for the purpose of voting must set parameters on what types of identification will be accepted and whether they can be expired. In this regard Wisconsin's Act 23 is no different from similar state statutes. The mix of acceptable types of identification that can be used for voting in Wisconsin has a heavy degree of overlap with other states. Further, Wisconsin is certainly not alone in refusing to accept out-of-state driver's licenses or certain types of expired identification. The success of the no-cost state ID card program should more than offset any minor, negative effects that may be produced by refusing out-of-state licenses or certain types of expired identification.

*Provisional Ballot Analysis*

The voter ID component of Act 23 has been in effect since May of 2015. From May through December of 2015 there have been a total of 29 local and special elections held throughout Wisconsin. I collected information on the number of provisional ballots that were cast in these elections because a voter was unable to present valid Act 23 identification at the polls.[87] The results of this exercise are located in Table 17 below.

Table 17. Act 23 Identification Provisional Ballots Cast in Wisconsin, 2015

| Election | Date | Provisional ID | Total Votes Cast | Percent Provisional |
|---|---|---|---|---|
| Hudson-Alderman, District 2 | 11/3/2015 | 0 | 196 | 0.0% |
| Arcadia-Mayoral Recall | 11/24/2015 | 1 | 541 | 0.18% |
| Windsor- Referendum | 11/3/2015 | 0 | 1,875 | 0.0% |
| Greenville-Referendum | 11/3/2015 | 0 | 2,208 | 0.0% |
| Milwaukee-Special, Alderman District 11 | 8/18/2015 | 0 | 4,496 | 0.0% |
| Milwaukee-Special Primary, Alderman District 11 | 7/21/2015 | 0 | 4,155 | 0.0% |
| Oconomowoc-Special Primary, District 4 | 10/13/2015 | 0 | 198 | 0.0% |
| Oconomowoc-Special, District 4 | 11/10/2015 | 0 | 223 | 0.0% |
| Germantown-Special Referendum | 11/3/2015 | 1 | 2,673 | 0.04% |

---

[85]For a more detailed explanation of this process see: http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/id-card.aspx.
[86]Those customers who are no longer in possession of their expired driver's license or state identification card, can simply use their Social Security card. For a full listing of documents which satisfy proof of identity see: http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/identity.aspx.
[87]Turnout and provisional vote data from the Wisconsin Government Accountability Board.

| | | | | |
|---|---|---|---|---|
| Maine-Referendum | 12/8/2015 | 0 | 716 | 0.0% |
| Polk-Referendum | 11/3/2015 | 0 | 551 | 0.0% |
| Somers-Special Election | 6/9/2015 | 0 | 321 | 0.0% |
| Franklin-Recall, Alderman District 4 | 9/8/2015 | 0 | 693 | 0.0% |
| Boscobel School-Referendum | 11/3/2015 | 0 | 1,106 | 0.0% |
| Crivitz-School Referendum | 12/22/2015 | 0 | 904 | 0.0% |
| Fennimore School-Referendum | 6/16/2015 | 0 | 427 | 0.0% |
| Geneva School-Referendum | 5/9/2015 | 0 | 201 | 0.0% |
| Peshtigo School-Referendum | 11/3/2015 | 0 | 1,663 | 0.0% |
| Potosi School-Referendum | 11/3/2015 | 0 | 657 | 0.0% |
| Randall School-Referendum | 10/13/2015 | 0 | 433 | 0.0% |
| Shawano School-Referendum | 11/3/2015 | 0 | 2,060 | 0.0% |
| South Shore School-Referendum | 5/19/2015 | 0 | 634 | 0.0% |
| Tigerton School-Referendum | 11/3/2015 | 0 | 654 | 0.0% |
| Tomorrow River School-Referendum | 11/3/2015 | 0 | 585 | 0.0% |
| Unity School-Referendum | 11/3/2015 | 0 | 1,243 | 0.0% |
| Special Primary-Assembly 99 | 9/1/2015 | 0 | 3,422 | 0.0% |
| Special-Assembly 99 | 9/29/2015 | 0 | 1,593 | 0.0% |
| Special Primary-State Senate 33 | 6/23/2015 | 3 | 11,449 | 0.03% |
| Special-State Senate 33 | 7/21/2015 | 1 | 10,012 | 0.01% |
| **Total (29 Elections)** | | **6** | **55,889** | **0.011%** |

Across the 29 election analyzed there were only six reported provisional ballots cast due to the identification provisions under Act 23. Aggregating across these 29 elections the provisional ballot rate was eleven-hundredths of a percentage point (0.011%). Stated differently, for every 10,000 votes cast there were 1.1 provisional ballots due to non-compliance with Act 23. While these results are based on a set of local and special elections with lower levels of turnout, they are indicative of one thing—almost no one participating in these elections was affected by the implementation of Act 23. The number of provisional ballots would naturally be expected to rise in a statewide election, but so would turnout. In my opinion the provisional ballot rate would still equate to only a fraction of a percentage point even during a general election scenario.

*Wisconsin ID: Overall Conclusions*
What can be concluded about the voter ID requirement instituted by Act 23 in Wisconsin? First, most registrants in the state are already in possession of a driver's license or state identification card and, therefore, in compliance with Act 23. Second, some subset of registrants on the no-match list will possess some other form of Act 23 identification such as a military ID or a U.S. passport. Third, under the State's program to provide a free form of Act 23 identification, over 400,000 no-cost state identification cards have been issued by the DMV and it has been minority citizens who have disproportionately taken advantage of this program. Fifth, I can find no empirical evidence that the plaintiffs' partisan fencing claim has any validity. Sixth, the mix of

acceptable forms of identification to comply with Act 23 is certainly within the parameters set by other states that have implemented photo ID laws. The specific claim that technical college IDs are not allowable forms of Act 23 identification is also moot. Finally, moving from potential to actual effects it is clear that, to date, almost no Wisconsin electors have been affected by the identification requirements of Act 23.

## IX. ADDITIONAL RESPONSE TO PROFESSOR MAYER[88]

In response to Professor Mayer's expert report I have some additional points of rebuttal I would like to cover. Again, I would like to reiterate that Professor Mayer's no match list is considerably larger than the list I produced. In fact, it is 1.8 times the size of my no-match list. The analyses he conducts, therefore, include over 130,000 registrants he classifies as not having Act 23 identification who, in fact, do (see again Table 10). These would also be individuals for whom racial self-identification data from the DMV databases could be used; instead, Professor Mayer must rely on estimates of this characteristic from Catalist. The Catalist estimates may not correctly identify the race/ethnicity of these registrants. As a consequence, any conclusions Professor Mayer draws about non-ID non-possession rates, race and ID non-possession rates, or race and voter turnout rates should not be relied upon.

Professor Mayer performs a series of statistical analyses in an effort to determine the effects of various changes to Wisconsin's election laws. There are, however, a number of issues with these analyses which make any inferences extremely problematic. First, Professor Mayer relies on a temporally static copy of the Wisconsin voter registration database produced on October 20, 2015 (nearly a year past the 2014 midterm). This is essentially a snapshot in time of the Wisconsin electorate as it existed on that date. The voter registration database, however, is in constant flux with registrants moving on and off the roll for a variety of reasons (e.g. reaching voting age; moving out of state). The voter history data in Wisconsin as well is very much tied to the registration snapshot as these data are simply appended to the registration records. As such, individuals who may have cast a ballot in a previous election, but who are no longer in the registration database will not be recorded as having voted. This same criticism also applies to the pool of registrants. As one moves further away from the snapshot date the database will be less reflective of the pool of registrants at that point in time.

Professor Mayer acknowledges this issue, however, he nevertheless proceeds with using this single snapshot of the registration database to draw over-time conclusions. The best method for managing this concern would be to obtain historical snapshots of the voter registration database. A second method might involve creating a panel of voters to study over time. Professor Mayer attempts to deal with this issue by truncating the registration database by specific dates. While this might capture a group who was a part of the electorate at a particular point in time, it does not accurately represent the electorate as it existed at that time (see point above). Second, if Professor Mayer is using the registration date field[89] this may not accurately reflect for all records the original date of registration.[90]

These problems are apparent by simply looking at Table 6 of Professor Mayer's report. The turnout rate he calculates for 2014 is 71.3% and for 2010 it is 73.9%. From 2010 to 2014

---

[88]This section references the Expert Report of Professor Kenneth Mayer. *One Wisconsin Institute v. Nichol* (3:15-cv-00324). December 10, 2015.

[89]Labeled as "Effective Date" in the SVRS database.

[90]For many registrants this value is reflective of the date which an existing registrant's voter record was first converted into the SVRS. Most conversions of these registrants occurred in 2005 and 2006 when the SVRS was being put in place. The Effective Date field value will also be altered if a registrant's status changes, for example from active to inactive. E-Mail correspondence from GAB. January 6, 2016.

Professor Mayer's figures indicate a drop in overall turnout of 2.5-points. The turnout rates he calculates from the GAB figures are 71.2% in 2014 and 62.3% in 2010—an increase of 8.9-points.[91] Looking back at Figure 1, I demonstrate that from 2010 to 2014 turnout went up 4.5-points (VEP), 4.2-points (VAP), or 2.9-points (registration). Professor Mayer's data shows a pattern of decreasing turnout from 2010 to 2014 which does not mirror reality. As such, what kind of confidence can one place in his turnout estimates by race for these elections? In my opinion, very little.

I would also point out that in the end Professor Mayer is simply comparing overall turnout rates (albeit estimated from individual-level data) and drawing the inference that these patterns are explained by the underlying changes to Wisconsin's election code. With the exception of denoting whether a registrant lives in a student ward or does not have identification he fails to directly test for potential effects of the challenged election reforms. For example, if one wants to determine the effects of Acts 23 and 146 on in-person absentee balloting then one should gather data on this particular method of voting and formulate a test, not rely on general voter turnout of which in-person absentee voting is but one component.

Professor Mayer argues that he isolates the effects related to these election changes by controlling for other factors (see Table 7). Again, as I argue above I do not agree that these models are effectively testing the potential impact of these challenged provisions. Even so, these models are only controlling for a registrant's race, age, sex, and prior voting history. In my opinion these turnout models are underspecified in that they do not control for a host of other known factors related to turnout such as income, education, residence, campaign spending, advertising coverage, and election competitiveness to name just a few. Professor Mayer also translates the findings from his empirical models into predicted probabilities which is standard practice. He, however, fails to provide any predicted probabilities for white registrants. In addition, he does not provide 95% confidence intervals for these probability estimates or test to see if the differences between these estimates [for example: p(White Turnout-2014) – p(Black Turnout-2014)] are statistically significant.

Further, as already noted any inferences about those lacking Act 23 identification should be viewed with skepticism as Professor Mayer's no-match list is highly inflated. Perhaps even more important is his claim that his analyses are actually testing the effects of the voter ID component of Act 23 in 2014. The voter ID statute was not in effect in 2014. Period. Any claim to the contrary is incorrect.

Professor Mayer bases this claim on the fact that voters who lacked identification believed the voter ID requirement to be in effect and were, therefore, deterred from voting (this, itself, is an untestable assumption). Professor Mayer cites a public opinion poll from Marquette University that indicates a slight majority (53%) thought the voter ID law would be in effect for the 2014 general election. Of course, we already know that despite what voters may have believed at the time, more than 95% of Wisconsin registrants were already in compliance with Act 23. Further,

---

[91]The denominator (total registration) Professor Mayer uses for these calculations is not correct in that it does not include late or election-day registrations. The turnout calculation is, therefore, inflated. Even though the GAB turnout figures he calculates are inflated they also show that turnout went up, not down, from 2010 to 2014.

it should be noted that there may have been good reason for some in the electorate to be confused at the time. A U.S. Supreme Court decision blocking implementation of Act 23 came out late in the evening of October 9th.[92] The poll was conducted from October 9-12, 2014.  Over the time span when the poll was being conducted the enforceability of Act 23 changed. Because of this confounding effect the results from this particular survey question should not have been reported. In reality, Wisconsin voters had several weeks before the election to absorb the news that Act 23 would not be enforced during the 2014 midterm. This is evident when examining a poll from the same organization a few weeks after the U.S. Supreme Court decision. In the October 23-26, 2014 Marquette Law School Poll, only 20.3% of respondents indicated that photo ID would be required in the 2014 general.[93] In summary, Professor Mayer's analyses in no way test the effects of Wisconsin's voter identification law on turnout.

Professor Mayer also attempts to draw inferences about college students in Wisconsin and their rates of voter turnout. He does this not by identifying individual college students, but by locating younger registrants (18-24 years of age) in wards that are in geographic proximity to college campuses. I note that Professor Mayer's average student ward contains less than a majority of 18 to 24 year olds. On the low end, a ward whose population is comprised of only 7% of 18 to 24 year olds was classified as a *student ward* simply on the basis of its geographic location.

Professor Mayer concludes from his analyses that registrants in these student wards were affected by the election provisions under challenge, as evidenced by depressed turnout in 2014. This inference is not as straightforward as it may appear. First, the use of this contextual measure is not necessarily the best indicator the target population Professor Mayer is attempting to isolate, namely enrolled college students who are Wisconsin residents and have moved their residency for the purpose of voting to their campus address. This population is several steps removed from the definition that Professor Mayer uses to classify a ward a student ward. Even if all 18 to 24 year olds in the ward are actually enrolled in college, one still has to ask if all these students are qualified to vote as residents of the ward in question. In sum, quite a few untested assumptions have to be accepted if one is to concur with Professor Mayer's characterization of what constitutes a student ward. Further, if there is uncertainty concerning these student wards, drawing inferences using these units must also be called into question.

Professor Mayer's analysis of turnout in Wisconsin is characterized by a number of concerns I have catalogued above. In isolation, any of these concerns would be enough to call his results into question. Taken collectively, these concerns do not allow any valid conclusions to be drawn about the election provisions under challenge.

---

[92] A *Washington Post* article on this decision was posted on October 9th. The first comments appear at 10:32 pm EDT (9:32 pm in Wisconsin). Most likely the poll was closed for the evening before the news story was released. See https://www.washingtonpost.com/politics/courts_law/supreme-court-blocks-wisconsin-voter-id-law/2014/10/09/e52af8fe-4ff4-11e4-8c24-487e92bc997b_story.html.
[93] Source: https://law.marquette.edu/poll/results-data.

## X. ADDITIONAL RESPONSE TO PROFESSOR BURDEN[94]

I previously responded to a number of issues raised by Professor Burden regarding in-person absentee voting sites and specific changes to the absentee balloting process. In this section I will offer a number of responses to other sections of Professor Burden's report.

*The Senate Factors*

A considerable portion of Professor Burden's report is devoted to what are known as the *Senate Factors* and within this group Senate Factor Five. In this section he provides evidence of employment, income/poverty, education, health, and housing disparities by race and ethnicity in Wisconsin. Poverty, by itself, is not a protected category as is race.[95] Professor Burden argues that *the challenged changes in Wisconsin election law will disproportionately deter or prevent black and Latino residents from voting* by interacting *with social and economic conditions affecting racial minorities* in the state.[96] Socio-economic statistics such as these are facts that can be documented. The real question in this case, however, involves the degree to which any such socio-economic disparities may interact with Wisconsin's election laws to hamper political participation on the part of racial minorities.[97]

Before one can widen the scope to examine other factors such as socio-economic disparities a causal connection needs to be established showing that the election practice(s) in question is/are denying racial (or language) minorities *an equal opportunity to participate in the political process*.[98] As I demonstrate in this report there is no evidence to support the supposition that these changes have caused, or will cause, a diminishment in the ability of minorities to participate politically in Wisconsin. As such, there is also no evidence to support the claim that such election provisions in association with noted socio-economic disparities will further compound the ability of minorities to participate in the political process in Wisconsin.

While Professor Burden's report does examine most of the named Senate Factors, it also ignores a host of other considerations related to the conduct of elections in Wisconsin. In formulating a list of factors to be considered in making a judgment regarding the totality of circumstances in reference to a Section 2 violation, the Senate made it clear that this set of factors is *neither exclusive nor comprehensive*.[99] The State of Wisconsin, along with municipal clerks, are charged with implementing elections. In this role the state must sometimes respond to circumstances and make adjustments to regulations that guide elections—elections are not static nor do they occur in a vacuum. As I have documented elsewhere in this report, a number of the challenged election provisions can be defended simply from an election administration standpoint. For example, limiting the transmission of absentee ballots to the mail helps maintain privacy while

---

[94]This section references the Expert Report of Barry C. Burden. *One Wisconsin v. Nichol*. December 10, 2015.
[95][T]he *law has never recognized poverty to be a protected sub-set under Section 2*. J. Christian Adams. 2015. "Transformation: Turning Section 2 of the Voting Rights Act into Something It Is Not." *Touro Law Review* 31(2): 320.
[96]See Expert Report of Barry C. Burden. *One Wisconsin v. Nichol*. December 10, 2015. Page 8.
[97]See 52 U.S.C. § 10301.
[98]U.S. Department of Justice. "Section 2 of the Voting Rights Act" found at: http://www.justice.gov/crt/section-2-voting-rights-act.
[99]U.S. Department of Justice. "Section 2 of the Voting Rights Act."

diminishing errors and confusion. Professor Burden's report fails to take into account that election laws may be altered for a whole host of legitimate reasons.

*The Calculus of Voting*

A portion of Professor Burden's report focuses on the *calculus of voting*.[100] This theory deals with probability that an individual will participate in the electoral process given the perceived benefits and costs. In reference to Down's theory, Professor Burden's report concentrates specifically and solely on the costs of voting.[101] He equates the challenged election provisions to additional <u>costs</u> that are borne by Wisconsin voters. Among his conclusions are that *the disruptions to the voting process introduced by the challenged changes in Wisconsin election law are likely to deter participation by groups of residents who have more fragile voting habits and fewer resources to overcome the disruptions to those habits.* Racial minorities are among those groups he says will be deterred from participating.[102]

While Professor Burden's predictions using the calculus of voting appear reasonable, a few points of rebuttal are in order. Although a prominent conceptual approach in political science, the calculus of voting is still a <u>theory</u>. As such, what is predicted by Down's theory does not always end up occurring in the actual world of elections. Uhlaner expands on this disconnect below:

> With regard to the specific issue of voter turnout, however, Down's work sets up a paradox. He concludes that most citizens would find it rational to abstain when voting is **not** costless: "since the returns from voting are often so miniscule, even low voting costs may cause many partisan citizens to abstain." However, empirically we do observe **substantial** numbers of voters.[103]

Given Professor Burden's application of the calculus of voting one would predict that reductions in the in-person absentee voting period, the total number of hours available, and the elimination of weekend availability would increase the cost for voters using this method; therefore, as a consequence there should be a corresponding drop in the in-person absentee turnout rate. As Section V of my report demonstrates this is not the case. Following changes to in-person absentee voting turnout using this method actually increased. This is but one example where the application of Down's theory would not have correctly predicted the actual pattern observed.

*Recent Voter Turnout in Wisconsin*

Professor Burden's report also makes some voter turnout comparisons by racial/ethnic subgroup in order to draw some inferences about the election provisions under challenge (see primarily Table 1 of his report). On this matter Professor Burden states:

---

[100]Anthony Dows. 1957. *An Economic Theory of Democracy.* New York: Harper and Row.

[101]Of course, opposite costs are benefits which for many voters may outweigh any costs associated with participating.

[102]See Expert Report of Barry C. Burden. *One Wisconsin v. Nichol.* December 10, 2015. Page 6.

[103]Carole Jean Uhlaner. 1993. "What the Downsian Voter Weighs: A Reassessment of the Costs and Benefits of Action." In *Information, Participation, and Choice: An Economic Theory of Democracy in Perspective*, Bernard Grofman, ed. Ann Arbor: University of Michigan Press, 67-79. Note: Emphases in bold added by myself.

> The most relevant comparison in Table 1 is between the 2010 and 2014 elections, as indicated by the shaded columns. These are the two midterm elections that bracketed the implementation of the provisions challenged by this litigation.[104]

As he notes, the State of Wisconsin does not keep official registration and turnout statistics by race and ethnicity. The statistics cited by Professor Burden were derived from the Census Bureau's Current Population Surveys of Voting and Registration. As the name implies, these are surveys and should be viewed in that light. Political science research has long indicated that self-reports of turnout often result in inflation of this measure.[105] Many surveys that include questions relating to voter turnout go through a validation process where public records are used to "correct" respondent's answers on the voter turnout question. The voting and registration surveys conducted by the Census Bureau do not undergo any type of vote validation process. Because these estimates are based on survey data and because these types of surveys are prone to specific biases it is important that the CPS turnout estimates be used in conjunction with measures of uncertainty. In other words, a range where the *true* measure is located should also be provided.

For each turnout estimate the Census Bureau provides a margin of error whereby a 90% confidence interval can be calculated. In Figure 12 below I report turnout from the CPS as a percentage of the citizen voting age population for Anglos (non-Hispanic whites), Blacks, and Hispanics in Wisconsin for the 2010 and 2014 midterm elections.[106] According to the CPS figures, Anglo turnout in 2010 was 55.3% in 2010 compared to 58.8% in 2014. These values are plotted in Figure 12 along with the 90% confidence interval. When comparing turnout across elections it is important to determine whether the confidence intervals for such estimates overlap. Looking at the figure, the confidence intervals for the two Anglo turnout estimates overlap. In this case one cannot say with any degree of statistical certainty that the real rate of voter turnout for Anglos increased in 2014, as compared to 2010.

The turnout point estimates for Blacks and Hispanics decline from 2010 to 2014. Again, one must also take note of the confidence intervals plotted for each of these estimates. For both blacks and Hispanics, however, the confidence intervals for the 2010 turnout estimate clearly overlap with those for 2014. Just as one cannot be certain that Anglo turnout increased from 2010 to 2014, it is equally true that one cannot be certain that Black and Hispanic turnout actually decreased across these same election cycles. Translating statistical language into plain English, the 2010 and 2014 voter turnout rates for Anglos, Blacks, and Hispanics are indistinguishable from each other. Although he does not report confidence intervals, Professor Burden acknowledges this fact when he states, [t]*hese differences across elections are generally not statistically significant by conventional standards given the modest sample sizes and*

---

[104]See Expert Report of Barry C. Burden. *One Wisconsin v. Nichol*. December 10, 2015. Page 8.

[105]For a review of this literature see Seth C. McKee, M.V. Hood III, and David Hill. 2012. "Achieving Validation: Barack Obama and Black Turnout in 2008." *State Politics and Policy Quarterly* 12: 3-22.

[106]U.S. Census Bureau. Voting and Registration. Population Characteristic (P20) Reports and Detailed Tables available at: http://www.census.gov/hhes/www/socdemo/voting/publications/p20/index.html.

*accompanying margins of error.*[107] The conclusion to be drawn from the findings displayed in Figure 12 indicate that minority turnout rates in Wisconsin remained constant across these two midterm election cycles. In summary, comparing racial/ethnic turnout rates from 2010 to 2014 tells us nothing about the potential impact of the election provisions under challenge.



Figure 12. Wisconsin Voter Turnout (CVAP) by Race/Ethnicity, 2010-2014

---

[107]See Expert Report of Barry C. Burden. *One Wisconsin v. Nichol*. December 10, 2015. Page 7.

47

## XI. RESPONSE TO PROFESSOR LICHTMAN[108]

In this section I respond to the expert report of Professor Lichtman who contends that the election provisions under challenge in this case were put in place by the Wisconsin State Legislature with the intention of discriminating against racial/ethnic minority voters. Professor Lichtman makes the claim that he will provide evidence of such discriminatory intent. In my opinion, much of his opinion concerning the intent of the Wisconsin Legislature is based on speculation or relationships in which he has failed to empirically demonstrate a causal connection. I also find much of the information on which he bases these claims are very selective in nature (below, I will provide some examples). Finally, he relies almost entirely on secondary data and provides almost nothing in terms of original data analysis on this question.

Professor Lichtman offers no evidence that Wisconsin has a past history of racial discrimination in reference to its election practices. On this point I would like to note that there have been three separate applications of Section 5 since the Voting Rights Act was implemented, in 1965, 1970, and 1975. The 1965 and 1970 *triggers* applied to jurisdictions which had a test or device for registration (e.g. literacy test) and which also had low levels of registration or turnout. In 1975, a third trigger related to single-language minorities was added. If a jurisdiction fell under Section 5 coverage the implication is that discriminatory registration or voting practices were present.[109] Section 5 jurisdictions are required to pre-clear any changes related to the conduct of elections or registration with the federal government prior to implementation in order to prevent new discriminatory measures from taking effect.[110] Neither the State of Wisconsin, nor any component therein, has ever fallen under Section 5 coverage of the Voting Rights Act.[111] Had Wisconsin had a long history of discriminatory election practices then certainly the state, or specific jurisdictions within the state, would have been covered by Section 5.

Much of Professor Lichtman's report focuses on socio-economic disparities between Anglos, Blacks, and Hispanics in Wisconsin. As I stated when critiquing Professor Burden's report, the fact is that such disparities do exist and this can be empirically demonstrated. The linkage of such disparities to a claim of intentional discrimination is not, in my opinion, tenable. As stated above, in what manner are such socio-economic disparities connected to minority political participation, much less the legislative intent to discriminate?

Professor Lichtman then proceeds to makes the assertion that white voting strength, on which GOP control of the state rests, is in decline. He then claims, as a consequence of this demographic shift, the Republican controlled legislature passed a series of election-related bills specifically designed to maintain GOP political control by suppressing minority turnout. This is

---

[108]This section references the Expert Report of Allan J. Lichtman. *One Wisconsin v. Nichol*. December 10, 2015.
[109]Examples of these types of practices included literacy or understanding tests, the use of white primaries, and poll taxes. These devices were especially prevalent in the South. See V.O. Key. 1949. *Southern Politics in State and Nation*. New York: Knopf.
[110]Charles S. Bullock, III and Ronald Keith Gaddie. 2009. *The Triumph of the Voting Rights Act*. Norman, OK: University of Oklahoma Press.
[111]A list of covered jurisdictions is located at: http://www.justice.gov/crt/jurisdictions-previously-covered-section-5. Section 5 is still active, but currently unenforceable since the U.S. Supreme Court decision *Shelby County v. Holder* in 2013.

quite a claim! In the end, Professor Lichtman provides nothing in the way of systematic evidence to support such an assertion. Again, I was unable to find any evidence to support the contention that the election provisions under challenge have negatively impacted the ability of citizens to participate in the political process.

Professor Lichtman makes use of a number of secondary data sources to bolster this claim. Looking at the issue of Republican voting strength in particular, he states, [e]*xit poll data demonstrates that Republican electoral success in Wisconsin turns in part on white voter turnout relative to minority turnout.*[112] He makes use of exit poll data in Table 8 of his report to substantiate this claim. This table, however, looks at vote choice by race, not turnout by race. Using the same exit poll data the as Professor Lichtman, the estimated composition of the Wisconsin electorate was 90% white in 2004, 92% white in 2006, 89% white in 2008, and 90% white in 2010. The share of the electorate that was white in 2010 was the same as in 2004, and up a point from 2008. The election-cycle preceding passage of Act 23 in 2011 saw white turnout up, not down as Professor Lichtman implies. In contrast, the white share of the Wisconsin electorate in 2012 was 86% and in 2014 it stood at 88%. If the challenged election provisions were put in place to bolster white turnout at the expense of minority participation (as claimed by Professor Lichtman), they did not produce the desired effect.

Again, in order to bolster the assertion that the Wisconsin Legislature intended to suppress minority turnout, Professor Lichtman cites evidence which he claims demonstrates that legislators had prior knowledge that such legislation would produce the desired negative impact sought. For example, he states that changes to Wisconsin's in-person absentee balloting were undertaken with the knowledge that minority voters would be disproportionately affected. He bases this on a set of surveys from 2008 and 2012 which he purports to show minorities in Wisconsin utilized early voting at a greater rate than whites. Of course, the 2012 surveys were not in existence when Act 23 was passed in 2011. Further, there is no evidence to conclude that any Wisconsin legislator was aware of the 2008 survey or its specific findings. Professor Lichtman also indicates that he relied on quantities produced by combining these surveys. He provides no explanation of how he produced these findings or the manner in which he constructed confidence intervals or significance tests. I was unable to access the underlying data for the 2008 and 2012 Performance of American Elections Surveys and the written reports found online do not present a breakdown of voting method by state and race.

In the same section covering in-person absentee voting Professor Lichtman asserts that cutting the number of days available for this mode of voting resulted in ever longer lines, especially for minority voters. These findings are located in Table 19 of his report. For these calculations he relies on the Cooperative Congressional Election Studies in 2008 and 2012. It should be noted that he does not make use of the racial identifiers in the survey, but only attempts to compare Milwaukee County to the rest of Wisconsin. Wait times in Milwaukee County do not equate with wait times for minority voters. Even more problematic is the fact that the question on these surveys asks, *approximately how long did you have to wait in line to vote?* It is asked of both

---

[112]This section references the Expert Report of Barry C. Burden. *One Wisconsin v. Nichol*. December 10, 2015. Page 17.

election-day precinct and in-person early (absentee) voters.[113] It is impossible then to separate wait times by voting method. Any inference drawn from these questions concerning in-person absentee voting and wait times is, consequently, <u>invalid</u>. Ironically, the Survey of Performance of American Elections showed the average wait time for in-person voting in Wisconsin was only 9 minutes in 2008 and 8 minutes in 2012.[114]

Professor Lichtman also claims that the legislative justification of public support for these various election reforms is unfounded. He cites evidence from a Marquette Law School public opinion poll. In this same poll 60.4% of Wisconsinites indicate that they favor *requiring a government issued photo ID to vote*.[115] Likewise, another academic article found that that 75% of Wisconsin residents favored requiring voters to show government-issued photo identification in 2008.[116]

In the end what are we left with? Much of the data Professor Lichtman cites to corroborate his assertions are not relevant. Second, even data that may have some bearing on the questions at hand can be refuted by the existence of contradictory evidence. As well, the corresponding causal relationships he posits to reach a conclusion of intentional discrimination are not, to any degree of confidence, substantiated.

---

[113]CCES information at: http://projects.iq.harvard.edu/cces/home.

[114]See Appendix 2, Average Line Length by State. Charles Stewart. 2012 Survey of the Performance of American Elections Final Report (http://elections.delaware.gov/pdfs/SPAE_2012.pdf).

[115]Marquette Law School Poll. October 23-26, 2014. Source: https://law.marquette.edu/poll/results-data.

[116]R. Michael Alvarez, Thad E. Hall, Ines Levin, and Charles Stewart III. 2011. "Voter Opinions about Election Reform: Do They Support Making Voting More Convenient?" *Election Law Journal* 10(2): 73-86.

## XII. RESPONSE TO PROFESSOR MINNITE

In this section I respond to an expert report submitted by Professor Lorraine Minnite. Professor Minnite's report deals primarily with the topic of voter fraud and voter ID laws.

In her expert report Professor Minnite states:

> *I conclude that measures which risk reducing voter access to the ballot are not justified by claims that such requirements are needed to reduce or prevent voter impersonation forms of election fraud because as the record makes clear, fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare.[117]*

Professor Minnite also states, *given historical patterns and evidence and the context for party competition, that such policies actually serve as a form of voter suppression.* Further, she contends that it is black Americans who are typically the object of such efforts.[118]

In specific reference to the voter ID component of Act 23, I take issue with a number of points in Professor Minnite's expert report and her ultimate conclusions offered above. Professor Minnite defines voter fraud as the *intentional corruption of the voting process by voters.*[119] Her search for fraudulent activity then is quite narrow in my opinion as it fails to take into account any election-related fraud committed in other contexts. For example, it is certainly possible for individual voters to be involved in electoral fraud in collusion with poll workers. In my own work I argue that a more expansive definition is required to study this subject which can include not only fraud committed on the part of individuals, but also other third-party entities as well as poll workers, candidates, and political parties. A wider definition of <u>election-related</u> fraud allows one to search for a variety of fraudulent activities and not just fraud which may be perpetrated by a single individual.

Second, all of Professor Minnite's conclusions are based on reports of voter fraud. As such, she has simply relied on secondary data sources like federal court indictments, GAB documents, or journalistic reports. Relying on reports overlooks fraudulent activity that may have gone unreported. As an illegal activity, those engaged in election fraud do not want to be discovered. I argue in my own work that in order to fully examine election fraud one must go beyond simply relying on reports of voter/election fraud and actively search for the existence of such activities. I suggest a general methodology to scientifically study election fraud through forensic techniques based on KDD (Knowledge Discovery in Databases).[120]

Wisconsin is among a handful of states that allow EDR or election-day registration. It is possible then for an unregistered Wisconsin resident to show up at the polls on election-day, register, and then cast a ballot. Given this scenario it seems reasonable for election officials to be able to confidently identify such individuals, given there is no time on election-day for these cases to

---

[117]Expert Report of Professor Lorraine C. Minnite. *One Wisconsin Institute v. Nichol* (3:15-cv-00324). December 10, 2015. Pages 34-35.

[118]Expert Report of Professor Lorraine C. Minnite. *One Wisconsin Institute v. Nichol* (3:15-cv-00324). December 10, 2015. Page 35.

[119]Expert Report of Professor Lorraine C. Minnite. *One Wisconsin Institute v. Nichol* (3:15-cv-00324). December 10, 2015. Pages 7-8.

[120]M.V. Hood III and William Gillespie. 2012. "They Just Don't Vote Like They Used To: A Methodology to Empirically Assess Election Fraud." *Social Science Quarterly* 93: 76-94.

undergo any type of validity checks. Requiring these individuals to provide a form of Act 23 identification could assist in this scenario in reducing the possibility of election-related fraud.

In the end, whether or not past election fraud in Wisconsin can be proven is not relevant to the ability of states to implement changes to their election code designed to prevent future instances of election fraud. Even in the absence of evidence for election fraud the U.S. Supreme Court has concluded in *Crawford et al. v. Marion County Election Board et al.* that the states should be able to implement reasonable requirements to safeguard against future occurrences of voter fraud.[121] As well, I have yet to find any expert, including Professor Minnite, who concludes that the presentation of government-issued photo identification does not make it extremely difficult for an individual to commit in-person voter impersonation. In Wisconsin, some fraud prevention is also extended to absentee by mail voting as these voters must also include a photocopy of a valid Act 23 identification with their ballot.[122]

As to the claims of voter suppression, especially those related to minority voters, Professor Minnite provides absolutely no empirical evidence, nor is she able to cite any peer-reviewed literature that finds such effects. My own academic work examining the implementation of Georgia's voter identification statute fails to find any evidence that racial minorities were disproportionately affected.[123]

---

[121] In this case the Court upheld the constitutionality of Indiana's voter ID law, in part, based on this logic (553 U.S. 181, 128 S.Ct. 1610).

[122] See http://bringit.wisconsin.gov.

[123] M.V. Hood III and Charles S. Bullock, III. 2012. "Much Ado About Nothing? An Empirical Assessment of the Georgia Voter Identification Statute." *State Politics and Policy Quarterly* 12(4): 394–414.

## XIII. OVERALL CONCLUSIONS

The framers left the qualification of voters up to the states and along with this task the responsibility to administer elections as well.[124] The State of Wisconsin, being admitted to the Union in 1848, has conducted elections for over 150 years. The plaintiffs in the present matter raise a plethora of objections concerning the manner in which Wisconsin administers its elections. However, after a close examination of these questioned procedures I have come to the conclusion that Wisconsin's election code provides a reasonable and common sense approach to the manner in which elections are conducted in the state. Further, Wisconsin has acted to continue to make elections more manageable, fair, and efficient (i.e. standardization for in-person absentee voting days and hours). As well, the electoral climate in the state can be characterized as extremely positive as evidenced by the fact that in three of the last four federal election cycles Wisconsin recorded the second highest voter turnout rate in the country.

My examination of in-person absentee balloting demonstrated that despite reductions in days and hours, turnout for this form of voting did not decrease as predicted, but actually increased. Likewise, the plaintiffs' claim that additional in-person absentee voting sites would equate to more convenience and, consequently, higher turnout was shown not to reflect reality. The results of my empirical analyses on this topic demonstrate that larger municipalities in Wisconsin are in no way disadvantaged by being able to offer only a single in-person absentee voting site. The recent changes to in-person absentee voting in Wisconsin represent a means by which voter convenience can be balanced against the cost, both literal and administrative, for providing this service.[125]

My report also examined changes to the absentee by-mail process in Wisconsin. Upon investigating the plaintiffs' complaints I discovered common sense administrative justifications for the existence of these provisions. For example, only allowing absentee ballots to be transmitted through the mail helps to prevent unintentional errors and maintain voter privacy. Second, contrary to what one would predict from claims alleged by the plaintiffs, I found that the rate at which absentee ballots have been rejected has fallen, not risen, over the last two federal election cycles. My examination of Wisconsin's registration process involving the end of corroboration determined that this change instituted a fair and consistent standard for all electors in the state. Finally, increasing the residency requirement to 28 days places Wisconsin firmly in line with other states that have similar requirements.

I would like to reiterate at this point that in-person absentee voting has not been eliminated in Wisconsin—this option is still fully available for registrants to utilize if they desire. As well, electors can also cast a no-excuse absentee ballot by mail or vote at their polling place on

---

[124]See Samuel Issacharoff, Pamela S. Karlan, and Richard H. Pildes. 2007. *The Law of Democracy, Legal Structure of the Political Process*. New York: Foundation Press. Obviously, states must operate within parameters that have been set by subsequent amendments to the U.S. Constitution and federal law (i.e. The Voting Rights Act); nevertheless, it is still the states who oversee and implement elections.

[125]On this point see the Declaration of Diane Hermann-Brown. *One Wisconsin Institute v. Nichol*. January 8, 2016. Page1-3; the Declaration of Kathleen Novack. *One Wisconsin Institute v. Nichol*. January 7, 2016. Pages 2-5; the Declaration of Constance McHugh. *One Wisconsin Institute v. Nichol*. January 5, 2016. Pages 1-2; and the Declaration of Susan Westerbeke. *One Wisconsin Institute v. Nichol*. January 5, 2016. Pages 1-3.

election-day. In addition, citizens can still register to vote during the in-person absentee period (SDR) or on the day of the election itself (EDR). A uniform statewide system for in-person absentee voting days, hours, and sites is now in place. This system still includes the ability of municipalities to offer extended in-person absentee hours.

A voter in Wisconsin, as in any state, can legally only cast a single ballot in a given election. For the 2016 presidential general election Wisconsinites will have the opportunity to vote absentee in-person across a total of 110 hours spread over a 10-day period. They will also have the opportunity to vote at their local polling location on election-day over a 13 hour period (from 7:00 am to 8:00 pm). Finally, any registrant can also cast an absentee ballot through the mail, without excuse, beginning 47 days prior to the date of the election.[126] Just considering in-person voting options for the moment, the hypothetical Wisconsin voter has a total of 123 hours across an 11-day period in which they can cast their single ballot. In short, there appears to be more than ample opportunity, time, and convenience for voters to accomplish this duty in the State of Wisconsin.

In summary, I can think of no reason that would lead me believe that the changes undertaken to Wisconsin's election code under challenge in this case have, or will have, a detrimental impact on the ability of Wisconsin voters to cast a ballot, including minority voters.

---

[126]See Wisconsin Government Accountability Board website: http://www.gab.wi.gov/clerks/guidance-absentee.

## XIV. DECLARATION

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on January 11, 2016

_____

M.V. (Trey) Hood III

Department of Political Science
School of Public and International Affairs
The University of Georgia
104 Baldwin Hall
Athens, GA 30602
Phone: (706) 583-0554
FAX: (706) 542-4421
E-mail: th@uga.edu