IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ONE WISCONSIN INSTITUTE, INC., et al.,

Plaintiffs,

-vs- Case No. 15-CV-324

GERALD C. NICHOL, et al.,

Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED 30(b)(6) DEPOSITION OF GAB DESIGNEE KEVIN J. KENNEDY

Thursday, January 28, 2016

9:18 a.m.

Reported by: Lisa A. Creeron, RPR

VIDEOTAPED 30(b)(6) DEPOSITION OF GAB DESIGNEE KEVIN J. KENNEDY, a witness in the above-entitled action, taken at the instance of the plaintiffs, under the provisions of the Federal Rules of Civil Procedure, taken pursuant to notice, before LISA A. CREERON, a Registered Professional Reporter and Notary Public in and for the State of Wisconsin, at the Wisconsin Department of Justice, 17 West Main Street, in the City of Madison, County of Dane, and State of Wisconsin, on the 28th day of January, 2016, commencing at 9:18 a.m.

A P P E A R A N C E S

JOSHUA L. KAUL,
PERKINS COIE, LLP,
Attorneys at Law,
One East Main Street, Suite 600,
Madison, Wisconsin 53703, appearing on behalf of the plaintiffs;

S. MICHAEL MURPHY,
Assistant Attorney General,
WISCONSIN DEPARTMENT OF JUSTICE,
17 West Main Street,
Madison, Wisconsin 53703, appearing on behalf of the defendants.

ALSO PRESENT: TODD CAMPBELL (Videographer)

* * * * *

I N D E X

| Examination by: | Page |
|---|---|
| Attorney Kennedy | 7 |
| Attorney Murphy | -- |

| Exhibit | | Identified |
|---|---|---|
| 81 | Summary of 2011-2012 election related legislative changes | 8 |
| 82 | Memo to GAB and others from K. Kennedy dated 4-14-14 | 11 |
| 83 | Memo to Members of Senate and Assembly committees from K. Kennedy dated 2-10-14 | 12 |
| 84 | State Elections Board meeting info from 2-1-79 | 23 |
| 85 | Emails among M. Haas, K. Michaels and others dated in July 2014 | 27 |
| 86 | Email to Interested Parties from N. Robinson dated 5-23-12 | 32 |
| 87 | Memo to Interested Parties from N. Robinson dated 7-26-12 | 33 |
| 88 | Email from B. Luchterhand to GAB help desk dated 11-6-12 | 35 |
| 89 | Emails among R. Hein, R. Magney and others dated 8-7-12 | 39 |
| 90 | Letter to Ross from K. Kratsch dated 8-6-12 | 40 |
| 91 | Emails among K. Kratsch, S. Ertmer and others dated 8-6-12 | 39 |
| 92 | Emails between L. Walsh and K. Backman dated 5-22-14 | 41 |

I N D E X (Continued)

| Exhibit | | Identified |
|---|---|---|
| 93 | Emails between D. Buerger and R. Houseman dated 3-6 and 3-7-12 | 45 |
| 94 | Email from S. Kohlhagen to the Clerk List dated 10-21-14 | 48 |
| 95 | Email from GAB help desk to R. Rydecki dated 10-6-14 | 49 |
| 96 | Emails among N. Albrecht, B. Bell and others dated between 3-7 and 3-10-14 | 52 |
| 97 | Letter from Governor Walker to the Senate dated 3-27-14 | 54 |
| 98 | Emails among M. Haas, P. Pratt and others dated 8-7-14 | 56 |
| 99 | Emails among R. Magney, S. Falk and others dated 10-30-12 | 58 |
| 100 | Romney volunteer observer training information | 59 |
| 101 | Emails among N. Judnic, J. Schmieder and others dated 3-24 and 3-26-14 | 62 |
| 102 | Testimony of Kevin Kennedy dated 10-13-15 | 64 |
| 103 | Memo to the Governor's Office from GAB dated 11-18-15 | 67 |
| 104 | WSJ news article dated 12-16-11 | 73 |
| 105 | GAB survey of voter fraud complaints for November 2008 election | 74 |
| 106 | Memo to Members, GAB, from K. Kennedy dated for the March 30-31, '09 meeting | 77 |

I N D E X (Continued)

| Exhibit | | Identified |
|---|---|---|
| 107 | Emails among S. Falk, D. Buerger and others dated 7-31-14 | 78 |
| 108 | Email from J. Futrell to N. Robinson and others dated 7-26-11 | 81 |
| 109 | GAB accessiblity advisory group meeting minutes dated 7-14-11 | 82 |
| 110 | Email from L. Hughes to D. Buerger dated 10-6-14 | 85 |
| 111 | Emails between A. Coakley and M. Pike dated 9-18 and 9-19-14 | 86 |
| 112 | Spreadsheets of data on absentee voting | 99 |

* * * * *

(Original transcript is filed with Attorney Kaul)

THE VIDEOGRAPHER: We are on the record. Seated before you is Mr. Kevin J. Kennedy. This is Media No. 1 of the video deposition of the 30(b)(6) designee for the Government Accountability Board testimony given by Mr. Kevin J. Kennedy. The date is January 28th, 2016. The time is 9:18 a.m.

This deposition is being taken in the matter of One Wisconsin Institute, Incorporated, et al., vs. Gerald C. Nichol, et al., pending in the United States District Court, State of Wisconsin, Western District, Case No. 15-CV-324. This deposition is taking place at the State of Wisconsin, Department of Justice, 17 West Main Street in Madison, Wisconsin.

I am Todd Campbell, videographer with Campbell Legal Video Company of Milwaukee, Wisconsin. The court reporter is Lisa Creeron of Madison Freelance Reporters. Would counsel please first introduce themselves and state whom they represent, starting with the plaintiff, and then the court reporter will swear in the witness.

MR. KAUL: I'm Josh Kaul on behalf of

the plaintiffs.

MR. MURPHY: Mike Murphy on behalf of the deponent, Government Accountability Board. I'd like to note that this is the 30(b)(6) deposition of the Government Accountability Board. The person testifying today is Mr. Kevin Kennedy. This is one of two depositions where he has testified, but he is today appearing as the representative of the Government Accountability Board under Rule 30(b)(6).

KEVIN J. KENNEDY,

called as a witness, being first duly sworn in the above cause, testified under oath as follows:

EXAMINATION

BY MR. KAUL:

Q Mr. Kennedy, let me start out by briefly talking about the nature of this deposition. Have you been a representative in a 30(b)(6) deposition before?
A No.
Q Okay. Are you familiar with the basic distinction between a 30(b)(6) deposition and a personal deposition?
A I believe so.

Q And just briefly to summarize that difference, is it your understanding that today you're testifying not on behalf of yourself and your own views but rather on behalf of the Government Accountability Board and its views?
A That's right.
Q I'm going to start out today by showing you a few documents, which this one we can mark as Kennedy 81, and I'll also show you Kennedy 82.

(Exhibits 81 and 82 are marked for identification)

Q Starting with 81, do you recognize that document?
A Yes.
Q What is that?
A It is a summary of election related changes that was prepared by the agency staff of election law changes from the 2011-2012 legislative session.
Q And when you say agency staff, you mean the GAB?
A I mean the Government Accountability Board staff, yes.
Q And is this summary made available to particular groups or people?
A I believe it's posted on our website. It's made particularly available to municipal clerks who have the greatest need for seeing this information, but it would be a document that we would have on our

website.
Q Let me direct your attention to Page 11 of the document, the last page. On that page there's a summary of 2011 Wisconsin Act 227, is that right?
A Yes.
Q And the first provision discussed in that summary talks about a provision that prohibits a municipal clerk from returning an absentee ballot to a voter once the voter mails or personally delivers the ballot to the clerk except under specified circumstances, is that right?
A That's right.
Q And it specifies that a ballot can be returned to a voter if there is an improperly completed certificate or no certificate, is that right?
A Yes.
Q And also that a ballot may be returned if the voter returns a spoiled or damaged absentee ballot to the clerk?
A Yes.
Q So aside from those exceptions, in what circumstances prior to this law would clerks return absentee ballots to voters?
MR. MURPHY: Object to form.
A Well, my recollection was there was no restriction,

that if there was a concern about the ballot that the vote -- the ballot could be returned to the voter and reissued. There was a note made on the absentee ballot log to indicate that so that there was only one ballot that was finally accepted, but it was my recollection it was a pretty rare occurrence that people would be asking for their ballot back. But occasionally it was simply because the ballot had -- they had changed their mind.
One of the concerns I think in practice was that voters would cast an absentee ballot and then they'd show up at the polls and when they were told that their absentee ballot had been -- that they had voted an absentee ballot, if it hadn't been processed, the voter would say I would rather vote here and then the absentee ballot would be rejected because they already voted at the polls.
Q Let me ask you about a scenario to make sure I understand how the law would impact that. Say a voter casts an absentee ballot by mail and subsequently realizes that he overvoted, meaning that he voted for two people for the same election. Prior to this change in the law, that voter could have requested to have his or her ballot returned and then cast a new ballot, correct?

MR. MURPHY: Object to form.
A Yes. Again it didn't happen very often that I'm aware of, but if that question were raised to our office, we would tell the clerk if you can make it work, reissue the ballot.
Q And now that would not be permissible, right?
MR. MURPHY: Object to the form.
A The advice that the agency would give the clerk is, no, you cannot.
Q All right. Let me ask you about Exhibit 82. Once you've had a chance to look at that, can you tell me if you recognize that document?
A Okay.
Q What is that document?
A This is a summary of legislation that was enacted by the Legislature in the 2013-2014 legislative session that's relevant to the Government Accountability Board.
Q Okay. And this was prepared by the GAB staff again?
A Yes, it was, by Brian Bell, who at the time was an employee of the staff -- of the agency.
Q Okay. And do the contents of Exhibits 81 and 82 reflect the GAB's understanding of the provisions discussed in those documents?
A Yes, they were prepared to -- you know, by the agency

staff for the board and its customers so that there would be a readily available summary of what action had happened in that legislative session that impacted -- as it says, it's relevant to the GAB.
Q And are those documents meant to be comprehensive summaries of election law legislation during the sessions discussed?
A I'm not sure I would use the word comprehensive in the sense that they don't go into great detail as to the contents of the legislation. They're meant to capture all of the relevant legislation, so in that sense they would be comprehensive and they're meant to provide a good reference point so that if people need to dig deeper, they can find it. There's a reference to the actual act so it can be looked up in the originating bill.
Q Let me show you another document then which we'll mark as Exhibit 83.
(Exhibit 83 is marked for identification)
A Okay.
Q First I just want to verify, I believe we received this as three separate PDFs that were all in one email, so I just want to confirm. My understanding is that the third page is the first attachment to the first two pages and then the fourth and fifth pages

are the second attachment to those -- to the letter in the first two pages, is that correct?
A I don't know. I mean I'm familiar with the email, but I don't recall the order of -- oh, are you saying it's how it's referenced?
Q Yeah. So the document refers to -- let's see. The letter -- let me find the relevant part here.
A Yeah.
Q Do you see what I'm referring to?
A I see what you're referring to. So Page 3 is the first attachment.
Q Okay.
A And the second attachment would be Page 4.
Q And that continues onto Page 5, is that right?
A They refer to it as a third table on Page 5, which is different.
Q Okay.
A It's -- on Page 4 it's two specific calendar years, and on Page 6 it's all of the records in the statewide voter registration system.
Q Okay. So who would this information -- first of all, the letter says this was -- it indicates it was sent to the Legislature. Was it in fact sent to the Legislature?
A It was sent to members of the legislative standing

committees. It's addressed to the Senate Committee on Elections and Urban Affairs and the Assembly Committee on Campaigns and Elections.
I don't recall that it went specifically to all legislators. I know there was an email that Brian sent it, but so I don't remember if -- I'd have to see the original email to see.
Q Okay. And were all the materials contained in this document and sent collectively?
A Yes.
Q I have a couple questions on Page 4. And I'll focus on the table with the header 2012 Approved Voter Applications. My questions are going to be what some of these rows refer to under the heading application source.
A Okay.
Q First there's a row that says clerks office. Do you know what that refers to?
A That would reflect voter registration applications that are filed in the municipal clerk's office.
Q Okay. And would that include both registrations submitted during open registration and after open registration?
A No.
Q Okay. When were those submitted?

A There was -- it appears from the way the column is structured that that number does not include the ones that would show up in the 20 days before the election, which would show up under the row late registration. So these would just be clerks, the second row of them, the clerks office should reflect voter registration forms that were just turned into the clerk's office but not during this special time, and there was a distinction because they didn't need -- at the time they did not need proof of residence whereas late registration required proof of residence. That doesn't mean that the clerks accurately entered the data, but that would be the purpose of creating those designations.
Q Okay. And do you know, would that include say voter registration forms turned in by a voter registration drive that was not being conducted by an SRD?
A We would be advising clerks to treat those as a mail registration. That would be the advice the agency would give if they were just dropped off by someone because -- who was not a special registration deputy.
Q So this indicates that a little over nine percent in 2012 were -- of voter registration applications were received at clerks' offices. Does that seem like a high number to you for in-person registration

application during open registration?
A I don't know. I mean there's lots of reasons why people would fill out a registration form in the clerk's office. I mean it's a major point of contact. So, you know, without more looking at a longer period of time or talking to clerks what their experiences are, I really don't -- I mean the agency certainly is not in a position to do anything other than say that the numbers are the numbers.
Q The next row lists special registration deputy, and am I right in understanding that those are applications that were received by special registration deputies and then submitted to clerks?
A They were delivered to clerks by special registration deputies, yes. I mean the idea is to track the source of the application for the voter registration and so these would be those that the source for -- the originating source was a special registration deputy.
Q And the registrations received via mail, next row, those would all have to have been postmarked during the open registration period, correct?
A Yes.
Q So in 2012, those would not have been -- would not have had to have been accompanied by proof of

residence?
A That's right.
Q And the same would be true for the special registration deputy registrations in 2012, right?
A That's right, no proof of residence.
Q All right. And the next column or row, rather, has late registration?
A Yes.
Q What type of registrations would those have been?
A Late registration, it refers -- it's a statutory provision, but it's for those individuals who register in the clerk's office after the close of registration.
Q Okay. So those registrations would have had to have been in person at the clerk's office?
A That's right.
Q So the only difference between those and the Election Day registrations is that the late registrations would have taken place prior to Election Day whereas the Election Day registrations would have taken place on Election Day, is that right?
A They would have taken place in that window of 20 days before the election and -- I'm trying to think if in 2012 we had -- I don't recall whether or not we ended on the Friday before the election or if it was still

the Monday before the election, but it would have been during that period of time and the statutes -- there's a particular statutory provision that authorizes that and it's titled Late Registration.
Q And I assume the terms for the 2010 chart are used the same way as the terms for the 2012 chart?
A Yes.
Q And then on the final page of this document, again the terms are being used the same way that we've been discussing, right?
A That's right.
Q And with the chart on the final page of the document, this is looking at all of the active voters in the SVRS, is that right?
A The number appears to reflect the active voters in the SVRS. I don't know if there's an explanation, but that number is consistent with what I -- what we would see at a given point in time as opposed to the number of actual records.
Q Okay. So this -- okay. I'd like to ask you some questions about voter registration provisions. This first document was previously marked as Kennedy 10.
A Okay.
Q Do you recall reviewing this document previously?
A I do.

Q I'd like to ask you about the chart on the first page of the document.
A Okay.
Q Which is about two-thirds of the way down, do you see that?
A Yes, it's the only chart on the first page.
Q Can you explain what that chart is showing?
A The chart shows a record of voters whose proof of residence was provided by corroborators and so for the first column for each of those three elections, those are the number of individuals who for their proof of residence offered -- had someone vouch for them as a corroborator.

The second column says, for those individuals, how many of them had a driver's license record in our statewide voter registration system. The third column is how many had a Social Security number in the voter registration system and some could have nothing and some could have both.
Q Do you know why your staff was assessing the number of people who used corroboration who had driver's licenses issued by the state?
A I think it was a reflection of the questions that had come in from the Milwaukee Journal Sentinel, and I would have to go back and look, but I think one of

the concerns really was, well, people who need a witness on Election Day might actually have an identifying document, but it's not current enough to use as proof of residence because it doesn't have -- because it's not current on the day of the election. It's an expired driver's license or it has the wrong address on it.
Q And these numbers indicate that that's with respect to driver's licenses, that's correct for a large percentage of people who use corroboration, is that right?
A It shows that a large number of them who use corroboration had a driver's license.
Q And those are Wisconsin driver's licenses specifically, right?
MR. MURPHY: Object to form.
A I don't know. But generally we discourage clerks from using out-of-state licenses because there's nothing that they can use them for.
Q And why were Social Security -- why were you analyzing the number of Social Security -- let me rephrase that -- the number of people for whom you had Social Security number information?
A I don't know why specifically that was done. I think it was just we had the information, so we included

it. And I think looking at those numbers, there's a number of reasons why people want to know as much information about the people who used a corroborator for their proof of residence, and so it would just be an added piece of information that might have value in the legislative discussion.
Q Can Social Security numbers be used in connection with voter registration?
MR. MURPHY: Object to form.
A If a voter does not have a driver's license, they are required to give the last four digits of their Social Security number and if they have neither, they have to indicate that they have neither.
Q Okay. If an individual were to provide the last four of a Social Security number when he or she registered with a corroborator, for individuals for whom you had the Social Security number on file, you could have done a cross-check, is that right, to determine if they provided the accurate final four Social Security number digits?
A We could do that, yes.
Q Do you know if that was done or not?
A Well, you know, it may be that the source of that Social Security number was actually the registration form that the voter filled out. I mean when you fill

out a voter registration form, you list some data and required fields are driver's license number. If not a driver's license number, then the last four digits of the Social Security number. So that information would be put into the system.
Q Were these statistics pulled out of the SVRS?
A They were.
Q So if an individual had -- who registered say in 2006 had become inactive, would his or her registration be reflected in this chart?
A I'm not sure what they were pulling from in terms of active. My sense is we were looking at active voters on this because inactive voters, the vast majority of those are people who have passed away or who have canceled their registration because they've moved to another state.
You know, in the previous document, you asked me about the number at the top, which is 3.3 million odd numbers, which is generally about where our active numbers rest, but the number of records in that system is significantly more on that, and so in trying to analyze data, we would be looking at those people who are currently active. I mean people also would be inactive if they were convicted of a felony, for example, on that. But people could register --

have to amend their registration because they move need a corroborator and we would probably have some data in the system on that they would have been an active voter but then their record got updated.
Q Okay. So if this data was pulled at the beginning of 2011, the data for some of the prior elections, like the 2006 election, would likely understate the number of people who registered using corroboration, right?
A Well, the system would be -- anybody who was registered before 2006, we would not have been collecting that data.
Q Right. But what I mean is there were likely some voters who registered in 2006 through corroboration who were no longer in the system when this data was pulled?
A I don't know for sure.
Q Would you say that it's likely?
A I don't know for sure.
Q I'll mark this next one as Exhibit 84.
(Exhibit 84 is marked for identification)
Q All right. And these are a series of documents relating to an investigation that the State Elections Board conducted regarding whether high schools were offering voter registration, is that right?
A That's right.

Q Let me first direct you to what I believe is the ninth page of the document that has the number 23 at the bottom, and it's a memorandum dated May 3 of 1979.
A Yes.
Q Who is Gerald Ferwerda?
A Mr. Ferwerda was the executive director of the State Elections Board at the time of this memorandum. Actually they called it the executive secretary. So he was the agency head of the Elections Board.
Q Was he your predecessor?
A He was my predecessor. At the time he was my boss.
Q All right. And then let me direct your attention to a few pages after that to the page with the number 26 on the bottom. And let me ask you to read the paragraph at the bottom of that page beginning with although not one.
A Do you want me to read it out loud or to myself?
Q I'm sorry. You can read it to yourself and then I will ask you a couple of questions.
A Okay.
Q Thank you. Okay. Now, in this paragraph, Mr. Ferwerda indicates that he is summarizing data to determine the productivity of the high school voter registration program.

A Yes.
Q And he then reports some statistics about the percentage of high school seniors who are registered, is that right?
A Yes.
Q Do you know, are the statistics he's reporting, are those total number of high school seniors who are registered, or are they the percentages of high school seniors who registered at high school?
A I don't know. It appears that he was drawing the numbers from the people who registered at high school because that's where he was at when he was looking at this. It appears to be that number.
Q Okay. So your understanding is that he's indicating that for 1976 to '77, 5.8 percent of high school seniors registered at their high school, is that right?
A That's right.
Q And similarly, the next period, 1977 to '78, it would be 4.3 percent of high school seniors registered at their high school?
A Yes.
Q And for 1978 to '79, it was 2.9 percent of high school seniors did so, is that right?
A That's what -- that would really be the only set of

numbers that he would have access to, so yes.
Q Okay. And did the Elections Board and then the GAB keep statistics after that point in time about the number of -- or the percentage of high school seniors who registered at high school?
A This is the only study that was done before -- that specifically reach out for this activity. There was no statewide voter registration database before 2006. So the kind of data we looked at in prior exhibits that shows the source of registrations would not appear.
Q Okay. And Mr. Ferwerda indicates that in the three-year period he analyzed, just under 5,700 high school students registered at their high school, is that right?
A That's right.
Q Now, at the time that he was doing this analysis, municipalities with 5,000 or fewer voters did not have voter registration, right?
A They were not required to have it. Some of them did, but most of them did not.
Q And do you know if his numbers, the percentage numbers are a percentage of all high school students in the state or just those in cities with registration?

A It appears that those numbers were all high school students in the state.
Q And do you know what --
A All high school seniors in the state.
Q Right. And do you know at this time approximately what percentage of Wisconsin residents were subject to the registration requirements?
A At that time I don't know. I know we had a pretty good handle on it in 2006 when we were building the statewide registration system.
Q And as of 2006, do you know what percentage were not subject to voter registration?
A In 2006, the numbers that we were looking at in assessing voter registration, we knew that there were about 1,500 municipalities of the 1,851 at the time who did not have voter registration, but 76 percent of the population were in areas that had voter registration.
Q And from the late 1970s to 2006, there was population growth in Wisconsin, correct?
A Yes.
Q I'll mark this document as Exhibit 85.
(Exhibit 85 is marked for identification)
Q And you're welcome to look at it as much as you'd like. I'm going to ask you about the first two pages

of the document.
A Okay.
Q First is it your understanding that this document involves email exchanges among the GAB staff and the clerk for the City of Brookfield?
A Yes, at least the first two pages.
Q All right. And this relates to difficulty that the clerk in Brookfield was having registering voters at nursing homes --
MR. MURPHY: Object to form.
Q -- because of the proof of residence requirement, is that correct?
A Well, her specific question is not there, but I think reading it in context, she's asking how to address -- better ways to address it. You know, where you've directed it, it seems late in the conversation. It simply points out -- and I haven't looked at the rest of the document. I've only looked at Page 2 and 1.
It's clear that Mr. Haas was responding to the Brookfield City Clerk and had a prior conversation and I don't know if it was by email or by phone and he was simply adding here is some more information that we didn't talk about.
Q Okay. About halfway through the second page, Mr. Haas is explaining that one of the options that

municipal clerks had available for ensuring that nursing home residents had proof of residence would be to send a letter from the clerk to the resident of the nursing home because that letter would then be a government document with the person's address, right?
A Well, that's not -- you wouldn't get that from that particular paragraph, but from the full context, you would know it was talking about nursing home voters.
Q Okay. And in response to that, at the bottom of the first page -- actually is Kelly Michaels Mr. Michaels or Ms. Michaels?
A Ms.
Q Okay. She indicates that she has concerns about providing proof of residence for the purpose of giving voters acceptable proof of residence, is that right?
A That's right.
Q And then she writes, "I'm staying away from that," is that right?
A That's what it says.
Q Do you know whether other municipal clerks had concerns about this procedure?
A I don't know for sure on that, no.
Q Based on your experience, the GAB's experience in administering elections, is this method of proving

residence more secure than the method that was in place before documentary proof of residence was required during the open registration period?
A I'm not sure exactly what you're driving at here. I mean it's the same proof of residence requirement for late registration. It's now been extended to early -- to all registration forms. So why it would be more secure in one situation than another, I'm not quite sure why you're asking that.
Q Well, previously voters who registered during open registration did not -- were not required to submit documentary proof of residence, right?
MR. MURPHY: Object to form.
A They were not required to provide an identifying document or a copy of one, no.
Q And now they are, right?
MR. MURPHY: Object to form.
A That's right.
THE WITNESS: Sorry.
Q And some voters since the change in the law have had difficulty obtaining a form of proof of residence with which they could register, right?
MR. MURPHY: Object to form.
A I think some voters always have difficulty finding a proof of residence. It doesn't matter whether it was

later or before. There are just certain types of documents that are required and either you have them or you don't.
Q Prior to the change in the law, though, if a voter registered during open registration, the voter didn't need to have proof of residence, right?
A They did not need to have it.
Q But now voters, although they're required to have documentary proof of residence, can use a letter sent to them from the municipal clerk informing them that their registration was not processed, for example, as proof of residence, is that right?
MR. MURPHY: Object to form.
A Well, there would have to be a different registration. I mean I don't think it quite works -- when they register to vote, they have to have the documentary proof of residence. If they don't have it, they're going to be informed that they don't. If they wanted to re-register and use that letter, the answer would be yes.
Q Okay.
A But the first time through, that would not be the case.
Q Under prior law, the registration would have just been processed the first time it was sent in if it

were sent during open registration, right?
MR. MURPHY: Object to form.
A That's one of the steps. They also receive a confirmation mailing and if that mailing comes back undeliverable, their registration is inactivated.
Q Right. And that hasn't changed, right?
A That has not changed.
Q This one we'll mark as Exhibit 86.
(Exhibit 86 is marked for identification)
A Okay.
Q Do you recognize that document?
A I do.
Q What is that?
A It is a memorandum that was prepared by the elections division administrator at the time or on his behalf, Nat Robinson, and it was about proof of residence for college or university students.
Q And that was sent to -- where it says interested parties, do you see that?
A I see that.
Q Do you know who it was sent to in particular?
A I'm not sure if it was -- who it was actually distributed to.
Q Do the contents of that letter accurately reflect the GAB's understanding as of the time it was sent?

A It reflects the advice the GAB staff was providing to local election officials and interested parties, most likely college students, university students and university administrators.
Q Has the advice changed since that time?
A I don't believe that it has.
Q And would you agree that registration is particularly confusing for student voters?
MR. MURPHY: Object to form.
A I'm not sure that the board has taken a position on that.
Q Does the GAB staff have a view on that?
A I'm not sure that the GAB staff -- I mean they have practices. I'm not sure that institutionally we would have a position on that.
Q Let me show you Exhibit 87.
(Exhibit 87 is marked for identification)
A Okay.
Q Now, this is a memorandum that Nat Robinson sent again to interested parties, is that right?
A That's right.
Q And do you have the same understanding of interested parties here that you did with the last document?
A Right. It was a general information document that we prepared whose primary audience would probably end up

being university and college students and people working with them in voter registration settings, which would include administrators.
Q Okay. And the beginning of this memo indicates that the GAB has received a number of inquiries from students and municipal clerks and university and college representatives regarding a proper location for college students to cast votes. Do you see that?
A Yes.
Q And is that correct?
A Yes.
Q And the memorandum addressing that issue, this memorandum is approximately five and a half single spaced pages, is that right?
A Yes.
Q Do you know why the memorandum was that length?
A Because we know that there are unique circumstances that apply to students in terms of their residence, in terms of the types of documents that they have accessible. There's a number of different groups that generate more sets of questions on this and so as a result even the statutes have specific provisions that deal just with students and so the idea was to gather all that information in place so it's an easy reference.

Q All right. Let me show you a document we'll mark as Exhibit 88.
(Exhibit 88 is marked for identification)
A Okay.
Q This is an email from an individual to the GAB help desk, is that right?
A That's right.
Q And is that -- well, is there a publicly available place for citizens to submit comments to the GAB?
A Yes.
Q Okay. And how do they do that?
A They can -- well, obviously they can write to our address, but most often people will go online and there's a place where they can send comments. There's a specific place about complaints. I don't know if this originated from a complaint. Probably not because complaints go -- people who fill out an online complaint form, it goes to our public information officer. But people would see that they could send a comment to the agency and where it would go to would be the agency help desk.
Q Okay. And in this email, is it your understanding that the voter was complaining that she was unable to cast a ballot, as was her husband, due to the residency rules?

MR. MURPHY: Object to form.
A Well, she describes the situation and she did not know what the residency rules were, so she did not have enough time when she showed up at the polls on Election Day to get back to the location where she could vote and chose not to.
Q And that relates to my next question actually. Do you receive -- this complaint wasn't unique with respect to the residency rules -- let me rephrase that.
Is it fair to say that you received other communications from voters who had difficulties voting because of the residency rules?
A I really can't speak to that. I don't know for sure.
Q Do you know whether -- well, does the GAB have an understanding as to the degree to which voters are familiar with the residency rules for voting in Wisconsin?
A We don't have an objective evaluation of that. I mean we know that we try to design materials to provide information to voters about the requirements, including changes that went into effect during the -- as they go into effect.
Q In your experience, are most voters, by your experience, I mean the GAB's experience, are most

voters familiar with the residency rules?
MR. MURPHY: Object to form.
A I'm not sure that the agency looks at things in that particular development. I mean they look at their responsibility is to make as much information available in forms that people can understand. Residency would be one of those issues because it's important not only for are you eligible to vote but where you vote.
So we design materials -- particularly we have the My Vote Wisconsin so people can see are you currently registered, where do you vote, and it does provide background information on the basic qualifications to vote. The website has I know a very specific, you know, section just for voters, and it does talk about the qualifications. So that's part of our job is to make sure that information is available, and I think we tailor it for all the components of voting, not just residency.
Q Has there been any public information campaign conducted by the GAB or anyone else to your knowledge regarding the change to the residency rules?
A By public information campaign, the only thing that I would say that we did was change our forward facing website, looked at our materials, discussed changes

37

in various settings, but we did not engage in any kind of media outreach.
You know, obviously there were media interviews that were done by myself and other members of the staff. We occasionally are called upon to speak at groups, and these are the kind of things that we would talk about, but there was no proactive taking out media advertising.
Q According to this email, the voter had tears when she was informed that she was not going to be able to vote at her new residence, is that right?
MR. MURPHY: Object to form.
A The email says she was in tears.
Q In your experience, are voters often upset when they learn that they're not able to vote?
A Well, this person commented that part of what it appears maybe driving this was how rude the poll worker was to her. But I think in my experience if a person can't vote, if they're upset and that if we get those kind of phone calls, it's because they took the time to express their concerns or that kind of contact.
Q I'm going to mark three documents which I believe go together, but I'd like to ask you about that. So this will be Kennedy 89, this will be 90, and this

38

will be 91.
(Exhibits 89 - 91 are marked for identification)
Q I guess I'll first ask you to review 89 if you haven't already.
A Okay.
Q So 89 contains a couple emails involving GAB staff, is that right?
A That's right.
Q And these emails were sent on August 7th of 2012, is that right?
A Yes.
Q And the second page of Exhibit 89 indicates that there are two attachments to that email?
A Yes.
Q And is it your understanding that -- I may have done these out of order -- that 91 is the first attachment identified there?
A I don't know if it's the first attachment. It makes reference to an email from -- again I don't know what the attachment is specifically, but the last email in the string, which is the first on the page, has the thank you for your kind words reference and it's tied to the Winnebago County Clerk, Sue Ertmer, but I don't have any reason to know if that's the actual attachment there.

39

Q Okay. And the second attachment, is it your understanding that Exhibit 90 is that attachment?
A I could infer that that's what it is based on the date, but again I don't know for sure.
Q Okay. And if these documents were produced consecutively in this case, would that inform your understanding as to whether --
A It would make sense.
Q It would make sense that they were attachments?
A Yes.
Q What I'd like to ask you about is the -- near the top of Exhibit -- I forget how I marked them, the top of Exhibit 91 -- no, I'm sorry, 90, do you see where the writer refers to the residency rule?
A Yes.
Q And indicates that, "The FEC states 10 days and at least half your county clerks post this as the law." Do you see that?
A Yes.
Q All right. Now, at this point in time the residency requirement was 28 days, right?
MR. MURPHY: Object to form.
A In August of 2012, which was when this was dated, yes.
Q Do you know whether it's correct that the FEC at that

40

time indicated that the residency requirement was 10 days?

MR. MURPHY: Object to form.

A I do not know what the FEC states. He may have been referring to a document that's prepared by the FEC, but I don't know if he had a conversation with the federal -- FEC I take to be the Federal Election Commission in Washington, DC.

Q And do you know whether county clerks had information on their websites at this time indicating that the residency period was 10 days?

A We know that there were a number of county clerks who had old information up and that we made an effort to communicate that to them, that there were -- you know, most government websites have a lot of information. When the law changes, they don't always catch everything, and that was one of the issues that we were dealing with.

Q Do you know whether the Federal Election Commission also had old information up?

A I don't know for sure. I wouldn't be surprised.

Q I'll mark this one as 92.

(Exhibit 92 is marked for identification)

A Okay.

Q This document is an email exchange between Lila Walsh

and the clerk from Menasha, is that right?

A For the Town of Menasha, yes.

Q Who is Ms. Walsh?

A Lila Walsh was one of our voter registration specialists who worked with municipal clerks to make sure that their voter registration records were correct and helped train them on using the statewide voter registration system.

Q Okay. On the bottom of the second page of this document, there's an email which she sent explaining that the Town of Menasha had POR required voter records that should be reviewed, do you see that?

A Yes.

Q And does POR required voter records mean that registrations were entered into the system that were not accompanied by proof of registration when they were submitted?

A No. One of the confusing things was that when the Help America Vote Act was passed and Wisconsin law incorporated this provision, an individual who registered to vote by mail who had never been registered in the State of Wisconsin was required to provide proof of residence in order to vote, and that was the one -- one of the few cases where they would get a provisional ballot if they showed up.

So the poll list was marked for those unique individuals, a very small number of people, POR required, but that designation in the voter registration system changed on how we treat them. That's what Lila was following up here is that if you had someone who had registered to vote and had not provided their proof of residence on the system, you had to take special steps to deal with those particular cases because it was now everybody had to provide proof of residence. So we weren't going to have that designation in there.

So what she was doing, and you can see it goes on for several pages and lists the individuals, providing them with specific instructions on how to deal with a unique group of people that were in a different situation prior to the change of the law.

Q Okay. And in response to that email, the clerk from Menasha noted that the GAB website did not appear to be updated with the new law requiring proof of registration for everyone registering, is that right?

A That's right.

Q And this was approximately a month and a half after the requirement was in effect, is that right?

A That's right.

Q And in response to that email, Ms. Walsh wrote that

there's still a lot of incorrect information on our website and emphasized the word -- the phrase a lot, is that right?

A Well, she put it in italics.

Q Okay. But otherwise that's right?

A Yes.

Q And is that your understanding as well?

A My understanding is we spent a lot of time trying to identify all the documents that we had developed over the course of years that needed to be changed.

Q And that's what she's referring to in Paragraph 3 of that same email, right?

MR. MURPHY: Object to form.

A She's referring to the fact that, yes, we have to go through and identify everything that's on our website because there's a lot of information there.

Q And so every time that there's a change made to the law, the elections laws, that means that GAB had to go through and update all of its forms, is that right?

A That's right.

Q And the same would be true for municipal and county clerks?

MR. MURPHY: Object to form.

A It would be true, although they would also be relying

pretty heavily on our information. We've developed most of the forms on that. If they synthesized information and created their own form, the answer would be yes.
Q And as the number of provisions that are passed increases, does that process become increasingly difficult?
A It's much more -- it takes a lot to do it and as evidenced by the fact that it took us quite a bit of time to catch up to it.
Q All right. This will be Exhibit 93.
(Exhibit 93 is marked for identification)
A Okay.
Q Now, this document is an email exchange involving the clerk from the City of Beloit and David Buerger from the GAB, is that right?
A That's right.
Q And this relates to difficulties that the City of Beloit was having getting absentee ballots to voters who were temporarily overseas?
MR. MURPHY: Object to form.
A Yes.
Q And the GAB has received other communications about voters who were temporarily overseas who were unable to get ballots in time for them to be cast, is that

right?
A Yes.
Q And on the second page near the top, Mr. Buerger in the last sentence of this email suggests that Beloit may even want to consider an alternative form of shipping that might be faster like FedEx, is that right?
A That's right.
Q And in response to that, the clerk indicates that she looked into that option, is that right?
A That's right.
Q And that it would cost between 100 and $130 to send the ballots?
A That's what she says.
Q And Mr. Buerger agreed that that's a prohibitively high cost, is that right?
A That's what he says.
Q And is that the GAB's view?
A No. I think you can't extrapolate that. I think that's one individual commenting on the set of figures. I can't say that the GAB has taken a view on the cost of that. And in fact, under certain federal requirements, we would have to require that to be done for military and overseas voters.
That's not an unusual requirement that the

Department of Justice puts on, states where someone is late getting -- municipalities getting that out that they would say you have to send it by express mail. They don't necessarily say FedEx, but they say express mail service.
Q And do you know how much it would have cost the Beloit clerk to email that ballot to someone?
A I don't know. But it's safe to assume that email was -- assuming you're only looking at the act of typing in the address and making the attachment, that's going to be whatever -- that's part of someone's daily duties. Whether you allocate that out, it's certainly not -- it's usually not a cost that's going to even be broken out.
Q So the email would have been about 100 to $130 cheaper than the FedEx would have been?
A I don't know what the allocation would have been for the city clerk, who gets paid a lot of money.
Q Sure. The clerk would have had to allocate time to FedEx the ballot, right?
A Sure.
Q And an email would have arrived virtually immediately?
A All the systems working as they should.
Q But they were -- the clerk was not permitted to email

this ballot, right?
A That's right.
Q This is Exhibit 94.
(Exhibit 94 is marked for identification)
Q First is it your understanding that this is an email that the GAB received by virtue of being a subscriber to the Clerk List?
A Yes.
Q And this is an email from the clerk from Mount Pleasant indicating that Mount Pleasant was swamped with in-person absentee voters?
A That's right.
Q Is it your understanding that Mount Pleasant was swamped with absentee -- in-person absentee voters?
A This is my only indication of it.
Q Did the GAB receive other communications about municipalities having lines or large numbers of voters for in-person absentee voting?
A I'm sure that we did. I think we were all aware that there was a large number of people who were voting in-person absentee. I mean it was something that was talked about in preparing for the elections. It obviously made the clerks list. I don't know what the responses were to this.
Q And this was in relation to the 2014 general

election, right?
A Yes.
Q Okay. So this type of comment was not unique at the time, is that fair?
A I'm sure there were others. I don't know if they all had the same wry sense of humor about sending us a bill and putting a smiley face on it.
Q But with respect to lines for in-person absentee voting and being swamped with voters, this comment is not unique, right?
A Well, lines. Whether people used the term swamped, there's nothing equivalent. I mean I think there was media coverage about the fact that there was long lines in many places. I'm sure there were other comments from clerks as well. Again I did not see what the clerk response to her comment was.
Q All right. This will be 95.
(Exhibit 95 is marked for identification)
A Okay.
Q All right. Now, this is an email that was sent to the GAB help desk in October of 2014, is that right?
A Yes.
Q And the emailer indicates that her daughter will be out of town on Election Day and during the in-person absentee voting period, is that right?

49

A That's right.
Q And again would it be accurate to say that the GAB has received other communications about individuals who will be out of town during the period available for in-person voting?
A Yes.
Q This emailer also indicates that her daughter is reluctant to send her ballot through the email because she's had her identity stolen twice, is that right?
A No.
MR. MURPHY: Object to form.
A The answer is no. It appears she's talking about registration, not about the ballot. Because it's the identification that she's concerned about. She wants to show her ID in order to register. That's the way I read this document.
Q Okay. Well, at this time the voter ID law was still --
A I understand that, but I'm just reading the ID -- you know, to register to vote, she needed to show an identifying document for proof of residence and that's the only reason I can think of why she would need an ID and so rather than mail in registration, which would have been permitted back then at that

50

time but would have required an identifying document for proof of residence.
Q She also at that time would have been under the understanding that her -- well, the law at the time was that she was also required to submit an ID, a form of voter ID to cast a mail absentee ballot, correct?
MR. MURPHY: Object to form.
A That's right, because the Seventh Circuit had reinstated the voter ID law during that time period.
Q Have you, meaning the GAB, encountered other voters who were concerned about identity theft?
A That issue was raised, yes.
Q And it was raised specifically in connection with the requirement that copies of IDs be included with absentee voting by mail, right?
A I think it was raised in a number of contexts, that's why.
Q Does the GAB have a view on how to advise voters in response to questions like this?
A I can't say that we have a view. I mean this is the kind of question that our staff will get, and we will try to work to problem solve it, walk them through the various options that they have trying to address their concerns. You know, it's kind of like an

51

individual case that you get.
Q This is Kennedy 96.
MR. MURPHY: Is this GAB 96?
MR. KAUL: You know, I have that -- that's because how they were written, but that's because we've been using that format before. They're all consecutively numbered. So I frankly think we could just call them by the number.
MR. MURPHY: That's fine.
MR. KAUL: I'll try to use that convention going forward.
(Exhibit 96 is marked for identification)
A Okay.
Q Now, this is an email exchange between Neil Albrecht and some members of the GAB staff, is that right?
A That's right.
Q And in the middle of the second page, Ross Hein sent some data to Mr. Albrecht about in-person -- well, about absentee voting generally and in-person absentee voting in particular in the City of Delafield, right?
A He gave him two numbers, right.
Q And Mr. Albrecht responded with some analysis of that data and some other data?

52

A That's right.
Q Does the data in Mr. Albrecht's email appear to be correct to you?
A I'm assuming that -- again I don't know for sure. I'd have to look at that information. I mean he's -- the City of Delafield is the information we gave him.
I would think he has a handle on how many absentee ballots he had. I mean he was simply dividing that over a certain number of hours, which I'm not sure of, but it would probably have to reflect the number of hours that were available for in-person absentee voting.
Q And on the hours, I'll note he says here assuming 90 hours, do you see that?
A Yes.
Q And the legislation was ultimately modified so the total was 110 hours, is that right?
A I don't recall.
Q The period for in-person absentee voting is from 8 a.m. to 7 p.m., right?
A It is now, yeah. I don't remember what the original proposal was.
Q Okay.
A But I mean this was all taking place during that discussion.

53

Q So currently it's 110 hours rather than the 90 he assumed, though, right?
A Yes.
Q Okay. So that would have some impact on the number of voters per minutes or seconds, correct?
A That's right.
Q Do you know if the numbers for the in-person absentee voters in Big Bend appear approximately correct?
A I don't know.
Q This will be Exhibit 97.
(Exhibit 97 is marked for identification)
A Okay.
Q Do you recognize this document?
A Yes.
Q What is this?
A It appears to be the veto message coming from the governor with respect to Senate Bill 324, which became 2013 Wisconsin Act 146.
Q And you say it appears to be. To the best of your knowledge, was this a true and accurate copy of that?
A Yes.
Q Did you, meaning anyone on behalf of the GAB, have any communications with the Governor's Office regarding this bill?
A Yes.

54

Q What, if anything, do you recall about those communications?
A We encouraged them to strike the 45 total hour limitation on the bill. I'm not sure what else we might have done on this, but because it was an appropriations bill, we thought that there could be some changes that would make it easier to administer.
Q And what, if any, way in your experience did this bill ensure the integrity of the voting process?
A I'm not sure that the GAB can speak to that.
Q The GAB must have some views on what would help ensure the integrity of the voting process, correct?
A But you asked about this in particular, and this is a policy decision on setting hours. The board doesn't normally go out and take strong positions on legislation in terms of integrity. They look at administrative concerns primarily.
MR. MURPHY: You want a break?
THE WITNESS: I'm okay.
MR. KAUL: I think we've probably got about 15 minutes.
THE VIDEOGRAPHER: Fifteen minutes.
Q I'm happy to take one whenever you want.
A Yeah, no.
Q I'm also happy to keep moving if that's easier. I'd

55

like to switch gears and ask you about election observers. This will be 98.
(Exhibit 98 is marked for identification)
A Okay.
Q All right. Now, this email string involves a constituent email sent to Representative Hutton's office which was then forwarded to the GAB, is that right?
A That's right.
Q And the constituent's email makes reference to the absentee voting process at a residential facility, Harwood, being private, is that right?
A That's what they say, yes.
Q And Mr. Haas ultimately responded to the legislative staff member who forwarded this communication, right?
A Yes.
Q All right. And I'd like to direct you to the second paragraph of his email. He writes that, "The Legislature has mandated that election observers must be allowed between three and eight feet of the location of where electors register and sign in at polling locations." Do you see that?
A Yes.
Q Does that rule apply when the special voting deputy process is being conducted at nursing homes?

56

A It does.
Q And have others raised concerns about privacy relating to the location of the observers?
A They have.
Q The line we just discussed also mentions three to eight feet of the location where an elector is registering and signing in at polling locations?
A Yes.
Q Now, am I correct in understanding that some locations, some polling places, those two processes take place at the same location?
MR. MURPHY: Object to form.
Q Those processes meaning signing in and registering.
A Your question is if they take place at the same place in the polling place?
Q Exactly.
A I don't recall that I have seen it, but it would make sense in smaller municipalities. Most polling places I've been in, if you need to register to vote, you go to a separate location.
Q Okay. And observers are required to be within three to eight feet of each of those two locations, correct?
A That's right.
Q So there are essentially two observer areas in

polling locations unless there's an overlap between the two?
A There could be additional observing areas as well. I mean if a voter gets challenged, the observer can be within three to eight feet of wherever that location is. If an observer wants to observe ballots being deposited in a ballot box, they could be positioned in that area. But generally they focus their attention on the sign-in or the registration process.
Q Okay. This will be Exhibit 99.
(Exhibit 99 is marked for identification)
A Okay.
Q All right. This document is an email exchange among members of the GAB staff, right?
A That's right.
Q And at the top of the first page, Mr. Magney says, "Here's the Romney version, which is slightly different." Do you see that?
A Yes.
Q And at the very end of this exchange, there's an image indicating that there was a PDF attachment, do you see that?
A Yes.
Q Let me mark Exhibit 101.
MR. MURPHY: 100.

Q I'm sorry, 100.
(Exhibit 100 is marked for identification)
Q And I'm not going to ask you specific questions about the content of that, but does that appear to you to be the attachment referred to?
A Yes.
Q Then going back to 99, let me first direct your attention to Page 4.
A And?
Q There's an email from Shane Falk.
A Dated October 30th at 9:29?
Q Yes.
A Okay.
Q First he writes, "This is pretty much the same stuff as from the RPW training guide that I reviewed." Do you see that?
A Yes.
Q And that's a reference to the Republican Party of Wisconsin training guide?
A Yes. The reference to RPW training guide is, yes.
Q Okay. And then the next sentence he says, "Remember all the issues we have had with We're Watching Wisconsin's training guides for observers."
A Yes.
Q And he says, "They were even more problematic"?

A Yes.
Q Do you know what he means by that?
A He's referring to observer training guides that were put on by that group we had looked at where we were very concerned that they had inaccuracies in them.
Q Do you recall what types of inaccuracies they had?
A I don't recall.
Q Is your recollection consistent with Mr. Falk's view that they were more severe than the ones in Exhibit 100?
A Well, he's -- yes. My recollection is consistent with his comment.
Q And then let me direct you to Page 1. There's another email from Mr. Falk?
A Um-hum.
Q In the second to third line of that email, he refers to problems you've seen in the past, particularly with Ardis. Do you see that?
A I see that.
Q And that's a reference to Ardis Cerny, is that right?
A That's right.
Q All right. In the next paragraph, he indicates that this can be handled at the polls in his opinion, do you see that?
A Yes.

Q And that means that mistakes that are made by observers at the polls based on any guidance being reviewed here can be dealt with at the polls?
MR. MURPHY: Object to form.
A What is being said there is that the best use of our resources is to make sure that we're training the poll workers to address how to handle observers rather than trying to correct the training that goes to observers.
Q And in the next sentence, he refers to the biggest issue being the driver's license numbers for suspended, rejected and revoked plus the expiration date of the driver's licenses. Do you see that?
A Yes.
Q Do you know what he's referring to there?
A I don't.
MR. KAUL: All right. Why don't we go off the record.
THE VIDEOGRAPHER: The time is 11:13 a.m. This concludes Media No. 1 in the deposition of the 30(b)(6) testimony.
(Short recess is taken)
THE VIDEOGRAPHER: The time is 11:37 a.m. We are on the record. This marks the beginning of Media No. 2 of the Government

Accountability Board 30(b)(6) deposition testimony given by Mr. Kevin J. Kennedy.
(Exhibit 101 is marked for identification)
Q I just handed you an exhibit that's marked as Exhibit 101. I just have a few quick questions about this document.
A Sure.
Q First this is an email exchange between GAB staff and John Schmieder, is that right?
A I believe that's how it's pronounced, yeah.
Q And he is the political director for the Republican Party of Wisconsin?
MR. MURPHY: Object to form.
A That's how he identifies himself in this email.
Q And he had sent the GAB slides from a PowerPoint for a presentation to election observers, is that right?
A Yes.
Q And Nate Judnic was responding with some suggestions about potential improvements for the slide, is that correct?
A That's right.
Q In the middle of Page 1, in a section beginning with Slide 8, observer rules, Mr. Judnic notes that the slide advised observers that they can sign in as either a concerned citizen or a Republican volunteer.

Do you see that?
A Yes.
Q Did you review these slides?
A I did.
Q Is it your understanding that that's an accurate characterization of the slide?
MR. MURPHY: Object to form.
A I don't recall, but you know, he provided a detailed response, so --
Q Did you ever ask the Republican Party why they were encouraging election observers to sign in as concerned citizens?
A No.
Q And this method of signing in had been used before by the Republican Party of Wisconsin, right?
MR. MURPHY: Object to form.
A I don't know.
Q Do you know whether the group from Waukesha that has had I think a couple different names, including We're Watching Wisconsin, encouraged their observers to sign in as concerned citizens?
A I think they did.
Q And many of the complaints that you've received regarding elections observers have involved people who signed in as concerned citizens, correct?

A I don't recall.
Q That's all I have on that one. This will be Exhibit 102.
(Exhibit 102 is marked for identification)
A Okay.
Q Do you recognize this document?
A I do.
Q What is this?
A This is my testimony that was given before a joint legislative hearing on October 13th, 2015.
Q All right. And this testimony related to the bill that eliminated the GAB, is that right?
A Both versions -- both the Assembly version and the Senate version, yes.
Q Okay. And let me direct your attention to the top of Page 2. Would you read that first paragraph into the record?
A "The timing of the legislation is all wrong as we embark on a presidential election year similar to the 2000 election cycle and implement the voter identification law. An evenly balanced commission of partisans is likely going to ensure gridlock on crucial administrative and enforcement issues during the 2016 election cycle and for years to come."
Q Okay. And when you say that the timing of the

legislation is all wrong, what did you mean by that?
MR. MURPHY: Object to vague as to whether you're asking GAB or Mr. Kennedy.
Q Well, let me go back a step actually. Was your testimony here provided on behalf of the GAB?
A I don't think it's fair to say that. My opening sentence says, "The Government Accountability Board has not met to discuss taking a position on this legislation. I am appearing here in my capacity as the director and general counsel for the board."
And while I speak on behalf of the board, I had no clearance for any of these comments.
Q Okay. Do you as the director and general counsel for the board frequently speak on behalf of the board?
A I do.
Q And typically when your agency provides testimony at the Legislature, you're the person who testifies, right?
A That's right.
Q So did anybody else from the GAB provide testimony regarding this issue?
A The board chair, Judge Nichol, did.
Q And were his comments about the timing of the legislation similar?
A I don't recall that he addressed that at all.

65

Q What is your understanding as a representative of the GAB as to what Mr. Kennedy meant when he referred to the timing of the legislation being all wrong?
A That the idea of changing the governing structure of the agency charged with administering elections in the middle of the busiest, most complex part of the four-year election cycle was not a prudent approach.
Q Okay. And doing so can undermine election administration, correct?
A Are those words in there?
Q I'm asking you.
A Well, I think there are other words to describe it, but I think it would create problems in public confidence in administration of the elections. It could create concerns about how -- well, let's just leave it at that.
Q All right. Going down about three paragraphs, there's a paragraph beginning with instead, do you see that?
A Yes.
Q And you said that, "Instead, legislators have engaged in a continuing series of exaggerated and unfounded critiques of the board in the media."
MR. MURPHY: Object to form.
Q Do you see that?

66

A I see that.
Q What did you mean by that?
MR. MURPHY: Same objection.
A I'm going to say those are my characterizations.
Q And again what's your understanding of what Mr. Kennedy meant by that?
A I think he meant that -- well, he meant that the proponents of the legislation were willing to mischaracterize, falsify or spin in this case findings of the Legislative Audit Bureau to advance the legislation.
Q All right. Let me show you another document. This one we'll mark as Kennedy -- or as 103.
(Exhibit 103 is marked for identification)
A Okay.
Q Do you recognize this document?
A I do.
Q And what is this?
A This is a bill analysis that the Governor's Office asked in this case of the Government Accountability Board, but it asked it of all state agencies with respect to legislation that may impact those agencies.
Q And this is on behalf of the board, correct?
A This is prepared on behalf of the board.

67

Q And this was sent to the Governor's Office prior to his signing the legislation?
A It was.
Q And does this document accurately reflect the GAB's views with respect to the bill that eliminated the GAB?
A This was shared with board members and they were offered the opportunity to provide comments before it was sent, so yes.
Q All right. Let me direct you to Page 2. The third paragraph in Section 3, which has the header Policy Significance, the memo states that, "The effective date of the bill will create significant administrative problems for the conduct of elections in the upcoming presidential election year"?
A Yes.
Q What types of administrative problems does the GAB anticipate will take place as a result of the timing of that bill?
A Well, as it points out, there's a discontinuity of the oversight of the agencies. There's a transition in leadership, and that could mean the impact is hard to say. It just breaks up the continuity of what's been in place for the past eight years.
Q And there are, I think you said before, over 1,500

68

municipal clerks in Wisconsin. Is that number right, or is that a different number?
A 1,853.
Q Thank you.
A Plus 72 county clerks.
Q Okay. So over 1,900 total clerks. Based on the GAB's experience, is it helpful to election administration to have a strong central election administration agency?
A I think that's the role of the agency is to be -- I'm not sure about how strong it is, but it's to provide uniform guidance and direction.
Q And one of the concerns that the agency had about the Elections Board that will replace it is that there could be partisan gridlock, is that right?
A That was one of the criticisms of it, yes.
Q And if that were the case, that would potentially leave municipal clerks without central guidance on issues of election administration?
A Potentially, yes.
Q The end of the paragraph we were discussing before says, "Quite simply, the effective date of this bill -- roughly five months prior to a major federal/state election -- is irresponsible, if not reckless, and could have major impacts on voters

across the State of Wisconsin." Is that right?
A That's right.
Q And that's an accurate summary of the GAB's view?
A It is.
Q And then let me direct your attention to the next page. The first full paragraph talks about both the rolling out of a new statewide voter registration system and updating its voter information portal as well as full implementation of the voter ID law?
A Yes.
Q And it says, "These projects could be subject to unnecessary and potentially catastrophic delay because of the change in the agency management structure negatively affecting the work of county and municipal clerks and ultimately the services provided to the voters." Do you see that?
A I do.
Q And the projects that it's referring to, that that sentence is referring to include the project of implementing the voter ID law in full, is that right?
A That's right.
Q And the following paragraph indicates that the sweeping restructuring of the GAB would erode public confidence, is that correct?
A That's right.

Q And did the GAB follow a public opinion polling regarding the elimination of the GAB at this time?
A Did the GAB what?
Q Follow a public opinion polling about the public's view about the elimination of the GAB.
A No.
Q We were just discussing public confidence. Is it your understanding that that was one of the rationales that the Legislature relied upon for some of the election laws that are at issue in this case?
MR. MURPHY: Object to form.
A I understand that the proponents of the legislation used that rationale to advocate for the passage.
Q In the following paragraph under administrative significance, the memorandum indicates that the uncertainty during the debate of the bill eliminating the GAB prompted an exodus of high level talented staff, is that correct?
A That's correct.
Q And does the exodus of high level talented staff undermine election administration?
A Well, you lose people with experience. You lose people with passionate commitment for their jobs. I would say the answer is yes.
Q And as a result of the bill eliminating the GAB, the

staff other than the director and general counsel have the option of remaining employed in election administration for the state, is that right?
MR. MURPHY: Object to form.
A Well, I'm not even sure it's an option. All of the existing staff except the person holding the position of director and general counsel automatically transfer to the new commissions.
Q And is there any guarantee in the legislation that those individuals will have the same positions in the new agencies --
MR. MURPHY: Object to form.
Q -- that they currently hold?
A The legislation doesn't address that. It requires the Department of Administration to develop a plan for allocating the staff.
Q So it's possible, for instance, that somebody currently working on elections could be moved to the Ethics Board?
MR. MURPHY: Object to form.
A I think that's speculation. The plan requires my input and recommendations, and I don't know what would happen beyond what I recommend.
Q And the decision will ultimately be made by the Department of Administration?

A Subject to approval by the Joint Committee on Finance.
Q At the end of that paragraph we were just discussing, the memorandum in reference to the exodus of high level staff says, "All signs point to this trend continuing once the bill is signed." Do you see that?
A Yes.
Q Is that still the GAB's view?
A Yes.
Q And is it your understanding that there have been calls for the elimination of the GAB dating as far back as 2011?
A Yes.
Q And that includes calls for that by then Assembly Speaker Jeff Fitzgerald, is that right?
A I know that he made that -- he's one of the individuals who did, yes.
Q And that was back in 2011?
A I don't recall when.
Q Okay. Let me just show you a news article. This is Exhibit 104.
(Exhibit 104 is marked for identification)
Q Does this document refresh your memory as to when --
A It does.

Q And when was it that Speaker Fitzgerald was initially calling for the elimination of the GAB?
A Well, the article is dated December 2011.
Q I'm sorry, December?
A 2011.
Q And is it in fact your understanding that he was calling for the elimination of the GAB at that time?
A Yes.
Q All right. I'm going to shift gears here. All right. This will be Exhibit 105.
(Exhibit 105 is marked for identification)
Q Do you recognize this document?
A I do.
Q What is this?
A This was a survey that the Government Accountability Board staff sent out to district attorneys around the state following the November 2008 election. Or at least a compilation of the results of the survey.
Q All right. And this survey indicates that -- actually do you know -- before I ask the next question, do you know when this document was prepared?
A No.
Q Do you know approximately how long after the election it was prepared?

A I don't.
Q Let me direct your attention to, I guess, Section 4.
A Okay.
Q That section summarizes six complaints that had resulted in the filing of a court action. Is that right?
A That's right.
Q And one of those complaints according to this related to somebody who allegedly voted without necessary qualifications or residency?
A That's right.
Q And then there's another category with five cases and it states falsely procuring registration or making false statement to election official. Do you see that?
A Yes.
Q Do you have an understanding of what that means more specifically?
A Generally that's the statute that charges people who falsify a voter registration form.
Q Okay. So if somebody were to submit a voter registration form under the name Mickey Mouse and if that weren't their actual name, that's the statute that would apply?
A Right.

Q If there were any cases of voter impersonation fraud, would that be listed differently?
MR. MURPHY: Object to form.
A It would be a different citation.
Q Okay. So is it fair to infer then that there were zero court actions filed involving alleged voter impersonation fraud in the November 2008 election?
A Based on the survey, yes.
Q And in 2008, the then Attorney General Van Hollen sent investigators to polling locations throughout the state, correct?
MR. MURPHY: Object to form.
A He sent a number of Department of Justice officials, many of them were attorneys, to act as observers at the polling place. Some of them may have been investigators.
Q And then Section 5 indicates that at least as of the time that this was prepared, there was a total of one felony conviction for election related fraud resulting from the 2008 election, is that right?
A That's right.
Q There's a reference to pending cases as well. Do you see that?
A Yes.
Q Do you know what happened with those?

A I don't.
Q And do you know what the one conviction was for?
A I don't.
Q Let me show you a related document. This will be 106.
(Exhibit 106 is marked for identification)
A Okay.
Q Do you recognize this document?
A I do.
Q And what is it?
A It's a report prepared by staff counsel Mike Haas for a board meeting on a survey that we conducted that we just discussed the results of.
Q Okay. And the second and third pages of this document contain samples of the letters that were sent to district attorneys to obtain responses to that survey and a sample survey, correct?
A That's right.
Q This information was provided to the Government Accountability Board, is that right?
A That's correct.
Q Were the results of the survey provided to the board?
A Yes, they were.
Q And was that in a public session?
A It was.

Q So that information was publicly available?
A Yes.
Q Do you know if the results were presented directly to the Legislature in any way?
A I don't believe they were.
Q And does the date of this memorandum indicate to you approximately when the survey data was collected?
A Yes.
Q And when is that?
A Early March of 2009.
Q Do you know whether there were any cases of voter fraud that were filed in court based on the 2008 election following this survey?
A I don't.
Q This will be 107.
(Exhibit 107 is marked for identification)
A Okay.
Q This is an email exchange among GAB staff following the State Supreme Court's ruling on the constitutionality under state law of the voter ID law, right?
A Yes.
Q And focusing on Mr. Falk's email at the top of Page 1, he refers to a particular case of voter fraud and states that the photo ID would not have stopped

this, do you see that?
A Yes.
Q And he is correct, isn't that right?
A He is.
Q Let me turn to another exhibit.
A Let me back up. I'm familiar with this case. And so let me change my answer on that because my understanding of this case is that this individual did vote in the name of other people.
Q Okay.
A And he did vote in person in someone else's name and he voted by absentee in some person's name.
Q And if he had voted absentee in someone else's name with their identification, he could have done so even with the voter ID law in place, correct?
A He could have.
Q And this individual was caught, is that right?
A He was.
Q And was the voter ID law in effect in the election in which he cast these ballots?
A He cast his ballot over several elections. These charges covered several different elections.
Q And was the voter ID law in effect during those elections?
A I don't believe so.

Q And he was caught despite that, right?
A That's right.
Q And he was prosecuted?
A Yes.
Q That incident occurred after the voter ID law had been passed, is that right?
MR. MURPHY: Object to form.
A Some of the incidents I know did, yes.
Q It came to public light after the --
A Yes.
Q Let me show you a document that was previously marked as Lowe 56.
A Okay.
Q Now, in the top, the first email at the top of Page 1 is from Adam Harvell, is that right?
A That's right.
Q Who is he?
A He's an employee of the Government Accountability Board.
Q And what's his position?
A Currently he works in the ethics division as a lead ethics staff person. He used to be a trainer in the elections division.
Q Okay. And at the time he sent this email, was he a trainer in the elections division?

A I'm thinking he was in transition between the two, which is why he was cleaning out his files.
Q And at the end of his email, he indicates that it will be nearly impossible for homeless people to get a state ID. Do you see that?
MR. MURPHY: Object to form.
A He does. That's what the email says.
Q And that is accurate, right?
MR. MURPHY: Object to form.
A It's accurate that what the email says.
Q Is his assessment accurate?
A I'm not sure I'm in a position to answer that.
Q All right. This is 108.
(Exhibit 108 is marked for identification)
Q And this relates to -- well, I guess first, this is either an email exchange or a calendar invite among GAB staff, is that right?
A I think it's just an email exchange.
Q And this relates to a meeting in which staff discussed the impact of the voter ID law on Wisconsin voters with disabilities?
A And we had that discussion with our accessibility advisory group.
Q Okay. And is that a part of the GAB staff?
A No. The accessibility advisory group is a number of

81

individuals that come from organizations or are individuals -- either organizations that represent people with disabilities or are people with disabilities.
Q Okay. And let me show you a related document. This is 109.
(Exhibit 109 is marked for identification)
A Okay.
Q Does this appear to you to be the attachment to Exhibit 108?
A Yes.
Q I'm going to ask you some specific questions about 109 in a minute, but just generally based on this accessibility meeting and any additional accessibility meetings you had, did GAB staff develop an understanding of any particular difficulties that disabled voters may face with the voter ID law?
A I think they identified a number of issues that needed to be addressed, yes.
Q What issues do you recall?
A I don't.
Q Then let's look at 109. There's a Section No. 1 on the first page with the heading Signature Requirement on Poll Book?
A Yes.

82

Q And subsection d states that there's no specific training for clerks or poll workers with a focus on physical disabilities and making a determination that someone cannot sign the poll book, no guidance is offered by GAB. Do you see that?
A Yes.
Q Was that correct at this time, do you know?
A I think that accurately describes our training in the area of persons with disabilities, yes.
Q Has there been any change made to the training since then?
A I don't recall.
Q The following subsection e says, "GAB will recommend that clerks be hesitant to exercise this discretion."
Do you know what discretion is being referred to?
A There is a -- there was a provision in the voter ID law that exempted people from signing the poll book if the poll workers could determine the person was unable to physically sign.
Q And why was the GAB recommending that clerks be hesitant to exercise the discretion?
A I'm not sure if this reflects that we were willing to do this as much as it reflects the notes that were taken at the meeting about the concerns that were

83

identified.
Q Does the GAB or has the GAB provided guidance about that issue?
A I don't know.
Q Subsection h at the bottom of the page states that, "An exemption must be sought at every election." Do you see that?
A Yes.
Q Is that correct?
A I'm not sure. I'd have to look at this to see what they're talking about an exemption for.
Q Let me ask a slightly different question. Is it correct that a voter to be excused from signing the poll book must seek an exemption based on disability at every election?
A That's my understanding, yes.
Q And then turning the page in subsection i, it says, "GAB will advocate for the exemption to be determined once and with no need for another decision to be made in the future." Do you see that?
A Yes.
Q Do you know whether GAB has advocated for that change?
A I don't.
Q Do you know whether that change has been made?

84

A I don't.
Q So to your knowledge, does it remain true that voters must be exempted every time they vote to be exempted from the requirement that they sign the poll book?
A That's my understanding at the moment, yes.
Q You can put those aside. This is 110.
(Exhibit 110 is marked for identification)
A Okay.
Q Do you know who Laurie Hughes is?
A Only by the indication at the bottom of the email.
Q And this is an email that she sent to Mr. Buerger at the GAB, is that right?
A That's right.
Q And in it she is relaying that residents in the Fox Valley had informed staff that in Appleton, voters had to wait an hour and a half to be issued a free voter ID, is that right?
A I'm not sure that's entirely accurate. She's indicating that a few residents were told by staff at DMV that they would have to wait an hour and a half.
Q Okay. And that was to obtain a free voter ID?
A Yes.
Q Has the GAB received other complaints about waiting times at the DMV?
A Well, we received complaints about processes with the

DMV and we have a process where we are in touch with someone at DMV and pass those complaints along for them to rely on them. Some of them deal with wait times. There are a lot of times it's just misunderstandings, but we let DMV sort those out.
Q What are the other issues that arise?
A I don't recall.
Q This will be 111.
(Exhibit 111 is marked for identification)
A Okay.
Q Now, this -- these emails begin with an email from a person named Mara Pike to the GAB help desk, is that right?
A Yes.
Q And Ms. Pike is relaying that she lost her driver's license and can't get a voter ID from the DMV unless she surrenders her driving privilege?
MR. MURPHY: Object to form.
A And it goes on to say that pays a fee in order to vote, which I would assume means to get her replacement driver's license.
Q Okay. And Allison Coakley sent a response to this email, is that right?
A She did.
Q And so she indicates that the voter's understanding

is correct that the voter either has to pay for a replacement or obtain a different form of photo ID in order to vote in that election?
MR. MURPHY: Object to form.
A Well, she states that she either has to pay for a replacement driver's license or use some other form. I don't think she necessarily agrees with the individual's assessment.
Q Is Ms. Coakley's statement correct?
A It's correct that states law does not allow you to have both DMV products, a driver's license and a state-issued ID card. It's also correct that if you lose your driver's license, if you want it back -- if you want it fixed, you have to pay to get it replaced, and if you don't have that, then there are other forms of ID that can be used, and she referenced them.
Q Let me ask you a question about Act 23, and I have a copy of it if that's helpful, but let me just ask if you remember. To the best of your recollection, did Act 23 contain a provision regarding a public informational campaign being conducted?
MR. MURPHY: Object to form.
A Yes.
Q And specifically it indicated that in conjunction

with the first regularly scheduled primary and election at which the voter identification requirements initially applied, the GAB was supposed to conduct a public informational campaign for the purpose of informing prospective voters of the voter identification requirements contained in Act 23, is that right?
MR. MURPHY: Object to form.
A That's my recollection of the requirement, yes.
Q And as an administrative matter, how did the GAB interpret the requirement that a public information campaign be conducted in the first regularly scheduled primary and election at which the ID law would apply?
MR. MURPHY: Object to form.
Q And let me try to clarify the question. Which elections did the GAB regard as the first primary and regularly scheduled election?
A Well, the first primary and regularly scheduled election would have been February and April of 2012, and we prepared a campaign to cover the whole period of 2012.
Q Okay. And through the presidential election?
A That's right.
Q And so the voter ID law was originally enjoined

between the 2012 primary, spring primary and the 2012 April spring election, is that right?
A That's right.
Q The GAB had never completed its public information campaign, is that right?
A We haven't done any broadcasts since following the -- since just before the April election.
Q And before the law was enjoined, did the GAB plan to do a public informational campaign between the date when it was enjoined and the November 2012 election?
A We did.
Q Since the law, the voter ID law has been put into effect, has the GAB been able to conduct a similar campaign to the one that it had anticipated doing?
A We updated all of the broadcast materials to reflect the changes in the law as a result of the state Supreme Court ruling. We will update them again to reflect the restructuring of the agency that's sponsoring the advertising. We've made them available, but we have not contracted out to broadcast them, but we have everything available. We continue to do public presentations on the voter ID law. One's taking place as we speak.
Q The GAB had originally intended to do advertising, correct?

89

A That was part of our original campaign, yes.
Q Okay. And there are no plans currently for advertising relating to the voter ID law between now and the 2016 presidential election, though, is there?
A Not at this point.
Q And after the voter ID law was put back into effect, you requested that several hundred thousand dollars be released to the GAB for a public informational campaign, is that right?
A That's right.
Q Has that money been released?
A It was not released. We did do some advertising in that period of time when the ID law was back in place before the 2014 election.
Q Do you recall how much money was spent on that?
A I don't recall.
Q Do you know if it was under $100,000?
A I don't know.
Q How does the GAB -- well, let me rephrase that.
The GAB has indicated that it would be impossible for it to get word out about the voter ID law to every voter in the State of Wisconsin, is that right?
A That's right.
Q And so is it correct that it intends to work with

90

private groups to try to get the word out?
A We do that now. As I indicated, we're doing it at the moment. We meet with local groups, put on presentations. We have presentation materials to share with groups. We issue press advisories. We provide our clerks with access and the public with access to all of the voter information materials related to voter ID.
Q And the GAB also relies in part on private groups and individuals to educate voters about other changes to election laws, is that right?
A Yes.
Q And one of those groups is a group known as Citizen Action Education Fund, is that right?
A I don't know specifically.
Q Are you familiar with that group?
A I am.
Q And that group does voter education and outreach, is that right?
MR. MURPHY: Object to form.
Q If you know.
A That's my understanding.
Q And those efforts relate to the changes to election law that have been made in the last five years, is that right?

91

MR. MURPHY: Object to form.
A I don't know specifically, but they would be one of the groups that would be able to access our materials.
Q Where or how are your materials made publicly available?
A We have a website that is specifically dedicated to voter identification. It's called Bring it to the Ballot. I think it's bringit.wi.gov.
Q And how, if at all, are outreach materials made available to non-Internet users?
A Well, as I said, we make presentations to groups, groups contact. We have a staff person who's dedicated to voter services who does some outreach of her own in identifying groups that we've identified in the past since the law was passed.
We regularly point it out to our municipal clerks and encourage them for their local groups to access the website or to -- for the clerks to download our materials and share them.
Q Okay. So just to summarize, you have one staff person dedicated to outreach, is that right?
A That's right.
Q And staff also make presentations to groups?
A They do.

92

Q And then you encourage municipal clerks to reach out?
A We do.
Q Any other forms of outreach that are not web based?
A We do press availabilities and press releases.
Q I have a question about the implementation of the voter ID law. If a voter has changed his or her last name say from when a voter gets married, is a voter able to use a form of ID with a different last name?
A The name has to conform, so probably not. A hyphenated name, I think you could make the case it's conformed.
Q Is there any direction that's been given to municipal clerks on that?
A I believe just on the general concept of that the name needs to conform to the name on the identification.
Q But it's possible that in some places a hyphenated name would be accepted but in other places not?
A I don't know.
Q What if the middle initials are different, but the name is otherwise the same?
A The advice we would give would be generally that -- actually I don't know.
Q And is the GAB monitoring current legislation relating to the voter ID law?

93

A Yes.
Q One bill currently pending would prevent FoodShare recipients from using photo IDs to vote, is that right?
A I'm not sure if that's exactly -- there's a couple of pieces of legislation. I'm not sure which one you're referring to.
Q Let me go back a step. So individuals who receive public assistance, food assistance in Wisconsin do so through a program called FoodShare, is that right?
MR. MURPHY: Object to form.
A That's my understanding.
Q And Wisconsin -- the Legislature is currently considering a bill to create photo identifications for FoodShare recipients, is that right?
MR. MURPHY: Object to form.
A Maybe. I don't recall specifically.
Q Okay. And do you know whether any such legislation specifically exempts that proposed form of ID for use for voting?
A I don't recall the legislation, so I don't know.
Q There is another bill pending that would prevent municipalities from issuing forms of identification that could be used for voting, is that right?
A That's not my understanding of the legislation. It's a bit more complex than that.

94

Q Okay. What's your understanding?
A My understanding is that prohibiting municipalities from issuing identification, I mean there's a number of different factors in it, but it limits which municipalities can issue ID cards and then it also limits what those ID cards could be used for.
Q And one of the limitations is that they could not be used for voting, right?
MR. MURPHY: Object to form.
A That's my understanding.
Q Does the GAB have a position on that legislation?
A The board has not taken a position on that.
Q Do you anticipate that it will?
A I do not anticipate that it will.
Q I apologize if I asked you this when you were deposed in your individual capacity, but the GAB has a variety of information on its website, right?
A That's right.
Q And subject to any oversights about updating old forms, is it your understanding that the information on the GAB website is generally true and accurate?
A That's our goal is to endeavor to make sure it's true and accurate.
Q Okay. I just have a few other quick topics. Has the GAB ever made an assessment of the racial diversity of clerks in Wisconsin?

95

A I don't know if we have or not. And I say that because I know that we contracted to have a survey done, but I don't know if that was a factor on that. You know, there was -- it's not -- if we did, it's not something that I've highlighted.
Q Do you have any understanding, you, the GAB, as to how the demographics of the clerks in Wisconsin differ, if at all, from the state's population as a whole?
A No.
Q I have the same question for you with respect to elections inspectors.
A The only thing we track with election inspectors is age.
Q And is it accurate that election inspectors are significantly older than the state's population as a whole?
A Yes.
Q And do you know what percentage of the clerks in the state speak Spanish?
MR. MURPHY: Object to form.
A I don't.
Q And what about election inspectors?

96

A I don't.
Q Do you know whether any municipalities in Wisconsin make a specific effort to recruit election inspectors who speak languages other than English?
A Well, Milwaukee is required by federal law to do it. Otherwise I don't know specifically. My understanding is from conversations that that is a factor. It's something we encourage.
Q A factor where?
A To -- we encourage municipal clerks that have a large speaking population to recruit. I don't know how effectively they do that or what they do, but it's something we try to make sure people are sensitive to.
Q Did GAB staff review the Presidential Commission on Election Administration's report?
A Yes.
Q Did the GAB take any position with respect to any of the content of the report?
A No.
Q Is it your understanding that one conclusion of that report is that no voter should have to wait in line for more than 30 minutes to cast a ballot?
A Yes.
Q Does the GAB share that view?

A The GAB hasn't taken a position on that.
Q Are you aware that the GAO in 2014 issued a report regarding voter identification laws?
A Yes.
Q And did GAB staff review that report?
A Yes.
Q And is it your understanding that the report found that voter identification laws decreased voter turnout?
A I don't remember.
Q Is it your understanding that the report found that voter ID laws decreased turnout for African-American voters in particular?
A I don't remember.
Q Were any results from that report relayed to officials outside of the GAB?
MR. MURPHY: Object to form.
A I don't know.
MR. KAUL: Could we go off the record?
THE VIDEOGRAPHER: Off the record at 12:41.
(Discussion off the record)
(Short recess is taken)
(Exhibit 112 is marked for identification)
THE VIDEOGRAPHER: The time is 1:27.

We are back on the record.
Q Director Kennedy, just one last topic I want to go over before we leave today. There's an exhibit in front of you that's been marked as Exhibit 112. Do you see that?
A Yes.
Q And is this a printout of a spreadsheet that contains data about both weekday and weekend in-person absentee voting?
A It is.
Q And a copy of this spreadsheet was provided to the Legislature, is that right?
A I'm not sure.
Q Do you recall that you provided some data regarding early voting to the Legislature prior to the bill that eliminated weekend and evening early voting?
A I do recall. I'm not sure if this is the document that was provided to the Legislature because I've been unable to find a transmittal with this document.
Q Okay.
A So I'm not certain that this was, but we did provide other data based on our -- what we call our GAB 190 forms, which are the post-election surveys which do have data and which was what was referenced in my earlier testimony to the Senate that was in my prior

testimony.
Q Okay. And what type of data is contained in those forms?
A In these forms or the prior forms?
Q The GAB 190s.
A The GAB 190 forms, which are all on our website, are a series of post-election questions that track how many people voted, how many people voted absentee. Beginning in 2010, we tracked whether they voted in-person absentee or by mail absentee.
We didn't break it down other than in those formats, but we also have total absentee voters, military voters, a lot of characteristics -- that's where we get the information about the age of poll workers that I referenced earlier. So it's about a -- it's a fairly large amount of data that we collect as part of a survey that we have to report to the Federal Election -- or the U.S. Election Assistance Commission.
Q Okay.
A And that information was transmitted to the Legislature with that data.
Q The GAB 190 data?
A Yes.
Q And do you know if you have a copy of that still?

A I believe we supplied that to you.
Q Okay. And does that contain an aggregation of these columns here? So, for example, would it have a total of the number of weekday in-person absentee voters for the June 2012 recall election?
A That data is not broken down by weekday and weekend. It's broken down by in-person absentee and other absentee.
Q Okay. Is it broken down by ward or municipality or in some other fashion?
A It's broken down by ward.
Q Okay. And then just briefly, this contains data from three elections, is that right?
A That's right.
Q And the left-hand column indicates which election the data is from?
A Yes.
Q And moving right, the next column shows the county for which the data in a particular row is reported, is that right?
A That's right.
Q And the next column over is the municipality?
A That's right.
Q And then the next column over is the ward?
A That's right.

Q All right. And then the weekday in-person column, is that the total turnout in that ward for weekday in-person absentee voting in the election listed on the far left?
A That is the number that we were able to assign to weekday in-person absentee voting based on the information that's in our database.
Q Okay. And likewise for weekend in-person absentee voting for that column, is that the total number of voters who cast in-person absentee ballots on the weekend in the listed ward and the listed election?
A Yes.
Q And is it your understanding that this data was transmitted to me earlier today?
A That's right.
Q All right. And then just briefly circling back to the GAB 190 forms you were describing before, can you provide an overview of what information would be included in those? I know you've mentioned some specific aspects, but --
A The GAB 190 form is a survey, a post-election survey that we've been doing for years that keeps getting bigger and bigger, as the clerks will tell you, and it includes federally mandated requirements that we have to report on both for military and overseas

electors but for the Federal Elections Commission as well as state statutory data.

It focuses first on how many votes were cast at an election. It focuses on voter registration overall statistics, how many people were registered at the close of registration, how many people were registered late and how many people register on Election Day. It focuses on absentee ballots. Since 2010 it's a bit more detailed than it was prior to that time because it breaks out in-person absentee voting from other absentee voting, but that's the breakout that it has.

It also collects -- as I said, there's a lot of detailed data on military and overseas voting, which includes how many of those ballots were rejected and the different types of reasons they were rejected because it was federal requirements. It contains general information about the type of voting equipment that is used in a municipality, and it contains information about poll workers.

It's a pretty comprehensive set of data. And we track it down to the ward level. Most states track it at the county level on up.
Q And is that data publicly available?
A Yes, it is.

Q And where is it publicly available?
A It's on our website under the statistics tab.

MR. KAUL: Okay. I don't have any further questions. Mike, do you have anything?

MR. MURPHY: No questions.

MR. KAUL: I think we can conclude the deposition then.

THE VIDEOGRAPHER: We are going off the record. This concludes the deposition and Media No. 2 of the testimony of the Government Accountability Board 30(b)(6) designee, testimony given by Mr. Kevin J. Kennedy.

(1:35 p.m.)

ERRATA SHEET

Witness Name: GAB 30(b)(6) - KEVIN KENNEDY

Date Taken: January 28, 2016

Case Name: One Wisconsin v. Gerald Nichol, et al.

| Page/Line | Reads | Should Read | Reason |
|---|---|---|---|
| | | | |

______________________
Kevin J. Kennedy

STATE OF WISCONSIN )
) ss.
COUNTY OF DANE )

I, LISA A. CREERON, a Registered Professional Reporter and Notary Public in and for the State of Wisconsin, do hereby certify that the foregoing is a true record of the deposition of the GAB 30(b)(6) designee-KEVIN KENNEDY, who was first duly sworn by me; having been taken on the 28th day of January, 2016, at the Wisconsin Department of Justice, 17 West Main Street, in the City of Madison, County of Dane, and State of Wisconsin, in my presence, and reduced to writing in accordance with my stenographic notes made at said time and place.

I further certify that I am not a relative or employee or attorney or counsel for any of the parties, or a relative or employee of such attorney or counsel, or financially interested in said action.

In witness whereof, I have hereunto set my hand and affixed my seal of office this 28th day of January, 2016.

______________________
Notary Public, State of Wisconsin
My Commission Expires: 1/29/17

<Dates>
1/29/17 106:28.
10-13-15 4:34.
10-21-14 4:8.
10-30-12 4:24.
10-6-14 4:11, 5:14.
11-18-15 4:37.
11-6-12 3:35.
2-1-79 3:23.
2-10-14 3:20.
2012 april 89:1.
3-10-14 4:15.
3-26-14 4:31.
3-27-14 4:18.
3-7-12 4:5.
4-14-14 3:16.
5-22-14 3:47.
5-23-12 3:29.
7-14-11 5:11.
7-26-11 5:8.
7-26-12 3:32.
7-31-14 5:5.
8-6-12 3:41, 3:44.
8-7-12 3:38.
8-7-14 4:21.
9-19-14 5:17.
August 7th 39:9.
December 2011 74:3.
January 28, 2016 1:22, 105:3.
January 28th, 2016 6:7.
January, 2016 2:10, 106:12.
January, 2016. 106:23.
July 2014 3:26.
June 2012 101:5.
March 30-31 4:46.
May 3 24:3.
November 2008 4:42, 74:17, 76:7.
November 2012 89:10.
$100,000 90:17.
$130 46:12, 47:15.
'09 4:47.
'77 25:15.
'78 25:19.
'79 25:23.
(1:35 104:13.
-vs- 1:11.
.
.
<1>.
1 6:3, 61:20, 62:22, 78:24, 80:14, 82:22.
1,500 27:15, 68:25.
1,851 27:15.
1,853 69:3.
1,900 69:6.
1. 28:18, 60:13.
10 40:16, 41:1, 41:11.
10. 18:22.
100 4:26, 46:12, 47:15, 58:25, 59:2, 60:10.
100. 59:1.
101 4:29, 62:3.
101. 58:24, 62:5.
102 4:33, 64:4.
102. 64:3.
103 4:36, 67:14.
103. 67:13.
104 4:39, 73:23.
104. 73:22.
105 4:41, 74:11.
105. 74:10.
106 4:45, 77:6.
106. 77:5.
107 5:4, 78:16.
107. 78:15.
108 5:7, 81:14, 82:10.
108. 81:13.
109 5:10, 82:7, 82:13.
109. 82:6, 82:22.
11 3:15, 9:2.
110 5:13, 53:17, 54:1, 85:7.
110. 85:6.
111 5:16, 86:9.
111. 86:8.
112 5:19, 98:24.
112. 99:4.
11:13 61:19.
11:37 61:23.
12 3:18.
12-16-11 4:39.
12:41. 98:21.
13th 64:10.
146 54:18.
15 55:21.
15-CV-324 1:11, 6:13.
17 2:8, 2:23, 6:15, 106:13.
190 99:22, 100:6, 100:23, 102:17, 102:21.
190s 100:5.
1970s 27:19.
1976 25:15.
1977 25:19.
1978 25:23.
1979. 24:4.
1:27. 98:25.
.
.
<2>.
2 28:18, 61:25, 104:10.
2. 64:16, 68:10.
2.9 25:23.
20 15:3, 17:22.
2000 64:20.
2006 22:8, 23:7, 23:10, 23:13, 27:9, 27:11, 27:13, 27:19.
2006. 26:8.
2008 76:9, 76:20, 78:12.
2009 78:10.
2010 18:5, 100:9, 103:9.
2011 9:4, 23:6, 73:13, 73:19, 74:5.
2011-2012 3:12, 8:16.
2012 14:12, 15:23, 16:24, 17:4, 17:24, 18:6, 39:9, 40:23, 88:20, 88:22, 89:1.
2013 54:18.
2013-2014 11:16.
2014 48:25, 49:21, 90:14, 98:2.
2015 64:10.
2016 64:24, 90:4.
227 9:4.
23 3:22, 24:2, 87:18, 87:21, 88:6.
26 24:14.
27 3:25.
28 40:21.
28th 2:9, 106:12, 106:23.
.
.
<3>.
3 13:10, 44:11, 68:11.
3-24 4:30.
3-6 4:5.
3-7 4:14.
3.3 22:18.
30 97:23.
30(b)(6 1:20, 2:1, 6:4, 7:4, 7:11, 7:23, 7:26, 61:21, 62:1, 104:11, 105:2, 106:10.
30th 59:11.
32 3:28.
324 54:17.
33 3:31.
35 3:34.
39 3:37, 3:43.
.
.
<4>.
4 13:13, 13:18.
4. 14:11, 59:8, 75:2.
4.3 25:20.
40 3:40.
41 3:46.
45 4:4, 55:3.

48 4:7.
49 4:10.
.
.
<5>.
5 13:14, 13:15, 76:17.
5,000 26:18.
5,700 26:13.
5.8 25:15.
52 4:13.
53703 2:17, 2:24.
54 4:17.
56 4:20.
56. 80:12.
58 4:23.
59 4:26.
.
.
<6>.
6 13:19.
600 2:16.
62 4:29.
64 4:33.
67 4:36.
.
.
<7>.
7 3:5, 53:20.
72 69:5.
73 4:39.
74 4:41.
76 27:16.
77 4:45.
78 5:4.
.
.
<8>.
8 3:12, 53:19, 62:23.
81 3:12, 5:7, 8:8, 8:10, 8:11, 11:22.
82 3:15, 5:10, 8:10, 11:22.
82. 8:9, 11:10.
83 3:18, 12:19.
83. 12:18.
84 3:22, 23:20.
84. 23:19.
85 3:25, 5:13, 27:23.
85. 27:22.
86 3:28, 5:16, 32:9.
86. 32:8.
87 3:31, 33:17.
87. 33:16.
88 3:34, 35:3.
88. 35:2.
89 3:37, 38:25, 39:2, 39:3, 39:6, 39:12.
.
.
<9>.
9-18 5:17.
90 3:40, 38:25, 40:2, 40:13, 53:13, 54:1.
91 3:43, 39:2, 39:16, 40:13.
91. 39:1.
92 3:46, 41:23.
92. 41:22.
93 4:4, 45:12.
93. 45:11.
94 4:7, 48:4.
94. 48:3.
95 4:10, 49:18.
95. 49:17.
96 4:13, 52:3, 52:13.
96. 52:2.
97 4:17, 54:11.
97. 54:10.
98 4:20, 56:3.
98. 56:2.
99 4:23, 5:19, 58:11, 59:7.
99. 58:10.
9:18 1:23, 2:10, 6:7.
9:29 59:11.
.
.
<A>.
A 1:25, 2:5, 5:16, 106:7.
a.m 1:23, 2:10, 6:8, 53:20, 61:20, 61:24.
able 38:10, 38:15, 89:13, 92:3, 93:8, 102:5.
above 7:16.
above-entitled 2:2.
acceptable 29:15.
accepted 10:5, 93:18.
access 26:1, 91:6, 91:7, 92:3, 92:19.
accessibility 81:22, 81:25, 82:14, 82:15.
accessible 34:20.
accessiblity 5:10.
accompanied 16:25, 42:16.
accordance 106:16.
According 38:9, 75:8.
Accountability 6:5, 7:3, 7:5, 7:10, 8:4, 8:18, 11:17, 62:1, 65:7, 67:20, 74:15, 77:20, 80:18, 104:11.
accurate 21:19, 50:2, 54:20, 63:5, 70:3, 81:8, 81:10, 81:11, 85:18, 95:22, 95:24, 96:17.
accurately 15:13, 32:24, 68:4, 83:8.
across 70:1.
Act 9:4, 12:15, 42:19, 47:9, 54:18, 76:14, 87:18, 87:21, 88:6.
Action 2:2, 12:2, 75:5, 91:14, 106:21.
actions 76:6.
active 18:13, 18:15, 22:12, 22:19, 22:23, 23:4.
activity 26:7.
actual 12:15, 18:19, 39:24, 75:23.
Actually 20:2, 21:24, 24:9, 29:10, 32:22, 36:7, 65:4, 74:20, 93:23.
Adam 80:15.
added 21:5.
adding 28:22.
additional 58:3, 82:14.
address 20:7, 28:14, 28:15, 29:5, 35:13, 47:10, 51:24, 61:7, 72:14.
addressed 14:1, 65:25, 82:19.
addressing 34:12.
administer 55:7.
administering 29:25, 66:5.
Administration 66:9, 66:14, 69:8, 69:9, 69:19, 71:21, 72:3, 72:15, 72:25, 97:16.
administrative 55:17, 64:23, 68:14, 68:17, 71:14, 88:10.
administrator 32:15.
administrators 33:4, 34:3.
advance 67:10.
advertising 38:8, 89:19, 89:24, 90:3, 90:12.
advice 11:8, 15:19, 33:1, 33:5, 93:22.
advise 51:19.
advised 62:24.



advising 15:18.
advisories 91:5.
advisory 5:10, 81:23, 81:25.
advocate 71:13, 84:18.
advocated 84:22.
Affairs 14:2.
affecting 70:14.
affixed 106:23.
African-american 98:12.
age 96:16, 100:14.
agencies 67:21, 67:23, 68:21, 72:11.
agency 8:15, 8:17, 11:8, 11:21, 11:25, 15:19, 16:7, 24:10, 35:20, 35:21, 37:3, 65:16, 66:5, 69:9, 69:10, 69:13, 70:13, 89:18.
aggregation 101:2.
agree 33:7.
agreed 46:15.
agrees 87:7.
al 1:7, 1:13, 6:11, 105:4.
Albrecht 4:13, 52:15, 52:19, 52:24, 53:2.
alleged 76:6.
allegedly 75:9.
Allison 86:22.
allocate 47:12, 47:19.
allocating 72:16.
allocation 47:17.
allow 87:10.
allowed 56:20.
already 10:17, 39:4.
alternative 46:5.
although 24:17, 31:8, 44:25.
amend 23:1.
America 42:19.
among 3:25, 3:37, 3:43, 4:13, 4:20, 4:23, 4:29, 5:4, 28:4, 58:13, 78:18, 81:16.
amount 100:16.
analysis 26:17, 52:24, 67:19.
analyze 22:22.
analyzed 26:13.
analyzing 20:21.
answer 31:20, 45:3, 50:13, 71:24, 79:7, 81:12.
anticipate 68:18, 95:14, 95:15.
anticipated 89:14.
anybody 23:9, 65:20.
apologize 95:16.
appear 26:11, 43:18, 53:2, 54:8, 59:4, 82:9.
appearing 2:17, 2:24, 7:9, 65:9.
appears 15:1, 18:15, 25:10, 25:13, 27:1, 38:17, 50:13, 54:16, 54:19.
Appleton 85:15.
application 14:14, 16:1, 16:16.
Applications 14:13, 14:19, 15:23, 16:12.
applied 88:3.
apply 34:18, 56:24, 75:24, 88:14.
approach 66:7.
appropriations 55:6.
approval 73:1.
Approved 14:12.
approximately 27:5, 34:13, 43:22, 54:8, 74:24, 78:7.
April 88:20, 89:7.
Ardis 60:18, 60:20.
area 58:8, 83:9.
areas 27:17, 57:25, 58:3.
arise 86:6.
around 74:16.
arrived 47:22.
article 4:39, 73:21, 74:3.
aside 9:21, 85:6.
aspects 102:20.
Assembly 3:19, 14:2, 64:13, 73:15.
assessing 19:20, 27:14.
assessment 81:11, 87:8, 96:1.
assign 102:5.
Assistance 94:9, 100:19.
Assistant 2:21.
assume 18:5, 47:8, 86:20.
assumed 54:2.
assuming 47:9, 53:4, 53:13.
attachment 12:24, 13:1, 13:11, 13:13, 39:16, 39:18, 39:20, 39:25, 40:1, 40:2, 47:10, 58:21, 59:5, 82:9.
attachments 39:13, 40:9.
attention 9:2, 24:13, 58:9, 59:8, 64:15, 70:5, 75:2.
Attorney 2:21, 3:5, 3:7, 5:23, 76:9, 106:19, 106:20.
Attorneys 2:15, 74:16, 76:14, 77:16.
audience 33:25.
Audit 67:10.
August 40:23.
authorizes 18:4.
automatically 72:7.
availabilities 93:4.
available 8:20, 8:23, 12:2, 29:1, 35:8, 37:6, 37:18, 50:4, 53:11, 78:1, 89:20, 89:21, 92:6, 92:11, 103:24, 104:1.
aware 11:3, 48:19, 98:2.
away 22:14, 29:18.
.
.
<B>.
B 3:34, 4:13.
back 10:7, 19:25, 32:4, 36:5, 50:25, 59:7, 65:4, 73:13, 73:19, 79:6, 87:13, 90:6, 90:13, 94:8, 99:1, 102:16.
background 37:13.
Backman 3:47.
balanced 64:21.
Ballot 9:8, 9:10, 9:13, 9:17, 9:18, 10:1, 10:2, 10:4, 10:5, 10:7, 10:8, 10:11, 10:13, 10:14, 10:16, 10:20, 10:24, 10:25, 11:5, 35:24, 42:25, 47:7, 47:20, 48:1, 50:8, 50:14, 51:6, 58:7, 79:21, 92:9, 97:23.
ballots 9:23, 45:19, 45:25, 46:13, 53:8, 58:6, 79:20, 102:10, 103:8, 103:15.
Based 29:24, 40:3, 61:2, 69:6, 76:8, 78:12, 82:13, 84:14, 93:3, 99:22, 102:6.
basic 7:25, 37:13.

109

became 54:18.
become 22:9, 45:6.
begin 86:11.
Beginning 23:5, 24:16, 34:4, 61:25, 62:22, 66:18, 100:9.
behalf 2:18, 2:25, 6:25, 7:2, 8:3, 8:4, 32:15, 54:22, 65:5, 65:11, 65:14, 67:24, 67:25.
believe 7:28, 8:22, 12:21, 24:1, 33:6, 38:23, 62:10, 78:5, 79:25, 93:14, 101:1.
Bell 4:13, 11:20.
Beloit 45:15, 45:19, 46:4, 47:7.
Bend 54:8.
best 54:19, 61:5, 87:20.
better 28:15.
beyond 72:23.
Big 54:8.
bigger 102:23.
biggest 61:10.
Bill 12:16, 49:7, 54:17, 54:24, 55:4, 55:6, 55:9, 64:11, 67:19, 68:5, 68:13, 68:19, 69:23, 71:16, 71:25, 73:6, 94:2, 94:14, 94:22, 99:15.
bit 45:9, 95:1, 103:9.
Board 3:22, 6:5, 7:3, 7:6, 7:10, 8:4, 8:18, 11:18, 12:1, 23:23, 24:8, 24:10, 26:2, 33:10, 55:14, 62:1, 65:7, 65:11, 65:14, 65:22, 66:23, 67:21, 67:24, 67:25, 68:7, 69:14, 72:19, 74:16, 77:12, 77:20, 77:22, 80:19, 95:13, 104:11.
board. 65:10.
Book 82:24, 83:4, 83:18, 84:14, 85:4.
boss 24:12.
bottom 24:3, 24:15, 24:16, 29:9, 42:9, 84:5, 85:10.
box 58:7.
break 55:18, 100:11.
breakout 103:12.
breaks 68:23, 103:10.
Brian 11:20, 14:5.
briefly 7:21, 8:1, 101:12, 102:16.
Bring 92:8.
bringit.wi.gov 92:9.
broadcast 89:15, 89:21.
broadcasts 89:6.
broken 47:14, 101:6, 101:7, 101:9, 101:11.
Brookfield 28:5, 28:8, 28:20.
Buerger 4:4, 5:4, 5:13, 45:15, 46:3, 46:15, 85:11.
building 27:9.
Bureau 67:10.
busiest 66:6.
.
.
<C>.
C 1:13, 6:11.
calendar 13:18, 81:16.
call 52:8, 99:22.
called 7:14, 24:9, 38:5, 92:8, 94:10.
calling 74:2, 74:7.
calls 38:20, 73:12, 73:15.
campaign 37:20, 37:23, 87:22, 88:4, 88:12, 88:21, 89:5, 89:9, 89:14, 90:1, 90:9.
Campaigns 14:3.
Campbell 2:27, 6:17, 6:18.
canceled 22:15.
capacity 65:9, 95:17.
capture 12:11.
card 87:12.
cards 95:6, 95:7.
Case 1:11, 6:13, 31:23, 40:6, 52:1, 67:9, 67:20, 69:17, 71:10, 78:24, 79:6, 79:8, 93:10, 105:4.
cases 42:24, 43:9, 75:12, 76:1, 76:22, 78:11.
cast 10:11, 10:25, 34:8, 35:24, 45:25, 51:6, 79:20, 79:21, 97:23, 102:10, 103:3.
casts 10:20.
catastrophic 70:12.
catch 41:17, 45:10.
category 75:12.
caught 79:17, 80:1.
cause 7:16.
central 69:8, 69:18.
Cerny 60:20.
certain 31:1, 46:22, 53:9, 99:21.
certainly 16:8, 47:13.
certificate 9:14, 9:15.
certify 106:9, 106:18.
chair 65:22.
challenged 58:4.
chance 11:11.
change 10:23, 30:20, 31:4, 37:22, 37:24, 43:16, 44:17, 70:13, 79:7, 83:10, 84:23, 84:25.
changed 10:9, 32:6, 32:7, 33:5, 43:4, 44:10, 93:6.
changes 3:13, 8:14, 8:15, 36:22, 37:25, 41:16, 55:7, 89:16, 91:10, 91:23.
changing 66:4.
characteristics 100:13.
characterization 63:6.
characterizations 67:4.
charged 66:5.
charges 75:19, 79:22.
chart 18:5, 18:6, 18:12, 19:1, 19:6, 19:7, 19:8, 22:10.
cheaper 47:16.
chose 36:6.
circling 102:16.
Circuit 51:9.
circumstances 9:11, 9:21, 34:17.
citation 76:4.
cities 26:24.
Citizen 62:25, 91:13.
citizens 35:9, 63:12, 63:21, 63:25.
City 2:8, 28:5, 28:20, 45:15, 45:18, 47:18, 52:21, 53:6, 106:14.
Civil 2:4.
clarify 88:16.
cleaning 81:2.
clear 28:19.

110

clearance 65:12.
Clerk 4:8, 9:8, 9:10, 9:19, 11:4, 11:8, 14:20, 15:8, 16:4, 17:12, 17:15, 28:5, 28:8, 28:20, 29:3, 31:10, 39:23, 42:1, 43:17, 45:15, 46:9, 47:7, 47:18, 47:19, 47:25, 48:7, 48:9, 49:16.
clerks 8:23, 9:22, 14:17, 15:5, 15:6, 15:12, 15:18, 15:24, 16:6, 16:13, 16:14, 20:17, 29:1, 29:21, 34:6, 40:17, 41:9, 41:12, 42:5, 44:23, 48:23, 49:15, 69:1, 69:5, 69:6, 69:18, 70:15, 83:2, 83:14, 83:21, 91:6, 92:18, 92:19, 93:1, 93:13, 96:2, 96:9, 96:21, 97:10, 102:23.
close 17:12, 103:6.
Coakley 5:16, 86:22, 87:9.
COIE 2:14.
collect 100:17.
collected 78:7.
collecting 23:11.
collectively 14:9.
collects 103:13.
college 32:17, 33:3, 34:1, 34:7, 34:8.
column 15:1, 17:6, 19:10, 19:14, 19:17, 101:15, 101:18, 101:22, 101:24, 102:1, 102:9.
columns 101:3.
come. 64:24.
comes 32:4.
coming 54:16.
commencing 2:10.
comment 35:20, 49:3, 49:9, 49:16, 60:12.
commented 38:16.
commenting 46:20.
comments 35:9, 35:14, 49:15, 65:12, 65:23, 68:8.
Commission 41:8, 41:19, 64:21, 97:15, 100:19, 103:1, 106:28.
commissions 72:8.
commitment 71:23.
Committee 14:1, 14:3, 73:1.
committees 3:19, 14:1.
communicate 41:14.
communication 56:15.
communications 36:12, 45:23, 48:16, 50:3, 54:23, 55:2.
Company 6:18.
compilation 74:18.
complaining 35:23.
complaint 35:16, 35:18, 36:8.
complaints 4:42, 35:15, 35:17, 63:23, 75:4, 75:8, 85:23, 85:25, 86:2.
completed 9:14, 89:4.
complex 66:6, 95:1.
components 37:19.
comprehensive 12:5, 12:8, 12:12, 103:21.
concept 93:14.
concern 10:1.
concerned 50:15, 51:12, 60:5, 62:25, 63:12, 63:21, 63:25.
concerns 10:10, 20:1, 29:13, 29:22, 38:21, 51:25, 55:17, 57:2, 66:15, 69:13, 83:25.
conclude 104:6.
concludes 61:20, 104:9.
conclusion 97:21.
conduct 68:14, 88:4, 89:13.
conducted 15:17, 23:23, 37:21, 56:25, 77:12, 87:22, 88:12.
confidence 66:14, 70:24, 71:7.
confirm 12:23.
confirmation 32:4.
conform 93:9, 93:15.
conformed 93:11.
confusing 33:8, 42:18.
conjunction 87:25.
connection 21:7, 51:14.
consecutively 40:6, 52:7.
consider 46:5.
considering 94:14.
consistent 18:17, 60:8, 60:11.
constituent 56:6, 56:10.
constitutionality 78:20.
contact 16:5, 38:22, 92:13.
contain 77:15, 87:21, 101:2.
contained 14:8, 88:6, 100:2.
contains 39:6, 99:7, 101:12, 103:17, 103:20.
content 59:4, 97:19.
contents 11:22, 12:10, 32:24.
context 28:14, 29:7.
contexts 51:17.
continue 89:22.
Continued 4:1, 5:1.
continues 13:14.
continuing 66:22, 73:6.
continuity 68:23.
contracted 89:20, 96:4.
convention 52:12.
conversation 28:16, 28:20, 41:6.
conversations 97:7.
convicted 22:24.
conviction 76:19, 77:2.
copies 51:15.
copy 30:15, 54:20, 87:19, 99:11, 100:25.
correct 10:25, 13:2, 16:22, 20:9, 27:20, 28:12, 34:10, 40:25, 42:7, 51:7, 53:3, 54:5, 54:8, 55:12, 57:9, 57:23, 61:8, 62:20, 63:25, 66:9, 67:24, 70:24, 71:18, 71:19, 76:11, 77:17, 77:21, 79:3, 79:15,

111

83:7, 84:9, 84:13, 87:1, 87:9, 87:10, 87:12, 89:25, 90:25.
corroboration 19:21, 20:10, 20:13, 23:8, 23:13.
corroborator 19:13, 21:3, 21:16, 23:2.
corroborators 19:9.
cost 46:12, 46:16, 46:22, 47:6, 47:13.
counsel 6:20, 65:10, 65:13, 72:1, 72:7, 77:11, 106:19, 106:21.
County 2:9, 39:23, 40:17, 41:9, 41:12, 44:22, 69:5, 70:14, 101:18, 103:23, 106:3, 106:14.
couple 14:11, 24:20, 39:6, 63:19, 94:5.
course 44:10.
Court 1:3, 6:12, 6:19, 6:23, 75:5, 76:6, 78:12, 78:19, 89:17.
cover 88:21.
coverage 49:13.
covered 79:22.
create 66:13, 66:15, 68:13, 94:14.
created 45:3.
creating 15:14.
CREERON 1:25, 2:5, 6:19, 106:7.
criticisms 69:16.
critiques 66:23.
cross-check 21:18.
crucial 64:23.
current 20:3, 20:5, 93:24.
Currently 22:23, 37:12, 54:1, 72:13, 72:18, 80:21, 90:2, 94:2, 94:13.
customers 12:1.
cycle 64:20, 64:24, 66:7.
.
.
<D>.
D 4:4, 5:4, 5:13.
daily 47:12.
damaged 9:18.
Dane 2:9, 106:3, 106:14.
data 5:19, 15:13, 22:1, 22:22, 23:3, 23:5, 23:6, 23:11, 23:14, 24:23, 26:9, 52:19, 52:25, 53:2, 78:7, 99:8, 99:14, 99:22, 99:24, 100:2, 100:16, 100:22, 100:23, 101:6, 101:12, 101:16, 101:19, 102:13, 103:2, 103:14, 103:21, 103:24.
database 26:8, 102:7.
Date 6:7, 40:4, 61:13, 68:13, 69:22, 78:6, 89:9, 105:3.
Dated 3:16, 3:20, 3:26, 3:29, 3:32, 3:35, 3:38, 3:41, 3:44, 3:47, 4:5, 4:8, 4:11, 4:14, 4:18, 4:21, 4:24, 4:30, 4:33, 4:37, 4:39, 4:46, 5:5, 5:8, 5:11, 5:14, 5:17, 24:3, 40:23, 59:11, 74:3.
dating 73:12.
daughter 49:23, 50:7.
David 45:15.
Day 2:9, 17:18, 17:19, 17:20, 17:21, 20:2, 20:5, 36:5, 49:24, 103:8, 106:12, 106:23.
days 15:3, 17:22, 40:16, 40:21, 41:2, 41:11.
DC 41:8.
deal 34:23, 43:8, 43:15, 86:3.
dealing 41:18.
dealt 61:3.
debate 71:16.
December 74:4.
decision 55:14, 72:24, 84:19.
decreased 98:8, 98:12.
dedicated 92:7, 92:14, 92:22.
deeper 12:14.
Defendants 1:15, 2:25.
degree 36:16.
Delafield 52:22, 53:6.
delay 70:12.
delivered 16:14.
delivers 9:9.
demographics 96:9.
Department 2:7, 2:22, 6:15, 47:1, 72:15, 72:25, 76:13, 106:13.
deponent 7:3.
deposed 95:16.
deposited 58:7.
DEPOSITION 1:20, 2:1, 6:4, 6:9, 6:14, 7:5, 7:22, 7:23, 7:26, 7:27, 61:21, 62:1, 104:7, 104:9, 106:10.
depositions 7:8.
deputies 16:13, 16:15.
deputy 15:21, 16:10, 16:19, 17:4, 56:24.
describe 66:12.
describes 36:2, 83:8.
describing 102:17.
design 36:20, 37:10.
designation 43:3, 43:11.
designations 15:14.
DESIGNEE 1:21, 2:1, 6:4, 104:11.
designee-kevin 106:11.
desk 3:35, 4:10, 35:6, 35:21, 49:21, 86:12.
despite 80:1.
detail 12:9.
detailed 63:8, 103:9, 103:14.
determination 83:3.
determine 21:18, 24:24, 83:19.
determined 84:18.
develop 72:15, 82:15.
developed 44:9, 45:1.
development 37:4.
differ 96:10.
difference 8:1, 17:17.
different 13:16, 31:14, 34:20, 43:16, 63:19, 69:2, 76:4, 79:22, 84:12, 87:2, 93:8, 93:20, 95:5, 103:16.
different. 58:18.
differently 76:2.
difficult 45:7.
difficulties 36:12, 45:18, 82:16.

112

difficulty 28:7, 30:21, 30:24.
dig 12:14.
digits 21:11, 21:20, 22:3.
direct 9:2, 24:1, 24:13, 56:17, 59:7, 60:13, 64:15, 68:10, 70:5, 75:2.
directed 28:16.
direction 69:12, 93:12.
directly 78:3.
Director 24:7, 62:11, 65:10, 65:13, 72:1, 72:7, 99:2.
disabilities 81:21, 82:3, 82:4, 83:3, 83:9.
disability 84:14.
disabled 82:17.
discontinuity 68:20.
discourage 20:17.
discretion 83:15, 83:22.
discretion. 83:14.
discuss 65:8.
discussed 9:6, 11:24, 12:7, 37:25, 57:5, 77:13, 81:20.
discussing 18:10, 69:21, 71:7, 73:3.
Discussion 21:6, 53:25, 81:22, 98:22.
distinction 7:25, 15:9.
distributed 32:23.
District 1:3, 1:4, 6:12, 6:13, 74:16, 77:16.
diversity 96:1.
dividing 53:9.
division 32:15, 80:21, 80:23, 80:25.
DMV 85:20, 85:24, 86:1, 86:2, 86:5, 86:16, 87:11.
documentary 30:2, 30:12, 31:9, 31:17.
documents 8:8, 11:24, 12:5, 23:21, 31:2, 34:19, 38:23, 40:5, 44:9.
doing 26:17, 43:12, 66:8, 89:14, 91:2, 102:22.
dollars 90:7.
done 20:24, 21:18, 21:22, 26:6, 38:4, 39:15, 46:24, 55:5, 79:14, 89:6, 96:5.
down 19:4, 66:17, 100:11, 101:6, 101:7, 101:9, 101:11, 103:22.
download 92:20.
drawing 25:10.
drive 15:17.
driver 19:15, 19:21, 20:6, 20:9, 20:13, 20:14, 21:10, 22:2, 22:3, 61:11, 61:13, 86:15, 86:21, 87:6, 87:11, 87:13.
driving 30:4, 38:17, 86:17.
dropped 15:20.
due 35:24.
duly 7:14, 106:11.
during 12:6, 14:22, 15:8, 16:1, 16:21, 18:2, 30:3, 30:10, 31:5, 32:1, 36:22, 49:24, 50:4, 51:10, 53:24, 64:23, 71:16, 79:23.
duties 47:12.
.
.
<E>.
earlier 99:25, 100:15, 102:14.
Early 30:7, 78:10, 99:15, 99:16.
easier 55:7, 55:25.
East 2:16.
easy 34:25.
educate 91:10.
Education 91:14, 91:18.
effect 36:22, 36:23, 43:23, 79:19, 79:23, 89:13, 90:6.
effective 68:12, 69:22.
effectively 97:12.
effort 41:13, 97:3.
efforts 91:23.
eight 56:20, 57:6, 57:22, 58:5, 68:24.
either 31:2, 62:25, 81:16, 82:2, 87:1, 87:5.
election. 84:6.
Elections 3:22, 14:2, 14:3, 19:10, 23:6, 23:22, 24:8, 24:10, 26:2, 29:25, 32:14, 44:18, 48:22, 63:24, 66:5, 66:14, 68:14, 69:14, 72:18, 79:21, 79:22, 79:24, 80:23, 80:25, 88:17, 96:14, 101:13, 103:1.
elector 57:6.
electors 56:21, 103:1.
eligible 37:8.
eliminated 64:12, 68:5, 99:16.
eliminating 71:16, 71:25.
elimination 71:2, 71:5, 73:12, 74:2, 74:7.
emailer 49:23, 50:7.
Emails 3:25, 3:37, 3:43, 3:46, 4:4, 4:13, 4:20, 4:23, 4:29, 5:4, 5:16, 39:6, 39:9, 86:11.
embark 64:19.
emphasized 44:2.
employed 72:2.
employee 11:21, 80:18, 106:19, 106:20.
enacted 11:15.
encountered 51:11.
encourage 92:18, 93:1, 97:8, 97:10.
encouraged 55:3, 63:20.
encouraging 63:11.
end 33:25, 58:20, 69:21, 73:3, 81:3.
endeavor 95:23.
ended 17:24.
enforcement 64:23.
engage 38:1.
engaged 66:21.
English 97:4.
enjoined 88:25, 89:8, 89:10.
enough 20:3, 36:4.
ensure 55:9, 55:12, 64:22.
ensuring 29:1.
entered 15:13, 42:15.
entirely 85:18.

equipment 103:19.
equivalent 49:12.
erode 70:23.
ERRATA 105:1.
Ertmer 3:43, 39:23.
essentially 57:25.
et 1:7, 1:13, 6:11, 105:4.
Ethics 72:19, 80:21, 80:22.
evaluation 36:19.
evening 99:16.
evenly 64:21.
everybody 43:9.
everyone 43:20.
everything 41:17, 44:15, 89:21.
evidenced 45:9.
Exactly 30:4, 57:16, 94:5.
exaggerated 66:22.
EXAMINATION 3:3, 7:19.
example 22:25, 31:11, 101:3.
except 9:10, 72:6.
exceptions 9:21.
exchange 41:25, 45:14, 52:15, 58:13, 58:20, 62:8, 78:18, 81:16, 81:18.
exchanges 28:4.
excused 84:13.
executive 24:7, 24:9.
exempted 83:18, 85:3.
exemption 84:6, 84:11, 84:14, 84:18.
exempts 94:19.
exercise 83:14, 83:22.
Exhibits 8:10, 11:22, 26:9, 39:2.
existing 72:6.
exodus 71:17, 71:20, 73:4.
experience 29:24, 36:24, 36:25, 38:14, 38:18, 55:8, 69:7, 71:22.
experiences 16:7.
expiration 61:12.
expired 20:6.
Expires 106:28.
explain 19:7.
explaining 28:25, 42:10.
explanation 18:16.
express 38:21, 47:3, 47:5.
extended 30:6.
extrapolate 46:19.
.
.
<F>.
face 49:7, 82:17.
facility 56:11.
facing 37:24.
fact 13:23, 44:14, 45:9, 46:22, 49:13, 74:6.
factor 96:5, 97:8, 97:9.
factors 95:5.
fair 36:11, 49:4, 65:6, 76:5.
fairly 100:16.
Falk 4:23, 5:4, 59:10, 60:8, 60:14, 78:23.
false 75:14.
falsely 75:13.
falsify 67:9, 75:20.
familiar 7:25, 13:3, 36:17, 37:1, 79:6, 91:16.
far 73:12, 102:4.
fashion 101:10.
faster 46:6.
February 88:20.
FEC 40:16, 40:25, 41:4, 41:5, 41:7.
Federal 2:4, 41:7, 41:19, 46:23, 97:5, 100:18, 103:1, 103:17.
federal/state 69:24.
federally 102:24.
Fedex 46:6, 47:4, 47:16, 47:20.
fee 86:19.
feet 56:20, 57:6, 57:22, 58:5.
felony 22:24, 76:19.
Ferwerda 24:6, 24:7, 24:23, 26:12.
few 8:7, 24:14, 42:24, 62:5, 85:19, 95:25.
fewer 26:18.
fields 22:2.
Fifteen 55:22.
fifth 12:25.
figures 46:21.
file 21:17.
filed 5:23, 14:20, 76:6, 78:12.
files 81:2.
filing 75:5.
fill 16:3, 21:25, 35:17.
filled 21:25.
final 18:8, 18:12, 21:19.
finally 10:5.
Finance 73:2.
financially 106:21.
find 12:14, 13:7, 99:19.
finding 30:24.
findings 67:10.
fine 52:10.
Fitzgerald 73:16, 74:1.
five 34:13, 69:23, 75:12, 91:24.
fixed 87:14.
focus 14:11, 58:8, 83:2.
focuses 103:3, 103:4, 103:8.
focusing 78:23.
Follow 71:1, 71:4.
following 43:5, 70:22, 71:14, 74:17, 78:13, 78:18, 83:13, 89:6.
follows 7:18.
food 94:9.
Foodshare 94:2, 94:10, 94:15.
foregoing 106:9.
forget 40:12.
format 52:6.
formats 100:12.
forms 15:7, 15:16, 30:7, 37:6, 44:19, 45:2, 87:16, 93:3, 94:23, 95:21, 99:23, 100:3, 100:4, 100:6, 102:17.
forward 37:24, 52:12.
forwarded 56:7, 56:15.
found 98:7, 98:11.
four 21:11, 21:14, 21:19, 22:3.
four-year 66:7.
fourth 12:25.
Fox 85:14.
frankly 52:8.
fraud 4:41, 76:1, 76:7, 76:19, 78:12, 78:24.
free 85:16, 85:21.
Freelance 6:20.
frequently 65:14.
Friday 17:25.
front 99:4.

full 29:7, 70:6, 70:9, 70:20.
Fund 91:14.
Futrell 5:7.
future. 84:20.
.
.
<G>.
GAO 98:2.
gather 34:24.
gave 52:23, 53:6.
gears 56:1, 74:9.
General 2:21, 33:24, 48:25, 65:10, 65:13, 72:1, 72:7, 76:9, 93:14, 103:18.
Generally 20:17, 22:19, 52:20, 58:8, 75:19, 82:13, 93:22, 95:22.
generate 34:21.
Gerald 1:13, 6:11, 24:6, 105:4.
gets 47:18, 58:4, 93:7.
getting 45:19, 47:2, 102:22.
give 11:8, 15:20, 21:11, 93:22.
given 6:6, 18:18, 62:2, 64:9, 93:12, 104:12.
giving 29:15.
goal 95:23.
governing 66:4.
Government 6:5, 7:3, 7:5, 7:10, 8:4, 8:18, 11:17, 29:5, 41:15, 61:25, 65:7, 67:20, 74:15, 77:19, 80:18, 104:10.
Governor 4:17, 4:36, 54:17, 54:23, 67:19, 68:1.
great 12:9.
greatest 8:24.
gridlock 64:22, 69:15.
group 5:10, 43:15, 60:4, 63:18, 81:23, 81:25, 91:13, 91:16, 91:18.
groups 8:21, 34:20, 38:6, 91:1, 91:3, 91:5, 91:9, 91:13, 92:3, 92:12, 92:13, 92:15, 92:18, 92:24.
growth 27:20.
guarantee 72:9.
guess 39:3, 75:2, 81:15.
guidance 61:2, 69:12, 69:18, 83:4, 84:2.
guide 59:15, 59:19, 59:20.
guides 59:23, 60:3.
.
.
<H>.
Haas 3:25, 4:20, 28:19, 28:25, 56:14, 77:11.
half 34:13, 40:17, 43:22, 85:16, 85:20.
halfway 28:24.
hand 106:22.
handed 62:4.
handle 27:9, 53:7, 61:7.
handled 60:23.
happen 11:2, 72:23.
happened 12:3, 76:25.
happy 55:23, 55:25.
hard 68:22.
Harvell 80:15.
Harwood 56:12.
head 24:10.
header 14:12, 68:11.
heading 14:14, 82:23.
hearing 64:10.
heavily 45:1.
Hein 3:37, 52:18.
Help 3:35, 4:10, 35:5, 35:21, 42:19, 49:21, 55:11, 86:12.
helped 42:7.
helpful 69:7, 87:19.
hereby 106:9.
hereunto 106:22.
hesitant 83:14, 83:22.
high 15:25, 23:23, 24:24, 25:3, 25:7, 25:8, 25:9, 25:11, 25:15, 25:16, 25:20, 25:21, 25:23, 26:4, 26:5, 26:13, 26:14, 26:23, 27:1, 27:4, 46:16, 71:17, 71:20, 73:4.
highlighted 96:7.
hold 72:13.
holding 72:6.
Hollen 76:9.
home 29:2, 29:4, 29:8.
homeless 81:4.
homes 28:9, 56:25.
hour 55:3, 85:16, 85:20.
hours 53:9, 53:11, 53:13, 53:14, 53:17, 54:1, 55:14.
Houseman 4:5.
Hughes 5:13, 85:9.
humor 49:6.
hundred 90:7.
husband 35:24.
Hutton 56:6.
hyphenated 93:10, 93:17.
.
.
<I>.
idea 16:15, 34:24, 66:4.
identification 8:10, 12:19, 23:20, 27:23, 32:9, 33:17, 35:3, 39:2, 41:23, 45:12, 48:4, 49:18, 50:15, 52:13, 54:11, 56:3, 58:11, 59:2, 62:3, 64:4, 64:21, 67:14, 73:23, 74:11, 77:6, 78:16, 79:14, 81:14, 82:7, 85:7, 86:9, 88:2, 88:6, 92:8, 93:16, 94:23, 95:4, 98:3, 98:8, 98:24.
identifications 94:14.
Identified 3:10, 4:2, 5:2, 39:17, 82:18, 84:1, 92:15.
identifies 62:14.
identify 44:9, 44:15.
identifying 20:3, 30:14, 50:22, 51:1, 92:15.
identity 50:9, 51:12.
Ids 51:15, 94:3.
image 58:21.
immediately 47:23.
impact 10:19, 54:4, 67:22, 68:22, 81:20.
impacted 12:4.
impacts 69:25.
impersonation 76:1, 76:7.
implement 64:20.
implementation 70:9, 93:5.
implementing 70:20.
important 37:8.
impossible 81:4, 90:21.

improperly 9:14.
improvements 62:19.
in-person 15:25, 48:11, 48:14, 48:18, 48:21, 49:8, 49:24, 50:5, 52:19, 52:20, 53:12, 53:19, 54:7, 99:8, 100:10, 101:4, 101:7, 102:1, 102:3, 102:6, 102:8, 102:10, 103:10.
inaccuracies 60:5, 60:6.
inactivated 32:5.
inactive 22:9, 22:13, 22:24.
INC 1:7.
incident 80:5.
incidents 80:8.
include 14:21, 15:2, 15:15, 34:3, 70:19.
included 20:25, 51:15, 102:19.
includes 73:15, 102:24, 103:15.
including 36:22, 63:19.
Incorporated 6:10, 42:20.
incorrect 44:1.
increases 45:6.
increasingly 45:6.
indicate 10:4, 20:8, 21:13, 78:6.
indicated 41:1, 87:25, 90:20, 91:2.
indicates 13:22, 15:22, 24:23, 26:12, 29:13, 34:4, 39:12, 40:16, 46:9, 49:23, 50:7, 60:22, 70:22, 71:15, 74:19, 76:17, 81:3, 86:25, 101:15.
indicating 25:14, 41:10, 48:10, 58:21, 85:19.
indication 48:15, 85:10.
individual 21:14, 22:8, 35:5, 42:20, 46:20, 52:1, 79:8, 79:17, 87:8, 95:17.
individuals 17:11, 19:11, 19:14, 21:16, 43:2, 43:13, 50:3, 72:10, 73:18, 82:1, 82:2, 91:10, 94:8.
infer 40:3, 76:5.
info 3:22.
inform 40:6.
informational 87:22, 88:4, 89:9, 90:8.
informed 31:18, 38:10, 85:15.
informing 31:10, 88:5.
initially 74:1, 88:3.
initials 93:20.
input 72:22.
inquiries 34:5.
inspectors 96:14, 96:15, 96:17, 96:25, 97:3.
instance 2:3, 72:17.
Instead 66:18, 66:21.
Institute 1:7, 6:10.
institutionally 33:14.
instructions 43:14.
integrity 55:9, 55:12, 55:16.
intended 89:24.
intends 90:25.
Interested 3:28, 3:31, 32:18, 33:2, 33:20, 33:22, 106:21.
interpret 88:11.
interviews 38:3.
introduce 6:21.
investigation 23:22.
investigators 76:10, 76:16.
invite 81:16.
involved 63:24.
involves 28:4, 56:5.
involving 39:6, 45:14, 76:6.
irresponsible 69:24.
issue 34:12, 51:13, 61:11, 65:21, 71:10, 84:3, 91:5, 95:6.
issued 19:22, 85:16, 98:2.
issues 37:7, 41:17, 59:22, 64:23, 69:19, 82:18, 82:20, 86:6.
issuing 94:23, 95:4.
italics 44:4.
.
.
<J>.
J. 1:21, 2:2, 4:30, 5:7, 6:3, 6:6, 7:12, 62:2, 104:12, 105:44.
Jeff 73:16.
job 37:17.
jobs 71:23.
John 62:9.
Joint 64:9, 73:1.
Josh 6:25.
JOSHUA 2:13.
Journal 19:24.
Judge 65:22.
Judnic 4:29, 62:18, 62:23.
Justice 2:8, 2:22, 6:15, 47:1, 76:13, 106:13.
.
.
<K>.
K. 3:16, 3:20, 3:25, 3:40, 3:43, 3:47, 4:46.
KAUL 2:13, 5:23, 6:25, 7:20, 52:4, 52:11, 55:20, 61:17, 98:19, 104:3, 104:6.
keep 26:3, 55:25.
keeps 102:22.
Kelly 29:10.
KENNEDY 1:21, 2:2, 3:5, 3:16, 3:20, 4:33, 4:46, 6:3, 6:6, 7:7, 7:12, 7:21, 8:8, 8:9, 18:22, 38:25, 52:2, 62:2, 65:3, 66:2, 67:6, 67:13, 99:2, 104:12, 105:2, 105:44, 106:11.
Kevin 1:21, 2:2, 4:33, 6:3, 6:6, 7:7, 7:12, 62:2, 104:12, 105:2, 105:44.
kind 26:9, 38:2, 38:6, 38:20, 38:21, 39:22, 51:22, 51:25.
knowledge 37:21, 54:20, 85:2.
known 91:13.
Kohlhagen 4:7.
Kratsch 3:40, 3:43.
.
.
<L>.
L. 2:13, 3:46, 5:13.
languages 97:4.
large 20:9, 20:12, 48:17, 48:20,

97:10, 100:16.
last 9:3, 21:11, 21:14, 22:3, 33:23, 39:20, 46:4, 91:24, 93:6, 93:8, 99:2.
Late 15:4, 15:11, 17:7, 17:10, 17:18, 18:4, 27:19, 28:16, 30:6, 47:2, 103:7.
later 31:1.
Laurie 85:9.
law 40:17.
laws 44:18, 71:10, 91:11, 98:3, 98:8, 98:12.
lead 80:21.
leadership 68:22.
learn 38:15.
least 28:6, 40:17, 74:18, 76:17.
leave 66:16, 69:18, 99:3.
left 102:4.
left-hand 101:15.
Legal 6:18.
legislation 11:15, 12:6, 12:10, 12:11, 53:16, 55:16, 64:18, 65:1, 65:9, 65:24, 66:3, 67:8, 67:11, 67:22, 68:2, 71:12, 72:9, 72:14, 93:24, 94:6, 94:18, 94:21, 94:25, 95:12.
Legislative 3:13, 8:16, 11:16, 12:3, 13:25, 21:6, 56:14, 64:10, 67:10.
legislators 14:5, 66:21.
Legislature 11:16, 13:23, 13:24, 56:19, 65:17, 71:9, 78:4, 94:13, 99:12, 99:15, 99:18, 100:22.
length 34:16.
Letter 3:40, 4:17, 13:1, 13:7, 13:22, 29:3, 29:4, 31:9, 31:19, 32:24.
letters 77:15.
level 71:17, 71:20, 73:5, 103:22, 103:23.
license 19:15, 20:6, 20:13, 21:10, 22:2, 22:3, 61:11, 86:16, 86:21, 87:6, 87:11, 87:13.
licenses 19:22, 20:9, 20:14, 20:18, 61:13.
light 80:9.
likely 23:7, 23:12, 23:17, 33:3, 64:22.
likewise 102:8.
Lila 41:25, 42:4, 43:5.
limitation 55:4.
limitations 95:8.
limits 95:5, 95:7.
line 57:5, 60:16, 97:22.
lines 48:17, 49:8, 49:11, 49:14.
LISA 1:25, 2:5, 6:19, 106:7.
List 4:8, 22:1, 43:1, 48:7, 48:23.
listed 76:2, 102:3, 102:11.
lists 16:10, 43:13.
little 15:22.
LLP 2:14.
local 33:2, 91:3, 92:18.
location 34:7, 36:5, 56:21, 57:3, 57:6, 57:11, 57:20, 58:5.
locations 57:7, 57:10, 57:22, 58:1, 76:10.
locations. 56:22.
log 10:4.
long 49:13, 74:24.
longer 16:6, 23:14.
look 11:11, 19:25, 27:24, 37:4, 53:5, 55:16, 82:22, 84:10.
looked 12:15, 26:9, 28:17, 28:18, 37:25, 46:10, 60:4.
looking 16:5, 18:13, 21:1, 22:12, 22:22, 25:12, 27:13, 47:9.
looks 37:3.
lose 71:22, 87:13.
lost 86:15.
lot 41:15, 44:1, 44:2, 44:8, 44:16, 45:8, 47:18, 86:4, 100:13, 103:13.
lots 16:2.
loud 24:18.
Lowe 80:12.
Luchterhand 3:34.
.
.
<M>.
M 3:25, 4:20, 5:17.
Madison 2:8, 2:17, 2:24, 6:16, 6:20, 106:14.
Magney 3:37, 4:23, 58:16.
mail 10:20, 15:18, 16:20, 42:21, 47:4, 47:5, 50:24, 51:6, 51:16, 100:10.
mailing 32:4.
mails 9:9.
Main 2:8, 2:16, 2:23, 6:15, 106:13.
major 16:4, 69:23, 69:25.
majority 22:13.
management 70:13.
mandated 56:19, 102:24.
Mara 86:12.
March 78:10.
mark 8:8, 12:18, 23:19, 27:22, 32:8, 35:1, 38:23, 41:22, 58:24, 67:13.
marked 8:10, 12:19, 18:22, 23:20, 27:23, 32:9, 33:17, 35:3, 39:2, 40:12, 41:23, 43:1, 45:12, 48:4, 49:18, 52:13, 54:11, 56:3, 58:11, 59:2, 62:3, 62:4, 64:4, 67:14, 73:23, 74:11, 77:6, 78:16, 80:11, 81:14, 82:7, 85:7, 86:9, 98:24, 99:4.
marks 61:24.
married 93:7.
materials 14:8, 36:20, 37:10, 37:25, 89:15, 91:4, 91:7, 92:4, 92:5, 92:10, 92:20.
matter 6:10, 30:25, 88:10.
mean 8:17, 8:18, 13:3, 15:12, 16:2, 16:4, 16:7, 16:15, 21:25, 22:23, 23:12, 30:5, 31:15, 33:13, 36:20, 36:25, 37:4, 42:14, 48:21, 49:12, 51:21, 53:5, 53:8, 53:24, 58:4, 65:1, 67:2, 68:22, 95:4.
meaning 10:21, 51:11, 54:22, 57:13.
means 44:18, 60:2,

61:1, 75:17, 86:20.
meant 12:5, 12:10, 12:12, 66:2, 67:6, 67:7.
Media 6:3, 38:2, 38:3, 38:8, 49:13, 61:20, 61:25, 104:10.
media. 66:23.
meet 91:3.
meeting 3:22, 4:47, 5:11, 77:12, 81:19, 82:14, 83:25.
meetings 82:15.
member 56:15.
Members 3:18, 4:45, 13:25, 38:4, 52:16, 58:14, 68:7.
Memo 3:15, 3:18, 3:31, 4:36, 4:45, 34:4, 68:12.
memorandum 24:3, 24:8, 32:14, 33:19, 34:12, 34:13, 34:16, 71:15, 73:4, 78:6.
memory 73:24.
Menasha 42:1, 42:2, 42:11, 43:18.
mentioned 102:19.
mentions 57:5.
message 54:16.
met 65:8.
method 29:25, 30:1, 63:14.
MICHAEL 2:20.
Michaels 3:25, 29:10, 29:11.
Mickey 75:22.
middle 52:18, 62:22, 66:6, 93:20.
Mike 7:2, 77:11, 104:4.
military 46:24, 100:13, 102:25, 103:14.
million 22:18.
Milwaukee 6:18, 19:24, 97:5.
mind 10:9.
minute 82:13.
minutes 5:11, 54:5, 55:21, 55:22, 97:23.
mischaracterize 67:9.
mistakes 61:1.
misunderstandings 86:5.
modified 53:16.
moment 85:5, 91:3.
Monday 18:1.
money 47:18, 90:11, 90:15.
monitoring 93:24.
month 43:22.
months 69:23.
Mount 48:9, 48:10, 48:13.
Mouse 75:22.
move 23:1.
moved 22:15, 72:18.
moving 55:25, 101:18.
Ms 29:11, 29:12, 42:3, 43:25, 86:15, 87:9.
municipal 8:23, 9:7, 14:20, 29:1, 29:21, 31:10, 34:6, 42:5, 44:22, 69:1, 69:18, 70:15, 92:17, 93:1, 93:12, 97:10.
municipalities 26:18, 27:15, 47:2, 48:17, 57:18, 94:23, 95:3, 95:6, 97:2.
municipality 101:9, 101:22, 103:19.
myself 24:18, 38:4.
.
.
<N>.
N 3:29, 3:32, 4:13, 4:29, 5:8.
Name 75:22, 75:23, 79:9, 79:11, 79:12, 79:13, 93:7, 93:8, 93:9, 93:10, 93:15, 93:18, 93:21, 105:2, 105:4.
named 86:12.
names 63:19.
Nat 32:16, 33:19.
Nate 62:18.
nature 7:22.
near 40:11, 46:3.
nearly 81:4.
necessarily 47:4, 87:7.
necessary 75:9.
need 8:24, 12:14, 15:10, 20:1, 23:2, 31:6, 31:7, 50:24, 57:19, 84:19.
needed 44:10, 50:21, 82:19.
needs 93:15.
negatively 70:14.
Neil 52:15.
neither 21:12, 21:13.
new 10:25, 38:11, 43:19, 70:7, 72:8, 72:11.
news 4:39, 73:21.
next 16:10, 16:20, 17:6, 23:19, 25:19, 36:7, 59:21, 60:22, 61:10, 70:5, 74:20, 101:18, 101:22, 101:24.
Nichol 1:13, 6:11, 65:22, 105:4.
nine 15:22.
ninth 24:2.
No. 1:11, 6:3, 6:13, 42:18, 46:19, 50:13, 61:20, 61:25, 63:13, 81:25, 82:22, 104:10.
non-internet 92:11.
normally 55:15.
Notary 2:6, 106:8, 106:27.
note 7:4, 10:3, 53:13.
noted 43:18.
notes 62:23, 83:24, 106:16.
nothing 19:19, 20:19, 49:12.
notice 2:5.
numbered 52:7.
numbers 16:9, 20:8, 21:1, 21:7, 22:19, 22:20, 25:11, 26:1, 26:22, 26:23, 27:1, 27:13, 48:17, 52:23, 54:7, 61:11.
nursing 28:9, 29:2, 29:4, 29:8, 56:25.
.
.
<O>.
oath 7:18.
objection 67:3.
objective 36:19.
observe 58:6.
observer 4:26, 57:25, 58:4, 58:6, 60:3, 62:23.
observers 56:2, 56:19, 57:3, 57:21, 61:2, 61:7, 61:9, 62:16, 62:24, 63:11, 63:20, 63:24, 76:14.
observers. 59:23.
observing 58:3.
obtain 77:16, 85:21, 87:2.
obtaining 30:21.
obviously 35:12, 38:3, 48:23.
occasionally 10:8,

38:5.
occurred 80:5.
occurrence 10:6.
October 49:21, 59:11, 64:10.
odd 22:18.
offered 19:12, 68:8, 83:5.
offering 23:24.
Office 4:36, 11:4, 14:17, 14:20, 15:6, 15:8, 16:4, 17:12, 17:15, 54:23, 56:7, 67:19, 68:1, 106:23.
officer 35:19.
offices 15:24.
official 75:14.
officials 33:2, 76:13, 98:16.
often 11:2, 35:13, 38:14.
old 41:13, 41:20, 95:20.
older 96:18.
Once 9:9, 11:10, 73:6, 84:19.
one. 24:17, 64:2.
ones 15:2, 60:9.
online 35:13, 35:18.
open 14:22, 16:1, 16:22, 30:3, 30:10, 31:5, 32:1.
opening 65:6.
opinion 60:23, 71:1, 71:4.
opportunity 68:8.
opposed 18:18.
option 46:10, 72:2, 72:5.
options 28:25, 51:24.
order 13:4, 39:16, 42:23, 50:16, 86:19, 87:3.
organizations 82:1, 82:2.
Original 5:23, 14:7, 53:21, 90:1.
originally 88:25, 89:24.
originated 35:16.
originating 12:16, 16:18.
others 3:15, 3:26, 3:38, 3:44, 4:14, 4:21, 4:24, 4:30, 5:5, 5:8, 49:5, 57:2.
Otherwise 44:5, 93:21, 97:6.
out-of-state 20:18.
outreach 38:2, 91:18, 92:10, 92:14, 92:22, 93:3.
outside 98:16.
overall 103:5.
overlap 58:1.
overseas 45:20, 45:24, 46:24, 102:25, 103:14.
oversight 68:21.
oversights 95:20.
overview 102:18.
overvoted 10:21.
own 8:3, 45:3, 92:15.
.
.
<P>.
P. 4:20.
p.m. 53:20, 104:13.
Page 3:3, 9:2, 9:3, 12:24, 13:10, 13:13, 13:14, 13:15, 13:18, 13:19, 14:11, 18:8, 18:12, 19:1, 19:6, 24:2, 24:14, 24:16, 28:18, 28:24, 29:10, 39:12, 39:21, 42:9, 46:3, 52:18, 58:16, 59:8, 60:13, 62:22, 64:16, 68:10, 70:6, 78:24, 80:14, 82:23, 84:5, 84:17.
Page/line 105:5.
pages 12:25, 13:2, 24:14, 27:25, 28:6, 34:14, 43:13, 77:14.
paid 47:18.
Paragraph 24:16, 24:22, 29:7, 44:11, 56:18, 60:22, 64:16, 66:18, 68:11, 69:21, 70:6, 70:22, 71:14, 73:3.
paragraphs 66:17.
part 13:7, 37:17, 38:16, 47:11, 66:6, 81:24, 90:1, 91:9, 100:17.
particular 8:20, 18:3, 29:7, 32:21, 37:4, 43:9, 52:21, 55:13, 78:24, 82:16, 98:13, 101:19.
particularly 8:23, 33:7, 37:10, 60:17.
Parties 3:28, 3:31, 32:19, 33:2, 33:20, 33:23, 106:20.
partisan 69:15.
partisans 64:22.
Party 59:18, 62:12, 63:10, 63:15.
pass 86:2.
passage 71:13.
passed 22:14, 42:19, 45:5, 80:6, 92:16.
passionate 71:23.
past 60:17, 68:24, 92:16.
pay 87:1, 87:5, 87:14.
pays 86:19.
PDF 58:21.
Pdfs 12:22.
pending 6:11, 76:22, 94:2, 94:22.
people 8:21, 10:7, 10:22, 12:13, 16:3, 19:21, 20:1, 20:10, 20:22, 21:2, 21:3, 22:14, 22:23, 22:25, 23:8, 25:11, 34:1, 35:13, 35:17, 35:19, 37:6, 37:11, 43:2, 43:15, 48:20, 49:11, 63:24, 71:22, 71:23, 75:19, 79:9, 81:4, 82:3, 83:18, 97:13, 100:8, 103:5, 103:6, 103:7.
per 54:5.
percent 15:22, 25:15, 25:20, 25:23, 27:16.
percentage 20:10, 25:3, 26:4, 26:22, 26:23, 27:6, 27:11, 96:21.
percentages 25:8.
period 16:6, 16:22, 18:2, 25:19, 26:13, 30:3, 41:11, 49:25, 50:4, 51:10, 53:19, 88:21, 90:13.
PERKINS 2:14.
permissible 11:6.
permitted 47:25, 50:25.
person 7:6, 17:15, 29:5, 38:16, 38:19, 65:17, 72:6, 79:11, 79:12, 80:22, 83:19, 86:12, 92:13, 92:22.
personal 7:26.
personally 9:9.
persons 83:9.
phone 28:21, 38:20.
photo 78:25, 87:2,

94:3, 94:14.
phrase 44:2.
physical 83:3.
physically 83:20.
piece 21:5.
pieces 94:6.
Pike 5:17, 86:12, 86:15.
place 6:14, 17:19, 17:20, 17:22, 30:2, 34:24, 35:9, 35:14, 35:15, 53:24, 57:11, 57:14, 57:15, 68:18, 68:24, 76:15, 79:15, 89:23, 90:13, 106:17.
places 49:14, 57:10, 57:18, 93:17, 93:18.
plaintiff 6:22.
Plaintiffs 1:9, 2:3, 2:18, 7:1.
plan 72:15, 72:21, 89:8.
plans 90:2.
Pleasant 48:10, 48:13.
please 6:21.
Plus 61:12, 69:5.
point 12:13, 16:4, 18:18, 26:3, 40:20, 73:5, 90:5, 92:17.
points 28:17, 68:20.
Policy 55:14, 68:11.
political 62:11.
Poll 38:17, 43:1, 61:7, 82:24, 83:2, 83:4, 83:18, 83:19, 84:14, 85:4, 100:14, 103:20.
polling 56:22, 57:7, 57:10, 57:15, 57:18, 58:1, 71:1, 71:4, 76:10, 76:15.
polls 10:12, 10:17, 36:4, 60:23, 61:2, 61:3.
population 27:17, 27:19, 96:10, 96:18, 97:11.
POR 42:11, 42:14, 43:2.
portal 70:8.
position 16:8, 33:10, 33:15, 65:8, 72:6, 80:20, 81:12, 95:12, 95:13, 97:18, 98:1.
positioned 58:7.
positions 55:15, 72:10.
possible 72:17, 93:17.
post 40:17.
post-election 99:23, 100:7, 102:21.
posted 8:22.
postmarked 16:21.
potential 62:19.
Potentially 69:17, 69:20, 70:12.
Powerpoint 62:15.
practice 10:10.
practices 33:14.
Pratt 4:20.
predecessor 24:11, 24:12.
prepared 8:15, 11:19, 11:25, 32:14, 33:25, 41:5, 67:25, 74:22, 74:25, 76:18, 77:11, 88:21.
preparing 48:22.
presence 106:15.
PRESENT 2:27.
presentation 62:16, 91:4.
presentations 89:22, 91:4, 92:12, 92:24.
presented 78:3.
Presidential 64:19, 68:15, 88:23, 90:4, 97:15.
press 91:5, 93:4.
pretty 10:6, 27:8, 45:1, 59:14, 103:21.
prevent 94:2, 94:22.
previous 22:17.
previously 18:22, 18:24, 30:10, 80:11.
primarily 55:17.
primary 33:25, 88:1, 88:13, 88:17, 88:19, 89:1.
printout 99:7.
Prior 9:22, 10:22, 17:19, 23:6, 26:9, 28:20, 31:4, 31:24, 43:16, 68:1, 69:23, 99:15, 99:25, 100:4, 103:9.
privacy 57:2.
private 56:12, 91:1, 91:9.
privilege 86:17.
proactive 38:7.
Probably 23:2, 33:25, 35:16, 53:10, 55:20, 93:9.
problem 51:23.
problematic 59:25.
problems 60:17, 66:13, 68:14, 68:17.
Procedure 2:4, 29:22.
process 45:6, 55:9, 55:12, 56:11, 56:25, 58:9, 86:1.
processed 10:14, 31:11, 31:25.
processes 57:10, 57:13, 85:25.
procuring 75:13.
produced 40:5.
productivity 24:24.
products 87:11.
Professional 2:6, 106:7.
program 24:25, 94:10.
prohibiting 95:3.
prohibitively 46:15.
prohibits 9:7.
project 70:19.
projects 70:11, 70:18.
prompted 71:17.
pronounced 62:10.
proof 15:10, 15:11, 16:25, 17:5, 19:8, 19:12, 20:4, 21:4, 28:11, 29:2, 29:14, 29:15, 30:2, 30:5, 30:12, 30:21, 30:25, 31:6, 31:9, 31:12, 31:17, 32:16, 42:16, 42:23, 43:7, 43:10, 43:19, 50:22, 51:2.
proper 34:7.
proponents 67:8, 71:12.
proposal 53:22.
proposed 94:19.
prosecuted 80:3.
prospective 88:5.
provide 12:13, 21:14, 30:14, 36:21, 37:13, 42:23, 43:10, 65:20, 68:8, 69:11, 91:6, 99:21, 102:18.
provided 19:9, 21:19, 43:7, 63:8, 65:5, 70:15, 77:19, 77:22, 84:2, 99:11, 99:14, 99:18.

**provides** 65:16.
**providing** 29:14, 33:1, 43:14.
**proving** 29:25.
**provision** 9:6, 9:7, 17:11, 18:3, 42:20, 83:17, 87:21.
**provisional** 42:25.
**provisions** 2:4, 11:23, 18:21, 34:23, 45:5.
**prudent** 66:7.
**Public** 2:6, 35:18, 37:20, 37:23, 66:13, 70:23, 71:1, 71:4, 71:7, 77:24, 80:9, 87:21, 88:4, 88:11, 89:4, 89:9, 89:22, 90:8, 91:6, 94:9, 106:8, 106:27.
**publicly** 35:8, 78:1, 92:5, 103:24, 104:1.
**pulled** 22:6, 23:5, 23:15.
**pulling** 22:11.
**purpose** 15:14, 29:14, 88:5.
**pursuant** 2:5.
**put** 22:5, 44:4, 60:4, 85:6, 89:12, 90:6, 91:3.
**puts** 47:1.
**putting** 49:7.
.
.
<Q>.
**qualifications** 37:14, 37:16, 75:10.
**question** 11:3, 28:13, 36:7, 51:22, 57:14, 74:21, 84:12, 87:18, 88:16, 93:5, 96:13.
**questions** 14:11, 14:13, 18:21, 19:23, 24:20, 34:21, 51:20, 59:3, 62:5, 82:12, 100:7, 104:4, 104:5.
**quick** 62:5, 95:25.
**Quite** 30:9, 31:15, 45:9, 69:22.
.
.
<R>.
**R.** 3:37, 4:5, 4:11, 4:23.
**racial** 96:1.
**raised** 11:3, 51:13, 51:14, 51:17, 57:2.
**rare** 10:6.
**rather** 8:3, 10:15, 17:6, 50:24, 54:1, 61:8.
**rationale** 71:13.
**rationales** 71:9.
**re-register** 31:19.
**reach** 26:7, 93:1.
**Read** 24:15, 24:18, 24:19, 50:17, 64:16, 105:5.
**readily** 12:2.
**reading** 28:14, 50:20.
**Reads** 105:5.
**realizes** 10:21.
**really** 16:7, 20:1, 25:25, 36:14.
**Reason** 39:24, 50:23, 105:5.
**reasons** 16:2, 21:2, 103:16.
**recall** 13:4, 14:4, 17:24, 18:24, 53:18, 55:1, 57:17, 60:6, 60:7, 63:8, 64:1, 65:25, 73:20, 82:20, 83:12, 86:7, 90:15, 90:16, 94:17, 94:21, 99:14, 99:17, 101:5.
**receive** 32:3, 36:8, 48:16, 94:8.
**received** 12:21, 15:24, 16:12, 16:20, 34:5, 36:11, 45:23, 48:6, 50:3, 63:23, 85:23, 85:25.
**recess** 61:22, 98:23.
**recipients** 94:3, 94:15.
**reckless** 69:25.
**recognize** 8:11, 11:12, 32:11, 54:13, 64:6, 67:16, 74:12, 77:8.
**recollection** 9:25, 10:6, 60:8, 60:11, 87:20, 88:9.
**recommend** 72:23, 83:13.
**recommendations** 72:22.
**recommending** 83:21.
**record** 6:2, 19:8, 19:15, 23:4, 61:18, 61:24, 64:17, 98:19, 98:20, 98:22, 99:1, 104:9, 106:10.
**records** 13:19, 18:19, 22:20, 42:6, 42:12, 42:14.
**recruit** 97:3, 97:11.
**reduced** 106:15.
**refer** 13:15, 14:14.
**reference** 12:13, 12:15, 34:25, 39:19, 39:22, 56:10, 59:18, 59:20, 60:20, 73:4, 76:22.
**referenced** 13:5, 87:17, 99:24, 100:15.
**referred** 59:5, 66:2, 83:15.
**referring** 13:9, 13:10, 41:5, 44:11, 44:14, 60:3, 61:15, 70:18, 70:19, 94:7.
**refers** 13:6, 14:18, 17:10, 40:14, 60:16, 61:10, 78:24.
**reflect** 11:23, 14:19, 15:6, 18:15, 32:24, 53:11, 68:4, 89:15, 89:18.
**reflected** 22:10.
**reflection** 19:23.
**reflects** 33:1, 83:23, 83:24.
**refresh** 73:24.
**regard** 88:17.
**regarding** 23:23, 34:7, 37:22, 54:24, 63:24, 65:21, 71:2, 87:21, 98:3, 99:14.
**register** 17:12, 22:25, 30:22, 31:16, 50:16, 50:21, 56:21, 57:19, 103:7.
**Registered** 2:5, 21:15, 22:8, 23:8, 23:10, 23:13, 25:3, 25:8, 25:9, 25:11, 25:16, 25:20, 26:5, 26:14, 30:10, 31:5, 37:12, 42:21, 42:22, 43:6, 103:5, 103:7, 106:7.
**registering** 28:8, 43:20, 57:7, 57:13.
**registrations** 14:21, 16:20, 17:4, 17:9, 17:14, 17:18, 17:20, 26:10, 42:15.
**regularly** 88:1, 88:12, 88:18, 88:19, 92:17.
**reinstated** 51:10.
**reissue** 11:5.

**reissued** 10:3.
**rejected** 10:16, 61:12, 103:15, 103:16.
**relate** 91:23.
**related** 3:13, 8:14, 64:11, 75:8, 76:19, 77:4, 82:5, 91:8.
**relates** 28:7, 36:7, 45:18, 81:15, 81:19.
**relating** 23:22, 57:3, 90:3, 93:25.
**relation** 48:25.
**relative** 106:18, 106:20.
**relayed** 98:15.
**relaying** 85:14, 86:15.
**released** 90:8, 90:11, 90:12.
**releases** 93:4.
**relevant** 11:17, 12:4, 12:11, 13:7.
**relied** 71:9.
**relies** 91:9.
**reluctant** 50:8.
**rely** 86:3.
**relying** 44:25.
**remain** 85:2.
**remaining** 72:2.
**Remember** 14:6, 53:21, 59:21, 87:20, 98:10, 98:14.
**rephrase** 20:22, 36:9, 90:19.
**replace** 69:14.
**replaced** 87:15.
**replacement** 86:21, 87:2, 87:6.
**report** 77:11, 97:16, 97:19, 97:22, 98:2, 98:5, 98:7, 98:11, 98:15, 100:17, 102:25.
**Reported** 1:25, 101:19.
**Reporter** 2:6, 6:19, 6:23, 106:8.
**Reporters** 6:20.
**reporting** 25:6.
**reports** 25:2.
**represent** 6:22, 82:2.
**Representative** 7:9, 7:23, 56:6, 66:1.
**representatives** 34:7.
**Republican** 59:18, 62:11, 62:25, 63:10, 63:15.
**requested** 10:24, 90:7.
**require** 46:23.
**required** 15:11, 21:11, 22:2, 26:20, 30:3, 30:11, 30:14, 31:2, 31:8, 42:11, 42:14, 42:22, 43:3, 51:1, 51:5, 57:21, 97:5.
**Requirement** 28:11, 30:5, 40:21, 41:1, 43:23, 46:25, 51:15, 82:23, 85:4, 88:9, 88:11.
**requirements** 27:7, 36:21, 46:23, 88:3, 88:6, 102:24, 103:17.
**requires** 72:14, 72:21.
**requiring** 43:19.
**residence** 15:11, 15:12, 17:1, 17:5, 19:9, 19:12, 20:4, 21:4, 28:11, 29:2, 29:14, 29:15, 30:1, 30:2, 30:5, 30:12, 30:21, 30:25, 31:6, 31:9, 31:12, 31:17, 32:16, 34:18, 38:11, 42:23, 43:7, 43:10, 50:22, 51:2.
**Residency** 35:25, 36:3, 36:9, 36:13, 36:17, 37:1, 37:7, 37:19, 37:22, 40:14, 40:20, 41:1, 41:11, 75:10.
**resident** 29:3.
**residential** 56:11.
**residents** 27:6, 29:2, 85:14, 85:19.
**resources** 61:6.
**respect** 20:8, 36:9, 49:8, 54:17, 67:22, 68:5, 96:13, 97:18.
**responded** 52:24, 56:14.
**responding** 28:19, 62:18.
**response** 29:9, 43:17, 43:25, 46:9, 49:16, 51:20, 63:9, 86:22.
**responses** 48:24, 77:16.
**responsibility** 37:5.
**rest** 22:20, 28:17.
**restriction** 9:25.
**restructuring** 70:23, 89:18.
**result** 34:22, 68:18, 71:25, 89:16.
**resulted** 75:5.
**resulting** 76:20.
**results** 74:18, 77:13, 77:22, 78:3, 98:15.
**return** 9:22.
**returned** 9:13, 9:17, 10:2, 10:24.
**returning** 9:8.
**returns** 9:18.
**review** 39:3, 63:3, 97:15, 98:5.
**reviewed** 42:12, 61:3.
**reviewed.** 59:15.
**reviewing** 18:24.
**revoked** 61:12.
**Robinson** 3:29, 3:32, 5:8, 32:16, 33:19.
**role** 69:10.
**rolling** 70:7.
**Romney** 4:26, 58:17.
**Ross** 3:40, 52:18.
**roughly** 69:23.
**row** 14:17, 15:4, 15:6, 16:10, 16:20, 17:6, 101:19.
**rows** 14:14.
**RPR** 1:25.
**RPW** 59:15, 59:20.
**rude** 38:17.
**Rule** 7:11, 40:14, 56:24.
**Rules** 2:4, 35:25, 36:3, 36:9, 36:13, 36:17, 37:1, 37:22, 62:23.
**ruling** 78:19, 89:17.
**Rydecki** 4:11.
.
.
<S>.
**S.** 2:20, 3:43, 4:7, 4:23, 5:4.
**safe** 47:8.
**sample** 77:17.
**samples** 77:15.
**saying** 13:4.
**says** 12:4, 13:22, 14:17, 19:14, 29:20, 32:18, 38:13, 46:14, 46:17, 53:13, 58:16, 59:21, 59:25, 65:7, 69:22, 70:11, 73:5, 81:7, 81:10, 83:13, 84:17.
**scenario** 10:18.
**scheduled** 88:1, 88:13, 88:18, 88:19.
**Schmieder** 4:30, 62:9.
**school** 24:24, 25:3, 25:7, 25:9, 25:11, 25:15, 25:16, 25:20, 25:21, 25:24, 26:4, 26:5, 26:14, 26:23, 27:1, 27:4.

**schools** 23:23.
**seal** 106:23.
**Seated** 6:2.
**second** 13:1, 13:13, 15:6, 19:14, 28:24, 39:12, 40:1, 42:9, 46:3, 52:18, 56:17, 60:16, 77:14.
**seconds** 54:5.
**secretary** 24:9.
**Section** 37:15, 62:22, 68:11, 75:2, 75:4, 76:17, 82:22.
**secure** 30:1, 30:8.
**Security** 19:17, 20:20, 20:21, 20:23, 21:7, 21:12, 21:15, 21:17, 21:19, 21:24, 22:4.
**seeing** 8:24.
**seek** 84:14.
**seem** 15:24.
**seems** 28:16.
**seen** 57:17, 60:17.
**Senate** 3:18, 4:18, 14:1, 54:17, 64:14, 99:25.
**send** 29:3, 35:14, 35:20, 46:12, 47:3, 50:8.
**sending** 49:6.
**seniors** 25:3, 25:7, 25:9, 25:16, 25:20, 25:24, 26:4, 27:4.
**sense** 12:9, 12:12, 22:12, 40:8, 40:9, 49:6, 57:18.
**sensitive** 97:13.
**sent** 13:22, 13:23, 13:25, 14:6, 14:9, 31:9, 31:25, 32:1, 32:18, 32:21, 32:25, 33:19, 39:9, 42:10, 49:20, 52:18, 56:6, 62:15, 68:1, 68:9, 74:16, 76:10, 76:13, 77:16, 80:24, 85:11, 86:22.
**sentence** 46:4, 59:21, 61:10, 65:7, 70:19.
**Sentinel** 19:24.
**separate** 12:22, 57:20.
**series** 23:21, 66:22, 100:7.
**service** 47:5.
**services** 70:15, 92:14.
**session** 8:16, 11:16, 12:3, 77:24.
**sessions** 12:7.
**set** 25:25, 46:20, 103:21, 106:22.
**sets** 34:21.
**setting** 55:14.
**settings** 34:2, 38:1.
**Seventh** 51:9.
**several** 43:13, 79:21, 79:22, 90:7.
**severe** 60:9.
**Shane** 59:10.
**share** 91:5, 92:20, 97:25.
**shared** 68:7.
**SHEET** 105:1.
**shift** 74:9.
**shipping** 46:6.
**Short** 61:22, 98:23.
**show** 8:9, 10:12, 12:17, 15:3, 15:4, 33:16, 35:1, 50:16, 50:21, 67:12, 73:21, 77:4, 80:11, 82:5.
**showed** 36:4, 42:25.
**showing** 8:7, 19:7.
**shows** 19:8, 20:12, 26:10, 101:18.
**sign** 56:21, 62:24, 63:11, 63:21, 83:4, 83:20, 85:4.
**sign-in** 58:9.
**Signature** 82:23.
**signed** 63:25.
**signed.** 73:6.
**Significance** 68:12, 71:15.
**significant** 68:13.
**significantly** 22:21, 96:18.
**signing** 57:7, 57:13, 63:14, 68:2, 83:18, 84:13.
**signs** 73:5.
**similar** 64:19, 65:24, 89:13.
**similarly** 25:19.
**simply** 10:8, 28:17, 28:22, 53:8, 69:22.
**single spaced** 34:13.
**situation** 30:8, 36:2, 43:16.
**six** 75:4.
**Slide** 62:19, 62:23, 62:24, 63:6.
**slides** 62:15, 63:3.
**slightly** 58:17, 84:12.
**small** 43:2.
**smaller** 57:18.
**smiley** 49:7.
**Social** 19:17, 20:20, 20:21, 20:23, 21:7, 21:11, 21:15, 21:17, 21:19, 21:24, 22:4.
**solve** 51:23.
**somebody** 72:17, 75:9, 75:21.
**someone** 15:20, 19:12, 43:6, 47:1, 47:7, 47:12, 79:11, 79:13, 83:4, 86:2.
**Sorry** 24:19, 30:19, 40:13, 59:1, 74:4.
**sort** 86:5.
**sought** 84:6.
**source** 14:15, 16:16, 16:17, 16:18, 21:23, 26:10.
**Spanish** 96:22.
**Speaker** 73:16, 74:1.
**speaking** 97:11.
**special** 15:8, 15:21, 16:10, 16:12, 16:14, 16:18, 17:3, 43:8, 56:24.
**specialists** 42:5.
**specific** 13:18, 28:13, 34:22, 35:15, 37:15, 43:14, 59:3, 82:12, 83:1, 97:3, 102:20.
**specifically** 14:4, 20:15, 20:24, 26:7, 39:20, 51:14, 75:18, 87:25, 91:15, 92:2, 92:7, 94:17, 94:19, 97:6.
**specified** 9:10.
**specifies** 9:13.
**speculation** 72:21.
**spent** 44:8, 90:15.
**spin** 67:9.
**spoiled** 9:18.
**sponsoring** 89:19.
**spreadsheet** 99:7, 99:11.
**Spreadsheets** 5:19.
**spring** 89:1, 89:2.

**SRD** 15:17.
**ss** 106:2.
**staff** 8:15, 8:17, 8:18, 11:19, 11:21, 12:1, 19:20, 28:4, 33:1, 33:12, 33:13, 38:5, 39:6, 51:22, 52:16, 56:15, 58:14, 62:8, 71:18, 71:20, 72:1, 72:6, 72:16, 73:5, 74:16, 77:11, 78:18, 80:22, 81:17, 81:19, 81:24, 82:15, 85:15, 85:19, 92:13, 92:21, 92:24, 97:15, 98:5.
**standing** 13:25.
**start** 7:21, 8:7.
**Starting** 6:22, 8:11.
**State** 2:7, 2:9, 3:22, 6:12, 6:14, 6:21, 19:22, 22:16, 23:22, 24:7, 26:24, 27:2, 27:4, 42:22, 67:21, 70:1, 72:3, 74:17, 76:11, 78:19, 78:20, 81:5, 89:16, 90:22, 96:10, 96:18, 96:22, 103:2, 106:1, 106:8, 106:14, 106:27.
**state-issued** 87:12.
**statement** 75:14, 87:9.
**States** 1:3, 6:12, 40:16, 41:4, 47:1, 68:12, 75:13, 78:25, 83:1, 84:5, 87:5, 87:10, 103:22.
**statewide** 13:20, 19:16, 26:8, 27:10, 42:7, 70:7.
**statistics** 22:6, 25:2, 25:6, 26:3, 103:5, 104:2.
**statute** 75:19, 75:23.
**statutes** 18:2, 34:22.
**statutory** 17:10, 18:3, 103:2.
**staying** 29:18.
**stenographic** 106:16.
**step** 65:4, 94:8.
**steps** 32:3, 43:8.
**stolen** 50:9.
**stopped** 78:25.
**Street** 2:8, 2:16, 2:23, 6:16, 106:13.
**strike** 55:3.
**string** 39:21, 56:5.
**strong** 55:15, 69:8, 69:11.
**structure** 66:4, 70:14.
**structured** 15:2.
**student** 33:8.
**students** 26:14, 26:23, 27:2, 32:17, 33:3, 34:1, 34:6, 34:8, 34:18, 34:23.
**study** 26:6.
**stuff** 59:14.
**Subject** 27:6, 27:12, 70:11, 73:1, 95:20.
**submit** 30:11, 35:9, 51:5, 75:21.
**submitted** 14:22, 14:25, 16:13, 42:17.
**subscriber** 48:6.
**Subsection** 83:1, 83:13, 84:5, 84:17.
**subsequently** 10:21.
**Sue** 39:23.
**suggestions** 62:18.
**suggests** 46:4.
**Suite** 2:16.
**summaries** 12:6.
**summarize** 8:1, 92:21.
**summarizes** 75:4.
**summarizing** 24:23.
**Summary** 3:12, 8:14, 8:20, 9:4, 9:6, 11:15, 12:2, 70:3.
**supplied** 101:1.
**supposed** 88:3.
**Supreme** 78:19, 89:17.
**surprised** 41:21.
**surrenders** 86:17.
**survey** 4:41, 74:15, 74:18, 74:19, 76:8, 77:12, 77:17, 77:22, 78:7, 78:13, 96:4, 100:17, 102:21.
**surveys** 99:23.
**suspended** 61:12.
**SVRS** 18:14, 18:16, 22:6.
**swamped** 48:10, 48:14, 49:9, 49:11.
**swear** 6:23.
**sweeping** 70:23.
**switch** 56:1.
**sworn** 7:16, 106:11.
**synthesized** 45:2.
**system** 13:20, 19:16, 19:18, 22:5, 22:21, 23:3, 23:9, 23:14, 27:10, 42:8, 42:15, 43:4, 43:7, 70:8.
**systems** 47:24.
.
.
<T>.
**tab** 104:2.
**table** 13:15, 14:12.
**tailor** 37:18.
**talented** 71:17, 71:20.
**talked** 48:22.
**talks** 9:7, 70:6.
**tears** 38:9, 38:13.
**temporarily** 45:20, 45:24.
**term** 49:11.
**terms** 18:5, 18:6, 18:9, 22:11, 34:18, 34:19, 55:16.
**testified** 7:8, 7:16.
**testifies** 65:17.
**testifying** 7:6, 8:2.
**Testimony** 4:33, 6:6, 61:21, 62:2, 64:9, 64:11, 65:5, 65:16, 65:20, 99:25, 100:1, 104:10, 104:12.
**theft** 51:12.
**themselves** 6:21.
**they've** 22:15.
**thinking** 81:1.
**third** 12:24, 13:15, 19:16, 60:16, 68:10, 77:14.
**though** 31:4, 54:2, 90:4.
**thousand** 90:7.
**three** 12:22, 19:10, 38:23, 56:20, 57:5, 57:21, 58:5, 66:17, 101:13.
**three-year** 26:13.
**throughout** 76:10.
**Thursday** 1:22.
**tied** 39:22.
**timing** 64:18, 64:25, 65:23, 66:3, 68:18.



**titled** 18:4.
**today** 7:6, 7:9, 8:2, 8:7, 99:3, 102:14.
**Todd** 2:27, 6:17.
**together** 38:24.
**took** 38:20, 45:9.
**top** 22:18, 40:11, 40:12, 46:3, 58:16, 64:15, 78:23, 80:14.
**topic** 99:2.
**topics** 95:25.
**total** 25:7, 53:17, 55:3, 69:6, 76:18, 100:12, 101:3, 102:2, 102:9.
**touch** 86:1.
**Town** 42:2, 42:11, 49:24, 50:4.
**track** 16:15, 96:15, 100:7, 103:22.
**tracked** 100:9.
**train** 42:7.
**trainer** 80:22, 80:25.
**training** 4:26, 59:15, 59:19, 59:20, 59:23, 60:3, 61:6, 61:8, 83:2, 83:8, 83:10.
**transcript** 5:23.
**transfer** 72:8.
**transition** 68:21, 81:1.
**transmittal** 99:19.
**transmitted** 100:21, 102:14.
**treat** 15:18, 43:4.
**trend** 73:5.
**true** 17:3, 44:22, 44:25, 54:20, 85:2, 95:22, 95:23, 106:10.
**try** 36:20, 51:23, 52:11, 88:16, 91:1, 97:13.
**trying** 17:23, 22:22, 44:8, 51:24,
61:8.
**turn** 79:5.
**turned** 15:7, 15:16.
**turning** 84:17.
**turnout** 98:9, 98:12, 102:2.
**twice** 50:9.
**two** 7:7, 10:22, 12:25, 13:2, 13:18, 27:25, 28:6, 39:13, 52:23, 57:10, 57:22, 57:25, 58:2, 81:1.
**two-thirds** 19:4.
**type** 17:9, 49:3, 100:2, 103:18.
**types** 31:1, 34:19, 60:6, 68:17, 103:16.
**typically** 65:16.
**typing** 47:10.
.
.
<U>.
**ultimately** 53:16, 56:14, 70:15, 72:24.
**Um-hum** 60:15.
**unable** 35:23, 45:24, 83:20, 99:19.
**uncertainty** 71:16.
**undeliverable** 32:5.
**undermine** 66:8, 71:21.
**understand** 10:19, 37:6, 50:20, 71:12.
**understate** 23:7.
**unfounded** 66:22.
**uniform** 69:12.
**unique** 34:17, 36:8, 43:1, 43:15, 49:3, 49:10.
**United** 1:3, 6:12.
**university** 32:17, 33:3, 33:4, 34:1,
34:6.
**unless** 58:1, 86:16.
**unnecessary** 70:12.
**unusual** 46:25.
**upcoming** 68:15.
**update** 44:19, 89:17.
**updated** 23:4, 43:19, 89:15.
**updating** 70:8, 95:20.
**upset** 38:14, 38:19.
**Urban** 14:2.
**users** 92:11.
**using** 20:18, 23:8, 42:7, 52:6, 94:3.
.
.
<V>.
**v.** 105:4.
**vague** 65:2.
**Valley** 85:15.
**value** 21:5.
**Van** 76:9.
**variety** 95:18.
**various** 38:1, 51:24.
**vast** 22:13.
**verify** 12:21.
**version** 58:17, 64:13, 64:14.
**versions** 64:13.
**veto** 54:16.
**via** 16:20.
**Video** 6:4, 6:18.
**VIDEOGRAPHER** 2:27, 6:1, 6:17, 55:22, 61:19, 61:23, 98:20, 98:25, 104:8.
**VIDEOTAPED** 1:20, 2:1.
**view** 33:12, 46:18, 46:21, 51:19, 51:21, 60:8, 70:3, 71:5, 73:9,
97:25.
**views** 8:3, 8:5, 55:11, 68:5.
**virtually** 47:22.
**virtue** 48:6.
**volunteer** 4:26, 62:25.
**Vote** 10:2, 10:15, 31:16, 36:6, 37:8, 37:9, 37:11, 37:12, 37:14, 38:11, 38:15, 38:19, 42:19, 42:21, 42:23, 43:6, 50:21, 57:19, 79:9, 79:11, 85:3, 86:20, 87:3, 94:3.
**voted** 10:13, 10:17, 10:22, 75:9, 79:12, 79:13, 100:8, 100:9.
**voters.** 70:16.
**votes** 34:8, 103:3.
**voting** 5:20, 36:13, 36:17, 37:19, 48:18, 48:20, 49:9, 49:25, 50:5, 51:16, 52:20, 52:21, 53:12, 53:19, 55:9, 55:12, 56:11, 56:24, 94:20, 94:24, 95:9, 99:9, 99:15, 99:16, 102:3, 102:6, 102:9, 103:11, 103:14, 103:18.
**vouch** 19:12.
**vs** 6:11.
.
.
<W>.
**wait** 85:16, 85:20, 86:3, 97:22.
**waiting** 85:23.
**walk** 51:23.
**Walker** 4:17.
**Walsh** 3:46, 41:25, 42:3, 42:4,

43:25.
**wanted** 31:19.
**wants** 50:15, 58:6.
**ward** 101:9, 101:11, 101:24, 102:2, 102:11, 103:22.
**Washington** 41:8.
**Watching** 59:22, 63:20.
**Waukesha** 63:18.
**ways** 28:15.
**web** 93:3.
**website** 8:22, 9:1, 37:14, 37:25, 43:18, 44:2, 44:15, 92:7, 92:19, 95:18, 95:22, 100:6, 104:2.
**websites** 41:10, 41:15.
**weekday** 99:8, 101:4, 101:6, 102:1, 102:2, 102:6.
**weekend** 99:8, 99:16, 101:6, 102:8, 102:11.
**welcome** 27:24.
**West** 2:8, 2:23, 6:15, 106:13.
**Western** 1:4, 6:13.
**whatever** 47:11.
**whenever** 55:23.
**whereas** 15:11, 17:19.
**whereof** 106:22.
**wherever** 58:5.
**Whether** 17:24, 23:23, 29:21, 30:25, 36:15, 40:7, 40:25, 41:9, 41:19, 47:12, 49:11, 63:18, 65:3, 78:11, 84:22, 84:25, 94:18, 97:2, 100:9.
**whole** 88:21, 96:11, 96:19.
**whom** 6:21, 20:22, 21:16.
**will** 6:23, 24:20, 35:13, 38:25, 39:1, 45:11, 49:17, 49:23, 50:4, 51:22, 54:10, 56:2, 58:10, 64:2, 68:13, 68:18, 69:14, 72:10, 72:24, 74:10, 77:4, 78:15, 81:4, 83:13, 84:18, 86:8, 89:17, 95:14, 95:15, 102:23.
**willing** 67:8, 83:23.
**window** 17:22.
**Winnebago** 39:23.
**Wisconsin** 1:4, 1:7, 2:7, 2:9, 2:17, 2:22, 2:24, 6:10, 6:13, 6:15, 6:16, 6:19, 9:4, 20:14, 27:6, 27:20, 36:18, 37:11, 42:19, 42:22, 54:18, 59:19, 59:23, 62:12, 63:15, 63:20, 69:1, 81:20, 90:22, 94:9, 94:13, 96:2, 96:9, 97:2, 105:4, 106:1, 106:9, 106:13, 106:15, 106:27.
**Wisconsin.** 70:1.
**within** 57:21, 58:5.
**without** 16:5, 69:18, 75:9.
**Witness** 2:2, 6:24, 7:14, 20:2, 30:19, 55:19, 105:2, 106:22.
**word** 12:8, 44:2, 90:21, 91:1.
**words** 39:22, 66:10,
66:12.
**work** 11:5, 51:23, 70:14, 90:25.
**worked** 42:5.
**worker** 38:18.
**workers** 61:7, 83:2, 83:19, 100:15, 103:20.
**working** 34:2, 47:24, 72:18.
**works** 31:15, 80:21.
**write** 35:12.
**writer** 40:14.
**writes** 29:18, 56:18, 59:14.
**writing** 106:15.
**written** 52:5.
**wrote** 43:25.
**wry** 49:6.
**WSJ** 4:39.
.
.
<Y>.
**year** 64:19, 68:15.
**years** 13:18, 44:10, 64:24, 68:24, 91:24, 102:22.
**yourself** 8:3, 24:19.
.
.
<Z>.
**zero** 76:6.