MICHAEL HAAS

**Page 1**

```
 1
 2
 3                 IN THE UNITED STATES DISTRICT COURT
 4              FOR THE WESTERN DISTRICT OF WISCONSIN
 5    * * * * * * * * * * * * * * * * * * * * * * * * * *
 6    ONE WISCONSIN INSTITUTE, INC., et al.,
 7                  Plaintiffs,
 8       -vs-                          Case No. 15-CV-324
 9    GERALD C. NICHOL, et al.,
10                  Defendants.
11    * * * * * * * * * * * * * * * * * * * * * * * * * *
12
13
14
15          VIDEOTAPED DEPOSITION OF MICHAEL HAAS
16                   Friday, January 22, 2016
17                        9:14 a.m.
18
19          Reported by:  Lisa A. Creeron, RPR
20
21
22
23
24
25
```

**Page 2**

```
 1          VIDEOTAPED DEPOSITION OF MICHAEL HAAS, a witness
 2    in the above-entitled action, taken at the instance of the
 3    plaintiffs, under the provisions of the Federal Rules of
 4    Civil Procedure, taken pursuant to notice, before
 5    LISA A. CREERON, a Registered Professional Reporter and
 6    Notary Public in and for the State of Wisconsin, at the
 7    Wisconsin Department of Justice, 17 West Main Street, in
 8    the City of Madison, County of Dane, and State of
 9    Wisconsin, on the 22nd day of January, 2016, commencing at
10    9:14 a.m.
11
12               A P P E A R A N C E S
13       BOBBIE L. WILSON,
14          PERKINS COIE, LLP,
              Attorneys at Law,
15          505 Howard Street, Suite 1000,
              San Francisco, California 94105, appearing
16          on behalf of the plaintiffs;
17       CLAYTON KAWSKI,
             Assistant Attorney General,
18          WISCONSIN DEPARTMENT OF JUSTICE,
             17 West Main Street,
19          Madison, Wisconsin 53703, appearing on
             behalf of the defendants.
20       ALSO PRESENT:  TODD CAMPBELL (Videographer)
21                        * * * * *
22
23
24
25
```

**Page 3**

I N D E X

| | | Page |
|---|---|---|
| Examination by: | | |
| Attorney Wilson | | 6/253 |
| Attorney Kawski | | 250 |

| Exhibit | | Identified |
|---|---|---|
| 39 | Email from L. Stottler to M. Haas dated 6-7-13 | 78 |
| 40 | Testimony of M. Haas dated 1-23-14 | 79 |
| 41 | Email from N. Robinson to S. Rossman and others dated 11-3-08 | 87 |
| 42 | Emails between R. Magney, S. Whitt and others dated 10-4 and 10-5-12 | 106 |
| 43 | Emails between M. Haas, D. Buerger and others dated 1-16-14 | 110 |
| 44 | Email from S. Rossman to R. Hein dated 8-12-14 | 112 |
| 45 | Emails between M. Haas, D. Buerger and others dated 10-20-14 | 116 |
| 46 | Emails between D. Buerger, M. Haas and others dated 6-5-12 | 117 |
| 47 | Memo to Municipal Clerks and others from M. Haas dated 9-4-13 | 138 |
| 48 | GAB meeting minutes dated 6-18-15 | 151 |
| 49 | Emails between B. Bell, N. Robinson and others dated 6-5-12 | 158 |
| 50 | Email from M. Haas to A. Coakley and others dated 8-7-12 | 165 |
| 51 | Electronic Proof of Residence for Registration document | 186 |
| 52 | Declaration of Michael Haas | 239 |

**Page 4**

I N D E X (Continued)

| Exhibit | | Identified |
|---|---|---|
| 53 | Letter to Hon. Gwen Moore from K. Kennedy dated 10-8-14 | 249 |

```
                    * * * * *
        (Original transcript is filed with Attorney Kaul)
                    * * * * *
```

MICHAEL HAAS

1    THE VIDEOGRAPHER:  We are on the
2  record.  Seated before you is Mr. Michael Haas.
3  This is Video No. 1 of his video deposition,
4  taken pursuant to notice, at the instance of the
5  plaintiffs, in the matter of One Wisconsin
6  Institute, Incorporated, et al., plaintiffs, vs.
7  Gerald C. Nichol, et al., defendants.  This
8  matter is pending in the United States District
9  Court for the Western District of Wisconsin,
10  Case No. 15-CV-324.
11    This deposition is taking place at the
12  State of Wisconsin, Department of Justice,
13  17 West Main Street, in Madison, Wisconsin.  The
14  date is Friday, January 22nd, 2016.  The time is
15  9:14 a.m.  I am Todd Campbell, videographer with
16  Campbell Legal Video Company of Milwaukee,
17  Wisconsin.  The court reporter is Lisa Creeron
18  of Madison Freelance Reporters of Madison,
19  Wisconsin.
20    Will counsel please first introduce
21  themselves and whom they represent?  Then the
22  court reporter will swear in the witness.
23    MS. WILSON:  Bobbie Wilson from
24  Perkins Coie for the plaintiffs.
25    MR. KAWSKI:  Clayton Kawski, assistant

5

1  attorney general at the Wisconsin Department of
2  Justice for the defendants.
3    THE VIDEOGRAPHER:  Thank you.
4    MICHAEL HAAS,
5    called as a witness, being first duly
6    sworn in the above cause, testified
7    under oath as follows:
8    THE VIDEOGRAPHER:  Please proceed.
9    EXAMINATION
10  BY MS. WILSON:
11  Q  Good morning, Mr. Haas.
12  A  Good morning.
13  Q  My name is Bobbie Wilson, and I'm going to be taking
14  your deposition today.  You are a lawyer, right?
15  A  Correct.
16  Q  And so are you familiar with the -- sort of the rules
17  of the game --
18  A  Yes.
19  Q  -- for depositions?
20  A  Yes.
21  Q  So I won't bore you with them again, but I will say
22  that for the sake of the poor court reporter because
23  I as a former New Yorker tend sometimes to talk fast
24  and talk over folks that you -- we wait until each
25  other is finished.  I finish my question even if you

6

1  think you know where I'm going; you finish your
2  answer.  If you need a break, let me know.  The only
3  thing I ask is if I have a question pending, unless
4  it's one of privilege, that you respond before we
5  take a break.
6    Is there any reason today that you cannot give
7  me accurate and truthful testimony?
8  A  No.
9  Q  Can you tell me -- let's talk a little bit of
10  background.  What is your current position?
11  A  I work at the Wisconsin Government Accountability
12  Board.  Currently I'm the division administrator for
13  the elections division.
14  Q  And you've been the -- in that position since what,
15  January 2013?
16  A  I'm sorry, yes, January 2013.
17  Q  Okay.  And can you describe for me currently what
18  your duties are?
19  A  Sure.  I supervise and manage the elections division
20  staff, which is approximately 25 individuals in
21  addition to a contract IT team of four individuals,
22  and our responsibilities are generally to administer
23  and enforce Wisconsin election laws.  So there's a
24  variety of duties that are involved, but that's our
25  general mission and responsibility.

7

1  Q  And when you say -- I'm sorry, what was the last part
2  that you said?
3    (Reporter reads back requested portion of transcript)
4  Q  There was a -- is there anything else associated with
5  your particular position?
6  A  Well, I guess in my position, there are also a
7  variety of duties.  I represent the division, I
8  direct our staff, communicate a lot with our local
9  election officials, municipal and county clerks.  I
10  work with the Legislature on pending legislation and
11  implementing legislation that's been passed.
12  Sometimes I also deal with the media and just acting
13  as part of the management team for the agency.
14  Q  Now, you said work with the Legislature on pending
15  legislation.  What sort of things do you do in that
16  role?
17  A  When the Legislature notifies us that they are
18  working on legislation, a particular legislator may
19  or may not contact us and ask us for input either to
20  discuss policy issues or more frequently to discuss
21  how the legislation would be implemented and any
22  challenges or obstacles that we might see from either
23  a state or local perspective.
24    Then we also, of course, testify in public
25  hearings.  Usually our director, Kevin Kennedy, or

8

1  myself on election matters try to provide whatever
2  feedback we can about any amendments and then, of
3  course, after it's -- any legislation is passed, we
4  implement the law, and sometimes that results in
5  follow-up with the Legislature about any questions we
6  may have about what the Legislature intended.
7  Q  Does -- when you're speaking with the Legislature, is
8  it simply -- are you doing it from the lens -- let me
9  rephrase.
10     When you're talking to the Legislature, are you
11  talking through the lens of the group of clerks that
12  you're responsible for, or are you speaking sort of
13  through the lens, if you understand my question, of
14  the voter?
15         MR. KAWSKI:  Object to the form of the
16     question.  You can answer.
17  A  I think it depends.  I think the expertise that we
18  would have to offer to the Legislature I would
19  categorize as being threefold.  We can talk to the
20  Legislature about implementation issues at the state
21  level and then implementation at the local level.
22     There's a lot of coordination between our office
23  and local election officials because elections are
24  run at the municipal level in Wisconsin and then also
25  anything that we can perceive that might affect

9

1  voters and the voting process and so that's -- you
2  know, that can involve, of course, both local clerks,
3  the election inspectors or poll workers and then also
4  voters and also other people that participate in the
5  process, such as election observers.
6     And so I think because we are involved with all
7  those parties, sometimes we can bring some expertise
8  to the discussion about what we have experienced or
9  observed.
10  Q  And in advising or talking to the Legislature, do you
11  reach out to groups that might be affected by the
12  particular pending legislation?
13  A  We're most likely to try to reach out to the local
14  election officials.  There might be instances where
15  there are specific groups that would have some input,
16  but I think they are probably more likely to reach
17  out to us or to come to one of our board meetings to
18  express their opinions.  We don't have really a
19  structured system of reaching out to any
20  organizations other than the organizations that
21  represent the local clerks.
22  Q  We'll talk a little bit more about that, but let me
23  continue with a little background.  So prior to this
24  position, what was your last position?
25  A  I was one of the two staff counsel at the Government

10

1  Accountability Board from October 2008 until --
2  through December 2012.
3  Q  And what were your duties there?  And let's put it in
4  the time frame just before you took the next
5  position.
6  A  Well, as one of the two staff attorneys, we
7  represented the entire agency, so that would be both
8  the elections division and the ethics division.  And
9  so the agency being responsible for election law,
10  campaign finance law, lobbying law and the code of
11  ethics for public officials, there were a variety of
12  issues we worked on.
13     We worked with our staff on program initiatives,
14  obviously provided legal advice to both the staff and
15  to our board, prepared materials for our board to
16  make either policy or legal decisions, again worked
17  with local election officials when the agency was
18  involved in litigation.  We would be involved in that
19  obviously and again working on legislative issues
20  either as legislation was being considered or in
21  trying to interpret it for our staff so they could be
22  administered properly.
23  Q  And did you work in a particular subject matter area?
24  A  You know, towards the end of that period, I think I
25  focused more on -- the assignments I received were

11

1  focused more on the elections side.  I was involved
2  in campaign finance issues.
3     There was a major campaign finance bill called
4  the Impartial Justice Act that was passed in 2010 and
5  we had to scramble a bit to get it in place for the
6  2011 Supreme Court election.  That was a public
7  financing bill for Supreme Court candidates, and I
8  was the lead attorney in trying to make sure that the
9  agency implemented that law correctly.
10     I was involved also as a lead attorney on the
11  photo ID law, and I think Director Kennedy's approach
12  was that he wanted both of the attorneys to have
13  experience providing assistance to both of the
14  divisions.  As things developed, I tended to get more
15  assignments in the elections division than the other
16  staff attorney.  Shane Falk tended to focus more on
17  campaign finance, especially when we had some
18  significant campaign finance litigation that required
19  a lot of time and focus.
20  Q  And when you used the term lead attorney, did that
21  give you different responsibilities?
22  A  Well, it was just basically that for that subject
23  matter, I was the one responsible for making sure
24  that assignments got done is essentially what that
25  meant.

12

MICHAEL HAAS

```
 1 Q   And so when the voter ID law came into effect, you
 2     were the main lawyer for that?
 3 A   Correct.
 4 Q   And -- I'm sorry.
 5 A   And when I was being the main lawyer did not exclude
 6     the other attorney from participating.  It was just
 7     that we had to divide up priorities and we would
 8     obviously consult with each other, but I was
 9     designated as the attorney that the staff would come
10     to for questions or that might communicate with the
11     clerks or the Legislature about that topic.
12 Q   What is the role of the -- can I use the term GAB?
13 A   Sure.
14 Q   What is its role?  What does it do?
15 A   Well, it was, as you may know, it developed out of
16     two prior agencies, the Elections Board and the
17     Ethics Board, and so the Legislature created the GAB
18     to begin in 2008 with the combined mission of taking
19     over those subject matters that I mentioned.
20         And so in general, as I said, we administer and
21     enforce laws related to Wisconsin elections, campaign
22     finance laws, the lobbying laws and the code of
23     ethics.  And it's a lot of -- some of those subject
24     areas obviously interact with each other, but we
25     administer those laws.
```
13

```
 1         So on the campaign financing side, for instance,
 2     all candidates running for state and federal office
 3     file their nomination papers with us and our staff
 4     counts the signatures and makes recommendations to
 5     our board as to whether or not they qualify for the
 6     ballot.  State -- candidates for state office need to
 7     file their campaign finance reports with our agency,
 8     and we put all that data on our website so it's
 9     available to the public.
10         We provide legal opinions and guidance to public
11     officials, candidates, lobbyists.  We receive and
12     process complaints that people may have either about
13     a decision of a local election official or a
14     candidate for public office or a public official, and
15     then our board may rule on whether or not it believes
16     any violations of the law occurred.
17         On the campaign finance and ethics and lobbying
18     side, our board can impose penalties, financial
19     penalties against those actors.  We can -- if there
20     is a complaint filed against a local election
21     official, we process that complaint and ultimately we
22     can issue a decision as to whether or not the local
23     election official violated the law or abused their
24     discretion.
25         But really the nuts and bolts of the election
```
14

```
 1     administration is processing things at the state
 2     level and then training the local election officials
 3     and assisting the local election officials so that
 4     they can administer elections.
 5         We are also responsible for hosting and
 6     maintaining the statewide voter registration system,
 7     which contains all the data related to voters and
 8     elections in Wisconsin, and it's really an election
 9     management system for both our office and the local
10     clerks to be able to create ballots, create poll
11     books and, you know, manage all of the data that's
12     involved with elections.
13         So as I said, there's a variety of duties, but
14     those are I guess an overall description of our
15     general responsibilities.
16 Q   And does the GAB enjoy a good reputation?
17 A   It depends who you talk to.
18 Q   What do you think?
19 A   I think it has earned a good reputation.  I guess I
20     would put it that way.  I think there's been
21     obviously a lot of attention paid to the agency.  I
22     think it has enjoyed a good reputation amongst
23     election officials and individuals in the elections
24     profession across the country.  It's been the subject
25     of a number of studies or articles about the
```
15

```
 1     structure of the agency and how that compares with
 2     other states.
 3         Obviously it's been involved in some high
 4     profile and some controversial issues and events and
 5     so not -- obviously not everybody agrees with the
 6     decisions that either the staff or the board has
 7     made.  So I think we have a very dedicated,
 8     professional staff that I think does its best every
 9     day and despite a lot of outside distractions or
10     media attention or political controversy has really
11     done an excellent job in the tasks that it's
12     assigned.
13 Q   Does the board investigate and then -- let me
14     withdraw that.
15         Does the board need someone to initiate a
16     complaint before it does any investigation?
17 A   It is not required to, but in most cases a complaint
18     is initiated by an outside party.  The board does
19     have the authority under the statutes to initiate an
20     investigation if it -- it becomes aware of a
21     potential issue.
22 Q   And what did you do prior to the GAB?
23 A   I was in private practice with a small general
24     practice firm for about 14 years.
25 Q   And the Legislature has decided to get rid of the
```
16

```
 1       GAB, isn't that right?
 2   A   Correct.
 3   Q   And when is that going to be?
 4   A   That will be effective June 30th, 2016.
 5   Q   And if you know, what or who will take over all the
 6       duties that you're doing now or -- I'm sorry, let me
 7       rephrase that -- what the GAB is doing now?
 8   A   The legislation created two new agencies, an
 9       Elections Commission and an Ethics Commission.  The
10       Elections Commission will be solely responsible for
11       election laws, and the Ethics Commission will take
12       over jurisdiction of the other subject areas,
13       campaign finance laws, the ethics code for public
14       officials and the lobbying laws, which are now
15       generally the responsibilities of the ethics division
16       within the GAB.  So that will be the division of
17       labor starting in July.
18   Q   And did you have an opportunity to speak to the
19       Legislature about getting rid of the GAB?
20   A   Yes.  I'm trying to think if I testified about that
21       bill.  I don't recall if I testified, but I've
22       certainly had discussions with individual legislative
23       staff and some legislators about the bill.
24   Q   Was there any concern about getting rid of the GAB in
25       the middle of a presidential election?
                                                          17
```

```
 1                MR. KAWSKI:  Object to the form.  You
 2           can answer.
 3   A   Was there any concern by who?
 4   Q   By you or anyone at the GAB.
 5   A   Our director, Kevin Kennedy, I think certainly
 6       expressed that concern, that we're in the middle of a
 7       presidential year, that's the pinnacle of a four-year
 8       cycle and that we -- that the partisan primary in the
 9       fall is in August, which is six weeks or so after the
10       transition, and he did express some concern about
11       making the change at that time.
12   Q   Do you share it or did you share his concerns?
13   A   I think it's certainly a concern and it's a
14       challenge.  I think at the GAB, we've been through so
15       many different changes with legislation and just
16       events that have happened that our staff has become
17       pretty resilient.  I think there's some concern about
18       local election officials and whether they feel it
19       will have any impact on them.
20           But I think at this point now that the bill has
21       been passed and enacted and we're in a transition
22       planning stage, there's less uncertainty amongst the
23       staff because they know that they are guaranteed
24       positions to transfer to one of the two new agencies.
25       So I think in general we are hoping that on a
                                                          18
```

```
 1       day-to-day basis there's not going to be a lot of
 2       impact for clerks or voters or the public, but there
 3       are a lot of details that have to be addressed in the
 4       transition.
 5   Q   Were you involved in any discussions about whether
 6       there would be an impact on the voters, this change?
 7   A   Well, I think just general discussions internally and
 8       it probably came up generally in discussions with
 9       legislative staff.
10   Q   And is there anything that the GAB is supposed to do
11       to make it easier for voters during this transition?
12   A   Well, I don't know specifically if it's related to
13       the transition.  We have a mission to educate voters
14       about election laws, and so that's something that has
15       been ongoing and is going to continue and would
16       happen regardless of whether there was a change in
17       the agency.
18   Q   So I understand this, so the GAB doesn't -- when
19       you're talking to the Legislature about a new bill,
20       the GAB doesn't take a position, right?  Am I right
21       about that?
22   A   Most times it does not.  In some cases our board has
23       specifically adopted a legislative agenda.  For
24       instance, this session the board has approved a
25       motion in favor of enacting online voter
                                                          19
```

```
 1       registration, and it approved a number of other items
 2       that our staff brought to them as a legislative
 3       agenda.
 4           But in many cases, a bill may come up that the
 5       board has not had an opportunity to weigh in on, and
 6       so our practice is to present testimony for the
 7       information of the Legislature and not to take a
 8       position for or against it, and I think in general
 9       that's because we recognize we are an administrative
10       agency and not a policy-making body and our job is to
11       implement whatever laws are enacted.
12   Q   But you guys are sort of on the ground, though,
13       right?
14   A   Correct.
15   Q   Where legislators tend to be up in the clouds
16       sometimes.
17                MR. KAWSKI:  Object to the form of the
18           question.
19                MS. WILSON:  I haven't asked a
20           question yet.
21                MR. KAWSKI:  Sorry.
22   Q   When you make -- when you see, for example, that a
23       piece of legislation may have an impact on the voters
24       and you testify to the legislative body, is your --
25       and I'm just trying to understand how you guys work.
                                                          20
```

1   Are your views given deference?
2              MR. KAWSKI:  Object to the form.
3              THE WITNESS:  Go ahead and answer?
4   Q   Yeah.
5   A   It depends.  And I don't know that I could answer
6       that question.  It's up to each individual legislator
7       or committee.  My experience in testifying in front
8       of committees is that they have always received our
9       testimony and expressed appreciation for it and in
10      some cases it does result in some issues being
11      addressed.  In other cases, it may -- the issues that
12      we identify may not be addressed in any amendments,
13      but again those are policy decisions.
14  Q   So let's talk a little bit about what you do, if
15      anything, to sort of stay abreast of the changes in
16      the election laws.  And there have been quite a few
17      since 2010, right?
18  A   Correct.
19  Q   And so how do you stay abreast of all the changes in
20      the job that you have currently?
21  A   A couple ways.  We have a pretty close working
22      relationship with legislative staff who work for the
23      chairs of the election committees in both the
24      Assembly and the Senate.
25              We subscribe to legislative notices, so if a

21

1   bill is introduced, we know, and we know the status
2   of it the entire way through.  We get those daily
3   updates, and we -- and then we have both general
4   and specific conversations with legislative staff
5   about what's coming up, what the progress of a bill
6   might be, what they expect to take on in any
7   particular session.  And so partly just developing
8   those relationships and working with those people to
9   make sure we know informally what the status is and
10  then obviously we track it as it goes through the
11  committee process and on the vote of the Legislature
12  and we make sure that we understand the status
13  because part of our job is to explain to local
14  election officials what was enacted and how it should
15  be implemented.
16          And so both as staff attorney and in my current
17  position, I've been involved in helping to track
18  legislation and I guess interpret for local election
19  officials and for our staff.
20  Q   And do you keep track of newspaper articles, for
21      example, that are talking about the different
22      changes?
23  A   Well, I read them.  We don't necessarily keep a file
24      of them.  If there's something that I think is
25      significant, I might try to save an electronic copy

22

1   and put it in a folder.  But we have a public
2   information officer who is pretty good about
3   collecting newspaper articles and he'll send around
4   links to those articles both to our staff and to our
5   board so that the agency is generally kept aware of
6   developments.
7   Q   Is part of your current job to talk to members of the
8       press?
9   A   Sometimes it is.  Not one of my primary
10      responsibilities, but I have some experience doing
11      that, and when our public information officer is out
12      of the office for any reason, usually I'm the one
13      who's designated to take media calls, and sometimes
14      that might be responding directly to the media.
15      Sometimes it may be just arranging contacts with our
16      director, Kevin Kennedy.
17  Q   And are you also responsible in your current job for
18      dealing with members of the public directly?
19  A   Yes, yes.
20  Q   And in what kinds of situations does that happen?
21  A   It could be a number of ways.  I guess the things
22      that come to mind are we receive phone calls every
23      day from voters or members of the public.  Again they
24      might be thinking about filing a complaint.  They
25      might just have a question about what the law is and

23

1   whether or not it's been applied correctly.
2           There are also members of the public that are
3   involved in observing elections and some
4   organizations that are active in that area, and that
5   was one issue that I dealt with quite a bit and so
6   they may also call up and have questions.  They may
7   have input into policy documents that we are
8   preparing.  We put out manuals on administering
9   elections and we've had members of the public who
10  have taken a particular interest in, for instance,
11  voting at nursing home and at other adult care
12  facilities, and that's -- we have a manual to
13  describe what that process is supposed to look like,
14  which our board -- we were asking our board to adopt
15  and sign off on, and we had some members of the
16  public who were very interested in that and they
17  actually offered suggestions for improving that
18  manual.
19          I've also been asked to speak at some events of
20  organizations that are interested in election laws
21  and just about either new legislation or the new
22  photo ID law or elections in general.  When we've had
23  activities that are more high profile, for instance,
24  when Wisconsin was going through a series of recall
25  elections and in controversies, sometimes we would

24

MICHAEL HAAS

1  have individuals or groups of people that would show
2  up at the office and they had complaints or an agenda
3  that they wanted somebody to pay attention to. So
4  sometimes I would just be the one to go out and
5  communicate with them.
6  Q  Would it be accurate to say that the GAB has input,
7  some input -- could have some input into a pending
8  piece of legislation, but once it's implemented, once
9  the Legislature signs off on it, that your job, the
10 job of the GAB is simply to implement that law?
11 A  Yes. And I guess the only caveat is sometimes there
12 are some gray areas in the law that the Legislature
13 did not address and we're put in the position of
14 trying to interpret what was intended, and in some
15 cases we have to make a decision at the staff level
16 simply to be able to answer questions on a daily
17 basis and sometimes we determine that it's
18 significant enough that we would like our board to
19 essentially adopt or sign off on an interpretation of
20 the legislation.
21 Q  And going back just a second to how you keep abreast
22 of the changes, do you read studies on voting
23 patterns or studies on how -- on like, for example,
24 the president's election commission report and things
25 like that, do you read those kind of studies?

25

1  A  Yes, I specifically read the presidential commission
2  report. There are a lot of reports that -- we
3  subscribe to a number of blogs and that are just
4  filled with articles or reports that I just don't
5  have time to study and just try to keep an eye on
6  things, but try to -- that report in particular, we
7  reviewed it, we had staff meetings about how it might
8  apply to Wisconsin elections, but there are a lot of
9  academic studies or journalistic reports that I see
10 come through the email but just don't have time to
11 digest.
12 Q  In your current position, do you have to approve or
13 sign off on, for example, press releases?
14 A  I will have -- often have input into the draft of a
15 press release. The public information officer is the
16 one typically who will draft them. But as with many
17 projects, it's often a team approach and we'll try to
18 make sure that whoever has some subject matter
19 expertise in it is able -- has an opportunity to
20 contribute.
21      I also in a prior job had some experience as --
22 essentially as communicating with the media, being a
23 press officer essentially and in the public sector,
24 and so based on that experience, generally
25 Kevin Kennedy has given me an opportunity to try to

26

1  weigh in. But I usually don't -- well, in some cases
2  I might sign off on the press release if it has to do
3  with a subject area that I'm familiar with and that
4  I'm responsible for. Kevin Kennedy has the ultimate
5  sign off on it, but I certainly have an opportunity
6  to provide input.
7  Q  And if you saw something incorrect in a press
8  release, you'd speak up and say something?
9  A  If I noticed it, correct, yes.
10 Q  Okay. As part of your current duties, do you also
11 prepare Mr. Kennedy for testifying before the
12 Legislature or any other body?
13 A  In some cases. Again it's often a team project to
14 prepare testimony, but oftentimes Director Kennedy
15 will make the first draft of testimony and circulate
16 it for input. In some cases where I've been
17 primarily responsible for either the subject area or
18 if we anticipate that I will be testifying, I might
19 take a crack at the first draft and circulate it.
20      But Kevin is very open about taking input from
21 the entire staff and he's been in the position for so
22 long that he doesn't need a lot of preparation. He
23 has the most knowledge about the history of the
24 legislation of anybody in the office. But it always
25 helps to toss out ideas and make sure everybody's on

27

1  the same page.
2  Q  You used the word teamwork a couple of times. Does
3  that mean that before a press release goes out or a
4  position is taken by the GAB that there has to be a
5  consensus amongst the group?
6  A  Well, generally there is. Ultimately it's
7  Director Kennedy's call, but usually we -- there
8  isn't -- at least on the election side, usually a
9  consensus develops and there's not a lot of dispute
10 about the direction. It tends to be wordsmithing and
11 how things are phrased.
12 Q  So would you consider you have a lot of experience
13 with election law?
14 A  Compared to the average person, yes. Not compared
15 to --
16 Q  Mr. Kennedy?
17 A  Yeah, or others around the country who are involved
18 in election law.
19 Q  Okay. And you've been involved in election law with
20 the GAB since 2008?
21 A  Yes.
22 Q  Would you say that there have been -- and I might
23 have asked you this already, and I apologize -- a lot
24 of election law changes in Wisconsin since 2010-2011?
25 A  Yes.

28

1 Q   Do you know how many changes there have been?
2 A   I don't know how many total.  I seem to recall in one
3     legislative session, maybe the 2011 session, a number
4     in the 20s came up, but I don't remember the specific
5     number.
6 Q   And that was just in one year?
7 A   In one two-year cycle.
8 Q   One two-year cycle.  What impact does frequent
9     changes in the election laws have on your group at
10    the GAB?
11 A  Well, a number of things.  We -- our staff first
12    needs to make sure it stays up to date on the
13    election law changes.  We have to implement any
14    changes that are required within our office and then
15    we need to make sure we understand it well enough to
16    communicate it to local election officials.  And
17    that's generally the progression we take is to make
18    sure we understand the law, what we have to do and
19    then we work on communicating that to clerks in a
20    variety of ways.
21 Q  And how do you communicate that to clerks?
22 A  A couple of different ways.  Our training involves
23    regular communications to clerks that we post on our
24    website that are available to all clerks with
25    reminders that we send out every couple weeks to

                                                    29

1 check those communications and then our whole
2     training program, which includes in-person
3     presentations to clerks and it also involves regular
4     Webinars.
5         We have in the last couple of years transitioned
6     to much greater use of Webinars.  We used to have
7     essentially phone conference training with clerks
8     around the state and we've transitioned to using
9     Webinars that clerks can either attend live or they
10    can view.  We post them after the fact and they're
11    available for clerks -- clerks or election inspectors
12    to view on their own time.
13 Q  Is there some type of -- you know how we have CLE as
14    lawyers?
15 A  Um-hum, um-hum.
16 Q  Is there some type of mandatory training amount --
17    withdraw it.  Is there a mandatory amount of time
18    they have to train on new election laws?
19 A  There is.  We have statutes and administrative rules
20    requiring, specifically requiring clerks and chief
21    inspectors to have a specific number of hours of
22    training.
23        And so for a clerk in a two-year cycle, they're
24    required to complete a three-credit three-hour core
25    training prior to conducting their first election if

                                                    30

1 they're a new clerk and then they're also required to
2     take an additional three hours of training during the
3     two-year period in order to be certified for the next
4     cycle.  So essentially in a two-year cycle, they are
5     required to take six credits.
6         Many clerks participate in a lot more training
7     than that between the Webinars and our in-person
8     training, but that's a requirement for clerks.
9 Q   How much training do you offer a year on average to
10    your clerks?
11 A  Let's see.  It depends on the election cycle.  We try
12    to structure the timing of the training so it's most
13    relevant for clerks.  So in the last few weeks, I
14    think we've had a Webinar each Wednesday the last
15    three weeks getting ready for this election cycle.
16        We publish a whole list of Webinars about six
17    months in advance.  I couldn't guess how many there
18    are, but going into an even numbered year, we would
19    have more Webinars than we would in an odd numbered
20    year.  And then we participate in two or three state
21    conferences of county clerks and provide them with
22    training that might be a three-hour training session.
23        We also participate in the regional meetings of
24    municipal clerks around the state.  I was just at one
25    last week where we provided three hours of training

                                                    31

1 on various election topics, and we will usually
2     attend those regional meetings at least once an
3     election cycle, sometimes twice depending on who
4     wants to invite us to their meetings, and we also
5     have our manuals that clerks are -- use essentially
6     as their guide in managing elections.
7         So we have an election administration manual to
8     sort of walk them through the entire cycle of an
9     election and then we have an Election Day manual
10    focused on what election inspectors and clerks need
11    to do on Election Day.  We have some specialized
12    manuals, as I mentioned, one having to do with voting
13    at adult care facilities.  We have a recall manual
14    and a recount manual.
15        So those, if there are legislative changes, we
16    need to update those manuals to make sure that they
17    are current.
18 Q  And that's all that is done by the -- what did you
19    say 25, 26 folks that you supervise?
20 A  Yes.
21 Q  Are most of your clerks part time?
22 A  Yes.  There was a study indicating that approximately
23    two-thirds of the clerks were part time.  That was
24    sometime in 2010 or 2011 I think that survey was
25    completed.

                                                    32

1  Q   And when you're thinking part time, what are you
2      thinking of hours per week?
3  A   It could range I think probably between 10 and 30
4      hours a week.
5  Q   Now, is the part time — the clerks who are working
6      part time, is that a particular position or is that a
7      choice, in other words, that you can choose to work
8      part time as a clerk or you can choose to work full
9      time?
10 A   Usually it's determined by the governing body.  So we
11     have cities, villages, towns, and clerks can be
12     either elected or appointed depending on what the
13     governing body decides.  And most clerks in Wisconsin
14     are appointed, but there are some clerks that are
15     elected.  And many of the part-time clerks, they have
16     another primary job and this might be their second
17     job.
18 Q   So does the GAB have any role in hiring or
19     supervising clerks?
20 A   We do not hire or appoint clerks.  We don't have any
21     authority to discipline clerks or to determine how
22     many hours a week they spend on election related
23     matters.
24         They're also responsible usually for a whole
25     variety of other tasks, budgeting or personnel or

33

1      issuing dog licenses, a variety of things, and they
2      often remind us that all of the information we are
3      providing to them is — goes along with all the other
4      duties that they have.
5  Q   How much confidence do you have that the clerks that
6      participating in the training that the GAB is
7      providing?
8  A   Well, we track their participation in the training
9      that they are -- the core training that they're
10     required to have.  And it's hard to tell, for
11     instance, if we have a Webinar going on if clerks are
12     focused on it and learning from it immediately or if
13     they're preoccupied with something else in their
14     office while they're watching the Webinar.
15         But we may find out after the fact that maybe
16     there was a mistake or a challenge that arose that
17     might have been prevented if they were following the
18     training we provided.  So we have 1,853
19     municipalities in Wisconsin, so that's how many
20     clerks there are for us to train.
21         And there's also quite a bit of turnover.  The
22     estimate is that there's 25 percent turnover in those
23     clerks every year.  And so we can train up clerks and
24     get them all set and they may leave for another
25     position.  So it's a constant challenge to make sure

34

1      that we are providing up-to-date information and also
2      making sure that the new clerks are brought up to
3      speed as quickly as possible.
4  Q   And I guess no way to know whether they read the
5      memos that you send about the new laws, right?
6  A   Correct.
7  Q   So of the 1,853 clerks, do you know what the
8      demographics are?  Let me ask you that first.
9  A   I do not.  I have a just general idea communicating
10     with the clerks and getting to know them around the
11     state, I have some general idea that it tends to be
12     largely women in that position, a mix of clerks that
13     have been in that position for 30 years and some
14     brand new clerks, and the level of education and
15     expertise varies widely.
16 Q   As does the amount of experience, I take it?
17 A   Right.  And that poses a challenge for our agency to
18     make sure that we are communicating effectively but
19     also to an audience that learns in a lot of different
20     ways, and that's just a continual issue that we pay
21     attention to in our training program.
22 Q   Is there a minimum educational requirement to be a
23     clerk?
24 A   No.
25 Q   And do you know whether or not that your 1,853 clerks

35

1      are ethnically and racially diverse?
2  A   I assume they, you know, in general reflect the local
3      population.  And Wisconsin in some parts of the state
4      is ethically diverse and in other parts it's not.
5  Q   And do you know what contributes to the 25 percent
6      turnover?
7  A   I think it is just a combination of individual
8      circumstances, what other opportunities individuals
9      have.  Maybe sometimes it's local issues or local
10     politics.  Some clerks have expressed to us that they
11     feel that regarding elections, a large number of
12     changes have caused them to think about whether or
13     not they want to stay in the position, but that may
14     not be the only reason that they decide to leave.
15 Q   Because a large number of changes requires new
16     education, right?
17 A   Correct.
18 Q   Have you read the complaint, the amended complaint in
19     this case?
20 A   I skimmed it briefly, yes.
21 Q   And did you read Mr. Kennedy's deposition?
22 A   No.
23 Q   Would you say that the — I think you called it the
24     photo ID law was one of the most sweeping changes
25     ever to occur in voter — in election law in

36

MICHAEL HAAS

**Page 37**

```
 1    Wisconsin?
 2              MR. KAWSKI:  Object to the form of the
 3    question.
 4 A  Well, I really only started paying attention closely
 5    to election law really in 2008, and so I guess I
 6    can't judge historically.  I think it was one of the
 7    most significant package of changes since I've been
 8    involved at the GAB.
 9 Q  And why do you say it was the most significant
10    package of changes?
11 A  Because it, first of all, impacts every voter, and so
12    that's -- be it a large general election will have
13    close to three million voters and so every individual
14    voter has to internalize that message about what they
15    need to be prepared to come to the polls and get a
16    ballot that they can cast.
17         And it also involved a lot of details as to what
18    individuals needed to do to obtain an ID, and that
19    message had to be communicated in an understandable
20    way not only to the public but also to clerks so that
21    clerks could answer questions and that they could
22    train their election inspectors.
23         There were also a number of other changes that
24    were involved in the voter photo ID law separate from
25    the requirement to present an ID.  And so we needed
```

**Page 38**

```
 1    to make sure we had a handle on all of those changes,
 2    many of which went into effect even while the photo
 3    ID requirement was stayed by the courts.
 4 Q  And when was the photo ID law, what year was that?
 5 A  2011.
 6 Q  And so I think you told me you were the -- maybe I'm
 7    misremembering this.  What was your -- let me just
 8    ask you.  In 2011 what was your role with respect to
 9    the photo ID law?
10 A  I was a staff attorney at that time and so again I
11    got involved early on in the process from the time it
12    was introduced and we were looking at presenting
13    testimony through its consideration by the
14    Legislature and then helping to implement it.
15         Almost every individual in the elections
16    division was involved in the implementation.  The
17    division was organized into teams to really evaluate
18    what the law did and to take on certain projects so
19    that we could make sure it was implemented
20    correctly.
21 Q  And what -- were there specific things that you had
22    to do to make sure it was implemented correctly?
23 A  Yes.
24 Q  And what were those things?
25 A  Well, we needed to make sure we updated all of our
```

**Page 39**

```
 1    training materials.  We had a specific responsibility
 2    to create a public information and awareness program.
 3    So that involved developing a budget and a plan for
 4    exposing the public to what the law meant and what it
 5    required.
 6         We created in conjunction with an outside firm a
 7    lot of resources like flyers, posters, public service
 8    announcements for radio and TV.  We had what we
 9    called a Speakers Bureau where we would send out
10    staff to organizations that invited us to come and
11    speak about the law.
12         We created resources so that clerks could have
13    handy references about which photo IDs were
14    acceptable.  We reviewed -- the law allowed student
15    photo IDs to be used if they were issued by a
16    university or college.  So we worked with the
17    University of Wisconsin System and other private
18    universities and colleges to advise them about what
19    was required for photo ID.  Many of those schools
20    would send us what they intended to use to ask for
21    our opinion as to whether or not it was acceptable.
22         We had to make sure that our staff was trained
23    on what the law required so that we could provide
24    advice and respond to phone calls and inquiries about
25    it.  I know I'm missing other tasks, but it was just
```

**Page 40**

```
 1    a whole slew of priorities that we had to take care
 2    of to make sure it was implemented.
 3 Q  And with respect to the public, were there specific
 4    groups that were targeted?
 5              MR. KAWSKI:  Object to the form.
 6 A  Well, I'd say I mean in general, first of all, we
 7    were just targeting the entire state.  Specifically
 8    in the public outreach program, I think a certain
 9    part of the public service announcements and
10    materials, I think there was a certain percentage of
11    that that we in some parts of the state wanted to
12    make sure we were reaching the entire population, so
13    there were -- some of those announcements may have
14    been placed with media that the outside firm expected
15    would be able to reach a certain audience more
16    effectively.
17 Q  But wasn't there -- weren't there groups of people
18    who were particularly vulnerable to the changes that
19    you tried to reach out to?  For example, the elderly?
20              MR. KAWSKI:  Object to the form.
21 A  That was certainly one of the arguments.  And I think
22    our approach was -- I think actually the legislation
23    specifically stated that we had a responsibility to
24    reach out to segments of the population that might
25    have difficulty -- that either may not have a photo
```

MICHAEL HAAS

1  ID or that might have specific difficulty in
2  obtaining a photo ID.  And so we tried to develop our
3  own materials to make sure the law was understandable
4  for those members of the public.
5       I guess I was speaking earlier more about the
6  public outreach which was really spearheaded and
7  developed by the outside firm that we contracted
8  with.
9  Q  And who was that outside firm?
10 A  It's called KW2.  It's a local firm here in Madison,
11 Wisconsin.
12 Q  And so they would develop public service
13 announcements for radio and TV?
14 A  Right, with our input.  We have a website called
15 Bring it to the Ballot, and that was our photo ID
16 website, and KW2 developed the website along with all
17 the public service announcements and all the
18 materials that can be downloaded from that site, but
19 our staff would review what they had proposed and had
20 a lot of input into the substance of what was
21 produced.
22 Q  So you said that that was one of the arguments when I
23 asked you about the elderly and other groups.  Did
24 you have any concern that with this photo ID, this
25 new law, that there would be certain groups like the

41

1  elderly, African-Americans, Latinos, students who
2  might be — where the law might — that particular
3  law might be more of a burden for them than others?
4       MR. KAWSKI:  Object to the form.
5  A  We had a concern about making sure the law could be
6  implemented as smoothly as possible for everybody,
7  and so we would be — you know, obviously we read all
8  the newspapers and what was being said about the law.
9  And so just in general, we wanted to have the most
10 effective communication program that we could have.
11 And that's no different from any other aspect of
12 legislative changes.
13      As I mentioned, there's been changes in voting
14 in adult care facilities.  And so we would
15 communicate, try to make sure that we are connecting
16 with organizations that might represent elderly
17 voters, voters with disabilities or others that might
18 be specifically affected by it.
19      So the information that we were producing was
20 intended for the entire population.  We would try to
21 outreach — reach out to whatever organizations
22 wanted to have us talk to them, and so we, for
23 instance, communicated with every legislator and we
24 asked them to spread the word that if they were in
25 touch with local organizations, that they helped us

42

1  spread the word that we would be available to speak
2  to those organizations.
3  Q  Did you or the GAB go out and speak to particular
4  groups like, for example, the NAACP or the Lawyers
5  Committee on Civil Rights or any of those type
6  groups?
7  A  Well, I don't recall specifically that those groups
8  were ones that invited us to speak.  Our staff
9  certainly went out and spoke to I know groups in
10 Milwaukee, and I was at one of the presentations last
11 year.  I just don't remember if it had — if it was
12 just a neighborhood group.  I think it was actually
13 connected with the church, but I don't remember the
14 name of the organization.
15      But we do have — you know, we have ongoing
16 contact with attorneys, local attorneys especially
17 around election time that might be working with
18 national groups, and so we would communicate to them
19 if they had questions about what the law was.  But we
20 took the approach that we would speak to any
21 organization that invited us, whether they were
22 partisan or nonpartisan.  We wanted to just make sure
23 that the information got out there.  And I would have
24 to look at the list of who we spoke to to know for
25 sure.

43

1  Q  But the GAB didn't reach out to groups on their own?
2  They were willing to go speak to groups, but they
3  didn't go find any groups to go talk to?
4  A  Well, I think what we tried to do was we knew that we
5  could not obviously individually reach each voter.
6  So our approach was to try to communicate with
7  organizations that could also do the outreach and
8  sort of extend the information that we had.  And so
9  that was the whole point of trying to task
10 legislators, who in your district could we come to
11 speak with, and if they gave us ideas, if they said
12 contact this organization, we would.  Otherwise we
13 would respond to invitations.
14      Obviously groups like the League of Women Voters
15 have a lot of contact with our organization and they
16 invited us to a number of their meetings to speak.
17 Q  With respect to the photo ID, the photo voter ID
18 implementation of the new law, how successful do you
19 think that the GAB was in communicating its message
20 to the public?
21 A  I think we were successful doing as much as we could
22 with the resources we had.  And the impact of that is
23 hard to measure at this point because it was only
24 implemented initially in a February election, small
25 turn-out election and now in a number of special

44

MICHAEL HAAS

1  elections, mostly local special elections in 2015.
2       So it hasn't really been tested in a high
3  turn-out partisan election yet, and so it's hard to
4  gauge ultimately what the impact has been.  But
5  knowing what the staff did and what we produced and
6  what's available, I think the agency did a pretty
7  effective job.
8  Q  Then you say the resources and you'd also mentioned
9     the budget.  Was there a specific amount of money
10    that the GAB had asked the Legislature for?
11 A  Well, the Legislature allocated a budget for a public
12    information and outreach campaign.  So that was part
13    of the law.  I don't know that we had any specific
14    input or that anybody asked us what the figures
15    should be.  But we were directed to come up with a
16    plan for how we would use those funds, and ultimately
17    it needed to be approved by a legislative agency
18    before we could implement that plan.
19 Q  And do you recall what that plan was in terms of how
20    you were going to spend the money that was allocated?
21 A  Well, in general terms.
22 Q  Sure.  What do you recall in general terms?
23 A  I'm guessing that the total number was somewhere
24    between one and two million and then we allocated a
25    good chunk of that to the contract with this outside

45

1  firm to develop materials and then ultimately to try
2  to buy media time so that the public service
3  announcements could be broadcast.
4       There were also some agency positions that were
5  authorized, additional positions that were authorized
6  in the bill so that we had additional staff to focus
7  specifically on the photo ID law.
8       So there is an entire plan that was produced and
9  approved and implemented and I at this point can only
10    really recall it in general terms.
11 Q  Okay.  When did the photo voter ID law take effect?
12 A  In 2011.
13 Q  2011, okay.  Sorry.
14 A  And it initially in the 2011 elections, it was what
15    we call soft implementation.  So it did not become
16    fully in effect until the February 2011 spring
17    primary.
18 Q  That's just where I was going.  With respect to the
19    soft implementation, do you recall any concerns or
20    criticisms at that time about the photo voter ID law?
21 A  Sure.
22 Q  And what do you recall?
23 A  Well, there were obviously people that oppose the law
24    and were critical of it throughout the entire debate
25    and implementation and obviously still are.  So I

46

1  just recall reading about it.  We would get calls
2  about it.  People might show up at our board meetings
3  and provide public comments about it.
4       And our general response was it's a policy
5  decision of the Legislature.  We're happy to listen,
6  but ultimately we would advise that they would need
7  to contact their legislator.
8  Q  But weren't there particular things -- I'm sorry,
9     weren't there particular criticisms during the soft
10    implementation period that had nothing to do with
11    policy but was more of a practical nature?
12        MR. KAWSKI:  Object to the form.
13 A  Sure.  There were concerns or criticisms about how it
14    was going to be implemented.
15 Q  Weren't there concerns about long lines, for example?
16 A  Oh, I think there were concerns that people expected
17    there to be longer lines and delays.
18 Q  And were there longer lines and delays?
19 A  I do not recall that there were, but again that may
20    be because long lines are a result of a variety of
21    factors and generally have not been a big issue in
22    Wisconsin elections.  In 2011 we had recall elections
23    for certain Senate districts and I just -- I don't
24    recall any major stories about long lines during the
25    soft implementation.

47

1  Q  But weren't there also concerns during this soft
2     implementation period from the clerks themselves who
3     were at the forefront?
4  A  From some clerks, right.
5  Q  And what do you recall about those concerns?
6  A  Well, I guess similar to any legislative changes, and
7     I mean the clerks, as I said, there's 1,853 municipal
8     clerks and theres's 72 county clerks and the county
9     clerks are elected on a partisan basis.  Municipal
10    clerks are not.  And so they have a variety of
11    opinions about it.
12        And some clerks like the photo ID law and
13    thought it was a good idea and some did not and some
14    clerks were just concerned about any changes, any
15    significant changes and just sort of a concern about
16    the unknown, about how things would play out.  And so
17    along the lines I think it was part of -- it was one
18    of the concerns.
19 Q  But once it was implemented, given your experience
20    and knowledge in talking to the clerks and the
21    public, weren't there particular concerns that still
22    exist today?
23        MR. KAWSKI:  Object to the form.
24 A  From some clerks, I would agree.
25 Q  Okay.  And what were those that still exist today?

48

MICHAEL HAAS

1 A   Well, I guess what I've heard expressed is still a
2     concern about whether voters are sufficiently aware
3     of the law, whether they've taken steps to obtain a
4     valid ID, whether there will be an increase in
5     provisional ballots and all that that entails, which
6     involves both voters and their own election
7     inspectors and whether that process will be followed
8     accurately.
9          You know, whether that would cause any delay in
10    really knowing who won an election because there
11    might be an increase in the original ballots that are
12    not returned potentially until the Friday after the
13    election, maybe concerns about some voters who may
14    not know that they have a valid ID or do not have a
15    valid ID and decide not to vote, not even to come to
16    the polls, I guess those are probably the main
17    concerns I've heard expressed.
18 Q  And with respect to voters may not be significantly
19    aware, is this something you hear a lot about, is it
20    something that comes from one or two clerks?  Where
21    does that come from?
22              MR. KAWSKI:  Object to form.
23 A   I think -- I don't know how to characterize it as a
24    lot or a little.
25 Q  Um-hum.

49

1 A   When we are presenting in front of clerks, we will
2     have interaction and exchange about the photo ID law
3     and we try to anticipate with any legislative change
4     what are things that clerks need to be aware of to be
5     prepared and to have their election inspectors
6     prepare.  And so these also may be concerns that we
7     try to anticipate and just make clerks aware of and
8     sometimes they come to fruition and sometimes they
9     don't.
10         And sometimes it's just simply any change is --
11    some clerks perceive as kind of a disruption in the
12    way that they are used to conducting elections, and
13    that change in itself they feel might affect the
14    process at the polls.
15 Q  But given your vast experience, what, if any, issues
16    that you see with the photo voter ID law that still
17    concern you?
18              MR. KAWSKI:  Object to form.
19 Q  If any.
20              MR. KAWSKI:  Object to form.
21 A   Well, so as the elections division administrator, I
22    mean anybody who's charged with trying to do
23    everything we can to make sure elections are pulled
24    off smoothly and without controversy, there's a
25    certain amount of let's prepare as much as we can and

50

1     keep our fingers crossed that things that we cannot
2     control do not disrupt an election, and those things
3     sometimes are not known unless you have a close
4     election and they come to light because there's more
5     media or more attention either from the public or the
6     media or because of the recount.
7          So like anybody I think who's charged with that
8     kind of responsibility, you're constantly trying to
9     come up with checklists to make sure that everything
10    is covered.  So photo ID I think at this point in
11    my -- in our collective mind at the agency and in my
12    mind specifically, we look at is as one of the main
13    teaching points coming into the 2016 election cycle
14    and one of the main things that we want to focus on
15    with clerks and the public to make sure that they're
16    aware of what the requirements are.
17         There are other challenges and issues and
18    developments involving our agency and the structure
19    of our agency and the fact that just last week we
20    launched a brand new voter registration system.  That
21    specifically is another major concern about how
22    clerks are going to be able to manage that system and
23    whether all the technology combined with the people
24    who need to use it, whether that's going to create
25    any problems in creating poll lists or ballots.  So

51

1     that's something that in particular probably keeps my
2     elections supervisor up at night is thinking about
3     those potential issues.
4          So I think in the last few election cycles,
5     we've tried to develop a training program that has a
6     little bit of a theme to it and focus to it.  And in
7     one election cycle, I think 2012, it was, okay,
8     there's been a lot of election law changes, so many
9     that clerks might get a little bit flustered and we
10    wanted to bring them back to the basics.  So that's
11    what we called it, Back to the Basics, pay attention
12    to the basics and the fundamentals, and we tried to
13    build on that in 2014.  And in 2016 I think is again
14    trying to identify what are the big challenges that
15    are going to affect the most number of people.
16         And in our minds, it's paying attention to photo
17    ID, making sure our new voter registration system
18    works properly and making sure that we manage the
19    transition to new agencies and that that does not
20    affect clerks or voters.
21 Q  What is this new voter registration system?  Can you
22    describe it for me?
23 A   Sure.  So with the funds from the Help America Vote
24    Act, part of that requirement was to create an
25    electronic database for a voter registration system

52

MICHAEL HAAS

**Page 53**

1   that was developed and launched in Wisconsin in 2006.
2   Prior to that, smaller communities in Wisconsin were
3   not even required to have voter registration, and so
4   the ones that did, we needed to transfer all of their
5   local data to the statewide system.
6       And so now that that system is 10 years old, the
7   last two years we focused on developing a plan to
8   upgrade that and what it involved — the main thing
9   it involved was transitioning this custom-built
10  system onto a Microsoft platform, and the technology
11  was becoming outdated.  The system was becoming less
12  reliable or slower or clunkier I guess is the best
13  way we could describe it, and we knew we had to be
14  prepared to essentially replace it.
15      And so now there's a lot of IT work and work by
16  our staff over the last two years and specifically in
17  the last six to eight months to use this Microsoft
18  dynamic CRM software, and that is now the platform
19  for the voter registration system and the hope being
20  that it has several advantages, newer technology,
21  more reliable, faster technology.  Also the intent is
22  that it's easier for us to customize.  Once it's in
23  place, we hope that any changes require less IT
24  coding and more things that can be done by our
25  program staff and also the hope is that it will be

**Page 54**

1   more usable for local election officials.
2       Our training program for our original voter
3   registration system was a two-day, two and a half day
4   training program and required a lot of time and
5   commitment from clerks and now we have — we do have
6   some in-person training for clerks who never worked
7   in the original system that we put on this week, but
8   we are going to rely mainly on online training
9   resources.  So we have a training center online where
10  they can view the manual that's been produced for the
11  system as well as view videos and also participate in
12  interactive tutorials.
13      So the hope is that it's going to be more usable
14  and that it will serve the state for some time in the
15  future.
16 Q   Okay.  So maybe I missed something.  So is this for
17  the clerks or for the voters?
18 A   For clerks and for the GAB.
19 Q   Okay.
20 A   And although it is — in one sense it is for voters
21  because that system is the basis for another website
22  we have called My Vote Wisconsin, and that's a
23  website that voters can go to.  Military and
24  permanent overseas voters can download their ballot
25  electronically and print it out and mail it back.

**Page 55**

1   All voters can go on that system and find out
2   where they vote, who's going to be on their ballot,
3   when their next election is.  They can find out who
4   their clerk is, where their polling place is.  They
5   could also start the registration process, although
6   in Wisconsin, we do not have online registration yet,
7   but they can obtain a registration form.
8       We also have a function that we call click and
9   mail that allows them to input their personal data
10  directly into the voter registration system, which
11  starts the process, but their registration cannot be
12  activated until the original form is submitted to the
13  clerk.
14      And so the clerk then gets a notification that
15  there's a pending registration and they can activate
16  the registration, but the advantage is that the clerk
17  does not have to do the data entry.  It reduces the
18  number of mistakes, data entry errors that we have.
19  That function, specific function is on hold while we
20  redevelop the My Vote Wisconsin website that will be
21  launched in June.  And because — so it is connected
22  to the voter registration system.
23      The data comes from the voter registration
24  system and because we've launched the voter
25  registration system, there's still some glitches to

**Page 56**

1   work out between how those two websites interact.
2 Q   In your opinion based on your experience and long
3   work in the election area, this new voter
4   registration system, the transition from the GAB to
5   another entity, do you have any concerns that it's
6   going to have a negative impact on the 2016
7   presidential election?
8       MR. KAWSKI:  Object to the form.
9 A   It's as I said, it's on our radar as things that we
10  need to pay attention to.  So I look at it as our job
11  is to make sure we're prepared, clerks are prepared
12  and voters are prepared.  And there is always
13  something that we need to pay attention to to make
14  sure that that happens, and those are three big
15  developments that have not happened before all at one
16  time.
17 Q   Perfect storm?
18      MR. KAWSKI:  Object to form.
19 A   Well — and we certainly implemented a voter
20  registration system before, that I think we expect
21  the transition to the new one is going to go more
22  smoothly than the original one.  There were a lot of
23  concerns from clerks and complaints from clerks about
24  the original system, but I don't recall any comments
25  that that system impacted the voting process at all.

MICHAEL HAAS

1    So as I said, it's my job to be concerned --
2  Q  Right.
3  A  -- about a lot of different things and the
4     implementation of it.  But I don't have any opinion
5     or guess as to whether ultimately it's going to
6     affect voter participation.
7  Q  Are you okay?  Do you need a break?
8  A  No, I'm fine.  I'm good.
9  Q  Okay.  In your experience, have there been any -- has
10    there been any negative impact of the photo ID law
11    since 2011?
12 A  It's hard to answer.  I think it's kind of a broad
13    question.  I think it depends who you ask.
14 Q  I'm just asking you as the guy in charge, sort of in
15    charge.
16 A  Well, it's had impacts, you know, that we've
17    discussed.  As administrators, it's had impact in the
18    work we do and the priorities and what we have to pay
19    attention to.  But there's always something that we
20    need to pay attention to, and so I don't really
21    characterize them as positive or negative impacts.
22    It's the work that we have to do.
23        And Wisconsin, you know, it's been through
24    pretty tumultuous political times in the last few
25    years and so it's just sort of -- you know, it's all

57

1    in the mix about how people feel, what their
2    perceptions are about policy changes.  And so there's
3    obviously been things that some people in Wisconsin
4    feel have been divisive and so generally people would
5    say when things are divisive, that the connotation is
6    that people have a negative feeling about that.
7        But there are certainly supporters of the law
8    that think this is going to improve the election
9    cycle, and part of my job is to be able to
10   communicate and work with people across the spectrum.
11   And so we try not to focus too much on whether we
12   think some legislative change is positive or negative
13   because somebody needs to be the one to make sure
14   that gets implemented.
15       And because of the -- because it's been used so
16   infrequently so far and with small elections, I'm not
17   really in a position to say whether it's had a
18   negative impact on -- ultimately had a negative
19   impact on the election process as a whole, taking
20   into account concerns of voters, election officials,
21   candidates or people who are concerned about either
22   voter participation or potential voter fraud.
23 Q  Have you heard from your clerks or anywhere with
24   respect to the voters, still on the voter photo ID
25   law that in this very limited experience of this

58

1    election that people were unable to vote because they
2    didn't have photo ID?
3  A  We reached out to clerks who conducted special
4     elections in 2015, since it's been in effect after
5     the April spring election, and we specifically asked
6     them did you need to issue any provisional ballots
7     and were any provisional ballots cast, and for the
8     most part what we heard was that there were no
9     provisional ballots issued.
10        In talking to or receiving feedback, I think one
11    or two clerks told us that an individual showed up
12    and did not have their ID and was told -- was given
13    the option to cast a provisional ballot and then
14    decided not to and left and did not return, but they
15    didn't know whether it was because they did not have
16    a photo ID at all or that they just decided not to
17    come back with the photo ID.  But that's, as I said,
18    really anecdotal.
19 Q  Does the GAB track issues, not just with the photo
20    ID, but with some of the other changes that have
21    occurred since -- some of the numerous changes that
22    have occurred since 2011?
23 A  Do we track?
24 Q  Do you track, for example, complaints about the
25    various changes in the law?  Let's start with that.

59

1  A  So we -- there's a couple different ways that we
2     might track their complaints or concerns.  We don't
3     keep something separate that is categorized by topic.
4         When we receive complaints, we log them into a
5     database, but often they're complaints about
6     something that's not really under our jurisdiction
7     and not really a complaint that we can address.
8         In the three weeks surrounding an election, we
9     specifically have a contact activity log and all of
10    our staff at the elections division is required to
11    log each call that they get in the week leading up to
12    the election, the week of the election and the week
13    after the election.  And that's a way for us to try
14    to track issues that are coming in and whether or not
15    they've been resolved or whether they need any
16    follow-up after the election, but we do not -- in
17    some elections, we have generally sort of tried to
18    categorize what the concerns are, but they're not
19    probably as specific as you're alluding to.
20        Usually it's a broad category that is this an
21    issue related to a local election official or the
22    polling place, is it a contact from a clerk or a
23    voter or from the media.  But they're not categorized
24    by photo ID or absentee ballot issues or any other
25    general category.  We just haven't had a lot of time

60

MICHAEL HAAS

1  to digest and analyze the data that might come out
2  from tracking those kinds of calls.
3  Q  Then how do you know then if something -- if there's
4  a problem if you don't track it by category?  Is it
5  anecdotal?
6  A  So I mean we know specific problems that come up, and
7  we'll have a little bit of a debriefing session after
8  elections and say what did we hear collectively, how
9  does that translate into what we're going to do in
10  the future for training clerks or for reaching out to
11  the public.
12      Some election cycles, election observers have
13  become a big issue, and so we have made them more of
14  a priority to communicate with political parties and
15  organizations that sponsor election observers and so
16  that's increased the communication that we've done on
17  that particular topic.  We might hear different
18  things in different parts of the state, too, just
19  depending on what's going on.  You know, it is a
20  little bit of hit and miss because it depends on who
21  contacts us or what we read in the paper.
22      But I think we have probably 10 staff that are
23  taking calls from voters and then another part of our
24  staff who are taking calls from clerks about things
25  like the voter registration system, and so I think we

61

1  try to keep a pretty good finger on the pulse of
2  what's going on in general around the state.
3  Q  Do you know how many of the voting public has access
4  to computers?
5  A  No.
6  Q  Or some kind of mobile device?
7  A  No.
8  Q  And for those who don't have access to computers or
9  mobile devices, is there some equivalent to your My
10  Vote Wisconsin where you reach out to the public?
11  A  Something equivalent?
12  Q  That's non-computer focused for those who don't have
13  computers.
14  A  You know, there are a lot of materials that are on --
15  well, a lot of the information that is on My Vote
16  Wisconsin.  The other place to get it for most people
17  would be from their local municipal clerk.  And so
18  some clerks will send out information in newsletters
19  or with property tax bills at the end of the year to
20  say these are the elections coming up, remember to
21  get a photo ID, remember to register and could
22  certainly answer questions about what offices are
23  going to be on the ballot.  But I don't know that
24  there's anything equivalent to My Vote Wisconsin.
25  Q  You said that observers have become a big issue.  Why

62

1  is that?
2  A  I think a combination of more contentious elections
3  and some organizations have taken more of an
4  interest in what happens at the polling place and
5  monitoring elections.
6      And the Government Accountability Board when I
7  first started was in the midst of promulgating an
8  administrative rule to regulate the conduct of
9  election observers, which the Elections Board had
10  developed in the previous year or two, and so there's
11  also been more focus on it from our office and by
12  local clerks because just more observers have showed
13  up at elections and so there's more potential for
14  there to be questions from observers, questions about
15  how to handle observers and potential for more people
16  to become involved in discussions and disagreements
17  at the polling place.
18      And there's been some specific instances where
19  there's been some fairly significant conflict between
20  election observers either amongst themselves or
21  conflict between specific election observers and some
22  voters or election inspectors.  And so we've tried to
23  use that administrative rule -- tried to use that
24  administrative rule as a way of getting everybody on
25  the same page about what the rules were for their

63

1  conduct.
2      And that also led us to reach out more to groups
3  that we knew were sponsoring election observers to
4  make sure that as they were training their election
5  observers, they were aware of what the rules were.
6  Q  And for the record, what is an election observer?
7  A  In Wisconsin, any member of the public can observe
8  elections, the public aspects of the elections at the
9  polling place.  So it could be an individual on their
10  own or representing some organization who wants to --
11  or a candidate -- or a campaign, I should say,
12  representing a campaign.  Candidates are not allowed
13  to be election observers.  But any other individual
14  can come and be placed in a designated area where
15  they are able to observe the process of issuing the
16  ballots and also the registration process if there's
17  a separate registration station.
18  Q  And there was a time where the distance between where
19  they could stand changed, right?
20  A  Correct.
21  Q  And now they can stand within what, three to eight
22  feet?
23  A  Correct.
24  Q  And is that of the registration or of the person
25  voting?  What is that area?

64

| | |
|---|---|
| 1 A | The statutes I believe starts out saying it's three |
| 2 | to eight feet from the distance of the table where |
| 3 | ballots are being issued and then also states that |
| 4 | there should be -- if there is a registration |
| 5 | station, that there should also be an observation |
| 6 | area between three to eight feet of that as well. |
| 7 Q | But some of the polling places are like no bigger |
| 8 | than -- the one I go to is no bigger than someone's |
| 9 | garage.  So how would that work exactly? |
| 10 A | Well, there is some language, there was both in our |
| 11 | administrative rule, which is not formally in effect |
| 12 | right now, and also language in the statute -- well, |
| 13 | I'm not sure if there's language in the statute, but |
| 14 | our administrative rule had some language saying |
| 15 | where physically feasible, the observation area was |
| 16 | to be between 6 and 12 feet. |
| 17 | And I don't know if those words are in the |
| 18 | statute, but the way we have administered it and |
| 19 | advised clerks to administer it is that three to |
| 20 | eight feet is also where physically feasible.  They |
| 21 | need to be able to conduct elections, have room for |
| 22 | inspectors and voters and then they have some |
| 23 | flexibility to make some adjustments based on the |
| 24 | physical layout of the polling place. |
| 25 Q | In addition to the three to eight feet, was there a |

65

| | |
|---|---|
| 1 | change in an observer having the right to hear the |
| 2 | name of the voter and the voter's address? |
| 3 A | No, that was always -- |
| 4 Q | That was always the case? |
| 5 A | That was always the case, yes. |
| 6 Q | With respect to the change from where the GAB had |
| 7 | said it and now the new change of three to eight |
| 8 | feet, what, if you know, is the purpose?  What's -- |
| 9 | how does it make for a more efficient election |
| 10 | process? |
| 11 | MR. KAWSKI:  Object to the form. |
| 12 A | I don't know if it makes the election process more or |
| 13 | less efficient.  I think the thought behind the |
| 14 | administrative rule and I believe behind the statute |
| 15 | is to provide an area where individuals can both see |
| 16 | and hear what's going on and the interaction between |
| 17 | election inspectors and voters. |
| 18 | There are some limitations on that, on what they |
| 19 | have a right to see and hear and challenge, but I |
| 20 | think the thought was to come up with some parameters |
| 21 | where clerks or chief inspectors could not make the |
| 22 | distance so far away that it affected the right under |
| 23 | the statutes to be able to observe the public aspects |
| 24 | of the voting process and to try to reach a balance |
| 25 | where election observers did not interfere with the |

66

| | |
|---|---|
| 1 | voting process. |
| 2 Q | Why does -- so GAB had a standard -- |
| 3 A | Um-hum. |
| 4 Q | -- which they -- a thoughtful group thought was the |
| 5 | right standard, right? |
| 6 A | It was the standard that the GAB approved in an |
| 7 | administrative rule.  It was the distance -- that |
| 8 | rule itself was the result of a pretty thorough |
| 9 | process of getting input from stakeholders.  Both |
| 10 | political parties and other organizations met with |
| 11 | the Elections Board and the GAB over a period of a |
| 12 | year or two and they came up with that administrative |
| 13 | rule and it was promulgated a couple times as an |
| 14 | emergency rule. |
| 15 | It's never been approved as a permanent rule. |
| 16 | So that was in the collective judgment of all the |
| 17 | stakeholders and the agency, 6 to 12 feet was where |
| 18 | they settled on being an effective distance. |
| 19 Q | And you may not know this.  So why the change? |
| 20 | MR. KAWSKI:  Object to form. |
| 21 A | Well, one answer is because that's the choice that |
| 22 | the Legislature made, and unfortunately, sometimes |
| 23 | that's the only answer we can give -- |
| 24 Q | Okay. |
| 25 A | -- to people.  What we heard in the discussion, the |

67

| | |
|---|---|
| 1 | debate is -- and what we have heard directly from |
| 2 | some observers is that in their opinion, six feet was |
| 3 | not close enough for them to effectively observe the |
| 4 | voting process.  Or sometimes to hear.  Sometimes |
| 5 | voters may not speak loud enough to be heard, |
| 6 | especially in a crowded polling place, and some |
| 7 | observers felt they needed to be closer to the |
| 8 | process. |
| 9 Q | So I guess I'm -- and I'm drawing on your expertise |
| 10 | here, but what's the purpose of the observer?  Like |
| 11 | what is -- what I mean is so I go down a few blocks |
| 12 | from my house, there's a garage, there are three |
| 13 | people in it.  I come in, I walk in, I get a -- they |
| 14 | take my name, I sign it.  They give me the bunch of |
| 15 | papers, because it's California, you have 1,001 |
| 16 | initiatives, and then I get it, I go behind this like |
| 17 | a lean-to thing, I do my thing, and then I take it |
| 18 | and I slip it into the machine.  There's never |
| 19 | anybody around. |
| 20 | I mean what's the purpose of observers?  What |
| 21 | is -- I guess my question is what is it they're |
| 22 | observing? |
| 23 | MR. KAWSKI:  Object to form. |
| 24 A | I think there are two general areas that I think of. |
| 25 | One is people or organizations may generally be |

68

MICHAEL HAAS

1   interested in the election process and they may want
2   to be there and consider themselves to be sort of
3   observers but sort of guardians to make sure
4   everything is being done properly and to be able to
5   document.
6        And as I said, it's a right that the statutes
7   provide, and in elections we are always preaching
8   that transparency is better.  And so having members
9   of the public there lends a certain level of
10  confidence and having the ability to observe itself
11  lends some confidence that the process is transparent
12  and that the procedures are being followed.  And as
13  we get -- as election procedures and laws have become
14  more complicated and specific, there are more steps
15  to the process and some people just have an interest
16  in making sure that it is done correctly.
17       The second, I think, general category is you
18  have campaign organizations that are interested in
19  sending observers and they are specifically tracking
20  who votes, who checks in to vote so that they can
21  come up with their list of people who voted and then
22  they can convey that information to those campaigns
23  because that's going to affect their get out to vote
24  effort later in the day, so they're not spending time
25  and resources contacting voters who have already

69

1   voted.
2   Q   Is there a conflict between what an observer wants to
3       do and a person's right of privacy?
4           MR. KAWSKI:  Object to form.
5   A   There can be, which I think is sort of embedded in
6       the statutes, the right to a private ballot and the
7       right of the public to observe.  Now, the observers
8       cannot go into the voting booth.  They cannot observe
9       how a ballot is being marked, and that has -- we have
10      always kept that as a priority and tried to train and
11      communicate to election observers that there's a
12      limit to what they can observe.
13  Q   And they're not supposed to talk to the voters?
14  A   Correct.
15  Q   But you've had complaints in some situations where
16      some have, right?
17  A   Yes.
18  Q   And does the GAB have the ability to discipline that
19      observer who's broken the rules?
20  A   The GAB does not.  The local election inspectors can
21      take actions to have that person removed if they do
22      not follow a lawful order of the chief inspector.
23  Q   And there were some issues, weren't there, about
24      taking photos, observers taking photos of people in
25      the polling place?

70

1           MR. KAWSKI:  Object to form.
2   Q   Do you recall that?
3   A   Well, there's been an issue about whether or not
4       cameras are allowed at the polling place, and the
5       administrative rule prohibited cameras, but that
6       directive of the GAB has been questioned by some and
7       is -- and I don't recall specifically if we've had
8       complaints or instances of observers taking photos.
9           With cell phone cameras, it's hard to tell if
10      sometimes there's video or photos being taken.  But
11      it's certainly one of the issues that we highlight
12      when we train and talk about rules for election
13      observers.
14  Q   And why is it a rule that cameras are not allowed?
15      What's the thinking of the GAB?
16          MR. KAWSKI:  Object to form.
17  A   I think the basic thinking is that having cameras --
18      allowing cameras at the polling place risks causing a
19      disruption to voters or to election inspectors and
20      cameras are allowed for the media.  And having one
21      observer using a camera might not be disruptive, but
22      then you've opened it up to possibly a whole bank of
23      observers pointing cameras at voters and that in some
24      voters' minds tends to be a distraction or a
25      disruption, and our focus is trying to protect the

71

1   process without either voters or election inspectors
2   being distractive or disruptive.
3   Q   You said that the rules for the voting have become
4       more complicated and specific.  In your opinion, your
5       knowledge and experience, has that had an impact on
6       people's ability to vote?
7           MR. KAWSKI:  Object to form.
8   A   I just don't know.
9   Q   Does the GAB keep track after a new election law is
10      implemented about whether or not it has an impact on
11      voter turnout?
12  A   No.
13  Q   Has the GAB commissioned or done any studies about
14      whether or not any of these changes in the voting
15      laws since 2011 have had any impact on voter turnout?
16  A   No, we have not.
17  Q   Does the GAB keep any information about the
18      demographics of voters in turnouts, like who shows up
19      at the polls to vote?
20  A   We do not.  You know, individual voter participation
21      is recorded in the voter registration system.  But we
22      don't go back and calculate what percentage of the
23      turnout was a certain age group.  And the only
24      demographics we have in the voter registration system
25      are the gender and the age of the voter and their

72

1  residence.  So we don't have access to any other
2  demographic data about who's participated.
3  Q    So is there no way for the GAB to know whether or not
4       these laws have had an impact on voter turnout since
5       2011?
6            MR. KAWSKI:  Object to form.
7  A    Well, there may possibly be some way.  There hasn't
8       really been any effort to try to determine that,
9       whether there's been an impact.
10 Q    Why not?
11 A    Pardon?
12 Q    Why not, not the jurisdiction of the GAB to --
13 A    Right.
14           MR. KAWSKI:  Object to form.
15 Q    -- determine on no voter impact -- I mean voter
16      turnout?
17           MR. KAWSKI:  Sorry.  Object to form.
18 A    Well, I think it's -- a couple of things.  It's not
19      something we've been directed or asked to do.  We
20      have over 150 specific statutory directives that our
21      agency is responsible for.  So usually we have plenty
22      on our plate without trying to initiate projects that
23      we're not directly responsible for.
24 Q    Do you know whether the change from the distance that
25      is now three to eight feet, whether that has caused

73

1  more disruption with respect to observers since
2  there's been that change in the law?
3            MR. KAWSKI:  Object to form.
4  A    I don't know if it's caused more disruption.  I think
5       the -- I just don't know if it's caused more -- how
6       to measure whether it's caused more or less
7       disruption.
8  Q    How do you know -- how does the GAB know if
9       something's an issue for the board?  In other words,
10      you've testified that people have opinions, you've
11      testified there have been complaints, but how do you
12      know when there's a problem, a real problem --
13           MR. KAWSKI:  Object to form.
14 Q    -- that's going to impact voters?
15           MR. KAWSKI:  Object to form.
16 A    You know, I think it's just generally having our
17      antennas up to pay attention to what clerks are
18      telling us, using our collective experience in the
19      field to try to anticipate what problems might arise,
20      and sometimes we're right and sometimes we're wrong.
21      And then just hearing the phone calls and emails that
22      we get.
23           You know, sometimes if there is a high turnout
24      during the in-person absentee voting process, that
25      might give us some signals about something to pay

74

1  attention to on Election Day, but it's a profession
2  and so we have good staff who tries to stay in tune
3  with what's going on around the country.
4            Sometimes the campaigns are focusing on specific
5       tactics that we become aware of and we say, okay, how
6       is this going to impact election officials, in turn
7       how is it going to impact the process at the polls.
8       So I think just in general it's being aware of what's
9       happening on the ground, and fortunately, we have
10      this network of all of the local clerks who keep us
11      pretty informed about what's happening individually
12      or collectively or if they think that we're on base
13      or off target with what we expect to happen.
14 Q    So is there -- so if a clerk complains about voter
15      confusion, if they're confused about the photo ID,
16      that they've come in and someone's complained or
17      someone didn't feel like they could vote or they
18      didn't know what to bring, is that something for the
19      clerk to deal with at the threshold level and then
20      communicate to you?  Like how does it work in real
21      time?
22           MR. KAWSKI:  Object to form.
23 A    Well, usually clerks are interested, if they can, in
24      trying to resolve the problem as soon as possible.
25      And sometimes they don't know the answer and so they

75

1  contact us and we try to assist.  And as I said,
2  sometimes it's after the fact where we may be
3  talking -- we may get a phone call from a clerk to
4  talk about a communication we sent out, for example,
5  and in that phone conversation, it might lead to what
6  else is happening at the local level, what are you
7  seeing and what are you hearing out there.
8            I've tried to make it a practice before major
9       elections to sit down with a list of maybe the 50
10      largest municipalities and check in with those clerks
11      and say what are you hearing, what are you expecting,
12      do you feel like your election inspectors are
13      prepared and your voters are prepared.
14           So we might hear about it as it's going on.  If
15      we're asked to try to solve the problem, then we may
16      just hear about it after the fact.  And as I said, we
17      also read about things in the paper.  Sometimes we'll
18      get calls from a district attorney, too, about a
19      question about the election laws or something that
20      they've been asked to look into.
21           MS. WILSON:  We have to change the
22      tape.
23           THE VIDEOGRAPHER:  The time is 11:06.
24      We are off the record concluding Media No. 1 of
25      the deposition of Michael Haas.

76

MICHAEL HAAS

1    (Short recess is taken)
2         THE VIDEOGRAPHER:  The time is 11:16.
3    This is the beginning of Media No. 2 in the
4    deposition of Michael Haas.  We are on the
5    record.
6  Q  Mr. Haas, you testified in the Walker case in
7    November 2013, correct?
8  A  Yes.
9  Q  And you've submitted a declaration in this case,
10    correct?
11  A  Yes.
12  Q  Have you testified in any other proceedings?  And I'm
13    not talking about legislative.  I mean legal.
14  A  With the GAB?
15  Q  Yes.
16  A  No.
17  Q  Any other depositions, whether as a staff attorney or
18    as in your current position?
19  A  The deposition in the other -- there was a deposition
20    in the other lawsuit, yes.
21  Q  Anything other than the deposition today, the one
22    before and the testimony in November?
23  A  No.
24  Q  I'm going to mark the next exhibit, No. 39.
25    Mr. Haas, take a look at it.  Let me know when you're

77

1    ready.
2         (Exhibit 39 is marked for identification)
3  A  Okay.
4  Q  Have you seen this document before,  Exhibit 39?
5  A  Yes.
6  Q  And can you tell me what it is?
7  A  It's an email chain which starts out with a
8    communication that I sent to clerks alerting them
9    that there was a significant election law bill that
10    had been introduced or at least was being circulated,
11    it appears, by Representative Stone, and there's
12    another email from Lori Stottler, who was at the time
13    the Rock County Clerk in 2013, and she had responded
14    to the general email that I had sent out to clerks.
15  Q  And is this the type of email that when you and I
16    were talking earlier that you would send out when
17    there's new legislation?
18  A  It's an example of it.  I was referring more to what
19    we call clerk communications, which are memos that we
20    post on our website.  This looks like we framed it
21    more as a direct email that went out to clerks.
22  Q  And when you sent this out to clerks, is it just to
23    let them know about the new legislation?
24  A  Yes.
25  Q  And it says -- where it says dear clerks, do you see

78

1    that?
2  A  Yes.
3  Q  And it says, "Our staff will be reviewing this
4    proposal to evaluate its impact upon current election
5    procedures."  Do you see that?
6  A  Yes.
7  Q  Was that done?
8  A  Well, I believe we would have reviewed it.  I don't
9    know if that review resulted in any subsequent
10    communications.  It would have depended on what
11    happened with the legislation.
12  Q  And do you know what happened with the legislation?
13  A  I do not.  I believe ultimately this looks like it
14    was — I believe this legislation ultimately did not
15    pass.
16  Q  Did you understand that this — let me withdraw that.
17    You can put that aside.  This is  Exhibit 40.
18         (Exhibit 40 is marked for identification)
19    Take a look at that.  Let me know when you're
20    finished.
21  A  Okay.
22  Q  Have you seen this document before?
23  A  Yes.
24  Q  Can you tell me what it is?
25  A  It's a copy of testimony that I provided to a

79

1    legislative committee.  It appears to be on
2    January 23rd, 2014.
3  Q  And do you see where it says under Assembly Bill 603,
4    the last — second to last sentence, "The voter
5    cannot surrender their identifying document to the
6    person collecting the registration form"?  Do you see
7    that sentence?
8  A  Yes.
9  Q  What was your concern there?
10  A  So it appears that the bill would require electors to
11    provide proof of residence when they were registering
12    to vote and previously a proof of residence document
13    was not required if an individual registered to vote
14    prior to 20 days before an election.
15         And the concern — the practical administrative
16    concern we raised here is that some voters register
17    in voter registration drives or with special
18    registration deputies, and it was not clear whether
19    they needed to submit their proof of residence
20    document or whether they simply needed to display it
21    to the special registration deputy, and we were just
22    raising that concern for the Legislature.
23  Q  And was it something that the Legislature fixed?
24  A  I do not recall whether there was a specific
25    amendment to change that.

80

1  Q   And if you look at the last paragraph under Assembly
2      Bill 603 on Page 2, it says, "Under current law,
3      these voters are sent a confirmation mailing.  If it
4      comes back undeliverable, the voter's registration is
5      inactive" -- "inactivated."  Sorry.
6          Do you recall that being addressed in the bill?
7  A   I just do not recall whether there was a change to
8      the bill.  I mean this -- this paragraph, it appears
9      that we were simply providing information about what
10     the process was.  I don't know that we were
11     identifying it as a concern because that mailing is
12     part of the process and continues to be part of the
13     process.
14         We were simply explaining what happens in order
15     to try to confirm that the voter lives at the address
16     that is stated on the registration form.
17  Q   But do you recall there being any concerns since 2011
18     about this issue of confirmation mailing?
19  A   Related to the mailing itself, I don't --
20  Q   Being undeliverable and the voter's registration is
21     inactivated?
22  A   A concern about?
23  Q   That happening to a voter.
24  A   Oh, no.  I mean that's been -- that had been part of
25     the statutes and part of the process.  I don't recall

81

1  Q   any specific concern being raised about that.
2  Q   And if you'd look at Page 3, the last sentence which
3      starts with while, do you see that?
4  A   Yes.
5  Q   While this will provide?
6  A   Yes.
7  Q   And at the end it says, "It will also create training
8      challenges for poll workers."  What did you mean
9      there?
10  A   Let me review --
11  Q   Sure.
12  A   -- what we had here.  I know generally what we meant,
13     but I was looking at the specific change here.  It
14     looks like we were referring specifically to a
15     proposed amendment which would limit the number of
16     digits that would need to be recorded related to a
17     proof of residence document that a voter offered.
18         So, for instance, a bank statement is going to
19     have an account number and there was some debate
20     about whether those account numbers should be
21     recorded by clerks, and we were simply stating that
22     the amendment would potentially increase privacy
23     because it would limit the number of digits to I
24     believe the last four digits of the account number,
25     and so we were simply pointing out that that may

82

1      address some privacy concerns, but we would need to
2      train clerks who would in turn need to train their
3      poll workers that they were now only to record those
4      limited number of digits for the account or any
5      identifying number that was on the form, and that
6      would be a change.
7  Q   When there are changes, and I think we talked about
8      this earlier, to the election laws and the -- is it
9      always the case that the Legislature will give money
10     to help implement those changes, or was it just
11     exceptional in the photo voter ID circumstance?
12  A   I think that's probably an exception where there was
13     specific money allocated to implement the changes.
14  Q   So does the GAB have to make sort of strategic
15     decisions about its budget with respect to election
16     laws and how much it can train and how much it can
17     do?
18  A   We certainly have to take our budget into account.  A
19     significant part of our budget is to HAVA funds,
20     which we're expecting to have through mid to late
21     2017, but that's part of the budget that is approved
22     and we certainly have to take into account what the
23     resources are that we have to produce materials and
24     communicate with clerks.  But I don't know that any
25     of that -- I don't recall specific instances where a

83

1      legislative change -- where we felt constrained in
2      being able to communicate the change to clerks.
3          In other words, we didn't say, well, we cannot
4      produce an update to the manual because we don't have
5      the money to do it.  Update manuals would have to be
6      produced and copied and so it's sort of a sunk cost
7      to have our staff create the manual and create any
8      updates to it.
9  Q   But it would affect, for example, possibly outreach
10     to communities or to voters if there were changes in
11     the law and there was no additional money?
12  A   Possibly, but I don't recall that that has happened.
13     I mean we have only a certain number of staff who are
14     assigned the job of going out to give presentations.
15         So every agency would love to be able to hire
16     more staff, to be able to duplicate that, and so we
17     have to make decisions about where meetings are
18     located throughout the state and how many people we
19     expect and the type of audience.
20         So I think in general, we've taken the approach
21     that if we're going to send -- if we are going to
22     send out somebody to give a presentation in person,
23     ideally we would like it to be an audience of people
24     who have the capability to spread the word, as I
25     said, maybe representatives of organizations who are

84

1   active and also that it be essentially an event
2   that's going to be worth the trip.
3       If we're going to have somebody on the road all
4   day, we prefer to have them speaking to an audience
5   that's large enough to make the trip worth the time.
6   And, you know, just also based on other priorities,
7   we probably -- we may have declined some invitations
8   just because of other priorities that are going on in
9   the office.
10      So I think in general budget constraints are
11  always an issue, but I don't think it's had -- I
12  think within that framework, I don't think we have
13  said we can't send somebody to this location because
14  we don't have the funds to pay for that trip.
15 Q  So even though there have been a number of laws
16  since -- election law changes since 2011, it's had --
17  are you saying it's had no real impact on your budget
18  or your ability to do what you need to do in terms of
19  implementing the law?
20 A  Well, you know, the question is compared to what.
21  Compared to having a budget twice the size where we
22  would be able to send out five people to focus on a
23  region of the state and be more aggressive in
24  soliciting, there's always more that can be done.
25      I think relative to what had been done in the

85

1   past, it's -- obviously it's a state agency and every
2   budget cycle we get directions about -- general
3   directions about the budget and whether it can be
4   increased or not increased.  So that has to affect
5   the amount and what we can do.
6   Q  The money that was allocated for the photo voter ID
7   provision, was that all spent for that provision or
8   was it spent elsewhere?
9   A  Well, I don't know the complete answer to that
10  because of the back and forth with the law being in
11  effect and not being in effect and the budget
12  instructions we had.  I believe that some of the
13  funds that were dedicated to additional staff were
14  not ultimately spent.  They might have been -- right
15  now I'm speculating a bit because I know that there
16  were -- I was not involved.
17      I was with all the budget discussions, but there
18  may have been some of those funds that ended up being
19  lapsed back at the end of a budget year.  And right
20  now, I think I just recently saw that we still have
21  some funds that were designated as photo ID funds
22  that we are still spending at this point.
23  Q  Since 2011, has that been the only time the
24  Legislature has funded a change in the election laws?
25          MR. KAWSKI:  Object to form.

86

1   A  To my recollection, I believe it is.  The change to
2   transition to new agencies has some funding aspects
3   to it, but I don't think it is to increase the
4   budget.  It's simply to accommodate -- essentially
5   separating the agency into two separate agencies and
6   determining the salary range for specific positions
7   and what piece of our current budget goes to which
8   agency.  But as far as funding a change in
9   legislation, an election legislation, I think the
10  photo ID law is the only one I can recall.
11 Q  I hand you what's going to be Exhibit 41.
12          (Exhibit 41 is marked for identification)
13 Q  Take a look and let me know when you've had a chance
14  to look at it.
15 A  Okay.
16 Q  Have you seen this document before?
17 A  Yes.
18 Q  And can you tell me what it is, please?
19 A  It's an email from Nathaniel Robinson, who is my
20  predecessor as the elections division administrator,
21  and it's an email to a handful of elections division
22  staff as well as two staff attorneys, including me,
23  from -- dated November 3rd, 2008 and it appears to be
24  an email in which Mr. Robinson has provided a list of
25  examples of concerns from voters and clerks and the

87

1   public that he had documented starting around
2   October 1, 2008, and he's requesting feedback from
3   the elections division staff.
4   Q  Now, do you recall whether you gave specific
5   feedback?
6   A  I do not recall that.
7   Q  And he says, "Please add this running list of
8   examples."
9       Do you recall that there's a list somewhere of
10  examples of voter/clerk/public concerns?
11 A  I don't recall specifically whether there was a list.
12  And I don't know if he meant that as there's a
13  specific list that somebody has custody of or if this
14  was just sort of a collective list.
15      This was shortly after I had started with the
16  agency and so I would have been really not as
17  familiar with these topics as most of the other
18  people that the email was sent to.
19 Q  And you would say that now in 2016 you're much more
20  familiar, correct?
21 A  Yes, yes.
22 Q  Okay.  On this, are there any in your knowledge and
23  experience, are there any of the items on this list
24  that still exist today that are examples of
25  voter/clerk/public concerns about the election laws?

88

1       MR. KAWSKI:  Object to form.

2  A    I would say yes.

3  Q    And which ones would you say?

4  A    Well, going down the list, he's documenting that

5       these were concerns related -- relate to us, not

6       necessarily concerns of the staff.  So the perception

7       of widespread voter fraud, I think some people still

8       have that perception.  Whether or not it is true,

9       that's still a perception that is conveyed to us

10      occasionally.

11          There's still confusion between early voting and

12      absentee balloting, although I'm not sure that that

13      has a real impact on voters.  It's a little bit of a

14      technical distinction that's more important for

15      clerks.

16 Q    What do you mean?

17 A    Well, the way -- the GAB completed a study for the

18      Legislature about whether or not Wisconsin should

19      adopt early voting, that was shortly after I had

20      started with the agency, and the distinction we made

21      between early voting and what Wisconsin has, which we

22      call in-person absentee balloting, is that with early

23      voting, those ballots are cast and tabulated prior to

24      Election Day.  And with in-person absentee balloting,

25      the ballots are simply marked and submitted by the

89

1       voters and then the clerk -- the municipal clerk

2       collects them, transports them to the polling place

3       or another location on Election Day and that's when

4       those ballots are counted.

5          So early voting was sort of a hot topic around

6       that time.  There was some policymakers that were

7       encouraging the Legislature to change the law to

8       authorize early voting and so we did a fairly

9       significant study to give the Legislature information

10      about what that would mean and what changes to the

11      law would need to take place.

12 Q    And what conclusions did you come up to -- come up

13      with?

14 A    I think what's -- my recollection is that the

15      proposal or the study was presented to our board and

16      received pretty significant public feedback, which we

17      tried to incorporate into the report, and then the

18      board at that time adopted a number of

19      recommendations to the Legislature and then we

20      forwarded that to the Legislature.  The end result

21      was that early voting was not adopted.

22          I don't recall if there was even a bill

23      introduced for it, but it took a significant amount

24      of time and attention by the staff and by the board

25      to research that.

90

1  Q    Have you ever seen any studies that say that early

2       voting actually helps voter turnout?

3  A    I think I've seen some studies or commentary

4       suggesting that it does and others suggesting that it

5       may not have an impact that could be measured on

6       overall turnout.

7  Q    And at that time did the GAB form any conclusion

8       about early voting, or were you just reporting on

9       what it would mean in terms of implementing?

10 A    I believe our board based on the recommendations of

11      the staff, that the board did go on record supporting

12      early voting.  There wasn't any specific bill.

13          There were specific changes that were

14      recommended in the report that the board at the time

15      did not agree with the staff on and was not prepared

16      to adopt and so I think -- I believe my recollection

17      is that we communicated to the Legislature this is

18      the action that our board took on the study and just

19      provided that to the Legislature for their

20      consideration.

21 Q    But the GAB did recommend early voting?

22 A    I believe it did.  I'm not 100 percent certain, but I

23      believe that it did recommend early voting, and the

24      challenge was administratively how to change the

25      statutes and then change the process.

91

1  Q    And do you recall why it was a positive

2       recommendation for early voting?

3  A    Well, our board is six -- it's a six-member board.

4       They're former judges, and they might have all had

5       different reasons.

6          I think administratively one of the reasons that

7       the staff would have recommended pursuing early

8       voting is that processing a large quantity of

9       absentee ballots on Election Day for some locations

10      is a challenge, and they have to insert those ballots

11      into the voting equipment either at slow times during

12      the day or after voting hours are over, and we were

13      trying to explore ways where that part of the job

14      could be done before Election Day.

15 Q    Does a high amount of in-person absentee ballots lead

16      to any delays?

17 A    Well, there's -- you mean delays on Election Day

18      or --

19 Q    Election Day, yeah.  Getting the results or anything

20      like that.

21 A    Well, it's hard to tell.  The delay -- I mean what

22      has happened it seems like for high turn-out

23      elections, because of the demand for early voting and

24      it's promoted more and more by campaigns, we tend to

25      sometimes see larger lines at the in-person absentee

92

MICHAEL HAAS

1  voting before Election Day and that relieves some of
2  the crowd on Election Day itself.
3      We've heard stories of in-person absentee voting
4  specifically here in Madison or Milwaukee where
5  people would stand in line for maybe an hour to cast
6  their ballot and then on Election Day the lines are
7  much shorter.  But some voters seem to feel that it's
8  more convenient for them because they can choose the
9  time where they can stand in line.  So I don't know
10 that it's necessarily created delays.  In some cases
11 it might have made the voting process go more quickly
12 on Election Day.
13 Q  And in some cases, as you've described, there have
14 been delays -- well, I should say long lines, that's
15 what you said.
16 A  Long lines during the in-person absentee voting, yes.
17 I think also, though, that clerks are -- it's a
18 continual process of learning from one election cycle
19 to the next.
20     So I think clerks in Wisconsin who have been
21 involved in it a while have also become better at
22 preparing for lines during in-person absentee voting
23 and made adjustments to make it go more quickly.
24 Q  It's not -- just a question.  It's not high turnout
25 because it's a presidential election, right?  I mean

93

1  even presidential elections may not be a high
2  turnout, is that right?
3  A  Well, presidential elections in general tend to get
4  the highest turnout of the four-year cycle.  But it
5  depends so much on candidates and what people are
6  interested in.
7      You know, we had a pretty high turnout for the
8  special elections involving the recalls.  But in
9  general, I think we can count on the turnout being
10 the highest in -- at the November general election,
11 whether it's a presidential election or a
12 gubernatorial election in the off years, and then
13 generally speaking, the two spring elections are
14 lower turnout and sometimes there is not a statewide
15 office on the ballot for the spring election and so
16 that would tend to be even lower turnout.
17 Q  Was the 2008 and 2012 presidential election the
18 highest turnout in Wisconsin?
19 A  You mean during that year or --
20 Q  During the 2008, let's start with that one.
21 A  The highest turnout compared to the other
22 elections -- well, compared to the other elections
23 occurred in those years, yes, that would have been
24 the highest turnout.
25 Q  And did 2012 beat 2008 presidential election turnout?

94

1  A  I believe it did.  I think we were a little over
2  three million -- you know, the 2008 election stuck in
3  my mind because we were focused on the numbers for
4  the early voting study and because we participated in
5  a program with the State of Minnesota and I recall
6  each state having roughly 2.8 or 2.9 million voters,
7  and I think since then it's creeped up over three
8  million.
9  Q  Did you ever speak to any legislators about why the
10 early voting wasn't adopted?
11 A  I did not, no.
12 Q  Has there been -- how long has Wisconsin had
13 in-person absentee ballot?
14 A  Quite a while.  I don't know specifically how long.
15 Q  And you were going down the list to see what's still
16 current today.
17 A  Sure.  So concerns about voters not receiving
18 absentee ballots after requesting them, my perception
19 is that that is not a significant concern at this
20 point, that we do not receive a lot of complaints
21 about that.  And in election administration, there
22 are complaints that we hear a lot about and then
23 there are complaints that might be an individual
24 complaint, but they are very important to that
25 individual voter.

95

1      And so I think some of what Mr. Robinson has
2  conveyed here, whether or not we receive a lot of
3  complaints, when we receive a complaint about a voter
4  not receiving an absentee ballot, we take it pretty
5  seriously because it's obviously affecting that
6  person's right to vote.
7      Large crowds of voters standing in line to cast
8  absentee ballots, you know, again I think to me,
9  2008 sticks out as an election where clerks were
10 maybe not as prepared for the turnout for in-person
11 absentee voting as they have been in the future.  And
12 so while that still might occur, I don't think it's
13 something that we hear as frequently now.
14     There's a concern about handicapped voters who
15 are not able to vote on voting systems, that still
16 comes up.  We have a pretty aggressive program for
17 accessibility at the polling place and so I think
18 that there are more polling places that are prepared
19 to assist voters who have disabilities.
20 Q  Is that curbside voting, or is that something else?
21 A  Well, it's something else.  I think he's specifically
22 referring here to voting equipment that -- accessible
23 voting equipment and that sometimes voters might not
24 be able to -- sometimes we've heard concerns that the
25 accessible voting equipment is at the polling place,

96

MICHAEL HAAS

**Page 97**

1   that it may not be turned on, that its use is not
2   promoted and some -- and that there's a perception
3   sometimes that if it's not going to be used by a lot
4   of people, it's -- the money that it takes to program
5   the equipment is not worth the effort.
6        So I think again this is a concern that we might
7   hear and if it's an individual concern, it's
8   something that we want to try to stay on top of and
9   try to help fix.  But I think over time, the
10   accessibility of polling places in Wisconsin has
11   improved.
12        Provisions to accommodate handicapped voters who
13   wait in long lines for periods of time, you know, I
14   think that's just a general concern about laying out
15   and structuring the polling place.  To me that
16   doesn't rank as something now that we've heard a lot
17   about more recently.
18        Concerns about clerks closing offices to the
19   public and not allowing residents to cast absentee
20   ballots, I think this is something that we have
21   addressed with clerks over the last few election
22   cycles because there are no uniform hours for
23   municipal clerks, it's up to them or their
24   municipality, but we have done much more to educate
25   clerks about the need -- the requirement that they

**Page 98**

1   are available for voters on specific deadlines like
2   the last day of in-person absentee voting or the last
3   day of registration, that we alert them that even if
4   you do not have your regular office hours at that
5   time, you have to be available to accommodate voters
6   who might want to cast ballots or you have to
7   publicize how somebody can contact you to make an
8   appointment or we have filing deadlines as well.
9        So I think that's something we may still hear
10   about, but I think it's a concern that's been
11   addressed much more effectively.
12        Voters' attire at polling place, that's not
13   something that I've really heard about.  He may be
14   referring to electioneering and voters wearing
15   T-shirts with candidates' names on or buttons.
16   That's something that we try to address before every
17   election.  I think the complaints we get about that
18   are pretty rare.  We have some training tips for
19   clerks about how to handle those situations.
20        He also lists the observer rules, and that
21   continues to be something that is a topic for
22   training and a topic for concerns.  There are some,
23   you know, clerks in some areas that relay stories of
24   observers who still are testing the rules or not
25   complying with the rules, but I think in general

**Page 99**

1   overall there's been much more education about what
2   the rules are, and election inspectors have become
3   more skilled at enforcing those rules.
4        HAVA checks, I think that was also a hot topic
5   in 2008 but is not really a controversial issue at
6   this point.  And then there was a lawsuit he
7   mentioned involving the attorney general suing the
8   Government Accountability Board.  That lawsuit was
9   dismissed, and that's also not really a current
10   topic.
11 Q  What was that suit about?
12 A  That had to do with HAVA checks, what we call HAVA
13   checks and the requirement under the HAVA law to
14   match voters -- when a voter registers, a requirement
15   to match the driver's license information or the
16   Social Security number data that they list on the
17   voter registration form with the DMV database or the
18   Social Security database to see if that matches.
19        The attorney general had brought a lawsuit that
20   was objecting in some way to the GAB's administration
21   of that requirement or asking the court to try to
22   clarify what the GAB had to do, and the board had
23   made a determination that whether or not the HAVA
24   check -- whether or not the two databases match
25   exactly, that that did not impact the eligibility of

**Page 100**

1   a voter, and that attracted some attention and I
2   think the attorney general at the time had some
3   questions about whether that was the proper
4   interpretation of HAVA and so ended up bringing a
5   lawsuit and the circuit court dismissed that
6   lawsuit.
7 Q  Does the GAB work with the DMV currently to make sure
8   that either in registration or at the polls that the
9   addresses match up?
10 A  We work really closely with them because when the
11   voter registration system was initially built, we had
12   to come up with a system for doing that match, and
13   so -- and that has continued to develop.  And when
14   either agency is updating its technology, there's
15   close cooperation to make sure that that process is
16   going to stay intact.  So we work closely with the
17   DMV.
18 Q  And you work with them closely under the new voter
19   registration, what did you call it, the CRM?
20 A  Oh, right.  So what we used to call SVRS, we have now
21   labeled WisVote.  It's still the statewide voter
22   registration system.  Right, so we worked closely
23   with the DMV to make sure that that process stayed
24   intact with the new voter registration system.
25        So that's a requirement after somebody

MICHAEL HAAS

1  registers.  So if there's a registration, I think you
2  asked about on Election Day, I mean that's a process
3  that occurs -- it doesn't occur instantly.  There are
4  nightly batches of data that are submitted to DMV.
5  So it's not something that would affect the voter at
6  the polling place.
7  Q  Has GAB had any issues with DMV with respect to their
8     responsiveness to issuing, for example, non-license
9     IDs?
10              MR. KAWSKI:  Object to form.
11 A  Oh, the state IDs?
12 Q  Non-driver IDs, yeah, state IDs.
13 A  Could you repeat the question?
14 Q  Is the GAB aware of any issues with respect to the
15    DMV and issuing non-driver IDs --
16              MR. KAWSKI:  Object to form.
17 Q  -- that voters can use at the ballot box?
18              MR. KAWSKI:  Sorry, object to form.
19 A  The concerns I think that we heard expressed I think
20    are not specific to the state ID versus the driver's
21    license.  There have been more general concerns about
22    availability of the DMV or to process for obtaining
23    either driver's license or state ID.
24 Q  What do you mean by both of those?  What do you mean
25    by the availability first?
                                                    101

1  A  Just the variety of DMV branches and the office hours
2     that they might have, the proximity to people who
3     might use that branch and because my understanding is
4     a number of those branches are not open 40 hours a
5     week, I think it's something that the DMV has tried
6     to address specifically with relation to the photo ID
7     law.
8        So that was one concern that was expressed and
9     then just questions initially about individuals
10    trying to obtain a photo ID and how smoothly that
11    process would go or would not go at a particular
12    branch and so we've had quite a bit of contact with
13    the DMV, basically a direct line between the two
14    agencies to resolve any problems.
15       If we become aware of an individual who has
16    tried to obtain an ID and has run into a roadblock,
17    we have a higher level contact at DMV who will then
18    reach out to that branch and try to get it
19    resolved.
20 Q  And what have been the types of roadblocks that
21    you've heard about?
22 A  I think, you know, just initially in the
23    implementation of the law ensuring that the DMV line
24    staff understood what the law was and what was
25    required and that people were treated consistently
                                                    102

1  and properly through that process.  And so since the
2  revision after the court cases with the petition
3  process that's been put in place, also fielding
4  questions about how that works and whether again the
5  line staff or the supervisor at the DMV is handling
6  applications appropriately.
7  Q  Well, what do you mean when you say people being
8     treated consistently?
9  A  I guess I would compare it to, you know, our training
10    of local clerks, the DMV needed to train all of their
11    line staff in something new, and whether or not
12    somebody was turned away for getting a driver's
13    license or a state ID in the past, that didn't affect
14    their ability to vote.
15       And so whether they were changing their process
16    or not understanding the law, we would tend to hear
17    about it because there would be a problem, and I
18    think that in some cases the DMV would find that
19    their staff maybe was either not applying the law
20    properly or maybe applying the standard that was too
21    strict in order to issue a driver's license or a
22    state ID.  And so the DMV just used similar efforts I
23    think to try to make sure that their training was
24    consistent throughout the state and that the law was
25    administered consistently.
                                                    103

1  Q  Was the DMV considered a bit of a roadblock to people
2     getting state-issued IDs?
3  A  By whom?
4  Q  By the people who couldn't get state-issued IDs.
5  A  I don't know.  I assume if somebody had that kind of
6     result and they were at the DMV that they would place
7     some responsibility on the DMV for not being able to
8     get it.  But I don't have any way to judge whether or
9     not that would be an accurate conclusion.
10 Q  Right.  But you heard about this, about this being an
11    issue, right?  So it came to your attention?
12 A  We heard about problems, but sometimes it was not --
13    they were not problems that could be, you know, laid
14    at the foot of the DMV.  It might be that the voter
15    did not bring all the documentation that they had or
16    was not prepared and there had to be some education
17    with the voter to make sure that they brought the
18    right documentation.
19       And in some cases where there was incorrect
20    information given out by DMV staff, again as I said,
21    the state level DMV staff would reach out to that
22    branch and we would identify issues, let them know
23    who the individual was and they would always follow
24    up with us and let us know whether or not the problem
25    got resolved or not.
                                                    104

MICHAEL HAAS

1  Q   But there's no way of telling the number of people
2      who were turned away from the DMV who just didn't
3      bother, right --
4  A   Not that I'm aware of.
5  Q   -- to come back?
6  A   Right.  I don't know if the DMV kept any such
7      statistics.
8  Q   Let me show you the next document.  You also used the
9      word appropriately.  What did you mean by that?
10         MR. KAWSKI:  Object to form.
11  Q   You said the DMV was --
12         MS. WILSON:  Can you read back that
13      place?
14         (Reporter reads back previous answer)
15  Q   And what did you mean by handling applications
16      appropriately?
17  A   Again this is all based on sort of anecdotes and
18      complaints that we heard in some cases but making
19      sure just in general that the law was being followed
20      and if the individual brought in the documentation
21      that the law required, that it would result in a
22      driver's license or ID being issued, and there was
23      some specific cases where that was a question and
24      because again the DMV has branches throughout the
25      state, one supervisor, you know, might have decided,

105

1      yeah, the documentation is correct and in another
2      location that it was not correct.  And so the goal
3      was to try to make sure that it was both accurate and
4      that it was consistent throughout the state.
5  Q   I show you, what, Exhibit 42.  And, Mr. Haas, take a
6      look at that and let me know when you're done.
7         (Exhibit 42 is marked for identification)
8  A   Okay.
9  Q   And have you seen this document before?
10  A   Yes.
11  Q   And you are -- that's you in to line, right?
12  A   Yes, as one of the individuals that both the emails
13      was addressed to.
14  Q   And the top email is dated 10-5, 2012, right?
15  A   Right.
16  Q   What position does Reid hold, Reid Magney?
17  A   Reid Magney is our public information officer, and
18      part of that is he's really in charge of our main
19      website.
20  Q   And is this the My Vote Wisconsin website or the GAB
21      website?
22  A   Reid is responsible for maintaining the GAB website,
23      but he does get involved in also how the My Vote
24      Wisconsin website is presented.
25  Q   And what is Sarah's position?

106

1  A   Sarah is -- her title is SVRS functional lead.  So
2      the best way for me to describe her position is she
3      is really kind of the connection between the IT work
4      and the program staff and interpreting how the
5      election laws need to be implemented in SVRS and
6      that -- in the statewide voter registration system,
7      and so she has a technical background, but she also
8      has a handle on what we call the election
9      administration rules.
10  Q   And do you see the fourth paragraph, it starts with
11      I've had voters?
12  A   Yes.
13  Q   "Express confusion because they are looking for
14      information about 'early voting' and don't see those
15      words.  One guy said he didn't want to vote absentee,
16      he wanted to vote early".
17         Did you have any discussions with either -- with
18      anyone at GAB about there still being some confusion
19      about "early voting"?
20  A   I'm sure I did.
21  Q   And this confusion is still going on in October 2012,
22      right?
23  A   I think there are -- some people, whether or not they
24      were confused, some people still use the term early
25      voting and they may not be aware of the distinction

107

1      that we make between early voting and in-person
2      absentee voting, and it's always a temptation for our
3      staff and for clerks just for shorthand to say early
4      voting as voting that occurs early prior to the
5      election, and the distinction is probably lost on
6      most people that the ballot isn't actually counted
7      early.
8         So in some cases we might be -- by trying to
9      distinguish between the terms, we might be creating
10      confusion that the voter wasn't even aware was there
11      because they are equating early voting with what the
12      actual in-person absentee process is.
13  Q   And so do you recall if anything was -- because Reid
14      says the voters who are expressing confusion don't
15      see the words.
16  A   Yeah.
17  Q   Do you know if those words were added to the website
18      or if any additional information was added to the
19      website during this time?
20  A   I'm pretty sure it was not because we've been pretty
21      adamant because of that distinction in not calling it
22      early voting.  In some cases we've tried to explain
23      that distinction, but I think we've tried to stay
24      away from using that term.
25  Q   But in other jurisdictions, right, absentee voting is

108

1    done by mail?  You get your absentee ballot, you mail
2    it in.  Doesn't that in itself cause some confusion?
3         MR. KAWSKI:  Object to form.
4  A  Does what cause confusion?
5  Q  That the — what did you call it, in-person absentee
6    ballot?
7  A  In person, right.  So we — Wisconsin also has
8    absentee voting by mail, and I think the reason we
9    try to stick with that term is because that's because
10   the statutes call it absentee voting.  There's no
11   statute describing early voting, and the statute
12   describes these are the ways you can request an
13   absentee ballot by mail or in person and some voters
14   can — well, or you can request — submit a request
15   electronically.
16  Q  So in-person absentee ballot is counted later, right?
17  A  On Election Day.
18  Q  The night of the election?
19  A  Or during the day.
20  Q  During the day, okay.
21  A  The election inspectors process them as they can
22   during the day.
23  Q  Can the rest of the election happen before those
24   ballots are counted?
25  A  No.

109

1    with how aware voters are of the rules related to
2    early voting and voter registration, and I was simply
3    making the observation that voters tend to be more
4    aware of what the rules are closer to major
5    elections.  It's more in the forefront of their mind,
6    and I just thought it would be interesting to know
7    whether the results would be similar because this
8    poll was not taken during the time of any major
9    election.
10  Q  So during a major election, you would expect it to be
11   even higher?
12  A  I would hope it to be higher, yes.
13  Q  Hope it to be higher, okay.  And what is Meagan's
14   job?
15  A  So Meagan Wolfe is our — she's an elections
16   specialist, and she is our voter outreach specialist.
17   So she's the primary person for giving in-person
18   presentations to the public and voter audiences.  And
19   she also is responsible for maintaining our Facebook
20   page and our Twitter account.  She will send out
21   messages related to elections and voting.
22  Q  The GAB tweets, huh?
23  A  Yeah, we do.
24  Q  How many followers do you have?
25  A  I don't know.  We tend to get more followers around

111

1  Q  The next exhibit.
2         (Exhibit 43 is marked for identification)
3  Q  Mr. Haas, look that over and let me know when you're
4    finished.
5  A  Okay.
6  Q  And have you seen this document before?
7  A  Yes.
8  Q  And this is from you to some people at the GAB?
9  A  The initial email was from David Buerger, one of our
10   election administration specialists, and then there
11   is a response from me to the same group of people
12   that he sent his email to.
13  Q  And did you write, "Thanks, David, these are good
14   points for Reid and Meagan to keep in mind for
15   continuing voter outreach and press releases"?
16  A  Yes.
17  Q  And you said, "It would be interesting to see if the
18   results were much different if the poll was conducted
19   much closer to a major election."  Do you see that?
20  A  Yes.
21  Q  What did you mean by the last sentence?
22  A  Well, this, David was referring to a national poll
23   that was conducted or at least he became aware of the
24   results in January 2014, and it appears that the poll
25   was conducted in September 2013, and it has to do

110

1    election time.
2  Q  Put that away.
3  A  We had one board member ask the question why are we
4    on Twitter.
5  Q  What was the response?
6  A  Well, we explained to him that that was an effective
7    way for us to try to communicate.
8         MS. WILSON:  Are we up to 44 or 45?
9         THE REPORTER  44.
10        (Exhibit 44 is marked for identification)
11  Q  Take a look at this and let me know when you're done.
12  A  Okay.
13  Q  Have you seen this document before?
14  A  Yes.
15  Q  Did you have any discussions with Mr. Hein or
16   Mr. Rossman about the subject, trouble voting in
17   St. Francis?
18  A  I'm sure we addressed it.  I don't recall a specific
19   conversation, but Ross Hein is our election
20   supervisor.  He may have taken the initiative to
21   reach out to the voter and the clerk.  We may have
22   had a discussion or it might have been assigned to
23   somebody else.  But this kind of email is something
24   that we would have responded to as quickly as we
25   could.

112

**Page 113**

1    It appears that we received it fairly early in
2  the morning on the day of the partisan primary in
3  August, and that would have given us time to try to
4  address it and make sure that this voter had been
5  taken care of and that any problem at the polls was
6  fixed for the rest of the day.
7  Q  Does the GAB track when it solves an issue like this?
8  A  Well, something like this because it happened on
9  Election Day would have been part of our contact
10  activity log, and that's a spreadsheet where we would
11  record -- if this came in as a phone
12  call, it would have been tracked.
13    Our contact activity log, we had not required
14  the staff to enter email inquiries into the log
15  because we assumed that there would be some record as
16  far as an email follow-up that we could see how it
17  was resolved.
18    If this had come in in a phone call, the staff
19  person would have recorded who had called, what the
20  problem was and then what our response was or what we
21  did to address it.
22  Q  And Mr. Rossman, it says GAB on behalf of the GAB
23  help desk.
24  A  Right.
25  Q  Is that one of the call people that you talked about

**Page 114**

1  earlier?
2  A  He is one of three staff on our help desk that answer
3  the -- basically the general help line for voters,
4  and the help desk is -- if somebody sends an email to
5  our general email address, they will receive it at
6  the help desk.
7  Q  And with respect to your contact activity logs, are
8  those kept in the normal course of business?
9  A  Yes.
10  Q  Are they ever deleted?
11  A  No.
12  Q  With respect to this trouble voting at St. Francis in
13  August of 2014, if this were resolved by phone, in
14  other words, if somebody had simply picked up the
15  phone and called the person, would there be any
16  activity noted?
17  A  It may or may not.  I mean if it was a phone call, it
18  might have been -- it might have resulted in the
19  staff person sending an email to me to say it's been
20  taken care of, but it also may not have been
21  separately recorded anywhere.
22    We've had some elections when we started using
23  the contact activity log, in some elections, staff I
24  think were required to or thought that they were
25  required to also record emails and eventually that

**Page 115**

1  got clarified and the policy became only -- that they
2  were only required to record phone calls.
3  Q  Do you recall in this -- I think you called it the
4  day of the partisan primary, were there other issues
5  with respect to the picture ID that you can recall?
6  A  There may have been.  I wouldn't be surprised if
7  there were some isolated incidents, but I don't know
8  for sure.
9  Q  And why do you say isolated?
10  A  Well, because we made a specific effort ever since
11  the photo ID law was enacted to make sure we were
12  educating clerks about what the status was.  And this
13  in particular was a time where there was legal
14  activity related to whether or not it was going to be
15  in effect and we kept trying to hammer away that
16  photo ID is not in effect and so any calls that we
17  got would have, I think, been an exception.
18    But sometimes either the clerks did not make a
19  point of it or maybe didn't -- or an election
20  inspector may have forgot what the status was and we
21  would receive a call that I was told that photo ID
22  was in effect.
23  Q  And this is despite all the training and education
24  that you did?
25  A  Right.  And I think as I said, they're fairly

**Page 116**

1  isolated in that it would sort of be pretty
2  significant -- we would note it pretty significantly
3  because we were so used to -- knowing what the status
4  of the law, that it would catch our attention if
5  somebody was told differently at the local level.
6    (Exhibit 45 is marked for identification)
7  Q  Mr. Haas, take a look at this exhibit marked  45 and
8  let me know when you've looked at it.
9  A  Okay.
10  Q  And have you seen this document before?
11  A  Yes.
12  Q  And it's -- can you tell me -- describe it for me,
13  please.
14  A  Sure.  It's an email I received from an attorney
15  working for the Wisconsin -- the Republican Party of
16  Wisconsin wanting to let me know that they had run
17  into an issue in a township where voters were having
18  difficulty scheduling times with the clerk to vote an
19  in-person absentee ballot and indicating that the
20  clerk or that this attorney was told that they were
21  turned away by the town clerk, who said -- who
22  claimed that there was no such thing as early voting
23  and that they needed to either have an absentee
24  ballot sent by mail or vote on Election Day.  And I
25  passed that along to David Buerger of our staff and

1    asked him to investigate it.

2  Q    And do you recall the conclusion of his

3        investigation?

4  A    I do not.

5  Q    If any.  And would there be any place where it's

6        documented at the GAB that this was resolved in one

7        way or the other?

8  A    There may or may not be.  If there was -- knowing

9        David Buerger, I wouldn't be surprised if he had

10       followed up with an email to let me know how it was

11       resolved, but I couldn't guarantee that there was a

12       document indicating what happened.

13  Q   Do you happen to know this particular clerk,

14       Lane Ruhland?

15  A    It says the town clerk is Jean Judd.

16  Q    Oh, I'm sorry, yeah.

17  A    And I don't know her.  The attorney who sent it to me

18       was Lane Ruhland.

19  Q    So you don't know if it was a long-term clerk or

20       somebody new?

21  A    I do not know that.

22  Q    Okay.  I'll show you -- Mr. Haas, take a look at

23       Exhibit 46, and let me know when you're finished.

24       (Exhibit 46 is marked for identification)

25  A    Okay.

117

1  Q    Have you seen this document before?

2  A    Yes.

3  Q    And can you describe it for me?

4  A    Sure.  There's an email from the City of Fond du Lac

5        Clerk to David Buerger of our staff describing a

6        situation with a student who wanted to register and

7        there appeared to be a disagreement about whether the

8        student could register at his home address in Fond du

9        Lac rather than at his campus address in Milwaukee,

10       and David Buerger passed that along to me and asked

11       me if I could contact the city attorney to discuss

12       guidance that we have provided, that the GAB had

13       provided about the subject of residency and voter

14       registration and specifically for college students.

15  Q    And was there at the time a lot of confusion about

16       this 28-day issue?

17  A    I think that was -- there was generally confusion on

18       issues that come up with residency in general, and

19       the change to 28 days I think just increased the

20       number of questions because the 28-day requirement

21       affected more people than the 10-day residency

22       requirement did.

23  Q    And just for the record, it changed from 10 days to

24       28 days, right?

25  A    Yes.

118

1  Q    And when was that, if you recall?

2  A    I think that might have been part of the photo ID

3        law.

4  Q    So approximately 2011?

5  A    Right.

6  Q    And do you recall calling, too, and chatting with

7        her?

8  A    I don't recall a specific conversation.  I'm sure I

9        did.  I was really the primary author of the memo

10       that is attached to the email.

11  Q    That was my next question.  If you know, why are you

12       making the call instead of Dave?  It's because you

13       were the primary author?

14  A    You know, I think that June 5th I think was the

15       recall election, and David may have been passing it

16       on to me just because of the volume of calls and that

17       it appeared that this clerk, you know, was not

18       pleased with maybe what she was hearing from David

19       and he thought that maybe I could try to explain it

20       and that the clerk might listen to a different voice

21       on what the law was.

22  Q    Did the change make it easier or harder for students

23       to vote?

24           MR. KAWSKI:  Object to form.

25  A    I think the change to 28 days, it affected more

119

1        students as to their eligibility to register to vote.

2        You know, not the actual act of voting, but in order

3        to register, just as with the general population,

4        residency had to be established at least 28 days

5        before an election and so that required a longer

6        period of time to be located in one place.

7  Q    Did you have any discussions with any legislators

8        about why the change from 10 to 28 days?

9  A    I don't recall specific conversations that I had.  I

10       may have.  I just don't remember.

11  Q    Do you have any understanding of why the change was

12       made from 10 to 28 days?

13  A    I guess just based on statements from the

14       Legislature, reading what was in the paper, my

15       understanding was that there was -- one reason or

16       justification for it was to maybe bring that period

17       more in line with other states that had a longer

18       residency period, and the thought might be that

19       Wisconsin would be more consistent with other states

20       and then just maybe generally the idea that an

21       individual should be established for a longer period

22       of time in one location before they were eligible to

23       vote there.

24  Q    But it made it harder for students to register,

25       didn't it?

120

1          MR. KAWSKI:  Object to form.

2  A   Well, so students in Wisconsin really -- university

3      and college students have the option to be registered

4      and vote at either their home address or their

5      college address, and so this would -- could make it

6      more challenging for some students to register at

7      their campus address.  And as with anybody else, once

8      registered at their campus address, it would require

9      a longer period of time to change that registration

10     to their home address.  But it did not prevent a

11     college student from registering or continuing to be

12     registered at their home address and having the

13     opportunity to vote there even if they were away at

14     school for four years.

15  Q   So they could register at home, but they can't

16     register both places?

17  A   Correct.

18  Q   Right.  You said that -- and I take it you're

19     speculating a bit about -- or maybe it's from

20     conversations.  Maybe you're basing it on something

21     and you can correct me.  Wisconsin wanted to be in

22     line with other states, was that just with respect to

23     the moving from 10 to 28?  In other words, there are

24     other states, for example, who have early voting.

25  A   Um-hum.

121

1  Q   But Wisconsin doesn't fall in line with those states.

2  A   Right.

3          MR. KAWSKI:  Object to form.

4  A   And I think that that's generally an argument you'll

5      hear in any policy debate is if it benefits the

6      argument to say we're in line with other states, that

7      that will be an argument that's used.  But it's

8      obviously not a rule that's applied consistently

9      across the board.

10  Q   I'm going to show you a document that's already been

11     marked as Kennedy 2.  Take a look at it.  Let me know

12     when you're ready.

13  A   Okay.

14  Q   Have you seen this document before?

15  A   Yes.

16  Q   And you are its author, right?

17  A   Yes.

18  Q   And did anybody else have input into this document?

19  A   I'm sure I circulated it to our staff to review

20     before we issued it.

21  Q   Is that your usual practice?

22  A   Yes.

23  Q   It says corrected August 5th, 2014.  Why was a

24     correction needed, do you recall?

25  A   It was initially issued April 11th 2014 and page --

122

1      it appears that maybe this is out of order a little

2      bit.  Page 2, which is I think the fourth page in the

3      packet, indicates that we had struck out a clause

4      having to do with whether or not proof of residency

5      was required when a voter was only processing a name

6      change at the polls.

7  Q   And that was incorrect?

8  A   We had changed our interpretation of the statute from

9      the time we issued it in April until August.

10  Q   And do you know why you made that change?

11  A   Yeah.  I recall having a pretty late meeting to try

12     to hash it out.  There was some uncertainty because

13     of conflicting language in the statutes about what is

14     required when a voter either changes their name or

15     changes their address, and there was some language

16     that could support the view that a new

17     registration -- or that proof of residence was not

18     required when that happened, and that was initially

19     our conclusion when we issued the memo in April.  And

20     then we received questions about it.

21          I recall receiving some phone calls from at

22     least one attorney, you know, questioning that

23     interpretation and then we revisited it, tried to

24     look through all the relevant statutory citations and

25     then we concluded that this was the more accurate

123

1      interpretation.  And it was also I think supported by

2      the language in the statutes and also made the

3      implementation of it a little bit easier because the

4      rules were simplified with clerks.  It removed one

5      more exception to the general rule.

6  Q   And you came to that conclusion the second time

7      around?

8  A   Right.

9  Q   It says subject, proof of residence now required for

10     all voter registrations.  Was there some change in

11     the law or just change in interpretation?

12  A   No, that was a significant change in the law.  2013,

13     Act 182 required every voter registration application

14     to be accompanied by a proof of residence document I

15     think except for military and overseas voters.

16     Military voters are not required to register in

17     Wisconsin.

18          And prior to that law, if somebody registered

19     earlier than 20 days before an election, proof of

20     residence -- a proof of residence document was not

21     required.

22  Q   Do you know why the change was made?

23  A   Again it was a legislative decision and I think some

24     of the arguments that were offered in favor of it was

25     then there would be a consistent rule for voters

124

MICHAEL HAAS

```
 1    registering at any time of the year and that maybe
 2    clerks may not have the same certainty that the
 3    individual resided at the location that they put on
 4    their form if there was no document provided that
 5    established that residence during the open
 6    registration period before 20 days prior to an
 7    election.
 8  Q  And is that for all voters all the time?  In other
 9    words, if I voted for the last 10 years, do I still
10    have to each time I vote show a proof of residency?
11  A  That's only when you register to vote or when you
12    update your registration because your address has
13    changed or your name has changed.  So it's part of
14    the registration process, not the voting process.
15  Q  And if you look at the -- where you say prior to the
16    Act 182's enactment, do you see that sentence?
17  A  On which page?
18  Q  On page -- the next page, Page 2.  You said yours
19    might be out of order.
20  A  Yeah, so the second page here is Page 3.
21  Q  Okay.  Do you have a Page 2?
22  A  Yes.
23  Q  I'll fix it later.
24  A  Prior, yes.
25  Q  So you see that sentence?
                                                      125
```

```
 1              MR. KAWSKI:  Object to form.
 2  A  So I don't recall hearing concerns from voters who
 3    wanted to register in that open registration period.
 4    There's always some individuals in groups who are
 5    also voters who were concerned that there was not a
 6    proof of residence requirement in place prior to that
 7    legislation.
 8  Q  When did Wisconsin first require proof of residence,
 9    do you know?
10  A  I do not know.
11  Q  Then you say the next paragraph, "The new law will
12    require changes in procedures for voters, clerks and
13    special registration deputies."
14        What did you mean by that?
15  A  Well, for voters, the main change is that they would
16    have to provide proof of residence when they did not
17    need to before in certain periods.  Clerks needed to
18    make sure that they were seen and collecting proof of
19    residence documents if registration was sent in by
20    mail.  And they needed to note certain things in the
21    statewide voter registration system about the proof
22    of residence, and special registration deputies were
23    now required to collect the proof of residence
24    document when they were not required to do that
25    before during the open registration period.
                                                      127
```

```
 1  A  Yes.
 2  Q  Do you know what interest is served by making that
 3    change, what election administration interest is
 4    served?
 5              MR. KAWSKI:  Object to form.
 6  A  Well, as far as administration, as I said, I guess
 7    the benefit would be consistency, that clerks would
 8    not have to apply a different rule 21 days before an
 9    election than they applied 19 days before the
10    election.  So I think administratively that's
11    probably one benefit.
12  Q  Had there been complaints or had there been some
13    problems caused by the difference?
14  A  Well, I guess I'd say as I indicated earlier with
15    1,853 clerks, they all have differing opinions.  Some
16    of them want tighter restrictions and some liked
17    things as they were and were not bothered by the fact
18    that they were not seeing a proof of residence
19    document.  As I mentioned, on the back end there's a
20    process to send out a mailing to verify the address,
21    and so I think it was a mix of opinions.
22  Q  What about the voters, the people that it affects the
23    most?
24              MR. KAWSKI:  Object to form.
25  Q  I understand the clerks, but what about the voters?
                                                      126
```

```
 1  Q  So what happens once they collect it?  What do they
 2    do with it?
 3  A  I believe we had some guidance here about how long
 4    they needed to keep or retain the proof of residence
 5    document.  They only needed -- they did not need to
 6    keep a proof of residence document if they registered
 7    in front of the clerk.
 8  Q  Okay.
 9  A  But if the registration was submitted by mail or
10    through a registration drive, they needed to retain
11    the proof of residence document.
12  Q  And then you say that, "Due to its immediate
13    effective date, however, the GAB provides the
14    following guidance and directives to voters and local
15    election officials regarding the implementation of
16    the act" -- I'm sorry, Act 182.
17        How was this -- how was the guidance provided,
18    for example, to the voters?  How was that provided?
19  A  It was incorporated into information that we posted
20    on our website, that was included in our training
21    manuals, which then were applied by local clerks.  We
22    sometimes put out press releases or public documents.
23    Often before -- leading up to an election, we would
24    often put out a press release saying these are the
25    top 10 things that voters should be aware of heading
                                                      128
```

MICHAEL HAAS

1  into an election.  So I'm sure we tried to
2  communicate it in a number of ways.
3  Q  Given the — using your word from before, modified a
4     little bit, given — let me start again.  Strike
5     that.
6        Given the frequency of some of these changes in
7     the election laws and given the complexity and the
8     specificity, in your experience, does it not make —
9     does it not put a burden on the voters to try to keep
10    up with all of these changes without having the
11    benefit, frankly, of what some of your clerks have,
12    which is to have someone like you and someone in GAB
13    constantly giving them information?
14               MR. KAWSKI:  Object to form.
15 A  Well, I guess it's sort of a subjective judgment.  I
16    think it depends on the voter.  It depends on if
17    they're already registered, if they've moved, if
18    they've had to make any changes.  And you know,
19    voters only need to know some of this information for
20    a specific period of time and then they can forget
21    about it.  It's the election officials that we need
22    to train that need to be continually up to date on
23    it.
24        So certainly it's a change.  Voters have to be
25    educated on the change and had to take additional

129

1  steps that they were not required to take sooner, and
2  whether or not that would be considered a burden or a
3  challenge I guess would be up to each individual.
4  Q  But it's not for the voters, right, just a one-time
5     thing to know and to forget?  Like, for example, if
6     you moved and you didn't realize, oh, shoot, I have
7     to change my — I have to re-register, you could be
8     unable to vote because you might have waited until
9     the last minute, right?
10               MR. KAWSKI:  Object to form.
11 A  Well, so Wisconsin has Election Day registration, so
12    that's always a good backup.  That resolves a lot of
13    issues as far as registration eligibility.  Now that
14    we have the photo ID requirement, that is something
15    that is not as easily able to be resolved on Election
16    Day if you don't have a photo ID.
17        So, yes, they may need to know it more than
18    once, but I guess what I'm saying is it's not a
19    priority to remember year-round.  They only need to
20    know when it's going to affect them.
21 Q  So someone who doesn't have a photo ID the day of
22    election, do they get to vote provisionally?
23 A  Yes.
24 Q  But there's a limited time period that they have to
25    come up with a photo, right?

130

1  A  Right.
2  Q  And if they don't come up with the photo, then their
3     vote isn't counted?
4  A  Correct.
5  Q  So wouldn't that put them sort of on the same par as
6     someone who's lost the right to vote, like a felon?
7               MR. KAWSKI:  Object to form.
8  A  Well, no.  A felon should not receive a ballot in the
9     first place.  So I guess I would disagree.  They're
10    in a little bit different situation.
11 Q  But my vote is not counted.  Isn't it the same?
12 A  Oh, you're saying if the photo ID is not subsequently
13    provided?
14 Q  Right.
15 A  Again they've been able to cast a ballot.  I guess in
16    that case whether it's because it's impossible or the
17    voter hasn't taken the steps to get an ID, in some
18    cases it may be the voter's option not to rectify
19    that provisional ballot.  But it is not considered to
20    be — to affect their eligibility to vote, which is
21    the case with a convicted felon who is still serving
22    a sentence.
23 Q  But doesn't the photo ID — it causes more work for
24    the clerks, right?
25               MR. KAWSKI:  Object to form.

131

1  A  It causes additional work than they had prior to the
2     law.
3  Q  It causes additional work for the poll takers, right?
4               MR. KAWSKI:  Object to form.
5  A  Additional tasks, yes.
6  Q  And it could conceivably result in a voter not — a
7     voter's vote not being counted, right?
8  A  Yes.
9  Q  What election administration interest does it serve
10    given the three things I just listed?
11               MR. KAWSKI:  Object to form.
12 Q  Based on your knowledge and experience.
13               MR. KAWSKI:  Object to form.
14 A  Well, I think as far as administering — issuing
15    ballots at the polling place or at the clerk's
16    office, I don't know that there is anything we've
17    identified to say that it's a benefit or a detriment.
18    I think in my mind at least it's a policy choice that
19    the Legislature decided that they wanted to implement
20    that, that's going to be one of the procedures that's
21    required, just like having to sign the poll list, and
22    it does require additional steps on behalf of the
23    voter.
24        I think one — maybe one argument that's been
25    expressed that as a benefit to the election

132

MICHAEL HAAS

Page 133

```
 1   administration process is that election officials
 2   have -- it may lend some confidence, additional
 3   confidence for election inspectors to know that the
 4   person in front of them is who they say they are, so
 5   that's maybe a specific thing related to that voter.
 6        You know, another argument that's been raised is
 7   just in general because that process is in place,
 8   more people have more confidence in the election
 9   process because that safeguard is there or that step
10   is required.
11 Q And what about on the flip side?
12        MR. KAWSKI:  Object to form.
13 A The flip side?
14 Q You said the benefits.  What about the down side in
15   your knowledge and experience?
16 A Well, administratively --
17        MR. KAWSKI:  Object to form.
18 A Administratively anything that adds additional steps
19   has the potential to increase the time it takes to
20   process a voter at the polls.  It has the potential
21   to affect the ability of people to vote who would
22   otherwise be allowed to vote without those steps.
23        So there's some potential that people may not be
24   able to vote or may decide, you know, not to vote,
25   and from an election administration perspective we're
```

Page 134

```
 1   always interested in trying to increase the ability
 2   for people to participate in elections.
 3        You know, any additional requirement, we are
 4   always also concerned about making sure it's applied
 5   consistently throughout the state and so it's another
 6   training thing that we have to pay attention to and
 7   that election -- that clerks and election inspectors
 8   have to pay attention to and to make sure everybody
 9   understands it and is applying it consistently and
10   that it doesn't affect their ability to administer
11   all of the other steps that are necessary.
12 Q When you were talking about the benefits, you said --
13   I think you said -- I'm using my words -- the comfort
14   of having the inspector know that it's the person.
15   Has that been a big issue in Wisconsin?
16        MR. KAWSKI:  Object to form.
17 Q People voting who aren't who they say they are?
18        MR. KAWSKI:  Object to form.
19 A So in one sense it's been a big issue because some
20   people have expressed that that's a concern of
21   theirs.  Whether -- it has not been -- at least as
22   far as I know, it has not been a frequent -- what we
23   would call a frequent occurrence that we've been made
24   aware of that people have voted under somebody else's
25   name.
```

Page 135

```
 1 Q Has the GAB ever looked at the issue of voter fraud?
 2        MR. KAWSKI:  Object to form.
 3 A Yes.
 4 Q In what way has it done that?
 5 A One specific way is that at one point we surveyed
 6   district attorneys throughout the state and asked
 7   them -- I think it was after the 2010 election if
 8   they had received any complaints of voter fraud and
 9   what the outcome of those cases was.
10        I think that's really the only way we attempted
11   to measure it at one specific election.  But then
12   looking at voter fraud, I mean we certainly thought
13   about what are the different ways that could happen.
14   As I mentioned, we deal with district attorneys quite
15   a bit.  We've held Webinars for law enforcement and
16   prosecutors to talk to them about the election laws
17   and issues to think about and how to approach a
18   potential case of voter impersonization.
19        And we have processes in place that are aimed at
20   trying to detect voter fraud.  The statewide voter
21   registration system gives clerks and us the ability
22   to determine whether it looks like somebody has voted
23   in more than one location of the same election or is
24   registered in two separate places.  Obviously with
25   the matching that we do with death lists in Wisconsin
```

Page 136

```
 1   and felon lists, that's a regular process that we
 2   have that would help detect any potential voter
 3   fraud.
 4 Q And when you used the word voter fraud, how do you
 5   define that?
 6 A I guess as somebody who violates the laws as far as
 7   eligibility for voting.  So those categories I think
 8   would be if they voted twice in one election, if
 9   they're not qualified to vote because they are
10   serving a felon sentence, if somebody attempts to
11   vote in another person's name or they attempt to
12   register or vote in a location that they're not
13   qualified to do so.
14 Q On that last one, because the rest seem to me to
15   suggest intent, if you accidentally voted at the
16   wrong place, would that be voter fraud in your mind?
17 A Well, in Wisconsin law, it has to be an intentional
18   crime.
19 Q Yeah, okay.  And when you were talking about that
20   study that you did, what was the result of it?  What
21   did you learn?  That was in 2008, right?
22 A It was following a general election, and I don't
23   recall.  I thought it was after 2010 because I had
24   just started in 2008, but I could be wrong.  But we
25   found I think roughly half of the 72 district
```

MICHAEL HAAS

1   attorneys responded to the survey and there ended up
2   being a handful of cases, complaints that were even
3   filed.
4       Our board also heard from the prosecutor in the
5   Milwaukee County District Attorney's Office who came
6   to one of our board meetings and explained how he
7   handles those cases.  I guess -- so it was I think a
8   handful of cases that resulted in any court action.
9 Q  Out of how many voters?
10 A  Again roughly three million.  I think another effort
11   that we had was we undertook a matching process, as I
12   said, with the State of Minnesota to determine
13   whether any individuals had voted in both states, and
14   I think that was -- I don't remember now if that was
15   the 2008 or 2010 election.
16 Q  And the result of that?
17 A  A very few number of people who appeared to have
18   voted in both states and we worked with the
19   prosecutors in both states and the clerks in both
20   states to try to determine whether there were any
21   individuals, and I don't think that resulted in any
22   convictions.  I don't even know if there were any
23   that turned out to be the same person.  Sometimes it
24   ended up being a family member with a similar name or
25   often it was a data entry error.  The wrong voter got
                                                    137

1   marked as participating.
2 Q  So no widespread voter fraud?
3 A  Right.
4           MS. WILSON:  Could we go off the
5       record for a second?
6           THE VIDEOGRAPHER:  Off the record at
7       1:04.
8           (Discussion off the record)
9           THE VIDEOGRAPHER:  The time is 1:07.
10       We are back on the record.
11           (Exhibit 47 is marked for identification)
12 Q  Mr. Haas, take a look at --
13           MS. WILSON:  Did I give it to you?
14           MR. KAWSKI:  Do you have a copy?
15 Q  Wait a minute.  Can I have that back for just a
16   second?
17           MS. WILSON:  Somehow I didn't make a
18       third copy.  I apologize.  So let me have you
19       take a look and pass it to him.  Sorry about
20       that.
21           MR. KAWSKI:  That's all right.
22 A  Okay.
23 Q  Have you seen this document before?
24 A  Yes.
25 Q  Take a look.  Okay.  And you're the author?
                                                    138

1 A  Myself, but mostly Allison Coakley.
2 Q  And you say mostly Allison Coakley.  Why do you say
3   that?
4 A  She is our training coordinator and so she would have
5   drafted this memo listing the Webinars that were
6   planned during this time period.  Our practice is in
7   most cases to list me as the author of communications
8   that are issued to clerks along with the staff person
9   who's the primary contact.
10 Q  And was this, where it says in the first paragraph
11   Back to Basics, the program you were talking about
12   earlier?
13 A  Well, this refers to that program in 2012.  This is a
14   memo from 2013 which we termed Building on the
15   Basics.  So that was sort of our theme for the 2014
16   election cycle.
17 Q  And is this an indication of how you generally train
18   through Webinar the clerks at the different
19   locations?
20 A  Yes.  So these would have been Webinars that we
21   hosted and conducted at our office and were available
22   for clerks to attend live and then would be made
23   available for them to view afterwards.
24 Q  Now, is the training for the clerks free of charge,
25   or do they have to contribute something?
                                                    139

1 A  It is free.  Sometimes when we do in-person training,
2   it depends on whatever organization is hosting the
3   training, but we do not charge for the training.
4 Q  And when you do the training with the clerks, do you
5   invite outsiders --
6           MR. KAWSKI:  Object to form.
7 Q  -- or organizations or other agencies?
8 A  No.
9 Q  And if you look at Page 2, who normally does the live
10   teaching?  Is that Allison Coakley or would it be
11   different people?
12 A  It's usually our -- a small team of election
13   specialists, and for these topics, mostly what we
14   call our election administration specialists, which
15   is a team of about six individuals.
16       We have listed on here My Vote Wisconsin, so
17   that might have also involved some of our SVRS staff.
18   Allison usually participates in that she really runs
19   the Webinar and is sort of the host and the traffic
20   cop and is monitoring questions that come in online,
21   but the substance of the training is usually done by
22   other staff.
23 Q  Now, if you look at Page 3 under Election Day duties,
24   special topics and situations, there's a list of six.
25   Were these particularly problematic areas, areas that
                                                    140

MICHAEL HAAS

1  needed additional training?  Like why are these
2  listed here, if you know?
3 A  Yes, I think we identified those as areas that were
4  either continuing topics that we thought needed
5  attention, maybe things that we had not trained on in
6  a while and that also things that might be timely.
7  That was being presented in March of 2014.  So we
8  were leading up to a spring election and sometimes
9  just a matter of reminders to refresh the
10  participants about what the rules are.
11 Q  During the presidential election, do you increase the
12  amount of training you do for clerks, or does it stay
13  the same?
14 A  Well, I think it's pretty comparable in even numbered
15  years versus odd numbered years.  I think our
16  training would increase during even numbered years or
17  you can see this is the fall into the spring of --
18  fall of an odd numbered year into the spring of an
19  even numbered year and then we would put out another
20  communication about training for the rest of that
21  even numbered year.
22 Q  And what does it mean, assisting voters?
23 A  Assisting voters, I think that refers to voters who
24  might need assistance because they have a disability
25  and so training on the procedures for who can assist

141

1  and what can that assister do to help the voter.
2 Q  And I might have asked you this or it might have
3  just -- curbside voting, what's that?
4 A  So that is an option on Election Day or even during
5  the in-person absentee voting.  If a voter has a
6  disability and they feel they cannot make it into the
7  polling place, there's a process where a ballot is
8  taken out to the curbside and they're permitted to
9  vote in their vehicle.  And we have issued some
10  guidance to ensure that as much as possible that
11  process is consistent with the process in the polling
12  place.
13 Q  Do you recall an issue with an observer objecting to
14  curbside voting?
15 A  I recall an issue with an observer being involved in
16  curbside voting I believe in the City of Milwaukee
17  and getting questions about how to handle the
18  situation.  I think that's partly what led to us
19  providing more specific guidance about the process.
20 Q  Has the -- let me withdraw that.  And what is
21  challenging voters?
22 A  So it's a process where a voter's eligibility to vote
23  can be challenged at the polls.
24 Q  Is that by the observer or by the poll person?
25 A  It could be by either one actually.  Observers are

142

1  allowed to challenge on a more limited basis than an
2  election inspector would be able to challenge a
3  voter.  But there's a specific process set out in our
4  administrative rules for what happens when a voter is
5  challenged and how that is resolved.
6 Q  Do you give any training with respect to
7  challenging -- when an observer challenges voters
8  taking into account that there may be biases that the
9  observer has with respect to the voter?
10 A  Well, the general rule is that the challenger needs
11  to have some firsthand knowledge that the person's
12  not eligible and so we try to emphasize it cannot be
13  some general unsupported challenge.
14 Q  And lastly, what is the absentee ballot log?  Is that
15  new?
16 A  No.  That's been around, but that's simply the
17  document that the status of absentee ballots are
18  tracked, when were they requested, when were they
19  issued and were they processed at the polls.
20        MS. WILSON:  We'll take a lunch
21     break.
22        THE VIDEOGRAPHER:  The time is 1:16.
23     We are going off the record concluding Media
24     No. 2 in the deposition of Mr. Haas.
25        (Lunch recess is taken)

143

1        (1:16 p.m. to 1:59 p.m.)
2        THE VIDEOGRAPHER:  We are on the
3     record.  The time is 1:59 p.m.  This marks the
4     beginning of Media No. 3 in the deposition of
5     Mr. Michael Haas.
6 Q  Good afternoon.  Just a little point of clarification
7  for me.  So when the original photo voter ID law came
8  into effect, the GAB did a lot of outreach, right,
9  before it was -- before the law was stayed or I
10  forget what it's called, you know, a public outreach,
11  training of clerks, that sort of thing, right?
12 A  Yes.
13 Q  And what was the time period between that and the
14  time that the photo ID came back?
15 A  So it was stayed shortly after the February 2012
16  spring primary and it remained stayed until shortly
17  before the 2014 -- sometime I believe in September of
18  2014.  And then it was reinstated and then in October
19  of 2014 it was stayed again by the U.S. Supreme
20  Court.  And it remained that way until after the
21  April election of 2015.
22 Q  And since 2015, has the GAB done any public outreach
23  similar to what they did when the law was first
24  enacted?
25 A  What we did as far as public outreach was we updated

144

MICHAEL HAAS

1   all the materials both on our website and on the
2   Bring it to the Ballot website.  Because of the new
3   petition process, we wanted to make sure the
4   information was accurate.
5       We updated the public service announcements,
6   basically made sure that everything on that website
7   was current and available for use.  We also have
8   continued our program of making public presentations
9   to groups that invite us.  There is not -- we have
10  not had the same funding in order to place the public
11  service announcements in any sort of media buy, so
12  we've not done that.
13  Q   Anything else that you haven't done since it's been
14  reinstated?
15  A   I think that's probably the main thing because that
16  would have required additional funding and everything
17  else we've just done internally with existing staff.
18  Q   Given the transition, has the -- oh, I think you said
19  there is some money for the transition, right?  I
20  think you told me that.
21  A   Well, there's not -- for the agency transition?
22  Q   Yes.
23  A   There's not money that's been allocated for the
24  transition process.  I think what I was referring to
25  is that there are some financial provisions to that

145

1   legislation directing that the budget lines need to
2   be separated.
3       There has to be a determination made by the
4   Department of Administration as to the pay range for
5   the top position in each of the two commissions, but
6   there's not been any additional funding for either
7   the GAB operations or the transition process.
8   Q   Have you ever had any discussions with anyone in the
9   Legislature that they were unhappy with the GAB and
10  that's one of the reasons that they were going to
11  form two separate agencies?
12  A   I've had conversations with legislators or
13  legislative staff who have expressed that they were
14  not happy with specific decisions with the GAB, and
15  certainly as part of the public hearings and debate,
16  there were public comments made by legislators that
17  they were not happy with specific decisions and
18  actions with the GAB.
19  Q   But that's not unusual, right, because some people
20  are happy with you and some people not and then it
21  depends on when it is?
22  A   Exactly.
23  Q   Okay.  But was there anything specific that was said
24  about either the organization or something the
25  organization had been involved in which caused the

146

1   Legislature to decide to create two new
2   organizations?
3   A   Well, there's certainly examples of decisions that
4   were identified as the majority party not being happy
5   with -- you know, publicly and in conversations I had
6   with individual legislators that they portrayed as
7   sort of piling up and leading ultimately to the
8   decision to create two different agencies.  So there
9   were a handful of pretty commonly known situations or
10  incidents that they expressed their concerns and
11  disagreement with.
12  Q   And what were those?
13  A   I think the ones that come to mind are maybe
14  stretching back to the recall elections where there
15  were some disagreements with decisions that the board
16  made about the recall petitions.  There were actually
17  individuals on both sides of the aisle that disagreed
18  with some of the decisions.
19      The board had to make a lot of different
20  administrative positions and they were in kind of
21  unchartered territory and in some cases the law
22  wasn't always clear.  So we had complaints from both
23  sides about how the recall petitions were processed
24  and the time it took and what was being reviewed.
25      So it was that whole category, there was debate

147

1   about whether or not the GAB was interpreting the
2   redistricting law appropriately, specifically the
3   effective date in which elections the new districts
4   were supposed to be used and which we were applying
5   the effective date that was in the law and there was
6   some disagreement in the Legislature about whether
7   the new district should be used for the recall
8   elections for state Senate districts.
9       There was concern about how the GAB had designed
10  the sample ballot for local clerks to use for the
11  2014 election, and that was sort of a template that
12  clerks could or could use.  It was mandatory.  I had
13  a specific conversation with the Assembly speaker
14  about that, about that decision.
15      Then, of course, there was everything on the
16  campaign finance side having to do with the agency's
17  investigation of certain campaigns and individuals
18  and groups and whether or not there were any
19  violations of the campaign finance laws and that
20  debate and dissatisfaction has been -- was building
21  for a couple of years and so I think those are
22  probably the main ones that some legislators pointed
23  to as justification for creating a new model for our
24  agency.
25  Q   And which legislators in particular?

148

MICHAEL HAAS

1 A    Well, some were more vocal than others.
2      Representative Knudson was I think one of the main
3      authors in the State Assembly for the GAB
4      restructuring bill, but certainly the Speaker,
5      Senator Fitzgerald, a number of other Republican
6      legislators were pretty outspoken about differences
7      that they had with the GAB.
8 Q    Any others that you can recall?
9 A    Any other legislators?
10 Q   Yes.
11 A   Well, sure.  I mean, you know, the ones that come to
12     mind are probably the ones that when I would be
13     attending in-person either public hearings of the
14     committees or their votes on the bill, so most of the
15     Republican legislators who were on the Assembly
16     elections committee or the Senate election committee
17     had pretty significant criticisms of the GAB.
18        So I don't know that I can go down the list and
19     name all of them, but I guess I would start with the
20     committee members because they were most involved
21     with that legislation.
22 Q   Any other criticisms other than the ones you just
23     listed from these committee members and others?
24 A   There were, as I mentioned earlier, this back and
25     forth regarding the election observer rules.

149

1      Senator Lazich had some concerns about the
2      administrative rule and whether that was appropriate.
3      I don't know if that was really a justification or a
4      reason for supporting the bill, but that was I think
5      another -- one of the more significant issues that
6      we've had back and forth with on the Legislature.  So
7      I'm sure there were other reasons that I'm just not
8      recalling right now.
9 Q    And when you're getting these criticisms, do you get
10     to say anything back?
11 A   Yes.  Yes.
12 Q   I couldn't tell if it was that time or like the time
13     the lady in the video was yelling at you.  I wasn't
14     sure.
15        Okay.  Any other -- anything else in terms of
16     criticisms from the Legislature about the GAB?
17 A   Not that I can recall right now.  I think those are
18     the main items that were identified.
19 Q   Now, were these criticisms before the law was -- the
20     change was made or was it during, after?  When it was
21     it?
22        MR. KAWSKI:  Object to form.
23 A   I think there were criticisms all leading up to the
24     introduction of the law.  On various occasions,
25     different legislators would indicate that they were

150

1      working on the bill and these were the reasons why
2      and that it became all part of the legislative debate
3      as well.
4 Q    Is GAB's mandate to be nonpartisan or bipartisan?
5 A    Yes.  Nonpartisan is required under the statutes.
6        (Exhibit 48 is marked for identification)
7 Q    Mr. Haas, take a look at what's been marked as
8       Exhibit 48 and let me know when you've had a chance
9       to review it.
10 A   Okay.
11 Q   Have you seen this document before?
12 A   Yes.
13 Q   And what is it?
14 A   They're minutes of the board's open session on
15     June 18th, 2015.
16 Q   And when you say open session, what do you mean?
17 A   So our board meets usually six to eight times a year
18     and their meetings consist of an open session that's
19     open to the public and then in most cases there's
20     also a closed session to handle matters that are
21     confidential under the law and that those sessions
22     are not open to the public.
23 Q   And who drafts the minutes?
24 A   Reid Magney drafts the minutes and then we have a
25     process where we circulate the minutes amongst, I

151

1      guess, four of us to review before they're finalized
2      and then they are -- we also process where they are
3      sent to the board members and they're given about a
4      week or so to provide any input to see if they have
5      any corrections before the minutes are finalized and
6      then they are presented to the board at the following
7      meeting for approval.
8 Q    And you were present at this meeting?  That's your
9      name down where it says staff present?
10 A   Yes.
11 Q   If you could turn -- I'm going to ask you a question
12     about on Page 5 where it says report on voter ID
13     implementation.
14 A   Yes.
15 Q   And these are the minutes from the June 18th, 2015
16     session.  It says that you made an oral presentation
17     based on a written report.
18 A   Right.
19 Q   Where you described recent special elections which
20     voter ID requirements were in effect and said
21     implementation had gone smoothly for the most part.
22     What do you mean, for the most part?
23 A   I think just that we had not heard of any consistent
24     themes that there were problems from the clerks who
25     had conducted special elections and that we had, as I

152

MICHAEL HAAS

1    mentioned earlier, heard of some isolated cases where
2    voters did not have an ID in one or two cases and
3    they decided not to vote for one reason or another.
4        I don't remember if there was anything else
5    specifically that I was referring to, but it would
6    have been captured in the written report that was in
7    the board materials.
8  Q   And if you turn back to Page 2, there was a personal
9    appearance by Marian Matthews on behalf of League of
10    Women Voters of Dane County?
11  A   Right.
12  Q   And she says approximately 9,000 Dane County
13    registered voters may not have acceptable photo ID
14    and talked about the concerns of the league.  And
15    then if you look back at Page 5, there's a paragraph
16    where it says board members and the staff discussed
17    the earlier comments of the League of Women Voters.
18    What do you recall about those discussions?
19  A   What I recall is that the summary of her comments
20    indicates that the source of that estimate was the
21    Dane County Clerk's Office, and we had provided data
22    to the Dane County Clerk at his request.
23        He was trying to isolate individuals who did not
24    have a photo ID who would be eligible to vote or who
25    would be registered voters, and we tried to -- we

153

1    provided him with some data from the statewide voter
2    registration list, but there were also some caveats
3    to that number because we could not really with any
4    certainty calculate for sure how many registered
5    voters did not have a photo ID just because of the
6    nature of the data we had in it.
7        So I think that we expressed some concern that
8    maybe that number was -- that we didn't really have a
9    way of knowing whether or not that number was
10    accurate.
11  Q   Was there any discussions with Ms. Matthews about
12    where she got that number from?
13  A   Well, she indicated that she had received it from the
14    Dane County Clerk in her public comments, and we knew
15    because of our interaction with the Dane County Clerk
16    what the source of that data was.
17  Q   And it says, "They discussed," in the next sentence
18    of that paragraph, "the current lack of funding for a
19    statewide public education campaign about voter ID
20    and whether the board should make a request of the
21    Legislature."  And then it says, "Director Kennedy
22    said the Legislature has been informed that if they
23    wish to have a campaign, now is the time to consider
24    it."
25        Why was then now the time?

154

1  A   Because our concern was that voters needed some time
2    to obtain an ID and we did not want to wait until an
3    election was upon us in order to get the message out
4    that they needed to take some steps to obtain a photo
5    ID and that would take some time.
6  Q   So I know you said that there was -- let me start
7    again.  Strike that.
8        With respect to the 9,000 voters that
9    Ms. Matthews claimed, the GAB couldn't substantiate
10    that number, right?
11  A   We could not substantiate that specific number,
12    right.
13  Q   Was there a number you could substantiate?
14  A   My recollection is that we did not take a stab at
15    calculating that number because we knew that based on
16    the data we had access to in the voter registration
17    system, there were too many caveats to really be
18    confident to know what the number was.
19  Q   How big is Dane County?
20  A   It includes the Madison area.  I'm not sure exactly
21    what the population is.
22  Q   Was there any other discussion about what should
23    be -- given that you didn't know the number, was
24    there any other discussion about what should be done,
25    if anything?

155

1  A   About what should be done to --
2  Q   About Ms. Matthews' concern about the number of
3    voters who may not be able to register.
4  A   The discussion, the board's discussion was really
5    centered on whether to request funding again for the
6    statewide public education campaign.  I don't think
7    there was any request or discussion about trying to
8    nail down a more definite figure.
9  Q   And why did the board decide to take no action?
10  A   Well, Director Kennedy had described what he was
11    doing in the communication he had with the
12    Legislature already, and the board just -- I think
13    the consensus was the message had been conveyed to
14    the Legislature, it's now in the Legislature's court
15    as to whether or not they want to -- they wanted to
16    provide any additional funding.
17        So they did not take up any motion other than
18    that because they knew that Director Kennedy had
19    talked -- had spoken to the Legislature, had conveyed
20    that now would be the time for a public education
21    campaign and they didn't see fit that any additional
22    statement by the board would be necessary or
23    useful.
24  Q   So after Mr. Kennedy talked to the Legislature, he
25    determined that they would not be interested in an

156

MICHAEL HAAS

1    appeal for more money for public outreach?

2  A  Well, I was in a meeting with Director Kennedy and

3    Senator Lazich and he mentioned to her -- that was at

4    least one of the contacts he had, and he made this

5    request or indicated that if the Legislature was

6    interested, we would need time to be able to use

7    those funds and develop a public information campaign

8    to place the ads, and at that time, at least in that

9    meeting, it was just left as this is where we're at,

10   if there are any funds available, this would be the

11   time for the Legislature to make a decision.

12       There wasn't any commitment beyond that or

13   discussion that she specifically was either opposed

14   or in favor of doing that.  And he may have followed

15   up with another phone call or a conversation with her

16   or her aide, but there hasn't been any definite

17   answer provided one way or the other.

18  Q  When you say may have followed up, do you know that

19   for sure?

20  A  I believe he did because I think and it may have just

21   been in passing while we were in the Capitol for a

22   hearing or on a phone call related to something else,

23   but I believe there's been at least one other

24   conversation.

25  Q  And has there been any follow-up from Ms. Matthews

157

1    about this issue, of the approximately 9,000 Dane

2    County registered voters who may not have acceptable

3    voter ID?

4  A  Not that I'm aware of.

5  Q  And the last sentence says, "He said the board's

6    other option would be to make an emergency funding

7    request later."  What does that mean?

8  A  Well, an emergency funding request would be a request

9    of the Legislature to appropriate funds that were not

10   included in the budget.

11  Q  So not funds that the GAB already has?

12  A  Right.

13  Q  Okay.  You can put that aside.

14       MS. WILSON:  I don't think my copy

15   person likes you, Clay.  Because for some

16   reason, I've only got --

17       MR. KAWSKI:  If it makes sense, we can

18   just position it so I can see it.

19       MS. WILSON:  Sure.

20       MR. KAWSKI:  That will work just fine.

21       (Exhibit 49 is marked for identification)

22  Q  Handing you what's been marked  Exhibit 49, take a

23   look at it.  It's fairly long, and just let me know

24   when you're done.

25  A  Okay.

158

1  Q  Have you seen this document before?

2       MR. KAWSKI:  I'd like to point out for

3    the record that this is not just one document.

4    This is a series of email chains, memoranda that

5    are very miscellaneous, incident logs, many

6    other things in this packet.

7  Q  That was going to be my question, whether there was

8    one document -- whether this was put together as one

9    document or whether these are different documents

10   because I had no way of telling.

11  A  Right.  There are -- exactly, right.  There are a

12   number of other documents here that I don't think

13   were intended to be presented as one document --

14  Q  Okay.

15  A  -- for any particular purpose.

16  Q  What I'm interested in is the very first page, and

17   maybe you can help me figure out what goes with it,

18   from Brian Bell, and you see you're cc'd there?

19  A  Yes.

20  Q  And do you recall seeing this document -- this page

21   before, sorry?

22  A  Yes.

23  Q  Page 1.  And can you tell me what this is, what

24   Mr. Bell is reporting?

25  A  Yes.  So Brian -- he really coordinated the contact

159

1    activity log.  So in every election, he would make

2    sure that that log was prepared and ready for staff

3    to use, and Brian was what we sort of referred to as

4    our data guy, and so he loves data and loves

5    analyzing data, and this was June 5th again, 2010,

6    the date of the gubernatorial recall election, and he

7    was indicating that as of one p.m., our staff had

8    received a number of contacts and he observes more

9    than we did all day on May 8th, which was the primary

10   election for the recall.  And he's itemizing what the

11   top categories of inquiries were, how they were

12   categorized by our staff after we received them.

13  Q  And did he do this out of his own self-interest or

14   was he asked to do this?

15  A  I don't know if he was asked to do that, although he

16   may have been looking at the other email from

17   Mr. Robinson.  He had informed Director Kennedy that

18   Brian Bell was keeping an eye on it and he would

19   share preliminary information.  So I assume that he

20   had a conversation with Brian and asked him to

21   provide that.

22  Q  And with respect to the information that Mr. Bell has

23   provided, were there any conversations with the

24   people on this email about those figures?

25       MR. KAWSKI:  Object to form.

160

MICHAEL HAAS

1  Q    And I'm specifically meaning where he says voter
2       registration absentee ballots, do you see that list,
3       and then there's a number next to them?
4  A    Yes.  Was there a conversation about those numbers?
5  Q    About the -- well, I'm not quite sure what this is.
6       Is this a result of the calls or a number of calls?
7  A    So I believe what it is Brian at one o'clock, he
8       would have access to the contact activity log.  It's
9       a database and all the staff enters information and
10      so I believe he went into that log and said, okay, as
11      of this time, there's a drop-down menu where you
12      could classify each inquiry as to whether it had to
13      do with one of these categories, and he just picked
14      up the statistics about how many inquiries were
15      categorized by staff under each of those listed
16      categories.
17  Q   And does this information at the -- well, did this
18      information tell you anything at the time?
19  A   It's just an overall real general picture.  As I
20      indicated earlier, we have not used that contact
21      activity log for a lot of heavy analysis.  And so we
22      did not sit down on this Election Day and say, okay,
23      we have X number of calls having to do with observers
24      and change anything.
25           It was more just a way for us to keep in touch

161

1       with what is going on on the ground, and we would
2       have sort of ad hoc touch base meetings on any
3       Election Day to say, okay, what is the staff hearing,
4       are there consistent themes, things that we have to
5       correct or emphasize.  So I think this was just
6       another way for Brian to try to quantify that.
7  Q    But it just has, for example, voter registration, but
8       it doesn't tell you more than that, right?
9  A    Correct.
10  Q   So how is it, if it is, useful to you or how would it
11      be useful to you?
12  A   Well, if he had, for instance, seen that 90 percent
13      of the calls had to do with election observers, we
14      would have maybe got our team together and say, hey,
15      what are you hearing, what can we do, is there
16      anything that we need to convey through the media, do
17      we need to contact clerks.
18           Similarly if we were seeing an extremely high
19      number of voting equipment concerns, we might have
20      reached out more to contact either clerks or the
21      voting equipment vendors to see if this was all
22      coming from one location or if it was widespread.  So
23      those would be examples of what we might use it for.
24           Looking at these numbers here, I don't think we
25      would make any specific conclusion that there was

162

1       anything unusual going on.  It was basically I think
2       a pretty standard spread of the types of inquiries
3       that we would expect.
4  Q    Would you expect in 2012 to have -- so is that 80 a
5       whole number or is that a percentage?
6  A    The way I read it is he's saying -- he's listing the
7       number of contacts in each of those categories and
8       then saying, okay, on May 8th, which was the primary
9       election, that's how many calls we received for that
10      category.  And it's a little bit -- the other caveat
11      is that basing it on one o'clock, one p.m., that
12      means that's what the staff has entered as of that
13      time.  They might have a stack of messages that they
14      did not enter into the database.
15  Q   Did you have any concerns when you saw the numbers,
16      especially let's say the voter registration number at
17      80?
18  A   No, no particular concerns.
19  Q   And no concerns about any of the other numbers?
20  A   No.
21  Q   Now, do you know -- look at the next page.  Do you
22      know if -- this probably does not go with it, right?
23      Because we could just take off the top.
24  A   So this is a printout of what is in the contact
25      activity log.  So each contact would result in this

163

1       type of information being recorded by our staff.  I'm
2       sorry.  You know what, looking at the title, that
3       looks like it came from our My Vote Wisconsin
4       website.  So that's something different than the
5       contact activity log where voters could use that site
6       just to submit comments to the agency.  The other
7       pages beyond that are printouts from the contact
8       activity log.
9  Q    But not necessarily related to Mr. Bell's June 12th
10      first page?
11  A   Right.  You can see some of the dates on the other
12      pages indicate June 5th or 6th.  So that would have
13      been in the week leading up to that election.
14           MS. WILSON:  So why don't we do this
15      for -- if it's okay with Clay and I'll replace
16      it with a better -- can we just take off this
17      top and he doesn't need to -- I'm just
18      interested in the top one.
19           MR. KAWSKI:  Oh, okay.  So just so
20      it's clear, Exhibit 49 is just the top page?
21           MS. WILSON:  It's just the top page.
22      Yeah.  We'll just take that off.
23  Q   Oh, you just committed a felony -- and I'll take that
24      back.
25  A   Is this the advice of my counsel?

164

1  Q  Oh, okay.  Now, this may be the same but hopefully
2     not.  This is the next one.
3        (Exhibit 50 is marked for identification)
4  Q  Sorry.  I was supposed to say, Mr. Haas, I've handed
5     you  Exhibit 50.  Let me know when you're finished
6     reviewing it.
7  A  Okay.
8  Q  Have you seen this document before?
9  A  Well, again it appears to be a number of documents
10    that are — seem to be all related to election
11    observers or observing elections in 2012, but it's a
12    number of different documents.
13 Q  Can I see that for a second?  So what's attached —
14    so this is from you, right, the email on the top from
15    Michael?
16 A  Yes.
17 Q  Okay.  Michael Haas.  August 7th, 2012.
18 A  Right.
19 Q  And attached — and then it says attachments,
20    Wisconsin election — what's Prot?
21 A  Protection.
22 Q  Protection, June 2012 recall report.  So where does
23    the recall report end, if you know?
24 A  Well, it looks like it's roughly 25 pages and then
25    there are some attachments.  I don't know if the

165

1     attachments are part of the report or not.  They
2     appear to be some election observer logs.
3  Q  Do you recall if that was part of the report?
4  A  I do not recall without looking at the report.
5  Q  Okay.  Let's do this just to make everybody's life
6     easier.  I'm just going to ask you about the email
7     and the attached report and I'll fix that at a break.
8     Why did you send this to Allison and Meagan, the
9     election protection?
10 A  So Allison is our training coordinator and Meagan is
11    our voter outreach election specialist, so I believe
12    I thought they would be interested in the
13    information.  Allison from the perspective of are
14    there things we can glean that might be helpful in
15    our training of clerks and Meagan because she focuses
16    on communicating with voters and what their rights
17    are and what the rights of election observers are and
18    how it affects voters at the polling place, and it
19    also appears as though maybe they were going to
20    participate in a telephone conference with me and
21    with the attorney who sent us the report.
22 Q  And do you recall any discussions with them about the
23    recommendations that are at Page 19 through 24?
24 A  My guess is that we would have discussed it, but I
25    don't remember any specific conversation.

166

1  Q  And had you been working with the legal coordinating
2     committee of Wisconsin Election Protection and the
3     lawyers committee for Civil Rights?
4  A  They would normally contact our office usually before
5     partisan elections and the attorney, Ann Jacobs, is
6     one attorney who was involved in that effort, and
7     they would — they would like to check in with us to
8     see what are topics that we think are sort of at the
9     top of the list of concerns or issues we were
10    following.
11       They would also sometimes share with us things
12    that they thought we should be paying attention to.
13    Attorney Jacobs also on occasion provides feedback
14    about things that we publish, which seems to be one
15    thing she addresses in her correspondence here, and
16    has suggestions for us about trying to improve the
17    effectiveness of those materials or how clear they
18    are to understand.
19       They consult with us because they have a lot
20    of — they have volunteers that go to polling places
21    and they want to make sure in advance that whatever
22    T-shirts that those volunteers are wearing that they
23    do not violate the electioneering rules.  So it was a
24    pretty regular occurrence that they would be in touch
25    with us, especially before partisan elections.

167

1  Q  So if you look at Page 19, they make some
2     recommendations relating to voter registration.  On
3     the very top it says, the very first one is, "The GAB
4     should provide greater guidance and clarity as to
5     documents that are acceptable for registration."
6        Did you agree or disagree with that
7     recommendation?
8  A  After some time, we eventually modified our list — I
9     think a couple different times.  We initially came up
10    with a list of acceptable proof of registration
11    documents and I think over time we would just expand
12    that as we thought of new examples, particularly in
13    the category of governmental documents that are
14    acceptable, and I think that's what this report
15    refers to.
16       So over time I think we would add to that list
17    either on our own at the suggestion of clerks or a
18    group like this, but I also remember specifically I
19    think this group and others thought it would be —
20    and some clerks thought it would be helpful to have a
21    list of documents that were not acceptable for proof
22    of residence.
23       So I do clearly remember that at some point we
24    sort of changed course and decided we would go ahead
25    and try to come up with a list of documents that were

168

MICHAEL HAAS

1    not acceptable, which was -- we had initially said,
2    no, we're not going to do that because that's the
3    whole wide universe of everything, but we eventually
4    came up with a list of documents that maybe more
5    commonly people thought were acceptable but were not
6    and then we published that.  So I think in that way,
7    we did agree with this recommendation.
8  Q  And it says, "On June 5th there were too many
9    eligible voters turned away unnecessarily because the
10   document they used to try to prove residency was not
11   specifically identified on any list or because poll
12   workers did not understand the document was
13   acceptable."
14       Do you recall any discussions about eligible
15   voters being turned away on June 5th?
16 A  I think just in general because it's mentioned here
17   that that was most likely a topic of our follow-up
18   phone conference.
19 Q  And what do you recall about those discussions, if
20   anything?
21 A  I don't recall anything specifically about it.  I
22   would speculate that they expressed their concern
23   that that -- that they thought that that was
24   happening and what could be done about it in the
25   future.

169

1  Q  Did they have any hard numbers?
2  A  Not that I recall.
3  Q  And did you look into the issue about poll workers
4    who did not understand the documents -- that the
5    document was acceptable?
6  A  If we had specific examples, we would try to follow
7    up with the clerk to make sure that -- to try to
8    verify whether that happened and also to emphasize
9    what should be corrected in the training for future
10   elections.
11 Q  Did you ever have a concern that the training doesn't
12   work as well as it should given that some of these
13   seem to be recurring themes?
14       MR. KAWSKI:  Object to form.
15 A  I think it's something that we always talk about as
16   far as our training program.  As I mentioned, we have
17   a wide variety of clerks and then it's a constantly
18   changing population.  So we have to try to make sure
19   we're keeping people up to date but also reinforcing
20   messages over and over.
21 Q  And on Page 20, this is the first one where it says,
22   "GAB should allow electronic verification of proof of
23   residency."
24       That's what we talked about earlier, that that's
25   going to happen, right?

170

1  A  Right.
2  Q  And the next one, that the GAB should require posting
3    of DMV license/identification information, is that
4    something within the GAB's control?
5  A  Well, we could direct clerks that that should be
6    posted at polling places.  I do not know if we've
7    done that.
8  Q  And do you know if the GAB is intending to do that?
9  A  We have not discussed that recently, so I would say
10   no.  I should -- I actually -- there might be a form
11   of that taking place because we try to publicize the
12   DMV phone number that they have dedicated for those
13   issues and so there may be places where that is
14   posted at the polling place or at least available to
15   the election inspectors.
16 Q  And the issue about corroboration should be restored,
17   was that a recommendation that the GAB agreed with?
18 A  Well, we took it as a recommendation that would need
19   to be taken up with the Legislature.
20 Q  Because the Legislature had gotten rid of
21   corroboration, right?
22 A  Right.
23 Q  And do you know why they had gotten rid of
24   corroboration?
25 A  I guess not specifically except that the idea was

171

1    that everybody was required to have proof of
2    residence and that would replace the possibility of
3    having corroboration.
4  Q  Did that change make it harder for people to vote?
5        MR. KAWSKI:  Object to form.
6  A  I don't know.  Again in theory it might make it
7    harder for some people to register who did not have
8    proof of residence, but I don't know how many people
9    that would be.
10 Q  Was there ever any discussion that you had with
11   either -- with GAB, with folks at GAB that there are
12   particular populations who for economic reasons may
13   not have access to IDs?
14       MR. KAWSKI:  Object to form.
15 A  I think that was part of the general discussion when
16   we were sort of ramping up to figure out how to
17   implement that given that we had a statutory mandate
18   to reach out to voters who might have difficulty
19   obtaining an ID.  So we would try to identify what
20   groups of people that would be.
21 Q  Is that mandate an ongoing mandate or just when the
22   law was implemented?
23 A  It was part of the legislation and I think we took it
24   as an ongoing mandate.
25 Q  But you would agree that having somebody corroborate

172

MICHAEL HAAS

1 is a lot easier than going to the DMV and getting an
2 ID, right?
3    MR. KAWSKI:  Object to form.
4 A Assuming that you had somebody who would corroborate
5 for you, that does not require getting additional
6 documentation.
7 Q If you know, are the IDs at the DMV, are they free?
8 A Yes -- well, right.  An individual can ask for a free
9 ID to be used for voting purposes.
10 Q But if they don't ask, what happens?
11 A Then they would need to pay for the state ID.  You
12 know, somebody can go in and get a driver's license
13 or they go in and get a state ID.  They may be
14 asked -- they may be obtaining a state ID for a lot
15 of different reasons as a substitute to the driver's
16 license, and it may not be specifically only for the
17 purpose of voting.  But the idea was if somebody
18 needed an ID, a state ID for photo ID purposes, that
19 they ought to be able to obtain one without paying
20 for it.
21 Q But only if they asked for it?
22 A Correct.
23 Q And the underlying information for getting an ID if
24 they don't have that, they have to pay for that,
25 right?

1 A The underlying what?
2 Q You have to show some type of identification to get
3 identification or even to get your license?  You've
4 got to fill out some forms, you might have to show
5 certain documents, and getting those documents,
6 copies of those documents cost money, don't they?
7    MR. KAWSKI:  Object to form.
8 Q If you know.
9 A In some cases it does.  In other cases it may not.
10 The waiver process that's become part of the law now
11 I think has tried to address some of those concerns.
12 Q Did the GAB put up on the website that you can get
13 free IDs to vote?
14 A Yes.
15 Q Do you know if DMV has it anywhere that you can get a
16 free ID to vote?
17 A I do not know for sure.
18 Q Is that something that was recommended to them by the
19 GAB since you worked so closely together?
20 A I don't know for sure.  It may have come up in
21 conversations as to whether they would be willing to
22 do it or whether they -- any branches do, but I don't
23 recall specific conversation where we asked them to.
24 Q Then there's a recommendation that you improve
25 training of chief inspectors statewide.  Why

1 specifically the chief inspectors?
2 A Well, so chief inspectors are the poll worker who is
3 in charge of each polling place, and so they're
4 really setting the tone at that polling place and
5 they are -- and the GAB is also responsible for
6 directly providing training to chief inspectors like
7 we are for clerks.
8   The other poll workers, the other election
9 inspectors are trained by the clerk and so this is
10 something that the GAB could control and chief
11 inspectors are -- they are one step, I guess, further
12 removed from the process than clerks are because they
13 are doing this job maybe four days a year or two days
14 a year.  And so I think the concern was to make sure
15 that chief inspectors were being consistently trained
16 and maybe to improve the content of the training for
17 chief inspectors.
18 Q But you offer training for the chief inspectors,
19 right?
20 A Right, right.
21 Q And this second paragraph under improved training, it
22 looks like they're asking specifically for training
23 in terms of poll site and crowd management.  Does the
24 GAB not currently train with respect to poll site and
25 crowd management?

1 A Well, first of all, I'd say in the paragraph above
2 that, it talks about some other substantive things
3 that they recommend we improve the training on.
4   As far as poll site and crowd management, that's
5 a different type of conversation or training because
6 it's not something that we can point to in the
7 statutes and say you must do this and this and this.
8 What we've tried to do is maybe encourage best
9 practices and help to brainstorm for what some new
10 ideas might be, but I don't think for chief
11 inspectors -- I don't know for sure, but I don't
12 think we've had any specific training on crowd
13 management and how to lay out the poll sites except
14 for some general recommendations.
15 Q Do you know what is meant when you say "training is
16 necessary on substantive issues," this is in the
17 first paragraph, "especially the registration issues
18 that have profoundly changed in the past year" --
19 we've talked about a little bit of that -- "such as
20 ensuring that chiefs understand the difference
21 between providing a driver's license number to
22 register and displaying the license as identification
23 or between a voter certifying he or she has lived in
24 a location or" -- I guess that must be before 28 days
25 and having to show a 28-day old document as proof of

MICHAEL HAAS

1   residency.
2        Were some of those issues during -- that came up
3   that prevented people from voting?
4 A  Well, I don't know necessarily for preventing people
5   from voting, but they're just issues that arose and
6   apparently their observers found that some chief
7   inspectors had not like really internalized what
8   those changes were.
9 Q  But those are changes that the GAB had spent time
10   training, time and money training the chiefs on,
11   isn't that right?
12 A  Yes.
13 Q  And where it says improve poll worker training, it
14   says, "Some, but not all, municipalities require poll
15   worker training before every election."
16        I understood that the GAB required training in
17   the municipalities.
18 A  So we -- under the statutes and administrative rules,
19   there are specific training requirements, a number of
20   required hours for clerks and for chief inspectors.
21   What we refer to as regular poll workers or regular
22   election inspectors, they're required to have
23   training, but there's no specific number of hours and
24   the training is left up to the municipal clerk.  And
25   sometimes the municipal clerk will rely partly on the

177

1   county clerk or another clerk to help them with that
2   training.
3 Q  And did the GAB adopt the suggestion about increasing
4   the poll worker staffing levels where it says high
5   turn-out sites and sites with large number of same
6   day registrants should have increased staffing and
7   then it goes on to say given the complexities of the
8   new registration requirements, the process of same
9   day registration similarly takes longer, do you see
10   that?
11 A  Right.
12 Q  Did the GAB adopt increased staffing levels?
13 A  Well, I think what we tried to communicate is what
14   are some of the options for accommodating lines in
15   larger turnout.  So options like being able to have
16   split shifts, so it maybe would have election
17   inspectors who were not there for the full day and
18   maybe committing more people to certain times of the
19   day when you expect larger turnout.
20        Often the poll books are split by sections of
21   the alphabet to try to decrease the lines.  There
22   isn't any particular formula that I'm aware of to
23   determine the number of staff that should be used,
24   but those are all local decisions about how many
25   inspectors are going to be -- that they will have

178

1   working at one time.
2 Q  Does the GAB make a recommendation about that,
3   though, like in high turn-out elections where the
4   lines get very long and people are trying to vote?
5 A  Well, I think what we try to do in general is to
6   remind clerks to prepare for that, and there's a
7   number of ways that they can -- solutions or options
8   that they can use.  But we have not mandated any
9   particular number of staff or any particular option
10   that they have to adopt.
11        Part of it is just a recognition again of just
12   widely varying circumstances and one clerk's idea
13   might work in one location and not in another for
14   some reason and that's part of running the elections
15   at the municipal level.  And there isn't any
16   statutory requirement that we can fall back on and
17   point to to say this is what you have to have.
18 Q  There were complaints, not necessarily talking about
19   Wisconsin, in the 2012 election about long lines in
20   many areas of the country.  Some of the criticism was
21   directed at long lines in ethnic communities.  Has
22   Wisconsin experienced that problem?
23        MR. KAWSKI:  Object to form.
24 A  As I said earlier, I think in general long lines have
25   not been a problem throughout the state.  There are

179

1   places where lines have been longer in higher
2   population areas, but I mean also as I indicated,
3   sometimes those lines would appear more at the
4   in-person absentee voting rather than on Election
5   Day.
6 Q  How about in predominantly African-American
7   communities?
8        MR. KAWSKI:  Object to form.
9 A  So the places I recall hearing stories about lines I
10   think for the most part would be Madison, Milwaukee,
11   maybe Racine.  You know, at various times and various
12   elections.
13 Q  And I don't know those communities.  So what are the
14   demographics of Racine, for example?
15 A  I don't know specific numbers, but they have a
16   significant minority population in Racine, certainly
17   in Milwaukee.  I've actually participated in the
18   in-person absentee voting in Madison, and compared to
19   other communities in Wisconsin, it is more diverse,
20   but certainly not as much as places like Milwaukee or
21   Racine.
22 Q  And is there in Milwaukee or Racine, are the clerks
23   given any special training or additional training
24   given the high minority populations?
25        MR. KAWSKI:  Object to form.

180

MICHAEL HAAS

1 A    So I guess I'd address Racine first, and specifically
2      in 2012 they had issues that got a lot of public
3      attention during the recall elections, and so we did
4      provide some additional focus on Racine heading into
5      the fall elections.  We had conversations with the
6      clerk and with the mayor brainstorming about how to
7      recruit more election inspectors because that was
8      really the root of the problem is not having enough
9      people to do the job, and there were some mistakes
10     made that again got a lot of attention because it
11     involved the recall elections.
12         There were stories about ballot bags being, you
13     know, kind of left open and accessible and not being
14     secured.  And so we went through a pretty significant
15     effort to pay attention to Racine for the fall
16     elections, and what we heard is that that paid off in
17     the fall, that they had much fewer problems.
18         And it's not unusual, we've gone into a number
19     of election cycles where we say, okay, are we hearing
20     about specific problems in communities, do we need to
21     target certain communities that we want to be in
22     closer contact with for one reason or the other.  So
23     in that election cycle, Racine was one of those
24     communities.
25         Milwaukee, we have pretty frequent contact with

181

1      Milwaukee.  Instead of a clerk, they have an election
2      commission, and so they have a staff which includes
3      an executive director, and so I'm in touch with him
4      pretty frequently on an ongoing basis.  They have a
5      challenge that other municipalities do not because
6      they're the only city in Wisconsin that has to comply
7      with Section 203 and provide voting materials in the
8      Spanish language.  And so we worked with them quite a
9      bit.
10         They've had a lot of contact with the U.S.
11     Department of Justice, and that's been again another
12     sort of specific project we've had specific to that
13     community that we've tried to assist them with.  They
14     have a challenge of having to recruit and train many
15     more election inspectors than any other municipality,
16     and I don't know how many inspectors they have
17     exactly, but they have, I think, over a couple of
18     hundred polling places in the city.
19         So it's a big effort and they have challenges
20     that no other city has just logistically getting the
21     supplies out to all these polling places, getting the
22     ballots out and training election inspectors.  And
23     they — so they will contact us if they're seeing
24     issues or problems or have questions.  It's not
25     unusual.

182

1 Q    Are they given any additional funds by the
2      Legislature because they have these unique problems?
3 A    No.  Not that I'm aware of.
4 Q    If we turn to Page 23, do you recall any discussions
5      about the voter ID cause for concern section where
6      they say, "We are extremely concerned that should
7      court injunctions be lifted, it will add another
8      confusing layer of requirements for chiefs, clerks,
9      poll workers and voters; will be cumbersome to
10     administer and add to long" — lines times and
11     polls — "and will be more likely to result in
12     eligible voters being denied the right to vote than
13     in preventing voter fraud — a problem that continues
14     to be alleged but still has not been proven."
15         Do you recall any discussions?
16 A   I'm sure we talked to this group and others about it,
17     that that was a concern that was being raised.
18 Q   And is this something that the GAB can tackle, or is
19     this an issue for the Legislature?
20 A   You mean the potential confusion or —
21 Q   The confusion, the cumbersomeness, the long lines,
22     the eligible voters being denied the right to vote.
23     Were there any specific discussions, if you can
24     recall, about any of those issues?
25 A   I'm sure there were just in the context of our

183

1      preparations for implementing the photo ID law.  All
2      of that went into why are we doing this and what can
3      we do to help educate election workers and voters.
4 Q    Mr. Haas, your view is that you haven't — that there
5      hasn't — and correct me if I'm wrong, that there
6      hasn't been sufficient — a sufficient election cycle
7      maybe to know whether or not the voter ID laws and
8      other changes made to the election laws are going to
9      reduce voter turnout, did I get that right?
10 A   Right.  I guess I would not feel comfortable making
11     any conclusions about whether there's been that
12     impact yet based on the lack of experience we've had
13     with all of these laws being in place for a high
14     turn-out election.
15 Q   But given your years of experience and what you
16     call — what you've already said is the complexity
17     and the specificity of the laws and given the number
18     of laws that have been changed since 2011 and on top
19     of that the GAB's no longer going to exist before the
20     2016 election, you have no public announcement
21     outreach on the voter ID since it's been back since
22     March and a number of other factors we've talked
23     about today, have you no opinion about whether or not
24     it's going to impact the 2016 election —
25         MR. KAWSKI:  Object to form.

184

**Page 185**

```
 1 Q    -- given your --
 2           MS. WILSON:  You can object in a
 3      second.
 4 Q    Given your experience and knowledge in this area?
 5           MR. KAWSKI:  Object to form.
 6 A    You know, I really would not be confident making a
 7      prediction.  I think we have really identified what
 8      the potential risks and impacts are, but there's some
 9      really things that are not knowable at this point and
10      primarily how motivated are voters to vote in any
11      particular election, and it's really difficult to
12      compare turnout from one election to another because
13      you have different candidates, you have voters that
14      may or may not be motivated, and our mantra at the
15      GAB is often we like to be able to rely on facts and
16      data and I just don't think that there's been enough
17      that we've seen that we can be confident making that
18      direct link yet.
19           MS. WILSON:  Okay.  I think what we'll
20      do is what we did with the last document, Clay.
21      So Exhibit 50 is going to be the top of the
22      email and the attachment going to Page 25.
23           MR. KAWSKI:  I'll remove that portion
24      then.  Do you want this part back then?
25           MS. WILSON:  Yeah, sure.  Too late to
```

**Page 186**

```
 1      save a tree.
 2           (Exhibit 51 is marked for identification)
 3 Q    I am handing you or you've been handed what's been
 4      marked  Exhibit 51.  Take a look at it.  It's a
 5      two-page document entitled Electronic Proof of
 6      Residence for Voter Registration.  Let me know when
 7      you're finished looking at it.
 8 A    Okay.
 9 Q    Have you seen this document before?
10 A    Yes.
11 Q    Is this the document that you were referring to
12      earlier that can be found on myvotewisconsin.com or
13      myvote.wi.gov?
14 A    I'm not sure that -- I don't think I was referring to
15      this document.
16 Q    Okay.  Well, tell me, what is this document?
17 A    So this is one of our -- it's a document we produced
18      at the GAB to inform voters and, frankly, clerks and
19      election inspectors about the decision to permit the
20      use of an electronic version of proof of residence to
21      register to vote, and so we tried to encapsulate the
22      main points in a format that was easy to understand.
23 Q    Then where can this be found usually, if you know?
24 A    Well, it may very well be posted on My Vote
25      Wisconsin.  It's just this -- I don't think I was
```

**Page 187**

```
 1      referring to this specific document.
 2 Q    Okay.
 3 A    We do have the website for My Vote Wisconsin at the
 4      end of the document, but I think we've also used it
 5      in our training of election officials as well.
 6 Q    Have you ever used something like this in a public
 7      service announcement?
 8 A    You know, I don't think the public service
 9      announcements talk about electronic proof of
10      residence because they really focus on the voter ID
11      law rather than registration.
12 Q    Do you know whether or not this electronic proof of
13      residence for voter registration is sent to any
14      organizations, any kind of other public outreach?
15 A    It may be something that we have included in some
16      in-person registrations, and we would certainly
17      provide it if we were asked to.
18 Q    Now, Mr. Haas, you're -- based on your knowledge and
19      experience, you're pretty familiar with the different
20      changes that have occurred in Wisconsin election law,
21      right?
22 A    Uh-huh, yes.
23 Q    And you said that you skimmed, I think, the amended
24      complaint?
25 A    Yes, I'm sorry.  Sometime when it was initially
```

**Page 188**

```
 1      filed, yes.
 2 Q    Okay.  Does the GAB always when it comes to an
 3      election law change get an opportunity to opine upon
 4      the changes before they happen?
 5 A    Yes, we would at a public hearing of the committee
 6      that the law -- that the bill is in.
 7 Q    So let's talk a little bit about -- we were talking
 8      before about how the GAB tries to be very cautious
 9      about using the term early vote versus in-person
10      absentee voting, right?
11 A    Yes.
12 Q    Okay.  But I've seen, and I'm sure you have, too,
13      documents which talk about "early voting," and I
14      think what is meant is in-person absentee voting,
15      right?
16           MR. KAWSKI:  Object to form.
17 A    If you've seen documents, I think if we have used the
18      term in our documents, we would try to make sure we
19      clarify what we're meaning by early voting.
20 Q    And you said earlier that that -- trying to do that
21      clarification might have caused some confusion.
22 A    Well, I think that we had some assertion by somebody
23      that it may have caused confusion.  And I think I
24      also said that for most people that think of
25      in-person absentee voting in Wisconsin, they just
```

MICHAEL HAAS

1   call it early voting, and they are not as particular
2   about what that means.
3        And so sometimes by the fact that we use the
4   term in-person absentee voting, that may create some
5   confusion that did not exist if we would just simply
6   give up and call it early voting like the rest of the
7   world does.
8  Q   Did the in-person absentee voting, has that changed
9   since 2011?
10 A   Yes, yes.
11 Q   And how did it change?
12 A   The hours that in-person absentee voting could occur
13   changed through legislation.
14 Q   Was it reduced, the time?
15 A   The number of hours were, yes.
16 Q   Do you know why?
17 A   Because the Legislature decided that there should be
18   more consistent availability for the opportunity to
19   conduct in-person absentee voting throughout the
20   state.  That was one of the reasons I think that was
21   proposed or that was stated.
22 Q   How does it do that given that reason?
23 A   Because in-person absentee voting can now occur only
24   during weekdays on the two weeks prior to the
25   election and only during certain hours, and

189

1   therefore, one municipality cannot offer its voters
2   the opportunity to do that type of voting on a
3   weekend or prior to the third Monday before an
4   election where ballots may be available or in evening
5   hours beyond 7 o'clock at night, I believe.
6  Q   So nobody can offer -- so no one can offer in-person
7   absentee voting on a weekend?
8  A   Correct.
9  Q   Did the GAB come out with a position -- not with a
10   position, I'm sorry.  Did the GAB make any comments
11   to the Legislature about taking away weekend
12   in-person absentee voting?
13 A   I'd have to look at the public testimony that we
14   offered.  I wouldn't be surprised if we testified
15   about what we thought about issues that we just
16   thought the Legislature should consider and the
17   impact that it might have.
18 Q   But doesn't taking away weekend -- the ability to
19   vote on the weekend impact a fair number of people
20   who have -- you know, work weekday jobs?
21        MR. KAWSKI:  Object to form.
22 A   Well, I think it impacts everybody.  If they're
23   occupied during the week and that's the only option,
24   they would not have the option to vote in-person
25   absentee, they would not have the option to have a

190

1   ballot mailed to them or to vote on Election Day.
2  Q   But what's the election administration benefit there?
3   Like what's the interest?  What's the benefit?
4        MR. KAWSKI:  Objection, asked and
5   answered.
6        THE WITNESS:  Do you want me to answer
7   or not?
8  Q   Yeah.
9        MR. KAWSKI:  Go ahead and answer
10   again.
11 A   Again I think that the things that were identified
12   were trying to make it consistent throughout the
13   state, make the opportunity to vote consistent
14   throughout the state so that -- again this is an
15   argument that was made, that voters in one community
16   did not feel that they were being slighted or did not
17   have the same opportunity as voters at another
18   community.
19        One administrative benefit would be for some
20   clerks -- some clerks like the fact that in-person
21   absentee voting ends on the Friday before the
22   election because then they could focus on preparing
23   for Election Day.  Prior to that law, in-person
24   absentee voting could take place up to the day before
25   the election, and we received a lot of concerns from

191

1   clerks when in-person absentee voting became more
2   popular that they would finish a full day of voting,
3   administering voting on Monday, and they had to turn
4   around and get ready for Election Day that night.
5        So at least as far as the weekend before the
6   election, I think that that's one benefit that was
7   identified.
8  Q   And did you get information from the public or voters
9   that by taking away weekend voting, it affects their
10   ability to -- impacts their ability to vote?
11 A   I think we probably heard that in some phone calls
12   and maybe some public comments that people offered at
13   our board meetings, and again all we could really do
14   is say that's a decision for the Legislature.
15 Q   Let me just ask you this.  We've already agreed there
16   have been a number of changes in election laws,
17   right, and we've already agreed that you have, for
18   lack of a better word, a certain amount of experience
19   and knowledge, and I don't want to use the word
20   expertise because that means something in the law, as
21   you know, but familiarity, let me use that word.  Of
22   the changes in the law given what you know about how
23   people vote and how they live their lives, do you
24   find none of the changes problematic?
25        MR. KAWSKI:  Object to form.

192

1  A    I guess I'm not sure what you mean by problematic.
2       Problematic for the date —
3  Q    The voter.
4  A    Oh, for the voter?
5              MR. KAWSKI:  Same objection.
6  A    There clearly have been voters who have said that
7       it's problematic for them.  And so if it's
8       problematic for them, it's something that we want to
9       pay attention to to try to reduce or eliminate the
10      problem.  And so it's something we need to pay
11      attention to.
12 Q    But I mean you as the professional, you as the person
13      charged with the running an organization where 25
14      people, 26 people report to you, you're in charge of
15      educating the public, educating the clerks, do you
16      not find any of these changes and the number of
17      changes, the complexity of some of the changes, you
18      the professional, you don't find any of that
19      problematic —
20             MR. KAWSKI:  Object to form.
21 Q    — for the voter?
22             MR. KAWSKI:  Object to form.
23 A    So I think and maybe a part of my view is influenced
24      by the fact that we've become a little bit used to
25      the amount of changes and maybe my answer seven or

193

1       eight years in would be different than it would be if
2       this is my first or second year sort of in the
3       election field.
4            So I think we have and within our agency
5       conditioned ourselves to say we're not — we're going
6       to focus on solving the problem and we know those
7       concerns are out there and all we can do is the best
8       we can do and whether — as I alluded to earlier, a
9       small percentage — sometimes a small percentage of
10      problems or voters who are affected monopolize a
11      large percentage of our time and so we just have to
12      allocate as best we can how we prioritize issues and
13      our efforts and our staff, and I think the clerks
14      went through a two or three-year period of sort of
15      one shock after another of political developments —
16      the statewide recount and recalls for two consecutive
17      years, the statewide recall, some recounts of those
18      recall elections, photo ID law, a lot of different
19      changes, and some — I think some, both in our office
20      and the clerks, feel like they've sort of been
21      through the gauntlet and feel like they've taken that
22      on and adjusted and they're more inclined to accept
23      that there's going to be continual changes in the
24      election laws and we just have to do our best to help
25      the voters adjust to those changes.

194

1  Q    Let's turn to there was — we talked about that.  Do
2       you recall — just one more question about the
3       elimination of the weekend voting.  Do you recall any
4       clerks speaking with the GAB about them not wanting
5       there to be an elimination of the weekend voting?
6  A    I recall getting comments both in our office and
7       hearing them in public testimony that some clerks
8       thought they preferred to keep the flexibility that
9       they had, and that occurred not only with this bill,
10      but when we had the discussions about early voting,
11      that topic came up as well about when it could be
12      offered, when it could not be offered.
13           And there was an earlier version of the bill
14      that passed that I think restricted even further what
15      hours could be offered, and there was an amendment to
16      it I believe that it did not limit the number of
17      hours.  I believe it was restricted to 40 hours a
18      week or something like that, and that restriction was
19      removed.  So there were certain clerks that expressed
20      their concern.
21 Q    And do you know from any conversations with the
22      Legislature why the change in the limit of times for
23      in-person absentee voting from 8 a.m. to 7 p.m.?  Is
24      that the same set — is that the same as what we
25      talked about before, to make it uniform, so-called

195

1       uniform?
2  A    Make it uniform throughout the state, right, but
3       trying to allow some flexibility so there would be
4       some evening hours available.
5  Q    7 o'clock, huh?  You can tell I live in a different
6       place because 7 o'clock is barely — we talked a
7       little bit about corroboration before.  Do you recall
8       any discussions with any legislator about — I'm
9       sorry, withdrawn.
10           Did the GAB take a position on the elimination
11      of corroboration?  I withdraw that one too.
12           Did the GAB express a view to the Legislature
13      about eliminating corroboration?
14 A    I'm sure it was addressed in the public testimony.  I
15      just don't specifically know.  Again that would have
16      been something where we were testifying for
17      information and not for or against the bill.
18           So I think we would have tried to highlight if
19      there were any administrative issues that we
20      anticipated.
21 Q    In any of the changes since 2011, the GAB has not
22      testified for or against the bill, right?  Or am I
23      wrong?
24 A    Well, there's I know at least one example, I don't
25      know if I mentioned earlier, but there's a bill

196

MICHAEL HAAS

1  pending which would authorize online registration.
2  Q  Right.
3  A  And that's one where our board formally took a vote
4     in support of that.
5  Q  Right.
6  A  And so that's one where we've offered testimony. We
7     testified in favor of that.  I think just recently I
8     provided testimony on a bill having to do with the
9     training cycles for clerks and other election
10    officials, and the board had gone on record
11    supporting that as part of our legislative agenda,
12    although not the specific bill, so we felt like we
13    were able to testify in support of that.
14 Q  But the GAB being a supporter of a particular bill in
15    those examples you gave, the two examples, that's the
16    exception, not the rule, right?
17 A  Yes, yes.
18 Q  Why are those two circumstances different?
19 A  Only because our board took a vote specifically on
20    those proposals or on the concepts.  And our board
21    because it only meets several times a year, they
22    don't always have the opportunity to meet while a
23    bill is pending and take a vote on whether or not to
24    support it.
25 Q  The voter ID bill was raised by the Legislature a

197

1  number of times, right, over the years?
2  A  Yes.
3  Q  Has the board ever taken a position on the voter ID
4     bill, any voter ID bill?
5  A  No.  Before the law was enacted, we had some
6     individuals come to the board and specifically ask
7     the board several times to support a photo ID law.
8        Some people wanted the GAB to enforce a photo ID
9     requirement without any statute, and I remember
10    eventually that topic was placed on the board meeting
11    as a separate agenda item so we could address those
12    concerns and we provided a staff report, which the
13    board adopted, and essentially the position was that
14    this is a policy decision for the Legislature and
15    more specifically there were people who wanted to be
16    able to voluntarily provide a photo ID when they got
17    to the table and they wanted the GAB's blessing on
18    that process and we recommended and the board said,
19    no, that's not allowed because that has the potential
20    for confusing people who might be in line who might
21    be hearing, overhearing that there's a photo ID
22    requirement or misinterpreting what the law is.
23       So the board went on record saying that that was
24    not to be allowed at polling places, and that was
25    maybe a year or two before the law actually passed.

198

1  Q  I'm just curious.  Why would someone want to present
2     an ID?
3  A  I think the theory was that they felt strongly
4     everybody needed to present a photo ID and they
5     wanted to demonstrate how it could be done.
6  Q  Gotcha.
7  A  And that they were willing to be subject to that
8     requirement and that they felt that that would
9     inspire more confidence in the integrity of the
10    election.
11 Q  And there was also a change about requiring
12    documentation of proof of residence while registering
13    except for overseas and military voters, right?
14 A  Right.
15 Q  And do you recall when that occurred?
16 A  I think that was part of the 2013 legislative
17    session.
18 Q  Do you recall whether or not the GAB gave testimony
19    to the Legislature about that provision?
20 A  I'm sure we did, yeah.
21 Q  Would all of your — let me ask you this.  Would all
22    of your testimony on these various changes of the
23    bill, is that all public record?
24 A  Yes.
25 Q  And is it kept up on your website, or is it something

199

1  that one would have to ask for in the Freedom of
2  Information Act?
3  A  No.  We usually post it all.  On our website, I think
4     there's a tab for news and notices and Reid Magney
5     tries to post all the public testimony that we
6     provide.
7  Q  And that's over the years, or is it archived
8     somewhere else?
9  A  As far as I know, it's just accumulated over the
10    years since the GAB started in 2008.
11 Q  Okay.  There was also a change in requiring college
12    administrators to provide proof of U.S. citizenship
13    on dorm lists that college students may use to
14    register.  Did the GAB discuss that with the
15    Legislature?
16 A  I believe that was part of our testimony on the bill
17    as well, on the photo ID bill.
18 Q  And did the GAB think that it was going to cause any
19    difficulties?
20 A  I don't recall specifically what we said.  I would
21    imagine that we just highlighted it as a change that
22    could be significant.  I think what we learned after
23    the law was passed is that most universities and
24    colleges were not willing to provide that list with
25    the citizenship requirement because they had their

200

MICHAEL HAAS

1  own privacy concerns, and I don't know if we knew
2  that at the time we testified or not.  But I think
3  the result of that is that less colleges and
4  universities used that dorm list than may have in the
5  past.
6 Q  And was part of the reason for that that there was
7  some issue with federal law?
8 A  I believe so.
9 Q  So do you know the number of colleges that actually
10  abide by this provision?
11 A  That use -- issue the dorm lists?
12 Q  Um-hum, yes.
13 A  I'm not aware of any for sure that do.  I'm pretty
14  confident that the UW Systems colleges and
15  universities, I think there are 26 of those
16  institutions, they do not.  At one point I heard that
17  maybe some private college was, but I don't recall
18  which one.  And our sense is that it's not widely
19  used, if at all.
20 Q  And did the Legislature make a change given that it's
21  not widely used, if at all?
22 A  No.
23 Q  There was also a change by eliminating the
24  requirement that special registration deputies be
25  appointed at high schools.  Do you recall that?

201

1 A  Yes.
2 Q  And in talking to the Legislature, do you know the
3  reason for that?
4 A  No, not specifically, no.
5 Q  Is there any election administration interests that
6  could be gleaned from eliminating the requirement
7  that special registration deputies be appointed at
8  high schools?
9       MR. KAWSKI:  Object to form.
10 A  I guess one that I could only speculate on is trying
11  to either centralize or focus the registration
12  process in fewer places, which might lead to better
13  control of it.  But that's just speculation.
14 Q  Has it led to better control?
15       MR. KAWSKI:  Object to form.
16 A  I have no idea.
17 Q  And did the GAB take -- not take a position, but did
18  the GAB speak on that issue to the Legislature?
19 A  I would have to check if it was in our testimony.
20  And again it may have been just simply to highlight
21  what's in the current law and what would change and
22  again without taking a position, although sometimes
23  our testimony when we would say we are simply
24  providing information --
25 Q  Right.

202

1 A  -- if we were not supporting the bill, sometimes the
2  authors of the bill would take that as taking a
3  position against it even though we were simply trying
4  to identify issues.
5 Q  Is there anywhere in the GAB where you keep the
6  results of when you testify or speak to the
7  Legislature and whether or not they adopt -- let's
8  say, for example, you make a recommendation for a
9  tweak in the law or a change in what they're
10  proposing.  Do you keep that anywhere, whether or not
11  the Legislature agreed with you, didn't agree with
12  you?
13 A  No.
14 Q  Do you have any sense in the job that you have
15  currently whether or not the GAB has any influence
16  with the Legislature on the election laws?
17 A  In some cases.  I just testified last week, I think,
18  on a bill and the committee acknowledged the concerns
19  that we raised.  There was a bipartisan bill, and we
20  had a follow-up phone conference with the author and
21  some other individuals, and there's going to be an
22  amendment introduced to fix those concerns.
23       You know, as far as influence where the
24  Legislature says, yeah, we will adopt what you're
25  suggesting, if it's -- I think that if it's in

203

1  general, as a general statement, if it's a policy
2  decision, policy/political decision, if our concerns
3  are viewed in that lens, generally they don't have a
4  lot of impact as far as changing the bill.
5       If they're convinced that they are things that
6  can make the administration go more smoothly, then
7  they might be more inclined to address them within
8  the bill.
9 Q  The other changes that they -- the Legislature
10  eliminated the requirement that in certain
11  circumstances special registration deputies be
12  appointed at or sent to private high schools or
13  tribal schools, is that right?
14 A  Yes.
15 Q  Do you know the reason for that elimination?
16 A  No.
17 Q  Do you recall whether the GAB commented on that?
18 A  I don't.  That I think in the context of all the
19  other legislative changes, I don't think that got a
20  lot of attention.  We may have testified about it,
21  but I don't recall specifically.
22 Q  Was there any election administration interest in
23  eliminating the special registration deputies be
24  appointed or sent to private schools or tribal
25  schools?

204

MICHAEL HAAS

1    MR. KAWSKI: Object to form.
2  A   Again speculating the one issue we've heard over the
3      years is that some individuals or groups or clerks
4      even are not real crazy about having any special
5      registration deputies because they feel that there
6      tend to be errors in the voter registration forms
7      that are sent in as a result of voter registration
8      drives and that they are interested in minimizing the
9      opportunity for people to register to vote outside of
10     direct contact with the municipal clerk.  And so that
11     may have been part of the concern that at least that
12     opportunity be eliminated.
13 Q   What is it that the special deputies do that caused
14     that issue?
15 A   Well, the special registration deputies or SRDs, they
16     have to be trained and approved by the municipal
17     clerk for that municipality.  But beyond that,
18     there's kind of a wide variety of how much attention
19     to detail they pay.  You know, do they promptly
20     submit the voter registration form, is it sent to the
21     right clerk.
22         I think over the last year or two since the
23     proof of residence law was changed, what we've heard
24     quite a bit of is that clerks receive voter
25     registration forms from SRDs or voter registration
                                                      205

1      drives that do not include the proof of residence.
2      So then the clerk has to do extra work to send it
3      back to the voter and request the voter registration
4      form, and I guess I'd also say that voter
5      registration drives can be conducted by people who
6      are not SRDs.  And so some of those mistake can come
7      from people who are not trained as special
8      registration deputies, but they -- it sort of gets
9      lumped into this same process.
10 Q   There was also a change that prohibits local
11     governments from requiring landlords to distribute
12     voter registration forms to new tenants.  Did the GAB
13     take a view about that?
14 A   That one was in a separate section of the statutes,
15     and I don't recall really even that coming up or that
16     it was an issue.  I remember reading something about
17     that maybe it was targeted to a particular
18     municipality, but I don't have really any specific
19     recollection of that change.
20 Q   But what's the election administration interest,
21     what's the --
22         MR. KAWSKI: Object to form.
23 A   I don't know.
24 Q   There was also the elimination of statewide, keeping
25     only municipal specific special registration deputies
                                                      206

1      or SRDs, right?
2  A   Yes.
3  Q   Did the GAB take a view of that?
4  A   I'm guessing that we provided testimony.  Again I'm
5      kind of guessing that Kevin Kennedy would have been
6      the one to provide that or else I would have had a
7      more specific recollection.  But our practice is to
8      try to offer public testimony on any election related
9      rules.
10 Q   And would that usually be Mr. Kennedy or would it
11     just depend whether it be him or you?
12 A   In most cases, it was Kevin Kennedy.  In some cases
13     it was me.  Just depending on his availability or
14     sometimes we had multiple bills happening or hearings
15     happening and so I would present the testimony.
16 Q   And are you two the primary people who presented
17     testimony from 2011 to present when there are changes
18     in election laws, or is there another person or two?
19 A   I think that's correct and I would be -- I would
20     probably have been presenting testimony more
21     frequently since I've been in this position, but I
22     did -- I remember testifying on the photo ID bill at
23     least once.  So it would probably be one of the two
24     of us.
25 Q   Now, there was also a change that increased the
                                                      207

1      residency requirement for voting for the office other
2      than president and vice president from 10 to 28 days
3      before the election.  I think we talked a little bit
4      about that earlier, didn't we?
5  A   Yes.
6  Q   Do you recall whether or not the GAB took a view on
7      that?
8  A   I'm sure we presented testimony about it.
9  Q   Now, when you say you're sure you presented
10     testimony, are you having a present recollection or
11     you're not sure or what do you mean?
12 A   Well, it's just something that is not at the top of
13     my mind, and I just know that that's a significant
14     enough change that we would have presented testimony.
15 Q   And why is it a significant enough change?
16 A   Because it's almost tripling the duration of the
17     period that somebody had to establish residency and
18     it had a broad enough impact that we would have
19     wanted to comment on it and provide our input to the
20     Legislature.
21 Q   Do you recall any discussions with concerned citizens
22     or voters about this particular change?
23 A   I'm sure we had discussions with individual voters
24     who call but also discussion with members of the
25     public or represented organizations that would come
                                                      208

MICHAEL HAAS

1  to our board and submit testimony to our board.
2  Q  And was there also a change that provided that
3  individuals who move within the state later than 28
4  days before an election must vote at their previous
5  ward or election district for all offices, do you
6  recall that?
7  A  Right.  That same law was in effect.  It just applied
8  to 10 days rather than 28 days.
9  Q  Okay.  So that law was in effect before?
10  A  Right.
11  Q  And also got expanded?
12  A  Right.
13  Q  Do you know of any election administrative interests
14  in doing — making that change?
15        MR. KAWSKI:  Object to form.
16  A  I guess I would just refer back to what we discussed
17  earlier about the 28 days and as far as possible
18  policy arguments.
19  Q  And this change we've talked about a little bit
20  requiring that an area for election observers be
21  placed between three and eight feet from the table at
22  which voters obtain their ballot and register to
23  vote, was that what you would consider a significant
24  change?
25  A  Significant in the sense that the whole topic of

209

1  election observers and their behavior was significant
2  and something that we have been dealing with since
3  2008 and so maybe not as significant for voters but
4  for election officials and those observers.
5        MS. WILSON:  Okay.  I think we have to
6  change the tape.
7        THE VIDEOGRAPHER:  The time is 3:52.
8  We are going off the record concluding Video
9  No. 3 in the deposition of Michael Haas.
10        (short recess is taken)
11        THE VIDEOGRAPHER:  The time is 4:03.
12  We are on the record.  This marks the beginning
13  of Media No. 4 of the deposition of
14  Michael Haas.
15        MS. WILSON:  What was my last
16  question?
17        (Reporter reads back previous portion of transcript)
18  Q  And there was another change in the law, right, the
19  elimination of straight ticket voting on the official
20  ballot?
21  A  Yes.
22  Q  What is straight ticket voting?
23  A  It's the ability to — in a general election to mark
24  your ballot for all candidates of one political party
25  or the other.

210

1  Q  And what is the benefit, if any, to the election
2  administration process?
3        MR. KAWSKI:  Object to form.
4  A  The benefit of eliminating that option?
5  Q  If there's one.
6  A  I'm not sure.  And that is not a change that I guess
7  that I can recall really specifically getting
8  involved in.
9  Q  There was a change that declined to allow overseas
10  voters to vote a straight ticket for non-national
11  offices on the Federal Write-in Absentee Ballot form.
12  Does that sound familiar to you?
13  A  Yes.
14  Q  And does that just affect military voters or all —
15  A  I believe it affects military — all UOCAVA voters
16  for military voters and voters who are overseas
17  permanently.
18  Q  And do you recall any discussions with the
19  Legislature about — or legislators about that
20  particular provision?
21  A  No.
22  Q  Any discussion — strike that.  Does that provision
23  make voting if you're overseas harder?
24        MR. KAWSKI:  Object to form.
25  A  I don't know, to be honest.

211

1  Q  Let me rephrase.  What is the effect of changing that
2  provision?
3        MR. KAWSKI:  Object to form.
4  Q  As a practical matter?
5  A  Can you read what the change was?
6  Q  Declining to allow overseas voters to vote a straight
7  ticket for non-national offices on the Federal
8  Write-in Absentee Ballot form.
9  A  And the question was?
10  Q  What's the practical effect of that?
11        MR. KAWSKI:  Object to form.
12  A  Well, that would mean that those voters would need to
13  vote for each individual candidate on the ballot
14  rather than being able to mark one party and vote for
15  all those candidates with essentially one vote.
16  Q  Do you see any down side to changing the law based on
17  your knowledge and experience?
18        MR. KAWSKI:  Object to form.
19  A  I just don't know because I don't know how popular of
20  an option that was or how widely it was used.
21  Q  So the law also changed and eliminated the option to
22  obtain absentee ballots by fax or email for all but
23  overseas and military voters.  Were you aware of
24  that?
25  A  Yes.  There was a couple of changes, but that was the

212

MICHAEL HAAS

```
 1    end result.  A couple of changes I think in the same
 2    legislative session about who was able to obtain
 3    ballots electronically.
 4  Q Do you know in talking to the legislators why that
 5    change was made?
 6  A I recall that there was some clerk input, and again I
 7    don't think there was a consensus opinion, but some
 8    clerks liked the option to transmit ballots
 9    electronically and some did not, and so maybe the
10    authors had heard from one side or the other and
11    determined that was the best way to go.
12        But as I said, there was a couple changes in the
13    same session, and they were trying to work towards a
14    consistent rule, and I think some clerks wanted to
15    have a black and white rule rather than leaving it up
16    to the discretion of the clerks as to who could be
17    sent a ballot electronically.
18  Q But isn't it easier to send something electronically
19    than send it any other way?
20        MR. KAWSKI:  Object to form.
21  A Assuming that the voter has access to be able to
22    download it electronically.
23  Q Right.
24  A It's certainly faster.
25  Q So what's the benefit?  What's the election
                                                    213
```

```
 1    administrative benefit?  What's the — why change it?
 2        MR. KAWSKI:  Object to form.
 3  A Of restricting that option?
 4  Q Yeah.
 5  A The only thing I can think of is one previous
 6    iteration of it was that it was not clearly spelled
 7    out in the law who had that ability, who had that
 8    option, and so again maybe to make it consistent
 9    throughout the state, the Legislature decided we are
10    going to decide and they settled on this group.  As
11    to why that option is not provided for all other
12    voters, I don't know what the rationale would be.
13  Q There's also a change which prohibits the returning
14    of absentee ballots to voters to correct certain
15    mistakes.  Do you recall that?
16  A Yes.
17  Q Is that something that the GAB weighed in on in favor
18    of making that change?
19  A I don't believe that we took a position on it, on
20    that bill.  We may have provided testimony, but I
21    don't think the board had taken a position on it.
22  Q So where's the electorate interest — the election
23    administration interests in not letting someone fix
24    their — not letting someone fix their absentee
25    ballot, doesn't that mean that if there's a mistake,
                                                    214
```

```
 1    they don't get to vote?
 2        MR. KAWSKI:  Object to form.
 3  A They could if — if they had thought that they had
 4    made a mistake, they could spoil the ballot up to the
 5    deadline for requesting an absentee ballot.  But
 6    there used to be something, an option we referred to
 7    as beat your ballot and if you had voted by absentee
 8    ballot and you changed your mind and you then showed
 9    up at the polls, if your absentee ballot had not been
10    processed yet, you had the ability to vote at the
11    polling place and then your absentee ballot would be
12    rejected once they got around to processing it.
13        And that's no longer an option now under this
14    bill.  And so one rationale might be once you voted
15    by absentee ballot, that's your opportunity to vote
16    and you shouldn't have the opportunity to then cast
17    another ballot.  You decided what your election day
18    is and you cast your ballot early.
19  Q So you don't have the right to change your mind or
20    the ability to change your mind?
21  A Right.
22  Q Does this prohibition save the GAB or the State of
23    Wisconsin any money by not allowing people to change
24    their mind?
25        MR. KAWSKI:  Object to form.
                                                    215
```

```
 1  A I don't know that there's a financial impact.  I
 2    would guess that maybe it reduces — it may on the
 3    margins reduce the number of ballots that have to be
 4    handled because people do not have that opportunity
 5    and then the election inspectors don't have to go
 6    through the process of rejecting a ballot, and every
 7    step along the way there's always the opportunity for
 8    human error, and that's one small way where one step
 9    would be eliminated.
10  Q Well, what if the human error was you just picked the
11    wrong guy or gal?
12        MR. KAWSKI:  Object to form.
13  Q Right, isn't that a possibility, human error?
14  A It is a possibility.  But I guess I go back to the
15    statutes express that voting by absentee ballot is a
16    privilege.  It's not considered to be a right, and if
17    a voter has chosen for whatever reason to submit
18    their ballot by absentee ballot before Election Day,
19    they assume the risk that they might for some reason
20    change their mind after they've submitted their
21    ballot.
22  Q So voting by absentee ballot is a privilege, not a
23    right.  Is that in the statute?
24  A It is.
25  Q But it's just another way to vote, so why wouldn't
                                                    216
```

MICHAEL HAAS

1  that be a right?
2           MR. KAWSKI:  Object to form.
3  A  Well, there's a policy statement.  I believe it's
4     Section 6.86 that talks about sort of a preamble to
5     absentee voting rules that makes that statement that
6     it's a privilege.  It needs to be accompanied by
7     measures that protect the integrity of the ballot and
8     the integrity of the election process and so anybody
9     who takes advantage of that privilege also is
10    subjected to whatever procedures are in place for it.
11 Q  Now, we've already talked about requiring voters —
12    the change that requires voters to present one of a
13    limited number of photo IDs in order to have their
14    vote counted.  And that was a change from there being
15    no law that required you to present proof of
16    identification, right?
17 A  Correct.
18 Q  I think Mr. Kennedy said it was — how did he put it,
19    a change that hadn't been seen since 18 something,
20    1896 or something like that, he said.  In that
21    situation, why doesn't the GAB take a position on
22    something as — I know Clay is going to object, but
23    I'm going to say it anyway, something as radical as
24    requiring voter ID?
25           MR. KAWSKI:  Object to form.

217

1  A  I think from the outset, the policy of
2     Director Kennedy and the board has been — or the
3     approach has been that we are an administrative
4     agency and we're responsible for administering the
5     election laws, whatever the election laws are, trying
6     to provide the best advice we can to the Legislature
7     about potential advantages or disadvantages or
8     constitutional issues if they exist, but recognizing
9     ultimately that we are an administrative branch and
10    not the policymakers and just having that sensitivity
11    about what the role is of the agency and only taking
12    a position in support of or in opposition to the bill
13    when our board has reached a consensus on it and they
14    direct us to take that — to take a specific
15    position.
16 Q  You said constitutional.  Do you speak on it if you
17    think something unconstitutional?
18 A  If there has been case law or there's clear
19    constitutional ramifications, then that's something
20    that we might raise in the public testimony.
21 Q  Do you raise it in the public testimony if it might
22    be argued that it's unconstitutional?
23 A  Yeah, we certainly might raise issues that this has
24    been tried or addressed before in other states.  This
25    is what they've run up against.  This is —

218

1     specifically we did a lot of research and provided
2     information to the board separate from the public
3     testimony, sort of a summary about which states had
4     photo ID laws in place and how this, the proposed law
5     compared to some of those other states and some of
6     the legal changes that were brought to those laws.
7  Q  So the GAB doesn't concern itself with whether or not
8     the law might be wrong?
9           MR. KAWSKI:  Object to form.
10 Q  Their job is simply to implement it, is that right?
11          MR. KAWSKI:  Same objection.
12 A  I guess the only wrinkle I would say is our board is
13    a board of former judges and so they are in tune with
14    constitutional issues and may not be experts in
15    election law, but if they saw something that they
16    thought was clearly unconstitutional, they might
17    direct us to or at least raise that concern.
18       But there's obviously a wide range of policy
19    choices in election law, and I think our board
20    recognized that we could not be in the business of
21    advocating those choices as a nonpartisan board
22    because it quickly would become perceived as being
23    taking a side politically.  And the board would want
24    to make sure it preserved its role to be seen as a
25    nonpartisan agency.

219

1  Q  But is that something that the board would raise on
2     its own, or does it look to you and Mr. Kennedy to
3     let them know of a constitutional issue?
4  A  I think usually they would — if we had the
5     opportunity to discuss it with the board, they would
6     be in the first instance relying on staff analysis of
7     it, and that might prompt some discussion by the
8     board members.
9  Q  And is the staff at GAB — did it give the
10    Legislature a certain amount of deference?
11 A  In what?
12 Q  In whether they decide they're going to take a side
13    for or against a particular provision.
14 A  Sure.
15 Q  Because the GAB is an administrative body?
16 A  Exactly.
17 Q  Okay.  I'm going to hand you what's been marked as
18    Kennedy 19.  I'm just going to go through some
19    documents now, and hopefully I won't keep you too
20    much longer.
21 A  Okay.
22 Q  I hand you what's marked as Kennedy 19, and let me
23    know when you're —
24 A  Okay.
25 Q  Have you seen this document before?

220

MICHAEL HAAS

1 A    Yes.

2 Q    And this is written by you?

3 A    Well, the first email was from Kevin Kennedy to our
4      elections division staff, which I was copied on, and
5      then I had responded with -- to alert our staff about
6      a phone conversation I had with the executive
7      director of the City of Milwaukee Election
8      Commission.

9 Q    And you said, "Just FYI, when we talked to Neil" --
10     what is it, Albrecht?

11 A   Albrecht.

12 Q   "At mid-morning today, he said that when he opened
13     voting, the line was three blocks long and that 1,000
14     people had already voted."

15     Do you recall any specific discussions with him
16     about why the line was three blocks long?

17 A   I don't recall specifically.  I think we both knew it
18     was a presidential election, they were expecting high
19     turnout, and we were just trying to document what it
20     actually was, and I think by indicating 1,000 people
21     had already voted, that meant by the time I had
22     talked to him at mid-morning.

23 Q   And he goes on to say that some observers were being
24     very aggressive and that he authorized that one
25     observer who he describes as out of control be given

                                                    221

1      a final warning before being removed by law
2      enforcement.

3      Do you recall any specific discussions about
4      observers being aggressive and who they were?

5 A    Yes.

6 Q    What do you recall?

7 A    I don't know if it was this election.  There was one
8      pretty notable incident where a group of observers
9      had confronted a voter, had challenged the voter's
10     ability to register, a young first-time voter, and
11     ultimately that voter left the polling place because
12     he, after having said basically I give up, I'm not
13     going to vote, a group of observers is what was
14     described to us as essentially surrounded him and
15     were continuing to harass him and I think that, if I
16     recall correctly, I think that maybe it ended up
17     where he tore up his voter registration application
18     or something like that.

19     That was really, I remember really disturbed
20     Neil, what he had heard and witnessed, and I don't
21     recall for sure, but it may have been in 2012.  The
22     only other time it might have been would have been
23     the 2014 election, but I'm guessing that it was 2012.

24     There were also some other incidents involving
25     observers that -- at the in-person absentee voting in

                                                    222

1      Milwaukee that tried to insist on observing voters as
2      they were in the voting booth rather than staying in
3      the observation area or being confrontational with
4      either voters or election inspectors.

5 Q    Do you know how he would give what he described as an
6      out-of-control individual a final warning and not
7      just call law enforcement?

8 A    Well, under our administrative rule for election
9      observers, there's a process outlined to say that the
10     chief inspector can give a warning, a lawful order to
11     any observer and then if that order is not complied
12     with, then they are authorized to contact law
13     enforcement and law enforcement is then required to
14     remove the person.

15     It's the one instance where the chief inspector
16     can really direct law enforcement and law enforcement
17     is not supposed to have any discretion.  They're
18     supposed to remove them.  So obviously that's a
19     pretty drastic remedy, and I believe in this case
20     Neil had been called to the site where the absentee
21     voting was taking place and he took it upon himself
22     to step in and give the individual a warning and said
23     if you don't comply, then we're going to call law
24     enforcement.

25 Q   Did anything ever -- was there any follow-up for the

                                                    223

1      young man who didn't get a chance to vote?

2 A    You know, I seem to remember that Neil followed up
3      with the young man and encouraged him to come back
4      and to vote, and I don't recall if he ever did.

5 Q    Did you and Neil discuss that the observer was
6      attempting to intimidate this young man because he
7      thought -- who he thought he was going to vote for?

8 A    Well, there was certainly discussion that it appeared
9      that the voter was being intimidated, but I don't
10     recall that we discussed why.

11 Q   You can put that aside.  The next one is Kennedy 21.
12     I've handed you Kennedy 21.  Let me know when you've
13     had a chance to look it over.

14 A   Okay.

15 Q   The very top email, is that from you?

16 A   Yes.

17 Q   And you say, "I just wanted to pass along this email
18     exchange so everyone has a feel of the atmosphere in
19     Milwaukee after one day of voting.  I would expect we
20     will hear about this story during public comments at
21     the board meeting."

22     What did you mean by the first sentence, meaning
23     specifically so everyone has a feel of the atmosphere
24     in Milwaukee?

25 A   Well, it was being sent to our entire staff in the

                                                    224

MICHAEL HAAS

```
 1    elections division, and any one of them may have
 2    fielded calls about incidents at polling places
 3    during the in-person absentee voting period, and I
 4    just wanted to give them a heads up about that this
 5    is what was happening in Milwaukee, that we were
 6    aware of it and we wanted to continue to keep an eye
 7    on it.
 8  Q  And what exactly was happening in Milwaukee?
 9  A  Well, without reading the entire exchange, it
10    appeared that this --
11  Q  Just a summary.
12  A  There was a disagreement between the election
13    inspectors and an observer about conduct at the
14    location where in-person absentee voting was taking
15    place.
16  Q  And this was the issue of taking pictures, right?
17  A  I believe so.  Yes, yes.  And although I would note
18    that Mr. Albrecht's email describes a couple of other
19    activities that he felt were violations of the
20    observer rules.
21  Q  Right.  So when you were referring to the atmosphere
22    in Milwaukee, was it specifically about the violation
23    of the observer rules or was something -- was it
24    other things?
25  A  It was the atmosphere involving tension that had
                                                        225
```

```
 1  Q  And if I recall correctly, Shane Falk is a lawyer,
 2    right?
 3  A  Correct.
 4  Q  And you're on this email in the to column with some
 5    other folks from the GAB, correct?
 6  A  Yes.
 7  Q  Did you have any discussions with Shane about this --
 8    the very first email, the top?
 9  A  We may have.  I mean our -- his office, the other
10    staff attorney's office and my office are all in a
11    row, and so we have pretty regular contact throughout
12    the day.
13  Q  Do you know what he meant when he said, "This is an
14    article that should go to the board so that they are
15    aware of the impact of Ardis, Mary Ann and their
16    close connections to the Legislature"?  Did you have
17    any discussions about that?
18  A  I don't recall any specific discussions, but I think
19    I know what he was trying to get at here.
20  Q  What was he trying to get at?
21  A  I think Ardis Cerny, Mary Ann Hanson and some other
22    individuals that are in that organization, they would
23    often come to our board and present public comments
24    about things that the board was doing, things that
25    they disagreed with maybe or had concerns about, and
                                                        227
```

```
 1    occurred between the observers and the election
 2    officials and the voters I think just in general.
 3  Q  And before -- had there been any sort of prewarning
 4    that there would be issues in Milwaukee of this
 5    nature?
 6  A  I don't recall anything specifically.  Milwaukee
 7    obviously is our largest municipality and we feel
 8    like at the state level in order to have a successful
 9    state election, things need to go well in our largest
10    municipalities, and so as I mentioned, Neil and I
11    have pretty regular phone contact and I was probably
12    generally aware -- certainly I was familiar with the
13    person he's writing to here because she attends a lot
14    of our board meetings and so we were aware that her
15    organization would be providing observers in the City
16    of Milwaukee and that there was some possibility for
17    some tension.
18  Q  And Milwaukee is also your largest minority city,
19    right?
20  A  Yes.
21  Q  You can put that one away.  I'm going to hand you
22    what's been marked Kennedy Exhibit 23.  Take a look
23    at it and let me know when you're -- when you've had
24    a chance to look at it.
25  A  Okay.
                                                        226
```

```
 1    they would also lobby the Legislature, and we are
 2    involved with this on a daily basis, and I think
 3    Shane was just trying to let the board know or get
 4    the board some background about who was coming to the
 5    board meetings and what their perspective was.
 6        We have a board of six members, and one member
 7    rotates every year or leaves every year, and so it's
 8    a constant effort to try to let the board know what
 9    we know.  So I think that's what he was
10    encouraging.
11  Q  What is their group, what is it, Waukesha --
12  A  Right.
13  Q  Women Watching Wisconsin Elections?
14  A  I think that organization has gone by a couple of
15    different names.  At one point it was called We Are
16    Watching Wisconsin Elections.  This title has been
17    shortened sometimes to the Waukesha Women's Group,
18    things like that.
19  Q  But what kind of group is it, if you know?
20  A  It's -- you know, really my contact has been really
21    with these two individuals and maybe one or two
22    others that attend our board meetings.  So they've
23    taken an interest in elections, they regularly attend
24    our board meetings.  They regularly attend public
25    hearings of the election committees, and they are
                                                        228
```

MICHAEL HAAS

1    interested in election procedures.
2        They've advocated for a long time things like
3    the photo ID law and anything that they perceive as
4    impacting election integrity.  They examined our
5    processes for the HAVA checks, for instance, and
6    raised concerns that they have and maybe will come to
7    our board and say do you realize this is what your
8    staff is doing and we think they should be doing more
9    or less or something different.
10 Q  Are they bipartisan?
11 A  I think they describe themselves as a nonpartisan
12   organization.  I think in general our perception is
13   that their perspective is more from the conservative
14   angle.  And I say that specifically because some of
15   the same individuals I think have been involved in,
16   for instance, training election inspectors for the
17   Republican Party or I should say election observers,
18   not election inspectors.
19 Q  She takes credit for — somebody takes credit for 16
20   new laws.  Is that accurate?
21 A  The number of laws or —
22 Q  Yeah.
23 A  — taking credit?
24 Q  Well, "Then I complained and look what happened, 16
25   new laws."
                                                        229

1 A  I think looking at the email from Reid Magney, it
2    says this is a blog post by Cindy Silken.
3 Q  Okay.  Do you read blog posts as part of your current
4    duties?
5 A  Usually only if Reid Magney circulates them.
6 Q  Sends it to you, okay.
7 A  Usually it's not fan mail.
8 Q  Yeah, no.  Do you recall having any discussions with
9    the board about the impact of Ardis, Mary Ann and
10   their close connection to the Legislature?
11 A  I don't recall any specific discussions with the
12   board as a whole.  There might be — I think there
13   may have been like individual discussions in passing
14   with certain board members if they might have more
15   questions about what's going on, what are you guys
16   dealing with.
17 Q  There wasn't any discussion that we have to watch for
18   these people because they're close to the Legislature
19   and they could give us a hard time?
20 A  No.  And any board member who was on the board for
21   more than six months would pretty quickly become
22   familiar with who they were and what their
23   perspective was.
24 Q  Okay.  Put that one away.  I hand you what is Kennedy
25   Exhibit 24.  And take a look at it.  Let me know when
                                                        230

1    you're done.
2 A  Okay.
3 Q  Have you seen this series of emails before?
4 A  Yes.
5 Q  And you're on the top email from Nathaniel Robinson
6    to you, right?
7 A  Right.
8 Q  And in the second email, you say to Nate, "We've
9    always known of this tie."
10       What did you mean, we've always known of this
11   tie?
12 A  Essentially that this group was somehow affiliated
13   with the Republican Party or at least individuals
14   that are involved or active with the Republican
15   Party.
16 Q  And did the GAB get involved or participate in
17   training some of its observers?
18 A  No.
19 Q  Did the Waukesha GOP folks send their materials to
20   you for review?
21 A  Not that I recall.
22 Q  Have they ever reached out to you to get the GAB's
23   input on their training materials for their
24   observers?
25 A  I do not believe they have.
                                                        231

1 Q  Did you read the attachment that Nathaniel sent?
2 A  Yes.
3 Q  Did you have any concerns about it at the time?
4 A  As I noted in the email, I was mostly wanting to make
5    sure that people just generally knew what was going
6    on.  A lot of different organizations train election
7    observers, and we sometimes review the materials that
8    they're going to use if they want us to.
9        And again because of our nonpartisan nature and
10   the fact that we want elections to be administered in
11   a nonpartisan way, I expressed here that hopefully
12   they were giving out accurate information because
13   based on our experience, we thought that sometimes
14   that was not the case with this group.
15 Q  Thus Nate's comment?
16 A  Nat's comment, yes.
17 Q  Nat's comment, sorry.  We can put that away.  The
18   next exhibit is Kennedy 29.  Take a look at that and
19   tell me when you're finished.
20 A  Okay.
21 Q  Remind me who Dave Buerger is.
22 A  He's one of our election administration specialists.
23   He's one of our more experienced election
24   specialists.
25 Q  And you are in that very first email, it was sent to
                                                        232

MICHAEL HAAS

1    you as well, right?

2 A   Yes.

3 Q   Do you recall what this discussion was about? I see

4     that Shane Falk says in the middle email, "Charge any

5     voter ID for students? Can anyone say 'poll tax'!

6     If DMV offers it for free, shouldn't the

7     universities?"

8      Do you know what he's referring to?

9 A   Yes. I believe there's an indication that college

10    students in the UW System might be charged to obtain

11    a photo ID. The original email from the attorney for

12    the University of Wisconsin System ends with the

13    statement that most of the UW System campuses plan to

14    charge student segregated fees for the expense as

15    authorized by the student government.

16 Q   And that was caused by the change in the law?

17 A   Well --

18 Q   Because they needed these IDs?

19 A   Right, they needed to have an ID that complied with

20    the law and the regular student ID cards did not

21    comply with the statute. And so they were looking at

22    producing a separate student ID that would comply

23    with the photo ID law.

24 Q   But it would come at a cost?

25 A   Yes.

233

1 Q   And do you know if Shane was drawing a legal

2     conclusion that in fact that could be a poll tax?

3 A   I think that was his sort of quick editorial comment

4     on it.

5 Q   And a poll tax would be unconstitutional, wouldn't

6     it?

7 A   Right. I think, though, the segregated fees, it's

8     not clear to me that the students were being charged

9     individually, but maybe the campus would take the

10    costs out of their pot of what are called segregated

11    fees for administering the program.

12 Q   And then David talks about the feds offering passport

13    certificate of naturalization for free. Oh, he says

14    as soon as.

15 A   Right.

16 Q   Was that a possibility?

17 A   I think David Buerger is also an attorney, and so

18    there's a certain amount of banter back and forth

19    about just playing devil's advocate and inserting

20    sort of policy or legal arguments.

21 Q   But he does say that the free ID, so-called free ID

22    in quotes requires a birth certificate which costs

23    $20 minimum.

24 A   Correct.

25 Q   Was there any follow-up with respect to the charge to

234

1    the students by GAB?

2 A   No. And in reading the email, I mean it does seem to

3     indicate that the program would be funded by this pot

4     of segregated fees rather than being a charge for any

5     student who requested one of the IDs. As David

6     indicates, much like how taxes are paying for the

7     free state IDs from the Department of Motor Vehicles.

8 Q   And do you know whether -- what UW ultimately did?

9 A   They did produce a separate student ID card.

10 Q   Do you know whether they charged the students for it?

11 A   I do not know for sure. I don't believe that they

12    did.

13 Q   And what's that based on?

14 A   I think just based on our contacts with Attorney Lind

15    and the UW System. I don't recall ever hearing that

16    they were charging students. And I think if they

17    were, that that would probably be something we would

18    know.

19 Q   I hand you what's Kennedy Exhibit 31. Look it over

20    and let me know when you've had a chance to do that.

21 A   Okay.

22 Q   Have you seen this email chain before?

23 A   Yes.

24 Q   And you're on the -- in the to line with some other

25    folks from GAB?

235

1 A   Yes.

2 Q   Do you recall whether or not GAB -- I'm sorry, Ross

3     says, "This should definitely be part of our outreach

4     and Jo and I have been discussing/identifying groups

5     that we will be reaching out to."

6      Do you know whether or not GAB in fact reached

7     out to either Rock the Vote or the Department of

8     Civil Rights?

9 A   I do not know, but I think that Ross was referring to

10    groups that might have been mentioned in this --

11    Article?

12 A   The last part of the article mentions the Department

13    of Civil Rights connecting with groups that are

14    unlikely to have current state identification cards,

15    and we were trying to track down what that was a

16    reference to.

17      And I think Ross in the end was saying it would

18    be great if we can get this list and add it to the

19    groups that we would be reaching out to.

20 Q   And do you know if that occurred?

21 A   I do not know.

22 Q   Did anyone follow up on -- it says, "The Department

23    of Civil Rights has developed an extensive outreach

24    plan after identifying key groups that do not have

25    current Wisconsin driver's licenses or state ID

236

MICHAEL HAAS

```
 1   cards."
 2        Did anyone at GAB attempt to reach any of these
 3   groups who might not have a current Wisconsin
 4   driver's license or state ID card?
 5 A  Well, I think in general not as a result of this
 6   article or because we necessarily got a list
 7   resulting from it.  Reading it, it's unclear whether
 8   the groups they mean are these demographics or some
 9   types of groups that individuals would be associated
10   with, and I don't really know the answer to that.
11        I was not the division administrator at the time
12   so would not necessarily have been following up with
13   whether or not it was done.
14 Q  Okay.  And I want to hand you Kennedy Exhibit 32.
15 A  Okay.
16 Q  Let me know when you're done.
17 A  Oh, sure, yes.
18 Q  Have you seen this document before?
19 A  Yes.
20 Q  Now, how is it that you saw this document?
21 A  It was something that I would have reviewed as part
22   of our work with the photo ID law.  It was produced
23   in early January of 2011 by professors at the
24   University of Wisconsin and we were in the mode of
25   trying to really collect any information we could,
                                                    237
```

```
 1   any literature we could about photo ID laws, and this
 2   group had conducted some research or reviews and they
 3   provided us with the summary.
 4 Q  And did this summary impact any of the -- impact your
 5   approach to the voter ID laws at all?
 6 A  I think it was part of the -- you know, the
 7   literature that added to our knowledge about issues
 8   that we should be aware of, populations that we
 9   should pay attention to that might need assistance
10   with the photo ID law.
11 Q  And did you have any meetings with any of the
12   professors or individuals who were in the front line?
13 A  I did not, and I do not know if Director Kennedy did.
14 Q  When the document talks about vulnerable groups, are
15   the vulnerable groups that they're talking about
16   minority groups, students, the elderly, to name a few
17   in here, consistent with the other information that
18   you had about who were vulnerable populations with
19   respect to the voter ID law?
20 A  Were they consistent?  Yes, I think they were largely
21   consistent.
22 Q  Okay.  I'm going to show you —
23        MS. WILSON:  So this is going to be
24   the next exhibit, which is what?
25        THE REPORTER:  52.
                                                    238
```

```
 1 Q  52.
 2        (Exhibit 52 is marked for identification)
 3        MR. KAWSKI:  And, Clay, this is the
 4   same.  It's just double-sided.
 5 Q  Take a look at Exhibit 52 and let me know when you're
 6   finished.
 7 A  Okay.
 8 Q  This is the declaration that you submitted in support
 9   of defendants' motion for summary judgment, correct,
10   in this case?
11 A  Yes.
12 Q  I'm going to ask you about some of the exhibits.  The
13   Exhibit A, maybe I'm missing it, do you know when
14   that was created?
15 A  I am guessing that it was created after the photo ID
16   law was passed as one of a number of documents where
17   we tried to sort of condense and crystallize what the
18   requirements were as a result of that law.
19 Q  And you say in your declaration that, "This is a true
20   and correct copy of the voter registration guide
21   created by GAB to aid voters."
22        Where was this published?
23 A  Well, we would have posted this on the Bring it to
24   the Ballot website.  We may have posted it on the
25   main GAB website.  It would have been made available
                                                    239
```

```
 1   to clerks as a tool that they could use as well.
 2 Q  Would it be posted anywhere else that was not a clerk
 3   or not a website?
 4 A  Well, I think not by us.  It would have been made
 5   available if anybody else wanted to use it and post
 6   it.  Sometimes we find that some of the materials we
 7   produce end up in public libraries and other public
 8   locations.
 9 Q  And do you know if this Exhibit A did end up in a
10   public library or other public location?
11 A  I do not know for sure.
12 Q  Let's take a look at Exhibit B.  This is a proof of
13   residence created by GAB to aid voters.  Do you know
14   when this was created?
15 A  Yes.  I believe it was also another document that was
16   created following the passage of the photo ID law.
17 Q  And do you know where it was published, if anywhere?
18 A  I guess similarly it would have been on our Bring it
19   to the Ballot website, maybe on our main website,
20   distributed to clerks as well.  And I think all of
21   these similar documents we would also take out on the
22   road if we were making in-person presentations.  It
23   became part of a packet that would accompany our
24   presentations.
25 Q  And do you know for sure that that was the case?
                                                    240
```

MICHAEL HAAS

1  A    If what was?
2  Q    You just said that the rest of the exhibits would
3       have been a packet, right, for your road shows?
4  A    Yes.
5  Q    Do you know that for sure, or are you guessing?
6  A    There is a Bring it to the Ballot packet later.  The
7       document I guess is Exhibit F, and I think that is
8       the packet that I believe would accompany our
9       in-person presentations, and that packet may have
10      changed as we modified it, but some of these fact
11      sheets would have ended up in that packet.
12 Q    And that would be places that you and I talked about
13      where you were invited to come and speak?
14 A    Yes.
15 Q    You meaning the GAB.
16 A    Right.  And also we let clerks know where they could
17      find our PowerPoint presentations in these types of
18      packets, and sometimes they would make presentations
19      locally.
20 Q    And do you recall a clerk making presentations
21      locally as you sit here today?
22 A    I recall being told of some specific clerks that were
23      doing that, but I don't recall who.
24 Q    Do you know whether Exhibit -- sorry, I'll do this
25      one at a time.  Do you know whether Exhibit B was

241

1       made available to the general public?
2  A    Yes, it was.
3  Q    Okay.  And where would that have been?
4  A    I think the same outlets I described, on our
5       websites, possibly being distributed and also being
6       made available to clerks.
7  Q    Anything other than clerks and online and possible
8       road shows?
9  A    You know what, we may have -- I know we were making
10      an effort to keep the Legislature apprised of what we
11      were doing, so we may have also sent out a
12      communication to the Legislature saying this is where
13      you and your constituents can find these resources.
14 Q    Is it the same with Exhibit D, that it would have
15      been available on the website?
16 A    Certainly.  And that is not specific to the photo ID
17      law.  That's the voter registration application, so
18      that would have always been available on our website.
19 Q    Okay.  Same thing for Exhibit F -- I'm sorry,
20      Exhibit E, also available on the website?
21 A    Right.  The application for absentee ballot, yes.
22 Q    We've already talked about Exhibit F.  Other than --
23      let me go back to F for a second.  Other than some of
24      the road shows you did and the clerks who may have
25      done some training, was this packet, these documents

242

1       in F that you call the packet more widely
2       disseminated other than online?
3  A    You know, I believe that we printed that packet and
4       at some point made some resources available to public
5       libraries because we felt that that was one facility
6       that is likely to be available statewide in a lot of
7       communities, and I don't recall if it was
8       specifically this packet or some of our other
9       resources.  But that may have -- it may have also --
10      we may have also distributed it to public libraries,
11      but I do not know that for sure.
12 Q    Mr. Haas, if you know, who decides what photos will
13      go up on -- like, for example, in the documents in
14      Exhibit F?  Is it the public relations group?
15 A    I'm trying to find which photos you're referring to.
16 Q    Oh, there's a bunch.  There's one on 21, there's one
17      on 18, 17, 13, 11, a bunch on 7.  I take it these are
18      actual people.  But is this the public relations
19      group of the GAB?
20 A    I believe that these are documents that we created.
21      The things that the other firm would have created are
22      more likely to be what's -- something that's -- there
23      are brochures later on that have the Bring it to the
24      Ballot theme, and that's what the outside firm
25      created.  I believe these are documents that our

243

1       staff collectively created.
2  Q    Okay.  Because it has the Bring it to the Ballot on
3       the first one?
4  A    Well, it has the Bring it to the Ballot notation on
5       the bottom.
6  Q    Yeah.
7  A    But I don't believe that this is -- I believe that
8       that packet, which is Exhibit F, is a document that
9       our staff created.
10 Q    You don't believe or do believe?
11 A    I do believe it is.
12 Q    Okay.
13 A    Those materials, in that we sort of slapped the Bring
14      it to the Ballot brand on the top and looking at --
15      it's got the GAB seal and the state seal.  I think
16      the documents that the outside firm created tended to
17      have less text and were -- so Exhibit G would have
18      documents that were created by the outside firm.
19 Q    Okay.  So the outside firm would be H -- G, H and I,
20      G, H -- I guess G and H, right?
21 A    Actually H, we would have created that because we
22      were -- had a project going where we tried to collect
23      actual examples of actual acceptable photo ID and so
24      we created that document.
25 Q    Okay.  But G is the outside firm?

244

MICHAEL HAAS

1  A   Yes.

2  Q   And Exhibit I, is this something that's on your

3      website?

4  A   Yes.

5  Q   And has it always been on your website?

6  A   Well, again I think this was — I believe this is

7      something that was produced after the photo ID law

8      was passed, and part of our intent was to try to

9      incorporate the photo ID requirements within other

10     regular training and information materials.  So it

11     became part of the process and not simply presented

12     as a separate issue.

13 Q   Okay.

14 A   So that looks like it is all materials really

15     relating to absentee voting rules.  And within that

16     we tried to explain the impact of the photo ID law

17     for different categories of absentee voters.

18 Q   And was this, what's in Exhibit I, made available

19     elsewhere other than a website?

20 A   Again I think it was part of the presentations both

21     to election officials as well as to any public

22     presentations.  These are the type of documents that

23     we would bring.  I've been in presentations even

24     recently to municipal clerks where we have again gone

25     over these type of documents.

245

1  Q   When you've been talking about presentations, are

2      they just to municipal clerks or are they also to the

3      broader public or usually you've been invited by a

4      group who's putting something together for the

5      broader public?

6  A   Really all three.  Our presentations to clerks, and

7      those count for their training requirements, and any

8      organization that invites us.  We also have some

9      initiatives related to voters with disabilities.  We

10     have an advisory committee for that initiative, and

11     we try to reach out to organizations representing

12     those individuals and make presentations to them.

13         So that would be a particular category of voters

14     again trying to hit audiences that themselves can

15     then spread the word and reach out to groups that

16     they represent and then just public presentations

17     that might be put on by a municipality, League of

18     Women Voters or any other organization.

19 Q   Is there any way to figure out how many people you

20     may have presented to since the — sorry, since the

21     voter ID law came into effect?

22 A   I know for a while, we were keeping track because we

23     wanted to be able to report to our board what the

24     efforts were that we were taking and so we — during

25     the initial rollout, we sort of had a running list of

246

1      which groups we had made presentations to, and we may

2      have even tried to estimate what the attendance was

3      at those events.

4  Q   And is that running list still available?

5  A   It should be.  And I don't know if we have kept the

6      same list for more recent presentations.  But we

7      certainly have records of all of our presentations

8      because it becomes part of our general report for

9      every board meeting.

10 Q   And have you done any of these presentations to

11     groups, put aside the clerks for a minute, to groups

12     or the more general public since March of '15?

13 A   Yes.  Our staff has, yes.

14 Q   And do you know how many they have done?

15 A   I'm guessing between 10 and 20.

16 Q   And do you know the — do you have any idea of the

17     size of the audiences?

18 A   It varies.  I attended one in Milwaukee where there

19     were maybe 20 to 25 people, but again they were

20     activists that were there to learn so that they could

21     present it to other people.

22 Q   Do they tend to be people who then go talk to other

23     people?

24 A   That's our intent.  And that was our general approach

25     when we were given the responsibility to reach out to

247

1      voters is we knew we couldn't touch everybody in the

2      state, so we wanted to try to have that multiplying

3      effect.

4  Q   For any of the Exhibits A through J, we didn't really

5      talk about J, but J is similar to the exhibit that we

6      saw earlier, right, that I gave you separately?

7  A   Yes.

8  Q   For any of the exhibits that are a part of your

9      declaration, are any of them in a language other than

10     English?

11 A   Not in this packet.  We have — I believe the

12     documents that we prepared are not, but I believe the

13     documents that are on the Bring it to the Ballot

14     website are available in the Spanish language.  We

15     have the voter registration form that is available in

16     both Spanish and Hmong language.

17         MS. WILSON:  Can we go off the record

18     for just a second?

19         THE VIDEOGRAPHER:  Off the record at

20     5:13.

21         (Discussion off the record)

22         THE VIDEOGRAPHER:  We are on the

23     record at 5:18.

24         (Exhibit 53 is marked for identification)

25 Q   I've handed you, Mr. Haas, a document we've marked as

248

1      Exhibit 53.  Have you had a chance to look it over?
2  A   Yes.
3  Q   Have you seen this document before?
4  A   Yes.
5  Q   Did you have any -- where have you seen it before?
6      Let me ask you that first.
7  A   Well, in our office.  This is a letter that
8      Director Kennedy sent to U.S. Representative
9      Gwen Moore.
10 Q   And did you have any input into the content of the
11     letter?
12 A   I think I probably reviewed it.  I believe that
13     Mr. Kennedy drafted the letter.
14 Q   Did you have any discussions with him about the
15     contents of the letter?
16 A   I believe so, yes.
17 Q   Did you have any discussions about the figure that's
18     cited, that over 11,000 voters who were mailed
19     absentee ballots prior to the recent court decision
20     that allowed for implementation of Act 23 in this
21     election?
22 A   Yes, we discussed that issue.
23 Q   Okay.  What do you recall about those discussions?
24 A   Well, as the letter indicates, there was some
25     confusion about what that figure represented and she

249

1      had contacted our office with her concerns, and this
2      was Director Kennedy's response.
3  Q   Was there any follow-up after Mr. Kennedy sent this
4      letter?
5  A   I don't recall if -- I do not believe that we
6      received any response from Representative Moore.
7  Q   Any other discussions from her or her office that
8      this was a continuing issue?
9  A   Not that I know of.
10         MS. WILSON:  Thank you.  I think I'm
11     done.  Thank you for your time unless you
12     have --
13         MR. KAWSKI:  I just have one follow-up
14     question.  And did you want -- you said you have
15     no further questions, correct?
16         MS. WILSON:  I have no further --
17     unless you have -- unless I have to follow up to
18     your follow-up.
19         MR. KAWSKI:  Sure.
20             EXAMINATION
21  BY MR. KAWSKI:
22 Q   Mr. Haas, several hours ago you talked about a
23     requirement or a law that would permit local election
24     officials to tell election observers where to stand.
25     Correct?

250

1  A   Yes, yes.
2  Q   And what was the distance that you said that they
3      were permitted to tell them to stand?
4  A   The new law established a distance be from three to
5      eight feet from the location of the tables where
6      voters received ballots or registered.
7  Q   What discretion, if any, does the local election
8      official have with regard to that law?
9  A   The primary -- under the statutes and under the
10     previous administrative rule were there for clerks
11     and the chief inspector to determine any space within
12     that distance could be used, and it's up to the clerk
13     and the chief inspector to lay out the polling place
14     and to determine whether the distance is going to be
15     under the current law three feet or four feet or up
16     to eight feet.
17         The observers do not have a right to be as close
18     as three feet, and in fact, there's an overlap
19     between the new law and the old administrative rule
20     between six and eight feet where if clerks previously
21     had stationed election observers six feet away, they
22     could continue with that practice.
23 Q   So under the current state of the law, local election
24     officials can tell people -- can tell observers you
25     cannot stand within four feet of the registration

251

1      table or voters, is that right?
2  A   That's correct.
3  Q   Instead they could tell them you have to stand as far
4      away as six feet from those folks?
5  A   That is an option, yes.
6  Q   So in other words, it leaves to the discretion of the
7      local election official where in that three to
8      eight-foot zone they tell people to stand?
9          MS. WILSON:  Objection, form.
10 A   That's correct.  The clerk and the chief inspector
11     can designate and in effect narrows -- narrow that
12     zone, as you said, to five feet away or six feet
13     away as long as it is no further away than eight
14     feet again where physically feasible is the caveat
15     that we put on it.
16 Q   And the administrative rule you talked about, is that
17     in effect currently?
18 A   It is currently not in effect as a promulgated
19     administrative rule.  When the permanent rule reached
20     the final stages, which was approval by the
21     Legislature in 2015, the Legislature did not allow it
22     to be approved and it lapsed at the end of the year
23     because of the time limits for promulgating the rule,
24     and so at this point we do not have an administrative
25     rule.

252

MICHAEL HAAS

**Page 253**

```
 1        Our guidance to clerks has been to continue to
 2   use essentially what was in the administrative rule
 3   with the exception of the distance, which is now set
 4   by statute, but all the other requirements that were
 5   in the administrative rule, our approach has been to
 6   say that is the board's interpretation of the
 7   statutes and that's how we advise clerks to implement
 8   the law.
 9        MR. KAWSKI:  I have no further
10   questions.
11             REEXAMINATION
12   BY MS. WILSON:
13   Q   But there's no rule?
14   A   There's no administrative rule on the books, that's
15   correct.
16             MS. WILSON:  Thank you.  That's it.
17             THE VIDEOGRAPHER:  We are off the
18   record.  This concludes the video deposition of
19   Mr. Michael Haas containing four media.  The
20   time is 5:24 p.m.
21             (5:24 p.m.)
22
23
24
25
```

**Page 255**

```
 1   STATE OF WISCONSIN  )
 2                       )  ss.
     COUNTY OF DANE      )
 3
 4
 5        I, LISA A. CREERON, a Registered Professional
 6   Reporter and Notary Public in and for the State of
 7   Wisconsin, do hereby certify that the foregoing is a
 8   true record of the deposition of MICHAEL HAAS, who was
 9   first duly sworn by me; having been taken on the 22nd day
10   of January, 2016, at the Wisconsin Department of Justice,
11   17 West Main Street, in the City of Madison, County of
12   Dane, and State of Wisconsin, in my presence, and reduced
13   to writing in accordance with my stenographic notes made
14   at said time and place.
15        I further certify that I am not a relative
16   or employee or attorney or counsel for any of the
17   parties, or a relative or employee of such attorney
18   or counsel, or financially interested in said action.
19        In witness whereof, I have hereunto set my hand
20   and affixed my seal of office this 23rd day of January,
21   2016.
22
23        _____
          Notary Public, State of Wisconsin
24        My Commission Expires:  1/29/17
25
```

**Page 254 — ERRATA SHEET**

```
 1             ERRATA SHEET
 2   Witness Name:  Michael Haas
 3   Date Taken:  January 22, 2016
 4   Case Name:  One Wisconsin v. Gerald Nichol, et al.
 5   Page/Line      Reads      Should Read      Reason
```

MADISON FREELANCE REPORTERS, LLC

**249** 4:4.
**25** 7:20, 32:19, 34:22, 36:5, 165:24, 193:13, 247:19.
**25**. 185:22.
**250** 3:7.
**26** 32:19, 193:14, 201:15.
**28** 118:19, 118:24, 119:25, 120:4, 120:8, 120:12, 121:23, 176:24, 208:2, 209:3, 209:8, 209:17.
**28-day** 118:16, 118:20, 176:25.
**29**. 232:18.

. . .
**< 3 >**.
**3** 8:22, 140:23, 144:4, 210:9.
**3**. 125:20.
**30**. 203:13, 35:13.
**30th** 17:4.
**31**. 235:19.
**32**. 237:14.
**39** 3:12, 78:2, 79:4.
**39**. 77:24.
**3:52**. 210:7.

**< 4 >**.
**4** 210:13.
**40** 3:15, 79:18, 102:4, 195:17.
**40**. 79:17.
**41** 3:17, 87:12.
**41**. 87:11.
**42** 3:20, 108:7.
**42**. 106:5.
**43** 3:23, 110:2.
**44** 3:26, 112:8, 112:19, 112:10, 1166, 116:7.
**46** 3:32, 117:23.

**47** 3:35, 138:11.
**48** 3:38, 151:6.
**49** 3:40, 158:21, 158:22, 164:20.
**4:03**. 210:11.

. . .
**< 5 >**.
**5** 152:12, 153:15.
**50** 3:43, 76:9, 165:3, 185:21.
**50**. 165:5.
**505** 2:16.
**51** 3:46, 186:2.
**51**. 186:4.
**52** 3:49, 238:25, 239:2, 239:5.
**52**. 239:1.
**53** 4:4, 248:24.
**53**. 249:1.
**53703** 2:24.
**5:13** 248:20.
**5:18**. 248:23.
**5:24** 253:20.

. . .
**< 6 >**.
**6** 65:16, 67:17.
**6-18-15** 3:38.
**6.86** 217:4.
**6:23** 3:35.
**603** 80:3, 81:2.
**6th** 164:12.

. . .
**< 7 >**.
**7** 190:5, 195:23, 196:5, 196:6.
**7**. 243:17.
**72** 48:8, 136:25.
**73** 3:12.
**79** 3:15.

. . .
**< 8 >**.
**8** 195:23.
**80** 163:4, 163:17.

**87** 3:17.

. . .
**< 9 >**.
**9,000** 153:12, 155:8, 168:1.
**90** 162:12.
**94105** 2:17.
**9:14** 1:22, 2:10, 5:15.

. . .
**< A >**.
**A**. 1:24, 2:5, 3:43, 255:7.
**a.m.** 1:22, 2:10, 5:15, 195:23.
**abide** 201:10.
**ability** 69:10, 70:18, 72:6, 85:18, 103:14, 133:21, 134:1, 134:10, 135:21, 192:18, 192:10, 210:23, 214:7, 215:10, 215:23, 222:10.
**able** 15:10, 25:16, 26:19, 40:15, 52:22, 58:9, 64:15, 65:21, 66:23, 69:4, 84:2, 84:15, 84:16, 85:22, 96:15, 99:24, 104:7, 130:15, 133:15, 133:24, 143:2, 156:3, 157:6, 173:19, 178:15, 185:15, 197:13, 198:16, 212:14, 213:2, 213:21, 246:23.
**above** 6:8, 176:1.
**above-entitled** 2:2.
**abreast** 21:15, 21:19, 25:21.
**abused** 14:23.
**academic** 26:9.
**accept** 194:22.

**acceptable** 38:14, 39:21, 153:13, 158:2, 168:5, 168:10, 168:14, 169:21, 169:8, 193:5, 170:5, 244:23.
**acceptable**. 169:13.
**access** 62:3, 62:8, 73:1, 155:16, 161:8, 172:13, 213:21.
**accessibility** 96:17, 97:10.
**accessible** 96:22, 96:25, 181:13.
**accidentally** 136:15.
**accommodate** 87:4, 97:12, 98:5.
**accommodating** 178:14.
**accompanied** 124:14, 217:6.
**accompany** 240:23, 241:8.
**accordance** 255:15.
**account** 58:20, 82:19, 82:20, 82:24, 83:4, 83:18, 83:22, 111:20, 143:8.
**Accountability** 7:11, 11:1, 63:6, 99:8.
**accumulated** 210:9.
**accurate** 7:7, 25:6, 104:9, 106:3, 123:25, 145:4, 154:10, 229:20, 232:12.
**accurately** 49:8.
**acknowledged** 203:18.
**across** 15:24, 58:10, 122:9.
**Act** 12:4, 52:24.

. . .
257

---

**120:2**, 124:13, 125:16, 128:16, 200:2, 249:20.
**acting** 8:12.
**action** 2:2, 91:18, 137:8, 156:9, 255:20.
**actions** 70:21, 146:18.
**activate** 55:15.
**activated** 55:12.
**active** 24:4, 85:1, 231:14.
**activists** 247:20.
**activities** 24:23, 225:19.
**activity** 60:9, 113:10, 113:13, 114:7, 114:16, 114:23, 115:14, 160:1, 161:8, 161:21, 163:25, 164:5, 164:8.
**actors** 14:19.
**actual** 108:12, 120:2, 243:18, 244:23.
**Actually** 24:17, 40:22, 43:12, 91:2, 106:6, 142:25, 147:16, 171:10, 180:17, 198:25, 201:9, 221:20, 244:21.
**ad** 162:2.
**adamant** 108:21.
**add** 88:7, 168:16, 183:7, 183:10, 236:18.
**added** 108:17, 108:18, 238:7.
**addition** 7:21, 65:25.
**Additional** 31:2, 46:5, 46:6, 84:11, 86:13, 108:18, 129:25, 132:1, 132:3, 132:5, 132:22, 133:2, 133:18, 134:3.

**141:1**, 145:16, 146:6, 156:16, 156:21, 173:5, 180:23, 181:4, 183:1.
**address** 25:13, 60:7, 60:2, 81:15, 83:1, 98:16, 102:6, 113:4, 113:21, 114:15, 118:1, 118:9, 121:4, 121:5, 121:7, 121:8, 121:10, 121:12, 123:15, 125:12, 129:20, 174:11, 181:1, 198:11, 204:7.
**addressed** 19:3, 21:11, 21:12, 81:6, 97:21, 98:11, 106:13, 112:18, 196:7, 218:24.
**addresses** 100:9, 167:15.
**adds** 133:18.
**adjust** 194:25.
**adjusted** 194:22.
**adjustments** 65:23, 203:24.
**administer** 7:22, 13:20, 13:25, 15:4, 65:19, 134:10, 183:10.
**administered** 11:22, 65:18, 103:25, 232:10.
**administering** 24:8, 132:14, 192:3, 218:4, 234:11.
**Administration** 15:1, 132:7, 150:7, 149:20, 107:9, 110:19, 126:3, 126:6, 129:13, 133:1, 133:23, 140:14, 146:4, 191:2, 202:5, 204:6, 204:22, 206:20, 211:2, 214:23.

**232:22**.
**administrative** 20:9, 30:19, 63:8, 63:23, 63:24, 65:11, 65:14, 66:14, 67:7, 67:12, 71:5, 80:15, 143:4, 147:20, 150:2, 177:18, 191:19, 196:19, 208:13, 214:1, 218:3, 219:6, 220:15, 223:8, 251:10, 251:19, 252:16, 252:18, 252:25, 253:14.
**Administratively** 91:24, 92:6.
**administrator** 7:12, 50:21, 67:20, 237:11.
**administrators** 57:17, 200:12.
**adopt** 24:14, 25:19, 89:19, 91:16, 178:3, 178:12, 179:10, 203:7.
**adopted** 19:23, 90:18, 90:21, 95:10, 198:13.
**ads** 178:13.
**adult** 24:11, 32:13, 42:14.
**advance** 31:17, 167:21.
**advantage** 55:16, 217:9.
**advantages** 53:20, 218:7.
**advice** 11:14, 39:24, 164:25, 218:6.
**advise** 39:18, 47:6, 253:7.
**advised** 65:19.
**advising** 10:10.
**advisory** 246:10, 211:2, 214:23.
**advocate** 234:19.

**advocated** 229:2.
**advocating** 219:21.
**affect** 9:25, 50:13, 52:15, 52:20, 57:6, 69:23, 84:9, 88:4, 101:5, 103:13, 130:20, 131:20, 133:21, 134:10.
**affected** 10:11, 42:18, 66:22, 118:21, 119:25, 194:10.
**affecting** 36:5.
**affects** 126:22, 166:18, 192:9, 211:5.
**affiliated** 231:12.
**affixed** 255:22.
**African-american** 180:6.
**African-americans** 42:1.
**afternoon** 144:6.
**afterwards** 138:23.
**age** 72:23, 72:25.
**agencies** 13:16, 17:8, 162:24, 52:19, 80:2, 87:5, 102:14, 140:7, 146:11, 147:8.
**agency** 9:13, 11:7, 11:9, 11:17, 12:9, 14:7, 15:21, 16:1, 19:17, 20:10, 23:5, 35:17, 45:6, 45:17, 46:4, 51:11, 51:18, 51:19, 67:17, 73:21, 84:15, 86:1, 87:5, 87:6, 88:16, 89:20, 100:14, 145:21, 148:16, 148:24, 164:6, 194:4, 218:4, 218:11, 219:25, 252:2, 197:11.
**agenda** 19:23, 20:3, 211:2.

. . .
258

---

**198**:11.
**aggressive** 85:23, 96:16, 221:24, 222:4.
**ago** 250:22.
**agree** 48:24, 91:15, 168:6, 169:7, 172:25, 203:11.
**agreed** 171:17, 192:15, 192:17, 203:11.
**agrees** 16:5.
**ahead** 21:3, 168:24, 191:9.
**aid** 239:21, 240:13.
**aide** 157:16.
**aimed** 135:19.
**aisle** 147:17.
**al** 1:7, 1:13, 5:6, 5:7, 255:4.
**alert** 98:3, 221:5.
**alerting** 78:8.
**alleged** 183:14.
**Allison** 139:1, 139:2, 140:10, 140:18, 168:8, 168:10, 168:3.
**allocate** 194:12.
**allocated** 45:11, 45:20, 45:24, 83:13, 86:6, 145:23.
**allow** 170:22, 196:3, 211:9, 212:6, 252:21.
**allowed** 39:14, 64:12, 71:4, 71:14, 71:20, 133:22, 143:1, 198:19, 198:24, 249:20.
**allowing** 71:18, 97:18, 215:23.
**allows** 55:9.
**alluded** 194:8.

**alluding** 60:19.
**Almost** 38:15, 235:16.
**alphabet** 178:21.
**already** 28:22, 69:25, 122:10, 123:17, 156:12, 158:11, 184:16, 192:15, 192:17, 217:11, 203:11.
**altered** 21:3, 168:24, 191:9.
**although** 54:20, 55:5, 89:12, 160:15, 197:12, 202:22, 225:17.
**amended** 36:18, 187:23.
**amendment** 80:25, 82:15, 82:22, 195:15, 203:22.
**amendments** 9:2, 21:12.
**America** 52:23.
**amongst** 15:22, 18:22, 28:5, 63:20, 151:25.
**amount** 30:16, 30:17, 35:16, 45:9, 50:25, 86:5, 93:23, 92:15, 141:12, 192:18, 193:25, 220:10, 234:18.
**analysis** 161:21, 220:6.
**analyze** 61:1.
**analyzing** 160:5.
**anecdotal** 59:18, 61:5.
**anecdotes** 105:17.
**angle** 229:14.
**Ann** 167:5, 227:15, 227:21, 230:9.
**announcement** 184:20, 187:7.
**announcements**

**39**:8, 40:9, 40:13, 41:13, 41:17, 46:3, 146:5, 145:11, 187:9.
**answer** 7:2, 9:16, 18:2, 21:13, 21:5, 25:16, 37:21, 57:12, 62:22, 67:21, 67:23, 75:25, 86:9, 105:14, 114:2, 157:17, 191:6, 191:9, 193:23, 237:10.
**answered** 191:5.
**antennas** 74:7.
**anticipate** 27:18, 50:3, 50:7, 74:19.
**anticipated** 196:20.
**anybody** 27:24, 45:14, 52:22, 51:7, 63:19, 121:7, 122:18, 217:8, 240:5.
**anyway** 217:23.
**apologize** 28:23, 138:18.
**apparently** 177:6.
**appeal** 157:1.
**appear** 166:2, 180:3.
**appearance** 153:9.
**appeared** 118:7, 119:17, 137:17, 234:8, 225:10.
**appearing** 2:17, 224.
**appears** 78:11, 80:1, 80:10, 81:8, 87:23, 110:24, 113:1, 123:1, 165:9, 166:19.
**application** 124:13, 222:17, 242:17, 242:21.
**applications** 103:6,

**105**:15.
**applied** 24:1, 122:8, 126:9, 128:21, 134:4, 209:7.
**apply** 28:8, 108:8.
**applying** 103:19, 103:20, 134:9, 148:4.
**appoint** 33:20.
**appointed** 33:12, 33:14, 201:25, 202:7, 204:12, 202:13.
**appointment** 98:8.
**appreciation** 21:9.
**apprised** 242:10.
**approach** 12:11, 26:17, 40:22, 43:20, 44:6, 84:20, 135:17, 218:3, 238:5, 247:24, 253:5.
**appropriate** 150:2, 158:9.
**appropriately** 103:6, 105:9, 105:16, 182:2.
**approval** 152:7, 252:20.
**approve** 26:12.
**approved** 192:24, 201:4, 5:17, 46:9, 67:6, 67:15, 83:21, 205:16.
**approximately** 7:20, 32:22, 119:4, 153:12, 158:1.
**April** 59:5, 122:25, 123:9, 123:19, 144:21.
**archived** 207:4.
**Ardis** 227:15, 227:21, 230:9.
**area** 11:23, 24:4, 27:3, 27:17, 56:3, 64:14, 64:25, 65:6,

. . .
259

---

**65**:15, 66:15, 155:20, 185:4, 209:20, 223:3.
**areas** 13:24, 17:12, 25:12, 68:24, 88:23, 142:25, 141:3, 179:22, 180:2.
**argued** 218:22.
**argument** 122:4, 122:6, 122:7, 123:24, 133:6, 191:15.
**arguments** 40:21, 41:22, 124:24, 209:18, 234:20.
**arise** 74:19.
**arose** 34:16, 177:5.
**around** 23:3, 28:17, 30:8, 31:24, 35:10, 43:17, 62:2, 89:19, 75:3, 88:1, 90:5, 111:25, 124:7, 143:16, 192:4, 215:12.
**arranging** 23:15.
**Article** 27:14, 236:11, 236:12, 237:6.
**articles** 15:25, 22:20, 23:3, 23:4, 35:4.
**aside** 79:17, 158:13, 224:11, 247:11.
**aspect** 42:1.
**aspects** 64:8, 66:23, 57:2.
**Assembly** 21:24, 80:3, 81:1, 148:13, 149:1, 149:13, 235:11.
**assertion** 188:22.
**assigned** 16:12, 84:14, 112:22.
**assignments** 11:25, 12:15, 12:24.
**assist** 76:1, 99:19, 141:25, 182:13.

**assistance** 12:13, 141:24, 238:9.
**Assistant** 2:21, 5:25.
**assistant** 142:1.
**Assisting** 15:3, 141:2, 141:23.
**associated** 8:4, 237:9.
**assume** 36:2, 104:5, 160:19, 216:19.
**assumed** 113:15.
**Assuming** 17:34, 213:21.
**atmosphere** 224:18, 224:23, 225:21, 225:25.
**attached** 119:10, 165:13, 165:19, 166:7, 167:6, 167:13, 227:10, 233:11, 234:17, 235:14, 255:18.
**attachment** 185:22, 232:1.
**attachments** 165:19, 165:25, 166:1, 66:20.
**attempt** 136:11, 237:2.
**attempted** 105:10.
**attempting** 224:6.
**attempts** 136:10.
**attend** 33:6, 132:22, 228:23, 228:24.
**attendance** 247:2.
**attended** 247:18.
**attending** 148:13.
**attends** 226:13.
**attention** 15:21, 16:10, 25:3, 35:21, 37:4, 51:5, 52:17, 57:20, 74:17, 75:1, 90:24, 100:1,

**104**:11, 116:24, 134:6, 134:8, 141:5, 167:12, 181:3, 181:10, 181:15, 193:9, 193:11, 204:20, 205:18, 238:9.
**attire** 98:12.
**Attorney** 2:21, 35, 3:7, 4:9, 6:1, 12:8, 12:10, 12:16, 12:20, 13:6, 13:9, 22:16, 36:10, 76:18, 77:17, 99:7, 99:19, 100:2, 116:14, 116:20, 117:17, 118:11, 123:22, 137:5, 169:21, 167:5, 167:6, 167:13, 227:10, 233:11, 234:17, 235:14, 238:13.
**Attorneys** 2:15, 11:6, 12:12, 43:16, 87:22, 135:6, 135:14, 137:1.
**attracted** 100:1.
**audience** 35:19, 40:15, 84:19, 84:23, 85:4.
**audiences** 111:18, 246:14, 246:17.
**August** 18:9, 118:3, 114:13, 123:9.
**author** 119:3, 119:13, 122:16, 138:25, 139:7, 203:20.
**authority** 16:19, 33:21.
**authorize** 90:8, 197:1.
**authorized** 46:5, 221:24, 223:12, 233:15.
**authors** 149:3, 203:2, 213:10.

**availability** 101:22, 101:25, 189:18, 207:13.
**available** 14:9, 29:24, 30:11, 43:1, 45:6, 38:1, 98:5, 139:21, 139:23, 145:7, 157:10, 171:14, 190:4, 193:21, 196:3, 226:2, 228:9, 240:14, 246:6.
**average** 28:14, 31:8.
**aware** 16:20, 23:5, 49:2, 49:19, 50:4, 50:7, 51:16, 64:5, 75:5, 75:8, 101:14, 102:15, 105:4, 107:25, 108:10, 110:23, 111:1, 111:4, 128:25, 134:24, 158:4, 178:22, 183:3, 201:13, 212:23, 226:6, 228:12, 226:14, 227:15, 238:8.
**awareness** 39:2.
**away** 62:22, 103:12, 105:2, 108:24, 112:2, 115:15, 116:21, 116:9, 121:13, 169:9, 169:15, 190:11, 190:18, 192:9, 226:21, 237:17, 251:21, 252:4, 252:12, 252:13.

. . .
**< B >**.
**B**. 3:40, 240:12.
**Back** 8:3, 25:21,

. . .
260

**[Page 261]**

52:10, 52:11,
54:25, 59:17,
72:22, 81:4, 86:10,
86:19, 105:5,
105:12, 105:14,
135:19, 138:10,
138:15, 138:11,
144:14, 147:14,
149:24, 150:6,
150:10, 153:8,
153:15, 164:24,
179:16, 184:21,
185:24, 206:3,
209:16, 210:17,
216:14, 224:3,
234:18,
242:23.
**background** 7:10,
10:23, 10:7,
228:4.
**backup** 130:12.
**bags** 181:12.
**balance** 66:24,
**balloting** 89:12,
89:22, 89:24,
**ballots** 15:10, 48:5,
49:11, 51:23, 59:6,
59:7, 59:9, 64:16,
65:3, 89:23, 89:25,
90:4, 92:9, 92:10,
92:15, 95:18, 96:8,
97:20, 98:6,
109:24, 132:15,
143:17, 161:2,
182:22, 193:4,
212:22, 213:3,
213:8, 214:14,
216:3, 249:19,
251:6.
**bank** 71:22.
82:18.
**barrier** 234:18.
**barely** 196:6.
**base** 75:12.
162:2.
**Based** 28:24, 56:2,
65:23, 85:6, 91:10,
105:17, 120:13,
132:12, 152:17,
155:15, 184:12.

187:18, 212:16,
232:13, 235:13,
235:14.
**basic** 71:17.
**basically** 12:22,
102:13, 114:3,
145:6, 163:1,
222:12.
**Basics** 52:10, 52:11,
52:12, 139:11,
139:15.
**basing** 121:20,
163:11.
**basis** 19:1, 25:17,
48:9, 54:21, 143:1,
182:4, 228:2.
**batches** 101:4.
**beat** 94:25.
215:7.
**became** 110:23,
115:1, 151:2,
192:1, 240:23,
245:11.
**become** 18:16,
46:15, 61:13,
62:25, 63:16,
69:13, 72:3, 75:5,
93:21, 99:2,
102:15, 174:10,
193:24, 219:22,
230:21.
**becomes** 16:20,
247:8.
**becoming** 53:11,
**begin** 13:18,
**beginning** 77:3,
144:4, 210:12.
**behalf** 21:8, 22:25,
113:22, 132:22,
153:9.
**behavior** 210:1.
**behind** 66:13, 66:14,
68:16.
**believes** 14:15.
**Bell** 34:10, 159:18,
159:24, 160:18,
169:22, 164:9,
**benefit** 126:7,
126:11, 129:11,
132:17, 132:25,

191:2, 191:3,
191:19, 192:6,
211:1, 211:4,
213:25, 214:1,
**blog** 230:2,
230:3.
**blogs** 26:3.
**Bobbie** 2:13, 5:23,
6:16.
**body** 20:10, 20:24,
27:12, 33:10,
33:13, 220:15.
**bolts** 14:25.
**book** 155:11, 178:20,
253:14.
**booth** 70:8,
223:2.
**bore** 6:24.
**bother** 105:3.
**bothered** 126:17.
**bottom** 244:5.
**box** 101:17.
**brainstorm**
176:9.
**brainstorming**
181:6.
**branch** 102:3,
102:12, 102:18,
104:22, 218:9.
**Branches** 102:1,
102:4, 105:24,
174:22.
**brand** 35:14, 51:20,
234:14.
**break** 7:2, 7:5, 57:7,
143:21, 166:7.
**Brian** 159:18,
159:25, 160:3,
160:18, 160:20,
161:7, 162:6.
**briefly** 36:20.
**Bring** 10:7, 41:15,
52:10, 75:18,
104:15, 120:16,
145:2, 239:23,
240:18, 241:6,
243:23, 244:2,
244:4, 244:13,
245:23,
248:13.
**bringing** 100:4.
**broad** 57:12, 60:20,
208:18.
**broadcast** 46:3.

261

**[Page 262]**

**broader** 246:3,
246:5.
**brochures**
243:23.
**broken** 70:19.
**brought** 20:2, 35:2,
99:19, 104:17,
105:20, 219:6.
**budget** 39:3, 45:9,
43:11, 83:15,
83:18, 83:19,
83:21, 85:10,
85:17, 85:21, 86:2,
86:3, 86:11, 86:17,
86:19, 87:4, 87:7,
146:1, 158:10.
**budgeting** 33:25.
**Buerger** 3:23, 3:29,
3:32, 110:9,
116:25, 117:9,
118:5, 118:10,
232:21,
234:17.
**build** 52:13.
**Building** 139:14,
148:20.
**built** 100:11.
**bunch** 68:14,
243:16,
243:17.
**burden** 42:3, 129:9,
130:2.
**Bureau** 39:9.
**business** 114:8,
219:20.
**buttons** 98:15.
**buy** 46:2, 145:11.

.
<C>.
**C.** 1:13, 5:7.
**calculate** 72:22,
154:4.
**calculating**
155:15.
**California** 2:17,
68:15.
**call** 24:6, 28:7,
46:15, 55:8, 60:11,
76:3, 78:19, 89:22,

99:12, 100:19,
100:20, 107:8,
109:5, 109:10,
113:12, 113:18,
113:23, 114:17,
115:21, 119:12,
134:23, 140:14,
157:15, 157:22,
184:16, 189:1,
189:6, 208:24,
223:7, 223:23,
243:1.
**called** 66:6, 12:3,
36:23, 39:9, 41:10,
41:14, 52:11,
54:22, 113:19,
114:15, 115:3,
144:10, 223:20,
228:15,
234:10.
**calling** 108:21,
119:6.
**calls** 23:13, 23:22,
39:24, 47:1, 61:2,
61:23, 61:24,
74:21, 76:18,
115:2, 115:16,
119:16, 123:21,
161:6, 161:23,
162:13, 163:19,
192:11, 225:2,
**camera** 71:21,
**cameras** 71:4, 71:5,
71:9, 71:14, 71:17,
71:18, 71:20,
71:23.
**campaign** 11:10,
12:2, 12:3, 12:17,
12:18, 13:21, 14:1,
14:7, 14:17, 17:13,
45:12, 64:11,
64:12, 69:18,
148:16, 148:19,
154:19, 154:23,
156:6, 156:21,
157:7.
**campaigns** 69:22,
75:4, 92:24,
148:17.
**Campbell** 2:27, 5:15,

5:16.
**campus** 118:9,
121:7, 121:8,
234:9.
**campuses**
233:13.
**candidate** 14:14,
64:11, 212:13,
**Candidates** 12:7,
14:2, 14:6, 14:11,
58:21, 64:12, 94:5,
98:15, 185:13,
210:24,
212:15.
**capability** 84:24.
**Capitol** 157:21.
**captured** 153:6,
168:13,
246:13.
**card** 233:5,
237:4.
**cards** 233:20,
236:14.
**cards.** 237:1.
**care** 24:11, 32:13,
40:1, 42:14, 113:5,
114:20.
**Case** 1:11, 5:10,
36:19, 66:4, 66:5,
77:6, 77:9, 83:9,
131:16, 131:21,
135:18, 218:18,
223:19, 232:14,
233:16,
233:23, 235:6.
**causes** 131:23,
132:1, 132:3.
**causing** 71:18.
**cautious** 188:8.
**caveat** 25:11,
163:10,
252:14.
**caveats** 154:2,
155:17.
**cc'd** 159:18.
**cell** 71:9.
**center** 54:9.
**centered** 156:5.
**centralize**
227:21.
**Cerny** 227:21.
**certain** 38:18, 40:8,
40:10, 40:15,
41:25, 47:23,
50:25, 69:5, 72:23,
84:13, 91:22,
127:17, 127:20,
148:17, 174:5,
**Campbell** 2:27, 5:15,
59:13, 89:23, 93:5.

262

**[Page 263]**

178:18, 181:21,
189:25, 192:18,
195:19, 204:10,
214:14, 220:10,
234:14,
234:18.
**Certainly** 17:22,
18:5, 18:13, 27:5,
40:21, 43:9, 56:19,
59:7, 62:22, 71:11,
83:18, 83:22,
129:24, 135:12,
146:15, 147:3,
149:4, 180:16,
180:20, 187:16,
213:24, 218:23,
224:8, 226:12,
242:16, 247:7.
**certainty** 125:2,
154:4.
**certificate** 234:13,
234:22.
**certified** 31:3,
**certify** 255:9,
255:17.
**certifying**
176:23.
**chain** 78:7,
235:22.
**chains** 19:4.
**chairs** 21:23.
**challenge** 18:14,
34:16, 34:25,
35:17, 66:19,
91:24, 92:10,
130:3, 143:1,
143:2, 143:13,
162:5, 182:14,
**challenged** 149:23,
143:5, 222:9.
**challenger**
143:10.
**challenges** 8:22,
51:17, 52:14, 82:8,
143:7, 182:19.
**challenging** 121:6,
142:21, 143:7.
**chance** 87:13, 151:8,
224:1, 224:13,
226:24, 235:20,

249:1.
**changed** 64:19,
118:23, 123:8,
125:13, 168:24,
178:18, 184:18,
189:8, 189:13,
205:23, 212:21,
215:8, 241:10.
**changing** 103:15,
170:18, 204:4,
212:1, 212:16,
**characterize** 49:23,
57:21.
**Charge** 57:14, 57:15,
106:18, 139:24,
140:3, 175:3,
193:14, 233:4,
233:14, 234:25,
235:4.
**charged** 50:22, 51:7,
193:13, 233:10,
234:8, 235:10.
**charging** 235:16.
**chat** 119:6.
**check** 30:1, 76:10,
99:24, 167:7,
**checklists** 51:9.
**checks** 69:20, 99:4,
93:12, 99:13,
233:5.
**chief** 30:20, 66:21,
70:22, 174:25,
175:1, 175:2,
175:6, 175:10,
175:15, 175:17,
175:18, 176:10,
177:6, 177:20,
223:10, 223:15,
251:11, 251:18,
252:10.
**chiefs** 176:20,
177:10, 183:8.
**choice** 33:7, 67:21,
132:18.
**choices** 219:19,
219:21.
**choose** 33:7, 33:8,
93:8.
**chosen** 216:17.

**chunk** 45:25.
**church** 43:13.
**Cindy** 230:2.
**circuit** 100:5.
**circulated** 27:15,
27:19, 151:25.
**circulated** 78:10,
122:19.
**circulates** 230:5.
**circumstance**
83:11.
**circumstances** 36:8,
179:12, 197:18,
204:11.
**citations** 123:24.
**cited** 249:18.
**cities** 33:11.
**citizens** 208:21.
**citizenship** 200:12,
200:25.
**City** 2:8, 118:4,
118:11, 142:16,
182:6, 182:18,
182:20, 221:7,
226:15, 226:18,
253:13.
**Civil** 2:4, 43:5,
167:3, 236:8,
236:13,
236:23.
**claimed** 116:22,
155:9.
**clarification** 144:6,
198:21.
**clarified** 115:1.
**clarify** 99:22.
**clarity** 182:19.
**clarity** 168:4.
**classify** 161:12.
**clause** 123:3.
**Clay** 158:15, 164:15,
195:20, 217:22,
239:3.
**Clayton** 2:20,
5:25.
**CLE** 30:13.
**clear** 80:18, 147:22,
164:20, 167:17,
218:18, 234:8.
**clearly** 168:23,

193:6, 214:6,
219:16.
**click** 55:8.
**close** 21:21, 37:13,
51:3, 68:3, 100:15,
227:16, 230:10,
230:16,
251:17.
**closed** 151:20.
**closely** 37:4, 100:10,
100:16, 100:18,
100:22,
174:19.
**closer** 68:7, 110:19,
111:4, 181:22.
**closing** 97:18.
**clouds** 20:15.
**clunker** 53:12.
**Coakley** 3:43, 139:1,
139:2, 140:10.
**code** 11:10, 132:22,
17:13,
**coding** 53:24.
**Coie** 2:14, 5:24.
**collect** 127:23,
128:1, 237:25,
244:22.
**collecting** 23:3,
80:6, 127:18.
**collective** 51:11,
67:16, 74:18,
88:14.
**collectively** 61:8,
75:12, 244:1.
**collects** 93:22.
**college** 39:16,
118:14, 121:3,
121:5, 121:11,
203:11, 203:13,
201:17, 203:9.
**colleges** 39:18,
195:20, 217:22,
239:3.
**column** 227:4.
**combination** 36:17,
52:2,
**combined** 13:18,
51:22.
**comes** 49:20, 55:23,
81:4, 96:16,

263

**[Page 264]**

1882.
**comfort** 134:13.
**comfortable**
184:10.
**coming** 22:5, 51:13,
60:14, 62:20,
162:22, 206:15,
228:4.
**commencing**
2:9.
**comment** 208:19,
222:15, 232:16,
222:17, 234:3.
**commentary**
91:3.
**commented**
204:17.
**comments** 47:3,
59:24, 146:16,
153:17, 153:19,
154:14, 164:6,
190:10, 192:12,
195:6, 224:20,
227:23.
**Commission** 17:9,
17:10, 17:11,
25:24, 26:1, 182:2,
221:8, 255:27.
**commissioned**
72:13.
**commissions**
146:5.
**commitment** 54:5,
157:12.
**committed**
164:23.
**Committee** 21:7,
22:11, 43:5, 80:1,
149:16, 149:22,
149:23, 167:2,
167:3, 188:5,
221:20.
**committees** 21:8,
21:23, 149:14,
228:25.
**committing**
72:8.
**commonly** 147:9,
169:5.

**communicate** 8:8,
13:10, 25:5, 29:16,
29:21, 42:15,
43:18, 44:6, 58:10,
61:14, 70:11,
75:20, 83:24, 84:2,
112:7, 129:2,
178:13.
**communicated**
37:19, 42:23,
91:17.
**communicating**
26:22, 29:19, 35:9,
43:9, 44:18, 91:19,
166:16.
**communication**
42:10, 61:16, 76:4,
78:8, 141:20,
156:11,
242:12.
**communications**
29:23, 30:1, 78:19,
79:10, 139:7.
**communities** 53:2,
84:10, 179:21,
180:7, 180:13,
180:19, 181:20,
181:21, 181:24,
243:7.
**community** 182:13,
191:15,
191:18.
**Company** 5:16.
**comparable**
141:14.
**compare** 103:9,
185:12.
**Compared** 28:14,
85:20, 85:21,
94:21, 94:22,
180:18, 219:5.
**comparing** 75:16.
**comparison**
223:24.
**complains** 75:14.
**complaint** 14:22,
14:21, 16:16,
16:17, 23:24,
36:18, 60:7, 95:24,
96:3, 187:24.

**complaints** 14:12,
25:2, 56:23, 59:24,
60:2, 60:4, 60:5,
70:15, 71:8, 74:11,
95:20, 95:21,
95:23, 96:3, 98:17,
105:18, 126:12,
135:8, 137:2,
147:22,
179:18.
**complete** 30:24,
86:9.
**completed** 32:25,
121:2.
**completing** 90:12,
184:11.
**complexities**
178:7.
**complexity** 129:7,
184:16,
193:17.
**complicated** 69:14,
72:4.
**complied** 223:11,
223:19.
**comply** 182:6,
223:23, 233:21,
233:22.
**complying** 98:25.
**computers** 62:4,
62:8, 62:13.
**conceivably**
132:6.
**concepts** 197:20.
**concern** 172:4, 183:1,
186:1, 186:10, 186:18,
203:20.
**conferences**
31:21.
**confidence** 34:5,
69:10, 69:11,
133:2, 133:3,
133:8, 199:9.
**confident** 155:18,
185:6, 185:17,
201:14.
**confidential**
151:21.
**confirm** 81:15.
**confirmation** 81:3,
81:18.
**conflict** 63:19,
63:21, 70:2.
**conflicting**
123:13.

**concerned** 48:14,

264

**Column 1**

confrontational 223:3.
confronted 222:9.
confused 75:15, 107:24.
confusing 183:8, 196:20.
confusion 75:15, 89:11, 107:13, 107:18, 107:21, 108:10, 108:14, 109:2, 109:4, 118:15, 118:17, 183:20, 183:21, 188:21, 188:23, 189:5, 249:25.
conjunction 39:6.
connected 43:13, 55:21.
connecting 42:15, 236:13.
connection 107:3, 230:10.
connections 227:16.
connotation 58:5.
consecutive 194:16.
consensus 28:5, 28:9, 156:13, 237:3, 218:13.
conservative 229:13.
consider 28:12, 69:2, 154:23, 192:16, 209:23.
consideration 38:13, 91:20.
considered 11:20, 104:1, 130:2, 131:19, 216:16.
consist 151:18.
consistency 126:7.
consistent 103:24,

106:4, 120:19, 124:25, 142:11, 152:23, 162:4, 189:18, 191:12, 191:13, 213:14, 214:8, 238:17, 239:20, 238:21.
consistently 102:25, 103:8, 103:23, 122:8, 134:5, 134:9, 175:15.
constant 34:25, 226:8.
constantly 51:8, 129:13, 170:17.
constituents 242:13.
constitutional 218:8, 218:16, 218:19, 219:14, 220:3.
constrained 84:1.
constraints 85:10.
consult 13:8, 167:19.
contact 8:19, 43:16, 44:12, 44:15, 47:7, 60:9, 60:22, 76:1, 98:7, 102:12, 102:17, 113:9, 113:13, 114:7, 114:23, 118:11, 139:9, 159:25, 161:8, 161:20, 162:17, 162:20, 163:24, 163:25, 164:5, 164:7, 167:4, 181:22, 181:25, 182:10, 182:23, 205:10, 223:12, 226:11, 227:11, 228:20.
contacted 250:1.
contacting 69:25.

**Column 2**

contacts 23:15, 61:21, 157:4, 160:8, 163:7, 235:14.
containing 253:19.
contains 15:7.
content 175:16, 249:10.
contentious 63:2.
contents 249:15.
context 183:25, 204:18.
continual 95:20, 93:18, 194:23.
continually 129:22.
continue 102:3, 19:15, 225:6, 251:22, 253:1.
Continued 4:1, 100:13, 145:8.
continues 81:12, 98:21, 183:13.
continuing 110:15, 121:11, 141:4, 222:15, 250:8.
contract 7:21, 40:25, 221:4.
copies 174:6.
copy 22:25, 79:25, 138:14, 138:18, 159:4, 239:20.
core 30:24, 34:9.
Correct 6:18, 13:3, 17:2, 20:14, 21:18, 27:9, 35:6, 36:17, 64:20, 64:23, 70:14, 77:7, 77:10, 106:2, 121:17, 121:21, 131:4, 162:5, 162:9, 173:22, 184:5, 190:8, 207:19, 214:14, 217:17, 227:3, 227:5, 234:24, 239:4.
convey 69:22, 162:16.
conveyed 89:9, 96:2, 156:13, 156:19.
convicted 131:21.
convictions 137:22.
convinced 204:5.
cooperation 170:15.
coordinated 159:25.
coordinating 167:1.
coordination 9:22.
coordinator 139:4, 166:10.
cop 140:20.
copied 84:6,

correctional 41:7.
contribute 26:20, 139:25.
contributes 36:5.
control 51:2, 171:4, 175:10, 202:13, 202:14, 221:25.
controversial 16:4, 99:5.
controversies 24:25.
controversy 16:10, 50:24.
convenient 93:8.
conversation 78:5, 112:19, 119:8, 148:13, 157:15, 157:24, 160:20, 161:4, 166:25,

174:23, 176:5, 221:6.
conversations 22:4, 120:9, 121:20, 146:12, 147:5, 160:23, 174:21, 181:5, 195:21.

**Column 3**

120:8, 120:12, 124:19, 125:6, 126:8, 126:9, 175:13, 176:24, 208:2, 209:4, 209:8, 209:17.
deadline 215:5.
deadlines 98:1, 98:8.
deference 21:1, 220:10.
define 136:5.
definite 156:8, 157:16.
definitely 236:3.
delay 49:9, 92:21.
delays 47:17, 47:18, 92:16, 92:17, 93:10, 93:14, 148:20, 151:2.
deleted 114:10.
demand 92:23.
demographic 73:2.
demographics 73:8, 72:18, 72:24, 180:14, 237:8.
demonstrate 199:5.
denied 183:12, 183:23.
Department 2:7, 2:22, 5:12, 6:1, 146:4, 182:11, 235:7, 236:7, 236:12, 236:22, 255:12.
depend 207:11.
depended 73:10.
depending 32:3, 33:12, 61:19, 207:13.
depends 9:17, 15:17, 21:5, 31:11, 57:13, 61:20, 94:5, 129:16, 140:2, 178:24.
DEPOSITION 1:20, 2:1, 5:3, 5:11, 6:17, 36:21, 76:25, 77:4, 77:19, 77:21,

211:9.
Declining 212:6.
decrease 178:21.
dedicated 16:7, 86:13, 171:12, 203:8, 209:17.
deputies 80:18, 127:22, 201:24, 202:7, 204:11, 204:23, 205:5, 205:13, 205:15, 206:8, 206:25.
deputies 127:13.
deputy 80:21.
describe 7:17, 24:13, 52:22, 53:13, 107:2, 116:12, 118:3, 229:11.
described 93:13, 152:19, 156:10, 222:14, 223:5, 242:4.
describes 109:12, 221:25, 225:18.
describing 109:11, 118:5.
description 282:11.
designate 252:11.
designated 13:9, 213:3, 64:14, 86:21.
designed 148:9.
desk 113:23, 114:2, 114:4, 114:6.
despite 16:9, 249:19.
detail 205:19.
details 19:3, 37:17.
detect 135:20, 136:2.
determination 98:23, 146:3.
determine 25:17, 33:21, 73:8, 73:15, 135:22, 137:12,

143:24, 144:4, 210:9, 210:13, 253:18, 255:10.
depositions 6:22, 7:7, 17.
detailed 33:10, 156:25, 213:11.
determining 87:6.
detriment 132:17.
develop 41:2, 41:12, 46:1, 52:5, 100:13, 157:7.
developed 12:14, 131:8, 41:7, 41:16, 53:1, 63:10, 236:23.
developing 22:7, 39:3, 53:7.
developments 23:16, 51:18, 56:15, 194:15.
develops 28:9.
device 62:6.
devices 62:9.
devil 234:19.
difference 128:13, 176:20.
differences 149:6.
different 122:1, 18:15, 22:21, 29:22, 35:19, 42:11, 57:3, 60:1, 61:17, 61:18, 92:25, 110:18, 119:20, 126:8, 131:10, 135:13, 139:18, 140:11, 147:8, 147:19, 150:25, 159:9, 164:4, 165:12, 169:9, 173:15, 176:5, 185:13, 187:19, 194:1, 194:18, 196:5, 197:18, 228:15, 229:9, 232:6, 245:17.
differently 116:5.
differing 126:15.

**Column 4 — page marker**

**Column 5**

239:20, 250:15, 250:25, 252:2, 252:10, 253:15.
corrected 122:23, 170:9.
correction 122:24.
corrections 162:5.
correctly 129:24:1, 36:20, 38:22, 69:16, 222:16, 227:1.
correspondence 167:15.
corroborate 172:25, 173:4.
corroboration 171:16, 171:21, 171:24, 172:3, 196:7, 196:11, 196:13.
cost 84:6, 174:6, 233:24.
costs 234:10, 234:22.
counsel 5:20, 10:25, 164:25, 255:18, 255:20.
count 94:9, 246:7.
counted 90:4, 108:6, 109:16, 109:24, 131:3, 131:11, 132:7, 217:14.
country 15:24, 28:17, 75:3, 179:20.
counts 144:4.
County 28, 8:9, 31:21, 48:8, 78:13, 137:5, 153:10, 153:12, 153:21, 153:22, 154:14, 154:15, 155:19, 158:2, 158:1, 159:25, 150:19.

60:1, 67:13, 73:18, 148:21, 168:9, 182:17, 212:25, 213:1, 213:12, 225:18, 228:14.
course 8:24, 9:3, 10:2, 114:8, 148:15, 168:24.
Court 1:3, 5:9, 5:17, 5:22, 6:25, 12:6, 12:7, 99:21, 100:5, 103:2, 137:8, 144:20, 159:14, 183:7, 249:19.
courts 38:3.
covered 51:10.
crack 27:19.
crazy 205:4.
create 15:10, 39:2, 51:24, 52:24, 82:7, 84:7, 147:1, 147:8, 189:4.
created 13:17, 17:8, 39:6, 39:12, 93:10, 238:14, 239:15, 239:21, 240:13, 239:24, 240:12, 243:20, 243:24, 243:25, 244:1, 244:9, 244:16, 244:18, 244:21, 244:24, 252:17, 252:18.
custody 88:13, 53:9.
customize 53:22.
creeped 95:7.
cycle 188:23, 29:8, 30:23, 31:4, 31:11, 31:15, 32:3, 32:8, 51:13, 57:3,

150:23.
CRM 53:18, 100:19.
crossed 51:1.
crowd 93:2, 175:23, 175:25, 176:4, 176:12.
crowded 68:6.
crowds 96:7.
crystalize 239:17.
cumbersome 183:9.
cumbersomeness 183:21.
curbside 96:20, 142:3, 142:8, 142:14, 142:16.
curious 199:1.
current 7:10, 22:16, 23:7, 23:17, 28:12, 27:10, 32:17, 77:18, 79:4, 81:2, 87:7, 95:16, 99:9, 145:7, 154:18, 202:21, 230:3, 236:14, 236:25, 237:3, 251:15, 251:23.
Currently 7:12, 7:17, 21:20, 100:7, 175:24, 203:15, 252:17, 252:18.

**Column 6**

<D>.
D. 3:23, 3:29, 3:32.
daily 22:2, 25:16, 228:2.
Dane 2:8, 153:10, 153:12, 153:21, 153:22, 154:14, 154:15, 155:19, 158:1, 255:3, 255:14.
data 14:8, 15:7, 15:11, 53:5, 55:9, 55:17, 55:18, 55:23, 61:1, 73:2, 99:16, 101:4, 137:25, 153:21, 154:1, 154:16, 155:16, 160:4, 160:5, 165:16.
database 52:25, 60:5, 99:17, 99:18, 161:9, 163:14.
databases 99:24.
Date 5:14, 29:12, 128:13, 129:22, 148:3, 148:5, 160:6, 170:19, 180:2, 254:3.
dated 3:13, 3:15, 3:18, 3:21, 3:24, 3:27, 3:30, 3:33, 3:36, 3:38, 3:41, 3:44, 4:5, 87:23, 106:14.
dates 119:1.
Dave 119:12, 232:21.
David 110:9, 110:13, 110:22, 116:25, 117:9, 118:5, 118:10, 119:15, 119:18, 234:12, 234:17, 226:5.
day-to-day 19:1.
days 60:14, 118:19, 118:23, 118:24, 119:25, 120:4,

difficult 185:11.
difficulties 200:19.
difficulty 40:25, 41:1, 116:18, 172:18.
digest 28:11, 61:1.
digits 82:16, 82:23.
direct 8:8, 78:21, 102:13, 171:15, 185:18, 205:10, 218:14, 239:17, 223:16.
directed 45:15, 73:19, 179:21.
directing 146:1.
direction 230:10.
directions 86:2, 86:3.
directive 71:6.
directives 73:20, 128:14.
directly 23:14, 23:18, 55:10, 68:1, 73:23, 175:6.
Director 8:25, 12:11, 18:5, 23:16, 27:14, 28:7, 154:21, 156:10, 156:18, 157:2, 160:17, 166:22, 169:1, 169:19, 183:4, 183:15, 183:23, 195:10, 196:8, 208:21, 208:23, 211:18, 221:15, 222:3, 227:7, 227:25, 230:8, 230:11, 230:13, 249:14, 249:17, 249:23, 250:7.

discipline 33:21, 70:18.
discretion 14:24, 213:16, 223:17, 251:7, 252:6.
discuss 8:20, 118:11, 200:14, 220:5, 224:5.
discussed 57:17, 153:16, 154:17, 168:24, 171:9, 209:16, 224:10, 249:22.
discussing identifying 124:4.
Discussion 10:8, 67:25, 112:22, 139:8, 155:22, 155:24, 156:7, 157:13, 172:10, 172:15, 208:24, 211:22, 220:7, 224:8, 220:17, 233:3, 248:21.
discussions 17:22, 19:5, 19:7, 19:8, 63:16, 86:17, 107:17, 112:15, 120:7, 146:8, 153:18, 154:11, 166:22, 169:14, 169:19, 183:4, 183:15, 183:23, 195:10, 196:8, 208:21, 208:23, 211:18, 221:15, 222:3, 227:17, 227:18, 230:8, 230:11, 230:13, 249:14, 249:17, 249:23, 250:7.
disability 141:24, 142:6.
disadvantages 218:7.
disagree 131:9.
disagreed 147:17, 227:25.
display 80:20.
displaying 176:22.
dispute 51:2.

disruption 50:11, 71:19, 71:25, 74:1, 74:4, 74:7.
disruptive 71:21, 71:22.
dissatisfaction 149:20.
disseminated 243:2.
distance 64:18, 65:2, 66:22, 67:7, 67:18, 73:24, 251:2, 251:4, 251:12, 251:14, 253:3.
distinction 89:14, 89:20, 107:25, 108:5, 108:21, 108:23.
distinguish 108:9.
distraction 71:24.
distractions 16:9.
distribute 206:11.
distributed 240:20, 242:5, 243:10.
District 1:3, 1:4, 5:8, 5:9, 44:10, 76:18, 135:6, 135:14, 136:25, 137:5, 148:7, 209:5.
districts 47:23, 148:3, 148:8.
disturbed 222:19.
diverse 36:1, 36:4, 180:19.
divide 13:7.
division 7:12, 7:13, 7:19, 8:7, 11:8, 12:15, 17:15, 17:16, 38:16, 38:17, 50:21, 60:10, 87:20, 87:21, 88:3, 221:4, 225:1, 237:11,

137:20, 178:23, 251:11, 251:14.
determined 33:10, 156:25, 213:11.
determining 87:6.
detriment 132:17.
develop 41:2, 41:12, 46:1, 52:5, 100:13, 157:7.

divisions 12:14.
divisive 58:4, 59:5.
DW 99:17, 100:7, 100:17, 100:22, 101:4, 101:7, 101:15, 101:22, 102:1, 102:5, 102:13, 102:17, 102:23, 103:5, 103:10, 103:18, 103:22, 104:1, 104:6, 104:7, 104:14, 104:20, 104:21, 105:2, 105:6, 105:11, 105:24, 171:3, 171:12, 173:17, 174:15, 233:6.
documentation 104:13, 104:18, 105:20, 106:1, 173:6, 199:12.
documented 88:1, 117:6.
documenting 89:4.
documents 24:7, 127:19, 128:22, 159:9, 159:12, 169:9, 165:12, 168:5, 168:11, 168:13, 168:21, 168:25, 169:4, 170:4, 174:5, 174:6, 188:13, 220:19, 239:16, 240:21, 242:25, 243:22, 243:24, 244:18, 245:24, 248:12, 248:13.
dog 34:1.
doing 9:8, 17:6, 17:7, 23:10, 44:21, 100:12, 156:11, 157:14, 175:13,

**Column footer markers**

MICHAEL HAAS

184:2, 209:14,
227:24, 229:8,
241:23,
242:11.
**done** 12:24, 16:11,
32:18, 63:24,
61:16, 69:4, 69:16,
72:13, 79:7, 85:24,
85:25, 92:14,
97:24, 100:6,
109:1, 112:11,
135:4, 140:21,
144:22, 145:12,
145:13, 145:17,
155:24, 155:1,
158:24, 169:24,
171:7, 199:5,
231:1, 237:13,
237:16, 242:25,
247:10, 247:14,
250:11.
**dorm** 200:13, 201:4,
201:11.
**double-sided**
239:4.
**down** 68:11, 76:9,
89:4, 95:15,
133:14, 149:18,
152:9, 156:8,
161:22, 212:16,
236:15.
**download** 54:24,
213:22.
**downloaded**
41:18.
**draft** 26:14, 26:16,
27:15, 27:19.
**drafted** 139:5,
249:13.
**drafts** 151:23,
151:24.
**drastic** 223:19.
**drawing** 69:9,
234:1.
**drive** 12:8:10.
**driver** 99:15, 101:20,
101:23, 103:12,
103:21, 105:22,
173:12, 173:15,
176:21, 236:25,

237:4.
**drives** 80:17, 205:8,
206:1, 206:5.
**drop-down**
161:11.
**Due** 128:12.
**duly** 6:6, 255:11.
**duplicate** 84:16,
**duration** 208:16.
**During** 19:11, 20:12,
47:9, 47:24, 48:1,
74:24, 92:11,
93:16, 102:20,
94:19, 94:20,
108:19, 109:19,
109:20, 109:22,
111:10, 111:10,
125:5, 127:25,
139:6, 141:11,
141:16, 142:4,
150:20, 177:2,
181:3, 189:24,
189:25, 190:23,
224:20, 225:3,
240:24.
**duties** 7:18, 7:24,
8:7, 11:3, 15:13,
17:6, 27:10, 34:4,
140:23, 230:4.
**dynamic** 53:18.

. . . < E > . . .

**earlier** 41:5, 78:16,
83:8, 114:1,
124:19, 126:14,
139:12, 149:24,
153:1, 153:17,
161:20, 170:24,
179:24, 186:12,
188:20, 194:8,
195:13, 196:25,
206:4, 209:17,
248:6.
**earned** 15:19.
**easier** 19:11, 53:22,
119:22, 124:3,
166:6, 173:1,
213:18.

**easily** 130:15.
**easy** 186:22.
**economic**
172:12.
**editorial** 234:3.
**educate** 19:13,
97:24, 184:3.
**educated** 129:25.
**educating** 115:12,
193:15.
**education** 35:14,
36:16, 99:1,
104:16, 115:8,
154:16, 156:6,
150:20.
**educational**
35:22.
**effect** 13:1, 38:2,
46:11, 46:16, 59:4,
65:11, 86:11,
115:15, 115:16,
115:22, 144:8,
152:20, 209:7,
209:9, 212:1,
212:10, 246:21,
248:3, 252:11,
252:17.
**effective** 17:4,
42:10, 45:7, 47:8,
112:6, 128:13,
148:3, 148:5.
**effectively** 35:18,
40:16, 68:3,
99:11.
**effectiveness**
157:17.
**efficient** 66:9,
66:13.
**effort** 69:24, 73:8,
97:5, 115:10,
137:10, 167:5,
181:15, 182:19,
228:8, 242:10.
**efforts** 103:22,
194:13,
248:24.
**eight** 53:17, 64:21,
65:2, 65:6, 65:20,
65:25, 66:7, 73:25,

151:17, 194:1,
209:21, 251:5,
251:16, 251:20,
252:12
252:17.
**eight-knot** 252:8.
**either** 8:19, 82:2,
11:16, 11:20,
14:12, 16:6, 24:21,
27:17, 30:9, 33:12,
40:25, 51:5, 58:21,
63:20, 72:1, 92:11,
100:8, 100:14,
101:23, 103:19,
107:17, 115:18,
116:23, 121:4,
123:14, 141:4,
142:25, 146:6,
146:24, 149:13,
157:13, 162:20,
168:17, 172:11,
202:11, 223:4,
236:7.
**elderly** 40:19, 41:23,
42:1, 42:16,
42:18.
**elected** 33:12, 33:15,
48:9.
**election** 110:19,
177:15.
**electioneering**
98:14, 167:23.
**electorate**
214:22.
**electors** 80:10.
**Electronic** 3:46,
22:25, 52:25,
170:22, 186:5,
186:20, 187:9,
187:12.
**electronically** 54:25,
109:15, 213:3,
213:9, 213:17,
213:18,
213:22.
**eligibility** 99:25,
123:1, 130:13,
131:20, 136:7,
142:22.
**eligible** 120:22,

1634, 178:19,
224:19.
**expected** 40:14,
47:16.
**expecting** 76:11,
83:20, 221:18.
**expense** 233:14.
**experience** 12:13,
21:7, 23:10, 28:21,
28:24, 28:12,
35:16, 48:19,
50:15, 56:2, 57:9,
58:25, 72:5, 74:18,
88:23, 123:8,
132:12, 133:15,
184:12, 184:15,
185:4, 187:19,
192:18, 212:17,
232:13.
**experienced** 10:8,
179:22.
**expertise** 9:17, 10:7,
26:19, 35:15, 88:9,
192:20.
**experts** 219:14.
**Expires** 255:27.
**explain** 22:13,
108:22, 119:19,
126:13.
**explained** 112:6,
137:6.
**explaining** 81:14.
**explains** 93:4.
**exposing** 39:4.
**Express** 10:18,
18:10, 107:13,
136:12,
216:15.
**expressed** 18:6,
21:9, 36:10, 49:1,
49:17, 101:19,
102:8, 132:25,
134:20, 146:13,
147:10, 154:7,
169:22, 195:19,
232:11.
**expressing**
108:14.
**extend** 44:8.

**extensive**
236:23.
**extra** 206:2.
**extremely** 162:18,
183:6.
**eye** 26:5, 160:18,
225:6.

. . . < F > . . .

**F.** 242:22.
**Facebook**
111:19.
**facilities** 24:12,
32:13, 42:14.
**February** 44:24.
**Federal** 2:3, 14:2,
201:7, 211:11,
232:18, 232:17,
232:13.
**fact** 30:10, 34:15,
51:19, 76:2, 76:16,
126:17, 189:3
191:20, 193:24,
222:10, 234:2,
236:6, 241:10,
251:18.
**factors** 47:21,
184:22.
**facts** 185:15.
**fair** 190:19.
**fairly** 63:19, 90:8,
113:1, 115:25.
**Falk** 12:16, 227:1,
233:4.
**fall** 18:9, 122:1,
141:17, 141:18,
179:16, 181:5,
181:15.
**familiar** 6:19, 27:3,
88:17, 88:20,
187:19, 211:12,
226:12,
222:22.
**familiarity**
192:21.
**family** 137:24.
**fan** 200:7.
**felon** 131:6, 131:8,

136:6, 144:25,
170:16, 176:4,
192:5, 200:9,
203:23, 204:4,
209:17, 252:3.
**faster** 53:21,
213:24.
**favor** 19:25, 124:24,
157:14, 197:7,
214:17.
**fax** 21:22:2.
**feasible** 65:15,
65:20, 252:14.
**federal** 2:3, 14:2,
. . .
**feedback** 9:2, 59:10,
88:2, 88:5, 90:16,
110:17.
**feel** 18:18, 36:11,
50:13, 58:1, 58:4,
75:17, 76:12, 93:7,
142:6, 184:10,
191:16, 194:20,
194:21, 205:5,
224:18, 224:23,
235:7.
**feeling** 58:6.
**fees** 223:4.
**feet** 64:22, 65:2,
65:6, 65:16, 65:20,
65:25, 66:8, 67:17,
68:2, 73:25,
209:21, 251:5,
251:15, 251:16,
251:18, 251:20,
251:21, 251:25,
252:12, 252:12,
252:13,
252:14.
**felon** 131:6, 131:8,
131:16, 136:1,
136:10.
**felony** 64:23.
**felt** 68:7, 84:1,
197:12, 199:2,

199:8, 225:19,
243:5.
**few** 21:16, 31:13
52:4, 57:24, 68:11,
97:21, 137:17,
208:16.
**fewer** 181:17,
202:12.
**field** 74:19,
194:3.
**fielded** 235:2.
**fielding** 103:3.
**figure** 156:8, 159:17,
172:16, 246:19,
249:17,
249:25.
**figures** 45:14,
160:24.
**file** 14:3, 14:7,
22:23.
**filed** 49:1, 64:20,
232:18.
**filing** 23:34, 98:8,
fill 174:4.
**filled** 26:4.
**final** 222:1, 223:6,
252:20.
**finalized** 15:21,
152:5.
**finance** 11:10, 12:2,
12:3, 12:17, 12:18,
13:22, 14:7, 14:17,
17:13, 148:16,
149:8.
**financial** 14:18,
145:25, 216:1.
**financially**
255:20.
**financing** 12:7,
14:1.
**find** 34:15, 44:3,
55:1, 55:3, 103:18,
192:24, 193:16,
193:18, 240:6,
241:17, 242:13,
243:15.
**fine** 57:8, 158:20.
**finger** 62:1.
**fingers** 51:1.
**finish** 6:28, 71:0,

269                                    271

143:12, 153:24,
169:9, 169:14,
183:12,
183:22.
**eliminate** 193:9,
**eliminated** 204:10,
205:12, 212:21,
216:9.
**eliminating** 196:13,
201:23, 202:6,
204:23, 211:4.
**elimination** 195:3,
195:5, 196:10,
204:15, 206:24,
210:19.
**elsewhere** 86:8,
245:19.
**Emails** 3:20, 3:23,
3:29, 3:32, 3:40,
74:21, 106:12,
114:25, 231:3.
**embedded** 70:5.
**emergency** 67:14,
158:6, 158:8.
**emphasize** 143:12,
162:5, 170:8.
**employee** 255:18,
255:19.
**enacted** 18:21,
20:11, 22:14,
115:11, 144:24,
198:5.
**enacting** 19:25.
**enactment**
125:16.
**encapsulate**
186:21.
**encourage**
176:8.
**encouraged**
243:3.
**encouraging** 90:7,
228:10.
**end** 11:24, 62:19,
82:7, 86:19, 90:20,
126:19, 165:23,
187:4, 213:1,
236:17, 240:7,
240:9, 252:22.
**ended** 86:18, 100:4,

137:1, 137:24,
222:16,
241:11.
**ends** 191:21,
233:12.
**enforce** 7:23, 13:21,
198:8.
**enforcement**
135:15, 222:2,
223:7, 223:13,
223:16,
223:24.
**enforcing** 99:3.
**English** 248:10.
**enjoy** 15:16.
**enjoyed** 15:22.
**enough** 25:18,
29:15, 68:3, 68:5,
85:5, 181:6,
185:16, 208:14,
208:15,
208:18.
**ensure** 142:10.
**ensuring** 102:23,
176:20.
**entails** 49:5.
**enter** 113:14,
163:14.
**entered** 163:12.
**enters** 161:9.
**entire** 11:7, 22:22,
27:21, 32:8, 40:7,
40:12, 42:20, 46:8,
46:24, 224:25,
225:9.
**entitled** 186:5.
**entity** 56:5.
**entry** 55:17, 55:18,
137:25.
**equating** 108:11.
**equipment** 92:11,
96:22, 96:23,
96:25, 97:5,
162:19,
162:21.
**equivalent** 62:9,
62:11, 62:24.
**ERRATA** 254:1.
**error** 137:25, 216:8,
216:10.

216:13.
**errors** 55:18,
205:6.
**especially** 12:17,
43:16, 88:6,
163:16, 167:25,
176:17.
**Essentially** 12:24,
25:19, 26:22,
223:7, 223:13,
223:16.
**establish** 208:17.
**established** 120:4,
120:21, 125:5,
251:4.
**estimate** 34:22,
153:20, 247:2.
**et** 1:7, 1:13, 5:6, 5:7,
254:4.
**ethically** 36:4.
**Ethics** 7:18, 11:11,
13:17, 13:23,
14:17, 17:9, 17:11,
17:13, 17:15.
**ethnic** 179:21.
**ethnically** 36:1.
**evaluate** 38:17,
76:4.
**evening** 190:4,
199:4.
**event** 95:1.
**events** 16:4, 18:16,
24:19, 247:3.
**eventually** 114:25,
168:8, 169:3,
198:10.
**everybody** 16:5,
27:25, 42:6, 63:24,
134:8, 166:5,
172:1, 192:22,
199:4, 248:1.
**everyone** 224:18,
224:23.
**everything** 50:23,
51:9, 69:4, 146:6,
145:16, 148:15,
169:3.

**Exactly** 65:9, 99:25,
146:22, 155:20,
159:11, 182:17,
220:16, 225:8.
**EXAMINATION** 3:3,
6:12, 250:20.
**examined** 229:4.
**example** 20:22
22:21, 25:23,
26:13, 40:19, 43:4,
47:15, 59:24, 76:4,
78:18, 84:9, 101:8,
121:24, 128:18,
130:5, 162:7,
180:14, 196:24,
203:8, 243:13.
**examples** 87:25,
88:8.
**excellent** 16:11.
**except** 124:15.
**exception** 83:12,
115:17, 124:5,
197:16, 253:3.
**exceptional**
83:11.
**exchange** 50:2,
224:18, 225:5.
**exclude** 13:5.
**executive** 182:3,
221:6.
**Exhibits** 229:12,
241:2, 248:4,
248:8.
**exist** 48:22, 48:25,
224:24, 246:16.
**existing** 146:17.
**expand** 168:11.
**expanded**
209:11.
**expect** 22:6, 56:20,
75:13, 84:19,
111:10, 163:3.

192:2,
**finished** 6:28, 79:20,
110:4, 117:23,
165:5, 186:7,
222:19, 239:6,
firm 16:24, 39:6,
40:14, 41:7, 41:9,
41:10, 46:1,
243:21, 243:24,
244:16, 244:18,
244:19,
244:25.
**first** 5:20, 6:6, 27:15,
27:19, 29:11,
30:25, 35:8, 37:11,
40:6, 63:7, 101:25,
127:8, 131:9,
169:17, 203:20,
223:25, 224:21,
224:22, 227:8,
232:25, 244:3,
244:16, 244:18,
250:17.
**follow** 70:22, 104:23,
170:6, 236:22,
250:17.
**followup** 9:5, 60:16,
113:16, 157:25,
169:17, 203:20,
250:18.
**followed** 49:7,
69:12, 105:19,
117:10, 157:14,
157:18, 224:2.
**followers** 111:24,
111:25.
**following** 34:17,
128:14, 136:22,
152:6, 167:10,
230:12,
240:16.
**follows** 6:10.
**Fond** 118:4,
118:8.
**food** 104:14.
**forefront** 48:3,
115:5.
**fixed** 80:23,
113:6.
**flexibility** 65:23,
195:6, 196:3.
**flip** 133:11,
135:13.
**flustered** 52:9.
**flyers** 39:7.
**focus** 12:16, 121:19,
46:6, 51:14, 52:6,
58:11, 63:11,
71:25, 85:22,
181:4, 187:10,
191:22, 194:6.

1922,
**focused** 12:11, 12:21,
32:10, 34:12, 53:7,
62:12, 95:3.
**focuses** 166:15.
**focusing** 75:4.
**folder** 23:1.
**folks** 6:27, 32:19,
172:11, 227:5,
244:16, 244:18,
244:19.
**foregoing** 255:9,
**forget** 1:29:20, 130:5,
131:20.
**forgot** 115:20.
**formally** 65:11,
197:3.
**format** 166:22.
**former** 6:26, 92:4,
219:13.
**forms** 174:4, 205:6,
205:23,
206:12.
**formula** 178:22,

**forth** 96:10, 149:25,
150:6, 234:18.
**fortunately** 75:9.
**forwarded** 90:20.
**found** 136:25, 177:6,
186:12,
186:23.
**four** 7:21, 82:24,
121:14, 152:1,
175:13, 251:15,
251:25,
253:19.
**four-year** 18:7,
94:4.
**fourth** 107:10,
123:2.
**frame** 114.
**framed** 78:20.
**framework**
85:12.
**Francis** 112:17,
114:1.
**Francisco** 2:17.
**frankly** 129:11,
186:18.
**fraud** 58:22, 89:7,
135:1, 135:8,
135:12, 135:20,
136:3, 136:4,
136:16, 138:2,
183:13.
**free** 133:24, 140:1,
173:7, 173:8,
174:13, 174:16,
233:6, 234:13,
234:21, 235:7.
**Freedom** 80:21.
**Freelance** 5:18,
248:6.
**game** 72:25.
**generally** 7:22
17:15, 19:8, 23:5,
24:24, 36:6, 29:17,
47:21, 59:4, 60:17,
65:25, 74:16,
82:12, 94:13,
118:17, 120:20,
122:4, 138:17,
204:3, 226:12,
232:5.
**Gerald** 1:13, 5:7,

**fruition** 50:8.
**fruit** 33:8, 178:17,
192:2.
**fully** 46:16.
**function** 55:8,
55:19.
**functional** 107:1.
**fundamentals**
52:12.
**funded** 86:24,
235:3.
**funding** 87:2, 87:8,
145:10, 145:16,
146:6, 154:18,
156:5, 158:16,
158:25, 159:3.
**funds** 45:16, 52:23,
83:19, 85:14,
86:13, 86:18,
86:21, 157:7,
157:10, 158:9,
158:11, 193:1.
**future** 54:15, 61:10,
96:11, 169:25,
170:9.
**FYI** 221:9.

. . . < G > . . .

**G.** 226:11.
**game** 6:20.
**garage** 65:9.
**gauge** 45:4.
**gavel** 194:21.
**gave** 44:11, 88:4,
197:15, 199:18,
248:6.

270                                    272

254:4.
gets 55:14, 58:14, 206:8.
Getting 17:19, 17:24, 31:15, 35:10, 63:24, 67:9, 92:19, 103:12, 104:2, 142:17, 150:9, 173:1, 173:5, 173:23, 174:5, 182:20, 182:21, 195:6, 211:7.
give 7:6, 12:21, 67:23, 68:14, 74:25, 83:9, 84:14, 84:22, 90:9, 138:13, 143:6, 189:6, 220:9, 222:12, 223:5, 223:10, 223:22, 225:4, 247:25.
Given 21:1, 26:25, 48:19, 50:15, 59:12, 104:20, 113:3, 129:3, 129:4, 129:6, 129:7, 132:10, 145:18, 152:3, 155:23, 170:12, 172:17, 178:7, 180:23, 180:24, 183:1, 184:15, 184:17, 185:1, 185:4, 189:22, 192:22, 201:20, 221:25, 247:25.
gives 135:21.
giving 111:17, 129:13.
glean 166:14.
gleaned 202:6.
glitches 55:25.
goal 106:2.
GOP 231:19.
Gotcha 199:6.
gotten 171:20, 171:23.

governing 33:10, 33:13.
Government 7:11, 10:25, 63:6, 99:8, 233:15.
governmental 168:13.
governments 206:11.
gray 25:12.
great 236:18.
greater 30:6, 168:4.
ground 20:12, 75:9, 162:1.
Group 9:11, 28:5, 29:9, 43:12, 67:4, 72:23, 110:11, 168:18, 168:19, 183:16, 214:10, 222:8, 222:13, 228:11, 228:17, 228:19, 231:12, 232:14, 238:2, 243:14, 243:19, 246:4.
groups 10:11, 10:15, 25:1, 40:4, 40:17, 41:23, 41:25, 43:4, 43:6, 43:5, 43:18, 44:1, 44:2, 44:3, 44:14, 64:2, 127:4, 145:9, 148:18, 172:20, 235:3, 236:4, 236:10, 236:13, 236:19, 236:24, 237:3, 237:8, 237:9, 238:14, 238:15, 238:16, 246:15, 247:1, 247:11.
guarantee 117:11.
guaranteed 18:23.
guardians 69:3.
gubernatorial 94:12, 160:6.
guessing 45:23.

207:4, 207:5, 222:23, 239:15, 241:5, 247:15.
guidance 14:10, 118:12, 128:3, 128:14, 128:17, 142:10, 142:19, 168:4, 253:1.
guide 32:6, 239:20.
guy 57:14, 107:15, 160:4, 216:11.
guys 20:12, 20:25, 230:15.
Gwen 4:4, 249:9.

<H>.
HAAS 1:20, 2:1, 3:12, 3:15, 3:23, 3:29, 3:32, 3:36, 3:43, 3:46, 5:2, 6:4, 6:14, 76:25, 77:4, 77:6, 77:25, 106:5, 110:3, 116:7, 117:22, 138:12, 143:24, 144:5, 151:7, 165:4, 165:17, 184:4, 187:18, 210:9, 210:14, 212:23, 243:14, 248:25, 250:22, 253:19, 254:2, 255:10.
half 54:3, 195:25.
hammer 115:15.
hand 87:11, 220:17, 220:22, 226:21, 230:24, 235:19, 237:14, 255:21.
handed 165:4, 186:3, 224:12, 248:25.
handful 87:21, 137:2, 137:8, 147:9.
HAVA 83:19, 99:4, 99:12, 99:13, 99:23, 100:4, 229:5.
he'll 233:3.
heading 128:25, 181:4.
heads 225:4.

186:3.
handle 38:1, 63:15, 98:19, 107:8, 142:17, 151:20.
handled 216:4.
handles 137:7.
handling 103:5, 105:15.
handy 39:13.
Hanson 227:21.
happen 19:16, 23:20, 75:13, 109:23, 117:13, 135:13, 170:25, 188:4.
happened 18:16, 75:11, 79:12, 84:12, 92:22, 113:8, 117:12, 123:18, 170:8, 229:24.
happening 75:9, 75:11, 76:6, 81:23, 169:24, 207:14, 207:15, 225:5, 225:8.
happens 56:14, 63:4, 81:14, 128:1, 146:14, 146:17, 146:20, 147:4.
harass 222:15.
hard 34:10, 44:23, 45:3, 45:3, 71:9, 92:21, 170:1, 230:19.
harder 119:22.

273

124:3, 128:15, 152:13, 152:21, 249:20.
implemented 8:21, 12:9, 22:15, 25:6, 38:19, 38:22, 40:2, 42:6, 44:24, 49:9, 47:14, 48:19, 56:19, 58:14, 72:10, 107:5, 172:22.
implementing 8:11, 85:19, 91:9, 184:1.
important 89:14, 95:24.
impose 14:18.
impossible 131:16.
improve 58:8, 167:16, 174:24, 175:16, 176:3, 177:13.
improved 97:11, 175:21.
improving 24:17, 233:9.
in. 27:1, 94:6, 109:2.
inactivated 81:21.
inactivated. 81:5.
inactive 81:5.
INC. 1:7.
incident 159:5, 222:8.
incidents 115:7, 147:10, 222:24, 225:2.
inclined 194:22, 204:7.
include 206:1.
included 128:20, 158:10, 187:15.
includes 30:2, 155:20, 182:2.
including 87:22, 90:17, 245:9.
Incorporate 90:17, 245:9.
Incorporated 5:6,

128:19.
incorrect 27:7, 104:19, 123:7, 249:20.
increase 49:4, 49:11, 82:22, 87:3, 133:19, 134:1, 141:11, 141:16.
increased 61:16, 86:4, 118:19, 178:6, 178:12, 207:25.
increasing 178:8.
indicate 150:25, 150:25, 164:12, 235:3.
indicated 128:14, 134:13, 157:5, 161:20, 180:2.
indicates 123:3, 153:20, 235:6, 249:24.
indicating 32:22, 116:19, 117:12, 160:7, 221:20.
indication 139:17, 233:9.
individual 17:22, 21:6, 36:7, 37:13, 38:15, 59:11, 64:9, 64:13, 72:20, 80:13, 95:23, 95:25, 97:7, 102:15, 104:23, 125:3, 130:1, 147:6, 173:8, 208:23, 212:13, 222:6, 223:22, 230:13.
individually 44:5, 75:11, 234:9.
inequities 39:24, 113:14, 160:11, 161:14, 163:2.
inference 20:13.
influence 203:15, 203:23.
influenced 193:23.
inform 168:18, 178:9, 178:12, 207:25.
informally 222:6, 223:15, 223:5, 229:16.
informed 75:11, 154:22, 160:17.
infrequently 246:25.
initial 110:9, 246:25.
initially 44:24, 46:14, 100:11, 102:9, 102:22, 122:25, 123:18, 168:9, 169:1, 187:25.
initiate 16:15, 16:19, 73:22.
initiated 16:18.
initiative 17:22, 246:10.
initiatives 11:13, 60:16, 246:9.
injunctions 183:7.
input 8:19, 10:15, 24:7, 25:6, 25:7, 26:14, 27:6, 27:16, 27:20, 41:14, 41:20, 45:14, 55:9, 67:9, 122:18, 152:4, 208:19, 210:6, 210:8, 249:10.
inquiries 39:24, 113:14, 160:11, 161:14, 163:2.
inquiry 161:12.
insert 92:10.
inserting 234:19.
insist 223:1.
inspector 70:22, 115:20, 134:14,

209:23, 222:22, 228:21, 229:15, 231:13, 237:9, 238:12, 239:2.
inspire 199:9.
instance 22:2, 5:4, 14:1, 19:24, 24:10, 24:23, 34:11, 42:23, 82:18, 112:12, 220:6, 223:15, 223:9, 229:16.
instances 10:14, 63:18, 71:8, 83:25.
instantly 101:3.
Instead 119:12, 192:1, 223:3.
Institute 1:7, 5:6.
institutions 201:16.
instructions 86:12.
intact 100:16, 100:24.
integrity 199:9.
intent 217:7, 217:8, 229:4.
intended 9:6, 25:14, 39:20, 42:20, 159:13.
intending 117:8.
intent 53:21, 136:15, 245:8, 247:24.
interlineal 136:17.
interact 13:24.
interaction 50:2, 66:16, 154:15.
interactive 54:12.
interest 24:10, 63:4, 69:15, 128:2, 128:3, 132:3, 191:3, 204:22, 226:20, 214:22, 228:23.
interested 24:16, 24:20, 69:1, 69:18, 75:23, 94:6, 134:1,

275

hear 49:19, 61:8, 61:17, 66:1, 66:16, 66:19, 68:4, 76:14, 76:16, 95:22, 96:13, 97:7, 98:9, 103:16, 122:5, 224:20.
heard 49:1, 49:17, 58:23, 59:8, 67:25, 68:1, 68:5, 93:3, 96:24, 97:16, 98:13, 101:19, 102:21, 104:10, 104:12, 105:18, 137:4, 152:23, 153:1, 181:16, 192:11, 201:16, 205:22, 213:10, 222:20.
hearing 74:21, 76:7, 76:11, 119:18, 127:2, 157:22, 162:3, 162:15, 180:9, 181:19, 188:5, 195:7, 198:21, 235:15.
hearings 8:25, 146:15, 149:13, 207:14, 228:25.
heavy 161:21.
Hein 3:26, 112:15, 112:19.
held 135:15.
Help 52:23, 83:10, 97:9, 113:23, 114:2, 114:3, 114:4, 114:6, 136:2, 142:1, 176:17, 178:1, 184:3, 194:24.
helped 42:25.
helpful 168:14, 168:20.
helping 22:17, 38:14.
helps 27:25.

91:2.
hereby 255:9.
hereunto 255:21.
high 16:3, 24:23, 45:2, 74:23, 92:15, 92:22, 93:24, 94:1, 94:7, 162:18, 178:4, 179:3, 180:24, 184:13, 201:25, 202:8, 204:12, 221:8.
higher 102:17, 111:11, 111:12, 111:13, 180:1.
highest 94:4, 94:10, 94:18, 94:21, 94:24.
highlight 71:11, 196:18, 202:20.
highlighted 207:21.
hire 33:20, 84:15.
hiring 33:18.
historically 37:6.
history 27:23.
hit 61:20, 246:14.
Hmong 248:16.
hoc 162:2.
hold 55:19, 106:16.
home 24:11, 118:8, 121:4, 121:10, 121:12, 121:15.
Hon 4:4.
honest 211:25.
Hope 53:19, 53:23, 53:25, 54:13, 111:12, 111:13.
hopefully 165:1, 220:19, 222:11.
hoping 185:25.
host 140:19.
hosted 139:21.
hosting 155, 140:2.
hot 90:5, 99:4.

Ids 39:13, 39:15, 101:9, 101:11, 101:12, 101:15, 104:2, 104:4, 172:13, 173:7, 174:13, 217:13, 233:18, 236:5, 235:7.
imagine 200:21.
immediate 128:12.
immediately 34:12.
impact 18:19, 19:2, 19:6, 20:23, 29:8, 44:22, 45:4, 56:6, 57:10, 57:17, 58:18, 58:19, 72:5, 72:10, 72:15, 73:4, 73:9, 73:15, 74:14, 75:6, 75:7, 79:4, 85:17, 89:13, 91:5, 99:25, 184:12, 184:24, 190:17, 190:19, 204:4, 206:18, 208:18, 216:1, 235:19, 236:4, 245:16.
impacted 56:25.
impacting 229:4.
impacts 37:11, 57:16, 57:21, 185:8, 190:22, 192:10.
Impartial 124.
impersonation 135:18.
implement 9:4, 20:11, 25:10, 29:13, 38:14, 45:18, 83:10, 83:13, 172:9, 172:17, 219:10, 253:7.
Identified 3:10, 4:2, 13:2:17, 141:3, 14:7:4, 150:18, 188:11, 188:27, 191:11, 192:7.
identify 21:12, 52:14, 104:22, 172:19, 203:4, 227:25.
identifying 83:5, 81:11, 83:5, 236:24.
implementation 9:20, 9:21, 38:16, 44:18, 46:15, 46:19, 46:25, 47:10, 47:25, 48:2, 57:4, 102:23,

274

156:25, 157:6, 158:16, 164:18, 166:12, 205:8, 229:1, 255:20.
interesting 110:17, 111:6.
interests 209:25, 209:13, 214:23.
interfere 66:25.
internalize 37:14, 231:16.
internalized 177:7.
internally 19:7, 145:17.
interpret 11:21, 22:18, 25:14.
interpretation 25:19, 100:4, 123:8, 123:23, 124:1, 124:11, 253:6.
interpreting 107:4, 148:1.
intimidate 224:6.
intimidated 223:21.
introduce 5:20.
introduced 22:1, 38:12, 78:10, 90:23, 203:22.
introduction 150:24.
investigate 16:13.
investigation 16:16, 16:20, 117:3, 148:17.
invitations 44:13.
85:7.
invite 32:4, 140:5, 145:9.
invited 39:10, 43:8, 43:21, 44:16, 241:13, 246:3.
invites 246:8.
involved 7:24, 10:6, 11:18, 12:1, 12:10, 15:12, 16:3, 19:5, 22:17, 24:3, 28:17,

28:19, 37:8, 37:17, 37:24, 38:11, 38:16, 39:3, 53:8, 53:9, 63:16, 88:16, 93:21, 106:23, 140:17, 142:15, 146:25, 149:20, 167:6, 181:11, 211:8, 228:2, 223:15, 231:14, 236:5, 236:6, 242:10.
involves 29:22, 30:3, 49:6.
involving 51:18, 94:8, 99:7, 222:24, 223:15.
<J>.
Jacobs 167:5, 167:13.
January 237:23.
Jean 117:15.
Jo 204:4.
job 16:11, 20:10, 21:20, 22:13, 23:7, 25:23, 25:10, 26:21, 33:16, 33:17, 45:7, 58:10, 57:1, 58:9, 84:14, 92:13, 111:14, 175:13, 181:9, 203:14, 219:10.
jobs 190:20.
journalistic 26:9.
Judd 117:15.
judge 37:6, 104:8.
judges 92:4, 219:13.
judgment 67:16, 129:15, 239:9.
July 17:17.
June 17:4, 55:21, 164:9.
jurisdiction 17:12, 60:6, 73:12.
jurisdictions 11:8, 25:23, 27:4, 27:20, 207:5.
Justice 27:22, 51:2, 62:12, 124:1, 182:11, 255:12.
justification 120:16, 148:23, 150:3.

<K>.
K. 4:5.

Kaul 4:9.
keep 52:21, 90:22, 222:3, 25:21, 26:5, 51:1, 60:3, 62:1, 72:9, 72:17, 75:10, 110:14, 128:4, 128:5, 129:3, 161:25, 159:8, 203:5, 203:10, 220:3, 225:6, 242:10.
keeping 160:18, 170:19, 206:24, 246:22.
keeps 52:1.
Kennedy 4:5, 8:25, 12:11, 18:5, 23:16, 35:25, 27:4, 27:11, 27:14, 28:7, 28:16, 36:21, 122:11, 154:21, 156:10, 156:18, 156:24, 157:2, 160:17, 207:5, 207:10, 207:12, 217:18, 218:2, 220:2, 220:18, 220:22, 221:3, 224:11, 224:12, 226:22, 230:24, 232:18, 238:13, 249:8, 249:13, 250:2, 250:3.
kept 23:5, 70:10, 105:6, 114:8, 115:15, 199:25, 247:5.
Kevin 8:25, 18:5, 23:16, 26:25, 27:4, 27:20, 207:21, 207:23.
key 236:24.
kick 25:25, 50:11, 51:8, 57:12, 62:6, 112:23, 147:20, 181:13, 187:14, 205:18, 207:5, 228:19.

276

## 277

kinds 23:20, 61:2.
knowable 185:9.
knowing 45:5, 49:10, 116:3, 117:8, 154:9.
knowledge 27:23, 48:20, 72:5, 88:22, 132:12, 133:15, 143:11, 185:4, 187:18, 192:19, 212:17, 238:7.
known 51:3, 147:9, 231:9, 231:10.
Knudson 149:2.
KW2 41:10, 41:16.
.
<L>.
L. 2:13, 3:12.
labeled 100:21.
labor 17:17.
Lac 118:4, 118:9.
lack 154:18, 184:12, 192:18.
lady 150:13.
laid 104:13.
landlords 206:11.
Lane 117:14, 117:18.
language 65:10, 65:12, 65:13, 65:14, 123:13, 124:2, 182:8, 248:9, 248:14, 248:16.
lapsed 86:19, 252:22.
Large 36:11, 36:15, 37:2, 92:8, 92:8, 96:7, 123:11, 178:5, 194:11.
largely 35:12, 238:20.
larger 92:25, 178:15, 178:19.
largest 76:10, 226:7, 226:9, 226:18.

last 8:1, 10:24, 30:5, 31:13, 31:14, 31:25, 43:10, 51:19, 52:4, 53:7, 53:16, 53:17, 57:24, 80:4, 81:1, 82:2, 82:24, 97:21, 98:2, 110:21, 125:9, 130:9, 136:14, 158:5, 185:20, 205:22, 210:15, 236:12.
lastly 143:14.
late 55:20, 185:25.
later 69:24, 109:16, 125:23, 209:3, 241:6, 243:23.
later. 158:7.
Latinos 42:1.
launched 51:20, 53:1, 55:21, 55:24.
lawful 70:22, 223:10.
laws 229:25.
lawsuit 77:20, 99:6, 99:8, 99:19, 100:5, 100:6.
lawyer 6:17, 13:2, 13:5, 227:1.
Lawyers 30:14, 43:4, 167:3.
lay 178:13, 251:13.
layer 183:8.
laying 97:14.
layout 65:24.
Lazich 150:1, 157:3.
lead 12:8, 12:10, 12:22, 78:5, 92:15, 107:1, 202:12.
leading 60:11, 128:23, 141:8, 147:7, 150:23, 164:13.
League 44:14, 153:9, 153:14.

153:17, 246:17.
lean-to 68:17.
learn 136:21, 247:20.
learned 200:22.
learning 34:12, 93:18.
learns 35:19.
least 28:8, 32:2, 78:10, 110:23, 120:4, 123:22, 132:18, 134:21, 157:4, 157:8, 157:23, 171:14, 192:5, 196:24, 205:11, 207:23, 219:17, 231:13.
leave 34:24, 36:14.
leaves 228:7, 252:6.
leaving 213:15.
led 64:2, 142:18, 202:14.
left 59:14, 157:9, 177:24, 181:13, 222:11.
Legal 5:16, 11:14, 11:16, 14:10, 77:13, 115:13, 167:1, 219:6, 234:1, 234:20.
legislation 8:10, 8:11, 8:15, 8:18, 8:21, 9:3, 10:12, 11:20, 17:8, 18:15, 20:23, 22:18, 24:21, 25:8, 25:20, 27:24, 40:22, 78:17, 78:23, 79:11, 79:12, 79:14, 87:9, 127:7, 146:1, 149:21, 172:23, 188:13.
legislative 11:19, 17:22, 19:9, 19:23, 20:2, 20:24, 21:22.

21:25, 22:4, 22:3, 32:15, 42:12, 45:17, 48:6, 50:3, 58:12, 77:13, 80:1, 84:1, 124:23, 146:13, 151:2, 197:11, 198:16, 204:19, 213:2.
legislator 8:18, 21:6, 42:23, 47:7, 196:8.
legislators 17:23, 20:15, 44:10, 95:9, 120:7, 146:12, 146:16, 147:6, 148:22, 148:25, 149:6, 149:9, 149:15, 150:25, 211:19, 213:4.
Legislature.
lend 133:2.
lends 89:9, 69:11.
lens 9:8, 9:11, 9:13, 204:3.
less 18:22, 53:11, 53:23, 66:13, 74:6, 201:3, 229:9, 244:17.
Letter 4:4, 249:7, 249:11, 249:13, 249:15, 249:24, 250:4.
letting 214:23, 214:24.
level 9:21, 9:24, 15:2, 25:15, 35:14, 69:9, 75:19, 76:6, 102:17, 104:21, 116:5, 179:15, 226:8.
levels 178:4, 178:12.
libraries 240:7, 243:5, 243:10.
library 240:10.
license 99:15, 101:21, 101:23, 103:13, 103:21.

## 278

105:22, 173:12, 173:16, 174:3, 176:21, 176:22, 237:4.
license-identificatio n 171:3.
licenses 34:1, 236:25.
life 166:5.
liked 183:7.
light 51:4.
likely 10:13, 10:16, 169:17, 183:11, 243:6, 243:22.
likes 158:15.
limit 70:12, 82:15, 82:23, 195:16, 195:22.
limitations 66:18.
limited 58:25, 83:4, 13:24, 143:1, 217:13.
limits 252:23.
Lind 235:14.
line 93:5, 93:9, 96:7, 102:13, 102:23, 103:5, 103:11, 106:11, 114:3, 120:17, 121:22, 122:1, 122:6, 138:20, 221:13, 221:16, 235:24, 238:12.
lines 47:15, 47:17, 47:18, 47:20, 47:24, 48:17, 92:25, 93:6, 93:14, 93:16, 93:22, 97:13, 146:1, 178:14, 178:21, 179:4, 179:19, 179:21, 179:24, 180:1, 180:3, 180:9, 183:10, 183:21.
link 185:18.
links 23:4.
USA 1:24, 2:5, 5:17, 255:7.
list 31:16, 43:24,

69:21, 76:9, 87:24, 88:7, 88:9, 88:11, 88:13, 88:14, 88:23, 89:4, 95:15, 93:16, 132:21, 139:7, 140:24, 149:18, 154:2, 161:2, 167:9, 168:8, 168:10, 168:25, 169:4, 169:11, 200:24, 201:4, 236:18, 237:6, 246:25, 247:4, 247:6.
listed 132:10, 140:16, 141:2, 149:23, 150:18.
listen 47:5, 119:20.
listing 139:5, 163:6.
lists 51:25, 98:20, 135:25, 136:1, 200:13, 201:11.
literature 238:1, 238:7.
litigation 11:18, 12:18.
little 7:9, 10:22, 10:23, 21:14, 49:24, 52:6, 52:9, 61:7, 61:20, 89:13, 95:1, 123:1, 124:3, 129:4, 131:10, 144:6, 163:10, 176:19, 188:7, 193:24, 196:7, 208:3, 209:19.
live 30:9, 139:22, 140:9, 192:23, 193:6.
lived 176:23.
lives 81:15, 81:19.
LLP 2:14.
lobby 228:1.
lobbying 11:10,

13:22, 14:17, 17:14.
lobbyists 14:11.
locally 241:19.
located 84:18, 123:6.
location 85:13, 90:3, 106:2, 120:22, 125:3, 135:23, 136:12, 162:22, 176:24, 179:13, 225:14, 240:10, 251:5.
locations 92:9, 139:19, 240:8.
log 60:4, 60:9, 60:11, 113:10, 113:13, 113:14, 114:23, 143:14, 160:1, 160:2, 161:8, 161:10, 161:21, 163:25, 164:5, 164:8.
logistically 182:20.
logs 114:7, 159:5, 186:2.
Long 27:22, 47:15, 47:20, 47:24, 56:2, 93:14, 93:16, 95:12, 95:14, 97:13, 128:3, 159:23, 179:4, 179:19, 179:21, 179:24, 183:10, 181:23, 183:8, 221:16, 229:2, 252:13.
longer 47:17, 47:18, 150:5, 120:17, 120:21, 121:9, 178:9, 180:1, 184:19, 215:13, 215:20, 182:20.
looked 116:8, 135:1.
Looking 38:12,

82:13, 107:13, 135:12, 160:16, 162:24, 164:2, 166:4, 186:7, 230:1, 233:21, 244:14.
looks 78:20, 79:13, 82:14, 135:22, 164:3, 165:24, 175:22, 236:9.
Lori 78:12.
lost 185:5, 131:6.
loud 68:5.
love 84:15.
loves 160:4.
lower 94:14, 94:16.
lumped 206:9.
Lunch 143:20, 143:25.
.
<M>.
M. 3:12, 3:15, 3:23, 3:29, 3:32, 3:36, 3:43.
machine 68:18.
Madison 28, 2:24, 5:13, 11:18, 41:10, 93:4, 155:20, 180:10, 180:18, 255:13.
Magney 32:20, 196:16, 196:17, 151:24, 200:4, 230:1, 230:5.
mail 54:25, 55:9, 108:1, 109:8, 109:13, 116:24, 127:20, 128:9, 230:7.
mailed 191:1, 249:18.
mailing 81:3, 81:11, 81:18, 81:19, 128:20.
Main 2:7, 2:23, 5:13, 13:2, 13:5, 49:16, 51:12, 51:14, 53:8,

## 279

109:18, 127:15, 148:15, 148:22, 149:2, 150:18, 186:22, 239:25, 165:3, 186:2, 186:4, 220:17, 220:22, 226:22, 239:2, 248:24, 248:25.
mainly 54:8.
maintaining 15:6, 106:22, 111:19.
major 12:3, 47:24, 51:21, 76:6, 110:19, 111:4, 111:8, 111:10.
majority 147:4.
man 224:1, 224:3, 224:6.
manage 7:19, 15:11, 51:22, 92:18.
management 8:13, 15:9, 175:23, 175:25, 176:4, 176:13.
managing 32:6.
mandate 151:4, 172:17, 172:21, 172:24.
mandated 179:8.
mandatory 30:16, 30:17, 148:12.
manner 185:14.
manual 24:12, 24:18, 32:7, 32:9, 32:13, 32:14, 140:8, 144:4, 84:7.
manuals 24:8, 32:5, 32:12, 32:16, 84:5.
March 141:7, 184:22, 247:12.
margins 216:3.
Marian 153:9.
mark 77:24, 210:23, 212:14.
marked 70:9, 78:2, 79:18, 87:12, 89:25, 106:7, 110:2, 112:10, 116:6, 116:7.

117:24, 132:11, 138:1, 138:11, 151:6, 151:7, 158:21, 158:22, 165:3, 186:2, 186:4, 220:17, 220:22, 226:22, 239:2, 248:24, 248:25.
marks 144:3, 210:12.
Mary 227:15, 227:21, 230:9.
mason 9:14, 99:15, 99:24, 100:9, 100:12.
matches 99:18.
matching 135:23, 137:11.
materials 11:15, 39:1, 40:10, 41:3, 46:12, 46:14, 83:23, 145:1, 153:7, 167:17, 182:7, 231:19, 231:21, 231:22, 232:3, 240:6, 244:13, 245:10, 245:14.
matter 5:5, 5:8, 11:23, 12:23, 26:18, 141:9, 212:4.
matters 9:1, 13:19, 33:23, 151:20.
Matthews 153:9, 154:11, 155:9, 159:2, 157:25.
mayor 181:6.
Meagan 110:14, 111:13, 111:15, 166:8, 166:10, 166:15.
meaning 161:1, 188:19, 244:22, 241:15.
means 163:12, 189:2, 192:20.
meant 12:25, 39:4, 92:12, 88:12.

176:15, 188:14, 221:21, 227:13.
measure 44:23, 74:6, 135:11.
measured 91:5.
measures 217:7.
Media 8:12, 16:10, 23:13, 23:14, 25:22, 40:14, 46:2, 51:5, 51:6, 60:23, 71:20, 76:24, 77:3, 143:23, 144:4, 145:11, 162:16, 210:13, 253:19.
meet 197:22.
meeting 3:36, 123:11, 152:7, 152:8, 157:2, 157:9, 198:10, 247:9.
meeting 224:21.
meetings 107:17, 26:7, 31:23, 32:2, 32:4, 44:16, 47:2, 84:17, 137:6, 151:18, 162:2, 192:13, 226:14, 228:5, 228:22, 228:24, 228:25.

memos 355, 78:19.
mentioned 13:19, 32:12, 42:13, 45:8, 99:7, 126:19, 135:14, 148:24, 153:1, 157:3, 169:16, 170:16, 196:25, 226:10, 236:10.
mention 236:12.
menu 161:11.
message 37:14, 37:19, 44:19, 155:3, 159:13.
messages 111:21, 163:13, 170:20.
met 107:10.
MICHAEL 1:20, 2:1, 3:49, 5:2, 6:4, 76:25, 77:4, 144:5, 165:15, 165:17, 210:9, 210:14, 253:19, 254:2, 255:10.
Microsoft 53:10, 53:17.
mid 83:20.
mid-morning 221:12, 221:22.
middle 17:25, 18:6, 233:4.
midst 63:7.
Military 54:23, 124:15, 124:16, 199:13, 211:14, 211:15, 211:16, 212:23.
million 37:13, 45:24, 95:2, 95:6, 95:8.
Milwaukee 5:16, 43:10, 93:4, 118:9, 137:5, 142:16, 180:10, 180:17, 180:20, 180:22, 181:25, 182:1, 221:7, 223:1.

## 280

224:19, 224:24, 225:5, 225:8, 225:22, 226:4, 226:6, 226:16, 226:18, 237:24, 246:2, 248:22, 248:18, 248:20.
mind 23:22, 51:11, 51:12, 95:3, 110:14, 111:5, 132:18, 136:16, 147:13, 149:12, 208:13, 215:8, 215:19, 215:20, 215:24, 216:20.
minds 52:16, 71:24.
minimizing 205:8.
minimum 35:22, 234:23.
Minnesota 95:5, 137:12.
minority 180:16, 180:24, 226:18, 226:16.
minute 100:9, 138:15, 247:11.
minutes 3:38, 151:14, 151:23, 151:24, 151:25, 152:1, 152:15.
miscellaneous 175:8.
misinterpreting 198:22.
misremembering 38:7.
missed 54:16.
missing 39:25, 239:1.
mission 7:25, 13:18, 19:10.
mistake 34:16, 206:4, 214:25, 216:4.
mistakes 55:18, 181:9, 214:15, mix 35:12, 58:1,

128:21.
mobile 62:6, 62:9.
mode 237:24.
model 148:23.
modified 123:3, 168:8, 241:10.
Monday 190:3, 192:3.
money 45:9, 45:20, 83:9, 83:13, 84:5, 84:11, 86:6, 97:4, 145:19, 145:23, 151:7, 174:6, 177:10, 215:23.
monitoring 63:5, 140:20.
monopolize 194:10.
months 31:17, 206:17, 206:18, 226:7, 246:17.
morning 6:14, 6:15, 132:4.
mostly 45:1, 139:1, 139:2, 140:13, 232:4.
motion 19:25, 158:17, 230:9.
motivated 185:10, 185:14.
move 139:9, 209:3.
moved 129:17, 130:6.
moving 121:23.
M5 5:23, 61:3, 20:19, 76:21, 105:12, 155:9, 156:2, 157:25, 158:14, 158:19, 164:14, 164:21, 185:2, 185:19, 185:25, 210:5, 210:15,

238:23, 248:17, 250:10, 250:16, 252:9, 253:12, 253:16.
multiple 207:14,
multiplying 249:2.
Municipal 3:35, 8:9, 9:24, 31:24, 48:7, 48:9, 62:17, 92:1, 97:23, 177:24, 177:25, 179:15, 205:10, 205:16, 206:25, 245:24, 246:2.
municipalities 34:19, 76:10, 177:14, 177:17, 182:5, 226:10, 103:10, 116:23, 122:24, 127:17, 127:23, 128:4, 128:5, 128:10, 141:1, 141:4, 155:1, 155:4, 173:18, 199:4, 233:16, 233:19.
myself 91:1, 139:1.
myotei.wi.gov 139:1.
myotewisconsin.c om 186:12.

Nathaniel 87:19, 231:5, 232:1.
national 43:18, 110:22.
naturalization 234:13.
nature 47:11, 154:6, 226:5, 232:9.
necessarily 22:23, 89:6, 130:10, 164:9, 177:4, 173:18, 237:6, 237:12.
necessary 134:11, 156:22, 176:16.
needed 37:18, 37:25, 38:25, 45:17, 59:4, 68:7, 80:19, 80:20, 103:10, 116:23.
needs 29:12, 58:13, 143:10, 217:6.
negative 58:6, 57:10, 57:21, 58:6, 58:12, 58:18.
neighborhood 43:2.
Neil 221:9, 222:20, 223:20, 224:2, 224:5, 226:10.
network 75:10.
never 53:20.
news 200:4.
newsletters 62:18.
newspaper 22:20, 23:3.
newspapers 42:9.
next 11:4, 31:3, 55:3, 77:24, 93:19, 105:8, 110:1,

MICHAEL HAAS

119:11, 125:18,
127:11, 154:17,
161:3, 163:21,
165:2, 171:2,
224:11, 232:18,
238:24.
**Nichol** 1:13, 5:7,
254:4.
**night** 5:22, 109:18,
190:5, 192:4.
**nightly** 101:4.
**No.** 1:11, 5:3, 5:10,
76:24, 77:3, 77:24,
81:24, 131:8,
143:16, 143:24,
144:4, 171:10,
183:3, 198:5,
200:3, 210:9,
210:13, 230:8,
230:20, 235:2.
**nobody** 190:6.
**nomination** 14:3.
**non-computer**
62:12.
**Non-driver** 101:12,
101:15.
**non-license**
101:8.
**non-national** 211:10,
212:2.
**none** 192:24.
**Nonpartisan** 43:22,
151:4, 151:5,
219:21, 219:25,
229:11, 232:9,
232:11.
**normal** 114:8.
**normally** 140:9,
167:4.
**notable** 222:8.
**Notary** 2:6, 255:8,
256:24.
**notation** 244:4.
**note** 116:2, 127:20,
225:17.
**noted** 114:16,
232:4.
**notes** 255:15.
**nothing** 47:10.
**notice** 2:4, 5:4.

noticed 27:9.
notices 21:25,
200:4.
notification
55:14.
notifies 8:17.
November 77:22,
94:10.
numbered 31:18,
31:19, 141:14,
141:15, 141:16,
141:18, 141:19,
141:21.
numbers 82:20,
95:3, 161:4,
162:24, 163:15,
163:19, 170:1,
180:15.
numerous 59:21.
nursing 24:11.
nuts 14:25.

**<O>.**

o'clock 161:7.
**objecting** 190:23,
194:5, 196:6.
**oath** 6:10.
**objecting** 92:12,
194:12.
**Objection** 191:4,
193:5, 219:11,
252:9.
**observation** 65:5,
65:15, 111:3,
223:3.
**observe** 64:7, 64:15,
66:23, 68:3, 69:10,
70:7, 70:8,
70:12.
**observed** 10:9.
**observer** 64:6, 66:1,
69:10, 70:2, 70:19,
71:21, 98:23,
142:13, 142:15,
142:24, 143:7,
143:9, 149:25,
166:2, 221:25,
223:11, 224:5,
225:13, 225:20,

225:23.
observes 160:8.
observing 24:3,
68:22, 165:11,
223:1.
obstacles 8:22.
obtain 37:18, 49:3,
55:7, 102:10,
102:16, 155:2,
155:4, 173:19,
203:22, 212:22,
213:2, 233:10,
141:21.
obtaining 41:2,
101:22, 172:19,
173:14.
Obviously 11:14,
11:19, 13:8, 13:24,
15:21, 16:3, 18:5,
22:10, 42:7, 44:5,
44:14, 46:23,
46:25, 58:3, 88:1,
96:5, 122:8,
126:24, 219:18,
223:18, 226:7.
occasion 167:13.
occasionally
88:10.
occasions
150:24.
occupied 190:23,
occur 36:25, 96:12,
101:3, 189:12,
189:23.
occurred 14:16,
59:21, 59:22,
94:23, 187:20,
195:9, 199:15,
226:1, 236:20.
occurrence 134:23,
167:24.
occurs 101:3,
106:4.
October 144:18.
odd 31:19, 141:15,
141:18.
offer 9:18, 31:9,
175:18, 190:1,
190:6, 207:8.
offered 24:17, 82:17,
124:24, 190:14,

192:12, 195:12,
195:15, 197:6.
offering 234:12.
offers 233:6.
Office 9:22, 14:2,
14:8, 14:14, 15:9,
23:12, 25:2, 27:24,
29:14, 34:14,
63:11, 85:9, 94:15,
98:4, 102:1,
132:16, 137:5,
139:21, 153:21,
167:4, 194:19,
195:6, 208:1,
227:9, 227:10,
249:7, 250:1,
250:7, 255:22.
official 8:5, 8:18,
10:12, 11:23, 22:7,
24:10, 26:6, 33:6,
42:2, 43:3, 47:8,
47:9, 48:21, 52:1,
61:17, 102:11,
115:13, 117:13,
148:25, 159:15,
163:18, 172:12,
178:22, 179:4,
185:11, 189:1,
197:14, 206:17,
208:22, 211:20,
220:13,
246:13.
particularly 40:18,
40:25,
168:12.
parties 10:7, 61:14,
67:10, 255:19.
partisan 18:9, 43:22,
45:3, 48:9, 118:2,
115:4, 167:5,
187:17.
partly 22:7, 142:18,
177:25.
parts 36:3, 36:4,
40:11, 61:18.
Party 16:18, 116:15,
147:4, 210:24,
212:14, 229:17,
231:13,
231:15.

part-time 33:15.
participants
141:10.
participate 10:4,
31:6, 31:20, 31:23,
54:11, 134:2,
166:20,
231:16.
participated 73:2,
95:4, 180:17.
participates
140:18.
participating 13:6,
34:6, 138:1.
participation 34:8,
57:6, 58:22,
72:20.
particular 8:5, 8:18,
10:12, 11:23, 22:7,
24:10, 26:6, 33:6,
42:2, 43:3, 47:8,
47:9, 48:21, 52:1,
61:17, 102:11,
115:13, 117:13,
148:25, 159:15,
163:18, 172:12,
178:22, 179:4,
185:11, 189:1,
197:14, 206:17,
208:22, 211:20,
220:13,
246:13.

pass 79:15, 138:19,
224:17.
passage 240:16,
passed 8:11, 9:3,
124:1, 182:1,
116:25, 118:10,
195:14, 198:25,
200:23, 239:16,
245:8.
passing 119:15,
157:21,
230:13.
passport 234:12.
past 86:1, 103:13,
176:18, 201:5.
patterns 25:23.
pay 25:3, 35:20,
52:11, 56:10,
56:13, 57:18,
57:20, 74:17,
74:25, 85:14,
134:6, 134:8,
146:4, 173:11,
173:24, 181:15,
193:9, 193:10,
205:19, 226:9,
paying 37:4, 52:16,
167:12, 173:19,
235:6.
penalties 14:18,
14:19.
pending 5:8, 7:3,
8:10, 8:14, 10:12,
25:7, 55:15, 197:1,
197:23.
per 33:2.
perceive 9:25, 50:11,
230:3.
perceived
221:9.
perspective 8:22,
133:25, 166:13,
228:5, 229:13,
230:23.
petition 103:2,
145:3.
petitions 147:16,
147:23.
phone 23:22, 30:7,
39:24, 71:9, 74:21,
76:3, 76:5, 113:11,
113:18, 114:13,

Perfect 55:17.
period 11:24, 31:3,
47:10, 48:2, 67:11,
120:6, 120:16,
120:18, 120:21,
121:9, 125:6,
127:3, 127:25,
129:20, 130:24,
139:6, 144:13,
194:14, 208:17,
225:3.
periods 97:13,
127:17.
Perkins 2:14,
5:24.
permanent 54:24,
67:15, 232:19.
permanently
211:17.
permit 186:19,
250:23.
permitted 142:8,
251:3.
person 28:14, 64:24,
70:3, 70:21, 80:6,
190:2, 96:6, 108:7,
109:13, 111:17,
113:19, 114:15,
114:19, 133:4,
134:14, 136:11,
137:23, 139:8,
142:24, 143:11,
158:15, 193:12,
207:18, 223:14,
228:13.
personal 55:9,
153:8.
personage 63:25.
perspective 8:28,
133:25, 166:13,
228:5, 229:13,
230:23.
petition 103:2,
145:3.
photos 70:24, 71:8,
71:10, 243:12,
243:15.
phrased 28:11.
physical 65:24.
physically 65:15,
65:20, 252:14.
picked 114:14,
161:13,
216:10.
picture 115:5,
161:19.
pictures 225:16.
piece 20:23, 25:8,
87:7.
piling 147:7.
pinnacle 18:7.
placed 40:14, 64:14,
198:10,
209:21.
places 65:7, 96:18,
97:10, 121:16,
135:24, 167:20,
171:6, 171:13,
182:1, 189:9,
180:20, 182:18,
182:21, 198:24,
202:12, 225:2,
241:12.
Plaintiffs 1:9, 2:3,
2:18, 5:5, 5:6,
5:24.
plan 33:3, 45:16,
45:18, 45:19, 46:8,
53:7, 233:13,
236:24.
planned 136:6.
planning 18:22.
plate 152:2.
platform 53:10,
53:18.
play 48:16.
playing 234:19.
Please 5:20, 6:11,

281                                    283

Once 25:8, 32:2,
48:19, 53:22,
121:7, 128:1,
130:18, 207:23,
215:12,
215:14.
one-time 130:4.
one, 56:22, 94:20,
164:18, 165:2,
201:18, 211:5,
ones 43:8, 53:4,
89:3, 147:13,
148:22, 149:11,
149:12,
149:22.
ongoing 19:15,
43:15, 172:21,
172:24, 182:4,
online 19:25, 54:8,
54:9, 55:6, 140:20,
197:1, 242:7,
243:2.
open 27:20, 102:4,
125:5, 127:3,
127:25, 151:14,
151:15, 151:18,
151:19, 151:22,
181:13.
opened 71:22,
221:12.
operations
14:6:7.
opine 188:3.
opinion 39:21, 56:2,
57:4, 68:2, 72:4,
184:23, 213:7.
opinions 10:18,
14:10, 48:11,
74:10, 128:15,
129:21.
opportunities
36:8.
opportunity 17:18,
20:5, 26:19, 26:25,
27:5, 121:13,
188:3, 189:18,
190:2, 191:13,
191:17, 197:22,
205:9, 205:12,
215:15, 215:16,

216:4, 216:7,
220:5.
oppose 46:23.
opposed 157:13.
opposition
218:12.
option 39:13, 121:3,
131:18, 142:4,
159:6, 179:9,
190:23, 190:24,
190:25, 211:4,
212:20, 212:21,
213:8, 214:3,
214:8, 214:11,
215:6, 215:13,
252:5.
options 178:14,
178:15, 179:7,
oral 152:16.
order 31:3, 70:22,
81:14, 103:21,
120:2, 123:1,
125:19, 145:10,
153:3, 217:13,
223:10, 223:11,
236:23.
organization 43:14,
43:21, 44:12,
44:15, 44:10,
140:2, 146:24,
146:25, 193:13,
226:15, 227:22,
228:14, 229:12,
229:21.
organizations 10:20,
24:4, 24:20, 39:10,
42:16, 42:21,
42:25, 43:2, 44:7,
61:15, 63:3, 67:10,
68:25, 69:18,
84:25, 140:7,
147:2, 187:14,
239:25, 232:6,
246:11.
organized 39:17.
Original 4:9, 49:11,
54:2, 54:7, 191:2,
56:22, 56:24,
144:7, 233:11,
201:1, 220:2.

.
324, 3:30, 3:33,
336, 3:41, 3:44,
28:17, 42:3, 42:17,
91:4, 149:1, 149:8,
149:23, 168:19,
183:16,
228:22.
Otherwise 44:12,
133:22.
ought 173:19.
ourselves 194:5.
out-of-control
223:6.
outcome 135:9,
outdated 33:11,
outlets 24:24.
outlined 223:9.
outreach 40:8, 41:6,
42:21, 44:7, 45:12,
84:9, 110:15,
111:16, 144:8,
144:10, 144:22,
144:25, 157:1,
166:11, 184:21,
187:14, 236:3,
236:23.
outset 218:1.
outside 16:9, 16:18,
39:6, 40:14, 41:7,
419, 45:25, 235:9,
243:24, 244:16,
244:18, 244:19,
244:25.
outsiders 140:5.
outspoken
149:6.
overall 15:14, 91:6,
99:1, 161:19.
overhearing
189:21.
overlap 251:18,
overseas 54:24,
124:15, 199:13,
211:9, 211:16,
211:23, 212:6,
212:23.
own 30:12, 41:3,
44:1, 49:6, 64:10,
160:13, 168:17,
201:1, 220:2.

.
**<P>.**

p.m. 144:1, 144:3,
160:7, 163:11,
195:23, 253:20,
253:21.
package 37:7,
37:10.
packet 122:3, 159:6,
240:23, 241:3,
241:6, 241:8,
241:9, 241:11,
242:25, 243:1,
243:3, 243:8,
243:9, 245:21,
245:24, 246:1.
packets 241:18.
Page 3:3, 261,
83:25, 81:2, 82:2,
111:20, 122:25,
1232, 125:17,
125:18, 125:20,
126:21, 140:9,
140:23, 152:12,
153:8, 153:15,
153:16, 159:18,
159:23, 163:21,
164:10, 164:20,
164:21, 166:23,
168:1, 170:21,
183:4, 185:22,
Page-line 254:5.
pages 116:7, 164:12,
165:24.
paid 152:21,
181:16.
paper 6:21, 27:11,
120:14.
papers 14:3,
88:15.
par 131:5.
paragraph 81:1,
81:9, 107:10,
127:11, 139:10,
153:15, 154:18,
175:24, 176:1,
176:17.
parameters
66:20.
Pardon 73:11.

87:18, 88:7,
116:13.
pleased 119:18.
plenty 73:21.
point 182:21, 44:9,
44:23, 46:9, 51:10,
86:22, 95:20,
115:19, 135:5,
144:6, 159:2,
168:23, 176:6,
179:17, 185:6,
201:16, 228:15,
243:4, 252:24.
point, 9:6,
pointed 148:22.
pointing 71:23,
82:25.
points 51:13,
110:14,
186:22.
policy 8:20, 11:16,
21:13, 24:7, 47:4,
47:11, 58:2, 115:1,
122:5, 132:18,
132:19, 133:20,
122:8, 156:1,
156:16, 159:8,
159:18, 217:3,
218:1, 219:18,
234:20.
policy-making
30:13.
policy/political
204:2.
policymakers 90:6,
200:6.
political 16:10,
57:24, 61:14,
67:10, 194:15,
210:24.
politically
219:22.
politics 36:10.
poll 10:3, 15:10,
51:25, 62:8, 82:3,
110:18, 110:22,
110:24, 111:8,
132:3, 132:21,
142:24, 189:11,
170:3, 175:2,
175:8, 175:23,
175:24, 176:4,

178:13, 177:13,
177:14, 177:21,
178:4, 178:20,
183:9, 233:5,
234:2, 234:5,
263:4, 263:7,
243:11, 243:11,
218:15.
positions 18:24,
46:4, 46:5, 87:6,
147:20.
positive 57:21,
59:12, 92:1.
possibility 172:2,
216:13, 216:14,
226:16,
234:16.
possible 35:3, 4:26,
75:24, 142:10,
209:17, 242:7.
Possibly 71:22,
73:7, 84:9, 84:12,
242:5.
post 29:23, 30:10,
78:20, 200:3,
200:5, 230:2,
240:5.
posted 128:19,
171:6, 171:14,
186:24, 239:23,
239:24, 240:2.
posters 39:7.
posting 171:2.
posts 200:3.
pot 234:10,
235:3.
potential 16:21,
52:3, 58:22, 63:13,
63:15, 133:19,
133:20, 133:23,
135:18, 136:2,
183:20, 185:8,
198:19, 218:7.
potentially 49:12,
152:16.
preparation 84:22,
152:16.
presentations 30:3,
43:10, 84:14,
111:18, 145:8,

.
**<P>.**

178:13, 177:13,
177:14, 177:21,
178:4, 178:20,
183:9, 233:5,
234:2, 234:5,
263:4, 263:7,
243:11, 243:11,
218:15.

106:16, 106:25,
107:2, 146:5,
158:18, 190:9,
190:10, 196:10,
198:3, 198:13,
200:17, 202:2,
203:3, 207:21,
214:19, 214:21,
217:21, 218:12,
218:15.
positions 18:24,
46:4, 46:5, 87:6,
147:20.
positive 57:21,
59:12, 92:1.
possibility 172:2,
216:13, 216:14,
226:16,
234:16.
possible 35:3, 4:26,
75:24, 142:10,
209:17, 242:7.
Possibly 71:22,
73:7, 84:9, 84:12,
242:5.
post 29:23, 30:10,
78:20, 200:3,
200:5, 230:2,
240:5.
posted 128:19,
171:6, 171:14,
186:24, 239:23,
239:24, 240:2.
posters 39:7.
posting 171:2.
posts 200:3.
pot 234:10,
235:3.
potential 16:21,
52:3, 58:22, 63:13,
63:15, 133:19,
133:20, 133:23,
135:18, 136:2,
183:20, 185:8,
198:19, 218:7.
potentially 49:12,
152:16.
Powerpoint
241:17.
practical 47:11,

80:15, 212:4,
212:10.
practice 162:3,
16:24, 20:6, 76:8,
122:21, 139:6,
207:7, 251:22.
practices 176:9.
preaching 69:7.
preamble 217:4.
predecessor
87:20.
prediction 185:7.
predominantly
190:6.
prefer 85:4.
preferred 195:8.
preliminary
193:19.
preoccupied
34:13.
preparation
27:2.
preparations
184:1.
prepare 27:11,
27:14, 50:6, 50:25,
179:6.
prepared 11:15,
37:15, 50:5, 53:14,
56:11, 56:12,
76:13, 91:15,
96:10, 96:18,
104:16, 160:2,
248:12.
preparing 24:8,
93:22, 191:22.
presence 255:14.
PRESENT 2:21,
20:6, 37:25, 152:8,
152:9, 199:1,
199:4, 207:15,
217:12, 217:15,
227:23,
247:21.
presentation 84:22,
152:16.
presentations 30:3,
43:10, 84:14,
111:18, 145:8,

282                                    284

MICHAEL HAAS

**[Index — page 285]**

240:22, 240:24, 241:9, 241:17, 241:18, 241:20, 245:20, 245:22, 245:23, 246:1, 246:6, 246:12, 246:16, 247:1, 247:6, 247:7, 247:10.
presented 93:15, 108:24, 141:7, 152:6, 159:13, 207:16, 208:8, 208:9, 208:14, 245:11, 246:20.
presenting 38:12, 52:1, 207:20.
preserved 219:24.
president 25:24, 208:2.
presidential 17:25, 18:7, 26:1, 56:7, 93:25, 94:1, 94:3, 94:11, 94:17, 94:25, 141:11, 221:18.
press 23:8, 26:13, 26:15, 26:23, 27:2, 27:7, 28:3, 110:15, 128:22, 128:24.
pretty 18:17, 21:21, 23:2, 45:6, 57:24, 62:1, 67:8, 75:11, 90:16, 94:7, 96:4, 96:16, 98:18, 108:20, 116:1, 116:2, 123:11, 141:14, 147:9, 149:6, 149:17, 163:2, 167:24, 181:14, 181:25, 182:4, 187:19, 201:13, 222:8, 223:19, 226:11, 227:11, 230:21.
prevent 121:10.

prevented 34:17, 177:3.
preventing 177:4, 183:13.
previous 63:10, 105:14, 209:4, 210:17, 214:5, 251:10.
previously 80:12, 251:20.
prewarning 226:3.
primarily 27:17, 185:10.
primary 18:8, 23:9, 33:16, 46:17, 111:7, 113:2, 115:4, 119:9, 119:13, 139:9, 144:16, 160:9, 163:8, 207:16, 251:9.
print 54:25.
printed 243:3.
printout 163:24.
printouts 164:7.
Prior 10:23, 13:16, 16:22, 26:21, 30:25, 53:2, 80:14, 89:23, 108:4, 124:18, 125:6, 125:15, 125:24, 127:6, 132:1, 189:24, 190:3, 191:23, 249:19.
priorities 143:7, 143:10, 57:18, 85:6, 85:8.
prioritize 194:12.
priority 61:14, 70:10, 130:19.
privacy 70:3, 82:22, 83:1, 201:1.
private 16:23, 39:17, 70:6, 201:17, 204:12, 204:24, 209:18, 216:16, 216:22.

217:6, 217:9.
probably 10:16, 19:8, 33:3, 49:16, 52:1, 60:19, 61:22, 83:12, 85:7, 108:5, 128:11, 145:15, 148:22, 149:12, 163:22, 192:11, 207:20, 207:23, 226:11, 235:17, 248:12.
problem 61:4, 74:12, 75:24, 76:15, 103:17, 104:24, 113:5, 113:20, 179:22, 179:25, 181:8, 183:13, 193:10, 194:3.
Problematic 140:25, 192:24, 193:1, 193:2, 193:7, 193:8, 193:19, 251:9.
problems 51:25, 61:6, 74:19, 102:14, 104:12, 104:13, 126:13, 181:17, 181:20, 182:24, 183:2, 194:10.
Procedure 2:4.
procedures 69:12, 69:13, 127:12, 132:20, 141:25, 217:10, 229:1.
procedures. 79:5.
proceed 6:11.
proceedings 77:12.
processed 143:19, 147:23, 215:10.
processes 135:19, 229:5.
processing 15:1, 92:8, 123:5, 215:12.
produce 83:23, 84:4, 235:9, 240:7.
produced 41:21,

45:5, 46:8, 54:10, 84:6, 186:17, 237:22, 245:7.
producing 42:19, 233:22.
profession 15:24, 75:1.
Professional 2:5, 16:8, 193:12.
professors 237:23, 238:12.
profile 16:4, 24:23.
profoundly 176:18.
program 11:13, 30:2, 35:24, 39:2, 40:8, 42:10, 52:5, 53:25, 54:2, 54:4, 95:5, 96:16, 97:4, 107:4, 139:11, 139:13, 145:8, 170:16, 234:11, 235:3.
progress 22:5.
progression 25:17.
prohibited 71:5.
prohibition 2:22.
prohibits 208:10, 214:13.
project 27:13, 192:12, 244:22.
projects 26:17, 38:18, 73:22.
prompt 230:7.
promptly 205:19.
promulgated 67:13, 252:18.
promulgating 63:7, 252:25.
Proof 3:46, 80:11, 82:12, 80:19, 82:17, 123:4, 123:17, 124:9, 124:14, 124:19,

285

**[Index — page 287]**

4221, 44:1, 44:5, 62:10, 64:2, 66:24, 102:18, 104:21, 112:21, 172:18, 237:2, 246:11, 246:15, 247:25.
reached 59:3, 162:20, 218:13, 251:22, 255:6, 252:19.
reaching 10:19, 40:12, 61:10, 208:5, 208:19.
Read 20:23, 25:22, 25:25, 26:1, 35:4, 36:18, 36:21, 42:7, 70:6, 77:1, 105:12, 163:6, 212:5, 220:3, 222:1, 254:5.
Reading 47:1, 120:19, 206:16, 225:9, 235:2, 241:3.
Reads 8:3, 105:14, 210:17, 254:5.
ready 31:15, 78:1, 122:12, 160:2, 221:9.
real 74:12, 75:20, 85:17, 89:13, 161:19, 205:4.
reality 130:6, 229:7.
Reason 7:6, 23:12, 36:14, 109:8, 120:15, 153:4, 153:3, 158:16, 179:14, 181:22, 189:22, 201:6, 223:3, 204:15, 216:17, 216:19, 254:5.
reasons 52:5, 92:6, 146:10, 150:7, 151:1, 172:12, 173:15, 189:20.
recalling 150:8,

recalls 204:8, 194:16.
receive 14:11, 23:22, 60:4, 95:20, 95:2, 96:3, 114:5, 115:21, 131:8, 205:24.
received 11:25, 21:8, 90:16, 113:1, 116:14, 123:20, 135:8, 154:13, 160:8, 160:12, 163:9, 191:25, 250:6, 251:6.
receiving 59:10, 95:17, 96:4, 123:21.
recent 152:19, 247:6, 249:19.
recently 86:20, 97:17, 171:9, 197:7, 245:24.
recess 77:1, 143:25, 210:10.
recognition 179:11.
recognize 20:9, 219:20.
recognized 219:20.
red 184:9.
reasons 179:1.
recalling 179:1.
recurring 170:13.
redevelop 55:20.
redistricting 148:2.
reduce 184:9, 193:9, 216:3.
reduced 189:14, 255:14.
reduces 55:17, 216:2.

record 5:2, 64:6, 76:24, 77:5, 83:3, 91:11, 113:11, 113:15, 114:25, 115:2, 118:23, 136:5, 138:6, 138:8, 138:10, 143:23, 144:3, 159:3, 197:10, 198:23, 199:23, 210:8, 210:12, 248:17, 248:19, 248:21, 248:23, 253:18, 255:10.
recorded 72:21, 82:16, 82:21, 113:19, 114:21, 147:24.
records 247:7.
recount 32:14, 51:6, 194:16.
recounts 194:17.
recruit 187:1, 182:14.
rectify 131:18.
recurring 170:13.
redevelop 55:20.
redistricting 148:2.
reduce 184:9, 193:9, 216:3.
reduced 189:14, 255:14.
reduces 55:17, 216:2.
REEXAMINATION 253:11.
refer 177:21, 209:16.
reference 206:16.
references 39:13.
referred 160:3, 215:6.
referring 78:18, 82:14, 96:22, 98:14, 110:22, 145:24, 153:5.

186:11, 186:14, 187:1, 225:21, 233:8, 236:9, 243:15.
refers 139:13, 141:23, 168:15.
reflect 36:2.
refresh 141:9.
regard 213:8.
regarding 36:11, 128:15, 149:25.
regardless 19:16.
region 85:23.
regional 31:23, 32:2.
register 62:21, 80:16, 118:6, 118:8, 120:1, 120:3, 120:24, 121:6, 121:15, 121:16, 124:16, 125:11, 127:3, 136:12, 156:3, 172:7, 176:22, 186:21, 200:14, 205:9, 209:22, 222:10.
Registered 2:5, 80:13, 121:3, 121:8, 121:12, 124:18, 128:6, 129:17, 135:24, 153:13, 153:25, 154:4, 158:2, 216:9, 235:7.
registering 80:11, 121:11, 125:1, 199:12.
registers 99:14, 101:1.
registrants 1:7, 8:6.
registration. 168:5.
registrations 124:10, 187:16.

287

**[Index — page 286]**

124:20, 125:10, 126:18, 127:6, 127:8, 127:16, 127:18, 127:21, 127:22, 128:4, 128:6, 128:11, 168:10, 168:21, 170:22, 172:1, 172:8, 176:25, 186:5, 186:20, 187:9, 187:12, 199:12, 200:12, 205:23, 206:1, 217:15, 240:12.
proper 100:3.
properly 11:22, 32:18, 69:4, 103:1, 103:20.
property 62:19.
proposal 79:4, 90:15.
proposals 197:20.
proposed 41:19, 82:15, 189:21, 219:4.
proposing 203:10.
prosecutor 137:4.
prosecutors 135:16, 137:19.
Prot 165:20.
protect 71:25, 217:7.
Protection 165:21, 165:22, 166:9, 167:2.
prove 169:10.
proven. 183:14.
provide 9:1, 14:10, 27:6, 31:21, 39:23, 47:3, 66:15, 69:7, 80:11, 82:5, 127:16, 152:4, 156:16, 160:21, 168:4, 181:4, 182:7, 187:17, 198:16, 200:6.

200:12, 200:24, 207:6, 208:19, 224:3.
provided 11:14, 31:25, 34:18, 79:25, 87:24, 91:19, 118:12, 118:13, 125:4, 128:17, 128:18, 131:13, 153:22, 153:24, 154:1, 157:17, 160:23, 197:8, 198:12, 207:4, 208:2, 214:20, 219:11, 238:3.
provides 128:13, 167:13.
providing 12:13, 34:3, 34:7, 35:1, 81:9, 142:19, 175:6, 176:21, 202:24, 226:15.
provision 86:7, 199:19, 201:10, 211:20, 211:22, 212:2, 220:13.
provisional 49:5, 59:6, 59:7, 59:9, 59:13, 131:19.
provisionally 130:22.
Provisions 2:3, 97:12, 145:25.
proximity 102:2.
publicize 98:7, 171:11.
publicly 147:5.
publish 31:16, 167:14.
published 169:6, 239:22, 240:17.
pulled 92:3.
pulse 62:1.
purpose 66:8, 68:10, 68:20, 159:15, 173:17.
purposes 173:9,

173:18.
pursuant 2:4, 5:4.
pursuing 92:7.
Put 113, 14:8, 15:20, 23:1, 24:8, 25:13, 54:7, 78:17, 103:3, 112:2, 125:3, 128:22, 128:24, 129:9, 131:5, 141:19, 158:13, 159:8, 198:12, 207:4, 224:11, 226:22, 230:24, 232:17, 246:17, 247:11, 252:15.
putting 246:4.

<Q>.
qualified 136:9, 136:13.
qualify 14:5.
quantify 162:6.
quantity 92:8.
question 6:28, 7:3, 9:13, 9:16, 20:18, 20:20, 21:6, 23:25, 37:3, 57:13, 69:21, 76:19, 85:20, 93:24, 100:13, 105:23, 112:3, 119:11, 152:11, 159:7, 159:22, 210:16, 212:9, 250:14.
questioned 71:6.
questioning 123:22.
questions 9:5, 13:10, 24:6, 25:16, 37:21, 43:19, 62:22, 63:14, 100:3, 102:9, 103:4, 118:20, 123:20, 140:20, 142:17, 182:24, 230:15, 250:15, 253:10.

quick 234:3.
quickly 35:3, 93:11, 93:23, 112:24, 219:22, 230:21.
Quite 21:16, 24:5, 34:21, 95:14, 102:12, 135:14, 161:5, 182:6, 205:24.
quotes 234:22.

<R>.
R. 3:20, 3:26.
racially 36:1.
Racine 180:11, 180:14, 180:16, 180:21, 180:22, 181:1, 181:4, 181:6, 181:25.
radar 66:9.
radical 217:23.
radio 39:8, 41:13.
raise 218:20, 218:21, 218:23, 219:17, 220:1.
raised 80:16, 82:1, 133:6, 183:17, 197:25, 203:19, 229:6.
raising 80:22.
ramifications 218:19.
ramping 172:16.
range 33:3, 87:6, 144:4, 219:18.
rank 97:16.
rare 98:18.
rather 118:9, 180:4, 187:15, 208:3, 212:14, 213:15, 233:2, 235:4.
rationale 214:12, 215:14.
re-register 130:7.
reach 10:11, 10:13, 10:16, 40:15, 40:24,

286

**[Index — page 288]**

regular 29:23, 30:3, 98:4, 136:1, 167:24, 177:21, 226:11, 227:11, 233:20, 245:10.
regularly 228:23, 228:24.
regulate 63:8.
Reid 106:18, 106:17, 106:22, 108:13, 110:14, 151:24, 200:4, 230:1, 230:5.
reinforcing 170:19.
reinstated 144:18, 145:14.
rejected 215:12.
rejecting 216:6.
relate 85:5.
Related 13:21, 15:7, 19:12, 33:22, 82:16, 89:5, 111:1, 111:21, 115:14, 133:5, 157:22, 164:9, 165:10, 207:8, 246:9.
relation 102:6.
relations 243:14, 243:16.
relationship 21:22.
relationships 25:25.
relative 85:25, 255:17, 255:19.
relay 98:23.
release 35:15, 27:2, 27:8, 28:3.
releases 26:13, 115:1, 128:22.
relevant 31:13, 123:24.

reliable 53:12, 53:21.
relies 93:1.
rely 54:8, 177:25, 185:15.
relying 220:6.
remained 144:16, 144:20.
remedy 23:19.
remember 29:4, 43:11, 43:13, 62:20, 62:21, 120:10, 130:19, 137:14, 153:4, 166:25, 168:18, 168:23, 169:8, 206:16, 207:22, 220:3, 240:4, 245:23.
Remind 34:2, 179:6, 232:21.
reminders 23:23, 141:9.
remove 185:23, 223:14, 223:18.
removed 70:21, 124:4, 175:12, 195:19, 222:1.
repeat 101:13.
rephrase 9:9, 17:7, 212:1.
replace 53:14, 164:15, 172:2, 202:24, 26:2, 216:2, 235:17, 241:14.
report 109:12, 109:14, 153:22, 156:2, 156:5, 156:7, 157:5, 158:7, 158:8, 206:3.
Reported 1:24.
Reporter 2:5, 5:17, 5:22, 6:25, 8:3, 105:14, 112:9, 210:17, 238:25, 255:8.
Reporters 5:18.

reporting 91:8, 159:24.
reports 14:7, 26:2, 26:4, 26:9.
represent 5:21, 8:7, 10:21, 42:16, 246:16.
Representative 78:11, 149:2, 249:8, 250:6.
representatives 84:25.
represented 11:7, 208:25, 249:25.
representing 64:10, 64:12, 246:11.
Republican 116:15, 148:25, 149:15, 229:17, 231:13, 231:14.
reputation 15:16, 15:19, 15:22.
request 109:12, 153:22, 153:22, 156:7, 157:5, 158:7, 158:8, 206:3.
requested 8:3, 143:18, 235:5.
requesting 89:2, 95:18, 215:5.
require 53:23, 80:10, 121:8, 127:8, 127:12, 132:22, 171:2, 173:15, 177:14.
requirement 31:8, 35:22, 37:25, 38:3, 52:24, 91:25, 99:13, 99:14, 99:21, 118:20, 118:22, 127:6, 130:14, 134:3, 179:16, 198:9, 198:19, 199:8, 199:12, 201:24, 204:10, 204:25, 204:10, 230:1.

250:23.
requirements 51:16, 152:20, 177:19, 178:8, 183:8, 239:18, 245:9, 246:7, 253:4.
requires 36:15, 217:12, 234:22.
requiring 30:20, 193:11, 200:11, 206:11, 209:20, 217:11, 217:24.
research 90:25, 219:1, 238:2.
resided 125:3.
Residence 3:46, 73:1, 80:11, 80:12, 80:19, 82:17, 123:17, 124:9, 124:14, 124:20, 125:5, 128:18, 128:19, 168:11, 169:10, 169:15, 169:17, 208:1, 208:17.
residency 118:18, 118:21, 120:4, 120:18, 123:4, 125:10, 169:10, 177:1, 208:1, 208:17.
residency 170:23.
residents 97:19.
resilient 181:17.
resolve 75:24, 102:14.
resolved 60:15, 102:19, 104:25, 113:17, 114:13, 176:9, 117:11, 130:15, 143:5.

288

MICHAEL HAAS

**289**

resolves 130:12.
resources 39:7, 39:12, 44:22, 45:8, 54:9, 69:25, 83:23, 242:13, 243:4, 289:9.
respect 38:8, 40:3, 44:17, 46:18, 49:18, 58:24, 66:6, 74:1, 83:15, 101:7, 101:14, 114:7, 114:12, 115:5, 121:22, 143:6, 143:9, 155:8, 160:22, 175:24, 234:25, 238:19.
respond 7:4, 39:24, 44:11.
responded 78:13, 112:24, 137:1, 221:5.
responding 23:14.
response 47:4, 110:11, 112:5, 113:20, 250:2, 250:6.
responsibilities 7:22, 12:21, 15:15, 17:15, 23:10.
responsibility 7:25, 39:1, 40:23, 51:8, 104:7, 247:25.
responsible 9:12, 11:3, 12:23, 15:5, 17:10, 23:17, 27:4, 27:17, 33:24, 73:21, 73:23, 106:22, 111:19, 175:5, 218:4.
responsiveness 101:8.
rest 113:6, 136:14, 141:20, 189:6, 241:2.
restored 171:16.
restricted 195:14, 195:17.
restricting 214:3.
restriction 195:18.
restrictions 126:16.
restructuring 149:4.
result 21:10, 47:20, 67:8, 90:20, 104:6, 105:21, 109:23, 132:6, 136:20, 137:16, 161:6, 163:25, 183:11, 201:3, 205:7, 213:1, 237:5, 238:18.
resulted 79:9, 114:18, 137:8, 137:21.
resulting 237:7.
results 9:4, 92:19, 110:18, 110:24, 117:7, 203:6.
retain 128:4, 128:10.
return 59:14.
returned 43:12.
returning 214:13.
review 41:19, 79:9, 82:10, 122:19, 151:9, 152:1, 231:20, 232:7.
reviewed 26:7, 39:14, 79:8, 147:24, 237:21, 249:12.
reviewing 79:3, 165:6.
reviews 239:2.
revision 103:2.
revisited 123:23.
rid 16:25, 17:19, 17:24, 171:20, 171:23.
Rights 43:5, 166:16, 166:17, 167:3, 236:8, 236:13, 236:23.
risk 216:19.
risks 71:18, 185:8.
road 65:3, 240:22, 241:3, 242:8, 242:24.
roadblock 102:16, 102:20.
roadblocks 102:20.
Robinson 3:17, 3:41, 87:19, 87:24, 98:1, 160:17, 231:5.
Rock 78:13, 236:7.
role 8:16, 13:12, 13:14, 33:18, 38:8, 218:11, 219:24.
rollout 246:25.
room 65:21.
root 181:8.
Ross 112:19, 236:2, 236:9, 236:15.
Rossman 3:18, 3:26, 112:16, 113:22.
rotates 228:7.
roughly 55:6, 136:25, 137:10, 165:24.
row 227:11.
RPR 1:24.
Ruhland 117:14, 117:18.
rule 14:15, 63:8, 63:23, 63:24, 65:11, 65:14, 66:14, 67:7, 67:8, 67:13, 67:14, 67:15, 71:5, 71:14, 122:6, 124:5, 124:25, 126:8, 143:10, 150:2, 197:16, 213:14, 213:15, 223:8, 251:10, 251:19, 252:16, 252:19, 252:22, 252:25, 253:2, 253:5, 253:13, 253:14.
Rules 2:3, 6:19, 30:19, 63:25, 64:5, 70:19, 71:12, 72:3, 98:20, 98:24, 98:25, 99:2, 99:3, 107:3, 111:1, 111:4, 124:4, 141:10, 143:4, 149:25, 167:23, 177:18, 207:9, 217:5, 225:20, 225:23, 245:15.
run 9:24, 102:16, 116:16, 218:25.
running 14:2, 88:7, 179:14, 193:13, 246:25, 247:4.
runs 140:18.

< S >.
S. 3:18, 3:20, 3:26.
safeguard 133:9.
sake 6:25.
salary 87:6.
sample 148:10.
San 2:17.
Sarah 106:25, 107:1.
save 22:25, 186:1, 215:22.
saw 27:7, 86:20, 163:15, 219:15, 237:20, 248:6.
saying 65:1, 65:14, 85:17, 128:24, 130:18, 131:12, 163:6, 163:8, 198:23, 236:17, 242:12.
says 78:25, 79:3, 80:3, 81:2, 82:7, 88:7, 108:14, 113:22, 117:15, 122:23, 124:9, 139:10, 152:9, 152:12, 152:16, 153:12, 153:16, 124:12, 148:17, 150:5, 180:16, 181:14, 200:22, 208:13, 208:15, 201:20, 210:3.
significantly 49:18, 116:2.
signs 25:9.
Silken 220:2.
similar 48:6, 103:22, 111:7, 137:24, 144:23, 240:21, 248:5.
Similarly 162:18, 178:9, 240:18.
simplified 124:4.
simply 98:15, 25:16, 60:10, 80:20, 81:9, 81:14, 82:21, 82:25, 87:4, 89:25, 111:2, 114:14, 143:16, 189:5, 202:20, 202:23, 203:3, 219:10.
sit 76:9, 161:22, 241:21.
site 41:18, 164:5, 175:23, 175:24, 176:4, 222:20.
sites 176:13, 176:5.
situation 118:6, 131:10, 142:18, 217:21.
situations 23:20, 70:15, 98:19, 140:24, 147:9.
six 18:9, 31:5, 31:16, 53:17, 68:2, 92:3, 140:15, 151:17, 226:6, 230:21, 251:20, 251:21, 252:4, 252:12.
six. 140:24.
size 85:21, 247:17.
skilled 99:3.
skimmed 36:20, 187:23.
slapped 244:13.
slew 40:1.
slighted 191:16.
slip 68:18.
slow 92:11.
slower 53:12.
small 16:23, 44:24, 58:16, 140:12, 194:9, 216:8.
smaller 53:2.
smoothly 42:6, 50:24, 56:22, 102:10, 152:21, 204:6.
so-called 195:25, 234:21.
Social 99:16, 139:18.
soft 46:15, 46:19, 47:9, 47:25, 48:1.
software 53:18.
solely 17:10.
soliciting 85:24.
solutions 179:7, 49:6, 76:15.
solves 113:7.
solving 194:6.
somebody 25:3, 58:13, 84:22, 85:3, 85:13, 88:13, 88:7, 100:25, 103:12, 104:5, 112:23, 114:4, 114:14, 116:5, 117:20, 124:18, 134:24, 135:22, 136:6, 136:10, 152:7, 173:4, 173:12, 173:17, 188:22, 208:17, 229:19.
Somehow 138:17, 231:12.
someone 16:15, 65:8, 75:16, 75:17, 166:11, 129:12, 130:21, 131:6, 199:1, 214:23, 214:24.
Sometime 32:24, 144:17, 187:25.
somewhere 45:23, 88:9, 200:8.
soon 75:24, 234:14.
sooner 130:1.
Sorry 7:16, 8:1, 13:4, 17:6, 20:21, 46:13, 47:8, 72:17, 81:5, 101:18, 117:16, 128:16, 138:19, 159:21, 164:2, 165:4, 187:25, 190:10, 196:9, 232:17, 236:2, 241:24, 242:19, 246:20.
sound 211:12.
source 153:20, 154:16.
space 251:11.
Spanish 182:8, 248:14, 248:16.
Speaker 148:13, 149:4.
Speakers 39:9.
speaking 9:7, 9:9, 41:5, 85:4, 94:13, 195:4.
spearheaded
special 44:25, 45:1, 59:3, 80:17, 82:21, 94:8, 127:13, 127:22, 140:24, 152:19, 152:25, 180:23, 201:24, 202:7, 204:11, 204:23, 205:4, 205:13, 205:15, 206:7, 206:25, 206:6, 207:1.
specialists 110:10, 140:13, 140:14, 222:22, 232:24.
specialized 32:11.
specificity 129:8, 184:17.
spectrum 58:10.
speculate 169:22, 202:10.
speculating 86:15, 121:19, 205:2.
speculation 202:13.
speed 35:3.
spelled 214:6.
spend 33:22, 45:20.
spending 69:24, 86:22.
spent 86:7, 86:8, 86:14, 177:9.
split 178:16, 178:20.
spoil 215:4.
spoke 43:9, 43:24.
spoken 156:19.
sponsor 61:15.
sponsoring 64:3.
spread 42:24, 43:1, 84:24, 163:2, 246:15.
spreadsheet 113:10.
spring 46:16, 59:5, 94:13, 94:15, 141:8, 141:17, 141:18, 144:16.
Srds 205:15, 205:25, 206:6, 207:1.
ss 255:2.
St. 112:17, 114:12.
stab 158:14.
stack 163:13.
staffing 178:4, 178:6, 178:12.

**291**

**290**

154:17, 154:21, 158:5, 161:1, 165:19, 168:3, 169:8, 170:21, 177:13, 177:14, 178:4, 203:24, 230:2, 233:4, 234:13, 236:3, 236:22.
scheduling 116:18.
school 121:14.
schools 39:19, 201:25, 202:8, 204:12, 204:13, 204:24, 204:25.
scramble 12:5.
seal 244:15, 255:22.
Seated 5:2.
second 25:21, 33:16, 69:17, 80:4, 124:6, 125:20, 135:5, 138:16, 165:13, 175:21, 185:3, 194:2, 231:8, 242:23, 248:18.
Section 182:7, 185:5, 208:14, 217:14.
sections 178:20.
sector 26:23.
secured 181:14.
Security 99:16, 99:18.
seeing 76:7, 126:18, 159:20, 162:18, 159:4, 165:10, 170:12, 224:2, 235:2.
seems 92:22, 167:14.
seen 78:4, 79:22, 87:16, 91:1, 91:3, 106:9, 110:6, 112:13, 116:10, 118:1, 122:14, 127:18, 138:23, 151:11, 159:1, 162:12, 165:8, 185:17, 186:3, 188:12, 188:17, 217:19, 219:24, 220:25, 231:3, 235:22, 237:18, 249:3, 249:5.
segments 40:24.
segregated 233:14, 234:7, 234:10.
self-interest 160:13.
Senate 21:24, 47:23, 148:8, 149:16.
Senator 148:5, 150:1, 157:3.
send 23:3, 29:25, 35:5, 39:9, 39:20, 62:18, 78:16, 84:21, 84:22, 85:13, 85:22, 111:20, 126:20, 166:8, 200:2, 213:18, 213:19, 231:19.
sending 69:19, 114:19.
Sends 114:4, 230:6.
sense 54:20, 134:19, 158:17, 201:18, 203:14, 209:25.
sensitivity 218:10.
sent 78:4, 78:8, 78:14, 78:22, 81:3, 88:18, 110:12, 116:24, 117:17, 127:19, 152:3, 166:21, 187:13, 204:12, 204:24, 205:7, 205:23, 213:17, 224:25, 232:11, 249:8.
sentence 80:4, 80:7, 82:2, 110:21, 125:16, 125:25, 131:22, 136:10, 154:17, 158:5, 234:22.
separate 37:24, 60:3, 64:17, 87:5, 135:24, 146:11, 198:11, 206:14, 219:2, 233:22, 239:5, 245:12.
separated 146:2.
separately 114:21, 248:6.
separating 87:5, 144:15.
series 24:24, 159:4, 231:3.
seriously 96:5.
serve 54:14, 132:9.
served 126:2, 126:4.
service 39:7, 40:9, 41:12, 41:17, 46:2, 145:5, 145:11, 146:7, 187:21.
serving 131:21, 136:10.
session 19:24, 22:7, 29:3, 31:22, 61:7, 151:14, 151:16, 151:18, 151:20, 152:16, 199:17, 213:2, 213:13.
sessions 151:21.
set 34:24, 143:3, 195:24, 253:3, 255:21.
setting 175:4.
settled 67:18, 214:10.
seven 193:25.
several 53:20, 197:21, 198:7, 250:22.
Shane 12:16, 227:1, 227:7, 228:3, 233:4, 234:1.
share 18:12, 160:19, 167:11.
SHEET 254:1.
sheets 241:11.
shifts 178:16.
shock 194:15.
shoot 130:6.
Short 77:1, 210:10.
shortened 228:17.
shorter 93:7.
shorthand 108:3.
shortly 88:15, 89:19, 144:15.
shouldn't 215:16, 233:6.
show 25:1, 47:2, 105:8, 106:5, 117:22, 122:10, 125:10, 174:2, 174:4, 176:25, 238:22.
showed 59:11, 63:12, 215:8.
shows 72:18, 241:3, 242:8, 242:24.
side 12:1, 14:1, 14:18, 28:8, 133:11, 133:13, 133:14, 148:16, 212:16, 213:10, 219:23, 220:12.
sides 147:17, 147:23.
sign 24:15, 25:19, 26:13, 27:2, 27:5, 68:14, 132:21.
signals 74:25.
signatures 14:4.
Significant 12:18, 22:25, 25:18, 37:7, 137:13, 137:16, 137:19, 137:20, 218:24, 232:8, 90:16, 90:23, 95:19, 116:2.
stage 18:22.
stages 252:20.
stakeholders 67:9, 67:17.
stand 64:19, 64:21, 93:5, 93:9, 250:24, 251:3, 251:25, 252:3, 252:8.
standard 67:2, 67:5, 67:9, 103:20, 163:2.
standing 96:7.
start 16:5, 59:23, 94:20, 129:4, 149:19, 155:6.
started 37:4, 63:7, 88:15, 89:20, 114:22, 136:24, 200:10.
starting 17:17, 88:1.
starts 15:11, 65:1, 78:7, 82:3.
state 76:15.
state-issued 104:2, 104:4.
stated 40:23, 81:16, 189:21.
statement 82:18, 156:22, 204:1, 217:3, 217:5, 233:11.
statements 144:9, 144:15.
States 11:3, 5:8, 65:3, 120:17, 120:19, 121:22, 121:24, 122:1, 122:6, 137:13, 137:16, 137:19, 137:20, 154:1, 155:4, 156:6, 174:16, 194:17, 206:24, 243:6.
stating 82:21.
station 64:17, 65:5.
stationed 251:21.
statistics 105:7, 161:14.
status 22:1, 22:9, 22:12, 115:12, 115:20, 116:3, 252:3, 252:8.
statutory 73:20, 123:24, 172:17, 179:16, 189:21.
stay 21:15, 21:19, 36:13, 75:2, 197:8, 218:20, 197:20, 198:8, 141:12.
stayed 38:3, 100:23, 144:9, 144:15.
staying 223:2.
stays 29:12.
stenographic 255:15.
step 133:9, 175:11, 216:7, 216:8, 216:22.
steps 49:3, 69:14, 130:1, 131:17, 132:22, 133:18, 133:22, 134:11, 159:4.
stick 109:9.
sticks 96:9.
Stone 78:11.
stories 47:24, 98:3, 99:23, 182:9, 181:12.
storm 56:17.
story 224:20.
Stoller 3:12, 78:12.
straight 210:19, 210:22, 211:10, 212:6.
strategic 83:14, 219:14, 143:17.
Street 2:7, 2:16, 223:5, 255:13.
stretching 147:14.
strict 103:21.
Strike 129:4, 155:7, 211:22.
strongly 199:3.
struck 123:3.
structure 16:1, 31:12, 51:18.
structured 10:19.
structuring 97:15.
stuck 95:2.
student 39:14, 118:6, 118:8, 121:11, 233:14, 233:15, 233:20, 233:22, 235:5, 235:9.
students 42:1, 118:14, 119:22, 120:1, 122:24, 121:2, 121:3, 121:6, 200:13, 233:5, 233:10, 233:16, 235:16, 236:18.
studies 15:25, 25:22, 25:23, 25:25, 26:9, 72:3, 26:11, 91:3.
Study 26:5, 32:22, 88:17, 90:9, 92:15, 91:18, 95:4, 136:20.
subject 11:23, 12:22, 13:19, 133:23, 15:24, 17:12, 26:18, 27:3, 27:17, 112:16, 118:13, 124:9, 199:7.
subjected 217:10.
subjective 129:15.
submit 80:19, 109:14, 164:6, 205:20, 209:1, 216:17.
submitted 55:12, 77:9, 89:25, 101:4, 128:9, 216:20, 239:8.
subscribe 21:25, 26:3.
subsequent 99:9.
subsequently 131:12.
substance 41:20, 140:21.
substantiate 155:9, 155:11, 155:13.
substantive 176:2, 176:16.
substitute 173:15.
successful 44:18, 44:21, 226:8.
sufficient 184:6.
sufficiently 49:2.
suggest 136:15.
suggesting 191:4, 205:25.
suggestion 168:17, 178:3.
suggestions 24:17, 167:16.
suing 99:7.
Suite 2:16.
summary 153:19, 219:3, 225:11, 238:3, 238:4.

**292**

239:9.
sunk 84:6.
supervise 7:19,
32:19.
supervising
33:19.
supervisor 52:2,
103:5, 105:25,
112:20.
supplies 182:21.
support 123:16,
197:4, 197:13,
197:24, 198:7,
218:12, 239:8.
supported 124:1.
supporter
197:14.
supporters 58:7,
supporting 91:11,
150:4, 197:11,
203:1.
supposed 19:10,
24:13, 70:13,
148:4, 165:4,
223:17,
223:18.
Supreme 126, 127,
144:19.
surprised 115:6,
117:9, 190:14,
surrender 80:5.
surrounded
222:14.
surrounding
60:8.
survey 32:24,
137:1.
surveyed 135:5.
SVRS 100:20, 107:1,
107:5, 140:17.
swear 5:22.
sweeping 36:24.
sworn 6:8,
255:11.
Systems 96:15,
201:14.
.
<T>.
T-shirts 98:15,

167:22.
tab 200:4.
table 65:2, 198:17,
209:21, 252:1.
tables 25:15.
tabulated 82:23.
tackle 183:18.
tactics 75:5.
takers 132:3.
talked 83:7, 113:25,
153:14, 153:19,
156:24, 170:24,
176:19, 183:16,
184:22, 195:1,
195:25, 196:6,
208:3, 209:19,
217:11, 221:9,
221:22, 241:12,
242:22, 250:22,
252:16.
talks 176:2, 217:4,
234:12.
238:14.
tape 76:22,
210:6.
target 75:13,
181:21.
targeted 40:4,
206:17.
targeting 40:7.
task 44:9.
tasks 16:11, 33:25,
39:25, 132:5.
tax 62:19, 233:5,
234:2, 234:5.
taxes 225:6.
teaching 51:13,
140:10.
team 7:21, 8:13,
25:17, 27:13,
140:12, 140:15,
162:14.
teams 38:17.
teamwork 28:2.
technical 89:14,
107:7.
technology 51:23,
53:10, 53:20,
53:21, 100:14.
telephone

166:20.
template 148:11.
templation
108:2.
tenants 208:12.
tend 62:8, 20:15,
92:24, 94:3, 94:16,
103:16, 111:3,
111:25, 205:6,
247:22.
tended 12:14, 12:16,
244:16.
tends 28:10, 35:15,
71:24.
tension 225:25,
226:17.
term 12:20, 13:12,
107:24, 108:24,
109:9, 188:9,
188:18, 189:4.
termed 139:14.
terms 45:19, 45:21,
45:22, 46:10,
85:18, 91:9, 108:9,
150:15,
175:23.
territory 147:21.
tested 95:2.
testified 6:8, 172:0,
17:21, 74:10,
74:11, 77:6, 77:12,
190:14, 196:22,
197:7, 201:2,
203:17,
204:20.
testify 8:24, 20:24,
197:13, 203:6.
testifying 21:7,
27:11, 27:18,
196:16,
207:22.
Testimony 3:15, 7:7,
20:6, 21:9, 27:14,
27:15, 38:13,
77:22, 79:25,
190:13, 195:7,
198:14, 197:6,
197:8, 199:18,
199:22, 200:5,
200:16, 202:19,

202:23, 207:4,
207:8, 207:15,
207:17, 207:20,
208:8, 208:10,
208:14, 209:3,
214:20, 218:20,
218:21, 219:3,
219:12, 255:21.
text 244:17.
Thanks 110:13.
thans 134:21.
theme 52:6, 139:15,
243:24.
themes 152:24,
162:4, 170:13.
themselves 5:21,
48:2, 63:20, 69:2,
223:11,
246:14.
theory 172:6,
199:3.
theres 48:8.
They've 49:3, 60:15,
75:16, 76:20,
129:17, 129:18,
131:15, 182:10,
194:20, 194:21,
216:20, 218:25,
228:22, 229:2.
thinking 23:24, 33:1,
33:2, 32:22, 71:15,
71:17.
third 138:18,
190:3.
thorough 67:8.
though 20:12, 85:15,
93:17, 166:19,
179:3, 203:3.
thoughtful 67:4.
three 31:2, 31:15,
31:20, 31:25,
37:13, 56:14, 60:8,
64:21, 65:1, 65:6,
65:19, 65:25, 66:7,
68:12, 73:25, 95:2,
95:7, 114:2,
132:10, 137:10,
209:21, 221:13,
221:16, 251:14,

tutorials 54:12.
TV 39:8, 41:13.
tweak 203:9.
tweets 111:22.
twice 32:3, 85:21,
136:8.
Twitter 111:10,
112:4.
two 10:25, 11:6,
13:16, 17:8, 18:24,
31:20, 45:24,
49:20, 53:7, 53:16,
54:3, 56:1, 59:11,
63:10, 67:12,
68:24, 87:5, 87:22,
94:13, 99:24,
102:13, 135:24,
146:5, 146:11,
147:1, 147:6,
153:2, 175:13,
189:24, 194:14,
194:16, 197:15,
197:18, 198:25,
205:22, 207:15,
207:18, 207:23,
228:21.
two-day 54:3.
two-page 186:5.
two-thirds 32:23.
two-year 29:7, 29:8,
29:11.
type 30:13, 30:16,
43:5, 78:15, 84:19,
164:1, 174:2,
176:5, 190:2,
245:22.
245:23.
types 102:20, 163:2,
237:9, 241:17.
typically 26:16.
.
<U>.
ultimate 27:4.
Ultimately 14:21,
28:8, 45:4, 45:16,
46:1, 47:6, 57:5,
58:18, 79:13,
79:14, 86:14,

147:7, 218:9,
222:11, 235:8,
235:22.
Um-hum 30:15,
49:25, 67:3,
121:25.
122:15,
201:12.
unable 59:1,
130:8.
uncertainty 18:22,
223:1.
unchartered
147:21.
unclear 237:7.
unconstitutional
127:17, 216:22,
219:16, 234:5,
undeliverable 81:4,
81:20.
underlying 173:23,
174:1.
understand 9:13,
19:18, 20:25,
22:12, 29:15,
29:18, 79:16,
126:25, 167:18,
169:12, 170:4,
176:20,
186:22.
understandable
37:19, 41:3.
understanding
102:3, 103:16,
120:11,
120:15.
understands
134:9.
understood 102:24,
177:16,
245:22.
undertook
137:11.
unfortunately
67:22.
unhappy 146:9.
uniform 97:22,
195:25, 196:1,
250:2.
unique 183:2.
United 1:3, 5:8,
universe 169:3.
universities 39:18,

200:23, 201:4,
201:15, 233:7.
University 39:16,
39:17, 121:2,
233:12,
237:24.
unknown 48:16.
unless 73:1, 51:3,
250:11,
250:17.
unwilling 236:14.
unnecessarily
169:9.
unsupported
143:13.
until 62:7, 11:1,
46:16, 49:12,
55:12, 123:9,
130:8, 144:16,
144:20, 155:2.
unusual 146:19,
163:1, 181:18,
182:25.
UOCAVA 211:15.
up-to-date 35:1.
Update 32:16, 88:4,
84:5, 125:12.
updated 38:25,
144:25, 145:5.
updates 22:3,
84:8.
updating 100:14.
upgrade 53:8.
usable 54:1,
54:13.
useful 156:23,
162:10,
162:11.
using 30:8, 71:21,
74:18, 108:24,
114:22, 129:3,
134:13, 188:9.
view 30:10, 30:12,
54:10, 54:11,
123:16, 139:23,
184:4, 193:23,
196:12, 206:13,
207:3, 208:6.
viewed 204:3.
views 21:1.
villages 33:11.

valid 49:4, 49:14,
49:15.
varies 35:15,
247:18.
variety 7:24, 8:7,
11:11, 15:13,
23:20, 33:25, 34:1,
47:20, 48:10,
102:1, 170:17,
205:18.
various 32:1, 59:25,
150:24, 180:11,
199:22.
vary 179:12.
vast 16:15.
vehicle 142:9.
Vehicles 235:7.
vendors 162:21.
verification
170:22.
verify 126:20,
170:8.
version 186:20,
195:13.
versus 101:20,
141:15, 189:9.
Video 53:3, 5:16,
71:10, 150:13,
169:23, 207:14.
VIDEOGRAPHER
2:27, 5:1, 5:15,
6:3, 6:11, 76:23,
77:2, 136:6, 136:9,
143:22, 144:2,
210:7, 210:11,
248:19, 248:22,
253:17.
videos 54:11.
VIDEOTAPED 1:20,
2:1.
video 30:10, 30:12,
54:10, 54:11,
123:16, 139:23,
184:4, 193:23,
196:12, 206:13,
207:3, 208:6.
viewed 204:3.
views 21:1.
villages 33:11.

251:15, 251:18,
252:7.
three-credit
30:24.
three-hour 30:24,
31:22.
three-year
194:14.
three, 246:6.
threefold 9:19.
threshold 75:19.
throughout 46:24,
84:18, 103:24,
105:24, 106:4,
135:6, 135:6,
179:25, 189:19,
191:12, 191:14,
196:2, 214:9,
227:11.
ticket 210:19,
210:22, 211:10,
212:7.
tie 231:11.
tie, 231:9.
tighter 126:16.
timely 141:6.
timing 31:12.
tips 98:18.
title 107:1, 164:2,
228:16.
to, 236:5.
today 6:17, 7:6,
43:22, 48:25,
77:21, 88:24,
95:16, 184:23,
221:12,
241:21.
Todd 2:27, 5:15,
together 159:8,
162:14, 174:19,
246:4.
tone 175:4.
took 11:4, 43:20,
90:23, 91:18,
147:24, 171:18,
172:23, 197:3,
197:19, 208:6,
214:19,
223:21.
tool 240:1.

top 97:8, 106:14,
128:25, 146:5,
160:11, 163:23,
164:17, 164:18,
164:20, 164:21,
165:14, 167:9,
168:3, 184:18,
185:21, 208:12,
224:15, 227:8,
231:5, 244:14.
topic 13:11, 60:3,
61:17, 90:5, 98:21,
98:22, 99:4, 99:10,
169:17, 195:11,
198:10.
209:25.
topics 32:1, 88:17,
140:13, 140:24,
141:4, 167:8.
tore 222:17.
toss 27:25.
total 29:2, 45:23,
touch 42:25, 161:25,
162:2, 167:24,
182:3, 248:1.
towards 11:24,
213:13.
town 116:21,
117:15.
towns 33:11,
township 116:17,
track 221:10, 22:17,
22:20, 34:9, 59:24,
59:23, 59:24, 60:2,
60:14, 61:4, 72:9,
113:7, 236:15,
246:22.
tracked 113:12,
143:18.
tracking 61:2,
69:19.
traffic 140:19.
train 30:18, 34:20,
34:23, 37:22,
70:10, 71:12, 83:2,
149:3, 151:12,
129:22, 139:17,
175:24, 182:14,
232:6.
trained 39:22, 141:5,

159:9, 175:15,
205:16, 206:7,
transcript 4:9, 83:3,
210:17.
transfer 18:24,
53:4.
transition 18:10,
18:21, 19:4, 19:11,
19:13, 52:19, 56:4,
58:21, 87:2,
145:18, 145:19,
145:21, 145:24,
146:7.
transitioned 30:5,
30:8.
transitioning
53:9.
translate 61:9.
transmit 213:8.
transparency
69:8.
transparent
69:11.
transports 60:2.
treated 10:2:25,
103:18.
tree 188:1.
tribal 204:13,
204:24.
tried 40:19, 41:2,
44:4, 52:5, 52:12,
60:17, 63:22,
63:23, 70:10, 76:8,
90:17, 102:5,
102:16, 108:22,
108:23, 123:23,
129:1, 153:25,
174:11, 176:8,
178:13, 182:13,
186:21, 196:18,
218:24, 223:1,
239:17, 244:22,
245:16, 247:22.
tries 75:2, 188:8,
200:5.
trip 85:2, 85:5,
95:14.
tumuous 72:18.
trouble 112:16,
114:12.

true 89:8, 239:19,
255:10.
truthful 7:7.
trying 11:21, 12:8,
17:20, 20:25,
25:14, 44:9, 50:22,
51:8, 52:14, 71:25,
73:22, 75:24,
92:13, 102:10,
108:8, 115:15,
134:1, 135:20,
153:23, 156:7,
167:16, 179:4,
189:20, 191:12,
196:3, 232:10,
203:3, 213:13,
218:5, 221:19,
227:19, 227:23,
228:3, 236:15,
237:25, 243:15,
246:14.
tumultuous
57:24.
tune 75:2
219:13.
turn 75:6, 83:2,
152:11, 153:8,
183:4, 192:3,
195:1.
turn-out 44:25, 45:3,
92:22, 178:5,
179:3, 184:14.
turnout 72:11, 72:15,
72:23, 73:4, 73:16,
74:23, 91:2, 91:6,
93:24, 94:2, 94:4,
94:7, 94:9, 94:14,
94:16, 94:18,
94:21, 94:24,
94:25, 95:10,
178:15, 178:19,
184:3, 185:12,
221:19.
turnouts 72:18.
turnover 34:21,
34:22, 36:6.

266:14.
websites 56:1,
242:5.
Wednesday
31:14.
week 31:25, 33:2,
33:4, 33:22, 51:19,
54:7, 60:11, 60:12,
102:5, 152:4,
164:13, 190:23,
195:18,
203:17.
weekday 190:20.
weekdays
189:24.
weekend 190:3,
190:7, 190:11,
190:18, 190:19,
192:5, 192:9,
195:3, 195:5.
weeks 189:9, 29:25,
31:13, 31:15, 50:8,
189:24.
weigh 20:5, 27:1.
weighed 214:17.
West 2:7, 22:3, 5:13,
255:13.
Western 1:4, 5:9.
whatever 9:1, 20:11,
42:21, 140:2,
167:21, 216:17,
217:10, 218:5,
whereof 255:21.
white 213:15.
Whitt 3:20.
whoever 26:18.
whole 30:1, 31:16,
33:24, 40:1, 44:9,
58:19, 71:22,
147:25, 163:5,
169:3, 209:25,
230:12.
whom 5:21,
104:3.
wide 169:3, 170:17,
205:18.
219:18.
widely 35:16,
179:12, 201:18,
201:21, 202:2,

243:1.
widespread 89:7,
138:2, 162:22.
willing 44:2, 174:21,
199:7, 200:24.
WILSON 2:13, 3:5,
5:23, 6:13, 8:16,
20:19, 76:21,
105:12, 112:8,
138:4, 138:13,
139:17, 149:20,
158:14, 158:19,
164:14, 164:21,
185:2, 185:19,
210:15, 238:23,
248:17, 250:10,
250:16, 252:9,
253:2,
253:16.
wish 154:23.
Wisvote 100:21.
withdraw 16:14,
30:17, 79:16,
142:20,
196:11.
withdrawn 196:9.
within 17:16, 29:14,
64:21, 85:12,
171:4, 194:4,
204:7, 203:3,
245:9, 245:15,
251:11,
251:25.
without 50:24, 72:1,
73:22, 129:10,
133:22, 166:4,
173:19, 198:9,
202:22, 225:9.
Witness 2:1, 5:22,
6:6, 21:3, 191:6,
254:2, 255:21.
witnessed
222:20.
Wolfe 111:15.
Women 35:12,
44:14, 153:10,
153:17, 228:13,
228:17,
246:18.

violate 167:23.
violated 14:23.
violates 136:6.
violation 225:22.
violations 14:16,
148:19,
225:19.
vocal 149:1.
voice 119:20.
volume 119:16.
voluntarily
198:16.
volunteers 167:20,
167:22.
voted 99:21, 70:1,
125:9, 134:24,
135:22, 136:8,
136:15, 137:13,
137:18, 215:7,
215:14,
221:21.
voter 214:14.
voter/clerk/public
88:10, 88:25.
voters, 239:21.
voters 69:20,
148:14.
vs 5:6.
vulnerable 40:18,
238:14, 238:15,
238:16.
.
<W>.
Wait 62:7, 97:13,
138:15, 155:2.
waited 130:8.
waiver 174:10.
walk 32:8, 68:13.
Walker 7:6.
wanted 12:12, 25:3,
40:11, 40:9, 42:22,
43:22, 52:10,
107:16, 118:6,
121:21, 127:3,
132:19, 145:3,
165:15, 198:8,
196:15, 198:13,
196:15, 208:19,
213:14, 224:17,

225:4, 225:6,
240:5, 246:23,
248:2.
wanting 116:16,
195:4, 232:4.
wants 32:4, 64:10,
70:2.
ward 209:5.
warning 222:1,
222:8, 223:10.
wasn't 35:16.
watch 230:17.
Watching 34:14,
166:22.
waukee 228:11,
228:17.
Waukesha 228:11,
228:17.
ways 21:21, 23:21,
29:20, 29:22,
35:20, 60:1, 92:13,
109:12, 129:2,
135:13, 173:7.
wearing 98:14,
167:22.
Webinar 31:14,
34:11, 34:14,
139:18,
140:19.
Webinars 30:4, 30:6,
30:9, 31:7, 31:16,
31:19, 135:15,
139:5, 139:20.
white 148:3, 29:24,
41:14, 41:16,
54:21, 54:23,
55:20, 78:20,
106:19, 106:20,
106:21, 106:22,
106:24, 108:17,
108:19, 128:20,
145:6, 164:4,
145:6, 164:4,
174:12, 187:3,
199:25, 200:3,
230:24, 239:25,
240:3, 240:19,
242:15, 242:18,
242:20, 245:3,
245:5, 245:19,



won 49:10.
word 28:2, 42:24,
  43:1, 84:24, 105:9,
  129:3, 136:4,
  192:18, 192:19,
  192:21,
  246:15.
words 33:7, 65:17,
  74:9, 84:3, 107:15,
  108:15, 108:17,
  114:14, 121:23,
  125:9, 134:13,
  232:6.
wordsmithing
  28:10.
work 7:11, 8:10,
  8:14, 11:23, 20:25,
  21:22, 23:19, 33:7,
  33:8, 53:15, 55:1,
  56:3, 57:18, 57:22,
  58:10, 65:9, 75:20,
  100:7, 100:10,
  100:16, 100:18,
  107:3, 131:23,
  132:1, 132:3,
  156:20, 170:12,
  179:13, 190:20,
  206:2, 213:13,
  237:22.
worked 11:12, 11:13,
  11:16, 39:16, 54:6,
  100:22, 137:18,
  174:19, 182:8.
worker 175:2,
  177:13, 177:15,
  178:4.
workers 10:3, 88:3,
  169:12, 170:3,
  175:8, 177:21,
  183:9, 184:3.
workers 8:28.
working 8:18, 11:19,
  21:21, 22:8, 33:5,
  43:17, 116:15,
  151:1, 167:1,
  179:1.
works 52:18,
  103:4.
world 189:7.
worth 85:2, 85:5,

97:5.
wrinkle 219:12.
write 110:13.
Write-in 211:11,
  212:8.
writing 226:13,
  235:15.
written 152:17,
  153:6, 221:2.
  .
  .
  <Y>.
year 18:7, 29:6, 31:9,
  31:18, 31:20,
  34:23, 38:4, 43:11,
  62:19, 63:10,
  67:12, 86:19,
  94:19, 125:1,
  141:18, 141:19,
  141:21, 151:17,
  175:13, 175:14,
  176:18, 194:2,
  197:21, 198:25,
  205:22, 228:7,
  252:22.
year-round
  130:19.
years 16:24, 30:5,
  35:13, 53:6, 53:7,
  53:16, 57:25,
  94:12, 94:23,
  121:14, 125:9,
  141:15, 141:16,
  148:21, 184:15,
  194:1, 194:17,
  198:1, 200:7,
  200:10, 205:3.
yelling 150:13.
Yorker 6:26.
young 222:10,
  224:1, 224:3,
  224:6.
  .
  .
  <Z>.
zone 252:8,
  252:12.