**Page 1**

```
 1
 2
 3              IN THE UNITED STATES DISTRICT COURT
 4            FOR THE WESTERN DISTRICT OF WISCONSIN
 5   * * * * * * * * * * * * * * * * * * * * * * * * *
 6   ONE WISCONSIN INSTITUTE, INC., et al.,
 7                Plaintiffs,
 8   -vs-                        Case No. 15-CV-324-bbc
 9   GERALD C. NICHOL, et al.,
10                Defendants.
11   * * * * * * * * * * * * * * * * * * * * * * * * *
12
13
14
15        VIDEOTAPED DEPOSITION OF KEVIN J. KENNEDY
16               Thursday, January 14, 2016
17                     9:14 a.m.
18
19          Reported by:  Lisa A. Creeron, RPR
20
21
22
23
24
25
```

**Page 2**

```
 1       VIDEOTAPED DEPOSITION OF KEVIN J. KENNEDY, a
 2   witness in the above-entitled action, taken at the
 3   instance of the plaintiffs, under the provisions of the
 4   Federal Rules of Civil Procedure, taken pursuant to
 5   notice, before LISA A. CREERON, a Registered Professional
 6   Reporter and Notary Public in and for the State of
 7   Wisconsin, at the Wisconsin Department of Justice, 17 West
 8   Main Street, in the City of Madison, County of Dane, and
 9   State of Wisconsin, on the 14th day of January, 2016,
10   commencing at 9:14 a.m.
11
12              A P P E A R A N C E S
13      JOSHUA L. KAUL,
            PERKINS COIE, LLP,
14          Attorneys at Law,
            One East Main Street, Suite 600,
15          Madison, Wisconsin 53703, appearing on
            behalf of the plaintiffs;
16
        S. MICHAEL MURPHY and GABRIEL JOHNSON-KARP,
17          Assistant Attorneys General,
            WISCONSIN DEPARTMENT OF JUSTICE,
18          17 West Main Street,
            Madison, Wisconsin 53703, appearing on
19          behalf of the defendants.
20   ALSO PRESENT:  TODD CAMPBELL (Videographer)
21                     * * * * *
22
23
24
25
```

**Page 3**

I N D E X

| Examination by: | | Page |
|---|---|---|
| Attorney Kaul | | 7 |
| Attorney Murphy | | --- |

| Exhibit | | Identified |
|---|---|---|
| 1 | Memo to Wisconsin Municipal Clerks and others from K. Kennedy dated 12-10-12 | 22 |
| 2 | Memo to Wisconsin County Clerks and others from M. Haas dated 4-11-14 | 29 |
| 3 | GAB press release dated 10-26-12 | 43 |
| 4 | GAB report, An Examination of Early Voting In Wisconsin | 48 |
| 5 | WSJ article dated 7-30-14 | 83 |
| 6 | Testimony of K. Kennedy dated 10-9-13 | 84 |
| 7 | Emails between N. Judnic and M. Haas and others dated 2-14 and 2-15-13 | 90 |
| 8 | E-mails from M. Klingenmeyer and J. McGinley dated 2-15-13 | 94 |
| 9 | Email from D. Lowe to D. Buerger dated 10-28-14 and other emails | 99 |
| 10 | Various emails between A. Oberle and others dated January 2011 | 111 |
| 11 | Written remarks by K. Kennedy dated 4-27-11 | 117 |
| 12 | Emails between M. Haas and others dated 8-23-13 | 136 |

**Page 4**

I N D E X (Continued)

| Exhibit | | Identified |
|---|---|---|
| 13 | Memorandum to Interested Parties from N. Robinson dated 5-23-12 | 139 |
| 14 | News article dated 7-2-14 | 145 |
| 15 | Testimony of K. Kennedy dated 1-23-14 | 151 |
| 16 | Letter to Election Observer Organization from N. Robinson dated 11-1-12 | 160 |
| 17 | GAB press release dated 7-31-12 | 162 |
| 18 | Emails between D. Lowe and others dated July 2012 | 164 |
| 19 | Emails between M. Haas and K. Kennedy and others dated 10-22-12 | 169 |
| 20 | Letter to B. Landgraf from N. Albrecht dated 11-5-12 | 173 |
| 21 | Emails between M. Haas and various people dated 10-22 and 23-12 | 176 |
| 22 | AP article dated 10-8-12 | 179 |
| 23 | Emails between S. Falk and R. Magney and others dated 4-1 and 4-2-14 | 180 |
| 24 | Emails between N. Robinson, M. Haas and others dated 9-7 and 9-8-10 | 182 |
| 25 | Congressional testimony of K. Kennedy dated 5-14-14 | 203 |
| 26 | Fiscal estimate for 2011 session | 215 |
| 27 | MJS article dated 11-25-11 | 219 |
| 28 | GAB press release dated 9-7-11 | 223 |

KEVIN KENNEDY                                                    01/14/2016

I N D E X (Continued)

| Exhibit | | Identified |
|---|---|---|
| 29 | Emails between D. Buerger, S. Falk and others dated 9-29 and 9-30-11 | 226 |
| 30 | Emails between R. Magney, D. Buerger and others dated 8-16-11 | 228 |
| 31 | Emails between R. Hein, A. Steinhauer and others dated 7-22-11 | 235 |
| 32 | Memo to K. Kennedy from B. Burden and others dated 1-4-11 | 240 |
| 33 | Letter to Hon. G. Tauchen from K. Kennedy dated 5-3-11 | 243 |
| 34 | Emails between D. Lowe, N. Robinson and others dated 7-15 and 7-16-09 | 250 |
| 35 | AP article dated 5-18-11 | 251 |
| 36 | Written remarks of K. Kennedy dated 11-15-11 | 252 |
| 37 | Letter to Hon. J. Fitzgerald from K. Kennedy dated 7-13-12 | 256 |
| 38 | Emails between R. Magney, K. Kennedy and others dated 9-20-10 | 266 |

(Original transcript is filed with Attorney Kaul)

5

---

1      THE VIDEOGRAPHER:  We are on the
2  record.  Seated before you is Kevin Kennedy.
3  This is Video No. 1 of his video deposition,
4  taken pursuant to notice, at the instance of the
5  plaintiffs, in the matter of One Wisconsin
6  Institute, Inc., et al., vs. Gerald C. Nichol,
7  et al., defendants, in the United States
8  District Court for the Western District of
9  Wisconsin, Case No. 15-CV-324.
10      This deposition is taking place at the
11  State of Wisconsin, Department of Justice,
12  17 West Main Street, Madison, Wisconsin.  The
13  date is January 14th, 2016.  The time is 9:15
14  a.m.  I am Todd Campbell, videographer for
15  Campbell Legal Video Company.  The court
16  reporter is Lisa Creeron with Madison Freelance
17  Reporters.
18      Would counsel please first introduce
19  themselves and state whom they represent?  And
20  the court reporter will swear in the witness.
21      MR. KAUL:  On behalf of the
22  plaintiffs, I'm Josh Kaul.
23      MR. MURPHY:  On behalf of the
24  defendants and Mr. Kevin Kennedy, Mike Murphy.
25      KEVIN J. KENNEDY,

6

---

1  called as a witness, being first duly
2  sworn in the above cause, testified
3  under oath as follows:
4      MR. MURPHY:  As an initial
5  housekeeping matter, we're here today under a
6  notice to depose Mr. Kevin Kennedy in his
7  capacity as defendant and we're appearing on
8  that notice today.  There may be another
9  deposition or other depositions where he appears
10  in a representative capacity, but here he is in
11  his capacity as defendant.
12      EXAMINATION
13  BY MR. KAUL:
14  Q    All right.  Mr. Kennedy, I just introduced myself a
15      moment ago, but I'm Josh Kaul.  I'm here on behalf of
16      the plaintiffs in this case, and let me start out by
17      going over just a few ground rules.  I know you've
18      been deposed before, right?
19  A    Yes.
20  Q    And you're an attorney, correct?
21  A    That's correct.
22  Q    So are you generally familiar with the deposition
23      procedures?
24  A    I am.
25  Q    All right.  Then just briefly I'll say if at any

7

---

1      point during today's deposition you want to take a
2      break or stop to get some water, feel free to let me
3      know that and we'll take a break, okay?
4  A    Fine.
5  Q    The one thing I would ask is that if I have a
6      question pending that you answer the question before
7      we take the break, okay?
8  A    Yes.
9  Q    And you understand that you just took an oath to
10      testify truthfully, right?
11  A    I do.
12  Q    And if at any point I ask you a question today and
13      you don't understand the question, please ask me to
14      clarify and I'd be happy to do so.
15  A    Okay.
16  Q    But if I ask a question and you do answer it, I'll
17      assume that you understood the question.  Is that
18      fair?
19  A    That's fair.
20  Q    Do you have any other questions about the deposition
21      procedure before we get started?
22  A    No.
23  Q    Let me start out by asking you a bit about your
24      background for the record.  When did you get involved
25      in elections work?

8

---

KEVIN KENNEDY

1  A   I was appointed the legal counsel for the former
2      State Elections Board on April 1st, 1979 and began my
3      career representing the State of Wisconsin in
4      elections and campaign finance at that point.
5  Q   Okay.  And that was after you graduated law school?
6  A   That's right.
7  Q   And at the time the State Elections Board was the
8      chief elections administration agency in the state,
9      right?
10 A   That's right.
11 Q   And what positions have you held in elections
12     administration since that time?
13 A   Well, in December of 1982 I was appointed acting
14     director of the State Elections Board and in -- on
15     August 17th, 1983 I became the executive director for
16     the State Elections Board and began my career as the
17     chief election officer for the State of Wisconsin.
18 Q   And have you been the chief election officer since
19     1983?
20 A   Yes.
21 Q   Now, that was with the State Elections Board until
22     2007, is that right?
23 A   That's right.
24 Q   Okay.  And in 2007 the State Elections Board was
25     replaced by an agency known as the Government

9

1      Accountability Board?
2  A   Technically the State Elections Board and the State
3      Ethics Board went out of business in January of 2008,
4      but I was hired on November 5th of 2007 as the
5      director and general counsel for the Government
6      Accountability Board.
7  Q   And if I refer to the Government Accountability Board
8      as GAB, you'll understand I'm referring to that?
9  A   Yeah.  I'll crinkle because we say G-A-B.
10 Q   Okay.  I will try to say G-A-B, although GAB is so
11     much easier, I may go with that.  So you have been
12     the director and general counsel of GAB since the
13     beginning of 2008, is that right?
14 A   Since November 5th, 2007.
15 Q   Okay.  And you hold that position as we sit here
16     today, correct?
17 A   I do.
18 Q   Now, in the course of your work on elections, you've
19     been involved in national organizations on election
20     administration, right?
21 A   That's correct.
22 Q   And in 2006 you were the president of the National
23     Association of State Election Directors?
24 A   That's correct.
25 Q   What is that organization?

10

1  A   It's an organization of chief election officials from
2      around the country or their designees because in many
3      cases it's a secretary of state who's the chief
4      election official, but these are the people who are
5      responsible for running elections in the 50 states,
6      District of Columbia and four territories.
7  Q   And what purpose does that organization serve?
8  A   It's really designed to share professional knowledge
9      is probably the primary goal.  It doesn't lobby for
10     election law changes, but it's really more of a
11     professional organization where people can exchange
12     ideas, learn best practices.
13 Q   And through your work in that organization, have you
14     become familiar with practices, election practices in
15     other states around the country?
16 A   I have.
17 Q   Let me ask you about the Government Accountability
18     Board also.  Can you explain how the Government
19     Accountability Board was different from the agencies
20     that preceded it?
21         MR. MURPHY:  Object to form.  You can
22         answer to the extent you're able.
23 A   Well, Wisconsin up until 1974, the Secretary of State
24     was in charge of elections, campaign finance and
25     lobbying.  After Watergate, Wisconsin was one of

11

1      several states that created an independent state
2      agency to oversee elections and campaign finance and
3      so the State Elections Board was created.  It
4      consisted of — it was a bipartisan board in the
5      sense that four of the nominees came from legislative
6      leaders.
7         The political parties who got 10 percent of the
8      vote for governor each got to nominate someone to
9      serve on the board.  The governor designated someone
10     to serve on the board, and the chief justice of the
11     Supreme Court nominated someone.  For a short period
12     of time towards the end, from 2003 until 2007, the
13     Libertarian Party also got to nominate someone
14     because their candidate for governor got 10.04
15     percent of the vote.
16 Q   Ed Thompson?
17 A   Yeah.
18 Q   So how does the GAB differ from those agencies?
19         MR. MURPHY:  Object to the form.  You
20         can answer to the extent you're able.
21 A   Well, the Government Accountability Board -- well,
22     the staff for both the State Elections Board and the
23     former Ethics Board were required by statute to be
24     nonpartisan.  There was no requirement on those board
25     members except for the Ethics Board, but the

12

**Page 13**

```
 1     Government Accountability Board, there are specific
 2     statutory criteria that say that, one, members of the
 3     board have to be former judges who had been elected
 4     and, two, they have to meet certain criteria of not
 5     having belonged to a political party, not made a
 6     campaign contribution for a year prior to their
 7     service on the board and while they're there can't
 8     hold any other public office other than that of a
 9     reserve judge.
10  Q  And the model that Wisconsin had with the Government
11     Accountability Board was unique within the country,
12     is that right?
13  A  Yes.
14              MR. MURPHY:  Object to form.  You can
15          answer.
16  A  Yes.
17  Q  And you've spoken at national forums about that
18     model, is that right?
19  A  I have.
20  Q  And you spoke favorably about that model, is that
21     fair?
22  A  I have.
23  Q  And there's been legal scholarships specifically
24     discussing the GAB, is that right?
25              MR. MURPHY:  Object to form.
```

**Page 14**

```
 1  A  That's correct.
 2  Q  And in particular, are you familiar with an article
 3     by Daniel Tokaji at Ohio State University regarding
 4     GAB?
 5  A  Yes.
 6  Q  And Mr. Tokaji is an election law expert, is that
 7     right?
 8  A  That's correct.
 9  Q  And that article called GAB the best American model,
10     is that right?
11  A  It did.  I think he was right.
12  Q  All right.  Let's talk about the success or lack
13     thereof in elections in Wisconsin through 2010, the
14     time of the 2010 election specifically.  Pew did a
15     study analyzing election administration across the
16     country, is that right?
17  A  Pew's done several different studies.
18  Q  And are you familiar with a study that analyzed the
19     2008 election specifically?
20  A  Are you referring to the performance index?
21  Q  Yes.
22  A  Yes.
23  Q  And Wisconsin ranked first in the nation in 2008, is
24     that right?
25  A  It did.
```

**Page 15**

```
 1  Q  And Wisconsin has also consistently been a national
 2     leader in turnout, is that right?
 3  A  It has.
 4  Q  And are you familiar with a Big 10 poll that studied
 5     voter confidence and voter satisfaction with election
 6     administration?
 7  A  By Barry Burden from the University of Wisconsin and
 8     others.
 9  Q  Do you know when that poll was conducted?
10  A  I don't.
11  Q  Do you know if it was around 2010 time frame?
12  A  It could have been, yes.
13  Q  And that poll showed that Wisconsin voters were more
14     satisfied with their election process than voters in
15     other states in the Big 10, is that right?
16              MR. MURPHY:  Object to form.
17  A  That's correct.
18  Q  And also other voters in the nation, is that right?
19  A  I don't recall, but I know that the poll demonstrated
20     that Wisconsin had the highest level of confidence
21     among its voters.
22              MR. MURPHY:  Object to form.  I'm just
23          going to put in a standing objection that to the
24          extent you're asking him about what's in
25          documents, that document would be the best
```

**Page 16**

```
 1     evidence of that, not what he thinks of the
 2     document.  So that's going to be a standing
 3     objection through the rest of this questioning,
 4     and I won't make that objection every time.
 5              MR. KAUL:  Okay.  I appreciate that.
 6  Q  And it's also your understanding that Wisconsin
 7     voters were more confident that their votes had
 8     counted according to that poll than voters in other
 9     states, right?
10  A  That's my recollection, yes.
11  Q  Let me ask you a bit about what your duties entail as
12     the chief elections officer in Wisconsin.  First can
13     you just generally provide an overview of what you
14     consider to be your duties in that role?
15  A  Well, as the chief election officer, I'm the person
16     that has to ensure that Wisconsin's elections are
17     conducted consistent with state statutes and federal
18     requirements in Wisconsin.  That means that I have a
19     staff of two divisions.
20        I have an elections division with an election
21     division administrator who handles the day-to-day
22     matters on those things and directly supervises the
23     staff, but we oversee the basic state infrastructure.
24     We provide information and training for our local
25     election officials.  Wisconsin probably has the
```

1   most -- it does have the most number of local
2   election officials because we administer our
3   elections at the municipal level, so we have 1,853
4   towns, cities and villages where that clerk, except
5   in Milwaukee where it's a board of election
6   commissioners, is sort of like the person on the
7   ground that handles poll worker recruitment, polling
8   place staffing, location, voting equipment
9   acquisition, absentee voting, voter registration
10  responsibilities, and it's our job to make sure that
11  they're following uniform practices.
12          Since 2006 we've had to implement requirements
13  under the Help America Vote Act that give the state
14  much more direct authority on things such as voter
15  registration, training, voting equipment approval.
16  Q   And in the course of your duties, do you and your
17      staff review and analyze legislation?
18  A   We do.
19  Q   Specifically legislation relating to election laws,
20      right?
21  A   Yes.
22  Q   Do you also regard it as part of your duties, both
23      you and your staff, to review news regarding election
24      law matters?
25  A   I don't know if it's a duty, but it certainly seems

17

1   like a prudent thing to do to read news articles and
2   various studies that come out, yes.
3   Q   Okay.  So that's something you do in the ordinary
4       course of your work?
5   A   Yes.
6   Q   And you mentioned studies.  You read those as well?
7   A   Yes.
8   Q   And it's not just you reading it, your staff also
9       reads these, right?
10          MR. MURPHY:  Object to form.
11  A   That's correct.  It's not unusual that my staff will
12      bring matters to my attention to read.
13  Q   And does the review of those materials help -- I'm
14      thinking of how to phrase this.  Does the review of
15      those materials form the body of knowledge that you
16      and your staff have in making elections decisions?
17          MR. MURPHY:  Object to form.
18  A   I would say that it enhances the body of knowledge.
19      I mean the body of knowledge that myself and the
20      staff have was our experience, our working with state
21      election laws and the collegiality that we've
22      developed amongst ourselves.  That's really the
23      strength of the staff is it's, you know, looking at
24      the statutory responsibility that it has in carrying
25      those out.

18

1   Q   And do you know, is there any chief elections officer
2       in the country who has as much experience as you
3       have?
4           MR. MURPHY:  Object as calls for
5       speculation.
6   A   The election director for the State of Michigan,
7       Christopher Thomas, has been there a couple years
8       longer than I have.  Otherwise I'm the longest
9       serving state election director, but again there is a
10      distinction that not all state election directors are
11      chief election officials.  In Michigan, for example,
12      the secretary of state is the chief election officer,
13      but Chris has been -- has served for four or five
14      different secretaries of state during that time
15      period.
16  Q   Okay.  So with the possible exception of Chris in
17      Michigan, you're the longest serving, is that right?
18          MR. MURPHY:  Object to form.
19  A   That's correct.
20  Q   Now, in the course of your --
21  A   Let me just clarify.  Since secretaries of state are
22      in charge of elections as the chief election officer
23      in most states, New Hampshire secretary of state
24      Bill Gardner probably has been there longer than I
25      have.

19

1   Q   Okay.  So there are two exceptions, I guess.
2   A   Yes.
3   Q   And you mentioned working with your colleagues and
4       collegiality a moment ago.  When you interact with
5       your staff, do you regularly correspond via e-mail in
6       the course of your work?
7   A   There is -- each of our divisions have a standing
8       weekly meeting.  We try to have agency-wide meetings,
9       although those tend to be more about operational
10      issues every quarter.  But a lot of the communication
11      is either -- it's a small office, so people are in
12      and out of my office all day long, and we have lots
13      of face-to-face meetings, but a lot of stuff is done
14      by email and a lot of people are on -- it's not
15      unusual that five to eight people might be on an
16      email related to a particular issue.
17  Q   Okay.  And you have official GAB email accounts,
18      right?
19  A   That's correct.
20  Q   And those are for the purpose of doing GAB business,
21      correct?
22  A   That's correct.
23  Q   And I'll ask you about some specific emails later in
24      the deposition, but are those emails unless an
25      exception applies, are those emails public records?

20

1 A   They are.

2 Q   And how are they maintained?

3 A   Well, the State of Wisconsin through the Department

4     of Administration provides the email service and

5     staff regulate archives and it's backed up every

6     night.  We don't have a specific written policy on

7     maintenance of those emails, but you know, the

8     practice has been generally unless it's a transitory

9     email such as are we ordering Indian food today or

10    it's so-and-so's birthday, if it's -- generally the

11    staff will archive those emails.

12 Q   Okay.  And do you have any practice for automatic

13    deletion of emails?

14 A   No.

15 Q   Now, we were talking a moment ago about your review

16    of legislation and news.  Is part of that work, does

17    part of that work involve reviewing statements that

18    legislators make in the news?

19 A   We tend to focus our attention on what is in the

20    drafting, you know.  We subscribe to a news service,

21    so we will circulate the articles amongst the staff

22    so that they are aware of news coverage, and

23    obviously that will contain statements made by

24    legislators.

25 Q   You've testified before the Legislature several

21

1     times, right?

2 A   That's correct.

3 Q   Do you communicate with legislators in other ways?

4 A   It's not unusual for me to talk with them on the

5     phone, to meet with them in their offices.  Usually

6     any email communications tend to be with legislative

7     staff, not so much with legislators.

8 Q   Okay.  And do legislators consult with you when bills

9     are in the drafting process?

10 A   Sometimes they do.

11 Q   Let me then turn to 2011.  From 2011 to the present,

12    do you know how many changes, if any, the Legislature

13    has made to Wisconsin election law?

14 A   I don't know the exact number.  I just know that

15    there's been a lot of changes.

16 Q   Do you know approximately how many changes?

17 A   I'm not going to speculate.

18 Q   You've -- actually let me show you a document.  We'll

19    mark this as  Kennedy 1.

20         (Exhibit 1 is marked for identification)

21 Q   And when you've had a chance to review that to your

22    satisfaction, please let me know.

23 A   Okay.

24 Q   Let me just first ask you about the form of the

25    document.  This is on letterhead, correct?

22

1 A   That's right.

2 Q   And that's the Government Accountability Board's

3     official letterhead, is that right?

4 A   It is.

5 Q   Now, this letter says that it's from you

6     specifically, is that right?

7 A   Well, it says it's from myself and the elections

8     division administrator at the time, Nat Robinson.

9 Q   And did Mr. Robinson, when did he leave your agency?

10 A   He left shortly after 2012.

11 Q   And do you know why he left?

12         MR. MURPHY:  Object to form.

13 A   I do.

14 Q   Why is that?

15 A   I asked him to leave.

16 Q   And why was that?

17 A   I wasn't satisfied with the way he was handling some

18    of the personnel matters in the office.

19 Q   And he was replaced by Michael Haas, is that right?

20 A   That's correct.

21 Q   And I don't mean to ask about anybody in particular,

22    so to the extent my question suggests that, let me --

23    I'm not asking about that.  I want to frame the

24    question this way.  But generally speaking, what were

25    the concerns you had about his management of

23

1     personnel?

2 A   Well, it had more to do with his treatment of staff.

3     I thought that in many cases he was overbearing,

4     there were times he made inappropriate comments that

5     needed to be addressed.  You know, I specifically

6     hired him because he was a taskmaster and I felt we

7     were bringing together a large number of people and

8     he had a proven reputation as a good manager and he

9     was very successful at that time, but from a

10    personality standpoint, it had gotten to the point

11    where I was losing staff who did not want to work

12    under his leadership and I thought despite all the

13    success we had that it was better for the staff and

14    for agency morale that he no longer be that person.

15 Q   Now, there are letters that go out on GAB letterhead

16    that are sent from folks other than you, correct?

17 A   Yes.

18         MR. MURPHY:  Object to form.

19 A   That's correct.

20 Q   Do you always approve those letters before they go

21    out?

22 A   Not necessarily always.  But it depends on what

23    they're about.

24 Q   Would it be fair to say that you typically approve

25    those letters?

24

KEVIN KENNEDY

1  A    It's fair to say that I review them and will offer
2       suggestions, but it's not necessarily a formal it's
3       okay to send.  Many of them are pretty standard
4       items, but, yes, I'm usually involved in most of the
5       communications that go out.
6  Q    Okay.  Let me direct you to the third paragraph in
7       this letter.  In the second sentence, you write —
8       well, let me — I'm not going to quote you, but let
9       me ask you a question.  In the second sentence you
10      indicate that in 2012, election officials had to deal
11      with the most sweeping changes in election
12      administration since Wisconsin's 1848 statehood, is
13      that right?
14 A    That's right.
15 Q    And you specifically refer to voter photo ID, is that
16      right?
17 A    That's right.
18 Q    And so when you were referring to the most sweeping
19      changes since statehood, were you specifically
20      referring specifically to voter ID?
21 A    Well, that was the biggest piece of several changes
22      that were made.
23 Q    And you believe that statement is accurate?
24 A    I believe that statement conveys how important we
25      thought the change was.  I'm sure people might

25

1       quibble over whether expanding the franchise to let
2       women vote or people of color vote might be — you
3       could argue some other changes, but this was — it
4       was looking at it primarily from what election
5       administrators had to deal with and what the voters
6       had to deal with.
7  Q    Okay.  And this was prior to any changes to election
8       law that were made in 2013 or '14, right?
9  A    That's correct.
10 Q    You can put that one aside.  Would the changes to
11      voting laws from 2011 through the present, would you
12      agree that there have been more than 10 provisions
13      that have been changed?
14 A    Yes.
15 Q    Based on your training and your knowledge and your
16      experience, do any of those changes make it easier to
17      vote?
18          MR. MURPHY:  Object to form.
19 A    I'm not sure that I could speculate on that.  I mean
20      there's just a lot of factors in evaluating what
21      constitutes easier to vote.  I mean voting contains
22      so many different aspects and there's different
23      elements, so I guess I'm not in a position to say
24      whether it makes it easier or more difficult.
25 Q    Okay.  We'll come back to that.  Are you aware of any

26

1       aspect of voting that has been made easier by any of
2       these laws?
3          MR. MURPHY:  Object to form.
4  A    Again I think I mentioned before that there's a lot
5       of opinion as to what's easy or what's not on that.
6       You know, I think we do our best to find ways to
7       reach out to voters so that they're able to
8       participate in the process, and increased use of
9       technology makes it easier for some people and harder
10      for others.  So again I would be loath to try and put
11      a label on those.
12 Q    During this time period, which I'll refer to as
13      post — I guess post-2010, meaning 2011 to the
14      present, you have recommended that Wisconsin adopt
15      online voter registration, correct?
16 A    That's correct.
17 Q    Why have you recommended that?
18 A    Because it would cut down on the number of mistakes
19      that are made when voter registration forms are
20      filled out both by special registration deputies --
21      actually probably primarily by special registration
22      deputies but also by voters.  It would increase the
23      accuracy of those lists.  It would enable people who
24      expect technology to serve them, meaning people my
25      age and younger who are used to doing things that

27

1       way.
2          The idea of filling out a piece of paper and
3       mailing it in, I've had representatives of the
4       University of Wisconsin-Madison tell us that their
5       students probably haven't gotten 10 pieces of mail in
6       their lifetime, and so it's a recognition of just how
7       you do business.  And so we've recognized that it's
8       more cost efficient in terms of the work that our
9       local elections officials do, it's much more
10      accurate, and that's why I have promoted it with the
11      blessing of the Government Accountability Board.
12 Q    And Wisconsin has not adopted online voter
13      registration, is that right?
14 A    Not yet.
15 Q    Do you recall when you began advocating for that
16      change?
17 A    I don't.  I'm sure that we talked about it in 2011.
18      In 2011 it was something that was on the cutting
19      edge.  Now we say that, you know, we're far back in
20      the pack for not having done it.  You know, over half
21      the states have online registration.
22 Q    So going back to the changes that have been made
23      since 2011 or — yes.  Those changes increase the
24      responsibilities that election administrators have,
25      correct?

28

1          MR. MURPHY:  Object to form.

2 A    You know, that's --

3 Q    Let me actually do this a different way.  I'll

4      withdraw the question.

5 A    Okay.

6 Q    I'm going to show you a document.  We'll mark this as

7      Kennedy 2.

8          (Exhibit 2 is marked for identification)

9 Q    And you are welcome to read as much of the document

10     as you would like.  I will tell you that I'm only

11     going to ask you about the first paragraph.

12 A   Okay.

13 Q   Now, this letter is from Michael Haas who we

14     discussed a moment ago, right?

15 A   That's right.

16 Q   Is this a letter that you reviewed?

17 A   It is.

18 Q   And so you were explaining before that you review

19     letters.  You don't necessarily approve them.  In the

20     event that you disagree with the content of a letter,

21     do you request that the person drafting the letter

22     change the content?

23 A   Absolutely.

24 Q   And so in this first paragraph, the letter indicates

25     that the "legislative changes will continue to cause

29

1 A    Well, that reflects the communication we have with

2      local election officials who have been here part

3      time.  Probably 62 percent of our 1,853 clerks are

4      part time, and a lot of the feedback we get is they

5      don't have time to do all the things that they need

6      to do, that they have limited resources.

7          You know, when you're making a communication

8      like this, you want to be able to show some empathy

9      for what they're going through on this.  I mean it's

10     an incredible challenge.  We want to make sure that

11     people see us as working together, and that means

12     understanding, you know, what the impact of things

13     are from their perspective, meaning we've heard what

14     they've told us, and that's why we put items like

15     this in there.

16 Q   But that statement is accurate, correct?

17 A   I believe it is.

18 Q   You can put that one aside too.  Now, in addition to

19     the changes to the laws about voting that we've been

20     discussing, the Legislature recently voted to

21     eliminate the GAB, is that right?

22          MR. MURPHY:  Object to form.

23 A   That's correct.

24 Q   And when does that change go into effect?

25 A   June 30th of 2016.

31

1      increased responsibilities for all of us," is that

2      right?

3 A    That's right.

4 Q    And this is a letter to clerks and election

5      commissioners and special registration deputies?

6 A    That's right.

7 Q    So you were -- I'm sorry, so your agency was

8      indicating in this letter that the changes to

9      election law at least in the period prior to April

10     2014 or I guess August 2014 had increased

11     responsibilities for election administrators, is that

12     right?

13          MR. MURPHY:  Object to form.  You may

14     answer.

15 A   That's what we indicate, yes.

16 Q   And is that your view?

17 A   I think that reflects -- I mean it's part of what

18     we're communicating to people is that you need to pay

19     much closer attention to certain requirements as a

20     result.

21 Q   And the letter also indicates that these changes may

22     strain limited resources in the clerk's office and

23     the GAB, right?

24 A   That's right.

25 Q   And what's your understanding of what that meant?

30

1 Q    Which we now are in, believe it or not.  Now, there's

2      an election in November 2016, is that right?

3 A    That's right.

4 Q    And you've said that the time at which the change in

5      the elimination of GAB goes into effect is a really

6      bad time, is that right?

7 A    I said that was not a good time to change the way

8      elections are administered in the State of Wisconsin.

9 Q    And you urged the Legislature to delay implementation

10     of that change until after the 2016 elections, is

11     that right?

12 A   Well, first I urged them not to make the change, but

13     if they were going to make the change, that it should

14     not happen until after the 2016 elections.

15 Q   All right.  And why did you make that request?

16 A   Presidential election years are the most challenging

17     for local election officials.  Our agency has been

18     very successful in how we conduct elections in the

19     state.  We've been through both the current agency

20     and its predecessor agency, the State Elections

21     Board, as you can see from these communications to

22     our local election officials, the need to have a

23     consistent voice throughout that period of time is

24     important.

25          And quite frankly, any change means that not

32

1   only the leadership who might change as a result in
2   terms of staff and managers but also in terms of the
3   board members means people are going to have to come
4   up to speed on some very important issues very
5   quickly, and the truth is it just keeps getting more
6   and more frenetic as you move through the year.
7   Q   So is it fair to say that based on your knowledge,
8       your training, your experience that that change is
9       going to be harmful to at the very least the
10      administration of the 2016 election?
11              MR. MURPHY:  Object to form.
12  A   I'm saying I have those kind of concerns.  I also
13      have a lot of confidence that the staff that remains,
14      again not knowing what that will be, is in a very
15      good position to continue things, that the groundwork
16      that we've laid, the processes that have been put in
17      place, you know, I have a lot of confidence in those
18      people to do the job.
19              But when it comes to legislative change, that
20      doesn't mean that I'm not going to advocate for what
21      I think is the best course of action.  In that case
22      it was maintaining the status quo in terms of agency
23      leadership throughout that period of time.
24  Q   And while we're just still speaking generally about
25      the changes, you mentioned before that one of the

                                                    33

1   things you do in the course of your work is you stay
2   aware of news regarding election laws, is that right?
3   A   That's right.
4   Q   And in the course of your work, did you observe a
5       statement in 2014 from then State Senator
6       Dale Schultz regarding a large number of bills that
7       had been passed relating to elections?
8   A   I recall seeing that statement in the pleadings that
9       I think you're referring to.
10  Q   That is what I'm referring to.
11  A   Yeah.  And at the time I remember the comment, yes,
12      but had I not reviewed the pleadings before the
13      deposition, I might not have remembered it
14      specifically.
15  Q   But you did see the quotes in the pleadings from
16      Mr. Schultz --
17  A   I did.
18  Q   -- in the paper at the time?
19  A   And I saw -- I remember reading it in the paper at
20      the time.
21  Q   Did you discuss those comments with Mr. Schultz?
22  A   I don't recall if I did.  Senator Schultz and I have,
23      you know, always had a very good relationship.  We
24      would see each other on the street.  We would talk.
25      He was always very supportive of the work that we

                                                    34

1   did.  I guest lectured -- he's now teaching a class
2   on politics at the University of
3   Wisconsin-Platteville and I went down there last fall
4   and talked to his class for a couple of hours.  That
5   was on campaign finance, not on elections, but --
6   Q   Based on your conversations with him, do the
7       statements that he was reported as having made in the
8       press accurately reflect his views?
9               MR. MURPHY:  Object to form.
10  A   I'm not surprised at them.  You know, again my
11      conversations with him, he was just generally
12      supportive of the work that we did and the
13      professionalism of how our agency carried itself and
14      so, you know, I'm not surprised at that, but I
15      couldn't speak specifically that he was posing for --
16      or posturing in any way.
17              He's a politician, so he was making the
18      statements to make a point, and I'm not surprised at
19      the points that were being made.  That's all I can
20      say.
21  Q   And he actually didn't run for reelection in 2014,
22      right?
23  A   That's right.
24  Q   All right.  Let me start talking about some specific
25      provisions then.  I'd like to speak first about

                                                    35

1   in-person absentee voting.  If I refer to that as
2   early voting, will that create any confusion?
3   A   It will only create confusion for people who don't
4       understand the fact that we don't have early voting
5       in Wisconsin.
6   Q   Right.  So stipulating that in-person absentee
7       differs from early voting in that in-person absentee
8       ballots are not counted immediately, it would be okay
9       if I refer to that as early voting?
10              MR. MURPHY:  No.  Let's use the right
11              words.
12              MR. KAUL:  Okay.
13  A   I can do my best not to use the term early voting, to
14      make that distinction because I think it's an
15      important distinction.
16  Q   Okay.  I was trying to make the deposition go a
17      little more quickly, that's all.  In 2008 -- actually
18      let me go back a step.  In both 2008 and 2012
19      approximately, half a million people used in-person
20      absentee voting in Wisconsin, is that right?
21  A   I don't know the exact numbers, but that sounds close
22      to the neighborhood.  We've got the statistics
23      somewhere.
24  Q   All right.  And early -- I'm sorry, in-person
25      absentee voting provides certain benefits for

                                                    36

KEVIN KENNEDY                                                      01/14/2016

**Page 37**

1     election administration, is that right?
2          MR. MURPHY:  Object to form.
3  A  I think like any process, it has its benefits and its
4     costs.  So it depends on — depending on the volume
5     of in-person absentee voting, you know, you're
6     shifting resources and costs.  You might get less
7     lines at the polls on Election Day, but you also have
8     a lot more processing of absentee ballots at the end
9     of the day that takes time in getting results out.
10    You also end up with long lines in larger elections.
11         In the municipal clerk offices, there would be
12    an absentee voting location if they choose to move it
13    outside of their office.  So there are changes no
14    matter how you handle it.
15 Q  One benefit of in-person absentee voting is that it
16    can reduce lines on Election Day, correct?
17         MR. MURPHY:  Object to form.
18 A  That's one —
19         MR. KAUL:  What's the form objection?
20         MR. MURPHY:  That it's a benefit or a
21    detriment is an opinion outside of sort of a
22    factual ingredient.
23         MR. KAUL:  Okay.
24 A  I guess my answer, I was going to say that's one of
25    the consequences.  Whether that's a benefit or not is

**Page 38**

1     a value judgment.
2  Q  Whether shorter lines for Election Day voting is a
3     benefit is a value judgment?
4  A  Well, because it translates into longer lines at a
5     different time.
6  Q  Does in-person absentee voting reduce costs on
7     Election Day?
8  A  I don't know.  Again as I pointed out, you still —
9     you have more absentee ballots to process at the
10    polls on Election Day.  Because Wisconsin has
11    in-person absentee voting or all of its absentee
12    voting, if not early voting, it means at the polling
13    place a certain number of those ballots, and I know
14    that we were looking at around 25 percent of all the
15    votes cast were by absentee ballots, not quite that
16    high in 2008 and 2012, it kept moving up on that.
17         It meant they all had to be processed at the
18    polls on Election Day, which actually probably takes
19    more time than a person going up, stating their name,
20    showing their ID, giving — signing the poll and
21    going because poll workers have to check the name in,
22    to make sure that the form is properly filled out,
23    have to open it up, check to make sure there's only
24    one ballot in there and then have to process it and
25    have to make a notation that the person voted

**Page 39**

1     absentee.
2  Q  When you say there's been increased usage of absentee
3     voting, you mean that over time, the number of votes
4     or the percentage of voters who cast their ballots by
5     absentee voting has gone up, is that right?
6  A  That's right.
7  Q  And that's true of in-person absentee voting
8     specifically, right?
9  A  That's right.
10 Q  And there's also been a national trend towards
11    increased early or in-person absentee voting usage,
12    right?
13         MR. MURPHY:  Object to form.
14 A  The answer is, yes, there's been a lot — a
15    significant increase in changes in the voting from
16    Election Day, whether it's early voting in some
17    states or in-person absentee voting or all mail
18    voting.
19 Q  And you mentioned earlier that you had reviewed
20    reports and studies relating to elections.  Did you
21    review the report of the Presidential Commission on
22    Election Administration?
23 A  I did.
24 Q  And is it your understanding that one of their
25    recommendations was that early voting or in-person

**Page 40**

1     absentee voting be expanded?
2  A  I don't recall specifically.
3  Q  Do you recall generally whether the report was —
4     took a favorable review with respect to early voting
5     or in-person absentee voting?
6  A  I think there was a recognition in the report that
7     some people place a high value on the fact that if
8     you have early voting or increased opportunities for
9     in-person absentee voting that the elector might be
10    better served in terms of their ability to choose
11    when they cast their ballot.
12 Q  And is that your view?
13 A  I think that — I'm trying to think how to
14    characterize it.  I think that's one of the
15    advantages to having a flexible system is that it
16    provides voters with the opportunity to participate
17    in the process.  It doesn't increase participation,
18    but it enables them to adapt the voting into — you
19    know, it can be a very busy life, but you know, we
20    have not seen — the numbers that I've seen do not
21    show that voter participation increases as a result
22    of those opportunities.  It just means people change
23    their behavior to better reflect their lifestyle.
24 Q  And when you refer to the numbers you've seen, what
25    are you referring to specifically?

KEVIN KENNEDY

1  A    I'm looking at -- well, I look at our numbers, first
2       of all.  You know, our voter participation has
3       remained relatively stable.  It's more of a factor of
4       how interesting the race is than anything else.
5       Obviously we had a higher turnout I think in 2004
6       than we did in 2008 because people knew that the vote
7       made a difference and the results showed that.
8            The same thing, the percentage might have been
9       lower in 2000, but generally what drives voter
10      participation from my observations is whether or not
11      the voters feel like their vote is going to make a
12      difference in the race.  In some states that it's
13      pretty lop-sided, you'll see that their voter turnout
14      is lower.  So it's not really reflective of how well
15      elections are administered.  It's more of a question
16      of what is at stake for the voter's choice.
17 Q    Would you agree that based on your experience that
18      holding that factor constant, interest in the
19      election, that the existence or lack of existence of
20      early voting or in-person absentee voting can impact
21      turnout?
22 A    Again the studies I've seen, most people -- the
23      references seem to suggest that it doesn't change
24      turnout.
25 Q    And are you specifically referring to a study done by

41

1  Q    Do you know how the percentages compare?
2  A    I don't.
3  Q    Let me show you another document.  We'll mark this
4       one as  Kennedy 3.
5            (Exhibit 3 is marked for identification)
6  Q    And when you've had a chance to review this, let me
7       know, please.
8  A    Okay.
9  Q    All right.  Now, this is on GAB letterhead, correct?
10 A    Yes.
11 Q    And did the letterhead change, or is it different for
12      different purposes?
13 A    This is a standard press release letterhead.  It's a
14      little different.  We're less concerned about
15      identifying, you know, who is in charge of the agency
16      on this than we are in getting the information out to
17      the media and ideally to the public.
18 Q    And we talked earlier about your review process for
19      the letters, I guess, that go out.  Is your review
20      process the same for press releases?
21 A    Yes.
22 Q    So you would have reviewed this before it went out?
23 A    I would have.
24 Q    And in particular, you approve your own quotes,
25      right?

43

1            Professors Burden and Mayer, among others, at the
2       University of Wisconsin?
3  A    I think they may have said that.  Again I haven't
4       gone back and reviewed the literature.
5  Q    And are you aware of their conclusion that when early
6       voting was paired with the same day registration, it
7       generally increases?
8  A    I'm aware of that.  I do know that the studies
9       generally say that there's a slight increase in
10      participation as a result of Election Day
11      registration.
12 Q    And Wisconsin does have not only Election Day
13      registration but same day registration during early
14      voting, right?
15 A    Yes, during in-person absentee voting.
16 Q    Thank you.  Do you know how the percentage of voters
17      who use in-person absentee voting in Milwaukee
18      compares to the rest of the state?
19 A    I don't.  I'd have to go back and look at the
20      numbers.
21 Q    How about Madison versus the rest of the state?
22 A    Again I'd have to go back and look at the numbers.  I
23      mean those are the two largest cities, so the numbers
24      are going to be higher no matter what the percentage
25      is.

42

1  A    I do.
2  Q    All right.  Let me ask you about a couple of those.
3       The second paragraph -- actually before I do that, I
4       will note that the title refers to in-person absentee
5       or early voting, right?  So it's not just me at
6       least.
7  A    No.  And it's a recognition of the fact that voting
8       before an election is referred to as early voting,
9       and election officials cringe in Wisconsin when they
10      see that because they recognize the difference.  So
11      this is targeted to reach voters and so we craft our
12      language to reflect that.
13 Q    The second paragraph quotes you saying, "We are
14      seeing long lines at many municipal clerks' offices
15      around the state."  Is that right?
16 A    Yes.
17 Q    Now, this was issued October 26, 2012, right?
18 A    That's right.
19 Q    All right.  So that's a reference to lines for
20      in-person absentee voting for the 2012 presidential
21      election, is that right?
22 A    That's right.
23 Q    When you say long lines, what do you mean by that?
24 A    I mean that for some of us who did -- stood in those
25      lines, we waited a while to cast our votes.  It means

44

1    that as municipal clerks called in, we would ask them
2    questions about how busy they were or they would
3    volunteer how busy they were and they'd talk that
4    we've had lines since it opened up.
5        You know, so when we say seen, we didn't
6    necessarily travel to Superior to look at the lines,
7    but we got reports back from our local election
8    officials and we saw news articles that showed lines
9    as well.
10   Q    So when you say long lines, does that refer to any
11       particular length of line?
12   A    No, I think it's just a recognition that you're not
13       going to walk in and get to go right to the counter.
14       You're going to spend a period of time waiting,
15       anywhere from 15 minutes to more than an hour.
16   Q    And what were the longest lines you were seeing?
17   A    I don't know that -- we did not quantify them.
18   Q    Did they exceed an hour?
19   A    I'm sure in many cases they did.
20   Q    And when you said that you saw lines around the
21       state, were there particular parts of the state you
22       were referring to, or was that a general statement?
23   A    It was a general statement.
24   Q    And you indicated personally you experienced long
25       lines in Madison, is that right?

                                                      45

1    a characteristic from my observations that was noted,
2    and that's why I used the term voter enthusiasm.
3    Convenience, as I referred to before, that's one of
4    the reasons why people choose to vote ahead of
5    Election Day because it fits their schedules better,
6    and that's an important factor.
7    Q    Okay.  So it makes it easier to vote for those
8        people, is that fair?
9    A    That's a fair characterization.
10   Q    And these statements were accurate, right?
11   A    Well, there could be many reasons for voter
12       enthusiasm and convenience.  In my opinion on that, I
13       think it's accurate, but the numbers were double
14       checked before we put that in there.
15   Q    Right.  And these statements you're making, both in
16       the deposition and any public statements you make,
17       reflect your 30-plus years of experience as the state
18       elections -- state's chief elections officer, is that
19       right?
20   A    They reflect my experience, they reflect the
21       information I'm getting from the data that we collect
22       and the information we pick up from observations.
23       You know, I mean the goal of this press release is to
24       give some direction to the voters, taking advantage
25       of the media, letting them know that you need to be

                                                      47

1    A    That's right.
2    Q    And were there also long lines in Milwaukee?
3    A    Yes, there were.
4    Q    All right.  Let me ask you about the quote -- there's
5        a quote on the second page, and it's the first full
6        paragraph, and in the second sentence of that quote
7        you state, "The number of absentee voters continues
8        to grow," is that right?
9    A    That's right.
10   Q    And then you say, "There could be many reasons -
11       voter enthusiasm and convenience," is that right?
12   A    That's correct.
13   Q    When you say voter enthusiasm, what did you mean by
14       that?
15   A    Well, there was a recognition in the 2008 and 2012
16       elections that again based on the nature of the
17       election with the first African-American candidate
18       for president and running for reelection, there was a
19       definite enthusiasm that you picked up from news
20       articles and news stories that people were excited
21       about the opportunity to participate in the electoral
22       process.
23       You picked up similar things sometimes in
24       closely contested elections where people wanted to
25       make sure their voted counted, but that was probably

                                                      46

1    prepared when you go to the polls that there's going
2    to be lines, that if you need to register, you need
3    certain documents.  I mean this is the kind of
4    outreach we think is important.
5    Q    Now, as early voting was starting in 2014, you also
6        stated that the GAB expected to see lines at many
7        municipal clerks' offices around the state, is that
8        right?
9    A    We expected that for in-person absentee voting, yes.
10   Q    And were there in fact lines for in-person absentee
11       voting?
12   A    There were.
13   Q    All right.  And the next document I'm going to show
14       you is the early voting report that your office
15       prepared.  We've been going about an hour, so I'm
16       happy to take a break now if you guys want or we can
17       start working through that document.
18   A    Let's start working through the document.
19   Q    This is  Kennedy 4.
20           (Exhibit 4 is marked for identification)
21   Q    Do you recognize this document?
22   A    I do.
23   Q    What is this?
24   A    This is a report that was prepared at my direction
25       and submitted to the approval of the Government

                                                      48

1    Accountability Board examining the concept of early
2    voting in Wisconsin.
3  Q   And why was this report prepared?
4  A   Well, after the 2008 election, we noticed just how
5    much in-person absentee voting had increased.  We had
6    gotten a lot of feedback from local election
7    officials about the challenges it presented.  There
8    was a lot of attention in the media about the long
9    lines.
10       You know, the distinctions we talked about
11   earlier between in-person absentee voting and early
12   voting were things we thought needed to be explored.
13   We wanted to find ways to make the process more
14   efficient, more cost effective, and so we wanted to
15   take advantage of that and provide an in-depth
16   analysis that we could present to the Legislature for
17   consideration.
18  Q   You just referred to attention to long lines.  Was
19   that reference to the long lines for in-person
20   absentee voting in the 2008 presidential election?
21  A   Yes.
22  Q   And there were long lines for early voting in the --
23   sorry, for in-person absentee voting in the 2008
24   presidential election?
25  A   Much as we said in the 2012 report, the answer is,

49

1    yes, there were.
2  Q   Now, this report was submitted to Governor Doyle and
3    the Legislature, is that right?
4  A   That's right.
5  Q   And what's the process for submitting these reports
6    to the Legislature and the governor?
7  A   Well, basically, you know, after the staff has worked
8    on a report, it's been vetted internally, we present
9    it to the board with a series of recommendations.
10   The board reviews it at a public hearing.  It gets
11   feedback as part of that, and it directs some changes
12   to the report, although the focus is mainly on what
13   recommendations are going to be made because the
14   staff's done most of the work.
15       If there had been concerns about the tenor of
16   the report, I'm sure the board would have addressed
17   them at that point.  But generally they were looking
18   at, well, what are the conclusions that are being
19   proposed to the board and recommendations that it
20   would like to forward on.  It is given to the chief
21   clerks in the Assembly and the Senate for
22   distribution to the Legislature, and it is delivered
23   to the governor's office.
24  Q   And what role did you play in the preparation of this
25   report?

50

1  A   Well, it was my idea to do it.  It was Nat Robinson
2    who put together the team and assigned them.  I would
3    review information as they were working on the
4    report.
5        I would review several drafts of the report,
6    probably had a hand in crafting some of the more
7    forward facing parts of the report that -- you know,
8    not the details but the summary, the conclusions,
9    things like that where, you know, you wanted to take
10   the data and synthesize it.  I probably had much more
11   of a hand in that.  But it was something that we
12   thought was an important thing to evaluate and get as
13   much input as we could.
14  Q   And did you approve the final content of the report?
15  A   I did.  Well, ultimately the board approved it.  But
16   before it went to the board, it had my approval.
17  Q   All right.  Let me ask you about specific parts of
18   the report.  First, page iii of the letter at the
19   start, so it's the Roman numeral iii, the third
20   paragraph down, about halfway through the paragraph,
21   there's a statement that says, "The board was mindful
22   that an estimated 60,000 voters cast ballots in the
23   offices of municipal clerks on the day before the
24   November 2008 general election."  Do you see that?
25  A   Yes.

51

1  Q   That would be the Monday before Tuesday election?
2  A   Right.
3  Q   And that is a day of early voting that was eliminated
4    by subsequent legislation, right?
5  A   That's right.
6  Q   And is that 60,000 figure accurate to the best of
7    your knowledge?
8  A   Well, it's an estimate, and I'd say we had a basis
9    for putting that number together.
10  Q   That was your best estimate?
11  A   Yeah.
12  Q   All right.  Now, there's another letter from you that
13   follows the Roman numeral pages.  Do you see that
14   letter?
15  A   I do.
16  Q   And there's -- this is a -- I guess it's better
17   described as a report synopsis, is that fair?
18  A   Yes.
19  Q   And there's a statement at the beginning of that
20   synopsis about concerns from voters, elected
21   officials and election administrators following the
22   November 2008 presidential election, is that right?
23  A   Yes.
24  Q   And it says, "In particular, election administrators
25   felt overwhelmed with managing in-person absentee

52

1     applications and ballot logs before Election Day
2     while voters complained of long lines at in-person
3     absentee voting sites."
4  A  That's right.
5  Q  And that statement is accurate?
6  A  That's right.
7  Q  All right.  We'll then turn to the body of the
8     report.  Now, I've been asking you whether particular
9     sentences are accurate.  To the best of your
10    knowledge as you sit here today, is there anything in
11    the report that's not accurate?
12 A  I can't think of anything.  And again we spent quite
13    a bit of time vetting the report.
14 Q  All right.  Let me direct your attention to Page 14
15    of the report.  And near the bottom there's a heading
16    that says keep absentee voting as is.
17             MR. MURPHY:  Sorry, before the
18        question, do you want a minute to look at this
19        before he asks you about it?
20             THE WITNESS:  Well, I looked at it --
21        I mean now that he's directed my attention to
22        it.
23             MR. MURPHY:  Okay.  Sorry.
24 Q  I'm going to ask you about the paragraph under that
25    heading.

                                                      53

1  A  Okay.
2  Q  All right.  Now, this indicates that what you refer
3     to as a sizable portion of clerk survey responses and
4     the public's responses supported keeping in-person
5     absentee voting unchanged, is that right?
6  A  That's right.
7  Q  Now, at this time, the window during which in-person
8     absentee voting could take place was as long as 30
9     days, is that right?
10 A  I believe it was.  It used to be as soon as the
11    ballots were made available for mailing out, a person
12    could go to the clerk's office and get the absentee
13    ballot.  That was the general practice up until --
14    I'm not sure when the change is specific -- I know we
15    had two changes reducing that window for voting in
16    the clerk's office.
17 Q  And the time when those absentee ballots were
18    available that you just referred to, that was 30 days
19    before the election?
20 A  It was in 2008.  It's now 48 days before the
21    election.
22 Q  Prior to 2008, do you know when those were prepared?
23 A  Well, we've had a requirement that absentee ballots
24    have to be available for voting 30 days before the
25    election for quite a while.  Probably it goes back

                                                      54

1     into the 1980s.  It used to be 21 days, but that's
2     primarily to make ballots available for people who
3     are overseas, military electors.
4  Q  And this states they, referring to the sizable
5     portion of clerks and the public's responses, argued
6     that changes — this is a reference to changes to
7     in-person absentee voting were unnecessary, citing
8     costs, confusion of voters and poll workers if
9     changes were made.  Do you see that?
10 A  I do.
11 Q  And that's accurate, right?
12 A  That's the inference we drew from those responses,
13    yes.
14 Q  And then it indicates that a few stated, "This is
15    only Madison and Milwaukee, so don't penalize us for
16    their problems."  Do you see that?
17 A  Yes.
18 Q  What's your understanding of what that means?
19 A  That means that whether it was members of the public
20    who responded to a survey that we had, a
21    questionnaire, or clerks, I think that was an exact
22    quote from one of the clerks is my recollection,
23    there was a perception that, you know, long lines
24    that were seen in 2008 and the concerns that were
25    raised in editorials really only reflected the two

                                                      55

1     largest cities in the state.
2  Q  Was that accurate?
3  A  Well, I think that's an accurate perception by some
4     people.  You know, I mean --
5  Q  I'm sorry, let me rephrase it.  Was the perception
6     accurate?
7  A  Again that's a value judgment that people would have
8     to make.  I mean I know from my own experience that
9     voting, depending on the size of the municipality,
10    depending on how well the clerk prepares for that
11    voting before Election Day, you know, presents --
12    some places it runs very smoothly because their
13    common council gives them the resources to do that.
14        Other places, the sheer numbers and the size of
15    the location — in Wisconsin, we have a large number
16    of municipalities where the population is under
17    5,000, so it's very easy with people coming in to
18    vote on the standard percentage.  It's just not a big
19    burden on the clerks.  And in some clerks' offices,
20    they're part time, and that means that they don't
21    have set hours for absentee voting.  You call the
22    clerk up and say will you be available to do this.
23 Q  Would you agree that Milwaukee faced particular
24    challenges in the 2008 election with in-person
25    absentee voting?

                                                      56

1  A    Well, Milwaukee has more people, so that creates more
2       challenges.  It requires more resources to handle
3       that.
4  Q    And what about Madison?
5  A    Madison is the same way.  I mean Madison is the
6       second largest city in the state.  And Madison
7       continues to run its voting through the clerk's
8       office rather than moving it to an off-site location
9       where they might have more space.
10 Q    Is Milwaukee's in-person absentee voting location at
11      the clerk's office?
12 A    No.
13 Q    It's at the Zeidler building, right?
14 A    It's in a building next door where they've got more
15      room and at ground level as opposed to a sixth floor.
16 Q    Okay.  Now, let me direct your attention to Page 18.
17      This contains an overview of GAB's recommendations,
18      is that right?
19 A    Yes.
20 Q    Now, there are five dashed points, I guess.  I'm not
21      sure what that symbol is called.  But do you see what
22      I'm referring to?
23 A    Yes.
24 Q    One of them is move the start of in-person absentee
25      voting from 30 days to 20 days before the election?

57

1       register by mail or through a voter registration
2       drive or in person in the clerk's office, which cuts
3       off 20 days before the election, and then you have
4       what we call late registration, which is in the 20
5       days before the election, you can register in the
6       clerk's office, but -- in person, and then you have
7       Election Day registration where on Election Day you
8       can, and that registration is not just your initial
9       registration.  You can make changes if you've moved
10      and your name has changed, you can make those kinds
11      of changes as well during that period of time.
12          And from an administrative standpoint, it made
13      sense to recognize, okay, very few people are coming
14      into the clerk's office to cast absentee ballots and
15      there's a different set of requirements for voter
16      registration for those people who may not be
17      registered, so let's tie it to that period of time.
18          That was I think really the basis for the
19      recommendation was to try and sync up the deadlines
20      and to recognize we really don't need to offer it
21      during this time period.  It's not going to have that
22      much of an impact on voter convenience.  They can
23      still get the ballot by mail.  There's plenty of time
24      for it to be returned in that 30 to 20-day period.
25 Q    Another recommendation was to allow for multiple

59

1  A    Yes.
2  Q    And by the way, this is -- let me go back a step.  In
3       this report, GAB laid out three different options,
4       Options A, B and C, is that right?
5  A    That's correct.
6  Q    And GAB's view was that the best option was what you
7       called a modified version of Option C?
8           MR. MURPHY:  Object to form.
9  Q    Is that right?
10 A    That's my recollection.  I'd have to look at it more
11      carefully, but that's my recollection.
12 Q    All right.  So one of the recommendations made was to
13      move the start of in-person absentee voting from 30
14      to 20 days before the election, is that right?
15 A    Yes.
16 Q    Why was that recommendation made?
17 A    Well, I think there were a number of factors that we
18      looked at.  One was that most of the people who came
19      in to vote in the clerk's office were coming in in
20      the two weeks prior to the election, and very few
21      people were coming into the clerk's office to cast
22      their vote in the office.
23          We also had some restrictions in voter
24      registration.  Wisconsin has three periods of voter
25      registration -- regular registration where you can

58

1       in-person absentee voting locations outside of or in
2       addition to the municipal clerk's office, is that
3       right?
4  A    That's right.
5  Q    And why was that recommendation made?
6  A    I think there was a recognition that in larger
7       municipalities or even smaller municipalities where
8       geographically it made sense, again thinking of the
9       convenience factor for voting, that municipalities
10      ought to have the option to provide locations that
11      were not necessarily tied to the clerk's office.
12          You know, and this was true whether it was
13      Madison, Milwaukee or Green Bay, which are the larger
14      municipalities, but also you have a number of
15      municipalities of medium size such as Sun Prairie and
16      Middleton where they divided their municipal services
17      into two locations and so people, it was not unusual
18      that people would go to a different location for
19      other types of services and why not do voting at the
20      same time in those.
21 Q    And you mentioned before that you've become familiar
22      with at least some voting practices in other states,
23      is that right?
24 A    That's correct.
25 Q    Are you aware of any other state that limits

60

KEVIN KENNEDY

| | |
|---|---|
| 1   in-person absentee voting or early voting to a single | 1  A   Okay. |
| 2   location per municipality? | 2  Q   This section indicates that the GAB staff recommended |
| 3  A   I don't know if anyone else has that.  I mean there's | 3      that in-person absentee voting remain available until |
| 4      some states that don't have early voting that have | 4      the day before the election, is that right? |
| 5      in-person absentee and they have developed the same | 5  A   Where are you specifically pointing? |
| 6      way as Wisconsin.  I don't know quite how Minnesota | 6  Q   Let me go through a couple specific parts.  The first |
| 7      does it, for example.  They're very similar to | 7      full paragraph -- the first paragraph on Page 19, |
| 8      Wisconsin in many of their requirements. | 8      halfway through, the report states that the privilege |
| 9  Q   And a number of states have multiple early voting | 9      of absentee voting until 5 o'clock p.m. on the Monday |
| 10     locations in municipalities when they conduct their | 10     prior to a Tuesday election has been accorded to |
| 11     elections, correct? | 11     Wisconsin voters since 1965, is that right? |
| 12             MR. MURPHY:  Object to form. | 12  A   Yes. |
| 13  A   That is correct. | 13  Q   And it says, "Moving up the deadline for in-person |
| 14  Q   And based on your training, your knowledge and | 14     absentee voting in the days leading up to Election |
| 15     experience, do you have a view as to whether having | 15     Day would restrict opportunities to vote that the |
| 16     multiple early voting locations -- sorry, multiple | 16     public has relied upon for over 44 years," is that |
| 17     in-person absentee voting locations would reduce wait | 17     right? |
| 18     times for in-person absentee voting in Milwaukee, for | 18  A   That's right. |
| 19     instance? | 19  Q   And those statements are accurate? |
| 20  A   I don't know how it would apply in Milwaukee.  It | 20  A   Yeah.  They are. |
| 21     would probably depend on the locations, but it would | 21  Q   And then the next paragraph notes that, "In |
| 22     make sense to me if you have more than one location, | 22     developing its recommendation on this issue, board |
| 23     you would have less wait times. | 23     staff balanced the concerns expressed by clerks with |
| 24         The drawback is it costs you more money to do | 24     the strong historical trend and intent of Wisconsin |
| 25     that because you have to staff it, you have to | 25     election law to encourage and accommodate the |
| 61 | 63 |

| | |
|---|---|
| 1   account for security procedures.  You know, when | 1      greatest possible voter participation.  Wisconsin |
| 2   ballots are not -- are in multiple locations, that's | 2      laws and election procedures have consistently |
| 3   an additional concern that you have to account for in | 3      resolved such legitimate and competing concerns in |
| 4   terms of your administration issues.  So there's | 4      favor of putting the voter first, and this has been a |
| 5   always a balancing of interests here that have to be | 5      key reason why Wisconsin is often recognized as a |
| 6   evaluated. | 6      leader in election administration."  Do you see that? |
| 7  Q   And as a matter of basic geography, if you had | 7  A   I see that. |
| 8     multiple locations, that would reduce commutes for a | 8  Q   And so the reference to concerns expressed by clerks |
| 9     number of voters, correct? | 9      refers to the administrative burden that having |
| 10  A   It would reduce -- it would provide probably more | 10     in-person absentee voting placed on clerks in the |
| 11     accessibility in terms of public transportation or | 11     final three days before the election, is that right? |
| 12     being able to walk or not have to find parking, | 12  A   That's right. |
| 13     depending on the locations, and again each city has | 13  Q   And clerks expressed concerns about that burden, is |
| 14     its own unique geographic features. | 14     that fair? |
| 15         I mean you have some places that are divided by | 15  A   They did.  That's why we spent so much time |
| 16     the river and what side of the river you're on makes | 16     discussing this. |
| 17     a big difference sometimes to accessibility of | 17  Q   And you're indicating here that that was being |
| 18     government services. | 18     balanced against the intent of Wisconsin election law |
| 19  Q   Do you know if there's free parking outside the | 19     to encourage and accommodate the greatest possible |
| 20     Zeidler building in Milwaukee? | 20     voter participation? |
| 21  A   I don't know.  I doubt it. | 21             MR. MURPHY:  Object to form. |
| 22  Q   Let me direct your attention then to the next page. | 22  Q   Is that right? |
| 23     And I guess before I do that, I should note that on | 23  A   That's the language that's in the report, yes. |
| 24     the previous page, the heading for this section is | 24  Q   And that's because having those final three days of |
| 25     Discussion: Retention of Monday Deadline. | 25     early voting encouraged and accommodated the greatest |
| 62 | 64 |

1    possible voter participation, correct?

2  A  I think that was the opinion that we expressed, yes.

3  Q  In the next paragraph, the second sentence, you

4    indicated that, "Changing the current deadline would

5    move Wisconsin away from the forefront in providing

6    access to voting opportunities," right?

7            MR. MURPHY:  Object as misstates

8        evidence, and I'll expand on that if you want me

9        to.

10           MR. KAUL:  Please do.

11           MR. MURPHY:  Excuse me.  I'm getting

12       confused when you're using me.  This is a GAB

13       report.  If we could just be a little more clear

14       on that.

15           MR. KAUL:  Okay.

16           MR. MURPHY:  Thank you.

17  Q  The report states that, "Changing the current

18    deadline would move Wisconsin away from the forefront

19    in providing access to voting opportunities,"

20    correct?

21  A  And where is that?

22  Q  Sorry.  It's the second sentence in the next

23    paragraph after the one we were just discussing.

24  A  Yes.

25  Q  Now, this is from the report that you approved,

65

1    correct?

2  A  Right.  This is the staff report, and yes, I

3    definitely had a hand in this.

4  Q  And the GAB ultimately issued a different

5    recommendation, correct, the actual board?

6  A  That's correct.

7  Q  Let me direct your attention to Page 20.  And the

8    preceding Page 19 indicates that these are a specific

9    recommendation, is that right?

10  A  Yes.

11  Q  No. 4, locations, in the second sentence you indicate

12    that municipalities -- by you, I mean the report

13    indicates that, "Municipalities which determine that

14    multiple sites are necessary, however, should be able

15    to use them," is that right?

16  A  Yes.

17  Q  And that reflects your view, right?

18  A  That reflects the view in the report, yes.

19  Q  That was the view of GAB staff?

20  A  That's right, which obviously I approved, that this

21    was what — it's a GAB staff report.

22  Q  And the report in the next Bullet 5 recommends that

23    hours for in-person absentee balloting become

24    flexible and under municipal control, is that right?

25  A  Yes.

66

1  Q  Now, let me direct your attention to Page 24.  Now,

2    this reflects public comments on the draft report, is

3    that right?

4  A  Yes.

5  Q  And does this summary to the best of your ability and

6    your staff's ability reflect your accurate

7    characterization of statements that were made in

8    response to the report?

9  A  I believe it does.

10  Q  And then let me direct your attention to Appendix A.

11    Now, this shows the results of a survey conducted of

12    municipal and county clerks, is that right?

13  A  That's right.

14  Q  And how was this administered, the survey?

15  A  I don't remember.

16  Q  These results do not account for relative population

17    differences that the clerks serve, right?

18  A  No.

19  Q  No meaning that my statement was accurate, right?

20  A  You're correct, it does not account for that that I

21    see here.

22  Q  Okay.  And Appendix B summarizes public responses to

23    GAB staff's early voting surveys, is that right?

24  A  Yes.

25  Q  And do you recall how this data was collected?

67

1  A  I don't recall, but I thought I saw earlier in this

2    report where it made a comment that we posted on our

3    website and invited comments.  I mean if you're

4    looking at Page 24 —

5  Q  Thank you.

6  A  — I think that might answer the question.  It does

7    explain at the top of Page 24 under the introduction.

8  Q  Okay.  So these were all comments received via online

9    submission?

10  A  According to the report, yes.

11  Q  All right.  And then following the collection of the

12    survey results, there are some other material,

13    including letters from some cities in Wisconsin, is

14    that right?

15  A  It appears there's not only letters, but there's

16    resolutions adopted by the county also in at least

17    one case.

18  Q  And let me direct your attention to Page 8 of that

19    appendix, which is a letter from the City of

20    Milwaukee.

21  A  It's from the Milwaukee City Board of Election

22    Commissioners.

23  Q  Okay.  Thank you.  And it's signed by Sue Edman who

24    at the time was the executive director of the City of

25    Milwaukee Election Commission, correct?

68

KEVIN KENNEDY                                      01/14/2016

1  A    Yes.

2  Q    And let me direct your attention then to Point No. 1
3       on Page 8.  This indicates that the City of Milwaukee
4       is requesting the opportunity to -- I'm sorry, is
5       requesting a change to the election law that would
6       permit municipalities to operate additional satellite
7       in-person absentee ballot locations, correct?

8  A    That's right.

9  Q    And it says that, "During high turn-out elections,
10      such as the November 2008 presidential election,
11      Milwaukee witnessed wait times of three hours or
12      longer at its in-person absentee voting location," is
13      that right?

14 A    That's what she says in her letter, yes.

15 Q    And is it your understanding that that's correct?

16 A    I can't speak to how long it was.  I do know there
17      were lines.  I was present there in 2008 and 2012 and
18      2014, so I know that there were lines.  I wasn't
19      measuring wait times.

20 Q    In 2014 there were lines?

21 A    Yes.

22 Q    And the next sentence indicates that, "Providing
23      municipalities with the authority to establish
24      additional satellite locations would provide voters
25      with greater accessibility to community-based voting

69

1       and reduce wait times"?

2  A    That's what she says in her letter, yes.

3  Q    What does greater accessibility to community-based
4       voting mean, if you know?

5  A    I'm assuming -- again this is an assumption I'm
6       making that it reflects the fact that a city like
7       Milwaukee has various neighborhoods, parts of the
8       city.  You know, the interstate divides the city
9       north and south, so that can be a barrier.  There are
10      other, you know, geographical features that tend to
11      create different community areas within the city, and
12      I think that there's a recognition of that.

13          I think most cities, you see a lot of comments
14      about serving neighborhoods or serving communities
15      within the city.  So it's a reflection when you have
16      a large diverse community how do you best provide
17      government services.

18 Q    Let me direct your attention to Appendix G then.  I
19      just want to make sure I'm understanding this
20      accurately.  This is data regarding both all absentee
21      voting in the 2008 presidential election and data
22      regarding in-person absentee voting in the 2008
23      presidential election, right?

24 A    Yes.

25 Q    And specifically this shows the number of people who

70

1       utilized those methods of voting for each of these
2       listed cities and towns and villages in 2008,
3       correct?

4  A    That's right.

5  Q    The reference to Milwaukee says City of
6       Milwaukee-Main?

7  A    That's because part of the City of Milwaukee goes
8       into Waukesha County and into Washington County, but
9       I don't believe there are any voters there.

10 Q    Okay.  So this is the total for Milwaukee then?

11 A    Yes.

12 Q    And this is based on data from the SVRS?

13 A    I'm not sure if it's entirely -- it could be because
14      I mean obviously this is not all 1,850 -- in fact,
15      back then there were only 1,851 municipalities, I
16      think, and so these are the ones where we had the
17      data from, and that means that we were -- our best
18      source for that would have been our statewide voter
19      registration system.

20 Q    Okay.  So is it fair to say that your belief is that
21      that's where the data is from, but you're uncertain?

22 A    Yes.

23 Q    And there are statewide totals listed here, do you
24      see those?

25 A    Yes.

71

1  Q    Those reflect the totals for the entire state, not
2       just those cities listed, right?

3  A    That's right.  Those are collected by a separate
4       survey after the election.

5  Q    Did you have discussions regarding this report with
6       members of the Legislature?

7  A    Some discussions.  Mostly with the chairs of the
8       committees about the recommendations.

9  Q    And do you recall the content of any of those
10      discussions?

11 A    I don't specifically.  This was quite a while ago.
12      Again part of this was to give the Legislature some
13      information to make decisions.

14 Q    Do you generally recall the content of those
15      conversations?

16 A    No.

17          MR. KAUL:  All right.  I think this is
18      a good time to take a brief break.  So we'll go
19      off the record.

20          THE VIDEOGRAPHER:  The time is 10:50.
21      We are going off the record.

22          (Short recess is taken)

23          THE VIDEOGRAPHER:  We are on the
24      record.  The time is 11:05 a.m.  This marks the
25      beginning of Disk No. 2 in the deposition of

72

**Page 73**

1      Mr. Kevin Kennedy.

2 Q  We were talking a moment ago about the rule that

3    limits localities -- I'm sorry, municipalities to one

4    in-person absentee voting location.  Have you

5    testified at any legislative hearings regarding

6    proposals to change that rule?

7 A  I don't recall.  I know that there was a Legislative

8    Council Study Committee on Elections.  I don't know

9    if it was in 2006 or something that I was an ex

10   officio member of and we discussed it at that time,

11   but I don't recall specifically testifying on this.

12   It doesn't mean I wouldn't have because it was

13   something that I personally thought was a good idea.

14 Q Did that Legislative Council Study Committee issue

15   any reports?

16 A It did.  It was under the leadership of

17   Senator Leibham, L-e-i-b-h-a-m.

18 Q And what did those reports pertain to?

19 A It was -- it dealt with changes in election law

20   administration.  Again I think it was after the Help

21   America Vote Act, which was an act in 2002 and

22   started to be implemented in 2006.

23 Q And was that a bipartisan study committee?

24 A Well, it was under the leadership of just one

25   Republican senator, but there were representatives

**Page 74**

1    from both parties, local election officials and

2    citizen groups who sat on it.

3 Q  And what recommendations did the study committee

4    make?

5 A  I don't remember all of the recommendations.  I do

6    remember that there was a consensus -- actually I

7    don't remember how it came out on that particular

8    issue, I should say.

9 Q  What issues was there a consensus on?

10 A I'd have to go back and look at the report.

11 Q Is that a publicly available report?

12 A Sure.  You could get it from the Legislative Council

13   off their website, I'm sure.

14 Q The SVRS does not keep data on the race or ethnicity

15   of voters, correct?

16 A That's right.  It's not collected as part of the

17   voter registration process, so the form that collects

18   information on voters does not track race, ethnicity

19   or sex.

20 Q Does GAB have any means of determining whether

21   election laws or changes to election laws impact

22   people differently by race?

23 A No.

24          MR. MURPHY:  Object to form.

25 A The answer is no.

**Page 75**

1 Q  Okay.  So it would be fair to say that GAB hasn't

2    done any assessment of racial disparities imposed by

3    any election laws in Wisconsin?

4         MR. MURPHY:  Objection, calls for

5    speculation.  You can answer.

6 A  We have not.

7 Q  And based on the experience we've been discussing

8    before, are you aware of how early voting rates or

9    in-person absentee voting rates in other states

10   compare by race?

11 A I am not.

12 Q Now, one of the changes that the Legislature made in

13   2011 to the election laws was to reduce the period

14   during which early voting could take place from 30

15   days to 12 days, is that right?

16 A It changed the deadline from in-person absentee

17   voting.

18 Q I'm sorry, thank you.  30 days to 12 days is correct?

19 A I believe that's the case.  It was a Monday through

20   Friday, including the weekend in between, yeah.  The

21   third Monday through the Friday before the election.

22 Q And based on your experience, in what, if any, ways

23   does that change make voting more difficult?

24         MR. MURPHY:  Object to form.

25 A Well, you know, the question is -- on one hand, it's

**Page 76**

1    easier for clerks, they have a limited time period to

2    do it, but they probably have to process more voters

3    because I mean we hadn't seen a reduction in

4    participation as a result of the change in numbers.

5    In fact, if anything, we've seen an increase.  It

6    obviously impacts a voter in terms of their ability

7    to go to the clerk's office.  It reduces the number

8    of days that are available to do that, but in

9    practice the numbers hadn't changed and the

10   experience was that the two weeks was the heaviest

11   period of time anyway.

12 Q You said that clerks need to process more voters in a

13   shorter period.  Is that what you meant?

14 A Yes.

15 Q And what, if any, impacts does that have on election

16   administration?

17 A It depends on the resources that the clerks bring to

18   bear.  It could be longer lines, more staff that they

19   have to hire, certainly more work at the polls on

20   Election Day if there's more votes cast absentee.

21 Q What, if any, state interests are served by the

22   reduction in early voting from the 30 days to 12

23   days?

24 A I'm not sure I could speculate on that.

25 Q Are there any interests in election administration

1    that are served by that reduction?
2  A  Well, as I said before, clerks have more time to
3    concentrate on other duties if they only have to gear
4    up their resources for different time periods.  As
5    clerks love to tell us, they do other things besides
6    elections.
7  Q  Meaning those first 18 days -- I'm sorry, the 18 days
8    that no longer have early voting, they now can have
9    time to devote to other activities?
10  A  I noticed one of the comments was that when they
11    weren't conducting in-person absentee voting, they
12    could do -- they would have more time to focus on
13    timely responding to mail requests for absentee
14    ballots that would come in.
15       Sometimes those requests, you know, there are
16    people who are proactive enough and have difficult
17    delivery situations and so it requires more time.
18    And if there's not someone standing at your counter
19    asking to vote absentee, it means you're less
20    distracted from those kind of election related
21    duties.  You also are recruiting and training
22    co-workers during that time period, and I'm only
23    speaking about the election duties, not their other
24    duties, and making sure that the polling places are
25    all set up.

                                                  77

1       I mean this is not something that happens just
2    overnight before Election Day.  You've got to make
3    sure -- I can think of several instances where clerks
4    did not know that there was construction going on in
5    front of a polling place and all of a sudden had to
6    make adjustments.  So there's a lot of those kind of
7    preparations that if you don't have to respond to a
8    voter, which normally would be persons -- a clerk's
9    top priority, you can focus on those things as
10    well.
11  Q  And would the converse also be correct, by which I
12    mean during the days when early voting remains, now
13    the voters would have less time to devote to other
14    tasks given, as you said before, that there were more
15    voters in a shorter period of time?
16            MR. MURPHY:  Object as vague.  But you
17       can answer.
18  A  I'm not sure -- I mean I'm familiar with what the
19    clerk's tasks are.  Voters bring a whole lifetime of
20    issues.  I mean the idea of allowing people to vote
21    before Election Day in a format is to provide some
22    convenience to the voters to cast a ballot because
23    the 13 hours that are available on Election Day may
24    not be enough.
25  Q  I think Mike is right that my question was vague

                                                  78

1    because I actually meant -- I was actually talking
2    about the clerks --
3  A  You said voters.
4  Q  I know, I must have misspoke.  I apologize.  During
5    the 12-day window the clerks as a result of this
6    change will now have less time to devote to other
7    tasks, right?
8  A  They would spend more time servicing the voters, but
9    again they'd also be able to plan their resources for
10    a more concentrated period of time.  It might be
11    easier for them to recruit temporary staff to assist
12    them.  You know, from a planning standpoint, if you
13    have a defined period that you know you have to work,
14    it makes a difference.
15  Q  Let me come back to that.  I'm just trying to make
16    sure I understand the point.  But before you said
17    that absentee voting was fairly light until the first
18    two weeks, right?
19  A  That's the feedback that we were getting from clerks.
20    That's from the limited amount of data that we tried
21    to collect, it seemed that people paid more attention
22    the closer it got to voting, that there was less
23    voting towards the 30-day period than there was in
24    the 12-day window.
25  Q  And do you have -- does GAB have data on that, or is

                                                  79

1    that just based on anecdotal information?
2  A  I know it's anecdotal.  There might have been some
3    data that was collected as part of the Election Day
4    survey or the early voting report, but I don't --
5  Q  So if absentee in-person usage was fairly light
6    during that time, that would mean that the burden on
7    clerks would also be relatively light during that
8    period, is that correct?
9  A  As far as serving the absentee voters go, yes.
10  Q  Now, there was a second change to the early voting
11    law made in 2013, is that right?
12  A  Yes.
13  Q  And as a result of that change, municipalities were
14    no longer allowed to offer early voting during the
15    weekend, correct?
16  A  You could not vote in-person absentee over the
17    weekend --
18  Q  I'm sorry.
19  A  -- in between was one of the changes, yes.
20  Q  And that change also limited the hours during which
21    in-person absentee voting could take place to 8 a.m.
22    to 7 p.m., is that right?
23  A  That's correct.
24  Q  Did the final version of that bill have provisions
25    that dealt with appointments with local clerks,

                                                  80

KEVIN KENNEDY                                           01/14/2016

1  voters setting up appointments with local clerks?
2  A  I don't recall.  I mean I think one of the arguments
3     in favor of the hours was that everybody would be the
4     same, but the reality is in many places, they don't
5     offer that many hours because they don't have as many
6     people.  The clerk is part time, as I mentioned
7     before, so it doesn't — it provides a uniform
8     window, but it doesn't provide uniform hours because
9     there's a lot of places where there's no voting on
10    certain days of the week or it's only in the
11    afternoon.
12 Q  And prior to that change, there was a uniform window
13    also, correct?
14 A  It was still a uniform window in the sense that there
15    was nothing that said you couldn't vote on how early
16    you started or how late, how early you could start or
17    how late you could run or weekends or holidays.
18 Q  Do you know prior to the change which cities in
19    Wisconsin offered in-person absentee voting on the
20    weekends?
21 A  I don't recall.
22 Q  Do you know whether Milwaukee offered in-person
23    absentee voting on the weekends prior to the change
24    in the law?
25 A  I know they offered some.  It varied depending on the

81

1     type of the election.  I know that in preparation of
2     this legislation, there was some data submitted by
3     local election officials on those hours.
4  Q  And do you know whether Madison offered in-person
5     absentee voting on the weekends prior to the change?
6  A  I don't know for sure.
7  Q  Do you know which cities offered in-person absentee
8     voting after 7 o'clock p.m. prior to the change?
9  A  Again I don't know.  One thing I can state is that
10    municipalities because it was under their control and
11    it was their responsibility would adjust their hours
12    based on what seemed to be the demand that best
13    suited either their citizens or, as I said before,
14    you have part-time clerks where they couldn't offer
15    voting on certain days because their clerk was
16    unavailable or they had office hours that had been
17    established for other reasons.
18 Q  All right.  Now, you said before that with respect to
19    this change we've been discussing that there were
20    concerns that it will have an impact on people who
21    live in urban areas who might be working during those
22    hours, meaning the eliminated hours, is that right?
23 A  What do you mean, I said before?  Are you referring
24    to my testimony before the Legislature?  Are you
25    referring to something I said today?

82

1  Q  No, no, I'm sorry.  I think this was a public
2     statement, but let me just show you the document.
3     That will be easier.  This will be  Kennedy 5.
4        (Exhibit 5 is marked for identification)
5  Q  And this is a printout of a Wisconsin State Journal
6     article.  Is that what it appears to you to be?
7  A  Yes.
8  Q  And this article discusses the change in early voting
9     hours that occurred since 2012, is that right?
10 A  That's right.
11 Q  And then the article quotes you saying there are
12    concerns it will have an impact on people who live in
13    urban areas who might be working during those hours,
14    do you see that?
15 A  Yes.
16 Q  Do you recall if that's a statement that you made?
17 A  It is a statement that I made.  It's a statement that
18    reflects comments that I have heard in general.  You
19    know, observations that were made as part of the
20    discussion in making these changes, you know, what
21    I'm saying there is there are concerns.  It doesn't
22    say it's my concerns specifically or that I have
23    anything to base it on, but it reflects the issues
24    that were discussed about the changes in this.
25 Q  And do you recall who had raised those concerns?

83

1  A  Well, these concerns were raised in testimony before
2     the Legislature by a number of different individuals
3     and groups when this was debated in the Legislature,
4     when committee hearings were held.
5  Q  And how do you know that?
6  A  Because I was present at the hearings.
7  Q  And your quote here is in reference to the 2013
8     change in early voting hours, correct?
9  A  That's right.
10 Q  All right.  And you also testified regarding this
11    change, is that right?
12 A  I did.
13       MR. KAUL:  We'll mark this as
14    Kennedy 6.
15       (Exhibit 6 is marked for identification)
16 Q  And actually I may have misstapled something here.
17    There's a letter on the back page of this.  Do you
18    know whether that letter relates to this testimony —
19    oh, I'm sorry, it does.
20 A  I did.  I made a reference to it at the beginning of
21    my testimony.
22 Q  I apologize, thank you.  I'm confused by my own
23    exhibits.  Does this — is this a true and accurate
24    copy of the testimony you provided to the
25    Legislature?

84

1  A    It looks like it is.

2  Q    Meaning that to the best of your knowledge, it is?

3  A    Yeah.  I mean this is the format that I prepared it

4       in.  It sounds familiar as I look at it.  So I'm

5       pretty sure we provided it to you based on our

6       records.

7  Q    And the GAB has a website, correct?

8  A    It does.

9  Q    And there is testimony posted on that website, is

10      that right?

11 A    That's right.

12 Q    And are the documents posted on that website true and

13      accurate copies of what they purport to be?

14 A    Yes.

15 Q    And is that also true of the other documents posted

16      on the website?

17 A    Yes.  I think you make mistakes probably, but

18      hopefully they're taken down and fixed if there's

19      something wrong.

20 Q    All right.  Now, one of the things on Page 2 of the

21      testimony, about halfway through the second

22      paragraph, you indicate that Milwaukee served a

23      little over 36,000 in-person absentee voters at City

24      Hall in 2012, is that right?

25 A    Right.

85

1  Q    And then in the following sentence -- I'm sorry, two

2       sentences later, you indicate that in many

3       municipalities, absentee in-person voting is by

4       appointment with the clerk and that there are no

5       regular office hours, right?

6  A    I'm sorry, which paragraph was that?

7  Q    I'm sorry, the same paragraph but the last sentence.

8  A    Yes, um-hum.  That's right.

9  Q    And that remains true after the change to the 2013

10      change to early voting hours, right?

11 A    It remains true, although the appointment has to be

12      made within that window.

13 Q    And it was prior to that change, it was true that the

14      appointment had to be made within the allotted window

15      also, right?

16 A    That's right.

17 Q    Now, two paragraphs down, you recommended that the

18      committee consider expanding the window to permit

19      in-person absentee voting between 7 o'clock a.m. and

20      8 o'clock p.m., is that right?

21 A    Yes.

22 Q    And why did you recommend 8 o'clock p.m.?

23 A    Well, as I said in my testimony, these are the same

24      hours the polls were open on Election Day.  So I was

25      looking to provide some level of uniformity as far as

86

1       establishing the window goes.  And Election Day hours

2       are set to a certain degree to accommodate voters on

3       that day and some time after a regular work schedule,

4       some time before a regular work schedule and covering

5       people with different work schedules.

6  Q    All right.  And later in the paragraph you indicate

7       that in-person absentee voting should be an option

8       for municipalities on the weekend?

9  A    I do.

10 Q    And why did you take that position?

11 A    Again talking about one of the reasons for allowing

12      people to vote before Election Day is to accommodate

13      various schedules and there are people who couldn't

14      get to a clerk's office to cast their vote during the

15      hours that are proposed here or even the 7 to 8

16      o'clock hours I proposed on the weekends might

17      provide a better opportunity for people.

18           There are also other distractions in people's

19      lives during the week such as school, children's

20      obligations, and they may have more flexibility on

21      the weekend.

22 Q    Are you familiar with the phrase Souls to the Polls?

23 A    I am.

24 Q    And do you know whether there were Souls to the Polls

25      efforts in Wisconsin?

87

1  A    I don't think it was a phrase that was used in

2       Wisconsin like it is used in some southern states.

3       There certainly were some efforts to target religious

4       communities because we had a lot of people in one

5       place and you could say, hey, let's now go to the

6       polling place or go cast a vote.

7  Q    And just to be clear, Souls to the Polls generally

8       refers to efforts by predominantly African-American

9       churches to vote following church on Sundays, right?

10 A    That's right.

11 Q    And I guess regardless of what phrase was used, do

12      you know whether there were such efforts in

13      Wisconsin?

14 A    My understanding was there were efforts.  I don't

15      know if it was limited just to the African-American

16      community, but there were certainly efforts to do

17      that.  It's not unusual for any type of rally to --

18      in that period when people could vote in the clerk's

19      office to encourage them to then go, whether it was a

20      weekday rally or a national candidate came in to

21      speak, they would then say, hey, if you want to go

22      down and vote now because we've got your attention,

23      let's do it.

24 Q    And on the weekend specifically and the post-church

25      trips to the polls, is it your understanding -- I

88

1  think you said that wasn't exclusively in
2  predominantly African-American churches.  Do you know
3  if it was predominantly African-American churches?
4 A  I don't really know.  You know, again the term wasn't
5  used much in Wisconsin.  I know from talking to
6  individuals that this was -- part of their get out to
7  vote efforts was to target these kind of communities,
8  but I also know it was done not just with church
9  groups, it was done with political rallies as well.
10 Q  Now, did you receive --
11 A  Just so you know, I have two copies of this.
12 Q  Oh, thanks.  That's why I was one short.  Thank you.
13  You're welcome to keep it for posterity if you'd
14  like.
15 A  I have my own electronic version.
16 Q  The GAB has received complaints from a number of
17  municipal clerks regarding this change to the law,
18  correct?
19 A  Which change?
20 Q  The change in 2013 that limited early voting hours.
21 A  I don't know if -- I'm sure we've had comments that
22  could be characterized as complaints from different
23  groups or I mean different local election officials.
24  I just don't recall any specifically, and I don't
25  recall that we treated them as something that was --
                                                        89

1  a specific action was taken on other than maybe to
2  respond to the complaints or say talk to your
3  legislator.
4 Q  Let me go over a couple of documents.  Here's
5  Kennedy 7.
6       (Exhibit 7 is marked for identification)
7 A  Okay.
8 Q  Let me start with a few just background questions on
9  this.  First of all, you were one of the recipients
10  of this email, right?
11 A  Yes.
12 Q  And this was sent by -- actually I'll let you
13  pronounce it because I'll mispronounce the last name.
14 A  Judnic.
15 Q  Nathan Judnic?
16 A  Yes.
17 Q  And who is he?
18 A  He's currently our staff counsel.  I'm trying to
19  remember if he had taken that position -- I don't
20  think he had taken that position in 2013.  He's been
21  a long-time staff member with the Government
22  Accountability Board working both in the elections
23  division and the ethics and accountability division,
24  and what he's forwarding is there's a clerk list
25  which is the municipal clerks, I don't know if you
                                                        90

1  call it a Listserv, but they get on and they make
2  their comments amongst each other and we try to
3  monitor it, and staff at various times request to opt
4  out of monitoring it so someone else can do it
5  because, as you can see from the comments, the clerks
6  have strong views, but we think it's important to
7  understand what's ruling them, what's important to
8  them, and so we try to have our staff monitor this
9  and when they see something in particular that dealt
10  with legislation that was up, it gets forwarded.
11       So Nate forwarded it to the people who were most
12  likely to read it, our public information officer and
13  the two elections supervisors and myself.
14 Q  Okay.  And so it would be a fair characterization of
15  what you just said then that GAB monitors the
16  contents of the clerk list to stay abreast of
17  concerns of local clerks?
18 A  Yes.
19 Q  All right.  And we discussed Nathan Judnic.  And the
20  Michael Haas on this email is Michael Haas we talked
21  about before, right?
22 A  Right.  And at that time he was the elections
23  division administrator.
24 Q  Okay.  And Reid Magney is the public information
25  officer?
                                                        91

1 A  That's correct.
2 Q  And who is Ross Hein?
3 A  Ross Hein is our election supervisor.  He oversees
4  primarily our election related IT initiatives.  He
5  used to be the voting equipment coordinator, meaning
6  he ran all the certifications on voting equipment,
7  but he was promoted to a position we call election
8  supervisor, which is sort of like the second person
9  in command in the elections division, gets a bit more
10  specialized than I asked him to, I wanted to
11  cultivate an in-house IT expert so that when we're
12  managing IT projects and so about half of his
13  responsibility is to make sure that the various IT,
14  meaning information technology endeavors we're in,
15  are effectively managed.
16       So he does the recruitment of our outside
17  contractors.  He evaluates their performance.  He is
18  sort of like the project manager on the various IT
19  related projects that we have.
20 Q  And this also indicates that Shane Falk was a
21  recipient of this email?
22 A  Yes.
23 Q  All right.  And he was a legal counsel at the time,
24  right?
25 A  Yeah, he was one of our staff counsel at the time.
                                                        92

1    At the time he was the only staff counsel.  Nate
2    eventually got promoted to that position later in the
3    year.  You can see from the title underneath his name
4    he was still in the ethics division.
5  Q   And when did Mr. Falk leave the GAB?
6  A   I believe it was August of 2014.
7  Q   And do you know why he left?
8  A   He thought he could do better financially in the
9    private sector.
10 Q   Probably right about that, is that fair?
11           MR. MURPHY:  Object to form.
12           MR. KAUL:  I'm teasing.
13 A   For some people, I'm sure that is the case.
14 Q   Now, is it your understanding that all of the
15   individuals on the clerk list are in fact clerks or
16   clerk staff in Wisconsin?
17           MR. MURPHY:  Object to form.
18 A   Well, you know, our staff is on it, so we're not
19   clerks, but I think the general audience is primarily
20   clerks, deputy clerks or other staff members in
21   clerks' offices.
22 Q   Okay.  And one of the things that the emails in this
23   string indicate is that at least the clerks who sent
24   these were unhappy about the inability to make
25   appointments with the voters outside of the time

93

1    window prescribed by the 2013 early voting
2    legislation, is that right?
3  A   Well, I think they talked about the inability to make
4    appointments or to have -- provide services beyond
5    the window, whether it was a weekend or whether it
6    was after -- I think the original proposal cut things
7    off at 5 or 6 o'clock, and there were a number of
8    changes to that legislation as it went through, but
9    this is -- reflects what some clerks felt about their
10   ability to serve their voters.
11 Q   And let me show you another email from the clerk
12   list.  This is  Kennedy 8.
13           (Exhibit 8 is marked for identification)
14           MR. MURPHY:  Object to the exhibit on
15   foundation grounds, but please proceed.
16 Q   Well, let me lay some foundation.  Do you know what
17   this document is?
18 A   I see it's a document that looks like it was
19   generated from the clerk list we were discussing
20   before.  It involves two different clerks'
21   communications.  I don't know how it got in your
22   hands or anything because I don't see anything that
23   indicates that it somehow came from our office.
24 Q   All right.  And if this was produced in discovery by
25   your office in this case, would that mean that your

94

1    office had it?
2  A   If we produced it in discovery, we had it.  But again
3    on the face of it, this is apparently all that was
4    retained from it.
5  Q   And when your office receives clerk list emails, they
6    would show up as this does at the top of the email,
7    correct?
8  A   I don't look at the clerk list.  I only see what's
9    passed on to me.  But so I'm not quite sure — again
10   I'm not sure if they're going to a website on the
11   clerks or whether they subscribe to the list and so
12   it would have the header of the staff person who
13   picked it up.
14 Q   Let me direct you to the prior exhibit then.
15 A   Yeah.
16 Q   Just to clarify.  Now, the top email in that prior
17   exhibit was a GAB internal email, right?
18 A   Yes.
19 Q   But the email below is a clerk list email, correct?
20 A   Yes.
21 Q   And that header is consistent with this new exhibit
22   in that they're both addressed to Clerk List, right?
23 A   Right.  Although the second one also talks about the
24   clerk network, and I think there might be two
25   different types of lists as a result of that.

95

1    I've often heard our staff refer to the clerk
2    network, which might be more of the back and forth
3    exchange that clerks have among themselves sometimes,
4    but again I don't know the distinctions.
5  Q   Okay.  Do you know whether GAB staff are on both the
6    Clerk List and Clerk Network email?
7  A   I don't know.  We just try to monitor the
8    communications as best we can because we think it's
9    important to get a flavor of what their concerns are
10   so that we can address them.
11 Q   I understand.  All right.  So this new exhibit, the
12   top email which appears to be from the clerk
13   treasurer in the Village of West Baraboo talks about
14   resenting the Friday deadline since it changed, do
15   you see that?
16 A   I see that.
17 Q   Are there any circumstances in which a voter can cast
18   an in-person absentee ballot on the weekend before
19   the election?
20           MR. MURPHY:  Objection to the extent
21   it calls for a legal conclusion, but you may
22   answer.
23 A   I don't think that there's an ability for them to go
24   into the clerk's office to cast it.  I'm trying to
25   think, you know, military and overseas have some

96

KEVIN KENNEDY                                              01/14/2016

1   different deadlines for applications, but those are
2   transmitted electronically or by mail, so I'm not
3   aware -- I'm trying to think about in --
4 Q  Sorry.
5 A  I'm trying to think about if there's a limit on -- we
6   have other methods tailored to specific situations.
7   Sequestered jurors, which I'm not sure if there's a
8   specific restriction on the time period, I'd have to
9   go back and look at the statutes, but we have special
10  procedures for sequestered jurors to get absentee
11  ballots, and I don't know if they're excluded in this
12  period of time without going back and doing some
13  checking.
14      We have people who are in nursing homes or other
15  special locations where we send special deputies out.
16  Again I mean I don't know if we've restricted the
17  time period by the weekend. I'm pretty sure that
18  that all ends before -- I mean it closes by Friday
19  before the election for sure, but I don't know if
20  that would allow for those special deputies to go to
21  a nursing home or community-based residential
22  facility or other special thing that's recognized in
23  the statutes on the weekend in between or if they
24  could go after hours. I'd have to go back and look
25  for those specific situations.

                                                          97

1       I'm trying to think if other hospitalized
2   electors is another one where we have a special
3   provision where an individual can apply to the clerk
4   to take an absentee ballot to someone and deliver it,
5   and that actually can be done on Election Day.
6 Q  Okay. Since this change we've been discussing in
7   early voting hours which eliminated weekend early
8   voting and early voting after 7 p.m., clerks have
9   made mistakes and received ballots outside of the
10  allowable hours, correct?
11      MR. MURPHY: Object to form.
12 A  I don't know for certain what the extent of those are
13  that a clerk might have offered someone the
14  opportunity to vote outside of those hours. I
15  remember -- I remember getting a call about it from
16  the Republican Party about a clerk in far northern
17  Wisconsin who did that on one instance. I'm trying
18  to think what the time period was on that, but -- so
19  I remember that incident specifically. And I
20  wouldn't be surprised that clerks have done this
21  either unintentionally or possibly even intentionally
22  because they're more concerned about taking care of
23  the voter.
24 Q  And following the first change in early voting we
25  discussed from the 30 days to the 12 days, there were

                                                          98

1   also incidents in which clerks issued absentee
2   in-person ballots to voters outside of the prescribed
3   window, correct?
4       MR. MURPHY: Objection, calls for
5   speculation.
6 A  I don't recall specifically, but I wouldn't be
7   surprised if that were the case.
8 Q  Okay. In the event that that happens, what happens
9   to that ballot?
10 A  It depends. I mean I would think someone would have
11  to identify it and would have to raise it as an
12  issue. I'm not aware that it became part of any
13  recount issues or challenges, but again, you know,
14  since we run this at the municipal level, not all of
15  these issues percolate up to us.
16 Q  Let me show you a document relating to this. This
17  will be  Kennedy 9.
18      (Exhibit 9 is marked for identification)
19 A  Okay.
20 Q  All right. Now, first of all, this is a string of
21  emails among GAB staff, correct?
22 A  That's right.
23 Q  And until the last forward of the email, you're
24  copied on these emails, is that right?
25 A  Yes.

                                                          99

1 Q  Let me start with the first in time email, which is
2   the last page of the document.
3 A  Um-hum.
4 Q  That's an email from Shane Falk to you, correct?
5 A  That's right.
6 Q  Now, this is dated October 25, 2012, is that right?
7 A  Yes.
8 Q  And in your experience, do the names and the dates on
9   your internal emails accurately reflect the people
10  who sent the emails and the dates that they were sent
11  on?
12 A  Yes.
13 Q  Now, at the beginning of Mr. Falk's email, he said,
14  "As you know, we have received numerous inquiries
15  regarding how to treat absentee ballots that a clerk
16  mistakenly permitted voters to vote in person," and
17  it goes on, do you see that?
18 A  I see that.
19 Q  To the best of your knowledge, is that statement
20  correct?
21 A  I know that it was brought to my attention that we've
22  had these. I don't know whether -- you know, how we
23  characterized numerous, whether that's three or 30,
24  but the fact is it was enough of an issue we needed
25  to craft a response for clerks.

                                                          100

KEVIN KENNEDY

1  Q   And then after Mr. Falk sent you that email, you
2      forwarded it to other members of the staff, is that
3      right?
4  A   That's right.
5  Q   And that indicates that you — well, is it fair to
6      say that you agreed with the guidance that Mr. Falk
7      had provided?
8  A   Yes.
9  Q   And then Mr. Falk replied to that email the next day,
10     right?
11 A   Yes.
12 Q   And I'd like to direct your attention to the fourth
13     paragraph of his email beginning with the time
14     period.
15 A   Okay.
16 Q   And going to the last sentence, Mr. Falk writes that,
17     "Ballots cast in contravention of the mandatory time
18     period for in-person absentee must be rejected
19     despite the fact that clerk or deputy error may be
20     the cause."  Do you see that?
21 A   Yes.
22 Q   And that is GAB's position, correct?
23 A   That was the advice that we were giving clerks.  The
24     board did not weigh in specifically on this, but this
25     is the kind of troubleshooting we had to do.

101

1  Q   So when GAB is asked questions about this issue,
2      that's the advice they provide, right?
3  A   This is what the staff would provide.  Again we've
4      not presented this specifically to the board to
5      endorse, but we can't get everything in front of the
6      board, particularly in that time period.
7  Q   And do you know whether clerks follow the advice that
8      GAB or GAB staff provides?
9              MR. MURPHY:  Object as calls for
10             speculation.
11 A   I don't know.  I mean that's part of why we're there
12     is to give them advice and direction and in most
13     cases they appreciate knowing how to handle things.
14     Sometimes they're not happy.
15 Q   Not happy because they may disagree with your
16     decision?
17 A   They may disagree.  It may require them to do more
18     work, more documentation or they may disagree.
19 Q   But they follow it despite the disagreement?
20             MR. MURPHY:  Same objection.
21 A   Again I don't know, but my experience is that
22     generally they will follow our advice even if it is
23     begrudgingly sometimes.  Sometimes, as I said, they
24     welcome it, so —
25 Q   What, if any, interests in election administration

102

1      are served by the elimination of weekend and early
2      evening voting?
3  A   I guess I'm not the right person to ask about that.
4      I can only talk, you know, just about what it is.  I
5      mean it's a policy decision that I have to apply.
6  Q   Do you know how the cost of in-person absentee voting
7      compares to the cost of absentee voting by mail for
8      clerks' offices?
9  A   I don't.  I mean I could think through some of the
10     elements, but I don't really know specifically.
11 Q   Do you know which is more expensive?
12 A   I don't know.
13 Q   Now, you mentioned before that you follow news
14     related to election bills, right?
15 A   Yes.
16 Q   And Senator Glenn Grothman was the author of this
17     bill we've been discussing that eliminated weekend
18     and early evening voting, right?
19 A   I don't recall specifically, but I'm sure he was —
20     I'm not surprised that he would have been involved in
21     it.
22 Q   Okay.  And did you see comments of his reported in
23     the press in which he stated that he wanted to nip
24     weekend and early voting in Madison and Milwaukee in
25     the bud before it spread to other areas?

103

1  A   I don't recall specifically seeing them.  I think
2      that was included in your amended complaint.
3  Q   Did you have any conversations with Senator Grothman,
4      then Senator Grothman about this bill?
5  A   I recall having meetings with him.  I'm not sure if
6      it was this bill or if it was about something dealing
7      with voting in long-term care facilities, but I know
8      that I certainly — both Mike Haas and I have been in
9      his office and talked with he and his staff on his
10     initiatives.  I don't remember specifically about
11     this one.
12 Q   Do you know whether that statement that you saw in
13     the complaint accurately reflects the views that he
14     conveyed to you and Mr. Haas?
15 A   I don't — I really couldn't say.  You know, it
16     doesn't surprise me.  It seems consistent with his
17     approach.
18 Q   What do you mean by that?
19 A   I mean I think he had a concern about restricting the
20     amount of — not restricting.  I think he thought
21     that there ought to be different provisions in place
22     for the timing of absentee voting.
23 Q   Okay.  Let's switch gears and talk about voter
24     registration, and let's start with corroboration.
25     First of all — well, can you explain what

104

1    corroboration was just for the record?
2 A  Corroboration, which is often referred to as
3    vouching, is a process where for Election Day
4    registration, and it may have been in place for late
5    registration as well where people who are required to
6    provide a document establishing proof of residence
7    showing that they currently live in a particular
8    address that they're registering to vote from, if
9    they didn't have that, someone who lived in the same
10   municipality could corroborate that person's address
11   by signing a statement under penalties of perjury
12   that the person was who they said they were, that
13   they lived at the location that they said they did
14   and this person knew them personally and that person
15   then had to show proof of residence establishing that
16   they lived in the same municipality as the voter they
17   were corroborating the information for.
18 Q  Okay.  And was the identity of the corroborator kept
19   in the clerk's records?
20 A  It was supposed to be.
21 Q  Are you aware of any fraud resulting from
22   corroboration?
23 A  I was aware of general allegations that people who
24   were offering to corroborate may not have actually
25   had the knowledge that they claimed to have had, that
                                                    105

1    I mean the comments tended to be, well, we don't know
2    if this person is -- I had co-workers or observers
3    tell me that they would caution people in student
4    locations don't volunteer this if you don't know the
5    truth on this.
6        I mean I know that there were concerns about the
7    veracity of that.  I don't know that there were any
8    cases that were presented to district attorneys on
9    that or any complaints that were given to our office
10   that gave specific facts on it, but I know those were
11   the kind of concerns that were articulated and that
12   people claimed to have had those observations.
13 Q  Did you verify any of those observations?
14 A  You know, by the time they got to me, they would be
15   after the election and wouldn't be in a position
16   where I would be able to go back and dig that up.
17   And absent a formal complaint, we probably were not
18   going to focus our resources on investigating those
19   kind of things, and ultimately it's the district
20   attorney who makes the prosecutorial decision anyway.
21 Q  When your office believes that there is voter fraud,
22   what actions do you take?
23 A  Well, generally if something is brought to our
24   attention, we'll tell the complainant to take it to
25   the district attorney because the most we can do with
                                                    106

1    a complaint about voter fraud is send it to the
2    district attorney.  We don't have any enforcement
3    power over that.
4        There are certain provisions we have where we're
5    required to identify that.  We have to do
6    post-election audits to determine if anyone who was
7    convicted of a felony has voted, and those get
8    referred directly to the district attorney's office,
9    but we do try to make sure that where we find the
10   match between the Department of Corrections list and
11   our list, people who are supposedly not eligible to
12   vote, we check with the Department of Corrections to
13   make sure their list was accurate and sometimes it's
14   not.  We check with the municipal clerk to make sure
15   they recorded the proper person on the poll list
16   before we send it to the district attorney.  So we do
17   that level of investigation.
18       Occasionally we've been — we've addressed
19   complaints.  We had someone come to our — one of our
20   meetings and wave around a list of noncitizens they
21   claimed had voted at the election and the board felt
22   given the fact that the person was going to make a
23   very public showing on this that before we refer it
24   to the district attorney, maybe we should do some
25   checking on this and so we did.  And it turned out
                                                    107

1    that not one single person on that list was actually
2    a non-U.S. citizen.
3 Q  What is the name of that person?
4 A  Her name was Ardis Cerny.
5 Q  I'll ask you about Ms. Cerny later.  But just
6    focusing specifically on corroboration, did you ever
7    have instances in which you recommended that poll
8    workers or anybody else, for that matter, refer a
9    case of allegedly fraudulent corroboration to a
10   district attorney?
11 A  I don't remember that.
12 Q  And you may have already addressed this, but do you
13   know of any even criminal case charging somebody with
14   fraudulent corroboration?
15 A  I don't recall any.
16 Q  Have you ever heard of the phrase chain
17   corroboration?
18 A  I don't specifically recall it.
19 Q  Have you ever to your knowledge had any reports about
20   chain corroboration?
21 A  Do you want to tell me what chain corroboration is?
22   I mean I think I know, but tell me what you're asking
23   me about.
24 Q  I'll provide you the context for my question, and I
25   acknowledge that this is not part of the record.
                                                    108

1    This is for background.  Senator Lazich is alleged to
2    have made a statement that chain corroboration was
3    out of hand.  Do you know what she would have meant
4    by chain corroboration?
5                   MR. MURPHY:  Object to foundation to
6         this line of questioning.  But you can answer to
7         the extent you're able.
8  A  I mean I've heard of situations where individuals,
9    one individual has offered to corroborate for several
10   different people.  I could make the leap from that
11   that maybe that's what she's referring to as chain
12   corroboration.  But like I said, the term is -- I
13   think I might have seen the term, now that you
14   mentioned it, in the complaint, but I don't recall it
15   specifically.
16        But I have heard of people being concerned about
17   one individual doing that, you know, providing
18   corroboration for individuals so they could register
19   to vote at the polls on Election Day.
20 Q  Now, that wouldn't indicate that that corroboration
21   was being done fraudulently, would it?
22 A  Well, again requirements for a person to corroborate
23   is they have to know that -- they have to live in the
24   same municipality as the individual and they have to
25   know that the individual lives at the address that
                                                        109

1    they say they do and they have to state so under
2    penalty of perjury.
3  Q  All right.  So a student who lived in a dorm, for
4    instance, could likely corroborate a number of
5    people?
6                   MR. MURPHY:  Object to the extent it
7         calls for speculation, but you may answer.
8  A  Again can it be done fraudulently?  I'm sure it could
9    be.  But the question is on any case, I don't know.
10   I just know what's required of that, and if there's a
11   failure on that, then ultimately it's the district
12   attorney who is going to prosecute that, but it needs
13   to be brought to the DA's attention with enough facts
14   that they could evaluate it.
15 Q  Do you know how many voters registered through
16   corroboration before it was eliminated?
17 A  I don't know if we have very good data on that.  We
18   tried when we built the statewide voter registration
19   system to identify the method by which -- what type
20   of proof of residence was used, which included
21   collecting information about corroboration and, you
22   know, how accurate the clerks were in completing
23   that.  It wasn't -- I don't think it was a mandatory
24   field in the sense that they could skip it.  But, you
25   know, it was something that we wanted to be able to
                                                        110

1    get the data to the extent we could.  So I'm sure
2    there's some information on our voter registration
3    system that does it.  How complete it is I'm not
4    sure.
5  Q  Okay.  So when you say clerks could skip it —
6  A  I'm speculating on whether they could skip it or not.
7  Q  Okay.
8  A  Whether it's a mandatory field to enter on the voter
9    record.  Sorry to get ahead of you there.
10 Q  No, it's okay.  To the extent that they could skip
11   it, that would mean that the number of corroborations
12   was higher than the SVRS would suggest, right?
13 A  That could be a possibility.
14 Q  Is there any reason to think that the SVRS would
15   overreport the number of corroborations?
16 A  No.
17 Q  All right.  Let me show you another document,
18   Kennedy 10.
19             (Exhibit 10 is marked for identification)
20 A  Okay.
21 Q  All right.  First of all, this is a string of emails
22   among GAB staff, right?
23 A  Well, it starts with an inquiry from Milwaukee
24   Journal Sentinel.
25 Q  Thank you.  Following that, it's a string of emails
                                                        111

1    among GAB staff, is that right?
2  A  That's right.
3  Q  Let me just ask you, first of all, who some of these
4    people are.  Who is Sarah Whitt?
5  A  Sarah Whitt is our technology lead for our voter
6    registration system.  She probably knows more about
7    the data fields and structure.  She's sort of, you
8    know, the person that is the go-to on the ground with
9    any of our developers, any of -- you know, when we
10   were looking to develop things like online
11   registration or other projects.  She's nationally
12   recognized for her knowledge in voter registration
13   structures data.
14 Q  So if you wanted to obtain data from the SVRS about a
15   particular election practice, say, she's the person
16   you'd go to?
17 A  She'd be the person I would ask if we could get it.
18   I'd probably have someone else do the work, but she
19   would be the bigger picture person.  I mean she could
20   do it, but it might not be the best use of her
21   resources.
22        It would be more of, all right, if I'm looking
23   to get this information, how could we do it, can we
24   talk through it.  She would be my subject matter
25   expert in that area.
                                                        112

1 Q   And who is -- and I apologize if I mispronounce this,
2     Kamalakar Pasikanti?
3 A   Kamal is -- we call him Kamal -- is one of our
4     contract programmers who has been -- that works on
5     our statewide voter registration system.
6 Q   And Ann Oberle?
7 A   That's right.  Ann Oberle is the -- her primary
8     responsibility is testing the statewide voter
9     registration system.  In other words, every time we
10    have to make a change in it, she's the one that
11    oversees the internal testing that we do on that, but
12    she has a number of other responsibilities.  I mean
13    she runs our statewide canvass, those interfaces with
14    that.
15          Like Sarah, she probably has the most knowledge
16    of a permanent staff person in terms of the structure
17    of the database and how it works and where we can
18    extract data.
19 Q   Is Sarah Whitt her supervisor?
20 A   No, Ross Hein supervises both of those individuals.
21 Q   And David Umhoefer is a reporter with the Milwaukee
22    Journal Sentinel, right?
23 A   That's right.
24 Q   So this email indicates that Mr. Umhoefer was
25    requesting information about corroboration, right?

113

1 A   That's right.
2 Q   And in response, you had your staff pull that
3     information, correct?
4 A   We did.
5 Q   And let me direct your attention to the fourth page
6     of the document, which contains a big chart.  Now,
7     this chart is information that your staff provided to
8     the Milwaukee Journal Sentinel, right?
9 A   That's correct.
10 Q   And that's because you believed it was accurate?
11 A   Yes.
12 Q   And this chart, among other things, includes the
13    total number of Election Day registrations for the
14    2006, 2008 and 2010 general elections?
15 A   Yes.
16 Q   And then it shows the number and percentage of
17    Election Day registrants who registered through
18    corroboration, right?
19 A   Yes.
20 Q   In other words, they proved their residence through
21    corroboration?
22 A   Yes.
23 Q   Now, this does not include the number of voters who
24    registered using corroboration prior to Election Day,
25    is that right?

114

1 A   That's right, but that number is a very low number to
2     begin with.  I mean when we look at the source of
3     registration, people who register in the clerk's
4     office before Election Day -- I mean because during
5     this time period, you only had to provide proof of
6     residence in two circumstances, Election Day
7     registration and late registration in that 20-day
8     period.  And the number of people statically who
9     register in the clerk's office is very small, it's
10    always less than one percent of voters.  It might
11    have been higher in 2006 simply because that's when
12    statewide registration went into effect.
13          So if you look at the number of Election Day
14    registrations in 2006 compared to 2010, 2006 was the
15    year that we required every voter in the state to be
16    registered as opposed to prior to that time if you
17    were in a smaller municipality, there was no voter
18    registration requirement and so a number of people,
19    that was the first time they were ever asked to fill
20    out a registration form and so we caught them on
21    Election Day.
22          Otherwise the numbers tend to be closer
23    percentagewise to what you see for 2010 for off year
24    elections.
25 Q   Okay.  And so I take the point that there are a

115

1     smaller percentage of voters who vote absentee in
2     person, register at the same time that they do that,
3     than the number who do Election Day registration?
4 A   Yeah, it's a much, much smaller number.
5 Q   Within that universe, though, do you know what the
6     percentage who use corroboration is?
7 A   I'd actually have to go back and see whether
8     corroboration was an acceptable option.  It probably
9     was, but I don't recall.  And again I would just
10    stop -- it would have been probably more difficult if
11    you saw Sarah's instructions on how to identify an
12    Election Day registrant.
13          There were certain assumptions we had to make to
14    figure out that that person actually did register on
15    Election Day based on the timing, the date that --
16    the information that the clerk put into the system.
17 Q   Let me then direct your attention to the first page.
18 A   Okay.
19 Q   And there's another chart about three emails down.
20    Now, you're not copied on that email, right?
21 A   No.
22 Q   Are you familiar with that chart?
23 A   I think this is the first time I saw it.  It might
24    have been discussed with me, but it was something I
25    think people were just -- Reid asked some more

116

1    follow-up questions and so they did some more
2    digging.
3 Q  So just to be clear, you're familiar with, generally
4    speaking, with what the content of the chart is but
5    not the chart itself?
6 A  I don't recall seeing it.  I don't recall discussing
7    it.  It doesn't mean that -- I mean once my staff
8    starts looking at something, they may -- I could see
9    from the pattern of emails that Reid raised a couple
10   of questions in anticipation of press follow-up
11   questions.  And that led them to do some more number
12   crunching to see what they could come up with.
13        MR. KAUL:  Actually why don't we go
14      off the record for just a moment.
15        THE VIDEOGRAPHER:  We are off the
16      record at 12:17.
17        (Short recess is taken)
18        THE VIDEOGRAPHER:  We are back on the
19      record at 12:29.
20 Q All right.  Director Kennedy, let me show you another
21   document,  Kennedy 11.
22        (Exhibit 11 is marked for identification)
23 Q  And I'll also tell you right now my plan is to ask
24   you about this document at two different portions
25   today, time permitting.

117

1 A  Okay.
2 Q  Much of it relates to the voter identification law,
3    but right now I'm planning to ask you about
4    corroboration, which is discussed at the end, but
5    take as much time as you need to make yourself
6    comfortable with the document.
7        First does this appear to be a true and accurate
8    copy of the written testimony that you submitted to
9    the Wisconsin Assembly Committee on Election and
10   Campaign Reform on April 27th, 2011?
11 A Yes.
12 Q And as I mentioned, I just want to ask you about the
13   corroboration part right now.  So let me direct you
14   to Page 11.  First this testimony was provided in
15   response to a bill that was a predecessor to what
16   ultimately became Act 23, is that right?
17 A  Yes.  I guess I'm not -- I don't remember exactly
18   which bills.  I thought it was the Assembly version
19   that ultimately got enacted into law, but it might
20   have been.
21 Q Okay.  The same --
22 A Yeah.
23 Q -- issues are discussed, is that right?
24 A Right, um-hum.
25 Q And first of all, this says, "The legislation

118

1    eliminates the opportunity for voters registering to
2    vote at the polling place on Election Day or in the
3    office of the municipal clerk after the close of
4    registration from using a corroborator to vouch for
5    the voter's residence."  Do you see that?
6 A  I see that.
7 Q  So that answers our first issue from before.  It
8    indicates that corroboration is permissible during
9    the early voting -- I'm sorry, the in-person absentee
10   voting period, right?
11 A Yes, it does.  And I'm comfortable if I said it in my
12   testimony that I don't have to go back and review the
13   statute.
14 Q Okay, good.  And then you wrote, "It appears this
15   proposal is driven by the perception the voter who
16   needs a corroborator is more likely to commit fraud."
17   Do you see that?
18 A I see that.
19 Q And why did you say it appeared that that was the
20   case?
21 A  I say that because the main arguments that were used
22   for voter identification by its proponents were to
23   eliminate fraud and since this was included in that
24   legislation, even though it had more to do with voter
25   registration than it did with voter identification, I

119

1    wanted -- it seemed appropriate to make that comment.
2 Q  Okay.  And then the next sentence you wrote, "Based
3    on statistics collected by our staff from municipal
4    clerks, it appears most of these voters have the
5    required photo identification."  And then you write,
6    "It is not current, so it cannot be used to establish
7    proof of current residence."
8        What, if any, relationship did that have to the
9    fraud point you had just made?
10 A Well, it points out that the people who are having
11   someone corroborate for them were having them do it
12   not because they lacked proper identification to
13   establish who they were but that the identification
14   didn't establish that they lived at the location they
15   wanted to register to vote for because it wasn't
16   current.
17       And one of the requirements for proof of
18   residence, which is what we're talking about there,
19   is that the identifying document be current with --
20   you know, the Legislature drew a distinction on that
21   for voter identification, meaning photo ID, by not
22   having the same currency requirements, recognizing
23   that the driver's license is the last eight years and
24   people often don't -- only update them online and
25   don't get a new one reissued.

120

**Page 121**

1 Q   So am I righting in understanding this to mean that
2     many voters who use corroboration to register had a
3     form — had a driver's license with the address at
4     which they registered, but they couldn't use it for
5     proof of residence because it was expired?
6 A   That's right.
7 Q   And then the next sentence you indicate that,
8     "Municipal clerks have informed our staff this could
9     work a real hardship on the elderly and women." Do
10     you see that?
11 A   Yes, um-hum.
12 Q   And why did you write that?
13 A   Because that was the feedback we got from a number of
14     clerks who felt strongly that corroboration should
15     not be eliminated and that was what they articulated,
16     that elderly people and women that they had from
17     their own experience often did not have current
18     identifying documents that listed their name and then
19     go on to explain that things like bank statements and
20     utility bills are often in the name of someone else.
21 Q   I'm going to move on to a different topic. I'd like
22     to ask you next about statewide special registration
23     deputies. One of the changes to the election laws in
24     2011 is that the Legislature eliminated the authority
25     of the GAB to appoint special registration deputies,

**Page 122**

1     correct?
2 A   Yes.
3 Q   And prior to that time, the GAB and only the GAB
4     could appoint special registration deputies who had
5     the authority to register voters who resided anywhere
6     in the state, right?
7 A   That's right.
8 Q   Municipalities can also appoint special registration
9     deputies, right?
10 A   Municipal clerks can, yes.
11 Q   And those clerks — I'm sorry, those special
12     registration deputies are only authorized to register
13     voters who reside in the municipality that the clerks
14     serve, right?
15           MR. MURPHY: Objection, requires a
16        legal conclusion, but you can answer.
17 A   That's right.
18 Q   Can county clerks appoint special registration
19     deputies?
20 A   I don't know if they currently — if that was a
21     change, but I don't think so.
22 Q   Okay. So as a result of the change in 2011, special
23     registration deputies can no longer be appointed with
24     authority to register voters on a statewide basis,
25     right?

**Page 123**

1 A   That's right.
2 Q   How were statewide — if I call them statewide SRDs,
3     do you understand I'm referring to the GAB —
4 A   The GAB.
5 Q   Sorry, GAB trained SRDs?
6 A   Yes.
7 Q   How were statewide SRDs trained when GAB had the
8     authority to train them?
9 A   We developed a training program which we shared with
10     municipal clerks and we — and we would hold training
11     programs at various locations around the state. I
12     had one staff member who did that. We would also —
13     I believe we also designated certain municipal clerks
14     and county clerks with the authority to do that
15     training for us.
16         Then we assigned them a number and they were
17     required to list that number on their registration
18     forms when they were completing them. But it was
19     basically we used one format for that and we also
20     required that municipal clerks when they train their
21     own registration deputies had to use the same format,
22     same training.
23 Q   Okay. So municipal clerks were doing the same
24     training that you were doing?
25 A   Right.

**Page 124**

1 Q   And in fact, some of the municipal clerks were doing
2     your training?
3 A   They were, but they had to be specifically authorized
4     by us to do it.
5 Q   And in your view, were the trainings done
6     professionally?
7 A   I think the trainings were done professionally.
8 Q   So the people you were training were well trained?
9 A   Yes.
10 Q   So currently if a special registration deputy is
11     deputized or appointed in a particular city, say
12     Madison, and a voter from Fitchburg wants to
13     register, can that special registration deputy
14     register the voter?
15 A   No, they can't.
16 Q   Do you know whether this change in the law has had
17     any impact on voter registration drives?
18 A   On the drives? It's forced the drives to probably
19     change their approaches. Instead of collecting the
20     forms and delivering them to the clerk, they would
21     have to mail them because anyone can have someone
22     fill out a form and they can be mailed in to the
23     clerk.
24         So photo registration drives would probably have
25     to treat this as very similar to the kind of outreach

1    they do where they send -- where they mail a form to
2    people to register to vote and the people would be
3    handing it out, like assisting in filling it out, but
4    it couldn't be personally delivered to the clerk.  It
5    would have to be mailed to the clerk.  And I think
6    the other distinction was that if you have a special
7    registration deputy, there's not a confirmation
8    mailing, but there was for mail-in registration.
9  Q  Okay.  And has GAB assessed the race or ethnicity of
10   voters who tend to register at voter registration
11   drives, how that compares to the overall population?
12 A  No.
13 Q  What, if any, election administration interests were
14   served by the elimination of statewide SRDs?
15 A  Well, on one level, it's hard to say.  I do know that
16   it was not something we opposed.  On this, I mean I
17   think our experience with statewide registration
18   deputies were that there were several very good ones,
19   but most of the forms that get completed as a result
20   of voter registration drives or many of the forms, I
21   shouldn't say most, and by mail tend to be hard to
22   read, inaccurate and in many cases people who have
23   already -- who are already registered in the system.
24   That's one of the reasons why we push online
25   registration.  The problems we get from registration

125

1    successful in terms of when they do their outreach.
2  Q  Let me also ask about special registration deputies
3    at high schools and I guess about registration in
4    high schools generally.  So one of the changes in
5    2011 is that the Legislature eliminated the
6    requirements that SRDs be appointed at public high
7    schools, correct?
8  A  Yes.
9  Q  The requirement that in certain circumstances, SRDs
10   be appointed at or sent to private high schools or
11   tribal schools?
12 A  I'm not quite as familiar with that provision.  I
13   know that it was eliminated.  I think that was
14   discretionary with the municipal clerk to allow that.
15   I'd have to go back and look.
16 Q  Okay.  And one of the other changes in 2011 was that
17   the Legislature eliminated the requirement that voter
18   registration applications from enrolled students and
19   members of the high school staff be accepted at high
20   schools, right?
21 A  Isn't that the same comment about eliminating special
22   registration deputies?  I'm not quite sure what
23   you're getting at.
24 Q  I guess it's the flip side of the same coin, right?
25 A  Yeah.

127

1    by mail and registration drives tend to be things
2    that drive up the cost of registering voters.
3  Q  Okay.  And we were talking a minute ago about how
4    voter registration drives now need to do -- need to
5    submit registrations by mail rather than in person,
6    right?
7  A  I'm saying that that's an avenue that voter
8    registrations can use without any special
9    registration deputies, that when they collect it,
10   they just have to make sure that they're mailed to
11   the appropriate municipal clerk.
12 Q  And you said that the ones that are received by mail
13   are the ones that have created the problems
14   eventually, right?
15 A  No.  I think we had equally problems with special
16   registration deputies, meaning that the forms were
17   difficult to read, they were delivered to the wrong
18   municipal clerks.  They registered voters who were
19   already registered.
20 Q  Okay.  And special registration deputies remain in
21   place, right?
22 A  They remain in place on the municipal only basis.
23   You know, some enterprising special registration
24   deputies have gotten -- tried to get deputized in
25   adjoining municipalities so that they can be more

126

1  Q  And what, if any, election administration interest
2    does that change serve?
3  A  I'm not sure exactly.  I mean registration in high
4    schools came about in the 1970s, late '70s, and I
5    think it was assessed now that we had 18-year-old
6    voters that we should try and provide opportunities
7    as best we could for reaching out to them.
8        Back then all registration was pretty much paper
9    driven even though we did have Election Day
10   registration at the time, but I think there was much
11   more of a commitment in the '70s to -- at least in
12   Wisconsin to finding, expanding the opportunities of
13   where we would present a registration form to voters
14   to get them onto the list.
15       I think the political climate changed since then
16   to focus more on getting accurate, complete and not
17   redundant voter registration forms, and that might be
18   one of the things that was driving this.
19 Q  Okay.  But is it fair to say you're speculating when
20   you say that --
21 A  Yes, I am.
22 Q  Okay.  And by definition, Wisconsinites who are under
23   18 years of age can't register, right, unless they're
24   going to be 18 by the election?
25 A  They have to be 18 by Election Day.  You know, we

128

1    don't collect -- we don't actively collect
2    registration forms.  If it appears they're going to
3    be 18 by Election Day, it gets marked in the poll
4    list so that we can turn it on on Election Day.
5         But unlike some states that will register 16 and
6    17 year olds and then turn it on, for us it's
7    mostly -- we don't actively do that.  Our law doesn't
8    specifically permit a 16 year old to register and not
9    be able to vote until then.  What we do is if we
10   happen to get a form, our system is set up so that
11   they won't show up as an active voter until they turn
12   18.
13 Q   And you would agree that the vast majority of
14   Wisconsinites become eligible to vote when they're
15   attending high school, right?
16 A   I wouldn't know that.  My daughter didn't turn 18
17   until a week before she started college, or her best
18   friend.  If you figure they get out of school by the
19   end of May, that's five months out of the year --
20   most people turn 18 sometime in the senior year.
21   You'd have to figure -- there's a number ways to
22   calculate that, but a lot --
23 Q   Let me ask a different --
24 A   -- of high school seniors do turn 18, but I don't
25   know if it's the vast majority.

                                                  129

1 Q   So the previous rule, though, meant that every public
2    high school student had a chance to register right at
3    their high school?
4 A   Yes.
5 Q   All right.  Now, are you also aware that Madison for
6    a period of time had an ordinance that required
7    landlords to provide voter registration applications
8    to new tenants?
9 A   I remember that, yes.
10 Q   And is it your understanding that in 2013 the
11   Legislature passed a bill that, among other things,
12   eliminated that requirement in Madison?
13 A   It prohibited that requirement.  It prohibited
14   requiring it, yes.
15 Q   Now, this requirement had made registration easier
16   for some voters in Madison, right?
17            MR. MURPHY:  Object to form.
18 A   Well, it provided a registration form to a very
19   mobile population.
20 Q   Right.  And voters who move and intend to remain at
21   their new location for -- and have been there for 28
22   days are required to reregister, right?
23 A   If they want to vote, yes.
24 Q   Fair enough.  Do you know how Madison's population
25   compares to the rest of the state in terms of its

                                                  130

1    demographics?
2 A   I know what you've said in your complaint, and it
3    jibes with my sense.  I mean I've lived in Madison
4    all my life, so --
5 Q   Is there any election administration interests served
6    by preventing Madison from requiring landlords to
7    provide registration voter applications to tenants?
8 A   Again I already said it provides a registration form
9    to a very highly mobile population.
10 Q   Sorry.  I mean to be asking the reverse question.  Is
11   there any interests served in getting rid of that
12   requirement?
13 A   The interest that could be served based on my
14   observations of forms that are filled out by hand are
15   that they would be less -- they're more likely to be
16   illegible, not delivered to the right location.  You
17   know, that's been one of the constant complaints that
18   local election officials have had is the quality of
19   registration forms that are not completed
20   electronically or in their presence.
21 Q   Right, okay.  And voters can still register outside
22   of the presence of --
23 A   They can.
24 Q   And in fact, the window during which voters could
25   both register and vote was reduced by the early

                                                  131

1    voting legislation we were discussing before, right?
2 A   The late registration still closes 20 days out.  So
3    if someone could register late but not be able to
4    vote in-person absentee the same day they registered,
5    but again that's a very small number of people that
6    take advantage of that based on the numbers we've
7    gathered, but they could still vote in absentee
8    ballot if it was mailed to them and they could still
9    vote at the polls on Election Day.
10        So I'm not sure that it doesn't -- it's just the
11   contemporaneous voting that you're talking about, I
12   think, which again is a relatively small number of
13   people who are not registered who try to -- who
14   register during that late period.
15 Q   And to eliminate this problem we've been discussing
16   about -- the problem with mailed in ballots and
17   ballots filled out at registration drives that are
18   either redundant or not --
19 A   You meant registration forms, not ballots.
20 Q   Sorry, yes.  That are filled out in sloppy
21   handwriting or that are redundant as you've been
22   discussing, the only way to eliminate that problem
23   would be to eliminate all forms of registration other
24   than in person and electronic registration, right?
25 A   I would say the best way to deal with that problem is

                                                  132

1    to utilize online registration or an online
2    registration tool.
3          Right now we have a tool where you can go onto
4    our website and draw your registration information,
5    print it out and send it to the municipal clerk and
6    it's more likely to be legible and accurate.
7  Q  How does that differ from online voter registration?
8  A  It differs from online registration in that while we
9    will -- when they enter -- I should preface we just
10   converted our voter registration system.  It's no
11   longer SVRS.  It's WisVote, and it's been totally
12   rewritten.  It just went live on Monday,
13   January 11th.
14         And in the process, we've had to make some
15   changes to our online registration tool.  You can
16   still go on, type everything in and print it out
17   prior.  But because we haven't synced up everything
18   with that tool with the new system and won't probably
19   until June, what we were doing is when they would
20   enter that information, it would be stored in our
21   voter registration system so it didn't have to be
22   rekeyed by the clerk.
23         But you know, in order to get our system rolled
24   out, we had to make some choices where we were going
25   to put our work, and so for the next five months,
                                                         133

1    people can still get the nice looking form, but we
2    won't be storing the data in WisVote until we have
3    updated that component.
4  Q  But so how does using the online form differ from
5    what voters would be able to do if there were an
6    online voter registration law passed?
7  A  Good follow-up.  With online voter registration, one
8    of the requirements when you register to vote is it
9    has to be matched against your driver's license if
10   you submit that, which is a new requirement that we
11   have on it.  It gets matched against the DMV
12   database.
13         If you don't have a driver's license or a
14   state-issued ID, you have to list the last four
15   digits of your Social Security number and that gets
16   matched against the Social Security database.  And
17   because we don't have a live connection yet with the
18   Department of Transportation, we can't do that type
19   of online registration, which is something we need to
20   be authorized by the law and we expect the current
21   Assembly Bill 389 to do.
22         And so we would not have that automatic check
23   that would get them registered as soon as they fill
24   out the form, but the proposed legislation would
25   allow that.  What it does do, as I said, it collects
                                                         134

1    the data, so it saves some data entry costs.  It
2    prints it out in the appropriate form.
3          Also online registration now under the proposals
4    would eliminate having to provide a separate proof of
5    residence document because the residence would have
6    been confirmed against the DMV database.
7  Q  All right.  Let me ask you about dorm lists for
8    registration.  First of all, when I say dorm lists,
9    do you understand that I'm referring to the lists
10   that colleges provided to municipal clerks in
11   connection with voter registration?
12 A  Yes.
13 Q  So under the law prior to 2011, a voter could use a
14   college ID as proof of residence for voter
15   registration if the college that he or she attended
16   sent a dorm list to a municipal clerk and he or she
17   was on that list, right?
18              MR. MURPHY:  Object to form.
19 A  They could.  The list had to be certified by the
20   college, but it still could to be.
21 Q  And in 2011 the law changed so that colleges also had
22   to certify the citizenship of the students on the
23   list, right?
24 A  That's correct.
25 Q  Now, has that requirement created any issues?
                                                         135

1  A  I don't know.  I don't have any information or data
2    on that.  I've read the concerns that are raised by
3    the fact that it runs counter to information that's
4    required under federal education laws, but what the
5    actual impact has been I don't know.
6  Q  Okay.  Do you know prior to the change in the law how
7    many voters registered through that method with the
8    dorm list?
9  A  I don't know.
10 Q  Do you know which colleges sent dorm lists to clerks?
11 A  I think most -- I guess I shouldn't say.  I know a
12   lot of the private colleges definitely did.  I don't
13   know about the state colleges, state universities.
14 Q  Do you know how many colleges currently provide dorm
15   lists?
16 A  I don't.
17 Q  I'll show you a couple of exhibits.  This one is
18     Kennedy 12.
19         (Exhibit 12 is marked for identification)
20 A  Okay.
21 Q  All right.  Now, first of all, this is an email
22   exchange that Michael Haas forwarded to several other
23   members of the GAB staff, right?
24 A  Yes.
25 Q  And it's an exchange between him and representatives
                                                         136

1    from the University of Wisconsin-Madison and
2    Milwaukee and then a third individual, is that right?
3  A  I think it's -- the UW-Madison and the UW System
4    themselves.  Matt Lind represent the UW System, which
5    is all campuses, and UW-Madison is counsel
6    Nancy Lynch.
7  Q  Okay.  So it's a representative from the UW System,
8    University of Wisconsin-Madison and University of
9    Wisconsin-Milwaukee, is that right?
10  A  I don't know.  I didn't see a Milwaukee person on
11    here.
12  Q  There's a jurdan@uwm.edu.
13  A  Okay.  And I don't see them weighing in, but I see
14    that they're copied, so I assume that's UW-Milwaukee,
15    but I don't know.
16  Q  All right.  And let me direct your attention to the
17    third page.  There's a section that starts with
18    residency and then it says on campus.
19  A  Yes.
20  Q  All right.  Now, in this email, Ms. Lynch from
21    UW-Madison is reporting that under the Family
22    Education Rights and Privacy Act, universities and
23    colleges are not permitted to disclose information
24    about a student's citizenship, is that right?
25  A  That's what I read, yes.

                                                      137

1    outcome of the problem.  It just makes it more
2    difficult to use a list for proof of residence in
3    conjunction with an ID card.
4  Q  The next sentence says, "No other voters are required
5    to show proof of citizenship as a requirement of
6    voting other than certifying their citizenship on the
7    registration form."  Do you see that?
8  A  I see that.
9  Q  Is that correct?
10  A  It's correct in the sense that to register to vote,
11    all you normally have to do is just sign the
12    statement saying you're a U.S. citizen.  You actually
13    do it twice.  You check a box and as part of your
14    verification, you indicate you're a U.S. citizen.
15    This isn't, you know, here it's a question of -- I'm
16    not so sure you're showing your citizenship.  I mean
17    but Mike points out that in order to get on this
18    list, you have to be a U.S. citizen.  It's one of the
19    requirements that the Legislature has put in.
20  Q  Okay.  We'll go a few more minutes and then we'll
21    take a lunch break.  If I can find my document.  This
22    is  Kennedy 13.
23        (Exhibit 13 is marked for identification)
24  A  Okay.
25  Q  Do you recognize this document?

                                                      139

1  Q  And so she and Mr. Haas are trying to identify means
2    of permitting voters to register via the dorm list
3    option without violating that law, is that right?
4  A  Well, I'm not sure it's specific to the dorm list as
5    much as it is the proof of residence because they're
6    talking about an enrollment certification and I guess
7    it does talk about the housing list as well.  But I
8    understand they're trying to work through that
9    problem that the Family Education Rights Privacy Act
10    restricts them on in terms of that list.
11  Q  Okay.  And then there's a response below that.  Is it
12    your understanding that that's a response from
13    Mr. Haas?
14  A  Yes.
15  Q  And in the middle of that email or that response,
16    rather, I guess the second sentence, halfway through
17    he says that he doesn't believe the Legislature
18    anticipated the problem with FERPA rules.  Do you see
19    that?
20  A  I see that.
21  Q  Do you agree that there's a problem with the FERPA
22    rules with this dorm list bill?
23  A  Well, to the extent that it limits what the
24    university can provide or makes it more difficult for
25    what they can provide.  You know, it does present an

                                                      138

1  A  I do.
2  Q  What is this?
3  A  It is a memorandum that was prepared by our staff to
4    be distributed I think primarily to municipal clerks
5    and universities about proof of residence for
6    registration.
7  Q  And did you approve this memorandum before it went
8    out?
9  A  I definitely did, yes.
10  Q  And the paragraph at the bottom of the first page
11    indicates that FERPA restricts the disclosure of
12    student citizenship status by most educational
13    institutions, do you see that?
14  A  Yes.
15  Q  And then it goes on to discuss FERPA in more detail.
16    Do you agree with the statements here about FERPA?
17    Are they accurate?
18  A  These are -- this reflects my understanding of the
19    law.
20        MR. MURPHY:  A belated objection to
21    the extent it calls for a legal conclusion.
22  Q  Okay.  And what I meant to ask, is it consistent with
23    your understanding of how FERPA impacts voters
24    attempting to register with the dorm list option?
25  A  Yes.

                                                      140

1    MR. KAUL:  Let's take our break now
2    then.
3        THE VIDEOGRAPHER:  The time is 1:12
4    p.m.  We are going off the record concluding
5    Disk No. 2 in the deposition of
6    Kevin J. Kennedy.
7            (Lunch recess is taken)
8            (1:12 p.m. to 2:08 p.m.)
9        THE VIDEOGRAPHER:  We are on the
10   record.  The time is 2:08 p.m.  This marks the
11   beginning of Media No. 3 in the deposition of
12   Kevin J. Kennedy.
13 Q  Director Kennedy, we'd been talking about the
14   registration laws before and there's one more subject
15   area I want to go over in that realm, which is the
16   change to the documentary proof of residence law.
17   And just to be clear, prior to 2013, voters were
18   required to show documentary proof of residence when
19   registering only if they were registering fewer than
20   20 days before an election, right?
21 A  Twenty days or less.
22 Q  Okay.
23 A  Including Election Day.
24 Q  And now all voters other than overseas and military
25   voters are required to provide documentary proof of
                                              141

1    residence with their voter registration even if they
2    register 20 or more days before an election, is that
3    right?
4 A  I believe so.  I'm trying to think about if we
5    have — the exceptions I'm thinking about are photo
6    ID, so yes.
7 Q  Okay.  And what, if any, interests in election
8    administration are served by that change in the law?
9 A  Well, the practical considerations that when you have
10   the form, you can compare it to the proof of
11   residence to make sure that it's accurate, that it
12   corrects some entry errors that assures the public
13   that when someone filled out a registration form,
14   they provided some evidence that they really live at
15   the address that they're registering from.
16 Q  And previously if voters registered more than 20 days
17   before an election without proof of ID, they did
18   still need to provide proof of — I'm sorry, proof of
19   residence, they still needed to provide proof of
20   residence when they showed up to vote, correct?
21       MR. MURPHY:  Object to form.
22 A  No.
23 Q  Okay.  So voters didn't have to provide proof of
24   registers?
25 A  If you're already on the voter registration --
                                              142

1        MR. MURPHY:  Go ahead.
2 A  If you're already on the voter registration list, the
3    only time you had to provide proof of residence was
4    if you were a first-time voter who had registered by
5    mail.
6 Q  Okay.
7 A  And that was a federal requirement that the state
8    adopted from the Help America Vote Act, so that only
9    kicked in starting in 2006.
10 Q  Okay.  So prior to the 2013 change then with proof of
11   registration — I'm sorry, proof of residence, a
12   voter could register, for example, with an SRD more
13   than 20 days before the election and that voter
14   wouldn't have to show proof of residence, is that
15   right?
16 A  That's right.
17 Q  A voter could also register in person at the clerk's
18   office, right?
19 A  That's right.
20 Q  Without showing proof of ID?
21 A  That's right.
22 Q  Now, there is a confirmation process that the clerk's
23   office used to confirm residency, right?
24 A  That's correct.
25 Q  How does that work?
                                              143

1 A  Basically when someone registers to vote, they send
2    them a confirmation mailing and if it comes back
3    undeliverable, they inactivate them in our voter
4    registration system and in a follow-up with them
5    have the person reregister if they can.
6 Q  How long does that process take?
7 A  It depends how quickly the clerk gets it out and the
8    mail delivery service.  There's a lot of variables to
9    that.
10 Q  Is there a typical amount of time?
11 A  I wouldn't know.
12 Q  Do you know how, if at all, this change has made
13   registration more difficult for voters?
14       MR. MURPHY:  Object to form.
15 A  Well, it requires an extra step for voters to have
16   the document or a copy of the document if they're
17   going to mail in the registration.
18 Q  New, this change doesn't only apply to by mail
19   registrations, right?
20 A  No, it applies to any registration.
21 Q  Since this change in the law, is it your
22   understanding that clerks' offices have received
23   numerous registration forms that didn't have proof of
24   residence included with them?
25 A  I don't know.  I don't know what kind of contact our
                                              144

1  staff has had for that.  I haven't been monitoring
2  very closely, so I don't know.
3  Q  And do you know whether groups involved in voter
4  registration, if many of them continued to use forms
5  following the change in the law that did not solicit
6  proof of registration?
7  A  It's not unusual that voter registration groups don't
8  avail themselves of the most current forms, whether
9  they're doing it by mail or whether they're doing it
10  in voter registration drives.
11      We spend a lot of time troubleshooting voter
12  registration drives either by mail, trying to get
13  them to make sure that they are paying attention to
14  the law and using the correct forms.
15  Q  Okay.  And the DMV actually also didn't update its
16  system to reflect this change following the
17  implementation of this law, did it?
18  A  I don't know.
19      MR. MURPHY:  Object --
20  Q  Let me show you a document.  This is  Kennedy 14.
21      (Exhibit 14 is marked for identification)
22  Q  All right.  Does this appear to be a news report from
23  July 2014?
24  A  Yes.
25  Q  And the report cites statements from you, is that

145

1  it's one of your clients that was mailing those forms
2  out.
3  Q  Okay.  So the voter registration forms were coming in
4  through the mail without proof of residence with
5  them, right?
6  A  They were coming in without proof of residence and
7  that required the clerk to follow up and say you
8  wouldn't be registered unless you provided that
9  proper proof of residence.
10  Q  So unless proof of residence came in, the voter would
11  not be registered?
12  A  That's right.
13  Q  Okay.  And that reference to my client before, was
14  that -- which client was that?
15  A  I remember the attorney.  It was someone at your DC
16  office.  I'm trying to think what the -- the voter --
17  VPC.
18  Q  Voter Protection Council or commission or something?
19  A  No, it's not voter protection.  But we dealt with
20  Perkins Coie lawyers to straighten it out, that's why
21  I remember.
22  Q  Oh, okay.  Not one of our clients in this case?
23  A  No.
24  Q  Okay.  Now, in the next paragraph in the second
25  sentence, you wrote that, "Unfortunately, some

147

1  right?
2  A  It does.  It's based on a news release that we
3  prepared.
4  Q  Okay.  And in the second line of the article, second
5  paragraph, I guess, it indicates that you had said
6  that, "Many Wisconsin municipal clerks report
7  receiving voter registrations on old forms that do
8  not have space for newly required information about
9  the voter's proof of residence."  Do you see that?
10  A  I do.
11  Q  Did you say that?
12  A  I did.
13  Q  And is that accurate?
14  A  That's accurate.  It's part of why we prepared this
15  press release was to deal with groups that weren't
16  updating their forms and the problems that clerks
17  were having, although the clerks, we did remind them
18  that they can -- just because there's not a space,
19  they can still write the proper document on the form
20  themselves.
21  Q  Okay.  But the clerks — were they receiving those
22  applications in person or by the mail?
23  A  They're getting them by mail.  They're getting them
24  from the voter registration drives, which would be
25  mail registration forms.  I could remind you that

146

1  organizations which register voters are still using
2  old forms, and it is creating a lot of extra work for
3  clerks and headaches for voters."  Do you see that?
4  A  I see that.
5  Q  That is your statement?
6  A  Yes.
7  Q  And it's accurate?
8  A  It is.
9  Q  And then let me direct your attention to the second
10  page, the only text paragraph there.  It indicates
11  that, "Mr. Haas said that some clerks were also
12  experiencing problems with voter registration forms
13  that have the proof of residence language in very
14  small print."  Do you see that?
15  A  I see that.
16  Q  Which is causing some voters using those forms not to
17  send the required proof of residence document?
18  A  Yes.
19  Q  And is that accurate?
20  A  That's accurate.
21  Q  Okay.  And let me clarify.  It's accurate that he
22  said that and what he said is accurate, is that
23  right?
24  A  What he said, it reflects -- that's why we put it in
25  the news release.  We wanted to be proactive and

148

1  shift the responsibility for these inaccurate forms
2  away from municipal clerks in our office to those
3  groups that were trying to register voters.
4 Q  Now, the proof of residence requirement has made the
5  process of registering voters slower, is that right?
6 A  It's added an extra step to the process.
7 Q  And is it your understanding that it will also
8  increase the number of voters who have to register at
9  the polls because they don't properly register?
10  MR. MURPHY:  Object to form.
11 A  I don't know that it necessarily will.  You know,
12  we've only had one election since that point and it's
13  hard to tell from the numbers given.  It was a 2014
14  election.
15 Q  To the extent that there is an increase in the number
16  of voters who register at the polls, will that cause
17  an increase in wait times to vote?
18 A  Well, there's a number of reasons why people would
19  register to vote at the polls.  It wouldn't be just
20  because they were unable to register in advance, but
21  the more people who register to vote at the polls,
22  usually those are separate lines.  So people who are
23  already registered aren't going to have a problem,
24  but people waiting to register will wait longer.
25 Q  And do you know whether the change in the proof of

149

1  residence law has deterred some individuals and
2  groups from engaging in voter registration
3  activities?
4 A  I don't know for sure.  I've heard comments from
5  groups that it makes it more difficult for them to
6  conduct the drives.
7 Q  Do you recall which groups those were?
8 A  I don't.
9 Q  And are there particular groups of voters that your
10  office has identified who have been particularly
11  impacted by this change in the law?
12 A  No.
13 Q  What about residents of nursing homes?
14 A  There is — I guess we have brought it to the
15  attention of the — that there is an issue there
16  because they often don't lack proof of residence and
17  there's been some legislation introduced to modify
18  some of the documents for people who are in extended
19  care facilities.
20 Q  And I think you accidentally misspoke, so I just want
21  to verify something.  Individuals in a nursing home
22  often don't have proof of residence, right?
23 A  What did I say?
24 Q  I think you said don't lack.
25 A  Oh, don't lack.  Yeah.

150

1 Q  But it's they often don't have proof of residence?
2 A  They often don't have.
3 Q  And you've also explained that many students don't
4  carry a driver's license because they live on campus,
5  use public transportation or don't drive, right?
6 A  I made those comments in part of my testimony for the
7  voter ID law, yes.
8 Q  Let me ask you about your testimony regarding proof
9  of residence specifically.  This will be  Kennedy
10  15.
11  (Exhibit 15 is marked for identification)
12 A  Okay.
13 Q  And this is a copy of testimony that you submitted to
14  the Senate Committee on Elections and Urban Affairs?
15 A  Yes.
16 Q  And I'd like to ask you about the part that discusses
17  Senate Bill 459, and that was a bill that required
18  electors to vote — to provide proof of residence
19  when submitting a voter registration form, right?
20 A  That's right.
21 Q  Do you know if this is the bill that ultimately
22  became the law we've been discussing?
23 A  I don't know.  I do know that I identified some
24  concerns with the bill, and I think some of them have
25  been remedied.

151

1 Q  Okay.  Which have been remedied?
2 A  I'm not sure without going back and looking.
3 Q  You wrote in your testimony that, "This creates some
4  very practical issues because of many different ways
5  in which voters submit voter registration forms," is
6  that right?
7 A  Yes.
8 Q  So one of the points you raise is that it's not clear
9  how a voter can provide proof of residence at a voter
10  registration drive, is that right?
11 A  That's right.
12 Q  And has that problem been remedied?
13 A  I think there was a recognition that if it's a
14  special registration deputy that they can make a
15  notation of the type of registration on the form.  If
16  it's a mail-in registration, they can provide a copy
17  that gets mailed in with the form.
18 Q  Okay.  So if it's somebody doing the registration
19  who's not a special registration deputy, the form can
20  only be submitted if they're able to make a copy of
21  proof of residence?
22 A  That's right.
23 Q  And we talked before about the changes to the special
24  registration deputy laws, right?
25 A  That's right.

152

1 Q   So it's now a more limited class of individuals who
2     can take that information, proof of residence
3     information, without making a copy, is that right?
4 A   Well, it's more limited in the sense that they have
5     to be appointed by municipal clerks and can only
6     serve whatever jurisdiction they're appointed by.
7 Q   And I meant to ask you this before, but do you know
8     how many statewide SRDs there were when the law
9     eliminating that position changed?
10 A   I don't know.
11 Q   And what happened to their SRD status when the law
12    changed?
13 A   I believe we sent them a letter saying that they were
14    no longer registered, they were no longer registered
15    as statewide registration deputies and if they wished
16    to continue, they'd have to contact municipal clerks.
17 Q   You note in the next paragraph that identifying
18    documents contain very personal information, is that
19    right?
20 A   That's right.
21 Q   And so has that problem been remedied in any way?
22 A   It has not in the sense that special registration
23    deputies would have access to that information.
24 Q   All right.  And in the next paragraph you indicated
25    that, "There was no provision in the law that allows

153

1     a voter who has submitted a voter application without
2     a proof of residence to cure that later."  Is that
3     right?
4 A   That's right.
5 Q   And that remains true in the law that was enacted,
6     right?
7 A   I don't think -- well, they have to re-register with
8     the proper proof of residence again is my
9     understanding.
10 Q   All right.  And the next paragraph here talks about
11    the confirmation mailing process that we had talked
12    about a minute ago?
13 A   Yes.
14 Q   And this states that the GAB sends these forms on a
15    weekly basis?
16 A   That's right.
17 Q   And you also had a number of checks that have to be
18    met as part of activating a voter registration,
19    including matches against the DMV database, death
20    records and phone records, is that right?
21 A   That's correct.
22 Q   And those are all reasons that proof of registration
23    may not be necessary for voters who register more
24    than 20 days before an election, right?
25 A   I'm sorry, can you rephrase it?

154

1 Q   Yeah, absolutely.  Those facts are all relevant to
2     your testimony here because they're reasons that it
3     may not be necessary to require proof of residence
4     more than 20 days -- documentary proof of residence
5     more than 20 days before an election?
6 A   I suppose someone could take that position and what
7     we're pointing out is that there are current checks
8     in the law.  At that time there were current checks
9     in the law in addition to the proof of residence,
10    one, undeliverable mail, the person doesn't get it
11    activated.  If there's a lack of a match, not so much
12    with the DMV database, unless there's no match
13    whatsoever, but if it's an inconsistent match, they
14    usually count it.
15        But if it's the driver's license doesn't turn up
16    any of it, they will be inactivated.  If they show up
17    as dead, there has to be a follow-up similar as with
18    a felon.  It was just to point out exactly what
19    provisions we already have in the statutes.
20 Q   So just to be clear, if a voter submitted a voter
21    registration without proof of residence and that
22    voter didn't have a Wisconsin identification issued
23    from the DMV, was that application invalidated?
24 A   Yes.  I mean it probably wouldn't even get entered
25    into the system if that form -- if there was no

155

1     driver's license or ID number listed or Social
2     Security, it wouldn't even get entered into the
3     system.  The voter would be told by the clerk I can't
4     process it, I don't have all the information that's
5     required by law.
6 Q   All right.  And what if a confirmation mailing was
7     sent and the mailing was returned as undeliverable?
8 A   Then they would already be in the system, so they
9     would be inactivated, and there's a code tied to the
10    system that says inactivated because of returned
11    mail.
12 Q   And what happened when a voter was inactivated for
13    that reason?
14 A   They would not show up on the poll on Election Day.
15 Q   They would not be allowed to vote?
16 A   Well, they would have to register again at the polls.
17 Q   Absent new registration, they couldn't vote?
18 A   Right.
19 Q   I'm going to switch gears and talk about election
20    observers.  Do you know how long Wisconsin has
21    permitted citizens to serve as election observers?
22 A   There's always been some provision as long as I have
23    been working on this, and I'm sure it goes back, but
24    I haven't really researched it because we've made a
25    number of changes over the years.  It used to be much

156

KEVIN KENNEDY

1    more limited than it is now.
2  Q   What changes have been made over the years?
3  A   It used to be that only candidates or political
4      parties could designate observers to be present at
5      the polling place.  Then it was expanded to allow
6      nonpartisan groups to be approved by the State
7      Elections Board and then was expanded to allow anyone
8      other than a candidate who was on the ballot to be an
9      observer.
10 Q   And when did that last expansion happen
11     approximately?
12 A   Probably late '80s, early '90s.
13 Q   And have there been elections in which you learned
14     that election observers were being overly aggressive?
15 A   It was not unusual for us to get complaints that they
16     were overly aggressive.
17 Q   And has the volume of those complaints increased over
18     time?
19 A   They increased for quite a while in early -- from
20     2000, 2004, 2008.  Probably less of a problem I think
21     since then.
22 Q   And was one of the complaints that observers were
23     slowing down the voting process?
24 A   I think it was more that they were interfering with
25     the process.  One of the consequences would be it

157

1      would slow down, it would distract poll workers, it
2      would create a disruption at the polling place.
3  Q   And do you know which elections you received those
4      complaints in?
5  A   Well, I think 2000 and 2004 were the big elections
6      where we saw the most issues because it was after
7      that that we developed a set of administrative rules
8      which -- you know, working with various groups to
9      provide reasonable guidelines.  And since that time,
10     the Legislature has actually directed us to
11     promulgate rules, although they tend not to approve
12     them when we submit them.
13 Q   And what about the 2012 recall election?
14 A   I'm sure there were some complaints about that.
15     There certainly a lot of -- in the 2012 recall
16     election, I know that there was a lot of concerns
17     about it going into the election, and as I said,
18     there's always places where there's some incidences
19     where this goes on.
20 Q   Have the complaints you've received come
21     disproportionately from certain types of precincts?
22 A   It's hard to say.
23 Q   What about heavily minority precincts?
24 A   I usually don't know necessarily when we get the
25     complaint.  You know, the complainer might identify

158

1      it that way, but I generally don't have the
2      demographics of a polling place or a municipality.
3  Q   Okay.  And you said that your office provided
4      guidance to local election officials, is that right?
5  A   Well, also to observers.  We have a pamphlet that we
6      prepared that we still continue to use even though
7      it's not backed by an administrative rule.
8          Back in -- before the 2006 election, I had one
9      of our staff, Ross Hein, who we've identified
10     earlier, sort of led a group where we brought in
11     representatives of the two major political parties,
12     League of Women Voters, other groups that we knew who
13     were active in this and municipal clerks to try to
14     hammer out what were reasonable guidelines for
15     individuals on behavior by observers and reinforce
16     what the current provisions are in the law in terms
17     of sanctions.
18 Q   Okay.  And one of the -- part of the guidance you
19     issued I guess is that observers should be typically
20     6 to 12 feet from the locations where voters
21     announced their presence and where they registered to
22     vote, right?
23 A   That's right.
24 Q   And in Racine specifically, the enforcement of that
25     rule helped resolve some problems the city had been

159

1      having with observers, is that right?
2  A   I'm sure in a lot of municipalities that was the
3      case.
4  Q   You mentioned --
5  A   I mean having a definite space was what was really
6      required.
7  Q   You mentioned before in the letter to election
8      observers -- I'll show you a copy of that.  This is
9      going to be  Kennedy 16.
10         (Exhibit 16 is marked for identification)
11 A   Okay.
12 Q   Is this the letter to observers you were referring
13     to?
14 A   This is one of the letters to observer organizations,
15     yeah.
16 Q   And this was sent out under Nate Robinson's name,
17     right?
18 A   Yes.
19 Q   Did you approve this letter?
20 A   I did.
21 Q   All right.  And I'd like to ask you about some
22     specific parts of it.  In the middle of the first
23     paragraph, the letter states that, "In recent
24     elections, the GAB received an increasing number of
25     reports describing aggressive or disruptive behavior

160

1    by a minority of observers."  Do you see that?
2 A  Yes.
3 Q  And this is dated November 1st, 2012, right?
4 A  That's right.
5 Q  And so the most recent election before then would
6    have been the recall elections, right?
7 A  The most recent major statewide election, yes.
8 Q  And then the next sentence says, "We've also received
9    reports regarding the apparent intentions of some
10   observers for the election next week."
11 A  Yes.
12 Q  What is that in reference to?
13 A  I don't remember the specifics, but I know that in
14   looking at news accounts and social media reports,
15   you know, there were comments about people trying to
16   be disruptive at the polling place, and again we're
17   trying to be proactive here.
18 Q  And the first sentence that I read, you refer to
19   aggressive -- I'm sorry, the letter refers to
20   aggressive or disruptive behavior.
21 A  Yes.
22 Q  What type of behavior did that mean specifically?
23 A  Oftentimes it was observers who insisted on seeing
24   voters' proof of residence documents when they were
25   registering, complaining loudly at the polling place

161

1    that they couldn't see or they couldn't hear.
2 Q  And they're not entitled to see that, right?
3 A  They're not entitled to see the proof of residence.
4    We state that in this correspondence, but the concern
5    was a small number of them, that's why we used the
6    term minority of observers, tend not to be there to
7    observe but want to have their hands on the process,
8    and our response is if you want to do that, become a
9    poll worker.
10 Q  The beginning of the next paragraph indicates that,
11   "In 2008, the GAB initiated emergency administrative
12   rules governing the conduct of election observers
13   which have been credited with establishing consistent
14   treatment of observers throughout the state and
15   preserving order at the polls during recent
16   elections."  Do you see that?
17 A  Yes.
18 Q  And one of those rules was the 6 to 12-foot rule
19   we've been discussing, right?
20 A  That's right.
21 Q  Let me show you another documents.  This is  Kennedy
22   17.
23         (Exhibit 17 is marked for identification)
24 A  Okay.
25 Q  Now, this is a press release put out by the GAB,

162

1    right?
2 A  That's correct.
3 Q  And this contains some quotes from you?
4 A  It does.
5 Q  And a little over halfway down, the second half of
6    the paragraph, you're quoted as saying, "In recent
7    elections, we have received disturbing reports and
8    complaints about unacceptable, illegal behavior by
9    observers.  Voters expect a calm setting in which to
10   exercise their right to vote."  Do you see that?
11 A  I do.
12 Q  Is that a statement that you made?
13 A  It is.  Or that I authorized to be made for me.
14 Q  Fair enough.  Yes, that's how these press releases
15   are drafted, right.  The unacceptable and illegal
16   behavior you're referring to, what was that?
17 A  The same thing I was describing earlier, that
18   observers wanting to inject themselves into the
19   administration process, being disruptive, which would
20   be illegal.  Talking to voters, which is not
21   permitted, asking to see documents that they couldn't
22   see or insisting on seeing documents that would
23   disrupt the process, such as even looking at the poll
24   book.
25        Well, they have a right to see the poll book.

163

1    They don't have a right to see it whenever they want,
2    particularly when there's a line of voters waiting to
3    check in.
4 Q  And this was issued shortly before the August 2012
5    primary, right?
6 A  That's right.
7 Q  And this again is after the recall?
8 A  After the recall.
9 Q  This is the document-intensive portion of the
10   deposition.  And this one is  Kennedy 18.
11         (Exhibit 18 is marked for identification)
12 A  Okay.
13 Q  Now, this exchange began with Janice Johnson-Martin
14   emailing various people at the GAB, correct?  At the
15   top of Page 2 is where it starts.
16 A  Yes.
17 Q  And then Diane Lowe prepared a draft response, is
18   that right?
19 A  That's right.
20 Q  Who is Diane Lowe?
21 A  Diane Lowe is our lead elections specialist.  She's
22   been there the longest and probably has the most
23   experience of people who are sort of our front line
24   people dealing with municipal clerks.
25 Q  Okay.

164

KEVIN KENNEDY

1  A    And candidates.

2  Q    Would Michael Haas be her supervisor then?

3  A    Yes.  At this time it would have been Nat Robinson.

4  Q    Okay.  And do you know whether you approved her draft
5       email?

6  A    I don't know.  I'm sure we probably would not have
7       let it go out this way.

8  Q    Why do you say that?

9  A    I think we would -- I mean we would probably have
10      some of the language.  Again that's just my sense
11      today.  I would have to go see what email actually
12      went out.

13 Q    Now, at the beginning of --

14 A    I mean I don't have much of a problem as I look back
15      over this with her draft answers.  I was thinking
16      more about her initial part where we definitely were
17      taking it seriously, the second part, but we probably
18      would not editorialize too much as she started out in
19      the first paragraph.  But again I'd have to see what
20      we filed.

21 Q    Do you disagree with the statement in the first
22      paragraph of the draft response, the one beginning
23      with I am so sorry?

24 A    No, I think we were sympathetic.  If people have to
25      deal with that, I think that it reflects our

165

1       sentiments.  But in dealing with clerks and making a
2       record, we're probably going to try and be a bit more
3       careful on how things were phrased.

4  Q    And I don't want -- I want to make sure I'm
5       characterizing this correctly.  So would it be fair
6       to say that your concern was more the tone of it than
7       the substance?

8  A    Yes.  I mean I think we -- you know, in the cases
9       where we have observers who act inappropriately, it
10      rankles us as much as it does the clerks.  It's one
11      of the challenges when you're dealing with people is
12      how do you get them to conform their conduct to that
13      of a civil society.

14 Q    Let me direct your attention to the email from
15      Ms. Johnson-Martin.  Who is she, by the way?

16 A    She's either the Racine city clerk or the deputy
17      clerk.

18 Q    And --

19 A    Or she was at the time.

20 Q    And in her email, she's indicating that there were
21      several incidents with observers in the June 5th
22      recall election, right?

23 A    Yes.

24 Q    Now, in the second full paragraph in her email, about
25      two-thirds of the way down, she indicates that most

166

1       of her poll workers are informing her that they will
2       not work any more elections?

3  A    Is this under election officials?

4  Q    Yes, thank you.  About two-thirds of the way down.

5  A    Okay, um-hum.

6  Q    She's informing your office that most of her poll
7       workers will not work any more elections due to the
8       treatment they received from the observers at the
9       June 5th election, right?

10 A    That's right.

11 Q    And is that problem unique to Racine, or are there
12      other locations that have had that problem?

13            MR. MURPHY:  Object to form.

14 A    I think Racine was particularly challenged in that
15      election.  Poll worker recruitment is a national
16      challenge.  I think larger municipalities have --
17      because they need more poll workers and have more
18      polling places, they have those challenges and
19      obviously if they're in a volatile situation where
20      observers are acting out, it makes it more difficult
21      to retain people.

22      Most of the people who work as poll workers, the
23      average age is well over 60, and so I think there's a
24      sense they have better things they can do with their
25      time than be treated that way.  But I would say that

167

1       Racine required and we took the initiative, as was
2       said, with Racine to do extra training in Racine
3       because it wasn't just the observers.  There were a
4       number of issues with the way the elections were
5       conducted.  We said, you know -- in fact, I was part
6       of a team that went to Racine in August of 2012 to
7       observe how the elections were conducted.

8       Before that, we sent a team of people down to do
9       special training for them and we worked with the
10      mayor to give them some ideas on recruitment of poll
11      workers and things because it was sort of pointed out
12      as this was a problem area both in how the elections
13      were performed and how things were done in terms of
14      behavior of inspectors, so I think the idea was how
15      can we best do this.

16      We also specifically sent election -- for every
17      election, we sent out a group of people to evaluate
18      polling places for accessibility for people with
19      disabilities, and we targeted Racine so that when
20      those people went in, we asked them for the first
21      three things, evaluate the polling place and let us
22      know if you see whether it seems to be under control.

23      Again you're trying to be proactive and make
24      sure that the problems that occurred in Racine in the
25      recall election would not be repeated in future

168

1    elections.
2 Q  Now, this is one of several exchanges we've discussed
3    so far between GAB staff members and municipal
4    clerks, right?
5 A  Yes.
6 Q  And are municipal clerks instructed to relay problems
7    to your office?
8 A  They are.
9 Q  And so this document we've just been going over is an
10   example of what they're instructed to do in the
11   ordinary course of their work?
12 A  Yes.
13 Q  Let's switch to Milwaukee. Have you also had issues
14   with election observers in Milwaukee?
15 A  Over the years, yes.
16 Q  By issues, I mean complaints about observers being
17   boisterous or rude or that sort of thing.
18 A  Yes, there were complaints about Milwaukee.
19 Q  This will be  Kennedy 19.
20        (Exhibit 19 is marked for identification)
21 A  Okay.
22 Q  Now, this is an email exchange between you and
23   Michael Haas on which some other GAB staff members
24   are copied, correct?
25 A  Well, the initial email is to all of the elections

                                                  169

1    were not following protocol, is that right?
2 A  Yes. I think I probably got direct phone calls from
3    representatives of those two groups saying why isn't
4    this happening and having to explain to them what the
5    law permitted and didn't permit.
6 Q  Okay. And specifically the complaint was that the
7    voters were not stating their names and addresses
8    when requesting an absentee ballot at the absentee
9    voting location, right?
10 A  That's right.
11 Q  And were voters required to state their names and
12   addresses when requesting absentee ballot at the
13   absentee voting location?
14 A  I don't believe they are. In this email I suggest
15   that that's not the case, that because they've filled
16   out an absentee ballot application, they've made a
17   record of who they are.
18 Q  All right. And in Mr. Haas' response to you, he
19   referred to a conversation he had with Neil Albrecht,
20   is that right?
21 A  That's right.
22 Q  And Mr. Albrecht is now and I believe at the time was
23   the head of the Milwaukee Election Commission, right?
24 A  He was — yeah, he's the executive director.
25 Q  Thank you. That's the equivalent position to yours

                                                  171

1    division.
2 Q  Oh, so is the second email, I apologize.
3 A  And then Mike's response is to the same group.
4 Q  Okay. Now, this exchange was taking place — this
5    would have been the first day of early voting. I'm
6    sorry, in-person absentee voting in Wisconsin for the
7    2012 presidential election, right?
8 A  That's right.
9 Q  I'm never going to get that right. Now, you
10   indicated that you were receiving complaints from
11   WWWE?
12 A  Yes.
13 Q  And RPW?
14 A  Yes.
15 Q  What is WWWE?
16 A  It's a group of people from — of women from Waukesha
17   and probably broader. We are Watching Wisconsin
18   Elections.
19 Q  And is that an election observation group?
20 A  Yes.
21 Q  All right. And RPW is the Republican Party of
22   Wisconsin?
23 A  That's right.
24 Q  All right. And those groups were sending complaints
25   suggesting that early in-person voters in Milwaukee

                                                  170

1    but for the Milwaukee Election Commission, right?
2 A  I don't know if it's -- it might be more equivalent
3    to Mike's position.
4 Q  Okay.
5 A  He's not required to be a lawyer. He's simply in
6    charge of the agency. So it's equivalent in terms of
7    agency head, but he doesn't -- they oversee campaign
8    finance and elections. We oversee elections,
9    campaign finance lobbying and ethics.
10 Q  Fair enough. He's the boss?
11 A  He's the boss, if you want to say.
12 Q  That's what I was getting at.
13 A  He reports to a commission like I report to a board.
14 Q  Okay. And he's relaying that the line for in-person
15   absentee voting was three blocks long when they
16   opened, right?
17 A  Yes.
18 Q  And that observers were being very aggressive and
19   that he authorized one observer who was out of
20   control to be given a final warning before being
21   removed?
22 A  Yes.
23 Q  And is that length of a line for in-person absentee
24   voting in Milwaukee, is that unusual?
25 A  I don't know. Again it was the first time they were

                                                  172

KEVIN KENNEDY

1   opening.  A lot of attention was being presented.
2   It's a shorter period of time.  I don't know if it's
3   unusual.
4 Q   Now, in the prior presidential election, 2008, early
5   voting would have begun a couple weeks earlier,
6   right -- I'm sorry, in-person absentee voting?
7 A   Yeah, because the changes came in 2010 or 2011.
8 Q   All right.  The next document, this is  Kennedy 20.
9       (Exhibit 20 is marked for identification)
10 A   Okay.
11 Q   This is a letter that was sent to you from
12   Mr. Albrecht, correct?
13 A   That's right.
14 Q   And the letter is dated November 5, 2012?
15 A   Yes.
16 Q   And did you receive this letter?
17 A   I'm pretty sure I did.  I don't have a specific
18   recollection of receiving it.  But I'm familiar with
19   the incident as it's described, so --
20 Q   Okay.  And did your office -- first of all, was this
21   sent to you due to your oversight responsibilities
22   for elections in Wisconsin, is that your
23   understanding?
24       MR. MURPHY:  Object to form.
25 A   I guess that's one way of characterizing it.  I mean

173

1   Neil Albrecht knows who I am and is going to tell me
2   when they have problems, and so yes.
3 Q   He wasn't sending this to you because you're personal
4   friends, it's because of your role with the GAB,
5   right?
6 A   That's right.
7 Q   And here --
8 A   Although he did tell me last night that if he won the
9   lottery, he would not be at work today.
10 Q   Unless he bought his ticket in California, I think
11   he's back, unfortunately.  Did your office conduct
12   any follow-up investigation into this incident?
13 A   I don't recall.
14 Q   All right.  And his letter is describing, generally
15   speaking, an incident in which a voter was
16   intimidated and ultimately didn't vote due to
17   observers, right?
18 A   I think that's a fair characterization, yes.
19 Q   And one of those observers is a person named
20   Ardis Cerny, right?
21 A   That's -- he identifies that person, yes.
22 Q   And that's A-r-d-i-s C-e-r-n-y?
23 A   Yes.
24 Q   Is it common for you to receive a letter like this?
25 A   No.

174

1 Q   And this took place -- this incident took place just
2   prior to the 2012 presidential election?
3       MR. MURPHY:  Object to form.
4 Q   If you know.
5 A   He says it happened on Friday, November 2nd, which
6   would have been the last day of absentee voting
7   before that election.
8 Q   Do you in your role as the chief elections officer
9   for Wisconsin provide information to the Legislature
10   about or have you provided information about
11   observers intimidating voters?
12 A   We've talked about it in general terms.  We haven't
13   done any real in-depth reports.  A lot of the issues
14   with observers are one-day incidents, so we try to
15   take the general trends and use them to shape our
16   training and information.
17 Q   And when you say you've provided information to the
18   Legislature in general terms, what general
19   information did you provide them?
20 A   Well, you've seen -- you shown me copies of my
21   testimony where I've made reference to -- in some of
22   that testimony to behavior of observers and certainly
23   the Legislature gets copies of things such as our
24   communication about election observer rules, and we
25   were pushing our administrative rule on election

175

1   observers.  This is some of the things we've pointed
2   out.
3 Q   And in your experience, do elected officials have a
4   keen interest in what takes place at polling
5   locations during elections?
6 A   Well, I would say that they -- I often characterize
7   them as experts in election law since they have to go
8   through the process to get into office.  So there's
9   at least one time a year, maybe two if you count the
10   primary, where they have a very strong interest in
11   what happens, mostly in the outcome.
12 Q   Have you also had situations in which observers were
13   photographing or videoing voters?
14 A   There have been instances where that's occurred at
15   various places around the state over time, yes.
16 Q   And one of those incidents involved Ms. Cerny, is
17   that right?
18 A   I don't recall.
19 Q   I'll show it to you.  We'll mark this as  Kennedy
20   21, and this may refresh your recollection about
21   that.
22       (Exhibit 21 is marked for identification)
23 A   Okay.
24 Q   All right.  And the top email, the last in time email
25   is one that Mr. Haas is circulating to staff members

176

1    at the GAB forwarding an email that he had received
2    from Neil Albrecht, right?
3  A  Yes.
4  Q  And Mr. Albrecht is indicating that Ms. Cerny had
5    been photographing voters entering the location at
6    which in-person absentee voting took place in
7    Milwaukee, right?
8  A  I think that's in an earlier email.
9  Q  Oh, okay.
10  A  I don't think it's in the one on the first page.
11  Q  Right.  It's in this string, though?
12  A  It's in this string.  It's dated October — the day
13    before.
14  Q  And he referred to three people taking photographs,
15    is that right?
16  A  Yes.
17  Q  Do you know who else was involved?
18  A  No.
19  Q  Is Ms. Cerny from Milwaukee?
20  A  I don't believe so.  I think she resides in Waukesha
21    County.
22  Q  In the course of your work, did you become aware of
23    billboards that were posted in Milwaukee prior to the
24    2012 election regarding voter fraud?
25  A  I recall that.  And I remember seeing them.

177

1  Q  What did you see?
2  A  I don't remember exactly.  I would need to —
3  Q  Were they billboards that indicated that voter fraud
4    was a felony?
5  A  That sounds about right, yeah.
6  Q  Do you know how many of those billboards there were
7    in Milwaukee?
8  A  No.
9  Q  Was there more than one?
10  A  Yes, because I saw at least two.
11  Q  And do you know which parts of Milwaukee those
12    billboards were located in?
13  A  No.
14  Q  Where did you see the two that you saw?
15  A  Well, I would have seen them off of a highway.
16  Q  Okay.
17  A  I know one was exiting Milwaukee on 94.  That's the
18    one I can picture in my head.
19  Q  And prior to the 2012 election, local election
20    officials around the state received an increasing
21    number of questions and complaints about recent
22    mailings that contained errors that could interfere
23    with voting, right?
24        MR. MURPHY:  Object to form.
25  A  I'm not quite sure what you're referring to.

178

1  Q  Let me work with a document.  It's Kennedy  22.
2        (Exhibit 22 is marked for identification)
3  A  Okay.
4  Q  And this appears to you to be a news article from the
5    AP of October 2012, is that right?
6  A  Yes.
7  Q  And the article indicates that Wisconsin election
8    officials warn voters to be cautious about slick
9    mailings giving misleading or incorrect information
10    about voter registration and absentee voting, is that
11    right?
12  A  Yes.
13  Q  And did your agency in fact give that warning?
14  A  We issued a press release trying to draw people's
15    attention to it.
16  Q  And you said in the release that local election
17    officials around the state had been receiving an
18    increasing number of questions and complaints and
19    recently mailings that contain errors that could
20    interfere with voting, right?
21  A  Yes.
22  Q  And one of the mailings was from the Republican Party
23    of Wisconsin, is that right?
24  A  That's right.
25  Q  And that mailing told residents in Madison and Dane

179

1    County to return voter registration applications to
2    the Town of Albion, is that right?
3  A  That's right.
4  Q  And that is not the correct location for voter
5    registration applications from Madison or Dane
6    County, is it?
7  A  Well, it depends where in Dane County.  It depends —
8    I think Albion is a township in Dane County.  So if
9    they lived in Albion, that would be correct.
10  Q  The rest of the residents in Dane County, though,
11    should be returning their voter registration
12    applications elsewhere, right?
13  A  Right.  And I'm not sure since we're not quoted who
14    characterized Madison and Dane County as heavily
15    Democratic.  It probably would not be.
16  Q  That's why I didn't ask you that.  I figured you
17    wouldn't.  We'll go through a couple more documents.
18    Kennedy 23.
19        (Exhibit 23 is marked for identification)
20  A  Okay.
21  Q  Now, this began — this exchange began in your office
22    with Reid Magney forwarding a blog post, I guess,
23    regarding the group Waukesha Women Watching Wisconsin
24    Elections, is that right?
25  A  That's what it says in the subject line.

180

1  Q  Okay.  And there are actually four W's now, but
2     that's the group you were previously referring to as
3     WWME, is that right?
4  A  But I always understood We Were -- We are Watching
5     Wisconsin Elections is what I always understood that
6     acronym to be.
7  Q  Okay.
8  A  We often referred to them as the Waukesha Women,
9     but --
10 Q  Okay.  It's the same individuals, right?
11 A  It's the same general group of people, yes.
12 Q  And Mr. Falk recommended forwarding this to the
13    board, meaning the actual board members, right?
14 A  That's right.
15 Q  And do you have an understanding of what he meant by,
16    "So they are aware of the impact of Ardis, Mary Ann
17    and their close connections with the Legislature"?
18        MR. MURPHY:  Object to form.
19 A  Well, Ms. Cerny and Ms. Hanson, Ardis and Mary Ann
20    respectively, tend to appear at almost every GAB
21    meeting and engage -- always have a presentation,
22    always have a handout and will talk to board members
23    on the breaks and stuff, and Shane thought that maybe
24    the board ought to know just how influential they are
25    in terms of their lobbying activity in front of the

181

1     Legislature.
2  Q  All right.  And so here is  Kennedy 24.
3        THE WITNESS:  Let's have a contest
4        with Mike Haas in his deposition to see who has
5        the most exhibits.
6  Q  I'm not taking his deposition, so --
7        (Exhibit 24 is marked for identification)
8  A  Okay.
9  Q  Now, this is an email exchange among some members of
10    the GAB which began with a forward of an email from
11    We're Watching Wisconsin Elections' campaign, is that
12    right?
13 A  It was forwarded by someone to Nat Robinson, yes, a
14    Deborah Speckmann.
15 Q  So you were just saying, we were just talking about
16    the confusion with the name.  Is it your
17    understanding that the individuals involved in this
18    group are the same ones as the group we were just
19    discussing?
20 A  Yes.  I don't know all the membership, but as I said,
21    you can see that their website is We're Watching
22    Wisconsin Elections.
23 Q  Okay.
24 A  And we're familiar with it.  We would often go and
25    look at it.

182

1  Q  And let me direct your attention to the third page.
2  A  Is that 321 on the bottom?
3  Q  Yes, yes.  There's a heading that says we have the
4     tools to make you an effective observer.  Do you see
5     that?
6  A  Yes.
7  Q  And there are -- Point No. 3 says that there are
8     training classes open to the general public?
9  A  Yes.
10 Q  And one of the locations at which the training was
11    taking place is the Waukesha Republican Party
12    headquarters, right?
13 A  That's right.
14 Q  And a few lines down it indicates to call
15    John Waclawski --
16 A  Yes.
17 Q  -- to arrange a training program.  Do you know who
18    Mr. Waclawski is?
19 A  I know he's an attorney that works with the
20    Republican Party of Wisconsin.  I don't know if
21    he's -- what exactly the role is, but we had a lot of
22    contact with him.
23 Q  When you had contact with him, was he representing
24    the Republican Party?
25 A  That's my recollection.  I can't remember if he was

183

1     representing -- if he spoke on behalf of the Romney
2     campaign as well.
3  Q  Okay.  Now, in the very first -- the top email, the
4     last in time email for Mr. Robinson, he says, "You
5     wanna bet they are giving out 'accurate'
6     information," and then it says, "Note this group."
7     Is it a fair assumption that he meant not this group?
8  A  That's the way I would have read it.
9  Q  And is it your understanding that he was writing that
10    because this group had given out inaccurate
11    information in the past?
12        MR. MURPHY:  Object as requiring
13        speculation.
14 A  I think he is just passing on his opinion of this.  I
15    think our experience had been that they often did not
16    understand the law based on their questions.
17 Q  And the 2013 change to the observer rules requires
18    all polling places to permit or to have a designated
19    observer area within three to eight feet of where
20    voters check in and where they register, is that
21    right?
22 A  That's a statutory change.
23 Q  Yes.
24 A  Yes.
25 Q  And previously the rule that applied was based on GAB

184

```
 1      policy, correct?
 2              MR. MURPHY:  Object to form.
 3   A  Well, the policy we had that was embodied in our
 4      emergency administrative rules was 6 to 12 feet,
 5      which we arrived at through various discussions with
 6      the groups involved.  The Legislature changed it by
 7      legislation to make it three to eight feet.
 8   Q  So the statute had the effect of moving the
 9      observation area closer to the voters, correct?
10   A  Potentially, yes.  Again it's three to eight feet.
11      Six to 8 is within a 6 to 12, so you don't have to
12      put it at three feet.  You could put it at eight.
13   Q  Okay.  Well, it depends on the layout of the
14      facility, right?
15   A  Everything is dependent -- when you're placing
16      observers, it's all dependent on the setup of the
17      facility.
18   Q  But if the best place is 10 feet away, a chief
19      inspector can't put the observation area there now,
20      right?
21   A  That's right.
22   Q  Okay.  And does moving election observers closer to
23      voters aid election administration in any way?
24   A  I think that's a question that people would have
25      differing views on.
                                                     185
```

```
 1   Q  What about your view?
 2   A  I think it's all dependent on behavior, not distance.
 3      How people behave is going to be the bigger issue and
 4      how far away they are.  If they're going to observe,
 5      you know, look and listen and make their own notes,
 6      that's one thing.
 7          If they're going to interrupt, it doesn't matter
 8      whether they're six feet away or three feet away if
 9      they're going to disrupt the process.  That's real --
10      we try to focus on the behavior.  By setting the
11      distance, it gives you something concrete to work
12      with, and the distance has always been a comfort
13      level, you know, balanced against what can you see or
14      hear at particular distances, and there are different
15      activities that go on at the polling place.
16          When someone checks in, it's one thing.  You
17      hear their name and their address.  When someone is
18      registering to vote, that's usually at a different
19      location, and when someone is putting their ballot in
20      or if they're challenged, those are different
21      locations in the polling place.
22   Q  You said the distance doesn't matter.  I want to, I
23      guess, follow up on that a little bit.  When your
24      agency set the 6 to 12-foot distance, there's a
25      reason you had some distance between where the voters
                                                     186
```

```
 1      were and where the observers were, right?
 2   A  Yes.
 3   Q  And so you thought six foot at a minimum was
 4      appropriate?
 5   A  That was the agreement that we came to in our
 6      discussions.  We actually started at three feet back
 7      in 2006 talking about the suggestion.
 8   Q  Right.
 9   A  Three feet is about where you and I are.
10   Q  I bet it's between you and Mike, but yeah.
11   A  No, it's not much different.
12   Q  But in Racine, for example, one of the things that
13      they did differently in 2012 in the presidential that
14      hadn't been done on the recall was enforcing the
15      six-foot limit at the time, right?
16   A  I don't recall, but I wouldn't be surprised.
17   Q  You said you would not be surprised?
18   A  Yeah.  I mean I don't recall specifically that that
19      was, you know, one of the things they did
20      differently.  I mean as I said before, we spent a lot
21      of time training people in Racine and so -- and since
22      observers was an issue, we reviewed those
23      requirements so that -- part of the frustration that
24      was expressed in that communication from
25      Janice Martin was poll workers feeling like they were
                                                     187
```

```
 1      being harassed.
 2          Well, if you give them the information about
 3      what can and can't be done, it gives them some power
 4      and confidence in their abilities.
 5   Q  And you've received complaints from election
 6      observers about observers standing too close to them,
 7      right?
 8   A  You mean from election officials?
 9   Q  Yes, I'm sorry.
10   A  I think people have different comfort levels.  Some
11      don't like them that close and it may not matter
12      whether it's three feet or six feet.  And part of the
13      reason I will tell you for the 6 to 12 feet was they
14      didn't get too far away either.  We had clerks that
15      were willing to say that you can be in the room, but
16      you're going to be 10 feet away, you're going to be
17      12 feet away, and we tried to keep -- tried to find a
18      reasonable accommodation because observers have a
19      right to see what's going on.
20   Q  Let me switch gears.  I think we have about a half an
21      hour left on the tape.  Are you okay to go for
22      another 20 minutes or so?
23   A  I am.
24              THE WITNESS:  How about you?
25   Q  That's a good question.  Let's talk about absentee
                                                     188
```

KEVIN KENNEDY                                      01/14/2016

1  voting.  In 2011 the Legislature changed the law so
2  that absentee ballots could be sent to -- could only
3  be sent to overseas and military voters by fax or
4  email, correct?
5  A  That's right.
6  Q  Previously clerks could have sent an absentee ballot
7  by fax or email to anybody, right?
8  A  The clerks have the option to do that.  It wasn't
9  required.
10 Q  Now they don't have that option, right?
11 A  That's right.
12 Q  Now, you've encountered problems with overseas voters
13 who are not permanent overseas voters being able to
14 obtain and return their absentee ballots in time to
15 be counted, correct?
16 A  Yes, yes.
17 Q  And the GAB recommended that electronic transmission
18 of absentee ballots be approved for all overseas
19 voters, right?
20 A  I believe that's the case, yes.
21 Q  And you provided testimony relating to that issue, is
22 that right?
23 A  I don't specifically recall, but that wouldn't
24 surprise me.
25 Q  Okay.  If there's testimony on the GAB website from
                                                      189

1  you on that topic, is it fair to say that you did
2  provide that testimony?
3  A  Yes.
4  Q  And do you -- has GAB assessed which parts of
5  Wisconsin temporary overseas voters tend to be from?
6  A  No.
7  Q  What, if any, state interests are served -- I'm
8  sorry, election administration interests are served
9  by prohibiting clerks from emailing absentee ballots
10 to voters other than overseas or military voters?
11 A  I don't know.
12 Q  And those ballots are currently sent by the My Vote
13 Wisconsin voter portal, right?
14 A  That's the primary means.  That's what we encourage
15 people to do.
16 Q  Can you explain what that is?
17 A  Well, under the Help America Vote Act, it
18 specifically required that what are known as UOCAVA
19 voters, Uniformed and Overseas Citizens Absentee
20 Voting individuals, which means people who are
21 permanently overseas as civilians or people who are
22 associated with the armed forces in some capacity as
23 defined by federal law, are entitled to have their
24 ballots transmitted to them electronically if they
25 ask.
                                                      190

1     And so what we did is we built a mechanism where
2  those voters could directly contact the Government
3  Accountability Board through the My Vote Wisconsin
4  portal and they could arrange to have their ballot
5  electronically transmitted to them.
6  Q  Could that system be modified so that all voters
7  could have their absentee ballots transmitted to them
8  that way?
9  A  If the law permitted it, yes.
10 Q  There's nothing technical that prevents that?  You
11 said no?
12 A  No.
13 Q  And just to be clear, to qualify as a permanent
14 overseas voter, is it your understanding that an
15 individual has to be residing overseas with no
16 present intention to return to the United States?
17 A  I believe that's the definition, yes.
18 Q  So somebody doing study abroad for a year is not a
19 permanent overseas voter?
20 A  No.
21        MR. MURPHY:  Object to form.
22 Q  All right.  Let me ask about the return of ballots by
23 municipal clerks.  In 2011 the Legislature changed
24 the law to limit the circumstances in which municipal
25 clerks could send absentee ballots back to voters for
                                                      191

1  corrections, right?
2  A  That's right.
3  Q  And specifically absentee ballots can now only be
4  returned to voters if they're spoiled, damaged or the
5  certificate is either improperly filled out or
6  there's no certificate, is that right?
7  A  Well, there's always the certificate.  The question
8  is if it's not completed.
9  Q  Right.
10 A  So improperly filled out or blank I think is --
11 Q  Okay.
12 A  Because that's one of the problems is that they don't
13 sign it, they don't get a witness.
14 Q  Right.
15 A  So that's I think the reference to no certificate.
16 Q  Okay.  So in those cases the law hasn't changed,
17 right?
18 A  No.
19 Q  Are there other circumstances in which absentee
20 ballots are cast with errors that prevent them from
21 being counted?
22 A  Well, as I understand it, the concern is that the
23 voter knows there's an error, but since the election
24 official doesn't know of an error, they can't -- you
25 know, they're relying on the voter to say I made a
                                                      192

1  mistake, I want to recast my ballot because the
2  ballot is sealed up in an envelope and so all the
3  election official can tell is is there a damaged --
4  is the thing damaged through transit or delivery or
5  does it lack the requirement of a signature properly
6  and filled out returned certificate.  And in most
7  cases, the certificate is all filled out by the clerk
8  with the exception of the signature of the voter and
9  the signature of the witness.
10 Q  So in what circumstances would clerks prior to this
11    change in the law have been returning absentee
12    ballots to voters aside from those covered by this
13    law?
14        MR. MURPHY:  Object to form.
15 A  I'm not sure.  My sense is it would be when a voter
16    contacted them and said I'd like my ballot back, I
17    made a mistake or I changed my mind or it would be
18    those kind of circumstances.
19 Q  Okay.  And under current law, the clerk cannot send
20    that ballot back, is that right?
21 A  That's my understanding.
22        MR. MURPHY:  Object to form.
23 Q  Okay.  So if a voter mistakenly votes for two
24    candidates for president and realizes that, the voter
25    can't get that absentee ballot back, right?

193

1 A  That would be my understanding.
2 Q  Do you know if the rate at which absentee ballots are
3    rejected varies from municipality to municipality?
4 A  I don't know.  I'm sure we have some numbers on it
5    based on the post-election surveys we do.  But I'm
6    not real familiar with that and it's not something I
7    think we've looked at very carefully.
8 Q  Okay.  And what -- do you know what the impetus for
9    this law change was?
10 A  I don't.
11 Q  Let me ask about straight ticket voting.  In 2011
12    straight ticket voting was eliminated in Wisconsin
13    for all voters except for military and permanent
14    overseas voters, right?
15 A  Yes.
16 Q  What, if any, election administration interest is
17    there in having military and overseas voters be able
18    to cast a straight ballot that distinguishes them
19    from other voters?
20 A  Well, military and overseas voters are covered by the
21    Uniform -- by the UOCAVA provisions.  And as a
22    result, federal law permits them to cast a ballot for
23    candidates of a party even if they don't know who the
24    candidates are in order to facilitate a better
25    transit of those ballots, and so it's a federal

194

1  provision.
2        Wisconsin law also specifically only allows
3  people who have left Wisconsin and indicated that
4  they're permanently overseas to vote only in national
5  elections, not in local elections.
6 Q  And the first provision you mentioned about the
7    straight ticket, that applies to a federal right in
8    absentee ballots, right?
9 A  That's right.
10 Q  Does it also require that the official ballot have a
11    straight ticket voting option?
12 A  I don't recall that it does.  And my sense, again I'd
13    have to go back and look at the provisions on that.
14 Q  Well, whatever they are, let me ask you this.  Aside
15    from that issue, are there other distinctions that
16    are relevant to election administration purposes
17    between overseas and military voters and other voters
18    that relate to straight ticket voting?
19        MR. MURPHY:  Object as vague.
20 A  The only distinctions I can think of were, one,
21    you're dealing with the ability to allow someone to
22    cast a vote who may not know yet who the candidates
23    are because of the timing of the process, which is
24    why they allow a federal write-in absentee ballot.
25    So that's one of the issues in terms of straight

195

1  party voting.  Federal says they should be able to
2  cast a vote for all candidates of a political party.
3        And then the distinction with, you know, the
4  rest in Wisconsin law, the federal law guarantees the
5  right of all U.S. citizens to vote in federal
6  elections, and so Wisconsin says -- has taken the
7  position in its legislation that if you are a former
8  Wisconsin resident whose right to vote is based
9  there, but you're no longer a resident of the state,
10 you get to use that residence for voting purposes for
11 participation in federal elections, that limits it to
12 casting for candidates for those federal offices
13 only, not for state and local offices.
14 Q  Are there circumstances in which the candidates for
15    office are not set when the UOCAVA ballots are sent
16    out?
17        MR. MURPHY:  Object to form.
18 A  Well, first of all, there are no UOCAVA ballots that
19    are sent out.
20 Q  Fair enough.
21 A  The only ballots that get sent by local election
22    officials are the official ballots, which could come
23    from the My Vote portal electronically or it could be
24    mailed by them.
25        The federal right in absentee ballot that you

196

1    referred to is a form that is placed at U.S.
2    embassies and consulates and made available at
3    military installations for people who are covered by
4    the UOCAVA provisions.
5  Q   When the official ballot is sent out to military and
6    overseas voters, first of all, that has to happen
7    something like 47 days before the election, is that
8    right?
9  A   Federal law requires that it be sent 45 days before
10   the election.  Wisconsin law requires it be sent 47
11   days before the election.
12 Q   And are there any circumstances in which the
13   candidates for election are not set 47 days before an
14   election?
15 A   Yes.
16 Q   And what circumstances are those?
17 A   Well, after a primary election, it could be a recount
18   and the resolution may not be there.  After ballot
19   qualification, there could be a challenge to whether
20   a person's name should be on the ballot or either
21   they were improperly placed or they were denied and
22   were tied up in court for that particular office.
23     There's also the possibility that someone, a
24   candidate passes away in the position if it's
25   permanent and hasn't been filled appropriately.

197

1  Q   The reason that Wisconsin's primaries were moved from
2    September to August was so the primaries would take
3    place before ballots had to be sent out to military
4    and overseas voters, right?
5          MR. MURPHY:  Object to form.
6  Q   If you know.
7  A   It is.  The main reason we moved from the second
8    Tuesday in September to the second Tuesday in August
9    was so that we could comply with the federal 45-day
10   transit requirement.
11 Q   Okay.  Now, in your experience in elections
12   administration, all else being equal, it takes voters
13   longer to cast ballots as ballots increase in length,
14   is that fair?
15 A   I don't think you have to be an election official to
16   realize if you have more choices, it takes more time.
17 Q   Okay.  And when voters would cast a straight ticket
18   ballot, they would only have to fill out one vote,
19   right?
20 A   Well, not in Wisconsin.
21 Q   Okay.  What did they have to do?
22 A   Because in presidential elections, straight party
23   doesn't count.
24 Q   Okay.
25 A   Wisconsin many, many years ago back when the

198

1    Progressives controlled State Legislature changed --
2    made sure that a straight party vote did not count
3    for president because --
4  Q   Bob LaFollette wanted to be elected president.  No,
5    I'm kidding.
6  A   Well, actually -- no, because the Progressives
7    controlled the Legislature and if a Democratic ballot
8    was cast or a Republican ballot was cast on a
9    straight party, the Progressives wouldn't get their
10   vote.
11 Q   That was the opposite of what I was saying.  Okay.
12   So a voter who is casting a straight ticket ballot
13   had to fill out two votes essentially?
14 A   In a presidential year, yes, and you only get to do
15   it in a general election.  You don't get to do it in
16   a primary.
17 Q   And otherwise it was just -- in a gubernatorial
18   election year, it would be just one vote, right?
19 A   That's right.
20 Q   But so now voters have to fill out all of the -- fill
21   out a vote for each election in order to have a vote
22   cast in that election, right?
23 A   For each contest, yes.
24 Q   And one result of that change, all else being equal,
25   is that wait times to vote will increase, right?

199

1  A   Well, it would except there's been some other changes
2    as well.  The number of offices that are on the
3    ballot has been reduced because the county courthouse
4    offices, you know, in a general election, you
5    normally have your president in presidential years,
6    your governor and four other state office holders --
7    well, actually the governor, lieutenant governor and
8    three other state office holders.  You might have two
9    congressional, a U.S. Senate and Congress.  You might
10   have two legislative races, but there could be five
11   to seven county courthouse races and now that's been
12   cut to three.
13 Q   Right.  And that could have been cut while straight
14   ticket voting was retained, though, right?
15 A   I'm just saying that the number of choices was also
16   reduced during that same time period.  Not by that
17   legislation but by some other different legislation.
18 Q   Right.  And I guess all I want to do is be clear that
19   all else being equal, an election system that has
20   straight ticket voting will have shorter lines than
21   one that doesn't, is that fair?
22 A   It depends on whether people choose to use the
23   straight party voting.
24 Q   Okay.  Did they in Wisconsin?
25 A   I really don't have very good numbers on that.  And

200

```
 1   when they were talking about — in Wisconsin they've
 2   talked about going -- they went back and forth about
 3   straight party voting for many years.
 4 Q   Does the GAB keep records on who casts straight
 5   ticket ballots?
 6 A   No.  We have some limited documents, I think.  It
 7   depends on how the voting equipment is programmed
 8   whether you can get a report that reflects that.
 9 Q   When straight ticket voting was available, do you
10   know approximately what percentage of voters use that
11   option?
12 A   I don't recall.
13 Q   Do you know if it was more than say 25 percent?
14 A   I don't recall.
15 Q   Who would know that at the GAB?
16 A   I don't think anyone at the GAB would know that.
17 Q   Is there anybody in Wisconsin who would know that?
18 A   There might be some political science professor who's
19   gathered this data.  One of the problems is that
20   unless you've been actively tracking this for several
21   years, it would be difficult to do.
22 Q   What, if any, election administration interests are
23   served by eliminating straight ticket voting for all
24   but military or overseas voters?
25 A   Well, I think there were definite reasons for
                                                         201
```

```
 1   military and overseas voters that I explained that
 2   provides for convenience for the voting.
 3       Otherwise I think it's entirely a policy
 4   decision on whether or not you use straight party
 5   voting.  As I pointed out, Wisconsin even deviated
 6   from that for -- based on its own considerations back
 7   in the '40s and '50s.
 8 Q   Okay.  But when you say it's purely a policy
 9   decision, that means you're not aware of any election
10   administration interests that are served by the
11   elimination of straight ticket voting, is that right?
12 A   I think that's fair because in all the discussions,
13   no one ever talked about the time it took to vote.
14   They always talked about what was the impact on the
15   political party, who would benefit from it.
16 Q   Do you want to do residency requirements or take a
17   quick break?
18 A   Let's take a break.
19       THE VIDEOGRAPHER:  The time is 3:49.
20   We are going off the record concluding Disk
21   No. 3 in the deposition of Kevin Kennedy.
22           (Short recess is taken)
23       (Exhibit 25 is marked for identification)
24       THE VIDEOGRAPHER:  The time is 4:12
25   p.m.  We are on the record.  This marks the
                                                         202
```

```
 1       beginning of Media No. 4 in the deposition of
 2       Kevin J. Kennedy.
 3 Q   All right.  I've just handed you what's been marked
 4   as Kennedy  Exhibit 25.  And I actually just have
 5   one question about this document near the end, but
 6   I'm happy to let you take a look at it until you're
 7   comfortable with it obviously.
 8 A   Okay.
 9 Q   And first does this appear to you to be a copy of a
10   statement that you made to the U.S. Senate?
11 A   Yes.
12 Q   And this was specifically the Committee on Rules and
13   Administration?
14 A   The Senate Committee on Rules and Administration,
15   yes.
16 Q   And do you know if this was written testimony or if
17   it was oral testimony?
18 A   It was written testimony.  I was limited in what I
19   could say orally.
20 Q   Time limited, is that right?
21 A   Right.
22 Q   The only thing I want to ask you about on this is on
23   the second to last page, there's a heading that says
24   importance of data and shaping legislative proposals.
25 A   Yes.
                                                         203
```

```
 1 Q   And then in this written testimony, you indicate
 2   that -- first of all, this testimony was provided in
 3   2014, right?
 4 A   Yes.
 5 Q   And you indicate that, "In the recently concluded
 6   2013-14 legislative session, 18 separate election
 7   proposals were enacted" -- I'm sorry, "were acted on
 8   in the waning days of the session".  Do you see that?
 9 A   Yes.
10 Q   Is that correct?
11 A   I would make sure that what I put in my testimony was
12   accurate, yes.
13 Q   Okay.  And do you know how many of those 18 election
14   proposals were passed?
15 A   I don't.
16 Q   And then you write that, "With several of the bills,
17   GAB staff was able to provide illuminating
18   information about the impact of the proposals"?
19 A   Yes.
20 Q   And you provide as an example that you were able to
21   show how many voters cast absentee ballots in person
22   during what time periods, do you see that?
23 A   Yes.
24 Q   How was that information supplied to the Legislature?
25 A   Well, I'm assuming there was a report that we
                                                         204
```

1    extracted from our voter registration system for
2    those municipalities that do absentee voting. We
3    could track -- I mean some of the municipalities used
4    the mechanism in our system for tracking absentee
5    voting and population-wise it's a large number.
6    Municipality-wise it's not quite as large, but it
7    covered that, and so we could tell based on when an
8    absentee ballot was processed what the mechanisms --
9    what day it was issued, so it allowed us to tie that.
10        Now, it didn't cover every single day because
11   not every -- I mean every single absentee vote that
12   was cast because again a large number of the
13   municipalities don't use that tool.
14 Q   Did that permit you to determine what time of day
15     those ballots were obtained?
16 A   No. It would not be time. It would just give us a
17     day.
18 Q   Okay. But it did let you determine whether it was on
19     a weekend day?
20 A   Yeah. If that was during the time period when --
21     yes. Absentee voting can be done on a weekend.
22 Q   And do you know, is that report publicly available?
23 A   I'm sure it is. I don't know where. We can try and
24     track it down. If you haven't gotten it in
25     discovery, then we can look for it.

205

1 Q   Okay. It's possible we have. I don't remember, but
2     if it's something you guys are able to get, we'll
3     request it.
4 A   Yeah.
5 Q   Let's see. That's all I have to ask about that one.
6     Okay. I promised we would do residency requirements.
7     Now, one of the changes to the law in 2011 changed --
8     was a change to the residency requirements for voting
9     in Wisconsin, right?
10 A   Yes.
11 Q   And specifically it changed the residency -- the
12     in-state residency period for voting from 28 to 10
13     day -- I'm sorry, from 10 to 28 days for all offices
14     except for president and vice president, is that
15     right?
16 A   That's pretty much right. I think there's more of a
17     distinction with president and vice president.
18 Q   Can you explain?
19 A   Wisconsin has always had a provision for former
20     Wisconsin residents and for new Wisconsin -- actually
21     it's for new Wisconsin residents. There's two
22     different provisions that relate to presidential
23     voting, but for new Wisconsin residents, the position
24     was if you had moved into Wisconsin for less than 10
25     days, we would let you vote for president only.

206

1 Q   Okay.
2 A   And the idea was you don't qualify for a full ballot
3     because you haven't been here long enough. But in
4     order to allow you to participate in the federal
5     election, you get a presidential only ballot.
6        We have a similar provision for people who have
7     left Wisconsin who may not qualify to vote in that
8     state. Even for president, we'll let them vote only
9     for president if they -- again they have to fill out
10     a form asserting that they don't qualify to vote. I
11     mean it happened to a friend of mine who moved to
12     Hawaii. Most of the time it's because they forget to
13     register.
14 Q   Right.
15 A   So we give them a presidential only ballot for that
16     election.
17 Q   And the law previously was that if you moved within
18     Wisconsin, it took 10 days to establish residency in
19     your new location, correct?
20 A   That's right.
21 Q   And now it's 28 days?
22 A   Twenty-eight consecutive days.
23 Q   Okay. A voter who moves who has not established
24     residency at his or her new location has to vote at
25     the residence at which he or she previously lived,

207

1     right?
2 A   If they're a Wisconsin resident.
3 Q   Right.
4 A   Otherwise if they're a non-Wisconsin resident, they
5     would be subject to whatever are the laws in that
6     state in using their right to vote.
7 Q   Okay. So they may not be able to vote at all if
8     they're not a Wisconsin resident?
9 A   It depends on the rule of the state. You know, as I
10     said for former Wisconsin residents, we will give a
11     presidential only ballot because they don't qualify
12     in their current state.
13 Q   And what, if any, election administration interests
14     are served by that increase in the residency period?
15 A   I don't know.
16 Q   Is it your understanding that as a result of that
17     change, more people than previously would now have to
18     vote at their prior residence?
19 A   It's not something that I've -- we've collected any
20     data on or that we've attempted to analyze.
21 Q   Okay. If an individual who is unregistered moves but
22     doesn't meet the residency requirements, moves within
23     Wisconsin, is that individual able to register at his
24     old address?
25 A   I would think so because the registration

208

1    requirement -- I mean it's your residency vote for
2    voting purposes that triggers that, and so my sense
3    is that if someone who had forgot to register lived
4    someplace for two years and just wasn't interested in
5    voting who all of a sudden was but didn't qualify at
6    their new residence, as long as they were still a
7    Wisconsin registrant, they could still register and
8    vote at that location.  I think there would be
9    questions coming from the clerk, but I think that
10   would be permissible.
11 Q  Do you know, does the registration form require
12   voters to indicate that they have no intent to leave
13   their current residence?
14 A  I think it does, but I don't know for sure.  We'd
15   have to -- the form is on the website.  You can look
16   at it.
17 Q  Assuming for the sake of argument that that's on the
18   form, a voter couldn't truthfully fill that out if he
19   had moved to a new location, correct?
20        MR. MURPHY:  Object to form.
21 A  Again, you know, you deal with the individual
22   circumstances and if -- and with the law also
23   doesn't -- the form doesn't reflect people who
24   haven't been there that they have to go to their old
25   location.  I mean I think again I'd have to go back

209

1    and read the statute, but I don't recall that we've
2    ever dealt with an incident of someone since the 28
3    days has been around.
4  Q  Do you recall if there were issues with that in the
5    2012 recall election?
6  A  There were certainly issues with students in terms of
7    their qualifications to vote because of the 28 days.
8    There was a lot of questions about where they were
9    eligible to vote.  And I know we spent a lot of time
10   trying to work through guidance, which probably
11   covered some of the questions you just asked.
12 Q  Were there other groups of voters, like students,
13   with whom you noticed particular issues like that?
14 A  I'm sure there were a number of different kinds of
15   individuals.  I mean the recall elections generated a
16   high turnout election, so you're probably faced with
17   a number of different questions.  The fact that it
18   landed in the summertime where a lot of people move,
19   particularly students, that would have had a big
20   impact.
21 Q  Okay.  Let's turn then to the voter identification
22   law.  From an election administration standpoint, the
23   purpose of that law is to identify voters but not
24   confirm their residence, is that right?
25        MR. MURPHY:  Object to form.

210

1  A  One of the purposes of the law is to ensure that the
2    person who's there is the person who's entitled to
3    vote by confirming their identity, yes.
4  Q  The voter identification law doesn't serve any
5    purpose with respect to residency, does it?
6        MR. MURPHY:  Object to form.
7  A  It doesn't touch residency, no.  I mean it's all
8    about identifying who you are.
9  Q  And you can actually vote with a form of
10   identification that has an address that's different
11   from the address at which you're registered, correct?
12 A  That's right.
13 Q  Have you assessed the cost, the financial cost that
14   the voter identification requirement will impose on
15   the GAB?
16 A  Well, it depends on what aspect.  I mean we've -- I
17   mean we've already done all of the training materials
18   and things and the Legislature gave us a couple
19   million dollars for that, which also included a voter
20   outreach program, but we've already -- you know, I'm
21   not sure exactly how much money we spent developing
22   all the training materials and then revising them
23   again after the Supreme Court didn't act, although
24   the revisions weren't that large, but we spent
25   resources in 2015 to make sure everything was up to

211

1    date.
2  Q  When did your agency conduct outreach efforts
3    relating to the voter ID law?
4  A  We started in 2011 and continued through February of
5    2012 and we restarted again in 2015.
6  Q  Okay.  And since 2015 started, what efforts have you
7    taken for outreach purposes?
8  A  Well, first of all, we updated all of our information
9    or brochures to make sure that accurately reflected
10   the law as it was in place based on some
11   modifications by the Supreme Court, updated our
12   public service announcements, our television and
13   radio ads.
14       We've had meetings with various groups, one in
15   particular was AARP, and I know that because I
16   remember reading an email with an article that they
17   did based on our meeting with them on that, but we've
18   talked to -- had training for municipal clerks.
19   We've conducted a Webinar on how to use the voter ID
20   for them, and that's been recorded and is on our
21   website so they can go back to it.  I think we just
22   actually presented it in the last couple weeks.
23       We have a person, Meagan McCord-Wolfe, who is
24   our voter outreach specialist who coordinates
25   meetings with civic groups.  A lot of times if it's

212

KEVIN KENNEDY                                                01/14/2016

1   just going to be a small group, we'll send them the
2   materials and say here, when we can't send someone
3   there.
4        But we've done our best to make everything
5   available for the clerks and for -- and we will --
6   part of our plan going into 2016, for example, is at
7   the end of this month I will hold a press
8   availability before the February primary election
9   because this will be the first statewide election
10  where we will emphasize the need for a photo ID for
11  voting, and our plan right now is to do that for each
12  of the four major elections.
13 Q  And how much money do you have allocated for
14  advertising related voter ID?
15 A  None.
16 Q  Has the Legislature provided any additional funding
17  for outreach since the Supreme Court decision that --
18  well, since the law has once again become effective?
19 A  No.
20 Q  Have you asked the Legislature to provide more
21  funding?
22 A  I'm trying to think.  We have not made a specific
23  media request.  We've had some informal conversations
24  letting them know if you want this, you're going to
25  need to act because we don't have it in our budget.

213

1        There was a discussion where groups came to us
2   saying what are you going to do and our answer was,
3   well, if the Legislature gives us the directive
4   because the original law gave us a very targeted time
5   period to do that, and we're outside that time period
6   now.
7 Q  And when you say that you had informed people that if
8   they want advertising, they have to act, are you
9   talking about conversations with legislators?
10 A  I've had some conversations with legislators where we
11  said if you think it's important to get out the voter
12  ID information, we have everything ready to go, but
13  we'll need money.
14 Q  Is it your expectation that you will receive that
15  funding?
16 A  I haven't gotten any signal that that's going to
17  come.
18 Q  Did you do any advertising in -- before the law was
19  first enjoined?
20 A  Yes.
21 Q  So that was in 2011?
22 A  2011 and early 2012.
23 Q  Okay.  But nothing since then?
24 A  No.
25 Q  Have any other agencies received funding for

214

1   advertising relating to voter ID?
2        MR. MURPHY:  Object to form.
3 A  I don't know.
4 Q  Do you know whether the DMV has?
5 A  I don't know.
6 Q  All right.  Let me show you a couple documents.
7   We'll start with this one, which is going to be
8   Kennedy 26 -- oh, that's mine.  Sorry.  And once
9   you've had a chance to look through it, I'll ask if
10  you can tell me what this is.
11 A  Okay.
12 Q  So what is this document?
13 A  This is a fiscal estimate that was prepared by the
14  GAB staff with respect to the photo ID legislation,
15  the initial version introduced by the Senate.
16 Q  Okay.  And did your fiscal estimate change based for
17  the final version?
18 A  I'm sure there were some changes made, but I don't
19  know exactly.  We didn't update it, I don't think.
20  And the basic costs wouldn't have changed because I
21  think the basic things that we were required to do
22  were modifications to our voter registration system
23  and our -- and the requirement that we engage in an
24  information program didn't change.
25 Q  Let me direct you to Page 7, the last page.  And this

215

1   would be an instance in which the bottom line is
2   literally the bottom line, is that right?
3 A  Okay, yeah.
4 Q  So the projection you provided to the Legislature for
5   the cost of the voter ID bill for GAB was a little
6   over two million dollars, is that right?
7 A  Yes.
8 Q  How much funding did GAB receive in connection with
9   the voter ID law?
10 A  I don't remember.
11 Q  Was it two million?
12 A  I think it was slightly less than that.
13 Q  You list the total local projected cost as
14  indeterminate, is that right?
15 A  That's right.
16 Q  And that's referring to local clerks' offices, right?
17 A  That's right.
18 Q  And why did you put that -- mark that as
19  indeterminate?
20 A  Because we would have no credible way of estimating
21  what their training costs would be, what their
22  commitment would be to outreach, to whatever costs
23  they might have paid for replicating materials that
24  we provided.
25 Q  And one of the consequences of the voter ID law is

216

1     that there will be more provisional ballots cast,
2     right?
3  A  That's right.  Or at least that's what we assumed.
4  Q  And does that impose an administrative burden on
5     local clerks' offices?
6         MR. MURPHY:  Object to form.
7  A  It will require more work, assuming that there are
8     more ballots.  I mean right now we have very few
9     provisional ballots.  I'm assuming that any
10    significant amount more will require more work by the
11    clerk's office after the election to process those
12    and on Election Day to deal with them by the poll
13    workers.
14 Q  And is it your expectation that the 2016 presidential
15    election will be the first election in which there
16    are large volumes of provisional votes cast in
17    Wisconsin?
18 A  I think we will see -- because that will be the
19    largest turnout election since then, I think we'll
20    see more.  Right now we don't have a very good handle
21    on how many that's going to be and maybe as we see
22    what happens in February and April, we'll have a
23    better sense of what we can project in November.
24 Q  And I should ask, by the way, you authorized this --
25    you're listed as the authorized signature?
                                              217

1  A  That's right.
2  Q  Asking it that way.  That means you approved this
3     document, right?
4  A  That's right.
5  Q  And this was provided to the Legislature?
6  A  It was.
7  Q  This estimate also does not include any costs for the
8     DMV, right?
9  A  No.  We only do our costs.  DMV would have provided
10    their own fiscal estimate.
11 Q  Do you know if they did?
12 A  I don't know.
13 Q  Has the money that you were appropriated in
14    connection with the voter ID law been spent at this
15    point?
16 A  It has.
17 Q  So any additional expenditures relating to voter ID
18    are coming out of the regular budget that you have?
19 A  That's right.
20 Q  Aside from the advertising we discussed before, are
21    there activities that -- other activities that you
22    would like to take relating to voter ID law prior to
23    the 2016 election that you're unable to take due to
24    cost?
25 A  I think at this point the primary thing that we're
                                              218

1     not doing that could be done would be getting a
2     public information campaign going through the media.
3         Obviously we probably will not have staff
4     resources available to do community outreach or
5     meetings either, but a lot of that was premised on
6     implementing this back in 2011 and 2012.
7  Q  Has GAB been required to utilize staff to prepare for
8     the transition to the new Elections Board and the
9     Ethics Board in the summer?
10 A  Yes.  I mean a lot of my activity was specifically
11    directed by the legislation to coordinate the
12    transition and work with the Department of
13    Administration on that, but a lot of the things that
14    have to be accomplished require directing staff to do
15    certain things such as inventory division,
16    document -- electronic document division.  Some of
17    it's already been done, but there's a lot to do.
18 Q  All right.  Let me show you a news article which
19    we'll mark as  Kennedy 27.
20        (Exhibit 27 is marked for identification)
21 A  Okay.
22 Q  First does this appear to you to be a news article in
23    the Milwaukee Journal Sentinel in November of 2011?
24 A  Yes.
25 Q  And you're quoted in this article, correct?
                                              219

1  A  I am.
2  Q  And the article indicates that when you speak to
3     groups about how to get a photo ID for voting, you
4     use a flow chart?
5  A  I did.
6  Q  Okay.  And you're quoted as saying, "I hold it up
7     mostly to show that this is not easy."  Do you see
8     that?
9  A  Yes.
10 Q  And is that an accurate quote?
11 A  Yes.
12 Q  And what did you mean by that?
13 A  I mean that in order to get an ID, there were a
14    number of different documents you have to get, they
15    have to meet certain requirements, and we took the
16    information from the DMV website and put it into a
17    flow chart, one, so that our staff could answer
18    questions, but, two, it was a great visual when
19    speaking to groups in preparation for this process to
20    show them that this is not an easy task to get the
21    required identification.
22 Q  Let me direct you to the last paragraph on that first
23    page.  And specifically the second sentence says,
24    "Kennedy said he's not aware of a single case of
25    identity fraud in voting behavior" -- I'm sorry, "in
                                              220

1   voting being prosecuted in Wisconsin," do you see
2   that?
3 A   Yes.
4 Q   Does that accurately reflect what you said to the
5   Milwaukee Journal Sentinel staff?
6 A   Yes.
7 Q   And let me direct you to the last line in the
8   article.  I'm sorry, the last paragraph.  It quotes
9   you as saying, "If they don't go online," they
10   referring to voters, "If they don't go online and
11   look at the list of required documents and then
12   figure out how do I get these before I come in, their
13   trip to the DMV will require a second stop."  Do you
14   see that?
15 A   Yes.
16 Q   And are you accurately quoted there?
17 A   Yes.
18 Q   Now, you've also said publicly that in connection
19   with the voter ID law that you're well aware of what
20   you would have had to do to help your mother out if
21   photo ID had been in effect when she was voting.  Do
22   you recall that?
23 A   I do.
24 Q   What did you mean by that?
25 A   I meant that my mother no longer had a valid driver's

221

1   license and she did qualify for certain exceptions to
2   the voter ID law because she was indefinitely
3   confined, but a lot of those comments were made
4   before the law was put in place.  You know, and there
5   was a recognition that my mother had a son who knew
6   the law or knew the proposals for the change in the
7   law and a son who lived in the same town as her,
8   actually two at the time who could take the time to
9   help her if that was going to be required to get an
10   ID.
11 Q   And am I right in understanding that the point you
12   were making was that if your mother hadn't had that
13   assistance, it would have been very difficult for her
14   to obtain an ID to vote?
15 A   Yes.
16 Q   You've also said that the GAB does not have the
17   resources to get IDs to everyone who needs them,
18   right?
19 A   I'm sure I probably made that statement in some
20   context.  I mean I would point out that my mother
21   passed away before the voter ID law went into —
22 Q   Yeah, actually —
23 A   So just to go back in terms of perspective, this has
24   been an ongoing discussion, voter ID has been
25   discussed for several legislative sessions and so the

222

1   iteration that was presented in 2011 that was
2   ultimately passed and some of my comments on this
3   because I was asked as various bills, you know, came
4   up in prior legislative sessions too.
5 Q   Okay.  The comment we were discussing, that was made
6   after it was passed, isn't that right?
7 A   I don't know.
8 Q   Okay.  Well, let me ask you about the resources to
9   get IDs to everyone who needs one.  This is Kennedy
10   28.
11       (Exhibit 28 is marked for identification)
12 Q   Okay.  And let me direct you to the second
13   paragraph — well, first of all, what is this
14   document?
15 A   It's a press release issued by the Government
16   Accountability Board informing the public about a
17   Speakers Bureau that we put together to speak to
18   groups on how to get a photo ID.
19 Q   And in the middle of the second paragraph you're
20   quoted saying, "The Government Accountability Board
21   does not have the resources to help every individual
22   voter who needs to get a photo ID.  We can, however,
23   provide organizations with the tools and knowledge to
24   get the job done."  Is that right?
25 A   Yes.

223

1 Q   When you wrote that the government or said that the
2   Government Accountability Board does not have the
3   resources to help every individual voter who needs to
4   get a photo ID, what did you mean by that?
5 A   Well, I was trying to manage some people's
6   expectations that the Government Accountability Board
7   is going to take care of everyone that doesn't have
8   it.  I mean it was being realistic that if there's an
9   expectation that the state elections agency can
10   somehow identify and reach out to every voter who
11   needs the required ID, you know, to get out ahead of
12   that and point out that that's not a realistic
13   expectation of our agency, but that doesn't mean that
14   we're giving — that we're folding up, that we are
15   still making efforts to provide the tools for that.
16 Q   And this release was issued after the voter ID law
17   was passed, right?
18 A   That's right.
19 Q   Is the voter photo ID Speakers Bureau, is that
20   still — is that an ongoing group?
21 A   I'm not sure we call it a Speakers Bureau anymore.
22   Part of that is we didn't need it after February of
23   2012.  It was actually closer to April when it got
24   shut down.  But we still have, as I said earlier, we
25   still have everything in place to do that and we

224

1    still have a person dedicated to that.
2         We've expanded.  She has some other
3    responsibilities at this time besides that, focusing
4    on military and overseas voting, but it's still part
5    of our mission.  I'm not sure we call it the Speakers
6    Bureau.  But as I mentioned, we've worked with groups
7    to get them that kind of information and we continue
8    to do that.
9  Q  Have you received as many requests for information
10   since the voter ID law has gone back into effect as
11   you received around the time that it was originally
12   passed?
13 A  I don't know.
14 Q  Would you agree that the voter ID law places greater
15   burdens on voters who don't possess a qualifying form
16   of ID than it places on voters who do possess a
17   qualifying form of ID?
18 A  Well, I think the question is -- it depends on what
19   they need to get it.  I mean some people would have
20   an easier time obtaining the requirement, but
21   obviously if you need an ID to vote, it's an extra
22   step that you have to take.
23 Q  And you've said that student IDs in particular are a
24   challenge under the voter ID law, is that right?
25 A  I probably have made comments along those lines

225

1    because the rules are different for the use of a
2    student ID than they are for most IDs because they
3    require two sets of documents.
4  Q  And can you explain how they're different?
5  A  Well, in addition to showing your ID card that has
6    your picture on it that has certain requirements in
7    terms of its currency, you also have to have proof
8    that you are actually enrolled at the college during
9    the time that you're using that to vote.
10 Q  Does that proof of enrollment requirement serve any
11   elections administration purpose in your experience?
12 A  I can't say.  I think it was just the provision the
13   Legislature put in because it saw student IDs as
14   different.
15 Q  Okay.  Let me show you another document.  This is
16   Kennedy 29.
17        (Exhibit 29 is marked for identification)
18        MR. MURPHY:  How much more on ID do we
19   have?
20        MR. KAUL:  I'd say I'm about halfway
21   through it.
22        MR. MURPHY:  Are there any claims
23   left -- I've just got to ask what's left.
24        MR. KAUL:  Intentional discrimination
25   claims.

226

1        MR. MURPHY:  All right.
2  A  Okay.
3  Q  All right.  This is an email exchange among GAB staff
4    that followed the receipt of an email from
5    Matthew Lind to Michael Haas, right?
6  A  Um-hum.
7  Q  And you mentioned earlier that Mr. Lind works with
8    the University of Wisconsin System, is that right?
9  A  Yes, that's right.
10 Q  And Mr. Lind's email indicates that the UW System
11   schools intend to charge students segregated fees for
12   the expense of creating voter ID compliance student
13   ID cards, is that right?
14 A  That's what it says in the last line, yes.
15 Q  All right.  And Mr. Falk responded to that email by
16   saying, "Charging for a voter ID for students?  Can
17   someone say poll tax!"  Do you see that?
18 A  I see that.
19 Q  Do you understand what he meant by that?
20        MR. MURPHY:  Object to form.
21 A  I can't speak specifically to what he meant on that.
22   I mean one of the concerns was that if it cost money
23   to be able to participate in the process, does that
24   constitute a poll tax.  I mean that was one of the
25   issues that was being discussed.

227

1  Q  Is it your understanding now that student IDs -- let
2    me rephrase that.
3        Is it your understanding that students are now
4    being charged separated segregated fees for their
5    voter ID compliance student IDs?
6  A  I don't know how that process works.  I mean when
7    students paid their tuition, part of that tuition
8    goes into a segregated fee account.  I'm not sure
9    that that means that a student is paying a specific
10   fee for their ID on that.  Again I think that's best
11   asked of the university system.
12 Q  But that is what your staff was understanding
13   Mr. Lind's email to mean?
14        MR. MURPHY:  Object to form.
15 A  Well, at this point it's a question of it costs money
16   to get valid IDs and where is the source of that
17   money.  And Mr. Lind indicated that, you know,
18   campuses are taking on this cost, but they're pulling
19   it from this particular fund.  And this is just an
20   internal, you know, comment by the staff -- amongst
21   staff about how student funds are being used, but
22   student funds as in general, they're not individual
23   as I understand the segregated fund account.
24 Q  Okay.  And let me show you another document, Kennedy
25   30.

228

KEVIN KENNEDY                                          01/14/2016

```
 1              (Exhibit 30 is marked for identification)
 2 A    Okay.
 3 Q    Now, this is an email exchange among members of the
 4      GAB staff, correct?
 5 A    This email was shared.  I mean it starts with one of
 6      our staff showing a video and sharing it with select
 7      staff and that was followed up by the public
 8      information officer sharing this news article
 9      attached with the same individuals but adding me to
10      the email string.
11 Q    All right.  And the information -- I'm sorry, the
12      email from the public information officer indicates
13      that the voter ID law was slowing down the voting
14      process in some locations, is that right?
15 A    No.  The news article says that.  But the public
16      information officer simply says this looks like
17      something we'll have to address with the clerks.
18 Q    Is it your understanding that the voter ID
19      requirement, the requirement that an ID be shown
20      slows down the voting process?
21 A    I'm not sure I can say.  I know that clerks have done
22      a number of -- taken a number of steps to measure its
23      impact.  I mean it used to be when you went in to
24      vote if you were already registered, all you did was
25      give your name.
                                                       229
```

```
 1      So those are all things that we're thinking,
 2      recognizing you've got two more steps here, you've
 3      got additional requirements of the poll workers, what
 4      do you do.  But we haven't really had a chance to
 5      look at this in a full-blown statewide election.
 6      That February primary was a very low turnout, so
 7      we'll have four more opportunities to evaluate it in
 8      2016.
 9 Q    And increasing of the transaction time that voters
10      have when they check in, all else being equal, means
11      longer lines, right?
12 A    It will take more time to get through, yes.
13 Q    And it also increases the likelihood of there being a
14      backlog, right?
15 A    It depends on how many check-in stations you have.
16      You know, there are ways to cut the lines down.  Part
17      of it, as I said, is better information to the
18      voters.  Part of it is having more poll workers
19      there.
20 Q    Right.  So I guess the point you're making is if
21      there are enough stations, there won't be any line at
22      all, so it won't make any difference in the line, is
23      that right?
24 A    I think there will always be some line of some kind.
25 Q    Right.
                                                       231
```

```
 1      Under Act 23, which is now in place, you have
 2      two more steps to do.  You have to show the ID and
 3      you have to sign the poll book.  So that's additional
 4      steps.  The question is how that works.  We had some
 5      cities that were timing that process, suggesting it
 6      added a minute per transaction to the process.  You
 7      know, what we tried to do was understand that and
 8      figure out how can we get people to be focused on the
 9      process, and we've sort of boiled it down to the
10      voter has three things to do, state their name, show
11      their ID, sign the poll list and then they get a
12      ballot.
13      The poll worker has four things they have to do
14      when they look at the ID to make sure that it's
15      valid.  Again part of it is we didn't want this to be
16      a cursory process where someone waves something and
17      it was never examined.  So part of our training was
18      trying to break these things down and make sure
19      people understand because the more you have a routine
20      down, if the voter understands when they walk in
21      they're going to have to show their ID and they're
22      going to have to sign something, they're better
23      prepared as opposed to, oh, digging into their
24      pocket, pulling their wallet out and finding what
25      they need to show.
                                                       230
```

```
 1 A    Even if the line is one person.
 2 Q    Right.  But this makes -- I mean by making the
 3      process of checking in slower, you're going to
 4      increase lines, right?
 5 A    Well, it adds two steps, and that means it's going to
 6      take more time to process each voter.
 7 Q    Okay.  Aside from the issues you just mentioned, in
 8      the elections in which voter ID has been in effect,
 9      and I'm including in this the soft roll-out election,
10      poll workers make mistakes in assessing what was
11      required from the voter ID, right?
12              MR. MURPHY:  Object to form.
13 A    I'm sure that they did.  I don't recall specifically
14      what kind of information we collected on that, but
15      it's only inexperience.  We expect that they're going
16      to make mistakes.
17 Q    Right.  And that can also slow down the process,
18      right?
19 A    It might speed it up if they're not doing all they're
20      supposed to do.
21 Q    If they're asking for information that's not
22      required, it would slow it down, right?
23 A    Yes.  I'm not sure if that's exactly what was going
24      on, but again there's a whole range of mistakes that
25      can be made that relate to voter ID or relate to
                                                       232
```

1    other aspects of the process.
2  Q  Some poll workers were insisting on a form of ID that
3    had the address that was reflected on the voter
4    registration, right?
5              MR. MURPHY:  Object to form.
6  A  I don't specifically recall.
7  Q  Did -- some voters were also upset about the voter ID
8    law being in effect, right?
9              MR. MURPHY:  Object to form.
10 A  I heard reports of that.  In my observations during
11    that period of time, I didn't see that.  I saw more
12    people prepared to show their IDs.
13 Q  To the extent that voters are unhappy about the law
14    and they express that while they're signing in, that
15    can slow the process down also, right?
16 A  If that happens, yes.
17 Q  In doing outreach back in 2011 and 2012 related to
18    the voter ID law, the GAB targeted particular
19    minority groups, is that right?
20 A  Yes.
21 Q  And specifically you targeted African-Americans and
22    Latinos, is that right?
23 A  Yes.
24 Q  Why did you target those groups?
25 A  Because those were groups that we thought would

233

1  Q  Have you targeted all those groups we've just been
2    discussing in any outreach efforts that have been
3    done since the voter ID law went back into effect?
4  A  I think we've built on the connections we made in
5    2011 and 2012 for that.
6  Q  Can you explain what you mean by that?
7  A  Well, I mean in 2011 and 2012, we -- part of our
8    contract with our provider was to hire some people
9    who specifically reached out to the African-American
10    community and to the Latino community.  We don't have
11    that contract in place anymore, but we still have the
12    names of various organizations that we provided
13    information to and so we have access to that and
14    we've continued to identify that as we remind people
15    that photo ID is back in place and are prepared to
16    either get materials to them or to go and speak,
17    depending on the size of the audience.
18 Q  Okay.  Let me show you the next document, Kennedy
19    31.  I'm just trying to help with your contest with
20    Michael Haas.
21 A  He doesn't know about it yet.
22         (Exhibit 31 is marked for identification)
23 Q  All right.  Would you please take a look at this
24    document and then let me know what it is when you've
25    had a chance to take a look?

235

1    probably need additional help from the feedback we
2    had gotten.  You know, they were clearly identifiable
3    groups where there was a sizable number of voters,
4    and they were also groups that had community
5    organizations involved where we could reach to those
6    community organizations.
7  Q  And what led you to believe that those groups needed
8    more help with outreach?
9  A  I think this is just general analysis of the concerns
10    that were raised during the debate.
11 Q  And one of those issues was the concern that
12    African-Americans and Latinos were less likely to
13    have qualifying forms of IDs than other voters,
14    right?
15 A  That was one of the assertions that was made
16    throughout the discussions.  So it made sense to
17    target those groups.
18 Q  Were there other groups that you targeted that you
19    were concerned might be less likely to have IDs?
20 A  Students and the elderly.  We had a whole initiative
21    where I had staff dedicated to working with the
22    various private and public higher educational
23    institutes.  As I said, we met with AARP.  We've
24    reached out to associations of nursing home providers
25    to make sure that that information was there.

234

1  A  Okay.  What's your question?
2  Q  Can you describe what this is, first of all?
3  A  Well, it's a series of email exchanges amongst staff
4    at the Government Accountability Board based on a
5    news article that was shared that talked about the
6    Madison City Clerk's evaluation after conducting a
7    special election in the summer of 2011 as part of the
8    soft implementation of voter ID.
9  Q  Okay.  And the Madison City Clerk, it refers to a
10    letter from the Madison City Clerk, the article
11    that's being —in this case here?
12 A  Yes.
13 Q  Did you receive that letter?
14 A  I don't recall who this letter was addressed to that
15    they're referring to, whether it was addressed to our
16    office or not.  I'm aware of what she had to say.
17 Q  I'm sorry, did you say you were aware of what she had
18    to say?
19 A  Yes.
20 Q  Okay.  And so she had expressed in one manner or
21    another these concerns to you?
22 A  She had expressed those concerns and I was aware of
23    them.  I'm not sure if they were directed to me or if
24    they were directed to someone else on our staff or if
25    they were directed to the mayor and got lots of

236

1     coverage.

2  Q  Okay.

3  A  Again I don't know — I don't recall who the letter

4     was addressed to.

5  Q  And those concerns included that the changes as part

6     of the voter ID law would result in long lines,

7     correct?

8  A  Yes. I mentioned earlier that they had done some

9     mock elections. Madison was one of them that was

10    timing the process.

11 Q  And what was Madison finding in its mock elections,

12    if you know?

13            MR. MURPHY: Object to form — never

14       mind.

15 A  I just know that they were documented that it was

16    going to increase the amount of time to serve the

17    voter with these two extra steps.

18 Q  Madison also reported that voters were angry at

19    having to sign the poll book, is that right?

20 A  That's what the news article says.

21 Q  So it appears you received reports from Madison and

22    from Brown County in the document we were previously

23    discussing and Kenosha, I guess, about voter ID law

24    causing longer lines, is that right?

25 A  Yes.

                                                237

1  Q  Were there other locations in the state from which

2     you received those sorts of reports?

3  A  I don't recall.

4  Q  And in one of the emails in this string at the bottom

5     of the first page, Mr. Falk refers to this being

6     useful to help narrow down the groups at risk and

7     that we were charged to work with, do you see that?

8  A  Yes.

9  Q  Do you have any understanding of what he meant by

10    narrow down the groups at risk?

11 A  Well, you know, part of the Act 23 was a specific

12    provision that was added that directs the Government

13    Accountability Board to reach out to organizations

14    that serve individuals who might have difficulty

15    obtaining an ID, and that's a pretty broad charge and

16    I think Shane is commenting, well, it would be

17    helpful to identify specifically what kind of groups

18    we should be reaching out to to get some specifics.

19 Q  And is he referring to the data that's cited at the

20    very end of this article?

21            MR. MURPHY: Object to form.

22 Q  If you know.

23 A  Well, he's responding to a comment in an earlier one

24    by his co-counsel asking if anyone knows anything

25    about the Department of Civil Rights, who that — it

                                                238

1     is a city department, what is it, is it somebody we

2     should be in touch with.

3  Q  And then the last email in time, the top email,

4     Mr. Hein says this should definitely be part of our

5     outreach?

6  A  Yes.

7  Q  Do you have an understanding of what he meant by

8     that?

9  A  I think the fact that we've identified a City of

10    Madison office that has information about minority

11    breakdowns and statistical breakdowns would be a good

12    place for us to reach out. I don't know if they

13    could get us in touch with organizations we should be

14    reaching out to.

15 Q  Did your office in fact reach out to that

16    organization?

17 A  I don't know specifically if we did.

18 Q  Do you know if you've reached out to the organization

19    since voter ID was reinstated?

20 A  Again I don't know.

21            MR. MURPHY: While we're in

22       transition, and maybe you are, but please make

23       sure we're keeping the distinction between

24       Mr. Kennedy and the GAB. And if you are, that's

25       fine, but I think when he's answering when you

                                                239

1       say I, you mean him. Or, I'm sorry, when you

2       say you, you mean him.

3  Q  Yeah, if any of my questions are unclear as to that,

4     please feel to correct me. And I apologize if they

5     aren't.

6  A  Well, I can answer what I know and don't know, but

7     I'm also speaking about some of the things that the

8     agency I'm in charge of is doing.

9  Q  All right. This is Kennedy 32. And again once

10    you've had a chance to look at this, I'll ask you if

11    you recognize this document.

12            (Exhibit 32 is marked for identification)

13 A  Okay.

14 Q  And for today's purposes at least, I'm not going to

15    ask you about the contents of what this is, but can

16    you just tell me what this is?

17 A  It's a memorandum from a number of political science

18    professors at the University of Wisconsin.

19 Q  And this was sent to you, is that right?

20 A  It was sent to me.

21 Q  And what were the circumstances of their sending this

22    to you, if you know?

23 A  Well, this was early on in the beginning of the

24    debate on developing voter ID legislation.

25 Q  And do you know, was this letter shared with the

                                                240

1        Legislature?

2    A   Well, these individuals testified to the Legislature

3        on much of what's in here. I don't know that we

4        specifically shared this. It was certainly, as I

5        mentioned before, this is the kind of information

6        that would have informed our views about what were

7        vulnerable populations based on reports that we had

8        seen or heard in discussion of the development of the

9        legislation.

10   Q   And how do you know that those individuals testified

11       before the Legislature?

12   A   Because I was at the hearings and I remember — I

13       think only one of them appeared or maybe two of them

14       appeared, but I remember them at the Senate hearing.

15       Mike Haas handled the Assembly hearing, so I don't

16       know if they were at that one.

17   Q   And is it your recollection that they testified to

18       the contents, whichever one of these professors

19       testified or two testified to the contents of this

20       letter?

21   A   Well, I think they — what's contained in this letter

22       was probably reflected in their testimony, but I

23       can't speak for sure. But given this is the

24       information they shared with me, I don't know why

25       they would share something less than this with the

241

1        Legislature whom they were trying to persuade.

2    Q   And do you know, was this document made publicly

3        available at the time also?

4    A   I don't know.

5    Q   If this document is on your website now, would it

6        have been on your website around the time you

7        received it?

8    A   Yes. And I mean one of the things that we did even

9        before legislation was openly discussed was following

10       the 2010 election, knowing that voter ID would be an

11       issue internally, we did a lot of research and we

12       shared that research with members of the Legislature,

13       as is mentioned in testimony that you showed me in a

14       prior exhibit.

15   Q   And is this part of the research that you were

16       referring to?

17   A   Well, this probably was added to it. I don't know if

18       this is something we shared specifically with them,

19       but we had developed a packet of information that I

20       describe in that testimony and certainly this is

21       information that our staff would have absorbed in

22       preparing that.

23   Q   And is that information publicly available to you?

24   A   The information we share with the Legislature, yeah.

25       I think we turned it over in discovery.

242

1    Q   Okay.

2    A   I know internally we talked about it. So I'm pretty

3        sure. I mean it's one of the things that — we've

4        tauted throughout this process that we've been trying

5        to be ahead of the game to give the Legislature as

6        much as possible. And again I make reference to it

7        in the testimony that you have as Exhibit 11.

8    Q   Putting aside whether it was provided in discovery or

9        not, do you know if it's available publicly?

10   A   It would be available publicly. I don't know if it's

11       posted on our website. We have a whole — if it's

12       currently posted on our website, but we have a

13       whole — everything we developed on photo ID at one

14       point was throughout the discussion process. You

15       know, I'm not quite sure what the structure is at the

16       moment. Right now I think we focus more on use of

17       the ID than the background of it. But it's certainly

18       a public document that can be obtained.

19   Q   Meaning through a public records request?

20   A   Through a public records request.

21   Q   Let me show you Kennedy 33.

22           (Exhibit 33 is marked for identification)

23   Q   And once you've had a chance to take a look at this,

24       would you let me know if you recognize this document?

25   A   Okay.

243

1    Q   What is this document?

2    A   It's a letter from me addressed to Representative

3        Gary Tauchen, T-a-u-c-h-e-n, who was the chair at the

4        time of the Assembly Committee on Elections, and to

5        the members of that Assembly committee.

6    Q   And in the second paragraph of this letter, you make

7        certain statements about identification requirements

8        for absentee ballots, right?

9    A   Yes.

10   Q   As a result of those statements, were any changes —

11       well, let me take out the as a result part. Were any

12       changes made to the absentee voting rules for

13       identification subsequent to your sending this

14       letter?

15   A   I'm not sure. I know there are some changes that

16       dealt with indefinitely confined voters and voters —

17       I can't remember specifically, but I know — I'm

18       pretty sure there were some changes made.

19   Q   Okay. And your statement applied to the for absentee

20       voting in general, right?

21   A   Yes.

22   Q   And that requirement remained in place, right, with

23       the exception you just mentioned?

24   A   Yes.

25   Q   All right. And going down two paragraphs to the

244

KEVIN KENNEDY

1    middle of the fourth paragraph, you said -- you've
2    suggested that the Legislature consider permitting
3    voters who do not have the required identification to
4    sign an affidavit of identity.  Is that right?
5  A  That's right.
6  Q  And if the Legislature had adopted that idea, a voter
7    without a photo ID, a qualifying photo ID could still
8    cast a ballot by signing an affidavit as to their
9    identity, right?
10 A  That's correct.
11 Q  And that was not included in the final bill, right?
12 A  No.
13 Q  By the way, you testified on multiple occasions
14    regarding the voter ID bill, right?
15 A  I did.
16 Q  And the suggestions you were making for improving the
17    bill were consistent throughout that process, right?
18 A  Yes.
19 Q  And they included the two suggestions we just
20    discussed?
21 A  Yes.
22 Q  In the final paragraph on that page, you discuss,
23    first of all, proposed changes for proof of residence
24    and the use of student identification cards, do you
25    see that?

245

1    the legislation as to how to deal with student ID
2    cards both again as in terms of proof of residence
3    because that also made changes as we talked about to
4    the certified list.
5  Q  Okay.  And so just so I'm clear, the Legislature
6    initially didn't have student IDs as a form of
7    identification that could be used for voting, right?
8  A  In my understanding, neither Assembly Bill 7 in 2011
9    or 2011 Senate Bill 6, which were the two initial
10    pieces of legislation, permitted the use of student
11    ID cards for an acceptable ID.
12 Q  Okay.  And you recommended that student IDs be added,
13    right?
14 A  That was part of my initial testimony and was part of
15    our analysis.
16 Q  And the Legislature did add student identification
17    cards as a form of approved voter identification,
18    right?
19 A  Yes.
20 Q  But the requirements for those identification cards
21    set a standard that was not met by any university in
22    Wisconsin at the time, is that right?
23 A  That was our understanding, yes.
24 Q  And that was also true at the time the legislation
25    was passed, right?

247

1  A  Yes.
2  Q  You wrote that, "They do no facilitate participation
3    by this important segment of voters and offer no
4    practical improvement to the original bill."  What
5    did you mean by that?
6  A  Well, I think in the next sentence it says that, "No
7    student identification card meets the standards
8    proposed in the bill," meaning that it had to have a
9    current address, a date of birth and a signature of
10    the student.
11 Q  Okay.  And the ultimate bill did not require a
12    current address, is that right?
13 A  It did not.
14 Q  Oh, I'm sorry, this is for the --
15 A  This is for student identification, correct.
16 Q  But this is for proof of residence, right -- oh,
17    sorry, I'm conflicting two things.
18 A  Well, the bill dealt with proof of residence and with
19    student identification, so -- and the use of student
20    ID cards in voting the original bill did not have a
21    provision that you could use a student ID card as
22    proof of identification and so there's a reference --
23    I mean there was a reference to various changes that
24    were enacted.
25      This was where there was a lot of tinkering in

246

1  A  That was our understanding from our outreach to
2    colleges and universities.
3  Q  And in this letter you were informing the Legislature
4    that it was highly unlikely that universities and
5    college would adopt the legislative standards because
6    of student security concerns, is that right?  It's
7    the last sentence on the first page.
8  A  That's what I said, yes.
9  Q  Okay.  Now, the next paragraph you were writing that,
10    "The elimination of the use of a list of certified
11    addresses for on-campus students will only serve to
12    deter voter participation by students."  Do you see
13    that?
14 A  Yes.
15 Q  So had the Legislature originally proposed to do away
16    with the dorm list option entirely?
17 A  I don't remember.
18 Q  Ultimately the dorm list option remained, but there
19    was a requirement that citizenship status be
20    certified, right?
21 A  Yes, that's right.
22 Q  And we've discussed that issue already.  And then the
23    final paragraph, you indicate that, "This draft was
24    first available for review late on Friday of last
25    week.  There has been no time for the careful

248

KEVIN KENNEDY                                                    01/14/2016

1  evaluation and vetting needed to ensure the best
2  options for voters and election officials as enacted.
3  There are numerous other provisions in this bill
4  which will significantly alter the administration of
5  elections and put additional stress on an already
6  overburdened system."  Do you see that?
7  A   Yes.
8  Q   Do you know how long after this the committee passed
9      this bill?
10 A   I don't know.  I mean I think they met in the
11     following week.
12 Q   And do you know when --
13 A   I mean again I'd have to go back.  I'm not sure what
14     day May 3rd, 2011 was in reference to the Friday of
15     last week and the time of the hearing, but I know it
16     was moving very quickly and I expressed my concerns
17     about -- in the paragraph about how effective that
18     was for careful consideration of the changes.
19 Q   And the final bill, Act 23, it was passed only a few
20     weeks after this, is that right?
21 A   I don't remember the exact time period.
22 Q   And at other points during the process of enacting
23     Act 23, you had raised concerns about the speed at
24     which the process was going, right?
25 A   I very likely did.

                                                            249

1  Q   I'm going to show you  Kennedy 34 next.
2          (Exhibit 34 is marked for identification)
3  Q   And once you've had a chance to review this, can you
4      tell me what it is?
5  A   Okay.
6  Q   Can you explain what this is?
7  A   Well, it appears to be a string of emails that
8      initiated from an individual at Demos that I worked
9      with on Election Day registration testimony that I've
10     provided in the past alerting us to this -- to a
11     potential advisory referendum that was going to be
12     held in Wauwatosa and then reaching out among staff
13     to see if we could identify exactly what was driving
14     this proposal.
15 Q   All right.  And in your email in response -- well,
16     not a response, a forwarding to staff, this is on the
17     bottom of the second page.
18 A   Yes.
19 Q   You indicated that you needed to get information out
20     that other Wisconsin communities do not have a fraud
21     problem, do you see that?
22 A   Yes.
23 Q   What did you mean by that?
24 A   I mean that a lot of times it was driving questions
25     about providing citizenship as a requirement to vote

                                                            250

1      or providing photo ID was that it was designed to
2      combat fraud, and the idea was that we needed to be
3      prepared to address those issues.
4  Q   Okay.  And when you said other communities, other
5      Wisconsin communities do not have a fraud problem,
6      what did you mean by that?
7  A   I mean that we did not have any evidence that there
8      was a voter fraud problem in general.
9  Q   Let me ask you about a news article.
10         MR. KAUL:  Mark this as Kennedy  35.
11         (Exhibit 35 is marked for identification)
12 Q   And again take as much time as you need, but I'll
13     tell you I'm going to ask you about a portion in
14     which you're quoted near the end of the second page.
15 A   Okay.
16 Q   Now, according to this article, you said you were "at
17     a loss" to explain certain details on obtaining
18     proper ID when asked by attendees at a recent NAACP
19     conference, do you see that?
20 A   Yes.
21 Q   Is that an accurate quote?
22 A   Yes.
23 Q   And this was shortly before the voter ID bill was
24     passed, right?
25 A   That's right.

                                                            251

1  Q   And what did you mean when you said you were at a
2      loss?
3  A   I mean they asked me questions and I couldn't give
4      them answers.
5  Q   And what did those questions pertain to, if you
6      recall?
7  A   How to get a qualifying ID.
8  Q   And -- okay.  Next I've got  Kennedy 36.  This is
9      the single-sided one, and I'm just going to
10     authenticate that document with you.
11         (Exhibit 36 is marked for identification)
12 A   Okay.
13 Q   Is this a copy of testimony that -- written remarks,
14     I should say, that you prepared for the Joint
15     Committee on Review of Administrative Rules?
16 A   Yes.
17 Q   The only content about which I want to ask you is on
18     Page 3, the second paragraph from the bottom, there's
19     a reference to this not being the first time a
20     statute may not mean what the author intended.
21 A   Okay.
22 Q   Do you know what you meant by that?
23 A   Well, I meant that there was quite a bit of
24     discussion about whether or not the technical college
25     system student ID card qualified as a college ID

                                                            252

KEVIN KENNEDY                                    01/14/2016

1   under the statutes, and our initial analysis as a
2   staff which the board adopted was it didn't, and we
3   were looking at statutes we don't administer to
4   evaluate that.
5        And in going back and looking at it again, we
6   recognized that there were different interpretations
7   that could be applied to this, and the board after
8   listening to the impact of its initial decision chose
9   to treat this in a manner which made more sense than
10  the language of the statute, which was a technical
11  college is a college and we're going to treat it as
12  that even if the definition in the statute seems to
13  exclude that.
14 Q  And when you say listening to evidence of the impact
15   of that interpretation, what are you referring to
16   specifically?
17 A  At the board meeting that it reconsidered its initial
18   decision.  There were several, 20, 30-plus
19   individuals who testified why technical college
20   students should be able to use their ID card as an
21   acceptable photo ID, as a college ID.
22 Q  And was it your understanding when you prepared this
23   testimony that the members of the Legislature who had
24   voted for Act 23 did not intend for technical college
25   IDs to be acceptable forms of IDs?

253

1 A  I think there was an argument based on the fact that
2   technical college IDs were specifically allowed in
3   one draft and not in another.
4 Q  Did the members of the Legislature specifically state
5   that they didn't want those forms of ID to be
6   included as an acceptable form of ID under the law?
7 A  Well, the position that they took in these hearings
8   was if you're going to interpret the law, you need to
9   adopt an administrative rule to reflect that
10   interpretation so that we have a chance to review
11   your interpretation.
12 Q  And did you adopt an administrative rule?
13 A  The board has adopted an administrative rule.  We
14   have an emergency rule in place during the various
15   periods of ID.  The permanent rule has passed all of
16   the steps except for publication, which I think is
17   February 1st, and it will be placed permanently on
18   February 1st.
19 Q  And at that point is the Legislature, can it still
20   review the rule?
21 A  No.  Its review process has ended and so it's
22   published and it will be effective.
23 Q  Is there anything that would prevent it from being
24   effective?
25 A  New legislation that would specifically override the

254

1   rule.
2 Q  Okay.  But absent new legislation, technical college
3   IDs will be permissible forms of photo ID?
4 A  Well, they are permissible now because our emergency
5   rule is still in place.
6 Q  Okay.  Are colleges currently permitted to use
7   stickers on their student IDs to make the IDs comply
8   with the voter ID requirements?
9        MR. MURPHY:  Object to form.
10 A  Our position is no.
11 Q  Why is that?
12 A  Because we haven't adopted a rule to reflect that
13   process, and I think it's pretty clear from talking
14   to the Legislature they wouldn't sign off on that
15   rule.
16 Q  Okay.  Who specifically has indicated that to you?
17 A  Well, when the technical college ID rule was going
18   forward, you know, the questions we were getting,
19   well, does this allow stickers because if it does, we
20   can't support it, and that was talking to members of
21   the Joint Committee on Review of Administrative Rules
22   staff.
23 Q  Okay.  And is it your understanding that that was the
24   view of the majority in the Legislature?
25 A  I don't know if it's the view of the majority in the

255

1   Legislature, but it's got to get through the Joint
2   Committee on Review of the Administrative Rules and
3   we're getting inquiries from colleges right now and
4   suggesting that they not go that route because we
5   don't think that that rule would get through.
6 Q  So it's your understanding that that's the view of
7   the majority of the Joint Committee on Administrative
8   Rules?
9 A  Yes.
10 Q  Kennedy 37.
11        (Exhibit 37 is marked for identification)
12 A  Okay.
13 Q  Do you recognize this document?
14 A  I do.
15 Q  What is this?
16 A  It's correspondence from myself to Representative
17   Jeff Fitzgerald.
18 Q  And was Representative Fitzgerald the speaker of the
19   Assembly at this time?
20 A  I think he was.  That's why I'm surprised it says
21   Dear Representative Fitzgerald and not dear speaker,
22   but —
23 Q  I want to ask you about the conclusion on the fifth
24   page.  You wrote, "Speaking frankly on behalf of our
25   agency and local election officials, absent direct

256

1    evidence, I believe continued unsubstantiated
2    allegations of voter fraud tend to unnecessarily
3    undermine the confidence that voters have in election
4    officials and the results of the election." Well, it
5    says that, correct?
6 A  Yes, it does.
7 Q  All right. And then two sentences later, skipping
8    the next sentence is what I mean, you write, "I hope
9    that, as an elected official, you would also agree
10   that there is little benefit in promoting"
11   unsubstantiated — I'm sorry, "unsupported
12   allegations questioning the credibility of the
13   election process and the work of local clerks and
14   election inspectors." Is that right?
15 A That's right.
16 Q And that is your view, correct?
17 A It is.
18 Q And then I'm just going to ask about a few other
19   things quickly and then we'll be all done for today
20   at lease. First I'm going to ask you about the use
21   of electronic records for proof of residence briefly.
22 A Okay.
23 Q In August of 2012, you ruled that electronic records
24   showing an individual's address could be used to
25   prove residence for the purpose of voter

257

1    registration, assuming they met the other proof of
2    residence qualifications?
3 A  The Government Accountability Board adopted that
4    condition, yes.
5 Q  Okay. Thank you for the clarification. That ruling
6    was criticized by certain members of the Legislature,
7    correct?
8 A  Yes.
9 Q  And specifically Senator Lazich?
10 A Yes.
11 Q Did you have any conversations with Senator Lazich
12   about that decision?
13 A Yes.
14 Q And what did she say to you?
15 A I'm not sure exactly. She's not the kind of person
16   that you talk a whole lot of policy with. Sometimes
17   she just has her views and —
18 Q She conveyed them to you?
19 A Conveyed them to me.
20 Q And you saw that she was quoted in our complaint, is
21   that right?
22 A I do. I forgot what she said, but — or what the
23   quote was, but yes.
24 Q Was the quote in the complaint consistent with your
25   understanding of her views based on your conversation

258

1    with her?
2 A  Yes.
3 Q  And have you been — has the GAB been required to
4    issue an administrative rule on this topic?
5 A  No.
6 Q  Do you know how the — or how electronic records have
7    been used in practice by voters and voter
8    registration groups to register voters? That's a
9    very vague question. Let me rephrase it.
10       Do you know which groups of voters have used
11   electronic registration in particular?
12 A You're asking if I have an idea of what the
13   demographics are of the individual voters who might
14   have pulled up an electronic record to show their
15   proof of residence?
16 Q Yes.
17 A I've got reports that it comes primarily — or that
18   people have noticed it a lot at polling places that
19   serve colleges and universities, from observers and
20   poll workers there, but I don't think it's by any
21   means limited to that, but it would make sense that
22   that group, which is not used to dealing with paper
23   and has access to that, would just assume that they
24   could flash their utility bill.
25 Q Okay. You mentioned earlier that until 2006,

259

1    Wisconsin did not require everyone to register to
2    vote, is that right?
3 A  That's right.
4 Q  And specifically voters were required to register
5    only if they lived in cities or municipalities with
6    populations of over 5,000 residents, is that right?
7 A  Municipalities with a population of more than 5,000
8    had to provide voter registration. Those with less
9    than 5,000 had the option of doing it.
10 Q Okay. And that policy ended as a result of the Help
11   America Vote Act?
12 A Of legislation adopted by the State Legislature in
13   response to the Help America Vote Act. The Help
14   America Vote Act didn't have anything to do with it
15   other than it required the statewide voter
16   registration system to be used and it made sense if
17   we were going to have one that everyone should be
18   registered, not just 76 percent of the eligible
19   population.
20 Q Did the GAB have — did the State Elections Board
21   have a position on whether statewide registration was
22   required to comply with the HAVA?
23      MR. MURPHY: Object to form.
24 A The State Elections Board I don't think took a formal
25   position, but in my role as the head of the State

260

KEVIN KENNEDY                                    01/14/2016

1  Elections Board working with the Legislature to
2  implement it, I recommended that we do that.  I said
3  it didn't make sense to try and implement a system
4  where a large number of voters would not be
5  registered.  It would defeat the whole purpose of a
6  statewide voter registration system, and we didn't
7  specifically say that, but I guess the question was
8  did we really want to get into a fight with the
9  federal government over that.
10 Q  Right.  All right.  And am I right that until 2002,
11    no city in Wisconsin provided Spanish language
12    ballots?
13              MR. MURPHY:  Object to the form.
14              Answer to the extent you're able.
15 A  I'm not aware that any Spanish language ballots were
16    provided to voters until Milwaukee was subject to
17    that, which I thought happened in 20 -- after the
18    2012 or before the 2012 election because of the
19    triggering mechanisms if ballots were available in
20    another language, they weren't authorized by state or
21    federal law.  And in inquiries that we had about
22    that, we took the position that an official ballot
23    could not be in any other language unless it was
24    required by law.
25 Q  Okay.  And I'll come back to that in a second.

261

1  Focusing just on Milwaukee first, prior to
2  Milwaukee's change, there was an action brought by
3  the U.S. Justice Department, right?
4  A  Not with respect to language compliance.  I mean
5    there was -- the Section 203 of the Voting Rights Act
6    kicks in based on census findings and we were
7    informed by the U.S. Department of Justice, as was
8    the City of Milwaukee, that they were now going to be
9    subject to the minority language requirements of
10   Section 203 as a result of -- the results of what I
11   thought as I recall was the 2010 census, not the 2000
12   census.  I'm fairly confident that's the case.
13       And the U.S. Department of Justice was
14   monitoring Milwaukee's compliance with that.  I don't
15   know that they filed a formal action, but they
16   certainly were spending an awful lot of time vetting
17   their materials and trying to get -- assure that they
18   were complying.
19 Q  Okay.  So I guess let me rephrase the question then,
20   I guess.  Milwaukee's adoption of Spanish language
21   ballots was in response to activities that the U.S.
22   Justice Department or investigation that the U.S.
23   Justice Department --
24 A  No, they were required, specifically required by law
25   under Section 203 of the Voting Rights Act.  Once the

262

1  census certified a certain threshold of minority
2  voters, and I'd have to go back and look at the
3  criteria that's in the census in that -- and the U.S.
4  Department of Justice is responsible for informing
5  them, so they sent a letter addressed to me as the
6  chief election official and they sent a letter to the
7  City of Milwaukee advising them that they were now
8  subject to those requirements.
9       And when a jurisdiction comes under that, the
10   U.S. Department of Justice spends a lot of time
11   monitoring their compliance to make sure of that, and
12   it took Milwaukee a bit of time to get their act
13   together.
14 Q  Okay.  And in April of 2012, the Justice Department
15   sent special monitors to oversee the conduct of
16   elections in Milwaukee, right?
17 A  That's my recollection, yes.
18 Q  And do you have an understanding as to why that
19   occurred?
20 A  Part of it I'm sure was just normal practice for a
21   new Section 203 jurisdiction.  And part of it I'm
22   sure was a response to the fact that Milwaukee, their
23   perception that Milwaukee might not have been taking
24   this seriously.
25 Q  And do you have a perception as to whether Milwaukee

263

1  was taking it seriously?
2  A  I don't think they were taking it seriously.
3  Q  And why do you have that view?
4  A  Because they kept -- they weren't communicating to
5    their attorneys about their communications with the
6    Department of Justice, for one.  In other words, the
7    Department of Justice would call and talk to them and
8    they wouldn't tell their attorneys about it and we'd
9    only find out and we'd call the city attorneys and
10   say your people are talking to lawyers who are going
11   to sue you, so -- and they kept saying, oh, this is,
12   you know -- and we tried to give them as much help as
13   we could, but we also had a few other things on our
14   plate at that time.
15 Q  You said they kept saying, oh, this is and then you
16   sort of trailed off.  What were they saying it was?
17 A  I'm sorry.  They felt like they had things under
18   control, but they weren't giving any specifics and
19   our emphasis was they needed a very detailed plan and
20   they needed to show progress.
21 Q  Who was the executive director of the Milwaukee
22   Election Commission at that time?
23 A  Sue Edman.
24 Q  So it wasn't Neil Albrecht at that time?
25 A  It was not Neil Albrecht.  Neil had -- he had been

264

1    the deputy director and had left at that time.

2  Q  You mentioned a moment ago that the State Elections

3    Board I think you said had taken a position that the

4    official ballot could only be in English unless

5    otherwise required by law, is that right?

6  A  That's right.

7  Q  And did that -- is that GAB's position also?

8  A  That's -- I don't think the board itself has taken

9    that position and I don't think the prior board did,

10   but in response to questions about can we have a

11   ballot in another language, the answer was not unless

12   there's a specific requirement authorizing it.

13 Q  And what's the basis for that?  Does it --

14 A  I guess the sense is that it's unusual to provide

15   ballots in another language unless there's been a

16   specific requirement to do that, and we didn't see

17   that as something we wanted municipalities to engage

18   in willy-nilly because we weren't sure that they

19   would give the kind of attention that you need to

20   ensure that things were properly translated and it's

21   an expensive undertaking and it seemed like a

22   misallocation of resources for that.

23       We did take the position there's nothing that

24   stops informational materials being put out in

25   another language, and we do that with the voter

265

1    registration form.  When we designed our system in

2    2006, we specifically allowed for access in Spanish

3    and Hmong in the anticipation that at some point they

4    would be required languages.  And a lot of government

5    agencies do put out informational materials, but a

6    ballot is a different kind of document.

7  Q  Okay.  So just so I make sure I'm understanding

8    clearly, so Milwaukee offers ballots that are in both

9    English and Spanish, correct?

10 A  Right.

11 Q  And they're required to by federal law?

12 A  That's right.

13 Q  But am I right that every other municipality in

14   Wisconsin is only permitted to offer ballots in

15   English?

16 A  That would be our advice to them, that's right.

17 Q  And is it your understanding that that's the practice

18   that every other municipality follows?

19 A  That's right.

20 Q  Let me ask you about one more document.  This is

21   Kennedy 38.

22       (Exhibit 38 is marked for identification)

23 A  Okay.

24 Q  Do you recognize this document?

25 A  I do.

266

1  Q  What is this?

2  A  It's an email containing an attachment that was

3    forwarded to our public information officer by

4    Mary Spicuzza, who I think at the time was a

5    Wisconsin State Journal or Cap Times reporter.

6  Q  And do you have an understanding as to why she

7    forwarded this to you without comment?  To you, I

8    mean to the GAB.

9  A  To Reid.

10 Q  Yes.

11 A  It may be that she -- I don't know why.  I mean there

12   may have been some discussions offline about were we

13   aware of this and Reid's practice would have been I

14   don't know, show me.  Because she obviously had

15   gotten -- the document that's attached is a press

16   release from One Wisconsin Now.

17 Q  All right.  And it's a press release regarding

18   alleged voter caging coordination, is that right?

19 A  Right.  Voter suppression including caging.

20 Q  And Mr. Magney's email said we need to discuss this,

21   do you see that?

22 A  Yes.

23 Q  Did you participate in discussions regarding this?

24 A  We did.

25 Q  And what action, if any, did you take?

267

1  A  I don't recall that we took any specific action

2    because we generally don't act on press releases, but

3    that doesn't mean we don't read them and talk about

4    what may come from them.

5  Q  And did you review the recording or video, I forgot

6    which, referred to in the press release?

7  A  I believe I did.  I don't specifically recall, but it

8    sounds like something that I would have been paying

9    attention to.

10 Q  And with allegations of this sort, does the GAB --

11   well, first of all, does the GAB have authority to

12   investigate these sorts of actions?

13 A  We can investigate, but the most we can do is refer

14   to a district attorney to take any action.  And the

15   general policy is we don't investigate unless we have

16   a sworn complaint alleging a specific violation of

17   the law.

18 Q  Okay.  So to the best of your recollection, there was

19   no investigation regarding this incident?

20 A  I don't recall one.

21       MR. KAUL:  Let's go off the record for

22     just a moment.

23       THE VIDEOGRAPHER:  Off the record at

24     6:01.

25       (Short recess is taken)

268

KEVIN KENNEDY                                                01/14/2016

```
 1            THE VIDEOGRAPHER:  We are back on the
 2      record at 6:14.
 3 Q    Director Kennedy, there's one last topic I just want
 4      to ask you about.  The GAB sometimes receives reports
 5      from groups that do election observing, correct?
 6 A    Yes.
 7 Q    And that includes the League of Women Voters, is that
 8      right?
 9 A    Yes.
10 Q    And a group called Wisconsin Election Protection, is
11      that right?
12 A    Yes.
13 Q    What, if anything, does your agency do with those
14      reports when you receive them?
15 A    We read those reports.  We try to figure out if
16      there's any trends in there that we might need to
17      focus our training on.  And I mean that's really the
18      primary use.  We don't necessarily use that to
19      trigger further follow-up on those.  You know,
20      probably — it usually has to be a pretty egregious
21      set of issues before we do some specific follow-up.
22          Racine's June 20th recount — recall and recount
23      was one good example of that as you saw from the
24      exhibits that were done, but generally we're reading
25      the reports to see where there might be performance
                                                        269
```

```
 1 comments being made, it gave us more information
 2 about where we thought there were issues.  So I think
 3 there was an inherent assumption of trusting them,
 4 but it had more to do with the fact that we've had
 5 regular dealings with both of those groups in terms
 6 of their training and work and we've seen them in the
 7 field doing our own observations.
 8            MR. KAUL:  I think that's all I have
 9      for you.  My understanding, Mr. Murphy, is that
10      you don't have any questions today, is that
11      right?
12            MR. MURPHY:  No redirect, that's
13      correct.
14            MR. KAUL:  Okay.  We can go off the
15      record then.
16            THE VIDEOGRAPHER:  The time is 6:17.
17      We are going off the record.  This concludes
18      Media No. 4 in the deposition of
19      Mr. Kevin J. Kennedy take January 14th, 2016.
20              (6:17 p.m.)
21
22
23
24
25
                                                        271
```

```
 1      issues.  It might direct us to do some more training
 2      in a particular location, but it's also trying to get
 3      an understanding of what causes confusion for voters
 4      and poll workers so that we can address our advice to
 5      clerks and our training materials and things like
 6      that.
 7 Q    When those reports raise issues about the
 8      administration of elections, do you do any follow-up
 9      with the administrators at the relevant — in the
10      relevant municipalities or polls?
11 A    Well, I can't recall if those reports have done it.
12      I mean there have been matters that have been brought
13      to our attention where we will reach out to the clerk
14      to ask if they understand some things or if they need
15      assistance or where we think that they clearly are
16      going off on the wrong path.  So I think those
17      reports might be one of those catalysts, but there's
18      been other reasons why we've done that.
19 Q    Focusing just on the reports prepared by those two
20      groups, the League of Women Voters and Wisconsin
21      Election Protection, have you found the contents of
22      those reports to be reliable?
23            MR. MURPHY:  Object to form.
24 A    I don't think we've evaluated them in terms of
25      reliability.  To us, if we saw the same kind of
                                                        270
```

ERRATA SHEET

```
 1                        ERRATA SHEET
 2 Witness Name:  Kevin J. Kennedy
 3 Date Taken:  January 14, 2016
 4 Case Name:   One Wisconsin Now Institute v. Gerald Nichol
 5 Page/Line      Reads        Should Read          Reason
 6 _____
 7 _____
 8 _____
 9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25            _____
                            Kevin J. Kennedy
                                                        272
```

KEVIN KENNEDY

**273**

```
 1   STATE OF WISCONSIN  )
 2                        )  ss.
     COUNTY OF DANE       )
 3

 4

 5        I, LISA A. CREERON, a Registered Professional
 6   Reporter and Notary Public in and for the State of
 7   Wisconsin, do hereby certify that the foregoing is a
 8   true record of the deposition of KEVIN J. KENNEDY, who was
 9   first duly sworn by me; having been taken on the 14th day
10   of January, 2016, at the Wisconsin Department of Justice,
11   17 West Main Street, in the City of Madison, County of
12   Dane, and State of Wisconsin, in my presence, and reduced
13   to writing in accordance with my stenographic notes made
14   at said time and place.
15        I further certify that I am not a relative
16   or employee or attorney or counsel for any of the
17   parties, or a relative or employee of such attorney
18   or counsel, or financially interested in said action.
19        In witness whereof, I have hereunto set my hand
20   and affixed my seal of office this 17th day of January,
21   2016.
22
23                          _____
                            Notary Public, State of Wisconsin
24                          My Commission Expires:  1/29/17
25
```

---

*[The following are index pages 274, 275, and 276, consisting of dense columnar word and line-number indexes. The content is reproduced below as legibly as possible.]*

**274**

&lt;Dates&gt;
1-23-14 4:10.
1-4-11 5:15.
1/29/17 273:27.
10-22-12 4:22.
10-23-12 4:28.
10-28-14 3:38.
10-9-13 3:28.
11-1-12 4:14.
11-15-11 5:27.
11-5-12 4:25.
12-10-12 3:14.
2-15-13 3:32,
   3:35.
4-11-14 3:18.
4-2-14 4:34.
4-27-11 3:44.
5-14-14 4:41.
5-23-12 4:5.
5-3-11 5:18.
7-13-12 5:30.
7-16-09 5:22.
7-22-11 5:12.
8-16-11 5:8.
8-23-13 3:47.
9-20-10 5:33.
9-30-11 5:5.
9-8-10 4:38.
April 1st, 1979
April 2014 30:9.
April 27th, 2011
   118:10.
August 17th, 1983
   9:15.
August 2012
   164:4.
August 2014
   30:10.
February 1st
   254:17.
January 14, 2016
   1:21, 272:3.
January 14th, 2016
   6:13, 271:19.
January, 2011
   3:41.
January, 2016 29,
   273:12.

January, 2016.
   273:22.
July 2012 4:19.
July 2014
June 5th 166:21,
   167:9.
May 3rd, 2011
   249:14.
November 1st, 2012
   161:3.
November 2008
   51:24, 52:22,
   69:10.
November 2016
   32:2.
November 2nd
   175:5.
November 5, 2012
   173:14.
November 5th
   104.
November 5th, 2007
   10:14.
October 2012
   179:5.
October 25, 2012
   100:6.
October 26, 2012
   44:17.
"44:28:8.
   (1:12 141:8.
   (6:17 271:20.
   -in 236:11.
   -vs- 1:11.

&lt;1&gt;.
1 3:12, 6:3, 22:20,
   69:2.
1,850 71:14.
1,851 71:15.
1,853 17:3, 31:3,
   1, 22:19.
10 3:40, 12:7, 15:4,
   16:2, 32:2, 28:5,
   111:19, 185:18,
   188:16, 206:12,
   206:13, 206:24,
   207:18.

10-22 4:28.
10-26-12 3:20.
10-8-12 4:30.
10 111:18.
10:04 12:14.
10:50 72:20.
11 3:43, 117:22,
   243:7.
11-25-11 4:45.
11. 117:21,
   118:14.
11th 133:20.
111 3:40.
117 3:43.
11:05 72:24.
11th 133:13.
12 3:46, 75:15,
   75:18, 76:22,
   98:25, 136:19,
   159:20, 185:4,
   185:11, 188:13,
   188:17.
12-day 79:5,
   79:24.
12-foot 162:18,
   186:24.
12. 136:18.
12:17. 117:16.
12:29 117:19.
13 4:4, 78:23,
   139:23.
13. 139:22.
136 3:46.
139 4:4.
14 4:7, 53:14,
   145:21.
14. 145:20.
145 4:7.
14th 2:9, 273:11.
15 4:3, 45:15,
   151:11.
15-CV-324 6:9.
15-cv-324-bbc
   1:11.
15. 151:10.
151 4:9.
16-4:12, 129:5,
   160:1, 160:10.
16. 160:9.
160 4:12.
162 4:16.

164 4:18.
169 4:21.
17 2:7, 2:23, 4:16,
   6:12, 129:6,
   182:2, 273:13.
17. 162:22.
173 4:24.
176 4:27.
176 273:22.
18 4:18, 77:7,
   128:23, 128:24,
   129:12, 129:13,
   129:20, 129:24,
   164:11, 204:6,
   204:13.
18-year-old
   128:5.
18. 57:16,
   164:10.
180 4:32.
182 4:36.
1848 25:12.
19-4:21, 63:7, 66:8,
   168:20.
19. 169:19.
1955 63:11.
1970s 128:4.
1974 11:23.
1980s 55:1.
1982 9:13.
1983 9:19.
1:12 141:3.

&lt;2&gt;.
2 3:16, 29:8, 72:25,
   85:20, 141:5,
   164:15.
2-14 3:31.
2. 29:7.
20 4:24, 57:25,
   58:14, 59:3, 59:4,
   132:2, 141:20,
   142:2, 142:16,
   143:13, 154:24,
   155:4, 155:5,
   173:9, 188:22,

**275**

253:18,
261:17.
20-day 59:24,
   115:7.
20. 46:7, 173:8.
2000 41:9, 157:20,
   158:5, 282:11.
2002 73:21,
   160:10.
2003 12:12.
2004 41:5, 157:20,
   158:5.
2005 10:22, 17:12,
   73:9, 73:22,
   114:14, 115:11,
   115:14, 143:9,
   159:8, 187:7,
   250:23, 266:2.
2007 9:22, 9:24,
   10:4, 12:12.
2008 10:3, 10:13,
   14:19, 14:23,
   36:17, 36:18,
   38:16, 41:6, 46:15,
   49:4, 49:20, 49:23,
   54:22, 55:24,
   55:24, 69:17,
   70:21, 70:22, 71:2,
   114:14, 162:11,
   204:7.
2009. 54:20,
   157:20.
2010 14:13, 14:14,
   15:11, 114:14,
   115:14, 115:23,
   173:7, 242:10,
   262:11.
2011 4:43, 22:11,
   28:11, 27:13,
   28:18, 28:23,
   75:13, 121:24,
   122:22, 127:5,
   127:16, 135:13,
   135:21, 173:7,
   189:1, 191:23,
   194:11, 206:7,
   212:4, 214:21,
   219:23, 223:1,
   233:17, 235:5,

235:7, 236:7,
247:8, 247:9,
2011. 22:11,
   28:17.
2012 23:10, 25:10,
   36:18, 38:16,
   44:20, 46:15,
   49:25, 69:17, 83:9,
   85:24, 158:13,
   159:15, 168:6,
   170:7, 175:2,
   177:24, 178:19,
   187:13, 210:5,
   212:5, 214:22,
   219:6, 233:17,
   235:5, 235:7,
   257:23, 261:18,
   266:2.
2012. 234:23,
   262:19, 262:19,
2013 26:8, 80:11,
   84:7, 86:9, 89:20,
   94:1, 130:10,
   141:17, 143:10,
   184:17.
2013-14 204:6.
2014 34:5, 35:21,
   48:5, 69:18, 69:20,
   93:6, 149:13,
   262:21.
2015 211:25, 212:5,
   212:6.
2016 31:25, 32:10,
   32:14, 33:10,
   213:6, 217:14,
   218:23, 231:8,
   263:9.
20th 269:22.
21 4:27, 55:1,
   176:20,
   176:22.
215 4:43.
219 4:45.
22 1:79:1,
   223:4:47.
226 5:4.

228 5:7.
23 4:32, 118:16,
   180:19, 230:1,
   238:11, 249:19,
   249:23,
   253:24,
23. 180:18.
235 5:10.
24 4:36, 68:4, 68:7,
   182:7.
24. 67:1, 182:2.
240 5:14.
243 5:17.
25 4:40, 38:14,
   201:13,
   202:23.
25. 203:4.
250 5:20.
251 5:24.
252 5:26.
255 5:29.
26 4:43, 215:8.
266 5:32.
27 4:45, 219:20.
27. 219:19.
28 4:47, 130:21,
   206:12, 206:13,
   207:21, 210:2,
   210:7, 223:11.
28. 223:10.
29 3:16, 5:4,
   226:17.
29. 226:16.
208 141:8,
   141:10.

&lt;3&gt;.
3 3:20, 43:5, 141:11,
   183:7, 202:21,
   252:18.
3. 43:4.
30 5:7, 54:8, 54:18,
   54:24, 57:25,
   58:13, 59:24,
   75:14, 75:18,
   76:22, 98:25,
   100:23, 229:1.
30-day 79:23.
30-plus 47:17,

253:18.
30. 228:25.
30th 31:25.
31 5:10, 235:22.
31. 235:19.
32 5:14, 240:12.
32. 240:9.
321 183:2.
33 5:17, 243:22.
33. 243:21.
34 5:20, 250:1,
   250:2.
35 5:24, 251:11.
35. 251:10.
36 5:26, 252:11.
36,000 85:23.
36. 252:8.
37 5:29, 256:11.
37. 256:10.
38 5:32, 266:22.
38. 266:21.
389 134:21.
3:49. 202:19.

&lt;4&gt;.
4 3:22, 48:20, 66:11,
   203:1, 271:18.
4-1 4:33.
4. 48:19.
40s 287:7.
40 3:20.
44 63:16.
45 197:9.
45-day 198:9.
459 151:17.
47 197:7, 197:10,
   197:13.
48 3:22, 54:20.
4:12 202:24.

&lt;5&gt;.
5 3:25, 63:9, 66:22,
   83:4, 94:7.
5-18-11 5:24.
5. 83:3.
50 11:5.

**276**

50s 23:27.
53703 2:17, 224:.

&lt;6&gt;.
6 3:27, 84:15, 94:7,
   159:20, 162:18,
   185:4, 185:11,
   186:24, 188:13,
   247:9.
6. 84:14.
60 167:23.
60,000 51:22,
   52:6.
600 2:16.
62 31:3.
6:01 268:24.
6:14 269:2.
6:17. 271:16.

&lt;7&gt;.
7 3:5, 3:30, 80:22,
   82:8, 86:19, 87:15,
   90:6, 98:8, 215:25,
   247:9.
7-15 5:21.
7-2-14 4:7.
7-30-14 3:25.
7-31-12 4:16.
7. 50:5.
70s 128:4,
   128:11.
76 260:18.

&lt;8&gt;.
8 3:34, 68:18, 80:21,
   86:20, 86:22,
   87:15, 94:13,
   185:11.
8. 69:3, 94:12.
80s 157:12.
80 3:25.
84 3:27.

&lt;9&gt;.
9 3:37, 99:18.
9-29 5:5.

9-7 4:37.
9-7-11 4:47.
9. 99:17.
90 3:30.
90s 157:12.
94 3:34.
94. 178:17.
99 3:37.
9:14 1:22, 2:10.
9:15 6:13.

&lt;A&gt;.
A-r-c-i-s 174:22.
A. 1:24, 2:5, 3:40,
   5:11, 67:10,
   273:7.
a.m. 1:22, 2:10, 8:14,
   72:24, 80:21,
   86:19.
AARP 212:15,
   234:23.
abilities 188:4.
ability 40:10, 67:5,
   67:6, 76:6, 94:10,
   98:23, 195:21,
   able 11:22, 12:20,
   27:7, 31:8, 62:12,
   66:14, 79:9,
   108:16, 109:7,
   110:25, 129:9,
   132:3, 134:5,
   152:20, 189:13,
   194:17, 196:1,
   204:17, 204:20,
   206:2, 208:7,
   208:23, 227:23,
   253:20,
   261:14.
above 7:3.
above-entitled
   185:11.
abreast 91:16.
80s 157:12.
80 3:25.
84 3:27.
absent 160:17,
   158:17, 255:2,
   256:25.
Absolutely 29:23,
   155:1.
absorbed

242:21,
acceptable 116:8,
   247:11, 253:21,
   253:25, 254:6.
accepted 127:19.
access 65:6, 65:19,
   153:23, 235:13,
   259:23, 266:2.
accessibility 62:11,
   62:17, 69:25, 70:3,
   188:18.
accidentally
   150:20.
accommodate
   63:25, 64:19, 97:2,
   87:12.
accommodated
   64:25.
accommodation
   188:18.
accomplished
   219:11.
accordance
   273:15.
accorded 63:10.
According 16:8,
   68:10, 251:16.
account 62:1, 62:3,
   67:16, 67:20,
   234:22, 263:12.
Accountability 10:1,
   106, 10:7, 111:7,
   11:19, 122:1, 133:1,
   133:11, 232:2, 28:11,
   49:1, 90:22, 94:23,
   191:3, 223:16.
accounts 201:17,
   161:14.
accuracy 27:23.
accurate 25:23,
   28:10, 31:16,
   47:10, 47:13, 52:6,
   53:5, 53:9, 53:11,
   55:11, 56:2, 58:3,
   56:6, 63:19, 67:6,
   67:19, 84:23,
   85:13, 107:13,

110:22, 114:10,
118:7, 128:16,
133:6, 140:17,
142:11, 146:13,
146:14, 148:7,
146:19, 148:22,
148:21, 148:22,
184:5, 204:12,
220:10,
accurately 35:8,
   70:20, 100:9,
   104:13, 212:9,
   224:11, 221:16.
acknowledge
   108:25.
acquisition 179.
acronym 181:6.
across 243:15.
Act 17:13, 73:21,
   118:16, 137:22,
   136:9, 143:8,
   166:9, 193:17,
   211:23, 213:25,
   214:8, 230:1,
   238:11, 249:19,
   249:23, 253:24,
   260:11, 260:13,
   260:14, 262:5,
   263:22, 263:12,
   266:2.
acted 204:7.
acting 9:13,
   167:21.
action 2:2, 33:21,
   90:1, 262:2,
   262:15, 267:25,
   268:1, 268:14,
   273:20.
actions 106:12,
   268:12.
activated 155:11.
activating
   154:18.
active 129:11,
   159:13.
actively 129:1,
   129:7, 201:20.
activities 77:9,
   150:3, 186:15,

218:21,
222:21.
**activity** 181:25,
219:10.
**actual** 66:5, 136:5,
181:13.
**Actually** 22:18,
27:21, 29:3, 35:21,
36:17, 38:18, 44:3,
74:6, 79:1, 84:16,
90:12, 98:5,
105:24, 106:1,
116:7, 116:14,
117:13, 139:12,
145:15, 158:10,
165:11, 181:1,
187:6, 199:6,
200:7, 203:4,
206:20, 211:9,
212:22, 222:8,
222:22, 224:23,
226:8.
**adapt** 40:18.
**add** 247:16.
**added** 149:6, 230:6,
238:12, 242:17,
247:12.
**adding** 229:9.
**addition** 31:18, 60:2,
159:9, 226:5.
**additional** 62:3,
69:6, 69:24,
213:16, 218:17,
230:3, 231:3,
234:1, 249:5.
**address** 96:10,
105:8, 105:10,
109:25, 121:3,
142:15, 186:17,
208:24, 211:10,
211:11, 229:17,
233:3, 246:9,
248:12, 251:3,
257:24, 270:4.
**addressed** 24:5,
50:16, 95:22,
107:18, 108:12,
238:14, 236:15,
237:4, 244:2,
263:5.

addresses 171:7,
171:12,
248:11.
**adds** 232:5.
**adjoining** 126:25.
**adjust** 82:11.
**adjustments**
78:6.
**administer** 17:2,
253:3.
**administered** 32:8,
41:15, 67:14.
**Administration** 9:8,
9:12, 10:20, 14:15,
15:6, 21:4, 25:12,
33:10, 37:1, 39:22,
62:4, 73:20, 76:16,
**administrator** 16:21,
23:8, 91:23,
**administrators** 26:5,
28:24, 30:11,
52:21, 52:24,
270:9.
**adopt** 27:14, 248:5,
254:9, 254:12,
**adopted** 28:12,
68:16, 143:8,
245:6, 253:2,

254:13, 255:12,
258:3, 260:12.
**adoption** 282:20.
**advance** 47:24,
**advantage** 47:24,
43:15, 132:6.
**advantages**
40:15.
**advertising** 213:14,
214:8, 214:18,
215:1, 218:20,
**advice** 101:23,
102:2, 102:7,
102:12, 102:22,
266:16, 270:4,
**advising** 253:7.
**advisory** 250:11.
**advocate** 33:20.
**advocating**
28:15.
**Affairs** 151:14.
**affidavit** 245:4,
245:8.
**affixed** 273:22.
**African-american**
46:17, 88:8, 88:15,
89:2, 89:3,
235:9.
**African-americans**
233:21,
234:12.
**afternoon** 81:11,
**age** 27:25, 128:23,
167:23,
**agencies** 11:19,
12:18, 214:25,
266:5.
**agency** 9:8, 9:25,
12:2, 23:9, 24:14,
30:7, 32:17, 32:19,
32:20, 33:22,
35:13, 43:15,
172:6, 172:7,
179:13, 186:24,
212:2, 234:9,
234:13, 240:8
256:25,
269:13.
**agency-wide**

20:8.
**aggressive** 157:14,
157:16, 160:25,
161:19, 161:20,
172:18.
**ago** 7:17, 20:4,
21:15, 29:14,
72:11, 73:2, 126:3,
154:2, 198:25,
265:2.
**agree** 28:12, 41:17,
56:23, 129:13,
138:21, 140:16,
225:14, 257:9.
**agreed** 101:6.
**agreement**
187:5.
**ahead** 47:4, 111:9,
143:1, 224:11,
243:5.
**aid** 246:23.
**al** 1:7, 1:13, 6:6,
6:10.
**Albion** 180:2, 180:8,
180:9.
**Alfred H** 4:25,
171:19, 171:22,
173:12, 174:1,
177:2, 177:4,
264:24,
264:25.
**alerting** 250:10.
**allegations** 105:23,
257:2, 257:12,
268:10.
**alleged** 109:1,
257:18.
**allegedly** 108:9.
**alleging** 268:16.
**allocated** 213:24.
**allotted** 86:14.
**allow** 59:25, 97:20,
127:14, 134:25,
157:5, 157:7,
195:21, 195:24,
207:4, 255:19.
**allowable** 86:10.
**allowed** 80:14,
156:15, 205:9,
254:2, 266:2.

45:8, 46:20.
**articulated** 106:11,
**Aside** 26:10, 31:18,
193:12, 195:14,
218:20, 232:7,
243:8.
**asks** 53:19.
**aspect** 27:1,
211:16.
**aspects** 26:22,
233:1.
**Assembly** 50:21,
119:9, 118:18,
134:21, 241:15,
**Assemblies**
25:1:18.
**attending**
129:15.
**attention** 18:12,
21:19, 30:19, 49:8,
49:18, 53:14,
53:21, 57:16,
82:22, 66:7, 67:1,
67:10, 68:18, 69:2,
70:18, 79:21,
88:22, 100:21,
101:12, 108:24,
110:13, 114:5,
116:17, 137:16,
145:13, 148:9,
150:15, 166:14,
173:1, 179:15,
183:1, 265:19,
268:9, 270:13,
**Attorney** 3:5, 3:7,
5:35, 7:22, 101:20,
106:25, 107:2,
107:8, 107:16,
107:24, 108:10,
110:12, 147:15,
183:19, 268:14,
273:18,
273:19.
**Attorneys** 2:15,
2:21, 106:8, 264:5,
264:8, 264:9.
**audience** 93:19,
236:17.
**August** 93:6, 168:6,
198:2, 198:8,

257:23.
**authenticate**
212:9.
**author** 103:16,
219:22.
**authority** 17:14,
69:23, 121:24,
122:5, 122:24,
123:8, 123:14,
268:11.
**authorized** 122:12,
124:3, 134:20,
163:13, 172:19,
217:24, 217:25,
261:20.
**authorizing**
265:12.
**automatic** 21:12,
43:4.
**avail** 145:8.
**availability**
213:8.
**available** 54:11,
54:18, 54:24, 56:2,
56:22, 63:3, 74:11,
76:8, 78:23, 197:2,
201:9, 205:22,
213:5, 219:4,
242:3, 242:23,
243:9, 243:10,
248:24,
261:19.
**avenue** 126:7.
**average** 167:23,
**award** 21:22, 243:25,
34:2, 42:5, 42:8,
60:25, 75:8, 97:3,
99:12, 105:21,
105:23, 133:5,
177:22, 181:16,
202:9, 220:24,
231:19, 236:16,
238:17, 236:22,
261:15,
267:3.
**away** 65:5, 65:18,
149:2, 185:18,
186:4, 186:8,
188:14, 188:16,
188:17, 197:24,

222:21,
248:15.
**awful** 262:16.

**< B >.**
**B.** 4:24, 5:14.
**backed** 21:5,
159:7.
**background** 8:24,
90:9, 109:1,
243:17.
**backlog** 231:14.
**bad** 30:8.
**balanced** 63:23,
64:18, 186:13.
**balancing** 62:5.
**balloting** 60:23.
**bank** 121:19.
**Baraboo** 96:13.
**barrier** 70:9.
**Barry** 15:7.
**base** 63:23.
**Based** 26:15, 33:7,
35:6, 41:17, 46:16,
61:14, 71:12, 75:7,
75:22, 80:1, 82:12,
85:5, 116:15,
120:2, 131:13,
132:6, 149:2,
182:16, 184:22,
184:15, 194:25,
194:5, 196:8,
202:6, 205:7,
212:10, 212:17,
215:16, 239:4,
241:7, 254:1,
258:25, 262:6,
base 16:23, 62:7,
215:20,
215:21.
**Basically** 50:7,
123:19, 144:1.
**basis** 52:8, 59:18,
122:24, 126:22,
154:15,
265:13.
**Bay** 60:13.
**bear** 76:18.
**became** 9:15, 99:12,
118:16.

**allowing** 78:20,
87:11.
**allows** 153:25,
195:2.
**almost** 181:20.
**already** 108:12,
125:23, 128:19,
131:8, 142:25,
143:2, 149:23,
155:19, 156:8,
211:17, 211:20,
219:17, 229:24,
248:22, 249:5.
**alter** 249:4.
**Although** 10:10,
20:9, 50:12, 66:13,
95:23, 146:17,
158:11, 174:8,
211:23.
**amended** 104:2.
**America** 17:13,
73:21, 143:8,
190:17, 260:11,
260:13,
260:14.
**American** 14:9,
among 15:21, 42:1,
96:3, 99:21,
111:22, 112:1,
114:12, 130:11,
182:9, 227:3,
229:3, 250:12.
**amongst** 18:22,
21:21, 91:2,
228:20, 236:3.
**amount** 79:20,
104:20, 144:10,
217:10,
237:16.
**analysis** 49:16,
234:9, 247:15,
233:1.
**analyze** 17:17,
208:20.
**analyzed** 14:18.
**analyzing** 14:15.
**anecdotal** 80:1,
80:2.
**angry** 237:18.
**Ann** 113:6, 113:7,

181:16,
181:19.
**announced**
159:21.
**announcements**
212:12.
**Answer** 8:6, 8:16,
11:22, 12:20,
13:15, 30:14,
37:24, 39:14,
49:25, 69:6, 74:25,
75:5, 78:17, 96:22,
122:17, 240:6,
261:14,
265:11.
**answering**
238:25.
**answers** 119:7,
165:15, 252:4.
**anticipated**
138:18.
**anticipation** 117:10,
266:3.
**anybody** 23:21,
108:8, 199:7,
201:17.
**anyway** 76:11,
106:20.
**AP** 4:30, 5:24,
179:5.
**apologize** 79:4,
84:22, 113:1,
170:2, 240:4.
**apparent** 161:9.
**apparently** 95:3.
**appear** 118:7,
146:22, 181:20,
203:9, 219:22.
**appeared** 119:19,
241:13,
241:14.
**appearing** 2:17,
2:24, 7:9.
**appears** 7:11, 68:15,
83:6, 98:12,
119:14, 120:4,
129:2, 179:4,
237:21, 250:7,

**Appendix** 67:10,
67:22, 68:19,
70:18.
**application** 154:1,
155:23,
171:16,
**applications** 53:1,
97:1, 127:18,
130:7, 131:7,
146:22, 180:1,
180:5, 180:12.
**applied** 184:25,
244:19, 263:7.
**applies** 20:25,
144:20, 195:7.
**apply** 61:20, 99:3,
103:5, 144:18,
165:24, 182:1,
122:18.
**appointed** 9:1, 9:13,
122:23, 124:11,
127:6, 127:10,
153:5, 153:6.
**argument** 209:17,
254:1.
**arguments** 81:2,
119:21.
**armed** 190:22.
**around** 11:2, 11:15,
15:11, 38:14,
44:15, 45:20, 48:7,
107:20, 122:11,
176:15, 178:20,
179:17, 210:3,
210:7, 210:8,
236:8, 239:3,
251:9, 251:16.
**articles** 18:1, 21:21,

151:22.
**become** 11:14,
60:21, 66:23,
129:14, 162:8,
177:22.
**becomes** 73:5,
225:3.
**best** 11:12, 14:9,
15:25, 27:6, 39:21,
36:13, 52:6, 92:10,
53:9, 59:6, 67:5,
70:16, 71:17,
82:12, 85:2, 96:8,
100:19, 112:20,
128:7, 129:17,
132:25, 168:15,
185:18, 213:4,
228:20, 240:1,
269:18.
**belated** 140:20.
**belief** 71:20,
**believe** 25:23, 25:24,
31:17, 32:1, 54:10,
67:9, 71:9, 75:19,
93:6, 123:13,
136:17, 142:4,
153:13, 171:14,
171:22, 177:20,
230:10, 191:17,
234:7, 257:1,
268:7.
**believed** 114:10.
**believes** 106:21.
**belonged** 135:5.
**below** 95:19,
138:11.
**benefit** 37:15, 37:20,

37:25, 38:3,
202:15, 202:20,
257:10.
**benefits** 36:25,
37:3.
**besides** 77:5,
225:3.
**best** 11:12, 14:9,
15:25, 27:6, 39:21,
36:13, 52:6, 92:10,
53:9, 59:6, 67:5,
**better** 24:13, 40:10,
40:23, 47:5, 52:16,
87:17, 93:8,
167:24, 194:24,
217:23, 230:22,
231:17.
**beyond** 94:4.
**Big** 15:4, 15:15,
56:18, 62:17,
114:6, 158:5,
210:19.
**bigger** 112:19,
186:3.
**Bill** 19:24, 80:24,
103:17, 104:4,
104:6, 118:15,
130:11, 134:23,
139:22, 151:17,
151:21, 151:24,
216:5, 245:11,
245:14, 245:17,
246:8, 246:11,
246:18, 246:20,
247:8, 247:9,
249:3, 249:13,
249:19, 251:23,
259:24,
**bill.** 246:4.

**billboards** 177:23,
178:3, 178:6,
178:12.
**bills** 22:8, 34:6,
103:14, 118:18,
121:20, 204:16,
223:3.
**bipartisan** 12:4,
73:23.
**birth** 246:9.
**birthday** 21:10.
**bit** 8:23, 16:11,
53:13, 92:9, 166:2,
186:23, 222:23,
263:12.
**blank** 190:10.
**blessing** 28:11.
**blocks** 172:15,
**blog** 180:22.
**Bob** 199:4.
**body** 18:15, 18:18,
18:19, 53:7.
**boiled** 230:9.
**boisterous**
169:17.
**book** 163:24,
163:25, 230:3,
237:19.
**boss** 172:10.
**bottom** 33:15,
140:10, 183:2,
216:1, 216:2,
258:4, 250:17.
**bought** 174:10,
252:18.
**box** 139:13.
**break** 8:2, 8:3, 8:7,
48:16, 72:18,
139:21, 141:1,
202:17, 202:18,
216:5, 245:11,
**breakdowns**
246:9.
**breaks** 181:23.
**brief** 72:16,
**briefly** 7:27,
257:21.
**bring** 18:12, 76:17,
78:19.

37:25, 38:3,
**bringing** 24:7.
**broad** 228:15.
**broader** 170:17.
**brochures** 212:9.
**brought** 102:21,
106:23, 110:13,
150:14, 159:10,
262:2, 270:12.
**Brown** 237:22.
**bud** 103:25.
**budget** 213:25,
218:18.
**Bulger** 3:37, 5:4,
5:8.
**building** 57:13,
57:14, 62:20.
**built** 110:18, 191:1,
235:4.
**Bullet** 66:22.
**Burden** 5:14, 15:7,
42:1, 56:19, 64:9,
64:13, 80:6,
217:4.
**burdens** 225:15.
**Bureau** 223:17,
234:19, 244:21,
225:6.
**business** 10:3,
20:20, 28:7,
45:3.

**< C >.**
**C-e-n-n-y** 174:22.
**C.** 1:13, 6:6.
**caging** 237:18,
267:19.
**calculate** 129:22.
**California**
174:10.
**call** 56:21, 59:4,
91:1, 92:7, 98:15,
113:3, 123:2,
183:14, 224:21,
225:5, 264:7,
264:9.
**called** 7:1, 14:9,
45:1, 57:21, 58:7,
269:10.

calls 19:4, 75:4,
99:21, 99:4, 102:9,
110:7, 140:21,
171:2.
calm 163:9.
Campaign 9:4,
11:24, 12:2, 13:6,
35:5, 118:10,
172:7, 172:9,
182:11, 184:2,
219:2.
Campbell 2:27, 6:14,
6:15.
campus 137:18,
151:4.
campuses 137:5,
228:18.
candidate 12:14,
46:17, 88:20,
157:8, 197:24.
candidates 157:3,
165:1, 193:24,
194:23, 194:24,
195:22, 196:2,
196:12, 196:14,
197:13.
canvass 113:13.
Cap 267:5.
capacity 7:9, 7:12,
7:13, 190:22.
card 139:3, 236:5,
246:7, 246:21,
252:25,
253:20.
cards 227:13,
245:24, 246:20,
247:2, 247:11,
247:17,
247:20.
care 99:22, 104:7,
150:19, 224:7.
career 9:3, 9:16.
careful 166:3,
246:25,
249:18.
carefully 58:11,
194:7.
carried 35:13.
carry 151:4.
carrying 18:24.

Case 1:11, 6:9, 7:18,
33:21, 68:17,
75:19, 93:13,
94:25, 99:7, 108:9,
108:13, 110:9,
119:20, 147:22,
163:3, 171:15,
189:20, 220:24,
236:11, 262:12,
272:4.
cases 11:3, 24:3,
45:19, 102:13,
106:8, 125:22,
166:8, 192:16,
193:7.
cast 38:15, 39:4,
40:11, 44:25,
51:22, 58:21,
59:14, 76:20,
78:22, 87:14, 88:6,
96:17, 96:24,
101:17, 192:20,
194:18, 194:22,
195:22, 196:2,
198:13, 198:17,
199:8, 199:22,
204:21, 205:12,
217:1, 217:16,
245:8.
casting 196:12,
199:12.
casts 201:4.
catalysts 270:17.
caught 115:20.
cause 7:3, 29:25,
149:16.
cause. 101:20.
causes 97:3.
causing 148:16,
237:24.
caution 106:3.
cautious 179:8.
census 262:6,
262:11, 262:12,
263:1, 263:3.
Cerny 108:4, 108:5,
174:20, 176:16,
177:4, 177:19,
181:19.
certain 13:4, 30:19,

36:25, 38:13, 48:3,
81:10, 82:15, 87:2,
98:12, 107:4,
116:13, 123:18,
127:9, 152:21,
219:15, 220:15,
222:1, 228:6,
244:7, 251:17,
258:6, 263:1.
certainly 17:25,
76:19, 89:3, 88:16,
104:8, 158:15,
175:22, 210:6,
241:4, 242:20,
243:17.
certificate 192:5,
192:6, 192:7,
192:15, 193:6,
193:7.
certification
136:6.
certifications
92:6.
certified 135:19,
247:4, 248:10,
248:20, 263:1.
certify 135:22,
273:9, 273:17.
certifying 136:6.
chain 108:16,
108:20, 108:21,
109:2, 109:4,
109:11.
chair 244:3.
chairs 72:7.
challenge 31:10,
167:16, 197:19,
225:24.
challenged 167:14,
186:20.
challengers 49:7,
56:24, 57:2, 99:13,
166:11,
167:18.
challenging
32:16.
chance 22:21, 43:6,
130:2, 215:9,
231:4, 235:25.

240:10, 243:23,
250:3, 254:10.
changed 26:13,
59:10, 75:16, 76:9,
96:14, 128:15,
135:21, 153:9,
153:12, 185:6,
189:1, 191:23,
192:16, 193:17,
199:1, 206:7,
209:11,
215:20.
Changing 65:4,
47:1.
characteristic
47:1.
characterization
47:9, 67:7, 91:14,
174:18.
characterize 40:14,
176:6.
characterized 89:22,
100:23,
180:14.
characterizing
166:5, 173:25,
168:6, 192:22,
234:11.
charge 11:24, 19:22,
43:15, 172:6,
227:11, 238:15,
240:8.
charged 228:4,
238:7.
Charging 108:13,
47:1.
chart 114:6, 114:7,
114:12, 116:19,
116:22, 117:4,
117:15, 220:4,
233:17.
check 38:21, 38:23,
107:12, 107:14,
127:3, 139:13,
164:3, 184:20,
231:10.
check-in 231:15.
checked 47:14.
checking 97:13,
107:25, 232:3.
checks 154:17,
155:7, 155:8,

30:18, 264:4,
communication
20:10, 31:1, 31:7,
175:24,
187:24.
communications
22:6, 25:5, 32:21,
94:21, 96:8,
264:5.
communities 70:14,
88:4, 89:7, 250:20,
251:4, 251:5,
community 70:11,
70:16, 88:16,
219:4, 234:4,
234:6, 235:10,
community-based
66:25, 70:3,
97:21.
commutes 62:8,
Company 6:15,
confidence 91:6,
compare 43:1,
75:10, 142:10,
compared
115:14.
compares 42:18,
103:7, 125:11,
130:25.
competing 64:3,
complainant
106:24.
complained 53:2.
complainer
153:25.
complaining
161:25.
complaint 104:2,
104:13, 106:17,
107:1, 109:14,
109:21, 118:9,
171:6, 258:20,
258:24,
268:16.
complaints 89:16,
89:22, 90:2, 106:9,
107:19, 131:17,
157:15, 157:17,
157:22, 158:4,
158:14, 158:20,
163:8, 169:16,

189:18, 170:10,
170:24, 178:21,
179:18, 188:5,
complete 111:3,
128:16,
completed 125:19,
131:19, 192:8,
completing 110:22,
123:18,
compliance 227:12,
228:5, 262:4,
262:14,
263:11.
comply 198:9,
complying
282:18.
component
134:3.
concentrate
77:3.
concentrated
79:10.
concept 49:1.
concern 62:3,
104:19, 162:4,
168:6, 192:22,
234:11.
concerned 43:14,
98:22, 109:16,
234:19.
concerns 23:25,
33:12, 50:15,
52:20, 55:24,
63:23, 64:3, 64:8,
64:13, 82:20,
83:12, 83:21,
83:22, 83:25, 84:1,
91:17, 96:9, 106:6,
106:11, 136:2,
151:24, 158:16,
227:22, 234:9,
236:21, 236:22,
237:5, 248:6,
249:16,
249:23.
concluded 204:5.
concludes
271:17.
concluding 141:4,

202:20.
conclusion 42:5,
96:21, 122:16,
140:21,
256:23.
conclusions 50:18,
51:8.
concrete 186:11.
condition 268:4.
conduct 32:18,
61:10, 153:6,
162:12, 166:12,
174:11, 212:2,
263:15.
conducted 15:9,
16:17, 67:11,
168:5, 168:7,
212:19.
conducting 77:11,
236:6.
conference
251:19.
confidence 15:5,
15:20, 33:13,
33:17, 188:4,
257:3.
confident 16:7,
262:12.
confined 222:3,
244:16.
confirm 143:23,
210:24.
confirmation 125:7,
143:22, 144:2,
154:11, 156:6,
confirmed 135:6.
confirming
211:3.
conflicting
246:17.
conform 166:12.
confused 65:12,
84:22.
contacted
193:16.
contain 21:23,
153:8, 179:19.
contained 178:22,
241:21.
containing

1393.
connection 134:17,
135:11, 216:8,
218:14,
221:18.
connections 181:17,
228:4.
consecutive
207:22.
consensus 74:6,
74:9.
consequences
37:25, 157:25,
216:25.
consider 16:14,
86:18, 245:2.
consideration
49:17, 249:18.
considerations
142:9, 202:6.
consisted 12:4.
consistent 16:17,
32:23, 95:21,
104:16, 140:22,
162:13, 245:17,
258:24.
consistently 15:1,
64:2.
constant 41:18,
131:17.
constitute
227:24.
constitutes
28:21.
construction
78:4.
consulates
197:2.
consult 228:3.
contact 144:25,
153:16, 183:22,
183:23, 191:2.
contacted
193:16.
contain 21:23,
153:8, 179:19.
contained 178:22,
241:21.
containing

186:16.
chief 9:8, 9:17, 9:18,
11:1, 11:3, 12:10,
16:12, 16:15, 19:1,
19:11, 19:12,
19:22, 47:18,
50:20, 175:8,
185:18, 263:6.
children 87:19.
choice 41:16.
choices 133:24,
198:16,
200:15.
choose 37:12,
40:10, 47:4,
200:22.
chose 253:8.
Chris 19:13,
19:16.
Christopher
19:7.
church 88:9,
88:8.
churches 88:9, 89:2,
89:3.
circulate 21:21.
circulating
176:25.
circumstances
96:17, 115:6,
127:9, 197:24,
192:19, 193:10,
193:18, 196:14,
197:12, 197:16,
209:22,
240:21.
cited 238:19.
cites 145:25.
cities 17:4, 42:23,
56:1, 68:13, 70:13,
71:2, 72:2, 81:18,
82:7, 230:5,
280:5.
citing 55:7.
citizen 74:2, 108:2,
139:12, 139:14,
139:18.
Citizens 82:13,
156:21, 190:19,
196:5.

citizenship 135:22,
137:24, 139:5,
138:6, 139:16,
140:12, 248:19,
250:25.
City 2:8, 5:6, 62:13,
69:19, 68:21,
68:24, 69:3, 70:6,
70:8, 70:11, 70:15,
71:5, 71:7, 95:23,
124:11, 139:25,
166:16, 236:6,
236:9, 236:10,
239:1, 239:9,
261:11, 262:8,
263:7, 264:9,
273:13.
civic 212:25.
Civil 2:4, 166:13,
238:25.
civilians 190:21.
claimed 126:25,
109:12.
claims 226:22,
226:25.
clarification
258:5.
clarify 8:14, 19:21,
95:16, 149:21.
class 35:1, 35:4,
153:1.
classes 183:8.
clear 65:13, 88:7,
117:3, 141:17,
152:8, 155:20,
191:13, 200:18,
247:5, 255:13,
clearly 234:2, 266:8,
270:15.
client 147:13,
147:14.
clients 147:1,
147:22.
Columbia 11:6.
climate 128:15.
close 39:21, 119:3,
259:17, 263:9.
closely 46:24,
145:2.

closer 30:19, 79:22,
115:22, 185:9,
185:22,
224:23.
closes 97:18,
132:2.
co-counsel
228:24.
co-workers 77:22,
106:2.
code 156:9.
Code 2:14,
147:20.
coin 127:24.
colleagues 20:3.
collect 47:21, 79:21,
126:9, 129:1.
collected 67:25,
72:3, 74:16, 80:3,
120:3, 208:19,
232:14.
collecting 110:21,
104:19.
collection 18:1,
124:25.
collects 74:17,
134:25.
college 129:17,
135:14, 135:15,
135:20, 226:8,
248:5, 252:24,
252:25, 253:11,
253:19, 253:21,
253:24, 254:2,
255:2, 255:17,
colleges 135:10,
126:21, 136:10,
136:12, 136:13,
136:14, 137:23,
248:2, 255:6,
256:3, 259:19,
collegiality 18:21,
20:4.
color 26:2.
combat 25:12.
comes 33:19, 144:4,
269:17, 263:9,
comfort 186:12,
188:10.
comfortable 118:6,

119:11, 203:7.
coming 56:17,
58:19, 58:21,
59:13, 147:3,
147:4, 209:9,
218:18.
command 92:9.
commenced
2:10.
comment 34:11,
69:2, 120:1,
127:21, 223:5,
228:20, 238:23,
257:7.
commenting
238:16.
comments 24:4,
34:21, 67:2, 68:3,
68:8, 70:13, 77:10,
83:18, 89:21, 91:2,
91:5, 103:22,
106:1, 150:4,
151:6, 161:15,
222:3, 223:2,
225:25, 271:1.
Commission 39:21,
69:25, 147:18,
171:23, 172:1,
172:13, 244:22,
273:27.
Commissioners
17:6, 30:5,
68:22.
commit 119:16.
commitment 128:11,
216:22.
Committee 73:8,
73:14, 73:23, 74:3,
84:4, 86:18, 118:9,
151:14, 203:12,
203:14, 244:4,
244:6, 248:5,
252:15, 255:21,
256:2, 256:7,
committees 72:8.
common 56:13,
174:24.
communicate
22:3.
communicating

26:7.2.
contains 26:21,
57:17, 114:6,
163:3.
converse 78:11.
converted
133:10.
Conveyed 104:14,
258:18,
258:19.
conveys 25:24.
convicted 107:7.
coordinate
219:11.
coordinates
212:24.
coordination
267:18.
coordinator 92:5.
copied 99:24,
116:20, 137:14,
169:24.
copies 85:13, 89:11,
175:20.
copy 84:24, 118:8,
144:16, 151:13,
152:16, 152:20,
153:3, 160:8,
203:9, 252:13.
Corrections 107:10,
107:12, 192:1,
correctly 166:5.
corrects 142:12,
contribution
136:6.
control 64:24, 82:10,
168:22, 172:22,
264:18.
controlled 199:1,
199:7.
Convenience 46:11,
47:3, 47:12, 59:22,
60:3, 79:22,
202:2.
conversation
171:16,
258:25.
conversations 35:6,
35:11, 72:15,

104:3, 213:23,
214:9, 214:10,
258:11.
contemporaneous
122:11.
content 29:20,
29:22, 51:14, 72:9,
72:14, 117:4,
252:17.
contents 91:16,
240:15, 241:18,
241:19,
270:21.
contest 182:3,
199:23,
235:19.
contested 46:24,
content 108:24,
222:20.
continue 29:25,
33:15, 153:16,
159:6, 225:7.
Continued 4:1, 5:1,
145:4, 212:4,
235:14, 257:1.
contrast 113:4,
235:8, 235:11.
contractors
92:17.
contravention
107:18.
corroborate 105:10,
135:24,
109:22, 110:4,
120:11.
corroborating
267:22.
Corroboration
104:24, 105:1,
105:2, 105:22,
108:6, 108:9,
108:14, 108:17,
108:20, 108:21,
108:8, 180:10,
180:14, 200:3,
200:11, 237:22,

109:20, 110:16,
110:21, 113:25,
114:18, 114:21,
114:24, 116:6,
116:8, 118:4,
118:13, 119:8,
121:2, 121:14,
corroborations
111:11, 111:15.
corroborator
105:18, 119:4,
119:16.
cost 28:8, 49:14,
103:6, 103:7,
129:2, 211:13,
216:5, 216:13,
218:24, 227:22,
228:18.
costs 37:4, 37:6,
38:6, 55:8, 61:24,
135:1, 215:20,
216:21, 216:22,
218:7, 218:9,
228:18.
Council 56:13, 73:8,
73:14, 74:12,
147:18.
counsel 6:18, 9:1,
10:5, 10:12, 90:18,
92:23, 92:25, 93:1,
123:15, 273:18,
273:20.
count 155:14, 176:9,
198:23, 199:2,
246:5, 189:15,
192:21,
counter 45:13,
77:18, 136:3,
country 11:2, 11:15,
13:11, 14:16,
19:2,
County 2:8, 3:16,
67:12, 68:16, 71:8,
122:18, 123:14,
177:21, 180:1,
180:6, 180:7,
180:8, 180:10,
180:14, 200:3,
200:11, 237:22,

273:3, 273:13.
couple 19:7, 35:4,
44:2, 63:6, 90:4,
117:9, 136:17,
173:5, 180:17,
211:18, 212:22,
215:6,
course 10:18, 17:16,
18:4, 19:20, 20:6,
33:21, 34:1, 34:4,
168:11,
177:22.
Court 1:3, 6:8, 6:15,
6:20, 12:11,
197:22, 211:23,
212:11,
213:17.
courthouse 200:3,
273:2.
cover 205:10.
coverage 27:22,
237:7.
covered 193:12,
194:20, 197:3,
205:7, 210:11,
covering 67:4.
craft 44:11,
100:25.
crafting 51:6.
create 36:2, 36:3,
70:11, 159:2,
created 12:1, 12:3,
126:13,
135:25.
creates 57:1,
152:3.
creating 148:2.
credibility
257:12.
credible 216:20.
credited 192:13,
CREEPON 1:24, 25,
6:16, 273:7.
criminal 169:13.
cringe 44:9.
crinkle 109:1.
criteria 13:2, 13:4,
263:3.
criticized 258:6.

## Page 285

crunching 117:12.
cultivate 92:11.
cure 154:2.
currency 120:22, 226:7.
current 32:19, 65:4, 65:17, 120:6, 120:7, 120:16, 120:19, 121:17, 134:20, 145:8, 155:7, 155:8, 159:16, 193:19, 208:12, 209:13, 246:9, 246:12.
currently 90:18, 105:7, 122:20, 124:10, 136:14, 190:12, 243:12, 255:6.
cursory 230:16.
cut 27:18, 94:6, 200:12, 200:13, 231:16.
cuts 59:2.
cutting 28:18.
. .
.
<D>.
D. 3:37, 4:18, 5:4, 5:8, 5:20.
DA 110:13.
Dale 34:6.
damaged 192:4, 193:3, 193:4.
Dane 2:8, 179:25, 180:5, 180:7, 180:8, 180:10, 180:14, 273:3, 273:14.
Daniel 14:3.
dashed 57:20.
data 47:21, 51:10, 67:25, 70:20, 70:21, 71:12, 71:17, 71:21, 74:14, 79:20, 79:25, 80:3, 82:2, 110:17, 111:1, 112:7, 112:13.

112:14, 113:18, 134:2, 135:1, 136:1, 201:19, 203:24, 208:20, 238:19.
database 113:17, 134:12, 134:16, 135:6, 154:19, 155:12.
Date 6:13, 116:15, 212:1, 246:9, 272:3.
dated 3:13, 3:17, 3:20, 3:25, 3:27, 3:31, 3:35, 3:38, 3:41, 3:44, 3:47, 4:5, 4:7, 4:9, 4:14, 4:16, 4:19, 4:22, 4:25, 4:28, 4:30, 4:33, 4:37, 4:41, 4:45, 4:47, 5:5, 5:8, 5:11, 5:15, 5:18, 5:21, 5:24, 5:27, 5:30, 5:33, 100:6, 161:3, 173:14, 177:12.
dates 100:8, 100:10.
daughter 129:16.
David 113:21.
day-to-day 16:21.
DC 147:15.
dead 155:17.
Deadline 62:25, 63:13, 65:4, 65:18, 75:16, 99:14.
deadlines 59:19, 97:1.
deal 25:10, 26:5, 26:6, 132:25, 146:15, 165:25, 209:21, 217:12, 247:1.
dealing 104:6, 164:24, 166:1, 166:11, 195:22, 259:22.
dealings 271:5.
dealt 73:19, 80:25,

91:9, 147:19, 210:2, 244:16, 246:18.
Dear 256:21.
death 154:19.
debate 234:10, 240:24.
debated 84:3.
Deborah 182:14.
December 9:13.
decision 102:16, 103:5, 106:20, 202:4, 212:9, 213:17, 253:8, 253:18, 258:12.
decisions 18:16, 72:13.
dedicated 225:1, 234:21.
defeat 261:5.
defendant 7:9, 7:13.
Defendants 1:15, 2:25, 6:7, 6:24.
defined 79:13, 193:23.
definite 46:19, 160:5, 201:25.
definitely 65:3, 136:12, 140:9, 165:16, 239:4.
definition 128:22, 197:17, 253:12.
degree 87:2.
delay 32:9.
deletion 21:13.
deliver 38:4.
delivered 50:22, 125:4, 126:17.
delivering 124:20.
delivery 77:17, 144:8, 193:4.
demand 82:12.
Democratic 180:15, 199:7.
demographics

131:1, 159:2, 259:13.
demonstrated 15:19.
Demos 250:8.
denied 197:21.
Department 27:7, 2:22, 6:11, 21:3, 107:10, 107:12, 134:18, 219:12, 238:25, 239:1, 262:3, 262:7, 262:13, 262:22, 262:23, 263:10, 263:14, 264:6, 264:7, 273:12.
depend 61:21.
dependent 185:15, 185:16, 186:2.
depending 37:4, 39:9, 92:10, 62:13, 81:25, 226:17.
depends 24:22, 37:4, 76:17, 99:10, 144:7, 180:7, 185:13, 200:22, 201:7, 208:9, 211:16, 225:18, 226:14, 268:19.
depose 7:8.
deposed 7:20.
DEPOSITION 1:20, 21:6, 3:6, 10:0, 7:11, 7:24, 8:1, 8:20, 20:24, 34:13, 36:16, 47:16, 72:25, 141:5, 141:11, 164:10, 182:4, 182:6, 202:21, 203:1, 271:16, 273:10.
depositions 7:11.
deputies 27:20, 27:22, 30:5, 97:15, 97:20, 121:23, 121:25, 122:4, 122:9, 122:12, 122:19, 122:23.

distracted 77:20.
distractions 87:18.
distributed 140:4.
distribution 50:22.
District 1:3, 1:4, 6:8, 11:6, 106:8, 106:25, 107:2, 107:8, 107:16, 107:24, 108:10, 110:11, 268:14.
disturbing 163:7.
diverse 70:16.
divided 60:16, 60:25.
divides 70:8.
division 16:20, 16:21, 23:8, 90:23, 91:23, 92:9, 93:4, 170:1, 219:15, 219:16.
divisions 16:19, 20:7.
DMV 134:11, 135:6, 145:15, 154:19, 155:12, 155:23, 215:4, 218:8, 218:9, 220:16, 221:13.
document-intensive 199:21.
documentary 141:16, 141:18, 141:25, 155:4.
documentation 102:18, 237:15.
documented 237:15.
documents 15:25, 48:3, 85:12, 85:15, 90:4, 121:18, 150:18, 153:18, 161:24, 162:21, 163:21, 163:22, 180:17, 201:6, 215:6, 220:14, 221:11, 226:3,

238:10, 244:25.
Doyle 50:2.
draft 67:2, 164:17, 165:4, 165:15, 165:22, 248:23, 254:3.
drafted 163:15.
drafting 21:20, 22:9, 23:21.
drafts 51:5.
draw 133:4, 173:14.
drawback 61:24.
drew 55:12, 120:20.
drive 59:2, 126:2, 151:5, 152:10.
driven 119:15, 138:9.
driver 120:23, 121:3, 134:9, 134:13, 151:4, 155:15, 156:1.
drives 41:9, 124:17, 124:18, 124:24, 125:11, 125:20, 126:1, 126:4, 126:11, 128:5, 150:6.
driving 128:18, 250:13, 252:24.
due 16:7, 7, 173:21, 174:16, 218:23.
duly 7:1, 273:11.
During 8:1, 19:14, 27:12, 42:13, 42:15, 54:7, 59:11, 59:21, 69:9, 75:14, 77:22, 78:12, 79:4, 80:6, 80:7, 80:14, 80:20, 82:21, 83:13, 87:14, 87:19, 115:4, 119:8, 131:24, 132:14, 162:15, 176:5, 200:16,

204:22, 205:20, 226:8, 233:10, 234:10, 249:22, 254:14.
duties 16:11, 16:14, 17:16, 17:22, 77:3, 77:21, 77:23, 77:24.
duty 17:25.
. .
. .
<E>.
e-mail 20:5.
E-mails 3:34.
earlier 39:19, 43:18, 49:11, 68:1, 159:10, 163:17, 173:5, 177:8, 234:24, 237:7, 237:8, 238:23, 259:25.
easier 101:21, 261:6, 262:8, 262:24, 27:1, 27:9, 47:7, 76:1, 79:11, 83:3, 130:15, 224:22.
East 2:16.
easy 27:5, 56:17, 220:20.
easy 220:7.
Ed 12:16.
edge 28:19.
editorialize 165:18.
editorials 55:25.
Edman 68:23, 264:23.
edu 137:12.
Education 136:4, 137:22, 138:9.
educational 140:12, 234:22.
effect 31:24, 32:5, 115:12, 185:8, 221:21, 225:10, 232:8, 233:8, 235:3.
effective 49:14, 183:4, 213:18,

285

286

## Page 286

123:21, 125:18, 126:9, 126:16, 126:20, 126:24, 127:2, 127:22, 153:15, 153:23.
deputized 124:11, 126:24.
deputy 93:20, 101:19, 124:10, 124:13, 125:7, 152:14, 152:19, 152:24, 166:16, 266:1.
describe 236:2, 242:20.
described 52:17, 173:19.
describing 160:25, 163:17, 174:14.
designate 157:4.
designated 123:9, 123:13, 134:18.
designed 11:8, 251:1, 266:1.
designees 11:2.
despite 24:12, 101:19, 102:19.
detail 140:15.
detailed 264:19.
details 51:8, 251:17.
deter 248:12.
determine 66:13, 107:6, 205:14, 205:18.
determining 74:20.
determined 150:1.
deterred 37:21.
develop 112:10.
developed 18:22, 61:5, 123:9, 158:7, 242:19, 243:13.
developers 112:9.

developing 63:22, 211:21, 240:24.
development 241:8.
deviated 202:5.
devote 77:9, 78:13, 79:6.
Diane 164:17, 164:20, 164:21.
differ 12:18, 133:7, 134:4.
difference 41:7, 41:12, 44:10, 62:17, 79:14, 231:22.
differences 67:17.
differently 74:22, 187:13, 187:20.
differing 185:25.
differs 38:7, 133:8.
difficult 28:24, 75:23, 77:16, 116:10, 126:17, 138:24, 139:2, 144:13, 150:5, 167:20, 201:21, 222:13.
difficulty 238:14.
dig 106:16.
digging 117:2, 199:13.
digits 134:15.
direct 17:14, 25:6, 53:14, 57:16, 62:22, 66:7, 67:1, 67:10, 68:18, 69:2, 70:18, 95:14, 101:12, 114:5, 116:17, 118:18, 137:16, 148:9, 182:23, 183:1, 215:25, 223:22, 221:17, 223:12, 256:25, 270:1.

directed 53:21, 158:10, 219:11, 236:23, 236:24, 236:25.
directing 219:14.
direction 47:24, 48:24, 102:12, directive 214:3.
directly 16:2, 197:9.
Director 9:14, 9:15, 10:5, 10:12, 19:6, 19:9, 68:24, 117:20, 144:18, 171:24, 264:21, 265:1, 269:3.
Directors 10:23, 19:10.
directs 50:11, 238:12.
disabilities 168:19.
disclose 20:20, 102:15, 102:17, 102:18.
disagreement 162:19.
disclose 137:23.
disclosure 140:11.
discovery 94:24, 95:2, 205:25, 242:25, 243:8.
discretionary 127:14.
discrimination 226:24.
discuss 34:21, 140:15, 245:22, 257:20.
discussed 29:14, 73:10, 83:24, 91:19, 98:25, 116:24, 118:4, 118:23, 169:2, 220:22, 222:25, 227:25, 242:9, 245:20, 270:1.

discusses 83:8, 151:16.
discussing 13:24, 31:20, 64:16, 65:23, 75:7, 82:19, 94:19, 98:6, 103:17, 117:6, 132:1, 132:15, 152:12, 162:19, 182:19, 223:5, 235:2, 237:23.
Discussion 62:25, 83:20, 214:1, 222:24, 241:8, 243:14, 252:24.
discussions 72:5, 72:7, 72:10, 185:5, 187:6, 202:12, 234:16, 257:12, 268:13.
Disk 72:25, 141:5, 202:20.
disparities 75:2.
disproportionately 158:21.
disrupt 163:23, 186:9.
disruption 158:2.
disruptive 160:25, 161:16, 161:20, 163:19.
distance 186:2, 186:11, 186:12, 186:22, 186:24, 186:25.
distances 186:4.
distinction 19:10, 36:14, 36:15, 120:5, 125:6, 186:3, 206:17, 239:23.
distinctions 49:10, 96:4, 195:15, 195:20.
distinguishes 194:18.
distract 158:1.

249:17, 254:22, 254:24.
effectively 92:15.
efficient 28:8, 49:14.
effort 67:25, 88:3, 88:8, 88:12, 88:14, 88:16, 89:7, 212:2, 212:6, 224:15, 226:2.
egregious 269:20.
eight 20:15, 120:23, 184:19, 185:7, 185:10, 185:12.
either 20:11, 82:13, 99:21, 132:18, 145:12, 169:18, 188:14, 192:5, 197:20, 219:5.
elderly 121:9, 121:16, 234:20.
elected 133:5, 52:20, 176:3, 199:4, 257:9.
election 51:24, 257:4.
elections.
elector 40:9.
electoral 46:21.
electors 55:3, 98:2, 151:18.
electronic 89:15, 132:24, 189:17, 219:16, 257:21, 257:23, 259:9, 259:11, 259:14.
electronically 192:4, 131:20, 190:24, 191:5, 196:23.
elements 26:23, 103:10.
eligible 107:11, 129:14, 210:9, 260:18.

eliminate 31:21, 119:23, 132:15, 132:22, 132:23, 135:4.
eliminated 52:3, 82:22, 96:7, 103:17, 110:16, 121:15, 121:24, 127:5, 127:13, 127:21, 132:20.
eliminates 119:1.
eliminating 127:21, 133:9, 201:23.
elimination 103:1, 125:14, 202:11, 202:16.
elsewhere 180:12.
emailing 164:14, 169:3.
Emails 33:30, 3:38, 3:40, 3:46, 4:18, 4:21, 4:27, 4:32, 4:36, 5:4, 5:7, 5:10, 5:20, 5:32, 20:23, 20:24, 20:25, 21:7, 21:11, 39:22, 39:25, 99:21, 99:24, 100:9, 100:10, 111:21, 111:25, 116:19, 117:9, 238:4, 260:7.
embassies 197:2.
embodied 185:3.
emergency 162:11, 185:4, 254:14, 255:4.
emphatically 31:8.
emphasis 264:19.
emphasize 2:13:10.
employee 273:18, 273:19.
enable 27:23.
enables 40:18.

enacted 118:19, 154:5, 204:7, 246:24, 249:2.
enacting 249:22.
encountered 188:12.
encourage 63:25, 64:19, 88:19, 190:14.
encouraged 64:25.
end 12:12, 37:8, 37:10, 118:4, 129:19, 203:5, 213:7, 238:20, 234:12.
endeavors 92:14.
ended 254:21, 260:10.
endorse 102:5.
ends 97:18.
enforcement 107:2, 159:24.
enforcing 187:14.
engage 181:21, 216:23, 265:17.
engaging 150:2, 265:9, 266:15.
English 265:4, 265:9, 266:15.
enhances 181:8.
enjoined 214:19.
enough 77:16, 78:24, 100:24, 110:13, 130:24, 163:14, 172:10, 196:20, 207:3, 231:21.
enrolled 127:18, 226:8.
enrollment 138:6, 138:8.
ensure 16:16, 211:1, 249:1, 265:20.
ensured 16:11.
enter 111:8, 133:9, 133:20, 260:11.
entered 155:24, 156:2.

entering 177:5.
enterprising 126:23.
enthusiasm 46:11, 46:13, 46:19, 47:2, 47:12.
entire 72:1.
entirely 71:13, 202:3, 248:16.
entitled 162:2, 162:3, 190:23, 211:2.
entry 135:1, 142:12.
envelope 193:2.
equal 198:12, 199:24, 200:19, 231:10.
equally 126:15.
equipment 17:8, 17:15, 92:5, 92:6, 201:7.
equivalent 171:25, 172:2, 172:21, 212:24, 265:17.
error 101:19, 192:23, 192:24.
errors 142:12, 178:22, 179:19, 192:20.
essentially 199:13.
establish 69:23, 120:6, 120:13, 120:14, 207:18.
established 82:17, 207:23, 231:23.
establishing 87:1, 105:6, 105:15, 162:13.
estimate 4:43, 52:8, 52:10, 215:13, 215:16, 218:7, 218:10.
estimated 51:22.
estimating 216:20.
et 1:7, 1:13, 6:6, 6:7.

288

Ethics 103, 122:3, 122:5, 90:23, 93:4, 172:9, 219:9.
ethnicity 74:14, 74:18, 125:9.
evaluate 51:12, 110:14, 168:17, 168:21, 231:7, 253:4.
evaluated 62:6, 270:24.
evaluates 92:17.
evaluating 26:20.
evaluation 236:6, 249:1.
evening 103:2, 103:18.
event 23:20, 92:8.
eventually 93:2, 126:14.
everybody 61:3.
everyone 222:17, 223:9, 224:7, 260:1, 260:17.
everything 105:5, 133:16, 133:17, 185:15, 211:25, 213:4, 214:12, 224:25, 243:13.
evidence 16:1, 65:8, 142:14, 251:7, 253:14, 257:1.
ex 73:9.
exact 22:14, 36:21, 55:21, 249:21.
exactly 118:17, 128:3, 159:18, 178:2, 183:21, 211:21, 215:19, 232:23, 250:13, 258:15.
EXAMINATION 3:3, 3:22, 7:14.
examined 220:17.
examining 49:1.
example 19:11, 61:7, 143:12, 169:10,

expected 48:6, 48:9.
expenditures 218:17.
expense 227:12.
experience 103:11, 235:21.
experience 18:20, 19:2, 26:16, 33:8, 41:17, 47:17, 47:20, 56:8, 61:15, 75:7, 75:22, 76:10, 100:8, 102:21, 121:17, 125:17, 194:23, 176:3, 184:15, 198:11, 226:11.
experienced 46:24.
experiencing 148:12.
expert 14:6, 92:11, 112:25.
experts 176:7.
expired 121:5.
Expires 273:27.
explain 11:18, 68:7, 104:25, 121:19, 171:4, 190:16, 206:18, 226:4, 236:6, 250:6, 251:17.
explained 151:3, 202:1.
explaining 29:18.
explored 49:12.
express 233:14.
expressed 63:23, 64:8, 64:13, 68:2, 187:24, 236:20, 236:22, 249:16.
extended 150:18, 261:9.
extent 11:22, 122:20, 15:24, 23:22, 96:20, 98:12, 108:7, 110:6, 111:1, 111:10, 138:23, 140:21, 149:15, 233:13,

261:14.
extra 144:15, 148:2, 149:6, 168:2, 225:21, 237:17.
extract 113:18.
extracted 205:1.

<F>
face 95:3.
face-to-face 20:13.
faced 55:23, 210:16.
facilitate 194:24, 246:2.
facilities 104:7, 150:19.
facility 97:22.
fact 5:14, 185:17.
facing 51:7.
fact 36:4, 40:7, 44:7, 48:10, 70:6, 71:14, 76:5, 93:15, 100:24, 101:19, 107:22, 124:1, 131:24, 136:3, 168:5, 179:13, 210:17, 239:9, 239:15, 254:1, 263:22, 271:4.
factor 41:3, 41:18, 47:6, 60:9.
factors 26:20, 58:17.
facts 106:10, 110:13, 155:1.
factual 37:22.
failure 110:11.
Fair 8:18, 8:19, 13:21, 24:24, 25:1, 33:7, 47:8, 47:9, 52:17, 64:14, 71:20, 75:1, 91:14, 93:10, 101:5, 128:19, 130:24, 163:14, 166:5, 172:10, 174:18,

forms 27:19, 128:18, 124:20, 125:18, 125:20, 126:16, 128:17, 129:2, 131:14, 131:19, 132:18, 132:23, 144:23, 145:4, 145:8, 145:14, 146:7, 146:16, 146:23, 147:1, 147:3, 149:2, 148:12, 148:16, 149:1, 152:5, 154:14, 234:13, 253:23, 254:5, 255:3.
forth 96:2, 201:2.
forums 13:17.
forward 50:20, 51:7, 99:23, 182:10, 255:18.
forwarded 91:10, 91:11, 101:2, 136:22, 182:13, 237:3, 267:7.
forwarding 90:24, 177:1, 190:22, 181:12, 250:16.
found 270:21.
foundation 94:15, 94:16, 109:5.
four 11:6, 12:5, 19:13, 134:14, 181:1, 200:6, 213:12, 230:13, 231:7.
fourth 101:12, 114:5, 245:1.
frame 15:11, 23:23.
franchise 26:1.
frankly 32:25, 295:24.
fraud 105:21, 106:21, 107:1, 119:23, 132:9, 177:24, 178:3, 220:25, 250:20, 251:2, 251:5,

251:8, 257:2.
fraud 119:16.
fraudulent 108:9, 108:14.
fraudulently 109:21, 110:8.
free 8:2, 62:19.
Freelance 6:16.
frenetic 33:6.
Friday 75:20, 75:21, 98:14, 97:18, 175:5, 248:24, 249:14.
friend 129:18, 237:11.
friends 174:4.
front 78:5, 102:5, 164:23, 181:25.
frustration 187:23.
full 46:5, 63:7, 166:24, 207:2.
full-blown 231:5.
funding 213:16, 213:21, 214:15, 214:25, 216:8.
funds 228:21, 228:22.
future 168:25.

<G>
G-A-B 109, 110:10.
G. 5:17.
GABRIEL 2:20.
game 243:5.
Gardner 19:24.
Gary 244:3.
gathered 132:7, 201:19.
gave 106:10, 211:18, 214:4, 271:1.
gear 77:3.
gears 190:23, 156:19, 180:20.

General 2:21, 10:5, 10:12, 45:22, 45:23, 51:24, 54:13, 83:18, 93:19, 105:23, 114:14, 175:12, 175:15, 175:18, 181:11, 183:8, 199:15, 200:4, 228:22, 234:9, 244:20, 251:8, 268:15.
generally 7:24, 16:13, 21:8, 21:10, 23:24, 33:24, 35:11, 40:3, 41:9, 42:7, 42:9, 50:17, 72:14, 88:7, 102:22, 106:23, 117:3, 127:4, 159:1, 174:14, 268:2, 269:24, 283:6.
governing 162:12.
Government 9:25, 60:5, 10:7, 11:17, 11:18, 12:20, 13:1, 13:10, 23:2, 28:11, 48:25, 62:18, 70:17, 90:21, 191:2, 223:15, 223:20, 224:1, 224:2, 224:6, 264:22, 258:3, 261:9, 269:4.
Governor 12:8, 12:9, 12:14, 50:2, 50:6, 50:23, 200:6, 200:7.
graduated 9:5.
grand 220:18.
greater 60:25, 70:3, 225:14.
greatest 64:1, 64:19, 64:25.
Green 60:13.
Grothman 103:16, 104:3, 104:4.
ground 7:19, 17:7,

287    289    291

184:7, 190:1, 196:20, 198:14, 200:21, 202:12.
fairly 79:17, 80:5, 254:12.
Falk 4:32, 5:4, 92:20, 93:5, 100:4, 100:13, 101:1, 101:6, 101:9, 101:16, 181:12, 227:15, 238:5.
fall 35:3.
familiar 7:24, 11:14, 14:2, 14:18, 15:4, 60:21, 78:18, 85:4, 87:22, 116:22, 117:3, 127:12, 173:18, 182:24, 194:6.
Family 137:21, 138:9.
far 28:19, 80:9, 86:25, 98:16, 169:3, 186:4, 198:14.
favor 64:4, 81:3.
favorable 40:4.
favorably 13:20.
fav 189:3, 189:7.
features 62:14, 70:10.
February 212:4, 213:8, 217:22.
Federal 24, 16:17, 136:4, 143:7, 190:23, 194:22, 194:25, 195:7, 195:24, 196:1, 196:4, 196:5, 196:11, 196:12, 196:25, 197:9, 199:3, 207:4, 261:9, 261:21, 266:11.
fee 228:8, 228:10.
feedback 31:4, 49:6, 50:11, 79:19,

121:13, 234:1.
feel 8:2, 41:11, 240:4.
feeling 187:25.
fees 227:11, 228:4.
feet 139:20, 184:19, 185:4, 185:7, 185:10, 185:12, 185:18, 186:8, 187:6, 188:12, 188:13, 188:16, 188:17.
felon 155:18.
felony 107:7, 178:4.
felt 24:6, 52:25, 94:9, 107:21, 121:14, 254:17.
FERPA 138:18, 138:21, 140:11, 140:15, 140:16, 140:23.
few 7:19, 55:14, 59:20, 59:13, 90:8, 139:20, 183:14, 217:8, 249:19, 257:18, 264:13.
fewer 141:19.
field 110:24, 111:8, 271:7.
Fitzgerald 5:29, 256:17, 256:18, 256:21.
five 19:13, 20:15, 57:20, 129:19, 133:25, 200:10.
fixed 85:18.
flash 259:24.
flavor 96:9.
flexibility 87:20.
flexible 40:15, 66:24.
flip 127:24.
floor 57:15.
flow 220:4, 208:10.

focus 21:19, 50:12, 77:12, 78:9, 106:18, 128:16, 186:10, 243:16, 269:17.
focused 200:8.
Focusing 108:6, 225:3, 262:1, 270:19.
folding 224:14.
folks 24:16.
follow 102:7, 102:19, 202:23.
followed 27:6, 49:13, 62:12, 107:9, 139:21, 188:17, 264:9.
following 17:11, 52:21, 58:11, 86:1, 88:9, 98:24, 111:25, 145:5, 150:14, 159:19, 173:25, 180:22, 189:23, 200:18, 231:20, 237:23, 261:7, 262:19, 262:22, 264:23, 266:1, 264:19.
follows 7:5, 52:13, 266:18.
food 21:9.
foot 187:3.
forced 124:18.
forces 190:22.
foregoing 273:9.
forget 27:12.
forgot 200:3, 258:22, 268:5.
form 139:7.
formal 25:2, 106:17, 200:24, 232:15.
flavor 96:9.
format 78:21, 85:3, 123:19, 123:21.
former 91:1, 122:3, 133:1, 196:7, 206:19, 208:10.

57:15, 112:8.
grounds 94:15.
groundwork 33:15.
group 159:10, 168:17, 170:3, 170:16, 170:19, 180:23, 181:2, 181:11, 182:18, 184:7, 184:10, 213:1, 224:20, 259:22, 269:10.
grow 46:8.
guarantees 196:4.
gubernatorial 21:14.
guess 20:1, 26:23, 27:13, 30:10, 37:24, 43:19, 52:16, 57:20, 62:23, 88:11, 103:3, 118:17, 122:24, 136:11, 138:6, 138:16, 146:5, 150:14, 159:19, 173:25, 180:22, 189:23, 200:18, 231:20, 237:23, 264:9.
guest 35:1.
guidance 101:6, 158:4, 159:18, 210:10.
guidelines 158:9, 159:14.
guys 48:16, 266:2.

<H>
Haas 3:17, 3:31, 3:46, 4:21, 4:27, 42:19, 43:19, 29:13, 91:20, 104:8,

104:14, 136:22, 138:1, 138:13, 148:11, 165:2, 169:23, 171:18, 178:25, 182:4, 227:5, 235:20, 241:15.
half 28:20, 36:19, 92:12, 163:5, 189:20, 190:20.
halfway 51:20, 63:8, 85:21, 138:16, 163:5, 226:20.
Hall 85:24.
hammer 159:14.
Hampshire 94:22.
hand 51:6, 51:11, 66:3, 75:25, 109:3, 131:14, 273:21.
handed 203:3.
handling 125:3.
handle 37:14, 57:2, 102:13, 217:20.
handled 241:15.
handles 16:21.
handling 23:17, 181:22, 231:20, 237:23, 261:7, 262:19, 262:22.
handout 181:22.
hands 94:22, 162:7.
handwriting 132:21.
Hanson 181:19.
happen 32:14, 129:10, 157:10, 210:10.
happened 153:11, 156:12, 175:5, 210:17, 261:17, 267:1.
happening 171:4.
happens 78:1, 199:8, 176:11, 217:22, 244:3, 234:8, 235:19, 91:20, 104:8.

203:6.
harassed 188:1.
hard 125:15, 125:21, 149:13, 158:22.
harder 27:9.
hardship 121:9.
harmful 33:9.
HAVA 260:22.
Hawaii 207:12.
head 171:23, 172:7, 178:18, 260:25.
headaches 148:3.
header 95:2, 95:21.
heading 53:15, 83:25, 62:24, 183:3, 203:23.
headquarters 183:12.
hear 162:1, 186:14, 186:17.
heard 31:13, 83:18, 96:1, 108:16, 109:8, 109:16, 233:10, 241:8.
hearing 50:10, 241:14, 241:15, 246:1.
hearings 73:5, 84:4, 84:6, 241:12, 254:7.
heaviest 76:10.
heavily 158:23, 180:14.
Hein 5:10, 92:2, 92:3, 113:20, 159:9, 239:4, 267:13.
Held 17:13, 18:13, 73:20, 143:8, 190:17, 221:22, 229:6, 223:21, 224:3, 234:1, 234:8, 235:19, 236:6, 260:10.

260:13, 264:12.
helped 159:25.
helpful 238:17.
hereby 239:9.
hereunto 273:21.
high 36:16, 40:7, 69:9, 127:3, 127:4, 127:6, 127:10, 127:19, 128:3, 129:15, 129:24, 130:2, 130:3, 210:16.
higher 41:5, 42:24, 111:12, 115:11, 234:22.
highest 15:20.
highly 131:9, 148:4.
highway 178:15.
hire 76:19, 258:6.
hired 104, 244:6.
historical 63:24.
Hmong 266:3.
hold 10:15, 138, 96:1, 108:16, 109:8, 109:16, 233:10, 241:8.
holders 200:6, 200:8.
holding 41:18.
holidays 81:17.
home 97:21, 150:21, 234:24.
homes 97:14, 254:7.
Hon 5:17, 5:29.
hope 257:8.
hopefully 85:18.
hospitalized 98:1.
hour 45:15, 45:18, 48:15, 188:21.
hours 35:4, 66:21, 66:23, 69:11, 78:23, 80:20, 81:3, 81:5, 81:8, 82:3, 82:11, 82:16, 82:22, 83:9, 83:13, 84:8, 86:5, 86:10, 86:24, 87:1, 87:15,

290    292

87:16, 89:20,
97:24, 98:7, 98:10,
98:14.
**housekeeping**
7:7.
**housing** 138:7.
.
.
**<I>.**
**idea** 28:2, 51:1,
73:13, 78:20,
168:14, 207:2,
245:6, 251:2,
259:12.
**ideally** 43:17.
**ideas** 11:12,
168:10.
**identifiable**
234:2.
**identification.**
120:5.
**identified** 3:10, 4:2,
52, 150:10,
151:23, 159:9,
239:9.
**identifies** 174:21.
**identify** 99:11, 107:5,
100:19, 116:11,
138:1, 158:25,
210:23, 224:10,
236:14, 238:17,
250:13.
**identifying** 43:15,
120:19, 121:18,
153:17, 211:8.
**identify** 105:18,
211:3, 220:25,
245:4, 245:9.
**Ids** 222:17, 223:9,
225:23, 225:2,
226:13, 228:1,
235:5, 228:16,
233:12, 234:13,
234:19, 247:6,
247:12, 253:23,
254:2, 255:3,
255:7.
**iii** 51:18, 51:19.
**illegal** 163:8, 163:15,
163:20.

**illegible** 131:16,
**illuminating**
204:17.
**immediately**
36:8.
**impact** 31:12, 41:20,
59:22, 74:21,
82:20, 83:12,
124:17, 136:5,
181:16, 202:14,
204:18, 210:20,
229:23, 253:8,
253:14.
**impacted** 150:11.
**impacts** 76:6, 76:15,
140:23.
**impetus** 194:8.
**implement** 17:12,
281:2, 281:3.
**implementation**
32:9, 145:17,
236:8.
**implemented**
73:22.
**implementing**
203:24.
**important** 25:24,
32:24, 33:4, 35:15,
47:6, 48:4, 51:12,
91:6, 91:7, 98:9,
214:11, 246:3.
**impose** 211:14,
217:4.
**imposed** 75:2.
**improperly** 192:5,
192:10.
**improper** 24:6:4.
**improving**
246:16.
**in-depth** 49:15,
175:13.
**in-house** 92:11.
**in-state** 209:12.
**in** 77:14, 85:4.
**inability** 93:24,
94:3.

**inaccurate** 125:22,
149:1, 184:10.
**inactivate** 144:3.
**inactivated** 155:16,
156:9, 156:10,
156:12.
**inappropriate**
24:4.
**inappropriately**
169:9.
**Inc.** 17:7, 6:6.
**incidences**
158:18.
**incident** 98:19,
173:19, 174:12,
174:15, 175:1,
210:2, 268:19.
**incidents** 98:1,
85:22, 86:2, 87:6,
93:23, 109:20,
121:7, 139:14,
204:1, 204:5,
209:12,
248:23.
**indicated** 45:24,
65:4, 153:24,
170:10, 178:3,
195:3, 228:17,
250:19.
**indicates** 29:24,
30:21, 54:2, 55:14,
63:2, 69:8, 66:13,
69:3, 69:22, 92:20,
94:23, 101:5,
113:24, 119:8,
144:5, 148:10,
148:10, 162:10,
166:25, 179:7,
183:14, 220:2,
227:10,
229:12.
**indicating** 30:8,
64:17, 166:20,
177:4.
**individual** 98:3,
109:9, 109:17,
109:24, 109:25,
137:2, 191:15,
208:21, 208:23,
209:21, 223:21,
224:3, 228:22,
250:8, 257:24.

**increasing** 160:24,
178:20, 179:18,
231:9.
**incredible** 31:10.
**indefinitely** 222:2,
244:16.
**independent**
12:1.
**indeterminate**
216:14,
216:19.
**index** 14:20.
**Indian** 21:9.
**indicate** 23:10,
30:15, 66:11,
85:22, 86:2, 87:6,
93:23, 109:20,
121:17, 139:14,
204:1, 204:5,
209:12,
248:23.

**increasing** 160:24,

**increasing**
**John** 183:15,
**JOHNSON-KARP**
2:20.
**Johnson-martin**
164:13,
168:15.
**Joint** 232:14,
255:21, 256:1,
256:7.
**Josh** 6:22, 7:17,
201:24.
**JOSHUA** 2:13.
**Journal** 83:5,
111:24, 113:22,
114:8, 210:23,
221:5, 267:5.
**judge** 13:9.
**judges** 13:3.
**judgment** 38:1, 38:3,
58:7.
**Judnic** 3:30, 90:14,
90:15, 91:19.
**June** 31:25, 133:19,
269:22.
**jurdan@uwm**
137:12.
**jurisdiction** 153:6,
263:8, 263:21.
**jurors** 97:7,
97:10.
**Justice** 2:7, 2:22,
62:12, 121:10, 282:3,
282:7, 282:13,
282:22, 282:23,
283:20, 283:10,
263:14, 284:6,
264:7, 273:12.

**<K>.**
**K.** 3:13, 3:27, 3:43,
4:9, 4:22, 4:41,
5:14, 5:18, 5:26,
5:30, 5:33.
**Kamal** 113:3.
**Kamalakar** 113:2.
**KAUL** 2:13, 3:5,
5:35, 6:21, 6:22,
7:15, 7:17, 16:5,
36:12, 37:19,
37:23, 65:10,

65:15, 72:17,
84:13, 93:12,
117:13, 141:1,
226:20, 226:24,
235:10, 268:25,
271:8, 271:14,
**keen** 176:4.
**keep** 53:16, 74:14,
89:13, 188:17,
201:4.
**keeping** 54:4,
239:23.
**keeps** 33:5.
**Kenosha** 237:23.
**kept** 38:16, 105:18,
264:4, 264:11,
264:15.
**KEMIN** 1:20, 2:1, 6:2,
6:24, 6:25, 7:8,
73:1, 141:6,
141:12, 202:21,
203:2, 271:19,
272:2, 272:44,
273:10.
**key** 64:5.
**kicked** 262:6.
**kidding** 199:5.
**kind** 33:12, 48:3,
77:20, 78:6, 89:7,
101:25, 108:19,
106:19, 124:25,
144:25, 193:18,
226:17, 230:24,
232:14, 238:17,
241:5, 258:15,
265:19, 266:6,
270:25.
**kinds** 59:10,
210:14.
**Klingenmeyer**
6:3.
**knowing** 33:14,
102:13,
242:10.
**knowledge** 11:8,
18:15, 18:18,
18:19, 26:15, 33:7,
52:7, 53:10, 61:14,
85:2, 100:19,

105:25, 108:19,
112:12, 113:15,
223:23.
**known** 9:25,
190:18.
**knows** 112:6, 174:1,
132:23,
238:24.
.
**<L>.**
**L-e-i-b-h-a-m**
1:2:13.
**label** 27:11.
**lack** 14:12, 41:19,
150:16, 150:24,
150:25, 155:11,
193:5.
**lacked** 120:12.
**Lafollette** 199:4.
**laid** 33:16, 58:3.
**landed** 210:18.
**Landgraf** 4:24,
273:6.
**landlords** 130:7,
157:16.
**language** 44:12,
64:23, 148:13,
165:10, 253:10,
265:11, 261:15,
261:20, 261:23,
263:4, 282:9,
262:20, 265:11,
265:15,
265:25.
**languages** 266:4.
**large** 24:7, 34:6,
55:15, 70:16,
205:5, 205:6,
205:12, 211:24,
217:16, 261:4.
**larger** 37:10, 60:6,
60:13, 167:16.
**largest** 42:23, 56:1,
57:6, 217:19.
**last** 35:3, 86:7,
90:13, 99:23,
100:2, 101:16,
120:23, 134:14,
157:10, 174:8,

175:6, 176:24,
184:4, 203:23,
212:22, 215:25,
220:22, 221:7,
248:24, 249:15,
249:24, 249:25,
272:19, 275:23.
**late** 59:4, 81:16,
81:17, 105:4,
115:7, 128:4,
132:2, 132:3,
132:14, 157:12,
248:24.
**later** 30:23, 86:2,
87:6, 93:2, 108:5,
257:7.
**later.** 154:2.
**Latino** 235:10.
**Latinos** 233:22,
234:12.
**Laws** 17:19, 18:21,
26:11, 27:2, 31:19,
34:2, 64:2, 74:21,
75:3, 75:13,
121:23, 136:4,
141:14, 152:24,
206:5.
**lawyer** 172:5.
**lawyers** 147:20,
234:10.
**lay** 94:16.
**layout** 185:13.
**Lizotch** 103:1, 258:9,
259:11.
**lead** 112:5,
164:21.
**leader** 192:6, 64:6.
**leaders** 126.
**leadership** 24:12,
33:1, 33:23, 73:16,
212:4.
**leading** 63:14.
**League** 159:12,
289:7, 270:20.
**leap** 109:10.
**learn** 11:12.
**learned** 157:13.
**lease** 257:20.
**least** 30:9, 33:9,

**259:13.**
**Individuals** 84:2,
89:6, 93:15, 109:8,
109:18, 113:20,
150:1, 150:21,
153:1, 159:15,
181:10, 182:17,
190:20, 210:15,
229:9, 238:14,
241:2, 241:10,
253:19.
**inexperience**
223:15.
**inference** 55:12.
**influential**
181:24.
**informal** 213:23.
**informational**
265:24, 266:5.
**informed** 121:8,
214:7, 241:6,
262:7.
**informing** 167:1,
167:6, 223:16,
248:3, 263:4.
**infrastructure**
16:23.
**ingredient** 37:22.
**inherent** 271:3.
**initial** 7:6, 59:8,
165:16, 169:25,
215:15, 247:3,
247:14, 253:1.
**initially** 247:6.
**initiated** 162:11,
250:8.
**initiative** 168:1,
234:20.
**initiatives** 104:2,
104:10.
**input** 163:18.
**input** 51:13.
**inquiries** 100:14,
256:3, 261:21.
**inquiry** 111:23.
**insisted** 161:23.
**insisting** 163:22,
233:2.
**inspector**

**185:19.**
**inspectors**
168:14.
**inspectors.**
257:14.
**installations**
197:3.
**instance** 2:3, 6:4,
61:19, 98:17,
110:4, 216:1.
**instances** 78:3,
108:7, 176:14.
**Instead** 124:19,
**Institute** 1:7, 6:6,
272:4.
**institutes** 234:23.
**institutions**
140:13.
**instructed** 169:6,
169:10.
**instructions**
116:11.
**intend** 130:20,
227:11,
253:24.
**intended** 252:20.
**intent** 63:24, 64:18,
209:12.
**intention** 191:16.
**Intentional**
228:24.
**intentionally**
98:21.
**intentions** 161:9.
**interact** 20:4.
**interest** 41:18,
128:1, 131:13,
176:4, 176:10,
194:16.
**Interested** 4:4,
209:4, 273:20.
**interesting** 41:4.
**interests** 62:5,
76:21, 76:25,
102:25, 125:13,
131:5, 131:11,
142:7, 190:7,
193:8, 201:22,
202:10,
208:13.

**interfaces**
113:13.
**interfere** 178:22,
179:20.
**interfering**
157:24.
**internal** 95:17,
100:9, 113:11,
228:20.
**internally** 50:8,
242:11, 243:2.
**interpret** 254:8.
**interpretation**
231:15, 254:10,
254:11.
**interpretations**
253:6.
**interrupt** 186:7.
**interstate** 70:8.
**intimidated**
174:16.
**intimidating**
175:11.
**introduce** 6:18.
**introduced** 7:16,
150:17,
215:15.
**introduction**
68:7.
**invalidated**
195:23.
**inventory** 219:15.
**investigate** 268:12,
268:13,
268:15.
**investigating**
106:18.
**investigation**
107:17, 174:12,
262:22,
268:19,
273:14, 273:22,
272:44,
271:19, 272:2,
271:20, 270:7,
271:2.
**items** 254:4,
31:14.
**iteration** 223:1.
**itself** 35:13, 117:5,
265:8.
.
**<J>.**
**J.** 1:20, 2:1, 3:35,
5:23, 6:25, 141:6,
141:12, 223:2,
271:19, 272:2,
272:44,
223:24.
**Janice** 164:13,
167:25.
**January** 10:3,
133:13.
**Jeff** 256:17.
**jibes** 131:13.
**job** 17:10, 33:18,
223:24.

**issue** 20:16, 63:22,
73:14, 74:8, 99:12,
100:24, 102:1,
119:7, 150:15,
186:3, 187:22,
189:21, 195:15,
242:11, 248:22,
264:4.
**issued** 44:17, 46:4,
191:7, 194:21,
159:19, 164:4,
179:14, 205:9,
223:15,
224:16.
**issues** 20:10, 33:4,
62:4, 74:9, 78:20,
83:23, 99:13,
99:15, 118:23,
135:25, 152:4,
158:6, 168:4,
169:13, 169:16,
175:13, 196:25,
210:4, 210:6,
210:13, 227:25,
232:7, 234:11,
270:1, 270:7,
271:2.
**items** 254:4,

**44:6, 60:22, 68:16,**
52:22, 128:11,
176:9, 178:10,
217:3, 240:14,
234:12, 234:19,
241:25, 260:8.
**lectured** 35:1.
**led** 117:11, 159:10,
234:7.
**left** 23:10, 23:11,
93:7, 188:21,
195:3, 207:7,
226:23, 265:1,
**Legal** 6:15, 9:1,
13:23, 92:23,
96:21, 122:16.
**legal** 105:7,
122:17, 123:8,
146:21.
**legible** 133:6.
**legislation** 17:17,
17:19, 21:16, 22:4,
82:2, 91:10, 94:2,
94:8, 118:25,
119:24, 132:1,
134:24, 150:17,
185:7, 196:7,
200:17, 215:14,
219:11, 240:24,
241:9, 242:9,
247:1, 247:10,
247:24, 254:25,
255:2, 260:12.
**Legislative** 12:5,
22:6, 29:25, 33:19,
73:5, 73:7, 73:14,
74:12, 200:10,
203:24, 204:6,
222:25, 223:4,
249:5.
**legislator** 90:3.
**legislators** 21:18,
21:24, 22:3, 22:7,
22:8, 214:9,
214:10.
**legitimate** 64:3.
**Leibham** 91:17.
**length** 45:11,
172:23,
198:13.
**less** 37:6, 43:14,
61:23, 77:19,

78:13, 79:6, 79:22,
115:10, 131:15,
141:21, 157:20,
206:24, 216:12,
234:12, 234:19,
241:25, 260:8.
**letterhead** 22:25,
23:3, 24:15, 43:9,
43:11, 43:13,
24:15, 24:20,
24:25, 29:19,
43:19, 68:13,
68:15, 160:14.
**Legal** 47:25,
213:24.
**level** 13:20, 17:3,
57:15, 86:25,
90:14, 107:17,
125:15,
186:13.
**levels** 180:10.
**Libertarian**
12:13.
**license** 120:23,
121:3, 134:9,
134:13, 151:4,
155:15, 156:1,
222:1.
**lieutenant** 200:7.
**life** 42:19, 131:4,
131:9.
**lifestyle** 40:23.
**lifetime** 28:6,
78:19.
**light** 79:17, 80:5,
80:7.
**likelihood**
231:13.
**likely** 91:12, 110:4,
119:16, 131:15,
133:6, 234:12,
234:19.
**limit** 97:5, 187:15,
191:24.
**limited** 30:22, 31:6,
76:1, 79:20, 80:20,
88:15, 89:20,
153:1, 153:4,
157:1, 201:6,
203:18, 203:20,

163:5, 186:23,
216:5, 257:10.
**live** 82:21, 83:12,
107:5, 109:23,
133:12, 134:17,
142:14, 151:4.
**lived** 105:9, 105:13,
105:16, 110:3,
120:14, 131:3,
180:9, 207:25,
209:3, 222:7,
260:5.
**lives** 87:19,
109:25.
**LLP** 2:14.
**loath** 27:10.
**lobby** 11:9.
**lobbying** 11:25,
172:6, 181:25.
**local** 16:24, 17:1,
28:9, 31:2, 32:17,
32:22, 45:7, 49:6,
74:1, 80:25, 81:1,
82:3, 89:23, 91:17,
131:18, 159:4,
178:19, 179:16,
195:5, 199:13,
196:21, 216:13,
216:16, 217:5,
216:23.
**localities** 33:4.
**located** 178:12.
**location** 17:8, 37:12,
56:15, 57:8, 57:10,
60:18, 61:2, 61:22,
69:12, 73:4,
105:13, 120:14,
134:24, 132:13,
171:9, 171:13,
177:5, 180:4,
190:19, 190:17,
207:24, 209:9,
209:19, 209:25,
270:2.
**locations** 60:1,
60:10, 60:17,
61:10, 61:16,
61:17, 61:21, 62:2,
62:8, 62:13, 66:11,

293                     295
294                     296

69:7, 69:24, 97:15, 106:4, 123:11, 159:20, 167:12, 176:5, 183:10, 186:21, 229:14, 238:1.
logs 53:1.
long 20:12, 37:10, 44:14, 44:23, 45:10, 45:24, 46:2, 49:8, 49:18, 49:19, 49:22, 53:2, 54:8, 55:23, 69:16, 144:6, 156:20, 156:22, 172:15, 207:3, 209:6, 237:6, 249:8.
long-term 104:7.
long-time 90:21.
longer 19:8, 19:24, 24:14, 38:4, 69:12, 76:18, 77:8, 80:14, 122:23, 133:11, 149:24, 153:14, 196:9, 198:13, 231:24, 237:24.
longest 19:8, 19:17, 45:16, 164:22.
look 41:1, 42:19, 42:22, 45:6, 53:18, 58:10, 74:10, 85:4, 95:8, 97:9, 97:24, 115:2, 115:13, 127:15, 165:14, 182:25, 186:5, 195:13, 203:6, 205:25, 209:15, 215:9, 221:11, 230:14, 231:5, 235:23, 235:25, 240:10, 243:23, 250:2.
looked 53:20, 58:18, 194:7.
looking 18:23, 26:4, 38:14, 41:1, 50:17, 68:4, 86:25, 112:10, 112:22, 117:8, 134:1,

152:2, 161:14, 163:23, 253:3, 293:5.
looks 85:1, 94:18, 223:16.
lop-sided 41:13.
losing 24:11.
loss 251:17, 252:2.
lots 20:12, 236:25.
lottery 174:9.
loudly 161:25.
love 77:5.
low 115:1, 231:6.
Lowe 3:37, 4:18, 5:20, 164:17, 164:20, 164:21.
lower 41:9, 41:14.
Lunch 133:21, 141:7.
Lynch 137:6, 137:20.

< M >.
M 3:17, 3:31, 3:34, 3:46, 4:21, 4:27, 4:37.
Madison 2:8, 2:17, 2:24, 6:12, 6:16, 22:4, 42:2, 42:25, 55:15, 57:4, 57:5, 57:6, 60:13, 82:4, 103:24, 124:12, 130:5, 130:12, 130:16, 130:24, 131:3, 131:6, 179:25, 180:5, 180:14, 236:6, 236:9, 238:10, 237:9, 237:11, 237:18, 237:21, 239:10, 273:13.
Magney 4:33, 5:7, 5:32, 91:24, 180:22,

267:20.
mail 28:5, 39:17, 59:1, 59:23, 77:13, 97:2, 103:7, 124:21, 125:1, 125:21, 126:1, 126:5, 126:12, 143:5, 144:8, 144:17, 144:18, 145:9, 145:12, 146:22, 146:23, 146:25, 147:4, 155:10, 156:11.
mail-in 125:8, 152:16.
mailed 124:22, 125:5, 126:10, 132:8, 132:16, 152:17, 196:24.
mailing 28:3, 54:11, 143:8, 144:2, 147:1, 154:11, 156:6, 156:7, 179:25.
mailings 178:22, 179:9, 179:19, 179:22.
Main 2:8, 2:16, 2:23, 6:12, 119:21, 198:7, 273:13.
mainly 50:12.
maintained 21:2.
maintaining 33:22.
maintenance 21:7.
major 159:11, 161:7, 213:12.
majority 129:13, 129:25, 255:24, 255:25, 259:2.
manage 224:5.
managed 92:15.
management 23:25.
manager 24:8, 92:18.
managers 33:2.

managing 52:25, 92:12.
mandatory 101:17, 110:23, 111:8.
manner 236:20, 253:9.
Mark 22:19, 23:6, 43:3, 84:13, 176:19, 216:18, 219:19, 251:10.
marked 22:20, 29:8, 43:5, 48:20, 83:4, 84:15, 90:6, 94:13, 93:18, 111:19, 117:22, 129:3, 136:19, 139:23, 145:21, 151:11, 160:10, 162:23, 164:11, 169:20, 173:9, 176:22, 179:2, 179:12, 180:7, 182:7, 202:23, 203:3, 219:20, 223:11, 226:17, 229:1, 235:22, 240:12, 243:22, 250:2, 251:11, 252:11, 256:11, 262:22.
marks 72:24, 141:10, 202:25.
Martin 187:25.
Mary 181:16, 181:19, 257:4.
match 107:10, 155:11, 155:12, 155:13.
matched 134:9, 134:11.
matches 154:19.
material 63:12.
materials 18:13, 18:15, 211:17, 211:22, 213:2, 216:23, 235:16, 262:17, 265:24, 266:5, 270:5.

263:11.
monitors 91:15, 263:15.
month 213:7.
months 129:19, 133:21.
morale 24:14.
Mostly 72:7, 129:7, 176:11, 220:7, 221:21, 222:5, 222:12, 222:20.
mother 221:20, 221:25, 222:25, 222:12, 222:20.
Mowing 38:16, 57:8, 63:13, 185:8, 185:22, 249:16.
Ms 108:5, 137:20, 166:15, 176:16, 177:4, 177:19, 181:19.
multiple 59:25, 61:9, 61:16, 62:2, 62:8, 66:14, 245:13.
Muncipal 3:12.
Municipalities 59:18, 60:7, 60:9, 60:14, 60:15, 61:10, 66:12, 68:13, 69:6, 69:23, 71:15, 73:3, 82:13, 82:10, 86:3, 87:8, 122:8, 126:25, 160:2, 167:16, 168:2, 205:13, 260:5, 260:7, 265:17, 270:10.

municipality 56:9, 61:2, 105:10, 105:16, 109:24, 115:17, 122:18, 159:2, 194:3, 268:13, 266:18.
Municipality-wise 205:6.
myself 7:16, 18:19, 23:7, 91:13, 256:16.

< N >.
N 3:30, 4:5, 4:13, 4:25, 4:36, 5:21.
moved 59:9, 198:1, 198:7, 206:24, 207:11, 207:17, 209:19.
moves 207:23, 208:21, 208:22.
Mowing 38:16, 57:8, 63:13, 185:8, 185:22, 249:16.
named 174:19.
NAACP 251:18.
Name 38:19, 38:21, 59:10, 90:13, 93:3, 108:3, 108:4, 121:18, 121:20, 160:16, 182:16, 186:17, 197:20, 229:25, 230:10, 231:19, 231:22, 264:19, 264:20.
named 174:19.
needs 110:12, 119:16, 222:17, 223:9, 223:22, 224:3, 224:11.
neighborhood 30:22.
neighborhoods 70:7, 70:14.
neither 247:8.
Network 92:24, 96:2, 231:6.
New 19:23, 95:21, 96:11, 122:25, 130:8, 130:21, 133:18, 134:10, 144:18, 156:17, 206:23, 206:25, 206:23, 207:19, 207:24, 209:6.

251:14.
necessarily 24:22, 25:2, 29:19, 45:6, 60:11, 149:11, 158:24, 159:8.
necessary 66:14, 154:23, 155:3.
need 30:18, 31:5, 32:22, 47:25, 48:2, 59:20, 76:12, 118:5, 126:4, 134:19, 142:18, 167:17, 178:2, 213:10, 213:25, 214:13, 224:22, 225:19, 225:22, 230:25, 234:1, 251:12, 254:8, 265:19, 267:20.
needed 24:5, 43:12, 100:24, 142:19, 234:7, 249:1, 250:19, 251:2, 264:19, 264:20.
named 174:19.
needs 110:12, 119:16, 222:17, 223:9, 223:22, 224:3, 224:11.
neighborhood 30:22.
neighborhoods 70:7, 70:14.
neither 247:8.
Network 92:24, 96:2, 231:6.
New 19:23, 95:21, 96:11, 122:25, 130:8, 130:21, 133:18, 134:10, 144:18, 156:17, 206:23, 206:25, 206:23, 207:19, 207:24, 209:6.

209:19, 219:8, 254:25, 255:2, 293:2.
newly 148:8.
News 4:7, 17:23, 18:1, 21:16, 21:18, 21:20, 21:22, 34:2, 45:8, 46:19, 46:20, 103:13, 145:22, 146:2, 148:25, 161:14, 179:4, 219:18, 219:22, 229:8, 229:15, 236:5, 237:20, 251:9.
Next 48:13, 57:14, 62:22, 63:21, 65:3, 220:25, 234:1, 251:12, 254:8, 100:2, 121:7, 121:22, 133:25, 139:4, 147:24, 153:17, 153:24, 154:10, 161:8, 161:10, 162:10, 173:8, 236:18, 246:6, 248:9, 250:1, 252:8, 257:8.
nice 134:1.
Nichol 1:13, 6:6, 272:4.
night 21:6, 174:8.
nip 103:23.
No 1:10, 6:3, 6:9, 36:10, 44:7, 66:11, 69:2, 72:25, 126:15, 141:5, 141:11, 183:7, 190:6, 201:6, 205:16, 211:7, 218:9, 229:15, 234:21, 235:23, 254:21, 271:18.
nominate 12:8, 12:13.
nominated 12:11.
nominees 12:5.
non-v 108:2.

297
299

Matt 137:4.
matter 6:5, 7:7, 37:14, 42:24, 62:7, 108:8, 112:24, 186:7, 186:22, 188:11.
matters 16:22, 17:24, 18:12, 23:18, 270:12.
Mathew 227:5.
Mayer 42:1.
mayor 168:10, 236:25.
Mccord-wolfe 21:23.
Mcginley 3:35.
Meagan 212:23.
Meaning 27:13, 27:24, 31:13, 67:19, 77:7, 82:22, 85:2, 92:5, 92:14, 120:21, 126:16, 181:13, 243:19, 246:8.
means 16:18, 31:11, 32:25, 33:3, 38:12, 40:22, 44:25, 55:18, 55:19, 56:20, 71:17, 74:20, 77:19, 138:1, 190:14, 190:20, 202:3, 218:2, 228:9, 231:10, 232:5.
meant 30:25, 38:17, 76:13, 79:1, 109:3, 130:1, 132:19, 140:22, 153:7, 181:15, 184:7, 221:25, 227:19, 227:21, 236:9, 237:9, 237:22, 232:23.
measure 229:22.
measuring 69:19.
mechanism 191:1, 205:4.
mechanisms 205:8,

251:19.
Media 43:17, 47:25, 49:8, 141:11, 161:14, 203:1, 213:23, 219:2, 271:18.
medium 60:15.
meet 134:4, 22:5, 208:22, 220:15.
meeting 20:8, 181:21, 212:17, 253:17.
meetings 20:8, 20:13, 104:5, 107:20, 212:14, 212:25, 219:5.
meets 24:6:7.
member 73:10, 90:21, 123:12, 172:3, 172:6, 172:9, 172:10, 182:4, 187:10.
members 12:25, 13:2, 33:3, 55:19, 72:6, 93:20, 101:2, 127:19, 136:23, 169:3, 169:23, 176:25, 181:13, 181:22, 182:9, 229:3, 242:12, 244:5, 253:23, 254:4, 265:20, 258:6.
membership 182:20.
Memo 3:12, 3:16, 5:14.
Memorandum 4:4, 140:3, 140:7, 240:17.
mentioned 18:6, 20:3, 27:4, 33:25, 39:19, 60:21, 81:6, 103:13, 109:14, 118:12, 160:9, 160:7, 195:6, 225:6, 227:7, 227:8, 241:5, 242:13, 243:23, 259:25, 265:2.
met 154:18, 234:23,

247:21, 249:10, 258:1.
method 110:19, 136:7.
methods 71:1, 97:6.
Michael 2:20, 23:19, 29:13, 91:20, 136:22, 165:2, 189:23, 227:5, 235:20.
Michigan 19:6, 19:11, 19:17.
middle 138:15, 160:22, 223:19, 245:1.
Middleton 60:16.
middle 6:24, 78:25, 104:8, 138:17, 170:3, 172:3, 182:4, 187:10, 241:15.
military 55:3, 96:25, 141:24, 189:3, 190:10, 194:13, 194:17, 194:22, 195:17, 197:3, 197:5, 198:3, 201:24, 202:1, 202:4.
million 36:19, 211:19, 216:6, 216:11.
Milwaukee-main 71:4.
mind 193:17, 237:14.
mindful 51:21.
mine 207:11, 215:8.
minimum 187:3, 189:6.
Minnesota 61:6.
minority 168:23, 161:1, 162:6, 233:19, 239:10, 262:9, 263:1, 288:17.
minute 53:18, 126:3, 154:12, 230:6, 261:3, 264:3, 261:3.
minutes 45:15, 139:20.

188:22.
misallocation 265:22.
misleading 179:9.
mispronounce 93:13, 113:1.
mission 225:5.
misspoke 79:4, 150:22.
misspled 84:16.
misstates 65:7.
mistake 193:1, 193:17.
mistakenly 100:16, 193:23.
mistakes 27:18, 85:17, 98:9, 232:10, 222:16.
MJS 4:45.
mobile 130:19, 131:9.
mock 237:9, 237:11.
model 13:10, 13:18, 13:20, 149:5.
modifications 212:11, 215:22.
modified 58:7, 191:6.
modify 150:17.
moment 7:17, 20:4, 21:15, 29:14, 73:2, 117:14, 243:16, 265:2, 268:22.
Monday 52:1, 62:25, 63:9, 75:19, 75:21, 133:12.
money 61:24, 211:21, 213:13, 214:13, 218:13, 227:22, 228:15, 228:17.
monitor 91:3, 91:8, 91:7.
monitoring 91:4, 145:1, 262:14.

non-wisconsin 208:1.
nonatizens 107:20.
None 213:15.
nonpartisan 12:24, 157:6.
normal 263:20.
normally 78:8, 139:11, 200:5, 137:7, 133:19, 210:20, 259:18.
November 217:23, 219:23, 260:24.
numbers 36:21, 40:20, 40:24, 41:1, 42:22, 42:24, 42:23, 47:13, 56:14, 76:4, 76:9, 115:22, 132:6, 149:13, 194:4, 200:25, 251:17.
numeral 51:19, 52:13.
numerous 100:14, 100:23, 144:22, 249:3.
nursing 97:14, 97:21, 150:13, 150:21, 234:24.

occurred 83:9, 168:24, 176:14, 269:15.
o'clock 63:9, 82:8, 86:19, 86:20, 86:22, 87:16, 94:7.
oath 7:5, 8:9.
Oberle 3:40, 113:6, 113:7.
Objection 15:23, 16:3, 16:4, 37:19, 75:4, 96:20, 92:4, 102:20, 122:15, 140:20.
obligations 87:20.
observation 170:19, 185:9, 185:19.
observations 41:10, 47:1, 47:22, 83:19, 106:12, 106:13, 131:14, 233:10, 271:7.
observe 34:4, 162:7, 168:7, 186:4.
Observer 4:12, 57:9, 160:14, 172:19, 175:24, 183:4, 184:17, 184:19.
observers 161:1.
observing 269:5.
obtain 11:2:14, 189:14, 189:22.
obtained 205:15, 243:18.
obtaining 225:20, 228:15, 261:17.
Obviously 21:23, 41:5, 66:20, 71:14, 76:6, 167:19, 203:7, 219:3, 225:21, 267:9.
official 11:4, 20:17, 233:1, 192:24, 193:3, 195:10, 196:22, 197:5, 198:15, 257:9, 261:22, 263:6.
officials 11:1, 16:25, 17:2, 19:11, 25:10, 28:19, 31:12, 32:17, 32:22, 44:9, 45:8, 49:7, 52:21, 74:1, 82:3, 89:23, 133:18, 159:4, 167:3, 176:3, 178:20, 179:8, 179:17, 189:8, 196:22, 249:2, 256:25, 257:4, 262:4.

105:2, 120:24, 121:17, 121:20, 150:16, 150:22, 151:1, 151:2, 176:6, 181:8, 182:24, 184:15.
Oftentimes 161:23.
Ohio 143.
old 139:8, 146:7, 148:2, 208:24, 209:24.
on-campus 248:11.
Once 117:7, 213:18, 215:8, 260:9, 243:23, 250:3, 262:25.
one-day 175:14.
ones 71:16, 125:18, 182:18.
ongoing 222:24, 224:20.
online 27:15, 28:12, 28:21, 69:8, 112:10, 122:24, 125:24, 133:1, 133:7, 133:8, 133:15, 134:4, 134:6, 134:7, 134:19, 135:3, 221:9, 221:10.
open 38:23, 86:24, 183:8.
opened 45:4, 172:16.
opening 173:1.
openly 242:9.
operate 69:6.
operational 20:9.
opinion 27:5, 37:21, 47:12, 65:2, 66:22, 184:14.
opportunities 40:8, 40:22, 63:15, 65:6,

298
<page footer>300</page footer>

MADISON FREELANCE REPORTERS, LLC

65:19, 128:6,
128:12, 231:7.
**opportunity** 40:16,
46:21, 69:4, 87:17,
98:14, 119:1.
**opposed** 57:15,
115:16, 125:16,
230:23.
**opposite** 199:11.
**opt** 91:3.
**Option** 58:6, 58:7,
60:10, 87:7, 116:8,
138:3, 140:24,
189:8, 189:10,
195:11, 201:11,
248:16, 248:18,
260:9.
**Options** 58:3, 58:4,
249:2.
**oral** 203:17.
**orally** 203:19.
**order** 133:23,
139:17, 162:15,
194:24, 199:21,
207:4, 220:13.
**ordering** 21:9.
**ordinance** 130:6.
**ordinary** 18:3,
169:11.
**Organization** 4:13,
10:25, 11:1, 11:7,
11:11, 11:13,
239:16, 239:18.
**organizations** 10:19,
148:1, 160:14,
223:23, 234:5,
234:6, 235:12,
238:13, 238:13.
**Original** 5:35, 94:6,
214:4, 246:4,
246:20.
**originally** 225:11,
248:15.
**others** 3:13, 3:17,
3:31, 3:41, 3:46,
4:18, 4:22, 4:23,
4:37, 5:5, 5:8,
5:11, 5:15, 5:21,

5:33, 15:8, 27:10,
42:1.
**Otherwise** 19:8,
115:22, 199:17,
203:23, 208:4,
265:5.
**ought** 60:10, 104:21,
181:24.
**ourselves** 18:22.
**outcome** 139:1,
176:11.
**outreach** 48:4,
124:25, 127:1,
211:20, 212:2,
212:7, 212:24,
213:17, 216:22,
219:4, 233:17,
234:8, 235:2,
238:5, 248:1.
**outside** 37:13,
37:21, 60:1, 62:19,
92:16, 93:25, 98:9,
98:14, 99:2,
131:21, 214:5.
**overall** 125:11.
**overbearing**
24:3.
**overburdened**
249:6.
**overly** 157:14,
157:16.
**overnight** 78:2.
**overreport**
111:15.
**override** 254:25.
**Overseas** 55:3,
96:25, 141:24,
189:3, 189:12,
189:13, 189:18,
190:5, 190:10,
190:19, 190:21,
191:14, 191:15,
191:19, 194:14,
194:17, 194:20,
195:4, 195:17,
197:6, 198:4,
201:24, 202:1,
225:4.
**oversee** 12:2, 162:3,
172:7, 172:8,

263:15.
**overseas** 92:3,
113:11.
**oversight**
173:21.
**overview** 16:13,
57:17.
**overwhelmed**
52:25.
**own** 43:24, 56:8,
62:14, 84:22,
89:15, 121:17,
123:21, 186:5,
202:6, 218:10,
271:7.

.

**< P >.**
**p.m.** 63:9, 80:22,
82:8, 86:20, 85:22,
99:8, 141:4, 141:8,
141:10, 202:25,
271:20.
**pack** 28:20.
**packet** 242:19.
**Page** 3:3, 46:5,
51:18, 53:14,
57:16, 62:22,
62:24, 63:7, 68:7,
66:8, 67:1, 68:4,
68:7, 68:18, 69:3,
84:17, 85:20,
100:2, 114:5,
116:17, 118:14,
137:17, 140:10,
148:10, 164:15,
177:10, 183:1,
203:23, 215:23,
220:23, 238:5,
245:22, 248:7,
250:17, 251:14,
252:18,
252:24.
**Page line** 272:5.
**pages** 52:13.
**paid** 79:21, 216:23,
228:7.
**paired** 42:6.
**pamphlet** 159:5.
**paper** 28:2, 34:18,

34:19, 128:8,
259:22.
**paragraphs** 86:17,
244:25.
**parking** 62:12,
62:19.
**part-time** 62:14.
**participate** 27:8,
40:16, 46:21,
207:23, 227:23,
267:23.
**participation** 40:17,
40:21, 41:2, 41:10,
42:10, 64:1, 64:20,
65:1, 76:4, 199:11,
246:2, 248:12.
**particular** 14:2,
20:16, 23:21,
43:24, 45:11,
45:21, 52:24, 53:8,
56:23, 74:7, 91:9,
105:7, 112:15,
124:11, 130:9,
186:14, 197:22,
210:13, 212:15,
225:23, 228:19,
233:18, 259:11,
270:2.
**particularly** 102:6,
150:10, 164:2,
167:14,
210:19.
**Parties** 4:4, 12:7,
74:1, 157:4,
159:11,
273:19.
**parts** 45:21, 51:7,
51:17, 63:6, 70:7,
180:22, 178:11,
190:4.
**Party** 12:13, 13:5,
159:6, 165:7,
179:22, 183:11,
183:20, 183:24,
194:23, 196:1,
196:2, 196:22,
199:2, 199:9,
200:23, 201:3,
201:4, 202:15,

34:19, 128:8,
259:22.
**possible** 19:16,
64:1, 64:19, 65:1,
206:1, 243:6.
**possibly** 98:21.
**post** 27:13,
180:22.
**post-2010** 27:13.
**post-church**
186:21,
259:18.
**post-election** 107:6,
194:5.
**posted** 68:2, 85:9,
85:12, 85:15,
177:23, 243:11,
243:12.
**posterity** 89:13,
270:10.
**potential** 250:11.
**Potentially**
185:10.
**power** 107:3,
188:3.
**practical** 142:9,
152:4, 246:4.
**practice** 21:8, 21:12,
54:13, 78:9,
112:15, 259:7,
263:20, 266:17,
267:13.
**practices** 11:12,
11:14, 17:11,
60:22.
**Prairie** 60:15.
**preceded** 11:20,
**preceding** 66:8.
**precincts** 158:21,
158:23.
**predecessor** 32:20,
118:15.
**predominantly** 88:8,
89:2, 89:3.
**preface** 133:9.
**premised** 219:5.
**preparation** 50:24,
82:1, 220:19.
**preparations**
78:7.
**prepare** 219:7.
**prepared** 48:1,

197:23.
**prepares** 56:10.
**preparing**
242:22.
**prescribed** 94:1,
302:2.
**presence** 131:20,
131:22, 159:21,
273:14.
**PRESENT** 2:27,
22:11, 26:11,
27:14, 49:16, 50:8,
69:17, 84:6,
128:13, 138:25,
157:4, 191:16.
**presentation**
181:21.
**presented** 49:7,
102:4, 106:8,
173:1, 212:22,
222:1.
**presents** 56:11.
**preserving**
162:15.
**president** 10:22,
46:18, 193:24,
199:3, 199:14,
200:5, 206:14,
206:17, 206:25,
207:8, 207:9.
**Presidential** 32:16,
39:21, 44:20,
49:20, 49:24,
50:2, 60:9, 60:10,
70:21, 70:23,
170:7, 173:4,
175:2, 187:13,
198:22, 199:14,
200:5, 206:22,
207:5, 207:15,
208:11,
217:14.

**press** 3:20, 4:16,
4:47, 35:8, 43:13,
43:20, 47:23,
103:23, 117:10,
146:15, 162:25,
163:14, 179:14,
213:7, 222:15,
267:15, 267:17,
268:2, 268:6.
**pretty** 25:3, 41:13,
85:5, 97:17, 128:8,
173:17, 206:16,
238:15, 243:2,
244:18, 255:13,
269:20.
**prevent** 192:20,
254:23.
**preventing**
131:6.
**prevents** 191:10.
**previous** 62:24,
130:1.
**Previously** 142:16,
181:2, 184:25,
189:6, 207:17,
266:18.
**primaries** 198:1,
198:2.
**primarily** 28:4,
27:21, 55:2, 92:4,
93:19, 140:4,
259:17.
**primary** 11:9, 113:7,
164:5, 176:10,
190:14, 197:17,
199:16, 213:8,
218:25, 231:6,
269:18.
**print** 133:5,
133:16.
**print** 148:14.
**printout** 83:5.
**prints** 135:2.
**Prior** 13:6, 26:7,
30:9, 54:2, 59:20,
63:10, 81:12,
81:18, 81:23, 82:5,
82:8, 86:13, 95:14,
95:16, 114:24,

**passed** 34:7, 95:9,
130:11, 134:6,
204:14, 222:21,
223:2, 223:6,
224:17, 225:12,
247:25, 249:8,
249:19, 251:24,
254:15.
**passes** 197:24.
**passing** 184:14.
**past** 184:11,
250:10.
**path** 270:16.
**pattern** 117:9.
**pay** 30:18.
**paying** 145:13,
228:9, 268:8.
**penalize** 55:15.
**penalties** 105:11.
**penalty** 110:2.
**pending** 8:6.
**per** 61:2, 230:6.
**percent** 12:7, 12:15,
31:3, 36:14,
115:10, 201:13,
203:18.
**percentage** 39:4,
41:8, 42:16, 42:24,
56:18, 114:16,
116:1, 116:6,
201:10.
**percentages**
43:1.
**percentage-wise**
115:23.
**perception** 55:23,
56:3, 56:5, 119:15,
263:23,
263:25.
**percolate** 99:15.
**performance** 14:20,
92:17, 269:25.
**performed**
168:13.
**periods** 58:24, 77:4,
204:22.
**perjury** 105:11,
110:2.
**Perkins** 2:14,

147:20.
**permanent** 113:16,
189:13, 191:13,
191:19, 194:13,
197:25.
**permit** 254:15.
**permanently** 190:21,
195:4, 254:17.
**permissible** 119:8,
209:10, 255:3.
**permit** 69:6, 86:18,
129:8, 171:5,
184:18,
205:14.
**permits** 194:22.
**permitted** 100:16,
137:23, 156:22,
163:21, 171:5,
191:9, 247:10,
255:6, 266:14.
**permitting** 117:25,
138:2, 245:2.
**personal** 153:18,
174:3.
**personality**
24:10.
**personally** 45:24,
73:13, 105:14,
253:4.
**personnel** 23:18,
24:1.
**persons** 78:8.
**perspective** 31:13,
223:23.
**persuade** 242:1.
**pertain** 73:18,
183:3.
**Pew** 14:14,
146:7.
**phone** 22:5, 154:20,
174:2.
**photo** 23:15, 120:5,
120:21, 124:24,
142:5, 213:10,
215:14, 220:13,
215:21, 223:8,
222:22, 224:4,
224:19, 226:15,
243:13, 245:7,

251:1, 253:21,
255:3.
**photographing**
176:13, 177:5.
**photographs**
177:14.
**phrase** 18:14, 87:22,
88:1, 88:11,
108:16.
**phrased** 166:3.
**pick** 47:22.
**picked** 46:19, 46:23,
95:13.
**picture** 112:19,
178:18, 228:6.
**piece** 25:21,
28:2.
**pieces** 28:5,
247:10.
**placed** 64:10, 197:1,
197:21,
254:7.
**places** 56:12, 56:14,
62:15, 77:24, 81:4,
81:9, 158:18,
167:18, 168:18,
176:15, 184:18,
225:14, 225:16,
253:1.
**placing** 185:15.
**Plaintiffs** 1:9, 2:3,
2:18, 6:5, 6:22,
7:18.
**plan** 79:9, 117:23,
213:6, 213:11,
264:19.
**planning** 79:12,
183:1.
**plate** 264:14.
**play** 50:24.
**pleadings** 34:8,
34:12, 94:15.
**Please** 6:18, 9:13,
22:22, 43:7, 65:10,
94:15, 235:23,
239:22, 240:4.
**plenty** 59:23.
**pocket** 230:24.
**Point** 8:1, 8:12, 9:4,
24:10, 35:18, 69:2,

115:25, 120:9,
149:12, 155:18,
183:7, 218:15,
218:25, 222:11,
222:20, 224:12,
228:15, 231:20,
243:14, 254:19,
254:21.
**point** 50:17,
79:16.
**pointed** 38:8,
168:11, 176:1,
176:2.
**pointing** 63:5,
155:7.
**points** 35:19, 57:20,
120:10, 139:17,
153:23, 156:22,
185:1, 185:3,
202:3, 202:8,
258:16, 260:10,
268:15.
**political** 12:7, 13:5,
89:9, 128:15,
157:3, 159:11,
196:2, 201:18,
202:15,
240:17.
**politician** 35:17.
**politics** 35:2.
**Poll** 15:4, 15:9,
15:13, 15:19, 16:8,
17:7, 38:20, 39:21,
55:8, 107:15,
108:7, 129:3,
156:14, 158:1,
162:9, 163:23,
163:25, 167:1,
167:6, 167:15,
167:17, 167:22,
168:10, 187:25,
217:12, 227:17,
227:24, 230:3,
230:11, 230:13,
231:3, 231:18,
232:10, 232:2,
237:19, 259:20,
270:4.
**polling** 17:7, 38:12,

11:8, 11:11,
273:7.
**professionalism**
35:13.
**professionally**
124:6, 124:7.
**professor**
201:18.
**Professors** 42:1,
240:18.
**program** 123:9,
183:17, 211:20,
246:3.
**programmed**
201:7.
**programmers**
77:4.
**programs**
123:11.
**progress** 264:20.
**Progressives** 199:1,
199:6, 199:9.
**prohibited**
130:13.
**prohibiting**
130:9.
**project** 92:18,
217:23.
**projected**
216:13.
**projection** 216:4.
**projects** 92:12,
92:19, 112:11,
93:10.
**promised** 220:6.
**promoted** 28:10,
92:7, 93:2.
**promoting**
257:10.
**promulgate**
158:11.
**pronounce**
90:13.
**proper** 107:15,
120:12, 146:19,
147:9, 154:8,
251:18.
**properly** 38:22,
149:9, 193:5,
265:20.

**proponents**
119:22.
**proposal** 94:6,
119:15,
250:14.
**proposals** 73:6,
135:3, 203:24,
204:7, 204:14,
204:18, 222:6.
**proposed** 50:19,
87:15, 87:16,
134:24, 245:23,
246:8, 248:15.
**prosecute**
110:12.
**prosecuted**
210:7.
**prosecutorial**
109:20.
**Protection** 147:18,
147:19, 269:10,
270:21.
**protocol** 171:1.
**prove** 257:25.
**proved** 217:25.
**provide** 84:24,
85:5, 101:7, 114:7,
118:14, 130:18,
135:10, 142:14,
147:8, 159:3,
175:10, 175:17,
189:21, 204:2,
213:16, 216:4,
216:14, 216:24,
218:9, 235:12,
248:18, 250:10,
251:1.
**provided** 24:14,
36:25, 40:16, 81:7,
55:5, 55:19, 62:11,
63:16, 67:2, 67:22,
83:1, 91:19, 91:24,
107:23, 127:6,
130:1, 142:12,
151:5, 183:6,
212:12, 219:2,
223:16, 229:7,
224:22, 243:18,
243:20, 263:12,
267:3, 273:8,
273:26.

**provision** 96:3,
127:12, 153:25,
156:22, 195:1,
195:6, 206:19,
206:12, 228:12,
238:12.
**provisional** 217:1,
217:9, 217:16.
**provisions** 2:3,
26:12, 35:25,
80:24, 104:21,
107:4, 155:19,
159:16, 194:21,
195:13, 197:4,
206:22, 249:3.
**proxy** 18:1.
**Public** 2:6, 13:8,
20:25, 43:17,
47:16, 50:10, 54:4,
55:5, 55:19, 62:11,
63:16, 67:2, 67:22,
83:1, 91:19, 91:24,
107:23, 127:6,
130:1, 142:12,
151:5, 183:6,
212:12, 219:2,
223:16, 229:7,
224:22, 243:18,
243:20, 263:12,
267:3, 273:8,
273:26.
**publicly** 74:11,
205:22, 221:18,
242:2, 242:23,
243:9, 243:10.
**published**
254:22.
**publishes** 21:4.
**provides** 21:4,
36:25, 40:16, 81:7,
102:18, 131:8,
203:24.
**purely** 22:8.
**pulling** 228:18,
230:24.
**purport** 85:13.
**purpose** 11:7, 20:20,
210:23, 211:5,
226:11, 257:25,

## Page 305

261:5.
purposes 43:12,
195:16, 196:10,
209:2, 211:1,
212:7, 240:14.
pursuant 2:4,
6:4.
push 125:24.
pushing 175:25.
put 15:23, 28:10,
27:10, 31:14,
31:18, 33:16,
47:14, 51:2,
116:16, 133:25,
139:19, 148:24,
162:25, 185:12,
185:19, 204:11,
216:18, 220:16,
222:4, 223:17,
226:13, 249:5,
265:24, 266:5.
Putting 52:9, 64:4,
186:19, 243:8.
.
<Q>.
qualification
197:19.
qualifications 210:7,
258:2.
qualified 252:25.
qualify 191:13,
207:2, 207:7,
207:10, 208:11,
209:5, 222:1.
qualifying 225:15,
225:17, 234:13,
245:7, 252:7.
quality 131:18.
quantify 45:17.
quarter 20:10.
question 8:6, 8:12,
8:13, 8:16, 8:17,
23:22, 23:24, 25:9,
29:4, 41:15, 63:18,
68:6, 75:25, 78:25,
108:24, 110:9,
131:10, 139:15,
185:24, 188:25,
192:7, 203:5,
225:18, 228:15,
230:4, 236:1,
259:9, 261:7,
262:19.
questioning 16:3.
questionnaire
55:21.
questions 8:20,
45:2, 60:8, 102:1,
117:1, 117:10,
117:11, 178:21,
179:18, 184:16,
209:9, 210:8,
210:11, 210:17,
220:18, 240:3,
250:24, 252:3,
252:5, 255:18,
265:10,
271:10.
quibble 26:1.
quick 232:17.
quickly 33:5, 38:17,
144:7, 249:16,
257:19.
quite 32:25, 38:15,
53:12, 54:25, 61:6,
72:11, 95:9,
127:12, 127:22,
157:19, 178:25,
205:6, 243:15,
252:23.
quo 33:22.
quote 25:6, 46:4,
48:5, 48:6, 63:22,
84:7, 220:10,
251:21, 258:23,
268:24.
quoted 163:6,
180:13, 219:25,
220:6, 221:16,
223:20, 251:14,
259:20.
quotes 34:15, 43:24,
44:13, 63:11,
163:3, 221:8.
.
<R>.
R. 4:33, 5:7, 5:10,
269:15, 272:25.
reading 18:8, 34:19,
212:16,
269:24.
Reads 18:9,
272:5.
ready 214:12.
real 121:9, 175:13,
186:9, 194:6.
realistic 224:8,
224:12.
reality 81:4.
realize 196:11.
realizes 193:24.
really 11:8, 11:10,
18:22, 32:5, 41:14,
55:25, 59:18,
59:20, 89:4,
103:10, 104:15,
142:14, 156:24,
160:5, 200:25,
231:4, 261:8,
293:17.
Reason 64:5,
111:14, 156:13,
186:25, 188:13,
198:1, 198:7,
272:5.
reasonable 158:9,
159:14,
188:18.
reasons 46:10, 47:4,
47:11, 82:17,
87:11, 125:24,
149:18, 154:22,
155:2, 201:25,
270:18.
recast 193:1.
receipt 227:4.
receive 89:10,
173:16, 174:24,
214:14, 216:8,
236:13.
received 68:8,
89:16, 98:9,
100:14, 126:12,
144:22, 158:3,
158:20, 160:24,

## Page 306

161:8, 163:7,
167:8, 177:1,
178:20, 188:5,
214:25, 225:9,
225:11, 237:23,
238:2, 242:7.
receives 95:5,
269:4.
receiving 146:7,
146:21, 170:10,
173:18,
179:17.
recent 160:23,
161:5, 161:7,
162:15, 163:6,
178:21,
251:18.
recently 31:20,
179:19, 204:5.
recess 72:22,
117:17, 141:7,
202:22,
268:25.
recipient 92:21.
recipients 90:9.
recognition 28:6,
40:6, 44:7, 45:12,
46:15, 60:6, 70:12,
152:13, 222:5.
recognize 44:10,
48:21, 59:13,
59:20, 139:25,
240:11, 243:24,
256:3,
268:24.
recognized 28:7,
64:5, 97:22,
112:12, 253:6.
recognizing 130:22,
231:2.
recollection 16:10,
55:22, 58:10,
58:11, 173:18,
176:20, 183:25,
241:17, 263:17,
268:18.
recommend
86:22.
recommendation
58:16, 59:19,
59:25, 60:5, 63:22,
66:5, 66:9.
recommendations
39:25, 50:9, 50:13,
50:14, 57:17,
59:12, 72:8, 74:3,
74:5.
recommended
27:14, 27:17, 63:2,
86:17, 108:7,
181:12, 189:17,
247:12, 261:2.
recommends
66:22.
reconsidered
253:17.
record 6:2, 8:24,
72:19, 72:21,
72:24, 105:1,
108:25, 111:9,
117:14, 117:16,
117:19, 141:4,
141:10, 169:2,
171:17, 202:20,
202:25, 259:14,
268:21, 268:23,
269:2, 271:15,
271:17,
273:10.
recorded 44:8,
43:18, 54:18,
71:5, 84:7, 84:20,
147:13, 161:12,
175:21, 192:15,
243:6, 246:22,
246:23, 249:14,
252:19.
references
41:23.
referendum
250:11.
referred 44:8, 47:3,
43:18, 54:18,
105:2, 114:22,
171:19, 177:14,
181:8, 191:1,
288:6.
referring 10:8,
14:20, 25:18,
25:20, 34:9, 34:10,
40:25, 41:25,
45:22, 55:4, 57:22,
82:23, 82:25,
103:11, 123:3,
130:18, 190:13,
163:16, 178:25,
181:2, 216:16,
221:10, 236:15,
238:19, 242:16,
242:18.
refers 44:4, 64:9,
88:8, 161:19,
236:9, 238:5.
reflect 35:8, 40:23,
44:12, 47:17,
47:20, 67:6, 72:1,
100:9, 145:16,
209:23, 221:4,
254:9, 255:12.
reflected 55:25,
212:9, 233:3,
241:22.
reflection 70:15.
reflective 41:14.
reflects 30:17, 31:1,
66:17, 66:18, 67:2,
70:6, 83:18, 83:23,
94:9, 104:13,
140:18, 148:24,
165:25, 210:8.
Reform 118:10.
refresh 176:20.
regard 17:22.
regarding 14:3,
17:23, 34:2, 34:6,
70:20, 70:22, 72:5,
73:5, 84:10, 89:17,
100:15, 151:8,
161:9, 177:24,
180:23, 245:14,
267:17, 267:23,
268:19.
regardless 88:11.
Registered 25:5,
59:17, 110:15,
114:17, 114:24,
115:16, 121:4,
125:23, 126:18,
126:19, 132:4,
132:13, 134:23,
136:7, 142:16,
143:4, 147:8,
147:11, 149:23,
150:3, 150:17,
211:11, 229:24,
250:18, 261:5,
273:7.
registering 105:8,
119:1, 119:2,
141:19, 142:15,
149:5, 161:25,
168:18.

## Page 307

registers 142:24,
144:1.
registrant 116:12,
209:7.
registrants
144:17.
registrations
114:13, 115:14,
126:5, 126:8,
144:19, 146:7,
regular 58:25, 88:5,
87:3, 87:4, 218:18,
270:3.
regularly 20:5.
regulates 21:5.
Reid 91:24, 116:25,
117:9, 180:22,
reinforce 159:15.
reinstated
239:19.
reissued 120:25.
rejected 101:18,
194:3.
rekeyed 133:22.
relate 195:18,
208:22,
232:25.
related 20:16, 17:20,
92:4, 92:19,
103:14, 213:14,
132:21.
relates 84:18,
118:2.
relating 17:19, 34:7,
39:20, 99:16,
189:21, 212:3,
215:1, 218:17,
218:22.
relationship 34:23,
120:8.
relative 67:16,
273:17,
273:19.
relatively 41:3, 80:7,
112:2.
relay 198:6.
relaying 172:14.
release 3:20, 4:16,
4:47, 43:13, 47:23,
146:2, 146:15,
148:25, 162:25,
179:14, 179:16,
223:15, 224:16,
267:16, 267:17,
266:6.
releases 43:20,
163:14, 268:2.
relevant 155:1,
156:16, 270:9.
reliability 270:25.
reliable 270:22.
relied 63:16.
religious 88:3.
relying 192:25.
remain 63:3, 126:20,
120:22,
130:20.
remained 41:3,
244:22,
248:18.
remarks 33:13,
78:12, 86:9, 88:11,
154:5.
remarks 3:43, 5:26,
232:13.
remedied 151:25,
152:1, 152:12,
153:21.
remember 34:11,
34:19, 67:15, 74:5,
74:6, 74:7, 90:19,
98:15, 96:19,
104:10, 108:11,
118:17, 130:9,
147:15, 147:21,
161:13, 177:25,
178:2, 183:25,
206:1, 212:16,
216:10, 241:12,
241:14, 244:17,
248:17,
249:21.
reminded
34:13.
remind 146:17,
146:25,
235:14.
removed 172:21.
repeated 168:25.
rephrase 56:5,
154:25, 228:2,
259:9, 262:19.
replaced 9:25,
23:19.
replicating
162:23.
replied 101:9.
Reported 1:24, 35:7,
103:22,
237:18.
Reporter 2:6, 6:16,
8:20, 113:21,
267:5, 273:8.
Reporters 6:17.
reporting 137:21.
reports 39:20, 45:7,
50:5, 73:15, 78:18,
108:19, 160:25,
161:9, 161:14,
163:7, 172:13,
175:13, 233:10,
237:21, 238:2,
241:7, 259:17,
259:4, 269:14,
268:15, 269:25,
263:12,
265:16.
represent 6:19,
137:4.
Representative
7:12, 137:7, 244:2,
256:16, 256:18,
256:21.
representatives
28:3, 73:25,
138:25, 159:11,
171:3.
representing 9:3,
183:23, 184:1,
210:10, 241:12,
216:10, 241:14,
244:17, 248:17,
255:8, 262:9,
263:8.
requires 57:2, 77:17,
122:15, 144:15,
184:17, 197:9,
197:10.
requiring 130:14,
131:6, 184:12,
reregister 130:22,
144:5.
research 242:11,

## Page 308

242:12,
242:15.
researched
156:24.
resenting 98:14.
reserve 139:1.
reside 122:13.
resided 122:5.
residence 139:5,
139:7, 149:9.
residency 137:18,
143:23, 202:16,
206:6, 209:8,
206:11, 206:12,
207:18, 207:24,
208:14, 208:22,
209:1, 211:5,
217:7.
resident 196:8,
196:9, 208:2,
208:4, 208:8.
residential 97:23.
residents 150:13,
179:25, 180:10,
206:20, 206:21,
206:23, 208:10,
260:6.
resides 177:20.
residing 191:15.
resolution
197:18.
resolutions
68:16.
resolve 159:25.
resolved 64:3.
resources 30:22,
31:6, 37:6, 58:13,
57:2, 76:17, 77:4,
79:9, 109:18,
112:21, 211:25,
219:4, 222:17,
222:18, 223:22,
224:3, 269:22.
respect 40:4, 82:18,
211:5, 215:14,
262:4.
respectively
181:20.
respond 78:7,
90:2.
responded 55:20,
227:15.
responding 77:13,
238:23.
response 67:8,
100:25, 114:2,
118:15, 138:11,
138:12, 138:15,
162:8, 164:17,
165:22, 170:3,
171:18, 250:15,
250:16, 260:13,
269:21.
responses 54:3,
54:4, 55:5, 55:12,
67:22.
responsibilities
17:10, 28:24, 30:1,
30:11, 113:12,
173:21, 225:3.
responsibility 18:24,
82:11, 92:13,
113:8, 149:1.
responsible 11:5,
23:4,
rest 16:3, 42:18,
42:21, 130:25,
180:10, 196:4,
43:22, 187:22.
restate 20:13,
restricted 13:15.
restricting 104:19,
211:20.
restrictions
58:23.
restricts 130:10,
140:11.
result 30:20, 33:1,
40:21, 42:10, 76:4,
79:5, 80:13, 95:25,
122:22, 125:19,
194:22, 199:24,
208:16, 237:6,
244:10, 244:11,
260:10.
resulting 105:21.
results 37:9, 41:7,
183:21,
260:25.
retain 167:21.
retained 95:4,
200:14.
Retention 62:25.
return 180:1, 189:14,
191:16, 191:22.
returned 59:24,
156:7, 156:10,
192:4, 193:6.
returning 180:11,
193:17.
reverse 131:10.
Review 17:17, 17:23,
18:13, 18:14,
21:15, 22:21, 25:1,
29:18, 39:21, 40:4,
43:6, 43:18, 48:19,
51:3, 51:5, 119:12,
248:24, 250:3,
252:15, 254:10,
254:14, 254:15,
254:20, 255:1,
255:21, 256:2,
265:1, 255:15,
255:17, 256:5,
256:21, 256:4,
256:8.
reviewed 29:16,
34:12, 39:19, 42:24,
43:22, 187:22.
reviewing 21:17.
reviews 50:10.
revise 211:22.
revised 211:24.
revision 132:12.
rewritten 133:12.
rid 131:11.
righting 121:1.
Rights 137:22,
138:9, 238:25.
risk 238:6, 238:10.
river 62:16.
Robinson 4:5, 4:13,
4:36, 5:21, 23:8,
23:9, 51:1, 160:16,
184:3.
role 16:14, 50:24,
174:4, 175:8.
.
roll-out 232:9.
rolled 133:23.
Romm 51:19,
52:13.
Romney 184:1.
room 57:15,
188:15.
Ross 92:2, 92:3,
110:20, 159:9.
route 256:4.
routine 230:19.
RPR 1:24.
RPM 170:13,
170:21.
rule 169:17.
rule 73:2, 73:6,
133:1, 159:7,
159:25, 162:18,
175:25, 184:25,
208:9, 254:9,
254:12, 254:13,
254:14, 254:15,
254:20, 255:1,
255:5, 255:6,
255:15, 255:17,
256:5, 259:4.
ruled 257:23.
Rules 2:4, 7:19,
138:18, 138:22,
158:7, 158:11,
162:12, 162:18,
175:24, 184:17,
185:4, 203:12,
203:14, 226:1,
244:12, 252:15,
256:21, 256:2,
256:8.
ruling 91:7,
258:5.
run 35:21, 57:7,
81:17, 99:14.
running 11:5,
44:18.
runs 56:12, 113:13,
136:3.
.
<S>.

## 309

S. 2:20, 4:32, 5:4.
sake 203:17.
sanctions 159:17.
Sarah 112:4, 112:5, 113:15, 113:19, 116:11.
sat 74:2.
satellite 69:6, 70:4.
satisfaction 15:5, 22:22.
satisfied 15:14, 23:17.
saves 135:1.
saw 34:19, 45:8, 45:20, 68:1, 104:12, 116:11, 116:23, 159:6, 178:10, 178:14, 225:13, 233:11, 269:20, 269:23, 270:25.
saying 33:12, 44:13, 83:11, 83:21, 136:7, 139:12, 153:13, 163:6, 171:3, 182:15, 199:11, 200:15, 214:2, 220:6, 221:9, 222:20, 227:16, 264:11, 264:15.
says 23:5, 23:7, 51:21, 52:24, 53:16, 63:13, 69:9, 69:14, 70:2, 71:5, 118:25, 137:18, 138:17, 139:4, 156:10, 161:8, 175:5, 180:25, 183:3, 183:7, 184:4, 184:6, 196:1, 196:6, 203:23, 220:23, 227:14, 229:15, 229:16, 237:20, 239:4, 246:6, 256:20, 257:5.

schedule 87:3, 87:4.
schedules 47:5, 87:5, 87:13.
scholarships 13:23.
school 9:5, 87:19, 127:19, 129:15, 129:18, 129:24, 130:2, 130:3.
schools 127:3, 127:4, 127:7, 127:10, 127:11, 127:20, 128:4, 127:11.
Schultz 34:6, 34:16, 34:21, 34:22.
science 201:18, 240:17.
seal 273:22.
sealed 193:2.
Seated 6:2.
second 25:7, 25:9, 44:3, 44:13, 46:5, 46:6, 57:6, 65:3, 65:22, 66:11, 80:10, 85:21, 92:8, 95:23, 138:16, 146:4, 147:24, 148:9, 163:5, 165:17, 169:24, 170:2, 198:7, 198:8, 203:23, 220:23, 221:13, 223:12, 223:19, 244:6, 250:17, 251:14, 252:18, 261:25.
secretaries 19:14, 19:21.
Secretary 11:3, 11:23, 19:12, 19:23.
Section 62:24, 63:2, 137:17, 262:5, 262:10, 262:25, 263:21.
sector 93:9.
Security 62:1, 134:15, 134:16.

seeing 34:8, 44:14, 45:16, 104:1, 117:6, 161:23, 163:2, 177:25.
seem 41:23.
seemed 79:21, 82:12, 120:1, 265:21.
seems 17:25, 104:16, 168:22, 253:12.
seen 40:20, 40:24, 41:22, 45:5, 55:24, 76:3, 76:5, 109:13, 175:20, 178:15, 241:8, 271:6.
segment 246:3.
segregated 227:11, 228:4, 228:8, 228:23.
select 239:6.
Senate 50:21, 151:14, 151:17, 167:7, 181:6, 203:14, 215:15, 241:14, 247:9.
Senator 34:5, 34:22, 73:17, 73:25, 103:16, 104:3, 104:4, 109:1, 258:9, 258:11.
send 25:3, 97:15, 107:1, 107:16, 125:1, 133:5, 144:1, 148:17, 191:25, 193:19, 213:1, 213:2.
sending 170:24, 174:3, 240:21, 244:13.
sends 154:14.
senior 129:20.
seniors 129:24.
sense 12:5, 19:3, 62:8, 61:22, 81:14, 110:24, 131:13, 139:10, 153:4, 153:22, 165:10.

167:24, 193:15, 195:12, 209:2, 217:23, 234:16, 253:9, 259:21, 260:16, 261:3, 265:14.
sent 24:16, 90:12, 93:23, 100:10, 101:1, 127:10, 135:16, 136:10, 153:13, 156:7, 160:16, 168:8, 168:16, 168:17, 173:11, 173:21, 189:2, 189:3, 189:6, 190:12, 196:15, 196:19, 196:21, 197:5, 197:10, 198:4, 198:13, 240:16, 240:20, 263:5, 263:6, 263:15.
sentence 25:7, 25:9, 46:6, 65:3, 65:22, 66:11, 69:22, 86:1, 86:7, 138:16, 139:4, 147:25, 161:8, 161:18, 220:23, 246:6, 248:7, 257:8.
sentences 53:9, 66:2, 257:7.
sentiments 166:1.
Sentinel 111:24, 113:22, 114:8, 219:23, 221:5.
separate 72:3, 135:4, 149:22, 204:4.
separated 228:4.
September 198:2, 198:8.
Sequestered 97:7, 97:10.
series 50:9, 236:3.
seriously 165:17, 165:10.

## 310

263:24, 264:1, 264:2.
serve 11:7, 12:9, 12:10, 27:24, 67:17, 94:10, 122:14, 128:2, 153:6, 156:21, 211:4, 226:10, 237:16, 238:14, 248:11, 259:19.
served 19:13, 40:10, 76:21, 77:1, 85:22, 103:1, 125:14, 131:5, 131:11, 131:13, 142:8, 190:7, 190:8, 201:23, 202:10, 264:4.
service 13:7, 21:4, 21:20, 144:8, 212:12.
services 60:16, 60:19, 62:18, 70:17, 94:4.
servicing 79:8.
serving 19:9, 19:17, 70:14, 80:9.
session 4:43, 204:6, 204:8.
sessions 222:25, 223:4.
set 56:21, 59:15, 77:25, 87:2, 129:10, 138:7, 186:24, 196:15, 197:13, 247:21, 269:21, 273:21.
sets 226:3.
setting 81:1, 163:9.
setup 185:16.
seven 200:11.
several 12:1, 14:17, 21:25, 25:21, 51:5, 78:3, 109:9, 125:18, 136:22, 166:21, 169:2, 201:20, 204:16.

222:25, 253:18.
sex 74:19.
Share 92:20, 100:4, 181:23, 228:16.
shape 175:15.
shaping 203:24.
share 11:8, 241:25, 242:24.
shared 123:9, 229:5, 236:5, 240:25, 241:4, 241:24, 242:12, 242:18.
sharing 229:6, 229:8.
She'd 112:17.
sheer 56:14.
SHEET 272:1.
shifting 35:6.
Short 12:11, 72:22, 89:12, 117:17, 202:22, 262:25.
shorter 38:2, 76:13, 78:15, 173:2, 200:20.
shortly 23:10, 164:4, 251:23.
shouldn't 125:21, 136:11.
showed 15:13, 41:7, 45:8, 142:20, 242:13.
showing 38:20, 107:7, 107:23, 139:16, 143:20, 226:5, 229:6, 257:24.
shown 17:5, 20:2, 229:19.
shows 67:11, 70:25, 114:16.
shut 224:24.
side 62:16, 127:24, 129:11, 192:13, 230:3, 230:11.

2223.
signal 214:16.
signature 193:5, 193:8, 193:9, 217:25, 246:9.
signed 68:23.
significant 39:15, 217:10.
significantly 249:4.
signing 38:20, 105:11, 233:14, 245:8.
similar 46:23, 61:7, 124:25, 155:17, 207:6.
simply 115:11, 172:5, 229:16.
single 61:1, 108:1, 205:10, 205:11, 239:1.
single-sided 224:10.
sit 10:15, 53:10.
sites 66:14, 53:3.
situation 167:19.
situations 77:17, 97:6, 97:25, 109:8, 112:18, 120:11, 121:20, 124:21, 132:3, 142:13, 144:1, 147:15, 155:6, 176:12.
Six 185:11, 186:8, 187:3, 188:12, 186:16, 186:17.
sixth 57:15.
sizable 54:3, 55:4, 234:3.
size 56:9, 56:14, 60:15, 235:17.
skip 110:24, 111:5, 111:6, 111:10.
skipping 257:7.
slick 17:8.
slight 4:2.
slightly 216:12.
sloppy 132:20.
slow 158:1, 232:17, 222:22.
slower 149:5.

slowing 157:23, 229:13.
slows 229:20.
small 20:11, 115:9, 132:5, 132:12, 148:14, 162:5, 213:1.
smaller 60:7, 115:17, 116:1, 116:4.
smoothly 56:12.
so-and-so 21:10.
Social 134:15, 134:16, 161:14.
society 166:13.
soft 232:9, 236:8.
solicit 145:5.
somebody 108:13, 152:18, 191:18, 239:1.
somehow 94:23, 224:10.
someone 12:8, 12:9, 12:11, 12:13, 77:18, 91:4, 98:4, 98:13, 99:10, 105:9, 107:19, 199:9, 199:22, 199:12, 201:3, 201:14, 202:1, 202:13, 203:20.
someplace 209:4.
sometime 129:20.
Sometimes 22:10, 46:23, 62:17, 77:15, 96:3, 102:14, 102:23, 107:13, 258:16, 269:4.
somewhere

## 311

36:23.
son 22:25, 22:27.
soon 54:10, 134:23.
sort 17:6, 37:21, 92:8, 92:18, 112:7, 159:10, 164:23, 168:11, 169:17, 200:9, 264:16, 269:3.
sorts 238:2, 268:12.
Souls 87:22, 87:24, 253:12.
sounds 36:21, 85:4, 178:5, 268:8.
source 71:18, 115:2, 228:16.
south 70:9.
southern 88:2.
space 57:9, 146:8, 146:18, 163:5.
Spanish 26:11, 261:15, 262:20, 266:2, 266:9.
Speaker 256:18, 256:21.
Speakers 223:17.
Speaking 23:24, 33:24, 77:23, 174:4, 174:15, 204:7, 266:7, 256:24.
special 27:20, 27:21, 30:5, 97:9, 97:15, 97:20, 97:22, 98:2, 121:22, 121:25, 122:4, 122:6, 122:11, 122:18, 124:10, 124:13, 125:6, 126:8, 126:15, 126:20, 126:23, 127:2, 127:21, 152:14, 152:18, 152:23, 153:22, 168:9, 236:7, 263:15.

specialist 164:21, 212:24.
specialized 92:10.
specific 13:1, 20:23, 21:6, 35:24, 51:17, 54:14, 63:6, 68:8, 90:1, 97:6, 97:8, 97:25, 106:10, 138:4, 160:22, 173:17, 213:22, 228:9, 238:11, 265:12, 265:16, 268:1, 268:16.
specifics 161:13, 238:18, 264:18.
Speckmann 182:14.
speculate 22:17, 28:19, 76:24.
speculating 111:16, 128:19.
speculation 19:5, 75:5, 99:5, 122:10, 110:7, 184:13.
speech 33:4, 232:19, 249:23.
speed 45:5, 144:9, 79:8, 145:11.
spending 262:16.
spends 263:10.
spent 53:12, 64:15, 187:20, 210:9, 211:21, 211:24, 218:14.
Spiuzza 267:4.
spoiled 152:4.
spoke 13:20, 184:1.
spoken 13:17, 183:20.
SPD 143:12, 153:11.
Srds 123:2, 123:5, 123:7, 125:14, 127:6, 127:9, 153:8.
ss 273:2.

stable 41:3.
staffing 17:8.
stake 41:16.
standard 25:3, 43:13, 56:18, 247:21.
standards 246:7, 248:5.
standing 15:23, 16:2, 20:7, 77:18, 186:6.
standpoint 24:10, 59:12, 79:12.
start 7:18, 8:23, 35:24, 48:17, 48:18, 51:19, 57:24, 58:13, 81:16, 90:8, 100:1, 104:24, 215:7.
started 8:21, 73:22, 81:16, 129:17, 169:18, 187:6, 212:4, 212:6.
starting 48:5, 143:9.
starts 111:23, 117:8, 137:17, 164:15, 229:5.
state-issued 134:14.
state 44:15.
stated 48:6, 55:14, 103:23.
statehood 25:12, 25:19.
statement 25:23, 25:24, 31:16, 34:5, 34:8, 45:22, 45:23, 51:21, 52:19, 53:5, 67:19, 83:2, 83:16, 83:17, 100:19, 104:12, 105:11, 109:2, 139:12, 148:5, 163:12, 165:21, 203:10, 222:19, 244:19.
statements 21:17, 21:23, 35:7, 35:18.

47:10, 47:15, 47:16, 63:19, 67:7, 121:19, 140:16, 145:25, 244:7, 244:10.
States 13:6, 17:5, 11:15, 12:1, 15:15, 16:9, 19:23, 28:21, 39:17, 41:12, 55:4, 60:22, 61:4, 61:9, 63:6, 65:17, 75:9, 88:2, 129:5, 154:14, 160:23, 191:16.
statewide 71:18, 71:23, 110:18, 113:5, 113:8, 113:13, 115:12, 121:22, 122:24, 123:2, 123:7, 125:14, 125:17, 153:8, 153:15, 161:7, 213:9, 231:5, 260:15, 260:21, 261:6.
statically 115:8.
stating 38:19, 171:7.
stations 231:15, 231:21.
statistical 239:11.
statistics 36:22, 120:3.
status 33:22, 140:12, 153:11, 248:19.
statute 123:23, 119:13, 185:8, 210:1, 252:20, 253:10, 253:12.
statutes 16:17, 97:9, 97:23, 155:19, 253:1, 253:3.
statutory 13:2, 18:24, 184:22.
stay 34:1, 91:16.
Steinhauer 5:11.
stenographic

## 312

273:15.
step 36:18, 58:2, 144:15, 149:6, 225:22.
steps 229:22, 230:2, 230:4, 231:2, 225:12, 232:21.
stickers 255:7, 256:9.
sticks 19:1.
stipulating 36:6.
stood 44:24.
stop 8:2, 116:10.
stops 265:24.
storing 134:2.
stories 46:20.
straight 194:11, 194:12, 194:18, 195:7, 195:11, 195:18, 195:25, 198:17, 199:22, 200:2, 200:20, 200:23.
strain 30:22.
Street 28:2, 2:16, 22:6, 23:12, 61:2, 34:24, 273:13.
strength 182:3.
stress 249:5.
string 93:20, 90:16, 111:21, 111:25, 177:1, 177:12, 229:10, 236:4, 250:7.
strong 63:24, 91:6, 176:10.
strongly 121:14, 243:15.
structure 112:7, 112:13.
structures 112:13.

student 106:3, 110:3, 130:2, 137:24, 140:12, 225:23, 226:2, 226:13, 227:12, 246:7, 246:15, 246:19, 246:21, 247:6, 247:10, 247:12, 247:16, 248:6, 252:25, 257:7.
Students 28:5, 127:18, 135:22, 151:3, 210:6, 210:12, 210:19, 227:11, 227:16, 228:3, 228:7, 234:20, 248:11, 253:20.
students 248:17.
studied 15:4.
Study 14:15, 14:18, 41:25, 73:8, 73:14, 73:23, 74:3, 191:18.
stuff 20:13, 181:23.
subject 112:24, 141:14, 180:25, 208:5, 261:16, 264:8.
submission 68:9.
submit 13:6, 134:10, 152:5, 198:12.
submitted 48:25, 50:2, 82:2, 188:8, 151:13, 152:20, 154:1, 155:20.
submitting 50:5, 151:19.
subscribe 210:21, 95:11.

subsequent 52:4, 244:13.
substance 166:7.
success 14:12, 24:13.
successful 24:9, 92:18, 127:1.
sudden 78:5, 209:5.
Sue 68:23, 264:11, 264:23.
suggest 41:23, 111:12, 171:14, 246:8, 252:25.
suggesting 170:25, 230:5, 256:4.
suggestion 187:7.
suggestions 25:2, 245:16, 245:19.
suggests 23:22, 32:18.
Suite 21:16.
suited 82:13.
summarizes 67:22.
summary 51:8, 67:5.
summer 219:9, 226:7.
summertime 210:18.
Sun 60:15.
Sundays 88:9.
Superior 45:6.
supervises 16:22, 113:20.
supervisor 92:3, 92:8, 113:19, 165:2.
supervisors 91:13.
supplied 204:24.
support 255:20.
supported 54:4, 80:4.
supporting 54:3.
supportive 34:25, 35:12.
suppose 155:6, 210:5.
supposed 105:20, 232:20.

supposedly 107:11.
suppression 257:19.
Supreme 12:11, 211:23, 212:11, 213:17.
surprise 104:16, 189:24.
surprised 35:10, 35:14, 35:18, 98:20, 99:7, 103:20, 187:16, 187:17, 256:20.
survey 54:3, 55:20, 67:11, 67:14, 92:7, 92:24, 80:4.
surveys 67:23, 194:5.
SVRS 71:12, 74:14, 111:12, 111:14, 112:14, 113:11.
swear 6:20.
sweeping 25:11, 25:18.
switch 104:23, 156:19, 169:13, 188:20.
sworn 7:3, 268:16, 273:11.
symbol 57:21.
sympathetic 185:24.
sync 59:19.
synced 133:17.
synopsis 57:21, 57:20.
synthesize 51:10.
System 47:15, 71:19, 110:19, 111:3, 112:6, 113:3, 113:6, 113:8, 113:9, 123:10, 123:16, 133:18, 133:21, 133:23, 137:3, 137:4, 137:7.

**[Index — page 313]**

144:4, 145:16,
155:25, 156:3,
156:8, 156:10,
191:6, 200:19,
206:1, 205:4,
215:22, 227:8,
227:10, 228:11,
252:25, 260:16,
261:3, 261:6,
266:1.
system 249:6.

<T>.
T-a-u-c-h-e-n
244:3.
tailored 97:6.
talked 28:17, 35:4,
43:18, 49:10,
91:20, 94:3, 104:9,
152:23, 154:11,
175:12, 201:2,
202:13, 202:14,
212:18, 236:5,
243:2, 247:3.
talks 95:23, 96:13,
154:10.
tape 188:21.
target 88:3, 89:7,
233:24,
234:17.
targeted 44:11,
168:19, 214:4,
233:18, 233:21,
234:18, 235:1.
task 220:20.
taskmaster 24:6.
taste 78:14, 78:19,
79:7.
Tauchen 5:17,
244:3.
talked 243:4.
tax 227:17,
227:24.
teaching 35:1.
team 51:2, 168:6,
168:8.
teasing 93:12.
technical 191:10,
252:24, 253:10.

253:19, 253:24,
254:2, 255:2,
255:17.
Technically 102:2.
technology 27:9,
27:24, 92:14,
112:5.
television 212:12.
temporary 79:11,
130:5.
tenants 130:8,
131:7.
tend 20:9, 21:19,
22:6, 70:10,
115:22, 125:10,
125:21, 126:1,
159:11, 162:6,
181:20, 190:5,
257:2.
tended 106:1.
tenor 50:15.
term 36:13, 47:2,
89:4, 109:12,
109:13, 162:6.
terms 28:8, 33:2,
33:22, 40:10, 62:4,
62:11, 76:6,
113:16, 127:1,
130:25, 138:10,
159:16, 169:13,
172:6, 175:12,
175:18, 181:25,
195:25, 210:6,
222:23, 226:7,
247:2, 270:24,
271:5.
terrible 11:6.
testified 7:3, 21:25,
73:5, 84:10, 241:2,
241:10, 241:17,
241:19, 245:13,
253:19.
testify 8:10.
testifying 73:11.
Testimony 3:27, 4:9,
4:40, 62:24, 84:1,
84:18, 84:21,
84:24, 85:9, 85:21,
86:23, 118:8,

200:8, 200:12,
230:10.
threshold 263:1.
throughout 32:23,
33:23, 162:14,
234:6, 243:4,
243:14,
245:17.
Thursday 1:21.
ticket 174:10,
194:11, 194:12,
195:7, 195:11,
195:18, 198:17,
199:12, 200:14,
200:20, 201:5,
201:9, 201:23,
202:11.
tight 50:17, 205:9.
tied 60:11, 156:9,
197:22.
timely 77:13.
timing 104:22,
116:15, 195:23,
230:5, 237:10.
tinkering 246:25.
title 44:4, 93:3.
today 7:7, 7:10, 8:1,
8:12, 10:16, 21:9,
53:10, 82:25,
177:25, 166:11,
174:9, 240:14,
257:19,
271:10.
together 34:7, 31:11,
51:2, 52:9, 223:17,
263:13.
Tokaji 14:3, 14:6.
tone 166:6.
took 8:9, 40:4,
168:1, 175:1,
177:6, 202:13,
207:18, 220:15,
254:7, 260:24,
261:22, 263:12,
268:1.
tool 133:2, 133:3,
133:15, 133:18,
205:13.
tools 183:4, 223:23,

**[Index — page 314]**

224:15.
top 68:7, 78:9, 95:6,
95:16, 96:12,
164:15, 176:24,
184:3, 239:3.
topic 121:21, 190:1,
259:4, 269:3.
total 71:10, 114:13,
216:13.
totally 133:11.
totals 71:23,
72:1.
touch 211:7, 239:2,
239:13.
towards 12:12,
39:10, 79:23.
Town 180:2.
towns 174, 71:2.
township 180:8.
track 74:18, 206:3,
205:24.
tracking 201:20,
205:4.
trailed 264:16.
train 123:8,
224:2.
trained 123:5, 123:7,
124:8.
training 16:24,
17:15, 26:15, 33:8,
61:14, 77:21,
123:9, 123:10,
123:15, 123:22,
123:24, 124:2,
124:8, 168:2,
168:9, 175:16,
183:8, 183:10,
183:17, 187:21,
211:7, 211:22,
212:18, 216:21,
230:17, 239:17,
270:1, 270:5,
271:6.
trainings 124:5,
124:7.
transaction 230:6,
231:9.
transcript 5:35.
transit 193:4,

194:25.
198:10.
transition 219:8,
219:12,
239:22.
transitory 21:8.
translated
265:20.
translates 38:4.
transmission
189:17.
transmitted 97:2,
190:24, 191:5,
191:7.
Transportation
62:11, 134:18,
151:5.
travel 45:6.
treasurer 96:13.
treat 100:15, 124:25,
253:9, 253:11.
treated 89:25,
167:25.
treatment 24:2,
162:14, 167:8.
trend 39:10,
63:24.
trends 175:15,
269:16.
tribal 127:11.
tried 79:20, 110:18,
126:24, 188:17,
230:7, 264:12.
trigger 269:19.
triggering
261:19.
triggers 209:2.
trip 221:13.
trips 88:25.
troubleshooting
101:25,
145:11.
true 39:7, 60:12,
84:23, 85:12,
85:15, 86:9, 86:11,
86:13, 118:7,
154:5, 247:24,
273:10.
trusting 271:3.
truth 33:5, 106:5.

truthfully 8:10,
209:18.
try 10:10, 20:8,
27:10, 59:19, 91:2,
91:8, 96:7, 107:9,
128:6, 132:13,
159:13, 166:2,
175:14, 186:10,
205:23, 261:3,
269:15.
trying 36:16, 40:13,
79:15, 90:18,
96:24, 97:3, 97:5,
98:1, 98:17, 108:1,
139:8, 142:4,
145:12, 147:16,
149:3, 161:15,
161:17, 168:23,
176:14, 210:19,
213:22, 224:5,
220:18, 235:19,
242:1, 243:4,
252:17, 270:2.
Tuesday 52:1, 63:10,
198:8.
turn 22:11, 53:7,
129:4, 129:6,
129:11, 129:16,
129:22, 129:24,
159:15,
210:21.
turn-out 69:9.
turned 107:25,
242:25.
turnout 15:2, 41:5,
41:13, 41:21,
41:24, 210:16,
217:19, 231:6.
Twenty 141:21.
Twenty-eight
207:22.
twice 139:13.
two-thirds 166:25,
167:4.
type 82:1, 88:17,
110:19, 133:16,
134:18, 152:15,
161:22.
types 60:19, 95:25,

158:21.
typical 144:10.
typically 24:24,
159:19.

<U>.
ultimate 246:11.
Ultimately 51:15,
66:4, 106:19,
110:11, 118:16,
118:19, 151:21,
174:16, 223:2,
248:18.
Um-hum 86:8,
100:3, 118:24,
121:11, 167:5,
227:6.
Umheeler 113:21,
113:24.
unable 149:20,
218:23.
unacceptable 163:8,
163:15.
unavailable
62:16.
uncertain 71:21.
unchanged 54:5.
unclear 240:3.
undeniable 144:3,
156:10, 156:7.
undermine
257:3.
underneath 93:3.
understand 8:9,
8:13, 108, 36:4,
79:16, 91:7, 96:11,
123:3, 135:9,
138:8, 184:16,
192:22, 227:19,
228:23, 230:7,
230:19, 270:1,
270:14.
understands
230:20.
understood 8:17,
181:4, 181:5.
undertaking
265:21.
Unfortunately

**[Index — page 315]**

147:25,
174:11.
unhappy 93:24,
233:13.
Uniform 17:11, 81:7,
81:8, 81:12, 81:14,
194:21.
Uniformed
190:19.
uniformity 86:25.
unintentionally
98:21.
unique 13:11, 62:14,
107:11.
United 1:3, 6:7,
191:16.
universe 116:5.
universities 136:13,
137:22, 140:5,
248:2, 248:4,
259:19.
University 14:3,
15:7, 28:4, 39:2,
42:21, 137:1, 137:8,
138:24, 227:8,
228:1, 246:16,
247:21.
Unless 20:24, 21:8,
128:23, 147:8,
147:10, 169:12,
174:10, 201:20,
261:23, 265:4,
265:11, 265:15,
269:15.
unlike 139:5.
unlikely 248:4.
unnecessarily
257:2.
unnecessary
55:7.
unregistered
208:21.
unsubstantiated
257:1, 257:11.
unsupported
257:11.
until 9:21, 11:23,
12:12, 32:10,
32:14, 54:13, 83:3,
63:9, 79:17, 99:23,

129:9, 133:19,
132:17, 133:19,
134:2, 203:6,
259:25, 261:10,
261:16.
unusual 181:1,
20:15, 22:4, 60:17,
88:17, 145:7,
157:15, 172:24,
173:3, 265:14,
194:21, 196:15,
196:18, 197:4.
update 120:24,
145:15,
251:19.
updated 134:3,
212:8, 212:11.
updating 146:16.
upset 233:7.
Urban 82:21, 83:13,
151:14.
urged 32:9,
32:12.
usage 39:2, 39:11,
90:5.
useful 238:6.
using 65:12, 114:24,
119:4, 134:4,
145:14, 148:1,
146:16, 208:6,
261:23.
utility 121:20,
239:24.
utilize 133:1,
219:7.
utilized 71:1.
UW 137:3, 137:4,
137:7, 227:10.
Uw-madison 137:3,
137:5, 137:21.
Uw-milwaukee
137:14.

v
v. 272:4.
vague 78:16, 78:25,
195:19, 259:9.
valid 221:25, 228:16,

124:5, 136:1,
255:24, 255:25,
256:6, 257:16,
264:3.
views 35:8, 91:6,
104:9, 113:3, 185:25,
241:6, 258:17,
258:25.
Village 96:13.
villages 17:4,
17:2.
violating 138:3.
violation 208:16.
visual 223:18.
vizio 32:23.
volatile 167:19.
volume 374,
157:17.
volumes 217:16.
volunteer 45:3,
106:4.
vote 163:10.
voted 31:20, 38:25,
46:25, 107:7,
107:21,
253:24.
voters 148:3.
votes 16:7, 38:15,
39:3, 44:25, 76:20,
193:23, 193:16,
217:16.
vouch 119:4.
vouching 105:3.
VPC 147:17.
vs 6:6.
vulnerable 241:7.

<W>.
Wadlawski 183:15,
183:18.
wait 61:17, 61:23,
69:11, 69:19, 70:1,
149:17, 149:24,
199:25.
waited 44:25.
waiting 45:14,
149:24, 164:2.
walk 45:13, 62:12,
66:18, 66:19,

value 38:1, 38:3,
40:7, 56:7.
variables 144:8.
varied 81:25.
varies 194:21.
Various 3:40, 4:27,
18:2, 70:7, 87:13,
91:3, 92:13, 92:18,
123:11, 158:8,
164:14, 176:15,
185:5, 212:14,
223:3, 234:22,
235:12, 246:23,
254:14.
vast 129:13.
veracity 106:7.
verification
139:14.
verify 165:13,
150:21.
version 58:7, 80:24,
89:15, 118:18,
215:15,
215:17.
versus 42:21.
vetted 50:8.
vetting 53:13, 249:1,
262:16.
via 20:5, 68:8,
138:2.
vice 206:14,
206:17.
Video 63:6, 6:15,
229:6, 268:5.
VIDEOGRAPHER
2:27, 6:1, 6:14,
72:20, 72:23,
117:15, 117:18,
141:3, 141:9,
202:19, 202:24,
268:23, 269:1,
271:16.
videoing 176:13.
VIDEOTAPED 1:20,
2:1.
view 30:16, 40:2,
58:6, 61:15, 66:17,
66:18, 66:19,

**[Index — page 316]**

wallet 220:24.
waning 204:8.
wanna 184:5.
wanted 46:24, 49:13,
49:14, 51:9, 92:10,
103:23, 110:25,
112:14, 120:1,
120:15, 148:25,
199:4, 265:17.
wants 124:12.
warn 179:8.
warning 172:20,
179:13.
Washington
71:8.
Watching 170:17,
170:18.
water 82:1.
Watergate 11:25.
Waukesha 71:8,
170:16, 177:20,
180:23, 181:8,
183:11.
Wauwatosa
250:12.
wave 107:20.
waves 220:16.
ways 22:3, 27:6,
43:13, 75:22,
122:21, 152:4,
231:16.
Webinar 212:19.
website 68:3, 74:13,
85:7, 85:9, 86:12,
85:16, 95:10,
133:4, 182:21,
189:25, 209:15,
212:21, 220:16,
224:1, 224:3,
243:13, 258:16,
261:5.

weekend 75:20,
80:15, 80:17, 87:8,
87:21, 88:24, 94:5,
96:18, 97:17,
97:23, 98:7, 103:1,
103:17, 103:24,
205:19,
205:21.
weekends 81:17,
81:20, 81:23, 82:5,
87:16.
weekly 20:8,
154:15.
wesson 80:16, 76:10,
79:18, 173:5,
212:22,
249:20.
weigh 101:24.
weighing 137:13.
welcome 29:9,
89:13, 102:24.
West 27:7, 223:2,
96:13, 273:13.
Western 1:4, 6:8.
whatever 153:6,
195:14, 208:5,
183:11.
whatsoever
155:13.
wherever 164:1.
whereof 273:21.
whichever
241:18.
White 112:4, 112:5,
113:19.
whole 78:19, 232:24,
234:20, 243:1,
243:13, 258:16,
261:5.
whom 61:9, 210:13,
242:1.
willing 188:15.
willy-nilly
265:16.
window 54:7, 54:15,
75:23, 78:24, 81:8,
81:12, 81:14,
86:12, 86:14,
86:18, 87:1, 94:1,
94:5, 99:3.

131:24.
Wisconsin-madison
28:4, 137:1,
137:8.
Wisconsin-milwauk
ee 137:9.
Wisconsin-plattevill
e 35:3.
Wisconsinites
128:22,
129:14.
wished 153:15.
Wisvote 133:11,
134:3.
withdraw 29:4.
Within 13:11, 70:11,
70:15, 86:12,
86:14, 116:5,
184:19, 185:11,
207:17,
208:22.
Without 97:12,
126:8, 138:3,
142:17, 143:20,
147:4, 147:6,
152:2, 153:3,
154:1, 155:21,
245:7, 267:7.
Witness 22:6, 8:20,
7:1, 53:20, 182:3,
188:24, 192:13,
193:9, 272:2,
273:21.
witnessed 69:11.
Women 28:2,
121:16, 159:12,
170:16, 180:23,
181:8, 269:7,
270:20.
women 121:9.
won 174:8.
words 36:11, 113:9,
114:20, 264:6.
worked 50:7, 168:9,
225:6, 250:8.
worker 17:7, 162:9,
167:15.
workers 38:21, 55:8,
108:8, 158:1,

167:1, 167:7,
167:17, 167:22,
168:11, 187:25,
217:13, 231:3,
231:18, 232:10,
233:2, 259:20,
270:4.
working 18:20, 20:3,
31:11, 48:17,
48:18, 51:3, 82:21,
83:13, 90:22,
156:23, 158:8,
234:21, 261:1.
works 113:4, 113:17,
183:19, 227:7,
234:24, 245:14,
261:11.
write 25:7, 120:5,
121:12, 146:19,
204:16, 257:8.
write-in 195:24.
writes 101:16.
writing 184:9, 248:9,
128:8, 138:3,
142:17, 147:8,
273:5.
Written 3:43, 5:26,
21:6, 118:8,
203:16, 203:18,
204:1, 262:13.
wrote 119:14, 120:2,
147:25, 152:3,
224:1, 246:2,
256:24.
WSJ 3:25.
WWWE 170:11,
170:15, 185:1.

<Y>.
year 136:3, 136:6, 93:3,
115:15, 115:23,
129:6, 129:8,
129:19, 129:20,
176:9, 191:18,
199:14.
years 19:7, 32:16,
47:17, 63:16,
120:23, 123:23,
159:25, 167:2,
169:15, 198:25,
200:5, 201:3,

201:21, 209:4.
**younger** 27:25.
**yourself** 118:5.
.
.
**<Z>.**
**Zeidler** 57:13,
62:20.

317