# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

---

**ONE WISCONSIN INSTITUTE, INC., CITIZEN ACTION OF WISCONSIN EDUCATION FUND, INC., RENEE M. GAGNER, ANITA JOHNSON, CODY R. NELSON, JENNIFER S. TASSE, SCOTT T. TRINDL, MICHAEL R. WILDER, JOHNNY M. RANDLE, DAVID WALKER, DAVID APONTE, and CASSANDRA M. SILAS,**

        Plaintiffs,

    v.

**JUDGE GERALD C. NICHOL, JUDGE ELSA LAMELAS, JUDGE THOMAS BARLAND, JUDGE HAROLD V. FROEHLICH, JUDGE TIMOTHY VOCKE, JUDGE JOHN FRANKE, KEVIN J. KENNEDY, MICHAEL HAAS, MARK GOTTLIEB, and PATRICK FERNAN,**

all in their official capacities,

        Defendants.

Case No.  15-cv-324

---

# SECOND AMENDED COMPLAINT

---

Pursuant to Fed. R. Civ. P. 15(a)(2) and this Court's March 21, 2016 Order (Dkt. 139), Plaintiffs respectfully file this Second Amended Complaint.  In response to the Court's direction that Plaintiffs "separately set[] out the new/reinstated claims" and allegations, Plaintiffs attach as Exhibit A to this Second Amended Complaint a red-lined version of this pleading showing precisely what has been added to and deleted from the prior June 22, 2015 Amended Complaint (Dkt. 19).[1]

---

[1] Plaintiffs have not attempted to update factual allegations outside the scope of the amendment/reinstatement of the voter ID claims authorized by the Court's March 21, 2016 Order (Dkt. 139).

This lawsuit concerns the most fundamental of rights guaranteed citizens in our representative democracy—the right to vote.  That right has been under attack in Wisconsin since Republicans gained control of the governor's office and both houses of the State Legislature in the 2010 election.  Indeed, since 2011, the State of Wisconsin has twice reduced in-person absentee ("early") voting, introduced restrictions on voter registration, changed its residency requirements, enacted a law that encourages invasive poll monitoring, eliminated straight-ticket voting on the official ballot, eliminated for most (but not all) citizens the option to obtain an absentee ballot by fax or email, and imposed a voter identification ("voter ID") requirement.  These measures were intended to burden, abridge, and deny, and have had and will have the effect of burdening, abridging, and denying, the voting rights of Wisconsinites generally and of African-American, Latino, young, and/or Democratic voters in Wisconsin in particular.

As set forth below, these and the other provisions challenged in this Second Amended Complaint (the "challenged provisions") violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and/or the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment, and/or the Twenty-Sixth Amendment to the United States Constitution.  The challenged provisions should therefore be declared illegal and enjoined.

Plaintiffs seek wherever possible to obtain "facial" rather than "as-applied" declaratory and injunctive relief, as those terms have been defined and applied in recent Supreme Court decisions.  "The label is not what matters."  *Doe v. Reed*, 561 U.S. 186, 194 (2010).  The distinction between facial and as-applied challenges is not a matter of "what must be pleaded in a complaint," but instead "goes to the breadth of the remedy employed by the Court."  *Citizens United v. FEC*, 558 U.S. 310, 330 (2010).  Because the "claim[s] and the relief that would follow … reach beyond the particular circumstances of these plaintiffs" named in this Second Amended

Complaint, Plaintiffs' claims are facial challenges "to the extent of that reach." *Doe v. Reed*, 561 U.S. at 194. To the extent that individual Plaintiffs' injuries are not fully remedied by the Court's facial declaratory and injunctive relief, Plaintiffs also seek appropriate "as-applied" relief with respect to their "particular circumstances." *Id.*

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1357, and 42 U.S.C. §§ 1983 and 1988.

2.      This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

3.      Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

4.      Plaintiff One Wisconsin Institute, Inc. (the "Institute"), is a corporation organized under section 501(c)(3) of the Internal Revenue Code that operates in Wisconsin. Its mission is to advance progressive values, ideas, and policies through strategic research and sophisticated communications. The Institute's position is that all eligible voters who want to vote should be able to do so and to know that their votes will be counted, and a significant portion of the Institute's work has focused, and in the future will focus, on voter-education efforts, efforts to encourage individuals to vote, and efforts to oppose restrictive voting measures and to support measures that expand access to voting and registration in Wisconsin. For example, the Institute was involved in the creation of a website that contains information about the types of ID that can be used for voting in Wisconsin and how to obtain such an ID, and its website links to information about voter registration and early voting. The Institute has held events on student-loan debt that were intended, in part, to demonstrate the importance of voting and to encourage

people—including young people in particular—to vote.  It submitted a successful request that the Wisconsin Government Accountability Board ("GAB") approve the use of electronic documents as a sufficient form of proof of residence for the purpose of voter registration.  It prepared and circulated a petition in opposition to the reduction of early voting in Wisconsin.  It has conducted research pertaining to voting issues and provided the findings from that research to the public and/or other organizations.  In an effort to help deter voter intimidation, it provided a memorandum to municipal clerks in Wisconsin outlining laws related to voter suppression.  In addition, it submitted an amicus brief in Wisconsin state court in support of a challenge to Wisconsin's voter ID law and an amicus brief in support of the petition for certiorari in *Frank v. Walker*, a federal court case involving a challenge to Wisconsin's voter ID law.

5.     The challenged provisions burden the Institute's efforts to make the opportunity to vote accessible to all eligible voters who want to vote because all of those provisions make it more difficult to register and/or to cast a ballot that will be counted.  The Institute has used resources that otherwise would have been put to other productive uses opposing some of the challenged provisions and doing educational work to make voters aware of some of these provisions.  Moreover, the challenged provisions that disproportionately burden young voters have the effect of disproportionately reducing the youth vote and, in turn, will potentially undermine the Institute's efforts to persuade elected officials to take action to address the issue of student-loan debt.

6.     Plaintiff Citizen Action of Wisconsin Education Fund, Inc. ("Citizen Action"), is a corporation organized under section 501(c)(3) of the Internal Revenue Code.  Citizen Action is an issue-focused organization that is committed to pursuing social and economic justice.  It seeks to increase the number of eligible voters who are registered to vote and who cast ballots that are

counted.  Citizen Action has engaged, and in the future will engage, in voter-registration, voter-education, and get-out-the-vote ("GOTV") efforts in Wisconsin.  Plaintiff Anita Johnson is an employee of Citizen Action, and her involvement in voter-registration, voter-education, and GOTV efforts, as described below, was undertaken on behalf of Citizen Action.  The challenged provisions burden Citizen Action's efforts to register voters, to get out the vote, and/or to increase the number of eligible voters who are registered and who cast ballots that are counted by making it more difficult to register and/or to cast a ballot that will be counted.

7.      Plaintiff Renee M. Gagner is a 22-year-old white resident of Milwaukee, Wisconsin, and is registered to vote in Wisconsin.  She graduated from Beloit College in May 2014.  She is a Democrat, has voted for Democratic candidates, and intends to vote for Democratic candidates in the future.  She has utilized early voting, voted absentee by mail, and registered and voted on Election Day.  She has used a college ID, in connection with a dorm list that Beloit College sent to the city clerk, to prove her residency for the purpose of registering to vote.  Gagner is actively involved in civic engagement as well.  She has been authorized to register voters as a special registration deputy in Beloit and Milwaukee and would become a statewide special registration deputy if that option were available.  She has done campaign work on behalf of Democratic candidates; has participated in voter-registration and GOTV efforts; and spent time when she was a college student educating other students about what they needed to do to register to vote.

8.      The challenged provisions burden and abridge Gagner's ability to register to vote; to vote; to engage in civic activities, including voter-registration, GOTV, and voter-education efforts; and/or to help elect Democratic candidates.  On March 21, 2015, Gagner moved from Waukesha to Milwaukee.  Because of the law requiring voters who move within Wisconsin

within 28 days of an election to vote at their previous ward or election district, Gagner was required to vote in Waukesha rather than Milwaukee. She chose to cast an absentee ballot by mail due to the time it would have taken her to travel to Waukesha to cast a ballot in person. Gagner also believes she would cast a straight-ticket ballot in the future if that option were available. In addition, Gagner intends to register and to vote in Milwaukee. The reductions to early voting and the rule limiting municipalities to a single early voting location will therefore make it more difficult than it otherwise would be for her to use early voting because she will not be able to do so on a weekend day and, in order to vote early, she will almost certainly have to wait in a line that is longer than it would have been absent the reductions in early voting and limitation on early voting locations. Further, upon information and belief, the challenged provisions burden Gagner's efforts to help elect Democrats. And the removal of authority from GAB to authorize special registration deputies to register voters on a statewide basis has burdened and will burden Gagner's efforts to register voters.

9.     Plaintiff Anita Johnson is a 70-year-old African-American resident of Milwaukee, Wisconsin, who is registered to vote in Wisconsin and has utilized early voting, including, on at least one occasion, weekend early voting. She is an organizer for Citizen Action. For several years, Johnson has made presentations at churches and other locations in which she discusses changes to laws pertaining to voting, encourages individuals to vote, and talks about voter registration and encourages people to register to vote. African Americans have been the primary audience for Johnson's presentations, but she has also presented to Latino[2] and white individuals. Johnson is a special registration deputy in Milwaukee. She was previously a statewide special registration deputy  and she would be a statewide special registration deputy if

---

[2] The term "Latino," as used in this Second Amended Complaint, means Hispanic and/or Latino.

that option were still available.  She has registered a number of voters, and she encourages others to participate in voter-registration efforts.  She has participated in GOTV efforts.  And she advocated against the voter ID law.  In her efforts related to voting and voting rights, Johnson's primary goal is to get as many eligible voters as possible registered and out to vote.

10.     The challenged provisions burden and abridge Johnson's right to vote; her efforts to register voters; and/or her efforts to get out the vote.  For instance, Johnson has devoted time that could have been used for other purposes to educating citizens about challenged provisions and taking an individual to get a birth certificate so he could attempt to obtain an ID for voting.  She believes based on her experience that the voter ID law will undermine her efforts to get out the vote.  She has taken individuals from church to weekend early voting, but she no longer can do so because of the elimination of weekend early voting.  In her experience, the proof-of-residence requirement for voter registration has slowed down the registration process, and there have been occasions on which she has been unable to register individuals because they did not have documentary proof of residence.  In one election, Johnson's son and his wife were able to vote for president and vice president but not for other offices because they had moved to Wisconsin from out of state fewer than 28 days (but more than 10 days) before an election.

11.     Plaintiff Cody R. Nelson is a 19-year-old white college student who recently completed his freshman year at the University of Wisconsin-Madison.  He is a resident of Madison, Wisconsin, and is registered to vote in Wisconsin.  He is a Democrat, has voted for Democratic candidates, and intends to vote for Democratic candidates in the future.  He has utilized early voting and expects to do so again in the future, and he has registered and voted on Election Day.  Nelson is actively involved in civic engagement in Wisconsin.  He has worked as a volunteer on political campaigns and was a special registration deputy authorized to register

voters in Madison. In addition, he has assisted people in registering to vote, participated in GOTV efforts, and provided election-related information to people, including information about the voter ID law. The challenged provisions burden and abridge Nelson's ability to register to vote; to vote; to engage in civic activities, including voter-registration, GOTV, and voter-education efforts; and/or to help elect Democratic candidates.

12.     Plaintiff Jennifer S. Tasse is a 21-year-old white college student who recently completed her junior year at the University of Wisconsin-Madison. She is a resident of Madison, Wisconsin, and is registered to vote in Wisconsin. She is a Democrat, has voted for Democratic candidates, and intends to vote for Democratic candidates in the future. She has utilized early voting, voted absentee by mail, and registered and voted on Election Day. Tasse is actively involved in civic engagement in Wisconsin as well. She is the Chair of the College Democrats at the University of Wisconsin-Madison and has worked on campaigns on behalf of Democratic candidates. She was a special registration deputy authorized to register voters from Madison, and she has assisted many people in registering to vote. She has participated in GOTV efforts, including efforts that encouraged individuals to vote during the early voting period. She has also provided information to people about candidates and the registration and voting process and has been an election observer.

13.     The challenged provisions burden and abridge Tasse's ability to register to vote; to vote; to engage in civic activities, including voter-registration, GOTV, and voter-education efforts; and/or to help elect Democratic candidates. For instance, because Tasse has used early voting and intends to do so again in the future, the reductions to the early voting period limit the times at which she can vote early. As a college student who is nearly certain to move after she graduates, Tasse is burdened by the challenged provisions that make registration more difficult.

She no longer has the option, as an example, to register 20 or more days before an election without showing documentary proof of ID.  Further, Tasse's civic engagement efforts will be burdened, as the challenged provisions make it more difficult to register voters and to get out the vote, and because she intends to spend time that otherwise could have been devoted to voter-registration efforts to educating voters about many of the changes to the laws at issue.  If the state had not eliminated GAB's authority to appoint statewide special registration deputies, moreover, Tasse would have become one and would have been able to register a greater number of voters than she did.  And, upon information and belief, all of the challenged provisions burden Tasse's ability to help elect Democratic candidates.

14.     Plaintiff Scott T. Trindl is a 60-year-old white resident of Waukesha, Wisconsin, who is registered to vote in Wisconsin.  He is a Democrat, has voted for Democratic candidates, and intends to vote for Democratic candidates in the future.  He has utilized early voting and intends to do so in the future.  Trindl is also actively involved in civic engagement in Wisconsin. He serves as the Chair of the Waukesha County Democratic Party and has done campaign work. He has been a special registration deputy and assisted many people in registering to vote.  His work has included registering African-American and Latino voters.  In addition, he has participated in GOTV efforts, including efforts that encouraged individuals to vote during the early voting period; he has participated in voter-education efforts; and he is a chief elections inspector.

15.     The challenged provisions burden and abridge Trindl's ability to engage in civic activities, including voter-registration, GOTV, and voter-education efforts, and/or to help elect Democratic candidates.  Trindl was a statewide special registration deputy—and thus was authorized to register voters from anywhere in Wisconsin—prior to the removal from GAB of

the authority to appoint statewide special registration deputies, and he used that authority to register voters from different municipalities. In 2012, after the change in the law regarding statewide special registration deputies, Trindl became a special registration deputy in Milwaukee, but he could not register voters from Waukesha, as the municipal clerk would not deputize special registration deputies. There were also a few occasions on which Trindl could not register voters who were interested in registering to vote because they were not from Milwaukee. Additionally, voters who cast ballots at the location at which Trindl is the chief elections inspector used corroboration to register when that was an option, and, since corroboration was eliminated, there has been at least one occasion on which Trindl was unable to register a voter who could have been registered had corroboration still been available.

16.     Plaintiff Michael R. Wilder is a 30-year-old African-American resident of Wauwatosa, Wisconsin. He is registered to vote in Wisconsin, and he has utilized early voting and voted on Election Day. Wilder is heavily involved in civic engagement in Wisconsin. He serves as co-chair of the African American Roundtable. He has done election-protection work and been a poll observer. He and organizations with which he is affiliated have conducted extensive voter-registration, GOTV, and voter-education efforts. Wilder seeks to register, and to get out the vote, of as many eligible voters as possible. He is a special registration deputy, and he has predominantly done registration work in the African-American community in Milwaukee. Most of the people he registers are between 18 and 30 years old.

17.     The challenged provisions burden and abridge Wilder's ability to engage in civic activities, including voter-registration, GOTV, and voter-education efforts, and/or his efforts to make the opportunity to vote accessible to as many eligible voters as possible. He has found that, due to the requirement that individuals provide documentary proof of residence even if they

are registering 20 or more days before an election, the registration process takes longer than it previously did, meaning that he and others are able to register fewer voters in a given period of time.  He has been unable to register individuals who were interested in registering but did not have a document that could be used to prove their residence.  And he has observed that there are fewer volunteers for voter-registration efforts because volunteers are reluctant to have to attest to the form of proof of residence a registrant provided.  The increased difficulty in registering voters has caused Wilder and organizations with which he is affiliated to do less voter-registration work than they otherwise would do.  In addition, Wilder has worked on efforts to inform voters about changes to the election laws that have been enacted since the beginning of 2011, including the enactment of the voter ID requirement.  At least some of the time that Wilder and others devoted to these efforts would have been used for other civic-engagement activities had the State Legislature not enacted these changes to Wisconsin's election laws.

18.     Plaintiff Johnny M. Randle is a 74-year-old African-American resident of Milwaukee, Wisconsin.  Like many other Wisconsin African-Americans, Mr. Randle was born in the Jim Crow South (in his case, Tchula, Mississippi) and he lived there for much of his life. After Mr. Randle developed serious health problems, he moved to Wisconsin in 2011 to live with and be cared for by his daughter.

19.     Mr. Randle and his daughter have been trying to obtain a Wisconsin ID for his use since 2011.  He ultimately filed a Form MV3012 ("DMV Administrator Petition — Unavailable Documentation") asking DMV to exercise its discretion to grant him a free ID because he could not obtain his Mississippi birth certificate without having to pay government fees and other expenses.  DMV required him to go through a 5-month-long "adjudication process" that culminated in an October 7, 2015  rejection letter advising him that, "[p]ursuant to lack of

required documentation reflecting your legal name your application for a free Wisconsin

Identification Card for voting is denied."  Although Mr. Randle's daughter had ultimately

tracked down and submitted his Mississippi birth certificate, DMV ruled he was nevertheless

ineligible because the name on his birth certificate is "**Johnnie Marton Randall**," whereas the

name he has used for his entire adult life is "**Johnny Martin Randle**."  DMV ruled that Mr.

Randle would need either to request a name correction through the Social Security

Administration to obtain a Social Security card spelling his name as it appears on his Mississippi

birth certificate or seek to "change" his name through legal proceedings and then "provide court

documents reflecting that your name has legally been changed to read as 'Johnny M Randle.'"

Mr. Randle is concerned that, if he attempts to change his Social Security information, there

might be an interruption in his monthly disability payments.  DMV has no basis to question Mr.

Randle's U.S. citizenship or that he is who he says he is.  Absent relief from this Court, Mr.

Randle may never be able to vote again.

20.     Plaintiff David L. Walker is a 64-year-old African-American resident of

Milwaukee, Wisconsin.  He is registered to vote in Wisconsin and has voted frequently over the

years, most recently in November 2014.  Mr. Walker was born in Missouri, but is not certain of

the circumstances of his birth and both of his parents are deceased.  He has been trying for two

decades to obtain his birth certificate from Missouri, but has repeatedly been told there is no

record there of his birth.

21.     Mr. Walker filed a Form MV3012 asking the DMV to exercise its discretion to

grant him a free voter ID.  After a 9-month-long "adjudication process" in which DMV

confirmed four times that Missouri indeed had no record of Mr. Walker's birth, just as that State

had repeatedly told Mr. Walker, DMV sent him a June 17, 2015 rejection letter advising that,

"[p]ursuant to this lack of required documentation, your application for a free Wisconsin Identification Card for voting is denied."  The DMV denial letter advised Mr. Walker that he was welcome to "submit a new application for a free Wisconsin identification card for voting" if he could locate "secondary documentation that is extraordinary proof," such as his baptismal certificate, hospital birth certificate, delayed birth certificate, "[c]ensus record," "[e]arly school record," "[f]amily Bible record," "[d]octor's record of post-natal care," or "[o]ther documentation that DMV accepts as proof of name, date of birth or U.S. citizenship."  Mr. Walker has no such "extraordinary proof," nor the ability to search further for it.  According to DMV's "IDPP Adjudication Report," DMV undertook no efforts to help Mr. Walker track down these ancient records, although it sometimes provides such assistance to other petitioners.  DMV has no basis to question Mr. Walker's U.S. citizenship or that he is who he says he is.  Absent relief from this Court, Mr. Walker may never be able to vote again.

22.     Plaintiff David Aponte is a 58-year old Latino resident of Milwaukee, Wisconsin. He is registered to vote in Wisconsin and voted most recently in November 2014.  Mr. Aponte understands he was born in eastern Pennsylvania, but his family moved to Puerto Rico when he was an infant and he was baptized and received his Social Security card there.  Mr. Aponte's primary language is Spanish, and he frequently needs to use an interpreter when communicating about complicated and unfamiliar matters.

23.     Mr. Aponte filed a Form MV3012 asking the DMV to exercise its discretion to grant him a free ID because he could not obtain a Pennsylvania birth certificate given that Pennsylvania had no record of his birth.  After a 9-month-long "adjudication process" in which DMV confirmed at least three times that Pennsylvania could not locate a record of Mr. Aponte's birth, DMV encouraged Mr. Aponte to keep looking for other ancient records of his existence

and legal identity.  Mr. Aponte's mother (a Florida resident) called the DMV twice to confirm her son's birth in Pennsylvania, and reported that the hospital where David had been born in 1958 had burned down and all records lost.  DMV provided no interpreter to help Mr. Aponte understand and respond fully to DMV's questioning; his brother-in-law often translated for him in communicating with the DMV.  Mr. Aponte told DMV in repeated communications that he had none of the other types of birth or early childhood records that DMV "deemed acceptable." DMV sent Mr. Aponte a June 16, 2015 rejection letter advising that, "[p]ursuant to this lack of required documentation, your application for a free Wisconsin Identification Card for voting is denied."  The DMV denial letter advised Mr. Aponte that he was welcome to "submit a new application for a free Wisconsin identification card for voting" if he could locate "any new or additional information to assist the DMV in verifying proof of your name and date of birth and/or citizenship."  Mr. Aponte has no such "extraordinary proof," nor the ability to search further for it.  According to DMV documents provided to date, DMV undertook absolutely no efforts to help Mr. Aponte track down these ancient records, other than telling him repeatedly that he had to track them down.  DMV has no basis to question Mr. Aponte's U.S. citizenship or that he is who he says he is.  Absent relief from this Court, Mr. Aponte may never be able to vote again.

24.     Plaintiff Cassandra M. Silas is a 48-year old African American resident of Milwaukee, Wisconsin.  She has registered to vote and voted in Wisconsin elections.  Like many other African-American Wisconsin residents, Ms. Silas was born in Cook County, Illinois and moved north to Wisconsin later in life.

25.     Ms. Silas filed a Form MV3012 asking the DMV to exercise its discretion to grant her a free ID because she could not obtain her Cook County birth certificate without paying a

fee.  Both DMV and Ms. Silas contacted the Cook County Clerk and the Cook County Hospital.

The consistent response was that only Ms. Silas could seek this information, and that she would

have to pay a fee in order for the County Clerk and the hospital to check their records.  DMV did

not offer to pay the required fees although, upon information and belief, it has provided modest

financial assistance to some other petitioners for such documents.  After a 5-month-long

"adjudication process," DMV sent Ms. Silas a June 18, 2015 rejection letter advising her that she

could not obtain a free state ID without providing "additional information to help verify accurate

birth record data in your name."  The DMV denial letter advised Ms. Silas that she was welcome

to "submit a new application for a free Wisconsin identification card for voting" if she could

locate "any new or additional information to assist the DMV in verifying proof of your name and

date of birth and/or citizenship."  Ms. Silas has no such "extraordinary proof," nor the ability

further to search for it.  According to DMV documents provided to date, DMV undertook

absolutely no efforts to help Ms. Silas track down these ancient records, other than telling her

repeatedly that she had to track them down.  DMV has no basis to question Ms. Silas's U.S.

citizenship or that she is who she says she is.

26.     All Defendants other than Mark Gottlieb and Patrick Fernan are members or staff

of GAB.  GAB is charged with oversight of Wisconsin's campaign finance, elections, ethics, and

lobbying laws and ensuring the integrity of the electoral process.  GAB also has the

responsibility for administering the voter ID law, including by training and overseeing election

officials in the interpretation and enforcement of the law, engaging in public outreach and

education, assisting voters in obtaining or renewing required IDs, interpreting and implementing

the voter ID law through formal rulemaking, and ensuring that the voter ID requirements are

enforced.  Defendants' acts and omissions in their capacities as members or staff of GAB are made under color of state law.[3]

27.   Defendant Judge Gerald C. Nichol is the Chair of GAB.

28.   Defendant Judge Elsa Lamelas is the Vice Chair of GAB.

29.   Defendant Judge Thomas Barland is the Secretary of GAB.

30.   Defendant Judge Harold V. Froehlich is a Member of GAB.

31.   Defendant Judge Timothy Vocke is a Member of GAB.

32.   Defendant Judge John Franke is a Member of GAB.

33.   Defendant Kevin J. Kennedy is the Director and General Counsel of GAB.

34.   Defendant Michael Haas is the Elections Division Administrator of GAB.

35.   Defendant Mark Gottlieb is Secretary of the Wisconsin Department of Transportation ("DOT").  DOT's Division of Motor Vehicles ("DMV") is responsible for issuing driver's licenses and official Wisconsin IDs (including "free" voter IDs) to eligible Wisconsin residents.  DOT promulgated Wis. Admin. Code Trans. § 102.15(5m), which provides an "extraordinary proof" petition process for voters unable to comply with Act 23's rigid documentation requirements.  DMV administers this voter ID petition process (which it calls the

---

[3] The Wisconsin Legislature and Governor have recently decided to dismantle the GAB effective June 30, 2016 and redistribute its functions to a newly created partisan Election Commission, an election-year disruption that the GAB's Director has warned is "all wrong," "not a prudent approach," "irresponsible, if not reckless," "will create significant problems for the conduct of elections in the upcoming presidential election year," and could cause "unnecessary and potentially catastrophic delay" in the implementation and administration of voter ID.  Among other things, GAB's elimination will deprive municipal clerks of a source of objective, authoritative guidance on how to implement the law.  This will result in less effective election administration and exacerbate the problem of voter confusion and outright denials of the right to vote.  Plaintiffs assume the State will move to substitute the appropriate new officer-defendants pursuant to Fed. R. Civ. P. 25(d) once GAB goes out of existence and its enforcement authorities have passed to the members of the Election Commission.

"IDPP").  Mr. Gottlieb's acts and omissions in his capacity as Secretary of DOT are made under color of state law.

36.     Defendant Patrick Fernan is Administrator of the DMV.  In addition to overseeing the voter ID program and the IDPP, Mr. Fernan often either makes the final decision or participates in deciding whether to issue a voter ID to petitioners.  Mr. Fernan's acts and omissions in his capacity as Administrator of DMV are made under color of state law.

## FACTUAL ALLEGATIONS

### Wisconsin's History and the Ongoing Effects of Discrimination

37.     Wisconsin has a lengthy of history of discrimination against African-Americans and Latinos that has hindered their ability to participate in the political process.

38.     Wisconsin's election practices have long discriminated against African-Americans and Latinos in the areas of registration and voting.  When Wisconsin first became a state in 1848, African Americans could not vote.  The original state constitution permitted African Americans to vote only if a majority of the state's (white) electorate approved.  As a result, African Americans did not gain the right to vote in Wisconsin until after the Civil War, when in 1866 the state supreme court ruled that a referendum held in 1849 had met the constitutional requirements for black suffrage.

39.     Similarly, between 1913 and 2006, Wisconsin only required voters to register before voting if they lived in municipalities with over 5,000 residents.  African-American and Latino voters have lived overwhelmingly in such areas.  As a result, Wisconsin's registration requirements historically placed a disproportionate burden on African-American and Latino voters.  Indeed, in 2006 approximately 98 percent of African Americans and 91 percent of Latinos in Wisconsin lived in municipalities where registration was required, compared to only

68 percent of whites.  This unequal system persisted until it was banned in 2006 by the Help America Vote Act, 42 U.S.C. § 15438(a).

40.     Similarly, even though 14 percent of Milwaukee speaks Spanish, Milwaukee County did not provide Spanish-language ballots until it was compelled to do so by the U.S. Justice Department in 2012 in order to comply with the Voting Rights Act of 1965.  The problems in Milwaukee have been severe enough that the Civil Rights Division of the U.S. Justice Department chose to dispatch special monitors to oversee the conduct of elections there in April 2012.

41.     As set forth below, moreover, several aspects of current election law in Wisconsin disproportionately burden African Americans and Latinos.  For instance, due to the law limiting early voting to a single location per municipality, African Americans and Latinos in Wisconsin, who disproportionately live in Wisconsin's largest municipalities, have less access to early voting locations than white voters have.

42.     African Americans and Latinos have also historically been underrepresented in elected offices in Wisconsin.  No member of a racial or ethnic minority group has ever been elected U.S. Senator from Wisconsin, governor, or attorney general, and Representative Gwen Moore is the first and only minority member of the U.S. House of Representatives from Wisconsin.  Vel Phillips, who served as Wisconsin Secretary of State from 1979-83, remains the only member of a racial minority group to hold statewide office in Wisconsin.  As of December 2013, the Wisconsin State Legislature had seven minority legislators, the fewest the state had had since 1992.  And, African-American and Latino voters in Wisconsin have historically participated in the electoral process at lower levels than has the population as a whole.

43.     Voting patterns in Wisconsin exhibit a high level of racial polarization.  In 2008, 91 percent of African Americans voted for the Democratic presidential ticket, whereas 54 percent of whites did so, a gap of 37 percentage points.  In 2004, this gap was 39 points.  In the 2010 gubernatorial election, the gap was 44 points.[4]

44.     Political campaigns in Wisconsin have involved both explicit and implicit racial appeals.  In 1964, Alabama Governor George Wallace received a third of the votes in the Democratic presidential primary by running on a segregationist platform.  In the 2006 gubernatorial campaign, one campaign advertisement appealed to anti-Latino sentiment by criticizing "illegal aliens" who were taking advantage of "welfare," "subsidized home loans," and "in-state tuition" breaks at UW system schools, "while Wisconsin kids are being turned away."  In the 2008 race for the Wisconsin Supreme Court, Louis Butler, who is African American, was attacked by ads denounced by some, such as the Wisconsin Judicial Campaign Integrity Committee and the Wisconsin Association for Justice, as "offensive" and "race-baiting."  Similarly, during the 2012 gubernatorial recall election, Republican Governor Scott Walker declared that "[w]e don't want Wisconsin to become like Milwaukee."

45.     Wisconsin's African Americans and Latinos have also suffered from the effects of discrimination in housing, education, employment, health, criminal justice, and other areas that have hindered their ability to participate in the political process.  Milwaukee is one of America's most racially segregated cities.  Indeed, Milwaukee was widely referred to as the "Selma of the North" during the 1960s and 1970s.  Almost two-thirds of African Americans in Wisconsin live in Milwaukee, and three quarters live in just four cities—Milwaukee, Racine, Kenosha, and

---

[4] These and other statistics in this Second Amended Complaint regarding election results among specific groups of voters are drawn from exit polls from media outlets.

Beloit.  Few African Americans live in Milwaukee's suburbs; 90 percent of African Americans living in Milwaukee County live in the city itself.

46.     The legacy of discrimination in housing has contributed in large part to this high degree of segregation.  Racially restrictive covenants were used widely in Wisconsin until they were banned by the U.S. Supreme Court in 1951.  Discriminatory real estate practices such as biased appraisals and racial "steering" served to limit African Americans' housing options to the inner city during much of the latter half of the 20th century.

47.     Discrimination in education is also particularly pronounced in Wisconsin.  The gap between high-school graduation rates for African-American and white males is 30 percentage points, the second highest in the nation.  The gap in graduation rates between Latino and white males is also notably high at 18 percentage points.  These disparities are the result of years of official discrimination in Wisconsin that continued decades after the U.S. Supreme Court banned school segregation in *Brown v. Board of Education*, 347 U.S. 483 (1954).  For example, as late as 1976—22 years after *Brown*—a federal court found that schools in Milwaukee continued to be unlawfully segregated.  *See Amos v. Bd. of Sch. Directors of the City of Milwaukee*, 408 F. Supp. 765, 818 (E.D. Wis. 1976).  In 1979, after that decision had been appealed to the U.S. Supreme Court, Milwaukee's school system finally settled and agreed to implement a school desegregation plan.

48.     Years of discrimination have also resulted in unusually high gaps in employment and income levels between minorities and whites in Wisconsin.  In 2010, 25 percent of African Americans were unemployed in Wisconsin, compared to 7.6 percent of whites, a gap of 17.4 percentage points that was double the national average.  In Milwaukee in 2010, 77.4 percent of white males were employed, whereas only 44.7 percent of African-American males were.

Remarkably, this gap of 32.7 percentage points is more than triple the disparity between African Americans and whites in 1970.

49.     These disparities in employment levels are reflected in large gaps between the income levels of minorities and whites in Wisconsin.  The poverty rate for whites is 11 percent, compared to 29 percent for Latinos and 41 percent for African Americans.  The gap of 30 points between African Americans and whites living in poverty is eight points higher than the national average.

50.     The legacy of discrimination in Wisconsin has also resulted in very high disparities between the incarceration rates of minorities and whites.  In 2008, African Americans made up 45 percent of the adults in the state's corrections system, despite constituting only 6 percent of the state's population.  Some data indicate that Wisconsin has the highest incarceration rate of African Americans in the country.

51.     There has been a significant lack of responsiveness on the part of Wisconsin's elected officials to the particularized needs of African Americans and Latinos.  This is demonstrated by the severe racial disparities discussed above, many of which have worsened over time.

**Recent Political History**

**The 2008 Election**

52.     In the 2008 election, President Barack Obama defeated Senator John McCain in Wisconsin by a margin of approximately 14%.  This lopsided victory marked a sharp departure from the two prior presidential elections, in each of which Wisconsin was decided by less than one-half of a percentage point.

53.     President Obama's success in 2008—both nationally and in Wisconsin—was due in part to his strong performance among African-American, Latino, and young voters.  Indeed, African-American and Latino voters turned out in record numbers across the nation.  By contrast, white turnout decreased by one percentage point between 2004 and 2008.

54.     Turnout in Wisconsin reflected these national trends.  African-American turnout in Wisconsin increased five percentage points from 68 percent in 2004 to 73 percent in 2008.  Latino turnout in Wisconsin increased from 33 percent in 2004 to 44 percent in 2008.  And these increases occurred despite the fact that there was a slight decrease in overall turnout in Wisconsin from 2004 to 2008.

55.     Both nationally and in Wisconsin, President Obama overwhelmingly defeated Senator McCain among African-American voters.  While Secretary (then-Senator) John Kerry won the African-American vote in Wisconsin in 2004 by a margin of 86 percent to 15 percent, President Obama won the African-American vote in Wisconsin in 2008 by a margin of 91 percent to 9 percent.  Nationally, President Obama won Latino voters by a margin of 67 percent to 31 percent, a marked improvement over Secretary Kerry's 53 percent to 44 percent victory among Latino voters.

56.     Turnout among young voters nationally also reached near-historic numbers in 2008.  Two million more American voters under the age of 30 voted in the 2008 election than 2004, for an increase of two percentage points in turnout.  The 2008 election marked the third-highest turnout rate among people under the age of 30 since the voting age was lowered to 18 in 1972.

57.     Both nationally and in Wisconsin, President Obama won the youth vote decisively.  Among voters nationally under the age of 30, President Obama defeated Senator

McCain by a margin of 66 percent to 32 percent.  Among voters under the age of 30 in

Wisconsin, President Obama won 64 percent and Senator McCain won 35 percent of the vote.

58.     Moreover, African-American, Latino, and young voters overwhelmingly voted for

Democratic candidates in other elections in 2008.  For instance, at the national level, 93 percent

of African-American voters, 68 percent of Latinos, and 60 percent of voters under 30 voted for

Democratic candidates for the U.S. House of Representatives in 2008.

**The 2010 Election and Subsequent Legislation**

59.     The political tides turned heavily in favor of Republicans in 2010.  In Wisconsin,

Scott Walker won the gubernatorial race, Republican Ron Johnson was elected to the U.S.

Senate, and Republicans took control of both houses of the State Legislature.

60.     With the legislative and executive branches of Wisconsin's government firmly in

Republican control, the State Legislature took up a number of measures that, upon information

and belief, were intended to burden, abridge, and deny, and that have had and will have the effect

of burdening, abridging, and denying, the voting rights of Wisconsin citizens generally and

Democratic, African-American, Latino, and/or young voters in particular.

61.     The most significant of these was Act 23, which contained an onerous voter ID

requirement.  With certain exceptions, that law requires voters to present one of a limited number

of forms of photo ID in order to have their ballots counted.

62.     Act 23 contained a number of other provisions that also burden the voting rights

of Wisconsin citizens.  It (1) reduced the early voting period from 30 to 12 days, 2011 Wis. Act

23, §§ 57, 96; (2) eliminated corroboration—i.e., one person's vouching for the residence of

another—as a means of proving residence for the purpose of registering to vote, *id.* §§ 17, 29,

40–41; (3) made it harder for students to use a college ID as proof of residence for the purpose of

registration by permitting "dorm lists" provided to municipal clerks to be used in connection

with college IDs to prove residence for the purpose of voter registration only if the colleges or

universities providing those dorm lists verify the citizenship status of the students on the list, *id.*,

§ 33m—a requirement that, if complied with, would result in funding cuts to those colleges and

universities under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g(a)(4)-(5),

(b)(1); (4) increased the in-state residency requirement for voting for offices other than president

and vice president from 10 to 28 days before an election, and required individuals who move

within the state later than 28 days before an election to vote at their previous ward or election

district, 2011 Wis. Act 23, §§ 10–12; (5) eliminated straight-ticket voting on the official ballot,

*id.* § 6; and (6) eliminated GAB's authority to appoint statewide special registration deputies—

that is, special registration deputies with the authority to register voters on a statewide basis, *id.* §

26.

     63.    The State Legislature did not stop with Act 23 during the 2011 session, but passed

other legislation that adversely affects the ability of Wisconsin citizens generally, and that

imposes a disproportionate burden on the ability of certain classes of voters, to register and to

vote.  In particular, the State Legislature, with Act 75, eliminated the faxing and emailing of

absentee ballots to all absentee voters except statutory overseas and military voters.  2011 Wis.

Act 75, § 50.  The State Legislature also targeted young voters by eliminating the requirements

that special registration deputies be appointed at public high schools; that, in certain

circumstances, special registration deputies be appointed at or sent to private high schools and

tribal schools; and that voter-registration applications from enrolled students and members of the

high school staff be accepted at high schools.  2011 Wis. Act 240, §§ 1–2; *see also* Wis. Stat. §

6.28(1)–(2) (repealed April 2012).  And, the State Legislature limited the circumstances in which

municipal clerks can return to voters absentee ballots that contain mistakes.  2011 Wis. Act 227, § 4.  Further, though Act 75 allows military voters to use the federal write-in absentee ballot form—a standard form that military and overseas voters may use to vote as long as they apply for an official absentee ballot by a certain deadline—to vote a straight ticket for *all* offices listed on the official ballot, it permits overseas voters to vote a straight ticket only for *national* offices. 2011 Wis. Act 75, §§ 32–33; Wis. Stat. § 6.25(1)(a)–(b).

64.     In August 2012, GAB ruled that electronic records showing an individual's address could be used to prove residence for the purpose of voter registration.  Republicans in the State Legislature criticized this ruling.  State Senator Mary Lazich, the chief sponsor of Act 23, said that she was disappointed by the ruling and that it could cause confusion for poll workers, including especially older poll workers in rural areas.  "That's going to be a nightmare for them," Senator Lazich said.  "If they are looking at a smartphone and want to be sure that it's a statement from their bank, or if it's some other website, how do they know?  Do I pick it up and hold it in my hand so that I can see it?  What if I drop it and break it?  I think it's a huge problem."

65.     Upon information and belief, young voters—especially college students—have disproportionately used electronic records to prove their residence for the purpose of voter registration.  Plaintiffs Nelson and Tasse have registered a number of college-student voters who would not have been able to register when they did but for the availability of the option to prove their residence through the use of electronic records.  Plaintiff Trindl has also registered voters who would not have been able to register when they did but for this option.

**The 2012 Election and Subsequent Legislation**

66.     President Obama was re-elected in 2012, and he again won Wisconsin.  As in 2008, President Obama's victory in 2012 was attributable in part to his success among African-American, Latino, and young voters.

67.     President Obama defeated Governor Mitt Romney among African Americans nationally by a margin of 93 percent to 6 percent.  In Wisconsin, President Obama won 94 percent of the African-American vote, while Governor Romney won 6 percent.

68.     President Obama also decisively won the Latino vote.  Nationally, he won 71% of the Latino vote and Governor Romney won 27%.  In Wisconsin, President Obama defeated Governor Romney among Latino voters by a margin of 66% to 31%.

69.     Voters under the age of 30 strongly supported President Obama's re-election as well.  Both nationally and in Wisconsin, he won 60 percent, while Governor Romney won 37 percent, of the votes cast by this group of voters.

70.     Democrats in other elections across the country similarly benefited from strong support among African-American, Latino, and young voters in 2012.  In the 2012 races for the U.S. House of Representatives, 91 percent of African Americans, 68 percent of Latinos, and 60 percent of voters under the age of 30 voted for Democrats across the country.

71.     Similarly, a *New York Times* analysis of 14 Senate races that year found that African Americans supported Democrats at rates ranging from 71 to 95 percent, Latinos at rates ranging from 51 to 90 percent, and voters under 30 at rates ranging from 49 to 73 percent.[5] These trends held true in Wisconsin.  Ninety-one percent of African Americans, 63 percent of

---

[5] The *New York Times* analyzed the Senate races in New York, California, New Jersey, Florida, Connecticut, Missouri, Pennsylvania, Massachusetts, Virginia, Ohio, Wisconsin, Indiana, Arizona, and Nevada.

Latinos, and 58 percent of voters between the ages of 18 and 29 supported Democratic senatorial candidate Tammy Baldwin over Republican Tommy Thompson in 2012.

72.     Against this backdrop, the State Legislature, which remained in Republican control, took up another round of restrictive voting legislation.  This time, it eliminated early voting on weekends—early voting days that had been particularly popular in the Democratic strongholds of Madison and Milwaukee—and evenings, 2013 Wis. Act 146,[6] while rejecting a bill, SB 91, that would have permitted municipalities to open more than one early voting location.  The State Legislature required all voters other than overseas and military voters to provide documentary proof of residence when registering, 2013 Wis. Act 182, § 2H—a change from prior law, under which only those who registered after the third Wednesday preceding (i.e., 20 days before) an election were required to provide documentary proof of residency.  The State Legislature also required that observation areas be placed between three and eight feet from the table at which voters sign in and obtain their ballots.  2013 Wis. Act 177.  Finally, the State Legislature overturned a city ordinance in Madison that required landlords to provide voter-registration forms to new tenants.  2013 Wis. Act 76, § 2.

73.     In March 2014, then-State Senator Dale Schultz, a Republican who had previously served as the Majority Leader, denounced the voting-law changes that the Republican majority had passed.  He said, "[W]e've had about 25 bills that deal with elections and voting, and I think almost anybody could say to themselves, 'What on earth is going on?'"  Senator Schultz added that he had begun that session thinking that "there was some lack of faith" in the voting process that needed to be addressed but that he had "come to the conclusion that this is far

---

[6] The version of the bill passed by the State Legislature would also have limited municipalities to 45 hours of early voting, but Governor Walker vetoed that portion of the bill on the grounds that it was "overly restrictive."

less noble."  He said, "It's just, I think, sad when a political party—my political party—has so lost faith in its ideas that it's pouring all of its energy into election mechanics" and that "it ought to be abundantly clear to everybody in this state that there is no massive voter fraud.  The only thing that we do have in this state is we have long lines of people who want to vote."  He continued, "[W]e should be pitching as political parties our ideas for improving things in the future rather than mucking around in the mechanics and making it more confrontational at our voting sites and trying to suppress the vote."  In addition, Senator Schultz noted, "these bills came up rather swiftly at the end of the session here.  I don't think we gave people adequate opportunity to comment on them."

## Challenged Provisions

### Limitation on Early Voting Locations

74.     Wisconsin limits early voting within a given municipality to a single location, either at the office of the municipal clerk or, if that office is not being used for early voting, at a single alternative site.  Wis. Stat. §§ 6.855–.86.  Under this law, Wisconsin's largest cities, such as Milwaukee and Madison, are not permitted to have any more early voting locations than the state's smallest municipalities.

75.     This limitation treats voters differently based on the municipality in which they live.  The law has resulted and will continue to result in there being more—and in the case of Milwaukee, hundreds of thousands more—registered voters per early voting location in larger municipalities than in smaller municipalities and severely burdens the right to vote of voters in Wisconsin's largest cities.

76.     This limitation has caused and will continue to cause long wait times for early voting.  For instance, a report issued by GAB in 2010 explained that there were lines as long as

three hours for early voting in 2008 and that some clerks "reported extremely long lines on the last days of [early] voting."  Milwaukee had long wait times for early voting in both the 2008 and 2012 general elections due in significant part to the limitation on early voting locations.  Such long wait times will almost certainly recur in the 2016 general election absent the relief requested herein.

77.     This limitation on early voting locations has also depressed turnout during early voting in Wisconsin's largest cities.  Indeed, the rate of early voting in 2012 was relatively low in Milwaukee (12.6 percent) and Madison (12.5 percent), Wisconsin's two largest cities, but relatively high in the smaller village of Whitefish Bay (34.5 percent) and the towns of Menasha (28.2 percent) and Brookfield (26.4 percent).

78.     Because the limitation on early voting locations depresses the rate of early voting in Wisconsin's largest cities, it has the further effect of causing more voters in those cities to vote and to register to vote on Election Day.  It thus results in increased wait times to vote in those cities on Election Day.

79.     The limitation on early voting locations also interacts with the ongoing effects of Wisconsin's history of discrimination against African Americans and Latinos disproportionately to abridge, deny, and burden the right to vote of African Americans and Latinos in Wisconsin.

80.     Based in part on the ongoing effects of Wisconsin's history of discrimination, Wisconsin's African-American and Latino populations are heavily concentrated in large cities, including Milwaukee in particular.  And, as explained above, the limitation on early voting locations disproportionately burdens individuals living in Wisconsin's largest cities.

81.     Indeed, in other states, African Americans have been *more likely* than other voters to utilize early voting.  For instance, in Cuyahoga County, Ohio, which is home to Cleveland,

African-Americans cast an estimated 77.9 percent of all early ballots in the 2008 election, despite accounting for a mere 28.6 percent of the estimated overall vote.  In North Carolina during the 2012 election, 70 percent of all African Americans who voted used early voting, and African Americans accounted for 29 percent of all early voters despite making up just 22 percent of the state's population.  Similarly, in Florida, African Americans cast 22 percent of the early in-person votes in the 2008 election, even though they comprise only 13 percent of the electorate. The same was true in Florida in 2012.  Yet, as noted above, the early voting rate in Milwaukee, the city with Wisconsin's largest African-American population and which has a far greater percentage of African-American residents than Wisconsin as a whole, lags far behind other locations in its early voting turnout.

82.     This disproportionate burden on African-American and Latino voters is compounded by other ongoing effects of Wisconsin's history of discrimination.  One such effect is the fact that costs of voting—such as the increased wait time at polling places and, for some voters, the reduced convenience in getting to the polling place that result from the limitation on early voting locations—have been found to depress turnout especially for racial and ethnic minorities.  In addition, racial and ethnic minorities make up a disproportionate percentage of the Wisconsinites in poverty, and long wait times to vote burden poor individuals in particular because such individuals are less able than wealthier individuals to expend time that could be put to other productive uses, tend to have less flexible job schedules, and have less access to convenient means of transportation.

83.     Based on the totality of the circumstances, the disproportionate burdens imposed on African-American and Latino voters from the limitation on early voting locations, alone and in combination with the other laws discussed herein, have resulted and will continue to result, in

minority voters in Wisconsin having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

84.     Wisconsin's limitation on early voting locations also disproportionately abridges, denies, and burdens the right to vote of young voters, poor voters, and Democratic voters.  Such voters constitute a disproportionately large percentage of eligible and of registered voters in the state's largest cities and are therefore disproportionately likely to wait in long lines to vote early, to be deterred from early voting due to long lines, and to have to wait in long lines to vote on Election Day.  According to Neil Albrecht, the Executive Director of the City of Milwaukee Election Commission, moreover, "[t]he working poor, single parents, students, people with disabilities, or anyone else that might have an Election Day schedule conflict or concern about limited physical access to their voting site" are among those who seek out the opportunity to vote early.

85.     The law limiting early voting to a single location per municipality does not materially benefit Wisconsin.  And the burdens this limitation imposes on voters generally, and on African-American, Latino, young, poor, and Democratic voters in particular, outweigh any benefits of the state's limitation on early voting locations.

86.     In fact, the City of Milwaukee has sought to have the limitation on early voting locations eliminated, and GAB has recommended that municipalities be permitted to have multiple early voting locations.  Yet SB 91, which would have permitted municipalities to open additional early voting locations, was defeated in 2013.

87.     Upon information and belief, the State Legislature has failed to pass legislation permitting municipalities to have multiple early voting locations because the limitation currently

in place disproportionately burdens and suppresses the vote of African Americans, Latinos, young voters, and Democrats.

**Reductions in the Early Voting Period**

88.     Hundreds of thousands of Wisconsinites have utilized early voting.  In the 2008 general election alone, 475,649 Wisconsin voters voted early, amounting to approximately 16 percent of all ballots cast.

89.     Prior to 2011, Wisconsin's municipalities could permit early voting for as many as 30 days before primary and general elections.  Act 23, which was enacted in 2011, limited early voting to the 12-day period that begins on the third Monday preceding an election and ends on the Friday before an election.  2011 Wis. Act 23, §§ 57, 96; Wis. Stat. § 6.86(1)(b).  In 2013, the State Legislature further reduced the opportunities for early voting by eliminating early voting on weekends and limiting the times for early voting to the period from 8 a.m. and 7 p.m. 2013 Wis. Act 146.  Prior to this change, much of Wisconsin's weekend early voting activity took place in Milwaukee and Madison, where a disproportionate percentage of Wisconsin's minority, young, and Democratic voters reside.  And in 2008, Madison offered early voting later than 7 p.m.

90.     These reductions in the period for early voting have burdened and will continue to burden Wisconsinites' right to vote.  By definition, reductions in the time period during which individuals can vote limit the options that individuals have for voting.  In addition, the reductions in early voting have exacerbated and will continue to exacerbate the problem of already-long lines that Wisconsinites face at the polls.  Further, because even small increases in the cost of voting can have a significant impact on individuals' likelihood of voting, these reductions in early voting have resulted and will result in a decrease in turnout.  Indeed, Milwaukee Election

Commission Executive Director Neil Albrecht said that the reduction in early voting days for the 2012 election caused the long lines for early voting and held down the increase in the number of early voters in Milwaukee in 2012.  And Madison City Clerk Maribeth Witzel-Behl said (prior to the elimination of weekend early voting), "When we're open on Saturday, we get a lot of feedback from voters saying, 'Thank you for being open.  This is the only time I'm able to get downtown.'"

91.    The reductions in the period for early voting also interact with the ongoing effects of Wisconsin's history of discrimination disproportionately to abridge, deny, and burden the right to vote of African Americans and Latinos in Wisconsin.  As noted, based in part on the ongoing effects of Wisconsin's history of discrimination, Wisconsin's African-American and Latino populations are heavily concentrated in large cities.  And the reductions in early voting disproportionately burden the residents of such cities by exacerbating the wait times to vote that those cities have had and because residents of Wisconsin's two largest cities, Milwaukee and Madison, were particularly likely to utilize weekend early voting.

92.    Other effects of Wisconsin's history of discrimination also contribute to the disproportionate nature of the burden on African Americans and Latinos from the reductions in early voting.  One such effect is that increases in the costs of voting depress turnout for racial and ethnic minorities disproportionately.  Another is that racial and ethnic minorities make up a disproportionate percentage of the Wisconsinites in poverty.  This is significant because long wait times to vote burden poor individuals in particular, as explained above.

93.    Based on the totality of the circumstances, the disproportionate burdens imposed on African-American and Latino voters from the reductions in early voting, alone and in combination with the other laws discussed herein, have resulted and will continue to result in

minority voters in Wisconsin having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

94.    Wisconsin's reductions in early voting also disproportionately abridge, deny, and burden the right to vote of young voters, poor voters, and Democratic voters.  Such voters constitute a disproportionately large percentage of voters in the state's largest cities and are therefore disproportionately likely to wait in long lines to vote early, to be deterred from early voting due to long lines, and to have to wait in long lines to vote on Election Day.

95.    The burdens on voters generally, and the burdens on African-American, Latino, young, poor, and Democratic voters in particular, from the reductions in early voting outweigh any benefits of those reductions.

96.    For instance, opponents of weekend early voting claimed that it was unfair to permit it in larger municipalities such as Madison and Milwaukee when it was unavailable in less-populous municipalities.  But, to be clear, every municipality in Wisconsin had the option of offering weekend early voting—some just chose not to do so.

97.    Moreover, this professed concern for uniformity in the provision of early voting opportunities is belied by the fact that the State Legislature rejected SB 91, which would have eliminated the limit to one early voting location per municipality and allowed for a more equitable distribution of early polling locations, and the statement of then-State Senator Glenn Grothman, the Senate author of the bill eliminating early voting on weekends, that he wanted to "nip" weekend early voting in Madison and Milwaukee "in the bud" before it spread to other areas.  This statement makes clear that the goal of the elimination of weekend early voting was not to promote uniformity—which could be accomplished by an expansion in early voting

opportunities, as well as by a reduction in such opportunities—but to reduce voting.  Tellingly, weekend early voting was eliminated despite the fact that a sizeable majority—approximately two-thirds—of Wisconsin citizens support weekend early voting.

98.     Also of note, Linda Cory, when she was Fitchburg City Clerk, stated that her office had stayed open for three hours on Saturday for the 2012 presidential election and that it was cheaper and faster to handle early voters than it was to have to pay for postage (for absentee ballots).

**Voter-Registration Restrictions**

99.     Since 2011, Wisconsin has imposed several burdens on the ability of Wisconsin citizens to register to vote.

<u>Elimination of Corroboration and Expanded Proof-of-Residence Requirement</u>

100.     With Act 23, the State Legislature eliminated corroboration (i.e., allowing one person to vouch for the residence of another) as an alternative to providing documentary proof of residence for voter registration.  2011 Wis. Act 23, §§ 17, 29, 40–41.  In 2013, the Wisconsin Legislature further burdened the ability of its citizens to register by enacting legislation requiring all voters other than overseas and military voters to provide documentary proof of residence when registering.  2013 Wis. Act 182, § 2H.  Under previous law, only those voters who registered after the third Wednesday preceding an election had to provide documentary proof of residence when registering.

101.     Each of these measures burdens the right to vote, and in some cases prevents eligible voters from registering and voting, by making it more difficult to prove residency for the purpose of registration and thus more difficult to register.  Each measure eliminates an option for

registration that was available for voters without documentary proof of residence or who were not in possession of such documentation at the time they sought to register.

102.     According to Diane Hermann-Brown, the City Clerk for Sun Prairie, in 2008 alone approximately 500 residents of Sun Prairie used corroboration to register to vote.  And, prior to the elimination of corroboration, Defendant Kennedy, in testimony before the Wisconsin Senate Committee on Transportation and Ethics, said, "Municipal clerks have informed our staff that [the elimination of corroboration] could work a real hardship on the elderly and women.  In many cases current identifying documents such as bank statements and utility bills are in the name of the husband or an adult child."  Moreover, Wisconsin Election Protection's *2012 Recall Election Report* explains that the elimination of corroboration "led to difficulties for a number of voters, and to the complete inability to vote for some voters."

103.     The expanded proof-of-residence requirement has slowed the registration process for many individuals; has caused some individuals to be unable to register when they have attempted to do so; and has made voter-registration activities less effective, thereby deterring some individuals from engaging in such activities.

104.     Furthermore, the elimination of corroboration and the expanded proof-of-residence requirement disproportionately abridge, deny, and burden the voting rights of young, poor, African-American, Latino, and Democratic voters.  Such individuals are less likely than other Wisconsin citizens to possess documentary proof of residence, such as an up-to-date driver's license, and they are therefore more likely to face burdens in registering or to be unable to register to vote as a result of these changes to the law.  For example, one analysis found that in 2013, African Americans were 1.4 times and Latinos were 2.3 times more likely than whites to lack a driver's license or state ID.  In addition, young and poor citizens move more frequently

- 36 -

than other citizens, and young eligible voters are disproportionately likely to live with their parents. Young and poor citizens are disproportionately less likely than other eligible voters to have documentation showing their current residence for these reasons as well. As Defendant Kennedy has explained, moreover, "[m]any students do not carry a driver license because they live on campus, use public transportation or do not drive."

105.    In a letter dated March 26, 2014, that urged Governor Walker to veto the bill containing the expanded proof-of-residence requirement and other legislation, Melanie G. Ramey, President of the League of Women Voters of Wisconsin, explained that the expanded proof-of-residence requirement would "impact many people who have recently moved or are temporarily living with family or friends and who do not have a document such as a Wisconsin driver's license or bank statement with their own name and current address."

106.    The elimination of corroboration and the expanded proof-of-residence requirement place disproportionate burdens on young and Latino citizens for the additional reason that members of these groups are less likely to be registered to vote than members of other groups. Sixty percent of citizens between 18 and 24 years of age are registered to vote in Wisconsin, compared to 80 percent of those between 45 and 64, and approximately 90 percent of those 65 and older. Similarly, 47 percent of Latino citizens are registered, compared to 79 percent of whites. As a result, young and Latino citizens are more likely than other members of the electorate to be burdened by laws that make registering to vote more difficult because young and Latino citizens are more likely than other members of the electorate to need to register in order to vote.

107.    The elimination of corroboration and the expanded proof-of-residence requirement do not materially benefit Wisconsin. Any benefits from these changes to the law are

outweighed by the severe burdens these measures impose on the right to vote generally, and on the right to vote of members of particular groups.

108.    For instance, the chief sponsor of the elimination of corroboration, State Senator Mary Lazich, said that, according to election clerks, "chain corroboration"—a number of people vouching for each other—was out of hand.  Yet Senator Lazich admitted that she could not recall which clerks said this, where this occurred, or if there was voter fraud.  Concerns of this nature plainly do not outweigh the burdens that the repeal of corroboration has imposed on voters.

109.    Nor do concerns about fraud indicate that these measures provide any material benefit to the State of Wisconsin.  Exhaustive research has demonstrated that voter fraud is extremely rare.  Moreover, Wisconsin Election Protection has written that Wisconsin allowed corroboration "[f]or decades and without adverse incident."  And poll workers were required to take identifying information from corroborators in order to safeguard against abuses.

110.    Defendant Kennedy has stated that the State Legislature, with the expanded proof-of-residence requirement, "sought to make the proof of residence requirement consistent for voters regardless of when they register to vote."  Without more, however, a desire for consistency is far outweighed by the significant burdens that the expanded proof-of-residence requirements has placed on the right to vote.

111.    In short, the burdens on voting rights from the elimination of corroboration and the documentary proof-of-residence requirement plainly outweigh any benefits of these measures.

112.    The elimination of corroboration and the expanded documentary proof-of-residence requirement also interact with the ongoing effects of Wisconsin's history of discrimination disproportionately to abridge, deny, and burden the right to vote of African

Americans and Latinos in Wisconsin.  African Americans and Latinos in Wisconsin are less likely than other Wisconsin citizens to possess driver's licenses and are therefore more likely to be burdened by registration laws that require documentary proof of ID.  In addition, increases in the costs of voting—such as making voter registration more difficult for some citizens—depress turnout for racial and ethnic minorities disproportionately.

113.    The disproportionate burdens imposed on African-American and Latino citizens in Wisconsin by the elimination of corroboration and the expanded documentary proof-of-residence requirement, alone and in combination with the other laws discussed herein, have resulted and will continue to result, based on the totality of the circumstances, in minority citizens in Wisconsin having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

114.    Upon information and belief, the State Legislature eliminated corroboration and imposed the expanded proof-of-residence requirement with the knowledge that these measures would disproportionately burden the ability of young, poor, African-American, and Latino citizens to register to vote.  Upon information and belief, the State Legislature did so with the knowledge that these groups vote for Democrats at higher rates than for Republicans.

Registration Restrictions Targeting Young Wisconsinites

115.    The Wisconsin Legislature also overtly targeted young people in making it more difficult to register to vote.  First, Act 23 made it more difficult for college students to use their school IDs to register to vote.  2011 Wis. Act 23, § 33m.  Prior to Act 23, Wisconsin colleges and universities could provide "dorm lists" to municipal clerks, and students could use those dorm lists along with their college IDs to register.  Act 23 changed this by requiring that college administrators certify that those students using their college IDs to register are U.S. citizens.

116.    This change in the law caused certain colleges and universities to discontinue the practice of providing dorm lists to municipal clerks, because the requirement that the dorm lists contain citizenship information conflicts with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, which cuts funding to educational institutions that disclose certain information, including citizenship information, about students.  This change in the law therefore prevents many college students from using their college IDs to register.  Indeed, in the 2012 presidential election, some college students in Wisconsin who had college IDs were unable to register to vote, and in turn unable to vote, because their college had not provided the municipal clerk with a dorm list due to this change in the law.  Thus, the change to the law regarding the use of dorm lists for voter registration burdens, abridges, and in some cases denies the right to vote of college students, the vast majority of whom are young citizens.

117.    The only apparent benefit to Wisconsin from this change in the law—that the change makes it more difficult for noncitizens to register to vote—is negligible.  Noncitizen students who sought to register unlawfully could use other forms of documentation of their residence that do not require certification of citizenship status (such as a driver's license) to register to vote.  The benefits of the change to the law permitting dorm lists to be used in connection with voter registration are therefore clearly outweighed by the burden this change imposes on citizens generally and young citizens in particular.

118.    The State Legislature has also imposed other burdens on the ability of young voters to register.  With Act 240, it eliminated the requirement that special registration deputies be appointed at public high schools and that, in certain circumstances, special registration deputies be appointed at or sent to private high schools and tribal schools.  2011 Wis. Act 240,

§ 2. Act 240 also eliminated the requirement that applications for registration by enrolled students and high school staff be accepted at high schools. *Id.* §§ 1–2.

119.    Because these changes eliminate voter-registration opportunities, they make it more difficult for young Wisconsin citizens to register to vote. This is particularly problematic because many studies have found that voting is habit forming, and that the younger a person is when he or she begins to vote, the more likely it is that the person will continue to vote in the future. Indeed, these studies indicate that a person who voted in the previous election is approximately 30 percent more likely to vote in the next. The consequences of inhibiting youth voter registration therefore continue well into the future. Upon information and belief, some Wisconsin citizens have not registered and will not register to vote because of the changes resulting from Act 240. Thus, these changes burden, abridge, and deny the right to vote of young Wisconsin citizens.

120.    These burdens on voting rights outweigh any benefit to Wisconsin from these changes. Indeed, a letter to the members of the Senate Committee on Transportation and Elections from Disability Rights Wisconsin, the Wisconsin Board on People with Developmental Disabilities, and the Survival Coalition of Wisconsin Disability Organizations explained, "According to the municipal clerks I have spoken to regarding the current law [in place prior to passage of Act 240], they do not think that it is a burden to provide this service [voter registration in high schools] and feel that it is a benefit to the community and an important part of the work they do."

Overturning Requirement that Landlords Distribute Voter-Registration Forms

121.    With Act 76, the State Legislature made it more difficult to register to vote by prohibiting local governments from requiring landlords to distribute voter-registration forms to

new tenants.  In 2012, the City of Madison passed an ordinance requiring landlords to provide new tenants with a voter-registration form when they moved in.  Madison, which is home to the state's flagship public university, has a disproportionately high number of young people and students who rent their homes and move frequently.  Twenty percent of Madison's residents are between the ages of 18 and 24, compared to four percent in Wisconsin as a whole.  The median age is 30 in Madison, compared to 38 in the state.  As a result of higher rates of residential instability among young persons, only 72 percent of Madison's residents live in the same residence for more than a year, compared to 86 percent in the state as a whole, and only 49 percent own their home, compared to 68 percent statewide.  Given the unique demographics of Madison's rental market, this ordinance served as a means of promoting civic engagement and political participation among the city's younger voters.

122.    However, the State Legislature nullified this ordinance in December 2013 with the passage of Act 76, which provides in part (with an exception not relevant here) that "[n]o city, village, town, or county may enact an ordinance that requires a landlord to communicate to tenants any information that is not required to be communicated to tenants under federal or state law."  2013 Wis. Act 76, § 2.

123.    Act 76 burdens the voting rights of Madison's citizens who rent and move frequently by prohibiting a means of facilitating their ability to register to vote or to keep their registration information up to date.  Because renters in Madison, relative to eligible Wisconsin voters as a whole, are disproportionately likely to be students and young citizens generally, these burdens fall disproportionately on students and young Wisconsinites.

124.    These burdens cannot be justified by any relevant or legitimate state interest.  Madison's renter-registration ordinance imposed negligible costs on landlords, and those costs

were far outweighed by the benefit of reducing the burdens of voter registration on renters.  As a result, Act 76 unconstitutionally burdens the voting rights of Madison's renter population.

<u>Elimination of Statewide Special Registration Deputies</u>

125.   Act 23 also limited opportunities for voter registration by eliminating GAB's ability to appoint statewide special registration deputies.  Under previous law, GAB could appoint individuals to register voters throughout Wisconsin.  *See* Wis. Stat. § 6.26(2)(c) (repealed May 2011).  Act 23 eliminated this option by requiring an individual to obtain the approval of the municipal clerk or municipal elections board of each municipality in which he or she seeks to register voters.  2011 Wis. Act 23, § 26.

126.   Prohibiting GAB from appointing statewide special registration deputies burdens the rights of Plaintiffs and other individuals and groups seeking to register voters by limiting the class of citizens they are able to register.  Under previous law, a statewide special registration deputy was able to register any Wisconsinite who was eligible to vote.  Now, individuals who become special registration deputies can only register voters from the specific municipality in which they have been authorized to register voters (and any municipalities that recognize that authorization) and must turn away Wisconsinites from other municipalities, even if those individuals are eligible to vote.  Thus, this prohibition similarly burdens the voting rights of Wisconsin's eligible voters who have not yet registered by restricting the number of special registration deputies who can register them.

127.   These burdens fall disproportionately on young, Latino, and African-American voters.  The registration rates of young and Latino voters lag behind those of other groups in the state, as explained above.  Upon information and belief, moreover, the elimination of statewide

special registration deputies burdens voter-registration drives, and Latinos and African Americans are more likely than other voters to register to vote through such drives.

128.    The burdens imposed by this prohibition plainly outweigh the state's interests in the prohibition.  Indeed, there is no rational basis for prohibiting GAB from authorizing a person to register voters throughout the state while permitting that person to obtain the permission of each municipality in which he or she seeks to engage in voter-registration activities.

**Increased Residency Requirements**

129.    Act 23 increased the residency requirement for voting for offices other than president and vice president from 10 to 28 days before an election, and provided that an individual who moves within the state later than 28 days before an election must vote at his or her previous ward or election district.  2011 Wis. Act 23, §§ 10–12.  The latter provision does not permit a voter who moves within the state to vote even for president or vice president at his or her new ward or election district.

130.    These changes severely burden those voters who move shortly before an election. In order to vote in person, voters who move in state must travel to their previous district.  A voter who moves from Milwaukee to Superior within 28 days of an election therefore must drive several hours each way to vote in person.  A voter who moves to Wisconsin from out of state within 28 days of an election is simply not permitted—that is, denied the right—to vote for offices other than president and vice president.

131.    These changes interact with the ongoing effects of Wisconsin's history of discrimination disproportionately to abridge, deny, and burden the right to vote of African Americans and Latinos in Wisconsin.  As a result of Wisconsin's history of discrimination, African Americans and Latinos in Wisconsin have less stable housing arrangements, are more

likely to be in poverty, and are more likely to move than other Wisconsinites. Laws, such as expanded residency requirements, that burden voters who move therefore disproportionately burden African Americans and Latinos in Wisconsin. In addition, African Americans and Latinos in Wisconsin are less likely than other Wisconsinites to have access to a vehicle or to possess a driver's license due to Wisconsin's history of discrimination, and the requirement that voters travel to their prior in-state residence to vote in person thus disproportionately burdens African Americans and Latinos in Wisconsin. And, as noted above, increases in the costs of voting generally depress turnout disproportionately for racial and ethnic minorities.

132.    The disproportionate burdens imposed on African Americans and Latinos by Wisconsin's expanded residency requirements, alone and in combination with the other laws discussed herein, have resulted and will continue to result, based on the totality of the circumstances, in minority citizens in Wisconsin having unequal access to the polls and less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

133.    The expanded residency requirements also disproportionately abridge, deny, and burden the voting rights of young, poor, and Democratic voters. Such voters, like African Americans and Latinos, move more frequently than other Wisconsinites, and they are therefore disproportionately likely to be impacted—and thus burdened—by the expanded residency requirements.

134.    The severe burdens imposed by Wisconsin's expanded residency requirements generally, and on the right to vote of members of particular groups, outweigh the benefits of the expanded residency requirements. There does not appear to be any material benefit to the state from having expanded the residency requirement from 10 to 28 days. Moreover, there is no

rational basis for permitting the class of voters who moved to Wisconsin from out of state within 28 days of an election to vote for president and vice president at their new ward or election district but not permitting the class of voters who moved within Wisconsin within 28 days of an election to vote for president and vice president at their new ward or election district.

**Invasive Poll Monitoring**

135.    In 2013, Wisconsin changed the law governing observation areas at polling locations to *require* that an area for election observers be placed between three and eight feet from the table at which voters obtain their ballots and register to vote.  2013 Wis. Act 177.  Prior to this law, observers were required, pursuant to GAB policy, to maintain a six-foot distance from voters.

136.    Election observers have intimidated voters and caused wait times to increase at polling places in Wisconsin, including in particular at sites that have high populations of students and/or minority voters.  During the 2012 recall election, election observers intimidated and challenged the qualifications of African Americans attempting to vote in Racine, and they slowed the registration process at Lawrence University in Appleton.

137.    On July 31, 2012, GAB issued a statement explaining that "in recent elections [it] ha[d] received disturbing reports and complaints about unacceptable, illegal behavior by observers," and that it put emphasis in its training of local election officials for the 2012 general election on dealing with boisterous, disruptive election observers.  Racine responded to the then-recent incidents that it had during the 2012 recall election by more strictly enforcing the six-foot buffer for election observers during the 2012 general election.

138.    By subsequently *reducing* the buffer zone, the State Legislature facilitated, and even encouraged, voter intimidation by election observers and will cause wait times to increase

for voters at polling locations at which aggressive observers are present. Andrea Kaminksi, the executive director of the League of Women Voters of Wisconsin, stated that an observer who is only three feet from the table is "standing right over the poll worker breathing down their neck." And, as that organization's president, Melanie G. Ramey, wrote in a letter dated March 26, 2014, three feet "is right behind the election official's chair and close enough to see a birth date or account number on a proof-of-residence document."

139.    Wisconsin's interest in moving election observers closer to voters is negligible, at best. Indeed, Ramey's March 26, 2014 letter states, "As an organization that has trained and placed hundreds of election observers in polling places in Wisconsin in the past few years, we can attest that observers do not need to be that close [i.e., as close as three feet from voters] in order to do their job." Moreover, poll workers—not observers—are primarily responsible for enforcing Wisconsin's election rules. The state's interest in requiring that an observation area for election observers be placed between three and eight feet from the table at which voters obtain their ballots and register to vote is clearly outweighed by the burden that this requirement places on voting rights.

140.    Because it does not serve any relevant or legitimate state interest, but instead facilitates voter intimidation, the rule requiring that election observers be permitted to stand as close as three feet from the table at which voters obtain their ballots and register to vote also burdens, abridges, and denies the voting rights of young persons, African Americans, and other voters who have been or will be the targets of intimidation and harassment by election observers.

141.    Upon information and belief, the State Legislature enacted Act 177 with knowledge that young voters and African Americans had been the target of voter suppression efforts and that moving election observers closer to the polling table would encourage those

efforts.  Upon information and belief, the State Legislature enacted Act 177 with the intent to discriminate against young, African-American, and Democratic voters.

### Changes to Straight-Ticket Voting

142.    Act 23 also eliminated straight-ticket voting on the official ballot for a general election.  2011 Wis. Act 23, § 6.  Straight-ticket voting permitted a voter to cast a ballot for all candidates of a single party.

143.    The elimination of straight-ticket voting on the official ballot burdens Wisconsin voters, including in particular voters in Milwaukee and other areas that are disproportionately likely to have long lines for voting, by increasing the time it takes for voters who otherwise would be casting a straight-ticket ballot to complete their ballots and, in turn, increasing wait times to vote.

144.    Prior to the enactment of Act 75, Wisconsin law provided that military and overseas voters who used the federal write-in absentee ballot form—which may be used in lieu of the official ballot if, among other things, a military or overseas voter applies for an official ballot by a certain deadline, Wis. Act § 6.25(1)(a)–(b)—in a general election could vote for all of the candidates of any recognized political party for national office listed on the official ballot. Wis. Stat. § 6.25(1)(a) (amended by 2011 Wis. Act 75).  Act 75 expanded military voters' right to vote a straight ticket on a federal write-in absentee ballot form to *all* offices on the official ballot in any election, but the State Legislature declined to fully extend that right to overseas voters.  2011 Wis. Act 75, §§ 32–33; Wis. Stat. § 6.25(1)(a)–(b).  Instead, overseas voters using the federal write-in absentee ballot form may vote a straight ticket only on *national* offices in any election.  2011 Wis. Act 75, § 33; Wis. Stat. § 6.25(1)(b).

145.   There is no rational basis for treating military voters differently from overseas voters with respect to straight-ticket voting on the federal write-in absentee ballot form.

146.   Upon information and belief, the State Legislature expanded the right to vote a straight ticket on the federal write-in absentee ballot form for non-national offices to military voters but not overseas voters based on its belief that military voters will disproportionately cast straight-ticket ballots in favor of Republican candidates while overseas voters would disproportionately cast such ballots in favor of Democratic candidates and that this distinction will therefore benefit Republican candidates.

**Changes to Absentee Voting**

<u>Elimination of Option to Obtain Absentee Ballots by Fax or Email</u>

147.   In 2011, the State Legislature also eliminated the option of obtaining absentee ballots by fax or email for all voters other than statutory overseas and military voters.  2011 Wis. Act 75, § 50.

148.   The elimination of the option for most voters to obtain absentee ballots by fax or email burdens the voting rights of Wisconsin citizens.  According to Wisconsin Election Protection's *2012 Recall Election Report*, this change "imposed barriers to voting for a number of voters, both within and outside Wisconsin," including several people "who were temporarily out of the country but not statutory overseas voters" and "reported that due to mail delays in other countries there simply was insufficient time for them to receive ballots mailed from the United States and timely return those ballots by mail so they would be received by the Friday after the election."

149.   The burdens imposed from the elimination for most Wisconsin voters of the option to obtain absentee ballots by fax or email clearly outweigh any benefits of this change in

the law.  Indeed, this change cannot be justified on any rational basis.  Upon information and belief, faxing or emailing absentee ballots makes election administration easier, not harder.

<u>Prohibition on Returning Absentee Ballots to Correct Certain Mistakes</u>

150.    The State Legislature also prohibited municipal clerks from returning absentee ballots to voters to correct mistakes (such as errors in marking the ballot) unless the ballots are spoiled or damaged or there was no certificate or an improperly completed certificate.  2011 Wis. Act 227, § 4.

151.    This prohibition severely burdens the voting rights of those voters who will be deprived of an opportunity to correct mistakes to their ballots as a result of this change: their votes will not be counted.

152.    Given the severity of the burden on the voting rights of the voters impacted by this change in the law, this burden outweighs whatever benefits the state claims to derive from this prohibition.

**The Voter ID Law**

153.    Wisconsin's voter ID law requires voters (with certain exceptions) to present one of a limited number of photo IDs in order to have their ballots counted.  *See* Wis. Stat. § 5.02(6m).  Even though technical college IDs can be used as proof of residence when registering to vote, Wis. Stat. § 6.34(3)(a)7, IDs from Wisconsin's two-year technical colleges cannot be used for voting.  The voter ID law also does not permit many expired IDs or out-of-state driver's licenses to be used for voting.

154.    Voters who show up to the polls without a qualifying ID must cast a provisional ballot.  Those ballots will be counted only if the individual appears at the municipal clerk's

office, with an acceptable form of ID, by 4:00 p.m. on the Friday after the election.  *See* Wis. Stat. §§ 6.79(3)(b), 6.97(3)(b).

155.     The voter ID law severely burdens the right to vote.  A large number of registered Wisconsin voters do not have a form of ID that can be used for voting.  Indeed, the trial court in *Frank v. Walker* found that "approximately 300,000 registered voters in Wisconsin, roughly 9% of all registered voters, lack a qualifying ID."  17 F. Supp. 3d 837, 854 (E.D. Wis.), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014), *rehearing en banc denied by an equally divided court*, 773 F.3d 783 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015).

156.     These hundreds of thousands of Wisconsin citizens are generally faced with the choice of undertaking the burden of obtaining an ID that can be used for voting or being disenfranchised.  And a number of these voters have been and will be disenfranchised.  Even small increases in the cost of voting can increase the likelihood that individuals will not vote. Moreover, a "quasi-experimental analysis" conducted by the Government Accountability Office ("GAO") found that the decrease in turnout from 2008 to 2012 was greater in two states that had adopted voter ID laws between those elections than in comparison states that had not done so. GAO, *Elections: Issues Related to State Voter Identification Laws*, GAO-14-634, Report to Congressional Requesters at 48-49, Sept. 2014 ("GAO Report"), *available at* http://www.gao.gov/assets/670/ 665966.pdf.

157.     Wisconsin's voter ID law interacts with the ongoing effects of Wisconsin's history of discrimination against African Americans and Latinos disproportionately to abridge, deny, and burden the right to vote of African Americans and Latinos.  African Americans and Latinos are less likely than whites to possess IDs that can be used for voting in Wisconsin. Indeed, during the consideration of Act 23, the State Legislature was presented with evidence

that, among Wisconsin residents, 55 percent of African-American men and 49 percent of African-American women lacked a valid driver's license; 46 percent of Latino men and 59 percent of Latino women lacked a valid driver's license; and 17 percent of white men and women lacked a valid driver's license. Moreover, African Americans and Latinos who lack a qualifying ID are much more likely than whites to encounter a variety of challenges and obstacles in obtaining the birth certificates and other ancient records required to obtain a qualifying ID. Plainly, the voter ID law places greater burdens on voters who lack a qualifying ID than on those who possess such an ID.

158.    This disparate impact is linked to the ongoing effects of discrimination. For instance, African Americans and Latinos in Wisconsin are disproportionately likely to live in poverty due to the effects of discrimination, and individuals in poverty are less likely to participate in activities for which a photo ID is required. And this disproportionate burden is made worse by another effect of Wisconsin's history of discrimination: the fact that increased costs of voting disproportionately depress the turnout of racial and ethnic minorities.

159.    The disparate impacts that the voter ID law imposes upon African Americans and Latinos, alone and in combination with many of the other provisions described in this Second Amended Complaint, result, based on the totality of the circumstances, in African Americans and Latinos in Wisconsin having unequal access to the polls and having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

160.    The voter ID law disproportionately burdens, abridges, and denies the right to vote of young, poor, and Democratic voters as well. Young and poor voters are less likely than the population as a whole to possess a qualifying form of voter ID, and they are therefore more

likely than the population as a whole to have their right to vote burdened or denied by the voter ID law.  Moreover, the GAO report cited above found greater decreases in turnout among young voters (as well as African-American and recently registered voters)  from 2008 to 2012 in the two states that had adopted voter ID than in the comparison states.  GAO Report at 51.  Upon information and belief, including that populations that strongly support Democratic candidates, such as African Americans, Latinos, and young voters, are disproportionately likely not to have a qualifying voter ID, Democratic voters are disproportionately likely not to have a qualifying ID.

161.    The voter ID law does not materially benefit Wisconsin.  There is no material amount of voter-impersonation fraud, and, upon information and belief, the voter ID law has not increased and will not increase confidence in Wisconsin's election process.  Thus, any benefits from the voter ID law are clearly outweighed by the burdens that the law imposes on voters generally and on specific classes of voters.

162.    Further, the voter ID law's exclusion from the list of qualifying voter IDs of technical college IDs, many expired IDs, and out-of-state driver's licenses does not serve any state interest and is not rational.  The purpose of the voter ID requirement is to confirm identity, not residency.  Indeed, U.S. passports, which can be used as voter ID, do not even contain address information.  And there is no reason to believe that technical college IDs, expired IDs, and out-of-state driver's licenses are any less capable of confirming identity than the documents that can be used as voter ID.  Certainly, the burdens imposed on voters outweigh any benefits resulting from excluding these forms of ID from the list of approved forms of voter ID. Nonetheless, in response to GAB's finding that technical college IDs met the statutory requirements for student IDs that could be used for voting, a legislative committee required GAB

to promulgate an administrative rule, thus effectively overruling the GAB decision because the legislative committee and the governor must approve the rule and neither has done so.

163.   Upon information and belief, the voter ID law was intended, at least in part, to suppress disproportionately the vote of African-American, Latino, young, and Democratic voters in Wisconsin.  The State Legislature enacted Act 23 on a largely party-line vote.  In the State Senate, the vote was strictly on partisan lines, with Republicans voting in favor of the Act and Democrats voting against it.  In the State Assembly, not a single Republican voted against it, and only two Democrats voted for it.  Jay Heck, the Executive Director of Common Cause in Wisconsin, referred to Act 23 (when it was still pending legislation known as Assembly Bill 7) as "the most restrictive, blatantly partisan and ill-conceived voter identification legislation in the nation."

164.   The Wisconsin Supreme Court concluded two years ago that Act 23, as construed and enforced by the State over the 38-month period between June 2011 and August 2014, had imposed a "severe burden" on the right to vote.  *Milwaukee Branch NAACP v. Walker*, 2014 WI 98, ¶¶ 7 & n. 5, 60, 851 N.W.2d 262, 266 & n.5, 277 (2014); *see also id*. ¶¶ 4-7, 50-65, 78-80, 851 N.W.2d at 265-66, 274-78, 280-81.  The Court held that the State had unconstitutionally required voters to pay for the official documents that must be obtained in order to receive so-called "free" voter IDs, a practice the Court repeatedly called a "*de facto* poll tax."  *Id*. ¶¶ 50, 54-55, 57, 851 N.W.2d at 274-76.  The Wisconsin Supreme Court's analysis of the monetary burdens involved in seeking a "free" voter ID was consistent with Judge Adelman's detailed findings of fact regarding the burdens of seeking birth certificates and other ancient records necessary to obtain a Wisconsin voter ID—findings the Seventh Circuit panel did not question.  *See Frank v. Walker*, 17 F. Supp. 3d at 853-62, 870-79.  Judge Adelman's findings document,

among other things, the costs of obtaining birth records in Wisconsin and elsewhere; the large

number of Wisconsin voters who were born out of state who "find that there is no birth

certificate on file for them in the states where they were born"; the frequency of "errors or

discrepancies in the documents needed to obtain an ID"; the time and expense in "[a]mending a

birth certificate"; the frequent instances in which voters have been able to get DMV officials to

excuse minor errors and omissions only by having public officials intercede on their behalf; and

the "additional hurdles that Blacks and Latinos who lack IDs are more likely to have to

overcome than whites who lack them," including "never having had an official birth certificate in

the first place."  *Id.* at 858 n.17, 859, 860 n.19, 861, 875, 876 n.36.

165.    Although the voter ID law had operated up to that point as a "*de facto* poll tax,"

the Wisconsin Supreme Court nevertheless upheld the law on a prospective basis by adopting a

newly fashioned "saving construction," not of Act 23 itself, but of Wis. Admin. Code Trans. §

102.15(5m), which provides an "extraordinary proof" petition process for voters unable to

comply with Act 23's rigid documentation requirements (the "IDPP" defined above).  The state

court held that the DMV must henceforth exercise its "discretion" during the IDPP so that voters

can obtain exemptions from having to pay for birth certificates and other government records

needed to obtain a voter ID.  2014 WI 98, ¶¶ 66-70, 851 N.W.2d at 278-79.

166.    The Seventh Circuit relied heavily on this "saving construction" and the State's

promised remedial measures in staying and then overturning the district court injunction.  The

Seventh Circuit's understanding, based on the State's representations, was that the new

procedures would "make it easier for persons who have difficulty affording any fees to obtain the

birth certificate or other documentation needed under the law, *or to have the need for*

*documentation waived*."  *Frank v. Walker*, 766 F.3d at 756 (emphasis added).  The court also

understood, based on the State's representations, that the new regulations would "require[e] officials to get birth certificates (or other qualifying documents) themselves for persons who ask for that accommodation on the basis of hardship." *Id.* at 747. The court concluded that the DMV should be given an opportunity to implement its new "hardship" procedures and to show they "alleviat[e] difficulties that some persons encounter in getting photo IDs." *Id.* at 747, 755. The Seventh Circuit also emphasized that Act 23's voter ID provisions could be challenged again if the State abused its discretion in implementing the amended process or made it "needlessly hard to get photo ID" in "hardship" cases. *Id.* at 747 n.1, 753.

167.    Discovery in this litigation establishes that the State has implemented and is presently administering the "free ID petition process" in an arbitrary, capricious, abusive, "needlessly hard," and racially discriminatory manner that only further exacerbates the disproportionate impacts of the voter ID law on African Americans, Latinos, senior citizens, the poor, and other populations targeted by the voter ID law and the other voting restrictions at issue in this litigation.

168.    The ID petition process is plagued with long delays, red tape, repeated errors, inconvenient service hours, and the need for enormous voter fortitude and persistence. Because so many petitioners are senior citizens who face especially difficult hurdles in tracking down ancient records, their children, other family members, and other caregivers must often spend substantial time dealing with multiple bureaucracies in multiple jurisdictions on the senior petitioners' behalf. DMV's files are replete with evidence of customer complaints about receiving inaccurate and misleading information about the process, complaints from agency personnel about the lack of any standards or guidance, and audits showing sub-par agency

performance in administering the IDPP.  A 2015 internal audit revealed an astounding 27% error rate in petitions processed between March and August 2015.

169.    DMV expects increased demand for voter IDs in this Presidential election year, but it has taken no steps to prepare for that increased demand.  It already has a backlog of dozens of "open" petitions, has cut back on staff, and has no extra staff or budget allocated to deal with the expected increased demand.  Requests for additional resources to deal with increased demand for voter IDs in this landmark election year have repeatedly been denied.

170.    Several dozen DMV officials exercise standardless discretion whether to grant "hardship" exemptions without requiring voters to go through the formal ID petition process. For those voters who are not fortunate enough to find a sympathetic DMV supervisor willing to sign off on their petition, they must "enter" (the DMV's word) the IDPP, a Dickensian process that often extends for many months and involves numerous additional hurdles before the voter can obtain the required ID.  The IDPP is governed by no written standards or guidelines, and has often resulted in the imposition of arbitrary and capricious requirements having nothing to do with eligibility to vote.  The IDPP also has resulted in the outright disenfranchisement of many eligible voters like Plaintiff Johnny M. Randle simply because of minor discrepancies in the spellings of their names or uncertainties about their exact dates of birth—even though DMV acknowledges it has no doubts these disenfranchised voters are U.S. citizens.  The DMV's burdensome demands and delays have led many additional petitioners simply to give up and either "suspend" their efforts or withdraw their petitions outright in anger and disgust.

171.    Plaintiffs' expert Dr. Allan J. Lichtman, Distinguished Professor of History at American University and a nationally recognized authority on voting discrimination, has examined the DMV's official voter ID denial letters and other agency records, and has concluded

that "as far as I know it represents *the first time since the era of the literacy test* that state officials have told eligible voters that they cannot exercise their fundamental right to vote—not in the next election, probably not ever. … I am *unaware in the post-voting rights era of other examples* of state officials telling eligible citizens of their state that they cannot vote because they fail to meet an external criteria established by the state—unrelated to age, residency or other objective qualifications for voting."  Feb. 16, 2016 Expert Rebuttal Report of Allan J. Lichtman, at 15-16 (emphases added) (Dkt. 129).

172.   DMV investigators often contact vital records offices and hospitals in other states, which tell them they will only release requested information for a fee, after which DMV contacts the petitioning voters and tells them they will either have to pay that fee to get their birth information or else come up with some other substitute proofs deemed acceptable by DMV such as family Bibles, baptism certificates, and early school records.  As DMV concluded in one such case, "[t]hrough no fault of the petitioner, we cannot verify [her] birth, so we cannot … issue a voter ID card."  In other instances, the birth states advise they have no record of the petitioner's birth, after which DMV urges the petitioner to keep searching for other ancient records.  Even where another jurisdiction confirms the voter's birth, DMV has often (but not always) refused to grant permission to vote if the name on the birth record does not agree with the name on the petitioner's Social Security account, in which case the voter must either change his Social Security records or go to court to change his name (e.g., Johnny Randle vs. Johnnie Randall).

173.   DMV in several instances has required voters who were adopted and lacked information about the precise circumstances of their births to search for that information before being allowed to vote.  In at least one instance, DMV directed the petitioner to an out-of-state "Post Adoption Services" bureau to seek help in tracking down her "adoption paperwork," even

though DMV had no reason to doubt the woman was a U.S. citizen.  DMV keeps track of such "interesting cases" where "we were able to connect people with their birth record through the petition process."

174.    Another Milwaukee voter—a 70-year-old Latina woman born in Puerto Rico—was told that her U.S. birth had been confirmed but that the Wisconsin Department of Health Services "said she's deceased," even though federal government records show she is "definitely not deceased."  The voter presented herself to prove she is alive, but was told by DMV that she "will have to sort out her status with the certifier of record before we can issue voter ID."

175.    DMV records also document that the entire "free ID" process is imposed in a staggeringly disproportionate manner on African American and Latino voters, and presumably Democratic voters as well.  The State's own expert has reported that *forty-four percent* of all voters who have obtained free IDs since 2011 are either African American or Latino.  And based on the petitions and case files thus far produced by the DMV, it appears that *well over sixty percent* of all voters required to "enter" the IDPP are either African American or Latino.  Most petitioners live in Milwaukee or Madison, and a large percentage were born in places known for their notorious problems with birth records, including African Americans born in the Jim Crow South prior to the 1960s, African Americans born in Illinois (especially Cook County), and citizens born in Puerto Rico (which has annulled all birth certificates of individuals born there prior to 2010).  And the vast majority of the ID "extraordinary proof" petitioners whose requests for ID have been denied outright appear to be either African American or Latino.

176.    In addition to failing to provide sufficient funding and staff for the IDPP to function in a fair, efficient, and prompt manner, those who control the State's purse strings have similarly choked off the GAB's budget for educating and assisting the public in adapting to the

voter ID regime.  The GAB has a statutory duty to "[e]ngage in outreach to identify and contact groups of electors who may need assistance in obtaining or renewing a document that constitutes proof of identification for voting … and provide assistance to the electors in obtaining or renewing that document."  2011 Wis. Act 23, § 95 (creating Wis. Stat. § 7.08(12)).  In addition, "[i]n conjunction with the first regularly scheduled primary and election at which the voter identification requirements of this act initially apply, the government accountability board shall conduct a public informational campaign for the purpose of informing prospective voters of the voter identification requirements of this act."  *Id.* § 144 ("Nonstatutory provisions").  Yet the Wisconsin Legislature has refused GAB's repeated funding requests to carry out these duties.

177.    The State of Wisconsin is thus three months into the 2016 presidential election year without an effective voter ID public education and assistance program in place, with the GAB (the agency that oversees the implementation of the voter ID regime) in the process of being dismantled, and with a DMV ID petition process for alleviating "hardship" cases that is understaffed, underfunded, standardless, and imposes additional arbitrary and irrelevant voting conditions on people the State *admits* are United States citizens, most of them African Americans and Latinos.

**CAUSES OF ACTION**

**COUNT I**

**(Violations of Section 2 of the Voting Rights Act)**

178.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Second Amended Complaint and the paragraphs in the counts below as though fully set forth herein.

179.    Section 2 of the Voting Rights Act of 1965 provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or

applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  52 U.S.C. § 10301(a).

180.    The limitation on early voting to single location per municipality, the reductions in early voting, the elimination of corroboration, the expansion of the proof-of-residence requirement, the removal of authority from GAB to appoint statewide special registration deputies, the changes to the residency requirements, the provision requiring that election observers be permitted to stand within 3-8 feet of voters, the elimination of straight-ticket voting on the official ballot, and the voter ID law (including the "free" voter ID program and the ID petition process administered by DMV) (collectively, the "provisions challenged under Section 2") have abridged and/or denied, and will continue to abridge and/or deny, the voting rights of African Americans and/or Latinos in Wisconsin on account of race.

181.    The Seventh Circuit held in October 2014 that Wisconsin's voter ID law on its face does not violate Section 2 of the Voting Rights Act and cannot be distinguished from the Indiana voter ID law upheld on its face in *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008).  To the extent that Plaintiffs' Section 2 voter ID claims are barred by *Frank,* Plaintiffs raise them here in order to preserve them for appeal.  In addition, the Seventh Circuit expressly left open the possibility of future challenges to the voter ID law if evidence emerged that, among other things, "substantial numbers of persons eligible to vote have tried to get a photo ID but been unable to do so"; that DMV has not "properly exercised" its bureaucratic discretion in implementing and administering the "free ID" program and the ID petition process; that the *actual* impacts and results of the voter ID law demonstrate a problem, as opposed to "predictions" of how the voter ID law might work, because "predictions cannot be compared with results"; and that "differences in economic circumstances" among whites, African-

Americans, and Latinos "are attributable to discrimination by Wisconsin." *Frank v. Walker,* 768 F.3d at 746-47 & n.1, 753; *see also id.* at 751, 755.  Plaintiffs have come forward with admissible evidence demonstrating that each of these distinguishing factors left open by the Seventh Circuit in *Frank* is present here.

182.    The provisions challenged under Section 2 have had and, if not declared illegal and enjoined, will continue to have an disparate adverse impact on African Americans and/or Latinos in Wisconsin.

183.    African Americans and Latinos in Wisconsin have suffered from, and continue to suffer from, discrimination on the basis of race, including through the electoral and political processes in the State of Wisconsin and its political subdivisions.  The ongoing effects of this discrimination include socioeconomic disparities between African-American and Latino Wisconsinites and white Wisconsinites.

184.    The interaction of the provisions challenged under Section 2 with the ongoing effects of discrimination in Wisconsin has caused and will continue to cause an inequality in the opportunity of African Americans and/or Latinos to vote in Wisconsin.

185.    Under the totality of the circumstances, the provisions challenged under Section 2 (including the "free" voter ID program and the ID petition process administered by DMV) have resulted and will result in less opportunity for African Americans and/or Latinos than for other members of the population in Wisconsin to participate in the political process and to elect candidates of their choice, and they violate Section 2 of the Voting Rights Act.

## COUNT II

### (Undue Burdens on the Right to Vote in Violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment)

186.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Second Amended Complaint and the paragraphs in the counts below as though fully set forth herein.

187.    Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) (internal quotation marks omitted).

188.    The challenged provisions impose significant burdens on the right to vote and the right to participate in voter-registration, GOTV, and voter-education efforts. The burdens imposed by the challenged provisions are especially severe for certain populations, including African Americans, Latinos, young voters, poor voters, and/or Democratic voters. The burdens imposed by the challenged provisions, individually and collectively, outweigh the benefits of these provisions and they must therefore be invalidated under the First and Fourteenth Amendment.

189.    The State's "free" voter ID program and the ID petition process, on their face and as administered by the DMV, impose substantial and often insurmountable burdens on many voters that vastly outweigh any conceivable benefit the State derives from, e.g., forcing voters to

change their Social Security records or petition a court to approve a legal change of name; forcing voters who were adopted in their infancy to track down their birth parents and "prove" the circumstances of their births; refusing to apply any kind of rule of reason where there is no basis to question particular voters' citizenship or their honesty in swearing that they are who they say they are; and forcing voters to spend money to obtain their birth records and other early childhood records, contrary to the "*de facto* poll tax" rulings by the Wisconsin Supreme Court.

190.     The Seventh Circuit held in October 2014 that Wisconsin's voter ID law on its face does not violate the Fourteenth Amendment's *Anderson/Burdick* standards and cannot be distinguished from the Indiana voter ID law upheld on its face in *Crawford* against an *Anderson/Burdick* challenge.  To the extent Plaintiffs' *Anderson/Burdick* voter ID claims are barred by *Frank,* Plaintiffs raise them here in order to preserve them for appeal.  In addition, the Seventh Circuit expressly left open the possibility of future challenges to the voter ID law if evidence emerges demonstrating that the *actual* impacts and results of the voter ID law demonstrate a problem, as discussed in further detail in paragraph 181 above.  Plaintiffs have come forward with admissible evidence demonstrating that each of the distinguishing factors left open by the Seventh Circuit in *Frank* is present here.

## COUNT III

### (Disparate Treatment of Voters Without a Rational Basis in Violation of the Equal Protection Clause of the Fourteenth Amendment)

191.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Second Amended Complaint and the paragraphs in the counts below as though fully set forth herein.

192.     All laws that distinguish between groups must at least be rationally related to a legitimate state interest in order to survive scrutiny under the Equal Protection Clause.  *See Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).

- 64 -

193.    As set forth above, the State Legislature granted military voters, but not overseas voters, the right to straight-ticket voting on the federal write-in absentee ballot form for non-national offices.

194.    There is no rational basis for permitting military voters to vote a straight ticket for non-national offices while refusing to permit overseas voters to cast such ballots.  The provision limiting overseas voters to straight-ticket voting only on national offices should therefore be struck down on equal protection grounds.

195.    In addition, the voter ID law does not permit technical college, out-of-state, or many expired IDs to be used for voting, and it therefore distinguishes between voters who possess such IDs but not qualifying voter IDs and voters who possess qualifying voter IDs. There is no rational basis for Wisconsin's refusal to permit technical college, out-of-state, and all expired IDs to be used to be used as voter IDs.

196.    Further, there is no rational basis for the rule permitting the class of voters who moved to Wisconsin from out of state within 28 days of an election to vote for president and vice president at their new ward or election district but not permitting the class of voters who moved within Wisconsin within 28 days of an election to vote for president and vice president at their new ward or election district.

## COUNT IV

### (Partisan Fencing in Violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment)

197.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Second Amended Complaint and the paragraphs in the counts below as though fully set forth herein.

198.    In *Carrington v. Rash*, 380 U.S. 89, 94 (1965), a case brought under the Equal Protection Clause, the Supreme Court held that "'[f]encing out' from the franchise a sector of the

population because of the way they may vote is constitutionally impermissible."  Similarly, the First Amendment protects citizens against "a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views."  *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring).

199.    Upon information and belief, the challenged provisions disproportionately burden the right to vote of individuals who are likely to vote for Democratic candidates.  Upon information and belief, the State Legislature, in not modifying the rule limiting early voting to one location per municipality and in enacting the other challenged provisions, acted with the intent disproportionately to suppress the vote of Democratic voters without a compelling reason. The challenged provisions therefore violate the First and Fourteenth Amendments to the United States Constitution.

## COUNT V

**(Abridgment or Denial of the Right to Vote on the Basis of Race in Violation of the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment)**

200.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Second Amended Complaint and the paragraphs in the counts below as though fully set forth herein.

201.    The Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

202.    The Fifteenth Amendment provides in relevant part: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

203.     The Equal Protection Clause of the Fourteenth Amendment and the Fifteenth

Amendment prevent states from enacting voting-related legislation intended, at least in part, to

discriminate on the basis of race.  *See, e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 62, 66 (1980)

(plurality opinion); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66

(1977).

204.     Upon information and belief, the provisions challenged under Section 2

disproportionately abridge and deny the right to vote of African Americans and/or Latinos in

Wisconsin.  Upon information and belief, the State Legislature, in not modifying the rule

limiting early voting to one location per municipality and in enacting the other provisions

challenged under Section 2, acted with the intent, at least in part, disproportionately to suppress

the vote of African Americans and/or Latinos in Wisconsin.  The provisions challenged under

Section 2 must therefore be invalidated under the Fourteenth and Fifteenth Amendments.

205.     The Fourteenth and Fifteenth Amendments also forbid voting qualifications that

vest "great discretion" in state or local officials because they "may be employed to perpetuate

that discrimination which the Fifteenth Amendment was designed to uproot." *Lassiter v.*

*Northampton County Bd. of Elections*, 360 U.S. 45, 53 (1959) (*re* literacy tests); *see also*

*Louisiana v. United States*, 380 U.S. 145, 153 (1965) (striking down on its face Louisiana's

open-ended "understanding test," i.e., a test in which the voter must demonstrate to a registrar's

satisfaction that he understands the principles of democracy, as an "arbitrary" and standardless

"trap"; "[t]he cherished right of people in a country like ours to vote cannot be obliterated by the

use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of

an individual registrar.  Many of our cases have pointed out the invalidity of laws so completely

devoid of standards and restraints."); *Schnell v. Davis,* 336 U.S. 933 (1949) (per curiam),

*affirming* 81 F. Supp. 872, 877-78 (S.D. Ala. 1949) (three-judge district court) (citizens may not be subjected to voting qualifications that are "so ambiguous, uncertain, and indefinite in meaning" as to confer unchecked discretion on government officials to determine "those who may vote and those who may not"—a "'naked and arbitrary power to give or withhold consent'") (citation omitted); *Lane v. Wilson*, 307 U.S. 268, 275 (1939) ("The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race.")

206.    The State's administration of the voter ID law—including its failure to fund meaningful voter education and outreach efforts, the DMV's administration of the "free ID" program, and the DMV's "extraordinary proof" ID "petition process"—violates the Fourteenth and Fifteenth Amendments in precisely the same ways as the voter suppression laws struck down in *Lassiter v. Northampton County Bd. of Elections, Louisiana v. United States, Schnell v. Davis*, and *Lane v. Wilson*. The voter ID law and its implementing regulations violate the Fourteenth and Fifteenth Amendments' prohibitions against race discrimination in voting (1) on their face, (2) as enforced by DMV against certain categories of voters who are forced to seek "free" IDs and to "petition" for the State's permission to vote, and (3) as applied specifically to Plaintiffs who have been subjected to the challenged laws (including the IDPP) and had their voting rights denied and abridged.

## COUNT VI

### (Abridgement or Denial of the Right to Vote on the Basis of Age in Violation of the Twenty-Sixth Amendment)

207.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

208.    The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age."  The goal of the amendment "was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions."  *Worden v. Mercer Cnty. Bd. of Elections*, 61 N.J. 325, 345 (1972).

209.    The Twenty-Sixth Amendment guarantees young, qualified voters a substantive right to participate equally with other qualified voters in the electoral process.  As a result, laws that have the purpose, at least in part, of denying or abridging the right to vote on account of age are unconstitutional.

210.    Upon information and belief, the following provisions disproportionately abridge and deny the right to vote of young Wisconsinites: the limitation on early voting to single location per municipality, the reductions in early voting, the elimination of corroboration, the expansion of the proof-of-residence requirement, the rule permitting dorm lists to be used in connection with voter registration only if college administrators certify that the students on the list are U.S. citizens, the elimination of the requirement that special registration deputies be appointed at public high schools and, in certain circumstances, be appointed at or sent to private high schools and tribal schools, the elimination of the requirement that applications for registration by enrolled students and high school staff be accepted at high schools, the law prohibiting local governments from requiring landlords to distribute voter-registration forms to new tenants, the removal of authority from GAB to appoint statewide special registration deputies, the changes to the residency requirements, the provision requiring that election

observers be permitted to stand within 3-8 feet of voters, the elimination of straight-ticket voting on the official ballot, the elimination of the option to receive absentee ballots by fax or email, and the voter ID law (the "provisions challenged under the Twenty-Sixth Amendment").  Upon information and belief, the State Legislature, in not modifying the rule limiting early voting to one location per municipality and in enacting the other provisions challenged under the Twenty-Sixth Amendment, acted with the intent, at least in part, disproportionately to suppress the vote of young voters in Wisconsin.  As such, these provisions violate the Twenty-Sixth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief against the Defendants:

A.   An order declaring that the challenged provisions violate Section 2 of the Voting Rights Act and/or the United States Constitution;

B.   An order enjoining Defendants, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them from implementing, enforcing, or giving any effect to the challenged provisions;

C.   An order requiring Defendants Gottlieb and Fernan, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them to issue voter IDs to Plaintiffs Randle, Walker, Aponte, and Silas, along with all other similarly situated petitioners for voter ID;

D.   An order requiring Defendants to permit municipalities to determine how many locations to make available for early voting;

E.   An order awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. §§ 1988, 1973*l*(e); and

F.   Such other and further relief as the Court deems just and proper.

Dated this 25th day of March, 2016.   Respectfully submitted,

**PERKINS COIE LLP**

By   _s/ Joshua L. Kaul_

Joshua L. Kaul
JKaul@perkinscoie.com
Charles G. Curtis, Jr.
CCurtis@perkinscoie.com
One East Main Street, Suite 201
Madison, WI  53703
Telephone:  (608) 663-7460
Facsimile:  (608) 663-7499

Marc E. Elias
MElias@perkinscoie.com
Bruce V. Spiva
BSpiva@perkinscoie.com
Elisabeth C. Frost
EFrost@perkinscoie.com
Rhett P. Martin
RMartin@perkinscoie.com
Joseph P. Wenzinger
JWenzinger@perkinscoie.com
Aria C. Branch
ABranch@perkinscoie.com
Colin Z. Allred
CAllred@perkinscoie.com
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone:  (202) 654-6200
Facsimile:  (202) 654-6211

Bobbie J. Wilson
BWilson@perkinscoie.com
505 Howard Street, Suite 1000
San Francisco, CA 94105
Telephone:  (415) 344-7000
Facsimile:  (415) 344-7050

_Attorneys for Plaintiffs_