IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ONE WISCONSIN INSTITUTE, INC., *et al.*,

    Plaintiffs,

v.                                            Case No. 15-CV-324

GERALD C. NICHOL, *et al.*,

    Defendants.

## DEFENDANTS' MOTIONS IN LIMINE

Pursuant to the Court's April 22, 2016, order, Dkt. 151, Defendants respectfully file the following motions in limine.

## MOTIONS IN LIMINE

**I.  Motion in limine to strike the December 10, 2015, expert report of Barry C. Burden and to exclude certain evidence**

    **A.  Legal background**

In *Frank v. Walker*, the Seventh Circuit rejected a challenge to Wisconsin's voter photo ID law brought under Section 2 of the Voting Rights Act of 1965. In rejecting that legal challenge, the Seventh Circuit held that "Section 2(a) forbids discrimination 'by race or color' but does not require states to overcome societal effects of private discrimination that affect the income or wealth of potential voters." 768 F.3d 744, 753 (7th Cir. 2014).

"[U]nits of government are responsible for their own discrimination but not for rectifying the effects of other persons' discrimination." *Id.*

The Seventh Circuit limited the Section 2 inquiry to whether the State of Wisconsin—*not* private parties and *not* non-State entities—discriminated against minorities in areas such as education, employment, and housing. The court emphasized: "Nor did the district court find that differences in economic circumstances are attributable to discrimination by Wisconsin." *Frank*, 768 F.3d at 753. Under *Frank*, discrimination *by a state* is the only type of relevant discrimination for Section 2 purposes.

### B. Argument

Here, Plaintiffs' expert witness, Barry C. Burden, has filed an expert report that includes opinions irrelevant to the Section 2 inquiry under *Frank*. Dr. Burden's report should be partially struck, and his testimony partially excluded, because the report addresses considerations of private and non-State discrimination that have nothing to do with the only relevant form of discrimination under *Frank* and Section 2: discrimination by a State. Furthermore, Dr. Burden's analysis of what are known as "the Senate Factors" are not relevant to Section 2 vote denial claims after the Seventh

Circuit's *Frank* decision. Such information is also irrelevant and should be struck and excluded from trial.[1]

Dr. Burden's report addresses, among other things, the information that district courts might consider in determining whether a challenged law violates Section 2 of the Voting Rights Act. Pages 8 through 20 of his report address what are known as "the Senate Factors." (Dkt. 72:8.) Burden summarizes the supposed relevance of these factors to the Section 2 inquiry:

> The U.S. Senate Committee on the Judiciary issued a report at the time [the VRA was amended in 1982], identifying an illustrative list of seven "Senate factors" and two unenumerated factors for courts to consider when evaluating the "totality of the circumstances." The Senate Judiciary Committee report notes that the factors are "neither exclusive nor exhaustive" and that "a plaintiff need not prove any particular number or a majority of these factors in order to succeed in a vote dilution claim.

(Dkt. 72:8.) Notably, the Senate Factors are not found in the text of the Voting Rights Act.

The Seventh Circuit has held that the Senate Factors are irrelevant in a Section 2 case raising a vote denial claim. The Seventh Circuit observed that such factors are sometimes considered in Section 2 cases that address

---

[1] This would not be the first time that a federal judge has declined to credit Dr. Burden's work. In the recent decision in *North Carolina State Conference of the NAACP v. McCrory*, No. 13-CV-658, 2016 WL 1650774, at *39 (M.D. N.C. April. 25, 2016), U.S. District Judge Thomas D. Schroeder stated: "In sum, Dr. Burden's testimony was of limited practical assistance to the court, as it was heavy on theory and light on facts."

"claims that racial gerrymandering has been employed to dilute the votes or racial or ethnic groups." *Frank*, 768 F.3d at 752 (citing *Thornburg v. Gingles*, 478 U.S. 30 (1986); *Chisom v. Roemer*, 501 U.S. 380 (1991)). "In *Gingles* the Justices borrowed nine factors from a Senate committee report (often called the '*Gingles* factors') as the standard for applying § 2." *Id.* The Seventh Circuit expressly rejected the *Gingles* or Senate factors as "unhelpful" to resolving Section 2 claims in "voter-qualification cases." *Frank*, 768 F.3d at 754. This Court is bound by *Frank*. Accordingly, the Court should not consider the *Gingles* (or Senate) factors because they are irrelevant to resolving Plaintiffs' Section 2 vote denial claims. Dr. Burden's analysis of the Senate Factors should be struck, and testimony regarding the Senate Factors should be excluded from trial as irrelevant.

If this Court finds that the Senate Factors are relevant here, it should still strike portions of Dr. Burden's report and exclude certain evidence from trial. In particular, pages 11 through 17 of Dr. Burden's report should be struck, including all material under the heading "Senate Factor Five." This material addresses only non-State discrimination and is irrelevant to the Section 2 inquiry under *Frank*. After *Frank*, this type of evidence is irrelevant to a Section 2 claim because it is not evidence of state-sponsored discrimination. *See Frank*, 768 F.3d at 753. The State of Wisconsin is not

responsible for rectifying the discrimination of private parties or non-State units of government. *Id.*

Dr. Burden's report also addresses purportedly discriminatory activities by the Cities of Milwaukee, Kenosha, and Beloit, and by Rock and Kenosha Counties. (Dkt. 72:10–11.) This is not alleged discrimination by the State of Wisconsin; therefore, it is also irrelevant to the Section 2 inquiry under *Frank. See Frank*, 768 F.3d at 753. This material should also be struck from Dr. Burden's report.

In addition to striking Dr. Burden's report, Dr. Burden and Plaintiffs' other witnesses should be excluded from testifying at trial regarding private discrimination and discrimination by non-State of Wisconsin entities, as such discrimination is entirely irrelevant to the Section 2 inquiry under *Frank*.

## II. Motion in limine to exclude expert report, analysis and testimony of Dr. Yair Ghitza

Dr. Yair Ghitza's expert report, his data analysis, and all other analysis relying on his work should be excluded from use at trial. His Rule 26 disclosures and subpoena responses did not include the statistical models that form the entire basis of his expert work, and non-disclosure of an expert's analysis compels exclusion. Even if not automatically excluded, neither Plaintiffs nor Dr. Ghitza can meet *Daubert*'s reliability standards. Accordingly, Dr. Ghitza's report, analysis, and testimony should be excluded from trial.

### A. Dr. Ghitza's expert analysis is, in its entirety, a spreadsheet that resulted from undisclosed statistical models and third-party vendor software.

Dr. Ghitza is an employee of Catalist, LLC, a "data utility" company. (Dkt. 73:2.) Catalist, LLC "works exclusively with *progressive* organizations who share [its] values." (Ghitza Dep. Ex 2 (emphasis in original).) For its work in this case, Catalist, LLC received a text file from Plaintiffs' counsel that contained information about 3.4 million individual Wisconsin voters. (Dkt. 73:3.) This data was derived from the Statewide Voter Registration System (SVRS) database, which is maintained by the Wisconsin Government Accountability Board. Catalist, LLC's job was to perform data work on that text file, and to produce a report. (Dkt. 73:3.) The resulting data "output file" is the substance of Dr. Ghitza's proposed contribution to this case. (*See* Dkt. 73:3.)

Among other things, Catalist, LLC appended "geocodes" to the data from Plaintiffs' counsel. (Dkt. 73:3.) A geocode is latitude and longitude coordinates for a street address—in this case, a person's home address. (*See* Ghitza Dep.[2] 50:12–23.) Catalist, LLC buys GPS/address matching software "en masse from different vendors" and then runs that third-party software. (Ghitza Dep. 51:1–7.) Dr. Ghitza does not know the accuracy of the

---

[2] The "Ghitza Dep." is the April 14, 2016, deposition of Dr. Yair Ghitza, a copy of which is being filed as Exhibit A to the Declaration of S. Michael Murphy.

third-party GPS matching software. (Ghitza Dep. 77:17–24.) He believes that the address/GPS correlation is good, but when asked why he believes it has good accuracy, he reported: "I don't know." (Ghitza Dep. 78:2.)

Catalist, LLC then created a "probabilistic race estimate[]" for every person in the spreadsheet it received from Plaintiffs' counsel. (*See* Dkt. 73:3.) Important here, Wisconsin does not track voting registrants by race in the SVRS. (*See* Ghitza Dep. 63:7–9.) But the race of individual voters is central to Plaintiffs' case, so Catalist, LLC was hired to assign a race label to voters.

Catalist, LLC did this by entering a number of items of data into a statistical model. The data input included name, address, birth year, and who a voter lives with. (Ghitza Dep. 62:5–10.) The third-party software geocode matching was "most relevant for the probabilistic race estimates." (Ghitza Dep. 75:10–18.)

What Catalist, LLC then did, generally speaking, is take information like name and home location, correlate that information with race, and then use statistical modeling to assign a race estimate based on those correlative factors. (Ghitza Dep. 72:10–15.) For example, Catalist, LLC has concluded that older people with the name "Clarence" are more likely to be White, and younger people named "Clarence" are more likely to be Black. (Ghitza Dep. 71:18–23.)

Dr. Ghitza wrote the software that produces the race estimates. (Ghitza Dep. 62:11–16.) The data output is the software's calculation of the likelihood that the person is one of six races: White, Black, Hispanic, Asian, Native American, or Other. (Ghitza Dep. 64:1–5.) A probability is assigned to each of these categories, adding up to a total of 100%. (Ghitza Dep. 64:1–5.) For example, the software might conclude that a voter is 75% likely to be Native American, 15% likely to be Black, and 10% likely to be White. But the highest likelihood for any particular race could also be low, even less than 50%. (Ghitza Dep. 98:22–25; 99:1–3.) Just for example, the software could conclude that a voter is 20% likely to be White, 20% likely to be Black, 30% likely to be Hispanic, 10% likely to be Asian, 10% likely to be Native American and 10% likely to be Other. (*See* Ghitza Dep. 98:22–25; 99:1–3.)

The software then reports which category of race had the single highest estimate. (Ghitza Dep. 98:13–24.) This is the race "designation." (Ghitza Dep. 98:13–16.) From the examples above, the first example would produce a designation of Native American based upon the 75% estimate. The second example would result in a designation of Hispanic based upon the 30% estimate.

**B.     Dr. Ghitza's expert report and data output should be excluded because the analytical basis is undisclosed, and he cannot demonstrate that it is the result of a reliable process.**

Admissible expert testimony must be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993). To be admissible, there must be "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Dr. Ghitza's expert "opinion" is entirely the output of his computer software, which relies on the third-party GPS matching software. Yet, neither the third-party software nor Dr. Ghitza's statistical models have been produced to Defendants or the Court for analysis. (Ghitza Dep. 59:24–25; 60:1–4.) The software was not turned over as part of the general Rule 26 requirement to provide the basis for all opinions, or even after a specific subpoena requesting all documents relied upon in his report. (Ghitza Dep. 58–59, Ex. 3.) At his deposition, Dr. Ghitza was even unable to say who made the third-party software. (Ghitza Dep. 52:1–2.) Failing to disclose the

mathematical formulas use to calculate race, which is the entire substance of his expert work, falls short of Rule 26(a)(2)(B)(i)'s requirement to disclose the basis of his opinion. The consequence is "'automatic and mandatory' exclusion from trial." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825 (7th Cir. 2010) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005)).

Even if not automatically excluded, Dr. Ghitza's analysis cannot be used at trial because it is impossible to know whether it is reliable. Catalist, LLC and Dr. Ghitza's expert work in this case involved applying third-party GPS software to a database, and then running the database through an algorithm that assigned a race to each voter. Dr. Ghitza's report does not establish the reliability of the analysis because it does not disclose the actual analysis.

Neither Defendants nor the Court should be required to simply take Dr. Ghitza's word for the reliability of his analysis, for four reasons. First, it is Plaintiffs' burden of proof to demonstrate the reliability of their expert's analysis. *Lewis*, 561 F.3d at 705. If they have not disclosed the analysis in the first instance, it is impossible for them to meet a burden of showing that the analysis is reliable. Indeed, Dr. Ghitza himself does not know an error rate in the GPS matching that forms part of the basis of his data output, and he cannot say why he believes the error rate to be acceptable. (Ghitza Dep.

77:17–25; 78:1–2.) If this Court cannot evaluate, or even know, the error rate, there can be no conclusion that the process is reliable.

Second, Dr. Ghitza has disclosed that his statistical models differ from others models used by other experts in the field. (Ghitza Dep. 90–94.) He uses "internal statistics" that he has developed, he uses census information differently than others, and he leverages data sources including survey data in ways differently than others in the field. (Ghitza Dep. 92–93.) He reports that these differences make his data output better, but "an expert must do more than just state that [he] is applying a respected methodology." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014). Here, without seeing the underlying data and statistical models, it is impossible to know whether his unique models are reliable.

Third, all of these innovative methods are specific to Catalist, LLC, a company that selectively works with "*progressive* organizations who share [its] values," and openly refuses to work with other clients. (Ghitza Dep. Ex 2 (emphasis in original).) Selectively working with only ideologically aligned clients gives Catalist, LLC an obvious incentive to skew its number-crunching to produce outcomes favorable to those clients. This open bias, combined with the secrecy of the actual analysis, compels excluding his report, his data output, and any other evidence relying on that data.

Finally, the very nature of the race-assigning data output casts serious doubt on the reliability of the data output. According to Dr. Ghitza, the ultimate race assignment is simply the category that included the highest statistical likelihood in his model, even if the highest number is very low. (Ghitza Dep. 98:13–24.) A race designation is applied even if the highest-race likelihood is less than 50%. (Ghitza Dep. 98:13–24; 99:1–3.) In other words, his data output could report a person's race as Latino even if his very best analysis indicates that the person is less than 50% likely to be Latino. That is not reliable. When asked how often low-probability estimates occurred in his analysis, Dr. Ghitza could only say that he "did not look at that." (Ghitza Dep. 99:1–11; 16–21.)

Accordingly, Defendants request an order excluding Dr. Ghitza from testifying at trial, excluding his expert report, excluding his data output, and excluding any other testimony or expert report that relies on his report or data output.

**III. Motion in limine to introduce evidence that, because of prior felony convictions, Plaintiff David Walker was not eligible to vote in Wisconsin from 1998 through 2007, and Plaintiff David Aponte was not eligible to vote in Wisconsin from 1999 through 2002**

**A. Background**

In Count II of the Second Amended Complaint, Plaintiffs allege that the State's voter photo identification requirement and the "extraordinary proof"

petition process that the DMV administers for a very small number of customers impose a substantial burden on the right to vote as applied to four Plaintiffs. Count V also claims these Plaintiffs' voting rights have been unconstitutionally denied and abridged. Two of the named Plaintiffs—David Walker and David Aponte—have prior felony convictions that resulted in a period of incarceration and subsequent supervision that rendered them ineligible to vote during that time in Wisconsin.

David Walker was convicted of felony burglary in Milwaukee County Case No. 98-CF-3546. Though he was released from confinement on January 24, 2006, he still remained on probation/parole until 2007. (Schmelzer Decl. Ex. A.) Likewise, David Aponte was convicted of felony drug possession in Milwaukee County Case No. 99-CF-2000. He was released from confinement on September 25, 2000, but still remained on probation/parole until 2002. (Schmelzer Decl. Ex. B.) Both Walker and Aponte were ineligible to vote in Wisconsin during the time period they were incarcerated and on probation/parole. *See* Wis. Const. art. III, § 2(4)(a); Wis. Stat. § 304.078(3) (restoration of civil rights after completion of probation).

### B. Argument

Rule 609(b) provides that a criminal conviction that is over ten years old may be used to impeach only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."

Fed. R. Evid. 609(b). Rule 609 is intended "to ensure that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances." *United States v. Redditt,* 381 F.3d 597, 601 (7th Cir. 2004). All evidentiary decisions are subject to Rule 403's balancing test, under which evidence may be excluded if its probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403, 609(b)(2).

In this case, Defendants do not intend to introduce evidence of Walker's and Aponte's prior felony convictions to attack their "character for truthfulness" under Rule 609. Instead, they intend to use the information to establish the period of time Walker and Aponte were eligible to vote in Wisconsin. So Rule 609(b)'s analysis is not applicable. *See Cobige v. City of Chi.,* 651 F.3d 780, 784 (7th Cir. 2011) (Rule 609(b)'s prohibition was not applicable where evidence of criminal history was relevant to the issue of damages and was not used to impeach a witness).

Rule 403, which permits a judge to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice," does not justify exclusion of this evidence. These Plaintiffs' voting histories, along with the full extent of their eligibility to vote in Wisconsin, are relevant to their claims that failure to obtain a qualifying form of ID

substantially burdened, denied, and/or abridged their right to vote. And this information appears largely uncontested.

For example, Walker admitted in his deposition that he first started voting in Wisconsin in 2007 because he was ineligible to vote prior to that, given a felony conviction. Likewise, Aponte admitted in his deposition that he remembered being on parole/probation until at least 2001. DOC records show that his parole/probation was in effect until March 25, 2002. (Schmelzer Decl. Ex. B.) Thus, evidence that Walker was not eligible to vote in Wisconsin from 1998 through 2007, and that Aponte was not eligible to vote from 1999 through 2002 because of prior felony convictions, is probative of their ability and propensity to vote, which is relevant to the issues in this case.

Limited evidence of Walker's and Aponte's prior felony convictions to establish their eligibility to vote in Wisconsin would also have little, if any, prejudicial effect. There is no jury in this case, and "it would be most surprising if such potential prejudice had any significance in a bench trial." *United States v. Caudle*, 48 F.3d 433, 435 (9th Cir. 1995); *see also Fannin v. Johnson,* No. CIV.A.3010034-M, 2001 WL 1149117, at *5 (N.D. Tex. Sept. 26, 2001) (plaintiff "can show no prejudice . . . since he was tried in a bench trial.").

Under Rule 403, the Court should permit Defendants to introduce evidence that, because of prior felony convictions, Plaintiff David Walker was

not eligible to vote in Wisconsin from 1998 through 2007, and Plaintiff David Aponte was not eligible to vote in Wisconsin from 1999 through 2002.

## CONCLUSION

For the reasons argued above, the Court should grant Defendants' motions in limine.

Dated this 2nd day of May, 2016.

        Respectfully submitted,

        BRAD D. SCHIMEL
        Wisconsin Attorney General

        JODY J. SCHMELZER
        Assistant Attorney General
        State Bar #1027796

        /s/ Clayton P. Kawski
        CLAYTON P. KAWSKI
        Assistant Attorney General
        State Bar #1066228

        S. MICHAEL MURPHY
        Assistant Attorney General
        State Bar #1078149

        GABE JOHNSON-KARP
        Assistant Attorney General
        State Bar #1084731

        Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-3094 (Schmelzer)
(608) 266-7477 (Kawski)
(608) 266-5457 (Murphy)

(608) 267-8904 (Johnson-Karp)
(608) 267-2223 (Fax)
*schmelzerjj@doj.state.wi.us*
*kawskicp@doj.state.wi.us*
*murphysm@doj.state.wi.us*
*johnsonkarpg@doj.state.wi.us*