Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ONE WISCONSIN INSTITUTE, INC., et al.,
    Plaintiffs,
v.        Case No.: 15-CV-324
GERALD C. NICHOL, et al.,
    Defendants.

_____

       Deposition of M.V.(TREY) HOOD, III, Ph.D.;
taken for purposes stated herein; all formalities
waived excluding the reading and signing of this
deposition transcript; before Philips P. Thomas,
Certified Court Reporter 2816, and notary public
in and for the State of Georgia; commencing at
9:02 a.m., on Thursday, April 7, 2016, at the
offices of Janice S. Baker & Associates, Inc.,
235 Peachtree Street, NE, North Tower, Suite 400,
Atlanta, Georgia.
          ******

Janice S. Baker & Associates, Inc.
235 Peachtree Street, NE
North Tower, Suite 400
Atlanta, Georgia 30303
(404)969-1206

Page 2

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
    Joshua L. Kaul, Attorney at Law
    Perkins Coie, LLP
    One East Main Street
    Suite 201
    Madison, Wisconsin 53703
    (608)663-7460

ON BEHALF OF THE DEFENDANTS:
    Clayton P. Kawski, Assistant Attorney General
    Wisconsin Department of Justice
    Division of Legal Services
    17 West Main Street
    Post Office Box 7857
    Madison, Wisconsin 53707
    (608)266-7477

Page 3

I N D E X

Examination by Mr. Kaul.........................Page 5

A T T A C H M E N T

Court Reporter's Disclosure Of No Contract.....Page 166
Signature Page and Errata Sheet................Page 167

TRANSCRIPT CODES

| -- | denotes interruption/change in thought |
| . . . | denotes incomplete thought |
| (sic) | denotes word/phrase written verbatim |
| (ph) | denotes word spelt phonetically |
| (unintelligible) | denotes word cannot be understood |

Page 4

E X H I B I T S

Plaintiff's

| Exhibit No. | Description | Page Referenced |
|---|---|---|
| 1 | Expert Report of M.V. Hood, III | 007 |
| 2 | AJPS Article | 014 |
| 3 | Election Law Journal Article | 052 |
| 4 | 2012 CNN Election Analysis | 116 |

Page 5

```
 1              P R O C E E D I N G S
 2              9:02 a.m.
 3         (Court reporter in compliance with Articles
 4    7.C. and 10.B. of the Rules and Regulations of the
 5    Board of Court Reporting of the Judicial Council
 6    of Georgia, and O.C.G.A. § 15-14-37(a) and (b) and
 7    O.C.G.A. § 9-11-28(c).)
 8         MR. KAUL:  Dr. Hood, good morning.
 9         THE WITNESS:  Good morning.
10         MR. KAUL:  Just for the record, let me
11    introduce myself.  My name is Josh Kaul.  I'm one
12    of the attorneys for the plaintiffs in the One
13    Wisconsin versus Nichol case.  And you are
14    accompanied by Mr. Kawski from the Wisconsin
15    Department of Justice today, correct?
16         THE WITNESS:  Correct.
17         MR. KAUL:  (To court reporter)  And has he
18    been sworn in; could we swear him in?
19         (Witness sworn.)
20    Whereupon,
21         M.V.(TREY) HOOD, III, Ph.D.
22    was called as a witness herein, and having first been
23    duly sworn, was examined and testified as follows:
24              EXAMINATION
25    BY MR. KAUL:
```

Page 6

```
 1    Q    And doctor, I know that you've been deposed
 2    several times before, so I won't go over the ground
 3    rules in too much detail.  But just generally speaking,
 4    for the court reporter's benefit, please try to answer
 5    questions by saying yes or no rather than uh-huh or
 6    uh-uh, or by nodding your head.  Okay?
 7    A    Yes, will do.
 8    Q    And I will do my best not to interrupt you
 9    when you're answering a question, and I will ask that
10    you also try not to interrupt me as I'm asking a
11    question, just so the record ends up being clear; is
12    that fair?
13    A    Certainly.
14    Q    As I was just mentioning to you off the
15    record, my practice is to take breaks at some regular
16    interval -- and I will actually bring my phone out so I
17    can pay attention to the time -- but if, at any point,
18    you need a break and want to stop for whatever purpose,
19    just let me know, and I'm happy to take a break.
20         The only thing I would ask is that if there's
21    a question pending, that you would answer it first and
22    then we take the break after that.  Okay?
23    A    Okay.
24    Q    And then, finally, if there's anything I ask
25    you that is unclear, please just ask me to clarify.  If
```

Page 7

```
 1    you do answer, though, I'll assume that you understood
 2    the question; is that fair?
 3    A    Yes, it is.
 4    Q    Okay.  Do you have any other questions before
 5    we get started?
 6    A    No.
 7    Q    Okay.  First, could you tell me what you did
 8    to prepare for today's deposition?
 9    A    Primarily, read over my expert report I
10    submitted in this case.
11    Q    Anything else?
12    A    I took a brief look at -- I guess it was
13    technically a rebuttal report that Professor Lichtman
14    submitted.
15    Q    Have you reviewed the appendices -- or the
16    appendix, I guess, to his expert report?
17    A    No, I didn't get to all of that.
18    Q    Okay.  All right.  My plan for today is to
19    sort of work through your expert report, and I'll show
20    you some exhibits as we go.  So let me start out by
21    handing out copies of that.
22         MR. KAUL:  (To court reporter)  Mark this as
23    Exhibit 1.
24         (Whereupon, Plaintiff's Exhibit No. 1 was
25    marked for identification.)
```

Page 8

```
 1    BY MR. KAUL:  (Resuming)
 2    Q    I mean, first, I'd like ask you to just take
 3    a look through that and let me know if that appears to
 4    you to be a copy of your expert report submitted in
 5    this case?
 6    A    Yes.
 7    Q    Now, have you done any analysis, in this
 8    case, subsequent to the submission of this report?
 9    A    On -- I guess, bearing on Wisconsin in
10    particular?
11    Q    Related to this case, yes.
12    A    Yes.  Okay.  A little bit.
13    Q    Okay.  And what was that?
14    A    There was a primary for state supreme court,
15    I believe, in February, and I have some provisional
16    ballot data collected from that election.  I also -- of
17    course, there was a primary Tuesday -- this past
18    Tuesday -- in Wisconsin, and I didn't do any analysis,
19    but I read some media reports of what went on with the
20    election in Wisconsin.
21    Q    All right.  Let me ask you about each of
22    those.  First of all, is there anything else you've
23    done, for this case, since the submission of the expert
24    report?
25    A    Well, I know that there have been -- there's
```

Page 9

```
 1    been, at least, one change, for instance, with the
 2    voter ID law.  I mean, that's not an analysis.  But
 3    some things have changed since I submitted this report,
 4    I guess.  So I've tried to keep up with those things.
 5        Q    Okay.  So you've followed developments in the
 6    case?
 7        A    Tried to, yes.
 8        Q    Anything else?
 9        A    Well, the case, and Wisconsin, in general;
10    what's going on with -- with the voter ID law and those
11    kinds of things?
12        Q    Any other analysis that you've done?
13        A    No.  No.
14        Q    And what analysis have you done of the
15    provisional ballot data from February?
16        A    Just calculated some percentages based on
17    total turnout.
18        Q    And what did you find?
19        A    Well, this is from memory, I don't -- I don't
20    have these numbers in front of me.  But in general,
21    very low provisional ballots cast for ID reasons
22    constituted a very small proportion of the total
23    turnout.  I think of those that were not eventually
24    counted -- and again, this is from memory -- I think it
25    was about a hundredth of a percentage point --
```

Page 10

```
 1    0.01 percent -- something like that.  I have this
 2    written down, I don't have all this with me.
 3        Q    And then, you said you've read about the
 4    primary this past Tuesday?
 5        A    Yes; I tried to read some of these stories on
 6    what happened.
 7        Q    And what have you -- what have you read
 8    about?
 9        A    Well, just the -- the election.  I mean, I
10    read about the results of the election.  Obviously, I'm
11    interested in that for other reasons, just as a
12    political scientist.  But I was looking at articles, or
13    looking for articles about how the election went in
14    terms of actually the conduct of the election and
15    administering the election.
16        Q    What did you find?
17        A    Well, one article I found, I believe, in the
18    Milwaukee Journal Sentinel said that, at least
19    initially, it looks like the turnout in Wisconsin in
20    this presidential primary is the highest since 1972.
21        Q    And did you see anything about the
22    administration of the voter ID law?
23        A    Yes.  There was another article specifically
24    on that topic -- or more -- or more related to that
25    topic.
```

Page 11

```
 1        Q    On the topic of turnout?
 2        A    Turnout and voter ID, I guess.
 3        Q    Well, do you recall the details of that
 4    article?
 5        A    I think the title was even something like the
 6    jury is still out on voter ID -- or something like
 7    that.
 8        Q    Did you read any news reports about lines for
 9    voting in Wisconsin?
10        A    It didn't mention that in the same article.
11    It wasn't -- I don't think it was exclusively about
12    just voter ID.
13        Q    Anything else that you saw related to the
14    recent election?
15        A    That was -- that was it.
16        Q    Okay.  All right.  Let's turn to your expert
17    report, then.  And I'd like to start out by asking you
18    about page 4.  In the bottom paragraph on that page,
19    you summarize some research by Professors Burden and
20    Mayer and others; is that right?
21        A    Yes; the research they conducted.
22        Q    Okay.  And you cite to the article that
23    you're referring to, in Footnote 6; is that right?
24        A    Yes.
25        Q    And did you review that article in connection
```

Page 12

```
 1    with preparing this expert report?
 2        A    Yes.  And I'd read it previously.
 3        Q    Okay.
 4        A    I'm pretty familiar with it.
 5        Q    All right.  And then, in the last sentence
 6    you say:  Wisconsin's electoral environment is already
 7    configured in such a way as to ensure maximum turnout.
 8        Do you see that?
 9        A    Yes.
10        Q    What did you mean by that?
11        A    Well, in this particular section of the
12    report, I'm, in particular, talking about SDR, or
13    same-day registration, and election-day registration.
14    So just to be clear, SDR would be occurring during the
15    early-absentee balloting period.  That's SDR versus
16    EDR -- on election day.
17        So that's what -- part of what I'm referring
18    to here.  SD -- the use of SDR and EDR in Wisconsin,
19    referencing back to the Burden et al. article, which
20    found very positive turnout effects for those election
21    devices.
22        Q    Okay.  Now, one of the things that their
23    article found was that the more days there were of
24    early voting, in combination with SDR, the higher the
25    turnout was, correct?
```

1   A   Okay.  So from what I remember -- and I don't
2   have the article in front of me -- from what I
3   remember, there's a -- there's -- there's a negative
4   effect for early voting alone, to somewhat -- that can
5   be somewhat counteracted if early voting is used in
6   conjunction with SDR.  Those are the findings from
7   their -- from their article.
8        And just so we're all on the same page, let
9   me just say that people use different terms -- early
10  voting, et cetera -- so, I think, in Wisconsin, I
11  called it early in-person absentee balloting, which
12  might be analogous in other states, the early voting
13  for instance.  So . . .
14   Q   And that's the analogy that you're drawing in
15  this paragraph, right?
16   A   Well, I'm drawing -- yeah.  Again, I'm
17  drawing an analogy between the deployment of SDR and
18  EDR having positive effects on the overall turnout,
19  again, based on what they said in their article --
20   Q   Okay.
21   A   -- which was based on all 50 states.
22   Q   Let me show you a copy of the article.
23   A   And if I could just add one thing while we're
24  pausing here for a minute.
25       (Witness reviews document.)

1   BY THE WITNESS:  (Resuming)
2    A   If I could just add one thing while we're
3   pausing here for a second.  The effects of EDR on
4   turnout tend to be more positive, from what I remember
5   in the article, than just SDR.
6    Q   Okay.  All right.
7    A   Which is something else I think I say here.
8   So . . .
9        (Whereupon, Plaintiff's Exhibit No. 2 was
10       marked for identification.)
11  BY MR. KAUL:  (Resuming)
12   Q   That is the document that's in front of you
13  now, marked as Exhibit 2.  Do you see that?
14   A   Yes.
15   Q   All right.  And is this the Burden article
16  that we've been discussing?
17   A   Yes.  Yes.
18   Q   All right.  And what I'd like to do is to
19  direct your attention to page 105 of the article.  And
20  the first full sentence, which is sort of the -- in the
21  paragraph at the top left of that page.  It starts
22  with:  Table 4 presents version . . .
23   A   Okay.
24   Q   Do you see that?
25   A   Yes.

1    Q   So this is describing one of the tables in
2   this paper; is that right?
3    A   Yes.  I mean, they did have a number of
4   different models they ran.  So this is . . .
5    Q   And this is the only one that estimates the
6   impact of the number of days on turnout, correct?
7        MR. KAWSKI:  Object to the form of the
8        question.
9   BY MR. KAUL:  (Resuming)
10   Q   And to be clear, I'm referring to the number
11  of days of early voting.
12   A   I'm looking.  I think so.  Seems to be.  Yes.
13   Q   Okay.  So near the end of this paragraph,
14  about halfway down, what you can see on page 105.  Do
15  you see they write:  The estimates suggest that an
16  additional 10 days of early voting decreases voter
17  turnout by about a percentage point, while an
18  additional 10 days of SDR increases turnout by about
19  2.5 points?
20   A   Right.  That's what -- yeah, that's what I
21  was talking about earlier.
22   Q   Okay.  And then, let's turn to Table 4, which
23  is on the next page.
24   A   Okay.
25   Q   And Table 4 quantifies these results; is that

1   right?
2    A   Well, the --
3    Q   Let me rephrase that.  That's -- I know what
4   you're about to say.  Table 4 is a table representation
5   of these results; is that right?
6    A   Yes.  I mean, these are the results of their
7   statistical models that they ran.
8    Q   Okay.  And so what they're finding is that
9   this confirms what they were saying in the text; is
10  that right?
11   A   Yes.
12   Q   Okay.
13   A   Yeah.  I mean, the text is describing the
14  table, I guess, is the way I'd put it.
15   Q   That makes sense.  And so the point is that
16  the longer a period of both early voting and same-day
17  registration, in combination, according to their
18  findings, the higher the turnout will be, right?
19   A   Okay.  According to this model, the more days
20  of early voting in combination with SDR, the more
21  positive effect on turnout.  Yes.
22   Q   Okay.  So going back to your expert report,
23  then, and again focusing on the Burden study, as your
24  report does, this means that the longer the period of
25  early voting with same-day registration, the higher

Page 17

1  turnout we would expect, correct?
2      A   Well, according to the findings from this one
3  table, yes.
4      Q   Okay.
5      A   I mean, that's what they're reporting.
6      Q   So to ensure maximum turnout, Wisconsin would
7  actually want to increase the period for early voting
8  and same-day registration, right?
9          MR. KAWSKI:  Object to form.
10 BY THE WITNESS:  (Resuming)
11     A   Well, again, this model is based on more than
12 just Wisconsin.  It's possible that if this model and
13 the results of this model can be applied directly to
14 Wisconsin, then it's possible the turnout could go up
15 some if the early voting period was expanded, but only
16 in combination with SDR.
17         And you know, I guess one of the major -- at
18 least for me -- one of the major takeaway points from
19 this article, in all, is that early voting alone can
20 actually be a drag on turnout.
21     Q   And in this paragraph we've been discussing
22 in your report, at the bottom of page 4, you are
23 applying their findings to Wisconsin specifically,
24 right?
25     A   I'm making an inference about Wisconsin,

Page 18

1  based on their findings, yes, which is down below the
2  quote.
3      Q   Okay.  Let's turn to the next section of your
4  report, which is on the next page, actually.  Now, in
5  this section, you discuss turnout data from Wisconsin;
6  is that right?
7      A   That's correct.  Overall turnout rates.
8      Q   Okay.  And Footnote 8 has a source?
9      A   Right.
10     Q   I just want to make sure I understand, sort
11 of, where that data comes from for the turnout numbers.
12 So in determining how many voters turned out in each of
13 these elections, did you use that source in Footnote 8,
14 or something else?
15     A   Footnote 8 was part of it but not all of it.
16     Q   Okay.  Can you explain?
17     A   Footnote 8, which is a Web site run by
18 Professor Michael McDonald at the University of
19 Florida.  He tracks turnout based on the
20 voting-eligible population.  He calculates all these
21 figures for each one of the states across elections.
22 So the voting-eligible -- the VEP turnout numbers are
23 from that Web site.
24     Q   Okay.
25     A   Some of the other registration numbers -- or

Page 19

1  excuse me -- turnout numbers, like based on
2  registration, it looks like I got those directly from
3  the GAB's Web site, from the reports.  That would be
4  Footnote 9, for instance.
5      Q   Okay.  And actually, can you explain what's
6  the point that's being made in Footnote 9 is?
7      A   Well, I'm just saying simply there that I'm
8  using GAB data.  But I'm -- but I'm using it -- I'm
9  capturing the snapshot, if you will, shortly after the
10 election because they were unable to go back and give
11 me numbers that would be representative of the
12 registrant pool right at the date of the election
13 because people that are coming in and, for instance,
14 changing their registration, in some ways, are being
15 double-counted at that point, at least, in terms of
16 total registrants.
17         So I waited until a few months after the
18 election, and got the GAB report at that point.
19     Q   Okay.  So the numbers that the GAB reports
20 for the number of registered voters at the time of
21 election, you think, are, I guess, inflated by the
22 double-counting issue you mentioned?
23     A   They can be.  Yes.
24     Q   Okay.  And do you have an opinion as to the
25 degree to which the numbers reported by GAB are

Page 20

1  inflated by that?
2      A   No.  I mean, I do remember asking them this
3  question.  And, again, the more conservative route was
4  to use the numbers shortly after the election.  I
5  guess, I'm saying, from January 2015, for instance, for
6  the November 2014 election, because things sort of
7  settled out, if you will, at that point, in terms of
8  the numbers to get a more accurate reflection.
9      Q   Okay.
10     A   To the degree, I don't -- I don't know what
11 the degree is.  So . . .
12     Q   And I have a question, I guess, about the
13 percentages themselves.  I think the best way to look
14 at this is probably to focus on Figure 1 on the next
15 page.
16     A   Okay.
17     Q   And, I guess, just so we are on the same
18 page, some of the text in the previous page relates to
19 this, too.  But what both the figure and the text show
20 -- or one of the things they show is the change in
21 turnout measured in these different ways from 2008 to
22 2012, and then, from 2010 to 2014, right?
23     A   You could calculate that.  I mean, it has
24 turnout figures for 2008, '10, '12, and '14.  I don't
25 give the -- the differences, but you can look and see

Page 21

1  how it changed.
2    Q   Yeah.  And that is actually why I was
3  referring to the text on page 5.
4    A   Okay.
5    Q   Because I think -- and I'm not trying to trip
6  you up here, I just want to make sure we're looking at
7  the same thing.  But in the second paragraph, for
8  example, it talks about turnout increase from 2008 to
9  2012?
10   A   Right.
11   Q   And so the differences are calculated in the
12  text, right?
13   A   Right.
14   Q   And so here's my question:  Going back to
15  Figure 1, using voting-eligible population from 2008 to
16  2010 -- or 2012, there's an increase of 0.5 percentage
17  points in turnout, right?
18     MR. KAWSKI:  Object to form.  It's unclear;
19     were you saying compare 2008 to 2012?
20  BY MR. KAUL:  (Resuming)
21   Q   From 2008 to 2012, in the voting-eligible
22  population, there's a 0.5 percentage point increase in
23  turnout, right?
24   A   That's correct.  Yeah.
25   Q   I mean, I think the numbers are in the

Page 22

1  text --
2    A   Yes.
3    Q   -- in the previous page at the top?
4    A   Yes.
5    Q   So that's 0.5.  And then, with voting-age
6  population, the increase from 2008 to 2012 is
7  0.2 percentage points, right?
8    A   Right.
9    Q   But then, with registration, the increase is
10  3.9 percentage points, right?
11   A   Yes.  Yes.
12   Q   And again, I'm not trying to --
13   A   Yeah.  I'm --
14   Q   -- trip you up on the math.  I just want
15  to --
16   A   -- just checking.
17   Q   But my question is actually -- well, I guess,
18  first of all, an observation that you would agree that
19  the increase using the registration denominator is much
20  larger than the other two increases, right?
21   A   That's true.  I mean, just in terms of the
22  sheer percentage difference.  Yes.
23   Q   So for that to be the case, that would mean
24  that the registration -- the share of the population
25  that was registered from 2008 to 2012 must have

Page 23

1  decreased by a similarly large margin, right?
2    A   Well, I would say that could produce that
3  effect.  I could go back and look at the numbers and
4  see if registration did decrease.
5    Q   Is there any other potential --
6    A   Oh, I mean --
7    Q   -- explanation for that effect?
8    A   -- turnout, obviously, is probably not
9  exactly the same.  I don't have the raw turnout number
10  here.  But that's the other part to this equation.
11   Q   Right.
12   A   Literally, how many people cast a ballot.
13   Q   But that would be accounted for in both the
14  voting-eligible population figure and the voting-age
15  population figure, right?
16   A   Right, it's -- it's part of all three of
17  those equations.  Yeah.
18   Q   Okay.  So the only time there's an increase
19  of more than half a percentage point is when
20  registration is used as the denominator, right?
21   A   That is true.  Yes.
22   Q   Okay.  And so is it fair to infer from that
23  that registration decreased by several percentage
24  points relative to the voting-eligible population and
25  voting-age population?

Page 24

1    A   Again, that's a possibility.  I could look at
2  those -- look those number up.  I mean, I have all
3  those numbers in a spreadsheet.
4    Q   Is there any other possibility that would
5  account for that?
6    A   It's probably the fact that the registration
7  base changed across those two election cycles.
8    Q   All right.  And then, let me do the same
9  thing with 2010 and 2014.  Now, here the
10  voting-eligible population from 2010 to 2014 saw a
11  turnout increase, according to these numbers, of
12  4.5 percentage points, right?
13   A   That's correct.
14   Q   And the voting-age population saw an increase
15  in turnout of 4.2 percentage points, right?
16   A   Yes.  Yes.
17   Q   But this time the increase in the turnout,
18  based on registration, was lower; it was 2.9 percent,
19  right?
20   A   Right.
21   Q   So now, the converse of what we were just
22  discussing would apply, right, which is that
23  registration would have to have gone up from 2010 to
24  2014?
25     MR. KAWSKI:  Object to form.

Page 25

1    BY THE WITNESS:  (Resuming)
2        A    It's certainly possible that it increased
3    over those election -- you know, from 2010 to 2014.
4        Q    And so do you think that it's possible that
5    it both decreased significantly from 2008 to 2012, and
6    yet increased by over a percentage point from 2010 to
7    2014?
8        MR. KAWSKI:  Object to form.
9    BY THE WITNESS:  (Resuming)
10       A    Well, these are the state's numbers from the
11   GAB.  And so -- I mean, in terms of the registrant
12   pool, these are the best possible numbers that I had to
13   work with.  So if there are these changes, I don't know
14   how else to get at it.
15       Q    Does that seem likely to you, though?
16       MR. KAWSKI:  Object to form.
17   BY THE WITNESS:  (Resuming)
18       A    Well, there's a lot of churn with
19   registration.  People moving in and people moving out
20   of these lists -- literally people moving in and moving
21   out of the state; people coming of age -- coming to be
22   18; or, dying.  So I mean, there are a lot of things
23   that could change the registration that are the pool of
24   registrants during a given time period.  So it does --
25   it does change over time.

Page 26

1        Q    Okay.  So with respect to the question
2    whether it's likely, I guess, would it be fair to say
3    you don't really have an opinion on that?
4        A    Not without looking at some more data.
5        Q    Okay.
6        A    But I will say again, I don't know what other
7    data there would be to look at.
8        Q    Now, near the end of the paragraph on page 6
9    -- the first paragraph -- you indicate that the
10   increase in turnout, I guess from 2008 to 2012, and
11   from 2010 to 2014, should give pause to the claims made
12   by the plaintiffs in this case; is that right?
13       A    Yes.
14       Q    And why do you say that?
15       A    Well, it's just a very, you know, cursory
16   look at things.  The later parts of the report delve
17   under the surface, if you will.  You have to get -- you
18   know, I do get a little more specific.
19           But, at least, it's a sort of a high-level
20   look at things comparing election cycles -- you know,
21   presidential to presidential and midterm to midterm --
22   across those periods in which a lot of these challenged
23   election provisions that we're talking about were
24   implemented, you don't see a decrease in turnout,
25   there's maybe a slight increase.

Page 27

1        Q    And do you believe that changes in aggregate
2    turnout from one election to another are a good metric
3    for determining the impact of changes to election law
4    on voting?
5        A    One of them.  One of them.  I mean, again,
6    I've got turnout measured three different ways here.
7    So . . .
8        Q    Three ways of measuring aggregate turnout,
9    right?
10       A    Right.  Right.  So I would say it's one of
11   them.
12       Q    Would you --
13       A    Not the only one necessarily.
14       Q    Would you ever, for example, publish a
15   political-science paper that relied on the change in
16   aggregate turnout from one election to the next in one
17   state as a method for assessing the impact of a
18   election-law change?
19       MR. KAWSKI:  Object to form.
20   BY THE WITNESS:  (Resuming)
21       A    Not alone.  I'm not saying I wouldn't present
22   that -- that -- this data.  Again, this was just sort
23   of a high-level look at what was going on with
24   Wisconsin in terms turnout overall.  So I wouldn't -- I
25   guess, if I was writing an academic article, I wouldn't

Page 28

1    stop there.
2        Q    And are you aware of any changes in the
3    political climate in Wisconsin between the 2010
4    election and the 2012 election that might have impacted
5    turnout?
6        MR. KAWSKI:  Object to form.
7    BY THE WITNESS:  (Resuming)
8        A    Well, I can't -- I can't place everything in
9    a -- in a time context, necessarily.  But there has
10   been a lot going on in Wisconsin -- there was the
11   gubernatorial recall election, which is pretty rare.
12   There was the fight over public-sector unions.  So
13   there's been a lot going on politically.  I can't
14   necessarily remember exactly when all of these things
15   transpired.
16       Q    And increased attention to political events
17   is generally correlated with increased turnout,
18   correct?
19       A    It can be.  It can be.
20       Q    Let's switch to the discussion of in-person
21   absentee voting.
22       A    Okay.
23       Q    And my first question relates to the sort of
24   second half of the first full paragraph -- and by the
25   way, if I ever ask you a question about any part of the

Page 29

```
 1   report, and you feel it's necessary to read the full
 2   paragraph or any of the parts, to provide context,
 3   please feel free to do so.
 4      A   Okay.
 5      Q   But near the end of that paragraph, you talk
 6   about the start time for in-person absentee voting
 7   varying between the municipalities, and the hours also
 8   varying; do you see that?
 9      A   Yes.
10      Q   And you wrote that there was little in the
11   way of uniformity prior to the 2012 election?
12      A   Yes.
13      Q   What was the basis for those statements --
14   the factual basis?
15      A   From my reading of the laws that existed at
16   that point in time, and how it was being implemented.
17      Q   Okay.  So --
18      A   Which was different across different
19   municipalities.
20      Q   So when you say your reading of the law, you
21   mean the statute?
22      A   Right.
23      Q   And when you say how it was being
24   implemented, what do you mean by that?
25      A   For instance, the manner in which
```

Page 30

```
 1   municipalities were actually holding early in-person
 2   absentee voting -- the days and times, and the start
 3   times, end times, those kinds of things.
 4      Q   And how did you learn about what the
 5   municipalities were actually doing?
 6      A   Well, a little bit later -- it does vary by
 7   municipality -- it certainly did back in time.  I was
 8   able to collect some information, at least, from
 9   Milwaukee, which is the largest city in Wisconsin -- in
10   Table 2 -- which sort of acts as a -- an example of how
11   things changed -- at least, in Milwaukee -- across
12   these time periods.  So . . .
13      Q   Okay.  Anything else?
14      A   Well, in talking with the -- with the GAB
15   about how things were implemented back in time.
16      Q   And who --
17      A   I think I also -- I talked with Kevin Kennedy
18   and Michael Haas.  And I -- I think I -- I don't know
19   if I have this in here or not.  I tried to collect the
20   same public notices from the City of Madison as I did
21   in the City of Milwaukee.
22          And I don't -- I don't know -- I may not have
23   included it because I don't know if I got notices for
24   all the elections I was trying to get notices for.
25   This notice as being the announcements of the days and
```

Page 31

```
 1   times when they were holding early voting.  So . . .  I
 2   know I got it from Milwaukee because I've got an
 3   example here in Table 2.
 4      Q   Anything else?
 5      A   No.  I think that covers most of it.
 6      Q   Okay.  So just to recap.  You took the
 7   example of Milwaukee, and then you spoke to Kevin
 8   Kennedy and Michael Haas; is that right?
 9      A   Well, I probably spoke to them first, and
10   then collected these notices from the City of
11   Milwaukee.  And again, I tried to -- I tried to collect
12   the same set of notices from the City of Madison.  And
13   I don't know that I got everything that I needed to
14   make a full comparison across all these years.
15      Q   Okay.
16      A   And in reading the statutes, again, that was
17   in effect at that point in time -- or statutes --
18   plural.
19      Q   All right.  And the end of the following
20   paragraph, has a sentence that says:  Though these
21   statutory changes -- I'm sorry -- through these
22   statutory changes, the State of Wisconsin has
23   established uniform day and hour limits for in-person
24   absentee voting throughout municipalities in the state.
25          Do you see that?
```

Page 32

```
 1      A   Yes.
 2      Q   Now, prior to -- well, let's first go prior
 3   to either of the changes to the early-voting law.
 4      A   Okay.
 5      Q   Prior to either of those changes, Wisconsin
 6   had uniform limits for in-person absentee voting,
 7   correct?
 8      A   Well, can you be more specific with . . .
 9      Q   With what?
10      A   I don't -- I don't under -- I don't quite
11   understand the question maybe.
12      Q   Well, let me go back to your language.  When
13   you say that through the statutory changes, the State
14   of Wisconsin has established uniform day and hour
15   limits for in-person absentee voting, what do you mean
16   by that?
17      A   Specifically, start and stop times in terms
18   of when the period can start and when it can end, and
19   the maximum number of hours it can be allowed, and the
20   fact that post-Act 146, at least, it doesn't include
21   weekend days.  So those -- those are the sort of the
22   uniform provisions I'm talking about at that point.
23      Q   Okay.  But before either of the changes to
24   early voting, Wisconsin still had uniform start and
25   stop times for early voting, right?
```

Page 33

1    A    Well, it seemed to be -- I'm -- I'm just
2 saying here, it just seemed to be a little fuzzy,
3 actually, in terms of trying to figure out -- I mean, I
4 could do it for Milwaukee because I could find the
5 notices where they -- they published these are our
6 early-voting hours.  At some point, at least, the
7 interpretation of the law I understood is that once the
8 absentee ballots were ready, then you could get
9 started.
10   Q    That was true uniformly, though, right?
11   A    Yes.  Although, from that, that doesn't mean
12 that municipalities were all starting right at that
13 point, I guess.  Okay.  So looking on page 6:  Prior to
14 2011, in-person absentee voting could begin when
15 ballots were made available to municipal clerks.
16        And then it says: . . . ballots were to be
17 made available 30 days prior to the date of the general
18 election.
19        So they certainly couldn't start before that
20 point.  They didn't have to start at that point,
21 though.  I guess they could have.
22   Q    And now they don't have to start at the
23 beginning of the period either, right?
24   A    I'd have to look and see how the -- I'm not
25 -- I'm not really sure without looking back at that

Page 34

1 statute, if it says can or may, I guess is the -- would
2 be the key point.
3   Q    Okay.  So you're not sure whether
4 municipalities in Wisconsin are all required to offer
5 the same early-voting hours or not?
6   A    Well, not hours.  Now, I do -- I do make that
7 point.  You know, I -- I specify that down in another
8 paragraph . . . some of the factors may still vary
9 slightly between voting units . . .
10        And that's where I use Milwaukee because you
11 don't necessarily have to have -- I know you don't have
12 to have the after-business hours.  You can, you don't
13 have to.  It was my understanding, though, that you
14 were supposed to offer early voting between this 10-day
15 period, start to stop.
16   Q    Okay.  Meaning that all municipalities were
17 supposed to offer early voting on all 10 days that are
18 available?
19   A    That was my understanding.  Now, if the
20 statute -- if I'm misremembering the statutes, then I
21 could be wrong.  But I thought that municipalities were
22 supposed to offer early in-person voting for those 10
23 days.  The hours that they offered, it could vary to
24 some degree.  Milwaukee is offering -- is continuing to
25 offer after-business hours here, till 7 o'clock at

Page 35

1 night.
2   Q    I think that may answer my next question.
3 But the last paragraph on page 7 says that: . . . the
4 changes to the early-voting laws have reduced the
5 differences across municipalities considerably to
6 create uniform dates for beginning and ending the
7 10-day in-person absentee weekday period.
8   A    Right.
9   Q    And so is the basis for that statement the
10 point that you were just making, which is your
11 understanding that all municipalities currently have
12 early voting available for a 10-day period?
13   A    Yes.
14   Q    All right.  Let's go to the next page.  And I
15 want to focus on the paragraph at the top.  In the
16 second sentence you write that:  Uniformity helps to
17 ensure, first and foremost, that every registrant has
18 the same opportunity . . . to vote in-person absentee.
19   A    Right.
20   Q    And by that, you mean the same time window;
21 is that right?
22   A    Right; at least, days.
23   Q    Okay.  Is that the only thing you're taking
24 into account in assessing whether every registrant has
25 the same opportunity?

Page 36

1   A    Yes.  I'm talking about the time period
2 there.
3   Q    Okay.  So that's not accounting for whether
4 registrants in some areas have longer lines, for
5 example, to vote, than registrants in other areas?
6   A    No, I'm not -- I'm not accounting for that at
7 that point.
8   Q    And then, you said:  In addition,
9 misunderstandings among voters concerning exactly when
10 they can vote in-person absentee should be greatly
11 diminished.
12        Do you see that?
13   A    Yes.
14   Q    What is your basis for thinking that there
15 were misunderstandings among voters concerning when
16 they can vote in-person absentee?
17   A    Well, I don't know that there were,
18 necessarily.  But to the degree to which the changes in
19 these -- in statutory law had made things more uniform,
20 if there were, I guess, misunderstandings, they should
21 be reduced.
22   Q    Okay.  So when you say should be greatly
23 diminished, you're assuming that there were
24 misunderstandings, but you don't know that; is that
25 right?

Page 37

1    A   Right.  I don't -- I don't have -- I didn't
2  collect any evidence or data on that point.
3    Q   But changing election laws can also create
4  confusion or misunderstanding, right?
5    A   Yes, that's possible.
6    Q   So the fact that the laws have been changed,
7  potentially, could offset whatever effect you're
8  referring to here; is that right?
9    A   Well, there may be some people who are basing
10  their behavior on previous election cycles in which the
11  law was different.  That's possible.
12    Q   And then, the last sentence you refer to the
13  possibility of the . . . GAB producing public-service
14  messages that can be used to blanket the state.
15      Do you see that?
16    A   Yes.
17    Q   Do you know whether the GAB has done that?
18    A   Not to my knowledge.  I just mention it as a
19  possibility.  I don't think -- I'm -- I'm fairly
20  certain they haven't.
21    Q   Do you know whether any funding has been
22  provided to the GAB for such messages?
23    A   I'm unaware of any, if there has been.
24    Q   All right.  Now, in the next section, you
25  analyze in-person absentee turnout in Wisconsin; is

Page 38

1  that right?
2    A   Yes.
3    Q   And let me direct your attention to Figure 2
4  on page 10.
5    A   Okay.
6    Q   Now, this summarizes the percentage of voters
7  who show up to vote, who use these different methods of
8  voting.  By these different methods, I mean early
9  in-person, absentee by mail, or voting at the precinct
10  on election day, right?
11    A   Yes.  I think it includes everyone except a
12  very small number of military and overseas voters.
13    Q   Okay.  And one of the things you find is that
14  from 2008 to 2012, there was an increase in the share
15  of the population who turned out, who used in-person
16  absentee voting, right?
17    A   Yes; slight increase.  Yes.
18    Q   And then, from 2010 to 2014, there was also
19  an increase in in-person early voting, right?
20    A   Yes.
21    Q   Now, are you aware of any trends in early
22  voting nationally that might account for increases in
23  Wisconsin over that time period -- in early in-person
24  voting?
25    A   You know, it -- early in-person or early

Page 39

1  in-person absentee balloting can vary greatly
2  state-to-state.  In some states, it's much more heavily
3  utilized than in other states.  So I'm not aware of --
4  well, let me just say I haven't done a study to answer
5  the question you just asked me.
6      So I don't know exactly.  I don't know, for
7  instance, if there is an increasing trend nationwide
8  towards voters using early in-person voting.  I don't
9  know the answer to that.
10    Q   Over what period of time?
11    A   Well, recently, the last several election
12  cycles.  I do know that usage, though, can vary greatly
13  state to state.  For instance, like in North Carolina,
14  it's just much higher -- early-voting utilization is
15  much higher than in Wisconsin.
16    Q   And do you know whether there was an increase
17  in early in-person voting, in North Carolina, from 2010
18  to 2014?
19    A   Yes, it was.
20    Q   So you don't know whether there's a national
21  trend of increasing --
22    A   Well, I --
23    Q   -- in-person early-voting usage.
24    A   I haven't studied that question nationally.
25  I can only rely on, in trying to answer your question,

Page 40

1  though, looking at some of the states I'm more familiar
2  with.
3    Q   Are there other states that you're familiar
4  with besides Wisconsin and North Carolina?
5    A   Well, Ohio's patterns, in terms of early
6  in-person voting usage look more like Wisconsin's;
7  smaller part of the electorate is utilizing early
8  in-person voting.
9    Q   And what about the trend in terms of the
10  percentage of the electorate using early in-person
11  voting?
12    A   Well, I mean, from what I remember from like
13  2010 to 2014, in Ohio, it went up.  I mean, just -- it
14  was almost the same.  I mean, it went up a fraction of
15  a percentage point, from what I remember.
16    Q   Do you think knowing whether there is a
17  national trend would inform your analysis here as to
18  whether the election laws at issue are playing a role
19  in the extent to which voters are using in-person
20  absentee voting?
21    A   I honestly don't know if that would shed a
22  whole light on things, because elections are very
23  state-specific, and the state context is what we're
24  talking about here.  So I -- it's probably more
25  important, I would say, what's going on in Wisconsin,

Page 41

1  and if there's a trend there versus not necessarily
2  what's going on in another state, or even nationally.
3       Because again, if you look at things
4  nationally, you're really just aggregating the cost of
5  a bunch of specific state contexts.  So . . .  Of
6  course, some states don't even have early voting.
7  Period.
8       Q    And going back before 2008, are you aware of
9  what the trend is in Wisconsin with respect to early
10  in-person voting usage?
11      A    Well, there -- there are no data available,
12  or I would have gone back further in time.
13      Q    Okay.  So you don't know whether Wisconsin
14  has had increasing early in-person voting usage since
15  prior to 2008?
16      A    Right.  These were the years I could -- I
17  could analyze.  And even in 2008, as I note somewhere,
18  I'm really relying -- I mean, I'm relying on hard data,
19  but the report I got from the GAB, for 2008, wasn't --
20  wasn't based on the full accounting of all
21  municipalities, I guess.  And I do note that.  And so
22  to go back before 2008, there's just really absolutely
23  no data to look at.
24      Q    So one thing you could do would be to look at
25  municipality-specific data, right?

Page 42

1      A    Right.  Again, though -- I mean, from what I
2  understand in Wisconsin, most of that gets reported up
3  to the GAB.  And so, again, I'm relying mostly on the
4  state-level data for these things.
5      Q    Okay.  And I'm going to ask you to do some
6  comparisons to the data in Figure 3 -- I'm sorry --
7  yeah, Figure 3.
8      A    Okay.
9      Q    So first of all, Figure 3 shows -- I guess
10  Figure 3 is sort of a subset of Figure 2, right; it
11  just shows the in-person absentee turnout for the 2008,
12  2010, 2012, and 2014 elections?
13      A    Right.  And let me say there's a typo in
14  Figure 3.  Where it says midterm, it should obviously
15  say presidential, and where it says presidential, it
16  should say midterm.  So . . .
17      Q    Yeah.  I noticed that, too, but I wasn't
18  going to ask you because I thought that was --
19      A    No, I don't mind pointing out --
20      Q    -- self-explanatory?
21      A    If it's -- if it's something -- something
22  I've -- an oversight.  So . . .  But yes, Figure 3 is a
23  subset of Figure 2.
24      Q    And what I just want to highlight is I'm
25  going to ask you to do some comparisons to these

Page 43

1  statewide numbers with some city-specific numbers you
2  we do later.  But just so we've got the baseline; so
3  according to this figure, in 2008, 15.87 percent of
4  voters used in-person absentee voting in Wisconsin,
5  right?
6      A    Correct.
7      Q    And in 2012, it was 16.67, right?
8      A    Correct.
9      Q    All right.  So let's turn to Figure 4, then.
10      A    Okay.
11      Q    And this shows in-person absentee turnout in
12  Milwaukee, right?
13      A    That is correct.
14      Q    And it shows that for 2008 in-person absentee
15  turnout was 11.63 percent, right?
16      A    Correct.
17      Q    And so that's more than 4 percentage points
18  lower than the statewide average for 2008, right?
19      A    Right.
20      Q    And for 2012, it was 12.57 percent?
21      A    Right.
22      Q    And again, that's more than 4 percentage
23  points than the statewide average?
24      A    Right.
25      Q    All right.  And I'm not going to walk you

Page 44

1  through each of the numbers.  But it's also true that
2  Milwaukee had lower in-person absentee turnout, in 2010
3  and 2014, than the state as a whole, correct?
4      A    That is correct.
5      Q    And the change from 2010 to 2014, in
6  Milwaukee, was an increase of 3.73 percentage points?
7      A    The midterm, yes.  That's correct, from 2010
8  to 2014.
9      Q    All right.  And that's about one-and-a-half
10  percentage points lower than the increase in the rest
11  of the state -- or the state overall, right?
12      A    Approximately, yes.
13      Q    All right.  And Figure 5 has similar data for
14  Madison, correct?
15      A    Right.
16      Q    And as with Milwaukee, the rates of in-person
17  absentee voting for 2008, 2010, 2012, and 2014, are
18  lower than the state as a whole, correct?
19      A    Yes.
20      Q    And also, as with Milwaukee, be the change
21  in -- the increase in in-person absentee usage from
22  2010 to 2014 was lower than the increase in the rest of
23  the state, right?
24      A    That's correct.
25      Q    Now, following that Figure 5, you have a

Page 45

1  discussion about the rule that says that municipalities
2  are permitted to have only one in-person absentee
3  voting location.
4      A   Right; that's what that section's on.
5      Q   What, if any, state interest is there in not
6  giving municipalities the option of opening multiple
7  early-voting locations.
8          MR. KAWSKI:  Object to the form of the
9  question.
10 BY THE WITNESS:  (Resuming)
11     A   I guess it goes to uniformity in terms of --
12 you know, again, we haven't talked about this, but
13 obviously, it's interesting, in Wisconsin, that
14 elections are administered at the point of impact, if
15 you will, by municipalities, not counties, really.
16         And so the law just says each municipality
17 can have one early in-person voting site.  It doesn't
18 have to be the elections office for the municipality,
19 it can be moved from there.  But they can only have
20 one.  So I guess it speaks to uniformity, really.
21     Q   Are there other state interests in that rule?
22         MR. KAWSKI:  Same objection.
23 BY THE WITNESS:  (Resuming)
24     A   None that I'm aware of, sitting here.
25     Q   And when you say that this goes to

Page 46

1  uniformity, in your opinion, is it uniform for cities
2  or the localities regardless of their size --
3          MR. KAWSKI:  Same objection.
4  BY MR. KAUL:  (Resuming)
5      Q   -- having the same -- let me rephrase the
6  question.  In your opinion, is Wisconsin's system with
7  respect to the number of early-voting locations a
8  uniform system?
9          MR. KAWSKI:  Object to form.
10 BY THE WITNESS:  (Resuming)
11     A   On that metric, yes.
12     Q   On which metric?
13     A   One per municipality.
14     Q   Okay?
15     A   Maybe we're talking past each other.
16     Q   From the perspective of voters, do you
17 believe that that's a uniform system?
18     A   It can be.  Again, some of it's going to
19 depend upon -- for instance -- and I talk about some of
20 this -- resources deployed to the early-voting site for
21 processing voters, et cetera, getting people through.
22     Q   Can you --
23     A   Well, I mean, you would expect that -- for
24 instance, Milwaukee would, one, have a much bigger
25 physical space for their early in-person voting site,

Page 47

1  and there would be more poll workers there on-site to
2  help process voters, et cetera.  Those kinds -- those
3  kinds of resources.
4      Q   Do you know how wait times for in-person
5  absentee voting compare by municipality size, in
6  Wisconsin?
7      A   I haven't seen any data on that.  No.  So,
8  no, I don't know the answer to that.
9      Q   So would you say that a system in which every
10 municipality in Wisconsin had one election-day voting
11 location would be a uniform system?
12         MR. KAWSKI:  Object to form.
13 BY THE WITNESS:  (Resuming)
14     A   Well, it would be uniform in one -- one way.
15     Q   Are you familiar with the one-person-one-vote
16 case law?
17     A   Some of it, yes.
18     Q   This is the same type of uniformity that
19 existed for allocation of legislators prior to the
20 one-person-one-vote case law, correct?
21         MR. KAWSKI:  Object to form.
22 BY THE WITNESS:  (Resuming)
23     A   Well, I will say that the legislative
24 districts in many states had unequal population counts
25 within the state.  And that was the whole point of that

Page 48

1  sort of spate to apportionment cases in the early or
2  mid-1960s.
3      Q   So representation was assigned not based on
4  population but just based on the fact that they
5  represented a number of localities, right?
6      A   Geography, a lot of times.  Different states
7  had different systems.  Some of them, for instance,
8  were based on counties or county groupings, for
9  instance.
10     Q   Now, there's another section that's got the
11 heading Response to Professor Burden's Opinion on
12 Uniform In-Person Absentee Sites?
13     A   Right.
14     Q   You talk about a study that Professor Burden
15 cites?
16     A   Right.
17     Q   Is that a reference to the former article
18 about whether more sites lead to higher turnout?
19     A   I believe.  I -- I'm just looking.  I thought
20 I would have -- I guess I didn't cite it directly.  I
21 guess I cited back to Professor Burden's report which
22 cited that article.  Yes, I think that's the article
23 that's being referenced there.
24     Q   Okay.  Are you familiar with that article?
25     A   I looked at it, yes.

Page 49

1      Q   And you write that . . . the study cited is
2   not specific to Wisconsin and does not analyze early
3   in-person turnout, which is the more appropriate metric
4   in this case.
5          Do you see that?
6      A   Yes.
7      Q   Why do you say that early in-person turnout
8   is -- well, first of all, let me preface this.  The
9   study he's talking about -- and I have it, and I'll ask
10  you about it in more detail in a minute.  But --
11     A   Okay.
12     Q   So if you need to refer to that, I'm happy to
13  show it to you.  But the study talks about the impact
14  of the number of early-voting locations on overall
15  turnout, right?
16     A   That's true.  Yes.
17     Q   And what you're saying here is that's not the
18  appropriate metric, that we should instead look at
19  early in-person turnout?
20     A   That's what I'm arguing.  Yes.
21     Q   Okay.  Why do you argue that?
22     A   Well, again, we -- we're looking at trying to
23  discern patterns with this specific type of voting and
24  to the extent to which we have data on early in-person
25  turnout -- I mean, you can look at overall turnout.

Page 50

1          I'm -- I'm just arguing that we can be more
2   specific about it and look primarily at early in-person
3   turnout.  I mean, because early-voting sites are not
4   going to have an impact on election-day voting, right?
5   They're not going to have an impact on absentee-by-mail
6   voting, per se.  They're going to have an impact, if
7   they're going to have an impact, I would argue, on
8   early in-person turnout.  So let's look at that.
9   That's what I'm saying.
10     Q   Well, they could also impact election-day
11  turnout, correct?
12     A   It could indirectly.  I mean, obviously, not
13  directly.
14     Q   So for example --
15     A   Because these sites are not open on election
16  day.  Then you're converting over to precincts in most
17  states.  So . . .
18     Q   So one of the advantages to early voting is
19  that it can reduce lines on election day, right?
20     A   It can.
21     Q   And so that can --
22     A   I mean, that's a -- I'll say that's a
23  possibility.
24     Q   And so that can lead to higher turnout,
25  correct?

Page 51

1      A   I don't know that I would draw that causal
2   connection.  It could lead to shorter lines on election
3   day.  I could see that causal connection.  I don't know
4   that it would lead directly to higher turnout.
5      Q   There is political-science literature on the
6   impact that lines have on turnout, correct?
7      A   I'm sure there is.  Yes.  I mean, there have
8   been studies done on wait times, I know.
9      Q   And it uniformly indicates that the longer
10  the wait times, the lower the turnout will be, correct;
11  in other words, long wait times deter people from
12  voting?
13     A   At least, I mean, I can think of one -- I'm
14  thinking of one study.  Yes.  Now, I can't say, sitting
15  here, that I'm familiar with every study that's been
16  done on that topic.  So . . .
17     Q   And the ultimate -- to the extent we're
18  concerned with whether early voting -- let me go back a
19  step.
20         The Burden article that you cite earlier,
21  that relates to early voting, that also talks about the
22  impact of early voting on the overall turnout, correct?
23     A   I'd have to review.  I'm not saying it
24  doesn't, I just don't remember that part of it.
25     Q   Are you -- okay.  Let me ask you about that

Page 52

1   former article since we've been mentioning it.
2          My inclination is to go through this and then
3   take a break after, but I'm happy to take one before if
4   you'd rather.
5      A   That's fine.  We can keep going.
6          (Whereupon, Plaintiff's Exhibit No. 3 was
7      marked for identification.)
8   BY MR. KAUL:  (Resuming)
9      Q   All right.  The document in front of you is
10  Exhibit 3, correct?
11     A   Correct.
12     Q   Can you recognize this article?
13     A   Yes, I do.
14     Q   Okay.  And what is this?
15     A   It's an academic article about early voting
16  and early voting sites related to overall turnout.
17  It's published in Election Law Journal.
18     Q   And are you familiar with that journal?
19     A   Yes.
20     Q   And you actually published in that journal
21  yourself, right?
22     A   Yes.  And I'm on the editorial board.
23     Q   Okay.  So were you on the editorial board for
24  this particular article?
25     A   Well, I didn't review this article.  Let me

Page 53

1 -- let me see.  I was probably on the editorial board,
2 but I didn't review the article.  I wasn't a peer
3 reviewer.
4     Q   I understand.  So this is a peer-review
5 journal?
6     A   Yes.
7     Q   And how is the Election Law Journal regarded?
8     A   Well, I mean, I think as an outlet -- as a
9 peer-reviewed academic outlet for work that
10 specifically looks at election administration.  It's
11 probably the most specific journal on that topic.
12     Q   Most specific meaning most prominent?
13     A   Yeah, I would think I would say that, on that
14 particular topic.  It's definitely specialize to that
15 area.
16     Q   Okay.  I'd just like to ask you about a few
17 parts of this article.  On the first page, which is
18 page 81, the right-hand column, about a third of the
19 way down, there's a sentence that says:  While fewer
20 than 10 percent of voters cast early ballots in 1992,
21 the percentage increased to over 30 percent of the
22 electorate in both 2008 and 2012, including a strong
23 majority of voters in several states.
24        Do you see that?
25     A   Yes.

Page 54

1     Q   Is that consistent with your understanding?
2        MR. KAWSKI:  Object to form.
3 BY THE WITNESS:  (Resuming)
4     A   I don't -- I don't have any reason not to
5 believe that statement.
6     Q   Okay.
7     A   I know that, for one, the number of states
8 that even began to allow early in-person voting is
9 increasing over that time period.  So it would be
10 natural that there would also be more voters utilizing
11 it once a state had implemented it.  So . . .
12     Q   So would it be fair to say that there's a --
13 over the last 25 years or so, there's been a strong
14 trend towards increasing early-voting usage?
15     A   Yes.  I mean -- I mean, I guess you go back
16 25 years, and it's going to be close to zero.  For
17 instance, Texas and Tennessee were actually some of the
18 first states, you know, over 20 years ago, to put early
19 voting in place in some form or another.
20        So yeah, you go back several decades, and
21 it's -- it's just really not existent, for the most
22 part, in most states.
23     Q   All right.  Then, let me direct you to the
24 second page of this article, page 82, and specifically
25 the last paragraph in the left-hand column.

Page 55

1     A   Okay.
2     Q   And this indicates that the study . . . finds
3 that early-voting sites generally have a significant
4 and positive relationship with voter turnout when
5 examined at the county level, and that this
6 relationship holds across many specifications.
7        Do you see that?
8     A   Yes.
9     Q   What do you understand that to mean?
10     A   Specifically, across many specifications?
11 That phrase?
12     Q   No.  About -- well, I -- tell me what you
13 understand that phrase to mean, first of all.
14     A   It means that he ran a number of different
15 model specifications and he got the same result.
16 That's how I'd interpret that.
17     Q   Okay.  And when he says that early voting
18 sites have a significant and positive relationship with
19 voter turnout when examined at the county level, what
20 does that mean?
21     A   Well, he -- he does use the qualifier,
22 generally.  But I would say that -- and again, I
23 haven't looked at this article real recently, but I
24 remember he ran quite a different number of statistical
25 models.

Page 56

1        So what he's saying -- or I would interpret
2 that to say that across the models that he ran, that
3 there is a signification relationship -- statistically
4 significant relationship between the number of early
5 voting sites in a county and turnout in the county --
6 at the county level.  He's measuring turnout at the
7 county level.  And it's over -- it is overall turnout.
8     Q   Okay.
9     A   Yeah.
10     Q   Are you aware of any academic literature that
11 contradicts that finding?
12     A   Specifically on the sites?
13     Q   Yes.
14     A   I'm not aware of anything that contradicts
15 it.  I mean, there's -- there's a larger academic
16 argument, I will say, about whether early voting, in
17 general, increases turnout or not.  And I guess that's
18 a subset of that.
19        But there's still an ongoing argument, slash,
20 debate -- whatever you want to call it -- about, you
21 know, whether early voting actually acts as a stimulant
22 to increase turnout, or is this more of a convenience
23 factor.
24     Q   And --
25     A   I think it's fair to say that about what's

Page 57

1    going in the discipline right now.
2        Q   Okay.  But with respect to whether an
3    increased number of sites leads to increased turnout,
4    you're not aware of any --
5        A   I'm not aware of any --
6        Q   -- literature contradicting this?
7        A   I'm sorry.  I didn't mean to talk over you.
8    I'm not aware of a whole lot of studies, period, that
9    have sort of honed in on early-voting sites.  I mean,
10   this is one of the few that I'm aware of.  So I'm -- so
11   to answer your question:  No, I'm not aware of anything
12   that contradicts this statement we just read.
13       Q   What other academic studies regarding the
14   number of -- regarding the impact of early-voting sites
15   on turnout, either generally or for early voting, are
16   you aware of?
17       A   I -- I can't think of another one about early
18   voting, just sitting here.  I'm not saying that there
19   aren't any.  But I think they're fairly rare.
20       Q   Let me ask you a question about page 83.  In
21   the top right, I'm going to ask you about the start of
22   the last paragraph before the new section.
23       A   Okay.
24       Q   Which begins with:  More specifically . . .
25           Do you see that?

Page 58

1        A   Right.
2        Q   It says . . . research suggests that voting
3    is most costly for poorer, less educated, and racial
4    and ethnic minority voters.
5            Do you see that?
6        A   Right.
7        Q   Is that consistent with your opinion?
8            MR. KAWSKI:  Object to form.
9    BY THE WITNESS:  (Resuming)
10       A   It's consistent with a lot of
11   political-science literature.
12       Q   Are you aware of any --
13       A   Although, I will say that -- I mean, there's
14   long been a noted linkage between, say -- if we can
15   just use the term socioeconomic status -- and turnout.
16   For instance, as part of socioeconomic status,
17   education is typically the single best predictor
18   whether someone is going to turn out to vote or not.
19           Now, if you go back in time, I would agree
20   that there were differences between racial or ethnic
21   groups and turnout.  I think, more recently, especially
22   in the south -- and again, this is some of things I
23   study -- Black and White turnout rates are on par,
24   really.  Now, Hispanic registration turnout rates
25   typically lag behind White -- Anglos and Black.  So

Page 59

1    there could still be some racial or ethnic differences.
2            I'm just saying some of these studies are not
3    new, that he cited, and things can change.  Especially,
4    I think what's changed here relates mostly to racial
5    voters.
6        Q   Okay.  So you do not agree with this with
7    respect to the reference to racial minority voters?
8        A   Well, not -- not from what I've seen -- not
9    from what I've observed more recently, especially in
10   the south.
11       Q   Okay.  And --
12       A   Between Whites and Blacks, especially.
13       Q   And you're focusing on turnout specifically,
14   correct?
15       A   Yes.  Yes.
16       Q   Okay.  Now, that's a different question from
17   whether voting is costly for voters, right?
18       A   Well, I mean -- I mean, the costs would be
19   part of the turnout equation, though, right?  So it's
20   not completely divorced from -- from that.
21       Q   But it's just part of it, correct?
22       A   Well, turnout is multifaceted.  It could be
23   related to a lot of different things.
24       Q   So if there was a market increase in the
25   benefit for turning out, for example, that might

Page 60

1    explain an increase in turnout even if it remained true
2    that costs were disproportionately high for racial
3    minority voters?
4        A   Well, again, when we talk about cost, this is
5    a general statement.  I don't know exactly what he's
6    referring to in terms of costs in terms of racial and
7    ethnic minority voters.  And I mean, I think he's
8    talking about turnout here.  He says voting, so he's
9    talking about turnout.
10           Now, I will say that the socioeconomic status
11   relationships seem to still be in place, if you will.
12   I'm just telling you about some of the things that I've
13   observed more recently in my own research in relation
14   specifically to Black and White voting patterns.  And
15   so I guess I would take issue with part of that
16   sentence.
17       Q   All right.  Let me direct your attention to
18   page 85.  And my question is about the first paragraph
19   under A New Theory of Early Voting and Turnout.
20       A   Okay.
21       Q   Professor Fullmer writes that:  Simply
22   offering early voting does not necessarily lower the
23   participation burden in a meaningful way.  If a
24   high-population county has one early voting site
25   situated in a crowded, busy downtown, then this option

Page 61

1  hardly lowers costs for a marginally interested voted.
2      And he cites the example of Los Angeles
3  County.  And he says:  Lines are likely to be very long
4  at stations such as this, while the single site will
5  probably be difficult to reach for many of the county's
6  residents.
7      Do you see that?
8      A   Yes.
9      Q   Do you agree with his assessment there?
10     A   Not necessarily.  I mean, just the fact, one,
11 that early voting is being offered as an option is a
12 benefit, if you will, or, at worst, can lower the cost
13 of voting for some voters whether there's one
14 early-voting site versus a number of early-voting
15 sites.  So I don't agree with that completely.
16     And again, some of it goes to the
17 administration of the early-voting site or sites
18 themselves, and what kind of resources are being
19 deployed to those sites or site.  You know, he's making
20 a supposition -- it could be true; maybe it is, maybe
21 it isn't -- lines are likely to be very long at
22 stations such as this.  It could be.
23     Apparently, he doesn't necessarily have -- or
24 he's not citing direct evidence of that.
25     Q   All right.

Page 62

1      MR. KAUL:  Let me go off the record.
2      (Whereupon, a break was taken from 10:24 a.m.
3  to 10:32 a.m.)
4  BY MR. KAUL:  (Resuming)
5      Q   Dr. Hood, I'd like to ask you about the
6  in-person absentee site density analysis.
7      A   Okay.
8      Q   And the discussion of that starts on page 14
9  of your report; is that right?
10     A   Yes.
11     Q   Now, in the second paragraph on page 14,
12 which is the first full paragraph, about halfway
13 through, you write that: . . . there is one in-person
14 absentee site per municipality, making the numerator
15 one in all cases.
16     A   Right.
17     Q   So just so I'm clear, this doesn't account
18 for the possibility that so many municipalities, for
19 example, may not have a site, they may only offer
20 early-voting by appointment, correct?
21     A   Yes.  I mean, I guess -- I guess I would say
22 the -- these are the number -- I mean, each
23 municipality cannot have more than one location.  So
24 whether it's going into the clerk's office in some
25 smaller municipality, or there's actually, you know, a

Page 63

1  dedicated site, that can vary.
2      Q   All right.  And then, Table 3 shows the
3  results from your analysis, correct?
4      A   Right.
5      Q   What, if any, controls did you use in
6  conducting this analysis?
7      A   Table 3 and 4, just to be fair, are both --
8  both results from -- from these models.  There aren't
9  any control variables.  I mean, that's -- that's the
10 model right there in Table 3 and Table 4.
11     Table 4 just limits sites to those that have
12 at least a thousand registrants or more -- or
13 municipalities that have a thousand registrants or
14 more.
15     Q   Okay.  And are these results weighted by
16 population size per municipality?
17     A   Well, they are weighted -- Footnote 24 --
18 they're weighted by total registration.  And then, I
19 also ran them unweighted.  I mean, I think
20 Professor Burden points out that, you know, there's,
21 again, a debate within the discipline about whether to
22 weight or not weight some of these models.  I think he
23 points that out in his own expert report.
24     So I ran them unweighted as well, and the
25 results were statistically and substantively the same.

Page 64

1  So yeah, they're weighted by total registration.
2      Q   Just to be clear, if I'm reading Footnote 24
3  correctly, that's saying that the results in your
4  report are not weighted by total registration?
5      A   Oh, okay.  I'm sorry.  Yes.  I'm just -- yes.
6  So these are not -- yeah, the models I present are not
7  weighted.  I'm just saying that I ran them weighted as
8  well, and got the same results.  So you're right.
9      Q   Okay.  So when you run it unweighted, that
10 means that Milwaukee counts the same as a town that's
11 got 400 people, say?
12     A   Right.  Yeah.  Each municipality has the same
13 weight, essentially.
14     Q   And did you provide the unweighted -- I'm
15 sorry -- the weighted results in the materials you
16 produced in discovery in this case?
17     A   I'm not sure.  I'm not sure.  I remember
18 providing the data sets of things in the -- the stated
19 code things.  I certainly have those.
20     Q   Now, we talked earlier about how in-person
21 absentee turnout in Milwaukee and Madison is lower than
22 the statewide average, correct?
23     A   Yes, that's true.
24     Q   And those are the two largest municipalities
25 in Wisconsin you're aware?

Page 65

1    A   Yes, that's true.
2    Q   So it's not those two cities that are driving
3  these results, correct?
4    A   Correct.
5    MR. KAWSKI:  Object to form.
6  BY THE WITNESS:  (Resuming)
7    A   Correct.  I mean, because, you know, when you
8  do take into account the size of the municipality with
9  the weighting scheme, as I reported, they are the same.
10  The results were statistically substantive with the
11  same.  I'm not saying that number for number they're
12  exactly the same.
13    Q   So what does that mean they're statistically
14  and substantively the same?
15    A   Well, what I mean there, when I -- when I use
16  a phrase like that, typically, is that, in this case,
17  the coefficient has the same sign and is statistically
18  significant in either the weighted or unweighted
19  models.
20    Q   Okay.
21    A   That's what I mean by that.
22    Q   And did you run both weighted and unweighted
23  models for all of these results, or just the results in
24  Table 3?
25    A   I'm sure I did them for Table 3 and 4.  The

Page 66

1  figures are just scatterplots based off of data from
2  Table 4.  So . . .
3    Q   And Table 3, right?
4    A   I think the figures are based off of Table 4.
5  I think I limited those to just certain municipalities.
6    Q   Do you know how many municipalities in
7  Wisconsin have a population of under a thousand -- or
8  I'm sorry -- under a thousand registrants, I should
9  say.
10    A   Well, there are quite a few.  So it goes from
11  about 1,812, 1,820, in some of these models, to right
12  at 600 or just under 600 when you subset it for
13  municipalities that have more than a thousand.  So that
14  would be, what, just ballpark 1200 or so municipalities
15  have less than a thousand registrants -- something like
16  that.
17    Q   Did you run any other robustness checks; for
18  example, by considering only municipalities with, say,
19  10,000 or more registrants?
20    A   I don't remember doing that.
21    Q   Now, the paragraph after Table 3, this on
22  page 15.
23    A   Okay.
24    Q   You indicate that: . . . the relationship
25  between in-person absentee usage and the density of

Page 67

1  in-person absentee sites in Wisconsin is negative; is
2  that right?
3    A   Right; the coefficient is negative.  Yes.
4    Q   And you say that:  In-person absentee turnout
5  in Wisconsin is, therefore, not related to convenience
6  measured in this matter; is that right?
7    A   Right.  Right.  I mean, again, that statement
8  is just based on the findings in that model.
9    Q   Okay.  So that's not your overall opinion?
10    A   Not necessary -- no, I'm -- I'm -- you know,
11  again, the paragraph is describing what is in the
12  table.
13    Q   Okay.  You're not drawing the conclusion that
14  having fewer voting sites actually leads to greater
15  voting usage, right?
16    A   No.  No.  That's why it says measured in this
17  manner.  It's specifically talking about the results
18  from this model -- or these models.
19    Q   Okay.  Because if you were to conclude that,
20  that would be sort of a groundbreaking result, right?
21    A   Well, I was surprised that it was -- the
22  coefficient was negative.  But it's -- you know, again,
23  I ran this several different ways, and, again, there's
24  several different election cycles included here.  I ran
25  it weighted and unweighted.  I also ran it, you know,

Page 68

1  for municipalities that had, at least, a thousand
2  registrants or more.  And the relationship doesn't
3  change.  So . . .
4    Q   And based on your knowledge of political
5  science --
6    A   I'm not really making --
7    Q   Oh, sorry.
8    A   I'm not making a causal argument, per se.
9  This is more, I guess, a descriptive argument.
10    Q   Based on your knowledge of political-science
11  research, are there reasons that you would expect there
12  to be higher early-voting usage in larger cities?
13    A   I -- I'm unaware of a study that looks
14  specifically at early-voting turnout between size of
15  municipalities.  I -- I don't know the answer to that.
16    Q   Do you know whether lines on election day
17  tend to be longer in larger cities?
18    A   I do know that it varies.  It can be.
19  Sometimes it's not -- oh, you said on election day?
20    Q   Yes.
21    A   Well, lot of that would -- yeah, it just
22  varies.
23    Q   So you said you were surprised by the
24  negative coefficient here?
25    A   Well, that's not what I would have

Page 69

1   hypothesized, I guess, is what I'm saying.
2      Q   So did you then test that by adding controls
3   into your analysis?
4      A   No.  And again, this is -- this is the full
5   model, what's presented here.
6      Q   If you were doing a model in a
7   political-science paper, you would add controls for a
8   variety of different things, correct?
9      A   Yes; probably would need to.  We'd have to
10  find -- it may or may not be easy to do in this case.
11  These -- these are not counties, which, it's much
12  easier to get data on.  These are municipalities.  And
13  so I don't know how difficult it would be to collect
14  data at that level.  I'm not sure.
15     Q   All right.  Let me direct your attention to
16  page 18.  And it's the first paragraph on that page,
17  which is the last paragraph in this section we're
18  discussing.
19     A   Okay.
20     Q   Let me ask you to read through that, just to
21  yourself.
22     A   (Witness complies.)  Okay.
23     Q   What's the basis for your analysis in this
24  section?
25     A   Some of it's based on -- for instance, work

Page 70

1   I've done in Georgia related to early voting -- in the
2   administration of early voting, and talking to election
3   officials who administer early voting.  I mean, just in
4   general.  I'm not saying it's necessarily in Wisconsin.
5   Just talking to various election officials.
6      Q   All right.  And what, specifically, is based
7   on that?
8      A   Well, the opinions here in this paragraph.
9      Q   Is there any other basis for the opinions in
10  that paragraph?
11     A   No.
12     Q   All right.  Let me turn to the next section,
13  then.  And in the second paragraph in that section, you
14  discuss: . . . reasons for not allowing the
15  transmission of absentee ballots by fax or e-mail.
16     Do you see that?
17     A   Yes.
18     Q   And then, in this paragraph, at the end, you
19  have a footnote to several declarations; is that right?
20     A   Right.  I did receive some declarations from
21  local election officials in Wisconsin.
22     Q   And were those declarations the sole basis
23  for that paragraph?
24     A   Yes, primarily.  Yes.
25     Q   Did you -- well, first of all, those

Page 71

1   declarations were supplied to you by counsel, correct?
2      A   That's correct.
3      Q   Did you make any attempt to contact other
4   elections officials, about these issues?
5      A   Not outside of those.  No.
6      Q   And do you know how many ballots those
7   elections officials had faxed or e-mailed to voters?
8      A   I have no idea.
9      Q   Do you know if any of them ever faxed or
10  e-mailed a ballot to a voter?
11     A   No, I don't know the answer to that.
12     Q   Did any of those elections officials discuss
13  problems that voters who were overseas but were not
14  permanent overseas voters had in receiving absentee
15  ballots in a timely fashion?
16     A   Okay.  From what I remember -- and it's been
17  a while since I looked at some of these declarations.
18  And again, I -- I don't remember speaking to any of
19  these individual -- these officials, directly, like on
20  the phone -- just reading the declarations.
21     I don't know that the particular topic of
22  overseas or military absentee ballots came up in these
23  declarations, specifically.
24     Q   Yeah.  I'm sorry.  My question, I think,
25  wasn't clear.

Page 72

1      A   Okay.
2      Q   The group of people I'm talking about are
3   people who are overseas but are not permanent overseas
4   voters, because there are special rules for permanent
5   overseas --
6      A   Right.
7      Q   -- and military voters.
8      A   Right.
9      Q   So these are people who are subject to all
10  the regular rules, they just happen to be overseas.
11  Did any of these clerks talk about difficulty
12  transmitting ballots, to voters like that, in a timely
13  fashion?
14     A   I don't remember that.  It seemed to be
15  mostly discussion of what was going on locally within
16  their municipality.
17     Q   So if a voter from that municipality was
18  studying abroad, for example, for a semester, that
19  would be an example where it wouldn't relate to the
20  municipality, but the person was overseas, right?
21     A   Right.  Yeah.
22     Q   Okay.  Did any of them discuss any
23  circumstances like that?
24     A   Not that I remember.  No.
25     Q   All right.  And then, turning to the

Page 73

1   following page, you talk about absentee-ballot
2   rejection rates.
3       A   Right.
4       Q   Now, this analysis is focused on responding
5   to the plaintiff's arguments with respect to Act 227;
6   the one that impacts when clerks can send absentee
7   ballots back to voters, correct?
8       A   Yes.  So that -- yeah, I see that in
9   Footnote 27 on the previous page.
10      Q   All right.  And the basic argument is that --
11  well, you're analyzing the absentee-ballot rejection
12  rate as a way to get a whether more absentee ballots
13  are being rejected since that change, correct?
14      A   That's exactly right.  Yes.
15      Q   Now, there are a number of things that could
16  impact the absentee-ballot rejection rate, besides that
17  change, right?
18      A   True.
19      Q   So the fact that the absentee-ballot
20  rejection rate went down doesn't mean that there aren't
21  additional votes being rejected because of that change
22  in the law, right?
23      A   Well, the law is only going to affect certain
24  reasons why a ballot -- an absentee ballot might be
25  rejected.  As you said, there could be other reasons.

Page 74

1   This was as fine as I could get to -- fine a point as I
2   could get to with the data that the state had.
3       Q   And then, Figure 9 shows an absentee-ballot
4   rejection rate, in 2012, of 0.53 percent.  Do you see
5   that?
6       A   Right.
7       Q   Do you believe that that's an accurate
8   figure?
9       A   Well, unless I made a mathematical error, you
10  know, based on the data that I received from the state
11  reports, it should be correct.
12      Q   So that figure is about, what, one-eighteenth
13  of the rejection rate of 2008?
14      A   Right.  You know, I don't -- I can't
15  necessarily explain why the rejection rate was higher
16  in 2008.  But it's -- you know, again, unless I've made
17  a mathematical error, these rates have dropped off
18  substantially since then.
19      Q   But it would be remarkable for it to decline
20  by 18 times from 2008 to 2012?
21      A   Well, all I can say is this is the pattern
22  that was derived from the data I had.  That's all I
23  have to go on in terms of trying to evaluate this
24  issue.
25      Q   Did you do any assessment to see whether the

Page 75

1   data seemed to make sense?
2       A   Well, I looked at the data to make sure that,
3   you know, it appeared to be what it was that I needed
4   to measure -- what I was trying to measure in terms of
5   absentee ballots being rejected.  That seemed to be
6   correct.  Again, there weren't, from what I remember,
7   any finer categories than that.  For instance, reason
8   for rejection.  It was just a category for rejections
9   in all.
10      Q   Now, in the following subpart, you critique
11  Professor Burden's analysis for focusing on the number
12  of absentee ballots requested rather than the number
13  rejected; is that right?
14      A   Right.  He uses -- I mean, it's -- I guess
15  I'm arguing over what is the best measure to use.
16  Yeah.
17      Q   Now, one advantage of using the number of
18  absentee ballots requested is that it might help show
19  -- would account for voters who requested an absentee
20  ballot but didn't receive it in a timely fashion so
21  that they could return it, right?
22      A   Well, it would capture that.  Yeah.  I mean,
23  I think that's a slightly different question than what
24  I was looking at.
25      Q   Okay.  All right.  The next section talks

Page 76

1   about Registration and Residency Requirements.
2       A   Okay.
3       Q   In the third paragraph, you talk about proof
4   of residence documents and you write that:  Most
5   Wisconsinites are in possession of one or more of these
6   documents?
7       A   Right.
8       Q   Do you have any data regarding that issue?
9       A   Well, I mean, I guess we could reference data
10  later in this report, which doesn't directly impinge on
11  this, but it could be applied to that, and that is the
12  section on ID Possession Rates.
13          So, you know, one proof-of-residence document
14  would be, for instance, a driver's license, right?
15  Yes, Wisconsin driver's license or state ID.  So to the
16  extent to which most registered Wisconsinites have one
17  of those forms of identification, it would also
18  count -- it could be used towards a residency document.
19  So some of it's based on that.
20      Q   Okay.
21      A   I know my numbers are different from
22  Professor Mayer's.  But, at least, with -- at least, in
23  terms of my numbers, I would say, you know, 95 percent
24  is most.
25      Q   And do you know what percentage of people who

Page 77

1  have a Wisconsin driver's license have their current
2  address on their driver's license?
3      A   I do not know the answer to that.
4      Q   Because a driver's license can only be used
5  as proof of residence if it has the address at which a
6  voter is registering, correct?
7      A   That's true.  Yes.
8      Q   So for instance, a person who got his
9  driver's license when he was 16, and used his parents'
10 address, if he was now a college student, he couldn't
11 use that driver's license to register his college
12 address unless he updated the address on the driver's
13 license, right?
14     A   That is my understanding of the statute.
15 Yes.
16     Q   At the end of this page, the sentence that
17 starts on 21 and goes onto 22, you talk about examples
18 of documents that can act as both proof of residence
19 and identity?
20     A   Right.
21     Q   Okay.  And we just talked about driver's
22 license.  You then refer to a university identification
23 card?
24     A   Right.
25     Q   What's your understanding of whether a

Page 78

1  university ID card can be used as proof of residence?
2      A   Well, I must have -- it must have been listed
3  -- that particular type of identification must have
4  been listed in one of these proof-of-residence
5  documents.  So that would be my understanding of where
6  I'm getting that from.
7      Q   Okay.  And are you aware that it has to be
8  accompanied by additional documentation to be used as
9  proof of residence?
10     A   Yes.  Yes.
11     Q   And do you know how many universities in
12 Wisconsin have ID cards that can be used as proof of
13 identity for voting?
14     A   Well, this is one of the things I read about
15 recently -- actually, very recently -- some do and some
16 don't.  I don't know the exact numbers.  But, for
17 instance, I did read where the University of Wisconsin,
18 Madison, was producing a sort of a second set of IDs
19 that could count -- or that a student could use as
20 proof of identification.
21         It's got to have your picture, an expiration
22 date, and your signature, as a university ID, to count.
23 So . . . So I don't know the answer to how many do and
24 don't.  Although, there does seem to be a movement, on
25 the part of universities themselves, to ensure that

Page 79

1  these ID's that they're issuing can also be used to
2  vote -- at least, some of the universities.
3      Q   And do you have an understanding as to
4  whether that's the primary student ID or an additional
5  ID that students have to obtain?
6      A   Well, it's an additional -- it seemed to be
7  in addition to the ID they already had.
8      Q   And that's because the ID that they had can't
9  be used for voting, right?
10     A   Yeah, at least, at the University of
11 Wisconsin, Madison, that's true.  It didn't have some
12 of that required information.
13     Q   Okay.  And then, here you say:  Any
14 Wisconsinite who possesses proof of identity for the
15 purpose of voting, therefore, should already possess
16 proof of residency?
17     A   Yes.
18     Q   Okay.  So the reason we talked about the
19 driver's license, for example, that's not necessarily
20 the case, right?
21     A   Well, with that caveat, yes.  It's got to
22 have the correct residential address, for instance.
23     Q   All right.  Now, the next paragraph talks
24 about the documentary proof-of-residency requirement?
25     A   Right.

Page 80

1      Q   About halfway through, you say that: . . .
2  Act 23 establishes a fair and consistent standard
3  across all electors?
4      A   Right.
5      Q   I ask you about the use of the word fair.  Is
6  that just your personal judgment?
7      A   Well, I guess, at this point it is, yes.
8  Yeah.
9      Q   Okay.
10     A   I think it's consistent, too.
11     Q   I mean, in none of your academic works you
12 would describe a law as being fair, for example, right?
13     A   I typically don't use normative terms, in
14 academic work, myself.
15     Q   And you say --
16     A   I'm not going to say I never have.  But I
17 typically don't.
18     Q   The next sentence says:  The fact that all
19 registrants must provide documentary evidence also
20 establishes a higher standard of proof?
21     A   Right.
22     Q   What do you mean by that?
23     A   Well, I guess I'm referring there to the fact
24 that corroboration is no longer available.  So everyone
25 has to provide some kind of document or identification

1  that establishes residency.
2      Q   And why do you believe that that's a higher
3  standard than the corroboration was?
4      A   Well, I mean, it's -- it's -- I guess it's
5  higher because it's -- it's someone's word -- or a set
6  of corroborator's words versus actual physical
7  evidence.
8      Q   Okay.  So it's just sort of a judgment call
9  about which is more --
10     A   Yes.  Yes.
11     Q   And in the next sentence you say: . . . given
12  a wide range of exceptional documents which could be
13  used to establish residency, the documentary
14  proof-of-residence requirement should not create a
15  burden to electors in Wisconsin?
16     A   Right.
17     Q   And that's just based on the list of
18  acceptable documents, right?
19     A   That is based on the size and the number and
20  type -- the different types of documents someone could
21  provide to meet this requirement.  Yes.
22     Q   Okay.  Do you know how many voters use
23  corroboration prior to its elimination?
24     A   No, I do not.
25     Q   Do you know why documentary proof of

1  residence was only required for late registrations
2  prior to changing the law?
3      A   Well, I think the assumption was -- again,
4  I'd have to go back and look at some of this stuff.  I
5  guess the assumption was that if someone is registered,
6  that they've not moved since then, so the residency had
7  been established.  And so if someone was registering
8  closer to the date of the election, they would need to
9  provide some evidence of where they're living
10  currently.  I think that's what it was.
11     Q   Okay.  Have you assessed the impact that the
12  documentary proof-of-residence requirement has on
13  voter-registration drives?
14     A   No.  No.
15     Q   What's your understanding of how a voter
16  would register in the voter-registration drive given
17  the documentary proof-of-residence requirement?
18     A   I'm not sure.  I'm not sure how that -- how
19  that would work.  I mean, I'm assuming they'd have to
20  provide it to the -- to the registration deputy with --
21  you know, that was taking part in the registration
22  drive.
23     Q   I mean, if there were no registration deputy,
24  they would have to actually submit a physical copy of
25  their proof of identity?

1      A   I think that's correct.  Yes.
2      Q   That can potentially be burdensome for voters
3  trying to register that way, right?
4          MR. KAWSKI:  Object to form.
5  BY THE WITNESS:  (Resuming)
6      A   Well, it would be an extra step they'd have
7  to go through.
8      Q   All right.  And then you, in the next
9  paragraph, turn to the residency requirement.
10     A   Right.
11     Q   You say that:  All states have some type of
12  residency requirement.
13         By that, do you mean that in every state you
14  have to be a resident in order to vote?
15     A   Yes, I think I'm just talking very
16  technically there that that should be the case.  I
17  mean, you'd have to be a resident somewhere.  Now, not
18  all states -- as I pointed out, not all states -- at
19  least, from what I was able to uncover -- have a
20  specified number of days that you have to have
21  established residency before the election.  Only a
22  subset of states have that.
23     Q   Okay.  So half the states don't require you
24  to be a resident for any period of time; is that right?
25     A   Well, there's no specific day requirement, I

1  guess, is this the way to put it, from what -- from my
2  understanding of the research I did.
3      Q   Okay.
4      A   In 28, there are -- or -- maybe it's not 28.
5      Q   I think you say 25 and D.C.; is that right?
6      A   Okay.  Yes.
7      Q   All right.  And Figure 11 contains statistics
8  for those states, right?
9      A   Right.
10     Q   So just to be clear, this figure is including
11  data only for the 25 states and D.C. that do require a
12  period of residency prior to voting, right?
13     A   Yes, that's true.  Yes.
14     Q   So the number for all the other states would
15  be zero days, correct?
16     A   I don't know that it's technically zero.
17  It's just that there was no -- in their statute, there
18  didn't appear to be a requirement that specified you
19  had to establish residency so many days out from the
20  election.
21     Q   So if that's true, you could become a
22  resident the same day you vote in those states, right?
23     A   Well, I guess, theoretically, you'd have to
24  be a resident before you could vote.
25     Q   But it could be the same day even, right?

Page 85

1    A   Yes.  Although, then, I guess you might have
2  to look, in fairness, at, say, the registration
3  deadlines.  For instance -- now, this is from memory,
4  so it might be wrong.  I don't think Georgia has a
5  specific number of days for a residency requirement,
6  but you have to be registered 30 days out from the
7  election.  So you couldn't just -- in some ways, it's
8  not just zero, you know, it would be, at least, 30 days
9  out.
10    Q   Okay.
11    A   But yes, these -- I mean, you're correct.
12  These are the states that, in their statutes, have a
13  number of days listed for residency -- for the
14  residency requirement.
15    Q   Right.  And so if you had included zero for
16  all the states that don't have any days, these numbers
17  would all be cut in half, basically, right?
18    A   Well, they would go down.  Certainly.
19    Q   Okay.  Now, in discussing the residency
20  requirement in Wisconsin, you're comparing it to other
21  states, right?
22    A   Well, certainly in Figure 11, I am, if that's
23  what you're getting at.
24    Q   And the text that relates to it, I guess?
25    A   Yes.

Page 86

1    Q   Are you offering an opinion as to whether
2  there are any state interests served by Wisconsin's
3  increase in its residency requirement?
4    A   I don't believe I'm -- I don't have an
5  opinion here specifically on that question.
6    Q   All right.  Are you planning to offer one in
7  this case?
8    A   Not necessarily.  I'm planning on sticking
9  with my report, which is usually a good idea.
10    Q   Fair enough.  Near the end of -- well, I
11  guess, after Figure 11, there is language that says
12  that: . . . in your opinion, the increase to 28 days
13  should not create an unfair burden on any Wisconsin
14  elector.
15      Do you see that?
16    A   Right.
17    Q   And the basis for that is the comparison
18  between Wisconsin's length of residency that's
19  required, and other states; is that right?
20    A   Yes.  That, and going back to the section
21  before that about the wide range of different types of
22  documentary evidence that could be brought to bear on
23  that.  The list that someone could use -- the list of
24  documents that someone could use to satisfy that
25  requirement.

Page 87

1    Q   Okay.  That doesn't have to be a residency
2  period, though, does it?
3    A   Not with the length of residency.  No.
4    Q   Okay.
5    A   But I think this is sort of a summation
6  statement here -- or paragraph.
7    Q   All right.  And you qualified the word burden
8  with the word unfair here; is that right?
9    A   Right.  That's true.
10    Q   So do you agree that there is a burden
11  associated with increasing the residency requirement to
12  28 days?
13      MR. KAWSKI:  Object to form.
14  BY THE WITNESS:  (Resuming)
15    A   I don't know that I would use -- I don't know
16  that I think it's a burden.  It's a necessary step
17  that, you know, voters have to satisfy.  That's true.
18  And to do that, someone may have to bring a document or
19  a type of identification to accomplish that.  That's
20  true.
21    Q   All right.  Let's turn to your matching.
22    A   Okay.
23    Q   On pages 26 and 27, you talk about data from
24  some other cases?
25    A   Right.

Page 88

1    Q   I guess, in particular, North Carolina.  And
2  you draw inferences from that data for Wisconsin; is
3  that right?
4    A   Texas, I think, and North Carolina, both.
5  Yes.
6    Q   Okay.
7    A   Yes.  I'm looking at in some other states
8  where some matching had been done -- database
9  matching -- how many registrants in these other states
10  had another form of ID, you know, beyond simply a
11  driver's license or state ID card -- like a passport or
12  a military ID.  So, yes.
13    Q   And are you aware of any reasons to think
14  that the number of people in North Carolina who have
15  those additional forms of ID may be different from the
16  number of people in Wisconsin who have those forms of
17  ID?
18    A   Well, I'm not saying that their rate would be
19  exactly the same.  I don't know that.  No one would
20  know that until we actually ran the data.
21    I'm just saying -- I'm just making the point
22  that based off of what we see in some of these other
23  states, that certainly there is some subset of
24  Wisconsin registrants who don't have a state driver's
25  license or state ID card, who have a passport or who

Page 89

1  have a military ID.  Now, what -- what's the exact
2  number, I don't know.
3      Q    Do you know how the military population in
4  Wisconsin compares to North Carolina's military
5  population?
6      A    Well, it's not nearly as pronounced; I can
7  tell you that.  I think, North Carolina, in terms of
8  just literal numbers, is about third in the country in
9  terms of military personnel in the state, after
10  California and Texas, I believe -- if I'm remembering
11  all that right.
12      Q    And do you know how those states compare in
13  passport-possession rates?
14      A    No, I don't -- I don't know the answer to
15  that.
16      Q    And what about the rates at which citizens
17  are veterans?
18      A    Well, I would just say, as a general rule,
19  that a lot of times you see higher veteran populations
20  around military bases.  So to the extent to which --
21  for instance, North Carolina has some very major
22  military installations like Fort Bragg, it wouldn't be
23  a surprise that the veteran population would be higher
24  in those areas.
25      Q    So given that, wouldn't you expect there to

Page 90

1  be many more people in North Carolina who had some form
2  of qualifying ID other than a driver's license, than
3  you'd find in Wisconsin?
4      MR. KAWSKI:  Object to form.
5  BY THE WITNESS:  (Resuming)
6      A    Well, we've gone over some things about
7  military IDs.  And that may be the case, specifically
8  with North Carolina.  I don't know about passports.
9      Q    All right.  Now, at the end of this
10  subsection -- I'm on page 27 now just before the
11  underlined part -- you talk about having a no-match
12  rate of 4.5 percent.  And then, you say that:  Based on
13  these examples from other states, the no-match rate
14  should fall below 3 percent in Wisconsin.
15      Do you see that?
16      A    That's a guess.  Yes.  Yes.  I mean, that's
17  based on, again, the fact that some subset of Wisconsin
18  registrants are going to have some other kind of
19  qualifying identification, but not a state ID or
20  driver's license.
21      Now, exactly -- I mean, that's why I don't
22  have an exact figure here.  I mean, no one knows unless
23  we ran the Wisconsin voter-registration database
24  against a lot of federal databases, et cetera, and some
25  other databases.

Page 91

1      Q    All right.  Let me ask you about Table 5 on
2  page 28.
3      A    Okay.
4      Q    And this summarizes the different methods you
5  used for matching between the DMV and the
6  voter-registration databases in Wisconsin, right?
7      A    Right.
8      Q    Let me ask you about Match Strings 3, 4,
9  and 5.
10      A    Okay.
11      Q    So 3 found all the people who matched, in
12  those two databases, based on last name, first name,
13  and date of birth, right?
14      A    Right.
15      Q    And then, 4 uses those same three things plus
16  ZIP Code, right?
17      A    Right.
18      Q    And then, 5 uses the same three things as
19  Number 3 plus middle initial, right?
20      A    Yes, that's right.
21      Q    So aren't 4 and 5 just -- won't the universe
22  of matches you get there just be a subset of what you
23  get in 3?
24      A    Yes.  Yes.
25      Q    So what was --

Page 92

1      A    I mean, I probably -- looking back on this, I
2  don't know that I necessarily needed to use 3.
3      Q    I'm sorry.  What do you mean you didn't need
4  to use 3?
5      A    Well, I mean, there are different -- you
6  know, there are different ways to create these match
7  strings.  You're right that 4 and 5 are really subsets
8  of 3.  So, you know, they could have been used in
9  isolation or with 3 or just 3 alone.  I mean, there are
10  just various ways, combinations you can use to do
11  those.
12      Q    So what was the purpose of doing 4 and 5?
13      A    Well, I will say that -- so the way I handled
14  things, just generally, is that if a record matched on
15  any one of these match strings, I considered it to be a
16  match.  Now, I don't have the exact statistics in front
17  of me, but most of these records matched on multiple
18  match strings, though, just -- just as sort of a point
19  of reference.
20      So typically, the way database matches evolve
21  specifically in some of these legal cases is that the
22  best way to get at -- to try to determine whether
23  there's a record match is to use multiple match
24  strings.
25      Q    But usually those multiple strings are

Page 93

1    subsets of each other?
2        A   True.  I mean, again, I could have just gone
3    1, 2, 3, really.
4        Q   Now, let me go back to 3.  There are likely
5    thousands of cases in which individuals share a last
6    name, first name, and date of birth, in Wisconsin,
7    right?
8            MR. KAWSKI:  Object to form.
9    BY THE WITNESS:  (Resuming)
10       A   I mean, it's going to happen just from the
11   probability standpoint.  Yes.
12       Q   Okay.  So that will result in false matches
13   being produced, correct?
14       A   There are going to be some false positives.
15   Yes.
16       Q   And the same thing would be true for Match
17   String 2, correct?
18       A   I'm sure it's just going to happen in terms
19   of probability.  Yes.
20       Q   Okay.
21       A   1; it shouldn't happen.
22       Q   And that's because it's a unique number,
23   right?
24       A   Well, it's unique at a given point in time,
25   as I point out.  It's not frozen in time, necessarily

Page 94

1    though, because it can actually change in Wisconsin.
2    And oftentimes changes, for instance, if someone gets
3    married -- if a woman gets married and changes her last
4    name, it's going to change her state ID number.
5        Q   Okay.  So to the extent that there are false
6    matches, your results would undercount the number of
7    people without IDs, correct?
8        A   Right.
9        Q   All right.  Now, when you --
10       A   My initial match queries are only slightly
11   better than Professor Mayer's.  I mean, I can't
12   remember exactly what he got, but Table 7 would be the
13   initial match queries.
14       Q   When you say slightly better, you mean that
15   you got more matches; is that right, you got slightly
16   more --
17       A   Right.  I was able -- I was able to achieve a
18   slightly higher match rate.  So the no-match rate was
19   slightly less than his.
20       Q   All right.  And one of the reasons for that
21   difference may have been that you had more false
22   matches, correct?
23       A   It's possible.
24       Q   Now, you conducted a second step of the
25   analysis here in addition to the linking of the

Page 95

1    databases, right?
2        A   Right.  Right.
3        Q   Can you sort of walk me through how that
4    process --
5        A   Well, I just knew -- I mean, this isn't the
6    first time I had attempted to do this.  I mean, it was
7    the first time I had attempted to do it for this case.
8    But I had done it in previous cases -- the database
9    matching, that is.  And so I knew about the issues
10   associated with trying to match registrants with their
11   state ID number.  And the issue being that it can
12   change.
13           In some states, it's permanent; when you get
14   a driver's license number, it just never changes --
15   whether your name changes, your address, it never
16   changes.  But in Wisconsin, it can change.  And so
17   after I got through with my initial matching query, I
18   had a number of records -- a certain subset of records
19   that didn't match but had a state ID number in that
20   data field.
21           And so I requested, and got permission to
22   send that list to the Department of Transportation to
23   see if they could use that state ID number to figure
24   out who those people were, and whether they had a valid
25   and current form of Act 23 ID -- at least, a driver's

Page 96

1    license or state ID card.
2        Q   Okay.
3        A   So then, once I got -- they did that.  They
4    did that part of the matching because they had to go
5    into their databases to do that.
6        Q   So first of all, who did that?  Who
7    specifically?
8        A   Well, I can't tell you who specifically,
9    specifically did it.  But I had a point of contact with
10   the DMV office.  I think her name was -- again, it's
11   been a little while -- Kristina Boardman.  She should
12   be cited somewhere.  And so I was communicating with
13   this individual.
14       Q   Okay.  So you sent her a list of the 242,000
15   people you had got matched --
16       A   No.  No.  I sent a subset of the 242,000 that
17   did not match but had driver's license number or state
18   ID number associated with the record.
19       Q   Okay.  That's about --
20       A   So it was about 119,000, it looks like.
21       Q   And that's the data reflected in Table 8?
22       A   Yes.
23       Q   So you sent Ms. Boardman those 119,000
24   records?
25       A   Right.

Page 97

1    Q   And then, what did she send you back?
2    A   In the end, I just got a spreadsheet that
3  basically had a field in it that indicated whether that
4  record -- which is a person -- had the qualifying act
5  of -- qualifying form of Act 23 ID -- or there was
6  another -- so there were basically three -- there were
7  three different values in the data field they added for
8  me, which is, they were unable to match them.  So
9  again, look at Table 8 here, 6,604 records they were
10  just unable to match.  They matched 112,817, and of
11  those, 89,077 had a current driver's license or state
12  ID card.
13    Q   Okay.  And so you don't know the name of the
14  person who conducted that matching for DMV, right?
15    A   No; because I wasn't -- I mean, I guess it
16  was one of their database analysts.
17    Q   Okay.  But that's just a guess?
18    A   Someone did it.  I don't know who.  Again, I
19  had a point of contact with her, and that's who I was
20  talking to.
21    Q   Do you know anything about the qualifications
22  of the person who did that matching?
23    A   Well, I don't know who did it.
24    Q   Do you how it was done by DMV?
25    A   Well, with their databases -- and again,

Page 98

1  we're talking about many, many tables, at this point,
2  not just one -- they could go in -- I know how it was
3  generally done, I can't say I know specifically, like
4  with code, how it was done.  But generally, what
5  they're doing is they're saying, okay, here is a
6  record, and it's got a state ID number.  And they can
7  go into another database table and look up that state
8  ID number and see if there's a newer state ID number
9  associated with the record, and if so, does that record
10  have, say, a current driver's license attached to it.
11    And so that's what they're doing.  They're
12  cross-referencing a number of tables in their own
13  databases.
14    Q   I just want to be clear I understand.  So you
15  took the ID number included in the voter-registration
16  file for individual, and essentially, asked the DMV to
17  see if that ID number was in their records somewhere --
18    A   Well, of --
19    Q   -- and if it was, what information they had
20  for that person.
21    A   Of -- of the records that I wasn't able to
22  match, that had a state ID number associated with the
23  records -- so not all of them -- but those -- I sent
24  that subset to the DMV.  I mean -- and there was more
25  information than just the state ID number.  I didn't

Page 99

1  include every field, but name, date of birth, if they
2  had a, you know, partial Social Security number,
3  et cetera.
4    Q   Okay.  And why didn't you just get that data
5  yourself, and analyze it?
6    A   Well, I don't think they were going to give
7  me access to their databases, basically.  I mean, I
8  don't think this analysis is possible using just one
9  table from a single database.  It probably required
10  multiple tables.
11    Q   And the DMV wouldn't give you those tables?
12    A   No.
13    Q   Did --
14    A   I mean, I don't know that I asked
15  specifically.  I asked -- I do remember asking them if
16  they could search for the state ID numbers and tell me
17  anything about these records.
18    Q   Okay.  And so you basically just took what
19  the DMV gave you as 100 percent accurate without
20  analyzing it?
21    A   Well, I don't have anything to analyze it
22  against, I guess.  So, yes, I'm taking it as -- I'm
23  taking what they sent me as being accurate.  That's
24  true.
25    Q   Now, you said that there are circumstances in

Page 100

1  which a person gets a new DMV ID --
2    A   Uh-huh (affirmative).
3    Q   -- number; is that right?
4    A   Uh-huh (affirmative).
5    Q   And I think you said that's if they change
6  their date of birth or their name?
7    A   Well, I mean, obviously, someone's date of
8  birth really doesn't change, right.  But if they made a
9  correction to their date of birth; if they had a middle
10  initial, and they added a middle name or vice versa; or
11  they changed their last name.
12    Because in Wisconsin, it's based off -- the
13  creation of state ID numbers is based off of the
14  algorithm based basically off of name and date of birth
15  and sex.
16    Q   Okay.
17    A   And so if any of that changes, that would
18  change your state ID number.  They generate a new state
19  ID number.
20    Q   Okay.  So that means that people who don't
21  have their -- whose state ID number is no longer -- or
22  has changed, they've changed either their -- or has
23  the official record of their sex, their date of birth, or
24  their name?
25    A   From what I understand, yes.

Page 101

1    Q   Okay.  So most of those, presumably, are name
2 changes, correct?
3    A   Yes.  So overwhelmingly, yeah.
4    Q   So that means that the name that the person
5 was using when they registered to vote has been
6 changed, right?
7    A   Yes.  Yeah.
8    Q   If, say, a woman changes her name when she
9 gets married, and she registered to vote as Susan
10 Smith, and now her name is Susan Johnson, and if she
11 shows up with an ID that says Susan Johnson on it, is
12 she permitted to vote under Susan Smith's registration?
13        MR. KAWSKI:  Object to form.
14 BY THE WITNESS:  (Resuming)
15    A   I don't -- I don't know what the
16 administrative rule is on that -- is on that exactly.
17    Q   Because if she's not, then she doesn't really
18 have a driver's license that can be used for voting,
19 right?
20        MR. KAWSKI:  Object to form.
21 BY THE WITNESS:  (Resuming)
22    A   Well, not unless -- well, I'll say this, that
23 may or may not be true.  I mean, eventually, someone is
24 going to probably need to alter their registration
25 record, or it will get altered.  There's a disconnect

Page 102

1 between these databases is the problem.  I mean, one of
2 them is being managed by one government entity, and
3 another by another.  And so it can take a while for
4 someone that goes to the DMV and gets a new driver's
5 license because they changed their name, for that
6 information -- I'm assuming, is eventually going to be
7 transmitted back to the voter registrar, and the
8 registration records should be updated.  But there's a
9 -- there's a lag there, a delay between these
10 processes.
11    Q   All right.  So you're assuming that everybody
12 who is matched in this DMV system has an ID that can be
13 used for voting, right?
14    A   Yes.
15    Q   But it's possible --
16    A   Well, I mean, of those they were able to
17 match, not -- again, Table 8 shows not everyone does --
18 even of that subset, not everyone had a current
19 driver's license or state ID card.
20    Q   But if most of those are name changes, it's
21 possible that most of those people have an ID that has
22 a name that's different from the ID on their voter
23 registration, right?
24    A   Well, that's possible.  I don't know that I'd
25 use the word most.  I just don't know.  Because

Page 103

1 eventually their registration record should get
2 updated, too.
3    Q   All right.  Now, in the paragraph under
4 Table 8, you talk about individuals who are not in
5 possession of qualifying identification but who were
6 prior holders of such identification?
7    A   Right.
8    Q   And you say that: . . . the process for them
9 to obtain a current no-cost state ID is straight
10 forward.
11    A   Right.
12    Q   And the reason you say that is because you
13 can use an expired ID to obtain a valid no-cost ID,
14 right?
15    A   That's my understanding.  Yes.
16    Q   And you can use the no-cost ID to vote,
17 right?
18    A   That's true.  Yes.
19    Q   But you can't use that expired ID to vote?
20    A   If it's -- you can as long as it's not -- not
21 been expired past the previous general election.
22    Q   But if it's been expired for more than two
23 years, you can't use it to vote, right?
24    A   That's correct.  That's correct.
25    Q   Are you aware of any state interest in

Page 104

1 requiring a voter with an ID that's been expired for
2 more than two years to go get a free ID so that they
3 can use that free ID to vote rather than just directly
4 using the ID that's been expired for more than two
5 years, in the first place?
6        MR. KAWSKI:  Object to form.
7 BY THE WITNESS:  (Resuming)
8    A   All I can say is that that's what Wisconsin
9 has determined is going to happen.  In some states like
10 in Georgia, you can -- from what I understand, you can
11 use an expired driver's license that may have been
12 expired for more than two years.
13    Q   But do you know of any state interest that's
14 served --
15        MR. KAWSKI:  Object --
16 BY MR. KAUL:  (Resuming)
17    Q   -- by Wisconsin doing that?
18        MR. KAWSKI:  Object to the form.
19 BY THE WITNESS:  (Resuming)
20    A   By -- by having it -- I mean, basically,
21 there's an expiration date, period, right, on most IDs
22 in Wisconsin that -- you know, you can't use a form of
23 ID that's more than two years' expired, right, since
24 the last general election.
25        That was a decision made that they were going

Page 105

1    to be -- there's going to be a cutoff on expiration
2    dates, and it was two years.
3       Q   Do you know how many DMV locations there are
4    in Wisconsin?
5       A   I can't tell you off the top of my head.
6       Q   Do you know how many counties there are, in
7    Wisconsin, with no DMVs?
8       A   I know there are some.  I can't tell you the
9    number.
10      Q   Do you know how many DMVs in Wisconsin are
11   accessible by public transit?
12      A   No, I don't know the answer to that.
13      Q   Do you know what the average wait time for
14   service is at a DMV in Wisconsin?
15      A   No.
16      Q   I assume you've never been to a DMV in
17   Wisconsin?
18      A   No, I haven't.  I've had to go to the DMV in
19   Georgia, though.  So . . .
20      Q   Would it be fair to say that a trip to the
21   DMV is not typically regarded as a cost-free
22   experience?
23      A   I think I could say that most citizens, in
24   general, do not enjoy going to the DMV in their state.
25   That's probably -- probably pretty close to the truth.

Page 106

1       Q   All right.  Let's talk a little bit about the
2    Free ID Program?
3       A   Can we take a bathroom break, or -- is this
4    okay?
5       Q   Yeah, it's a good time.
6          MR. KAUL:  (To court reporter)  Let's go off
7    the record.
8          (Whereupon, a break was taken from 11:37 a.m.
9    to 11:44 a.m.)
10   BY MR. KAUL:  (Resuming)
11      Q   Let me direct your attention to page 31 of
12   your report.
13      A   Okay.
14      Q   There's a section regarding the Free ID
15   Program.
16      A   Right.
17      Q   You write that approximately 413,000 no-cost
18   state ID cards were issued from 2011 through 2015.  Do
19   you see that?
20      A   Yes.
21      Q   Now, do you know how many of those cards were
22   issued for voting purposes specifically?
23      A   Well, when I say the no-cost state ID cards,
24   I'm assuming that they were all issued for that
25   purpose.  I know you had to fill out a form, in

Page 107

1    Wisconsin, at the DMV, that specifies you need an ID
2    for the purpose of voting, to get one for free.
3       Q   Okay.  And you wrote a footnote which
4    indicates that that 413,000 number: . . . includes both
5    original issuances as well as renewals and duplicates.
6          Do you see that?
7       A   Yes.  Yes.
8       Q   Do you know how many of those 413,000 were
9    renewals or duplicates?
10      A   I was not able to obtain data to break it
11   down.  Now, a little bit later I got another number I'm
12   able to break down.  But I asked for this data and they
13   didn't have them.
14         MR. KAWSKI:  (To court reporter)  Go off the
15   record for a second.
16         (Whereupon, a break was taken from 11:46 a.m.
17   to 11:47 a.m.)
18   BY MR. KAUL:  (Resuming)
19      Q   Okay.  So you don't know how many of the
20   413,000 are renewals or duplicates, right?
21      A   No.  I asked about that.  I asked to get more
22   finer gradation of data, and they didn't have it -- the
23   DMV, that is.
24      Q   A no-cost state ID had an eight-year
25   expiration period, right?

Page 108

1       A   I believe so.  Yes.
2       Q   So why would a voter have to get a renewal
3    for an ID that wasn't required until 2011?
4       A   I think that's what that word renewal is
5    referring to; someone that may have had a state ID that
6    they paid for previously, they came in to get a
7    renewal, and they got a free form of ID.
8       Q   All right.  And on the next page, you talk
9    about the percentage of which the free ID program is
10   used by different racial groups in Wisconsin; is that
11   right?
12      A   Right; just a racial or ethnic breakdown.
13   Yes.
14      Q   And African-Americans are almost seven times
15   more likely than their share of the population to use
16   the Free ID Program, right?
17      A   That's correct.  Yes.
18      Q   And Hispanics are about two-and-a-half times
19   more likely than their share of the citizen voting-age
20   population to use the Free ID Program, right?
21      A   Yeah, about two-and-a-half times.  Maybe a
22   little less than that.  Yeah.
23      Q   And so this indicates that African-Americans
24   and Hispanics in Wisconsin are far more likely than
25   Whites to need to obtain a free ID in order to vote,

Page 109

1  correct?
2      A   Well, yes -- I mean, in comparison to the
3  population numbers, Blacks and Hispanics both were more
4  likely to make use of the Free ID Program.  That is
5  true.
6      Q   But that means that they're more likely to
7  need to get an ID in order to vote, right?
8      A   Yes.  They must need some qualifying -- they
9  must need to obtain some qualifying form of ID.
10     Q   So that supports Dr. Mayer's conclusion that
11  there is disparate possession rates of ID by race in
12  Wisconsin, right?
13     A   Well, I did not perform that type of
14  analysis.  I'll say that.  Might there be a possession
15  rate that varies between Blacks, Whites, and Hispanics
16  in Wisconsin?  Yes.  I've noticed that pattern
17  certainly in other states, including Georgia, where, at
18  least, in terms of possession rates, minorities seem to
19  be less likely to be in possession than Whites.
20         But again, to the extent to which that may be
21  the case, it's also true that Blacks and Hispanics in
22  Wisconsin are making more use of the mitigation in the
23  law that provides for a free ID.
24         So all that said, on the other end of things,
25  is there still a disparity in possession rates and at

Page 110

1  what level?  I don't know the answer to that.
2      Q   In the next section, you talked about
3  Underlying Documentation?
4      A   Right.
5      Q   And you referred to the process put in place
6  that permits voters to attempt to obtain an ID pursuant
7  to a Wisconsin State Supreme Court opinion; is that
8  right?
9      A   Yes, that's true.
10     Q   You say that:  In order to obtain an original
11  ID . . . a voter must provide proof of name, date of
12  birth, and proof of citizenship?
13     A   Right.
14     Q   Do you know why voters have to provide proof
15  of citizenship?
16     A   I'm not certain why that was written into the
17  law.
18     Q   To obtain a driver's license in Wisconsin,
19  you don't need to be a citizen, right?
20     A   I'm sure that's the case.  I mean, most
21  states have provisions for residents who have a green
22  card, for instance, to get a driver's license.
23     Q   All right.  Now, on the next page, the first
24  full paragraph, you talk about some statistics you
25  obtained from the Wisconsin Department of

Page 111

1  Transportation?
2      A   Right.
3      Q   Now, you're just relaying the statistics they
4  reported to you, right, you didn't look behind those
5  statistics to determine whether they were accurate, did
6  you?
7      A   Well, no, I didn't.  I had no way to delve
8  into -- delve under the surface for these particular
9  statistics.
10     Q   You didn't look at the individual petitions,
11  for example?
12     A   No, no, I didn't do that.  No.
13     Q   Have you done that at any point?
14     A   No.
15     Q   Did you receive any data about the average
16  length of the adjudications that you are describing in
17  this paragraph, in terms of how long the processes is
18  from application to receipt of a free ID?
19     A   I don't remember receiving anything on that
20  specifically.
21     Q   Did you receive any data from DMV about its
22  error rate in resolving those petitions?
23     A   What do you mean by error rate in that
24  context?
25     Q   Did you receive any kind of data about DMV's

Page 112

1  error rates in resolving the petitions, in any context?
2      A   Are you saying how many petitions they were
3  able to resolve?  I mean --
4      Q   No.  I'll --
5      A   I guess I don't understand what you mean by
6  error rate in relation to this.
7      Q   I'll represent to you that it's my
8  understanding that DMV keeps data about its error rate,
9  in resolving petitions.  Did you see any data like
10  that?
11     A   This doesn't sound -- it doesn't sound
12  familiar at all.
13     Q   Okay.  Now, you have a footnote --
14  Footnote 66 -- that talks about cases that were
15  canceled by the customer, and then, cases that were
16  suspended?
17     A   Right.
18     Q   And then, cases that were denied.  Do you see
19  that?
20     A   Right.
21     Q   Did you obtain any information about why the
22  cases that were canceled by the customer were canceled?
23     A   No.  No.
24     Q   And in the case of the suspension, did you
25  receive any information about how long people have been

Page 113

1 engaged in the process of attempting to obtain an ID
2 before their cases were suspended?
3    A   No.
4    Q   And then, you said that 15 cases were denied,
5 according to this data you received; is that right?
6    A   Yes, that's correct.
7    Q   Now, all the people described in that
8 footnote, they're not able to vote in Wisconsin unless
9 they found some other way to obtain an ID, correct?
10      MR. KAWSKI:  Object to form.
11 BY THE WITNESS:  (Resuming)
12   A   Yeah -- I mean, yes, they'd have to have some
13 kind of qualifying form of ID unless they -- I mean, I
14 can't comment on those people specifically.  But if the
15 process ended there, then it would appear that they
16 don't.
17   Q   And that's not --
18   A   Unless they went out and did something in the
19 interim.
20   Q   Right.  And that's not like a one-election
21 thing, those people are permanently disenfranchised,
22 correct?
23      MR. KAWSKI:  Object to form.
24 BY THE WITNESS:  (Resuming)
25   A   Well, I don't know the answer to that.  I

Page 114

1 mean, especially these that were suspended after the
2 customer failed to respond.  I guess it's possible they
3 could, at some point -- in those cases, at least, could
4 reinitiate the process and complete it.  I don't have
5 -- again, I don't have information that underlies these
6 numbers.  You know, I don't know why people canceled,
7 for instance.  Did they get another form of ID?  I
8 don't know.
9    Q   Okay.  I'm going to direct you to the last
10 paragraph on page 33.
11   A   Okay.
12   Q   You refer to Professor Mayer finding a racial
13 gap in ID possession.  And then you say you dispute
14 this is necessarily the case?
15   A   Right.
16   Q   Was that based on any data?
17   A   Well, I didn't -- again, I will state I did
18 not produce my own racial estimates.
19   Q   So what's your basis for disputing that?
20   A   Well, part of it is, again, the fact -- well,
21 there's a couple of things.  Part of it is the fact
22 that I don't think that his matching analysis was
23 complete.  We talked about how there's a subset of
24 people who apparently have an ID, who were very
25 difficult to match using the data that we received,

Page 115

1 without some additional data added onto that.  So I
2 don't know that his no-match rate, if you will, is
3 accurate.  And if you're starting at that point -- and
4 then, in Wisconsin, we don't know race of registrants.
5 So you're making some estimate off of that number.  So
6 if that number is wrong, then you're sort of
7 compounding to the potential that your estimate may be
8 off in the end.
9       So again, you know, I've calculated these
10 gaps myself in other states.  I'm not -- I wouldn't be
11 surprised if one existed -- a gap in ID possession by
12 race.  I just don't know that -- I guess what I'm
13 saying is, I don't know that he's really proven that
14 beyond a doubt, or certainly the level at which that
15 might be the case.
16   Q   You mentioned that the voter-registration
17 data doesn't have race data.  But the DMV files do have
18 self-identified race data, correct?
19   A   That is true.  That is true.
20   Q   So one of the things you could have done is
21 looked at the additional matches you found that
22 Professor Mayer didn't find, and observed what their
23 race was in the DMV file, right?
24   A   I could have done that.  Yes.
25   Q   But you did not do that, right?

Page 116

1    A   No, I did not do that.
2    Q   Let me direct your attention to the next
3 page, and specifically Table 12.
4    A   Okay.
5    Q   And you report some data about the Two-Party
6 Breakdown by Race in Wisconsin?
7    A   Right.
8    Q   Do you know what the margin of error was for
9 the data for Blacks and Hispanics?
10   A   Well, I could -- I could find out.  I don't
11 know what it is, just sitting here.
12   Q   Do you think that it's plausible that
13 24.5 percent of Black voters in Wisconsin were
14 self-identified Republicans in 2014?
15   A   I will say I went back and checked my
16 calculations -- and, you know, I usually keep printouts
17 of things -- and, in 2014, using this survey, these
18 were the numbers I derived.
19   Q   As part of your work, do you use exit polls
20 to analyze voting patterns by race?
21   A   I've used exit polls.  Yes.
22      (Whereupon, Plaintiff's Exhibit No. 4 was
23   marked for identification.)
24 BY MR. KAUL:  (Resuming)
25   Q   All right.  You've just been handed

Page 117

1    Exhibit 4. Does this appear, to you, to be a printout
2    of exit polls from the 2012 presidential election in
3    Wisconsin?
4        A    Yes, it is.
5        Q    And you've seen data like this before, right?
6        A    Sure.
7        Q    So let me direct your attention to page --
8    the third page of the document. This has, in the
9    bottom left, data about President Obama and
10   Governor Romney's respective vote share in Wisconsin by
11   race, correct?
12       A    Right.
13       Q    And it shows that President Obama won
14   94 percent of the African-American vote in Wisconsin --
15       A    Correct.
16       Q    -- is that --
17       A    Correct.
18       Q    And so that number is -- that leaves a very
19   small percentage for the Republican vote share for
20   African-American in Wisconsin, right?
21       A    Well, I mean that -- let me -- let me just
22   say that the data in Table 12 are self-identified
23   partisan identification, which is not exactly the same
24   thing as vote share.
25       Q    Okay. So you think the data in Table 12 may

Page 118

1    be accurate?
2        A    Well, let me just put it this way. The CCES
3    is a well-respected survey. It's a very large survey
4    and, in fact, it's designed for analysis down to the
5    congressional-district level. So you can certainly
6    analyze things state by state. I don't know of any
7    other survey to try to estimate partisan identification
8    of the Wisconsin electorate from.
9        Q    Are you aware of --
10       A    Especially -- specifically like in 2014 --
11   you know, very recently.
12       Q    Are you aware of any election -- well, let me
13   rephrase this. What is the last election in Wisconsin,
14   of which you are aware, in which African-American
15   voters -- in which at least 25 percent of
16   African-American voters voted for a Republican
17   presidential candidate?
18       MR. KAWSKI: Object to form.
19   BY THE WITNESS: (Resuming)
20       A    I haven't looked at all the exit-poll data
21   from Wisconsin. And clearly, in 2012, that wasn't the
22   case.
23       Q    And you would agree that that wasn't the case
24   for, at least, a couple decades prior to that, also,
25   right?

Page 119

1        MR. KAWSKI: Object to form.
2    BY THE WITNESS: (Resuming)
3        A    Well, I could look at the exit-poll data and
4    then give you an answer on that.
5        Q    All right. Let's turn to Table 16 on
6    page 36.
7        A    Okay.
8        Q    Now this table compares the types of IDs that
9    can be used to vote in various states that have
10   voter-ID laws, right?
11       A    That was the purpose. Yes.
12       Q    How did you select the sample of states in
13   this chart?
14       A    Well, in my -- I guess a couple of things.
15   One, I was familiar with these states. Two -- familiar
16   with these states in terms of their voter ID law. And
17   two, they all have what I would classify as some strict
18   government-issued form of identification -- voter
19   identification law.
20       Q    All right. And all the states in this chart,
21   other than Wisconsin, were covered jurisdictions under
22   the Voting Rights Act until the Shelby County decision,
23   right?
24       A    Not all with North Carolina, but a
25   considerable chunk of it, yes. And all of Texas,

Page 120

1    Georgia, and South Carolina, yes.
2        Q    Now, in North Carolina, voters can vote
3    without showing any form of ID, correct?
4        A    Well, if you want to just -- we'll just cut
5    through the chase. In North Carolina and
6    South Carolina, there is an affidavit that voters can
7    execute to where that can be the case. Yes, that's
8    true.
9        Q    Okay.
10       A    Again, I guess one of my sort of points of
11   departure here, with this table, is that you can
12   execute that kind of affidavit in North Carolina and
13   South Carolina; that's true, I'm not denying that. But
14   you're still -- you're asked for ID, and you're asked
15   for certain types of government-issued ID. So it's a
16   comparison of what IDs would satisfy that.
17       Q    Right. But if you don't have any of those
18   IDs in those states, you can still vote, right?
19       A    You can execute an affidavit. Yes.
20       Q    And just to be clear for the record, the
21   affidavit permits you to vote, right?
22       A    Right. Right. You have to declare you have
23   a reasonable impediment that prevented you from getting
24   qualifying ID.
25       Q    All right. And the Texas law, in the

Page 121

1  district court -- and I know there are appeals, so I'll
2  come back to that in a minute -- the district court
3  found it intentionally discriminatory, correct?
4      A   Yes, that would be correct.
5      Q   All right.  And then, on appeal, the panel
6  that reviewed that decision upheld the finding that
7  there was a violation of the Voting Rights Act, but was
8  going to remand to the district court for further
9  inquiry into the intentional-discrimination question,
10 right?
11      MR. KAWSKI:  Object to form.
12 BY THE WITNESS:  (Resuming)
13     A   I believe that's correct, yes.
14     Q   Okay.  And then, recently the full Fifth
15 Circuit decided to hear that case, right?
16     A   Again; yes.  The North Carolina case is
17 pending currently.
18     Q   Yes.
19     A   But these laws -- I mean, I know there are
20 legal challenges -- they have been in effect.  They've
21 been in effect in Texas, and it just went into effect
22 in North Carolina.  So they're not hypothetical, I
23 guess is what I'm saying.
24     Q   All right.
25     A   I could be wrong, but I think the Fifth

Page 122

1  Circuit panel reversed on the
2  intentional-discrimination claim -- but I can be wrong
3  about that -- and then returned the rest of the case
4  about the Section 2 violation -- unless I've misread
5  it.  Of course, this is the --
6      Q   We can talk about that off the --
7      A   This is the point -- okay.
8      Q   -- record.  It's not important.
9      A   This is the point where you can say I'm not a
10 lawyer.  So . . .
11     Q   All right.  Now, on page 37 --
12     A   I would like to point out, in Table 16, that
13 since I wrote this report, in Wisconsin, you can now
14 use a Veteran Affairs ID.
15     Q   Oh, yes.
16     A   So that has changed since I submitted this
17 report.
18     Q   All right.  So turning to page 37, the third
19 paragraph -- the second full paragraph -- you talk
20 about out-of-state driver's licenses.
21     A   Right.
22     Q   About halfway down you say that:  Given the
23 fact that a licensed driver who moves to Wisconsin from
24 another state must obtain a Wisconsin driver's license
25 within 60 days of establishing residency, allowing the

Page 123

1  use of out-of-state licenses for voting would be of
2  limited utility to most voters.
3      Do you see that?
4      A   Yes.
5      Q   First, do you know whether residency for
6  purposes of driving is defined the same as residency
7  for purposes of voting in Wisconsin?
8      MR. KAWSKI:  Object to form.
9  BY THE WITNESS:  (Resuming)
10     A   It may not be.  I'm not certain on that.
11     Q   All right.  And there are some people who
12 move to Wisconsin who do so without bringing a car,
13 correct?
14     MR. KAWSKI:  Object to form.
15 BY THE WITNESS:  (Resuming)
16     A   Certainly.
17     Q   And so those people would, potentially, be
18 impacted by this law, right?
19     A   Well, only if they had a driver's license in
20 another state, and moved to Wisconsin without a car,
21 right.
22     Q   So an example of that would be an
23 out-of-state college student who goes to the University
24 of Wisconsin to attend college, right?
25     A   Okay.

Page 124

1      Q   Is that right?
2      A   It's plausible that, I guess, someone could
3  have an Illinois driver's license, and they go to
4  college at the University of Wisconsin, Madison, and
5  don't bring a car.  I mean, that's possible.
6      Q   Okay.  And you haven't made any attempt to
7  quantify how many of those people there are, right?
8      A   I have no idea.  No.
9      Q   All right.  Are you offering any opinion as
10 to what state interest is served by Wisconsin's rule
11 that does not permit out-of-state licenses to be used
12 for voting?
13     A   Only to the extent to which it seems to be
14 consistent with the rest in that Wisconsin only allows
15 types of what I would call in-state ID or federal ID,
16 but not in allowing other state ID; if that makes
17 sense?
18     Q   Okay.
19     A   So it's, at least, consistent, I would say,
20 with that.
21     Q   All right.  And on the next page, at the
22 beginning, you talk about expired IDs?
23     A   Yes.
24     Q   And we've covered this a little bit already.
25 But are you offering an opinion as to whether there's

Page 125

1  any state interests served by Wisconsin's not accepting
2  IDs that have been expired for more than two years, for
3  voting?
4       MR. KAWSKI:  Objection; asked and answered.
5  BY THE WITNESS:  (Resuming)
6     A   Only to the extent to which it creates
7  consistency in the statute.
8     Q   What --
9     A   Across ID types.
10    Q   Oh, I see.  Okay.  Are you offering an
11 opinion as to whether there is a state interest in
12 Wisconsin's not accepting any types of ID that have
13 been expired for more than two years?
14      MR. KAWSKI:  Same objection.
15 BY THE WITNESS:  (Resuming)
16    A   Only to the extent to which that's what the
17 state has decided to do in terms of implementing the
18 law.
19    Q   All right.  You then turn to a Provisional
20 Ballot Analysis?
21    A   Right.
22    Q   Do you believe that the number of provisional
23 ballots cast is an appropriate metric for analyzing the
24 impact of a voter ID law?
25    A   It's one of them.  Certainly.

Page 126

1     Q   What other metrics would be appropriate?
2     A   Well, I've done other things myself.  I've
3  certainly made use of provisional ballots.  In South
4  Carolina, I collected data on reasonable impediment
5  affidavits, which we just discussed; how many were
6  executed.
7       I've done other types of analyses that
8  involved turnout.  So . . . I published a study, in
9  Georgia, looking at that question.  So I think it's
10 certainly a piece of data that can be looked at.
11    Q   In your study in Georgia, did you analyze
12 provisional ballot there?
13    A   I only had some very gross numbers on
14 provisional ballots in Georgia.
15    Q   What do you mean gross numbers?
16    A   Like total provisional -- I mean, I couldn't
17 -- I couldn't subdivide provisional ballots in Georgia
18 based on the data that the secretary of state was
19 providing.  Because you could cast a provisional ballot
20 for different reasons; registration issue, for
21 instance, something like that.
22    Q   You didn't know whether the provisional
23 ballots were based on no ID?
24    A   Right.  Now, in north -- excuse me -- in
25 South Carolina and Texas, I have collected those data.

Page 127

1     Q   And you would agree that the number of people
2  deterred from voting, by a voter-ID laws, exceeds the
3  number of provisional ballots that are rejected for no
4  ID, right?
5     A   Well --
6       MR. KAWSKI:  Object to form.
7  BY THE WITNESS:  (Resuming)
8     A   -- I would agree that it's very hard to
9  figure out who may or may not be deterred by a law.
10 It's very difficult to figure that out.
11    Q   Okay.  And --
12    A   I mean, in -- at least, provisional ballots
13 are what I would call hard data.  Is it the whole
14 picture?  Not necessarily.  But it's part of the
15 picture.
16    Q   And would it be fair to say that you used the
17 results that you did here not because those would be
18 the ideal types of elections to use but because that's
19 the data that was available?
20    A   Well, I would -- I guess I would put it this
21 way.  This was the only data available, period, at that
22 point.  I've gotten some more -- at least, total
23 numbers, as I said, on the State Supreme Court primary
24 that was in February.  I certainly, you know, fully
25 support adding to this, if possible, and just as

Page 128

1  anything I would study in political science, you know,
2  more data points, you know, yields more information.
3  So . . . There was an election on Tuesday.  I have no
4  idea when that metric will be fully reported up to the
5  GAB, about the Tuesday primary that just occurred.
6     Q   And you've done your own academic work
7  analyzing the impact of voter-ID laws and turnout,
8  right?
9     A   Yes.  Yes.
10    Q   And in that work, you did statistical
11 modeling, correct?
12    A   I did, yes.
13    Q   You did not do any statistical modeling here,
14 though, right?
15    A   No.  This is just a table with data in it.
16    Q   All right.  Let me direct your attention to
17 page 41.
18    A   Okay.
19    Q   Near the beginning of the first full
20 paragraph, you talk about Catalist estimates?
21    A   Yes.
22    Q   And you said that they: . . . may not
23 correctly identify the race/ethnicity of these
24 registrants.
25       Do you see that?

Page 129

1     A  Yes.
2     Q  Catalist data is used in published
3  political-science research, correct?
4     A  I've seen it.  Yes.
5     Q  And did you do anything to test the Catalist
6  estimates to determine whether their estimates were
7  accurate?
8     A  Well, not in the case of Wisconsin, because
9  it's very hard to -- there's nothing to really compare
10  it against.  I mean, if we're talking about the
11  no-match list -- if we're back on that.
12     Q  But --
13     A  Since they didn't match the DMV database, we
14  don't know their race.
15     Q  Right.  But you could have tested by looking
16  at the people who did match the DMV database, right?
17     A  That would have been a possibility.  Yes.
18     Q  Okay.  So you don't know how accurate their
19  estimates were for people whose race we do know based
20  on self-identification?
21     A  That's fair; I don't.
22     Q  All right.  Let me go down two paragraphs.
23     A  Okay.
24     Q  You talk about Professor Mayer's use of a
25  single snapshot --

Page 130

1     A  Right.
2     Q  -- of registration data.  And you say:  The
3  best method would be to obtain historical snapshots.
4        Do you see that?
5     A  Yes.
6     Q  Do you know whether that data exists?
7     A  I'm uncertain whether the GAB, for instance,
8  keeps archived copies of the registration database,
9  which is what would have to happen.
10     Q  Okay.  So if it doesn't, then he couldn't
11  have done that, right?
12     A  Well, that's true; no.  I was just talking
13  about the best of all worlds.
14     Q  Did you obtain any historical snapshots of
15  the voter-registration data?
16     A  No, not from Wisconsin.
17     Q  Did you attempt to?
18     A  No.
19     Q  All right.  Let's turn to the next page.  The
20  paragraph in the middle of that page, you talk about
21  Professor Mayer's analysis.  And you say that -- I
22  guess, you critique his models: . . . for only
23  controlling for a registrant's race, age, sex, and
24  prior voting history.
25     A  Right.

Page 131

1     Q  Is that right?
2     A  Yeah, that's correct.
3     Q  And you say that the: . . . models are
4  underspecified in that they don't control for enough
5  other factors.  Is that right?
6     A  Well, he could have had more controlled
7  variables.  Yes.
8     Q  Okay.  In the models that you did in this
9  case, did you use any controls?
10     A  Well, the only models I ran I guess --
11  statistical models -- would be the sites analysis we
12  talked about.  And no, I don't have any controls in
13  there.
14     Q  Okay.  And did the comparison of turnout from
15  one election to another contain any controls?
16     A  Well, that's not -- no.  But that's not a
17  model -- that's not a statistical model.
18     Q  Okay.  What do you mean by that?
19     A  It's just literally a table that's converted
20  into a figure.  A statistical model -- I'd have to run
21  a statistical model turnout -- say, something
22  predicting turnout to have variables and controlled
23  variables in the model.
24     Q  Okay.  So a model would be like a much more
25  rigorous detailed analysis; is that fair?

Page 132

1     A  It would be more detailed, certainly.
2     Q  Do you disagree that it would be more
3  rigorous?
4     A  Well, it just all depends on how it's
5  specified, I guess, I would say.
6     Q  Okay.  If it's appropriately specified, it
7  would be more rigorous, right?
8     A  It could be more rigorous.  Yes.
9     Q  All right.  Now, in the next paragraph, you
10  say that:  The voter-ID statute was not in effect in
11  2014.  Period.  Any claim to the contrary is incorrect.
12        Do you see that?
13     A  Yes.
14     Q  It's not your understanding that
15  Professor Mayer was saying that the voter-ID law was in
16  effect in 2014, is it?
17     A  No.  No.
18     Q  Okay.
19     A  But I guess the point is that he does try to
20  draw inferences about the potential effects of the
21  voter-ID law.  And I'm just saying, as he did point out
22  fairly enough, that it wasn't in effect.
23     Q  Do you dispute that a number of voters were
24  confused about whether the law was in effect in 2014?
25     A  It's possible.  He cites some survey data

Page 133

1  from the Marquette poll. But then, I found some survey
2  data from another Marquette poll that was closer to the
3  election, and I guess you could say the amount of
4  confusion had dropped off considerably.
5      Q   Okay. But still over 20 percent of the
6  respondents in your survey thought the voter-ID law was
7  in effect, right?
8      A   Well, it wasn't my survey.
9      Q   I'm sorry. The Marquette Law School survey.
10     A   It was just a survey I cited. Yes. I
11 believe that's on the next page.
12     Q   And what he had found was that -- what
13 Dr. Mayer's analysis finds is that voters, in 2014,
14 without an ID were much less likely to vote than they
15 were in prior elections, correct?
16     A   Well, that's what he -- that's what he
17 communicates that he found. Yes.
18     Q   Do you have an alternative explanation for
19 that finding other than that voters were confused about
20 the voter-ID law and believed they didn't have
21 qualifying ID?
22     A   Well, one -- one of the alternative
23 explanations, for me, is statistical. And that is if
24 Dr. Mayer's no-match list is off, then he's identified
25 people that may have an ID in the no-ID group. And so

Page 134

1  I'm, sort of from the get-go, concerned about his
2  measurements of that. So . . .
3      Q   Okay. Is there any reason to think that that
4  group -- any reason other than the ID issue to explain
5  why that group of people would be -- well, first of
6  all, let me go back a step.
7      A   Okay.
8      Q   To the extent that he's off on the matching,
9  as you're suggesting, that would mean that some of his
10 no-ID people are actually ID holder?
11     A   Right.
12     Q   So his no-ID group would be diluted somewhat
13 by people with IDs?
14     A   It's possible. Yes.
15     Q   So, in some ways, that would actually make
16 his finding that the no-ID group had significantly
17 reduced turnout in 2014 even more significant because
18 it would mean that the true effect on people with no
19 IDs was likely higher since it was diluted by people
20 with IDs, right?
21     A   That's possible. It's possible. I do know,
22 from other academic work I've done, that people in that
23 category oftentimes don't have very high turnout rates.
24 Period. We know the law is not in effect, so why did
25 the turnout rate amongst that group drop? It could be

Page 135

1  from a number of different factors.
2      Q   But he controlled for prior turnout, right?
3      A   Yes, at least, in some of the models I
4  remember looking at.
5      Q   So that the concern you just mentioned would
6  have been accounted for in his model, right?
7      A   To some degree.
8      Q   So do you have any alternative explanation
9  for why people without an ID would have been less
10 likely to turnout in 2014, other than that they
11 believed the voter-ID law was in effect?
12     A   Well, I guess -- I guess I don't necessarily
13 have a counter hypothesis, per se, besides to say that
14 I don't know that that was a very direct effect or test
15 of the voter-ID law in Wisconsin.
16     Q   Okay.
17         MR. KAUL: (To court reporter) Why don't we
18 go off the record right now.
19         (Whereupon, a break was taken from 12:28 p.m.
20 to 1:33 p.m.)
21 BY MR. KAUL: (Resuming)
22     Q   All right. Dr. Hood, let me -- I'm, just
23 quickly, going to ask you a couple of follow-up
24 questions on one thing I touched on before. On page 31
25 of your report --

Page 136

1      A   Okay.
2      Q   -- near the bottom, you talked about the free
3  ID program, and you write that there were about: . . .
4  413,000 no-cost state IDs.
5      A   Well --
6      Q   Do you see that?
7      A   Yes. I mean, that's -- that were issued
8  between July 2011 and November of 2015.
9      Q   All right. And you mentioned, before, that
10 you don't know how many renewals there were, or
11 duplicates, and so am I right that you don't know how
12 many people who did not have ID as of July 2011 now
13 have an ID?
14     A   Not from those numbers. No.
15     Q   And focusing on that 413,000 number, if you
16 turn to page 32, you have your table breaking down race
17 and ethnicity?
18     A   Right.
19     Q   And the total listed there is 268,000?
20     A   Right.
21     Q   Do you know why that number is different from
22 the 413,000 number on the previous page?
23     A   Well, these are -- it's a -- for one, it's --
24 this is a snapshot in time. I ran these numbers from
25 the database that DMV sent over for state ID cards. So

Page 137

1   this is -- the 413,000 was the number reported by DMV
2   in some documents -- some spreadsheet documents.  This
3   is the number I ran.  So as of the time they ran the
4   state ID-card database, within that database, there
5   were 268,843 individuals that had a current free
6   version of the state ID card.
7       Q   Okay.  So that means that, at least, roughly,
8   145,000 -- well, first of all, there's a difference
9   between those numbers of about 145,000, right?
10      A   Right.
11      Q   And so that means that those 145,000 were
12  either duplicates, renewals -- well, they had to be
13  either duplicates or renewals, right, because they
14  couldn't have expired yet?
15      A   Right.  Or there are people moving in and out
16  of the database, you know, for a variety of reasons;
17  death, for instance, would remove someone, for
18  instance.  So it could be for a variety of reasons.
19      Q   Okay.  And do you know when this snapshot was
20  taken for Table 11?
21      A   Well, it was the one sent to me to work on
22  this case.  I probably have -- somewhere I probably
23  have a footnote about . . .
24      Q   And I'm not concerned about the exact date.
25  It was, roughly, late 2015?

Page 138

1       A   Yes, that's fair.
2       Q   Okay.
3       A   Late fall 2015.
4       Q   In doing your broader match analysis, between
5   the DMV database and the voter-registration database,
6   were you able to account for licenses that were
7   suspended or had been revoked?
8       A   No, I didn't account for that.
9       Q   Okay.  So it's possible that somebody was
10  listed as a match but their license had been physically
11  revoked from them; is that right?
12      A   It's possible it could have been physically
13  removed (sic).  Yes.
14      Q   Or suspended?
15      A   Yes.
16      Q   All right.  Let me direct you to the section
17  of your report that starts on page 44, which discusses
18  Professor Burden's report.
19      A   Okay.
20      Q   Let me start on page, I guess, 45.  Near the
21  bottom, there is a paragraph that starts with:  Given
22  Professor Burden's application of the calculus of
23  voting . . .
24          Do you see that?
25      A   Right.

Page 139

1       Q   And you are arguing that if the cost of
2   voting went up, the in-person absentee turnout rate
3   should have gone down; is that right?
4       A   Well, I'm -- yes, I'm arguing as
5   Professor Burden applied the calculus of voting theory,
6   he would say that was an increased cost to voters, say
7   the shortened early in-person turnout period.  So
8   theoretically, that increased cost should decrease
9   turnout.
10      Q   And you said that that was as he interpreted
11  it.  But that's actually a commonly used analytical
12  method in political science, right?
13      A   Well, he's not the only one.  No.
14      Q   Would it be fair to say that's generally
15  accepted?
16      A   Well, this is a very famous theorem, if you
17  will, in political science.
18      Q   And most political scientists would agree
19  that reducing the early-voting period would increase
20  the costs of voting, right?
21      A   Most political scientists would probably
22  frame it that way.  Yes.
23      Q   Now, to link the increase in the cost to a
24  voting to a decrease in turnout, that linkage would
25  only happen if all other costs and benefits were held

Page 140

1   constant, right?
2       A   True.  Yeah, I think that's an important
3   point that there are other costs and benefits out there
4   to voters.
5       Q   Right.  And so it's certainly possible both
6   that the cost of early voting went up and that turnout
7   for early voting went up?
8       A   Well, I mean, put in that context, if you
9   want to -- if you want to say that a shortened early
10  in-person voting period is an increased cost, well, in
11  that context, the cost went up, but, at least, from the
12  numbers I was able to collect, the turnout went up as
13  well.
14      Q   Right.  I guess the point is turnout may have
15  gone up despite that, not because of that, right?
16      A   I'm not arguing that it's causal, certainly.
17      Q   Okay.  All right.  Let's talk about your
18  rebuttal to Professor Lichtman --
19      A   Okay.
20      Q   -- on page 48.  Before I ask you about the
21  substance, let me ask you a little bit about the method
22  of analysis.  Have you, prior to this case, offered any
23  opinions on the intent with which legislation was
24  passed?
25      A   In this case or any other case?

Page 141

1      Q    In any case prior to this one?
2      A    I typically, from what I remember, have not
3  performed what I would call a legislative intent
4  analysis; if that's fair.
5      Q    Okay.  Is this the first time you have
6  assessed legislative intent?
7      A    Probably this directly, yes.
8      Q    And have you written any history papers?
9      A    Well, I guess I've written political-history
10  papers.  I'm not a historian.
11      Q    Okay.
12      A    I do some political history work, if you
13  will.
14      Q    Do you have formal training in history work?
15      A    No, I'm not a trained historian.
16      Q    Are you familiar with the causal and
17  historical analysis?
18      A    To some degree, yes.
19      Q    Have you ever done it?
20      A    No.  I'm an empirical social scientist.  So
21  usually when I go to prove something, I'm looking to
22  model it with empirical data.
23      Q    All right.  Now, in the second paragraph on
24  page 48, you indicate that Wisconsin is not a state
25  that was covered by Section 5; is that right?

Page 142

1      A    Right.
2      Q    And then, at the end of that paragraph, you
3  write:  Had Wisconsin had a long history of
4  discriminatory election practices, then certainly the
5  state, or specific jurisdictions within the state,
6  would have been covered by Section 5.
7          Do you see that?
8      A    Yes.
9      Q    So is it your view that all states that are
10  not -- or that were not subject to preclearance -- let
11  me rephrase this.
12          Is it your view that none of the states that
13  were not subject to preclearance had histories of
14  discriminatory election practices?
15          MR. KAWSKI:  Object to form.
16  BY THE WITNESS:  (Resuming)
17      A    No, I wouldn't say that.  But certainly this
18  is one indicator that that has occurred.
19      Q    Okay.
20      A    Coverage under Section 5 would be one
21  indicator of that.
22      Q    Okay.  So you wouldn't conclude, just from
23  the fact that Wisconsin was not under Section 5
24  preclearance state, that it does not have a history of
25  voting discrimination?

Page 143

1          MR. KAWSKI:  Object to form.
2  BY THE WITNESS:  (Resuming)
3      A    Not -- not alone.  No.
4      Q    Were there other factors that you considered
5  in assessing Wisconsin's history of discrimination?
6      A    Well, this is really just -- you know, I
7  didn't perform my own original legislative intent
8  analysis here.  This is really a response to
9  Professor Lichtman's report on this topic.
10      Q    Okay.  But did you consider anything other
11  than the preclearance issue with respect to Wisconsin's
12  history of discrimination?
13      A    That was probably the primary thing in terms
14  of history.
15      Q    Have you studied Wisconsin history?
16      A    A little bit.  I read a book -- I think it
17  was called Wisconsin Votes -- at one point.
18      Q    When was that?
19      A    Couple years ago.  I can't say -- I'm not an
20  expert on Wisconsin.  I'm not saying that.  But I read
21  a little bit on it.
22      Q    Okay.  How much familiarity would you say
23  that you have with Wisconsin's historical voting
24  practices?
25      A    Some.  I mean, again, I read a book on the

Page 144

1  topic.  It's been several years.
2      Q    Have you ever written anything on that topic?
3      A    In Wisconsin?
4      Q    Yeah.
5      A    Not on Wisconsin specifically.  No.
6      Q    In the next paragraph, at the end you
7  write -- you ask, I guess: . . . in what manner are
8  socioeconomic disparities connected to minority
9  political participation, much less the legislative
10  intent to discriminate.
11          Do you see that?
12      A    Tell me where you are.
13      Q    Sorry.  It's the second-to-last paragraph on
14  the page.
15      A    Okay.  Okay.  I'm there.
16      Q    Do you dispute that socioeconomic disparities
17  impact minority political participation?
18      A    I'm not going to dispute the fact that they
19  can.
20      Q    Okay.  Do you dispute the fact that they do?
21      A    Well, I think, again, there needs to be a
22  much clearer causal connection between the election
23  practice or device under challenge and the interaction
24  with that and the socioeconomic status for minorities.
25      Q    Okay.  And you're talking about in

Page 145

1  establishing a Section 2 violation, now, or . . . ?
2      A   As part of that, yes.
3      Q   So it's well-established in political-science
4  literature that socioeconomic factors strongly
5  influence political participation, correct?
6      MR. KAWSKI:  Object to form.
7  BY THE WITNESS:  (Resuming)
8      A   You have no argument there.  We have talked
9  about that.
10     Q   All right.  On the next page, in the first
11 full paragraph you talk about Dr. Lichtman's assertion
12 that the decline White share of voter turnout in
13 Wisconsin.
14     A   Right.
15     Q   Do you see that?
16     A   Yes.
17     Q   I want to make sure I understand that.  Do
18 you disagree with him that there is a decline in White
19 share of turnout in Wisconsin?
20     A   Not necessarily.  I think that can be
21 documented.
22     Q   Okay.  So you agree with him, then?
23     A   Well, I mean I think we can agree on the
24 numbers.  Again, he was using those numbers to draw an
25 inference I didn't agree with, I guess is the way to

Page 146

1  put it.
2      Q   What's the inference that you're arguing
3  with?
4      A   Well, he's -- he makes an inference -- I
5  mean, the way I read things, he claimed:  As a
6  consequence of this demographic shift -- the
7  demographic shift being a decline in White-voting
8  strength, which I don't necessarily disagree with.  I
9  think that can be documented -- but he says:  The
10 Republican-controlled legislature passed a series of
11 election-related bills specifically designed to
12 maintain GOP political control by suppressing minority
13 turnout.
14     I guess I don't agree with that assertion.
15     Q   The suppression of turnout part?
16     A   Yes.  Yeah.
17     Q   Okay.  About halfway through that paragraph,
18 you write:  The share of the electorate that was White
19 in 2010 was the same as in 2004, and up a point from
20 2008.
21     A   Right.
22     Q   Now, you would agree that it's not
23 appropriate to compare a midterm to a presidential
24 election in assessing the trend with respect to the
25 White turnout, right?

Page 147

1      A   Well, I would agree that, you know, that the
2  -- I would agree that the turnout is different in a
3  midterm from a presidential election.
4      Q   And, in particular, White turnout tends to be
5  a larger share of the midterm turnout, right?
6      A   It has typically in a lot of cases.  Yes.
7      Q   So let's just take the numbers here in
8  Wisconsin.  So if you just follow the presidential
9  elections, in 2004, the White share of turnout was
10 90 percent, and it was 89 in 2008, and then, 86 in
11 2012, right?
12     A   Right.
13     Q   So there was consistent decline there,
14 correct?
15     A   Correct.
16     Q   And in midterms in 2006, the White share was
17 92 percent, in 2010, it was 90 percent, and in 2014, it
18 was 88 percent, right?
19     A   Right.
20     Q   So again, a consistent decline, right?
21     A   Right.  I'm not arguing with these numbers,
22 per se.
23     Q   Okay.  All right.  In the final paragraph on
24 that page, you talk about how:  Wait times in Milwaukee
25 County do not equate to wait times for minority voters.

Page 148

1      A   Right.
2      Q   Do you know what percentage of the
3  African-American population in Wisconsin lives in
4  Milwaukee County?
5      A   I can't tell the exact percentage, but it's
6  very high.  I mean, most of the Black community in
7  Wisconsin is in about four counties, with Milwaukee
8  County being one of those.
9      Q   All right.  Let's turn to the response
10 Professor Minnite.  First, I want to ask about your
11 definition of fraud.
12     A   Okay.
13     Q   And you have a different definition of fraud
14 than she does, correct?
15     A   Yes.
16     Q   And yours is broader; is that right?
17     A   Yeah, I think that's fair.
18     Q   Now, about halfway down the page, in the
19 bottom of that paragraph, you indicate that:  A wider
20 definition of election-related fraud allows one to
21 search for a variety of fraudulent activities and not
22 just fraud which may be perpetrated by a single
23 individual.
24     Do you see that?
25     A   Right.  Yes.

Page 149

```
 1        Q    To the extent that the laws at issue in this
 2   case relate to fraud, the fraud it theoretically
 3   relates to is the type of fraud that would be committed
 4   by a single voter, right?
 5        MR. KAWSKI:  Object to form.
 6   BY THE WITNESS:  (Resuming)
 7        A    Unless there's some kind of collusion between
 8   voters, potentially -- or voters and others.
 9        Q    Okay.  And her definition would cover that,
10   right?
11        A    Maybe.  Her definition -- she defines voter
12   fraud as, quote, the intentional corruption of the
13   voting process by voters, end quote.  To the extent to
14   which that definition may or may not indicate collusion
15   or cooperation between voters, I don't know.  Maybe you
16   could fit it under that.
17        Q    Okay.  And so you also refer, in this
18   paragraph, to fraud committed by other third-party
19   entities like poll workers, candidates, and political
20   parties?
21        A    Right.
22        Q    You would agree that none of the laws at
23   issue in this case would prevent any fraud by poll
24   workers, candidates, or political parties, right?
25        MR. KAWSKI:  Object to form.
```

Page 150

```
 1   BY THE WITNESS:  (Resuming)
 2        A    Well, again, there could be collusion between
 3   voters and some of these other entities.  I mean, to
 4   the extent to which someone could impersonate another
 5   voter in person, would be fairly difficult, I'd say, at
 6   this point in Wisconsin.
 7        Q    So how does that relate to poll workers,
 8   candidates, or political parties?
 9        A    Well, again, those are really just entities
10   where there could be collusion, say, between a group of
11   voters.  I mean, you could have a case where those
12   entities themselves may be trying to commit fraud, or
13   they might be trying to commit fraud -- so they could
14   commit fraud with or without voters, I guess is what
15   I'm saying.
16             So there's the old stuffing the ballot box,
17   you know; that doesn't require voters -- I mean, that's
18   a historical example -- versus, you know, using voters
19   in some scheme; colluding with voters.  I mean, in the
20   '90s, there was a vote-buying scheme in Dodge County,
21   Georgia.  I mean, so that would be an example of
22   elected officials sort of colluding with a group of
23   voters.
24        Q    So none of the laws at issue in this case
25   would prevent those types of fraud you were just
```

Page 151

```
 1   discussing, though, right?  They wouldn't prevent vote
 2   buying?
 3        MR. KAWSKI:  Object to form.
 4   BY THE WITNESS:  (Resuming)
 5        A    No, it may not prevent vote buying.
 6        Q    And it wouldn't prevent ballot-box stuffing?
 7        MR. KAWSKI:  Object to form.
 8   BY THE WITNESS:  (Resuming)
 9        A    No, it wouldn't prevent ballot-box stuffing.
10        Q    Are there any types of fraud that can be
11   committed without voters, that are prevented by the
12   laws at issue in this case?
13        MR. KAWSKI:  Object to form.
14   BY THE WITNESS:  (Resuming)
15        A    Without voters?  No.  They would probably
16   have to involve voters at some point in this -- in the
17   fraud scheme.
18        Q    So doesn't that weigh in favor of using a
19   definition of fraud that requires involvement of voters
20   in determining the fraud that's relevant to this case?
21        A    Well, my definition doesn't preclude that;
22   it's just a little bit wider net.
23        Q    And so it's capturing stuff that's not
24   relevant to this case, by casting a wider net, right?
25        A    Well, it may or may not be relevant.  I mean,
```

Page 152

```
 1   that's what researchers are for.
 2        Q    Okay.  You talk about using a different
 3   method, to detect fraud, from the one used by
 4   Professor Minnite?
 5        A    Yes.
 6        Q    And you refer to that as KDD?
 7        A    Yes.  I mean, I didn't make up that term.
 8   It's a database mining.
 9        Q    Okay.
10        A    That's what it is.
11        Q    And so that's where you essentially compare
12   two databases, right?
13        A    Yes.  I mean, that's one of the -- one of the
14   ways you can use it.  So . . .
15        Q    Who made up the term?
16        A    I didn't.  I'm not claiming credit for the
17   term.
18        Q    Okay.
19        A    I mean, I think it's been around in the
20   business or informatics world for a long time.
21        Q    But you did actually conduct the type of
22   analysis that you're suggesting that Professor Minnite
23   should have conducted, right?
24        A    Well, not in Wisconsin.
25        Q    Okay.  You did it in Georgia?
```

Page 153

1    A   Yes, I did it in Georgia.
2    Q   All right.  And you did not find any cases of
3  voter-impersonation fraud, in your study, correct?
4    A   No.  I mean, specifically we were looking for
5  dead voters -- or someone voting on behalf of a
6  deceased voter.  And we didn't find any cases in
7  Georgia, at least, in 2006, of that issue.
8    Q   Okay.  And did you conduct a similar analysis
9  in Wisconsin for this case?
10   A   No, I did not.
11   Q   Okay.  In the next paragraph you talk about
12  photo ID reducing the possibility of fraud connected to
13  election-day registration?
14   A   Uh-huh (affirmative) -- yes.
15   Q   Can you explain to me how those two things
16  are related?
17   A   Well, again, I mean, it's possible -- or it's
18  theoretically possible for someone to present
19  themselves as registered -- who is not registered to
20  vote, register to vote, and cast a ballot.  And, you
21  know, if they wanted to do that for fraudulent
22  purposes, it's possible that they could.
23       And it's difficult for election officials to
24  catch that because of all that's going on on election
25  day.  So again, having someone present

Page 154

1  government-issued photo ID with their picture on it,
2  and matching that up with who they say they are, could
3  possibly help alleviate that issue.
4    Q   Are you aware of --
5    A   Or the potential for that, I guess.
6    Q   Are you aware of any case in which that's
7  happened?
8    A   In Wisconsin?
9    Q   Yes.
10   A   I don't know that there are any documented
11  cases of that.
12   Q   What I don't understand, I guess, is how the
13  inquiry is different for election-day registration
14  versus, say, same-day registration four days earlier?
15   A   Well, it may be a problem during that time
16  period as well.
17   Q   Okay.  Or even during early registration?
18   A   Potentially.  I mean, the closer, I think,
19  you get up to the date of the election the more
20  difficult it is because election officials are having
21  to devote time to other tasks.
22   Q   I'm sorry.  The more difficult what is?
23   A   To ferret out any of these -- any of these
24  cases that might be potentially fraudulent, to
25  double-check on the registrations that are presented.

Page 155

1    Q   All right.  So photo ID has to do with
2  establishing your identity to vote, right?
3    A   Right.
4    Q   It's not part of the registration process?
5    A   No, you don't need it to register.
6    Q   Okay.  But your tying it to election-day
7  registration, right?
8    A   Well, if you did go and register and vote on
9  election day, you'd obviously, as part of that process,
10  have to present ID for the voting component of it.
11   Q   Okay.  So why is that more important with
12  election-day registration.  That's what --
13   A   I'm just -- in this paragraph, just saying
14  that that's obviously during the election, when the
15  election's going on, there's just less time to check up
16  on some of these registrations.
17   Q   All right.  In the bottom paragraph on
18  page 52, you talk about: . . . voter suppression,
19  especially those relating to minority voters.  And you
20  say that:  Professor Minnite provides absolutely no
21  empirical evidence, nor is she able to cite any
22  peer-reviewed literature that finds such effects.
23       Do you see that?
24   A   Yes.  And that's the term I think she used,
25  was voter suppression.

Page 156

1    Q   Okay.  Are you familiar with a study that the
2  GAO published in 2014 regarding the
3  voter-identification laws?
4    A   Yes, I am.
5    Q   And the GAO is considered sort of the gold
6  standard with respect to studies, correct?
7       MR. KAWSKI:  Object to form.
8  BY THE WITNESS:  (Resuming)
9    A   Well, not necessarily, in my opinion.
10   Q   Well, what is your opinion?
11   A   Well, I do say here: . . . she's not able to
12  cite any peer-reviewed literature.
13       The GAO study is not an academic
14  peer-reviewed article, for instance.
15   Q   You're saying that the GAO report was not
16  peer reviewed?
17   A   Not to my knowledge -- I mean, it wasn't
18  submitted to a journal, and it didn't go through the
19  peer-review process is what I'm saying.
20   Q   Okay.
21   A   It's a report they commissioned and executed
22  and issued as the GAO, right, so . . .
23   Q   Okay.  Do you know whether it was reviewed by
24  scholars in a peer-review process?
25   A   Not to my knowledge.

Page 157

1  Q   Okay.
2  A   It was a -- because it was a report published
3  by the GAO.  Not in an academic journal.
4  Q   Okay.  So you do not believe that the --
5  well, what's your opinion of the GAO study?
6  A   I would not necessarily have conducted it at
7  all that way.
8  Q   How so?
9  A   Well, I don't have it in front of me.  But a
10 lot of it was based on -- for instance, the states they
11 chose to compare in their analysis.  So if you chose
12 different states, you might get a different result.
13 There was also not a lot of data -- I don't think -- at
14 the individual level.
15     Again, I'd have to look at this again.  It's
16 been a while.  I didn't see a lot of data at the
17 individual level on who had ID, who didn't have ID, for
18 instance.  So . . . I mean, I just -- I think there
19 were some shortcomings in that study.
20 Q   Okay.  The GAO is a non-partisan government
21 organization, right?
22 A   True.  It's part of Congress.
23 Q   And its findings concluded that strict
24 voter-ID laws in the states that had analyzed depressed
25 turnout, right?

Page 158

1  A   That was -- yeah, that was their finding.
2  Yes.
3  Q   And that it did so disproportionately among
4  minority voters, correct?
5  A   Yes.
6  Q   And also among young voters?
7  A   I'll take your word for it.  I don't remember
8  that particular part of it.
9  Q   Okay.  And are you familiar with the recent
10 study from Rice University regarding the impact of
11 voter-ID laws on turnout?
12 A   Vaguely.
13 Q   Okay.  It's a study -- just as a background,
14 are you familiar with the study that talks about voter
15 confusion leading to voters who may even have a
16 qualifying from ID not turning out to vote?
17 A   Yes.
18 Q   Out of Texas?
19 A   Yes.
20 Q   Okay.  So those are both recent studies which
21 found the suppressive effect of voter-ID laws on
22 turnout, correct?
23 A   Right.  Although, I want to say I haven't
24 read that study in detail; the second one we've talked
25 about.

Page 159

1  Q   Okay.  And then, you say at the end of this
2  paragraph, that your: . . . own academic work examining
3  the implementation of Georgia's voter-ID statute fails
4  to find any evidence that racial minorities were
5  disproportionately affected.
6  A   Right.
7  Q   I just want to talk briefly about what you
8  found in your work.
9  A   Okay.
10 Q   So you found that, in Georgia,
11 African-Americans were less likely than Whites to have
12 a qualifying form of voter ID, correct?
13 A   In one -- yeah.  There were multiple studies
14 we've published on Georgia specifically.  But yes, we
15 did find that.
16 Q   Okay.  And you also found that in the 2008
17 election, the voter-ID law in place in Georgia
18 deterred, approximately, 24,000 people from voting,
19 correct?
20 A   Something -- that's one estimate.  Yes.
21 Something like that.
22 Q   Okay.  And you further found that in that
23 election, among people who don't have IDs, the effect
24 was greater on White voters, in suppressing turnout,
25 than it was on Black voters, correct?

Page 160

1  A   That's correct.  Or Hispanics.
2  Q   Okay.  Now, that study, though, didn't take
3  into account the extent to which African-American and
4  Hispanic voters were disproportionately likely to lack
5  ID in the first instance, right?
6  A   No.
7  Q   Okay.  And if that had been taken into
8  account, the overall suppressive effect would have
9  actually been greater on African-Americans than on
10 Whites, right?
11 A   I didn't conduct that study.
12 Q   Okay.
13 A   I mean, in fairness, we did -- we implemented
14 a specific kind of policy impact analysis called a
15 Difference in Differences Test.  So . . . And the
16 results of which are published in this article.
17 Q   And the 2008 election was obviously an
18 unusual election with respect to African-American
19 turnout in particular, right?
20 A   It was higher, yes.  Higher in Georgia.
21 Q   And that was the first election in which
22 there had been an African-American candidate for
23 president on the ballot, right?
24 A   Right.  For a major party, yes.
25 Q   Have there been a minority-party candidates?

Page 161

1    A   Maybe not.  It's a good question.
2    Q   It's not relevant to your analysis.
3    A   No; I know.
4    Q   In your Overall Conclusion section on
5  page 53, in the first paragraph, you talk about your
6  conclusion that: . . . Wisconsin's election code
7  provides a reasonable and common-sense approach to the
8  manner in which elections are conducted in the state.
9       Do you see that?
10   A   Right.  Yes.
11   Q   And again, that's just -- that's not based on
12  any -- let me rephrase that.  There's no standard for
13  what Dr. Hood thinks is a reasonable and common-sense
14  approach, right, that's just sort of a subjective
15  judgment?
16   A   Well, I guess it's an informed opinion, I
17  would say.  It is based on certain things I read and
18  certain statements made by election officials, for some
19  of these things.
20   Q   It's not something that you would -- it's not
21  the type of thing you would conclude in an academic
22  piece, correct?
23   A   Well, I usually don't -- you know, in
24  fairness, an expert report in a court case is not
25  always an academic article.  Again, I typically don't

Page 162

1  delve into the normative, in academic articles -- I try
2  not to.
3    Q   Did you review any of the rebuttal reports
4  submitted by the experts for the plaintiffs in this
5  case?
6    A   Well, just -- I guess the only one that maybe
7  touched on me was Dr. Lichtman.  And I read through it
8  very quickly.
9    Q   Have you developed any opinions with respect
10  to his rebuttal report?
11   A   On some things, I guess, we just don't agree.
12   Q   And what are you referring to specifically?
13   A   Well, I know he ran some more party-ID
14  numbers for Wisconsin.  And I tried to replicate what
15  he did, and I wasn't able to using the same data
16  source.  So I guess we're just -- we just disagree
17  about that.  We're getting different numbers for some
18  reason.  So . . .
19   Q   Did you --
20   A   But I didn't try all day long.  But I tried
21  to sort of figure out where he got those numbers from.
22  So . . .
23   Q   Did you develop any other opinions about his
24  rebuttal report?
25   A   Well, overall, I mean, I just don't agree

Page 163

1  with a lot of what he said.  Again, I just took a very
2  quick read-through of his report.  I'm going to have to
3  go back and look at it in more detail, to be honest
4  with you.
5    Q   Okay.  So no other specific opinions that you
6  have right now?
7    A   Well, I did try to -- I mean, I did look
8  under the surface, or delved into that party-ID issue.
9  But I haven't had time to explore any of these other
10  things.  So . . .
11   Q   Okay.  We talked a little bit earlier about
12  some of your academic work.  Have you published any
13  articles that you believe support the specific
14  conclusions or opinions you've developed in this case?
15   A   Well, if I have, they're probably cited in
16  the report; like the article we just talked about on
17  the voter ID.
18   Q   So your belief is that to the extent that
19  your article supports the conclusions you've drawn,
20  they are cited in the report?
21   A   Yes, as far as I know.  I usually -- yeah,
22  I've got a couple of things cited throughout the
23  report, couple of different articles.  I mean, if I
24  thought something was germane, that I'd published as an
25  academic article, to what's going on here, then I

Page 164

1  usually try to cite it.
2    Q   Okay.
3    A   And my full CV was appended to the report --
4  or should have been.  So . . .
5    Q   And have you published any articles that have
6  findings that you believe contradict any of your
7  opinions in this case?
8    A   No, not that I can -- not that I can think
9  of.  I don't know that I directly cited the -- the
10  initial article we did in Georgia.  Before the law was
11  implemented, it showed a gap in racial ID possession.
12  But we've already talked about that today, and it is
13  cited in my vitae, of course.
14   Q   All right.  Dr. Hood, those are all the
15  questions that I have for you today.
16   A   Okay.  Thank you.
17       MR. KAWSKI:  And I have no questions.
18       MR. KAUL:  Does he want to read and sign?
19       MR. KAWSKI:  Yeah, he will want to read and
20  sign.
21       (Whereupon, the deposition concluded at
22  2:13 p.m.)
23
24
25

Page 165

### C E R T I F I C A T E

STATE OF GEORGIA )
COUNTY OF COBB )

    I, PHILIPS P. THOMAS, Certified Court Reporter in and for the State of Georgia, do hereby certify that the foregoing proceedings were taken down by me; that the foregoing proceedings were reduced to print by me; that the foregoing pages represent a true, correct, and complete transcript of the testimony given by the witness, who was first duly sworn by me; that I am not a relative, employee, attorney or counsel of any of the parties; that I am not a relative or employee of attorney or counsel for any of said parties; nor am I financially or otherwise interested in the outcome of the action.

    This certification is expressly withdrawn and denied upon the disassembly, photocopying, reproduction of electronic copies, and/or distribution of the foregoing transcript or any part thereof, including exhibits, unless said disassembly, photocopying, reproduction, and/or distribution is done by me and my signature and original seal is attached thereto.

    This, the 22nd day of April 2016.

_____
PHILIPS P. THOMAS
Certified Court Reporter
License Number 2816

---

04/07/16/M.V.(TREY) HOOD, III, Ph.D./PPT
SIGNATURE PAGE AND ERRATA SHEET
    I have read the within and foregoing pages and no changes are required.

_____
M.V.(TREY) HOOD, III, Ph.D.
******

    I have read the within and foregoing pages and the following changes are required as a result of the transcription thereof:

Page/Line      Correction/Reason
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____

_____
M.V.(TREY) HOOD, III, Ph.D.
Sworn to and subscribed before me, this _____
day of _____ 2016.

_____
NOTARY PUBLIC
******

Janice S. Baker & Associates, Inc.
235 Peachtree Street, NE
North Tower, Suite 400
Atlanta, Georgia 30303
(404)969-1206

167

---

Page 166

COURT REPORTER'S DISCLOSURE OF NO CONTRACT

    I, Philips P. Thomas, Certified Court Reporter, do hereby disclose pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that I am a Georgia certified court reporter here as an independent contractor of Janice S. Baker & Associates, Inc.; I was contacted by Janice S. Baker & Associates, Inc. to provide court reporting services for this deposition; I will not be taking this deposition under any contract that is prohibited by O.C.G.A. § 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board of Court Reporting; and I am not disqualified for a relationship of interest under O.C.G.A. § 9-11-28(c).

    There is no contract to provide court reporting services between myself, Janice S. Baker & Associates, Inc., or any person with whom I have a principal and agency relationship nor any attorney at law in this action, party to this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond the usual and customary rates have been disclosed and offered to all parties.

_____
PHILIPS P. THOMAS
Certified Court Reporter
License Number 2816