# In The Matter Of:

*One Wisconsin Institute, Inc., et al.  vs.*
*Gerald C. Nichol, et al.*

---

*Deposition of KENNETH MAYER*
*April 8, 2016*

---

## Verbatim Reporting, Limited

2 East Mifflin Street, Suite 102
Madison, Wisconsin  53703
www.Verbatim-Madison.com
verbatim@tds.net
608.255.7700



V·E·R·B·A·T·I·M
REPORTING, LIMITED
"Excellence in Reporting Since 1988"

*Min-U-Script® with Word Index*

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

---

Page 1

```
 1   STATE OF WISCONSIN    CIRCUIT COURT    DANE COUNTY

 2   = = = = = = = = = = = = = = = = = = = = = = = = =

 3   One Wisconsin
     Institute, Inc., et al,
 4                         Plaintiffs,

 5        -vs-                          Case No. 15-C-324

 6   Gerald C. Nichol, et al,

 7                         Defendants.

 8   = = = = = = = = = = = = = = = = = = = = = = = = =

 9
                         Deposition of:
10
                         KENNETH MAYER
11
                        Madison, Wisconsin
12                        April 8, 2016

13

14
                   Reported by:  Paula Thompson
15

16

17

18

19

20

21

22

23

24

25
```

---

Page 2

```
 1                    I N D E X

 2   WITNESS                              Page(s)

 3     KENNETH MAYER

 4        Examination by Mr. Johnson-Karp        4

 5

 6

 7                  E X H I B I T S

 8

 9   No.      Description              Identified

10   Exh 1    Mr. Mayer's expert report        4

11   Exh 2    Mr. Mayer's rebuttal report      4

12   Exh 3    Crosstabs LV document            4

13   Exh 4    Crosstabs RV document            4

14   Exh 5    Document entitled, "Modeling
              Problems in the Voter
15            Identification - Voter Turnout
              Debate"
16
     Exh 6    Document entitled, "A Brief Yet
17            Practical Guide to Reforming
              U.S. Voter Registration Systems"
18
     Exh 7    Mr. Hood's expert report         4
19
     Exh 8    Mr. McCarty's expert report      4
20

21        (Attached to the original transcript and
          copies provided to both counsel)
22

23        (Original transcript filed with Mr.

24    Johnson-Karp and copies provided to both

25                      counsel)
```

---

Page 3

```
 1            DEPOSITION of KENNETH MAYER, called as a

 2   witness, taken at the instance of the Defendants,

 3   under the provisions of Chapter 804 of the Wisconsin

 4   Statutes, pursuant to Notice, before Paula Thompson,

 5   a Notary Public in and for the State of Wisconsin, at

 6   Perkins Coie, LLP, One East Main Street, Suite 201,

 7   City of Madison, County of Dane, and State of

 8   Wisconsin, on the 8th day of April, 2016, commencing

 9   at 9:00 a.m.

10

11            A P P E A R A N C E S

12

13   CHARLES CURTIS, JR, Attorney,
     PERKINS COIE
14       One East Main Street, Suite 201, Madison,
         Wisconsin 53703-5118, appearing on behalf of
15       the Plaintiffs.
         ccurtis@perkinscoie.com      608-663-5411
16

17   GABE JOHNSON-KARP, Attorney,
     STATE OF WISCONSIN, DEPARTMENT OF JUSTICE
18   ASSISTANT ATTORNEY GENERAL, DIVISION OF LEGAL
     SERVICES
19       17 West Main Street, P.O. Box 7857, Madison,
         Wisconsin 53707-7857, appearing on behalf of
20       the Defendants.
         johnsonkarpg@doj.state.wi.us      608-267-8904
21

22

23

24

25
```

---

Deposition of KENNETH MAYER, 4-8-16

Page 4

```
 1              (Exhibits 1-8 were marked.)
 2                  KENNETH MAYER,
 3         called as a witness, being first duly
 4          sworn, testified on oath, as follows:
 5                   EXAMINATION
 6   BY MR. JOHNSON-KARP:
 7   Q  Good morning, Professor Mayer.
 8   A  Good morning.
 9   Q  My name is Gabe Johnson-Karp.  I represent the
10      defendants in this matter.  I'll go through a
11      brief introduction, kind of nuts and bolts here.
12      I understand you have been deposed in the past.
13      Is that correct?
14   A  That's correct.
15   Q  So you have an understanding of the general
16      ground rules, make sure your answers are audible,
17      you've been sworn to tell the truth.  Do you
18      understand both of those?
19   A  I do.
20   Q  If you don't understand a question, if you'd
21      please ask me to rephrase it or clarify.  If --
22      if you do answer, I'll take it as you do
23      understand the question.  Is that fair?
24   A  Yes.
25   Q  Okay.  What did you do to prepare today?
```

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                                    Page 5

1  A   I reviewed the materials that I used to prepare
2      my report, reviewed my report and the report and
3      data that Professors Hood and McCarty prepared.
4      I had conversations with Counsel, and that's it.
5  Q   And did you bring anything with you today?
6  A   I did not.
7  Q   Okay.  How were you first contacted regarding
8      your work in this case?
9  A   My recollection is that sometime -- actually, I
10     don't even know precisely when; but I believe it
11     was sometime over the summer.  I was contacted by
12     Josh Kaul who asked me if I would be available
13     and willing to do some work on -- on a case; and
14     I would have to look at my notes to an invoice to
15     -- primarily, to tell you what the exact time
16     frame was.  But they -- I was contacted by -- by
17     Counsel who inquired if I would be willing and
18     able to to work on this case.
19 Q   And you mentioned invoices.  You are being paid
20     to work on this case; correct?
21 A   That's correct.
22 Q   And what is your rate?
23 A   $300 an hour.
24 Q   And have you -- you've submitted invoices; is
25     that correct?

Deposition of KENNETH MAYER, 4-8-16                                    Page 6

1  A   I have.
2  Q   Do you know how many invoices for a total of how
3      many hours?
4  A   I -- I do not.
5  Q   Have -- have you been paid for any of your
6      invoices?
7  A   Yes.
8  Q   Do you know how much you've been paid so far?
9  A   Not off the top of my head I don't.
10         MR. JOHNSON-KARP:  Counsel, I would -- I
11     would ask, we haven't seen invoices.  We did --
12     we did request them.  Are those forthcoming?  Do
13     you know?
14         MR. CURTIS:  I do not know, Counsel; but
15     I will check on those to see what our position
16     is.  I didn't realize those were discoverable.
17         MR. JOHNSON-KARP:  My understanding is
18     -- is that they are, but we can take that up --
19         MR. CURTIS:  Okay.
20         MR. JOHNSON-KARP:  -- at some other
21     time.
22         MR. CURTIS:  Okay.  I'll make a note and
23     inquire today.
24         MR. JOHNSON-KARP:  Okay.  Thank you.
25 BY MR. JOHNSON-KARP (CONTINUING):

Deposition of KENNETH MAYER, 4-8-16                                    Page 7

1  Q   And, when you were first approached for your work
2      on this case, what was presented as the -- the
3      scope of -- of your task?
4  A   Again, I'm working from recollection that the
5      scope of the work, as I recall, was to analyze
6      the effect of changes in the voting registration
7      practices on turnout.
8  Q   And were you given any materials or -- or shown
9      anything to kind of get you started on that task?
10 A   Well, can you clarify?  Are we talking about a
11     sequence or anything to start or -- or the full
12     range of materials that I was given?
13 Q   We can -- let's start at the initial retention.
14     Were you -- were you given any materials when you
15     were initially approached for your work on this
16     case?
17 A   I don't think so.  I'm not certain, but I don't
18     recall that -- that I was provided with any
19     background materials; but I would have to check.
20     I -- I don't think so.
21 Q   Okay.  And, since your initial retention, have
22     you been provided any materials?
23 A   Yes.  I received a number of electronic data
24     files that I used in the course of doing my
25     analysis.

Deposition of KENNETH MAYER, 4-8-16                                    Page 8

1  Q   Is that the -- the SVRS file?
2  A   That was one of them.
3  Q   What -- what were the others?
4  A   The others --
5  Q   I'm sorry.  Just -- if -- if I use the term
6      "SVRS," will you understand that I'm talking
7      about the statewide voter registration system?
8  A   So let's -- let's be more specific.  It's the
9      statewide voter of registration system as polled
10     on September 2015 because that -- so it was that
11     and then a file from the Department of
12     Transportation consisting of driver's license and
13     State ID holders.
14 Q   And any other files or documents?
15 A   I was provided a copy of the -- of the complaint.
16     In the course of doing my work, I was given some
17     files about the ID petition process, which
18     consisted of e-mails and the -- the records of
19     the -- of several individuals who had gone
20     through the process.  Let me think for a minute.
21     I was given files that Professor Hood used in the
22     course of preparing his report; but, apart from
23     -- apart from materials that fall into that
24     category, everything else I used, I -- I sought
25     and found.

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 4 of 81
One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.
Deposition of KENNETH MAYER
April 8, 2016

1  Q  Okay.  I think we'll probably get into this as we
2     talk about specific questions.  But what -- what
3     other materials did you use if -- if there's
4     anything kind of broadly applicable to your
5     report?
6  A  Well, the literature, the academic literature,
7     the peer-reviewed literature, a number of reports
8     that were produced by government agencies I cited
9     in my report, a Government Accountability office
10    report on the effect of voter ID, various
11    publications from the Government Accountability
12    Board in Wisconsin.  Now, I'd have to go through
13    the report point by point.  I recall that there's
14    a -- the -- the Carnegie Classification of
15    Institutions of Higher Education, which is
16    publicly available.  But anything that I used in
17    the course of my report was either provided to me
18    or noted in my report.
19 Q  Okay.  And I think you mentioned or I'm
20    remembering this from your report, you said
21    you're paid $300 an hour.  Is that correct?
22 A  That's correct.
23 Q  And how does this compare to your work in other
24    cases?
25 A  It's the same.

1  Q  And how does that compare to your salary?
2  A  In terms of?
3  Q  At -- at U -- at UW.
4  A  In terms of?
5  Q  If you were to breakdown your salary to an
6     hourly --
7          MR. CURTIS:  Objection.  Confusing.
8     BY MR. JOHNSON-KARP (CONTINUING):
9  Q  If -- if your salary were broken down to a
10    2,080-hour a year.  Do you know how a $300 per
11    hour would compare?
12 A  I imagine the $300 figure is higher than what the
13    analogous compensation would be from the
14    university.
15 Q  What is your annual compensation from the
16    university?
17 A  Actually, I'm not sure if I recall.  I think it's
18    in the range of $114,000 a year.
19 Q  Okay.
20 A  But I'm not -- I'm actually not entirely sure.
21 Q  Okay.  All right.  All right.  You said you're
22    not sure how many hours you -- you have billed at
23    this point; correct?
24 A  That's correct.
25 Q  I would like to talk a little bit about your --

1     your background.  I think most of this is -- is
2     in your report in your CV.  But if you could just
3     briefly describe your -- your educational
4     background in your -- your area of expertise.
5  A  My --
6  Q  Areas.  Sorry?
7  A  Okay.  My PhD is from Yale University in
8     political science.  I received that in 1988
9     specializing in American politics with training
10    in econometrics and statistics and methods.  My
11    bachelor's degree is also in political science,
12    and that is from the University of California-San
13    Diego; and I received that in 1982.  I had a
14    minor in applied mathematics.  I've been at UW
15    since 1989.  My immediately prior job was at the
16    RAND Corporation in Washington, D.C.  My areas of
17    expertise generally are American politics, the
18    presidency, congress, elections, election
19    administration, campaign finance with -- those --
20    those are the main areas of expertise.  I've
21    written on some other areas.  I've written on
22    Australia constitutional history, which is an
23    interest but not really relevant here.
24 Q  Haven't traveled to Australia to serve as a -- as
25    an expert there?

1  A  Not as an expert witness; although, I have
2     traveled to Australia.
3  Q  Okay.  You mentioned econometrics.  What -- could
4     you describe that, please?
5  A  That is essentially the application of
6     statistical techniques to the analysis of social
7     science data.  It encompasses a broad range of --
8     of techniques.  It emerges from the fact that --
9     that many of the methodological contributions
10    came from economists and people working to
11    understand economic data, but it's -- in
12    political science, that term is no longer used
13    commonly.  It's mostly -- mostly been replaced by
14    methods --
15 Q  Okay.
16 A  -- quantitative methods.
17 Q  Okay.  And you have testified in a number of
18    cases; is that correct?
19 A  That's correct.
20 Q  I think you set them out in your report.  Are
21    there any that aren't in your report that you've
22    either testified or served as an expert witness?
23 A  Can I look at my report?
24 Q  Sure.  It's Exhibit 1 there, and it's on page
25    four.

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 13

1  A  All right.  Over the last which is the time
2     period covered by the report in past eight years,
3     this is comprehensive.
4  Q  And if you could distinguish in these cases
5     between just providing a report and testifying at
6     trial.
7  A  Let's see.  Whitford will be a report and trial;
8     Baldus versus Brennan, report and trial; NAACP
9     versus -- these are all -- I'm looking.  The only
10    one I didn't testify in trial, although I was
11    deposed, was McComish versus Brewer.  I did not
12    appear at the trial, but I did give a deposition.
13 Q  Okay.  And Kenosha County was also both?
14 A  I'm thinking.  I'm not sure I was actually
15    deposed in that case.  I -- actually, I don't
16    remember.
17 Q  Okay.  And did you -- which side did you testify
18    for in each of these cases?
19 A  Kenosha County versus City of Kenosha, I appeared
20    on -- testified on behalf of the city.  McComish
21    versus Brewer, I appeared on behalf of the State
22    of Arizona.  NAACP versus Walker, it was NAACP.
23    Baldus versus Brennan, I believe it was Baldus
24    because I think Brennan was the defendant of the
25    GAB.  And Whitford is on behalf of the

Deposition of KENNETH MAYER, 4-8-16                    Page 14

1     plaintiffs, the Whitford plaintiffs.
2  Q  Okay.  And did all of these cases involve changes
3     to election laws -- or, I should say, challenges
4     to changes?
5  A  Well, it depends -- it depends on what
6     redistricting counts as.  Whether we're talking
7     about changes to an election administration or
8     changes to the electoral environment whether --
9     where redistricting falls into.
10 Q  Sure.  I guess the follow-up question is then, in
11    these cases, did you ever determine that the
12    challenged laws were not detrimental or that they
13    were valid changes?
14        MR. CURTIS:  Objection.  Confusing.  You
15    can answer if you can.
16 A  In McComish versus Brewer, that was a challenge
17    to a state campaign finance law; and I -- I -- I
18    appeared to -- on behalf of that law.
19 BY MR. JOHNSON-KARP (CONTINUING):
20 Q  And that -- was that law -- how did that -- that
21    campaign finance law change?
22 A  Well, that was -- that was a challenge to the
23    state public funding system, the clean elections
24    system.  And I had done work on that subject, and
25    so I testified as to the -- the consequences of

Deposition of KENNETH MAYER, 4-8-16                    Page 15

1     the Clean Elections Law.
2  Q  Okay.  And was that placing more limits on
3     campaign finance contri -- or campaign
4     contributions?
5  A  Yes.
6  Q  Okay.  And, outside of court, you've written many
7     articles; is that correct?
8  A  Yes.
9  Q  And have you written on -- it sounds like from --
10    from your previous answer that you've written
11    that changes to campaign or election laws are --
12    you know what?  Sorry.  Strike that question.
13 A  Okay.
14 Q  I'll come back to that.  Have -- have you ever
15    worked in election administration?
16 A  Can you be more specific?
17 Q  Have you ever worked as an elections' clerk or a
18    municipal clerk?
19 A  No.
20 Q  Within a clerks office?
21 A  No.
22 Q  Have you ever volunteered for a poll watching?
23 A  No.
24 Q  Any get-out-the-vote eff -- efforts?
25 A  No.

Deposition of KENNETH MAYER, 4-8-16                    Page 16

1  Q  Any other involvement in election day activity?
2  A  Not election day activity, no.
3  Q  Okay.  Any -- anything leading up to election
4     day?
5  A  Well, so the -- I've done quite a bit of work for
6     election administrators.  Since 2009, I was part
7     of a group at the UW which worked cooperatively
8     with the Government Accountability Board
9     analyzing data that they provided on election
10    administration.  We did quite a bit of work, a
11    comprehensive statewide survey of local election
12    officials with interviews and survey data on how
13    they conducted their jobs.  We've done analysis
14    of incident reports.  We have studied the effects
15    of a number of different election procedures
16    ranging from early voting to the administrative
17    burdens to effects on turnout.  I recently
18    prepared a report for the Madison and Dane County
19    clerks on wait times looking at Queueing Theory
20    and the effect of changed altered admin --
21    election administration procedures and the
22    effects that those might have on lines of the
23    polls and wait times.
24 Q  Is that what Queueing Theory -- Queueing Theory
25    refers to wait time?

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 6 of 81
One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.
Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16 — Page 17

1 A  Yes.
2 Q  Okay.  Now, more specifically about this case,
3    what's -- what's your understanding of what the
4    case is about?
5 A  My understanding of the case is that it
6    challenges a number of changes to Wisconsin
7    election laws that effect voting registration
8    practices that have been implemented since 2011.
9 Q  And you have not been retained as an expert to
10   opine on all aspects of -- of the challenge; is
11   that correct?
12 A  That's correct.
13 Q  What -- how would you define what you've been
14   asked to opine on in this case?
15 A  Well, what I opined on was the specific effects
16   of some of the changes, which are delineated in
17   my report, on probabilities of voting and some
18   evidence about the -- the effects on the ability
19   to register.
20 Q  What was your -- your process for preparing the
21   report, creating the report?
22 A  The primary process involved analyzing the SVRS
23   and the DOT data and looking at the individual
24   level and aggregate level effects on -- on
25   turnout over, essentially, 2006 to 2014; but the

Deposition of KENNETH MAYER, 4-8-16 — Page 18

1    -- the primary focus of the report was looking at
2    the -- the specific SVRS data as linked to the
3    Department of Transportation data.
4 Q  And I think you mentioned the -- the SVRS that
5    we're talking about is the September 2015
6    snapshot.  Is that correct?
7 A  That's correct.
8 Q  Are you aware of any -- and this might play out a
9    little more with specific questions -- but
10   general margins of error in -- in the kind of
11   work that you did in this case?
12 A  Well --
13       MR. CURTIS:  Objection.  Confusing.
14 A  There are a number of different elements of that.
15   If we're talking about the margins of error of
16   the actual statistical techniques that I used,
17   which are a measure of the precision of the
18   estimates, the -- I -- I know what -- precisely
19   what those are.  There are other forms of -- I
20   wouldn't necessarily call them measurement error
21   but uncertainties in the data, and that's going
22   to be the case in any large scale, large data
23   set.  And I'm not aware of any ways of
24   specifically measuring that other than to say
25   that the techniques that I used are very, very

Deposition of KENNETH MAYER, 4-8-16 — Page 19

1    common; and the -- the overall conclusion of
2    scholars who have looked at this is that the
3    methods are actually a very reliable way of
4    making accurate inferences about the -- the
5    effects of changes on what we can observe, which
6    is whether someone votes.
7 BY MR. JOHNSON-KARP (CONTINUING):
8 Q  You mentioned uncertainties.  Could you talk
9    about any of the specific uncertainties that were
10   maybe in your mind when you -- when you mentioned
11   that?
12 A  Well, as I mentioned in the report, the SVRS is a
13   snapshot.  It is a -- the SVRS -- SVRS is a
14   dynamic system which is continually updated.  I
15   don't know if it's updated on a daily or weekly
16   basis; but the SVRS as it -- as it exists in
17   September 2014 -- 2015 is not going to be exactly
18   what the SVRS looks like in October of 2015
19   because people are added to it.  People drop out.
20   And so there is a -- a -- not a zero but small
21   number of people who are in the SVRS but would no
22   longer be what you would consider an active
23   voter.  People might have moved out of state.
24   They might have moved in state in which case they
25   would still be a resis -- an eligible voter, but

Deposition of KENNETH MAYER, 4-8-16 — Page 20

1    they might have to update their registration
2    information; and so it's a -- it is a -- it is a
3    snapshot.  And it -- now, the -- the uncertainty
4    is the -- you know, the unobserved elements of
5    that which exist; and there are a variety of ways
6    to control for those effects, which I did in my
7    report.  But it is -- there's no question that it
8    is a -- it's a dynamic changing database that has
9    what scholars would call churn as people move in
10   and out.  And many -- much of that churn would be
11   captured in the SVRS, but some of it will not be
12   observed.
13 Q  Now, are you aware if there are any previous
14   snapshots?  You know, is -- is there some record
15   of a snapshot in 2014, 2013, 2012 or -- or not?
16 A  So my understanding of the SVRS is that there --
17   there are not archives that are kept; so I -- I
18   do not believe it is possible to go to the GAB
19   and say, Let me see what the SVRS was as of this
20   earlier date because they don't -- I mean, it's a
21   gigabyte -- a six, three or four, five gigabyte
22   data set.  So I -- I don't think and I've never
23   been aware that there is historic -- historical
24   data where you can actually look at what the SVRS
25   would have, you know -- SVRS was on a particular

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 21

1   date.  So one way to describe it is that the --
2   you know, the SVRS is this -- is this data set
3   that is -- constantly changes, and it changes
4   whether or not you observe it.  So updates are
5   made.  And then, when you do what -- I think the
6   terminology is, when you pull the data at a
7   particular point in time, you query the SVRS; and
8   you take all of the data that exists at the time
9   that you pull.  But I am not aware of and I don't
10  think the GAB tracks that changes over time;
11  so you could not look at the SVRS in September of
12  2015 and say, I want you to query it and tell me
13  what it looked like in November 2010.
14  Q   Would -- and it -- well, I'll -- I'll let you
15      answer.  Would it be more accurate if -- if you
16      have those snapshots going backwards?  Would your
17      analysis be more accurate?
18  A   Not necessarily because the people in the SVRS
19      will be different, and the -- if we are looking
20      at the behavior at the individual level, one of
21      the things that we want to look at is the effect
22      on -- you know, the effect on the individuals.
23      So you could -- you could draw some inferences,
24      you know, and -- and do some comparisons; but I
25      -- I don't think that my analysis would

Deposition of KENNETH MAYER, 4-8-16                    Page 22

1   materially change if I could do that in a large
2   part because the controls that I use were
3   designed to capture some of those possible
4   effects.
5   Q   Okay.  When did you first reach the conclusions
6       that you present in your report?
7   A   Well, the conclusions that I reached I reached
8       when I did the analysis.  I didn't have -- well,
9       let me correct that.  The -- the literature, the
10      political science literature, the academic liter
11      -- literature is an extensive one, is conclusive
12      that changes to voting and registration practices
13      have observable effects; and they move in fairly
14      plausible and predictable directions.  So my
15      expectation was that -- and that led me to look
16      for to perform certain kinds of tests to see what
17      the effects would be on, for example,
18      differential effects on different racial
19      categories, the effects of people who do not
20      possess a driver's license or ID.  And so I -- I
21      had an understanding based on the literature of
22      the direction of those effects; but, in terms of
23      the magnitude and comparable sizes and the actual
24      numbers, I didn't reach any conclusions until I
25      had completed the tests.

Deposition of KENNETH MAYER, 4-8-16                    Page 23

1   Q   And did you reach any conclusions in your
2       research for this case that didn't make it into
3       your report?
4   A   So let me ask you to be more specific.  Are there
5       -- are you asking if there were things that I
6       looked at and -- and decided not to put into the
7       report for one reason or another?
8   Q   That or if there were conclusions that you
9       reached that were -- yes.  What -- what you
10      asked.
11  A   Okay.  There were some intermediary tests that I
12      conducted on the data that I always do when I am
13      presented with a large and complicated data set.
14      There were some re -- reliability tests.  There
15      were some analyses that I -- that I did and
16      concluded they were not reliable and was not able
17      to draw any conclusions about them and -- but
18      there was -- there was nothing that I looked at
19      and said, Well, that's a surprising result.  I'm
20      not going to put it in there because it -- it
21      doesn't -- it's not consistent with what I think
22      the answers ought to be; so there was nothing
23      like that.  And, of course, in doing the
24      analysis, you -- there's a lot of data
25      exploration that goes on to try to determine what

Deposition of KENNETH MAYER, 4-8-16                    Page 24

1   the -- you know, what -- what the data actually
2   looked like.
3   Q   What were, if you -- if you can remember, some of
4       the analyses that you concluded were not
5       reliable?
6   A   Well, I did some work on absentee ballots and
7       concluded that those were not reliable primarily
8       because there were a number of elections where
9       the clerks don't accurately enter the information
10      into the SVRS that there's -- in the voter
11      history, they're -- the clerks are supposed to
12      enter "AP" for at the polls if someone votes on
13      election day and "ABS," absentee, if they vote
14      absentee.  There are a number of elections where
15      that voter history is just an X, so you can't
16      tell whether someone voted absentee or not.  What
17      really drove that analysis was the fact that,
18      unlike many states, Wisconsin does not
19      distinguish between mail-in absentees and
20      in-person absentees; so we don't know -- we have
21      no indication of when the absentee ballot came
22      in.  And I -- looking at that concluded that the
23      data were not at a -- at a sufficient granularity
24      to allow me to make any inferences about what
25      might or might not be going on.

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1 Q   Okay.  Anything else with regard to reliability?
2 A   I did some -- you know, let me -- let me think
3     here.  In the course of doing the work, I had
4     been working with some aggregate data and
5     concluded that looking at individual level data
6     was the appropriate way to -- to do the analysis.
7     So, again, it was that the -- did not think that
8     -- again, using the -- you know, the SVRS, that
9     relying on the aggregate data which I did to some
10    extent.  There was some aggregate data in the
11    report, but I concluded that it was necessary to
12    -- to do the individual level analysis.
13 Q  And, when you referred to aggregate data, is that
14    talking about word level data --
15 A  Mostly.
16 Q  -- or something else?
17 A  Mostly.
18 Q  What else?
19 A  Well, I did some analysis at the municipality
20    level as well.
21 Q  Okay.
22 A  Actually, some of the municipal analysis was in
23    the report, particularly taking a look at late
24    weekend absentee voting.
25 Q  So anything else as to reliability?

1 A   No.
2 Q   In drafting your report, was anybody else
3     involved in the drafting process?
4 A   In the drafting process?  Other than some sort of
5     questions about clarity and what I meant and, of
6     course drafting it, you know, provided by
7     Counsel, I drafted the report by myself.
8 Q   And does the report include any suggested
9     revisions on anything substantive?
10 A  Substantive?  No.
11 Q  Okay.  Since you've prepared your report and your
12    rebuttal, have you encountered any data that
13    would change any of your conclusions?
14 A  I have.  The -- the major -- the -- the major
15    pieces of evidence are the files that I have seen
16    about the ID petition process and the -- the
17    special process for people who lack the
18    underlying documentation, was able to look at or
19    analyze data from the City of Madison from the
20    February primary in which I've learned that the
21    -- the number of provisional ballots and the rate
22    of provisional ballots shot up enormously; and,
23    virtually, all of those were related to
24    individuals who presented at the polls without a
25    qualifying form of ID and were allowed to vote

1     provisionally.  And also issues of wait times and
2     provisional ballots in the April 5th primary.
3     But those don't change my conclusions.  In my
4     view, those -- those reinforced the conclusions
5     that I reached in my report.
6 Q   Okay.  You mentioned the -- the files you've seen
7     with regard to the IDPP; is that correct?
8 A   Correct.
9 Q   What -- what files have you seen and what -- how
10    does that -- how do they change your analysis?
11 A  So the -- the files that I saw were -- I don't
12    know what the precise terminology is, but they
13    were DMV -- or DOT files that were turned over as
14    part of the discovery process; and they consisted
15    of e-mails from DOT staffers when they're trying
16    to deal with -- with -- with the people who
17    present without the underlying documentation.
18    Some of the decision letters -- and, basically, I
19    don't recall going through every page of those
20    documents but -- so enough of them to form an
21    opinion about the -- the efficacy of that process
22    as a -- as a safety valve.
23 Q  And what is that or are those conclusions?
24 A  The conclusion is that it is not remotely a
25    safety valve.  It requires people to go through

1     an extraordinarily burdensome administrative
2     process to -- to try to obtain the -- the
3     documents, and there were a number of instances
4     -- when I looked at the files, I believe the
5     number was 16.  I believe the number has grown to
6     22.  In addition to -- and these are people who
7     were ultimately denied an ID, even though there
8     was no question.  They were citizens that were
9     otherwise qualified to vote.  And the number of
10    people who either suspended their applications,
11    they stopped responding, which in my view is a
12    reasonable response when presented to -- with
13    unreasonable administrative burdens, or they
14    formerly canceled so -- and that -- that was in
15    the course of analyzing Professor Hood's claim
16    that the existence of the IDPP is a meaningful
17    remedy for the difficulty that a -- many people
18    have in obtaining the free voter ID through the
19    Department of Motor Vehicles.
20 Q  And I think it was in your rebuttal report that
21    you gave a figure of how many failures there
22    were.  Is that correct?
23 A  Yes.
24 Q  And we can -- we can look at that if you'd like.
25    I believe it's Exhibit 2, and I'm looking at page

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 9 of 81
One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1    five of -- is that marked Exhibit 2 for you?
2 A  Yes.
3 Q  Okay.  And the first partial paragraph there, you
4    give 143 as the measure of the failure rate?
5 A  Correct.
6 Q  And is that still roughly your -- your -- your
7    conclusion including -- I think you said it's now
8    up to 22 as the -- rather than 16?
9 A  So that -- the underlying foundation for that
10   conclusion, which is -- you -- you can't simply
11   count the number of outright denials.  But you
12   would also want to include the number of
13   applications that were suspended or canceled as
14   part of the failure rate because the result is
15   that the person ultimately doesn't get an ID.
16 Q  Are you aware -- is there a -- a way of
17   distinguishing between frustration with the
18   process and kind of a volitional decision that, I
19   just don't want to do it anymore?
20 A  In terms of the outcome, I don't think it matters
21   because, when you present individuals with the
22   barrier to achieving something, which is, in this
23   case, getting an ID which enables them to vote,
24   the -- it is not surprising to me that some
25   people just decide that it's -- it's too much

1    effort, that it's -- they don't have the birth
2    certificate, they don't have the information that
3    the DOT tells them that they -- that they need.
4    And, you know, why -- why go through the
5    additional effort?  I mean, we're -- we're
6    talking about a process that can take months,
7    sometimes almost a year.  And, if someone through
8    frustration decides that they just want to forget
9    it, I would regard that as a -- as a failure of
10   the process because the result is that someone
11   who has already gone through a fairly
12   extraordinary effort to obtain the ID for voting
13   purposes when it becomes clear to them that it's
14   just not going to happen.  And they say, I'm --
15   I'm not going to put any more effort into this.
16   There's a huge difference between that and
17   someone waking up on election day and it's
18   raining and deciding, Ah, it's too much trouble.
19   I don't think I want to get wet.  I'm going to --
20   these are people who have already put in a
21   significant amount of administrative effort to
22   obtain that ID.
23 Q  With regard to the -- the suspensions and the
24   cancelations -- I believe those are the two
25   categories.  Is that right?

1 A  Yes.
2 Q  Would you agree that there's no way to quantify
3    the measure between somebody who starts the
4    process and doesn't contact DOT at all anymore
5    and somebody who is engaged for -- you know, for
6    example, nine months?
7         MR. CURTIS:  Objection.  Confusing.  You
8    can answer if you can.
9 A  Yeah.  I don't -- I don't think it matters
10   because the issue here is that there is an
11   additional administrative step that someone has
12   to go through, and the only -- I guess, the only
13   counterfactual would be someone who doesn't have
14   the underlying documentation because, if they
15   did, they would present the -- the DOT.  They'd
16   get their ID, and they'd have the ID.  Someone
17   without those documents, they start the process;
18   so we already know that they -- at that point,
19   they don't have the underlying documents.  It is
20   already an additional step.  The only
21   counterfactual would be if someone starts the
22   process and then they realize they do have their
23   birth certificate or they do have some other form
24   of ID that they have found.  And I -- I -- you
25   know, based on what I know about administrative

1    practices and -- and the -- the -- the ways in
2    which individuals interact with government
3    administration procedures, I would say it's not
4    impossible, but the numbers of people who fall
5    into that category are going to be small.
6 BY MR. JOHNSON-KARP (CONTINUING):
7 Q  Is it -- is it your position that requiring
8    somebody to enter the -- the IDPP process is
9    itself a substantial burden?
10 A  It is.
11 Q  So really talking about a failure rate is
12   irrelevant; right?
13 A  No, because the -- again, there are different
14   types of failure.  In -- in the case of the IDPP,
15   the failure is defined as the person not getting
16   an ID.  I also think that the -- you know, the
17   existence of the IDPP and the -- the -- the
18   manner in which voter ID is allocated, you know,
19   that itself is a burden.  But the -- the -- in
20   this case, the -- the -- in this instance, the --
21   and this is not the only quantity of interest.
22   But, in the case of talking about people who
23   enter the IDPP, the -- here, the quantity at
24   interest is the number of people or percentage of
25   the people who enter that process and who

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1  complete it without getting an I -- ID and
2  whether they -- they don't get the ID because
3  they are denied formally or they don't get the ID
4  because they exit that process.  Those are
5  essentially equivalent because, in the end, you
6  have an individual who was -- obviously wishes to
7  obtain the identifications necessary to vote; and
8  they -- they wind up not having it.
9 Q  Okay.  If you'd like, you can put aside your
10   rebuttal for now.  You mentioned a couple minutes
11   ago -- and I think we know there was an election
12   this week.  Have you encountered any reports
13   about turnout this week or election
14   administration that would impact your analysis in
15   this case?
16 A  Well, I -- I -- I know what the turnout was.
17   According to the GAB, it was roughly 47 percent.
18   The -- I don't think that you can draw any real
19   reliable inferences from that turnout figure in a
20   primary election because there are lots of
21   reasons why primaries are -- are -- they vary in
22   ways that general elections do not.  So you have
23   even more moving parts than -- than general
24   elections, which you can rely or reclassify or --
25   for example, if you're looking at on year and off

1  year elections.
2 Q  Do you acknowledge, though, that that turnout was
3   high by the estimates?
4 A  By the historical standards of primary elections,
5   the turnout on April 5th was high.
6 Q  Were you surprised by that?
7 A  No.
8 Q  Why not?
9 A  Because this is the -- this was the first time in
10   quite a while that you have had two hotly
11   contested primaries on both sides.  You know, in
12   2012, you didn't.  You had an accompanying
13   president.  In 2008, you had contested primaries;
14   but the Republican primary was sort of on its way
15   to being wrapped up.  In 2004, incumbency, a
16   combination of incumbent presidents or some
17   aspect of one party or another, which -- which
18   made it less likely that you were going to see
19   high turnout in that primary.  So it doesn't -- I
20   was not surprised that the turnout was high.
21 Q  And maybe it's the same answer.  But, separate
22   from kind of the we'll call it campaign-related
23   considerations, given your conclusion -- or your
24   conclusions in this case, were you surprised by
25   the turnout?

1 A  Well, so there are -- there are two things going
2   on here.  One, you can look at the turnout.  You
3   can draw some inferences based on the turnout.  I
4   don't think they're necessarily that reliable,
5   but there are lots of other indicators that go to
6   the question of burdens.  You know, there were
7   students that showed up; and they didn't have the
8   correct ID, and they had to go stand in another
9   line.  And so lots of stories of students waiting
10   longer than they otherwise would have had to.  My
11   understanding is that the number of provisional
12   ballots was high.  I haven't seen the final
13   figures.  But that is a concrete measure of the
14   number of people who presented the polls and are
15   not able to vote or cast a regular ballot; so I
16   would want to look at the full range of
17   indicators and data of not just what the turnout
18   was but what were the hurdles that people had to
19   go through in order to cast a ballot,
20   particularly when those hurdles were, you know,
21   not necessarily long lines because you had lots
22   of people turning out but long lines because the
23   requirements to -- to vote had changed.  So it's
24   true that turnout was high.  I strongly suspect
25   that if -- or when -- because, eventually, this

1  data will become available.  But, if you look at
2   indicators of the burden, particularly
3   provisional ballots, that, alongside the high
4   turnout, you will very likely see a historically
5   high number of provisional ballots.
6 Q  Does the -- the consideration of provisional
7   ballots, is it effected by how many people then
8   go back by the -- is it the following Friday?
9 A  It's the Friday after the election.
10 Q  I guess what I'm getting at is, is it just the
11   mere casting of a provisional ballot that's
12   concerning or -- or I should say, is that
13   mitigated if the person then comes back and is
14   able to cast the vote?
15 A  Well -- so not really.  It's fairly well
16   established that provisional ballots are far less
17   likely to be counted than regular ballots, in a
18   large part, because that's simply another step
19   that someone has to go through.  You show up at
20   your polling place, which is in your
21   neighborhood.  You don't have your ID or, for
22   whatever reason you don't have it, you cast a
23   provisional ballot; and now you have to go
24   through yet another step, which is to go to the
25   clerks office with your ID.  And so now you're

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                                        Page 37

1   adding yet another burden; and the -- you know,
2   the -- the nature of those burdens and the
3   reasonable -- the reasonableness of those burdens
4   is a function of the -- need for them.  And,
5   based on all of the work that I have done on
6   voter ID and studies of voter impersonation and
7   rates of voter fraud, this is -- this is not a --
8   in my view, a reasonable burden to ask people to
9   go through because you're requiring people to do
10  things that -- that do not make any contribution
11  to any of the goals that are purported to be
12  satisfied by the voter ID law.  So now you have a
13  situation where, not only do people wish to
14  obtain an ID, they can't get it.  You have people
15  trying to vote; and, even if they do have an ID,
16  which some of them will, some people will simply
17  not have their wallet with them or -- so then a
18  number of people who fall into that category is
19  going to be nonzero.  Well, now they have to go
20  through yet another step; and we also don't
21  know -- although we will have some indication
22  because, many times, this is reflected in the
23  incident reports that poll workers fill out,
24  that, frequently, people will present at the
25  polls, see -- realize that they need an ID, don't

Deposition of KENNETH MAYER, 4-8-16                                        Page 38

1   have it, and they simply leave and don't come
2   back.  And that -- that also is a -- is a barrier
3   to exercising their -- their right.  So it is --
4   it is possible if someone has an ID and they
5   merely forgot it to vote provisionally and then
6   follow up, but that's just yet another burden
7   which doesn't get to what provisional ballots are
8   normally used for.  In other states, the reason
9   provisional ballots were established at the
10  requirement of the Help America Vote Act is
11  people would present at the polls believing that
12  they were qualified to vote, believing that they
13  were registered and they -- they're not
14  registered.  And in states that don't have
15  same-day registration when there was a
16  controversy about not whether someone had an ID
17  but whether they were actually registered they
18  would be able to try to clear that up.  Well,
19  that's different than what's going on here.  This
20  is, you know, people who -- who are registered or
21  who could qualify for registering.  You actually
22  don't need a photo ID to -- to register.  So, in
23  many circumstances -- and it's just another
24  burden, another -- you know, another hoop they
25  have to jump through in order to have their vote

Deposition of KENNETH MAYER, 4-8-16                                        Page 39

1   counted.
2   Q  Am I encapsulating your -- your thought there
3      that having the vote counted eventually does not
4      diminish the burden of having to cast a
5      provisional ballot?
6   A  In my view, that's correct.
7   Q  Okay.  And you mention -- you mentioned people
8      who show up and see a line and just leave.  Is
9      there any -- any data on that?
10  A  Well, let me dispute the premise of that.  There
11     are people who will show up, see a line, and
12     leave.  That's one category, and that's -- there
13     are also people who show up and present and they
14     don't have their ID, are told that they need an
15     ID, and then they leave.  Those are two different
16     things.  Obviously, the length of a line is not
17     exactly a function of voter ID; although, it
18     actually is indirectly because the need to
19     check-in with the voter ID lengthens the -- the
20     time to check-in.  And that has an effect on
21     lines.  But, you know, someone who sees a long
22     line, they don't want to wait, they leave.
23     That's-- that's a separate category than someone
24     who presents, you know, they -- they wait in
25     line, they present, they realize that they need

Deposition of KENNETH MAYER, 4-8-16                                        Page 40

1   an ID, they don't have one, and then they leave.
2   Q  And are there any -- is that what the incident
3      reports encapsulate?
4   A  They can.  Frequently, the incident reports will
5      -- will note that.
6   Q  So there -- there is somewhere within GAB's data
7      a number of people who -- who presented and
8      experienced what you just described?
9   A  Yes.  It's not -- it's not always reported
10     because, frequently, the -- the poll workers can
11     be inconsistent.  Some of them will record it.
12     Some of them won't.  But that will give you a --
13     a lower bound of the number of people, and they
14     all -- they also don't track the number of people
15     who appear and then leave because that's not
16     something you can necessarily observe from inside
17     the polling place particularly if the line snakes
18     out.
19  Q  Okay.  And you mentioned the -- the amount of
20     time added by checking IDs.  Are you aware of any
21     studies about the actual amount of time that it
22     adds to each individual transaction?
23  A  I am.  And this is work that I did.  That's -- I
24     was contacted by the Madison City Clerk and the
25     Dane County Clerk, and we actually -- they timed

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1    on the different polling places, and they -- they
2    timed the check-in process; and so we have data
3    on the mean and median and the -- the
4    relationship of the check-in time versus time of
5    day.  And we found that the -- the mean check-in
6    time, which is the time that starts when someone
7    gets to the front of the line to the time that
8    they receive their ballot, the mean was
9    68 seconds; and there was a -- there was a range.
10   And so --
11 Q  Just to clarify, this is without checking ID?
12 A  This is with checking ID.
13 Q  With.  Okay.
14 A  And there was no -- as -- as far as I'm aware,
15   there was no formal timing of the check-in
16   process without ID.  But it was -- I mean, I
17   think that they're -- the way that they described
18   it was on the order of 10 -- 10 seconds or
19   15 seconds so --
20 Q  Total?  Or less than the 68?
21 A  Total.
22 Q  Okay.
23 A  So the -- the -- the expectation was that the --
24   that the new check-in procedure -- so it's not
25   just ID.  It's also signing the -- the poll book

1    that -- that would lengthen the amount of time it
2    takes to check-in.
3  Q  By about a minute you said?
4  A  Well, not -- the -- the overall time that -- that
5    -- that was recorded was -- the -- the mean was
6    68 seconds, and the median was about 60 seconds.
7  Q  And you said the -- the 10 second number was an
8    estimate that -- that wasn't --
9  A  That -- that -- that was sort of a -- that's just
10   sort of a -- a loose -- I don't know how long it
11   took, but it was -- it didn't take long.  I think
12   some of the figures they talked about were, you
13   know, 10, 15, 20 seconds.
14 Q  Okay.
15 A  But I -- I don't know what the actual number is.
16          MR. JOHNSON-KARP:  Okay.  How are we
17   doing for time?  Do you want a break?
18          THE WITNESS:  I could take a short
19   break.
20          MR. CURTIS:  Sure.
21          (Recess.)
22          MR. JOHNSON-KARP:  And we're back on the
23   record.
24 BY MR. JOHNSON-KARP (CONTINUING):
25 Q  I think now we can dive into your report, which

1    is Exhibit 1.  And, on page four, you -- you
2    summarize your opinions, four into five.  Do
3    those still reflect an accurate summary of your
4    opinions in this case?
5  A  Yes.
6  Q  I think you got into this a little -- well, quite
7    a bit.  But, just to clarify, you talk about the
8    SVRS as a dynamic system.  Anything in addition
9    to what you described earlier that would present
10   a difficulty in working with such a dynamic
11   system?
12 A  Well, I wouldn't necessarily -- necessarily
13   describe them as difficulties but describe them
14   as things that you -- that -- that one must be
15   attentive to in drawing -- making inferences from
16   the -- from the data.  But, you know, the fact
17   that it is -- it is dynamic and is a snapshot,
18   that that captures the essence of the -- of the
19   issue.
20 Q  You -- you made -- or you -- you drew some
21   conclusions about turnout based on your SVRS
22   data.  Is that correct?
23 A  Correct.
24 Q  And those conclusions were based on different
25   numbers than what GAB numbers showed for a

1    turnout; is that correct?
2  A  That's correct.
3  Q  Why -- why didn't you use the GAB numbers for
4    overall turnout?
5  A  Because I wanted to get at what the SVRS was
6    telling me and also because the GAB figures are
7    simply aggregates; and -- and, in the course of
8    -- of working with the SVRS, I was able to add in
9    particular crucial demographic information such
10   as age and -- and race.  And so that was the --
11   the main reason I focused on the SVRS because the
12   -- the question here is not simply one of
13   aggregate turnout.  The question is one of the
14   effect on specific populations.  And you can't
15   get that from just the GAB data is all that would
16   tell you is, you know, whether someone voted and
17   you count up the number of votes; and that's your
18   turnout figure.
19 Q  Using your SVRS data, though, you showed a
20   decline in overall turnout between 2010 and 2014;
21   is that correct?
22 A  In -- in -- in aggregate, that is correct.
23 Q  Whereas the GAB showed an increase in turnout; is
24   that correct?
25 A  So yes.  But with -- with a qualifier is the --

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1    the GAB turnout is the -- the overall number.
2    Typically, it's expressed as the -- the
3    percentage of the voting age population. What I
4    was looking at is people who are already in the
5    SVRS, so I'm -- I'm -- I'm not as -- as concerned
6    with people who are not in the SVRS. I'm looking
7    at people who have already registered, and so
8    that's -- that's -- that's the difference between
9    the -- the GAB aggregate turnout figures and the
10   -- again, just the specific aggregate figures
11   that I was looking at, those were percentages of
12   the people who were actually in the SVRS.
13 Q  So you looked at registered voter turnout as
14    the -- the denominator in your -- in your
15    analysis is registered voters?
16 A  Correct.
17 Q  And, for GAB, it's voting age --
18 A  Usually.
19 Q  Okay. Voting age population. So, if -- if -- if
20    -- if we -- if we assume that turnout did, in
21   fact, increase as the GAB numbers show, does that
22   impact -- or would that impact your analyses or
23   alter?
24 A  Not really. And, again, the reason is that I'm
25   -- I'm looking at the effect on specific

1    populations. So, you know, the -- the -- looking
2    at aggregate turnout is a different test than
3    looking at the identified turnout among people in
4    the SVRS.
5 Q  Okay. Would it be possible, once you have the --
6   the snapshot of the individual data, the -- the
7   race, age, to sort of transpose that on to GAB's
8   numbers? Do you understand what --
9 A  I -- I think so. I mean, the -- not in a
10   reliable way because you wind up having to make
11   lots of assumptions about the -- the data. And
12   it is -- when you are make -- using aggregate
13   data to make inferences about specific
14   populations, what you run into is what is known
15   -- the discipline is the ecological inference
16   problem that you -- you cannot, it turns out,
17   make individ -- individ -- cannot easily make
18   individual level inferences from aggregate data.
19   And that just is the nature of the statistical
20   properties and the -- the fact that you don't
21   know what -- the fact that a group of individuals
22   or a group behave in a certain way, that doesn't
23   really give you reliable information about how
24   each individual in that group behaved; and that's
25   the main reason why I -- that the core of my

1    report was the individual level analysis where if
2    the -- the aggregate problems go away because I'm
3    not -- I'm not interested in the percentage of
4    people who, in a particular area, voted or not
5    voted. I'm looking at the effect on specific --
6    on whether a specific individual with
7    identifiable characteristics voted or not.
8 Q  And it's not -- am I understanding this
9   correctly? It's not if voter X actually voted.
10   It -- you deal with the probability that voter X
11   with these characteristics would --
12 A  Not -- not exactly. So I -- I do look at whether
13   individual X voted or not. But, the statistical
14   tests -- the method -- the methodology that I
15   used examines the -- whether an individual voted
16   or not and then with the independent variables
17   will estimate the effects of those
18   characteristics, whether someone is African
19   American, whether they live in student ward,
20   whether they're, you know, 18 to 24, whether they
21   reside in what I call the student ward. And that
22   will estimate the proba -- the -- the effect of
23   those variables on whether individuals voted. So
24   it's a way of looking at the outcome here which
25   is whether someone voted or not; or, in the case

1    of the SVRS, we have 3 million people. I don't
2    remember the exact numbers. It's in the report.
3    We -- we know, based on the SVRS, who voted and
4    who didn't; and we can look at the information,
5    look at the characteristics of people who voted
6    and didn't vote and derive estimates of what
7    effect those characteristics had on the
8    probability that someone voted or not.
9 Q  And talking about characteristics, there were
10   other characteristics that effect an individual's
11   decision other than what you took into account,
12   is that correct, an individual's decision to --
13   to vote?
14 A  Correct.
15 Q  And what are some of those?
16 A  Probably the two -- the -- the two that come to
17   mind are someone's education and -- and income.
18   It's known that education and income have a
19   positive effect on turnout.
20 Q  So there are -- your models do not take into
21   account every possible consideration; is that
22   correct?
23 A  That's correct. Although, my strong suspicion,
24   based on other work that I have done, is that, if
25   I -- I had that information, that would actually

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1 likely increase the -- the effects of the things
2 that I did look at. And that -- particularly for
3 not having an ID and -- and the effective race.
4 My -- my suspicion -- my strong suspicion is
5 that, including -- actually, let me put it this
6 way. I'm quite confident that, if I had access
7 to that information and was able to put it into
8 the model, it would not materially effect my
9 conclusions.
10 Q  Are -- are there studies elsewhere in the country
11    that have been able to include -- did you say
12    education and economic status --
13 A  No --
14 Q  -- or income?
15 A  -- not of the type that I did. I mean, there are
16 studies of turnouts that rely on survey data that
17 asks people. And some of these I have done where
18 you can look at something like the current
19 population survey, which is a large-scale census
20 survey of over $100,000 people where it asks
21 about voting history; and that includes that
22 demographic information. But not in the sense of
23 doing what I did here, which is working with the
24 -- with the actual voter data file which does not
25 contain information about income or education.

1 Q  You -- you mentioned the -- the CPS. Is that --
2 A  Correct.
3 Q  If I could draw your attention to what's been
4    marked as Exhibit 5, an article by Robert Erikson
5    and Lorraine -- is it Minnite?
6 A  Minnite.
7 Q  Minnite. Have you seen this article?
8 A  I have.
9 Q  Have you read it?
10 A  I have.
11 Q  Do you have any -- any impressions or thoughts
12    from -- from reading that article?
13 A  Give me a minute.
14 Q  Yeah. I'm sorry. Take your time.
15 A  Okay.
16        MR. CURTIS: I object to the question on
17    grounds as vague and confusing.
18        MR. JOHNSON-KARP: I'll -- I'll
19    withdraw.
20        MR. CURTIS: Okay.
21 BY MR. JOHNSON-KARP (CONTINUING):
22 Q  If I could draw your attention to that first long
23    paragraph above the introduction on page 85. In
24    the middle of the paragraph, there's a sentence
25    that starts, However.

1 A  Okay.
2 Q  "However, the complexity of electoral laws and
3    voting behavior together with the likely marginal
4    effect of photo ID rules makes statistical
5    outcomes quite sensitive to research designs."
6    Did I read that correctly?
7 A  Yes.
8 Q  And then, at the end of that paragraph, "While we
9    do not conclude that voter ID rules have no
10   effect on turnout, our data and tools are not up
11   to the task of making a compelling statistical
12   argument for an effect." Did I read that
13   correctly?
14 A  You did.
15 Q  Okay. And I assume you -- you'll have a better
16   sense of their analysis than I do, and I just
17   want to draw your attention to a couple other
18   sentences towards the end of their article. I'm
19   looking at page 98 just above the conclusions
20   section. The last sentence of the second
21   paragraph above that, it states, "We stand by our
22   interpretation that the evidence is far too shaky
23   to stake a claim of discovery." Did I read that
24   correctly?
25 A  Mm-hmm.

1 Q  And then the -- the last sentence of the next
2    paragraph, But the data are not up to the task of
3    making a compelling statistical argument and the
4    -- I'll -- I'll just stop there. Do -- do you
5    have any im -- impressions about the -- the
6    conclusions that they're stating there in --
7 A  I do.
8 Q  -- in this article?
9 A  I do.
10 Q  And -- and what are they?
11 A  A couple of things. One, this was written -- the
12   research was probably done almost 10 years ago.
13   It was published in 2009. It's work that was
14   probably done in 2007 at a time when there were
15   much far fewer strict photo ID laws, and so the
16   -- the universe of data has -- has changed since
17   then. At the time that this was written, there
18   were sort of controversies over how to accurately
19   characterize voter ID laws in terms of
20   strictness; and you can see that in their figures
21   where, you know, there are different types of IDs
22   that are permitted. There are different types of
23   practices. And my conclusion from this is that,
24   at the time this was -- this was reflected, the
25   -- the state of data, the state of analysis, we

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                                    Page 53

1    know a lot more now.  We have a lot more data.
2    We have many more states that have enacted very
3    strict photo ID laws like Wisconsin, which I
4    regard as, if not the strictest in the country,
5    certainly one of the most restrictive.  And there
6    has been a lot of work since then done by lots of
7    other scholars, including people like Trey Hood
8    who have concluded that voter ID not only drives
9    turnout down but drives turnout down among
10   African Americans and vulnerable populations.
11   The Government Accountability office did a
12   detailed study in 2014 looking at strict ID
13   states.  They found that they -- or they
14   concluded that voter ID -- strict photo ID had a
15   -- had a demonstrable effect on reducing turnout.
16   So my conclusion about this is that it is -- it
17   -- it reflected perhaps the state of knowledge at
18   the time.  But we know a lot more now.  And I --
19   I suspect if you asked Professor Minnite about
20   this, she would tell you the same thing, that the
21   overwhelming consensus, if that's what -- the
22   proper term, I would -- I would say the
23   overwhelming view among scholars who study the
24   problem have concluded that there is virtually no
25   question that voter ID laws, particularly strict

Deposition of KENNETH MAYER, 4-8-16                                    Page 54

1    voter ID laws, have a negative effect on turnout.
2    So I -- I -- I look at this and say, this is --
3    at the time, this was a conclusion but it -- it
4    no longer accurately reflects the state of
5    knowledge in this area.
6  Q  That the -- the amount of data and the quality of
7     data are now more robust to allow researchers to
8     draw more accurate conclusions.  Is that --
9  A  Not only is the data more robust, but we have a
10   lot more experience.  We have -- I think the last
11   election they looked at was probably two thousand
12   -- 2006.  Right?  So we have '08, '10, '12, '14.
13   We have four more elections.  We have lots of
14   different states that have an act of strict voter
15   ID laws.  If you look at their graphs, they have
16   two states that have strict photo ID laws,
17   Indiana and South Dakota.  I think now there are
18   six or eight that have strict photo ID laws, so
19   we have an enormously larger amount of data.
20 Q  You mentioned strictness.  How do you classify a
21    state as having a strict voter ID?  And we can be
22    done with --
23 A  Well, I would have to look at -- I note in my
24   rebuttal report that the national conference of
25   state legislatures classifies a photo ID law as

Deposition of KENNETH MAYER, 4-8-16                                    Page 55

1    strict.  Let me -- let me take a minute and find
2    that because I believe I describe it.
3  Q  Are you referring to pages three and four?
4  A  Okay.  So what I said here -- and I believe this
5    is true -- is that, the national conference of
6    state legislatures classifies a state as a strict
7    photo ID with respect to whether someone is
8    actually required to show a qualifying form of
9    photo ID in order to vote.  A -- there are states
10   that have photo ID requirements that are not
11   strict.  You have to show a photo ID.  If you
12   don't have a photo ID, you can use some other
13   form of identification; and sometimes those don't
14   even require a photo.  You can use social
15   security number.  So there are more states that
16   are strict.  Wisconsin is unusual because,
17   virtually, all of the other states have some
18   degree of safety about particularly absentee
19   voting.  States like Texas, which has a strict
20   photo ID law; and I think, in Georgia, you don't
21   have to have a photo ID to vote absentee.  So
22   there are alternatives.  Wisconsin does.  You
23   need to include -- I said in my report you needed
24   to include it when you return your absentee
25   ballot.  I believe you need to include your ID

Deposition of KENNETH MAYER, 4-8-16                                    Page 56

1    when you request it.  But, in any event, the
2    conclusion is the same that you must have a photo
3    ID to vote absentee.  So we have an additional
4    set of states that have enacted these laws.  We
5    have laws that were, at -- at the time, the --
6    the Minnite and Erikson article was written.  The
7    only large state -- you know, taking South Dakota
8    off the table for the moment because it's very
9    small, the only state of any significant size
10   that had a photo ID law was Indiana; and, in
11   Indiana, didn't -- I don't believe requires it to
12   vote absentee.  There's a -- if you don't have an
13   ID, you can execute an affidavit on the spot and
14   still vote; and so now we have additional states
15   that have passed laws that are even stricter than
16   what -- what existed at the time that article was
17   written.
18 Q  All right.  Is Wisconsin's then, would you say,
19    the strictest?
20 A  I would say -- I would say it is the strictest.
21   You know, I -- I qualify that because there are
22   -- you know, there are -- there are other states
23   that are -- you know, they're not exactly
24   comparable in terms of the forms of ID.  But, if
25   you look at the totality of the requirements, the

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1      fact that there are a limited form, a limited
2      number of IDs that -- that qualify under Act 23,
3      the fact that you must have a photo ID in order
4      to vote absentee, the fact that there is no
5      safety valve.  There is no mechanism.  If you
6      don't have an ID, you can't vote.  That's it.
7      There's no provision for allowing people to have
8      some type of alternative.  You know, I would
9      regard it as the strictest.  Sitting here now, I
10      qualify that among the most restrictive because,
11      you know, make a claim three months ago, it's
12      always possible that something may -- may change.
13      But I wouldn't regard it as -- as -- in my view,
14      it is the strictest photo ID law in the country.
15 Q    **And one of the considerations you mentioned was**
16      **the -- the number and types of IDs that are**
17      **allowable?**
18 A    That's one of the considerations.
19 Q    **Has Wisconsin's law softened, if you will, at all**
20      **by the recent allowance of VA IDs and -- and**
21      **technical college IDs?**
22 A    Possibly.  I mean, we don't know how many people
23      with a VA ID who don't possess one of the other
24      forms of ID.  But, you know, I don't regard that
25      as -- as significantly easing the impact of it.

1 Q    **Do you -- do you have any sense of how many**
2      **people would come into those -- those two groups,**
3      **the VA and the -- the technical college IDs?**
4 A    Well, my understanding is that the technical
5      college IDs still have to meet the requirements
6      of the signature and expiration date.  So I don't
7      know -- I don't know, sitting here, how many
8      existing technical college IDs would fall into
9      that category.  But that actually doesn't --
10      doesn't effect my analysis because, when I'm
11      looking at the effect of students, I'm looking at
12      -- I exclude technical college areas from -- from
13      the analysis.  So I -- I am quite certain that my
14      conclusions would not be materially changed by
15      allowing for those additional forms of ID.
16 Q    **While we're on the topic of these additional IDs,**
17      **just slightly shifting gears, the -- the -- the**
18      **analyses that you conducted looked only at DOT**
19      **IDs; is that correct?**
20 A    That's correct.
21 Q    **And is -- would there be any way to incorporate**
22      **the various other IDs into your analysis?**
23 A    There would if I had access to the data, which I
24      did not.  Charles Stewart who's a professor at
25      MIT did a -- an analysis for, I believe, North

1      Carolina where he did have access to primarily
2      passport -- I believe, passports and Veterans IDs
3      and that -- that there are -- there are -- the
4      number of people who don't have a DOT ID who
5      possess one of those other forms of ID is not
6      zero.  It's a positive number.  But his
7      conclusions -- that -- that did not effect his
8      conclusions about the effect of the ID
9      requirement.  My -- if I had that data and had
10      the number of people who didn't match as having
11      ID would be a little bit lower, but I am
12      confident that that would not effect my analysis
13      because -- in part, because I replicated it --
14      rep -- replicated what I did with Professor
15      Hood's matching results; and we could talk about
16      those in a bit.  But my conclusions were
17      unchanged.  When you reduce the number of people
18      who don't match as having an ID by a number, is a
19      third, 40 percent, it doesn't change.  You still
20      have the issue that people without one of the
21      forms of ID are unable to vote; and, you know,
22      whether that number is 340 thousand, 280
23      thousand, or 190 thousand, that's -- that -- that
24      does not resolve the question of whether it is a
25      burden on those people because it is.

1 Q    **Okay.  Okay.  Going back to your primary report,**
2      **the last paragraph on page eight above section B**
3      **you state, Even the January 1st, 2018 -- well,**
4      **'18 -- registration date affects only 5 percent**
5      **of records.  Can you explain, A, how that**
6      **happened, the 1/1/18, and how you corrected for**
7      **that?**
8 A    As I note in my report, "All large databases have
9      errors."  And the Social Security Administration
10      Medicare database has errors.  It is inevitable
11      when you are aggregating millions of pieces of
12      information that there are going to be some
13      mistakes.  The SVRS is -- you know, because, up
14      until now, all of the information has to be
15      manually entered.  There are mistakes.  And I
16      noted several of them, you know, obviously
17      incorrect zip codes, obviously incorrect IDs, ID
18      numbers, obviously incorrect birth dates.  You
19      know, someone -- birth date of someone
20      January 1st, '00, it could either be January 1st,
21      2000, in which case they'd be 15 years old or
22      January 1st, 1900, in which case they would be
23      115 years old.  Those are both wrong virtually --
24      in the case of 15-year-olds, they're all wrong.
25      In the case of 115-year-olds, almost all of them

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1 are wrong so -- and the other issue is the
2 1/1/18. And the reason those don't effect my
3 results is that I did not use the registration
4 date except for a -- a -- a couple of instances.
5 I -- when I did my analysis, I -- I established
6 the date on which someone entered the SVRS on the
7 earlier of when they registered because that
8 registration date is coded, the earlier of the
9 registration date or the -- the first election
10 that they show as voting in. So someone who has
11 this incorrect election date -- registration date
12 of 1/1/18, if I observe that they voted in 2006,
13 I placed them in the SVRS in 2006. That error
14 doesn't matter. Someone who has never voted and
15 shows up as a 1/1/18, they would basically drop
16 out because I don't use the registration date for
17 anything other than to establish -- to establish
18 the date in which they entered the SVRS. The
19 only other time I actually used the registration
20 date was in the section of the report where I
21 looked at early voting and, you know, drawing an
22 inference on the date that someone voted by
23 looking at the date that they registered and
24 whether they voted absentee, and so there are --
25 there are two dates that are material here. One

1 is the registration date. One is the effective
2 date. Most of the time, those are the same.
3 But, in the course of the doing the analysis of
4 absentee voting, if someone has a registration
5 date of 1/1/18, it's invalid -- it's an invalid
6 data; and we don't do anything with it. It
7 simply is not included in the -- in the data.
8 And I note that the reason this is not an issue
9 is that almost all of the registrants with that
10 data of 1/1/18 actually had been in the SVRS as
11 early as 2010, so it's -- it's an invalid data
12 field. I don't use it for anything really
13 substantive. And, in the portions of the
14 analysis that I do pay attention to the
15 registration date, that becomes a -- a missing
16 data point that's not included in the analysis.
17 Q  Shifting to page nine, the -- the process of
18 linking the -- the race data. I'm looking at the
19 last sentence on page nine. You talk about the
20 -- the accuracy being 99.74 as to link -- is that
21 as to linking the race between the SVRS and the
22 DOT?
23 A  Not precisely. The question here is, as I note
24 in the report, that, All large-scale matching
25 methods have an error rate. There are some

1 people who actually should be matched but they
2 don't match, that they are -- basically are in
3 both databases but it's not possible to link them
4 because of some data error. It is also possible
5 that someone is not a person -- in this case, the
6 SVRS, I actually link them to someone in the DOT
7 file which is not them. It's a different
8 individual with the same set of matching
9 variables. But, for the purposes of matching
10 race, which is the only field that I add to it, I
11 looked at the numbers of people that they -- the
12 -- the duplicates on the -- either the
13 triplicates or quadruplicates of the variables
14 and almost all of the time, even if it was all of
15 the individuals on that name and birth date have
16 the same race. And so this is the -- the -- in
17 the unlikely event that every person I matched to
18 who matches to when there's more than one person
19 in the DOT files with that same information,
20 90 percent of the time, they will have the same
21 race. And so -- so, of the 8 thousand -- so only
22 530 duplicates on the quadruple of last name,
23 first name, date of birth, and zip code and 8,840
24 on the triplet of last name, first name, and date
25 of birth. Even if all of those are linking to

1 the wrong person, it's still going to be the
2 right race because most of the people who have
3 those -- who are duplicated on those things have
4 the -- they code as having the same race on the
5 DOT file. So, ultimately, I take, as
6 authoritative, all of the matches. If I can link
7 someone to someone and I know I have the right
8 person, I have their accurate race. And, in this
9 case, the 99.74 is actually the lower bound
10 because that's assuming that all of the
11 duplicates are matched to the wrong person, which
12 is unlikely. So, even if I match all of those
13 dup -- those triplicates and quadruplicates
14 incorrectly, I still have the right race, 98.74
15 percent of the time, it's actually going to be
16 higher than that because the -- the -- not all of
17 those are going to be matched to the wrong
18 person.
19 Q  Just to clarify, I think you said 98.74.
20 A  99.74.
21 Q  So your report is correct?
22 A  Yes.
23 Q  Okay.
24 A  Yeah. I'm sorry.
25 Q  Okay.

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 65

1  A  That's what I thought I said.
2  Q  And I might have misheard you.  I apologize.  So
3     that quarter percent possible error rate is -- is
4     the lower bound, you said?
5  A  That's -- that's -- yeah.
6  Q  Okay.  As a practical question, how long did this
7     process take, the -- the linking of the -- the
8     DOT and the SVRS?  Is it kind of a click of a
9     button, or do you -- do you have to actually
10    review visually?
11 A  So you're talking about the -- the process of
12    writing the code or just, once I tell it to
13    execute the -- the command, how long does it take
14    to -- for the computer to go through it?
15 Q  And I guess that's my question.  Is it -- did you
16    just write a code to tell the -- the two
17    databases to link?
18 A  Well, it's -- it's not quite that simple; but
19    there was --
20 Q  I shouldn't say "just."
21 A  -- however, there was -- it's in one of the files
22    that I disclosed that -- that -- that includes
23    the actual commands to go through it.  And it's
24    not -- it's not a single step.  It's a multistep
25    process.  You know, I would say -- I have a very

Deposition of KENNETH MAYER, 4-8-16                    Page 66

1     fast computer.  I would say the actual how long
2     it took once I started running the code to a
3     completed, five minutes.
4  Q  Okay.
5  A  On my old computer, it would have taken 12 hours;
6     but I -- I upgraded.
7  Q  If I remember correctly, that's a Mac.
8  A  It's a -- it's a --
9  Q  You said you're a Mac guy?
10 A  It's a -- it's a supercharge Mac.
11 Q  Supercharge.  I like that.
12 A  It's a -- it's a -- it's a Mac Pro.  And the
13    reason I got it is, I do a lot of work with large
14    databases; and I got tired of waiting 45 minutes
15    for files to load.  So it has 32 gigabytes of
16    memory.  It has a 512 gigabyte digital hard
17    drive, and eight processors.  So, you know, on my
18    old Mac, this would have taken six hours to run;
19    and, this one, it takes about five minutes which
20    is very nice.
21 Q  Nice.
22          MR. CURTIS:  It must be awesome for
23    video games.
24          THE WITNESS:  I don't play video games.
25    It's good that's on the record.  I can show

Deposition of KENNETH MAYER, 4-8-16                    Page 67

1     the transcript to my wife.
2  BY MR. JOHNSON-KARP (CONTINUING):
3  Q  And I'm looking at pages 11 and 12.  You have the
4     total SVRS records.  I'm looking at table one,
5     3,380,338.  That includes the -- or that number
6     incorporates the 13,000 that you removed?
7  A  No, it does not.
8  Q  Or I should say that it excludes the 13,000?
9  A  Right.  And there -- there's actually some
10    subsequent processing that I did that actually
11    lowered the number of unlinked records so the --
12    that number E, I don't think it matches exactly
13    the number I used in subsequent analysis.  I
14    think I have 218,015.  So the -- the number that
15    went into subsequent analysis, I can't remember
16    exactly what I did to -- to process them; but
17    there were a number of cases where I -- I recall
18    that I concluded that I had -- I had matched to a
19    duplicate record that was material.  And so I
20    removed those -- or that it was a -- it was a
21    false non-match, so I changed it to a match.
22 Q  Okay.
23 A  I don't remember exactly what the process was,
24    but the -- the -- the numbers that went into
25    subsequent analysis was actually the lower

Deposition of KENNETH MAYER, 4-8-16                    Page 68

1     number.
2  Q  Okay.  And, for your unlinked number, the
3     283,346, is that what you were referring to that
4     it is a different number; or is it the -- the 3
5     million 380 thousand number that's changed?  I
6     guess --
7  A  It's the unlinked number that's -- that's
8     changed.
9  Q  Okay.
10 A  Give -- give -- give me a second here.
11 Q  Sure.
12 A  I think I may have described what I did.  Okay.
13    I think what -- what the difference is that I
14    removed the registrants that were -- that who --
15    that -- who were registered after, but that's
16    what accounts for the difference.  On page 13, I
17    note that there were a number of people who
18    registered after the November 14th election.  And
19    I removed them, so that -- that reduces the
20    number -- the number of non-matches.
21 Q  And, if I remember correctly, was that about the
22    13,000?
23 A  Yeah.
24 Q  Okay.  Now that -- that number, 283,000, give or
25    take, the -- the post-2014, that just includes

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1     the DOT IDs; correct?
2  A  Correct.  That's the number of people in the SVRS
3     who do not -- who do not link to the Department
4     of Transportation file.
5  Q  So is it necessarily so that number in your
6     8.4 percent nonpossession rate doesn't account
7     for non-DOT IDs, passports, military?
8  A  That's -- that's correct.
9  Q  Okay.  And so, if we would incorporate those
10    kinds of IDs, it would -- it would be a lower
11    nonpossession rate?
12 A  That's correct.  But I don't think that would --
13    I'm confident that that would not effect the --
14    have a material effect on the subsequent
15    conclusions I draw.
16 Q  Okay.  My understanding is there are -- there are
17    DOT IDs that you don't have to have a picture on,
18    religious exemption.  Is that right?
19 A  I believe so.
20 Q  Does -- does the number of linked records include
21    those?
22 A  I suspect it does because the DOT does not
23    indicate whether it's a photo ID or not.  So I
24    don't know for sure, but I suspect someone who
25    did have that religious objection to have their

1     picture taken if they did have a DOT driver --
2     you know, a license or something that that --
3     that would match if those individuals were in
4     both data files.
5  Q  Because those kinds of IDs can be used to vote;
6     is that correct?
7  A  Under Act 23, I believe an individual who has a
8     religious objection to voting does not have to
9     show a photo ID to vote; although, I suspect the
10    number of people who fall into that category is
11    quite small.
12 Q  Right.  On the top of page 13, you compare the --
13    the finding in "Frank" about 300 thousand or
14    9 percent was -- was similar to your number.  Do
15    you know when -- when the data used in Frank was
16    from?
17 A  So I believe that number was from a professor at
18    the University of Texas.  I actually don't know
19    the precise date that that data was polled.  You
20    know, I suspect it was late 2013 or early 2014;
21    but I -- I don't know.
22 Q  Okay.  And are you aware from your research of a
23    sort of progressive decline in rates of
24    nonpossession after states have had voter ID laws
25    in place for longer periods?

1  A  I'm not aware of research that has tracked that
2     over time.  I can say that the -- that the
3     nonpossession rate that I found of 8.4 percent is
4     consistent with what other states have -- has
5     conduct -- this -- this type of analysis has been
6     conducted in a number of states; and the -- the
7     range is actually pretty consistent, usually
8     within the range of 6 to 9 percent of people
9     registered voters show up as not possessing a
10    photo -- photo ID.  But I -- to answer the
11    question, I -- I am not aware of any research
12    that tracks the nonpossession rate over time.
13 Q  Do you know what the longest strict ID state --
14    let me start that over.  Do you know when the --
15    the first defined strict ID state implemented its
16    voter ID law?
17 A  I'm not sure.  I don't know whether Indiana is
18    classified as a strict photo ID state in part
19    because of the exemption.  So I -- I don't know
20    off the top of my head the precise dates when the
21    various states enacted their photo ID laws.
22 Q  So, if I understand the answer to your earlier
23    question, regardless of when voter ID laws were
24    implemented, the nonpossession rates stays
25    consistent over -- over time.  Is that --

1  A  I -- I don't know.
2  Q  Okay.  As a -- I mean, would it stand to reason
3     that, as laws are implemented or as time passes
4     after -- after they're implemented, more people
5     would get qualifying IDs?
6  A  Well, so that's the sort of question I would
7     prefer to have data rather than speculate because
8     that -- that -- I -- I don't know and would
9     prefer not to speculate about what the -- you
10    know, what -- what stands to reason.
11 Q  Since -- since the enactment of the -- the voter
12    ID law in Wisconsin, are you aware of any data
13    showing a higher rate of obtaining qualifying ID
14    or higher or lower?
15 A  Well, we could compare the 9 percent in 2014 to
16    the 8.6 percent -- or 8.4 percent.  What did I
17    say?  8.4 percent.  So, if those two matching
18    methods were directly analogous, which I don't
19    know that they are, that would indicate a slight
20    decline in the number of people who don't -- who
21    -- who don't match.  So that would be one piece
22    of information.
23 Q   Is there -- is there a -- a point of the
24    percentage of nonpossession at which you believe
25    that there's no longer a -- a problem with voter

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1    ID laws?
2        **MR. CURTIS:** Objection.  Calls for a
3    legal conclusion.
4  A  So you're asking my personal opinion or my --
5  **BY MR. JOHNSON-KARP (CONTINUING):**
6  **Q  From -- from your research.**
7  A  Well, from -- from my research, I would say that
8    there was no positive number that would ease my
9    concerns about the -- the impact of these laws.
10    If there was one person who was prevented from
11    voting because he or she doesn't have the
12    appropriate ID and is otherwise qualified, I
13    still would regard the law as unnecessarily
14    burdensome.
15  **Q  At page 17, you talk about the -- the Marquette**
16    **Law School Poll, 17 and 18.  As illustrating**
17    **confusion going into the -- the 2014 election,**
18    **are you aware that there was a subsequent poll to**
19    **the one that you relied on?**
20  A  Subsequent?
21  **Q  Sub -- sub -- between the poll that you relied on**
22    **and the election in 2014.**
23  A  No.
24  **Q  If I could draw your attention to Exhibits 3 and**
25    **3.  And do these look familiar to you?  And there**

1    **should be two.**
2  A  These do not look familiar to me.
3  **Q  I'll represent to you that these are the -- the**
4    **results polled from the Marquette Law School Poll**
5    **for the week of October 23rd through 26th, the**
6    **week after the poll you relied on in your report.**
7    **Does the -- the -- the question at the top of**
8    **these pages, is that familiar to you as the --**
9    **the question posed in the poll you looked at?**
10  A  I -- I would have to look at you know, this
11    doesn't have any indication of the -- of the
12    provenance of the -- of the poll.  You know, the
13    fact that this is a poll of two hundred and --
14    yeah.  I mean, I -- so, I mean, the question here
15    26 is different than the question 25.  And, you
16    know, without actually looking at the -- at the
17    poll and, you know, who was included, whether
18    it's registered voters or likely voters, I would
19    be uncomfortable drawing any inferences from --
20    from this particular data.
21  **Q  And I'll -- I'll represent to you that**
22    **Exhibit 3 -- at the top you'll see the -- the --**
23    **the file "MLSP27StandardCrosstabsLV" was from the**
24    **-- the likely voter information.  And Exhibit 4,**
25    **at the top, you'll see RV for registered voters.**

1  A  Okay.
2  **Q  And I -- I will represent that this was taken**
3    **from the Marquette Law School Poll website on the**
4    **week of October 23rd through 26th, 2014.  As you**
5    **look at these numbers, do you -- do you see any**
6    **different information from the information you**
7    **relied on in your report as to voter confusion?**
8        **MR. CURTIS:** I -- I object to this line
9    of questioning because the witness is being asked
10    to speculate about these poll results.  We have a
11    couple of pages, which I understand are
12    identified as cross tabs.  But, Counsel, do you
13    have the -- the -- the full poll results that the
14    witness could look at or --
15        **MR. JOHNSON-KARP:** It was thousands of
16    pages.
17        **MR. CURTIS:** Okay.
18        **MR. JOHNSON-KARP:** I -- I thought I
19    would save us some -- some time of looking
20    through a thousand pages but --
21        **MR. CURTIS:** And I'm not -- Counsel, I'm
22    not questioning your representation.  I -- I
23    accept that as just -- just with a couple of
24    pages here, you're kind of asking the -- the
25    witness to speculate a bit; but -- but you can

1    you can answer to the -- to the extent you can.
2        **MR. JOHNSON-KARP:** And I -- I can ask a
3    more general question, I guess, as a lead in.
4  **BY MR. JOHNSON-KARP (CONTINUING):**
5  **Q  If, as these polls seem to suggest, voters --**
6    **fewer voters believed that they were required to**
7    **show an ID, would that change your conclusion**
8    **about whether voters were confused going into the**
9    **2014 election, whether voters were confused about**
10    **the voter ID law?**
11  A  Well, based on this stipulation, which I -- I'm
12    actually not prepared to -- to make without
13    understanding more about this poll, that, you
14    know, it shows -- this data do show that there
15    were fewer people who were confused about the
16    necessity of showing a photo ID at the polls.
17  **Q  And, if -- if these data do, in fact, show what**
18    **they seem to suggest, does that -- would that**
19    **alter your conclusion about whether voters --**
20    **whether more voters believed that ID was required**
21    **going into the 2014 election?**
22        **MR. CURTIS:** Ongoing objection to this
23    line of questioning because the witness is being
24    asked to speculate on incomplete data.  But,
25    again, you can answer.

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                          Page 77

1  A   So I -- I would say no because we are talking
2     about a -- a marginal effect.  All right?  It's
3     not that everybody who thinks that they are --
4     that the -- the -- the effects that I found in my
5     analysis are, in part, a function of how many
6     people were deterred from voting because they
7     thought that they had to show an ID.  But it is
8     not entirely a function of what that number is
9     because the effects that I observed are
10    consistent with the State of Social Science
11    Research on voting that show that voter ID laws
12    have an effect, and the -- the purpose of this
13    analysis was that it's true that the voter ID law
14    was not in effect in 2014; but there were a
15    significant number of voters who believed it
16    wasn't in effect.  And, whether that number was
17    in the earlier poll, 53 percent or 25 percent,
18    those numbers are different.  But, if a quarter
19    of the electorate believes in -- inaccurately
20    that they need to have a photo ID in order to
21    vote, you will still see an effect; and so the
22    effect that I identified in my analysis is
23    actually independent of the size of this effect.
24    The only way in which you could say there clearly
25    was no effect if you did a poll like that and

Deposition of KENNETH MAYER, 4-8-16                          Page 78

1     then the percentage of people was zero.  There
2     would -- there would -- there would be no
3     confusion.  Everybody understood that they didn't
4     have to show an ID even give the -- the margins
5     of error and the public opinion poll.  You know,
6     in that case you can say, well, there might be
7     other things going on; but, you know, I suspect
8     very strongly that, if I were to replicate the --
9     this analysis that I did for 2014 for this
10    election or for 2016, the effects would be
11    significantly larger because now the effects are
12    in place.  So this is -- you know, the fact that
13    there was some voter confusion was an effort to
14    demonstrate that we expect to see some effects in
15    2014.  It is not dependent on the -- the
16    conclusions that I reached from those tests is
17    not a function of whether this -- the percentage
18    of voters who were confused was 53 percent or
19    45 percent or 25 percent.  I also note that the
20    -- the effects of the confusion are entirely
21    consistent with what I find, younger people, 18
22    to 29 are more confused, nonwhite -- for
23    nonwhites.  African American and Hispanic are
24    more confused.  So those are all consistent with
25    the -- the direction of the -- of the data.  So,

Deposition of KENNETH MAYER, 4-8-16                          Page 79

1     having gone through this sort of thought process,
2     my conclusion is that this data has no effect --
3     no material effect on my conclusions.
4  BY MR. JOHNSON-KARP (CONTINUING):
5  Q   And just to --
6        MR. CURTIS:  I'm -- oh, I'm sorry.
7        MR. JOHNSON-KARP:  Go ahead.
8        MR. CURTIS:  Counsel, could I just ask a
9     -- a question to clarify the record?  The
10    difference between Exhibit 3 and Exhibit 4 is
11    what?  Are these different dates?  Because I see
12    all of the percentages change from 3 to 4.
13       MR. JOHNSON-KARP:  So Exhibit 3, if you
14    look at the top, the last two letters are LV,
15    likely voters.
16       MR. CURTIS:  I got it.  Okay.
17       MR. JOHNSON-KARP:  And then registered
18    voters.
19       MR. CURTIS:  Okay.  Thank you, Counsel.
20  BY MR. JOHNSON-KARP (CONTINUING):
21  Q   And, just to clarify, Professor, you said that
22    **the rate of confusion was higher for African**
23    **Americans and Hispanics; is that correct?**
24  A   Correct.
25  Q   **How I read -- I'm looking at page two of**

Deposition of KENNETH MAYER, 4-8-16                          Page 80

1     **Exhibit 3.  In the -- the row, Required to show**
2     **photo -- photo ID, White 20.1 percent; Blacks,**
3     **16.1 percent; Hispanic, 14 percent.**
4  A   Well, that's -- that's the wrong indicator here
5     because my analysis is among registered voters.
6     I'm looking at people who have registered.
7  Q   **I -- and -- and the other one shows otherwise?**
8  A   It could well be --
9  Q   **Okay.**
10  A   -- that the people who are registered say that
11    the reason they're not likely to vote is because
12    they think they need to show an ID, which they
13    don't have; so they're not likely to vote.  So
14    that -- that's what the -- the -- the -- the
15    table that is the most consistent with what I did
16    is the registered voters.
17  Q   **And, if you could expand on -- on that, the --**
18    **the distinction between -- or your reliance on**
19    **registered voters as opposed to likely voters.**
20  A   So, I mean, the way that the Marquette Poll is
21    conducted is there are screening questions.  One
22    of them is, Are you currently registered to vote?
23    And that is registered voters.  The second
24    question is, How likely are you to vote?  And you
25    can see that the number of registered voters,

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

---

Deposition of KENNETH MAYER, 4-8-16                    Page 81

1    1,409, is larger than the number of likely votes.
2    And the reasons these numbers are none -- they
3    don't -- they're not exactly round is that
4    Professor Franklin waits.  He -- he adjusts the
5    data to reflect demographics.  And so someone who
6    in -- inaccurately believes that they need to
7    show a photo ID incorrectly, which they don't
8    have, they may be registered but have concluded
9    that they can't vote.  So, yes, I'm registered;
10   but I'm not likely to vote, and that's -- you're
11   capturing a certain number of people there.  If
12   someone has already gone through the process of
13   understanding that they don't need to show a
14   photo ID; and I note that the -- you know, the
15   percentage of likely voters is still, you know,
16   20 percent.  So there's still -- is -- is quite a
17   bit of confusion.  You know, they -- they may
18   have an ID and think that they'll need to show
19   it; and so they've -- they've already gone
20   through that second stage registering and then
21   becoming likely to vote.  But, again, I don't see
22   this data -- the fact that this shows the
23   confusion was somewhat lower does not effect my
24   -- does not effect my -- the -- does not effect
25   the conclusions that I draw from the -- from my

---

Deposition of KENNETH MAYER, 4-8-16                    Page 82

1    individual level analysis.
2  Q  So where you say on page 19, "Because a majority
3    of Wisconsin voters believed the voter ID law to
4    be in effect, 2014 serves as a trial of what
5    effect a lack of ID will have on turnout."  Did I
6    read that correctly?
7  A  Yes.
8  Q  Even if a majority doesn't believe that --
9  A  I mean, my -- if you want to change that -- that
10   even, you know, because a quarter of Wisconsin
11   voters believe that the voter ID law was in
12   effect, my conclusions would be unchanged.
13 Q  2014, you say still serves as a trial.
14 A  Yes.
15 Q  Okay.
16 A  And, in the sense that in -- in -- in my opinion,
17   you can draw reliable inferences about the effect
18   of not having an ID from looking at 2014, even
19   though, from a formal perspective, the law was
20   not in effect.
21 Q  Okay.  I'd like to go briefly back to the
22   distinction between using registered and likely
23   voters.  There are other considerations than the
24   -- the existence of the voter ID law that could
25   shift somebody or -- from the -- or make somebody

---

Deposition of KENNETH MAYER, 4-8-16                    Page 83

1    less likely to vote.  Fair?
2  A  That's correct.
3  Q  So I guess, broadly speaking, what -- why not use
4    likely voters?
5  A  Because the SVRS doesn't indicate whether someone
6    is a likely voter.  I have -- that is a survey
7    question.
8  Q  Okay.
9  A  I would need to ask people -- you know, if I had
10   -- if -- so it's not -- there's no way to do
11   that --
12 Q  Okay.
13 A  -- given the -- the nature of the analysis that I
14   did.
15 Q  But that would almost, by definition, produce a
16   -- a higher measure of turnout; right?
17 A  Well, perhaps.  But that's the wrong unit of
18   analysis that -- that I'm looking at the
19   likelihood of -- of an individual voting based on
20   these demographic characteristics.  And, if --
21   even if someone registered and said that they --
22   they were not a likely voter -- well, I would
23   really prefer not to speculate.
24 Q  Sure.
25 A  But the -- to answer the original question, the

---

Deposition of KENNETH MAYER, 4-8-16                    Page 84

1    reason I didn't look at likely voters is I was
2    working with the SVRS, which is a -- most people
3    who register vote.  It is -- I don't know what
4    the exact figure is.  But, you know, depending on
5    the election turnout, it can be 85 or 90 percent
6    of the people who register vote.  And we know
7    that the people who have registered have already
8    gotten over the first step, that they've taken
9    the initiative to actually go through the steps
10   to register.  And so that becomes a -- and that
11   also, by definition, excludes everybody who is
12   not eligible.  So, if someone who, for whatever
13   reason, is too young, they are not a citizen,
14   they are not a -- they're only here temporarily,
15   they are a felon who was still on paper, whatever
16   reasons they have for -- so we've already
17   excluded those, and so that gives me the -- the
18   baseline of looking at the propensity to vote.
19        MR. JOHNSON-KARP:  Okay.  Do we want to
20   take a break now?
21        THE WITNESS:  Yeah.  I could take a
22   break.
23        MR. JOHNSON-KARP:  Just a quick break or
24   lunch?
25        THE WITNESS:  Quick break.  Not lunch.

---

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                               Page 85

1           **MR. JOHNSON-KARP:** Okay.
2           (Recess.)
3           **MR. JOHNSON-KARP:** Back on the record.
4     **BY MR. JOHNSON-KARP (CONTINUING):**
5  **Q   I'd like to now get into some of your results.**
6      **Starting with residents in a student ward, if you**
7      **could explain the process for -- well, why have**
8      **you decided to use student wards as opposed to**
9      **18- to 24-year-olds?**
10 A   Primarily because Act 23 imposes particular
11     demands on students, particularly the subset of
12     students who are not permanent Wisconsin
13     residents and who would be less likely to have a
14     driver's license or a photo ID. Those students
15     would have to use some other form of ID. One of
16     them could be, depending on where they go to
17     school, their student ID if it qualifies with a
18     signature and an expiration date. But, even
19     then, they have to show proof of enrollment,
20     which is an additional burden that -- that
21     doesn't apply to anybody else. And so I was
22     interested in analyzing the effects on college
23     students. The way that I -- one of the ways I
24     did that, not the only way, involved identifying
25     those areas in which students are more likely to

Deposition of KENNETH MAYER, 4-8-16                               Page 86

1      live; and I did that by using the Carnegie
2      Classification. I forget what the exact name is.
3      It's in the report. The Carnegie -- it's on page
4      14. The Carnegie Foundation for the advancement
5      of teaching which is an authoritative and
6      widely-used list of institutes -- institutions of
7      higher education. I wanted to know where --
8      where those places are because that's where the
9      students are most highly to live. So I
10     identified all institutions that were on that
11     list with enrollment over 500, so I'm being --
12     I'm being under-inclusive. There are
13     institutions that are on this list that I don't
14     count, in part, because, at some point, the
15     numbers become small enough that they don't make
16     a material contribution to any analysis. And I
17     identify -- it identifies those -- where those
18     colleges and universities are by geocoding the
19     addresses. Each of these institutions has a main
20     address, and you can use different applications
21     to convert a street address into a latitude and
22     longitude, which you can then import into a GIS
23     system, geographic information system, program to
24     see where they are. And so I had a geographic
25     information systems program that's basically a

Deposition of KENNETH MAYER, 4-8-16                               Page 87

1      map that had the wards, and I could locate each
2      of the colleges and universities on that list;
3      and I could see where they are. And I counted.
4      I had three criteria for identifying student
5      wards. One is if they -- there was a ward where
6      a college and university existed, I think -- let
7      me make sure that -- and then, in addition, to
8      the -- the ward where a university was and --
9      because these are four-year universities, almost
10     all of them will have dorms, which would be
11     places of residents. I then identified either
12     contiguous wards that were adjacent or nearby
13     wards that were moving outwards in concentric
14     circles where the percent of 18- to 24-year-olds,
15     I believe is the category I used, which is the
16     prime -- 18- to 24-years-old were -- they
17     constituted at least 10 percent of the population
18     of that ward. And because the -- that -- that
19     was significantly higher -- that it was almost
20     50 percent higher than the average ward
21     population of 18- to 24-year-olds, which is about
22     7 percent, I made the inference that those are
23     wards where there are likely to be a material
24     number of students who live; and I provided the
25     list in the appendix. Most of them are -- you

Deposition of KENNETH MAYER, 4-8-16                               Page 88

1      know, there's -- there's -- there's no question
2      because we're looking at, you know, wards where
3      you have 90 percent and 80 percent 18- to
4      24-year-olds that meet these criteria. And so I
5      -- I classified these as student wards, and the
6      only wards were -- that are included that are
7      under 10 percent are because those are actually
8      the locations of the universities; and I wanted
9      to apply a consistent methodology so you could
10     see that, in a couple of places, I think
11     particularly for the Milwaukee School of Art and
12     Design, which is on page 43, Milwaukee - Ward
13     185, it's only 7.8 percent. And for the City of
14     Wauwatosa, Wards 7 and 12 for the Medical College
15     of Wisconsin, those are the only wards where the
16     population was below 10 percent. And that's
17     because that's where the -- those -- those wards
18     were physically where all or part of the
19     university was located, and so I classified these
20     as student wards based on the empirical
21     expectation that you would see a -- an
22     identifiable and material effect on turnout in
23     these wards, which you -- which you did. And so
24     that's -- that was the process of identifying --
25     what I define as student wards.

Case: 3:15-cv-00324-jdp    Document #: 175    Filed: 05/11/16    Page 24 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1  Q  Any turnout that we see in -- in student wards,
2      though, necessarily includes some people outside
3      of the 18- to 24-year-old range; is that correct?
4  A  That's correct.
5  Q  Just a question about appendix one, the chart.
6      The percent, 18 to 24 registered, is that the
7      percentage of 18- to 24-year-olds living in the
8      ward who are registered or the percentage of
9      registered people in the ward who are 18 to 24?
10 A  That's the percentage of registered voters who
11     fall into the 18 to 24.  So the age.
12 Q  Okay.  So, looking at this -- this first one,
13     there's -- you know, if we assume 100 registered
14     voters, 70 of them are 18- to 24-year-olds?
15 A  No.  We don't need to make that assumption
16     because we -- we can look directly and -- so, if
17     we're looking at the City of Appleton, Ward 8 --
18 Q  Yep.
19 A  -- okay -- we know, based on the SVRS, that there
20     are 1,383 registrants in that ward --
21 Q  Okay.
22 A  All right -- because one of the pieces of
23     information in the SVRS is the location of the --
24     the ward location of the registrant.  Because I
25     have the birth date, which is one -- it's a

1      nonpublic.  It's not something normally that the
2      GAB gives out; but, because, for the purposes of,
3      trial I had that information.  I was able to
4      calculate the age of a person on election day
5      2014; and, of those three eight -- 1,383
6      registrants in the City of Appleton, Ward 8, 968
7      are between the ages of 18 to 24.
8  Q  Okay.
9  A  So that's -- so you can't -- you cannot look at
10     this and say -- and -- and infer that 70 percent
11     of the 18- to 24-year-olds -- you can't make
12     assumptions based on this about how -- what
13     percentage of 18 to 24-year-olds are registered,
14     if that's -- if that's what your question was.
15 Q  Could you say that again, please?
16 A  So it sounded to -- to me like the -- what you
17     had said is that, we know that 70 percent of all
18     18- to 24-year-olds in that ward are registered;
19     and that's incorrect.  What we know is, of the
20     people who registered, 70 percent are between the
21     ages 18 to 24 because there is a -- there's a
22     number -- I don't know how many.  There was a --
23     there are a number of people who reside in the
24     ward who are not registered, and they are totally
25     excluded from this calculation.

1  Q  Got it.  Okay.  Okay.  Okay.  I'm looking at page
2      16 of your report now.  Looking at -- in fact,
3      it's on registrants who do possess ID.  On page
4      16, you're talking about the Government --
5      Government Accountability Office study.  It shows
6      a 1.9 to 3.2 percentage point difference
7      following implementation of voter ID law.  Is
8      that --
9  A  That's correct.
10 Q  I just was wondering about the percentage in the
11     -- the next sentence, 1.5 to 3.7 percentage
12     points -- I'm sorry.  I'll read the whole
13     sentence.  "The GAO also included that the
14     decrease in turnout was between 1.5 to 3.7
15     percentage points larger among African Americans
16     than among white voters."  So is that within the
17     -- the percentage from the preceding sentence?
18 A  No.  So I would want to go back and look at the
19     report.  But the way this reads is that the --
20     the total effects, including all demographic
21     groups, the GAO concluded that states with voter
22     -- voter ID -- strict voter ID laws have driven
23     -- have decreased turnout by depending on the
24     state between 1.9 and 3.2 percentage points.
25     Now, that's -- they also broke out percentages

1      among different demographic groups; and so they
2      concluded that the -- the drop and turnout among
3      African Americans was higher than for Whites.
4      You can't just add that 1.5 to the 1.9 to get
5      their turnout.  You would have to know what the
6      turnout was among Whites, and then you would add
7      that one point -- it's a -- it's a statement
8      about the differential effect on White versus
9      African American voters.
10 Q  Okay.  I just wanted to clarify that.  And, just
11     moving through the report -- I apologize.  I
12     could have brought this up earlier.  But, talking
13     again about the -- the Marquette Law School Poll
14     report, Professor Hood notes that the decision
15     overturning the injunction happened -- or was in
16     the midst of that poll.  Do you recall that?
17 A  In -- in his report specifically?
18 Q  The event.  And we can look to his report if
19     you'd like.  It's Exhibit 7, 42 and 43.
20     Actually, top of 43, second line down.  "A U.S.
21     Supreme Court decision blocking implementation of
22     Act 23 came out late in the evening of
23     October 9th.  The poll --" I believe that refers
24     to the poll you relied on "-- was conducted from
25     October 9th through the 12th of 2014.  Over the

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1    time span when the poll was being conducted, the
2    enforceability of Act 23 changed.  Because of
3    this confounding effect, the results from this
4    particular survey question should not have been
5    reported."  And then he goes on at the end of the
6    -- the paragraph, "In summary, Professor Mayer's
7    analyses in no way test the effects of
8    Wisconsin's voter identification law on turnout."
9    Specific as to the effect of that -- the Supreme
10   Court overturning the injunction, how -- how do
11   you believe that that impacted the -- the poll
12   results, if at all?
13 A  Well --
14            MR. CURTIS:  Objection.  Just -- I'm --
15   I'm sorry, Gabe.  Just to the accuracy of the
16   question, I think that mischaracterizes.  The
17   Supreme Court didn't overturn the injunction.
18            MR. JOHNSON-KARP:  And I wondered about
19   that as I said it.  I think -- I think that's how
20   it's stated in the --
21            MR. CURTIS:  Overturned the stay of the
22   injunction.
23            MR. JOHNSON-KARP:  Right.  Right.
24            MR. CURTIS:  Yeah.
25   BY MR. JOHNSON-KARP (CONTINUING):

1  Q  Did I read it correctly?  In any event, when the
2    Supreme Court maintained the injunction of
3    blocking the enforceability of the Act 23, in the
4    midst of the poll, do you have any opinion on how
5    that would impact the poll results?
6  A  It would likely reduce the number of people who
7    were confused.  But, as I said earlier, even if
8    we use this more -- the -- the -- the later poll,
9    that doesn't materially effect my contribution or
10   my conclusions about the result because that --
11   there were still a significant number of people.
12   You know, if we were looking at the, you know,
13   23 percent of regis -- you know, registered
14   voters, you know, we're looking at hundreds of
15   thousands of people who mistakenly believed that
16   they would have to show an ID.  So it's true that
17   that 20 percent is lower than the number in the
18   earlier poll, but that does not materially effect
19   the fact that my analysis shows what it shows and
20   has produced its results which are entirely
21   consistent with what is -- what is known about
22   the effect of the voter ID laws.  And that --
23   again, I'm -- I am quite confident that, if you
24   were to replicate my analysis using the election
25   on April 5th or perspectively to November, the

1    effects would be larger.  So this does not, in my
2    view, undermine the validity of my analysis; and
3    Professor Hood is simply wrong when he says that
4    -- that twenty -- that my analysis in no way
5    tests the effects of Wisconsin's voter
6    identification law and turnout.  That's simply
7    incorrect.
8  Q  And I think you stated --
9  A  And let me -- and let me know that Professor
10   Hood's own research demonstrates that voter ID
11   laws drive down turnout; and he -- he himself has
12   written that Georgia's voter ID law has driven
13   down turnout, especially among African Americans.
14   So, you know, Professor Hood is making claims
15   here that are entirely contradictory to what his
16   own research shows; so I -- I -- I don't find
17   this to be a persuasive criticism of the analysis
18   that I did.
19 Q  And I think you stated earlier but, just to -- to
20   clarify, whether it's 50, 25, 5 percent
21   confusion, that illustrates sufficient confusion
22   about --
23 A  Well, let me phrase it a little bit differently.
24   If the result -- if the confusion was 55 percent,
25   35 percent, or 8 percent, the -- you would still

1    be able to test for that effect because the
2    people who don't have an ID would be less likely
3    to vote.  They would be -- the effect would be
4    smaller if it was 8 percent as opposed to
5    15 percent, but the effect would still be there;
6    and you'd be able to detect it if it existed.  So
7    the -- the -- the -- the results that I found are
8    the results that I found; and -- and, whether or
9    not the confusion rate was 53 percent or
10   20 percent, that doesn't effect my conclusion
11   that the results that I found are entirely
12   consistent with the inference that -- that the
13   voter ID requirement or, more properly, people
14   who did not possess a photo ID were less likely
15   to vote, which I, in turn, in -- in part, because
16   of that documented confusion, I -- I can
17   attribute to the voter ID -- the photo ID
18   requirement.
19 Q  It is -- it is an inference, though, right, that
20   decrease -- if the inference decreases in
21   strength, the less -- or the fewer people that
22   are confused between the confusion and the -- the
23   effect of decreased turnout?
24 A  It's -- it's -- it's possible, but we don't know
25   for sure; but it's certainly plausible to argue

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 26 of 81

One Wisconsin Institute, Inc., et al.  vs.                                    Deposition of KENNETH MAYER
Gerald C. Nichol, et al.                                                                             April 8, 2016

1   that the -- the effect that I observe would have
2   been even larger if, in fact, the -- the true
3   great of confusion on election day -- which we
4   don't know -- if that true great was 53 percent
5   and not 23 percent, the effect would be
6   significantly larger than it would be if the true
7   confusion rate was 20 percent.
8 Q   And, as -- as the confusion rate goes down,
9   there's a possibility of an increase in the
10   likelihood that any of the other extrinsic
11   factors were the cause in the decline turnout; is
12   that correct?
13 A   It's possible.
14 Q   I'm looking at page 19 of your report.  Sorry.
15   Was it the 21.4 number of residing in a student
16   ward, was that the correction that you had that
17   was, I think, 19.8 somewhere else in the report?
18 A   That's correct.
19 Q   Okay.  So the 21.4 is correct?
20 A   That's correct.
21 Q   Okay.  So we're looking at the -- the numbers of
22   nonpossession on page 19.  If -- if those numbers
23   are -- are in fact lower, fair to say that the
24   percentage in each category be lower?  For
25   example, if the total number of not possessing ID

1   is lower than 282, that would trickle down
2   through each category?
3 A   Presumably.  But the -- the -- the issue here is
4   simply not the percentage but the difference in
5   the percentages in the demographic groups, and I
6   don't know precisely whether the -- the
7   difference, for example, the 1.5 percentage point
8   difference between the nonpossession rate among
9   African Americans would go -- you know, would --
10   would stay the same or go up or down if the
11   overall number of people who don't show up is
12   matching was smaller.
13 Q   Okay.  I'd like to, again, pull out Professor
14   Hood's report, which is Exhibit 7.  And I'm
15   looking at pages 33 and 34.  Professor Hood does
16   a two-party breakdown by race for Wisconsin. I'm
17   looking at table 12.  In -- in your research,
18   have you encountered this kind of breakdown?
19 A   Yes.
20 Q   And --
21 A   I mean, this kind of breakdown in terms of these
22   numbers or doing calculations or trying to
23   estimate the percentage of different groups who
24   identify with one party or the other?
25 Q   I -- I -- I think the latter.

1 A   Okay.  So this is -- I am familiar with this --
2   with this technique.
3 Q   And, if you're able to tell just by looking at
4   the numbers, does this -- does this seem like a
5   -- an accurate representation of the -- the
6   population of Wisconsin?
7 A   I would have to say no.  I find it very
8   surprising the -- the claim that 60 -- that only
9   60 percent of African Americans identify as
10   Democrats and 24 percent identify as Republican
11   when the more -- the other figures put those at
12   90/10 or 95 to 5; so I'm not sure where those
13   numbers come from.  I don't know whether
14   Professor Hood has included leaners or whether he
15   has -- I don't know how he did his calculations.
16   But I -- just looking at this, this looks -- this
17   does not look right to me.
18 Q   What -- what other data sources suggest
19   otherwise?
20 A   You can look at the -- you know, the voting
21   behavior of African Americans, which are
22   overwhelmingly Democratic.  You can look --
23   Wisconsin does not have party registration.  We
24   also don't record the race of the registrant,
25   which is something that -- that frequently would

1   happen in states that were previously covered
2   under Section 5 of the Voting Rights Act.  So
3   this is based on the -- a large scale survey of
4   Republicans and -- or of large scale -- large
5   scale survey of something called the Cooperative
6   Congressional Election Study of state level
7   inferences.  But, you know, I haven't tried to
8   replicate this; but this does not look right to
9   me.  I find it very surprising, the claim, that a
10   quarter of African Americans in Wisconsin
11   identify as Republicans.  That's not consistent
12   with what you observe in voting behavior, and
13   it's not consistent with lots of other data that
14   suggest that African Americans are overwhelmingly
15   Democratic.
16 Q   Talking about measuring voter behavior, is that
17   through -- through surveys?
18 A   Exit polls.  You can also look at ecological
19   inference studies of voting behavior in wards and
20   districts with very high concentrations of
21   African Americans.
22 Q   So, overall, you would -- you would dispute the
23   numbers specifically -- overall, you would
24   dispute the numbers in this table?
25 A   So, you know, not having done the -- or

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 101

1    replicated the calculation, you know, I can't say
2    that, if I did what he did, I would come up with
3    these same numbers; but this does not look to me
4    like a reliable calculation that is an accurate
5    reflection of the party identification of -- of
6    -- of race. This is just -- this does not look
7    correct to me based on my experience and
8    knowledge of patterns of party identification
9    among different demographic groups.
10  Q   You mentioned --
11  A   For one thing, you know, Hispanics --
12      traditionally, Blacks, African Americans are
13      overwhelmingly Democratics; and Hispanics are
14      Democratic but by slightly less margins. And,
15      here, you see the reverse. This -- this just
16      looks -- this looks strange.
17  Q   You would say then that the 71.4 percent number
18      in the Hispanic column would be lower -- closer
19      to what -- what's your estimate there?
20  A   I -- not having -- I would have to look at the --
21      look at the data. I'm not prepared to -- to say
22      what the numbers ought to be. What I can say is
23      that these numbers do not -- are not consistent
24      with other indicators or other estimates of the
25      party identification of -- of different

Deposition of KENNETH MAYER, 4-8-16                    Page 102

1    demographic groups.
2   Q   Okay. What about table 13? Are you familiar
3       with those measures?
4   A   Yes.
5   Q   And what about the accuracy of the percentage
6       of --
7   A   Well, this is a -- this is a different source.
8       The table 12 is a Cooperative Congressional
9       Election Study. The citizen voting age
10      population is from Census Bureau and -- yeah.
11      The -- the -- the number -- so the -- the percent
12      CVAP, which is an abbreviation for Citizen Voting
13      Age Population, looks correct to me.
14  Q   Okay.
15  A   The next column, which is numbered, is Professor
16      Hood's hypothetical partition of a -- an
17      electorate based on those percentages. But,
18      again, this is not directly applicable to my
19      analysis because I did not look at Citizen Voting
20      Age Population. I looked at registrants, which
21      is, by definition, eligible voters. So the idea
22      behind the -- the CVAP is that you are -- you
23      want to remove people who are noncitizens and
24      therefore not eligible to register and vote. But
25      I don't need to do that. I don't need to

Deposition of KENNETH MAYER, 4-8-16                    Page 103

1    estimate what the -- what the population of
2    eligible voters are because I have the population
3    of eligible voters at that point in time, which
4    is the people who have registered.
5   Q   Turning -- turning to the next page then of his
6       report, 35, my understanding is that this is a
7       combination -- or, I should say, it includes the
8       -- the percents used in table 12; is that
9       correct?
10  A   I'm sorry. Say that again.
11  Q   So the -- the numbers in table 14 are based on
12      the percentages in table 12; is that correct?
13  A   That appears to be correct.
14  Q   Do you then take the same issue that you had with
15      table 12 as to table 14?
16  A   Yes.
17  Q   And, now looking at table 15, are you familiar
18      with -- with this kind of -- this kind of
19      breakdown?
20  A   I'm going to say no because I don't think this is
21      a reliable methodology.
22  Q   Why is that?
23  A   Professor Hood is combining multiple data
24      sources; and -- and, most importantly, I don't
25      make any claims in my report about the partisan

Deposition of KENNETH MAYER, 4-8-16                    Page 104

1    effects of voter ID; and so this -- this has no
2    relevance to anything that I did because I -- I
3    make no representations that the voter ID or any
4    of the other effects or -- or the other changes
5    have had a partisan effect. And so, clearly what
6    Professor Hood is attempting to do here is, try
7    to make the claim that the voter ID does not have
8    a significant partisan effect; and I think that's
9    wrong. And you don't have to take my word for
10  it. You can ask senator -- you know, Congressman
11   Rothman about that. I don't think it's -- I
12   don't think this is plausible. I don't think
13   this is correct. I think this is combining
14   different -- different data sets in ways that --
15   that, you know, I -- I think, if Professor Hood
16   submitted this as a peer review general
17   submission, it would be summarily rejected as
18   unreliable.
19  Q   For the reasons you've just catalogued?
20  A   For the reasons that I've said. Is that okay if
21      I grab some water?
22  Q   Yeah. Absolutely. Okay. Now, going back to
23      your report. And I'm on page 21. I'm looking at
24      table six. Why are there those blank spots in
25      the table?

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                                    Page 105

1  A  Because the GAB aggregate figures do not break
2     out.  The notes by -- by race, you can calculate
3     those directly.  I didn't.  I was interested in
4     the differential effects of the turnout, but we
5     could certainly add them in.
6  Q  So it's not correct.  It sounds like that, to get
7     a number in the -- the far right column, 2010 to
8     2014 drop off, we wouldn't just add the two
9     columns together for GAB turnout?
10 A  I'm sorry.  Say that again.
11 Q  So my understanding of this 2010 to 2014 drop-off
12    column is that it's some of the column for 2014
13    and 2010.  So, for example, looking at White in
14    2014 and 2010, we have 72.8 and 74.9; is that
15    correct?
16 A  Mm-hmm.
17 Q  And then the 2.1 --
18 A  I'm sorry.  That's -- that's correct.  Sorry.
19 Q  The 2.1 corresponds to that change; right?
20 A  From 2010 to 2014.  That's correct.
21 Q  So, then looking down to GAB turnout, if we --
22    some 62 -- or I'm sorry -- 71.2 and 62.3, we get
23    an 8.9 percent increase.  Is that correct?
24 A  That's correct.
25 Q  Okay.  And -- and -- and is that your

Deposition of KENNETH MAYER, 4-8-16                                    Page 106

1     understanding of what the GAB data show for the
2     -- the increase between 2010 and 2014?
3  A  That's correct.
4  Q  Okay.  I'm looking at page 22 of your report, the
5     last sentence of that full paragraph at the
6     bottom starting with, The bump.  "The bump in the
7     recall turnout is consistent with what the actual
8     GAB turnout figures show and is likely in part
9     the result of a gradual decline in the number of
10    regis -- registrants since the 2010 election.
11    And the fact that the June recall took place
12    before mobilizing, and thus registration, for the
13    2012 presidential election had intensified."
14    Could you -- could you explain that, please?
15 A  So let me refer you to table four on page 20,
16    which, if you look in the -- the point of this
17    exercise and -- is an exploration of the data.
18    The inferences that I drew for the purposes of
19    the report come from the individual level
20    analysis; but let me explain, you know, the
21    argument.  If you look at the GAB registration
22    totals, which are taken directly from the GAB,
23    you see that, in 2010, there were 3 thousand --
24    3,450,847 people registered on election day 2010.
25    And then, if you go to the recall, you see that

Deposition of KENNETH MAYER, 4-8-16                                    Page 107

1     number goes down by about 113,000.  There are
2     only 3,337,939 registered voters; and that is a
3     reflection of the churn.  Over time, people will
4     leave.  I believe the GAB may have gone through
5     its list maintenance process, which, if someone
6     has not voted in two elections or has not voted
7     for four years, there's a process where the GAB
8     will send them a notification and trying to --
9     and -- and, if they don't respond, they can be
10    removed; so it's a way of keeping the list
11    current.  It's possible that people move out of
12    state and register somewhere else; and -- and,
13    you know, they may inform the GAB.  They may not.
14    There's no question that the number of
15    registrants is lower in the recall in -- than
16    there were in 2010.  Now, the turnout figures
17    that I show on table six are actually the GAB's
18    calculation of turnout as the number of
19    registered voters.  So, in this case, the number
20    of votes that were cast in the recall was about
21    the same as the -- actually, a little bit larger
22    than the vote totals -- actually, the turnout
23    went up by about 300 thousand votes; but turnout
24    went up, and the number of registrants went down.
25    So you're going to see a spike in the turnout as

Deposition of KENNETH MAYER, 4-8-16                                    Page 108

1     a -- a -- as a percentage of registered voters.
2     Now, returning to table four, you look at --
3     between the recall, which I believe was in June
4     of 2010 -- or 2012 and 2014, the number of
5     registrants goes up by about 65 thousand,
6     roughly.  And then, again, that's consistent with
7     what we know about turnout that, as an election
8     -- a regular November general election becomes
9     closer, that you see a mobilizing effect.  It'll
10    be larger in the presidential year; so that --
11    that's -- that's the explanation for the -- for
12    the bump and turnout, the fact that, according to
13    the GAB, turnout went from 62 percent to
14    75 percent and then fell off.
15 Q  Okay.  Why is there such a discrepancy in the
16    registration -- again, looking at table four.
17    Where the SVRS registration count shows
18    increasing registration from 2010 to the recall
19    to 2014, GAB registration totals don't show that.
20    What -- do you have any explanation, especially
21    looking at the -- the recall, why there's that
22    400 -- approximately 400 thousand gap?
23 A  Well, that's -- that's the function of the churn.
24    It's the fact that we're looking at the SVRS in
25    September of twenty thir -- 2015.  We actually

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                           Page 109

1    don't know what the SVRS looked like in November
2    of 2010 because that -- that information no
3    longer exists, unless -- in the unlikely event,
4    which I don't think exists, that -- they have
5    this number, which I don't think they do.  And so
6    what has happened is that people have dropped --
7    people who were registered to vote and voted in
8    2010 have dropped out.  There are people who have
9    come into the SVRS.  And so, you know, the -- the
10   -- the -- the population of registrants who --
11   that we observe in 2015 is not the same as what
12   we observed in 2010.  And so just looking at the
13   aggregate number, that doesn't give you a --
14   that's not the only number you want to look at.
15   All right?  Because people will roll off, which
16   we know happens.  The -- you know, the -- one of
17   the relevant quantities is what happens among --
18   how do -- how do subgroups compare?  And the --
19   so it's not the -- I'm not making the claim the
20   turnout actually went down between 2010 and 2014.
21   We know that's not true.  What I'm claiming is
22   the -- the -- the -- the observation here, right --
23   and I'm calling it an observation rather than a
24   claim because, ultimately, my conclusions are not
25   based upon this.  If you look at it, they are

Deposition of KENNETH MAYER, 4-8-16                           Page 110

1    based on the individual level analysis, which
2    allows me to control for things in ways that this
3    -- this does not.  Making the observation that
4    the difference in turnout between the elections
5    is very different in various demographic groups.
6    It's higher for African Americans and Hispanics.
7    It's higher for people who reside in student
8    wards, and so that -- I -- I look at that, and
9    that -- that is a -- an indicator that there is
10   some empirical patterns going on here that are --
11   that require investigation, which leads me into
12   the individual level analysis.
13 Q   Does the -- the GAB -- this -- for example, the
14   -- the recall total for the GAB column, the 3
15   million 337, doesn't that capture the churn that
16   had occurred up to that point?  I guess, relative
17   to the two years on either side of it, doesn't it
18   -- doesn't that number illustrate the existence
19   of churn such -- I'll let you answer that.
20 A   Well, we -- we don't -- we don't need to look at
21   that number to know that churn exists; and -- and
22   that -- this number doesn't -- is -- is different
23   than the -- the issue of looking at the SVRS at a
24   point in time and trying to draw aggregate
25   inferences to get them to go back to an earlier

Deposition of KENNETH MAYER, 4-8-16                           Page 111

1    point in time because the populations are -- are
2    different.  And so we know from the character of
3    this -- that SVRS or statewide, you know, voter
4    registration systems that every state has, the --
5    the -- the -- the churn character is, you don't
6    need to look at vote totals.  The churn would
7    exist even if those vote totals were exactly the
8    same.
9 Q   So am I correct that this -- these numbers in the
10   GAB column are not equivalent to a snapshot of
11   the SVRS at -- at those times?
12 A   Right.  That's just a count of -- for the number
13   of people who voted.
14 Q   Well, in table four, isn't it -- it's a count of
15   registration, right, as opposed to voting?
16 A   I'm sorry.  Yes.  That's -- that's right.  So
17   that -- that is a -- I got confused between table
18   four and table five.  So, if we're looking at the
19   registration totals, the -- the fact that that
20   number is lower is a -- I -- I understood that we
21   were talking about vote totals, not registration
22   totals.
23 Q   And I apologize if I --
24 A   So the answer is that that is -- that is an
25   indicator of -- of -- of change of -- of churn.

Deposition of KENNETH MAYER, 4-8-16                           Page 112

1 Q   Okay.
2 A   The fact that that number is -- is different is
3    an indicator of churn; but I -- I would submit
4    that, even if that number was exactly the same,
5    you would still see churn.  That would just mean
6    an equal number of people moving in and out.
7 Q   Then I -- and, just -- just to clarify, again,
8    looking at table four, do you have any sense of
9    why there's a 400,000-person discrepancy between
10   the -- the registrations in 2012 under the SVRS
11   count and the GAB totals?
12 A   Because -- so what the SVRS registration count is
13   that I'm -- I'm looking at the snapshot in -- in
14   September of 2015.  I know when people register
15   because I have that date.  I'm going back to
16   2010, and I'm looking at that snapshot in 2015
17   looking at how many people were in the SVRS as of
18   2010.  So, basically, I'm excluding everybody who
19   was added to the SVRS since the 2010 election.
20   So, if someone registered the day after election
21   day on 2010, they are not included in those 2010
22   totals because I am only interested in who was in
23   the SVRS as of election day 2010; and so this is
24   a way of -- of -- of observing, right, not
25   necessarily in the sense of drawing a -- a

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 113

1    concrete inference.  But this is a way of
2    observing that the SVRS changes over time and
3    that one must be attentive to that fact and doing
4    subsequent analysis by, for example, doing
5    controls and -- and doing different tests about
6    when people entered the SVRS.
7  Q  So, for example, the recall year, again, the
8    2012, that -- that isn't linked to people who are
9    registered in 2010.  That's linked to people who
10   are registered in June of 2012?
11 A  As of June of 2012.
12 Q  Okay.
13 A  Correct.  Or people who are -- who are registered
14   as of the recall day and who are still in the
15   SVRS in 2015.
16 Q  And I guess we don't -- we don't know the date
17   that the -- the GAB's number for 2012 is from, do
18   we?
19 A  I believe the GAB figures are monthly.
20 Q  Oh, I'm sorry.  June 2012.
21 A  Yeah.
22 Q  Okay.
23 A  I believe those figures are monthly.
24 Q  So these -- these should be identical, shouldn't
25   they, the -- between the two columns?

Deposition of KENNETH MAYER, 4-8-16                    Page 114

1  A  No.  No.  They shouldn't be because, again, I am
2    the -- so the -- the GAB registration total for,
3    say, the recall, the 3,373,939, that's everybody
4    who was in the SVRS on that day.  My registration
5    count is different.  The count here is everybody
6    who was in the SVRS as of the 2012 recall who
7    remains in the SVRS when I entered the snapshot.
8  Q  Okay.
9  A  So there are -- essentially, this is one
10   indicator of -- roll off of -- of this churn
11   so --
12 Q  Okay.
13 A  -- we would have -- I am not making a claim that
14   these numbers ought to be equal.  They're not.
15   We know they're not.
16 Q  Right.
17 A  I am making -- making the claim that this is
18   something that -- that needs to be controlled for
19   in subsequent analysis.
20 Q  Okay.
21 A  Let me -- let me add one thing.  There was a --
22   well, no.  I'll just leave it at that.
23 Q  Don't let me stop you.
24 A  No.  No.  That's fine.
25     MR. JOHNSON-KARP: It's ten after 12.

Deposition of KENNETH MAYER, 4-8-16                    Page 115

1    Do we want to take lunch?
2      THE WITNESS: Yeah.  Yeah.  I could use
3    some lunch.
4      MR. CURTIS: Sure.  Okay.
5      (Recess for lunch.)
6      MR. JOHNSON-KARP: Back on the record.
7  BY MR. JOHNSON-KARP (CONTINUING):
8  Q  And I just want to clarify one point that we were
9    discussing before lunch about the -- the 400,000
10   discrepancy.  I'm sorry.  I'm on page 20, table
11   four.  And I think -- and I just want to clarify.
12   What the number in the SVRS column shows -- is
13   the people who registered in 2012 who were also
14   registered in 2015; is that correct?
15 A  Right.  So the -- I think the -- the more precise
16   way of putting it is that -- that -- that
17   2.9 million figure is the people who are in the
18   SVRS who we observed in September 2015 who were
19   in as of election day on the recall so --
20 Q  And the -- the 3.3 million number in the GAB
21   column reflects who was in in 2012 but not
22   necessarily who was in in 2015?
23 A  Right.  So that -- that reflects people who are
24   in the SVRS in November of twenty four -- 2012 --
25   or June -- June of 2012 at that snapshot.

Deposition of KENNETH MAYER, 4-8-16                    Page 116

1  Q  Okay.  And I apologize if you said this.  But,
2    just -- just to clarify, why -- why the 400
3    thousand doll -- 400 thousand discrepancy?
4  A  Because it's -- it's a function of the people who
5    have essentially dropped off who are in the --
6    who either -- largely, it's -- it's going to be
7    the -- the roll off, people who are in the SVRS
8    on that day, on June -- I think it was June 5th
9    who subsequently, for one reason or another,
10   dropped out.  They were removed through the list
11   maintenance.  They moved and notified the GAB
12   that they moved; and so they were, at some point,
13   subsequent to the -- that election day, they --
14   they dropped out of the SVRS.
15 Q  And why does that matter?
16 A  Well, it matters because it means that, in
17   subsequent analysis, you need to account for
18   that.  There are -- you know, that -- that the
19   population in 2015 is not precisely the same
20   population in the SVRS in 2012 or 2010; so it's
21   important to incorporate methods that can
22   identify and test for those effects or control
23   for those effects.
24 Q  Is it -- is it more important for your -- your
25   conclusions as to individual behavior than it is

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                                    Page 117

1        to aggregate conclusions?
2    A   So I think I understand.  I mean, it -- it is --
3        it is more -- it's more significant for the
4        aggregate effects; and that's why my conclusions
5        are actually not based on this.  This -- this is
6        an effort and data exploration identifying
7        patterns.  But the conclusions that I draw and
8        the inferences I make about the effects of the
9        voting changes on the likelihood of voting.
10       That's all -- that comes from the individual
11       level analysis.
12   Q   Okay.  Now, I'm on page 23.  Middle of the big
13       paragraph there, "Between 2010 and 2014, overall
14       turnout, among voters in the SVRS on the date of
15       each election, declined by 2.5 percentage
16       points."  Did I read that correct?
17   A   Yes.
18   Q   If -- if the -- the overall turnout did not, in
19       fact, decline by 2.5 percent, if we assume that,
20       that would change your numbers as to any declines
21       in the subgroups; correct?
22   A   I'm sorry.  Can you say that again?
23   Q   If the overall turnout between 2010 and 2014 did
24       not decline by 2.5 percent and declined by a
25       lesser number or increased, that would impact any

Deposition of KENNETH MAYER, 4-8-16                                    Page 118

1        perceived declines in the subgroups that you
2        calculated?
3    A   Possibly.  Again, it's important to keep in mind
4        that this isn't an overall measure of turnout.
5        This is -- this is a measure of people who are in
6        the SVRS in 2015 and looking at the behavior of
7        those -- of -- of that subset of the people in
8        the SVRS who were in there in 2015, who were also
9        in there in twenty -- 2012.  All right?  So we
10       are -- we are -- there are, you know, two things
11       that can happen is that people are added to the
12       SVRS; and they register subsequent to the recall,
13       and we can capture that.  Or they can -- they can
14       drop out.  If they drop out, they would have been
15       in the SVRS in 2012, if we had taken that
16       snapshot; but we don't observe them in 2015
17       because they're gone.  And so there is a -- a --
18       the -- the populations that -- when you look at
19       that 2010 snapshot and look at the 2015 snapshot,
20       they're -- they're not identical.
21   Q   So how -- how is it possible that, if -- if, say,
22       the 2.5 decline was, in fact, a 1.5 increase, is
23       it possible that that wouldn't alter the subgroup
24       number?
25   A   So here's -- here's perhaps a different way of --

Deposition of KENNETH MAYER, 4-8-16                                    Page 119

1        of explaining what -- what this means.  So I can
2        look at the SVRS at the point in which I have
3        that snapshot, which is September 2015; and I can
4        go back in time, and I can look at how many
5        people were in the SVRS in 2010 and see -- see
6        what they did, see how -- how they voted.  And I
7        can also observe -- and I did this in the -- in
8        the controls that in the -- in the individual
9        level of controls, if I use that same group of
10       people, just the people who were in the SVRS as
11       of 2010, I looked at their behavior in 2015 and
12       compared it to their behavior in 2015.  And so
13       that -- in that case, I am looking at exactly the
14       same group of people, and I'm observing their
15       turnout in one point; and I'm observing a turnout
16       of that same group of people at a different
17       point.  So that's what I did at the individual
18       level.  At the aggregate level, it's a little
19       different because I am looking at the people who
20       are in the SVRS as of 2015 and comparing that to
21       that sub -- or I'm looking at everybody, and then
22       I am comparing that to the subgroup of people who
23       are in the SVRS as of 2010; but they're still
24       there today.  So the -- the -- the group in 2015
25       is going to be larger than the group in 2010

Deposition of KENNETH MAYER, 4-8-16                                    Page 120

1        because I'm capturing the people who have rolled
2        on and registered since then, but I -- I don't
3        know their identities; or I don't know -- I can't
4        observe the people who dropped off, so that's --
5        that's what accounts largely for the -- the
6        difference.  I mean, I -- I wouldn't describe it
7        as a discrepancy because I'm not representing
8        that those should be the same.  It's just a --
9        it's just a -- a description of what is going on
10       in the -- in the data.  And the -- the -- the
11       conclusion that I draw from this is that you do
12       see some differential patterns that are suggested
13       and that I use as the -- the -- the -- the basis
14       of the individual level analysis where I can
15       actually do those controls.  Now, I can -- I can
16       -- I can select different subsets of the SVRS
17       looking at people who are in 2010, looking at
18       those same people in 2014, looking at people who
19       were in the SVRS as of the recall election,
20       looking at those people -- same people so I'm not
21       -- I'm not looking at anybody else.  And I'm
22       eliminating everybody who I have -- who has
23       subsequently registered.  So it allows me to make
24       more -- more precise and more accurate inferences
25       about the behavior of that group of people.

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 121

1  Q   Okay.  Okay.  I'm on 26.  You say on 26, "Voting
2      is a learned habit."  I'm in the first paragraph.
3      "Voting is a learned habit and that past turnout
4      is a good predictor of future voting habits."
5      And, later on in the next paragraph, "Prior
6      voting behavior is a strong determinant of voting
7      in 2014, as is increasing age."  So it is -- it
8      is the case that increased voting is correlated
9      to increased age?
10 A   That's correct.  The propensity to vote is --
11     goes up as people get older.
12 Q   And, in 2010, is it correct that there was a high
13     turnout for 18 to 24 -- or, I guess, two
14     questions -- for 18- to 24-year-olds and/or
15     residents in a student ward?
16 A   I would have to actually look at the -- the --
17     the -- you know, you can look at the -- at the --
18     the actual data; but I'd have to be very careful
19     here because -- so, again, the -- these aggregate
20     comparisons in table six are not the relevant
21     quantity anymore because I'm looking at the
22     behavior of people who voted in 2010, which is
23     the starting point; and I'm now looking at the
24     behavior of that same group of people in 2014, so
25     I'm not adding anybody.  Same -- I'm -- I'm

Deposition of KENNETH MAYER, 4-8-16                    Page 122

1      observing their voting behavior in 2010 and 2014
2      of the same group of people.  And so I actually
3      -- I don't think -- I think I -- the individual
4      level analysis -- let me -- let me think about
5      this for a second.  I want to make sure that I'm
6      -- I'm precise.  Okay.  So it looks like table
7      six actually -- the -- the -- the 2010 figure is
8      the relevant quantity here because that's the
9      people who were in the SVRS as of 2010; so I've
10     already eliminated everybody who registered
11     after.  So, in this case, you know, the direct
12     comparison is not 2010 to 2014 because those are
13     two different groups.  I'm looking at the
14     behavior of that group in 2010 and then looking
15     at the behavior of that same group in 2014.  So,
16     I mean, we can look at the -- the turnout of that
17     group was 72.7; but I don't know what the turnout
18     of that same group was where people lived in
19     student wards was in 2014.
20 Q   And I -- I think that gets to my next question.
21     But the number in 2014 of resides in student ward
22     is people who resided in a student ward in 2010?
23 A   That's correct.
24 Q   So they didn't necessarily reside in a student
25     ward in 2014?

Deposition of KENNETH MAYER, 4-8-16                    Page 123

1  A   No.  I guess the -- the -- the -- the correct way
2      to phrase that is that I'm observing where they
3      lived in 2014.  I don't know where they lived in
4      2010.  So it's possible that the students who --
5      or -- or the people who live in a student ward in
6      2014 lived somewhere else in 2010.
7  Q   So -- or -- or presumably weren't registered;
8      right?
9  A   No.  They had to be -- they had to be registered.
10 Q   In 2010?
11 A   In 2010.
12 Q   Oh, yeah.  Yeah.  I gotcha.  I gotcha.
13 A   But, even if I don't know where they lived in
14     2010, I can still observe whether they voted or
15     not because that's recorded.  That's an
16     individual -- that -- that -- that follows an
17     individual registrant, even if they re-register.
18 Q   So, given that these people -- the -- the student
19     ward residents in 2014 were also registered in
20     2010, there's like a -- a four-year cohort that
21     is included in that group that -- that's not a
22     clear question.  What I'm trying to get at is
23     that the analysis of a student ward in 2010 would
24     not have included -- or rather in 2014 -- I'm
25     sorry -- wouldn't have included the people who

Deposition of KENNETH MAYER, 4-8-16                    Page 124

1      were 18 to 22 years old because they wouldn't
2      have been registered in 2010.  Does that make
3      sense?
4  A   Yeah.  But it's not necessarily true.  Someone
5      who is 18 in 2014 I've already excluded because
6      they would have been 14 in 2014.  So the -- the
7      -- for the purposes of the analysis from 2010 to
8      2014, the youngest person in that group would
9      have been 18 in 2010; so they would have been 22
10     in 2014.  They still fall into that -- that --
11     that demographic; and, you know, I also include
12     the control from the recall to 2014 which will
13     pick up anybody who's 20 years old or older.  But
14     it is -- it is correct that someone who is 18 in
15     twenty four -- in 2014 would not be included in
16     the 2010 analysis.  It would have been -- they
17     would have been kicked out entirely.  I wouldn't -- I
18     wouldn't care about -- I wouldn't analyze their
19     voting behavior in 2010 because they didn't have
20     any, and I wouldn't analyze their voting behavior
21     in 2014 because I couldn't observe anything in
22     2010; so they would be -- they would be removed
23     from the data site.
24 Q   So it -- and is that a smaller sample because
25     those -- that three-year cohort wouldn't be

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 125

1      included?
2  A   Well, yes.  If you look -- if you look on table
3      7, if you look at the end, which is the fourth
4      row from the bottom, that's the -- that's the
5      number of individuals who formed part of that
6      analysis; and so that's smaller than the
7      3,330,338 that was in the SVRS as of 2014, so
8      I've already removed a several hundred thousand
9      people.  And you can see that number changes.  If
10     you look at the next column, model two, the
11     recall, the number goes up because I'm now
12     picking up everybody who registered between
13     election day 2010 and election day on the recall.
14     So the -- the -- each of these analyses begin --
15     or works with a -- a set of people who were in
16     the SVRS as of a particular day, which means that
17     anybody who registered after that day is not
18     included in that analysis.
19  Q  Okay.  In -- in your research, have you
20     encountered anything that would suggest that a --
21     a higher turnout in 2010 was anomalous such that
22     2014 might be more of a typical turnout?
23  A   You know, I would say no because we can actually
24     observe directly the actual turnout.  But, again,
25     be careful in interpreting that, because I'm not

Deposition of KENNETH MAYER, 4-8-16                    Page 126

1      -- I'm not looking at turnout as a percentage of
2      everybody who voted.  I'm looking at the
3      percentage of people who were in the SVRS at a
4      point in time who voted; and so, that -- that
5      number, you have to -- you have to interpret that
6      number carefully, which is, again, why I have the
7      different control models to -- to identify
8      patterns that would be due to this roll off
9      phenomenon, that -- that the farther back you go
10     in time, there are -- there are more people who
11     have fallen out of the SVRS.  And so you need to
12     account for that and starting analyses at
13     different points to see whether any differences
14     you observe might be due to the fact that the
15     populations are different.
16  Q  And I'm not -- I'm not going to look for it now.
17     I had a note that -- I wondered about, if we
18     would project -- if it was possible to project
19     the roll-off effect backwards in time, wouldn't
20     that conceivably lead to some point at which
21     there's nobody in the SVRS?  I mean, not
22     realistically but --
23  A   Well, I mean, it's -- it's not really a
24     meaningful analytical concept because it -- the
25     SVRS didn't exist prior to 2006; so that's the

Deposition of KENNETH MAYER, 4-8-16                    Page 127

1      earliest point in which you can observe the
2      state-wide database.  Prior to that, there was no
3      statewide database.  And so, now, if you -- so I
4      guess it's correct that, if -- if hypothetically,
5      you were able to go back 60 years and look at --
6      look -- you know, look at the people who were
7      registered in 2015 and see what -- you know, they
8      registered 60 -- but that's -- that's not --
9      there'd be no reason to -- to do that.
10  Q  Because that 60-year snapshot for your purposes
11     would be looking at the same people?
12  A   Right.  And, again, you know, the -- the -- the
13     question here is that there's no -- there's no
14     denying that there's roll off.  I mean, that's --
15     that's -- that's the empirical fact we know.  We
16     can see that.  The -- once you know that, the
17     thing to do would be to identify ways of --
18     identifying those effects.  And one of the ways
19     that you do that is, you use different starting
20     -- starting points and -- and stopping points.
21     And, if these -- if what I observe is
22     attributable to roll off, then there are certain
23     patterns that you should see, which is, the
24     farther back you go, the smaller the effect ought
25     to be.  It should be, the farther back you go as

Deposition of KENNETH MAYER, 4-8-16                    Page 128

1      people drop out, the effects ought to go towards
2      zero because there -- there are more people
3      dropping out.  The population gets smaller.  And
4      so that's -- that's one of the reasons I think
5      the controls and I think -- the reason I conclude
6      that, even though roll off exists, it does not
7      have a material -- it -- it -- that's not what's
8      -- what's accounting for the differences that I
9      see.  It's that you actually don't see those
10     patterns.  You know, sometimes the -- the effects
11     go up.  Sometimes the effects go down.  Sometimes
12     they stay the same.  And so that -- that pattern
13     that we observe is inconsistent with the -- what
14     the argument that my results are due to the fact
15     that the populations are different and people
16     have rolled off.
17  Q  So -- so what -- what you're measuring doesn't
18     capture, for example, any demographic shift in
19     the, for example, 18- to 24-year-old cohort.  If
20     there were fewer people coming into that -- the
21     18- to 24-year-old cohort, that's not what you're
22     measuring; is that correct?
23  A   I -- I think so.  I mean, one of the reasons that
24     I don't measure changes in demographics is that
25     I'm looking at the same people.  If someone was

1  White in 2010, they remain White in 2014.  If
2  someone is 18 years old in 2010 and they're still
3  in the SVRS, they're 22 in 2014.  So I can -- you
4  know, I can describe the changes in that
5  population; and they will -- you know, that'll be
6  the same as any -- any group.  When you're
7  looking at that same group four years later, you
8  -- you know, you will be able to identify and --
9  and control for changes in -- in things like age.
10 Q  Other than -- but the student ward residents we
11    said that that can be different in the earlier --
12 A  That's correct.
13 Q  Okay.  So I'm looking at page 23, your -- the
14    models.  You talk about demographic variables.
15    Those are just -- those are what you list in the
16    appendix; is that correct?
17 A  Just let me -- let me refresh my memory.  That's
18    correct.
19 Q  Okay.  And there's a -- there's a no ID variable
20    there.  Is that kind of a binary that we don't
21    need to figure out for ID because the no ID
22    necessarily excludes those people?
23 A  So that's -- that's a -- that's a bi -- binary
24    dichotomous variable that's zero for people who
25    match into the DOT database, and it's one for

1  people who don't match; so that will capture the
2  effect -- the effect of not having an ID because
3  it's one -- set to one.  It'll capture that
4  effect on the probability of voting.
5  Q  And, if I understand correctly, the same is true
6     of being White, that, if you -- you cate --
7     categorized everybody who's not black or Hispanic
8     for these purposes as a -- a one?  Or is it --
9  A  So I think these are all bi -- yeah.  They --
10    these are all dichotomous variables.
11 Q  So one -- if -- okay.  So they get a one if black
12    or if -- if Hispanic.  Zero, otherwise.  So that
13    would -- they would be a zero if they're White or
14    some other smaller demographic group; is that
15    right?
16 A  See, the way that it -- the way that you -- if we
17    have an individual who is White, the variable for
18    White would be equal to one; and the variable for
19    -- technically, His -- Hispanic is not a race.
20    It's an ethnicity as far as Census is concerned.
21    The DOT counts it as a race, so these are all
22    mutually exclusive categories.  Although, I
23    suppose, someone who identifies as a Hispanic
24    might be either White or Black; but the -- the
25    ethnicity is the important thing.  So, if someone

1  who registered as White would have to be -- White
2  would be -- actually, it wouldn't be included
3  because that's the excluded variable -- would
4  have a value of black, zero; Hispanic, zero.  And
5  someone who was black would have a value of
6  black, one; Hispanic equal to zero.
7  Q  And, for example, someone who's -- does Native
8     American get classified or --
9  A  It -- it -- it does not.  There is -- there is a
10    Native American classification, but the numbers
11    are so small that they get folded -- basically
12    get folded in.  It's a -- so yeah.  I did not
13    include a -- a separate measure for Native
14    Americans.
15 Q  Okay.  Asian or --
16 A  An Asian, again, the -- the numbers are so small
17    that they don't have an effect.  I mean, I could
18    have included them.  I -- I am quite confident
19    that that wouldn't effect the coefficients for
20    the -- the variables that I'm interested in for
21    the purposes of demonstrating this proportionate
22    effect.
23 Q  Okay.  Did -- just to be clear, only black or
24    Hispanic got one.  White and any other --
25 A  Are --

1  Q  -- ethnic classification got a zero?
2  A  That's correct.
3  Q  Okay.  Looking at page 26 now, second to last
4     paragraph, first sentence, "The most important
5     coefficients are those for race, residence in a
6     student ward, and possession of an ID."  Is that
7     just -- that's for your analysis; correct?
8  A  That's because those were the effects that I was
9     most interesting -- most interested in
10    identifying.
11 Q  Could you explain probit, please?
12 A  Okay.  So multiple regression is the standard
13    statistical technique for identifying
14    relationships among variables.  And the -- you
15    know, it's very common; but it -- it does not
16    work well when variables only take the values of
17    zero and one.  Some of the -- the assumptions
18    that are necessary for ordinarily scores to be --
19    to be accurate, we'll call it, even though that's
20    not exactly the correct term, they don't hold
21    when you have a dichotomous variable.  So probit
22    is a technique that allows you to do a regression
23    analysis with binary variables.  And the way that
24    it works is that it describes the -- it -- it
25    essentially produces, at the end, a probable

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

---

Deposition of KENNETH MAYER, 4-8-16                                Page 133

1     listing estimate between zero and one of the
2     likelihood of the person falling into the
3     Category 1.  And so it's a -- it is a -- it's a
4     -- it's a -- it's a method that allows you to
5     draw reliable inferences when the -- when the
6     independent variable, in this case, which is you
7     either voted or not.  If you voted, you get a
8     value of one.  If you didn't vote, you get a
9     value of zero.  I can then go through the -- the
10    process of -- of estimating the effects of
11    different independent variables on whether
12    someone voted or not.
13  Q  **Okay.  And, at the top of 27, there's one way of**
14    **doing this is to set all coefficients to their**
15    **mean values.  Is there another way that you --**
16  A  We're going to get into the weeds here.  So most
17    regressions are -- are linear, that they are --
18    that the marginal effected at any point is going
19    to be similar to what it is at any other point.
20    And that's especially true if you think about a
21    bivariate regression that, if we're looking at,
22    you know, the relationship between age and height
23    because people get -- you know, as kids get
24    holder, they grow; and so you would expect the
25    line relating those variables to be positive, and

---

Deposition of KENNETH MAYER, 4-8-16                                Page 134

1     it would increase over time.  And the marginal
2     effect of going from one to two and two to three
3     under a linear analysis would be the same.  Well,
4     that doesn't work when you're in probit because
5     the -- if you are in the middle of the -- the
6     probit is -- the curve is actually S shape.  It's
7     flat.  It's zero.  And then it shoots up around
8     50 percent and then flattens up again at one.
9     And so the -- the shape of that curve at any
10    point depends on the values that the variables
11    take, so you can't -- you can't look at those
12    coefficients.  If this was a -- a linear
13    egression, I could say, a coefficient of .12
14    means that that coefficient makes a 12 percent
15    difference if we run it on a zero to 100 scale.
16    You can't do that with probit, where you -- the
17    -- the marginal effect of a -- of a coefficient
18    depends on what the underlying probability is.
19    But the effect that the coefficient was .1 would
20    be different if you were at a probability of .1
21    as opposed to a probability to .5 or a
22    probability of .9.  And so the most common way of
23    estimating the effect -- the marginal effect of a
24    variable is, you take all of -- you have your
25    underlying predictive equation.  You set all of

---

Deposition of KENNETH MAYER, 4-8-16                                Page 135

1     the variables equal to their means, their
2     averages, except for the one variable that you're
3     interested in looking at; and so that's what this
4     means.  The -- these are the -- the marginal
5     effects of a -- of all of the variables set to
6     their means, except for the variable in interest
7     here.  So, if you look at the upper left-hand
8     cell of black, that minus 2.4 percent is an -- is
9     an estimate that the effects -- someone who is
10    African American is 2.4 percent less likely to
11    vote than someone who is not African American.
12    And you estimate that by setting all of the other
13    variables to their means and then looking at the
14    value of that equation when African -- when black
15    is equal to zero and then you look at it black
16    equals to one.  And so that's -- it's just a --
17    it's a standard technique of -- of estimating the
18    marginal effects when you have a nonlinear model
19    like -- like probit.  And it -- it sounds more
20    complicated than it actually is; but this is --
21    this is very, very typical.
22  Q  **And if -- and I don't know.  Rather than mean, if**
23    **you used some other calculation, would that then**
24    **give different results?**
25  A  I would say yes.  They would not be exactly the

---

Deposition of KENNETH MAYER, 4-8-16                                Page 136

1     same.  I don't know quite how much they would
2     change, but -- but the -- the reason the mean is
3     used most commonly is that we're interested in an
4     average effect; and you could -- you could set
5     those values to anything that you'd like.  We're
6     not going to estimate the probability -- the --
7     the effect of being black for a, you know,
8     24-year-old who lives in a student ward; and I
9     could estimate that.  But, you know, you start
10    getting into how many permutations of the
11    variables do you have and very quickly run into
12    very complicated and unwieldy combinations.  It's
13    more representative and -- and clearer to use the
14    mean, and that -- that gives me the -- the
15    average effect of the variable of interest.
16  Q  **Okay.  About the -- the negative probability,**
17    **that's just -- that's saying that percent less**
18    **likely to do whatever you're asking about; right?**
19  A  Correct.  I mean, one of the other reasons probit
20    is useful for dichotomous variables is
21    probabilities above one or less than zero don't
22    have any mean.  Right?  And so, once you hit one
23    or the other, you're done.  The probability of
24    zero is going to be different than the
25    probability of minus .2.  It's -- that's zero.

---

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1    So -- so what -- what this is, is whatever -- on
2    average, in the -- the basic model, which is 2014
3    voting for registrants who are in the SVRS as of
4    2010, on -- on average, African Americans were
5    2.4 percentage points likely because the
6    probabilities are expressed between zero and one.
7    It's essentially equivalent to a percentage.
8    8.69 means that there's a .69 probability or a
9    69 percent probability that -- that -- that you
10   will vote; and then, for an African American, it
11   would be 2.4 percentage points less.
12 Q Okay.  I'm at 28 now, middle of the paragraph in
13   the middle of the page, In 2010, prior to the
14   voting changes, Control Model C1, African
15   American registrants were more likely than others
16   to vote.  And -- and I think that's the statement
17   that Professor McCarty took issue with.  Is that
18   correct in your recollection?
19 A I believe so.  And -- and -- well, I'll let --
20   I'll let you ask the question.
21 Q Is that an accurate statement in your mind, that
22   the African American registrants were more likely
23   than others vote?
24 A Based on all of the controls, that's correct.
25   And, again, I'm -- I'm not representing that

1    African Americans on the whole were more likely
2    to vote in 2010.  What I'm saying is that, based
3    on this data set that I have, that, if I look at
4    the -- the population of registrants who were in
5    the SVRS at a point in time -- so this is --
6    we're talking about control model C1, which is
7    people who voted in 2010 registered since 2006.
8    So it's a -- it's a subset of people who were in
9    the SVRS in 2014 and who were in the SVRS for the
10   entire range of the SVRS; and that's why that
11   number is small of the -- there are 1.99 million.
12 Q Oh.
13 A And, in that population of -- of African
14   Americans registrants who were in it for the
15   whole range -- the whole -- the whole length of
16   the SVRS, in that population, controlling for
17   everything else, that -- people who -- who are in
18   that group were more likely to vote in 2010 than
19   other groups.  Now, this is a control.  I'm not
20   representing that, if you went back in 2010 and
21   did an analysis of voting behavior, that you
22   would find that African Americans were more
23   likely to vote in 2010 than Whites.  I -- I -- I
24   haven't done the analysis.  I don't think that
25   I'd be surprised if that were true.  But the --

1    the purpose of that was to demonstrate -- or to
2    test, I guess is the better way to put it,
3    whether the effects that I see in 2012 can be
4    explained by this roll off.  Because, if we go
5    back to 2016, we have rolled off the maximum
6    number of people.  The only people we are
7    including in this analysis are people who have
8    been in the SVRS since the beginning.  And, if --
9    if the -- if roll off is what was accounting for
10   that, the effects ought to be more or less a
11   straight line.  The farther back you go, the
12   larger or smaller the effects ought to be.  But
13   what you see is that the effect of being African
14   American remains significant and negative for the
15   basic model.  The second model, which looks at
16   voting in 2014 going back to the recall, which is
17   a different group, for voting in 2014, for people
18   who were registered and -- since 2006 and people
19   who registered between 2010 and the recall.  So
20   there are basically four different alternative
21   specifications that should -- should demonstrate
22   a -- a -- a certain type of pattern and the
23   coefficients if what's accounting for, as
24   Professor McCarty argued, that it's the less
25   likely voters who are rolling off, that -- that

1    I'm -- I'm only including the most likely voters,
2    which is people who have stuck around forever.
3    If that were true, the pattern that we see in the
4    -- the coefficients ought to be different.  What
5    should happen is, as you go farther back in time,
6    the coefficients should get smaller and smaller
7    because the -- the effect of being African
8    American would -- would -- or any of these
9    variables goes down if the underlying population
10   becomes more likely to vote, which is what you
11   would expect if the argument is correct that roll
12   off means that the less likely voters are -- are
13   disappearing.  So we're -- we're left with people
14   who are at a baseline level more likely to vote.
15   That's why I don't -- I don't agree with the
16   criticism that the -- the fact that the
17   populations are different from one point to
18   another is what's driving these outcomes.  Again,
19   we knew that roll off is -- exists.  But the
20   effect of the -- the effect of that roll off is
21   not consistent with the explanation that it's the
22   roll off that's driving the outcome.  The reason
23   that there's a difference that the African
24   Americans are less likely to vote in 2014 is
25   because the -- the -- the -- the likely -- the

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1    unlikely voters have already dropped out.
2  Q  I think you kind of touched on this before.  The
3     -- the next sentence, "Registrants --' and I'm
4     sorry.  I'm on 28 again.  "Registrants living in
5     student wards were more likely to vote than
6     registrants in nonstudent wards."  And then you
7     go into controlling for where -- where they lived
8     in 2014; correct?
9  A  Correct.
10 Q  Now, about the -- about the student wards, those
11    wards include people, I think as -- as you said
12    earlier, who aren't in the -- aren't 18 to 24;
13    correct?
14 A  That's correct.
15 Q  They're -- it's based on location of the various
16    institutions?
17 A  That's correct.  And we can identify,
18    specifically, the percentages of people who were
19    in that age group by looking at the appendix,
20    which gives the percentage.  But it's -- it's
21    correct that -- that the percentage is not
22    100 percent in any of the student wards.
23 Q  Okay.  Okay.  Now, on page 30, looking at the
24    figure one, is it possible to tell which student
25    wards are which or the population of any given

1     student ward in figure one?
2  A  No.  Actually, can I -- I want to -- I want to
3     expand on that.  The answer is no, but that's
4     because that's not what this figure is
5     representing.  This figure does not tell you what
6     percentage of -- of -- what -- what percentage in
7     each ward consists of students.  What this tells
8     you -- and so, if you look at this graph, the --
9     the blue dots are the nonstudent wards.  The
10    maroon Xs are student wards.  If you look at the
11    -- the X axis, the variable I'm interested in is
12    the percentage of registrants in the student ward
13    who do not match into the DOT, which is
14    reasonably a proxy for how many students in a
15    student ward are -- don't have a Wisconsin
16    driver's license or ID.  The Y axis is the
17    turnout percentage in twenty four -- 2014.  And
18    what you observe is a very strong relationship
19    because the -- the higher the percentage of a
20    registrant in the student ward who don't match
21    into the DOT, the -- the -- the more -- the --
22    the higher the percentage of -- of registrants of
23    student wards who don't have an ID, the lower the
24    turnout.  That's -- that's what this is
25    demonstrating.  You -- you could -- you can't

1     look at this and point to the -- one of the Xs
2     and say -- and -- and -- and obtain the
3     information from the graph of what -- what
4     percentage of resident -- registrants in that
5     ward are students.
6  Q  Okay.  Now, between figure one and figure two,
7     how -- how I'm understanding that is that, in
8     2010, there were fewer student wards with higher
9     percentages of nonpossession.  Is it -- am I
10    reading that correctly?
11 A  That's correct.
12 Q  Why is that?
13 A  Well, the -- the reason is that, we're looking at
14    two different groups here.  One is I'm looking at
15    2014.  Figure one is looking just at 2014.  I'm
16    looking at turnout residents non-ID possession.
17    When I go to twenty -- 2010, I am only including
18    people who are in the SVRS as of 2010; and so
19    that doesn't include people who have registered
20    subsequent.  So that -- that's -- that's one of
21    the reasons why the underlying data are not the
22    same.  But what's -- what's important here is the
23    -- the slope of the line that relates to not having
24    an ID with turnout.  In 2014, it's a very strong
25    negative relationship.  In -- in 2010, it's a --

1     it's a weak relationship.  It is still negative
2     as you would expect, but it's not nearly as -- as
3     large.
4  Q  So I'm on table nine now.  If we accept that GAB
5     turnout -- GAB showed that turnout increased
6     overall.  But, also, your conclusion that turnout
7     in the subgroups, those without ID, those in
8     student wards, minority groups, the turnout
9     dropped.  Would there have to then be some sort
10    of increase in -- in turnout in other groups?
11       MR. CURTIS:  Objection.  Confusing.
12 A  Yeah.  I'm not sure I understand the question.
13 BY MR. JOHNSON-KARP (CONTINUING):
14 Q  I'll withdraw it.
15       MR. JOHNSON-KARP:  Do you mind if we
16    take a break?
17       THE WITNESS:  No.
18       MR. CURTIS:  Sure.
19       (Recess.)
20       MR. JOHNSON-KARP:  Back on the record.
21 BY MR. JOHNSON-KARP (CONTINUING):
22 Q  Looking on page 33, Aggregate effects of late
23    registration.  You state that, "Research on early
24    --" beginning of the first large paragraph under
25    sub -- sub F.  "Research on early voting has

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1     found consistently that minority voters are more
2     likely than white voters to vote on the weekend
3     before an election."  Why is that if that's
4     correct?
5 A   That's -- that's correct.  You know, I -- I don't
6     know if it has been established precisely why.
7     Some of the explanations are -- are -- they are
8     often organized efforts to get people to the
9     polls, the souls to the polls, where, after a
10     church service, there will be efforts to get
11     congregants to an early voting place on the
12     Sunday before an election.  This is more a -- a
13     confirmation of the empirical pattern that the
14     research by Harren and Smith [ph] in Florida,
15     which -- because of the way that they tract --
16     they handle registration and absentee voting.
17     They track both the race of voters and
18     registrants in a -- in a day in which an absentee
19     ballot is submitted.  They did find that, based
20     on their analysis of the data, that African
21     Americans and Hispanics were more likely than as
22     a -- as a percentage of the group to make use of
23     late absentee and late registration than -- than
24     -- than White registrants and White voters.
25 Q   Is there a -- are you familiar with any research

1     looking at longer term effects?  So, looking
2     back, if final weekend registration was
3     abolished, does -- does any decreased -- are --
4     are you aware of any research that shows,
5     overtime, decreased registration would pick back
6     up?
7 A   I'm not aware of any research that demonstrates
8     that.  And -- and part, it's because these are
9     all very recent changes.  But the Harren and
10     Smith article, they -- they examine behavior
11     before and after and note the change; but I'm not
12     aware of any research that tracks it over a
13     longer time period.
14 Q   And, just to be clear, the -- the abolition -- or
15     the elimination of final weekend registration
16     left in tact election day registration; correct?
17 A   That's correct.
18 Q   So -- so there's a gap from the Friday to the
19     Tuesday that you can't register.  But you can
20     register on Tuesday?
21 A   That's correct.
22 Q   Yeah.  And, if you could, just please describe
23     what figures three and four are showing us.
24 A   So three and four, I -- I -- I concluded that the
25     -- the appropriate unit of analysis here was the

1     municipality in a large part because you would
2     have to register and vote if you did that at the
3     municipal center, the -- the clerk's office,
4     which there is one in each jurisdiction.  And so
5     this is -- I describe in the report a method of
6     identifying people who register and presumably
7     vote; although, we don't know the precise date in
8     which they cast a ballot.  I think it's -- it's a
9     reasonable inference, if someone registers on the
10     Saturday before an election day, they would also
11     cast their votes.  But there is a bit of
12     uncertainty there, so I focus most -- mostly on
13     late weekend registration; and I -- I basically
14     graph and then estimate using regression, the
15     relationship between the -- the number of
16     registrants who cast a ballot and the percentage
17     of municipality that's African Americans.  And it
18     shows that -- that municipalities that have
19     higher concentrations of African Americans tend
20     to make more use of late weekend registration or
21     between 2006 and 2010, prior to its elimination.
22 Q   Is -- are there analyses in either of these
23     tables effected in any way by the fact that it --
24     that there are some clear outliers?  I guess
25     that's your separate line.  Is that right?

1 A   Right.  So Milwaukee is clearly an outlier.
2     Milwaukee's population is also the highest
3     population of African Americans, so that's why I
4     estimated the line and the relationship both with
5     and excluding Milwaukee.  So the -- the blue line
6     is all municipalities.  The maroon line is all
7     municipalities except for Milwaukee.  And, as you
8     would expect, the relationship becomes weaker
9     although it is still positive.
10 Q   On page 37, you say, end of the first paragraph,
11     "This analysis confirms that late weekend
12     registration in Wisconsin was disproportionately
13     used by African Americans, which is the same
14     pattern observed in other states."  Don't these
15     figures show that it's communities -- isn't the
16     analysis of communities not African Americans
17     in --
18 A   So I -- I -- I -- that's correct.  I suppose a more
19     accurate way of phrasing that would be, the --
20     the late weekend registrations is used
21     disproportionately by -- in cities with high
22     African American population because this is not
23     an individual level analysis.
24 Q   So it doesn't, in fact, make a conclusion about
25     African American registration.  It's communities

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                     Page 149

1    in which there's a higher proportion of African
2    Americans?
3  A  So -- correct.  This is -- this is not -- this is
4    not an individual level inference about specific
5    people, so I think the correct way of phrasing
6    that is that it's used disproportionately in
7    communities with high African American
8    populations.  I'm not sure there's a significant
9    difference between those two but -- I guess as
10    far as the precision matters.
11  Q  Okay.  Now, nothing in this -- in these analyses
12    suggests that African Americans would be unable
13    to register, is that correct, as a -- as a
14    general proposition?
15  A  That's correct.
16  Q  It only refers to late weekend registration and
17    the likelihood that communities with large
18    African American populations use late weekend
19    registration?
20  A  That's correct.
21  Q  Okay.  And, after late weekend registration was
22    eliminated, are you aware of any specific
23    instances of people who, for that reason, were
24    unable to register?
25  A  So you're asking, can I -- do I know of

Deposition of KENNETH MAYER, 4-8-16                     Page 150

1    individuals for whom that made a difference?
2  Q  Right.
3  A  I do not.
4  Q  Okay.  Moving on to corroboration, page 37, you
5    say in your report that you don't have specific
6    data about people who were unable to register
7    following the elimination of corroboration; is
8    that correct?
9  A  That's correct.
10  Q  Do you believe -- strike that.  And you -- I'm
11    going to be looking at table four here as well as
12    your statements about corroboration.  You say
13    that, in October of 2012, there were 19,464
14    voters who had used corroboration.  If we look at
15    GAB's numbers on table four for October -- or for
16    2012, that number is about half of a percent.  If
17    you're able to do that math off the top of your
18    head, I give you credit because I had to use a
19    calculator.
20  A  It's a little bit more than half of a percent
21    because half of a -- half of a percent would be
22    16 thousand.
23  Q  Okay.
24  A  So it's -- it's slightly greater -- slightly more
25    than -- or, actually, the -- the -- right.  So

Deposition of KENNETH MAYER, 4-8-16                     Page 151

1    the -- and this comes from the GAB that, as of
2    2012 -- October 2012, there were 19,464 active
3    voters who had used corroboration; so that's a --
4    it's a little more than half of a percent of the
5    total SVRS.
6  Q  So, of those who used corroboration since 2006,
7    is it fair to say that about 16 thousand of them
8    were no longer active if you look at the 35,000
9    less the 19,464?
10  A  Well, I -- I don't know.
11  Q  Okay.
12  A  Because these are -- these are two numbers that I
13    -- that the GAB produced.  We -- you can't
14    necessarily make that specific conclusion looking
15    at this that the people who -- that the number
16    who dropped out is not necessarily going to be
17    the larger number minus the smaller number
18    because people might have dropped out and come
19    back in or just some other things.  But the --
20    you can infer from that that some people who
21    register by corroborations between 2006 and 2012
22    were no longer in the -- the SVRS; although, I
23    don't know what the number is precisely, 35,332
24    minus 19,464.
25  Q  Okay.  Are you aware of anybody who, since the

Deposition of KENNETH MAYER, 4-8-16                     Page 152

1    elimination of corroboration, hasn't been able to
2    register?
3  A  I am not.
4  Q  All right.  I think, for now, we can put away
5    your report; and I'll move onto Professor Hood's
6    report.  Have you -- you've read and are familiar
7    with Professor Hood's report?
8  A  I would say that I have read and am familiar with
9    the portions of Professor Hood's report that
10    pertain to what I did.  Parts of it that dealt
11    with the reports and opinions of the other
12    experts I'm less familiar with.
13  Q  At page four, he quotes a publication of which
14    you were one of the authors, Despite being a
15    popular election reform, early voting depresses
16    net voter turnout.  The only consistent way to
17    increase turnout is to permit election day
18    registration.  The depressant effect of early
19    voting is only partially offset if same-day
20    registration -- that's SDR --
21  A  That's correct.
22  Q  -- is -- is present or if election day
23    registration offers a vehicle for the last-minute
24    mobilization of marginal voters.  This result
25    upends the conventional view that anything that

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

| Deposition of KENNETH MAYER, 4-8-16 | Page 153 |
| --- | --- |

1  makes voting easier will raise turnout.  Is that
2  -- did I read that correctly?
3 A  You read that correctly.
4 Q  And do you still maintain that that's an accurate
5  statement?
6 A  That is not an accurate statement of what the --
7  what that research showed.
8 Q  And why not?
9 A  The -- what that work demonstrated is that early
10  voting by itself without same-day registration,
11  if all you did is take an election system or
12  electoral regime and add early voting without
13  doing anything else, that will actually depress
14  turnout for reasons that we specify, that it
15  diffuses the -- the activity around election day.
16  However, if with what we found is that early
17  voting with same-day registration and election
18  day registration that the effects actually go --
19  the negative effects go away.  So I think
20  Professor Hood is incorrect when you say that we
21  argued it.  They only partially off set.  That --
22  my recollection is that -- and it's been a while
23  since I've looked at that piece -- that election
24  day registration and same-day registration
25  actually increase turnout.  Those are -- those

| Deposition of KENNETH MAYER, 4-8-16 | Page 154 |
| --- | --- |

1  are the keys.  So -- so it is -- it's not true
2  that we are arguing that eliminating early --
3  early voting will increase turnout.  What -- our
4  argument is that early voting which is -- which
5  has been a very popular reform, if you institute
6  early voting without making other changes,
7  without allowing same-day registration, without
8  allowing election day registration, all you do is
9  pick out voters who would have voted anyhow.  If
10  fact, what we concluded, the people who vote --
11  and early voting by itself actually have a higher
12  likelihood of voting than people -- than other
13  voters.  So the important thing is the existence
14  of same-day registration and early -- and
15  election day registration, both of which exist in
16  Wisconsin.  The other common misperception about
17  that piece is that we examine states that added
18  early voting; so we looked at states that, over
19  the -- the time period, the practice that states
20  would add early voting.  They didn't take it
21  away.  And so that piece should not be read as
22  arguing that eliminating early voting would
23  increase turnout because the existence of early
24  voting would decrease -- decrease turnout.
25  There's other research on this that shows, as

| Deposition of KENNETH MAYER, 4-8-16 | Page 155 |
| --- | --- |

1  voters become habituated to a particular
2  practice, whether it's election day registration
3  or early voting or late weekend registration,
4  voters begin to organize -- some voters organize
5  their voting activity around these -- these
6  options.  And, when you take them away, you
7  actually decrease turnout because you've -- you
8  -- you require those voters who have become
9  habituated to voting early or voting late or --
10  or who had -- you know, they move around; and
11  they tend to register on election day.  If you
12  take away that option, you force people to
13  reconfigure or rearrange their activities leading
14  up to elections.  So research that Professor
15  Burden [ph] has done -- and his argument is that
16  eliminating early voting actually can -- can
17  depress a turnout, even though what we found is
18  that, adding early voting to a system that
19  doesn't have it, by itself actually will decrease
20  turnout.  But eliminating early voting from a
21  regime that has it actually depresses turnout.
22  So it's not just the -- the direction of change,
23  but it's -- it's the fact of the change that --
24  that can matter.
25 Q  And I believe you said this earlier.  But, at

| Deposition of KENNETH MAYER, 4-8-16 | Page 156 |
| --- | --- |

1  this point, you're not aware of any research that
2  shows that those depressive effects are mitigated
3  over time; is that correct?
4 A  That's correct.  I'm not aware of any research
5  that -- that demonstrates that.
6 Q  Now, I'm looking at Professor Hood's figure one
7  on page six, I'm looking at both the EP and VAP.
8  It shows an increase in turnout; is that correct?
9 A  Well, it depends on the starting and stopping
10  point but --
11 Q  I guess, comparing eight -- twenty -- 2008 to
12  2012 and 2010 to 2014, would you agree those are
13  the appropriate comparisons to draw?
14 A  That's a reasonable comparison, yes.
15 Q  And, between each of those two sets, there were
16  increases, whether you looked at -- increases in
17  turnout, whether you looked at voting eligible or
18  voting age population?
19 A  That's correct.
20 Q  Okay.  As well as registration?
21 A  That's correct.
22 Q  What's your -- what's your -- what's your
23  perception of Professor Hood's use of voting
24  eligible population and voting age population for
25  these comparisons?

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1 A   Well, they're -- there are two ways of
2      calculating turnout.  The -- the difference
3      between the voting age population and the voting
4      eligible population is the voting eligible pop --
5      voting eligible population estimate removes
6      people who are not eligible to vote.  The two
7      largest categories are people who are noncitizens
8      and people who are ineligible to vote because
9      they are either in -- in prison for a felony or
10     on -- out of prison but on paper.  In Wisconsin,
11     you -- you forfeit your right to vote until you
12     have completed your -- your sentence.  So that's
13     -- that's the -- that's the difference; and
14     that's why the -- the numerator, which is the
15     number of people who vote, is the same in both.
16     But the denominator is somewhat smaller for the
17     voting eligible population than for the voting
18     age population because we're subtracting people
19     from that.  And that's why the voting eligible
20     population turnout is -- is always going to be
21     higher than the voting age population.
22 Q   **Professor Hood also notes that, both in Wisconsin**
23     **across these comparisons and Wisconsin compared**
24     **to other jurisdictions nationwide, there was an**
25     **increase in each of these years.  Is that your**

1      **understanding of his --**
2 A   Well -- so, I mean, I -- I -- I -- I'm
3      uncomfortable commenting on that because this is
4      not something that I -- I looked at carefully
5      because this is not really directly related to --
6      to my report; so, I mean, I -- I'm looking at
7      this figure now, but much of the rest of this
8      section is actually not something that I've
9      looked at very closely.
10 Q   **But he does show, you would agree, that there was**
11     **-- there were increases in turnout?**
12 A   Well, let's -- can you point me to the -- to the
13     -- the figure or table where he purports to show
14     that so I can take a look?
15 Q   **Just looking at figure one, that -- between -- I**
16     **think as you indicated, between those two**
17     **comparison years, there was an increase in**
18     **turnout.**
19 A   That's correct.  But this is just Wisconsin that
20     was -- that I responded to your question about
21     other jurisdictions.
22 Q   **Yeah.  And, I guess, it's not a figure; but he**
23     **does -- he does state in the paragraph on page**
24     **six, "Comparing turnout among the fifty states**
25     **and the District of Columbia, one finds that, in**

1      **2012 and 2014, Wisconsin had the second highest**
2      **turnout rate."**
3 A   I mean, I -- I -- I'm going to just dispute that
4      that's a meaningful inference because Wisconsin
5      almost always has one of the highest turnout
6      rates.  And that's in part because of the -- the
7      way in which elections have been handled,
8      election day registrations.  So the -- the -- the
9      fact that turnout in Wisconsin is higher than
10     turnout in other states either in any particular
11     election or historically does not allow you to
12     make inferences about the -- the -- the burdens
13     or the ability of individuals to vote there.  I
14     mean, we have election day registration; and
15     that's one -- we have an electorate, which
16     historically turns out at high levels.  But,
17     again, that's why I did the individual level
18     analysis because the -- the aggregate analysis is
19     illuminating; but it doesn't allow you to
20     definitively answer the question of what -- what
21     the burdens of these administrative changes are
22     on any individuals.
23 Q   **Okay.  I'm looking at figures three, four, and**
24     **five -- two, three, and four -- I'm sorry -- on**
25     **10, 11, and 12; and I -- these show increases in**

1      **in-person absentee turnout in those same**
2      **comparisons.  Are those comparison to yours?  Is**
3      **that correct?**
4 A   That's -- that's what these figures -- these
5      figures purport to show.
6 Q   **You say "purport."  Do you --**
7 A   Well, the reason I'm -- I'm being cautious here
8      is that -- that I -- you know, this -- this is
9      not something that I really looked at.
10 Q   **Okay.**
11 A   I mean, I made no representation about rates of
12     absentee voting other than the pattern that I
13     showed in the figures about late registration at
14     the municipal level.  So, I -- I mean, I -- I
15     mean, we can go through this and talk about it;
16     but I'm not really prepared to render an opinion
17     about whether these -- these figures are -- are
18     right or meaningful.
19 Q   **That's -- that's fair.  Skipping ahead to page**
20     **26, I'm looking at the second to last paragraph**
21     **below the heading, "Data sources do not take into**
22     **account," the last sentence of that --**
23 A   I'm sorry.  I'm on the wrong page.
24 Q   **Second to last paragraph.**
25 A   Okay.

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1  Q  The last sentence there, "Not being able to take
2     these other forms of identification..."  And, by
3     "those," he's referring to non-DOT methods.  Is
4     that your understanding?
5        MR. CURTIS:  Objection.  Confusing.  Is
6     -- is what his understanding?  This sentence?
7        MR. JOHNSON-KARP:  Yeah.  I'll -- I'll
8     back up.
9        MR. CURTIS:  Okay.
10  BY MR. JOHNSON-KARP (CONTINUING):
11  Q  Here do you understand Professor Hood to be
12     discussing non-DOT IDs that satisfy Act 23?
13  A  Well, with -- you know, with the qualification
14     that only certain types of university or college
15     IDs will satisfy that.  But it is true that there
16     are other forms of identification that will not
17     be captured by the -- DOT data.
18  Q  And, in that last sentence, his conclusion that,
19     "Not being able to take these other forms of
20     identification into account will produce an
21     undercount of the number of registrants who lack
22     Act 23 identification."  Did I read that
23     correctly?
24  A  I think that's -- I think what he means to say
25     is, not being able to take those will produce an

1     over count of the number of registrants.
2  Q  Right.  And, with that correction, do you -- do
3     you dispute that -- that conclusion?
4  A  The -- in part.  And the reason I say "in part"
5     is that, what -- what matters here is whether
6     someone who does not have the most common form of
7     identification, which is a driver's license or
8     ID, whether someone who does not have a driver's
9     license or an ID may possess one of these other
10     forms of identification.  As we talked about
11     earlier today, the -- the -- the number of people
12     who fall into that category is not zero.  Right?
13     There are some who don't have a driver's license
14     but have a passport or who don't have a driver's
15     licence but have a travel ID or -- or a -- a
16     veterans' administration card.  So that -- that
17     would have a marginal effect on reducing the
18     number of people who will not have one of the
19     forms of qualifying ID.  But, in -- in the -- the
20     analysis that I have done, in particular, looking
21     -- you know, incorporating Professor Hood's
22     estimate, which I don't think is accurate -- but,
23     for the purposes of discussion, I used it.  His
24     estimate of the smaller number of people who
25     don't possess a driver's license or ID, the --

1     the substance of conclusions that I reached are
2     the same.  So, even if it were true that the --
3     there are some people who have one of these other
4     forms of ID, that would reduce the number of
5     people who lack an ID.  But it doesn't make the
6     effect go away for the people who don't have one
7     of these forms of ID.  So I will -- I will agree
8     that the existence of these other forms of ID
9     could have a marginal effect on reducing the
10     number of people who actually don't have a
11     qualifying form of ID but not to a degree that
12     effects substantive conclusions about the effect
13     of not having an ID.
14  Q  Would you be able to speculate -- you -- you say
15     that it's not likely his 4.5 percent number; is
16     that correct?
17        MR. CURTIS:  Objection to the extent
18     you're asking the witness to speculate.  Go
19     ahead.
20        MR. JOHNSON-KARP:  I'll clarify.
21  BY MR. JOHNSON-KARP (CONTINUING):
22  Q  Just for purposes of this question, you -- you
23     disagree with his 4.5 percent --
24  A  I do.
25  Q  -- number?  And what -- what would be, do you

1     believe, a more accurate calculation?
2  A  Well, let me explain why I -- I disagree with his
3     estimate.  The -- the difference between my
4     estimate of 8.4 percent and his is that he
5     maintained in his report that the Department of
6     Transported -- he submitted the names of people
7     who did not match to the Department of
8     Transportation; and the Department of
9     Transportation was able to match these people to
10     some record, which indicated that, as far as DOT
11     is concerned, they had an ID.  The difficulty is
12     that he goes into no detail about how they
13     matched it.
14  Q  And, just to clarify here, you're talking about
15     what he calls the secondary match?
16  A  Right.  And he has -- he has no idea -- he
17     doesn't explain how the Department of
18     Transportation matched those, and I understand
19     from his deposition yesterday that he actually
20     has no idea how they did it.  He simply took
21     their word for it that these people matched.  You
22     know, we don't know whether these people matched
23     and there's a record of them having a driver's
24     license that is expired and if they tried to
25     renew it, they might have to then show the

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 43 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1  underlying documentation.  And it -- the -- the
2  problem is it's just completely opaque.  We don't
3  know whether DOT used exact matching, whether
4  they used probabilistic matching, how they -- how
5  -- how they did the matching; and that's a
6  material -- that's an important set of facts.  So
7  I am -- I am not prepared to agree that that's a
8  reliable method that allows him to say that it
9  is, in fact, correct that all of those people, in
10  fact, have a driver's license or ID that would
11  qualify under Act 43.  I will note he also then
12  goes on to speculate without any evidence
13  whatsoever that he thinks the true rate is
14  actually closer to 3 percent.  And that -- that's
15  just a -- that's just a guess, and so I -- and to
16  follow up, even if he is right, even if -- if his
17  4.5 figure is correct, as I noted in my rebuttal
18  report, I -- I re -- I redid my analysis of the
19  individual effect using his method of identifying
20  people who match.  So I -- I re-ran it using
21  people who -- who didn't match according to his
22  definition so the population of people who -- who
23  didn't have an ID was much smaller.  I re-ran my
24  results.  Substantively, they were identical.  So
25  the -- the -- the conclusions -- even if there's

1  a relatively small number of people, the effect
2  of not having an ID remains significant; and I'm
3  not sure there's a -- in terms of the burden on
4  an individual, whether it's 280 thousand or
5  190,000, I think that's -- that's an
6  extraordinary level of disenfranchisement.
7 Q  With regard to the secondary match process, is
8  there anything that you could see that would give
9  you more confidence in the effect of that
10  secondary match?
11 A  Well, let me -- the starting point would be an
12  explicit description of what they actually did;
13  and, you know, without that, it's simply not
14  possible to -- to judge with any real degree of
15  confidence about how they did it and --
16 Q  So, recognizing that you dispute his numbers, do
17  you have an estimate of what an accurate
18  percentage of nonpossession would be including
19  the non-DOT?  Something -- something less than
20  8.4 percent; is that correct?
21 A  You know, based on the -- the data that I had
22  access to, I -- I don't know that I would want to
23  speculate about what that number would be other
24  than to say that the effect is likely to be
25  relatively small.  We're not talking about taking

1  that 8.4 percent and turning it into 2.1.  It's
2  -- it is -- it will be smaller.  My intuition is
3  that it would be smaller by relatively modest
4  amounts, but I can't -- I can't be more precise
5  than that.
6 Q  Okay.  Looking at page 29, T six, table six, are
7  you familiar with this --
8 A  Yes.
9 Q  -- with this table?  Are there any of these
10  numbers that -- that you take issue with?
11 A  Actually, there is.  Let me look at my rebuttal
12  report.  So, if you look at my rebuttal report,
13  on page one, one of the matching steps, step two
14  links based on the last name, the date of birth,
15  and the last four digits of the individual's
16  social security number.  And, if you look at his
17  report, he was able to match 965,146 people.  I
18  examined his data and looked for duplicates on
19  that triplicate of last name, date of birth, last
20  four digits of social security; and I found out
21  that there were 85,171 records that were -- that
22  had -- in which more than one person had the same
23  set of values in his combination.  And so that
24  means that there are -- that the -- the
25  likelihood is quite high that Hood is matching

1  someone in the SVRS to a different person in the
2  DOT.  Maybe -- because sometimes there's one
3  extra.  Sometimes there are two extras, and
4  sometimes there are -- I think there was one
5  triplicate was actually duplicated a number of
6  times, and so that means that Hood is matching on
7  people who increases the likelihood that this is
8  a false match, that he's actually matching to
9  someone different.  And so that is one reason why
10  I concluded that -- I think that may be one
11  reason why Hood's non-match rate or non-match
12  count of 242,393 is lower than mine; and I -- and
13  I -- one of the first things I did when I
14  conducted my analysis, I tried to control for
15  duplicates and tried to match on data
16  combinations that had few duplicates.  I would --
17  I would never have tried to match on a
18  combination where I had close to 100 thousand
19  duplicates.  And I don't think that that gives
20  you a reliable number.  So, based on this -- the
21  -- the -- the matching process that I used and
22  the matching process that he used, not counting
23  his step two -- or I don't know what --
24 Q  Secondary match.
25 A  -- secondary match.  Just based on the primary

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 44 of 81
One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.
Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16 — Page 169

1 match, I'm quite confident my number is more
2 accurate that his because of the -- the -- this
3 -- this duplication issue that -- that he has.
4 So, based on the -- we'll call it the primary
5 match, I -- I believe that my identification of
6 the individuals who don't match my -- that my
7 method is more -- is more reliable and accurate
8 than his.
9 Q I'm looking at table 11 on page 32, and he says
10 that African Americans and Hispanics possess the
11 -- free IDs at a disproportionate rate to the
12 population.  Is that correct?
13 A These -- these percentages are correct, but I
14 think the inference he draws is entirely wrong.
15 On the one hand, he's arguing that there is no
16 meaningful disparity in the possession or
17 nonpossession of an ID when, in fact, if you look
18 at the breakdown of the no-fee state ID cards,
19 that -- that half of the people who have to take
20 advantage of that are minorities.  And so, on the
21 one hand, he's arguing that there is no racially
22 disproportionate effect when we can see, based on
23 his own data, that there is, in fact, the
24 racially disproportionate effect because it is --
25 it is primarily -- not primarily.  But it is

Deposition of KENNETH MAYER, 4-8-16 — Page 170

1 almost half of the people who have to go through
2 the process of getting that no-fee state ID,
3 which, prior to Act twenty -- 23, they would not
4 have had to do; so that's a -- that's a burden
5 that is imposed on them.  They have to go and
6 obtain one of these IDs, so he's making
7 inconsistent arguments here.  So, I mean, I don't
8 dispute these numbers as -- are accurate.  What
9 I do dispute is the inference that he draws,
10 which is, his -- his inference is, there's no
11 problem because we can see that minorities have
12 an opportunity to get an ID when, in fact, what
13 this demonstrates is that the very -- the very
14 existence of Act 23 imposes a disproportionate
15 burden on minorities who, at a much greater rate
16 than their frequency in the population, have to
17 go through the steps of obtaining this ID.
18 Q Now, looking at page 33 with regard to partisan
19 fencing, am I correct that you're not opining on
20 -- on partisan fencing?
21 A That's correct.  I make no claims about the
22 partisan effect of these administrative changes.
23 Q Then we can skip that.  I'm looking now at page
24 43.  Professor Hood takes issue with -- with your
25 definition of a student ward.  Do you have any

Deposition of KENNETH MAYER, 4-8-16 — Page 171

1 response to that?
2 A Yeah.  The only thing he says is that, because I
3 have identified one word of only 7 percent of 18-
4 to 24-year-olds, my method is wrong.  I mean,
5 that's -- that's -- that's -- that's an
6 inconsequential criticism.  The reason that word
7 is in there based on my definition of by -- of
8 counting wards where there is a college and
9 university, I needed to count that ward because
10 that's where the Medical College of Wisconsin is.
11 And that's -- I mean, that's just throwing stuff
12 at a wall and seeing what sticks.  That's not a
13 meaningful criticism.
14 Q I just -- I'd like to clarify about the
15 population of student wards.  It is the case that
16 student wards might, in many instances -- or, in
17 some instances, do include populations of over
18 90 percent that are not 18- to 24-year-olds.
19 A No.  In -- in -- in two instances.  And, again,
20 the -- I don't know exactly how many student
21 wards I identified; but it was more than 100.
22 And, even if one or two or 15 of those
23 identifications is incorrect, the -- you would
24 still be able to detect and effect if it were
25 there.  You know, even if any individual ward

Deposition of KENNETH MAYER, 4-8-16 — Page 172

1 identification was incorrect -- and I don't think
2 my definitions are incorrect.  If anything, I
3 think my definitions are highly under inclusive
4 because, if you count up the number of 18- to
5 24-year-olds in the wards, it's actually less
6 than the number of estimates -- or the number of
7 college students that there are in the state.  So
8 the -- the method I used was a -- in my view, a
9 reasonable one that I would be entirely
10 comfortable using in my own published work as a
11 way of identifying an important variable where we
12 have reason to think that there is going to be an
13 effect on students, not only because they -- we
14 know that they are less likely to possess a
15 driver's license or ID and the additional
16 requirement that, if they use their student ID,
17 they also have to prove enrollment.  And so I --
18 I regard the method that I used as reliable, and
19 I think it would be -- I don't think there's any
20 question that it would be accepted in -- in the
21 course of trying to do peer review literature on
22 -- on this.  There's certainly other forms of
23 data that would be important.  But, with respect
24 to the information I have, I -- I regard this as
25 a -- as a reliable way of making inferences about

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                                                   Page 173

1    the effect on, primarily, student populations.
2  Q   **Based on the fact that it isn't all students or**
3      **all 18- to 24-year-olds in those -- in the**
4      **student wards, is it the case that any effects**
5      **are not -- are attributable to the -- the other**
6      **population than students who are 18- to**
7      **24-year-olds?**
8  A   It's possible, but it becomes much less likely as
9      the percentage of 18- to 24-year-olds go up --
10     goes up.  Remember that the -- I think the -- the
11     mean percentage in these student wards is
12     43 percent when the mean in non-student wards is
13     closer 7 percent, so we're talking about a
14     sixfold difference in the percentage of -- of 18-
15     to 24-year olds.  And, even if -- you know, even
16     if we account -- and it's not the fact that it's
17     because those wards have a lot of 18- to
18     24-year-olds because that's one of the control
19     variables that I use.  So it -- it -- it -- it is
20     the marginal effects of residing in a student --
21     in a ward that I identify as a student ward even
22     controlling for age.  I just want to make sure
23     that I'm -- I'm describing this accurately.  That
24     -- the -- it -- it -- it controls -- it -- so
25     here is the -- my analysis about why this is

Deposition of KENNETH MAYER, 4-8-16                                                   Page 174

1      meaningful.
2  Q   **Are you at 25?**
3  A   I'm at 25, table seven.
4          **MR. CURTIS:**  Could you identify the
5      exhibit?
6          **THE WITNESS:**  Oh, I'm sorry.  This is
7      Exhibit 1.
8          **MR. CURTIS:**  Okay.
9  A   So the -- the student ward that there was not a
10     separate control for 18 to 24 -- that's the
11     excluded category.  But the -- the inference that
12     they're -- that it is the -- the ID requirement
13     that is one of the things that is driving this;
14     and, again, this is consistent with what we
15     observed in other context.  I mean, we -- we know
16     in news accounts and -- that there were
17     out-of-state students who were unable to vote
18     with an Illinois or Minnesota driver's license
19     and they had to go through a process if they
20     could to get a qualifying ID.  But the fact that
21     the results for 2014 are much larger than they --
22     than they are in previous eras or in previous
23     elections is -- suggests to me -- and the
24     inference that I draw is that something changed
25     between 2010 and 2014, and the thing that changed

Deposition of KENNETH MAYER, 4-8-16                                                   Page 175

1      is the existence of the photo ID.  So, you know,
2      again, we have a range of things with the higher
3      concentrations of 18- to 24-year-olds; but you
4      see concentrations of -- see concentrations --
5      above-average concentrations of 18- to
6      24-year-olds in wards that I have not designated
7      as student wards because, again, I wanted to be
8      -- I didn't want to count student wards unless I
9      was sure that they were student wards.  So the --
10     I am comfortable making the inference that there
11     -- that this is an effect that is
12     disproportionate on people who live in student
13     wards that's over and above the impact of age.
14  **BY MR. JOHNSON-KARP (CONTINUING):**
15  Q   **Are you aware of any other significant factors**
16     **that might be present in student wards that would**
17     **effect voting -- for example -- if -- if you're**
18     **aware of any?**
19  A   No.  The primary one would be age.  But, again,
20     if that was what was driving it, you'll want to
21     see an inconsistent pattern where the effect gets
22     smaller as -- as you move back; and that's not
23     quite what you see.  It bounces around.
24     Sometimes it's larger.  Sometimes it's smaller.
25     And so I -- I don't think my -- my conclusion is

Deposition of KENNETH MAYER, 4-8-16                                                   Page 176

1      that the -- it is not simply age that is driving
2      that.  It is a function of what has changed
3      between 2010 and 2014.
4  Q   **I'm turning now to Professor McCarty's report,**
5      **unless there's any other problems or concerns**
6      **that you noted as to Professor Hood's report.**
7  A   Well, the one thing I'd like to add on Professor
8      Hood's report is his claim that the ID petition
9      process is a meaningful safety valve; and he
10     makes that claim --
11  Q   **32 and 33?**
12  A   Correct.  So Professor Hood is making the claim
13     that the -- the existence of a program that
14     allows individuals who actually lack the
15     underlying documentation, which is essentially a
16     birth certificate is the primary one for -- for
17     people who -- so we're talking about page 32.
18     People who lack the underlying documentation,
19     Professor Hood asserts that the ID petition pro
20     -- process is a meaningful safety valve; and he
21     points out that -- let's see.  He points out
22     there's a very small number of people who have
23     gone through this process.  I -- my -- my
24     understanding is that Professor Hood has actually
25     not done the investigation about how this process

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 177

1    works.  But my understanding is that there are --
2    I think there are 22 people who have gone through
3    this process who, in fact, essentially have been
4    denied an ID.  And that means, for all practical
5    purposes, that they have been permanently
6    disenfranchised, unless there was some other
7    extraordinary process.  And the -- my reading of
8    the documentary record, the process that the
9    Department of Transportation goes through in
10   considering these extraordinary cases is that it
11   is -- you know, I describe it in my rebuttal
12   report as COCA-esque.  I mean, I think that's --
13   that's accurate.  I mean, it's -- it's written
14   with inefficiency and errors and multiple efforts
15   to obtain information and uncooperative state
16   agencies.  And I find it just extraordinary that
17   he claims that this is a -- this is a -- a safety
18   valve because it requires people to -- to jump
19   through enormous and just extraordinary hoops.
20   And -- and, in a nontrivial number, I think I --
21   I argue that you need to count not just the
22   outright denials but the suspensions and
23   cancelations which presumably are people who just
24   get fed up and they decide they're going to
25   forget it.  They still wind up with no ID, and

Deposition of KENNETH MAYER, 4-8-16                    Page 178

1    these people are essentially permanently
2    disenfranchised; so I -- I strongly dispute his
3    assertion that the IDPP is an effective or
4    meaningful alternative or safety valve for people
5    who lack the underlying documentation.
6  Q You -- you talked about the -- the -- the error
7    rate in your rebuttal report.
8  A Correct.
9  Q 27 percent.  I'm on page five of Exhibit 2, your
10   rebuttal.  Towards the end of the first full
11   paragraph --
12 A Yes.
13 Q -- you state, 27 percent of all petitions
14   initiated between March 22nd and August 1st were
15   processed erroneously.  Does it impact your
16   analysis at all how long those errors would delay
17   the process -- the process of issuing a --
18 A I would say no because, I mean, I -- I -- I find
19   that the process inexplicably complicated at the
20   outset.  And the -- and the fact that the
21   Department of Transportation keenly makes
22   mistakes and how its own internal processing
23   occurs I think is just additional evidence about
24   -- about how ad hoc it is.  I will add one other
25   thing, and this comes from my reading of the --

Deposition of KENNETH MAYER, 4-8-16                    Page 179

1    of the record of denials.  What's most noteworthy
2    about this process is that, even though it was
3    purported to be a safety valve where in some
4    cases maybe the document -- documentary
5    requirements might even be waived, in the cases
6    that I examined of the miles -- in every case
7    where there was an ambiguity, some uncertainty
8    about a voter's name or residence that all of
9    those ambiguities will result against the voter,
10   that everything had to line up perfectly for the
11   Department of Transportation to ultimately, in
12   those ambiguous cases, give someone an ID.  And I
13   -- this is based on my understanding of
14   administrative processes and the way that even
15   election administration takes place, that that's
16   -- that's an enormous and, in my view, a
17   completely unreasonable standard to use, that you
18   require what amounts to, you know, absolute
19   equality and -- and -- and alignment of -- of the
20   data; and I -- I think that's unreasonable.
21 Q Is it your position then that requiring absolute
22   proof of citizenship and identity is unnecessary?
23 A Well, there's no need to make that claim because,
24   in some of these cases, the Department of
25   Transportation admitted they had no basis of

Deposition of KENNETH MAYER, 4-8-16                    Page 180

1    questioning -- of doubting that someone was a
2    citizen or where they were born -- where they
3    said they were born.  And it goes into
4    depositions of the DOT officials where they were
5    asked, Do you have any doubt that this person is
6    a U.S. citizen?  No.  Do you have any doubt that
7    this person is who he or she says he or she is?
8    No.  Yet, they don't have an ID.  So I -- I -- I
9    think that the -- the -- the manner in which that
10   program has been implemented makes it impossible
11   to agree with -- with Hood's assertion that it's
12   a meaningful safety valve.  I -- I -- I -- I
13   don't think anybody can reasonably look at that
14   and conclude that it's anything other than a -- a
15   complete jumble.
16 Q And, if I remember correctly from this morning,
17   that's your conclusion regardless of the
18   number --
19 A Well -- well, there are two different things.
20   One of those is how many people are -- are
21   effected, and we can estimate that number.
22   Right?  That's -- that's an empirical question.
23   The other question is, what is the -- what is the
24   impact on people who -- who fall into the
25   category of someone who is burdened or, in many

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1   cases, simply prevented from casting a ballot.
2   How many people need to fall into that category
3   for that burden to be substantial?  My view is
4   that the -- the answer to that question properly
5   ought to be zero; that, if there is even a small
6   number of people who wish to vote who are
7   prevented from voting, I think that's
8   unacceptable, especially since the problem that
9   photo ID is purported to solve, which is voter
10  impersonation, someone appearing at a polling
11  place pretending to be someone else and casting a
12  ballot under those pretenses.  That -- that
13  occurs -- and the -- the amount of voter
14  impersonation is vanishingly small.  I mean, the
15  -- the number of confirmed cases in Wisconsin --
16  I mean, we're probably talking about a handful
17  going back 20 years, 15 years.  And so, you know,
18  what -- what is -- what is the -- the balance?
19  Again, that's -- that's not an empirical
20  question.  That's a normative question.  But I --
21  I think it -- in my own research -- I've -- I've
22  done research on this, and we have -- have found
23  that it is -- there is no -- no reliable evidence
24  that voter impersonation occurs in anything other
25  -- of the most trivial amounts.  And, you know,

1   the notion that hundreds of thousands of people
2   are either prevented from voting or have to go
3   through extraordinary administrative purposes for
4   -- for no reason because it doesn't solve any
5   problem I find unreasonable.
6  Q   You -- you talked about the idea of people who
7      wish to vote and are somehow prevented.  Do you
8      acknowledge that there are various -- various
9      things that might prevent someone from voting
10     that do not pose a substantial burden?
11         MR. CURTIS:  Objection.  Confusing.  You
12     can answer.
13 A   Well, I mean, this -- I'll answer.  Taking the
14     time to go vote is a burden.  Right?  And so the
15     -- the question is that, what is the -- what is
16     the purpose of these burdens?  And you -- you
17     need to have a process of accurately counting
18     votes.  You need to have a process of accurately
19     assigning people to the correct locations so that
20     they're voting the correct board or district or
21     however you want to put it.  And so there are
22     certain consequences that flow from that.  You
23     know, people are not allowed to vote anywhere
24     they -- they choose to vote.  If they decide that
25     I'm going to cast my ballot in Green Bay because

1   I feel like it, that -- that's -- that is not
2   consistent with the standards by which we view
3   elections.  And then the -- the question becomes,
4   what is the -- what is the -- the balance?  What
5   is the nature of the requirement?  What is the
6   justification for that requirement?  It would be
7   reasonable to require registration; although, I
8   note that, for a long time, even Wisconsin didn't
9   have photo registration.  But, for administrative
10  purposes, that's -- that's necessary.  But voter
11  ID does not fall into that category because
12  there's no reason for it.  There is -- there's no
13  evidence that it solves a problem.  There's no
14  evidence that the types of things that voter ID
15  prevents actually occur, and -- and -- and that
16  means that it doesn't -- there's no reason for
17  it.  And so you're requiring people to go through
18  these administrative hoops; and, in many cases --
19  and for monetary costs, someone has to get an
20  out-of-state birth certificate, Illinois, from my
21  understanding, doesn't waive the fee.  It costs
22  money.  It costs time.  For the people to go
23  through the IDPP, an enormous amount of aggra --
24  aggravation for nothing.  For no purpose.  It
25  doesn't solve the problem; and, in my view, that

1   makes it an unjustifiable restriction that
2   prevents people from voting for no reason.
3  BY MR. JOHNSON-KARP (CONTINUING):
4  Q   Unless you have any other objections or
5      corrections to Professor Hood's report, I'd turn
6      to Professor McCarty's report.
7  A   Okay.
8         THE WITNESS:  Could I take a five-minute
9      break?
10        MR. JOHNSON-KARP:  That's fine.
11     (Recess.)
12        MR. JOHNSON-KARP:  Back on the record.
13 BY MR. JOHNSON-KARP (CONTINUING):
14 Q   Turning to Professor McCarty's report, which is
15     Exhibit 8, looking at page five, Professor
16     McCarty notes the difference between having a
17     Senate election and -- between 2010 and 2014.  Do
18     you believe that that's a relevant distinction to
19     draw?
20 A   Not precisely.  I mean, it is one of the factors
21     that might, in fact, turn out; but there are
22     reasons why 2014 was exceptional too.  We had a
23     governor who clearly was interested in running
24     for president.  He had lots of interest, and
25     there were lots of efforts to mobilize; and it

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 185

1    was an important election. So it is true that
2    the existence of a Senate election, all other
3    things being equal, could be interpreted as
4    having an -- an effect on turnout; but there were
5    factors in 2014 that make 2014 the kind of
6    election where you would see higher turnouts than
7    -- than 2010.
8  Q  **And do you believe that those factors would**
9     **outweigh any -- any dip based on the lack of a**
10    **Senate election?**
11 A  Well, it's hard to say. And, again, I will note
12    that the bulk of Professor McCarty's criticism of
13    my report is it takes -- is that the advocate
14    level. He looks at advocate turnouts, state-wide
15    municipalities, and sometimes at the -- at the
16    county level. And those don't apply nearly as
17    much to the individual level analysis. And,
18    again, the reason I -- I put the -- the aggregate
19    analysis in my report is not because that was --
20    that was what I was basing my conclusions on; but
21    that was to present the data and explore the
22    different attributes of it, which would then
23    inform the -- what I -- what I did in the -- in
24    the individual level analysis, which formed the
25    basis for my conclusions.

Deposition of KENNETH MAYER, 4-8-16                    Page 186

1  Q  **I think you acknowledged this earlier. But, just**
2     **to be clear, there's -- there's no questioning**
3     **that overall turnout increased from 2010 to 2014;**
4     **correct?**
5  A  I'm not disputing that.
6  Q  **Okay. Do you have any sense of why that would**
7     **happen, why a turnout would be increased?**
8  A  Well, again, the -- you know, the -- the -- the
9     relevant quantity is not simply the number of
10    people who vote; and -- and, you know, the -- the
11    relevant quantity -- the relevant question is, Do
12    the changes that were made in election and
13    registration practices after 2011, did those have
14    an effect on the likelihood and individuals and
15    certain types of individuals to vote? And you --
16    and you -- you can't get at the second question
17    merely by looking at the first question. You
18    need to do the kind of individual level analysis
19    that I did.
20 Q  **Professor McCarty represents -- or suggests that**
21    **the -- the overall increase turnout raises the**
22    **burden of what you would have to show to suggest**
23    **any -- any argument that turnout would have been**
24    **higher -- how do you respond to that -- would**
25    **have been higher without the -- the voter ID**

Deposition of KENNETH MAYER, 4-8-16                    Page 187

1     **changes?**
2        **MR. CURTIS:** Objection to the extent
3     that it's asking the witness to respond to a
4     legal conclusion about increasing the burden.
5     But, otherwise, go ahead.
6        **MR. JOHNSON-KARP:** And, I guess, to
7     clarify, I'm talking about -- I -- I understand
8     your objection.
9        **MR. CURTIS:** But you can answer.
10 A  So I -- I -- that was the question I was going to
11    ask about whether the burden refers to a legal
12    conclusion as opposed to an empirical --
13 BY MR. JOHNSON-KARP (CONTINUING):
14 Q  **I guess I was thinking of it more as a matter of**
15    **proof that --**
16 A  So I'm going to answer no. And -- and the reason
17    is that I don't draw any firm conclusions based
18    solely on the aggregate results. My conclusions
19    were based on an assessment of the individual
20    level propensities to vote in the SVRS, not
21    saying that turnout in Milwaukee was X in 2014
22    and Y in 2010; and, therefore, we can draw an
23    inference about what had happened. I am looking
24    at the -- individual probabilities that
25    registered -- registrants cast a ballot. So I --

Deposition of KENNETH MAYER, 4-8-16                    Page 188

1     again, I'm not going to argue with you about
2     whether turnout -- advocate turnout went up
3     between 2010 and 2014 because we know that it
4     did. You can count the number of votes in 2010.
5     You can count the number in 2014, and you can
6     compare it. But that doesn't exhaust the
7     analysis that you need to look at the underlying
8     factors that effected an individual's propensity
9     to vote in those elections as -- as reflected in
10    their presence in the SVRS at a point in time.
11    So, in a one sense, we're -- we're kind of doing
12    apples and oranges here where Professor McCarty
13    is -- is trying to demonstrate that turnout
14    actually went up; but that's not -- I mean, it's
15    true it went up; but that's not the -- that's not
16    the real quantity of interest. It is the
17    effective -- the changes that we can identify and
18    the effect on specific populations that we can
19    identify; and that's what my individual level
20    analysis was designed to get at.
21 Q  **Okay. Looking at page seven, the first sentence**
22    **of the last paragraph where he says, "The central**
23    **problem with Professor Mayer's use of the SVRS**
24    **file is that it is a --" I'm sorry. I'm reading**
25    **the -- later -- later in that paragraph on page**

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                    Page 189

1   eight where he says, "If, as one would expect
2   likely, nonvoters exit the voter files at higher
3   rates than voters, then estimates of turnout in
4   previous elections will be dramatically
5   overstated."  Is that correct?
6 A  I think the -- the question is whether it is, in
7   fact, apparently true that nonvoters exit the
8   voter files at higher rates than voters; and I
9   don't really see any basis for making that
10  statement because people drop out of the SVRS for
11  a number of reasons.  They drop out of the SVRS
12  because they're -- they don't vote.  But I will
13  note that, you know, people are -- are removed
14  only have a four-year period.  And, even then,
15  it's not assured that people will -- will drop
16  out or will -- will -- will be removed.  People
17  move out of state.  There's a nonzero rate of
18  people moving, and those people will eventually
19  drop out; but I would argue that people who move
20  out of state most likely have demographic
21  characteristics that would make them more likely
22  to vote.  But, again, we -- we don't know.  So I
23  -- I would -- I would dispute the -- as one would
24  expect likely part of that; and it's also the --
25  the other aspect of this is that, if Professor

Deposition of KENNETH MAYER, 4-8-16                    Page 190

1   McCarty is right that it is the roll off of
2   nonvoters or the less likely voters that is
3   driving the results -- again, we know that
4   there's roll off.  But, if he is correct that it
5   is that roll off process that is driving the
6   results, we should see certain patterns in the --
7   in the results.  And the control models that I
8   ran should -- should demonstrate or should show
9   certain patterns, which they don't show, that it
10  is not necessarily true that, the farther back
11  you go, the smaller the effects are and that --
12  the higher the likelihood is of people voting.
13  The effects bounce around.  Sometimes you go back
14  to one point in time.  They go back up.  You go
15  back to a different point in time, they go down.
16  There's no consistent pattern, which is something
17  that you would expect to see if this line of
18  argument is correct.  So, again, I'm not
19  disputing that role off occurs.  It clearly does.
20  Roll on occurs.  It clearly does.  The -- the
21  manner in which I did my analysis would capture
22  those effects and would -- would alert me to the
23  fact that that's what's driving the results and
24  -- and the pattern that would suggest that roll
25  off is causing this is not what I see.

Deposition of KENNETH MAYER, 4-8-16                    Page 191

1 Q  You talked about the -- the kind of bouncing
2   around effects overtime.  Is it possible that
3   2014 was one of those bounces and that we would
4   see different results if you looked at 2015 and
5   2018?
6 A  I don't think so.  And the reason I don't think
7   so is the effect that you see are consistent with
8   what we know about voting and the effect of
9   administrative changes.  And the -- it -- there
10  were no real anomalies in the 2014 results that
11  would suggest to me that something strange is
12  going on.  You know, all of the variables are in
13  the expected direction; and there was nothing in
14  there that I look at and say, Well, this is
15  curious.  I wonder why that's happening.  It's --
16  it's -- it is consistent with what we -- what we
17  know and what we would expect this effect to be
18  given the demographics and given the -- the known
19  effects of voter ID requirements in particular.
20 Q  In your answer, you mention that it's a
21  possibility that there are people in the SVRS
22  that are, in fact -- that -- that could be rolled
23  off but are, for some reason or another, not
24  taken off of the -- the system.  Is that correct?
25  What I'm getting at is, you came -- are you

Deposition of KENNETH MAYER, 4-8-16                    Page 192

1   familiar with Deadwood, the term?
2 A  Yes.
3 Q  And what's your understanding of that term?
4 A  My understanding of Deadwood is that it -- it
5   means, in this context, people who remain on the
6   SVRS but, for one reason or another, are no
7   longer eligible to vote either because they --
8   not that they have died because those will be
9   removed.  People -- primarily people who have
10  moved out of the state or, for whatever reason,
11  they're no longer active voters, even though they
12  -- they show up in the SVRS.
13 Q  And I'll just draw your attention to what has
14  been labeled as Exhibit 6.  Are you familiar with
15  that protocol?
16 A  I am.
17 Q  On page 30 of the internal numbering, right-hand
18  column, second full paragraph from down, the
19  authors are discussing Catalist's analysis of
20  Deadwood suggesting that there are -- I'm in the
21  last sentence, "The data reveal that 7.3 percent
22  of all registration records in the United States
23  are Deadwood.  3.0 percent of records on the
24  active lists in the states are Deadwood."  And
25  that's what I'm curious about, the 3 percent of

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

| Deposition of KENNETH MAYER, 4-8-16 | Page 193 |
|---|---|

1 **records in the -- the active lists. Does that --**
2 **first, do you have any sense of what the**
3 **Deadwood, if any, is in the SVRS?**
4 A   In terms of the percentage?
5 Q   **Correct.**
6 A   I don't. But, again, there's -- there's --
7     there's no question that this happens. I think
8     we know that -- that the -- the SVRS -- all SVRS
9     like databases are not immediately up to date. I
10    mean, the issue of people dying I think is less
11    of an issue than those tend to be removed fairly
12    quickly with connections to the DHS. I believe
13    also the GAB also removes people who have been
14    convicted of felonies. But the -- the issue is
15    that, if that is -- if that is a real phenomenon
16    or if that is driving the results, the farther
17    back you go, the more Deadwood you should see.
18    And the -- what -- what should happen is that, if
19    you go farther back in time, the probability of
20    voting should be -- the effects of all of these
21    variables should -- should disappear because the
22    -- you're -- people who are still on the list but
23    are not removed that you look at what -- what
24    happened in 2006. Or you start the time in 2006,
25    2008, or 2012, you want to see a consistent

| Deposition of KENNETH MAYER, 4-8-16 | Page 194 |
|---|---|

1     pattern where the -- the results depend on your
2     starting point. Because, the farther back you
3     go, the more Deadwood there's going to be; but
4     that's not what you see. The -- there is no
5     consistent pattern based on the starting point.
6     I did the one model, 2010. Another model
7     starting in 2012. Another model twenty -- 2006.
8     Another model looking at people who registered
9     between 2010 and the recall in 2012. And there's
10    no consistent pattern, which is what you would
11    expect to see if my results or my findings were
12    being driven by this Deadwood or roll off
13    phenomenon. So I don't know what the Deadwood
14    percentage is, but I am confident that the
15    effects that I observed in 2014 are not
16    attributable to this Deadwood or roll off
17    phenomenon.
18 Q   **And this might be my misunderstanding. I was**
19    **thinking of Deadwood as something different than**
20    **-- that roll off, that Deadwood is people who are**
21    **on the list despite the roll off process. Is**
22    **that not correct?**
23 A   So that's -- that's -- so the Deadwood is a
24    subset of the roll off; but, again, in the
25    context of looking at the SVRS as of

| Deposition of KENNETH MAYER, 4-8-16 | Page 195 |
|---|---|

1     September 2015, they're identical because I'm --
2     I'm -- everybody who I'm looking at is on the
3     SVRS in 2015. If someone has dropped out and
4     they're removed from the list, they're not there.
5     I can't observe that. So there is a difference
6     between roll off and Deadwood; but the -- there
7     is no difference in terms of what I'm observing
8     in 2015 because, if people -- everybody who is
9     Deadwood in 2015 has, for whatever reason, rolled
10    off; but they're still on the SVRS. But, again,
11    I keep coming back to the conclusion that that's
12    not what's driving my results.
13 Q   **So, using their number of 3 percent of records**
14    **being Deadwood, would that mean that 3 percent of**
15    **the records that you're looking at in 2015 really**
16    **shouldn't be on --**
17 A   Well, I'm going to dispute that you can directly
18    apply that 3 percent because that's an average;
19    and Wisconsin actually has a very good reputation
20    for election administration, much more effective
21    than -- that most states with professionalized
22    administrative structures. So I -- I suspect the
23    rate in Wisconsin is lower than that, but I don't
24    know what the rate is; but I -- I am not willing
25    to simply apply that 3 percent to -- to Wisconsin

| Deposition of KENNETH MAYER, 4-8-16 | Page 196 |
|---|---|

1     and -- and make -- draw any inferences based on
2     that 3 percent number.
3 Q   **Putting aside the -- the actual 3 percent number,**
4     **do you acknowledge that there's some -- very**
5     **likely, some percentage of entries that shouldn't**
6     **be there based --**
7 A   Well, I mean, I'll -- I'll put it in more precise
8     terms. The -- the -- the number of people who
9     show up in the SVRS at the point when I looked at
10    it, the -- the number of people who are actually
11    not voters anymore, either because they have
12    moved out of state or for whatever reason, is not
13    zero. I don't know what the percentage is. The
14    number is not zero.
15 Q   **Okay. Going back to Professor McCarty's report,**
16    **looking at the second to last paragraph starting**
17    **with the -- the sentence, "For example, a voter**
18    **who registered in 2008 but did not vote until**
19    2012 would have been eliminated from calculations
20    **involving the 2010 election. Thus, this**
21    **procedure also biases the turnout estimates of**
22    **early --**
23 A   I'm sorry. What -- what page are we on?
24 Q   **Page eight. I'm at the -- the little below the**
25    **middle of the page. It's the paragraph that**

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 51 of 81
One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.
Deposition of KENNETH MAYER
April 8, 2016

1      starts, "Although Professor Mayer --"
2  A   Mm-hmm.  So that statement is incorrect.  A voter
3      who registered in 2008 but did not vote in 2012
4      would actually be included in my -- my analysis
5      because I -- I -- I assigned the starting point
6      at the earlier of the registration date or an
7      election in which someone voted.  So, in that
8      particular case, that's simply wrong; that, if
9      someone in the SVRS registered in 2008, they'd be
10     included as of that registration date whether or
11     not they voted in 2010 or 2012 or 2014.
12 Q   Do you do then also dispute his ultimate
13     conclusion that it biases the turnout estimates
14     of early elections upwards?
15 A   I do.  That -- that depends on the -- the nature
16     of the people who roll off.  And, again, I mean,
17     I'm -- I'm not prepared to say that we can say
18     with any confidence, those people are more likely
19     or less likely to -- to vote.  So now he is
20     emphatically incorrect when he says that I am
21     eliminating people who were eligible that didn't
22     vote because, if they had registered, they are
23     eligible; and that -- that was the turning point.
24     So that criticism is -- is unambiguously
25     incorrect.  And the -- again, if he is right

1      about the effect of the roll off -- again,
2      there's no dispute that roll off occurs.  But, if
3      he -- if his analysis of the effects of roll off
4      is correct and that there is a bias that is
5      introduced, you would see a pattern in my models
6      and the control models that you, in fact, do not
7      see.
8            MR. CURTIS:  Can we just take a break?
9            MR. JOHNSON-KARP:  Sure.
10           (Recess.)
11           MR. JOHNSON-KARP:  Back on the record.
12 BY MR. JOHNSON-KARP (CONTINUING):
13 Q   Looking at page -- page 10, Professor McCarty
14     came up with a -- a waiting method.  Are you
15     familiar with that?
16 A   Yes.
17 Q   What are your thoughts on -- on that method?
18 A   You know, I'm -- I'm not going to dispute that
19     this -- that the way that he did this is -- is
20     reasonable.  But, again, it doesn't get at to the
21     fundamental question, which is whether the
22     effects that I've observed in the analysis are
23     driven by roll off.  And -- and it is also -- we
24     note that there is a crucial qualifier here in
25     the second paragraph of page 10, that these rates

1      will provide an accurate estimate as long as his
2      roll off rates are uncorrelated with race at the
3      voting district level.  So Professor McCarty is
4      playing it both ways.  In some places he says
5      that, We know roll off is occurring and
6      correlated with certain variables; and that's why
7      my analysis is wrong.  And then here he's arguing
8      that we know roll off occurs, and this shows that
9      Professor Mayer's analysis is wrong but only, if
10     in this case, roll off is not correlated with --
11     with race.  And so he's -- he's making
12     inconsistent criticisms.  And the -- this all --
13     criticism is fundamentally a function of what the
14     differential roll off rates are.  You know, we
15     can't observe those and don't know exactly what
16     they are.  But, again if he is right that this
17     roll off occurs as he said it does and that this
18     is what is driving my results, we ought to see a
19     pattern in those results that we don't see.  And
20     so that's -- that's why I -- I am not entirely
21     persuaded that he is correct.  But, even if he is
22     right, it doesn't effect -- it doesn't undermine
23     the -- the conclusions because I -- my
24     conclusions -- my conclusions or my -- my
25     analysis is not driven by the existence or -- or

1      absence of roll off.
2  Q   So your critique that you state in your rebuttal
3      to his statement on page ten, you're not saying
4      that race is correlated with roll off; correct?
5  A   I'm not making any claims about the -- the
6      correlations with -- what's -- what's correlated
7      or not correlated with roll off.
8  Q   Now I'm looking at towards the top of page 12,
9      second sentence, "Both Black and Hispanic voters
10     saw substantial turnout increases over that
11     period."  Do you dispute that statement?
12 A   Well, this is the result of his -- these are
13     estimates.  And, again, there's an apples and
14     oranges comparison here because these arguments
15     that both he and Professor Hood make are looking
16     at turnout as a percentage of population.  My
17     estimates of turnout and the way that I do the
18     analysis is the percentage of people who are in
19     the SVRS, and so they're not directly comparable.
20     So I -- you know, whether or not turnout went up
21     or down is not identical to the question of
22     whether certain people were effected.  You know,
23     if -- if -- if, for example, the probability that
24     a Hispanic person had a -- had a more difficult
25     time voting, just hypothetically, say it's

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1    20 percent, relative to a White voter but you had
2    a 50 percent increase in the number of Hispanic
3    registrants, even though each of those
4    registrants had a 20 percent less likelihood of
5    actually being able to cast a ballot, you would
6    still see turnout among Hispanics go up, even
7    though, at the individual level, you would
8    observe that each individual Hispanic person had
9    a lower likelihood of voting than a non-Hispanic
10   person.  So, you know, it is -- it is tricky to
11   try to draw individual inferences based on
12   aggregate data; and that's -- that's why, even if
13   this is correct, it -- it doesn't negate the
14   conclusions of the individual level analysis that
15   I did.
16 Q  **Doesn't -- doesn't it though -- so if you weaken**
17   **the inferential connection that the voter ID law**
18   **has a disproportionate effect on minority groups**
19   **if -- if we see an increase in these groups**
20   **voting?**
21 A  No, because there's -- there is a difference
22   between if -- even within a -- a different racial
23   or ethnic group, some people are going to be more
24   effected than -- than others.  And so the --
25   making an inference about the effect on an

1    individual or making an inference based on the
2    effect on a group of identifiable individuals and
3    -- what I can say, that a Hispanic registrant is
4    X percent less likely to vote than a non-Hispanic
5    registrant where X could be replaced with the
6    value in my report.  You know, we might have 100
7    thousand more Hispanics register and would still
8    be able to see that pattern because there's a --
9    there's a difference between a population
10   increase and an individual within that
11   population.  So, I mean, this is -- this is, I
12   think, an example of the ecological inference
13   problem where Professor McCarty and Professor
14   Hood are -- are making -- making inferences about
15   the effect on individuals based on the aggregate
16   data; and that's -- that's a -- that's something
17   that is fought with difficulty.
18 Q  **So your position is that, despite increases in --**
19   **in voter turnout amongst Hispanics and African**
20   **Americans, the voter ID law, nonetheless, had a**
21   **depressive effect on individuals with -- within**
22   **that group?**
23 A  Well, I'll -- I'll phrase it more precisely;
24   that, even though overall turnout in those groups
25   may have gone up, that -- that doesn't mean that

1    voter ID had a -- had reduced the probability
2    that any individual in that group was able to
3    vote because, when we get to -- when we're
4    looking at voting, people have cast their
5    ballots; so we know that someone who has cast a
6    ballot has been able to overcome whatever
7    barriers exist.  All right?  We also know that
8    there are people who have over -- overcome some
9    of those barriers, which, in the case of the
10   SVRS, is registering for -- for reasons that we
11   don't observe directly but which we can make
12   inferences about don't vote.  And so, if you have
13   100 thousand more African Americans register and,
14   of those 100 thousand, only 90 thousand of them
15   vote, well, there's something that's causing
16   people to register and not vote; and you can
17   estimate those -- those individual effects by
18   doing the kind of analysis that I did.  So,
19   again, you know, I am -- I am not necessarily
20   disputing that turnout among different racial
21   groups went up between 2010 and 2014; but that's
22   not the same as making a claim that -- that a
23   particular individual or specific individuals
24   within those groups had -- had -- had -- were
25   less likely to turn out than individuals in other

1    groups.  Those -- those are very different
2    claims.
3 Q  **And it doesn't -- it doesn't weaken the**
4    **inference?**
5 A  Well, the inference is driven by the -- what the
6    -- what the individual level data shows; so I
7    would say that -- that, no, it does not weaken
8    the inference that the individual level data
9    indicates.
10 Q  **Okay.  It talks about the -- the odds-ratio there**
11   **on page 12.  Are you familiar with that?**
12 A  Yes.
13 Q  **Do you have any --**
14 A  Well, again, I will return to the statement I
15   just made.  You know, the odds-ratio is just the
16   -- the proportionate likelihood that someone or
17   members of a group -- or, in the aggregate, the
18   -- the likelihood that members of a group voted,
19   you know, went up or down.  And the likelihood
20   ratio comes in that -- that, going from 10 to
21   20 percent is a much larger effect than going
22   from 60 to 70 percent because it's a change in
23   the underlying likelihood.  And so, you know, I'm
24   -- I'm not necessarily disputing this -- that
25   this is incorrect; but I don't see this as

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

1  undermining the validity of the individual level
2  analysis that I did because, again, he's trying
3  to make -- make a claim about individuals based
4  on aggregate data or aggregate outcomes. And
5  that's -- that's not what I did. I'll just add
6  one thing. The requirements to register and the
7  requirements to vote are -- are different now.
8  You can register and reregister without having a
9  photo ID under many circumstances. I don't know
10 what the precise requirements are. A photo ID,
11 in many cases, is not required to register, even
12 though it is to vote; so it's possible for --
13 that people have registered but I'll -- the
14 underlying documentation that is not necessary to
15 vote.
16 Q   And what is that in reference to as far as --
17    that Professor McCarty --
18 A   Well, that -- this is a statement of why it's --
19    it is one of the reasons why you have to be very
20    careful; and you can't really make statements
21    about individual effects by looking at aggregate
22    effects. So, again, the fact that turnout among
23    African Americans went up between 2010 and 2014
24    doesn't mean that you will not -- you -- you --
25    you will not identify a specific burden that

1  applies to African Americans that are -- that are
2  particular to -- that -- that you will not see in
3  other groups.
4  Q   At the bottom of page 15, where Professor McCarty
5     says, "This statement is incorrect and a
6     misinterpretation of his findings." That's what
7     we already addressed; correct?
8  A   Correct.
9  Q   Now I'm at page 17, the first full sentence on
10    that page, The differential rates of attrition
11    between 2006 nonvoters and voters is so large
12    that the 2006 turnout rate is estimated from the
13    SVRS to be 87.8 percent." What do you understand
14    his -- his critique to be there?
15 A   So, as I understand his criticism, it's that the
16    use of vote history is going to introduce a -- a
17    bias; and the -- the -- the -- the argument that
18    he makes about the attrition rate between
19    nonvoters and voters, I'm not sure I agree with
20    the method of how he did that because we don't
21    necessarily know what the -- what the actual
22    attrition rate is because we can't observe it.
23    He's assuming that the -- that there is a
24    difference, that nonvoters are roll off or -- or
25    fall out of the SVRS more than nonvoters. Again,

1  this is a criticism just of control model one.
2  And, again, this is not the only control that I
3  -- that I utilized; and so he's -- he's -- you
4  know, there's a little bit of looking at voting
5  in 2010, registered since 2006. But I also
6  looked at people who voted in 2014 who registered
7  between 2010 and the -- the recall. And, again,
8  sometimes the effects are consistent. Sometimes
9  they are not. And I infer from that that the
10 effects that I observed are, in fact, not
11 consistent with the claim that it is roll off
12 that is driving this. So, even if he's right
13 that there are differential rates of attrition,
14 that -- that doesn't -- that doesn't undercut the
15 overall conclusion because, if -- if that were
16 what was driving this, you would see a different
17 pattern in the coefficients for the control
18 models, which you don't see.
19 Q   Looking at page 18, in paragraph, Measurement
20    Error, he states in the second full sentence, "He
21    measures whether a registrant has a driver's
22    licence or state photo ID in 2015 and assumes
23    that, if the voter had one in 2015, she had one
24    in 2010." Is that correct? Did I -- is that a
25    correct statement of your assumption?

1  A   Well, so -- that's correct. So whether or not
2     someone matches is a function of whether they
3     match in twenty -- in 2015 and that does not
4     change so that is -- that is a correct statement.
5  Q   And the next assumption -- I think we touched on
6     this earlier -- that's -- that's also a correct
7     statement of your assumption?
8  A   Which one?
9  Q   About student ward residents?
10 A   That's correct.
11 Q   Okay.
12 A   I mean, the -- the -- the ID one doesn't -- I
13    mean, if someone was able to qualify for having
14    an ID in 2015, I think it's likely that they
15    would have been able to qualify -- they -- they
16    didn't have one. They would have qualified.
17    Certainly would have been old enough to do so, so
18    I don't think that's meaningful. And the -- you
19    know, the residents -- residents in student,
20    wards we've already talked about that.
21 Q   On page 19 in the middle of that first paragraph,
22    he states, "There are strong reasons to believe
23    that the effect of not having an ID in 2010 in
24    Control Model 1 is biased towards zero."
25 A   I disagree. This is a -- a function of -- if I

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                                    Page 209

1  were to think about the -- again, let's assume
2  he's right.  Let's assume for the moment that
3  he's right.  When we look at the effect of no ID
4  or license voter in 2010 registered since 2006,
5  the effect of a -- not having an ID, the
6  coefficient is minus .2.  But, if we look at the
7  effects of different starting dates, voting in
8  2014, registered since 2006, voting in 2014,
9  registered between 2010 and the recall, if -- if
10 there was measurement error there, it would
11 presumably be effected by the -- starting
12 point.  And I think that it is -- it is a more
13 reasonable inference to think that, if someone
14 had an ID and a driver's license in 2014 in that
15 control model, they were old enough.  They were
16 18 years old in 2006; so, clearly, they were old
17 enough to have an ID or driver's license.  And I
18 think that, if there was a source of error,
19 that's not it.  I don't think that the -- that
20 the -- the fact that people might have had an ID
21 in 2015 but not in 2010 or might not have had in
22 ID in 2010 but -- or 2015 but have had one
23 earlier, I think that's -- that's not the source
24 of what's -- what's driving this.  I think it's
25 more reasonable to think that this is a function

Deposition of KENNETH MAYER, 4-8-16                                    Page 210

1  of the -- the change in requirements.
2 Q  Just looking across that -- that row in your
3    table seven, there is the -- just to the layman,
4    clear discrepancy in your control one compared to
5    the four other, the other -- the model one, model
6    two, control two, and control three are all
7    pretty similar.  What's --
8 A  Well, the -- the -- the difference is that
9    control one is looking at voting in 2010.  The
10   other controls are also looking at voting in 2014
11   but are using different starting points, voting
12   at people who registered between 2010 and the
13   recall, people who registered since 2006.  And,
14   if there were -- you know, if there were
15   measurement error that -- it -- it should also be
16   picked up to some degree in there because the --
17   the false match -- or the false non-match, you
18   know, may well have correlated with when people
19   entered the SVRS.  So I don't -- and the -- and
20   the other issue is that this lines up with what
21   is known about the effects of voter ID.  It's not
22   like we're looking at the effect in 2014 and
23   saying, this is entirely inconsistent with what
24   the literature shows.  It's a completely
25   surprising finding.  It's -- it's inexplicable.

Deposition of KENNETH MAYER, 4-8-16                                    Page 211

1    It's not.  I mean, this is entirely consistent
2    with what research has shown about the effect of
3    not having an ID or a license in other states,
4    including Professor Hood's own research.  So,
5    again, I -- I am not persuaded that the
6    criticisms that Professor McCarty makes undermine
7    the validity of my conclusions.  And I would also
8    note that -- that, if you read Professor
9    McCarty's criticisms, there are -- are lots of
10   qualifications.  This may be true.  This might be
11   true.  It's possible that -- there are actually
12   not firm and fact statements that this is what's
13   going on, and so he's raising possibilities; but
14   he is -- he is expressing his criticisms in
15   somewhat qualified terms.
16 Q  On page 19, it discusses partisan effects.  Am I
17   correct that you're not opining on the partisan
18   effects?
19 A  That is correct.
20 Q  That's all I have for Professor McCarty's report.
21   Just a few general questions.  Catalist came up
22   in your -- in your report.  What is Catalist?
23 A  It's a national data analytics firm that produces
24   different kinds of data that are useful in -- in
25   the context of ana -- analyzing election.  Much

Deposition of KENNETH MAYER, 4-8-16                                    Page 212

1    of what they produce they provide to campaigns
2    because it's useful for them; but much of what
3    they produce -- a lot of what they produce is
4    also widely used in the academic literature
5    because they do things that a lot of existing
6    governmental registration files don't do, such
7    as, in the case of Wisconsin, assigning
8    probabilities or estimating probabilities of
9    different racial classifications.  And so that's
10   the -- that's the piece of information that I --
11   I used from Catalist.
12 Q  So am I correct that you used Catalist only for
13   those SVRS entries that you couldn't get the
14   information from DOT?
15 A  That's correct.
16 Q  And how many was that?
17 A  It was 282,015 or however many didn't -- didn't
18   match.
19 Q  And that was the -- that's their probabilistic
20   estimate; correct?
21 A  Correct.
22 Q  Okay.  I think we might have touched on this
23   earlier.  But, just to be -- be sure, are you
24   familiar with any research about decreasing
25   impacts of voter ID laws as -- as we move away

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

Deposition of KENNETH MAYER, 4-8-16                 Page 213

1   from the time in which they were inactive?
2 A   I am not.
3 Q   You're not -- you're not aware of any research?
4 A   I am -- I am -- sorry.  I am not aware of any
5     research that demonstrates that the effect of
6     voter ID laws diminishes over time after
7     implementation.
8 Q   Do -- do you have an opinion as to whether the
9     effect would diminish over time?
10 A   For the -- for the people who are unable to
11     obtain the -- the necessary ID, there's no reason
12     to expect that those effects would go down.
13 Q   Is there a reasonable expectation that, after an
14     implementation, the --- the further away you get
15     from implementation, the burden is decreased?
16          MR. CURTIS: Object.  Con -- con --
17     confusing.
18 A   So --
19          MR. CURTIS: Go ahead.
20 A   -- there might be an effect where the number of
21     people who are effect -- the number of people who
22     are effected might go down.  But the burden on
23     the people who are unable to obtain that -- those
24     -- those qualifying IDs, there's -- there's no
25     reason to expect that would change.  If they

Deposition of KENNETH MAYER, 4-8-16                 Page 214

1     don't have the ID, they don't have the ID.  They
2     can't vote.
3          MR. JOHNSON-KARP: I think that's all I
4     have.
5          MR. CURTIS: Okay.  I have no questions.
6          (Adjourned at 4:10 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 215

1   STATE OF WISCONSIN.        )
2   COUNTY OF DANE             )  SS

3

4       I, Paula Thompson, a Notary Public in and for the
5   State of Wisconsin, do hereby certify that the
6   foregoing deposition was taken before me at
7   Perkins Coie, LLP, One East Main Street, Suite 201,
8   City of Madison, County of Dane, and State of
9   Wisconsin, on the 8th day of April, 2016; that it was
10   taken at the request of the Defendants, upon verbal
11   interrogatories; that it was taken in shorthand by
12   me, a competent court reporter and disinterested
13   person, approved by all parties in interest and
14   thereafter converted to typewriting using
15   computer-aided transcription; that said
16   deposition is a true record of the deponent's
17   testimony; that the deposition was taken pursuant
18   to Notice; that said Kenneth Mayer before examination
19   was sworn by me to testify to the truth, the whole
20   truth, and nothing but the truth relative to said
21   cause.
22              Dated April 11th, 2016.
23
24          _____
25          Notary Public
            In and for the State of Wisconsin

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

**$**

**$100,000 (1)**
49:20
**$114,000 (1)**
10:18
**$300 (4)**
5:23;9:21;10:10,12

**[**

**[ph] (2)**
145:14;155:15

**A**

**abbreviation (1)**
102:12
**ability (2)**
17:18;159:13
**able (30)**
5:18;23:16;26:18;
35:15;36:14;38:18;
44:8;49:7,11;90:3;
96:1,6;99:3;127:5;
129:8;150:17;152:1;
161:1,19,25;163:14;
164:9;167:17;171:24;
201:5;202:8;203:2,6;
208:13,15
**abolished (1)**
146:3
**abolition (1)**
146:14
**above (6)**
50:23;51:19,21;60:2;
136:21;175:13
**above-average (1)**
175:5
**ABS (1)**
24:13
**absence (1)**
200:1
**absentee (19)**
24:6,13,14,16,21;
25:24;55:18,21,24;
56:3,12;57:4;61:24;
62:4;145:16,18,23;
160:1,12
**absentees (2)**
24:19,20
**absolute (2)**
179:18,21
**Absolutely (1)**
104:22
**academic (3)**
9:6;22:10;212:4
**accept (2)**
75:23;144:4
**accepted (1)**
172:20
**access (4)**

49:6;58:23;59:1;
166:22
**accompanying (1)**
34:12
**According (3)**
33:17;108:12;165:21
**account (8)**
48:11,21;69:6;
116:17;126:12;160:22;
161:20;173:16
**Accountability (5)**
9:9,11;16:8;53:11;
91:5
**accounting (3)**
128:8;139:9,23
**accounts (3)**
68:16;120:5;174:16
**accuracy (3)**
62:20;93:15;102:5
**accurate (22)**
19:4;21:15,17;43:3;
54:8;64:8;99:5;101:4;
120:24;132:19;137:21;
148:19;153:4,6;
162:22;164:1;166:17;
169:2,7;170:8;177:13;
199:1
**accurately (6)**
24:9;52:18;54:4;
173:23;182:17,18
**achieving (1)**
29:22
**acknowledge (3)**
34:2;182:8;196:4
**acknowledged (1)**
186:1
**across (2)**
157:23;210:2
**Act (14)**
38:10;54:14;57:2;
70:7;85:10;92:22;93:2;
94:3;100:2;161:12,22;
165:11;170:3,14
**active (6)**
19:22;151:2,8;
192:11,24;193:1
**activities (1)**
155:13
**activity (4)**
16:1,2;153:15;155:5
**actual (12)**
18:16;22:23;40:21;
42:15;49:24;65:23;
66:1;106:7;121:18;
125:24;196:3;206:21
**actually (80)**
5:9;10:17,20;13:14,
15;19:3;20:24;24:1;
25:22;38:17,21;39:18;
40:25;45:12;47:9;
48:25;49:5;55:8;58:9;
61:19;62:10;63:1,6;
64:9,15;65:9;67:9,10,

25;70:18;71:7;74:16;
76:12;77:23;84:9;88:7;
92:20;107:17,21,22;
108:25;109:20;117:5;
120:15;121:16;122:2,
7;125:23;128:9;131:2;
134:6;135:20;142:2;
150:25;153:13,18,25;
154:11;155:7,16,19,21;
158:8;163:10;164:19;
165:14;166:12;167:11;
168:5,8;172:5;176:14,
24;183:15;188:14;
195:19;196:10;197:4;
201:5;211:11
**ad (1)**
178:24
**add (12)**
44:8;63:10;92:4,6;
105:5,8;114:21;
153:12;154:20;176:7;
178:24;205:5
**added (5)**
19:19;40:20;112:19;
118:11;154:17
**adding (3)**
37:1;121:25;155:18
**addition (3)**
28:6;43:8;87:7
**additional (10)**
30:5;31:11,20;56:3,
14;58:15,16;85:20;
172:15;178:23
**address (2)**
86:20,21
**addressed (1)**
206:7
**addresses (1)**
86:19
**adds (1)**
40:22
**adjacent (1)**
87:12
**Adjourned (1)**
214:6
**adjusts (1)**
81:4
**admin (1)**
16:20
**administration (11)**
11:19;14:7;15:15;
16:10,21;32:3;33:14;
60:9;162:16;179:15;
195:20
**administrative (14)**
16:16;28:1,13;30:21;
31:11,25;159:21;
170:22;179:14;182:3;
183:9,18;191:9;195:22
**administrators (1)**
16:6
**admitted (1)**
179:25

**advancement (1)**
86:4
**advantage (1)**
169:20
**advocate (3)**
185:13,14;188:2
**affects (1)**
60:4
**affidavit (1)**
56:13
**African (46)**
47:18;53:10;78:23;
79:22;91:15;92:3,9;
95:13;98:9;99:9,21;
100:10,14,21;101:12;
110:6;135:10,11,14;
137:4,10,14,22;138:1,
13,22;139:13;140:7,
23;145:20;147:17,19;
148:3,13,16,22,25;
149:1,7,12,18;169:10;
202:19;203:13;205:23;
206:1
**Again (63)**
7:4;25:7,8;32:13;
45:10,24;76:25;81:21;
90:15;92:13;94:23;
98:13;102:18;103:10;
105:10;108:6,16;
112:7;113:7;114:1;
117:22;118:3;121:19;
125:24;126:6;127:12;
131:16;134:8;137:25;
140:18;141:4;159:17;
171:19;174:14;175:2,
7,19;181:19;185:11,
18;186:8;188:1;
189:22;190:3,18;
193:6;194:24;195:10;
197:16,25;198:1,20;
199:16;200:13;203:19;
204:14;205:2,22;
206:25;207:2,7;209:1;
211:5
**against (1)**
179:9
**age (24)**
44:10;45:3,17,19;
46:7;89:11;90:4;102:9,
13,20;121:7,9;129:9;
133:22;141:19;156:18,
24;157:3,18,21;
173:22;175:13,19;
176:1
**agencies (2)**
9:8;177:16
**ages (2)**
90:7,21
**aggra (1)**
183:23
**aggravation (1)**
183:24
**aggregate (30)**

17:24;25:4,9,10,13;
44:13,22;45:9,10;46:2,
12,18;47:2;105:1;
109:13;110:24;117:1,
4;119:18;121:19;
144:22;159:18;185:18;
187:18;201:12;202:15;
204:17;205:4,4,21
**aggregates (1)**
44:7
**aggregating (1)**
60:11
**ago (3)**
33:11;52:12;57:11
**agree (8)**
31:2;140:15;156:12;
158:10;163:7;165:7;
180:11;206:19
**Ah (1)**
30:18
**ahead (5)**
79:7;160:19;163:19;
187:5;213:19
**alert (1)**
190:22
**alignment (1)**
179:19
**allocated (1)**
32:18
**allow (4)**
24:24;54:7;159:11,
19
**allowable (1)**
57:17
**allowance (1)**
57:20
**allowed (2)**
26:25;182:23
**allowing (4)**
57:7;58:15;154:7,8
**allows (6)**
110:2;120:23;
132:22;133:4;165:8;
176:14
**almost (10)**
30:7;52:12;60:25;
62:9;63:14;83:15;87:9,
19;159:5;170:1
**alongside (1)**
36:3
**alter (3)**
45:23;76:19;118:23
**altered (1)**
16:20
**alternative (3)**
57:8;139:20;178:4
**alternatives (1)**
55:22
**although (12)**
12:1;13:10;37:21;
39:17;48:23;70:9;
130:22;147:7;148:9;
151:22;183:7;197:1

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 57 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

always (5)
23:12;40:9;57:12;
157:20;159:5
ambiguities (1)
179:9
ambiguity (1)
179:7
ambiguous (1)
179:12
America (1)
38:10
American (18)
11:9,17;47:19;78:23;
92:9;131:8,10;135:10,
11;137:10,15,22;
139:14;140:8;148:22,
25;149:7,18
Americans (32)
53:10;79:23;91:15;
92:3;95:13;98:9;99:9,
21;100:10,14,21;
101:12;110:6;131:14;
137:4;138:1,14,22;
140:24;145:21;147:17,
19;148:3,13,16;149:2,
12;169:10;202:20;
203:13;205:23;206:1
among (20)
46:3;53:9,23;57:10;
80:5;91:15,16;92:1,2,
6;95:13;98:8;101:9;
109:17;117:14;132:14;
158:24;201:6;203:20;
205:22
amongst (1)
202:19
amount (8)
30:21;40:19,21;42:1;
54:6,19;181:13;183:23
amounts (3)
167:4;179:18;181:25
ana (1)
211:25
analogous (2)
10:13;72:18
analyses (9)
23:15;24:4;45:22;
58:18;93:7;125:14;
126:12;147:22;149:11
analysis (96)
7:25;12:6;16:13;
21:17,25;22:8;23:24;
24:17;25:6,12,19,22;
27:10;33:14;45:15;
47:1;51:16;52:25;
58:10,13,22,25;59:12;
61:5;62:3,14,16;67:13,
15,25;71:5;77:5,13,22;
78:9;80:5;82:1;83:13,
18;86:16;94:19,24;
95:2,4,17;102:19;
106:20;110:1,12;
113:4;114:19;116:17;

117:11;120:14;122:4;
123:23;124:7,16;
125:6,18;132:7,23;
134:3;138:21,24;
139:7;145:20;146:25;
148:11,16,23;159:18,
18;162:20;165:18;
168:14;173:25;178:16;
185:17,19,24;186:18;
188:7,20;190:21;
192:19;197:4;198:3,
22;199:7,9,25;200:18;
201:14;203:18;205:2
analytical (1)
126:24
analytics (1)
211:23
analyze (4)
7:5;26:19;124:18,20
analyzing (5)
16:9;17:22;28:15;
85:22;211:25
and/or (1)
121:14
annual (1)
10:15
anomalies (1)
191:10
anomalous (1)
125:21
anymore (4)
29:19;31:4;121:21;
196:11
AP (1)
24:12
apart (2)
8:22,23
apologize (4)
65:2;92:11;111:23;
116:1
apparently (1)
189:7
appear (2)
13:12;40:15
appeared (3)
13:19,21;14:18
appearing (1)
181:10
appears (1)
103:13
appendix (4)
87:25;89:5;129:16;
141:19
apples (2)
188:12;200:13
Appleton (2)
89:17;90:6
applicable (2)
9:4;102:18
application (1)
12:5
applications (3)
28:10;29:13;86:20

applied (1)
11:14
applies (1)
206:1
apply (5)
85:21;88:9;185:16;
195:18,25
approached (2)
7:1,15
appropriate (4)
25:6;73:12;146:25;
156:13
approximately (1)
108:22
April (3)
27:2;34:5;94:25
archives (1)
20:17
area (3)
11:4;47:4;54:5
Areas (6)
11:6,16,20,21;58:12;
85:25
argue (4)
96:25;177:21;188:1;
189:19
argued (2)
139:24;153:21
arguing (5)
154:2,22;169:15,21;
199:7
argument (10)
51:12;52:3;106:21;
128:14;140:11;154:4;
155:15;186:23;190:18;
206:17
arguments (2)
170:7;200:14
Arizona (1)
13:22
around (8)
134:7;140:2;153:15;
155:5,10;175:23;
190:13;191:2
Art (1)
88:11
article (8)
50:4,7,12;51:18;
52:8;56:6,16;146:10
articles (1)
15:7
Asian (2)
131:15,16
aside (2)
33:9;196:3
aspect (2)
34:17;189:25
aspects (1)
17:10
assertion (2)
178:3;180:11
asserts (1)
176:19

assessment (1)
187:19
assigned (1)
197:5
assigning (2)
182:19;212:7
assume (6)
45:20;51:15;89:13;
117:19;209:1,2
assumes (1)
207:22
assuming (2)
64:10;206:23
assumption (4)
89:15;207:25;208:5,
7
assumptions (3)
46:11;90:12;132:17
assured (1)
189:15
attempting (1)
104:6
attention (4)
50:3,22;51:17;62:14;
73:24;192:13
attentive (2)
43:15;113:3
attributable (3)
127:22;173:5;194:16
attribute (1)
96:17
attributes (1)
185:22
attrition (4)
206:10,18,22;207:13
audible (1)
4:16
August (1)
178:14
Australia (3)
11:22,24;12:2
authoritative (2)
64:6;86:5
authors (2)
152:14;192:19
available (3)
5:12;9:16;36:1
average (6)
87:20;136:4,15;
137:2,4;195:18
averages (1)
135:2
aware (24)
18:8,23;20:13,23;
21:9;29:16;40:20;
41:14;70:22;71:1,11;
72:12;73:18;146:4,7,
12;149:22;151:25;
156:1,4;175:15,18;
213:3,4
away (9)
47:2;152:4;153:19;
154:21;155:6,12;

163:6;212:25;213:14
awesome (1)
66:22
axis (2)
142:11,16

## B

bachelor's (1)
11:11
back (41)
15:14;36:8,13;38:2;
42:22;60:1;82:21;85:3;
91:18;104:22;110:25;
112:15;115:6;119:4;
126:9;127:5,24,25;
138:20;139:5,11,16;
140:5;144:20;146:2,5;
151:19;161:8;175:22;
181:17;184:12;190:10,
13,14,15;193:17,19;
194:2;195:11;196:15;
198:11
background (3)
7:19;11:1,4
backwards (2)
21:16;126:19
balance (2)
181:18;183:4
Baldus (3)
13:8,23,23
ballot (17)
24:21;35:15,19;
36:11,23;39:5;41:8;
55:25;145:19;147:8,
16;181:1,12;182:25;
187:25;201:5;203:6
ballots (13)
24:6;26:21,22;27:2;
35:12;36:3,5,7,16,17;
38:7,9;203:5
barrier (1)
29:22;38:2
barriers (2)
203:7,9
based (43)
22:21;31:25;35:3;
37:5;43:21,24;48:3,24;
76:11;83:19;88:20;
89:19;90:12;100:3;
101:7;102:17;103:11;
109:25;110:1;117:5;
137:24;138:2;141:15;
145:19;166:21;167:14;
168:20,25;169:4,22;
171:7;173:2;179:13;
185:9;187:17,19;
194:5;196:1,6;201:11;
202:1,15;205:3
baseline (2)
84:18;140:14
basic (2)
137:2;139:15

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 58 of 81

One Wisconsin Institute, Inc., et al.  vs.                    Deposition of KENNETH MAYER
Gerald C. Nichol, et al.                                      April 8, 2016

basically (8)
27:18;61:15;63:2;
86:25;112:18;131:11;
139:20;147:13
basing (1)
185:20
basis (5)
19:16;120:13;
179:25;185:25;189:9
Bay (1)
182:25
become (4)
36:1;86:15;155:1,8
becomes (5)
30:13;62:15;84:10;
108:8;140:10;148:8;
173:8;183:3
becoming (1)
81:21
begin (2)
125:14;155:4
beginning (2)
139:8;144:24
behalf (4)
13:20,21,25;14:18
behave (1)
46:22
behaved (1)
46:24
behavior (21)
21:20;51:3;99:21;
100:12,16,19;116:25;
118:6;119:11,12;
120:25;121:6,22,24;
122:1,14,15;124:19,20;
138:21;146:10
behind (1)
102:22
believes (2)
77:19;81:6
believing (2)
38:11,12
below (3)
88:16;160:21;196:24
better (2)
51:15;139:2
bi (2)
129:23;130:9
bias (2)
198:4;206:17
biased (1)
208:24
biases (2)
196:21;197:13
big (1)
117:12
billed (1)
10:22
binary (3)
129:20,23;132:23
birth (12)
30:1;31:23;60:18,19;
63:15,23,25;89:25;

167:14,19;176:16;
183:20
bit (13)
10:25;16:5,10;43:7;
59:11,16;75:25;81:17;
95:23;107:21;147:11;
150:20;207:4
bivariate (1)
133:21
black (12)
130:7,11,24;131:4,5,
6,23;135:8,14,15;
136:7;200:9
Blacks (1)
80:2;101:12
blank (1)
104:24
blocking (1)
92:21;94:3
blue (2)
142:9;148:5
Board (3)
9:12;16:8;182:20
bolts (1)
4:11
book (1)
41:25
born (2)
180:2,3
both (15)
4:18;13:13;34:11;
60:23;63:3;70:4;
145:17;148:4;154:15;
156:7;157:15,22;
199:4;200:9,15
bottom (3)
106:6;125:4;206:4
bounce (1)
190:13
bounces (2)
175:23;191:3
bouncing (1)
191:1
bound (3)
40:13;64:9;65:4
break (10)
42:17,19;84:20,22,
23,25;105:1;144:16;
184:9;198:8
breakdown (6)
10:5;98:16,18,21;
103:19;169:18
Brennan (3)
13:8,23,24
Brewer (3)
13:11,21;14:16
brief (1)
4:11
briefly (2)
11:3;82:21
bring (1)
5:5
broad (1)

12:7
broadly (2)
9:4;83:3
broke (1)
91:25
broken (1)
10:9
brought (1)
92:12
bulk (1)
185:12
bump (3)
106:6,6;108:12
burden (23)
32:9,19;36:2;37:1,8;
38:6,24;39:4;59:25;
85:20;155:15;166:3;
170:4,15;181:3;
182:10,14;186:22;
187:4,11;205:25;
213:15,22
burdened (1)
180:25
burdens (8)
16:17;28:13;35:6;
37:2,3;159:12,21;
182:16
burdensome (2)
28:1;73:14
Bureau (1)
102:10
button (1)
65:9

# C

C1 (2)
137:14;138:6
calculate (2)
90:4;105:2
calculated (1)
118:2
calculating (1)
157:2
calculation (6)
90:25;101:1,4;
107:18;135:23;164:1
calculations (3)
98:22;99:15;196:19
calculator (1)
150:19
California-San (1)
11:12
call (6)
18:20;20:9;34:22;
47:21;132:19;169:4
called (2)
4:3;100:5
calling (1)
109:23
Calls (2)
73:2;164:15
came (6)

12:10;24:21;92:22;
191:25;198:14;211:21
campaign (6)
11:19;14:17,21;15:3,
3,11
campaign-related (1)
34:22
campaigns (1)
212:1
can (115)
6:18;7:10,13;12:23;
14:15,15;15:16;19:5;
20:24;24:3;28:24,24;
30:6;31:8,8;33:9,18,
24;35:2,3;40:4,10,16;
42:25;48:4;49:18;
52:20;54:21;55:12,14;
56:13;60:5;64:6;66:25;
70:5;71:2;75:25;76:1,
1,2,25;78:6;80:25;
82:17;84:5;86:20,22;
89:16;92:18;96:16;
99:20,22;100:18;
101:22;104:10;105:2;
107:9;116:21;117:22;
118:11,13,13,13;119:1,
3,4,7;120:14,15,15,16;
121:17;122:16;123:14;
125:9,23;127:1,16;
129:3,4,11;133:9;
139:3;141:17;142:2;
146:19;149:25;151:20;
152:4;155:16,16,24;
158:12,14;160:15;
169:22;170:11,23;
180:13,21;182:12;
187:9,22;188:4,5,5,17,
18;195:17;197:17;
198:8;202:3;203:11,
16;205:8
cancelations (2)
30:24;177:23
canceled (2)
28:14;29:13
capture (7)
22:3;110:15;118:13;
128:18;130:1,3;190:21
captured (2)
20:11;161:17
captures (1)
43:18
capturing (2)
81:11;120:1
card (1)
162:16
cards (1)
169:18
care (1)
124:18
careful (3)
121:18;125:25;
205:20
carefully (2)

126:6;158:4
Carnegie (4)
9:14;86:1,3,4
Carolina (1)
59:1
case (42)
5:8,13,18,20;7:2,16;
13:15;17:2,4,5,14;
18:11,22;19:24;23:2;
29:23;32:14,20,22;
33:15;34:24;43:4;
47:25;60:21,22,24,25;
63:5;64:9;78:6;107:19;
119:13;121:8;122:11;
133:6;171:15;173:4;
179:6;197:8;199:10;
203:9;212:7
cases (16)
9:24;12:18;13:4,18;
14:2,11;67:17;177:10;
179:4,5,12,24;181:1,
15;183:18;205:11
cast (14)
35:15,19;36:14,22;
39:4;107:20;147:8,11,
16;182:25;187:25;
201:5;203:4,5
casting (3)
36:11;181:1,11
Catalist (4)
211:21,22;212:11,12
Catalist's (1)
192:19
catalogued (1)
104:19
cate (1)
130:6
categories (4)
22:19;30:25;130:22;
157:7
categorized (1)
130:7
category (16)
8:24;32:5;37:18;
39:12,23;58:9;70:10;
87:15;97:24;98:2;
133:3;162:12;174:11;
180:25;181:2;183:11
cause (1)
97:11
causing (2)
190:25;203:15
cautious (1)
160:7
cell (1)
135:8
census (3)
49:19;102:10;130:20
center (1)
147:3
central (1)
188:22
certain (14)

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

7:17;22:16;46:22;
58:13;81:11;127:22;
139:22;161:14;182:22;
186:15;190:6,9;199:6;
200:22
**certainly (5)**
53:5;96:25;105:5;
172:22;208:17
**certificate (4)**
30:2;31:23;176:16;
183:20
**challenge (3)**
14:16,22;17:10
**challenged (1)**
14:12
**challenges (2)**
14:3;17:6
**change (21)**
14:21;22:1;26:13;
27:3,10;57:12;59:19;
76:7;79:12;82:9;
105:19;111:25;117:20;
136:2;146:11;155:22,
23;204:22;208:4;
210:1;213:25
**changed (11)**
16:20;35:23;52:16;
58:14;67:21;68:5,8;
93:2;174:24,25;176:2
**changes (30)**
7:6;14:2,4,7,8,13;
15:11;17:6,16;19:5;
21:3,3,10;22:12;104:4;
113:2;117:9;125:9;
128:24;129:4,9;
137:14;146:9;154:6;
159:21;170:22;186:12;
187:1;188:17;191:9
**changing (1)**
20:8
**character (2)**
111:2,5
**characteristics (9)**
47:7,11,18;48:5,7,9,
10;83:20;189:21
**characterize (1)**
52:19
**Charles (1)**
58:24
**chart (1)**
89:5
**check (2)**
6:15;7:19
**check-in (8)**
39:19,20;41:2,4,5,15,
24;42:2
**checking (3)**
40:20;41:11,12
**choose (1)**
182:24
**church (1)**
145:10
**churn (13)**

20:9,10;107:3;
108:23;110:15,19,21;
111:5,6,25;112:3,5;
114:10
**circles (1)**
87:14
**circumstances (2)**
38:23;205:9
**cited (1)**
9:8
**cities (1)**
148:21
**citizen (6)**
84:13;102:9,12,19;
180:2,6
**citizens (1)**
28:8
**citizenship (1)**
179:22
**City (7)**
13:19,20;26:19;
40:24;88:13;89:17;
90:6
**claim (17)**
28:15;51:23;57:11;
99:8;100:9;104:7;
109:19,24;114:13,17;
176:8,10,12;179:23;
203:22;205:3;207:11
**claiming (1)**
109:21
**claims (6)**
95:14;103:25;
170:21;177:17;200:5;
204:2
**clarify (17)**
4:21;7:10;41:11;
43:7;64:19;79:9,21;
92:10;95:20;112:7;
115:8,11;116:2;
163:20;164:14;171:14;
187:7
**clarity (1)**
26:5
**Classification (4)**
9:14;86:2;131:10;
132:1
**classifications (1)**
212:9
**classified (4)**
71:18;88:5,19;131:8
**classifies (2)**
54:25;55:6
**classify (1)**
54:20
**clean (2)**
14:23;15:1
**clear (8)**
30:13;38:18;123:22;
131:23;146:14;147:24;
186:2;210:4
**clearer (1)**
136:13

**clearly (7)**
77:24;104:5;148:1;
184:23;190:19,20;
209:16
**clerk (4)**
15:17,18;40:24,25
**clerks (5)**
15:20;16:19;24:9,11;
36:25
**clerk's (1)**
147:3
**click (1)**
65:8
**close (1)**
168:18
**closely (1)**
158:9
**closer (4)**
101:18;108:9;
165:14;173:13
**COCA-esque (1)**
177:12
**code (5)**
63:23;64:4;65:12,16;
66:2
**coded (1)**
61:8
**codes (1)**
60:17
**coefficient (5)**
134:13,14,17,19;
209:6
**coefficients (8)**
131:19;132:5;
133:14;134:12;139:23;
140:4,6;207:17
**cohort (4)**
123:20;124:25;
128:19,21
**college (12)**
57:21;58:3,5,8,12;
85:22;87:6;88:14;
161:14;171:8,10;172:7
**colleges (2)**
86:18;87:2
**Columbia (1)**
158:25
**column (11)**
101:18;102:15;
105:7,12,12;110:14;
111:10;115:12,21;
125:10;192:18
**columns (2)**
105:9;113:25
**combination (4)**
34:16;103:7;167:23;
168:18
**combinations (2)**
136:12;168:16
**combining (2)**
103:23;104:13
**comfortable (2)**
172:10;175:10

**coming (2)**
128:20;195:11
**command (1)**
65:13
**commands (1)**
65:23
**commenting (1)**
158:3
**common (5)**
19:1;132:15;134:22;
154:16;162:6
**commonly (2)**
12:13;136:3
**communities (5)**
148:15,16,25;149:7,
17
**comparable (3)**
22:23;56:24;200:19
**compare (7)**
9:23;10:1,11;70:12;
72:15;109:18;188:6
**compared (3)**
119:12;157:23;210:4
**comparing (4)**
119:20,22;156:11;
158:24
**comparison (5)**
122:12;156:14;
158:17;160:2;200:14
**comparisons (6)**
21:24;121:20;
156:13,25;157:23;
160:2
**compelling (2)**
51:11;52:3
**compensation (2)**
10:13,15
**complaint (1)**
8:15
**complete (2)**
33:1;180:15
**completed (3)**
22:25;66:3;157:12
**completely (3)**
165:2;179:17;210:24
**complexity (1)**
51:2
**complicated (4)**
23:13;135:20;
136:12;178:19
**comprehensive (2)**
13:3;16:11
**computer (3)**
65:14;66:1,5
**Con (2)**
213:16,16
**conceivably (1)**
126:20
**concentrations (6)**
100:20;147:19;
175:3,4,4,5
**concentric (1)**
87:13

**concept (1)**
126:24
**concerned (3)**
45:5;130:20;164:11
**concerning (1)**
36:12
**concerns (2)**
73:9;176:5
**conclude (3)**
51:9;128:5;180:14
**concluded (16)**
23:16;24:4,7,22;
25:5,1;53:8,14,24;
67:18;81:8;91:21;92:2;
146:24;154:10;168:10
**conclusion (27)**
19:1;27:24;29:7,10;
34:23;52:23;53:16;
54:3;56:2;73:3;76:7,
19;79:2;96:10;120:11;
144:6;148:24;151:14;
161:18;162:3;175:25;
180:17;187:4,12;
195:11;197:13;207:15
**conclusions (44)**
22:5,7,24;23:1,8,17;
26:13;27:3,4,23;34:24;
43:21,24;49:9;51:19;
52:6;54:8;58:14;59:7,
8,16;69:15;78:16;79:3;
81:25;82:12;94:10;
109:24;116:25;117:1,
4,7;163:1,12;165:25;
185:20,25;187:17,18;
199:23,24,24;201:14;
211:7
**conclusive (1)**
22:11
**concrete (2)**
35:13;113:1
**conduct (1)**
71:5
**conducted (8)**
16:13;23:12;58:18;
71:6;80:21;92:24;93:1;
168:14
**conference (2)**
54:24;55:5
**confidence (3)**
166:9,15;197:18
**confident (7)**
49:6;59:12;69:13;
94:23;131:18;169:1;
194:14
**confirmation (1)**
145:13
**confirmed (1)**
181:15
**confirms (1)**
148:11
**confounding (1)**
93:3
**confused (9)**

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 60 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

76:8,9,15;78:18,22,
24;94:7;96:22;111:17
**Confusing (9)**
10:7;14:14;18:13;
31:7;50:17;144:11;
161:5;182:11;213:17
**confusion (17)**
73:17;75:7;78:3,13,
20;79:22;81:17,23;
95:21,21,24;96:9,16,
22;97:3,7,8
**congregants (1)**
145:11
**congress (1)**
11:18
**Congressional (2)**
100:6;102:8
**Congressman (1)**
104:10
**connection (1)**
201:17
**connections (1)**
193:12
**consensus (1)**
53:21
**consequences (2)**
14:25;182:22
**consider (1)**
19:22
**consideration (2)**
36:6;48:21
**considerations (4)**
34:23;57:15,18;
82:23
**considering (1)**
177:10
**consisted (2)**
8:18;27:14
**consistent (29)**
23:21;71:4,7,25;
77:10;78:21,24;80:15;
88:9;94:21;96:12;
100:11,13;101:23;
106:7;108:6;140:21;
152:16;174:14;183:2;
190:16;191:7,16;
193:25;194:5,10;
207:8,11;211:1
**consistently (1)**
145:1
**consisting (1)**
8:12
**consists (1)**
142:7
**constantly (1)**
21:3
**constituted (1)**
87:17
**constitutional (1)**
11:22
**contact (1)**
31:4
**contacted (4)**

5:7,11,16;40:24
**contain (1)**
49:25
**contested (2)**
34:11,13
**context (4)**
174:15;192:5;
194:25;211:25
**contiguous (1)**
87:12
**continually (1)**
19:14
**CONTINUING (24)**
6:25;10:8;14:19;
19:7;32:6;42:24;50:21;
67:2;73:5;76:4;79:4,
20;85:4;93:25;115:7;
144:13,21;161:10;
163:21;175:14;184:3,
13;187:13;198:12
**contradictory (1)**
95:15
**contri (1)**
15:3
**contribution (3)**
37:10;86:16;94:9
**contributions (1)**
12:9;15:4
**control (23)**
20:6;110:2;116:22;
124:12;126:7;129:9;
137:14;138:6,19;
168:14;173:18;174:10;
190:7;198:6;207:1,2,
17;208:24;209:15;
210:4,6,6,9
**controlled (1)**
114:18
**controlling (3)**
138:16;141:7;173:22
**controls (9)**
22:2;113:5;119:8,9;
120:15;128:5;137:24;
173:24;210:10
**controversies (1)**
52:18
**controversy (1)**
38:16
**conventional (1)**
152:25
**conversations (1)**
5:4
**convert (1)**
86:21
**convicted (1)**
193:14
**Cooperative (2)**
100:5;102:8
**cooperatively (1)**
16:7
**copy (1)**
8:15
**core (1)**

46:25
**Corporation (1)**
11:16
**corrected (1)**
60:6
**correction (2)**
97:16;162:2
**corrections (1)**
184:5
**correctly (14)**
47:9;51:6,13,24;
66:7;68:21;82:6;94:1;
130:5;143:10;153:2,3;
161:23;180:16
**correlated (7)**
121:8;199:6,10;
200:4,6,7;210:18
**correlations (1)**
200:6
**corresponds (1)**
105:19
**corroboration (7)**
150:4,7,12,14;151:3,
6;152:1
**corroborations (1)**
151:21
**costs (3)**
183:19,21,22
**Counsel (9)**
5:4,17;6:10,14;26:7;
75:12,21;79:8,19
**count (18)**
29:11;44:17;86:14;
108:17;111:12,14;
112:11,12;114:5,5;
162:1;168:12;171:9;
172:4;175:8;177:21;
188:4,5
**counted (4)**
36:17;39:1,3;87:3
**counterfactual (2)**
31:13,21
**counting (3)**
168:22;171:8;182:17
**country (3)**
49:10;53:4;57:14
**counts (2)**
14:6;130:21
**County (5)**
13:13,19;16:18;
40:25;185:16
**couple (7)**
33:10;51:17;52:11;
61:4;75:11,13;88:10
**course (11)**
7:24;8:16,22;9:17;
23:23;25:3;26:6;28:15;
44:7;62:3;172:21
**court (5)**
15:6;92:21;93:10,17;
94:2
**covered (2)**
13:2;100:1

**CPS (1)**
50:1
**creating (1)**
17:21
**credit (1)**
150:18
**criteria (2)**
87:4;88:4
**criticism (4)**
95:17;140:16;171:6,
13;185:12;197:24;
199:13;206:15;207:1
**criticisms (4)**
199:12;211:6,9,14
**critique (2)**
200:2;206:14
**cross (1)**
75:12
**crucial (2)**
44:9;198:24
**curious (2)**
191:15;192:25
**current (2)**
49:18;107:11
**currently (1)**
80:22
**CURTIS (38)**
6:14,19,22;10:7;
14:14;18:13;31:7;
42:20;50:16,20;66:22;
73:2;75:8,17,21;76:22;
79:6,8,16,19;93:14,21,
24;115:4;144:11,18;
161:5,9;163:17;174:4,
8;182:11;187:2,9;
198:8;213:16,19;214:5
**curve (2)**
134:6,9
**CV (1)**
11:2
**CVAP (2)**
102:12,22

## D

**daily (1)**
19:15
**Dakota (2)**
54:17;56:7
**Dane (2)**
16:18;40:25
**data (107)**
5:3;7:23;12:7,11;
16:9,12;17:23;18:2,3,
21,22;20:22,24;21:2,6;
8;23:12,13,24;24:1,23;
25:4,5,9,10,13,14;
26:12,19;35:17;36:1;
39:9;40:6;41:2;43:16,
22;44:15,19;46:6,11,
13,18;49:16,24;51:10;
52:2,16,25;53:1;54:6,7,
9,19;58:23;59:9;62:6,

7,10,11,16,18;63:4;
70:4,15,19;72:7,12;
74:20;76:14,17,24;
78:25;79:2;81:5,22;
99:18;100:13;101:21;
103:23;104:14;106:1,
17;117:6;120:10;
121:18;124:23;138:3;
143:21;145:20;150:6;
160:21;161:17;166:21;
167:18;168:15;169:23;
172:23;179:20;185:21;
192:21;201:12;202:16;
204:6,8;205:4;211:23,
24
**database (5)**
20:8;60:10;127:2,3;
129:25
**databases (5)**
60:8;63:3;65:17;
66:14;193:9
**date (35)**
20:20;21:1;58:6;
60:4,19;61:4,6,8,9,11,
11,16,18,20,22,23;
62:1,2,5,15;63:5,23,
24;70:19;85:18;89:25;
112:15;113:16;117:14;
147:7;167:14,19;
193:9;197:6,10
**dates (5)**
60:18;61:25;71:20;
79:11;209:7
**day (35)**
16:1,2,4;24:13;
30:17;41:5;90:4;97:3;
106:24;112:20,21,23;
113:14;114:4;115:19;
116:8,13;125:13,13,16,
17;145:18;146:16;
147:10;152:17,22;
153:15,18,24;154:8,15;
155:2,11;159:8,14
**DC (1)**
11:16
**Deadwood (17)**
192:1,4,20,23,24;
193:3,17;194:3,12,13,
16,19,20,23;195:6,9,14
**deal (2)**
27:16;47:10
**dealt (1)**
152:10
**decide (3)**
29:25;177:24;182:24
**decided (2)**
23:6;85:8
**decides (1)**
30:8
**deciding (1)**
30:18
**decision (6)**
27:18;29:18;48:11,

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 61 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

12;92:14,21
**decline (8)**
44:20;70:23;72:20;
97:11;106:9;117:19,
24;118:22
**declined (2)**
117:15,24
**declines (2)**
117:20;118:1
**decrease (6)**
91:14;96:20;154:24,
24;155:7,19
**decreased (5)**
91:23;96:23;146:3,5;
213:15
**decreases (1)**
96:20
**decreasing (1)**
212:24
**defendant (1)**
13:24
**defendants (1)**
4:10
**define (2)**
17:13;88:25
**defined (2)**
32:15;71:15
**definition (6)**
83:15;84:11;102:21;
165:22;170:25;171:7
**definitions (2)**
172:2,3
**definitively (1)**
159:20
**degree (5)**
11:11;55:18;163:11;
166:14;210:16
**delay (1)**
178:16
**delineated (1)**
17:16
**demands (1)**
85:11
**Democratic (3)**
99:22;100:15;101:14
**Democracies (1)**
101:13
**Democrats (1)**
99:10
**demographic (14)**
44:9;49:22;83:20;
91:20;92:1;98:5;101:9;
102:1;110:5;124:11;
128:18;129:14;130:14;
189:20
**demographics (3)**
81:5;128:24;191:18
**demonstrable (1)**
53:15
**demonstrate (5)**
78:14;139:1,21;
188:13;190:8
**demonstrated (1)**

153:9
**demonstrates (5)**
95:10;146:7;156:5;
170:13;213:5
**demonstrating (2)**
131:21;142:25
**denials (3)**
29:11;177:22;179:1
**denied (3)**
28:7;33:3;177:4
**denominator (2)**
45:14;157:16
**denying (1)**
127:14
**Department (12)**
8:11;18:3;28:19;
69:3;164:5,7,8,17;
177:9;178:21;179:11,
24
**depend (1)**
194:1
**dependent (1)**
78:15
**depending (3)**
84:4;85:16;91:23
**depends (6)**
14:5,5;134:10,18;
156:9;197:15
**deposed (3)**
4:12;13:11,15
**deposition (2)**
13:12;164:19
**depositions (1)**
180:4
**depress (2)**
153:13;155:17
**depressant (1)**
152:18
**depresses (2)**
152:15;155:21
**depressive (2)**
156:2;202:21
**derive (1)**
48:6
**describe (11)**
11:3;12:4;21:1;
43:13,13;55:2;120:6;
129:4;146:22;147:5;
177:11
**described (4)**
40:8;41:17;43:9;
68:12
**describes (1)**
132:24
**describing (1)**
173:23
**description (2)**
120:9;166:12
**Design (1)**
88:12
**designated (1)**
175:6
**designed (2)**

22:3;188:20
**designs (1)**
51:5
**Despite (3)**
152:14;194:21;
202:18
**detail (1)**
164:12
**detailed (1)**
53:12
**detect (2)**
96:6;171:24
**determinant (1)**
121:6
**determine (2)**
14:11;23:25
**deterred (1)**
77:6
**detrimental (1)**
14:12
**DHS (1)**
193:12
**dichotomous (4)**
129:24;130:10;
132:21;136:20
**died (1)**
192:8
**Diego (1)**
11:13
**difference (26)**
30:16;45:8;68:13,16;
79:10;91:6;98:4,7,8;
110:4;120:6;134:15;
140:23;149:9;150:1;
157:2,13;164:3;
173:14;184:16;195:5,
7;201:21;202:9;
206:24;210:8
**differences (2)**
126:13;128:8
**different (69)**
16:15;18:14;21:19;
22:18;32:13;38:19;
39:15;41:1;43:24;46:2;
52:21,22;54:14;63:7;
68:4;74:15;75:6;77:18;
79:11;86:20;92:1;
98:23;101:9,25;102:7;
104:14,14;110:5,22;
111:2;112:2;113:5;
114:5;118:25;119:16,
19;120:16;122:13;
126:7,13,15;127:19;
128:15;129:11;133:11;
134:20;135:24;136:24;
139:17,20;140:4,17;
143:14;168:1,9;
180:19;185:22;190:15;
191:4;194:19;201:22;
203:20;204:1;205:7;
207:16;209:7;210:11;
211:24;212:9
**differential (7)**

22:18;92:8;105:4;
120:12;199:14;206:10;
207:13
**differently (1)**
95:23
**difficult (1)**
200:24
**difficulties (1)**
43:13
**difficulty (4)**
28:17;43:10;164:11;
202:17
**diffuses (1)**
153:15
**digital (1)**
66:16
**digits (2)**
167:15,20
**diminish (2)**
39:4;213:9
**diminishes (1)**
213:6
**dip (1)**
185:9
**direct (1)**
122:11
**direction (4)**
22:22;78:25;155:22;
191:13
**directions (1)**
22:14
**directly (10)**
72:18;89:16;102:18;
105:3;106:22;125:24;
158:5;195:17;200:19;
203:11
**disagree (3)**
163:23;164:2;208:25
**disappear (1)**
193:21
**disappearing (1)**
140:13
**discipline (1)**
46:15
**disclosed (1)**
65:22
**discoverable (1)**
6:16
**discovery (2)**
27:14;51:23
**discrepancy (6)**
108:15;112:9;
115:10;116:3;120:7;
210:4
**discusses (1)**
211:16
**discussing (3)**
115:9;161:12;192:19
**discussion (1)**
162:23
**disenfranchised (2)**
177:6;178:2
**disenfranchisement (1)**

166:6
**disparity (1)**
169:16
**disproportionate (6)**
169:11,22,24;
170:14;175:12;201:18
**disproportionately (3)**
148:12,21;149:6
**dispute (15)**
39:10;100:22,24;
159:3;162:3;166:16;
170:8,9;178:2;189:23;
195:17;197:12;198:2,
18;200:11
**disputing (4)**
186:5;190:19;
203:20;204:24
**distinction (3)**
80:18;82:22;184:18
**distinguish (2)**
13:4;24:19
**distinguishing (1)**
29:17
**District (3)**
158:25;182:20;199:3
**districts (1)**
100:20
**dive (1)**
42:25
**DMV (1)**
27:13
**document (1)**
179:4
**documentary (2)**
177:8;179:4
**documentation (8)**
26:18;27:17;31:14;
165:1;176:15,18;
178:5;205:14
**documented (1)**
96:16
**documents (5)**
8:14;27:20;28:3;
31:17,19
**doll (1)**
116:3
**done (17)**
14:24;16:5,13;37:5;
48:24;49:17;52:12,14;
53:6;54:22;100:25;
136:23;138:24;155:15;
162:20;176:25;181:22
**dorms (1)**
87:10
**DOT (27)**
17:23;27:13,15;30:3;
31:4,15;58:18;59:4;
62:22;63:6,19;64:5;
65:8;69:1,17,22;70:1;
129:25;130:21;142:13,
21;161:17;164:10;
165:3;168:2;180:4;
212:14

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 62 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

dots (1)
142:9
doubt (2)
180:5,6
doubting (1)
180:1
down (21)
10:9;53:9,9;92:20;
95:11,13;97:8;98:1,10;
105:21;107:1,24;
109:20;128:11;140:9;
190:15;192:18;200:21;
204:19;213:12,22
drafted (1)
26:7
drafting (4)
26:2,3,4,6
dramatically (1)
189:4
draw (24)
21:23;23:17;33:18;
35:3;50:3,22;51:17;
54:8;69:15;73:24;
81:25;82:17;110:24;
117:7;120:11;133:5;
156:13;174:24;184:19;
187:17,22;192:13;
196:1;201:11
drawing (4)
43:15;61:21;74:19;
112:25
draws (2)
169:14;170:9
drew (2)
43:20;106:18
drive (2)
66:17;95:11
driven (6)
91:22;95:12;194:12;
198:23;199:25;204:5
driver (1)
70:1
driver's (16)
8:12;22:20;85:14;
142:16;162:7,8,13,14,
25;164:23;165:10;
172:15;174:18;207:21;
209:14,17
drives (2)
53:8,9
driving (14)
140:18,22;174:13;
175:20;176:1;190:3,5,
23;193:16;195:12;
199:18;207:12,16;
209:24
drop (11)
19:19;61:15;92:2;
105:8;118:14,14;
128:1;189:10,11,15,19
drop-off (1)
105:11
dropped (11)

109:6,8;116:5,10,14;
120:4;141:1;144:9;
151:16,18;195:3
dropping (1)
128:3
drove (1)
24:17
due (3)
126:8,14;128:14
duly (1)
4:3
dup (1)
64:13
duplicate (1)
67:19
duplicated (2)
64:3;168:5
duplicates (7)
63:12,22;64:11;
167:18;168:15,16,19
duplication (1)
169:3
dying (1)
193:10
dynamic (5)
19:14;20:8;43:8,10,
17

## E

earlier (20)
20:20;43:9;61:7,8;
71:22;77:17;92:12;
94:7,18;95:19;110:25;
129:11;141:12;155:25;
162:11;186:1;197:6;
208:6;209:23;212:23
earliest (1)
127:1
early (29)
16:16;61:21;62:11;
70:20;144:23,25;
145:11;152:15,18;
153:9,12,16;154:2,3,4,
6,11,14,18,20,22,23;
155:3,9,16,18,20;
196:22;197:14
ease (1)
73:8
easier (1)
153:1
easily (1)
46:17
easing (1)
57:25
ecological (3)
46:15;100:18;202:12
econometrics (2)
11:10;12:3
economic (2)
12:11;49:12
economists (1)
12:10

Education (6)
9:15;48:17,18;49:12,
25;86:7
educational (1)
11:3
eff (1)
15:24
effect (124)
7:6;9:10;16:20;17:7;
21:21,22;39:20;44:14;
45:25;47:5,22;48:7,10,
19;49:8;51:4,10,12;
53:15;54:1;58:10,11;
59:7,8,12;61:2;69:13,
14;77:2,12,14,16,21,
22,23,25;79:2,3;81:23,
24,24;82:4,5,12,17,20;
88:22;92:8;93:3,9;
94:9,18,22;96:1,3,5,10,
23;97:1,5;104:5,8;
108:9;126:19;127:24;
130:2,2,4;131:17,19,
22;134:2,17,19,23,23;
136:4,7,15;139:13;
140:7,20,20;152:18;
162:17;163:6,9,12;
165:19;166:1,9,24;
169:22,24;170:22;
171:24;172:13;173:1;
175:11,17,21;185:4;
186:14;188:18;191:7,
8,17;198:1;199:22;
201:18,25;202:2,15,21;
204:21;208:23;209:3,
5;210:22;211:2;213:5,
9,20,21
effected (9)
36:7;133:18;147:23;
180:21;188:8;200:22;
201:24;209:11;213:22
effective (5)
49:3;62:1;178:3;
188:17;195:20
effects (73)
16:14,17,22;17:15,
18,24;19:5;20:6;22:4,
13,17,18,19,22;47:17;
49:1;77:4,9;78:10,11,
14,20;85:22;91:20;
93:7;95:1,5;104:1,4;
105:4;116:22,23;
117:4,8;127:18;128:1,
10,11;132:8;133:10;
135:5,9,18;139:3,10,
12;144:22;146:1;
153:18,19;156:2;
163:12;173:4,20;
190:11,13,22;191:2,19;
193:20;194:15;198:3,
22;203:17;205:21,22;
207:8,10;209:7;
210:21;211:16,18;
213:12

efficacy (1)
27:21
effort (7)
30:1,5,12,15,21;
78:13;117:6
efforts (5)
15:24;145:8,10;
177:14;184:25
egression (1)
134:13
eight (8)
13:2;54:18;60:2;
66:17;90:5;156:11;
189:1;196:24
either (16)
9:17;12:22;28:10;
60:20;63:12;87:11;
110:17;116:6;130:24;
133:7;147:22;157:9;
159:10;182:2;192:7;
196:11
election (78)
11:18;14:3,7;15:11,
15;16:1,2,3,6,9,11,15,
21;17:7;24:13;30:17;
33:11,13,20;36:9;
54:11;61:9,11;68:18;
73:17,22;76:9,21;
78:10;84:5;90:4;94:24;
97:3;100:6;102:9;
106:10,13,24;108:7,8;
112:19,20,23;115:19;
116:13;117:15;120:19;
125:13,13;145:3,12;
146:16;147:10;152:15,
17,22;153:11,15,17,23;
154:8,15;155:2,11;
159:8,11,14;179:15;
184:17;185:1,2,6,10;
186:12;195:20;196:20;
197:7;211:25
elections (19)
11:18;14:23;15:1;
24:8,14;33:22,24;34:1,
4;54:13;107:6;110:4;
155:14;159:7;174:23;
183:3;188:9;189:4;
197:14
elections' (1)
15:17
electoral (3)
14:8;51:2;153:12
electorate (3)
77:19;102:17;159:15
electronic (1)
7:23
elements (2)
18:14;20:4
eligible (17)
19:25;84:12;102:21,
24;103:2,3;156:17,24;
157:4,4,5,6,17,19;
192:7;197:21,23

eliminated (3)
122:10;149:22;
196:19
eliminating (6)
120:22;154:2,22;
155:16,20;197:21
elimination (4)
146:15;147:21;
150:7;152:1
else (14)
8:24;25:1,16,18,25;
26:2;85:21;97:17;
107:12;120:21;123:6;
138:17;153:13;181:11
elsewhere (1)
49:10
e-mails (2)
8:18;27:15
emerges (1)
12:8
emphatically (1)
197:20
empirical (7)
88:20;110:10;
127:15;145:13;180:22;
181:19;187:12
enables (1)
29:23
enacted (3)
53:2;56:4;71:21
enactment (1)
72:11
encapsulate (1)
40:3
encapsulating (1)
39:2
encompasses (1)
12:7
encountered (4)
26:12;33:12;98:18;
125:20
end (8)
33:5;51:8,18;93:5;
125:3;132:25;148:10;
178:10
enforceability (2)
93:2;94:3
engaged (1)
31:5
enormous (3)
177:19;179:16;
183:23
enormously (2)
26:22;54:19
enough (5)
27:20;86:15;208:17;
209:15,17
enrollment (3)
85:19;86:11;172:17
enter (5)
24:9,12;32:8,23,25
entered (6)
60:15;61:6,18;113:6;

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

114:7;210:19

**entire (1)**
138:10
**entirely (12)**
10:20;77:8;78:20;
94:20;95:15;96:11;
124:17;169:14;172:9;
199:20;210:23;211:1
**entries (2)**
196:5;212:13
**environment (1)**
14:8
**EP (1)**
156:7
**equal (7)**
112:6;114:14;
130:18;131:6;135:1,
15;185:3
**equality (1)**
179:19
**equals (1)**
135:16
**equation (2)**
134:25;135:14
**equivalent (3)**
33:5;111:10;137:7
**eras (1)**
174:22
**Erikson (2)**
50:4;56:6
**erroneously (1)**
178:15
**error (13)**
18:10,15,20;61:13;
62:25;63:4;65:3;78:5;
178:6;207:20;209:10,
18;210:15
**errors (4)**
60:9,10;177:14;
178:16
**especially (4)**
95:13;108:20;
133:20;181:8
**essence (1)**
43:18
**essentially (10)**
12:5;17:25;33:5;
114:9;116:5;132:25;
137:7;176:15;177:3;
178:1
**establish (2)**
61:17,17
**established (4)**
36:16;38:9;61:5;
145:6
**estimate (22)**
42:8;47:17,22;98:23;
101:19;103:1;133:1;
135:9,12;136:6,9;
147:14;157:5;162:22,
24;164:3,4;166:17;
180:21;199:1;203:17;
212:20

**estimated (2)**
148:4;206:12
**estimates (10)**
18:18;34:3;48:6;
101:24;172:6;189:3;
196:21;197:13;200:13,
17
**estimating (4)**
133:10;134:23;
135:17;212:8
**ethnic (2)**
132:1;201:23
**ethnicity (2)**
130:20,25
**even (49)**
5:10;28:7;33:23;
37:15;55:14;56:15;
60:3;63:14,25;64:12;
78:4;82:8,10,18;83:21;
85:18;94:7;97:2;111:7;
112:4;123:13,17;
128:6;132:19;155:17;
163:2;165:16,16,25;
171:22,25;173:15,15,
21;179:2,5,14;181:5;
183:8;189:14;192:11;
199:21;201:3,6,12,22;
202:24;205:11;207:12
**evening (1)**
92:22
**event (5)**
56:1;63:17;92:18;
94:1;109:3
**eventually (3)**
35:25;39:3;189:18
**everybody (14)**
77:3;78:3;84:11;
112:18;114:3,5;
119:21;120:22;122:10;
125:12;126:2;130:7;
195:2,8
**evidence (8)**
17:18;26:15;51:22;
165:12;178:23;181:23;
183:13,14
**exact (5)**
5:15;48:2;84:4;86:2;
165:3
**exactly (15)**
19:17;39:17;47:12;
56:23;67:12,16,23;
81:3;111:7;112:4;
119:13;132:20;135:25;
171:20;199:15
**EXAMINATION (1)**
4:5
**examine (2)**
146:10;154:17
**examined (2)**
167:18;179:6
**examines (1)**
47:15
**example (16)**

22:17;31:6;33:25;
97:25;98:7;105:13;
110:13;113:4,7;
128:18,19;131:7;
175:17;196:17;200:23;
202:12
**except (4)**
61:4;135:2,6;148:7
**exceptional (1)**
184:22
**exclude (1)**
58:12
**excluded (5)**
84:17;90:25;124:5;
131:3;174:11
**excludes (3)**
67:8;84:11;129:22
**excluding (2)**
112:18;148:5
**exclusive (1)**
130:22
**execute (2)**
56:13;65:13
**exemption (2)**
69:18;71:19
**exercise (1)**
106:17
**exercising (1)**
38:3
**exhaust (1)**
188:6
**Exhibit (18)**
12:24;28:25;29:1;
43:1;50:4;74:22,24;
79:10,10,13;80:1;
92:19;98:14;174:5,7;
178:9;184:15;192:14
**Exhibits (2)**
4:1;73:24
**exist (5)**
20:5;111:7;126:25;
154:15;203:7
**existed (3)**
56:16;87:6;96:6
**existence (12)**
28:16;32:17;82:24;
110:18;154:13,23;
163:8;170:14;175:1;
176:13;185:2;199:25
**existing (2)**
58:8;212:5
**exists (7)**
19:16;21:8;109:3,4;
110:21;128:6;140:19
**exit (4)**
33:4;100:18;189:2,7
**expand (2)**
80:17;142:3
**expect (12)**
78:14;133:24;
140:11;144:2;148:8;
189:1,24;190:17;
191:17;194:11;213:12,

25
**expectation (4)**
22:15;41:23;88:21;
213:13
**expected (1)**
191:13
**experience (2)**
54:10;101:7
**experienced (1)**
40:8
**expert (4)**
11:25;12:1,22;17:9
**expertise (3)**
11:4,17,20
**experts (1)**
152:12
**expiration (2)**
58:6;85:18
**expired (1)**
164:24
**explain (7)**
60:5;85:7;106:14,20;
132:11;164:2,17
**explained (1)**
139:4
**explaining (1)**
119:1
**explanation (3)**
108:11,20;140:21
**explanations (1)**
145:7
**explicit (1)**
166:12
**exploration (3)**
23:25;106:17;117:6
**explore (1)**
185:21
**expressed (2)**
45:2;137:6
**expressing (1)**
211:14
**extensive (1)**
22:11
**extent (4)**
25:10;76:1;163:17;
187:2
**extra (1)**
168:3
**extraordinarily (1)**
28:1
**extraordinary (7)**
30:12;166:6;177:7,
10,16,19;182:3
**extras (1)**
168:3
**extrinsic (1)**
97:10

**F**

**fact (53)**
12:8;24:17;43:16;
45:21;46:20,21;57:1,3,

4;74:13;76:17;78:12;
81:22;91:2;94:19;97:2,
23;106:11;108:12,24;
111:19;112:2;113:3;
117:19;118:22;126:14;
127:15;128:14;140:16;
147:23;148:24;154:10;
155:23;159:9;165:9,
10;169:17,23;170:12;
173:2,16;174:20;
177:3;178:20;184:21;
189:7;190:23;191:22;
198:6;205:22;207:10;
209:20;211:12
**factors (6)**
97:11;175:15;
184:20;185:5,8;188:8
**facts (1)**
165:6
**failure (6)**
29:4,14;30:9;32:11,
14,15
**failures (1)**
28:21
**fair (5)**
4:23;83:1;97:23;
151:7;160:19
**fairly (4)**
22:13;30:11;36:15;
193:11
**fall (12)**
8:23;32:4;37:18;
58:8;70:10;89:11;
124:10;162:12;180:24;
181:2;183:11;206:25
**fallen (1)**
126:11
**falling (1)**
133:2
**falls (1)**
14:9
**false (4)**
67:21;168:8;210:17,
17
**familiar (16)**
73:25;74:2,8;99:1;
102:2;103:17;145:25;
152:6,8,12;167:7;
192:1,14;198:15;
204:11;212:24
**far (10)**
6:8;36:16;41:14;
51:22;52:15;105:7;
130:20;149:10;164:10;
205:16
**farther (9)**
126:9;127:24,25;
139:11;140:5;190:10;
136:19;194:2
**fast (1)**
66:1
**February (1)**
26:20

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 64 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

**fed (1)**
177:24
**fee (1)**
183:21
**feel (1)**
183:1
**fell (1)**
108:14
**felon (1)**
84:15
**felonies (1)**
193:14
**felony (1)**
157:9
**fencing (2)**
170:19,20
**few (2)**
168:16;211:21
**fewer (6)**
52:15;76:6,15;96:21;
128:20;143:8
**field (2)**
62:12;63:10
**fifty (1)**
158:24
**figure (21)**
10:12;28:21;33:19;
44:18;84:4;115:17;
122:7;129:21;141:24;
142:1,4,5;143:6,6,15;
156:6;158:7,13,15,22;
165:17
**figures (19)**
35:13;42:12;44:6;
45:9,10;52:20;99:11;
105:1;106:8;107:16;
113:19,23;146:23;
148:15;159:23;160:4,
5,13,17
**file (8)**
8:1,11;49:24;63:7;
64:5;69:4;74:23;
188:24
**files (17)**
7:24;8:14,17,21;
26:15;27:6,9,11,13;
28:4;63:19;65:21;
66:15;70:4;189:2,8;
212:6
**fill (1)**
37:23
**final (3)**
35:12;146:2,15
**finance (4)**
11:19;14:17,21;15:3
**find (10)**
55:1;78:21;95:16;
99:7;100:9;138:22;
145:19;177:16;178:18;
182:5
**finding (2)**
70:13;210:25
**findings (2)**

194:11;206:10
**finds (1)**
158:25
**fine (2)**
114:24;184:10
**firm (3)**
187:17;211:12,23
**first (24)**
4:3;5:7;7:1;22:5;
29:3;34:9;50:22;61:9;
63:23,24;71:15;84:8;
89:12;121:2;132:4;
144:24;148:10;168:13;
178:10;186:17;188:21;
193:2;206:9;208:21
**five (9)**
20:21;29:1;43:2;
66:3,19;111:18;
159:24;178:9;184:15
**five-minute (1)**
184:8
**flat (1)**
134:7
**flattens (1)**
134:8
**Florida (1)**
145:14
**flow (1)**
182:22
**focus (2)**
18:1;147:12
**focused (1)**
44:11
**folded (2)**
131:11,12
**follow (2)**
38:6;165:16
**following (3)**
36:8;91:7;150:7
**follows (1)**
4:4;123:16
**follow-up (1)**
14:10
**force (1)**
155:12
**forever (1)**
140:2
**forfeit (1)**
157:11
**forget (3)**
30:8;86:2;177:25
**forgot (1)**
38:5
**form (9)**
26:25;27:20;31:23;
55:8,13;57:1;85:15;
162:6;163:11
**formal (2)**
41:15;82:19
**formally (1)**
33:3
**formed (2)**
125:5;185:24

**formerly (1)**
28:14
**forms (15)**
18:19;56:24;57:24;
58:15;59:5,21;161:2,
16,19;162:10,19;163:4,
7,8;172:22
**forthcoming (1)**
6:12
**fought (1)**
202:17
**found (14)**
8:25;31:24;41:5;
53:13;71:3;77:4;96:7,
8,11;145:1;153:16;
155:17;167:20;181:22
**foundation (2)**
29:9;86:4
**four (29)**
12:25;20:21;43:1,2;
54:13;55:3;106:15;
107:7;108:2,16;
111:14,18;112:8;
115:11,24;124:15;
129:7;139:20;142:17;
146:23,24;150:11,15;
152:13;159:23,24;
167:15,20;210:5
**fourth (1)**
125:3
**four-year (3)**
87:9;123:20;189:14
**frame (1)**
5:16
**Frank (2)**
70:13,15
**Franklin (1)**
81:4
**fraud (1)**
37:7
**free (2)**
28:18;169:11
**frequency (1)**
170:16
**frequently (4)**
37:24;40:4,10;99:25
**Friday (3)**
36:8,9;146:18
**front (1)**
41:7
**frustration (2)**
29:17;30:8
**full (8)**
7:11;35:16;75:13;
106:5;178:10;192:18;
206:9;207:20
**function (12)**
37:4;39:17;77:5,8;
78:17;108:23;116:4;
176:2;199:13;208:2,
25;209:25
**fundamental (1)**
198:21

**fundamentally (1)**
199:13
**funding (1)**
14:23
**further (1)**
213:14
**future (1)**
121:4

## G

**GAB (39)**
13:25;20:18;21:10;
33:17;43:25;44:3,6,15,
23;45:1,9,17,21;90:2;
105:1,9,21;106:1,8,21,
22;107:4,7,13;108:13,
19;110:13,14;111:10;
112:11;113:19;114:2;
115:20;116:11;144:4,
5;151:1,13;193:13
**Gabe (2)**
4:9;93:15
**GAB's (5)**
40:6;46:7;107:17;
113:17;150:15
**games (2)**
66:23,24
**GAO (2)**
91:13,21
**gap (2)**
108:22;146:18
**gave (1)**
28:21
**gears (1)**
58:17
**general (9)**
4:15;18:10;33:22,23;
76:3;104:16;108:8;
149:14;211:21
**generally (1)**
11:17
**geocoding (1)**
86:18
**geographic (2)**
86:23,24
**Georgia (1)**
55:20
**Georgia's (1)**
95:12
**get-out-the-vote (1)**
15:24
**gets (4)**
41:7;122:20;128:3;
175:21
**gigabyte (3)**
20:21,21;66:16
**gigabytes (1)**
66:15
**GIS (1)**
86:22
**given (11)**
7:8,12,14;8:16,21;

34:23;83:13;123:18;
141:25;191:18,18
**gives (5)**
84:17;90:2;136:14;
141:20;168:19
**goals (1)**
37:11
**goes (13)**
23:25;93:5;97:8;
107:1;108:5;121:11;
125:11;140:9;164:12;
165:12;173:10;177:9;
180:3
**Good (5)**
4:7,8;66:25;121:4;
195:19
**gotcha (2)**
123:12,12
**government (8)**
9:8,9,11;16:8;32:2;
53:11;91:4,5
**governmental (1)**
212:6
**governor (1)**
184:23
**grab (1)**
104:21
**gradual (1)**
106:9
**granularity (1)**
24:23
**graph (3)**
142:8;143:3;147:14
**graphs (1)**
54:15
**great (2)**
97:3,4
**greater (2)**
150:24;170:15
**Green (1)**
182:25
**ground (1)**
4:16
**grounds (1)**
50:17
**group (31)**
16:7;46:21,22,24;
119:9,14,16,24,25;
120:25;121:24;122:2,
14,15,17,18;123:21;
124:8;129:6,7;130:14;
138:18;139:17;141:19;
145:22;201:23;202:2,
22;203:2;204:17,18
**groups (20)**
58:2;91:21;92:1;
98:5,23;101:9;102:1;
110:5;122:13;138:19;
143:14;144:8,10;
201:18,19;202:24;
203:21,24;204:1;206:3
**grow (1)**
133:24

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

**grown (1)**
28:5
**guess (20)**
14:10;31:12;36:10;
65:15;68:6;76:3;83:3;
110:16;113:16;121:13;
123:1;127:4;139:2;
147:24;149:9;156:11;
158:22;165:15;187:6,
14
**guy (1)**
66:9

**H**

**habit (2)**
121:2,3
**habits (1)**
121:4
**habituated (2)**
155:1,9
**half (7)**
150:16,20,21,21;
151:4;169:19;170:1
**hand (2)**
169:15,21
**handful (1)**
181:16
**handle (1)**
145:16
**handled (1)**
159:7
**happen (6)**
30:14;100:1;118:11;
140:5;186:7;193:18
**happened (5)**
60:6;92:15;109:6;
187:23;193:24
**happening (1)**
191:15
**happens (3)**
109:16,17;193:7
**hard (2)**
66:16;185:11
**Harren (2)**
145:14;146:9
**head (3)**
6:9;71:20;150:18
**heading (1)**
160:21
**height (1)**
133:22
**Help (1)**
38:10
**here's (2)**
118:25,25
**high (14)**
34:3,5,19,20;35:12,
24;36:3,5;100:20;
121:12;148:21;149:7;
159:16;167:25
**Higher (29)**
9:15;10:12;64:16;

72:13,14;79:22;83:16;
86:7;87:19,20;92:3;
110:6,7;125:21;
142:19,22;143:8;
147:19;149:1;154:11;
157:21;159:9;175:2;
185:6;186:24,25;
189:2,8;190:12
**highest (3)**
148:2;159:1,5
**highly (2)**
86:9;172:3
**himself (1)**
95:11
**Hispanic (15)**
78:23;80:3;101:18;
130:7,12,19,23;131:4,
6,24;200:9,24;201:2,8;
202:3
**Hispanics (9)**
79:23;101:11,13;
110:6;145:21;169:10;
201:6;202:7,19
**historic (1)**
20:23
**historical (2)**
20:23;34:4
**historically (3)**
36:4;159:11,16
**history (5)**
11:22;24:11,15;
49:21;206:16
**hit (1)**
136:22
**hoc (1)**
178:24
**hold (1)**
132:20
**holder (1)**
133:24
**holders (1)**
8:13
**Hood (22)**
5:3;8:21;53:7;92:14;
95:3,14;98:15;99:14;
103:23;104:6,15;
153:20;157:22;161:11;
167:25;168:6;170:24;
176:12,19,24;200:15;
202:14
**Hood's (17)**
28:15;59:15;95:10;
98:14;102:16;152:5,7,
9;156:6,23;162:21;
168:11;176:6,8;
180:11;184:5;211:4
**hoop (1)**
38:24
**hoops (2)**
177:19;183:18
**hotly (1)**
34:10
**hour (3)**

5:23;9:21;10:11
**hourly (1)**
10:6
**hours (4)**
6:3;10:22;66:5,18
**huge (1)**
30:16
**hundred (2)**
74:13;125:8
**hundreds (2)**
94:14;182:1
**hurdles (2)**
35:18,20
**hypothetical (1)**
102:16
**hypothetically (2)**
127:4;200:25

**I**

**ID (202)**
8:13,17;9:10;22:20;
26:16,25;28:7,18;
29:15,23;30:12,22;
31:16,16,24;32:16,18;
33:1,2,3;35:8;36:21,
25;37:6,12,14,15,25;
38:4,16,22;39:14,15,
17,19;40:1;41:11,12,
16,25;49:3;51:4,9;
52:15,19;53:3,8,12,14,
14,25;54:1,15,16,18,
21,25;55:7,9,10,11,12,
20,21,25;56:3,10,13,
24;57:3,6,14,23,24;
58:15;59:4,5,8,11,18,
21;60:17;69:23;70:9,
24;71:10,13,15,16,18,
21,23;72:12,13;73:1,
12;76:7,10,16,20;77:7,
11,13,20;78:4;80:2,12;
81:7,14,18;82:3,5,11,
18,24;85:14,15,17;
91:3,7,22,22;94:16,22;
95:10,12;96:2,13,14,
17,17;97:25;104:1,3,7;
129:19,21,21;130:2;
132:6;142:16,23;
143:24;144:7;162:8,9,
15,19,25;163:4,5,7,8,
11,13;164:11;165:10,
23;166:2;169:17,18;
170:2,12,17;172:15,16;
174:12,20;175:1;
176:8,19;177:4,25;
179:12;180:8;181:9;
183:11,14;186:25;
191:19;201:17;202:20;
203:1;205:9,10;
207:22;208:12,14,23;
209:3,5,14,17,20,22;
210:21;211:3;212:25;
213:6,11;214:1,1

**idea (4)**
102:21;164:16,20;
182:6
**identical (5)**
113:24;118:20;
165:24;195:1;200:21
**identifiable (3)**
47:7;88:22;202:2
**identification (14)**
55:13;93:8;95:6;
101:5,8,25;161:2,16,
20,22;162:7,10;169:5;
172:1
**identifications (2)**
33:7;171:23
**identified (7)**
46:3;75:12;77:22;
86:10;87:11;171:3,21
**identifies (2)**
86:17;130:23
**identify (15)**
86:17;98:24;99:9,10;
100:11;116:22;126:7;
127:17;129:8;141:17;
173:21;174:4;188:17,
19;205:25
**identifying (10)**
85:24;87:4;88:24;
117:6;127:18;132:10,
13;147:6;165:19;
172:11
**identities (1)**
120:3
**identity (1)**
179:22
**IDPP (8)**
27:7;28:16;32:8,14,
17,23;178:3;183:23
**IDs (25)**
40:20;52:21;57:2,16,
20,21;58:3,5,8,16,19,
22;59:2;60:17;69:1,7,
10,17;70:5;72:5;
161:12,15;169:11;
170:6;213:24
**Illinois (2)**
174:18;183:20
**illuminating (1)**
159:19
**illustrate (1)**
110:18
**illustrates (1)**
95:21
**illustrating (1)**
73:16
**im (1)**
52:5
**imagine (1)**
10:12
**immediately (2)**
11:15;193:9
**impact (10)**
33:14;45:22,22;

57:25;73:9;94:5;
117:25;175:13;178:15;
180:24
**impacted (1)**
93:11
**impacts (1)**
212:25
**impersonation (4)**
37:6;181:10,14,24
**implementation (5)**
91:7;92:21;213:7,14,
15
**implemented (6)**
17:8;71:15,24;72:3,
4;180:10
**import (1)**
86:22
**important (11)**
116:21,24;118:3;
130:25;132:4;143:22;
154:13;165:6;172:11,
23;185:1
**importantly (1)**
103:24
**imposed (1)**
170:5
**imposes (2)**
85:10;170:14
**impossible (2)**
32:4;180:10
**impressions (2)**
50:11;52:5
**inaccurately (2)**
77:19;81:6
**inactive (1)**
213:1
**incident (4)**
16:14;37:23;40:2,4
**include (12)**
26:8;29:12;49:11;
55:23,24,25;69:20;
124:11;131:13;141:11;
143:19;171:17
**included (17)**
62:7,16;74:17;88:6;
91:13;99:14;112:21;
123:21,24,25;124:15;
125:1,18;131:2,18;
197:4,10
**includes (6)**
49:21;65:22;67:5;
68:25;89:2;103:7
**including (9)**
29:7;49:5;53:7;
91:20;139:7;140:1;
143:17;166:18;211:4
**inclusive (1)**
172:3
**income (4)**
48:17,18;49:14,25
**incomplete (1)**
76:24
**inconsequential (1)**

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

171:6
**inconsistent (6)**
40:11;128:13;170:7;
175:21;199:12;210:23
**incorporate (3)**
58:21;69:9;116:21
**incorporates (1)**
67:6
**incorporating (1)**
162:21
**incorrect (15)**
60:17,18,18;61:11;
90:19;95:7;153:20;
171:23;172:1,2;197:2,
20,25;204:25;206:5
**incorrectly (2)**
64:14;81:7
**increase (20)**
44:23;45:21;49:1;
97:9;105:23;106:2;
118:22;134:1;144:10;
152:17;153:25;154:3,
23;156:8;157:25;
158:17;186:21;201:2,
19;202:10
**increased (6)**
117:25;121:8,9;
144:5;186:3,7
**increases (7)**
156:16,16;158:11;
159:25;168:7;200:10;
202:18
**increasing (3)**
108:18;121:7;187:4
**incumbency (1)**
34:15
**incumbent (1)**
34:16
**independent (4)**
47:16;77:23;133:6,
11
**Indiana (4)**
54:17;56:10,11;
71:17
**indicate (3)**
69:23;72:19;83:5
**indicated (2)**
158:16;164:10
**indicates (1)**
204:9
**indication (3)**
24:21;37:21;74:11
**indicator (5)**
80:4;110:9;111:25;
112:3;114:10
**indicators (4)**
35:5,17;36:2;101:24
**indirectly (1)**
39:18
**individ (2)**
46:17,17
**individual (54)**
17:23;21:20;25:5,12;

33:6;40:22;46:6,18,24;
47:1,6,13,15;63:8;
70:7;82:1;83:19;
106:19;110:1,12;
116:25;117:10;119:8,
17;120:14;122:3;
123:16,17;130:17;
148:23;149:4;159:17;
165:19;166:4;171:25;
185:17,24;186:18;
187:19,24;188:19;
201:7,8,11,14;202:1,
10;203:2,17,23;204:6,
8;205:1,21
**individuals (23)**
8:19;21:22;26:24;
29:21;32:2;46:21;
47:23;63:15;70:3;
125:5;150:1;159:13,
22;169:6;176:14;
186:14,15;202:2,15,21;
203:23,25;205:3
**individual's (4)**
48:10,12;167:15;
188:8
**inefficiency (1)**
177:14
**ineligible (1)**
157:8
**inevitable (1)**
60:10
**inexplicable (1)**
210:25
**inexplicably (1)**
178:19
**infer (3)**
90:10;151:20;207:9
**inference (25)**
46:15;61:22;87:22;
96:12,19,20;100:19;
113:1;147:9;149:4;
159:4;169:14;170:9,
10;174:11,24;175:10;
187:23;201:25;202:1,
12;204:4,5,8;209:13
**inferences (22)**
19:4;21:23;24:24;
33:19;35:3;43:15;
46:13,18;74:19;82:17;
100:7;106:18;110:25;
117:8;120:24;133:5;
159:12;172:25;196:1;
201:11;202:14;203:12
**inferential (1)**
201:17
**inform (2)**
107:13;185:23
**information (27)**
20:2;24:9;30:2;44:9;
46:23;48:4,25;49:7,22,
25;60:12,14;63:19;
72:22;74:24;75:6,6;
86:23,25;89:23;90:3;

109:2;143:3;172:24;
177:15;212:10,14
**initial (2)**
7:13,21
**initially (1)**
7:15
**initiated (1)**
178:14
**initiative (1)**
84:9
**injunction (5)**
92:15;93:10,17,22;
94:2
**in-person (2)**
24:20;160:1
**inquire (1)**
6:23
**inquired (1)**
5:17
**inside (1)**
40:16
**instance (1)**
32:20
**instances (6)**
28:3;61:4;149:23;
171:16,17,19
**institute (1)**
154:5
**institutes (1)**
86:6
**Institutions (6)**
9:15;86:6,10,13,19;
141:16
**intensified (1)**
106:13
**interact (1)**
32:2
**interest (7)**
11:23;32:21,24;
135:6;136:15;184:24;
188:16
**interested (10)**
47:3;85:22;105:3;
112:22;131:20;132:9;
135:3;136:3;142:11;
184:23
**interesting (1)**
132:9
**intermediary (1)**
23:11
**internal (2)**
178:22;192:17
**interpret (1)**
126:5
**interpretation (1)**
51:22
**interpreted (1)**
185:3
**interpreting (1)**
125:25
**interviews (1)**
16:12
**into (50)**

8:23;9:1;14:9;23:2,
6;24:10;30:15;32:5;
37:18;42:25;43:2,6;
46:14;48:11,20;49:7;
58:2,8,22;67:15,24;
70:10;73:17;76:8,21;
85:5;86:21,22;89:11;
109:9;110:11;124:10;
128:20;129:25;133:2,
16;136:10,11;141:7;
142:13,21;160:21;
161:20;162:12;164:12;
167:1;180:3,24;181:2;
183:11
**introduce (1)**
206:16
**introduced (1)**
198:5
**introduction (2)**
4:11;50:23
**intuition (1)**
167:2
**invalid (2)**
62:5,5,11
**investigation (2)**
110:11;176:25
**invoice (1)**
5:14
**invoices (5)**
5:19,24;6:2,6,11
**involve (1)**
14:2
**involved (3)**
17:22;26:3;85:24
**involvement (1)**
16:1
**involving (1)**
196:20
**irrelevant (1)**
32:12
**issue (16)**
31:10;43:19;59:20;
61:1;62:8;98:3;103:14;
110:23;137:17;167:10;
169:3;170:24;193:10,
11,14;210:20
**issues (1)**
27:1
**issuing (1)**
178:17

**J**

**January (4)**
60:3,20,20,22
**job (1)**
11:15
**jobs (1)**
16:13
**JOHNSON-KARP (57)**
4:6,9;6:10,17,20,24,
25;10:8;14:19;19:7;
32:6;42:16,22,24;

50:18,21;67:2;73:5;
75:15,18;76:2,4;79:4,7,
13,17,20;84:19,23,25;
85:1,3,4;93:18,23,25;
114:25;115:6,7;
144:13,15,20,21;161:7,
10;163:20,21;175:14;
184:3,10,12,13;187:6,
13;198:9,11,12;214:3
**Josh (1)**
5:12
**judge (1)**
166:14
**jumble (1)**
180:15
**jump (2)**
38:25;177:18
**June (9)**
106:11;108:3;
113:10,11,20;115:25,
25;116:8,8
**jurisdiction (1)**
147:4
**jurisdictions (2)**
157:24;158:21
**justification (1)**
183:6

**K**

**Kaul (1)**
5:12
**keenly (1)**
178:21
**keep (2)**
118:3;195:11
**keeping (1)**
107:10
**KENNETH (1)**
4:2
**Kenosha (2)**
13:13,19,19
**kept (1)**
20:17
**keys (1)**
154:1
**kicked (1)**
124:17
**kids (1)**
133:23
**kind (19)**
4:11;7:9;9:4;18:10;
29:18;34:22;65:8;
75:24;98:18,21;
103:18,18;129:20;
141:2;185:5;186:18;
188:11;191:1;203:18
**kinds (4)**
22:16;69:10;70:5;
211:24
**knew (1)**
140:19
**knowledge (3)**

One Wisconsin Institute, Inc., et al. vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

53:17;54:5;101:8
**known (5)**
46:14;48:18;94:21;
191:18;210:21

# L

**labeled (1)**
192:14
**lack (8)**
26:17;82:5;161:21;
163:5;176:14,18;
178:5;185:9
**large (16)**
18:22,22;22:1;23:13;
36:18;56:7;60:8;63:6;
100:3,4,4;144:3,24;
147:1;149:17;206:11
**largely (2)**
116:6;120:5
**larger (15)**
54:19;78:11;81:1;
91:15;95:1;97:2,6;
107:21;108:10;119:25;
139:12;151:17;174:21;
175:24;204:21
**large-scale (2)**
49:19;62:24
**largest (1)**
157:7
**last (23)**
13:1;51:20;52:1;
54:10;60:2;62:19;
63:22,24;79:14;106:5;
132:3;160:20,22,24;
161:1,18;167:14,15,19,
19;188:22;192:21;
196:16
**last-minute (1)**
152:23
**late (16)**
25:23;70:20;92:22;
144:22;145:23,23;
147:13,20;148:11,20;
149:16,18,21;155:3,9;
160:13
**later (5)**
94:8;121:5;129:7;
188:25,25
**latitude (1)**
86:21
**latter (1)**
98:25
**law (30)**
14:17,18,20,21;15:1;
37:12;54:25;55:20;
56:10;57:14,19;71:16;
72:12;73:13,16;74:4;
75:3;76:10;77:13;82:3,
11,19,24;91:7;92:13;
93:8;95:6,12;201:17;
202:20
**laws (28)**

14:3,12;15:11;17:7;
51:2;52:15,19;53:3,25;
54:1,15,16,18;56:4,5,
15;70:24;71:21,23;
72:3;73:1,9;77:11;
91:22;94:22;95:11;
212:25;213:6
**layman (1)**
210:3
**lead (2)**
76:3;126:20
**leading (2)**
16:3;155:13
**leads (1)**
110:11
**leaners (1)**
99:14
**learned (1)**
26:20;121:2,3
**least (1)**
87:17
**leave (9)**
38:1;39:8,12,15,22;
40:1,15;107:4;114:22
**led (1)**
22:15
**left (2)**
140:13;146:16
**left-hand (1)**
135:7
**legal (3)**
73:3;187:4,11
**legislatures (2)**
54:25;55:6
**length (2)**
39:16;138:15
**lengthen (1)**
42:1
**lengthens (1)**
39:19
**less (29)**
34:18;36:16;41:20;
83:1;85:13;96:2,14,21;
101:14;135:10;136:17,
21;137:11;139:10,24;
140:12,24;151:9;
152:12;166:19;172:5,
14;173:8;190:2;
193:10;197:19;201:4;
202:4;203:25
**lesser (1)**
117:25
**letters (2)**
27:18;79:14
**level (39)**
17:24,24;21:20;25:5,
12,14,20;46:18;47:1;
82:1;100:6;106:19;
110:1,12;117:11;
119:9,18,18;120:14;
122:4;140:14;148:23;
149:4;159:17;160:14;
166:6;185:14,16,17,24;

186:18;187:20;188:19;
199:3;201:7,14;204:6,
8;205:1
**levels (1)**
159:16
**licence (2)**
162:15;207:22
**license (17)**
8:12;22:20;70:2;
85:14;142:16;162:7,9,
13,25;164:24;165:10;
172:15;174:18;209:4,
14,17;211:3
**likelihood (16)**
83:19;97:10;117:9;
133:2;149:17;154:12;
167:25;168:7;186:14;
190:12;201:4,9;
204:16,18,19,23
**likely (62)**
34:18;36:4,17;49:1;
51:3;74:18,24;79:15;
80:11,13,19,24;81:1,
10,15,21;82:22;83:1,4,
6,22;84:1;85:13,25;
87:23;94:6;96:2,14;
106:8;135:10;136:18;
137:5,15,22;138:1,18,
23;139:25;140:1,10,12,
14,24,25;141:5;145:2,
21;163:15;166:24;
172:14;173:8;189:2,
20,21,24;190:2;196:5;
197:18,19;202:4;
203:25;208:14
**limited (2)**
57:1,1
**limits (1)**
15:2
**line (20)**
35:9;39:8,11,16,22,
25;40:17;41:7;75:8;
76:23;92:20;133:25;
139:11;143:23;147:25;
148:4,5,6;179:10;
190:17
**linear (3)**
133:17;134:3,12
**lines (5)**
16:22;35:21,22;
39:21;210:20
**link (6)**
62:20;63:3,6;64:6;
65:17;69:3
**linked (4)**
18:2;69:20;113:8,9
**linking (4)**
62:18,21;63:25;65:7
**links (1)**
167:14
**list (12)**
86:6,11,13;87:2,25;
107:5,10;116:10;

129:15;193:22;194:21;
195:4
**listing (1)**
133:1
**lists (2)**
192:24;193:1
**liter (1)**
22:10
**literature (10)**
9:6,6,7;22:9,10,11,
21;172:21;210:24;
212:4
**little (11)**
10:25;18:9;43:6;
59:11;95:23;107:21;
119:18;150:20;151:4;
196:24;207:4
**live (6)**
47:19;86:1,9;87:24;
123:5;175:12
**lived (6)**
122:18;123:3,3,6,13;
141:7
**lives (1)**
136:8
**living (2)**
89:7;141:4
**load (1)**
66:15
**local (1)**
16:11
**locate (1)**
87:1
**located (1)**
88:19
**location (3)**
89:23,24;141:15
**locations (2)**
88:8;182:19
**long (12)**
35:21,22;39:21;
42:10,11;50:22;65:6,
13;66:1;178:16;183:8;
199:1
**longer (13)**
12:12;19:22;35:10;
54:4;70:25;72:25;
109:3;146:1,13;151:8,
22;192:7,11
**longest (1)**
71:13
**longitude (1)**
86:22
**look (85)**
5:14;12:23;20:24;
21:11,21;22:15;25:23;
26:18;28:24;35:2,16;
36:1;47:12;48:4,5;
49:2,18;54:2,15,23;
56:25;73:25;74:2,10;
75:5,14;79:14;84:1;
89:16;90:9;91:18;
92:18;99:17,20,22;

100:8,18;101:3,6,20,
21;102:19;106:16,21;
108:2;109:14,25;
110:8,20;111:6;
118:18,19;119:2,4;
121:16,17;122:16;
125:2,2,3,10;126:16;
127:5,6,6;134:11;
135:7,15;138:3;142:8,
10;143:1;150:14;
151:8;158:14;167:11,
12,16;169:17;180:13;
188:7;191:14;193:23;
209:3,6
**looked (25)**
19:2;21:13;23:6,18;
24:2;28:4;54:11;58:18;
61:21;63:11;74:9;
102:20;109:1;119:11;
153:23;154:18;156:16,
17;158:4,9;160:9;
167:18;191:4;196:9;
207:6
**looking (127)**
13:9;16:19;17:23;
18:1;21:19;24:22;25:5;
28:25;33:25;45:4,6,11,
13,25;46:1,3;47:5,24;
51:19;53:12;58:11,11;
61:23;62:18;67:3,4;
74:16;75:19;79:25;
80:6;82:18;83:18;
84:18;88:2;89:12,17;
91:1,2;94:12,14;97:14,
21;98:15,17;99:3,16;
103:17;104:23;105:13,
21;106:4;108:16,21,
24;109:12;110:23;
111:18;112:8,13,16,17;
118:6;119:13,19,21;
120:17,17,18,20,21;
121:21,23;122:13,14;
126:1,2;127:11;
128:25;129:7,13;
132:3;133:21;135:3,
13;141:19,23;143:13,
14,15,16;144:22;146:1,
1;150:11;151:14;
156:6,7;158:6,15;
159:23;160:20;162:20;
167:6;169:9;170:18,
23;184:15;186:17;
187:23;188:21;194:8,
25;195:2,15;196:16;
198:13;200:8,15;
203:4;205:21;207:4,
19;210:2,9,10,11,22
**looks (8)**
19:18;99:16;101:16,
16;102:13;122:6;
139:15;185:14
**loose (1)**
42:10

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

**Lorraine (1)**
  50:5
**lot (10)**
  23:24;53:1,1,6,18;
  54:10;66:13;173:17;
  212:3,5
**lots (11)**
  33:20;35:5,9,21;
  46:11;53:6;54:13;
  100:13;184:24,25;
  211:9
**lower (19)**
  40:13;59:11;64:9;
  65:4;67:25;69:10;
  72:14;81:23;94:17;
  97:23,24;98:1;101:18;
  107:15;111:20;142:23;
  168:12;195:23;201:9
**lowered (1)**
  67:11
**lunch (6)**
  84:24,25;115:1,3,5,9
**LV (1)**
  79:14

# M

**Mac (5)**
  66:7,9,10,12,18
**Madison (3)**
  16:18;26:19;40:24
**magnitude (1)**
  22:23
**mail-in (1)**
  24:19
**main (4)**
  11:20;44:11;46:25;
  86:19
**maintain (1)**
  153:4
**maintained (2)**
  94:2;164:5
**maintenance (2)**
  107:5;116:11
**major (2)**
  26:14,14
**majority (2)**
  82:2,8
**makes (9)**
  51:4;134:14;153:1;
  176:10;178:21;180:10;
  184:1;206:18;211:6
**making (23)**
  19:4;43:15;51:11;
  52:3;95:14;109:19;
  110:3;114:13,17,17;
  154:6;170:6;172:25;
  175:10;176:12;189:9;
  199:11;200:5;201:25;
  202:1,14,14;203:22
**manner (3)**
  32:18;180:9;190:21
**manually (1)**

  60:15
**many (32)**
  6:2,3;10:22;12:9;
  15:6;20:10;24:18;
  28:17,21;36:7;37:22;
  38:23;53:2;57:22;58:1,
  7;77:5;90:22;112:17;
  119:4;136:10;142:14;
  171:16,20;180:20,25;
  181:2;183:18;205:9,
  11;212:16,17
**map (1)**
  87:1
**March (1)**
  178:14
**marginal (12)**
  51:3;77:2;133:18;
  134:1,17,23;135:4,18;
  152:24;162:17;163:9;
  173:20
**margins (4)**
  18:10,15;78:4;
  101:14
**marked (3)**
  4:1;29:1;50:4
**maroon (2)**
  142:10;148:6
**Marquette (5)**
  73:15;74:4;75:3;
  80:20;92:13
**match (30)**
  59:10,18;63:2;64:12;
  67:21;70:3;72:21;
  129:25;130:1;142:13,
  20;164:7,9,15;165:20,
  21;166:7,10;167:17;
  168:8,15,17,24,25;
  169:1,5,6;208:3;
  210:17;212:18
**matched (9)**
  63:1,17;64:11,17;
  67:18;164:13,18,21,22
**matches (4)**
  63:18;64:6;67:12;
  208:2
**matching (15)**
  59:15;62:24;63:8,9;
  72:17;98:12;165:3,4,5;
  167:13,25;168:6,8,21,
  22
**material (9)**
  61:25;67:19;69:14;
  79:3;86:16;87:23;
  88:22;128:7;165:6
**materially (5)**
  22:1;49:8;58:14;
  94:9,18
**materials (8)**
  5:1;7:8,12,14,19,22;
  8:23;9:3
**math (1)**
  150:17
**mathematics (1)**

  11:14
**matter (5)**
  4:10;61:14;116:15;
  155:24;187:14
**matters (5)**
  29:20;31:9;116:16;
  149:10;162:5
**maximum (1)**
  139:5
**may (13)**
  57:12,12;68:12;81:8,
  17;107:4,13,13;162:9;
  168:10;202:25;210:18;
  211:10
**maybe (4)**
  19:10;34:21;168:2;
  179:4
**MAYER (3)**
  4:2,7;197:1
**Mayer's (3)**
  93:6;188:23;199:9
**McCarty (13)**
  5:3;137:17;139:24;
  184:16;186:20;188:12;
  190:1;198:13;199:3;
  202:13;205:17;206:4;
  211:6
**McCarty's (7)**
  176:4;184:6,14;
  185:12;196:15;211:9,
  20
**McComish (3)**
  13:11,20;14:16
**mean (62)**
  20:20;30:5;41:3,5,8,
  16;42:5;46:9;49:15;
  57:22;72:2;74:14,14;
  80:20;82:9;98:21;
  112:5;117:2;120:6;
  122:16;126:21,23;
  127:14;128:23;131:17;
  133:15;135:22;136:2,
  14,19,22;158:2,6;
  159:3,14;160:11,14,15;
  170:7;171:4,11;
  173:11,12;174:15;
  177:12,13;178:18;
  181:14,16;182:13;
  184:20;188:14;193:10;
  195:14;196:7;197:16;
  202:11,25;205:24;
  208:12,13;211:1
**meaningful (12)**
  28:16;126:24;159:4;
  160:18;169:16;171:13;
  174:1;176:9,20;178:4;
  180:12;208:18
**means (16)**
  116:16;119:1;
  125:16;134:14;135:1,
  4,6,13;137:8;140:12;
  161:24;167:24;168:6;
  177:4;183:16;192:5

  **meant (1)**
  26:5
**measure (9)**
  18:17;29:4;31:3;
  35:13;83:16;118:4,5;
  128:24;131:13
**measurement (4)**
  18:20;207:19;
  209:10;210:15
**measures (2)**
  102:3;207:21
**measuring (4)**
  18:24;100:16;
  128:17,22
**mechanism (1)**
  57:5
**median (2)**
  41:3;42:6
**Medical (2)**
  88:14;171:10
**Medicare (1)**
  60:10
**meet (2)**
  58:5;88:4
**members (2)**
  204:17,18
**memory (2)**
  66:16;129:17
**mention (2)**
  39:7;191:20
**mentioned (15)**
  5:19;9:19;12:3;18:4;
  19:8,10,12;27:6;33:10;
  39:7;40:19;50:1;54:20;
  57:15;101:10
**mere (1)**
  36:11
**merely (2)**
  38:5;186:17
**method (12)**
  47:14;133:4;147:5;
  165:8,19;169:7;171:4;
  172:8,18;198:14,17;
  206:20
**methodological (1)**
  12:9
**methodology (3)**
  47:14;88:9;103:21
**methods (8)**
  11:10;12:14,16;19:3;
  62:25;72:18;116:21;
  161:3
**middle (7)**
  50:24;117:12;134:5;
  137:12,13;196:25;
  208:21
**midst (2)**
  92:16;94:4
**might (27)**
  16:22;18:8;19:23,24;
  20:1;24:25,25;65:2;
  78:6;125:22;126:14;
  130:24;151:18;164:25;

  171:16;175:16;179:5;
  182:9;184:21;194:18;
  202:6;209:20,21;
  211:10;212:22;213:20,
  22
**miles (1)**
  179:6
**military (1)**
  69:7
**million (6)**
  48:1;68:5;110:15;
  115:17,20;138:11
**millions (1)**
  60:11
**Milwaukee (6)**
  88:11,12;148:1,5,7;
  187:21
**Milwaukee's (1)**
  148:2
**mind (5)**
  19:10;48:17;118:3;
  137:21;144:15
**mine (1)**
  168:12
**Minnesota (1)**
  174:18
**Minnite (5)**
  50:5,6,7;53:19;56:6
**minor (1)**
  11:14
**minorities (3)**
  169:20;170:11,15
**minority (3)**
  144:8;145:1;201:18
**minus (5)**
  135:8;136:25;
  151:17,24;209:6
**minute (4)**
  8:20;42:3;50:13;
  55:1
**minutes (4)**
  33:10;66:3,14,19
**mischaracterizes (1)**
  93:16
**misheard (1)**
  65:2
**misinterpretation (1)**
  206:6
**misperception (1)**
  154:16
**missing (1)**
  62:15
**mistakenly (1)**
  94:15
**mistakes (3)**
  60:13,15;178:22
**misunderstanding (1)**
  194:18
**MIT (1)**
  58:25
**mitigated (2)**
  36:13;156:2
MLSP27StandardCrosstabsLV (1)

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 69 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

74:23
**Mm-hmm (3)**
51:25;105:16;197:2
**mobilization (1)**
152:24
**mobilize (1)**
184:25
**mobilizing (2)**
106:12;108:9
**model (17)**
49:8;125:10;135:18;
137:2,14;138:6;
139:15,15;194:6,6,7,8;
207:1;208:24;209:15;
210:5,5
**models (7)**
48:20;126:7;129:14;
190:7;198:5,6;207:18
**modest (1)**
167:3
**moment (2)**
56:8;209:2
**monetary (1)**
183:19
**money (1)**
183:22
**monthly (2)**
113:19,23
**months (3)**
30:6;31:6;57:11
**more (84)**
8:8;15:2,16;17:2;
18:9;21:15,17;23:4;
30:15;33:23;53:1,1,2,
18;54:7,8,9,10,13;
55:15;63:18;72:4;76:3,
13,20;78:22,24;85:25;
94:8;96:13;99:11;
115:15;116:24;117:3,
3;120:24,24,24;
125:22;126:10;128:2;
135:19;136:13;137:15,
22;138:1,18,22;
139:10;140:10,14;
141:5;142:21;145:1,
12,21;147:20;148:18;
150:20,24;151:4;
164:1;166:9;167:4,22;
169:1,7,7;171:21;
187:14;189:21;193:17;
194:3;195:20;196:7;
197:18;200:24;201:23;
202:7,23;203:13;
206:25;209:12,25
**morning (3)**
4:7,8;180:16
**most (23)**
11:1;53:5;57:10;
62:2;64:2;80:15;84:2;
86:9;87:25;103:24;
132:4,9,9;133:16;
134:22;136:3;140:1;
147:12;162:6;179:1;
181:25;189:20;195:21
**mostly (4)**
12:13;25:15,17;
147:12
**mothly (1)**
12:13
**Motor (1)**
28:19
**move (9)**
20:9;22:13;107:11;
152:5;155:10;175:22;
189:17,19;212:25
**moved (6)**
19:23,24;116:11,12;
192:10;196:12
**moving (6)**
33:23;87:13;92:11;
112:6;150:4;189:18
**much (16)**
6:8;20:10;29:25;
30:18;52:15;136:1;
158:7;165:23;170:15;
173:8;174:21;185:17;
195:20;204:21;211:25;
212:2
**multiple (3)**
103:23;132:12;
177:14
**multistep (1)**
65:24
**municipal (4)**
15:18;25:22;147:3;
160:14
**municipalities (4)**
147:18;148:6,7;
185:15
**municipality (3)**
25:19;147:1,17
**must (5)**
43:14;56:2;57:3;
66:22;113:3
**mutually (1)**
130:22
**myself (1)**
26:7

## N

**NAACP (3)**
13:8,22,22
**name (10)**
4:9;63:15,22,23,24,
24;86:2;167:14,19;
179:8
**names (1)**
164:6
**national (3)**
54:24;55:5;211:23
**nationwide (1)**
157:24
**Native (3)**
131:7,10,13
**nature (5)**
37:2;46:19;83:13;
183:5;197:15
**nearby (1)**
87:12
**nearly (2)**
144:2;185:16
**necessarily (20)**
18:20;21:18;35:4,21;
40:16;43:12,12;69:5;
89:2;112:25;115:22;
122:24;124:4;129:22;
151:14,16;190:10;
203:19;204:24;206:21
**necessary (6)**
25:11;33:7;132:18;
183:10;205:14;213:11
**necessity (1)**
76:16
**need (30)**
30:3;37:4,25;38:22;
39:14,18,25;55:23,25;
77:20;80:12;81:6,13,
18;83:9;89:15;102:25,
25;110:20;111:6;
116:17;126:11;129:21;
177:21;179:23;181:2;
182:17,18;186:18;
188:7
**needed (2)**
55:23;171:9
**needs (1)**
114:18
**negate (1)**
201:13
**negative (6)**
54:1;136:16;139:14;
143:25;144:1;153:19
**neighborhood (1)**
36:21
**net (1)**
152:16
**new (1)**
41:24
**news (1)**
174:16
**next (9)**
52:1;91:11;102:15;
103:5;121:5;122:20;
125:10;141:3;208:5
**nice (2)**
66:20,21
**nine (4)**
31:6;62:17,19;144:4
**nobody (1)**
126:21
**no-fee (2)**
169:18;170:2
**noncitizens (2)**
102:23;157:7
**non-DOT (4)**
69:7;161:3,12;
166:19
**none (1)**
81:2
**nonetheless (1)**
202:20
**non-Hispanic (2)**
201:9;202:4
**non-ID (1)**
143:16
**nonlinear (1)**
135:18
**non-match (4)**
67:21;168:11,11;
210:17
**non-matches (1)**
68:20
**nonpossession (12)**
69:6,11;70:24;71:3,
12,24;72:24;97:22;
98:8;143:9;166:18;
169:17
**nonpublic (1)**
90:1
**nonstudent (2)**
141:6;142:9
**non-student (1)**
173:12
**nontrivial (1)**
177:20
**nonvoters (7)**
189:2,7;190:2;
206:11,19,24,25
**nonwhite (1)**
78:22
**nonwhites (1)**
78:23
**nonzero (2)**
37:19;189:17
**normally (2)**
38:8;90:1
**normative (1)**
181:20
**North (1)**
58:25
**note (17)**
6:22;40:5;54:23;
60:8;62:8,23;68:17;
78:19;81:14;126:17;
146:11;165:11;183:8;
185:11;189:13;198:24;
211:8
**noted (4)**
9:18;60:16;165:17;
176:6
**notes (5)**
5:14;92:14;105:2;
157:22;184:16
**noteworthy (1)**
179:1
**notification (1)**
107:8
**notified (1)**
116:11
**notion (1)**
182:1
**November (3)**
21:13;68:18;94:25;
108:8;109:1;115:24
**number (154)**
7:23;9:7;12:17;
16:15;17:6;18:14;
19:21;24:8,14;26:21;
28:3,5,5,9;29:11,12;
32:24;35:11,14;36:5;
37:18;40:7,13,14;42:7,
15;44:17;45:1;55:15;
57:2,16;59:4,6,10,17,
18,22;67:5,11,12,13,
14,17;68:1,2,4,5,7,17,
20,20,24;69:2,5,20;
70:10,14,17;71:6;
72:20;73:8;77:8,15,16;
80:25;81:1,11;87:24;
90:22,23;94:6,11,17;
97:15,25;98:11;
101:17;102:11;105:7;
106:9;107:1,14,18,19,
24;108:4;109:5,13,14;
110:18,21,22;111:12,
20;112:2,4,6;113:17;
115:12,20;117:25;
118:24;122:21;125:5,
9,11;126:5,6;138:11;
139:6;147:15;150:16;
151:15,17,17,23;
157:15;161:21;162:1,
11,18,24;163:4,10,15,
25;166:1,23;167:16;
168:5,20;169:1;172:4,
6,6;176:22;177:20;
180:18,21;181:6,15;
186:9;188:4,5;189:11;
195:13;196:2,3,8,10,
14;201:2;213:20,21
**numbered (1)**
102:15
**numbering (1)**
192:17
**numbers (36)**
22:24;32:4;43:25,25;
44:3;45:21;46:8;48:2;
60:18;63:11;67:24;
75:5;77:18;81:2;86:15;
97:21,22;98:22;99:4,
13;100:23,24;101:3,22,
23;103:11;111:9;
114:14;117:20;131:10,
16;150:15;151:12;
166:16;167:10;170:8
**numerator (1)**
157:14
**nuts (1)**
4:11

## O

**oath (1)**
4:4

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 70 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

**object (3)**
50:16;75:8;213:16
**Objection (15)**
10:7;14:14;18:13;
31:7;69:25;70:8;73:2;
76:22;93:14;144:11;
161:5;163:17;182:11;
187:2,8
**objections (1)**
184:4
**observable (1)**
22:13
**observation (3)**
109:22,23;110:3
**observe (23)**
19:5;21:4;40:16;
61:12;97:1;100:12;
109:11;118:16;119:7;
120:4;123:14;124:21;
125:24;126:14;127:1,
21;128:13;142:18;
195:5;199:15;201:8;
203:11;206:22
**observed (9)**
20:12;77:9;109:12;
115:18;148:14;174:15;
194:15;198:22;207:10
**observing (7)**
112:24;113:2;
119:14,15;122:1;
123:2;195:7
**obtain (10)**
28:2;30:12,22;33:7;
37:14;143:2;170:6;
177:15;213:11,23
**obtaining (1)**
28:18;72:13;170:17
**obviously (5)**
33:6;39:16;60:16,17,
18
**occur (1)**
183:15
**occurred (1)**
110:16
**occurring (1)**
199:5
**occurs (8)**
178:23;181:13,24;
190:19,20;198:2;
199:8,17
**October (8)**
19:18;74:5;75:4;
92:23,25;150:13,15;
151:2
**odds-ratio (2)**
204:10,15
**off (56)**
6:9;33:25;56:8;
71:20;105:8;108:14;
109:15;114:10;116:5,
7;120:4;126:8;127:14,
22;128:6,16;139:4,5,9,
25;140:12,19,20,22;

**150:17;153:21;190:1,
4,5,19,25;191:23,24;
194:12,16,20,21,24;
195:6,10;197:16;
198:1,2,3,23;199:2,5,8,
10,14,17;200:1,4,7;
206:24;207:11
**offers (1)**
152:23
**office (6)**
9:9;15:20;36:25;
53:11;91:5;147:3
**officials (2)**
16:12;180:4
**offset (1)**
152:19
**often (1)**
145:8
**old (11)**
60:21,23;66:5,18;
124:1,13;129:2;
208:17;209:15,16,16
**older (2)**
121:11;124:13
**olds (2)**
87:14;173:15
**once (5)**
46:5;65:12;66:2;
127:16;136:22
**one (132)**
8:2;13:10;21:1,20;
22:11;23:7;34:17;35:2;
39:12;40:1;43:14;
44:12,13;52:11;53:5;
57:15,18,23;59:5,20;
61:25;62:1;63:18;
65:21;66:19;67:4;
72:21;73:10,19;80:7,
21;85:15,23;87:5;89:5,
12,22,25;92:7;98:24;
101:11;109:16;113:3;
114:9,21;115:8;116:9;
119:15;127:18;128:4,
23;129:25;130:3,3,8,
11,11,18;131:6,24;
132:17;133:1,8,13;
134:2,8;135:2,16;
136:19,21,22;137:6;
140:17;141:24;142:1;
143:1,6,14,15,20;
147:4;152:14;156:6;
158:15,25;159:5,15;
162:9,18;163:3,6;
167:13,13,22;168:2,4,
9,10,13;169:15,21;
170:6;171:3,22;172:9;
173:18;174:13;175:19;
176:7,16;178:24;
180:20;184:20;188:11;
189:1,23;190:14;
191:3;192:6;194:6;
205:6,19;207:1,23,23;
208:8,12,16;209:22;

**210:4,5,9
**Ongoing (1)**
76:22
**only (43)**
13:9;31:12,12,20;
32:21;37:13;53:8;54:9;
56:7,9;58:18;60:4;
61:19;63:10,21;77:24;
84:14;85:24;88:6,13,
15;99:8;107:2;109:14;
112:22;131:23;132:16;
139:6;140:1;143:17;
149:16;152:16,19;
153:21;161:14;171:2,
3;172:13;189:14;
199:9;203:14;207:2;
212:12
**onto (1)**
152:5
**opaque (1)**
165:2
**opine (2)**
17:10,14
**opined (1)**
17:15
**opining (2)**
170:19;211:17
**opinion (7)**
27:21;73:4;78:5;
82:16;94:4;160:16;
213:8
**opinions (3)**
43:2,4;152:11
**opportunity (1)**
170:12
**opposed (6)**
80:19;85:8;96:4;
111:15;134:21;187:12
**option (1)**
155:12
**options (1)**
155:6
**oranges (2)**
188:12;200:14
**order (6)**
35:19;38:25;41:18;
55:9;57:3;77:20
**ordinarily (1)**
132:18
**organize (2)**
155:4,4
**organized (1)**
145:8
**original (1)**
83:25
**others (5)**
8:3,4;137:15,23;
201:24
**otherwise (7)**
28:9;35:10;73:12;
80:7;99:19;130:12;
187:5
**ought (10)**

**23:22;101:22;
114:14;127:24;128:1;
139:10,12;140:4;
181:5;199:18
**out (48)**
12:20;18:8;19:19,23;
20:10;35:22;37:23;
40:18;46:16;61:16;
90:2;91:25;92:22;
98:13;105:2;107:11;
109:8;112:6;116:10,
14;118:14,14;124:17;
126:11;128:1,3;
129:21;141:1;151:16,
18;154:9;157:10;
159:16;167:20;176:21,
21;184:21;189:10,11,
16,17,19,20;192:10;
195:3;196:12;203:25;
206:25
**outcome (3)**
29:20;47:24;140:22
**outcomes (3)**
51:5;140:18;205:4
**outlier (1)**
148:1
**outliers (1)**
147:24
**out-of-state (2)**
174:17;183:20
**outright (2)**
29:11;177:22
**outset (1)**
178:20
**outside (2)**
15:6;89:2
**outwards (1)**
87:13
**outweigh (1)**
185:9
**over (28)**
5:11;13:1;17:25;
21:10;27:13;49:20;
52:18;71:2,12,14,25,
25;84:8;86:11;92:25;
107:3;113:2;134:1;
146:12;154:18;156:3;
162:1;171:17;175:13;
200:10;203:8;213:6,9
**overall (17)**
19:1;42:4;44:4,20;
45:1;98:11;100:22,23;
117:13,18,23;118:4;
144:6;186:3,21;
202:24;207:15
**overcome (2)**
203:6,8
**overstated (1)**
189:5
**overtime (2)**
146:5;191:2
**overturn (1)**
93:17

**Overturned (1)**
93:21
**overturning (2)**
92:15;93:10
**overwhelming (2)**
53:21,23
**overwhelmingly (3)**
99:22;100:14;101:13
**own (7)**
95:10,16;169:23;
172:10;178:22;181:21;
211:4

**P**

**page (64)**
12:24;27:19;28:25;
43:1;50:23;51:19;60:2;
62:17,19;68:16;70:12;
73:15;79:25;82:2;86:3;
88:12;91:1,3;97:14,22;
103:5;104:23;106:4,
15;115:10;117:12;
129:13;132:3;137:13;
141:23;144:22;148:10;
150:4;152:13;156:7;
158:23;160:19,23;
167:6,13;169:9;
170:18,23;176:17;
178:9;184:15;188:21,
25;192:17;196:23,24,
25;198:13,13,25;200:3,
8;204:11;206:4,9,10;
207:19;208:21;211:16
**pages (8)**
55:3;67:3;74:8;
75:11,16,20,24;98:15
**paid (4)**
5:19;6:5,8;9:21
**paper (2)**
84:15;157:10
**paragraph (28)**
29:3;50:23,24;51:8,
21;52:2;60:2;93:6;
106:5;117:13;121:2,5;
132:4;137:12;144:24;
148:10;158:23;160:20,
24;178:11;188:22,25;
192:18;196:16,25;
198:25;207:19;208:21
**part (19)**
16:6;22:2;27:14;
29:14;36:18;59:13;
71:18;77:5;86:14;
88:18;96:15;106:8;
125:5;146:8;147:1;
159:6;162:4,4;189:24
**partial (1)**
29:3
**partially (2)**
152:19;153:21
**particular (15)**
20:25;21:7;44:9;

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 71 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

47:4;74:20;85:10;93:4;
125:16;155:1;159:10;
162:20;191:19;197:8;
203:23;206:2
**particularly (9)**
25:23;35:20;36:2;
40:17;49:2;53:25;
55:18;85:11;88:11
**partisan (8)**
103:25;104:5,8;
170:18,20,22;211:16,
17
**partition (1)**
102:16
**parts (2)**
33:23;152:10
**party (6)**
34:17;98:24;99:23;
101:5,8,25
**passed (1)**
56:15
**passes (1)**
72:3
**passport (2)**
59:2;162:14
**passports (2)**
59:2;69:7
**past (3)**
4:12;13:2;121:3
**pattern (16)**
128:12;139:22;
140:3;145:13;148:14;
160:12;175:21;190:16,
24;194:1,5,10;198:5;
199:19;202:8;207:17
**patterns (9)**
101:8;110:10;117:7;
120:12;126:8;127:23;
128:10;190:6,9
**pay (1)**
62:14
**peer (2)**
104:16;172:21
**peer-reviewed (1)**
9:7
**people (265)**
12:10;19:19,19,21,
23;20:9;21:18;22:19;
26:17;27:16,25;28:6,
10,17;29:25;30:20;
32:4,22,24,25;35:14,
18,22;36:7;37:8,9,13,
14,16,18,24;38:11,20;
39:7,11,13;40:7,13,14;
45:4,6,7,12;46:3;47:4;
48:1,5;49:17,20;53:7;
57:7,22;58:2;59:4,10,
17,20,25;63:1,11;64:2;
68:17;69:2;70:10;71:8;
72:4;20;76:15;77:6;
78:1,21;80:6,10;81:11;
83:9;84:2,6,7;89:2,9;
90:20,23;94:6,11,15;

96:2,13,21;98:11;
102:23;103:4;106:24;
107:3,11;109:6,7,8,15;
110:7;111:13;112:6,
14,17;113:6,8,9,13;
115:13,17,23;116:4,7;
118:5,7,11;119:5,10,
10,14,16,19,22;120:1,
4,17,18,18,20,20,25;
121:11,22,24;122:2,9,
18,22;123:5,18,25;
125:9,15;126:3,10;
127:6,11;128:1,2,15,
20,25;129:22,24;
130:1;133:23;138:7,8,
17;139:6,6,7,17,18;
140:2,13;141:11,18;
143:18,19;145:8;
147:6;149:5,23;150:6;
151:15,18,20;154:10,
12;155:12;157:6,7,8,
15,18;162:11,18,24;
163:3,5,6,10;164:6,9,
21,22;165:9,20,21,22;
166:1;167:17;168:7;
169:19;170:1;175:12;
176:17,18,22;177:2,18,
23;178:1,4;180:20,24;
181:2,6;182:1,6,19,23;
183:17,22;184:2;
186:10;189:10,13,15,
16,18,18,19;190:12;
191:21;192:5,9,9;
193:10,13,22;194:8,20;
195:8;196:8,10;
197:16,18,21;200:18,
22;201:23;203:4,8,16;
205:13;207:6;209:20;
210:12,13,18;213:10,
21,21,23
**per (1)**
10:10
**perceived (1)**
118:1
**percent (98)**
33:17;59:19;60:4;
63:20;64:15;65:3;69:6;
70:14;71:3,8;72:15,16,
16,17;77:17,17;78:18,
19,19;80:2,3,3;81:16;
84:5;87:14,17,20,22;
88:3,3,7,13,16;89:6;
90:10,17,20;94:13,17;
95:20,24,25,25;96:4,5,
9,10;97:4,5,7;99:9,10;
101:17;102:11;105:23;
108:13,14;117:19,24;
134:8,14;135:8,10;
136:17;137:9;141:22;
150:16,20,21;151:4;
163:15,23;164:4;
165:14;166:20;167:1;
171:3,18;173:12,13;

178:9,13;192:21,23,25;
195:13,14,18,25;196:2,
3;201:1,2,4;202:4;
204:21,22;206:13
**percentage (50)**
32:24;45:3;47:3;
72:24;78:1,17;81:15;
89:7,8,10;90:13;91:6,
10,11,15,17,24;97:24;
98:4,7,23;102:5;108:1;
117:15;126:1,3;137:5,
7,11;141:20,21;142:6,
6,12,17,19,22;143:4;
145:22;147:16;166:18;
173:9,11,14;193:4;
194:14;196:5,13;
200:16,18
**percentages (9)**
45:11;79:12;91:25;
98:5;102:17;103:12;
141:18;143:9;169:13
**percents (1)**
103:8
**perception (1)**
156:23
**perfectly (1)**
179:10
**perform (1)**
22:16
**perhaps (3)**
53:17;83:17;118:25
**period (5)**
13:2;146:13;154:19;
189:14;200:11
**periods (1)**
70:25
**permanent (1)**
85:12
**permanently (2)**
177:5;178:1
**permit (1)**
152:17
**permitted (1)**
52:22
**permutations (1)**
136:10
**person (21)**
29:15;32:15;36:13;
63:5,17,18;64:1,8,11,
18;73:10;90:4;124:8;
133:2;167:22;168:1;
180:5,7;200:24;201:8,
10
**personal (1)**
73:4
**perspective (1)**
82:19
**perspectively (1)**
94:25
**persuaded (2)**
199:21;211:5
**persuasive (1)**
95:17

**pertain (1)**
152:10
**petition (4)**
8:17;26:16;176:8,19
**petitions (1)**
178:13
**PhD (1)**
11:7
**phenomenon (4)**
126:9;193:15;
194:13,17
**photo (41)**
38:22;51:4;52:15;
53:3,14;54:16,18,25;
55:7,9,10,11,12,14,20,
21;56:2,10;57:3,14;
69:23;70:9;71:10,10,
18,21;76:16;77:20;
80:2,2;81:7,14;85:14;
96:14,17;175:1;181:9;
183:9;205:9,10;207:22
**phrase (3)**
95:23;123:2;202:23
**phrasing (2)**
148:19;149:5
**physically (1)**
88:18
**pick (3)**
124:13;146:5;154:9
**picked (1)**
210:16
**picking (1)**
125:12
**picture (2)**
69:17;70:1
**piece (5)**
72:21;153:23;
154:17,21;212:10
**pieces (3)**
26:15;60:11;89:22
**place (8)**
36:20;40:17;70:25;
78:12;106:11;145:11;
179:15;181:11
**placed (1)**
61:13
**places (5)**
41:1;86:8;87:11;
88:10;199:4
**placing (1)**
15:2
**plaintiffs (2)**
14:1,1
**plausible (3)**
22:14;96:25;104:12
**play (2)**
18:8;66:24
**playing (1)**
199:4
**please (6)**
4:21;12:4;90:15;
106:14;132:11;146:22
**pm (1)**

214:6
**point (44)**
9:13,13;10:23;21:7;
31:18;62:16;72:23;
86:14;91:6;92:7;98:7;
103:3;106:16;110:16,
24;111:1;115:8;
116:12;119:2,15,17;
121:23;126:4,20;
127:1;133:18,19;
134:10;138:5;140:17;
143:1;156:1,10;
158:12;166:11;188:10;
190:14,15;194:2,5;
196:9;197:5,23;209:12
**points (12)**
91:12,15,24;117:16;
126:13;127:20,20;
137:5,11;176:21,21;
210:11
**political (4)**
11:8,11;12:12;22:10
**politics (2)**
11:9,17
**poll (31)**
15:22;37:23;40:10;
41:25;73:16,18,21;
74:4,6,9,12,13,17;75:3,
10,13;76:13;77:17,25;
78:5;80:20;92:13,16,
23,24;93:1,11;94:4,5,8,
18
**polled (3)**
8:9;70:19;74:4
**polling (4)**
36:20;40:17;41:1;
181:10
**polls (11)**
16:23;24:12;26:24;
35:14;37:25;38:11;
76:5,16;100:18;145:9,
9
**pop (1)**
157:4
**popular (2)**
152:15;154:5
**population (43)**
45:3,19;49:19;87:17,
21;88:16;99:6;102:10,
13,20;103:1,2;109:10;
116:19,20;128:3;
129:5;138:4,13,16;
140:9;141:25;148:2,3,
22;156:18,24,24;157:3,
4,5,17,18,20,21;
165:22;169:12;170:16;
171:15;173:6;200:16;
202:9,11
**populations (14)**
44:14;46:1,14;53:10;
111:1;118:18;126:15;
128:15;140:17;149:8,
18;171:17;173:1;

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 72 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

188:18
**portions (2)**
62:13;152:9
**pose (1)**
182:10
**posed (1)**
74:9
**position (4)**
6:15;32:7;179:21;
202:18
**positive (5)**
48:19;59:6;73:8;
133:25;148:9
**possess (9)**
22:20;57:23;59:5;
91:3;96:14;162:9,25;
169:10;172:14
**possessing (2)**
71:9;97:25
**possession (3)**
132:6;143:16;169:16
**possibilities (1)**
211:13
**possibility (2)**
97:9;191:21
**possible (22)**
20:18;22:3;38:4;
46:5;48:21;57:12;63:3,
4;65:3;96:24;97:13;
107:11;118:21,23;
123:4;126:18;141:24;
166:14;173:8;191:2;
205:12;211:11
**Possibly (2)**
57:22;118:3
**post-2014 (1)**
68:25
**practical (2)**
65:6;177:4
**practice (2)**
154:19;155:2
**practices (6)**
7:7;17:8;22:12;32:1;
52:23;186:13
**preceding (1)**
91:17
**precise (10)**
27:12;70:19;71:20;
115:15;120:24;122:6;
147:7;167:4;196:7;
205:10
**precisely (9)**
5:10;18:18;62:23;
98:6;116:19;145:6;
151:23;184:20;202:23
**precision (2)**
18:17;149:10
**predictable (1)**
22:14
**predictive (1)**
134:25
**predictor (1)**
121:4

**prefer (3)**
72:7,9;83:23
**premise (1)**
39:10
**prepare (2)**
4:25;5:1
**prepared (8)**
5:3;16:18;26:11;
76:12;101:21;160:16;
165:7;197:17
**preparing (2)**
8:22;17:20
**presence (1)**
188:10
**present (12)**
22:6;27:17;29:21;
31:15;37:24;38:11;
39:13,25;43:9;152:22;
175:16;185:21
**presented (6)**
7:2;23:13;26:24;
28:12;35:14;40:7
**presents (1)**
39:24
**presidency (1)**
11:18
**president (2)**
34:13;184:24
**presidential (2)**
106:13;108:10
**presidents (1)**
34:16
**Presumably (5)**
98:3;123:7;147:6;
177:23;209:11
**pretending (1)**
181:11
**pretenses (1)**
181:12
**pretty (2)**
71:7;210:7
**prevent (1)**
182:9
**prevented (5)**
73:10;181:1,7;182:2,
7
**prevents (2)**
183:15;184:2
**previous (5)**
15:10;20:13;174:22,
22;189:4
**previously (1)**
100:1
**primaries (3)**
33:21;34:11,13
**primarily (8)**
5:15;24:7;59:1;
85:10;169:25,25;
173:1;192:9
**primary (13)**
17:22;18:1;26:20;
27:2;33:20;34:4,14,19;
60:1;168:25;169:4;

175:19;176:16
**prime (1)**
87:16
**prior (7)**
11:15;121:5;126:25;
127:2;137:13;147:21;
170:3
**prison (2)**
157:9,10
**Pro (2)**
66:12;176:19
**proba (1)**
47:22
**probabilistic (2)**
165:4;212:19
**probabilities (6)**
17:17;136:21;137:6;
187:24;212:8,8
**probability (16)**
47:10;48:8;130:4;
134:18,20,21,22;136:6,
16,23,25;137:8,9;
193:19;200:23;203:1
**probable (1)**
132:25
**probably (6)**
9:1;48:16;52:12,14;
54:11;181:16
**probit (7)**
132:11,21;134:4,6,
16;135:19;136:19
**problem (11)**
46:16;53:24;72:25;
165:2;170:11;181:8;
182:5;183:13,25;
188:23;202:13
**problems (2)**
47:2;176:5
**procedure (2)**
41:24;196:21
**procedures (3)**
16:15,21;32:3
**process (55)**
8:17,20;17:20,22;
26:3,4,16,17;27:14,21;
28:2;29:18;30:6,10;
31:4,17,22;32:8,25;
33:4;41:2,16;62:17;
65:7,11,25;67:16,23;
79:1;81:12;85:7;88:24;
107:5,7;133:10;166:7;
168:21,22;170:2;
174:19;176:9,20,23,25;
177:3,7,8;178:17,17,
19;179:2;182:17,18;
190:5;194:21
**processed (1)**
178:15
**processes (1)**
179:14
**processing (2)**
67:10;178:22
**processors (1)**

66:17
**produce (6)**
83:15;161:20,25;
212:1,3,3
**produced (3)**
9:8;94:20;151:13
**produces (2)**
132:25;211:23
**professionalized (1)**
195:21
**Professor (63)**
4:7;8:21;28:15;
53:19;58:24;59:14;
70:17;79:21;81:4;
92:14;93:6;95:3,9,14;
98:13,15;99:14;
102:15;103:23;104:6,
15;137:17;139:24;
152:5,7,9;153:20;
155:14;156:6,23;
157:22;161:11;162:21;
170:24;176:4,6,7,12,
19,24;184:5,6,14,15;
185:12;186:20;188:12,
23;189:25;196:15;
197:1;198:13;199:3,9;
200:15;202:13,13;
205:17;206:4;211:4,6,
8,20
**Professors (1)**
5:3
**program (4)**
86:23,25;176:13;
180:10
**progressive (1)**
70:23
**project (2)**
126:18,18
**proof (3)**
85:19;179:22;187:15
**propensities (1)**
187:20
**propensity (3)**
84:18;121:10;188:8
**proper (1)**
53:22
**properly (2)**
96:13;181:4
**properties (1)**
46:20
**proportion (1)**
149:1
**proportionate (2)**
131:21;204:16
**proposition (1)**
149:14
**protocol (1)**
192:15
**prove (1)**
172:17
**provenance (1)**
74:12
**provide (2)**

199:1;212:1
**provided (7)**
7:18,22;8:15;9:17;
16:9;26:6;87:24
**providing (1)**
13:5
**provision (1)**
57:7
**provisional (13)**
26:21,22;27:2;35:11;
36:3,5,6,11,16,23;38:7,
9;39:5
**provisionally (2)**
27:1;38:5
**proxy (1)**
142:14
**public (2)**
14:23;78:5
**publication (1)**
152:13
**publications (1)**
9:11
**publicly (1)**
9:16
**published (2)**
52:13;172:10
**pull (3)**
21:6;9;98:13
**purport (2)**
160:5,6
**purported (5)**
37:11;179:3;181:9
**purports (1)**
158:13
**purpose (4)**
77:12;139:1;182:16;
183:24
**purposes (13)**
30:13;63:9;90:2;
106:18;124:7;127:10;
130:8;131:21;162:23;
163:22;177:5;182:3;
183:10
**put (3)**
23:6,20;30:15,20;
33:9;49:5,7;99:11;
139:2;152:4;182:21;
185:18;196:7
**putting (2)**
115:16;196:3

**Q**

**quadruple (1)**
63:22
**quadruplicates (2)**
63:13;64:13
**qualification (1)**
161:13
**qualifications (1)**
211:10
**qualified (5)**
28:9;38:12;73:12;

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 73 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

208:16;211:15
**qualifier (2)**
  44:25;198:24
**qualifies (1)**
  85:17
**qualify (7)**
  38:21;56:21;57:2,10;
  165:11;208:13,15
**qualifying (8)**
  26:25;55:8;72:5,13;
  162:19;163:11;174:20;
  213:24
**quality (1)**
  54:6
**quantify (1)**
  31:2
**quantitative (1)**
  12:16
**quantities (1)**
  109:17
**quantity (7)**
  32:21,23;121:21;
  122:8;186:9,11;188:16
**quarter (4)**
  65:3;77:18;82:10;
  100:10
**query (2)**
  21:7,12
**Queueing (3)**
  16:19,24,24
**quick (2)**
  84:23,25
**quickly (2)**
  136:11;193:12
**quite (16)**
  16:5,10;34:10;43:6;
  49:6;51:5;58:13;65:18;
  70:11;81:16;94:23;
  131:18;136:1;167:25;
  169:1;175:23
**quotes (1)**
  152:13

---

**R**

**race (23)**
  44:10;46:7;49:3;
  62:18,21;63:10,16,21;
  64:2,4,8,14;98:16;
  99:24;101:6;105:2;
  130:19,21;132:5;
  145:17;199:2,11;200:4
**racial (4)**
  22:18;201:22;
  203:20;212:9
**racially (2)**
  169:21,24
**raining (1)**
  30:18
**raise (1)**
  153:1
**raises (1)**
  186:21

**raising (1)**
  211:13
**ran (1)**
  190:8
**RAND (1)**
  11:16
**range (11)**
  7:12;10:18;12:7;
  35:16;41:9;71:7,8;
  89:3;138:10,15;175:2
**ranging (1)**
  16:16
**rate (29)**
  5:22;26:21;29:4,14;
  32:11;62:25;65:3;69:6,
  11;71:3,12;72:13;
  79:22;96:9;97:7,8;
  98:8;159:2;165:13;
  168:11;169:11;170:15;
  178:7;189:17;195:23,
  24;206:12,18,22
**rates (12)**
  37:7;70:23;71:24;
  159:6;160:11;189:3,8;
  198:25;199:2,14;
  206:10;207:13
**rather (5)**
  29:8;72:7;109:23;
  123:24;135:22
**ratio (1)**
  204:20
**re (2)**
  23:14;165:18
**reach (3)**
  22:5,24;23:1
**reached (6)**
  22:7,7;23:9;27:5;
  78:16;163:1
**read (16)**
  50:9;51:6,12,23;
  79:25;82:6;91:12;94:1;
  117:16;152:6,8;153:2,
  3;154:21;161:22;211:8
**reading (5)**
  50:12;143:10;177:7;
  178:25;188:24
**reads (1)**
  91:19
**real (5)**
  33:18;166:14;
  188:16;191:10;193:15
**realistically (1)**
  126:22
**realize (4)**
  6:16;31:22;37:25;
  39:25
**really (15)**
  11:23;24:17;32:11;
  36:15;45:24;46:23;
  62:12;83:23;126:23;
  158:5;160:9,16;189:9;
  195:15;205:20
**rearrange (1)**

155:13
**reason (41)**
  23:7;36:22;38:8;
  44:11;45:24;46:25;
  61:2;62:8;66:13;72:2,
  10;80:11;84:1,13;
  116:9;127:9;128:5;
  136:2;140:22;143:13;
  149:23;160:7;162:4;
  168:9,11;171:6;
  172:12;182:4;183:12,
  16;184:2;185:18;
  187:16;191:6,23;
  192:6,10;195:9;
  196:12;213:11,25
**reasonable (11)**
  28:12;37:3,8;147:9;
  156:14;172:9;183:7;
  198:20;209:13,25;
  213:13
**reasonableness (1)**
  37:3
**reasonably (2)**
  142:14;180:13
**reasons (15)**
  33:21;81:2;84:16;
  104:19,20;128:4,23;
  136:19;143:21;153:14;
  184:22;189:11;203:10;
  205:19;208:22
**rebuttal (11)**
  26:12;28:20;33:10;
  54:24;165:17;167:11,
  12;177:11;178:7,10;
  200:2
**recall (32)**
  7:5,18;9:13;10:17;
  27:19;67:17;92:16;
  106:7,11,25;107:15,20;
  108:3,18,21;110:14;
  113:7,14;114:3,6;
  115:19;118:12;120:19;
  124:12;125:11,13;
  139:16,19;194:9;
  207:7;209:9;210:13
**receive (1)**
  41:8
**received (3)**
  7:23;11:8,13
**recent (2)**
  57:20;146:9
**recently (1)**
  16:17
**Recess (6)**
  42:21;85:2;115:5;
  144:19;184:11;198:10
**reclassify (1)**
  33:24
**recognizing (1)**
  166:16
**recollection (4)**
  5:9;7:4;137:18;
  153:22

**reconfigure (1)**
  155:13
**record (16)**
  20:14;40:11;42:23;
  66:25;67:19;79:9;85:3;
  99:24;115:6;144:20;
  164:10,23;177:8;
  179:1;184:12;198:11
**recorded (2)**
  42:5;123:15
**records (11)**
  8:18;60:5;67:4,11;
  69:20;167:21;192:22,
  23;193:1;195:13,15
**redid (1)**
  165:18
**redistricting (2)**
  14:6,9
**reduce (3)**
  59:17;94:6;163:4
**reduced (1)**
  203:1
**reduces (1)**
  68:19
**reducing (3)**
  53:15;162:17;163:9
**refer (1)**
  106:15
**reference (1)**
  205:16
**referred (1)**
  25:13
**referring (3)**
  55:3;68:3;161:3
**refers (4)**
  16:25;92:23;149:16;
  187:11
**reflect (2)**
  43:3;81:5
**reflected (4)**
  37:22;52:24;53:17;
  188:9
**reflection (2)**
  101:5;107:3
**reflects (3)**
  54:4;115:21,23
**reform (2)**
  152:15;154:5
**refresh (1)**
  129:17
**regard (13)**
  25:1;27:7;30:9,23;
  53:4;57:9,13,24;73:13;
  166:7;170:18;172:18,
  24
**regarding (1)**
  5:7
**regardless (2)**
  71:23;180:17
**regime (1)**
  153:12;155:21
**regis (2)**
  94:13;106:10

**register (25)**
  17:19;38:22;84:3,6,
  10;102:24;107:12;
  112:14;118:12;146:19,
  20;147:2,6;149:13,24;
  150:6;151:21;152:2;
  155:11;202:7;203:13,
  16;205:6,8,11
**registered (80)**
  38:13,14,17,20;45:7,
  13,15;61:7,23;68:15,
  18;71:9;74:18,25;
  79:17;80:5,6,10,16,19,
  22,23,25;81:8,9;82:22;
  83:21;84:7;89:6,8,9,10,
  13;90:13,18,20,24;
  94:13;103:4;106:24;
  107:2,19;108:1;109:7;
  112:20;113:9,10,13;
  115:13,14;120:2,23;
  122:10;123:7,9,19;
  124:2;125:12,17;
  127:7,8;131:1;138:7;
  139:18,19;143:19;
  187:25;194:8;196:18;
  197:3,9,22;205:13;
  207:5,6;209:4,8,9;
  210:12,13
**registering (1)**
  38:21;81:20;203:10
**registers (1)**
  147:9
**registrant (7)**
  89:24;99:24;123:17;
  142:20;202:3,5;207:21
**registrants (30)**
  62:9;68:14;89:20;
  90:6;91:3;102:20;
  106:10;107:15,24;
  108:5;109:10;137:3,
  15,22;138:4,14;141:3,
  4,6;142:12,22;143:4;
  145:18,24;147:16;
  161:21;162:1;187:25;
  201:3,4
**registration (69)**
  7:6;8:7,9;17:7;20:1;
  22:12;38:15;60:4;61:3,
  8,9,11,16,19;62:1,4,15;
  99:23;106:12,21;
  108:16,17,18,19;111:4,
  15,19,21;112:12;114:2,
  4;144:23;145:16,23;
  146:2,5,15,16;147:13,
  20;148:12,25;149:16,
  19,21;152:18,20,23;
  153:10,17,18,24,24;
  154:7,8,14,15;155:2,3;
  156:20;159:14;160:13;
  183:7,9;186:13;
  192:22;197:6,10;212:6
**registrations (3)**
  112:10;148:20;159:8

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

**regression (4)**
132:12,22;133:21;
147:14
**regressions (1)**
133:17
**regular (3)**
35:15;36:17;108:8
**reinforced (1)**
27:4
**rejected (1)**
104:17
**related (2)**
26:23;158:5
**relates (1)**
143:23
**relating (1)**
133:25
**relationship (8)**
41:4;133:22;142:18;
143:25;144:1;147:15;
148:4,8
**relationships (1)**
132:14
**relative (2)**
110:16;201:1
**relatively (3)**
166:1;25;167:3
**relevance (1)**
104:2
**relevant (8)**
11:23;109:17;
121:20;122:8;184:18;
186:9,11,11
**reliability (3)**
23:14;25:1,25
**reliable (18)**
19:3;23:16;24:5,7;
33:19;35:4;46:10,23;
82:17;101:4;103:21;
133:5;165:8;168:20;
169:7;172:18,25;
181:23
**reliance (1)**
80:18
**relied (5)**
73:19,21;74:6;75:7;
92:24
**religious (3)**
69:18,25;70:8
**rely (2)**
33:24;49:16
**relying (1)**
25:9
**remain (2)**
129:1;192:5
**remains (3)**
114:7;139:14;166:2
**remedy (1)**
28:17
**remember (9)**
13:16;24:3;48:2;
66:7;67:15,23;68:21;
173:10;180:16

**remembering (1)**
9:20
**remotely (1)**
27:24
**remove (1)**
102:23
**removed (14)**
67:6,20;68:14,19;
107:10;116:10;124:22;
125:8;189:13,16;
192:9;193:11,23;195:4
**removes (2)**
157:5;193:13
**render (1)**
160:16
**renew (1)**
164:25
**rep (1)**
59:14
**rephrase (1)**
4:21
**replaced (2)**
12:13;202:5
**replicate (3)**
78:8;94:24;100:8
**replicated (3)**
59:13,14;101:1
**report (90)**
5:2,2,2;8:22;9:5,9,
10,13,17,18,20;11:2;
12:20,21,23;13:2,5,7,8;
16:18;17:17,21,21;
18:1;19:12;20:7;22:6;
23:3,7;25:11,23;26:2,7,
8,11;27:5;28:20;42:25;
47:1;48:2;54:24;55:23;
60:1,8;61:20;62:24;
64:21;74:6;75:7;86:3;
91:2,19;92:11,14,17,
18;97:14,17;98:14;
103:6,25;104:23;
106:4,19;147:5;150:5;
152:5,6,7,9;158:6;
164:5;165:18;167:12,
12,17;176:4,6,8;
177:12;178:7;184:5,6,
14;185:13,19;196:15;
202:6;211:20,22
**reported (2)**
40:9;93:5
**reports (7)**
9:7;16:14;33:12;
37:23;40:3,4;152:11
**represent (4)**
4:9;74:3,21;75:2
**representation (3)**
75:22;99:5;160:11
**representations (1)**
104:3
**representative (1)**
136:13
**representing (4)**
120:7;137:25;

138:20;142:5
**represents (1)**
186:20
**Republican (2)**
34:14;99:10
**Republicans (2)**
100:4,11
**reputation (1)**
195:19
**request (2)**
6:12;56:1
**require (5)**
55:14;110:11;155:8;
179:18;183:7
**required (5)**
55:8;76:6,20;80:1;
205:11
**requirement (8)**
38:10;59:9;96:13,18;
172:16;174:12;183:5,6
**requirements (10)**
35:23;55:10;56:25;
58:5;179:5;191:19;
205:6,7,10;210:1
**requires (3)**
27:25;56:11;177:18
**requiring (4)**
32:7;37:9;179:21;
183:17
**re-ran (2)**
165:20,23
**reregister (1)**
205:8
**re-register (1)**
123:17
**research (32)**
23:2;51:5;52:12;
70:22;71:1,11;73:6,7;
77:11;95:10,16;98:17;
125:19;144:23,25;
145:14,25;146:4,7,12;
153:7;154:25;155:14;
156:1,4;181:21,22;
211:2,4;212:24;213:3,
5
**researchers (1)**
54:7
**reside (4)**
47:21;90:23;110:7;
122:24
**resided (1)**
122:22
**residence (2)**
132:5;179:8
**resident (1)**
143:4
**residents (10)**
85:6,13;87:11;
121:15;123:19;129:10;
143:16;208:9,19,19
**resides (1)**
122:21
**residing (2)**

97:15;173:20
**resis (1)**
19:25
**resolve (1)**
59:24
**respect (2)**
55:7;172:23
**respond (3)**
107:9;186:24;187:3
**responded (1)**
158:20
**responding (1)**
28:11
**response (2)**
28:12;171:1
**rest (1)**
158:7
**restriction (1)**
184:1
**restrictive (2)**
53:5;57:10
**result (9)**
23:19;29:14;30:10;
94:10;95:24;106:9;
152:24;179:9;200:12
**results (30)**
59:15;61:3;74:4;
75:10,13;85:5;93:3,12;
94:5,20;96:7,8,11;
128:14;135:24;165:24;
174:21;187:18;190:3,
6,7,23;191:4,10;
193:16;194:1,11;
195:12;199:18,19
**retained (1)**
17:9
**retention (2)**
7:13,21
**return (2)**
55:24;204:14
**returning (1)**
108:2
**reveal (1)**
192:21
**reverse (1)**
101:15
**review (3)**
65:10;104:16;172:21
**reviewed (2)**
5:1,2
**revisions (1)**
26:9
**right (60)**
10:21,21;13:1;30:25;
32:12;38:3;54:12;
56:18;64:2,7,14;67:9;
69:18;70:12;77:2;
83:16;89:22;93:23,23;
96:19;99:17;100:8;
105:7,19;109:15,22;
111:12,15,16;112:24;
114:16;115:15,23;
118:9;123:8;127:12;

130:15;136:18,22;
147:25;148:1;150:2,
25;152:4;157:11;
160:18;162:2,12;
164:16;165:16;180:22;
182:14;190:1;197:25;
199:16,22;203:7;
207:12;209:2,3
**right-hand (1)**
192:17
**Rights (1)**
100:2
**Robert (1)**
50:4
**robust (2)**
54:7,9
**role (1)**
190:19
**roll (40)**
109:15;114:10;
116:7;126:8;127:14,
22;128:6;139:4,9;
140:11,19,20,22;190:1,
4,5,20,24;194:12,16,
20,21,24;195:6;
197:16;198:1,2,3,23;
199:2,5,8,10,14,17;
200:1,4,7;206:24;
207:11
**rolled (5)**
120:1;128:16;139:5;
191:22;195:9
**rolling (1)**
139:25
**roll-off (1)**
126:19
**Rothman (1)**
104:11
**roughly (3)**
29:6;33:17;108:6
**round (1)**
81:3
**row (5)**
80:1;125:4;210:2
**rules (3)**
4:16;51:4,9
**run (4)**
46:14;66:18;134:15;
136:11
**running (2)**
66:2;184:23
**RV (1)**
74:25

**S**

**safety (10)**
27:22,25;55:18;57:5;
176:9,20;177:17;
178:4;179:3;180:12
**salary (3)**
10:1,5,9
**same (44)**

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

9:25;34:21;53:20;
56:2;62:2;63:8,16,19,
20;64:4;98:10;101:3;
103:14;107:21;109:11;
111:8;112:4;116:19;
119:9,14,16;120:8,18,
20;121:24,25;122:2,15,
18;127:11;128:12,25;
129:6,7;130:5;134:3;
136:1;143:22;148:13;
157:15;160:1;163:2;
167:22;203:22

**same-day (7)**
38:15;152:19;
153:10,17,24;154:7,14

**sample (1)**
124:24

**satisfied (1)**
37:12

**satisfy (2)**
161:12,15

**Saturday (1)**
147:10

**save (1)**
75:19

**saw (2)**
27:11;200:10

**saying (5)**
136:17;138:2;
187:21;200:3;210:23

**scale (5)**
18:22;100:3,4,5;
134:15

**scholars (4)**
19:2;20:9;53:7,23

**School (5)**
73:16;74:4;75:3;
85:17;88:11;92:13

**science (6)**
11:8,11;12:7,12;
22:10;77:10

**scope (2)**
7:3,5

**scores (1)**
132:18

**screening (1)**
80:21

**SDR (1)**
152:20

**second (18)**
42:7;51:20;68:10;
80:23;81:20;92:20;
122:5;132:3;139:15;
159:1;160:20,24;
186:16;192:18;196:16;
198:25;200:9;207:20

**secondary (5)**
164:15;166:7,10;
168:24,25

**seconds (6)**
41:9,18,19;42:6,6,13

**section (5)**
51:20;60:2;61:20;

100:2;158:8

**security (4)**
55:15;60:9;167:16,
20

**seeing (1)**
171:12

**seem (3)**
76:5,18;99:4

**sees (1)**
39:21

**select (1)**
120:16

**Senate (3)**
184:17;185:2,10

**senator (1)**
104:10

**send (1)**
107:8

**sense (10)**
49:22;51:16;58:1;
82:16;112:8,25;124:3;
186:6;188:11;193:2

**sensitive (1)**
51:5

**sentence (21)**
50:24;51:20;52:1;
62:19;91:11,13,17;
106:5;132:4;141:3;
157:12;160:22;161:1,
6,18;188:21;192:21;
196:17;200:9;206:9;
207:20

**sentences (1)**
51:18

**separate (5)**
34:21;39:23;131:13;
147:25;174:10

**September (9)**
8:10;18:5;19:17;
21:11;108:25;112:14;
115:18;119:3;195:1

**sequence (1)**
7:11

**serve (1)**
11:24

**served (1)**
12:22

**serves (2)**
82:4,13

**service (1)**
145:10

**set (17)**
12:20;18:23;20:22;
21:2;23:13;56:4;63:8;
125:15;130:3;133:14;
134:25;135:5;136:4;
138:3;153:21;165:6;
167:23

**sets (2)**
104:14;156:15

**setting (1)**
135:12

**seven (3)**

174:3;188:21;210:3

**several (3)**
8:19;60:16;125:8

**shaky (1)**
51:22

**shape (2)**
134:6,9

**shift (2)**
82:25;128:18

**shifting (2)**
58:17;62:17

**shoots (1)**
134:7

**short (1)**
42:18

**shot (1)**
26:22

**show (40)**
36:19;39:8,11,13;
45:21;55:8,11;61:10;
66:25;70:9;71:9;76:7,
14,17;77:7,11;78:4;
80:1,12;81:7,13,18;
85:19;94:16;98:11;
106:1,8;107:17;
108:19;148:15;158:10,
13;159:25;160:5;
164:25;186:22;190:8,
9;192:12;196:9

**showed (7)**
35:7;43:25;44:19,23;
144:5;153:7;160:13

**showing (3)**
72:13;76:16;146:23

**shown (2)**
7:8;211:2

**shows (18)**
61:15;76:14;80:7;
81:22;91:5;94:19,19;
95:16;108:17;115:12;
146:4;147:18;154:25;
156:2,8;199:8;204:6;
210:24

**side (2)**
13:17;110:17

**sides (1)**
34:11

**signature (2)**
58:6;85:18

**significant (10)**
30:21;56:9;77:15;
94:11;104:8;117:3;
139:14;149:8;166:2;
175:15

**significantly (4)**
57:25;78:11;87:19;
97:6

**signing (1)**
41:25

**similar (3)**
70:14;133:19;210:7

**simple (1)**
65:18

**simply (17)**
29:10;36:18;37:16;
38:1;44:7,12;62:7;
95:3,6;98:4;164:20;
166:13;176:1;181:1;
186:9;195:25;197:8

**single (1)**
65:24

**site (1)**
124:23

**Sitting (2)**
57:9;58:7

**situation (1)**
37:13

**six (11)**
20:21;54:18;66:18;
104:24;107:17;121:20;
122:7;156:7;158:24;
167:6,6

**sixfold (1)**
173:14

**size (2)**
56:9;77:23

**sizes (1)**
22:23

**skip (1)**
170:23

**Skipping (1)**
160:19

**slight (1)**
72:19

**slightly (4)**
58:17;101:14;
150:24,24

**slope (1)**
143:23

**small (13)**
19:20;32:5;56:9;
70:11;86:15;131:11,
16;138:11;166:1,25;
176:22;181:5,14

**smaller (19)**
96:4;98:12;124:24;
125:6;127:24;128:3;
130:14;139:12;140:6,
6;151:17;157:16;
162:24;165:23;167:2,
3;175:22,24;190:11

**Smith (2)**
145:14;146:10

**snakes (1)**
40:17

**snapshot (16)**
18:6;19:13;20:3,15;
43:17;46:6;111:10;
112:13,16;114:7;
115:25;118:16,19,19;
119:3;127:10

**snapshots (2)**
20:14;21:16

**social (5)**
12:6;55:14;60:9;
77:10;167:16,20

**softened (1)**
57:19

**solely (1)**
187:18

**solve (3)**
181:9;182:4;183:25

**solves (1)**
183:13

**somebody (5)**
31:3,5;32:8;82:25,25

**somehow (1)**
182:7

**someone (71)**
19:6;24:12,16;30:7,
10,17;31:11,13,16,21;
36:19;38:4,16;39:21,
23;41:6;44:16;47:18,
25;48:8;55:7;60:19,19;
61:6,10,14,22;62:4;
63:5,6;64:7,7;69:24;
81:5,12;83:5,21;84:12;
107:5;112:20;124:4,
14;128:25;129:2;
130:23,25;131:5,7;
133:12;135:9,11;
147:9;162:6,8;168:1,9;
179:12;180:1,25;
181:10,11;182:9;
183:19;195:3;197:7,9;
203:5;204:16;208:2,
13;209:13

**someone's (1)**
48:17

**sometime (2)**
5:9,11

**sometimes (14)**
30:7;55:13;128:10,
11,11;168:2,3,4;
175:24,24;185:15;
190:13;207:8,8

**somewhat (3)**
81:23;157:16;211:15

**somewhere (4)**
40:6;97:17;107:12;
123:6

**sorry (26)**
8:5;11:6;15:12;
50:14;64:24;79:6;
91:12;93:15;97:14;
103:10;105:10,18,18,
22;111:16;113:20;
115:10;117:22;123:25;
141:4;159:24;160:23;
174:6;188:24;196:23;
213:4

**sort (12)**
26:4;34:14;42:9,10;
46:7;52:18;70:23;72:6;
79:1;144:9

**sought (1)**
8:24

**souls (1)**
145:9

Verbatim Reporting, Limited
(608) 255.7700

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

**sounded (1)**
90:16
**sounds (3)**
15:9;105:6;135:19
**source (3)**
102:7;209:18,23
**sources (3)**
99:18;103:24;160:21
**South (2)**
54:17;56:7
**span (1)**
93:1
**speaking (1)**
83:3
**special (1)**
26:17
**specializing (1)**
11:9
**specific (22)**
8:8;9:2;15:16;17:15;
18:2,9;19:9;23:4;
44:14;45:10,25;46:13;
47:5,6;93:9;149:4,22;
150:5;151:14;188:18;
203:23;205:25
**specifically (5)**
17:2;18:24;92:17;
100:23;141:18
**specifications (1)**
139:21
**specify (1)**
153:14
**speculate (10)**
72:7,9;75:10,25;
76:24;83:23;163:14,
18;165:12;166:23
**spike (1)**
107:25
**spot (1)**
56:13
**spots (1)**
104:24
**staffers (1)**
27:15
**stage (1)**
81:20
**stake (1)**
51:23
**stand (3)**
35:8;51:21;72:2
**standard (3)**
132:12;135:17;
179:17
**standards (2)**
34:4;183:2
**stands (1)**
72:10
**start (6)**
7:11,13;31:17;71:14;
136:9;193:24
**started (2)**
7:9;66:2
**Starting (16)**

85:6;106:6;121:23;
126:12;127:19,20;
156:9;166:11;194:2,5,
7;196:16;197:5;209:7,
11;210:11
**starts (5)**
31:3,21;41:6;50:25;
197:1
**State (38)**
8:13;13:21;14:17,23;
19:23,24;52:25,25;
53:17;54:4,21,25;55:6,
6;56:7,9;60:3;71:13,
15,18;77:10;91:24;
100:6;107:12;111:4;
144:23;158:23;169:18;
170:2;172:7;177:15;
178:13;189:17,20;
192:10;196:12;200:2;
207:22
**stated (3)**
93:20;95:8,19
**statement (15)**
92:7;137:16,21;
153:5,6;189:10;197:2;
200:3,11;204:14;
205:18;206:5;207:25;
208:4,7
**statements (3)**
150:12;205:20;
211:12
**states (33)**
24:18;38:8,14;51:21;
53:2,13;54:14,16,55:9,
15,17,19;56:4,14,22;
70:24;71:4,6,21;91:21;
100:1;148:14;154:17,
18,19;158:24;159:10;
192:22,24;195:21;
207:20;208:22;211:3
**statewide (5)**
8:7,9;16:11;111:3;
127:3
**state-wide (2)**
127:2;185:14
**stating (1)**
52:6
**statistical (8)**
12:6;18:16;46:19;
47:13;51:4,11;52:3;
132:13
**statistics (1)**
11:10
**status (1)**
49:12
**stay (3)**
93:21;98:10;128:12
**stays (1)**
71:24
**step (9)**
31:11,20;36:18,24;
37:20;65:24;84:8;
167:13;168:23

**steps (3)**
84:9;167:13;170:17
**Stewart (1)**
58:24
**sticks (1)**
171:12
**still (32)**
19:25;29:6;43:3;
56:14;58:5;59:19;64:1,
14;73:13;77:21;81:15,
16;82:13;84:15;94:11;
95:25;96:5;112:5;
113:14;119:23;123:14;
124:10;129:2;144:1;
148:9;153:4;171:24;
177:25;193:22;195:10;
201:6;202:7
**stipulation (1)**
76:11
**stop (2)**
52:4;114:23
**stopped (1)**
28:11
**stopping (2)**
127:20;156:9
**stories (1)**
35:9
**straight (1)**
139:11
**strange (2)**
101:16;191:11
**street (1)**
86:21
**strength (1)**
96:21
**strict (18)**
52:15;53:3,12,14,25;
54:14,16,18,21;55:1,6,
11,16,19;71:13,15,18;
91:22
**stricter (1)**
56:15
**strictest (5)**
53:4;56:19,20;57:9,
14
**strictness (2)**
52:20;54:20
**Strike (2)**
15:12;150:10
**strong (6)**
48:23;49:4;121:6;
142:18;143:24;208:22
**strongly (3)**
35:24;78:8;178:2
**structures (1)**
195:22
**stuck (1)**
140:2
**student (53)**
47:19,21;85:6,8,17;
87:4;88:5,20,25;89:1;
97:15;110:7;121:15;
122:19,21,22,24;123:5,

18,23;129:10;132:6;
136:8;141:5,10,22,24;
142:1,10,12,15,20,23;
143:8;144:8;170:25;
171:15,16,20;172:16;
173:1,4,11,20,21;
174:9;175:7,8,9,12,16;
208:9,19
**students (19)**
35:7,9;58:11;85:11,
12,14,23,25;86:9;
87:24;123:4;142:7,14;
143:5;172:7,13;173:2,
6;174:17
**studied (1)**
16:14
**studies (5)**
37:6;40:21;49:10,16;
100:19
**study (5)**
53:12,23;91:5;100:6;
102:9
**stuff (1)**
171:11
**Sub (5)**
73:21,21;119:21;
144:25,25
**subgroup (2)**
118:23;119:22
**subgroups (4)**
109:18;117:21;
118:1;144:7
**subject (1)**
14:24
**submission (1)**
104:17
**submit (1)**
112:3
**submitted (4)**
5:24;104:16;145:19;
164:6
**subsequent (13)**
67:10,13,15,25;
69:14;73:18,20;113:4;
114:19;116:13,17;
118:12;143:20
**subsequently (2)**
116:9;120:23
**subset (4)**
85:11;118:7;138:8;
194:24
**subsets (1)**
120:16
**substance (1)**
163:1
**substantial (4)**
32:9;181:3;182:10;
200:10
**substantive (4)**
26:9;10;62:13;
163:12
**Substantively (1)**
165:24

**subtracting (1)**
157:18
**sufficient (2)**
24:23;95:21
**suggest (8)**
76:5;18;99:18;
100:14;125:20;186:22;
190:24;191:11
**suggested (2)**
26:8;120:12
**suggesting (1)**
192:20
**suggests (3)**
149:12;174:23;
186:20
**summarily (1)**
104:17
**summarize (1)**
43:2
**summary (2)**
43:3;93:6
**summer (1)**
5:11
**Sunday (1)**
145:12
**supercharge (2)**
66:10,11
**suppose (2)**
130:23;148:18
**supposed (1)**
24:11
**Supreme (4)**
92:21;93:9,17;94:2
**sure (26)**
4:16;10:17,20,22;
12:24;13:14;14:10;
42:20;68:11;69:24;
71:17;83:24;87:7;
96:25;99:12;115:4;
122:5;144:12,18;
149:8;166:3;173:22;
175:9;198:9;206:19;
212:23
**surprised (4)**
34:6;20,24;138:25
**surprising (5)**
23:19;29:24;99:8;
100:9;210:25
**survey (9)**
16:11,12;49:16,19,
20;83:6;93:4;100:3,5
**surveys (1)**
100:17
**suspect (8)**
35:24;53:19;69:22,
24;70:9,20;78:7;
195:22
**suspended (2)**
28:10;29:13
**suspensions (2)**
30:23;177:22
**suspicion (1)**
48:23;49:4,4

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 77 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

**SVRS (125)**
8:1,6;17:22;18:2,4;
19:12,13,13,16,18,21;
20:11,16,19,24,25;
21:2,7,11,18;24:10;
25:8;43:8,21;44:5,8,11,
19;45:5,6,12;46:4;
48:1,3;60:13;61:6,13,
18;62:10,21;63:6;65:8;
67:4;69:2;83:5;84:2;
89:19,23;108:17,24;
109:1,9;110:23;111:3,
11;112:10,12,17,19,23;
113:2,6,15;114:4,6,7;
115:12,18,24;116:7,14,
20;117:14;118:6,8,12,
15;119:2,5,10,20,23;
120:16,19;122:9;
125:7,16;126:3,11,21,
25;129:3;137:3;138:5,
9,9,10,16;139:8;
143:18;151:5,22;
168:1;187:20;188:10,
23;189:10,11;191:21;
192:6,12;193:3,8,8;
194:25;195:3,10;
196:9;197:9;200:19;
203:10;206:13,25;
210:19;212:13
**sworn (2)**
4:4,17
**system (12)**
8:7,9;14:23,24;
19:14;43:8,11;86:23,
23;153:11;155:18;
191:24
**systems (2)**
86:25;111:4

**T**

**table (36)**
56:8;67:4;80:15;
98:17;100:24;102:2,8;
103:8,11,12,15,15,17;
104:24,25;106:15;
107:17;108:2,16;
111:14,17,18;112:8;
115:10;121:20;122:6;
125:2;144:4;150:11,
15;158:13;167:6,9;
169:9;174:3;210:3
**tables (1)**
147:23
**tabs (1)**
75:12
**tact (1)**
146:16
**talk (9)**
9:2;10:25;19:8;43:7;
59:15;62:19;73:15;
129:14;160:15
**talked (6)**

42:12;162:10;178:6;
182:6;191:1;208:20
**talking (23)**
7:10;8:6;14:6;18:5,
15;25:14;30:6;32:11,
22;48:9;65:11;77:1;
91:4;92:12;100:16;
111:21;138:6;164:14;
166:25;173:13;176:17;
181:16;187:7
**talks (1)**
204:10
**task (4)**
7:3,9;51:11;52:2
**teaching (1)**
86:5
**technical (5)**
57:21;58:3,4,8,12
**technically (1)**
130:19
**technique (4)**
99:2;132:13,22;
135:17
**techniques (4)**
12:6,8;18:16,25
**telling (1)**
44:6
**tells (2)**
30:3;142:7
**temporarily (1)**
84:14
**ten (2)**
114:25;200:3
**tend (3)**
147:19;155:11;
193:11
**term (7)**
8:5;12:12;53:22;
132:20;146:1;192:1,3
**terminology (2)**
21:6;27:12
**terms (12)**
10:2,4;22:22;29:20;
52:19;56:24;98:21;
166:3;193:4;195:7;
196:8;211:15
**test (5)**
46:2;93:7;96:1;
116:22;139:2
**testified (5)**
4:4;12:17,22;13:20;
14:25
**testify (2)**
13:10,17
**testifying (1)**
13:5
**tests (8)**
22:16,25;23:11,14;
47:14;78:16;95:5;
113:5
**Texas (2)**
55:19;70:18
**that'll (1)**

129:5
**That's- (1)**
39:23
**Theory (3)**
16:19,24,24
**there'd (1)**
127:9
**therefore (2)**
102:24;187:22
**thinking (3)**
13:14;187:14;194:19
**thir (1)**
108:25
**third (1)**
59:19
**though (16)**
28:7;34:2;44:19;
82:19;89:2;96:19;
128:6;132:19;155:17;
179:2;192:11;201:3,7,
16;202:24;205:12
**thought (5)**
39:2;65:1;75:18;
77:7;79:1
**thoughts (2)**
50:11;198:17
**thousand (23)**
54:11;59:22,23,23;
63:21;68:5;70:13;
75:20;106:23;107:23;
108:5,22;116:3,3;
125:8;150:22;151:7;
166:4;168:18;202:7;
203:13,14,14
**thousands (3)**
75:15;94:15;182:1
**three (11)**
20:21;55:3;57:11;
87:4;90:5;134:2;
146:23,24;159:23,24;
210:6
**three-year (1)**
124:25
**throwing (1)**
171:11
**thus (2)**
106:12;196:20
**timed (2)**
40:25;41:2
**times (6)**
16:19,23;27:1;37:22;
111:11;168:6
**timing (1)**
41:15
**tired (1)**
66:14
**today (5)**
4:25;5:5;6:23;
119:24;162:11
**together (2)**
51:3;105:9
**told (1)**
39:14

**took (6)**
42:11;48:11;66:2;
106:11;137:17;164:20
**tools (1)**
51:10
**top (11)**
6:9;70:12;71:20;
74:7,22,25;79:14;
92:20;133:13;150:17;
200:8
**topic (1)**
58:16
**total (9)**
6:2;41:20,21;67:4;
91:20;97:25;110:14;
114:2;151:5
**totality (1)**
56:25
**totally (1)**
90:24
**totals (10)**
106:22;107:22;
108:19;111:6,7,19,21,
22;112:11,22
**touched (3)**
141:2;208:5;212:22
**towards (5)**
51:18;128:1;178:10;
200:8;208:24
**track (2)**
40:14;145:17
**tracked (1)**
71:1
**tracks (3)**
21:10;71:12;146:12
**tract (1)**
145:15
**traditionally (1)**
101:12
**training (1)**
11:9
**transaction (1)**
40:22
**transcript (1)**
67:1
**Transportation (10)**
8:12;18:3;69:4;
164:8,9,18;177:9;
178:21;179:11,25
**Transported (1)**
164:6
**transpose (1)**
46:7
**travel (1)**
162:15
**traveled (2)**
11:24;12:2
**Trey (1)**
53:7
**trial (8)**
13:6,7,8,10,12;82:4,
13;90:3
**trickle (1)**

98:1
**tricky (1)**
201:10
**tried (5)**
100:7;164:24;
168:14,15,17
**triplet (1)**
63:24
**triplicate (2)**
167:19;168:5
**triplicates (2)**
63:13;64:13
**trivial (1)**
181:25
**trouble (1)**
30:18
**true (23)**
35:24;55:5;77:13;
94:16;97:2,4,6;109:21;
124:4;130:5;133:20;
138:25;140:3;154:1;
161:15;163:2;165:13;
185:1;188:15;189:7;
190:10;211:10,11
**truth (1)**
4:17
**try (5)**
23:25;28:2;38:18;
104:6;201:11
**trying (9)**
27:15;37:15;98:22;
107:8;110:24;123:22;
172:21;188:13;205:2
**Tuesday (1)**
146:19,20
**turn (4)**
96:15;184:5,21;
203:25
**turned (1)**
27:13
**turning (7)**
35:22;103:5,5;167:1;
176:4;184:14;197:23
**turnout (135)**
7:7;16:17;17:25;
33:13,16,19;34:2,5,19,
20,25;35:2,3,17,24;
36:4;43:21;44:1,4,13,
18,20,23;45:1,9,13,20;
46:2,3;48:19;51:10;
53:9,9,15;54:1;82:5;
83:16;84:5;88:22;89:1;
91:14,23;92:2,5,6;
93:8;95:6,11,13;96:23;
97:11;105:4,9,21;
106:7,8;107:16,18,22,
23,25;108:7,12,13;
109:20;110:4;117:14,
18,23;118:4;119:15,
15;121:3,13;122:16,
17;125:21,22,24;
126:1;142:17,24;
143:16,24;144:5,5,6,8,

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

10;152:16,17;153:1,14,
25;154:3,23,24;155:7,
17,20,21;156:8,17;
157:2,20;158:11,18,24;
159:2,5,9,10;160:1;
185:4;186:3,7,21,23;
187:21;188:2,2,13;
189:3;196:21;197:13;
200:10,16,17,20;201:6;
202:19,24;203:20;
205:22;206:12
**turnouts (3)**
49:16;185:6,14
**turns (2)**
46:16;159:16
**twenty (11)**
95:4;108:25;115:24;
118:9;124:15;142:17;
143:17;156:11;170:3;
194:7;208:3
**two (43)**
30:24;34:10;35:1;
39:15;48:16,16;54:11,
16;58:2;61:25;65:16;
72:17;74:1,13;79:14,
25;105:8;107:6;
110:17;113:25;118:10;
121:13;122:13;125:10;
134:2,2;143:6,14;
149:9;151:12;156:15;
157:1,6;158:16;
159:24;167:13;168:3,
23;171:19,22;180:19;
210:6,6
**two-party (1)**
98:16
**type (4)**
49:15;57:8;71:5;
139:22
**types (7)**
32:14;52:21,22;
57:16;161:14;183:14;
186:15
**typical (2)**
125:22;135:21
**Typically (1)**
45:2

# U

**ultimate (1)**
197:12
**ultimately (5)**
28:7;29:15;64:5;
109:24;179:11
**unable (7)**
59:21;149:12,24;
150:6;174:17;213:10,
23
**unacceptable (1)**
181:8
**unambiguously (1)**
197:24

**uncertainties (3)**
18:21;19:8,9
**uncertainty (3)**
20:3;147:12;179:7
**unchanged (2)**
59:17;82:12
**uncomfortable (2)**
74:19;158:3
**uncooperative (1)**
177:15
**uncorrelated (1)**
199:2
**under (11)**
57:2;70:7;88:7;
100:2;112:10;134:3;
144:24;165:11;172:3;
181:12;205:9
**undercount (1)**
161:21
**undercut (1)**
207:14
**under-inclusive (1)**
86:12
**underlying (16)**
26:18;27:17;29:9;
31:14,19;134:18,25;
140:9;143:21;165:1;
176:15,18;178:5;
188:7;204:23;205:14
**undermine (3)**
95:2;199:22;211:6
**undermining (1)**
205:1
**understood (2)**
78:3;111:20
**unit (2)**
83:17;146:25
**United (1)**
192:22
**universe (1)**
52:16
**universities (4)**
86:18;87:2,9;88:8
**university (10)**
10:14,16;11:7,12;
70:18;87:6,8;88:19;
161:14;171:9
**unjustifiable (1)**
184:1
**unless (5)**
109:3;175:8;176:5;
177:6;184:4
**unlike (1)**
24:18
**unlikely (4)**
63:17;64:12;109:3;
141:1
**unlinked (3)**
67:11;68:2,7
**unnecessarily (1)**
73:13
**unnecessary (1)**
179:22

**unobserved (1)**
20:4
**unreasonable (4)**
28:13;179:17,20;
182:5
**unreliable (1)**
104:18
**unusual (1)**
55:16
**unwieldy (1)**
136:12
**up (63)**
6:18;16:3;26:22;
29:8;30:17;33:8;34:15;
35:7;36:19;38:6,18;
39:8,11,13;44:17;
46:10;51:10;52:2;
60:13;61:15;71:9;
92:12;98:10,11;101:2;
107:23,24;108:5;
110:16;121:11;124:13;
125:11,12;128:11;
134:7,8;146:6;155:14;
161:8;165:16;172:4;
173:9,10;177:24,25;
179:10;188:2,14,15;
190:14;192:12;193:9;
196:9;198:14;200:20;
201:6;202:25;203:21;
204:19;205:23;210:16,
20;211:21
**update (1)**
20:1
**updated (2)**
19:14,15
**updates (1)**
21:4
**upends (1)**
152:25
**upgraded (1)**
66:6
**upon (1)**
109:25
**upper (1)**
135:7
**upwards (1)**
197:14
**use (29)**
8:5;9:3;22:2;44:3;
55:12,14;61:3,16;
62:12;83:3;85:8,15;
86:20;94:8;115:2;
119:9;120:13;127:19;
136:13;145:22;147:20;
149:18;150:18;156:23;
172:16;173:19;179:17;
188:23;206:16
**used (34)**
5:1;7:24;8:21,24;
9:16;12:12;18:16,25;
38:8;47:15;61:19;
67:13;70:5,15;87:15;
103:8;135:23;136:3;

148:13,20;149:6;
150:14;151:3,6;
162:23;165:3,4;
168:21,22;172:8,18;
212:4,11,12
**useful (3)**
136:20;211:24;212:2
**using (12)**
25:8;44:19;46:12;
82:22;86:1;94:24;
147:14;165:19,20;
172:10;195:13;210:11
**Usually (2)**
45:18;71:7
**utilized (1)**
207:3
**UW (3)**
10:3;11:14;16:7

# V

**VA (3)**
57:20,23;58:3
**vague (1)**
50:17
**valid (1)**
14:13
**validity (3)**
95:2;205:1;211:7
**value (6)**
131:4,5;133:8,9;
135:14;202:6
**values (5)**
132:16;133:15;
134:10;136:5;167:23
**valve (9)**
27:22,25;57:5;176:9,
20;177:18;178:4;
179:3;180:12
**vanishingly (1)**
181:14
**VAP (1)**
156:7
**variable (13)**
129:19,24;130:17,
18;131:3;132:21;
133:6;134:24;135:2,6;
136:15;142:11;172:11
**variables (23)**
47:16,23;63:9,13;
129:14;130:10;131:20;
132:14,16,23;133:11,
25;134:10;135:1,5,13;
136:11,20;140:9;
173:19;191:12;193:21;
199:6
**variety (1)**
20:5
**various (7)**
9:10;58:22;71:21;
110:5;141:15;182:8,8
**vary (1)**
33:21

**vehicle (1)**
152:23
**Vehicles (1)**
28:19
**versus (10)**
13:8,9,11,19,21,22,
23;14:16;41:4;92:8
**Veterans (1)**
59:2
**veterans' (1)**
162:16
**video (2)**
66:23,24
**view (13)**
27:4;28:11;37:8;
39:6;53:23;57:13;95:2;
152:25;172:8;179:16;
181:3;183:2,25
**virtually (1)**
26:23;53:24;55:17;
60:23
**visually (1)**
65:10
**volitional (1)**
29:18
**volunteered (1)**
15:22
**vote (95)**
24:13;26:25;28:9;
29:23;33:7;35:15,23;
36:14;37:15;38:5,10,
12,25;39:3;48:6,13;
55:9,21;56:3,12,14;
57:4,6;59:21;70:5,9;
77:21;80:11,13,22,24;
81:9,10,21;83:1;84:3,6,
18;96:3,15;102:24;
107:22;109:7;111:6,7,
21;121:10;133:8;
135:11;137:10,16,23;
138:2,18,23;140:10,14,
24;141:5;145:2;147:2,
7;154:10;157:6,8,11,
15;159:13;174:17;
181:6;182:7,14,23,24;
186:10,15;187:20;
188:9;189:12,22;
192:7;196:18;197:3,
19,22;202:4;203:3,12,
15,16;205:7,12,15;
206:16;214:2
**voted (35)**
24:16;44:16;47:4,5,
7,9,13,15,23,25;48:3,5,
8;61:12,14,22,24;
107:6,6;109:7;111:13;
119:6;121:22;123:14;
126:2,4;133:7,7,12;
138:7;154:9;197:7,11;
204:18;207:6
**voter (82)**
8:7,9,9;10:19;23,25;
24:10,15;28:18;32:18;

Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 79 of 81

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

37:6,6,7,12;39:17,19;
45:13;47:9,10;49:24;
51:9;52:19;53:8,14,25;
54:1,14,21;70:24;
71:16,23;72:11,25;
74:24;75:7;76:10;
77:11,13;78:13;82:3,
11,24;83:6,22;91:7,21,
22,22;93:8;94:22;95:5,
10,12;96:13,17;
100:16;104:1,3,7;
111:3;152:16;179:9;
181:9,13,24;183:10,14;
186:25;189:2,8;
191:19;196:17;197:2;
201:1,17;202:19,20;
203:1;207:23;209:4;
210:21;212:25;213:6
**voters (64)**
45:15;71:9;74:18,18,
25;76:5,6,8,9,19,20;
77:15;78:18;79:15,18;
80:5,16,19,19,23,25;
81:15;82:3,11,23;83:4;
84:1;89:10,14;91:16;
92:9;94:14;102:21;
103:2,3;107:2,19;
108:1;117:14;139:25;
140:1,12;141:1;145:1,
2,17,24;150:14;151:3;
152:24;154:9,13;
155:1,4,4,8;189:3,8;
190:2;192:11;196:11;
200:9;206:11,19
**voter's (1)**
179:8
**votes (9)**
19:6;24:12;44:17;
81:1;107:20,23;
147:11;182:18;188:4
**voting (103)**
7:6;16:16;17:7,17;
22:12;25:24;30:12;
45:3,17,19;49:21;51:3;
55:19;61:10,21;62:4;
70:8;73:11;77:6,11;
83:19;99:20;100:2,12,
19;102:9,12,19;
111:15;117:9,9;121:1,
3,4,6,6,8;122:1;124:19,
20;130:4;137:3,14;
138:21;139:16,17;
144:25;145:11,16;
152:15,19;153:1,10,12,
17;154:3,4,6,11,12,18,
20,22,24;155:3,5,9,9,
16,18,20;156:17,18,23,
24;157:3,3,4,5,17,17,
19,21;160:12;175:17;
181:7;182:2,9,20;
184:2;190:12;191:8;
193:20;199:3;200:25;
201:9,20;203:4;207:4;

209:7,8;210:9,10
**vulnerable (1)**
53:10

**W**

**wait (6)**
16:19,23,25;27:1;
39:22,24
**waiting (3)**
35:9;66:14;198:14
**waits (1)**
81:4
**waive (1)**
183:21
**waived (1)**
179:5
**waking (1)**
30:17
**Walker (1)**
13:22
**wall (1)**
171:12
**wallet (1)**
37:17
**ward (40)**
47:19,21;85:6;87:5,
8,18,20;88:12;89:8,9,
17,20,24;90:6,18,24;
97:16;121:15;122:21,
22,25;123:5,19,23;
129:10;132:6;136:8;
142:1,7,12,15,20;
143:5;170:25;171:9,
25;173:21,21;174:9;
208:9
**wards (46)**
85:8;87:1,5,12,13,
23;88:2,5,6,14,15,17,
20,23,25;89:1;100:19;
110:8;122:19;141:5,6,
10,11,22,25;142:9,10,
23;143:8;144:8;171:8,
15,16,21;172:5;173:4,
11,12,17;175:6,7,8,9,
13,16;208:20
**Washington (1)**
11:16
**watching (1)**
15:22
**water (1)**
104:21
**Wauwatosa (1)**
88:14
**way (44)**
19:3;21:1;25:6;
29:16;31:2;34:14;
41:17;46:10,22;47:24;
49:6;58:21;77:24;
80:20;83:10;85:23,24;
91:19;93:7;95:4;
107:10;112:24;113:1;
115:16;118:25;123:1;

130:16,16;132:23;
133:13,15;134:22;
139:2;145:15;147:23;
148:19;149:5;152:16;
159:7;172:11,25;
179:14;198:19;200:17
**ways (11)**
18:23;20:5;32:1;
33:22;85:23;104:14;
110:2;127:17,18;
157:1;199:4
**weak (1)**
144:1
**weaken (3)**
201:16;204:3,7
**weaker (1)**
148:8
**website (1)**
75:3
**weeds (1)**
133:16
**week (5)**
33:12,13;74:5,6;75:4
**weekend (12)**
25:24;145:2;146:2,
15;147:13,20;148:11,
20;149:16,18,21;155:3
**weekly (1)**
19:15
**weren't (1)**
123:7
**wet (1)**
30:19
**what's (24)**
17:3,3;38:19;50:3;
101:19;128:7,8;
139:23;140:18;143:22,
22;156:22,22,22;
179:1;190:23;192:3;
195:12;200:6,6;
209:24,24;210:7;
211:12
**whatsoever (1)**
165:13
**Whereas (1)**
44:23
**White (18)**
80:2;91:16;92:8;
105:13;129:1,1;130:6,
13,17,18,24;131:1,1,
24;145:2,24,24;201:1
**Whites (3)**
92:3,6;138:23
**Whitford (3)**
13:7,25;14:1
**whole (5)**
91:12;138:1,15,15,
15
**who's (4)**
58:24;124:13;130:7;
131:7
**widely (1)**
212:4

widely-used (1)
86:6
**wife (1)**
67:1
**willing (3)**
5:13,17;195:24
**wind (3)**
33:8;46:10;177:25
**Wisconsin (32)**
9:12;17:6;24:18;
53:3;55:16,22;72:12;
82:3,10;85:12;88:15;
98:16;99:6,23;100:10;
142:15;148:12;154:16;
157:10,22,23;158:19;
159:1,4,9;171:10;
181:15;183:8;195:19,
23,25;212:7
**Wisconsin's (4)**
56:18;57:19;93:8;
95:5
**wish (3)**
37:13;181:6;182:7
**wishes (1)**
33:6
**withdraw (2)**
50:19;144:14
**Within (8)**
15:20;40:6;71:8;
91:16;201:22;202:10,
21;203:24
**without (19)**
26:24;27:17;31:17;
33:1;41:11,16;59:20;
74:16;76:12;144:7;
153:10,12;154:6,7,7;
165:12;166:13;186:25;
205:8
**witness (17)**
4:3;12:1,22;42:18;
66:24;75:9,14,25;
76:23;84:21,25;115:2;
144:17;163:18;174:6;
184:8;187:3
**wonder (1)**
191:15
**wondered (2)**
93:18;126:17
**wondering (1)**
91:10
**word (5)**
25:14;104:9;164:21;
171:3,6
**work (25)**
5:8,13,18,20;7:1,5,
15;8:16;9:23;14:24;
16:5,10;18:11;24:6;
25:3;37:5;40:23;48:24;
52:13;53:6;66:13;
132:16;134:4;153:9;
172:10
**worked (3)**
15:15,17;16:7

**workers (1)**
37:23;40:10
**working (7)**
7:4;12:10;25:4;
43:10;44:8;49:23;84:2
**works (3)**
125:15;132:24;177:1
**wrapped (1)**
34:15
**write (1)**
65:16
**writing (1)**
65:12
**written (11)**
11:21,21;15:6,9,10;
52:11,17;56:6,17;
95:12;177:13
**wrong (16)**
60:23,24;61:1;64:1,
11,17;80:4;83:17;95:3;
104:9;160:23;169:14;
171:4;197:8;199:7,9

**X**

**Xs (2)**
142:10;143:1

**Y**

**Yale (1)**
11:7
**year (7)**
10:10,18;30:7;33:25;
34:1;108:10;113:7
**years (16)**
13:2;52:12;60:21,23;
107:7;110:17;124:1,
13;127:5;129:2,7;
157:25;158:17;181:17,
17;209:16
**Yep (1)**
89:18
**yesterday (1)**
164:19
**young (1)**
84:13
**younger (1)**
78:21
**youngest (1)**
124:8

**Z**

**zero (26)**
19:20;59:6;78:1;
128:2;129:24;130:12,
13;131:4,4,6;132:1,17;
133:1,9;134:7,15;
135:15;136:21,24,25;
137:6;162:12;181:5;
196:13,14;208:24
**zip (2)**

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

60:17;63:23

**0**

**00 (1)**
60:20
**08 (1)**
54:12

**1**

**1 (7)**
12:24;43:1;133:3;
134:19,20;174:7;
208:24
**1,383 (2)**
89:20;90:5
**1,409 (1)**
81:1
**1.5 (5)**
91:11,14;92:4;98:7;
118:22
**1.9 (3)**
91:6,24;92:4
**1.99 (1)**
138:11
**1/1/18 (6)**
60:6;61:2,12,15;
62:5,10
**10 (13)**
41:18,18;42:7,13;
52:12;54:12;87:17;
88:7,16;159:25;
198:13,25;204:20
**100 (8)**
89:13;134:15;
141:22;168:18;171:21;
202:6;203:13,14
**11 (3)**
67:3;159:25;169:9
**113,000 (1)**
107:1
**115 (1)**
60:23
**115-year-olds (1)**
60:25
**12 (15)**
54:12;66:5;67:3;
88:14;98:17;102:8;
103:8,12,15;114:25;
134:13,14;159:25;
200:8;204:11
**12th (1)**
92:25
**13 (3)**
68:16;70:12;102:2
**13,000 (3)**
67:6,8;68:22
**14 (6)**
54:12;80:3;86:4;
103:11,15;124:6
**143 (1)**
29:4

**14th (1)**
68:18
**15 (8)**
41:19;42:13;60:21;
96:5;103:17;171:22;
181:17;206:4
**15-year-olds (1)**
60:24
**16 (6)**
28:5;29:8;91:2,4;
150:22;151:7
**16.1 (1)**
80:3
**17 (3)**
73:15,16;206:9
**18 (20)**
47:20;60:4;73:16;
78:21;89:6,9,11;90:7,
13,21;121:13;124:1,5,
9,14;129:2;141:12;
174:10;207:19;209:16
**18- (23)**
85:9;87:14,16,21;
88:3;89:3,7,14;90:11,
18;121:14;128:19,21;
171:3,18;172:4;173:3,
6,9,14,17;175:3,5
**1-8 (1)**
4:1
**185 (1)**
88:13
**19 (5)**
82:2;97:14,22;
208:21;211:16
**19,464 (4)**
150:13;151:2,9,24
**19.8 (1)**
97:17
**190 (1)**
59:23
**190,000 (1)**
166:5
**1900 (1)**
60:22
**1982 (1)**
11:13
**1988 (1)**
11:8
**1989 (1)**
11:15
**1st (5)**
60:3,20,20,22;
178:14

**2**

**2 (5)**
28:25;29:1;136:25;
178:9;209:6
**2,080-hour (1)**
10:10
**2.1 (3)**
105:17,19;167:1

**2.4 (4)**
135:8,10;137:5,11
**2.5 (4)**
117:15,19,24;118:22
**2.9 (1)**
115:17
**20 (12)**
42:13;81:16;94:17;
96:10;97:7;106:15;
115:10;124:13;181:17;
201:1,4;204:21
**20.1 (1)**
80:2
**2000 (1)**
60:21
**2004 (1)**
34:15
**2006 (20)**
17:25;54:12;61:12,
13;126:25;138:7;
139:18;147:21;151:6,
21;193:24,24;194:7;
206:11,12;207:5;
209:4,8,16;210:13
**2007 (1)**
52:14
**2008 (6)**
34:13;156:11;
193:25;196:18;197:3,9
**2009 (2)**
16:6;52:13
**2010 (98)**
21:13;44:20;62:11;
105:7,11,13,14,20;
106:2,10,23,24;107:16;
108:4,18;109:2,8,12,
20;112:16,18,19,21,21,
23;113:9;116:20;
117:13,23;118:19;
119:5,11,23,25;120:17;
121:12,22;122:1,7,9,
12,14,22;123:4,6,10,
11,14,20,23;124:2,7,9,
16,19,22;125:13,21;
129:1,2;137:4,13;
138:2,7,18,20,23;
139:19;143:8,17,18,25;
147:21;156:12;174:25;
176:3;184:17;185:7;
186:3;187:22;188:3,4;
194:6,9;196:20;
197:11;203:21;205:23;
207:5,7,24;208:23;
209:4,9,21,22;210:9,12
**2011 (2)**
17:8;186:13
**2012 (32)**
20:15;34:12;106:13;
108:4;112:10;113:8,
10,11,17,20;114:6;
115:13,21,24,25;
116:20;118:9,15;
139:3;150:13,16;

151:2,2,21;156:12;
159:1;193:25;194:7,7,9;
196:19;197:3,11
**2013 (2)**
20:15;70:20
**2014 (90)**
17:25;19:17;20:15;
44:20;53:12;70:20;
72:15;73:17,22;75:4;
76:9,21;77:14;78:9,15;
82:4,13,18;90:5;92:25;
105:8,11,12,14,20;
106:2;108:4,19;
109:20;117:13,23;
120:18;121:7,24;
122:1,12,15,19,21,25;
123:3,6,19,24;124:5,6,
8,10,12,15,21;125:7,
22;129:1,3;137:2;
138:9;139:16,17;
140:24;141:8;142:17;
143:15,15,24;156:12;
159:1;174:21,25;
176:3;184:17,22;
185:5,5;186:3;187:21;
188:3,5;191:3,10;
194:15;197:11;203:21;
205:23;207:6;209:8,8,
14;210:10,22
**2015 (36)**
8:10;18:5;19:17,18;
21:12;108:25;109:11;
112:14,16;113:15;
115:14,18,22;116:19;
118:6,8,16,19;119:3,
11,12,20,24;127:7;
191:4;195:1,3,8,9,15;
207:22,23;208:3,14;
209:21,22
**2016 (2)**
78:10;139:5
**2018 (2)**
60:3;191:5
**21 (1)**
104:23
**21.4 (2)**
97:15,19
**218,015 (1)**
67:14
**22 (7)**
28:6;29:8;106:4;
124:1,9;129:3;177:2
**22nd (1)**
178:14
**23 (14)**
57:2;70:7;85:10;
92:22;93:2;94:3,13;
97:5;117:12;129:13;
161:12,22;170:3,14
**23rd (2)**
74:5;75:4
**24 (10)**
47:20;89:6,9,11;

90:7,21;99:10;121:13;
141:12;174:10
**242,393 (1)**
168:12
**24-year (2)**
87:14;173:15
**24-year-old (4)**
89:3;128:19,21;
136:8
**24-year-olds (18)**
85:9;87:21;88:4;
89:7,14;90:11,13,18;
121:14;171:4,18;
172:5;173:3,7,9,18;
175:3,6
**24-years-old (1)**
87:16
**25 (6)**
74:15;77:17;78:19;
95:20;174:2,3
**26 (5)**
74:15;121:1,1;132:3;
160:20
**26th (2)**
74:5;75:4
**27 (3)**
133:13;178:9,13
**28 (2)**
137:12;141:4
**280 (2)**
59:22;166:4
**282 (1)**
98:1
**282,015 (1)**
212:17
**283,000 (1)**
68:24
**283,346 (1)**
68:3
**29 (2)**
78:22;167:6

**3**

**3 (19)**
48:1;68:4;73:24,25;
74:22;79:10,12,13;
80:1;106:23;110:14;
165:14;192:25;195:13,
14,18,25;196:2,3
**3,330,338 (1)**
125:7
**3,337,939 (1)**
107:2
**3,373,939 (1)**
114:3
**3,380,338 (1)**
67:5
**3,450,847 (1)**
106:24
**3.0 (1)**
192:23
**3.2 (2)**

**Case: 3:15-cv-00324-jdp   Document #: 175   Filed: 05/11/16   Page 81 of 81**

One Wisconsin Institute, Inc., et al.  vs.
Gerald C. Nichol, et al.

Deposition of KENNETH MAYER
April 8, 2016

91:6,24
**3.3 (1)**
  115:20
**3.7 (2)**
  91:11,14
**30 (2)**
  141:23;192:17
**300 (2)**
  70:13;107:23
**32 (4)**
  66:15;169:9;176:11,
  17
**33 (4)**
  98:15;144:22;
  170:18;176:11
**337 (1)**
  110:15
**34 (1)**
  98:15
**340 (1)**
  59:22
**35 (2)**
  95:25;103:6
**35,000 (1)**
  151:8
**35,332 (1)**
  151:23
**37 (2)**
  148:10;150:4
**380 (1)**
  68:5

---

**4**

**4 (3)**
  74:24;79:10,12
**4.5 (3)**
  163:15,23;165:17
**4:10 (1)**
  214:6
**40 (1)**
  59:19
**400 (4)**
  108:22,22;116:2,3
**400,000 (1)**
  115:9
**400,000-person (1)**
  112:9
**42 (1)**
  92:19
**43 (6)**
  88:12;92:19,20;
  165:11;170:24;173:12
**45 (2)**
  66:14;78:19
**47 (1)**
  33:17

---

**5**

**5 (6)**
  50:4;60:4;95:20;
  99:12;100:2;134:21

**50 (4)**
  87:20;95:20;134:8;
  201:2
**500 (1)**
  86:11
**512 (1)**
  66:16
**53 (4)**
  77:17;78:18;96:9;
  97:4
**530 (1)**
  63:22
**55 (1)**
  95:24
**5th (4)**
  27:2;34:5;94:25;
  116:8

---

**6**

**6 (2)**
  71:8;192:14
**60 (6)**
  42:6;99:8,9;127:5,8;
  204:22
**60-year (1)**
  127:10
**62 (2)**
  105:22;108:13
**62.3 (1)**
  105:22
**65 (1)**
  108:5
**68 (3)**
  41:9,20;42:6
**69 (2)**
  137:8,9

---

**7**

**7 (7)**
  87:22;88:14;92:19;
  98:14;125:3;171:3;
  173:13
**7.3 (1)**
  192:21
**7.8 (1)**
  88:13
**70 (5)**
  89:14;90:10,17,20;
  204:22
**71.2 (1)**
  105:22
**71.4 (1)**
  101:17
**72.7 (1)**
  122:17
**72.8 (1)**
  105:14
**74.9 (1)**
  105:14
**75 (1)**
  108:14

---

**8**

**8 (6)**
  63:21;89:17;90:6;
  95:25;96:4;184:15
**8,840 (1)**
  63:23
**8.4 (7)**
  69:6;71:3;72:16,17;
  164:4;166:20;167:1
**8.6 (1)**
  72:16
**8.69 (1)**
  137:8
**8.9 (1)**
  105:23
**80 (1)**
  88:3
**85 (2)**
  50:23;84:5
**85,171 (1)**
  167:21
**87.8 (1)**
  206:13

---

**9**

**9 (4)**
  70:14;71:8;72:15;
  134:22
**90 (5)**
  63:20;84:5;88:3;
  171:18;203:14
**90/10 (1)**
  99:12
**95 (1)**
  99:12
**965,146 (1)**
  167:17
**968 (1)**
  90:6
**98 (1)**
  51:19
**98.74 (2)**
  64:14,19
**99.74 (3)**
  62:20;64:9,20
**9th (2)**
  92:23,25