IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ONE WISCONSIN INSTITUTE, INC.,
CITIZEN ACTION OF WISCONSIN EDUCATION
FUND, INC., RENEE M. GAGNER,
ANITA JOHNSON, CODY R. NELSON,
JENNIFER S. TASSE, SCOTT T. TRINDL,
MICHAEL R. WILDER, JOHNNY M. RANDLE,
DAVID WALKER, DAVID APONTE, and
CASSANDRA M. SILAS,

                          Plaintiffs,

          v.                                                OPINION & ORDER

JUDGE GERALD C. NICHOL,                                     15-cv-324-jdp
JUDGE ELSA LAMELAS,
JUDGE THOMAS BARLAND,
JUDGE HAROLD V. FROEHLICH,
JUDGE TIMOTHY VOCKE,
JUDGE JOHN FRANKE,
KEVIN J. KENNEDY, MICHAEL HAAS,
MARK GOTTLIEB, and PATRICK FERNAN,
*all in their official capacities*,

                          Defendants.

---

Plaintiffs here challenge a set of Wisconsin laws that have significantly changed the state's elections. The most significant new law is 2011 Wisconsin Act 23, which requires voters to present one of several specified types of photo ID. But Act 23 and a handful of other new laws passed since 2011 contain approximately a dozen new provisions relating to elections. In general, in addition to the voter ID requirement, the new provisions restrict early and absentee voting and they impose new restrictions on voter registration, presumably to ensure the integrity of Wisconsin elections and to make election administration more efficient.

But plaintiffs contend that the new election laws were actually designed to suppress the votes of African Americans, Latinos, the young, the poor, and voters inclined to vote for Democrats. Plaintiffs mount a comprehensive challenge to the new laws, alleging multiple claims based on Section 2 of the Voting Rights Act of 1965 and various provisions of the United States Constitution.

Now before the court is defendants' motion for summary judgment, which attempts to pick off each of plaintiffs' claims. In general, defendants contend that the challenged laws are all legitimate non-discriminatory efforts to improve Wisconsin elections and that they impose, at most, modest burdens on voters. The court concludes that plaintiffs' claims are justiciable, and that there are genuine disputes about both the interests served by the new laws and the burdens that they impose. Accordingly, the court will deny defendants' motion for the most part. But the court will grant defendants' motion with respect to plaintiffs' challenge to the state's refusal to accept certain forms of expired and out-of-state IDs, which the parties agree is evaluated under rational basis review. Wisconsin's decision to exclude these IDs passes constitutional muster under that standard, a determination that the court makes as a matter of law without considering evidence of the associated burdens and benefits.

UNDISPUTED FACTS

Plaintiffs One Wisconsin Institute, Inc. and Citizen Action of Wisconsin Education Fund, Inc. (the corporation plaintiffs) are both nonprofit organizations that, among other things, provide research on the right to vote and promote voter engagement in Wisconsin. Plaintiffs Renee Gagner, Anita Johnson, Cody Nelson, Jennifer Tasse, Scott Trindl, Michael

Wilder, Johnny Randle, David Walker, David Aponte, and Cassandra Silas (the individual plaintiffs) reside in Wisconsin and are eligible to vote. Most of the defendants are members of the Government Accountability Board (GAB), a state governmental entity that oversees Wisconsin's campaign finance, election, ethics, and lobbying laws. Defendant Mark Gottlieb is the secretary of the Wisconsin Department of Transportation, and defendant Patrick Fernan is the administrator of the Division of Motor Vehicles.

The Wisconsin Constitution provides that "[e]very United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." Wis. Const. art. III, § 1. The Wisconsin legislature is responsible for enacting laws defining residency, providing for voter registration, and providing for absentee voting. Beginning in 2011, the legislature began changing Wisconsin's election system. Plaintiffs challenge provisions from four separate pieces of legislation: 2011 Wis. Act 23, 2011 Wis. Act 75, 2011 Wis. Act 227, and 2013 Wis. Act 76. Plaintiffs allege that the new laws violate the Voting Rights Act and the United States Constitution. The court therefore has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

The provisions that plaintiffs challenge fall into four categories: (1) registering to vote; (2) absentee voting; (3) voter ID; and (4) miscellaneous voting procedures. The court will summarize the provisions at issue in each of these categories.

## A. Registering to vote

The first category of provisions at issue deals with registering to vote. Under former law, proof of residence was necessary only when registering within 20 days of an election. But the new laws require all voters to provide proof of residence when registering no matter when they register. Voters can no longer use "corroboration" (i.e., one voter vouches for another

voter's residence) as proof of residence. They must instead submit documents showing their names and current addresses. Examples of acceptable proof of residence documents include a Wisconsin driver license, a utility bill from no more than 90 days before the election, a bank statement, a paycheck or pay stub, a residential lease, and a college identification card with a tuition receipt from within the previous nine months. Voters can register: (1) by mail up to 20 days before an election; (2) with a special registration deputy; (3) in-person at the municipal clerk's office until the Friday before an election or at other designated locations up to 20 days before an election; or (4) at the polling place on election day.

The new laws narrowed the use of special registration deputies by eliminating statewide deputies. Individuals must now apply to the municipal clerk or election board to serve as a special registration deputy for that municipality. There is no limit to the number of municipalities in which a person can be a special registration deputy.

The legislature also imposed two targeted changes to registration. The first change was to repeal a statute that required public high schools to serve as registration locations for their enrolled students and staff members. High school students and staff members must now use the same methods of registering to vote that all other citizens use. The second change was to prohibit municipalities from requiring landlords to provide any election information that federal law does not require them to provide. Defendants do not dispute that this statute preempted a Madison ordinance that required landlords to give voter registration forms to new tenants.

The final change to registration that plaintiffs are challenging involves the length of time that a voter must reside in his or her ward before voting in that ward. The new laws increased the durational residency requirement from 10 days to 28 days. Thus, voters who

move from one ward to another within 28 days of an election must vote in their old wards, either in-person or absentee. Voters who move into Wisconsin from out-of-state within 28 days of an election cannot vote for any office other than President and Vice President, the two offices that federal law requires states to permit its citizens to vote for regardless of durational residency.

## B. Absentee voting

The new laws also changed the availability of, and procedures for, absentee voting in Wisconsin. Before 2011, Wisconsin did not limit the days or times that municipalities could offer in-person absentee voting.[1] But now, in-person absentee voting occurs only during the two weeks immediately preceding an election. Specifically, in-person absentee voters must vote on weekdays, excluding legal holidays, between the hours of 8 a.m. and 7 p.m. And in-person absentee voting must occur at the municipal clerk's office or at an alternate site that the municipality requests, but not both.[2]

The state legislature also changed the procedures for requesting and receiving absentee ballots. Although voters can apply for absentee ballots in person, by mail, by email, or by fax, municipal clerks now distribute ballots to most voters only by mail or in person (military or permanently overseas voters can receive ballots by fax or email).

Finally, Wisconsin now prohibits clerks from returning an absentee ballot to a voter unless the ballot is spoiled or damaged, or has an improperly completed certification. This

---

[1] Defendants explain that "Wisconsin does not permit early voting." Dkt. 77, at 15. But a voter can nevertheless vote before an election by submitting an "in-person absentee ballot."

[2] The limit of one location for in-person absentee voting has existed since 2006. *See* Wis. Stat. § 6.855. But plaintiffs allege that this limit makes other new changes to absentee voting particularly burdensome.

measure prevents clerks from returning ballots to absentee voters to correct mistakes like overvoting or improper marks.

## C. Voter ID

Part of Act 23 brought voter ID requirements to Wisconsin. With some exceptions for regular absentee voters, military or overseas voters, and voters with other privacy- or health-related issues, all voters must show proof of identification to vote. For voters who lack acceptable ID, the Wisconsin Department of Transportation provides free ID cards. These cards normally cost $18, but a person may receive one for free by meeting the other requirements for obtaining an ID, being at least 18 years old by the date of the next election, and requesting that the Department of Transportation waive the fee so that the person may use the ID card to vote.

There are nine qualifying forms of ID: (1) a Wisconsin driver license; (2) a Wisconsin ID card; (3) a U.S. military ID card; (4) a U.S. passport; (5) a certificate of U.S. nationalization, issued within two years of the election; (6) an unexpired Wisconsin driver license fee receipt; (7) an unexpired Wisconsin ID card receipt; (8) an ID card issued by a federally recognized Indian tribe; and (9) an unexpired college or university ID card. A voter who does not have a valid ID on election day may cast a provisional ballot and present acceptable ID at the polling place later that day or at the municipal clerk's office until 4:00 p.m. on the Friday after the election.

This case is not the first time that someone has challenged Wisconsin's voter ID law. In 2011, a group of plaintiffs (not the same plaintiffs who brought this case) challenged Wisconsin's voter ID requirements in federal court. *See Frank v. Walker*, No. 11-cv-1128 (E.D. Wis. filed Dec. 13, 2011). On appeal, the Seventh Circuit held "that Act 23 does not

violate either § 2 [of the Voting Rights Act] or the Constitution." *Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015). Acknowledging that this precedent foreclosed much of their challenge to the voter ID requirements, plaintiffs' first amended complaint attacked those requirements only to preserve the issue for appeal. *See* Dkt. 19, ¶ 156 n.5. Until recently, their non-foreclosed challenge to the voter ID requirements was principally about the forms of ID that Wisconsin does *not* accept. For example, voters cannot use out-of-state driver licenses or other expired forms of ID, even though the purpose of requiring an ID is to prove identity, not residence.

But plaintiffs now want to expand the scope of their challenge because they allege that the Department of Transportation has abused its discretion in providing free IDs. Thus, plaintiffs have filed a second amended complaint alleging that Wisconsin's voter ID law violates the Voting Rights Act and the Constitution. *See* Dkt. 141. These claims were not part of the case when defendants filed their motion for summary judgment, and so they are not yet at issue. The Department of Transportation's allegedly improper methods for issuing free IDs will be an issue for trial, and this opinion will analyze only the voter ID claims that plaintiffs pursued in their first amended complaint.

## D. Miscellaneous voting procedures

Plaintiffs also challenge two changes to voting procedures in Wisconsin. The first change deals with observers at polling places. Wisconsin permits members of the public to be present wherever voters are casting ballots. Observers must print their names in a log, and the chief election inspector or municipal clerk in charge of a particular site may designate an area in which all observers must remain. Before 2013, the GAB required observers to be between 6 and 12 feet from the tables at which voters announced their names and addresses or

registered to vote. The legislature changed this "buffer zone" in Act 117, requiring election officials to designate an area that is between three and eight feet away from the tables. None of the named defendants are responsible for designating areas at specific polling places; that responsibility belongs to the chief election inspector or municipal clerk.

The second change that plaintiffs are challenging is the elimination of "straight-ticket" voting. Except for military and overseas voters, Wisconsin ballots no longer contain a straight-ticket option that lets a voter select all candidates of a particular political party.

ANALYSIS

Defendants have moved for summary judgment on all of plaintiffs' claims (except for the voter ID claims that were not part of the first amended complaint). Under Federal Rule of Civil Procedure 56(a), the court must grant defendants' motion if they show that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. In reviewing defendants' motion for summary judgment, the court construes all facts and draws all reasonable inferences in plaintiffs' favor. *Common Cause Ind. v. Individual Members of the Ind. Election Comm'n*, 800 F.3d 913, 916 (7th Cir. 2015). But "the non-moving party does not bear the burden of *proving* his case; the opponent of summary judgment need only point to evidence that can be put in an admissible form at trial, and that, if believed by the fact-finder, could support judgment in his favor." *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011) (original emphasis).

The state laws that plaintiffs are challenging fall into four categories: (1) registering to vote; (2) absentee voting; (3) voter ID; and (4) miscellaneous voting procedures. *See generally* Dkt. 141, ¶¶ 74-177. Plaintiffs challenge these laws under Section 2 of the Voting Rights Act,

8

and under the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments to the United States Constitution. *Id.* ¶¶ 178-210. Defendants have moved for summary judgment, presenting both justiciability issues and defenses on the merits of each claim.

## A. Justiciability

Defendants contend that all plaintiffs lack standing to challenge the voter ID law and the new registration requirements. Defendants also contend that plaintiffs' claims regarding the 28-day residency requirement are moot. Finally, defendants contend that the corporation plaintiffs lack standing to pursue claims under the Voting Rights Act. The court is not persuaded by any of these justiciability challenges and will deny this aspect of defendants' motion for summary judgment.

### 1. Standing

To have standing, a plaintiff in federal court must show "that the challenged action of the defendant caused an 'injury in fact' that is likely to be redressed by a favorable decision." *Judge v. Quinn*, 612 F.3d 537, 544 (7th Cir.), *opinion amended on denial of reh'g*, 387 F. App'x 629 (7th Cir. 2010). "The alleged injury must be concrete and particularized, and either actual or imminent." *Id.* In this case, only one plaintiff needs to have standing to challenge a given provision because the complaint seeks only injunctive relief. *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

The individual plaintiffs named in the amended complaint have qualifying IDs and have registered to vote. Dkt. 117, at 3-4. Defendants therefore contended that these plaintiffs have not been injured by the voter ID law or by the new registration requirements. As for the corporation plaintiffs, they cannot vote and do not need IDs or valid registrations, so defendants contend that they do not have standing either. But the second amended

complaint now includes as plaintiffs four individuals who have been unable to obtain IDs, which effectively preempts some of defendants' justiciability arguments. Dkt. 141, ¶¶ 18-26. Regardless, defendants' analysis of standing takes too narrow a view of the injury that plaintiffs have alleged in this case, and they overlook the corporation plaintiffs' standing to assert claims in a representational capacity.

In reviewing similar challenges to Wisconsin's voter ID law, the United States District Court for the Eastern District of Wisconsin held that the requirement of *presenting* an ID to vote is a sufficient injury for purposes of Article III standing. *Frank*, 17 F. Supp. 3d 837, 866 (E.D. Wis.), *rev'd*, 768 F.3d 744 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015)[3]; *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009) ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing."). And IDs expire, meaning that the individual voters who currently have IDs will eventually have to renew them or acquire new forms of acceptable identification. These injuries are sufficient to confer standing to challenge the voter ID law.

The individual plaintiffs' standing to challenge Wisconsin's registration requirements is less clear. Many of the individual plaintiffs have helped register voters in Wisconsin, and they allege that the new laws hinder their ability to continue doing so. *See, e.g.*, Dkt. 106; Dkt. 108; Dkt. 109. The Seventh Circuit has suggested that a plaintiff may have standing to challenge an outright prevention of his or her efforts to register other voters. *See People*

---

[3] Although the Seventh Circuit reversed the Eastern District of Wisconsin, the court of appeals did not disagree with the district court's standing analysis. To the contrary, the Seventh Circuit did not identify any justiciability issues that prevented it from reviewing the merits of the case. *See generally Frank*, 768 F.3d 744.

*Organized for Welfare & Emp't Rights (P.O.W.E.R.) v. Thompson*, 727 F.2d 167, 170 (7th Cir. 1984) ("P.O.W.E.R. in bringing this suit alleged only that its goal of improving the lot of the poor and the unemployed required for its fulfillment that the state make it easier for them to register. This might be a persuasive basis for standing if P.O.W.E.R. had been trying to advance its goal by registering new voters itself. Anyone who prevented it from doing that would have injured it."). But plaintiffs do not allege outright prevention. The new registration laws merely take longer for the individual plaintiffs to explain and help others navigate. This fact distinguishes this case from the authorities that the individual plaintiffs cite in support of their standing arguments. *See* Dkt. 99, at 21-22.

Plaintiff Jennifer Tasse comes closer to alleging a concrete injury arising out of the new registration requirements. She is a junior at the University of Wisconsin-Madison, and she states that she will move after she graduates and will have to register to vote at her new address. Dkt. 106, ¶¶ 3, 11. As defendants observe, however, Tasse does not indicate when she will move (or even when she will graduate), and she does not confirm that she will stay in Wisconsin after graduation. Any injury that Tasse will suffer because of the new registration requirements is therefore speculative. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (original emphasis). Thus, none of the individual plaintiffs have demonstrated that they have standing to challenge the new registration requirements.

This leaves the corporation plaintiffs, who contend that they have standing in their own right, as well as associational standing on behalf of their members. The court agrees that

the corporation plaintiffs have standing in their own right and will not address associational standing.

"An organization may establish an injury to itself sufficient to support standing to challenge a statute or policy by showing that the statute or policy frustrates the organization's goals and necessitates the expenditure of resources in ways that would not otherwise be required." 15 James Wm. Moore et al., *Moore's Federal Practice* § 101.60[1][f] (3d ed. 2015) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Crawford*, 472 F.3d at 951 ("[T]he new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."). To establish standing, an organization must point "to a 'concrete and demonstrable injury to its activities,' not 'simply a setback to the organization's abstract social interests.'" *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (quoting *Havens Realty Corp.*, 455 U.S. at 379).

Plaintiffs One Wisconsin Institute, Inc. and Citizen Action of Wisconsin Education Fund, Inc. have adduced evidence that they have each devoted money, staff time, and other resources away from other priorities and toward educating voters about the new registration laws. *See* Dkt. 98, ¶¶ 40-48. The corporation plaintiffs are not simply redirecting their resources to litigation, which would not be an injury-in-fact that would confer standing. *See N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). Instead, there is evidence in the record that both corporations are devoting resources to educating Wisconsin voters about how to comply with the state's new voter registration requirements. These expenditures are injuries that give both corporations standing to challenge the registration laws. *Cf. Scott v.*

*Schedler*, 771 F.3d 831, 837 (5th Cir. 2014); *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008).

There is at least one plaintiff with standing to challenge each of the provisions that are at issue in this case. The individual plaintiffs can challenge the voter ID laws and the corporation plaintiffs can challenge the registration laws. The court will therefore deny defendants' motion for summary judgment as it pertains to plaintiffs' lack of standing.

### 2.  Mootness

 "A case becomes moot, and the federal courts lose subject matter jurisdiction, when a justiciable controversy ceases to exist between the parties." *Aslin v. Fin. Indus. Regulatory Auth., Inc.*, 704 F.3d 475, 477 (7th Cir. 2013). Here, defendants contend that there is no longer a justiciable controversy over the 28-day durational residency requirement because the rule is not preventing any of the individual plaintiffs from voting (they have all lived at their current residences for at least 28 days) and because the rule is not injuring the corporation plaintiffs. Plaintiffs disagree with both contentions. They assert that the rule will once again apply to Tasse when she moves after graduation and that it is currently burdening One Wisconsin and Citizen Action's efforts to register voters.

Regardless of whether the individual plaintiffs' claims concerning the 28-day durational residency requirement have become moot, the corporation plaintiffs' claims are still live. The corporation plaintiffs have suffered injuries in the form of diverting resources to educate voters about Wisconsin's registration laws, including the 28-day durational residency requirement. The corporation plaintiffs are continuing to divert these resources and so their claims are not moot. The court will therefore deny defendants' motion for summary judgment as it pertains to mootness.

### 3.  Ability to assert claims under the Voting Rights Act

Defendants' final justiciability challenge concerns the corporation plaintiffs' ability to assert claims under the Voting Rights Act. Defendants couch this challenge in terms of "statutory standing," Dkt. 77, at 46-49, although the inquiry has nothing to do with Article III. *See HSBC Bank USA, N.A. v. Townsend*, 793 F.3d 771, 796 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 897 (2016) ("[W]hether a particular plaintiff has a cause of action under a statute no longer falls under the rubric of standing."). Instead, the question is one of statutory interpretation: whether organizations can file suit under the Voting Rights Act.

Neither party cites to binding authority from the Seventh Circuit that addresses this issue. But defendants contend that 52 U.S.C. § 10302 authorizes only the Attorney General or "an aggrieved person" to bring suit to enforce voting rights. And because corporations are not people, defendants argue that One Wisconsin and Citizen Action cannot pursue Voting Rights Act claims.

The Eastern District of Wisconsin rejected this argument in *Frank*, *see* 17 F. Supp. 3d at 867-68, and the Seventh Circuit did not disturb that conclusion on appeal. As the *Frank* court explained:

> The word "person" in an act of Congress is presumed to include organizations, *see* 1 U.S.C. § 1, and thus the text of the statute does not suggest that a cause of action under Section 2 is limited to individuals. Moreover, the Senate Report on the bill that added the "aggrieved persons" language to the Voting Rights Act confirms that Congress intended to confer a right to sue on organizations seeking to protect the voting rights of their members and others. *See* S.Rep. No. 94-295, at 40 (1975), *reprinted in* 1975 U.S.C.C.A.N. 774, 806-07 ("An 'aggrieved person' is any person injured by an act of discrimination. It may be an individual or an organization representing the interests of injured persons.").

14

*Id.* Defendants essentially contend that the Eastern District of Wisconsin reached the wrong result, and they urge the court to ignore the case as unpersuasive. Dkt. 125, at 10-11. But *Frank* is not an outlier: other federal courts have concluded that organizations can assert claims under the Voting Rights Act. *See, e.g., Veasey v. Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014) (collecting cases). Based on these decisions (including the Eastern District's discussion of the cases that defendants cited in *Frank* and cite again here), the court is persuaded that One Wisconsin and Citizen Action qualify as "aggrieved persons" under the Voting Rights Act. They can therefore assert claims under the act, and the court will deny this aspect of defendants' motion for summary judgment.

## B.  Count 1: Voting Rights Act claims

Turning to the merits of plaintiffs' claims, § 2 of the Voting Rights Act prohibits states and political subdivisions from implementing any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A plaintiff can establish a violation of § 10301(a) by showing that, based on the totality of the circumstances, a state's election processes "are not equally open to participation by members of a class of [protected] citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

The Seventh Circuit has endorsed a two-step inquiry for reviewing challenges to voting qualifications under the Voting Rights Act:

> First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate

15

> in the political process and to elect representatives of their choice.
>
> Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Frank*, 768 F.3d at 754-55 (citations and internal quotation marks omitted). But the Seventh Circuit also cautioned that "§ 2(a) does not condemn a voting practice just because it has a disparate effect on minorities. . . . It is better to understand § 2(b) as an equal-treatment requirement (which is how it reads) than as an equal-outcome command." *Id.* at 753-54.

Plaintiffs allege that Wisconsin's new registration requirements, the limits on absentee voting, and the procedures for straight-ticket voting and election day observers all violate the Voting Rights Act. Dkt. 141, ¶ 180.[4] Plaintiffs contend that these requirements, individually and collectively, abridge or deny the voting rights of African Americans and Latinos in Wisconsin on account of race. *Id.* The court concludes that summary judgment is not appropriate on these claims.

There are disputes of fact regarding whether the challenged practices abridge the voting rights of African Americans or Latinos in Wisconsin. For example, plaintiffs have adduced evidence that the new limits on in-person absentee voting give minority voters less opportunity to use in-person absentee voting. Minority voters are more likely to lack access to a vehicle, which may now be necessary to travel to a municipality's single in-person absentee voting location. Dkt. 72, at 13. Minority voters are also more likely to vote on the weekend before an election, Dkt. 71, at 34, an option that the new laws have now removed. As for registering to vote, plaintiffs have adduced evidence that African Americans and

---

[4] Plaintiffs also challenge the voter ID requirement as part of their Voting Rights Act claim. But this claim is not at issue in defendants' motion for summary judgment.

Latinos are more likely to lack the required documentary proof of residence and instead rely on corroboration. Dkt. 75, at 40-41. Minority voters are also more likely to register through organized registration drives (which are more difficult to organize and implement, now that the state does not allow statewide special registration deputies). Dkt. 101, ¶ 14 and Dkt. 95 (Lowe Dep. 49:9-50:9).

This issue may be an uphill battle for plaintiffs at trial. In *Frank,* the Seventh Circuit observed that Wisconsin's voter ID law—like the laws at issue in this case—did not "draw any line by race, and the district judge did not find that blacks or Latinos have less 'opportunity' than whites to get photo IDs. Instead the judge found that, because they have lower income, these groups are less likely to *use* that opportunity." 768 F.3d at 753. The Seventh Circuit concluded that a decreased likelihood of using an opportunity to participate did not violate § 2. *Id.* Thus, in this case, plaintiffs will have to demonstrate at trial that the challenged provisions actually give African Americans and Latinos fewer opportunities to participate in Wisconsin elections.

For the second part of the analysis under the Voting Rights Act—burdens linked to social and historical conditions that produced discrimination—the Seventh Circuit has clarified that "units of government are responsible for their own discrimination but not for rectifying the effects of other persons' discrimination." *Id.* (citing *Milliken v. Bradley*, 418 U.S. 717 (1974)). Plaintiffs acknowledge that this is the state of the law, but they nevertheless contend that there is evidence that Wisconsin is responsible for the social and historical conditions that have led African Americans and Latinos to be burdened by the challenged provisions. Dkt. 99, at 85.[5] For example, Wisconsin's constitution initially did not extend the

---

[5] Plaintiffs principally recount evidence of discrimination by local units of government (i.e.,

right to vote to African Americans; they obtained that right after the measure was passed at a statewide election.[6] Dkt. 72, at 10. Wisconsin has also only recently begun providing Spanish-language ballots, and even then, just in Milwaukee. *Id.* at 11. And in terms of socioeconomic factors, plaintiffs have adduced evidence of disparities in unemployment, wages, education, and incarceration. *Id.* at 14-17. This evidence may not carry the day, but it is enough to carry plaintiffs to trial. Summary judgment is not appropriate on Count 1.

## C. Count 2: First and Fourteenth Amendment claims of undue burdens on the right to vote

Plaintiffs allege that the challenged provisions place undue burdens on the right to vote in Wisconsin, in violation of the First and Fourteenth Amendments. "A state election law, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.'" *Common Cause Ind.*, 800 F.3d at 917 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). But that is not to say that every voting-related law must survive strict scrutiny. Requiring states to narrowly tailor their election regulations to advance compelling interests "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Federal courts must therefore apply

---

the City of Milwaukee), which they attribute to the state. *See* Dkt. 99, at 96-106.

[6] The election occurred in 1849, a year after Wisconsin became a state. But the effect of the election remained in doubt until 1866, when the Wisconsin Supreme Court clarified that African Americans had the right to vote. *See generally Gillespie v. Palmer*, 20 Wis. 544 (1866).

a "more flexible standard" when reviewing challenges to a state's election laws. *Common Cause Ind.*, 800 F.3d at 917.

Under the flexible *Anderson-Burdick* standard, "the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. When the state imposes "severe" restrictions on the right to vote, then the regulations "must be narrowly drawn to advance a state interest of compelling importance." *Id.* (citations and internal quotation marks omitted). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788).

Here, plaintiffs allege that every provision identified in their complaint places severe restrictions on the right to vote and that the state's interest in each of these provisions does not justify that burden. Stripped to its elements, plaintiffs' constitutional claims under the First and Fourteenth Amendments turn on a two-part inquiry: (1) how severely the challenged provisions burden the right to vote; and (2) whether the state has a sufficient interest to justify the burden that it has imposed.

Plaintiffs may well be stuck with the conclusions reached in *Crawford* and *Frank* that the challenged provisions impose only a modest burden on voters in Wisconsin. The Supreme Court has concluded that "the inconvenience of making a trip to the [department of motor vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198

19

(2008). And according to the Seventh Circuit, "[r]egistering to vote is easy in Wisconsin." *Frank*, 768 F.3d at 748.

Of course, plaintiffs challenge voting regulations that were not directly at issue in *Crawford* and *Frank*. And plaintiffs have mounted a comprehensive challenge to the state's election procedures. This type of wide-sweeping challenge distinguishes plaintiffs' case from *Crawford* and from *Frank*. Even if no individual measure in isolation creates an undue burden for voters in Wisconsin, it may still be that the system, as a whole, presents too many obstacles for those who want to vote. To quote one of Milwaukee's election officials, "[t]he changes to Wisconsin's election laws since the beginning of 2011 have created a perfect storm for across-the-board confusion for both voters and poll workers." Dkt. 100, ¶ 52. Plaintiffs have adduced evidence that since Wisconsin has enacted the challenged provisions, African Americans, Latinos, and those living in student wards are less likely to vote. Dkt. 71, at 28.

Disputes of fact prevent the court from determining the nature and severity of the burden that the challenged provisions create. In turn, this prevents the court from balancing that burden against the state's justification for its laws. Summary judgment is not appropriate on Count 2.

**D. Count 3: Fourteenth Amendment claims for disparate treatment of voters**

The court dismissed plaintiffs' disparate treatment claims in Count 3 that related to Wisconsin's durational residency requirement and the elimination of straight-ticket voting. Dkt. 66, at 5-7. And in responding to defendants' motion for summary judgment, plaintiffs have dropped their challenge to the exclusion of technical college IDs as valid forms of identification. Dkt. 99, at 151 n.23. Thus, Count 3 now includes only plaintiffs' allegation

that the state does not have a rational basis for excluding out-of-state driver licenses and certain expired IDs as valid forms of identification.

Under rational basis review, the state's classification carries "a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). The court will uphold the challenged provisions if defendants identify "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 320. Defendants do not need to produce evidence to support the rationality of the state's decision, nor are defendants limited to the justifications that the legislature had in mind at the time that it passed the challenged provisions—any rational justification for the laws will defeat an equal protection challenge. *Id.* at 320-21.

Beginning with out-of-state driver licenses, defendants contend that "[i]t would make no sense to include out-of-state driver licenses [as forms of acceptable voter ID] because one cannot be a resident of Wisconsin for purposes of voting and a resident of another state for purposes of driving." Dkt. 77, at 64. One problem with this justification—the problem that plaintiffs emphasize—is that it overlooks college students from other states who move into Wisconsin and do not obtain new driver licenses because they do not plan on driving here. But defendants have an answer for the special problem that college students pose: they can use their school IDs to vote. Allowing out-of-state licenses (at least for college students) would have simply duplicated the solution that the legislature created for this problem. It also would have increased the likelihood of confusion for poll workers, who would need to familiarize themselves with 49 other forms of identification.

Wisconsin's decision to exclude out-of-state driver licenses was rational. The court's order on defendants' motion to dismiss indicated that the legislature could not sustain its

21

burden of rationality "by simply claiming that [it] had to draw the line somewhere." Dkt. 66, at 9. But defendants have articulated a justification for the line that the legislature drew. "[R]estraints on judicial review have added force where the legislature must necessarily engage in a process of line-drawing [which] . . . inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315-16 (1993) (citations and internal quotation marks omitted). The mere "fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Id.* at 316 (citations, internal quotation marks, and alterations omitted). Plaintiffs essentially contend that the state should accept any card or document that proves a voter's identity (i.e., that has a picture of the voter). But the state has an interest in limiting the number of acceptable IDs. It would be nearly impossible to expect election officials to compile a list of all acceptable forms of photo ID and then train poll workers on how to check each form of ID on the list. These considerations rationally justify the line that the legislature drew. *See Frank*, 2015 WL 6142997, at *7-8. The court will therefore grant this aspect of defendants' motion for summary judgment.

As for other expired forms of ID, plaintiffs have not articulated exactly which excluded forms they are challenging.[7] But their submissions suggest that they take issue with the state's decision to exclude expired: (1) driving receipts, issued under Wis. Stat. § 343.11;

---

[7] Defendants pointed this out in their opening brief. Dkt. 77, at 66. Yet even in opposing summary judgment, plaintiffs *still* have not come forward with an affirmative list of IDs that they want included. *See* Dkt. 99, at 153-54. The court agrees with defendants that plaintiffs cannot hide the ball and then expect to withstand summary judgment just because the state is unable to anticipate their argument.

(2) state ID card receipts, issued under Wis. Stat. § 343.50; and (3) college or university IDs. *See* Dkt. 99, at 151-54.

Defendants explain that the receipts are temporary; the DMV provides them to applicants for driver licenses and ID cards while it processes their applications. The receipts are eventually replaced by plastic cards, which is why they are valid for official purposes for only 60 days. Wis. Stat. §§ 343.11(1), (3), 343.50(1)(c). Based on the temporary nature of the receipts, defendants argue that the legislature rationally chose to exclude them from the list of acceptable IDs for voting purposes. This argument is persuasive. The receipts are essentially placeholders for actual plastic cards; permitting the latter all but requires permitting the former. Yet once a citizen *has* the plastic card, the receipt is duplicative. True, the receipt does not suddenly become any less able to identify the holder. But the legislature was entitled to decide that for simplicity, it would permit receipts only in the limited window during which a voter did not have the plastic driver license or ID card. Eliminating duplicative forms of acceptable ID would help streamline the process of checking IDs at polling places. This is a rational justification for excluding expired receipts, and the court will grant this aspect of defendants' motion for summary judgment.

Defendants offer similar arguments to support excluding expired college or university IDs. To qualify as valid proof of identity, a student ID must contain a date of issuance, be signed by the student to whom it was issued, and have an expiration date of not later than two years after it was issued. Wis. Stat. § 5.02(6m)(f). A voter who uses an unexpired student ID as proof of identity must also establish that he or she is currently enrolled at the institution that issued the ID. *Id.* Defendants hypothesize that a student with an expired student ID card is likely no longer enrolled at the issuing institution. Thus, according to

defendants, there is no harm in excluding expired student IDs because anyone trying to use them likely cannot comply with the enrollment requirements of Wis. Stat. § 5.02(6m)(f).

The court is not persuaded by defendants' proposed justification for excluding expired student IDs. First, defendants apparently make no room for the possibility that a student could be enrolled at an institution but have an expired student ID. If incoming freshmen at four-year universities receive student IDs that expire two years after issuance, then any junior or senior who fails to obtain a new student ID would have to find a different way to prove his or her identity. Second, unlike receipts for driver licenses and ID cards, expired student IDs are not later replaced with entirely different documents. Defendants therefore cannot rely on the same arguments about simplifying elections by eliminating unnecessary duplicative forms of ID. At this point, defendants have failed to identify a rational basis for the legislature's decision to exclude expired student IDs. The court will deny this aspect of defendants' motion for summary judgment.

To summarize, the court will grant defendants' motion for summary judgment on Count 3 in part. Wisconsin's exclusion of out-of-state driver licenses, expired driver license receipts, and expired ID card receipts as acceptable forms of voter ID does not violate the Fourteenth Amendment because the legislature had a rational basis for these measures. Defendants are therefore entitled to summary judgment on these aspects of Count 3. But the court will deny their motion as it pertains to Wisconsin's exclusion of expired student IDs as an acceptable form of voter ID.

### E.  Count 4: First and Fourteenth Amendment claims for partisan fencing

At least one Justice of the Supreme Court has suggested that there would be First Amendment implications for state restrictions on voting that place burdens on voters because

24

of their political views. *See Vieth v. Jubelirer*, 541 U.S. 267, 315 (2004) (Kennedy, J., concurring) ("If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest."). And other members of the Court have noted that this suggestion is "uncontradicted by the majority in any of our cases." *Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015). These decisions involved gerrymandering, which is not at issue in this case. But the general import of these cases is that the First Amendment protects against voting procedures that make it harder for a person to vote simply because of his or her political views.

The parties have not identified authority that establishes a framework for analyzing plaintiffs' partisan fencing claims. Defendants urge the court to re-apply the *Anderson-Burdick* test, or to simply lump plaintiffs' partisan fencing claims into the analysis for Count 2. Dkt. 77, at 49-55 and Dkt. 125, at 27. Plaintiffs prefer to have the court treat Count 4 as a type of intentional discrimination claim, essentially suggesting that Democrats should enjoy heightened constitutional protection akin to the level of scrutiny that the Constitution requires for laws that discriminate on the basis of race or any other suspect class. *See* Dkt. 99, at 146. Defendants' approach is consistent with the limited case law that exists on this issue, and it incorporates the First Amendment principles that are necessary to evaluate plaintiffs' partisan fencing claims. For the purposes of this motion at least, the court will apply this framework to plaintiffs' partisan fencing claims.

"The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). This means that "unduly restrictive state election laws

may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973). But "[w]hen a state electoral provision places no heavy burden on associational rights, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Clingman v. Beaver*, 544 U.S. 581, 593 (2005) (quoting *Timmons*, 520 U.S. at 358). Thus, much like plaintiffs' undue burden claims, the court must determine how severely the challenged provisions burden voters' First Amendment rights to associate with the political party of their choice. The court must then determine whether Wisconsin's asserted interests justify imposing that burden.

For substantially the same reasons that the court identified in discussing Count 2, summary judgment is not appropriate on plaintiffs' partisan fencing claims. Plaintiffs have adduced evidence that the challenged provisions, individually and in the aggregate, make it difficult for Democratic voters to register to vote and to cast their votes on election day. Defendants have adduced rebuttal evidence, but at this point, plaintiffs have demonstrated that they are entitled to a trial. The court will deny defendants' motion for summary judgment on Count 4.

## F. Count 5: Fourteenth and Fifteenth Amendment claims for intentional race discrimination

Plaintiffs allege that Wisconsin's new registration requirements, the limits on absentee voting, the voter ID requirement, and the procedures for straight-ticket voting and election day observers violate the Fourteenth and Fifteenth Amendments because the state legislature adopted these measures for racially discriminatory purposes. Dkt. 141, ¶ 204. To succeed on these claims, plaintiffs will have to demonstrate that Wisconsin intentionally discriminated

26

against minority voters because of their race. *Rogers v. Lodge*, 458 U.S. 613, 617 (1982); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Discriminatory animus does not need to be the sole reason for Wisconsin's new laws, but "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Village of Arlington Heights*, 429 U.S. at 264-65.

Plaintiffs may show discriminatory intent through direct or circumstantial evidence, and the court may infer an unlawful purpose "from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Rogers*, 458 U.S. at 618 (citations and internal quotation marks omitted). Here, plaintiffs rely exclusively on the report of one of their experts—Allan J. Lichtman, PhD—as evidence of the legislature's discriminatory animus. *See* Dkt. 99, at 124-28. Dr. Lichtman offers 17 "major opinions" in his report, and he concludes that:

> After Republicans achieved unified control of Wisconsin state government in 2011, the majority in the legislature enacted Act 23 and other measures relating to voting and registration with the intent and purpose of achieving partisan advantage through the limitation of African American and Hispanic voting and registration opportunities as compared to opportunities for whites in Wisconsin.

Dkt. 75, at 60.

Defendants object to plaintiffs using Dr. Lichtman's opinions as "facts" with which to oppose summary judgment. *See* Dkt. 125, at 23 and Dkt. 127, at 190-96. But these objections challenge the merits of Dr. Lichtman's conclusions, not whether his opinions constitute admissible evidence of intentional discrimination. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where

27

appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Thus, plaintiffs may rely on Dr. Lichtman's opinions to oppose summary judgment.

Based on Dr. Lichtman's expert report, the court concludes that plaintiffs have adduced evidence that entitles them to a trial on their claims of intentional race discrimination. For example, Dr. Lichtman observes that the Wisconsin legislature passed the voter ID laws despite receiving evidence about the disparate impact that the laws would have on minority voters. Dkt. 75, at 32-34. Dr. Lichtman also opines that the Republican majority in the Wisconsin government would stand to benefit (i.e., stay in power) from reduced minority voter turnout. *Id.* at 16, 18. Finally, Dr. Lichtman recounts procedural irregularities that further cloud the legislature's motive in passing the challenged provisions.

The court will deny defendants' motion for summary judgment on Count 5.

## G. Count 6: Twenty-Sixth Amendment claims for age-based discrimination

The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." According to defendants, the amendment does not prohibit intentional discrimination on the basis of age; rather, it "'simply bans age qualifications above 18.'" Dkt. 77, at 61 (quoting *Gaunt v. Brown*, 341 F. Supp. 1187, 1191 (S.D. Ohio), *aff'd*, 409 U.S. 809 (1972)). Because the challenged provisions apply equally to voters of all ages, defendants contend that they are entitled to summary judgment on plaintiffs' age discrimination claims. This argument is not persuasive because it takes too narrow a view of the Twenty-Sixth Amendment.

Plaintiffs' age discrimination claims are novel. As another district court recently commented, "no court has ever applied *Arlington Heights* to a claim of intentional age

28

discrimination in voting. Nor has any court considered the application of the Twenty-Sixth Amendment to the regulation of voting procedure." *N.C. State Conference of NAACP v. McCrory*, 997 F. Supp. 2d 322, 365 (M.D.N.C.), *aff'd in part, rev'd in part and remanded sub nom.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015). But that is not to say that no federal court has considered whether particular regulations impermissibly abridge the voting rights of younger citizens. In *United States v. Texas*, a three-judge district court considered a county official's refusal to register college students who were not married, had not obtained a job offer in the county following graduation, or did not have a permanent residence in the county. 445 F. Supp. 1245, 1251 (S.D. Tex. 1978), *aff'd sub nom.*, *Symm v. United States*, 439 U.S. 1105 (1979). The *Texas* court concluded that the official's position violated the Twenty-Sixth Amendment and the Supreme Court's decision in *Carrington*. *Id.* at 1257, 1261. The Supreme Court summarily affirmed. *See Symm*, 439 U.S. 1105.

Based on this authority, the court concludes that the Twenty-Sixth Amendment does more than prohibit states from setting explicit age-based qualifications on the right to vote. Indeed, the text of the amendment is virtually identical to the text of the Fifteenth Amendment. The textual and structural similarities suggest that the *Arlington Heights* framework is the appropriate mechanism for evaluating plaintiffs' age discrimination claims. Thus, plaintiffs must adduce evidence that the Wisconsin legislature passed the challenged regulations with the purpose of making it harder for younger citizens to vote.[8] But like their

---

[8] Defendants quibble that plaintiffs have not precisely defined what they mean by "young" voters. But plaintiffs' submissions clarify that their age discrimination claims principally concern how the challenged provisions affect high school and college students.

intentional race discrimination claims, evidence of a disparate impact on younger voters will not be sufficient.

Plaintiffs argue that the challenged provisions create unnecessary complications for young voters, and that the legislature knew that these complications would be a likely result of the new laws. For example, a 2011 letter from the director of the GAB warned the legislature that some of its proposed changes would "only serve to deter voter participation by students [and] impose[] artificial barriers to participation." Dkt. 112-16, at 3. The state nevertheless passed the challenged provisions, and many college students must now provide more documentation than other voters have to provide, both to register and to cast a ballot. Plaintiffs also contend that removing the requirement of registration deputies in high schools is evidence that the legislature targeted younger voters and made it difficult for them to participate in elections. And Dr. Lichtman's opinion that the Republican-controlled state government stood to gain from suppressing young votes (which tend to be Democratic votes) is evidence of a discriminatory motive.

Much of plaintiffs' evidence simply recounts the impact that the challenged provisions have had on young voters, which may not be enough to carry the day at trial. But for now, plaintiffs have adduced evidence that the legislature acted, at least in part, with the purpose of abridging younger citizens' rights to vote. Defendants are not entitled to summary judgment on Count 6.

## ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment, Dkt. 76, is GRANTED in part and DENIED in part:

a. Defendants are not entitled to summary judgment on Counts 1, 2, 4, 5, and 6 of the second amended complaint.

b. Defendants are entitled to summary judgment on the claims in Count 3 that relate to out-of-state driver licenses, expired IDs other than expired student IDs, and technical college IDs. Defendants are not entitled to summary judgment on the remaining claims in Count 3.

Entered May 12, 2016.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

31