UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

ONE WISCONSIN INSTITUTE, INC.,
CITIZEN ACTION OF WISCONSIN EDUCATION
FUND, INC., RENEE M. GAGNER,
ANITA JOHNSON, CODY R. NELSON,
JENNIFER S. TASSE, SCOTT T. TRINDL, and
MICHAEL R. WILDER,

      Plaintiffs,

 -vs-                                    Case No.  15-cv-324-jdp

JUDGE GERALD C. NICHOL,                  Madison, Wisconsin
JUDGE ELSA LAMELAS,                      May 18, 2016
JUDGE THOMAS BARLAND,                    1:38 p.m.
JUDGE HAROLD V. FROEHLICH,
JUDGE TIMOTHY VOCKE,
JUDGE JOHN FRANKE,
KEVIN J. KENNEDY, and MICHAEL HASS,
all in their official capacities,

      Defendants.

_____

TRANSCRIPT OF COURT TRIAL
AFTERNOON SESSION
HELD BEFORE U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiffs:
                Perkins Coie LLP
                BY:  JOSHUA KAUL
                    CHARLES CURTIS, JR.
                    BOBBIE WILSON
                    RHETT MARTIN
                    BRUCE SPIVA
                1 East Main Street, Suite 201
                Madison, Wisconsin  53703

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
(608) 255-3821

For the Defendants:

        Wisconsin Department of Justice
        BY:  CLAYTON KAWSKI
             GABE JOHNSON-KARP
             JODY SCHMELZER
             SEAN MURPHY
        P.O. Box 7857
        Madison, Wisconsin 53707

Also appearing:     MATT KENNEDY, IT Specialist

**INDEX OF WITNESSES**

PLAINTIFFS' WITNESS | EXAMINATION | PAGE

MARIBETH WITZEL-BEHL — Cross-Examination by Mr. Kawski — 4
Redirect Examination by Mr. Spiva — 23
RENEE GAGNER — Direct Examination by Ms. Wilson — 27
Cross-Examination by Mr. Johnson-Karp — 42
CARRIE SCHERPELZ — Direct Examination by Mr. Martin — 47
Cross Examination by Mr. Murphy — 66
KENNETH MAYER — Direct Examination by Mr. Spiva — 70

**INDEX OF EXHIBITS**

PLAINTIFFS' EXHIBITS | IDENTIFIED | RECEIVED

38 Report - Kenneth Mayer — 71 — 73
43 Rebuttal Report - Kenneth Mayer — 87 — 131
463 Chart — 137 — 138
464 Chart — 142 — 142
465 Chart — 144 — 145
466 Chart — 147 — 147

\*\*\*

(Proceedings called to order at 1:38 p.m.)

THE COURT: Are we ready?

MR. KAWSKI: I think so, Your Honor.

THE COURT: All right. Very good. Before we start, I have a question for you.

THE WITNESS: Yes.

1          THE COURT:  If I understand the law correctly, despite

2     the fact that we have a 28-day residential duration

3     requirement --

4          THE WITNESS:  Yes.

5          THE COURT:  -- if a person has moved into the state

6     within that 28 days, so they haven't been a Wisconsin resident

7     for 28 days, they're still entitled to vote for president and

8     vice president.  How do you handle that situation?

9          THE WITNESS:  They would complete a voter registration

10    for after their 28-day residency is met, but they'd also

11    complete an application for a presidential ballot, and that's

12    not for the presidential primary; that's just for the

13    presidential election in November.  And then we would give them

14    a sheet of paper with just the office of president and vice

15    president on it.  They would mark that as their ballot, and then

16    two election officials would remake it onto an official ballot

17    so they'd only be voting for those offices, and the election

18    officials would feed the official ballot into the tabulator to

19    be counted.

20         THE COURT:  Oh, okay.  Because I was wondering whether

21    they had to prepare yet another ballot form for just voters in

22    that circumstance.

23         THE WITNESS:  It's on an 8 1/2 x 11 sheet of paper.

24         THE COURT:  You'd just print it up and Xerox it, and

25    you'd have it ready in case you needed one.

1        THE WITNESS:  That's right.

2        THE COURT:  Then the official ballot gets marked, and

3   you would only just mark the presidential --

4        THE WITNESS:  That is right.

5        THE COURT:  Okay.  Good.  Thank you.

6   Cross-examination.

7                    CROSS-EXAMINATION

8   BY MR. KAWSKI:

9   Q    Good afternoon, Ms. Witzel-Behl.

10  A    Good afternoon.

11  Q    How are you?

12  A    Good.

13  Q    You and I spoke at your deposition on April 22nd.

14  A    Yes.

15  Q    I am going to try and be brief and focused.  It's going to

16  be difficult because I have notes from two days and an outline.

17  A    Okay.

18  Q    So if I'm looking down a lot, that's why.

19  A    That's okay.

20  Q    And I may refer to the deposition transcript at times.

21  Just so Mr. Spiva knows, it will be starting at page 43.  That's

22  where I'd be starting when I get to those questions.

23  A    Okay.

24  Q    Mr. Spiva asked you some questions about poll workers being

25  confused about the forms of qualifying ID for voting, right?

─────────────── MARIBETH WITZEL-BEHL - CROSS ───────────────

1    A    Yes.

2    Q    And those poll workers are trained?

3    A    Yes, they are.

4    Q    And they're trained ultimately by the city.

5    A    Yes.

6    Q    And you're ultimately responsible for making sure they know

7    the forms of qualifying ID, correct?

8    A    That's right.

9    Q    So when they get it wrong, it's your fault?

10   A    It's my responsibility to make sure that they don't make

11   that mistake again, yes.

12   Q    Okay.  So what types of steps do you take to make sure that

13   that's corrected if they do make mistakes?

14   A    In Madison we require all of our election officials to

15   complete one hour of training before every election that they

16   work, and after an election I will take note of any problems

17   that I saw from the documentation prepared by the poll workers,

18   any complaints that I receive from voters, any feedback I

19   receive from the Government Accountability Board, and then I use

20   that to prepare the training for the next election.  And after

21   the February primary, there were some complaints from voters who

22   thought that the poll workers took too long to figure out that

23   their nonexpiring military ID card was acceptable, and so we

24   really focused on that in our training for the April election,

25   and one of our voters who is a retired member of the military

1    provided us with examples of what each military ID card looks

2    like.  There are many different looks, and they're not all

3    pictured on the infographic we have available from the state, so

4    we were able to spend time in training on looking at each of

5    those examples.  That way the poll workers could become more

6    familiar with what they might be seeing at the polling place and

7    not have to check with the chief inspector before accepting one

8    of those as acceptable voter ID.

9    Q    And you mentioned that you do use state materials to do

10   your training?

11   A    Yes.

12   Q    But ultimately it's not the state's responsibility to train

13   the City of Madison's poll workers, correct?

14   A    That's right.

15        THE COURT:  Does the state -- sorry to interrupt -- but

16   does the state GAB, I presume, mandate certain standards for the

17   training --

18        THE WITNESS:  No.

19        THE COURT:  -- or is it really left up to your

20   discretion to figure out what training is appropriate?

21        THE WITNESS:  It's left up to our discretion, and there

22   are requirements for the number of hours that chief inspectors

23   must receive training for every two years, and then other than

24   that, the requirement is that the clerk needs to make sure that

25   the poll workers are trained.  To administer that in the City of

1    Madison, we just have a requirement that all poll workers attend

2    one hour of training before every election that they work.

3    Because the law keeps changing, there are new things to go over,

4    and we want to review any trends that we saw in the last

5    election that they need to work on improving.  So we're trying

6    to go for continual improvement.  Other municipalities have just

7    training sessions for their chief inspectors and have their

8    chief inspectors train their poll workers where they have

9    training sessions that are three hours long once a year.

10                   THE COURT:  Thank you.

11                   THE WITNESS:  Uh-huh.

12   BY MR. KAWSKI:

13   Q    You mentioned the training sessions, the one-hour training

14   session for the poll workers, right?

15   A    That's right.

16   Q    Just so the Court understands the difference between poll

17   workers and election inspectors, poll workers sit at the table

18   and do the check-ins and things like that?

19   A    Poll workers are election inspectors, and, yes, they do sit

20   at the table and check in voters.  Chief inspectors are also

21   election officials, but they attend a different training as a

22   group in the City of Madison, and that training syllabus we get

23   approved by the Government Accountability Board, so it counts

24   toward their recertification.

25   Q    So the chief inspector is in charge of the other election

MARIBETH WITZEL-BEHL - CROSS

3-P-8

1    inspectors at a polling place?

2    A    That's right.

3    Q    And we talked in your deposition about when those one-hour

4    trainings take place, right?

5    A    Yes.

6    Q    And you mentioned how you do some of them on weekends?

7    A    Yes, we do.

8    Q    And given that there's no absentee voting on the weekend

9    anymore, you're now able to do those more easily or it doesn't

10   make a difference?

11   A    It doesn't make a difference.  It's the same offerings that

12   we've had in the past.  We try to vary the days of week that we

13   offer training sessions, the time of day, and the locations in

14   Madison.  Not everybody can reach the City-County Building

15   easily by bus.  We'd prefer it if people wouldn't have to take a

16   bus with a transfer to get to training, and that's why we try to

17   have training sessions on the north side, the south side, east,

18   west, and downtown.  And then the training sessions that are

19   held on the weekend are usually downtown because those are

20   spaces that are easiest for us to reserve, but then the

21   officials have to pay for parking when they come downtown to

22   take the training.  So for some officials, that's not really a

23   good option.

24   Q    And you talked about you have staff that work during the

25   in-person absentee period, correct?

1    A    Yes.

2    Q    And in the prior version of the law when weekend absentee

3    voting was permitted, they would be working on the weekend,

4    correct?

5    A    That's right.

6    Q    And now with no weekend in-person absentee voting, they

7    sometimes have to work on the weekend and sometimes they're able

8    to take time off, correct?

9    A    That's right.  What I do to prepare the training schedule

10   is ask for my staff's availability for overtime hours for the

11   weeks leading up to the election, and then when I have staff

12   available to work nights and weekends in addition to myself,

13   that gives me an option for another training session to be

14   offered.

15   Q    Okay.  Shifting topics, Mr. Spiva asked you about voting

16   lines for in-person absentee voting for the 2012 general

17   presidential election, right?

18   A    Yes.

19   Q    And you talked about lines kind of snarling around the

20   building and throughout your building, correct?

21   A    The first floor of the building.

22   Q    Okay.  So the first floor of the building.  But to be

23   clear, during that time weekend in-person absentee voting was

24   still allowed?

25   A    Yes.

1    Q    And what I would say is the hours were not limited yet at

2    that time, correct?

3    A    That's right.

4    Q    That didn't occur until 2014?

5    A    I don't remember exactly when that change went into effect

6    in the law.

7    Q    But it was not in effect for the 2012 presidential general?

8    A    Right.

9    Q    And you still had these lengthy lines?

10   A    Yes.

11   Q    Okay.  When someone submits a copy of their ID card for

12   in-person absentee, you keep it on file, right?

13   A    Not for in-person absentee.  In-person absentee requires

14   that the voter present their ID, so we look at their ID.  It's

15   when the voter requests that we mail them an absentee ballot

16   that we keep a copy of their ID on file.

17   Q    Right, thank you.  So when you receive a copy of that ID

18   and you keep it for 99 years --

19   A    Yes.

20   Q    -- if that person changes their registration, they don't

21   have to submit a copy of the ID again?

22   A    If they change their -- if they reregister, then they're

23   supposed to submit another copy of their ID.  How we catch that,

24   I'm not sure yet, but we'll figure that out with the WisVote

25   program.

MARIBETH WITZEL-BEHL - CROSS

1    Q    Only if they have to change their registration do they have

2    to submit another copy of ID, correct?

3    A    That's right.

4    Q    Otherwise you have it on file already?

5    A    That's right.

6    Q    Okay.  We talked in your deposition about what are the

7    bottlenecks for in-person absentee voting, and I asked you the

8    question, what are the two biggest bottlenecks for in-person

9    absentee voting, right?

10   A    Yes.

11   Q    Referring to starting at page 43 of your deposition, I

12   asked you what the number one bottleneck is, and you said --

13   tell me if I'm wrong, but I think I will read it here -- "The

14   slowness of the state's new voter registration system would be

15   the biggest bottleneck."

16   A    Yes.

17   Q    I said, "Okay."  And I was trying to figure out what you

18   meant by that, a computer system, not any change in the law?

19   A    Right.  That's a new computer program that we have for

20   statewide voter registrations.

21   Q    And the computer system was creating delays because of how

22   I think -- how it populated addresses of people when you entered

23   them or something?

24   A    Right.  I'm not an expert in any way on computer

25   technology, but when a voter registers and they're registering

1    at an address where somebody isn't currently also registered at

2    that address, we need to search for that address in the system,

3    and then if it's not out there as a possible address to just

4    validate them, we need to create that address in the system,

5    make sure that its placement is correct on a map that is shown

6    on the screen, make sure it has a district combination code and

7    then activate it, and then we can go on with the voter

8    registration, and the address portion is slower than my

9    patience.

10   Q    And so this system is called WisVote?

11   A    Yes.

12   Q    And the slowness has nothing to do with the proof of

13   residency requirement per se?

14   A    No.  This is the computer system that we have to use.

15   Q    And that was the number one bottleneck you identified for

16   in-person absentee voting?

17   A    That's right.  This past February into April election, that

18   was the one thing that slowed down our line of voters the most.

19   Q    Okay.  And then the number two bottleneck was the voter ID

20   law, correct?

21   A    Right.

22   Q    And specifically you talked about how voters might not

23   understand what IDs are acceptable?

24   A    Right.

25   Q    That they might not be clear when they go to the desk to

MARIBETH WITZEL-BEHL - CROSS

1    check in which ID is allowed?

2    A    Right.

3    Q    And I asked you, well, isn't there significant signage

4    around there; remember that?

5    A    Yes.

6    Q    You said sometimes people are on their phones or they're

7    reading a book, not paying attention to the signage?

8    A    Yes.

9    Q    There's really nothing you can do for someone who is not

10   paying attention, right?

11   A    There is nothing that I could do without walking up and

12   talking to each voter, but as we talked about in the deposition,

13   I was answering the phone in the office.

14   Q    That's just not reasonable to require you guys to walk up

15   to everyone and tell them what IDs are allowed?

16   A    Right.  Without enough people to do so.

17   Q    We talked about the process of checking someone's ID, and

18   you testified that it takes about 40 seconds to do that?

19   A    Yes.

20   Q    And before Act 23, it took about 20 seconds to check

21   someone in, right?

22   A    I don't know that I have timing on checking in at the

23   counter during absentee voting, but prior to the new

24   regulations, the voter would step up to the counter, give their

25   name and address, but there are other changes, as we talked

1    about, that had gone into place as well.  Years ago the voter

2    also filled out a form that they would hand to us in addition.

3    So there have been numerous changes through the years; some that

4    would speed things up, and then others that did not.

5    Q    And Act 23 created two main changes for the check-in

6    process, right?  And those being showing qualifying ID and

7    signing the poll book?

8    A    Are you still talking about in-person absentee voting --

9    Q    No, I'm talking about election day.

10   A    Oh, at the polls.

11   Q    Yes.

12   A    Yes.  At the polls there's a requirement that you sign the

13   poll book as a voter, and prior to that you also show your ID.

14   Q    Okay.  And so, again, talking about at the polls on

15   election day --

16   A    Yes.

17   Q    -- you testified that now it takes 40 seconds about to

18   check someone in; is that right?

19   A    It can take as few as 40 seconds.  It can take about a

20   minute or over a minute.  So we did some timing on this in

21   February at our polling places, and the fastest interactions

22   that we had at the poll book table were about 40 seconds.  There

23   were others that it was over a minute.

24   Q    Okay.  And prior to that, again, it took about 20 seconds?

25   I think that's what you testified to.

MARIBETH WITZEL-BEHL - CROSS

1   A    Yes.

2   Q    Okay.  And so I asked you could you break out how much time

3   was added by Act 23 in terms of signing the poll book added time

4   and checking ID added time; do you recall that?

5   A    And I cannot break that out for you.  When we did our mock

6   elections, we were doing the mock elections to figure out how to

7   implement the law while shortening the lines as much as

8   possible, and so we were looking at the law as a whole and not

9   breaking it out into signature versus showing ID.

10  Q    So you can attribute of that extra added time how much of

11  it goes to showing and checking the ID, correct?

12  A    No, because we did our timing as a whole, the whole

13  process.

14  Q    So some of that time is obviously then attributed to the

15  signing the poll book part?

16  A    Yes.  That was part of the new law.

17  Q    And that part can create slowdown as well because the poll

18  book is sort of upside down facing?

19  A    Our experience is that the voter signing the poll book

20  upside down is not confusing.  That works out fine.  It probably

21  would be more disruptive for the poll workers to keep flipping

22  the poll book back and forth during the day, so signing the poll

23  book upside down actually is helpful for the poll workers.  They

24  just move the poll book forward and then slide it back without

25  messing with the binding and having the poll book fall apart.

1     Q     I guess what I meant is that the person's name is upside

2     down to the election official who is sitting there with the poll

3     book, right?

4     A     The person's name and address are facing the poll worker.

5     The box where the voter signs is still facing the voter.  The

6     voter just signs right within that box.  The signature itself is

7     upside down to the poll worker.  I don't know if that's what

8     you're referring to.

9     Q     I'm just getting at do sometimes poll workers struggle

10    pointing out which box to sign in?

11    A     Actually, the Government Accountability Board when they set

12    this up put numbers for each line, and so I haven't had any

13    feedback that the signature boxes are confusing at all.

14    Q     Okay.  But you have seen instances where people have signed

15    in the wrong box, correct?

16    A     We have.

17    Q     How frequent does that happen?

18    A     Every so often, and we tell the poll workers to document

19    that on their inspector statement.  If they notice that, they

20    just make note of it.  They don't need to call the voter at home

21    and have them come back into the polling place.

22    Q     You talked to Mr. Spiva about provisional ballots?

23    A     Yes.

24    Q     And you said that for the April 2016 election, there were

25    123 provisional ballots issued for voter ID reasons in Madison?

1    A    Yes.

2    Q    And I asked you at your deposition what were the total

3    number of ballots cast in Madison; do you remember that?

4    A    Yes.

5    Q    How many was it?

6    A    It was over 118,000.

7    Q    So --

8    A    And that's for April.

9    Q    Right, just for April.  I'm not asking you to do the math

10   on the stand, but I did do the math, and that's .1 percent of

11   all ballots cast were provisional.

12   A    Yes.  For the campus wards it was .14 percent.

13   Q    Okay.  So you did do the math?

14   A    Yes, but I couldn't have come up with that up here on the

15   stand.  I didn't do the math right now.

16   Q    Okay.  How many provisional ballots did you order for the

17   April 2016 election?

18   A    A provisional ballot isn't a separate print job.  It's a

19   regular ballot.  On the back of the ballot, the poll workers

20   write the provisional voter number, and there's a stamp we give

21   them to stamp the relevant section of the state statute.  So

22   it's not that we print separate provisional ballots.  We also

23   send about 20 provisional envelopes to each polling place that

24   they have available that they could use for any election.

25   They're not election-specific.

1    Q    So for each polling place they had a total of 20 envelopes?

2    A    They did.

3    Q    And you said there were 87 polling places?

4    A    That's right.

5    Q    So how many total envelopes about did you prepare for

6    provisional ballot purposes?

7    A    In addition to those that we sent to the polling places, we

8    have thousands and thousands in our office printed when voter ID

9    first went into effect.  So I don't remember how many we printed

10   at that time, but we're still using those envelopes.

11   Q    And so you sent 20 to each polling place, and they didn't

12   use them all?

13   A    That's right.

14   Q    And, you know, doing quick math, you sent out about 1,600

15   provisional envelopes?

16   A    Yes.

17   Q    Would it be fair to say you were anticipating at least

18   1,600 provisional ballots?

19   A    No.

20   Q    No.  Okay.  Here is where we get to my notes, and it's

21   going to be a lot of miscellaneous, I think.

22   A    That's fine.

23   Q    You talked about election observers with Mr. Spiva?

24   A    Yes.

25   Q    And I just want to be clear that when you're talking about

1    the blue tape area where they stand, that that is an area that

2    election inspectors, the chief inspector, can order the

3    observers to stand in that area?

4    A    That's right.

5    Q    And that is not a change in the law, right?

6    A    A few years ago there was a change in the Government

7    Accountability Board rules for observers to actually have a

8    brochure that is handed to the observer with all the rules

9    spelled out.

10   Q    I guess what I mean is the chief inspector could always

11   order the observers to stand in a certain spot?

12   A    Yes, have a designated area for the observers.  A few years

13   ago we started designating that with blue painter's tape on

14   election morning because feedback from the poll workers was that

15   the observer area tended to move itself forward during the day,

16   so that was our solution.

17   Q    Okay.  And it's always been the case that the chief

18   election inspector could order a misbehaving observer out of the

19   polling place?

20   A    That's right.

21   Q    You talked in your direct exam about taking pictures at the

22   polling place and zooming in with a cell phone?

23   A    Yes.

24   Q    Cameras are not allowed for observers, correct?

25   A    The observers can't take pictures during voting hours.

1   They could take pictures as the polls are being closed after

2   voting is complete.  They are allowed to use their cell phones

3   during the day while voting is taking place, but not take

4   pictures unless they're a member of the media.

5   Q    So a nonmedia election observer who is on their cell phone

6   zooming in, what do you do with that?

7   A    Well, the question that came up to me from a number of

8   chief inspectors was that they were concerned about when

9   observers are holding up their phone, whether they're zooming in

10  to see personal information, and so I have told them they need

11  to walk by behind the observers to see exactly what's taking

12  place.

13  Q    But that could, I guess, be construed as using the cell

14  phone inappropriately for camera purposes?

15  A    If they're taking a picture.  If they're not taking a

16  picture, they're allowed to use the cell phone in the polling

17  place, and sometimes they're texting or they're checking

18  something on the internet, and that's perfectly fine.

19        THE COURT:  So you're saying they're using it more like

20  a binoculars instead of a camera.  They're not taking the

21  photograph, but they're using the zoom feature to get a closer

22  look.

23        THE WITNESS:  Right.  That's the concern that's been

24  brought up to me by some chief inspectors.

25        THE COURT:  Okay.  So could you sanction or discipline

1   or control an observer for that behavior?

2          THE WITNESS:  The observers would have to catch them

3   doing that, and then first we'd try to just talk to the observer

4   and tell them that that's personal, confidential information

5   that can't be disclosed and they can't do that, and then if they

6   were to do it again, they'd be told to leave the polling place.

7          THE COURT:  Okay.

8   BY MR. KAWSKI:

9   Q    You talked about different proof of residence documents,

10  right?

11  A    Right.

12  Q    And in March of 2016 a new document was added to that list

13  which isn't -- what is it?

14  A    It's an intake document for a care facility.  So assisted

15  living or a nursing home wouldn't necessarily have a lease with

16  their residents, but they would do a contract or some sort of an

17  intake document when somebody moves in, and that could be used

18  to prove an address.

19  Q    And that was an addition that the Wisconsin legislature

20  made to the law?

21  A    That's right.

22  Q    And what population would that assist?

23  A    Those who are living in care facilities.  So it might be a

24  nursing home or assisted living facility or CBRF facility.

25  Q    And is that a population you would have potentially seen

1   using the corroboration option in the past?

2   A    Not necessarily.  They in the past probably would have

3   registered during open registration and not given a document.

4   In the past we had seen more married couples using the

5   corroboration option.

6   Q    Okay.  You talked about the -- and I don't remember -- it's

7   the certified housing list for students and the issue of

8   confirming citizenship, correct?

9   A    Right.

10  Q    It's not that students have to use that certified housing

11  list to prove their residency, correct?

12  A    No.  They could use any document on the list of acceptable

13  documents.

14  Q    You talked about sending absentee ballots overseas?

15  A    Yes.

16  Q    And the complications that can create?

17  A    Right.

18  Q    I'm wondering, have you ever sent a ballot using a

19  commercial carrier?

20  A    No, we do not.  We use U.S. mail.

21  Q    Okay.  And why do you use U.S. mail only?

22  A    Because that is what we are able to use through our mail

23  room.  We take the tray of absentees down to the mail room.

24  They are able to seal those envelopes for us saving us paper

25  clips -- or paper cuts on our tongues, and then they also will

1    put the postage on and get it to the post office for us, so we

2    don't have to deal with any of that administration.

3    Q    The reason I ask is Mr. Spiva asked you whether it would be

4    impossible to get certain people a ballot in time, and as I was

5    sitting here, I went online and put in DHL for Ecuador and DHL

6    for -- the other country was -- Ecuador is the one I remember.

7    Do you acknowledge that a commercial carrier like DHL can

8    deliver to countries like Ecuador?

9    A    I have no information on DHL.  We'd have to get special

10   permission from the finance department if we were to use a

11   service other than what we have available through our payment

12   options with the county.

13   Q    You would acknowledge though that it may be possible to get

14   a ballot to a voter in another country using a commercial

15   carrier?

16   A    It may be.

17            MR. KAWSKI:  Okay.  I have no further questions.

18            THE COURT:  Any redirect?

19            MR. SPIVA:  Just a couple, Your Honor.

20                       REDIRECT EXAMINATION

21   BY MR. SPIVA:

22   Q    You probably haven't done the comparison, but would e-mail

23   be cheaper than DHL to send the ballots overseas?

24   A    We have no postage costs on e-mail.

25   Q    Okay.  And what impact on costs do you think it would have

MARIBETH WITZEL-BEHL - REDIRECT

1    if you were sending international -- absentee ballots

2    internationally through commercial carriers?

3    A    I have no idea.

4    Q    You were asked some questions about the observers?

5    A    Yes.

6    Q    And you mentioned that people were using, I guess, the

7    cameras, or the phones rather, as binoculars?

8    A    Yes.

9    Q    If someone were to snap a picture even though they're not

10   supposed to, would there be a way to necessarily tell that they

11   were doing that unless somebody was standing right behind them?

12   A    I don't know.  It would, I guess, depend on the cell phone

13   that they're using.  My cell phone sometimes lets off a flash;

14   sometimes it doesn't.  So I don't know.

15   Q    And if they were taking a video, would there be a way to

16   tell that unless somebody was standing behind them?

17   A    I don't know of a way to tell unless you're standing behind

18   the observer.

19   Q    And then you were asked some questions about, you know,

20   whether it was your responsibility to do certain training.

21   Probably an obvious question, but the voter ID law is a state

22   law, correct?

23   A    Yes.

24   Q    And you didn't have a need to do any training on voter ID

25   before the voter ID law was passed by the state, I take it?

MARIBETH WITZEL-BEHL - REDIRECT

1    A    No.  We did training every election since I became clerk.

2    I have required all officials to attend training every election,

3    and it would be on whatever we have determined that they need

4    the most work on to improve.

5    Q    And does the state have some responsibility for training

6    the clerk of the city?

7    A    The state does provide webinars that we watch, and they

8    offer those pretty frequently -- I'd say at least once a

9    month -- and then we try to catch when they're going to be held

10   to watch and find out if they have any new guidance for us, and

11   then we'll include that information in the training that we do

12   for our local officials.

13   Q    Do they have any oversight responsibilities, say, over you,

14   GAB, since it's still in existence?  Is there some kind of

15   oversight responsibility over the localities, the locality

16   clerks?

17   A    They give us direction on how to do things and guidance.

18   They also provide that guidance and direction to the county

19   clerks.

20   Q    And is that guidance -- is some of that guidance binding in

21   that it's mandatory?

22   A    They do have rules that we need to follow, yes.

23   Q    And does the state have responsibility for implementing at

24   least state and federal elections?

25   A    Yes.  They are the ones who certify the elections in the

1    end, and we are required as municipalities to report certain

2    information to them within a deadline after each election.

3            MR. SPIVA:  Thank you very much.  I don't have any

4    further questions.

5            THE WITNESS:  Thank you.

6            THE COURT:  Just one quick follow-up.  Before the

7    change that eliminated the weekend voting, there still was a

8    window within which you could do in-person absentee voting?

9            THE WITNESS:  Before they --

10           THE COURT:  Before they eliminated the weekend voting

11   and then set the parameters for your weekday hours that you

12   could --

13           THE WITNESS:  Right.  We could have in-person absentee

14   voting once we had ballots in the office, and then that would

15   end the day before election day.

16           THE COURT:  Okay.  So could you -- was it totally

17   within your discretion to set whatever hours you thought were

18   appropriate?

19           THE WITNESS:  Yes.  And then we would publish those

20   hours in the newspaper.

21           THE COURT:  So you could do 24/7 if you wanted to --

22           THE WITNESS:  We could.

23           THE COURT:  -- before that.  Okay.  Thanks.

24           THE WITNESS:  Thank you.

25           THE COURT:  Okay.  Thank you very much.  You get the

1    endurance prize so far.  I hope your record stands unchallenged.

2          (Witness excused at 2:10 p.m.)

3                THE COURT:  Okay.  Next witness.

4                MR. SPIVA:  Your Honor, plaintiffs call Renee Gagner.

5          **RENEE GAGNER, PLAINTIFFS' WITNESS, SWORN,**

6                      DIRECT EXAMINATION

7    BY MS. WILSON:

8    Q    Good afternoon.

9    A    Good afternoon.

10   Q    Would you please state your name and spell your name for

11   the record?

12               THE COURT:  Ms. Wilson, would you turn your mic just a

13   little bit toward you?  Thanks.

14               THE WITNESS:  Renee Gagner, R-E-N-E-E G-A-G-N-E-R.

15   BY MS. WILSON:

16   Q    And you're one of the plaintiffs in this case, right?

17   A    Yes.

18   Q    And how old are you?

19   A    23.

20   Q    And where do you live?

21   A    I live in Milwaukee, Wisconsin.

22   Q    And how long have you lived there?

23   A    I have lived there for a little over a year, since late

24   March of 2015.

25   Q    And where do you work?

1    A    I work for SEIU Healthcare Wisconsin.

2    Q    And what is SEIU?

3    A    The Service Employees International Union.

4    Q    And what do you do for them there?

5    A    I am a staff representative/organizer.

6    Q    And are you also a recent college graduate?

7    A    Yes.  I graduated in 2014.

8    Q    And where did you go to school?

9    A    Beloit College.

10   Q    And is Beloit a private school, state school?  What kind of
11   school is it?

12   A    It's a private liberal arts school.

13   Q    And what was your degree in?

14   A    I had a Bachelor of Arts in political science and
15   psychology.

16   Q    And did you study election law in political science?

17   A    I did study it a little bit though I think my interaction
18   with it was more doing some student organizing on campus than in
19   my coursework.

20   Q    Okay.  We'll talk about that in just a minute.  Are you a
21   voter?

22   A    I am.

23   Q    And how long have you voted?

24   A    I have been voting since I was 18, which was the fall
25   election in 2010.

1    Q    And did you vote in the last election?

2    A    I did.

3    Q    And when was that?

4    A    That was in early April of this year.

5    Q    And why do you vote?

6    A    I vote because I think it's very important to be involved

7    in the political process.  Our elected officials influence a lot

8    of aspects of our everyday lives.

9    Q    And where did you live when you were in school?

10   A    I lived in the dorms on campus.

11   Q    And were you in the dorms the whole four years?

12   A    With the exception of a semester being abroad, yes.

13   Q    And did you have one sort of single address because you

14   lived at the school or did you have different addresses over the

15   years?

16   A    Each dorm building was considered a separate -- sort of a

17   separate address.  We were all under 700 College Street as the

18   college's address, but each dorm building was kind of its own

19   address, and we would need to reregister when we moved

20   buildings.

21   Q    So you registered when you were 18 to vote, right?

22   A    Yes.

23   Q    And do you remember the address you used?

24   A    700 College Street, Aldrich Hall, Beloit, Wisconsin 53511.

25   Q    Okay.  That's very good.

RENEE GAGNER - DIRECT

1    A    Thanks.

2    Q    I actually meant did you register at school or at home?

3    A    At school, yes.

4    Q    And so how many times when you were at school did you have

5    to register or reregister?

6    A    I had to reregister if I were home in the summer and there

7    were elections in the summer, which did happen at least two

8    summers, I believe.  I would reregister at home if I had been

9    there for more than whatever the residency requirement was at

10   the time, and even if I didn't reregister at home during the

11   summer, I would need to reregister if I had moved to a new

12   building on campus in the fall.

13   Q    And did having to register and reregister, did that have

14   any impact on you as far as your voting went?

15   A    I was always able to do it and, you know, this is

16   something that I'm pretty passionate about, so I made sure that

17   I was able to reregister and made plans to do so, but it was

18   more work than, you know, it would have been if we had just

19   voted under the same address across campus.

20   Q    And did you have other students, college students of yours

21   that had the same issue in terms of registering and then having

22   to reregister?

23   A    Yes.

24   Q    Now, do you have a preferred way of voting that you like to

25   vote?

1    A    I prefer to vote in-person absentee.

2    Q    And why do you prefer to vote in-person absentee?

3    A    I'm often busy on election day either encouraging and

4    helping others to vote or just work or in class and doing my

5    normal day-to-day activities.

6    Q    And when you voted in-person absentee, did you ever vote on

7    the weekends?

8    A    I don't recall ever voting on the weekends.

9    Q    So you know there's been a change, that the weekends have

10   been eliminated, right?

11   A    Yes.

12   Q    So that's not going to have any impact on you at all

13   because you never voted on the weekends?

14   A    It does have an impact on me.

15   Q    How so?

16   A    Even though I never used it when I was a student because my

17   schedule did allow me to go and vote on a weekday during

18   business hours where I maybe had an hour or two hours in between

19   classes to do that, I now work during business hours and

20   sometimes even longer than that, and it's a lot more difficult

21   for me to, you know, get down to early vote during that time.

22   Q    We talked a little bit about your major.

23   A    Uh-huh.

24   Q    But do you feel like you're familiar with Wisconsin's

25   voting laws?

RENEE GAGNER - DIRECT

1    A    Yes, I would say so.

2    Q    And how is it that you're familiar with them?

3    A    I became familiar with them primarily through helping other

4    students to vote when I was on campus.

5    Q    And what kinds of activities did you do to help other

6    students to vote?

7    A    So I sort of worked to -- along with some of my peers to

8    educate students about voting, make sure they knew what was on

9    the ballot and when the elections were as well as what they

10   needed at the polls, if anything, and where to go vote.

11   Q    And how did you do that?  Did you just -- did you volunteer

12   somewhere?  How did you do that?

13   A    I did that primarily through the College Democrats in

14   Beloit.

15   Q    And what is the College Democrats?

16   A    It's an organization that, you know, it was at least

17   partially affiliated with the state party and works to support

18   and elect Democratic candidates, but we also did have a focus on

19   just more general voter education, so if we were talking to

20   someone about the election and they were a Republican, we would,

21   you know, still tell them when and where to go vote.

22   Q    Okay.  Would you also register voters as part of the

23   College Democrats?

24   A    Yes.  Some of us were Special Registration Deputies.

25   Q    And when did you -- were you a Special Registration Deputy?

1    A    Yes.

2    Q    And when did you become a Special Registration Deputy?

3    A    I do not exactly recall, but I believe it would have been

4    sometime around the spring of -- actually I'm not sure.  Either

5    in 2011 or 2012.

6    Q    And in what area were you a Special Registration Deputy?

7    A    I was a Special Registration Deputy in the City of Beloit

8    and the City of Milwaukee.

9    Q    And were you a special deputy in your hometown?

10   A    No.

11   Q    And why not?

12   A    So I had initially tried to become a Special Registration

13   Deputy when living in my hometown in 2008, and that was when one

14   could still become a statewide deputy, and at that time I was

15   not 18 so I was not allowed to do it.  And then later on I would

16   have liked to become a Special Registration Deputy for the City

17   of Waukesha, but the clerk really did not provide trainings for

18   people to be able to do that.

19   Q    And you can't be a Special Registration Deputy without the

20   training?

21   A    Yes.

22   Q    And are you currently a Special Registration Deputy?

23   A    No, but I would like to be.

24   Q    And what's preventing you from being one?

25   A    I need to arrange my schedule to attend a training again.

1    Q    Okay.  Now, did you do any other activities when you were

2    in college to help people to vote?

3    A    Well, as a Special Registration Deputy, I did a lot of

4    voter registration.  I also worked with the College Democrats

5    and with other organizations on campus to make sure that

6    students knew where our polling location was, that they knew

7    when the elections were, what was on the ballot, and things of

8    that nature.

9    Q    And how would the College Democrats go about finding

10   students or directing them?

11   A    We would try to reach them in a variety of ways.  So we

12   would hang flyers around campus, and we would use kind of an

13   online bulletin board that we had access to.  We would sometimes

14   just sort of do what's called tabling, so stand outside at a

15   table outside of the cafeteria and talk to students coming in

16   and out or, you know, even talk to students in another location

17   on campus.  And then we would do what's called dorm storming the

18   night before each election where we would put flyers either on

19   or under the doors of all the dorm rooms on campus and then sort

20   of draw chalk arrows toward the polling location to guide

21   students there.

22   Q    Literally chalk on the ground?

23   A    Yes.

24   Q    Okay.  What was your experience when you were working to

25   help students to vote and to register them?

3-P-35

1    A    My experience was that students were definitely interested

2    in registering and voting, but they were kind of confused by the

3    process.  We did have a large number of students who did not

4    grow up in the State of Wisconsin, and obviously voting in, you

5    know, Oregon or even Illinois is going to be different than

6    voting here in Wisconsin.  So it took a lot of work to make sure

7    that they were informed about the process.

8    Q    Okay.  And did you -- were you ever involved in being an

9    observer or a poll watcher?

10   A    I was an observer and kind of led a team of observers in a

11   special election in the summer of 2011.

12   Q    And that was while you were still in school?

13   A    Yes, but that was not in Beloit.  That was in the greater

14   Milwaukee area.

15   Q    Okay.  And why did you do observing?

16   A    I did observing partially because it was just part of the

17   job I was doing at the time, but I think the reason that our

18   organization was doing observing was, for one, just to sort of

19   see how the turnout was looking in some targeted areas to make

20   sure that we were, you know, getting voters out to the polls in

21   those areas and also because we had heard of some concerns,

22   especially with all the changing laws, and wanted to make sure

23   that everybody was being given good information about voting

24   when they went to go vote.

25   Q    Now, you said it was through the job that you had.  What

1    job was that?

2    A    I was working for We Are Wisconsin.

3    Q    Okay.  And what is We Are Wisconsin?

4    A    It's an organization kind of made up of I think various

5    labor unions and sort of other progressive groups who were

6    coming together to work on some of the recall elections in

7    Wisconsin.

8    Q    Okay.  And when -- you talked about problems that you had

9    heard of because of the changing laws.  Can you tell me a little

10   bit more about that?

11   A    I think, and I don't recall exactly, you know, what

12   anecdotes we were told about, but we had heard that there was

13   just more confusion going on because there had been so many

14   changes to the law in such a short period of time and that we

15   wanted to make sure that that confusion was not preventing

16   people from voting.

17   Q    That actually reminds me of a question I should have asked

18   you a little earlier.  When you were working with the students,

19   did you find that they were confused about the -- how to

20   register?

21   A    I think a little bit.  Because we were SRDs, it was easy

22   for us to walk them through that process very directly by

23   actually sitting down and filling out the form with them or, you

24   know, walking them through that form, so I think it would have

25   been much more confusing for them if they did not have access to

1    SRDs.

2    Q    You said you voted at 18, right?

3    A    Yes.

4    Q    And the first time you voted, did you have to show a photo

5    ID?

6    A    No.

7    Q    But at some point that changed, right?

8    A    Yes.

9    Q    And then you had to show a photo ID?

10   A    Yes.

11   Q    How did you feel about that?

12   A    I felt a little frustrated about it, so, you know, even

13   though I do have access to a photo ID because I do have a

14   driver's license, which I know is not the case for everybody,

15   you know, I had previously been able to vote with my signature.

16   And, you know, I filled out a form with my legal information,

17   including my Social Security number, and signed off on that

18   form, and then went and signed off that I was who I was and the

19   state believed me, and I don't see any reason for that to

20   change.

21   Q    But what about that photo ID makes -- it gives more

22   integrity to the system?

23   A    I don't think it really does.  I don't think there was any

24   issue with the integrity of the system before the photo ID law

25   was in place, and I think the most integral part of the

1    integrity of the system is making sure that everyone has access
2    to voting.
3    Q    Okay.  Now, you said that you were an observer.  That was
4    in Milwaukee, right?
5    A    Yes.
6    Q    Okay.  And did you have an opportunity to observe any
7    issues with observers while you were being an observer in
8    Milwaukee?
9    A    So the one issue that we ran into -- I did not witness the
10   full problem.  This is when I was kind of supervising a group of
11   observers, but we had a polling location in sort of a heavily
12   African-American part of Milwaukee way in the northwest corner,
13   and I was called in to sort of assist because at this location
14   there was a person there, I don't know who she was or what
15   organization she was from, but she was kind of standing in the
16   lobby of the building and telling voters that they needed ID,
17   and we wanted to make sure that that did not continue because
18   the voter ID law was not in effect at that time.
19   Q    So what did you do?
20   A    So I talked to the volunteers who were there and made sure
21   that they were speaking to the poll workers at the location to
22   address it, and then I also went over there just to assist them
23   in that, and I think the woman who was there had left -- ended
24   up leaving shortly after I arrived, so I didn't see her
25   interacting with any voters, but I did see her there.

RENEE GAGNER - DIRECT

1    Q    Okay.  Has there ever been a time when you wanted to vote
2    but you were unable to vote?
3    A    Yes.
4    Q    I'm not talking about the time when -- before you were 18.
5    A    So in the spring of 2013, I studied abroad that semester,
6    and I had ordered or, you know, requested an absentee ballot to
7    be sent to my parents' house because I wasn't really sure, you
8    know, what the situation would be like when I got over there.  I
9    don't think I was told my address until I arrived in Austria, so
10   I couldn't really make arrangements before I went over there to
11   have a ballot sent directly to me.  So I did ask my parents to
12   send that to me once it was at their house, and it did not
13   arrive to me until a few days after the election.
14   Q    And how did you feel about that?
15   A    I was a little frustrated.  It was a spring election.  It
16   was, you know, not one of the big, flashy elections, but I still
17   like to make sure that I can vote in every election.
18   Q    And is there anything that you think that could have been
19   in place that might have helped in that situation?
20   A    I think if I had access to vote by e-mail or, you know, in
21   another digital format, that that would have helped me.
22   Q    Okay.  Have you ever used the mail-in absentee ballot?
23   A    Yes.
24   Q    And when did you -- was that the time you just told us
25   about, Austria?

1    A    There were a couple of other times as well.  So I did use

2    it -- so after I first graduated college, I was working a job

3    temporarily in another state, down in Arkansas for about six or

4    seven months, and at that time I did have an absentee ballot

5    mailed to my address down there and did fill that out and sent

6    it back to Wisconsin.  And then in last spring, so the spring of

7    2015, when I moved to Milwaukee from Waukesha, I had not been

8    living in the city for the full 28 days when the election rolled

9    around, so I did need to still vote at my parents' address in

10   Waukesha and did use a mail-in absentee ballot to do that.

11   Q    So the residency requirement change, that impacted you?

12   A    Yes.  If it had stayed at I believe it used to be ten days,

13   I would have been able to vote in Milwaukee.

14   Q    But you were still able to vote, right?

15   A    Yes.

16   Q    And did you have any issues with using the mail-in ballot?

17   A    It took a little bit longer I think than if I had just been

18   able to vote in-person absentee in Milwaukee because I did need

19   to gain access to a printer to actually print the form to

20   request that ballot, and then, you know, take a small amount of

21   extra time to mail that in.  I wouldn't say it was a significant

22   impact but a slight one.

23   Q    And so why don't you use the mail-in ballot all the time?

24   A    I prefer to go in in person and make sure that my ballot

25   gets there, first of all, since I can actually see it being

1    handed to the clerk.  Yeah, so I honestly just prefer that, and

2    it's easier for me to go in in person than to try to print the

3    form and continue to request a ballot each time.

4    Q    So might be obvious because you work for the College of

5    Democrats, but you're a Democrat, right?

6    A    Yes.

7    Q    And you've also done some work, not just voter

8    registration, poll watching, but you've worked for some

9    campaigns, right?

10   A    Yes.

11   Q    Okay.  There's been a change in straight-ticket voting.

12   You understand that, right?

13   A    Uh-huh.

14   Q    And has that had any impact on you in any way?

15   A    I did straight-ticket vote when it was available to me,

16   which I believe was only the fall election in 2010, and I would

17   continue to do that if it was accessible to me.  And I think

18   just beyond me personally, it's much easier when I'm helping a

19   voter who, you know, doesn't read about elections quite as much

20   as I do, when I'm assisting them in sort of preparing to go to

21   the polls, you know, if I can just tell them, you know, if they

22   tell me they want to vote Democrat, I can tell them, that's

23   great; there is a box you can check for that.  That's much

24   easier than having to assist them in making sure that they know

25   all of the elections to look for on what can be a confusing

1    ballot.

2              MS. WILSON:  Okay.  Thank you very much.

3              THE WITNESS:  Uh-huh.

4              THE COURT:  Cross-examination.

5                        CROSS-EXAMINATION

6    BY MR. JOHNSON-KARP:

7    Q    Good afternoon, Miss Gagner.  My name is Gabe Johnson-Karp.

8    You mentioned that it was not a significant impact when you had

9    to mail -- use an absentee by mail; is that correct?

10   A    For me personally, yes.  I do have access to a printer at

11   work, and my employer did allow me to print out that form, but I

12   do understand that for people who don't necessarily have that

13   access, it may be a greater impact to have to either go

14   somewhere to find a printer or pay to use one.

15   Q    But for you not a significant impact?

16   A    No.  I wouldn't say that.

17   Q    Are you aware you can e-mail or fax a request for an

18   absentee ballot?

19   A    I was not aware of that.

20   Q    And are you aware that you can write to your clerk to

21   confirm whether your ballot was received?

22   A    I also was not aware of that actually.  Though I do know

23   that you can access that online.

24   Q    You're aware of the My Vote website?

25   A    Yes.

1    Q    And you can confirm whether your ballot was received?

2    A    Uh-huh.

3    Q    Or whether it was sent to you?

4    A    Yes.

5    Q    Okay.  And you mentioned straight-ticket voting.  The

6    elimination of straight-ticket voting hasn't prevented you from

7    voting, has it?

8    A    No, it hasn't prevented me from voting, but I don't see any

9    reason for it to happen.

10   Q    And you've still been able to vote for the candidates of

11   your choice?

12   A    Yes.

13   Q    You've still been able to locate the candidates of your

14   choice on the ballot?

15   A    Yes.

16   Q    You mentioned being a Special Registration Deputy; is that

17   correct?

18   A    Uh-huh.

19   Q    You are a Special Registration Deputy in Milwaukee right

20   now?

21   A    I am not currently, but I would like to be.

22   Q    Okay.  And you've taken the certification in the past?

23   A    Yes, both in Beloit and Milwaukee.

24   Q    And you've been able to complete that?

25   A    Yes.

1    Q    And you would like to be a deputy in other municipalities?

2    A    I would primarily like to be a deputy in Milwaukee again,

3    but I do in my work travel to different municipalities

4    throughout the state and would like to be deputized in those as

5    well.

6    Q    And you mentioned that the clerk in Waukesha has made it

7    difficult to become a Special Registration Deputy; is that

8    correct?

9    A    Yes.  I don't believe there are any Special Registration

10   Deputy trainings offered in the City of Waukesha, at least not

11   when I lived there.

12   Q    Other than Waukesha, is anything preventing you from

13   becoming a Special Registration Deputy for another municipality?

14   A    I think time is.  You know, kind of depends on how many

15   municipalities I'm looking to be a Special Registration Deputy

16   in, but it does take much more time for me to go to each

17   municipality, find a training that works with my work schedule,

18   and attend that training versus just being deputized for the

19   whole state.

20   Q    But it's your time, correct?  Nobody is preventing you

21   from -- nobody has taken any steps to prevent you from being a

22   Special Registration Deputy?

23   A    Except making it more difficult with my schedule, yes.

24   Q    You mentioned you have done work registering college

25   students; is that correct?

1    A    Yes.

2    Q    And that was before you graduated in 2014?

3    A    Yes.

4    Q    And during your time in college, the voter ID law was only

5    in effect for one election; is that correct?

6    A    I believe so.

7    Q    That would have been the February 2012 election?

8    A    Yes, that sounds right.

9    Q    And other than that election, students weren't required to

10   show an ID to vote?

11   A    No.  Though I do remember, because the law was kind of

12   going back and forth whether it was in effect or not, that we

13   were dealing with helping students to get IDs in case they would

14   need them for future elections.

15   Q    But during that period they weren't required to show an ID

16   other than the February 2012?

17   A    I believe that's correct.

18   Q    Okay.  And you believe that the voter ID requirement

19   imposes one obstacle too many for college students?

20   A    Yes, I do.

21   Q    Are you aware of the amount of time that college students

22   on average spend on social media?

23   A    I couldn't give you a number, no.

24   Q    You said you do have a valid Act 23-compliant ID, correct?

25   A    Yes, I have a driver's license.

1    Q    Do you have a passport?

2    A    I do.

3    Q    Any other compliant IDs?

4    A    Not that I am aware of.

5    Q    And you are registered in Milwaukee?

6    A    Yes.

7    Q    Just briefly like to discuss that instance I think you

8    mentioned on the north side of Milwaukee?

9    A    Uh-huh.

10   Q    Somebody was telling people that an ID was required when it

11   wasn't required?

12   A    Yes.

13   Q    Do you recall which election that was?

14   A    That was the 8th Senate District recall election which was

15   in the summer of 2011.  It was a special election.

16   Q    Okay.  And as far as you know, the person telling people

17   that they needed an ID wasn't a member of the Government

18   Accountability Board, was it?

19   A    No.

20   Q    As far as you know, it wasn't a state employee?

21   A    As far as I'm aware, it was not.

22   Q    As far as you know, it was a private citizen?

23   A    As far as I'm aware, yes.

24        MR. JOHNSON-KARP:  No further questions.  Thank you.

25        THE COURT:  Any redirect?

1       MS. WILSON:  No, Your Honor.

2       THE COURT:  Thank you, Ms. Gagner.

3       THE WITNESS:  Thank you.

4    (Witness excused at 2:35 p.m.)

5       MR. SPIVA:  Your Honor, our next witness is Carrie

6    Scherpelz.

7          **CARRIE SCHERPELZ, PLAINTIFFS' WITNESS, SWORN,**

8                   DIRECT EXAMINATION

9    BY MR. MARTIN:

10   Q    Good afternoon, Miss Scherpelz.

11   A    Hello.

12   Q    Would you please state your name and spell it for the

13   record.

14   A    Carrie Scherpelz, C-A-R-R-I-E S-C-H-E-R-P-E-L-Z.

15   Q    Thank you.  Ms. Scherpelz, could you tell me where you were

16   born and where you grew up?

17   A    I grew up in Oak Park, Illinois, and grew up in Illinois,

18   moved to Wisconsin in 1978.

19   Q    Okay.  And where did you go to college?

20   A    University of Illinois.

21   Q    Okay.  And what do you do for a living?

22   A    I'm a freelance marketing communication expert.

23   Q    Okay.

24   A    I work from home.

25   Q    Okay.  And do you also work and volunteer your time on

                    CARRIE SCHERPELZ - DIRECT

1    election voting-related activities?

2    A    Yes.

3    Q    And how do you do that?

4    A    I have worked as a Special Registration Deputy.  I have

5    worked at the city clerk's office as a volunteer during early

6    absentee voting, and I began working in 2013 at my own polling

7    place as a poll worker.

8    Q    Okay.  And let's talk a bit about your work as a Special

9    Registration Deputy.  When did you start doing that work?

10   A    It was sometime in early 2012.

11   Q    Okay.  And was that a statewide registration deputy or was

12   that a city specific?

13   A    So whatever date it started, I was not able -- the

14   opportunity to be statewide no longer existed.  I don't know

15   exactly when that started.  So I was only deputized for the City

16   of Madison.

17   Q    Okay.  And can you describe your work as a registration

18   deputy for Madison?

19   A    Yeah.  I would sit at a table outside of a local grocery

20   store where the grocery allowed us to have a table for actually

21   many weeks -- days during the week before an election, and many

22   people considered that a real convenience and would say, oh, I

23   need to do this and stop by.  And then I've also been on the

24   University of Wisconsin campus in Madison just with a clipboard

25   asking students if they were registered and would like to

1    register.

2    Q    Okay.  And describe me the process of actually registering

3    someone when you were a registration deputy.

4    A    Okay.  When I first started, I would have my clipboard,

5    piece of paper, and the individual could just either give me the

6    last four digits of their Social Security number if they did not

7    have a Wisconsin driver's license or they could fill in their

8    driver's license number, and they did not even need to have that

9    if it was a memorized number.  And then they would fill out

10   either their change of address or their new address -- their

11   only address if they were a new voter, check off the box that

12   they were a citizen, and, you know, et cetera.  Then I would

13   sign it.  They would sign it.  And I could do this up to 20 days

14   before an election, and it would go to the city clerk's office

15   for confirming all of that information.

16   Q    And then how would the city clerk's office confirm that

17   information?

18   A    They would use their database and then send a postcard to

19   that address, and it was first class, so if it didn't bounce

20   back, my understanding was that would confirm the address.

21   Q    Okay.  Did you ever hear any complaints about the

22   registrations that you submitted?

23   A    No.

24   Q    And how many people would you say that you registered to

25   vote as a Special Registration Deputy?

CARRIE SCHERPELZ - DIRECT

1    A    Probably 50 to 75 people.

2    Q    Okay.  And for how long were you a Special Registration

3    Deputy?

4    A    I'm thinking it was a year and a half to two years that I

5    was actively doing it.

6    Q    And why did you stop?

7    A    Well, when it became necessary for a person to have

8    documentation with them, I just didn't think I would find many

9    people who had that.  I'm kind of old school, so I don't have

10   any of my bills or lease or any of the requested documentation,

11   and I don't have anything on my phone because I don't do that

12   kind of work on my phone.

13   Q    Okay.  And you're referring to the change in -- the 2014

14   change in the law --

15   A    Yeah.  Then they would have to prove their residence to me

16   by showing me this documentation, and I didn't really understand

17   why because, as I understood it, that process of -- the city

18   clerk was taking care of that and could ascertain whether

19   someone actually lived at that address, and I didn't know there

20   was a problem with it.

21   Q    Okay.  And you mentioned that you didn't do that type of

22   work on your phone, and you mean --

23   A    I still don't.  Yeah, I just don't handle any bills,

24   banking, et cetera.  I just do phone calls, e-mail, and texts.

25   Q    Right.  And do you think many of the voters or some of the

CARRIE SCHERPELZ - DIRECT

1    voters that you have interacted with as a registration deputy

2    would be in a similar situation?

3    A    Now that I have worked to register people at the polls, I

4    realize that most young people have something on their phone.

5    It's not so much the case that someone in my age range has

6    showed me something on their phone.

7    Q    Okay.

8    A    Yeah.

9    Q    And so people are still continuing to have to meet these

10   proof of residency requirements now but at the polling place

11   where you worked that you mentioned earlier?

12   A    Yeah, yeah.

13   Q    And we'll talk about that in a little bit.  Can you

14   describe some of the forms of documentation that the change in

15   the law required?

16   A    Well, it just made a list of specific forms, and we

17   actually designate them with a letter, so "B" in general refers

18   to banks.  "U" is utilities of any kind including Charter, MG&E,

19   and I'm not going to go through all the other ones, but "R"

20   would be for lease, residential lease, and we can take pay

21   stubs, and there's a different initial for each one.

22   Q    Okay.

23   A    And I should mention that in my work as an SRD, it just

24   went from needing none of those things, and the same thing with

25   registration at the polls, to first putting those initials down

1    and then later having to add the entity.  So not just "U" but

2    MG&E, and then later adding the digits of their account number.

3    Q    Okay.  And now you're describing things that people -- new

4    requirements that people have to do at the polls on election

5    day?

6    A    Yeah.  I just want people to realize that during these

7    several years, I saw a big change.

8    Q    Okay.  Describe some of those changes and what you've

9    observed as a poll worker.  Actually, let me back up a little

10   bit and tell me about your background as a poll worker, and then

11   we'll talk about those changes.

12   A    Okay.  So I guess, first of all, would be maybe why I

13   started doing it.  It's just I've always been a regular voter

14   since I was 18.  I think everyone's vote is important, and every

15   voter matters, and so that's why I decided to volunteer.  I had

16   a little more time.  I've also really liked election day because

17   it's been a community event.  I lived at the same address for 25

18   years, walked to the same polling place.  Then I moved and

19   decided that I would get involved at my polling place and be a

20   poll worker there, so that's what I did.

21   Q    And which polling place is this?

22   A    I work at Capitol Lakes Retirement Center in downtown

23   Madison.

24   Q    And can you describe the type of voters that you service at

25   that center?

1   A   Yeah.  It's a wide range because we get a lot of university

2   students, then we get the people who live in that retirement

3   center from nursing care to assisted living to independent

4   living, and then in between there are a lot of condo and

5   apartment dwellers, young people and retired people.

6   Q   Okay.  So students and elderly people?

7   A   Yeah.  If you're calling me elderly.

8   Q   No, I meant --

9   A   Not in the nursing home yet.

10  Q   I apologize.  I did not mean to insinuate that at all.  A

11  moment ago you were describing the changes in the amount of

12  information that you as a poll worker are required to take from

13  a voter when they register or update their registration at the

14  polls?

15  A   Right.

16  Q   Can you describe those changes in a little more detail to

17  me and what your observations about them are?

18  A   Okay.  First of all, I tend to work at the registration

19  table in my poll worker role.  It seemed to boil down to because

20  it's a more complex task than the other tasks on voting day, and

21  so I have kind of got a niche in doing that, and so, as I said,

22  the first time I started working there we just had to write the

23  "U," "V," et cetera, on the forms.

24  Q   I see.

25  A   I started working as a poll worker at the point when that

1    was required.

2    Q    And that was in --

3    A    I can't tell you exactly what year it was, but it's all

4    since -- probably 2013.  I've worked five elections at this

5    polling place, and I have not yet worked a presidential election

6    just by the way.  So it was definitely after 2012.

7    Q    Okay.

8    A    So there's a line of people at our particular polling place

9    the whole time, so it's a very intense process.  I do it every

10   minute practically when I'm there.

11   Q    Okay.

12   A    And so we have people fill out a form on a clipboard and

13   then come to us.  We check their form to be sure everything is

14   all right, and then we have to ask them for their proof of

15   address, and they -- I mentioned the different options for that.

16   We have a spot on the form to write down the initial and then,

17   as I said, at one election it changed so that we began writing

18   down the actual entity and then had to write down at another

19   election -- again, this is out of the five I worked in, and I

20   can't tell you which one -- but the last two at least I have

21   been writing down people's -- the last four digits of their

22   account numbers.

23   Q    So their account numbers on their bank accounts or their

24   utility bills or something.  And in your experience as a poll

25   worker and someone registering voters, has that increased your

1    confidence at all in the accuracy or the truthfulness of these

2    registrations?

3    A    No.

4    Q    Okay.

5    A    I didn't really have a worry about it.

6    Q    Okay.  And let's talk about the account numbers for a

7    moment.  So it's just a part of an account number if you use a

8    bank account --

9    A    Uh-huh.

10   Q    -- or a utility statement.  Do you know whether anyone ever

11   calls the bank or the utility company to confirm that this

12   document is truthful?

13   A    I don't know that personally, but I felt uneasy about

14   collecting the information, and I thought a voter might ask me

15   sometime about it, and so I did call my own utility company,

16   bank, and internet service provider -- I'm sorry, I didn't call

17   them, I e-mailed them, and each one of them responded almost

18   immediately.  My question was, poll workers are asking for this

19   information.  If you were to be called by the city clerk's

20   office to confirm my identity, would you give them my identity

21   based on these digits and tell them that I was at that bank?

22   And they all --

23              MR. MURPHY:  Object as hearsay, Your Honor.

24              THE COURT:  I'll overrule it.  Go ahead.

25              THE WITNESS:  Okay.  They just responded no, that they

CARRIE SCHERPELZ - DIRECT

1    would need a court order to do that.

2         MR. MARTIN:  Okay.

3         THE WITNESS:  And that my privacy was protected.

4    BY MR. MARTIN:

5    Q    Okay.  So in administering these requirements, has it

6    impacted the amount of time it takes to register voters at your

7    polling location?

8    A    It has.

9    Q    Can you describe that?

10   A    As I said, in our location I'm busy the whole time

11   registering people, so there's always a line and -- or almost

12   always a line I would say, and so every few minutes matters, and

13   so just having to get those account numbers, write down the

14   entity, it just takes a little time.  Even on a lease it's

15   difficult because you kind of have to read down and find where

16   the actual leasing company is on it because they're all

17   different, and there's a different line that they're on.  So

18   it's just -- it may not seem like much, but it adds up when

19   you've got a long line of people.

20   Q    Okay.  And how would you compare the length of time that

21   this process takes now to when you first started?

22   A    As I said, probably a minute or two longer.

23   Q    For each voter?

24   A    Yeah.  And, again, it varies on how quick they are to get

25   out their information because on a screen it can take quite a

3-P-57

1    long time for them to pull it up, so it's kind of hard to

2    compare apples to apples.

3    Q    Right.  And have you encountered voters who have been

4    unable to provide that documentary proof of residency?

5    A    I've had voters who could not provide it without helping --

6    us helping them by having a laptop there for them to pull

7    something up.

8    Q    Okay.

9    A    Because they didn't have it in their possession or on their

10   phone.

11   Q    And do you know whether every polling location has a laptop

12   like that?

13   A    I don't --

14            MR. MURPHY:  Object to foundation.

15            THE COURT:  It's a question about whether she knows.

16            THE WITNESS:  I do not know.

17   BY MR. MARTIN:

18   Q    Okay.  And since you started working as a poll worker, the

19   voter ID law has also come into effect; is that correct?

20   A    Yes.

21   Q    And how many elections have you participated in or worked

22   as a poll worker in with the voter ID law in effect?

23   A    Two.  I missed the earliest one, and I have done this past

24   February and April.

25   Q    Okay.  Can you describe your observations in those

CARRIE SCHERPELZ - DIRECT

1    elections with the voter ID law?

2    A    I think that in general at my polling place people seem to

3    have gotten the word that they needed an ID, and it's slowed

4    down the process, and there was some confusion with the polling

5    staff, getting it going.  We staffed up at ours by a third.

6    Q    Okay.

7    A    So we had additional people, but a lot of them had little

8    experience.

9    Q    Right.

10   A    And so I wouldn't say it was like perfectly smooth, but

11   February was great because it was a slow -- very slow election.

12   Q    Right.

13   A    So I had one problem where I could not allow someone to

14   vote.

15   Q    And we'll talk about that in a moment.

16   A    Okay.

17   Q    But let's go back to your comment about the poll workers

18   increasing by a third.  And how many additional people is that?

19   A    In our polling place I think it was about four extra

20   people.

21   Q    Okay.

22   A    And in the City of Madison it was many hundreds that -- I

23   know because I was helping to round up volunteers because of an

24   e-mail the city clerk's office sent out about how many

25   additional people they would need.

1    Q    Okay.  And how many polling locations are there in Madison?

2    A    87.

3    Q    Okay.  And you participated in a process of signing up

4    several hundred, you said, additional poll workers?

5    A    I sent out -- I mean, not if you're implying I signed up

6    several hundred, but I think there were 600, if I remember

7    right, that we needed, and so they just asked us to e-mail our

8    friends.

9    Q    Okay.  Let's talk about the person in February who you had

10   to turn away you said.

11   A    Uh-huh.

12   Q    Can you describe that?

13   A    Yeah.  It was one of our registered voters, so I was

14   standing at the poll book, and his name was in there, and he

15   showed me his Wisconsin -- I mean his Minnesota driver's

16   license, which was a current license with his likeness on the

17   license, and he had no other acceptable ID.  We offered him a

18   provisional ballot, and he did not take that.  But I could see

19   why he was legitimately confused because there were people with

20   passports that didn't indicate what state they were from, and

21   people can also show Wisconsin driver's license as a proof of

22   identity even if the address isn't correct.

23   Q    Right.

24   A    And so, I mean, there's been a lot of education about the

25   fact that if you could get a prescription drug and drive, you

1    can vote, and I think he just thought, you know --

2    Q    He can do those things so --

3    A    Yeah, so he could vote.  So I could really see how he got

4    confused.

5    Q    Right.  And you mentioned that people were using Wisconsin

6    addresses [verbatim] that don't have a current address, and

7    that's because the ID law isn't there to confirm residency,

8    right?  That's the proof of registration requirements, correct?

9    A    Yeah.

10   Q    And have you experienced fellow poll workers who have had a

11   hard time keeping track of the difference between the proof of

12   residency requirements and the ID requirements?

13   A    Yes.

14   Q    Can you talk a little bit about that?

15   A    I think especially if you register people, there was

16   definitely some confusion at the first election among the poll

17   workers about whether that -- the address had to be current on

18   the driver's license because it's a different standard for each.

19   For registration proof of address, it must be current, but not

20   for purposes of identity.

21   Q    And have you similarly observed voters who have a hard time

22   keeping those two distinct?

23   A    Yes.  Some people I have had to say, no, your address does

24   not have to be current.

25   Q    Okay.  And have there been any other incidents maybe in the

1    April election that you observed where you had to turn someone

2    away because of the ID law?

3    A    Yes.  In that election -- and I should mention I feel

4    really bad about these, especially because they were both

5    registered, legitimate voters, and so this man also -- a young

6    man was in our poll book, but then when it came time to show his

7    ID, he was a student, and he had a student ID and his proof of

8    enrollment, but he didn't realize that the ID he was using was

9    not a student voter ID.

10   Q    Right.

11   A    And so, again, it had a picture of him.  It looked just

12   like him.  We knew he was one of our voters.  He was in our poll

13   book.  And so I felt really bad about turning him away, and,

14   again, he did not want a provisional ballot.

15   Q    He did not.  Do you have an opinion about why either one of

16   these individuals did not want a provisional ballot?

17   A    I think because we explained to them what it would involve,

18   that they would have to come up with the correct ID within three

19   days and then get it to the city clerk's office in order to have

20   their vote be counted.  Apparently -- I mean, I can only guess,

21   but it sounded like they didn't think they'd be able to do that.

22   Q    Okay.  Fair enough.  Now, you were -- felt compelled to

23   write some articles about your experience as a poll worker,

24   correct?

25   A    I did.

1  Q   Can you describe those articles and the reasons that you

2  decided to write them?

3  A   Well, the first article I wrote was called "Open Letter

4  from a Poll Worker to the Student I Turned Away Yesterday," and

5  it was published in Madison the day after the February election,

6  and it was about the situation I described with the young man,

7  and I tried to speak as a nonpartisan poll worker and just say,

8  I feel bad about this.  I know it's confusing from the two

9  aspects I mentioned, a passport would work, noncurrent license,

10 Wisconsin ID would work, and I said I know that was you.  I know

11 you weren't impersonating a voter.  And then I listed the ways

12 he could get an ID and what they were and for future reference

13 to tell other people.

14 Q   You felt the need to educate the public?

15 A   Yeah, yeah.

16 Q   And do you feel like the public had been adequately

17 educated up to that point?

18 A   I don't think so, and I actually am just making my way

19 along as a poll worker.  We were getting changes even by e-mail

20 down to the April election.  One of the new things in our

21 training was that people with a citation or a rescinded --

22 temporarily rescinded license can vote without a photo ID if

23 they showed those pieces -- those documents.

24 Q   And by citation you mean like a speeding ticket?

25 A   A speeding ticket, yeah, and so I just thought, well, this

CARRIE SCHERPELZ - DIRECT

1    is weird and confusing.  There must have been some people who

2    came up against that.

3    Q    When did you learn about that requirement?

4    A    In the training for the April election, so it had happened

5    between February and April, and then the thing we got by e-mail

6    a couple of days before had to do with the process of checking

7    people in and the ability to take a veteran's ID as a proof of

8    identity.

9    Q    And just to sort of summarize what you're saying is that

10   the laws were changing up until the eve of the election; that's

11   right?

12   A    Yeah.  And that actually gets me to the point of the second

13   article.  I don't know if you had a question before that because

14   I didn't quite finish.  The second one was called "I'm a Poll

15   Worker and I've Come to Dread My Job," and it was because I

16   realized on the eve of the election that I was just -- I knew it

17   would be a very busy election compared to February, and I work

18   in a very high-density polling place to begin with, so we can

19   have just many, many people coming through there.

20   Q    Let me stop you right there real quick.  How did you know

21   it was going to be a high-intensity election?

22   A    I knew because they were in a primary that many Republicans

23   and many Democrats had strong motivation, strong feelings, so it

24   was predicted that it would be a high turnout.

25   Q    Right.  Go on.

CARRIE SCHERPELZ - DIRECT

1    A    So we were prepared for that and staffed up for it, but I

2    realized that I, first of all, wanted to serve voters well, and

3    I didn't want them to get a sense of confusion because I just

4    think that's really damaging to democracy if they feel like

5    their poll workers don't know because I feel like we're some of

6    the more trusted people out there, and so I wanted to be sure I

7    understood everything well and didn't look confused or lead them

8    astray.

9         And then I just kind of have two feelings that are more

10   emotional, just that I felt intrusive more and more about asking

11   for the account information.  It just kind of nagged at me.  And

12   the second thing was just that I've always felt like it was a

13   very trusting atmosphere at the polls, and it seemed to be

14   growing more trusting -- you know, less trusting between poll

15   workers and voters, like we were starting out with a distrust

16   rather than trust even though I think everyone tries to be

17   really encouraging to voters and helpful to voters.  There's

18   that underlying thing, and especially for college students

19   because I felt like they had an additional thing they had to do

20   by showing their proof of enrollment.

21   Q    Right.

22   A    That seemed especially untrusting.

23   Q    Right.

24   A    And one last thing, because I work in a retirement

25   community, in the first election in February there was a man who

1    his license was close to being expiring, and he would have had

2    no reason -- he stopped driving years ago, using a walker and

3    stuff, and I thought, oh, my gosh, I hope I don't run into

4    somebody who lives here, and people around it all know him, but

5    I have to turn him away from voting when he's been voting all

6    these years.  I mean, I just -- I was really worried about that.

7    So there were just things like that.  I worried how the new

8    people would do and things like that.

9    Q    Right.  And so you said that you felt that there was a

10   dynamic of -- the default position was one of distrust rather

11   than trust now?

12   A    Yeah.

13   Q    And that's, from your point of view as a poll worker, as a

14   result of the state's laws, right?

15   A    Uh-huh.

16   Q    And in your opinion, are you more confident in the

17   integrity of the election system now because of these laws?

18   A    No.

19   Q    Are you less confident?

20   A    I think I am because to me the integrity means that every

21   eligible voter gets to vote and have their vote counted.

22   Q    Right.  And the gentleman you mentioned whose ID was about

23   to expire and who lived in Capitol Lakes, I take it, that's a

24   situation where everyone there knows him.  There's no doubt

25   about where he lives, but --

1    A    Uh-huh, right.

2    Q    -- if he failed to meet this residency requirement, you

3    would have to turn him away?

4    A    I even know he lives there.

5    Q    Right, right.  I don't know if you had started working

6    before this option had been eliminated, but were you aware that

7    you used to be able to corroborate the residency and identity of

8    a person at the polls?

9    A    I was aware, but that hasn't been an option while I have

10   been working.

11   Q    Okay.

12   A    It would have given peace of mind if I knew someone could

13   do that.

14        MR. MARTIN:  Right.  Okay.  I think that is it for me,

15   Your Honor.

16        THE COURT:  Okay.  Before we turn you over for

17   cross-examination, Capitol Lakes Retirement Center, is that

18   right around the corner from the courthouse here?

19        THE WITNESS:  It is.

20        THE COURT:  Okay.  Cross-examination.

21                   CROSS-EXAMINATION

22   BY MR. MURPHY:

23   Q    Good afternoon, Ms. Scherpelz.  I'm Mike Murphy.  We talked

24   a couple times on the phone.

25   A    Yeah.

1    Q    So hello.

2    A    Hello.

3    Q    So I want to make sure I have the time line correct here.

4    You talked about being a registration deputy and doing work at

5    grocery stores.  Do I have it correct that you have not done

6    that since the changes in the law that you discussed?

7    A    I have not.

8    Q    So you don't have a comparison personally for before and

9    after?

10   A    I don't.

11   Q    Okay.  And you now work at a polling place, and you do some

12   registration work, but you did not do that before the laws

13   changed, the document laws changed, right?

14   A    Not when it was just give us your last four digits and fill

15   in your driver's license, but I did it as the law changed so

16   that we had to include the entity that we gave the initials for

17   and then include the last four digits, so those were incremental

18   changes.

19   Q    Okay.  This might just be a matter of clarification, but

20   you did not work at polling places before there was a

21   requirement to show the documents, just since when the

22   requirements of what you have written down is different?

23   A    Right, right.

24   Q    Okay.  So you can't make a comparison to before and after

25   showing documents?

1    A    I can't.

2    Q    Okay.  You discussed two people who came to vote and didn't

3    have a qualifying ID, right?

4    A    Uh-huh.

5    Q    One was a student who didn't have a qualifying student ID.

6    Do you know what's involved in getting a qualifying student ID

7    here in Madison?

8    A    Yes, I do.

9    Q    Okay.

10   A    I'm actually a senior guest auditor, so I have a Wiscard

11   which wouldn't allow me to vote, but if I wanted to get a

12   student ID, I would go to the same place where you get your

13   Wiscard, stand in line, have my picture taken, and then they

14   would give me a second card.

15   Q    Okay.  So you're familiar with the Union South location

16   where that can be done?

17   A    Uh-huh.

18   Q    And the Gordon Commons location where that can be done,

19   expanded during election times?

20   A    Yes.

21   Q    And that person who came to vote in April did not want a

22   provisional ballot and left saying he was going to try to get a

23   qualifying ID, right?

24   A    Right.

25   Q    And you don't know if he came back or not?

1    A    I don't because I work half days, so I don't know.

2    Q    So you just can't speak to whether or not he was able to

3    vote that day?

4    A    I can't.

5    Q    And the other person with the out-of-state driver's

6    license, he or she also said that they were going to come back,

7    get a qualifying ID and come back, right, or look for one?

8    A    That one I don't think did.  The first one did.

9    Q    Okay.

10   A    Yeah.

11           THE COURT:  The student came back.

12           THE WITNESS:  He said he would try to.

13           THE COURT:  The student said he would try to come back

14   with the student voting ID.

15           THE WITNESS:  He had two possible options.  One was to

16   go over to Union South or another location to get the proper ID.

17   The second one, he could have had a passport, but he believed

18   his had expired.  You can't use one that's more than two years

19   expired.

20           THE COURT:  Okay.

21   BY MR. MURPHY:

22   Q    But you don't know whether he came back with a passport

23   that day?

24   A    I don't.  I was not there.

25           MR. MURPHY:  That's all.

CARRIE SCHERPELZ - CROSS

1           THE COURT:  Any redirect?

2           MR. MARTIN:  Nothing from me, Your Honor.

3           THE COURT:  Thank you, Ms. Scherpelz.

4       (Witness excused at 3:08 p.m.)

5           THE COURT:  Next up.  Just to let you know what my

6   thinking is on scheduling here:  When you get to the 3:45 to

7   4:00 neighborhood, we'll take our afternoon break and then come

8   back for the closing session.

9           MR. SPIVA:  Okay, great.

10          THE COURT:  Wherever you have a natural break in that

11  range.

12          MR. SPIVA:  Sounds good.  Your Honor, we call

13  Dr. Kenneth Mayer.

14          **KENNETH MAYER, PLAINTIFFS' WITNESS, SWORN,**

15                      DIRECT EXAMINATION

16  BY MR. SPIVA:

17  Q    Good afternoon, Dr. Mayer.

18  A    Good afternoon.

19          THE COURT:  Do you have a copy of Dr. Mayer's report?

20          MR. SPIVA:  I do.

21          THE COURT:  Could you hand those out?

22          MR. SPIVA:  Will do.  And these are on our exhibit

23  list, but for some reason the copies I have didn't have the

24  exhibit numbers, but I wrote them on.

25          THE COURT:  Okay.

1    BY MR SPIVA:

2    Q     So Dr. Mayer, what is your area of expertise?

3    A     Generally in political science, the study of American

4    politics with specialties in election administration,

5    presidential power, elections generally, election law.

6    Q     Okay.  Let me ask you to turn in your initial report,

7    plaintiffs' exhibit 38, to your CV which appears on PX38, begins

8    on page 50.  It's Exhibit 1 to your initial report.

9    A     So my copy of the report does not have my CV.

10   Q     Okay.  Why don't we put it up on the monitor.  And I don't

11   know if we can make that a little easier to see.  That's just

12   the first page --

13        THE COURT:  Just do it by chunk, and also I'll tell you

14   to give me the 10,000-foot view.

15        MR. SPIVA:  Yeah, absolutely.  That was my intent.

16        THE COURT:  You're not going to need to qualify him as

17   an expert here.  I'm going to hear his testimony.  Just give me

18   the highlights of his qualifications, and we can be done with

19   that.  Don't need to belabor it.

20        MR. SPIVA:  Okay.

21   BY MR. SPIVA:

22   Q     So, Dr. Mayer, where are you employed?

23   A     I'm employed in the Political Science Department at the

24   University of Wisconsin-Madison.

25   Q     And how long have you been there?

1    A    Since 1989.

2    Q    What do you teach?

3    A    I teach courses in American politics, presidency, campaign

4    finance, graduate courses on the presidency and American

5    politics.  I have taught courses on election law, comparative

6    electoral systems, and the odd special topic seminar from time

7    to time.

8    Q    Have you written any peer-reviewed articles or books

9    relevant to the topics that you're going to be testifying on

10   today?

11   A    Quite a few.

12   Q    Okay.  And I take it you got your Ph.D. from Yale

13   University in 1988 in political science?

14   A    That's correct.

15   Q    And you have an M.A. from Yale University in 1987 also in

16   political science?

17   A    That's correct.

18   Q    And your undergraduate degree is from the University of

19   California-San Diego also in political science?

20   A    Yes.

21   Q    Okay.  And what did we ask you to do in this case?

22   A    I was asked to evaluate the effects of the changes in

23   registration and election administration practices since 2011

24   primarily by analyzing the Statewide Voter Registration System

25   and the Department of Transportation list of driver's licenses

1    and IDs to look at the individual-level effects on the

2    probability that a registrant would cast a ballot.

3    Q    Let me ask you, if we could put up page 4 of Dr. Mayer's

4    initial report, PX38.  You can turn in your hard copy.  Can you

5    just at first at a kind of a high level give us a summary of

6    what you concluded along the lines of what you laid out here on

7    page 4 of your report.  Your Honor, I think this PX38 I believe

8    is not objected to.  Correct me if I'm --

9              THE COURT:  Is it?

10             MR. JOHNSON-KARP:  No objection.

11             THE COURT:  Okay.  Very good.  I'll admit it.

12             MR. SPIVA:  Thank you.

13             THE WITNESS:  The primary conclusion that I reached was

14   that the probability that an individual -- individuals voted in

15   2014 went down among certain key groups, particularly

16   African-Americans, Latinos, individuals who resided in a student

17   ward, and among people who did not show up as possessing a

18   driver's license or Wisconsin state ID, and I found that most of

19   those effects were either entirely absent or much smaller in the

20   2010 election before any of these restrictions had gone into

21   effect.

22        I did some ancillary analysis that looked at the number of

23   individuals who registered on the weekend before -- the late

24   weekend registration in the weekend before elections and through

25   2006 and 2010, which was the time period that the SVRS was

1    started in the last election where you could do that.  I

2    subsequently also reviewed some materials relating to the ID

3    petition process and the issuance and status of provisional

4    ballots in the April 2016 primary.

5    BY MR. SPIVA:

6    Q    And what did you conclude with respect to the effects of

7    the photo ID requirement on minorities and young voters?

8    A    There are two pieces to that.  The one piece of information

9    is that the nonpossession rate for driver's licenses and photo

10   IDs, which I believe was among all registrants, was 8.4 percent.

11   That nonpossession rate was higher for African-Americans and

12   Latinos and significantly higher among people who resided in

13   student wards.  If you looked at the individual-level analysis

14   that I did, that each of those characteristics, being

15   African-American, being Latino, residing in a student ward, all

16   had a significant depressive effect on the probability that a

17   registrant cast a ballot in 2014.

18   Q    All right.  And we're going to look at each of those in

19   some detail.  But before we do that, can you describe the

20   sources that you drew upon and your methodology that you used in

21   reaching your conclusion?

22   A    The primary source material that I used was a copy of the

23   Statewide Voter Registration System, which is the statewide list

24   of all registered voters, and that was pulled in September of

25   2015.  At about the same time I believe I received the database

1    from the Department of Transportation listing everyone who

2    possessed a driver's license or state ID.  The primary method

3    that I used was to try to match those to databases.  That gave

4    me information on the race of individuals who did match because

5    self-identified races data, that's collected by the Department

6    of Transportation.  It also for people who did not match, I used

7    race probability data from a national voting technologies firm

8    called Catalist.

9    Q    Can you explain that?

10   A    Catalist is a national voter data company that provides

11   primarily information to campaigns and other organizations that

12   they use for voter contact, and one of the things that they do

13   is provide estimates of the rates of registered voters, which in

14   a state like Wisconsin, which is not a Section 5 or former

15   Section 5 state, does not collect race information as part of

16   the voter registration process, and it provides an estimate of

17   the probability -- it provides an estimate of the racial

18   identification of registered voters, at least is how I use them.

19   They use a combination of demographic data, location, name,

20   census block, date of birth.  It's validated through a number of

21   processes, and it provides, based on some tests that I

22   conducted, a very high degree of confidence that they get the

23   racial identification correct.

24   Q    What is it about -- what gives you confidence in their

25   data?

1    A    I received probability estimates of the race of everybody

2    in the SVRS.

3          THE COURT:  From Catalist.

4          THE WITNESS:  From Catalist.  I also at the conclusion

5    of the matching process, I had successfully matched about 91.6

6    percent of the registrants matched up to a unique record in the

7    Department of Transportation.  For each one of those

8    individuals, I had both the Catalist estimate of their race as

9    well as their self-identified race, which they themselves had

10   entered when they applied for a driver's license or state ID,

11   and they matched about 96 percent of the time, which I took to

12   be a very high degree of confidence that they got it right.

13   BY MR. SPIVA:

14   Q    So Catalist got it right 96 percent of the time?

15   A    That's correct.

16   Q    Okay.

17          THE COURT:  Is there some reason to think that the 8.4

18   percent of the voter records that you didn't have matches for

19   from the Wisconsin driver's license database were particularly

20   racially ambiguous records?

21          THE WITNESS:  I don't, and the reason is that the -- to

22   the degree that Catalist made errors, and it was a non-zero

23   error rate -- it was small -- about 90 percent of the errors

24   amounted to misclassifying someone who was a minority as white.

25   So I was not overidentifying members of minority populations.

1    What I was doing or what Catalist was doing was mistakenly

2    classifying minority registrants as white, and what that has the

3    effect of doing is it actually biases all of my estimates

4    towards zero.  So the estimates that I produce are actually

5    smaller than what they would be if I had absolute accuracy in

6    the identification, but the numbers of inaccurate

7    identifications was so small that in my view it would not have

8    had a material effect on any of my conclusions.

9          THE COURT:  Because you already had 91.6 match from the

10   driver's license data, and then that meant that 8.4 percent of

11   the time you had to take an estimate based on the Catalist data.

12         THE WITNESS:  That's correct.  And that accuracy rate

13   of 96 percent carries across, and there's no reason to think

14   that it wouldn't.  I'm looking at an error rate of, you know, on

15   the order of .7 percent, which is not material.

16         THE COURT:  Okay.

17   BY MR. SPIVA:

18   Q    Let me ask you to turn to table 3 which is on page 19 of

19   your initial report, plaintiffs' exhibit 38.  And if you could

20   just explain what table 3 shows us.

21   A    So there's quite a bit of processing that went on to get

22   this table.

23   Q    And you can obviously explain that, please, in your answer.

24   A    So do you want me to describe the matching process?

25   Q    Yeah, to some extent.  I think at least briefly, yeah.

1    A    So I used a technique known as exact matching where you're

2    looking at particular variables that uniquely identify

3    individuals in one or the other databases, and I described the

4    process that I used.  It was a three-pass matching process.  On

5    a first pass one of the fields that exists in the SVRS is that

6    individuals who register using their driver's license or photo

7    ID number, that number is recorded, and those numbers are unique

8    or they are mostly unique.  There's a small number of

9    duplicates, and so I simply matched -- for each person in the

10    SVRS, I matched to the person in the DOT with that driver's

11    license or ID number, and that was most of the matches that I

12    got.

13         For people who did not match, I then -- let me look at my

14    table of describing that process.  It's on table 12 of my

15    report.

16    Q    What page is that?

17    A    That's page 12 of my report, table 1.  So link step A is

18    the match on driver's license or ID number, and that produced

19    about 2.3 million linked records.  The second pass I matched on

20    the last name, first name, date of birth, and zip code, and

21    there were a small -- trivial number of people who were

22    duplicated on this quadruplicate.  I think it was on the order

23    of a dozen or so -- it was not many -- and I had eliminated

24    those duplicates, and then I matched to the correct person

25    or was able to match to the Department of Transportation for

1    another 631,000.  And then I matched on the last name, first

2    name, and date of birth which gave me an additional set of

3    matches.  The total --

4          THE COURT:  That means that on the C pass there was not

5    a match on zip code?

6          THE WITNESS:  Right.  The way that it's done in exact

7    match is you start with the highest level of granularity and

8    then you expand it marginally, but, again, by the time I had got

9    to step C, there were very few duplicated records on this

10   triplicate, so it's not like I was matching a person in the SVRS

11   to the wrong person in the Department of Transportation file.

12         So the total number of linked records was 3,096,992.  I had

13   283,346 unlinked records.  Once I had conducted the linking

14   process, I went through that list and eliminated everybody who

15   had registered after the November 2014 election because I was

16   not going to be able to observe their voting behavior, and that

17   eliminated about 12,700 records, and so that gives me a list of

18   282,000 -- if we go back to table 3 -- 282,015 registered voters

19   who do not link to the Department of Transportation file, which

20   indicates they do not possess -- as of September 2015, they did

21   not possess a driver's license or photo ID.

22   BY MR. SPIVA:

23   Q    So that's -- and that's 8.4 percent of the registered

24   voters don't have one of those types of IDs?

25   A    That's correct.  And because I have the racial

1    identification data either combination of the DOT or Catalist, I

2    can compute the percentage -- the nonpossession rate for

3    different subcategories.  The nonpossession rate for white

4    registrants was 8.3 percent.  For black registrants it was 9.8

5    percent so about almost 20 percent higher, and for Hispanic

6    registrants it was 11.1 percent, and for individuals who resided

7    in a student ward, a nonpossession rate of 21.4 percent.

8    Q    And are those significant differences?

9    A    I'm not sure that I would classify them as statistically

10   significant.  I didn't do any significance tests.  I suspect

11   they probably would be, but I can't say for certain, but one of

12   the things that's important here is all of this is entirely

13   consistent with the full range of literature on driver's license

14   and possession rate.  There's nothing here that is surprising.

15   The nonpossession rate overall is in line with what similar

16   studies have found in other states, Pennsylvania, Texas, North

17   Carolina, Georgia.  The fact that there are racial disparities

18   in the nonpossession rate was also completely in line with the

19   existing literature, so there's nothing in here that is an

20   outlier.

21   Q    Would you --

22        THE COURT:  I'm sorry to interrupt here.  And I'm

23   retrenching just a touch on my suggestion that we be very high

24   level on your background, but it's apparent that you have used

25   some statistical analyses in your report, and your educational

1   background doesn't make it manifest how you have a background in

2   statistics.  So if you would just recap that.

3           THE WITNESS:  Sure.  So my training in graduate school

4   included training in econometrics and statistics and actually

5   includes graduate level work in the statistics department.

6   These are all techniques I have used throughout my career in my

7   own work with high-level programming languages and high-level

8   statistical packages.  This is also -- this particular matching

9   technique is also something that I have done in other court

10  cases.  The particular statistical techniques that I use, in

11  particular the individual-level analysis itself, is not all that

12  sophisticated.  The numbers --

13          THE COURT:  This one here, what we've done here so far

14  you're talking about?

15          THE WITNESS:  Well, when we get to the individual-level

16  probit analysis, which estimates the underlying probabilities,

17  these are all techniques that I have used throughout my career

18  and in my own work.

19          THE COURT:  Okay.

20  BY MR. SPIVA:

21  Q    If I might, this is actually not a sample, right?  This is

22  based on the entire data set?

23  A    Right.  And so it gets a little tricky trying to do

24  significance tests when you're dealing with full populations.  I

25  suppose you could make the argument that the SVRS itself is a

1    subsample of the entire population of eligible voters.  But as

2    far as I am aware, the literature that I have seen, this is not

3    something that people apply statistical tests to --

4            THE COURT:  This isn't sampling and projection from a

5    sample case.  This is the whole universe of registered voters.

6            THE WITNESS:  That's correct.

7            THE COURT:  Okay.

8            MR. SPIVA:  And then let me just -- I will kind of

9    retrench, Your Honor, since I didn't get the CV attached to that

10    one.  The one that's in the record --

11            THE COURT:  And I've got it digitally here.

12            MR. SPIVA:  Okay.

13    BY MR. SPIVA:

14    Q    But you were the Director of the Data and Computation

15    Center, College of Letters and Science, University of Wisconsin

16    from June 1996 through September 2003?

17    A    That's correct.

18    Q    And -- well, we've got the CV in the record probably better

19    than me, definitively not a statistical person, picking out the

20    things that I think --

21            THE COURT:  Well, I guess -- it's apparent then -- tell

22    me if this is true.  When you got your Ph.D., you had a research

23    tool requirement or something like that and --

24            THE WITNESS:  There was a research methods requirement,

25    but I make extensive use of quantitative techniques.  I have for

1    my whole career.

2         THE COURT:  Okay.  I'm satisfied.

3    BY MR. SPIVA:

4    Q    Just do one more.  You got the Robert Durr Award from the

5    Midwest Political Science Association for best paper applying

6    quantitative methods to a substantive problem presented at the

7    2013 meeting.  You had some co-authors on election laws and

8    partisan gains.

9    A    That's correct.

10   Q    Okay.  So, now, you are aware that Dr. Hood did a matching

11   analysis a little differently, and he says he was able to match

12   many more individuals between the DOT and the SVRS databases?

13   A    That's correct.

14   Q    And do you have any dispute with the way he did it?

15   A    I do.

16   Q    And what is that?

17   A    There are two issues I have with the way Dr. Hood performed

18   his matching analysis.  The first is that one of the steps that

19   he matched on was, I believe, the last name -- I think it was

20   last name, date of birth, and the last four digits of the Social

21   Security number, that triplicate.  The problem with that is that

22   on that triplicate, there were 90,000 duplicated records in the

23   Department of Transportation database, and so it's almost a

24   certainty that he is producing a large number of false matches.

25   I can't say how many.  It's probably about half assuming that

1   they're randomly assigning to the wrong person.

2   Q    How did you handle the duplicates?

3   A    I eliminated them.  So before I did a match, and there

4   weren't many of them, I went through the Department of

5   Transportation database, and actually one of the issues -- we

6   should talk about this -- in the SVRS, there are actually some

7   duplicated records in the SVRS.  It's the same individual, the

8   same name, the same birth date, the same address, who actually

9   appear more than once, and that's an artifact of the nature of

10  large-scale data sets with millions of records, and I went

11  through and eliminated all of those duplicates.

12      So I had done some preprocessing of both data sets to

13  eliminate -- they're also in the Department of Transportation

14  data set that I received.  There are actually hundreds of

15  thousands of duplicates, people who show up as possessing both a

16  driver's license and a state ID, which is not supposed to

17  happen, but they're in there.  The records show large numbers of

18  people who are deceased, and I removed those because that's one

19  of the status flags.

20      I went through with some care examining the data and

21  preprocessing it in a way that increased my confidence that the

22  matching that I did was matching the right individual in the

23  Statewide Voter Registration System to the right individual in

24  the Department of Transportation data set.

25  Q    And do you have a lot of experience in training -- in

1    matching large databases and working with large databases?

2    A    I do.  I've done it a number of different times.  There was

3    a state photo ID trial in 2011-2012 in which I did that.  There

4    was also an analogous process that I did as part of a federal

5    redistricting trial here in Wisconsin in 2012 to identify

6    registered voters of Hispanic descent.  So this is a technique

7    that I have used before and am familiar with.

8    Q    Okay.  And the court has accepted your technique in those

9    cases?

10   A    They did.

11   Q    What else was wrong with Professor Hood's matching process?

12   A    The second thing that Dr. Hood did is when he had completed

13   his first matching process, which is similar to mine although he

14   produced -- actually he produced about 40,000 fewer -- actually

15   40,000 more matches than I did, which is roughly the same as the

16   number of duplicates on that one triplicate.  At the result of

17   that process, he turned over the list of nonmatches to the

18   Department of Transportation, and they came back to him and told

19   him that about 90,000 of those individuals actually did show up

20   in their data as -- they said that they had a record of this

21   individual, and he accepted that, said I'm counting that as a

22   match.  These people are showing up as a match.

23       I don't think that's the right way to go about that in part

24   because he has no information about how the Department of

25   Transportation actually conducted that match.  He doesn't know,

1    and I don't know --

2    Q    He didn't put anything in his report about how the

3    Department of Transportation did that?

4    A    That's correct.  And he admitted in his deposition that he

5    had no idea how they did it.  We don't know whether they used

6    exact matching.  We don't know whether they used probabilistic

7    matching.  We don't know what fields they matched on; I simply

8    accepted that, which I don't think that's the proper way of

9    doing it.  But as I noted in my rebuttal report, even if you

10   accept his smaller number of nonmatches, I was able to replicate

11   my analysis with his list of 145,000 people who didn't match as

12   opposed to my 283,000 people or 282,000 people who didn't match.

13   My substantive conclusions were identical.  The coefficients

14   didn't change.  People who didn't have an ID were less likely to

15   vote.  People who were African-American, Latino, who were in

16   student wards, my substantive conclusions were identical.  All

17   it means is that there's slightly fewer people who don't match.

18   Q    Okay.  And did he also -- I think he got down to about four

19   point -- I think it was 4.5 percent.  I don't seem to have the

20   figure right in front of me.

21   A    That's correct, 4.5 percent.

22   Q    Matching kind of compared to your 8.4 percent.  Did he then

23   make some kind of a jump to reduce it further?

24   A    Sure.  He then, after he concluded that his unspecified

25   matching process resulted in the 4.5 match rate, he then

1    speculated, and he said I think the real rate is probably closer

2    to 3 percent without any evidence.  It was just speculation.

3         THE COURT:  This is 3 percent of registered voters not

4    possessing --

5         THE WITNESS:  That's correct.

6         THE COURT:  -- ID.  Okay.

7    BY MR. SPIVA:

8    Q    And I think you said this, but even if he were right about

9    there being fewer people, does it make a difference to

10   your ultimate --

11   A    Not to my substantive conclusions, no.

12        THE COURT:  And by that you mean the proportionality

13   across these various groups of --

14        THE WITNESS:  The effect of these variables, the effect

15   of not possessing an ID on not voting.  It still is a large and

16   negative and statistically significant negative effect.  The

17   effect of a registrant being black or Latino or residing in a

18   student ward, all those effects are roughly the same size.

19        THE COURT:  Yeah.  The difference being essentially

20   that it just affects fewer people.

21        THE WITNESS:  That's correct.

22        THE COURT:  Okay.

23   BY MR. SPIVA:

24   Q    If I could ask you to turn to your rebuttal report, which

25   is PX43, to page 12, the updated table 7, and then let me just

1    ask you, you know, there's an updated table 7 on page 12 and an

2    updated page -- updated table 8 on page 13.  What are these

3    updated from?

4    A    When I did the original analysis, one of the variables that

5    I included in the analysis was whether a registrant was female

6    because that's one of the -- that's one of the self-identified

7    features of the Department of Transportation database, and as I

8    was preparing for my rebuttal report, I discovered I made a

9    coding error in my original analysis which was that I actually

10   don't have gender information for people who didn't match.  I

11   don't know what their gender is because I hadn't linked them.

12        And the way that I wrote the computer code, that for -- it

13   classified -- everybody was classified as female if their

14   underlying gender wasn't male.  So that meant for the people who

15   did not match, that field was blank.  I mistakenly characterized

16   all of those individuals as female, and that's wrong.  So I had

17   to redo the analysis to make sure we had the correct

18   information, and so what I had to do was simply drop that

19   variable because I didn't have it for everybody, and the updated

20   table 7 and updated table 8 reflect that.  Again, it doesn't

21   change any of my conclusions.  It has really very, very small

22   effects on a couple of the variables, but not in any significant

23   way.

24   Q    Okay.  So there's a table 7 and a table 8 in your original

25   report, and these are updated versions of those tables?

1    A    That's correct.

2    Q    Okay.  So looking at updated table 7 on page 12 of your

3    rebuttal report, can you explain that table to us?

4    A    So this is the first time that I have been able to do or I

5    think anybody has been able to do this analysis in Wisconsin.

6    Up until now the inferences about the effect of voter ID have

7    occurred at the aggregate level.  We try to observe changes in

8    turnout and try to analyze turnout in particular locations,

9    which is not an ideal way of doing it.

10        I have individual-level data.  I have data for every

11   registered voter in the state.  I know whether they voted

12   because voter history is part of the records.  I have

13   demographic information about voters.  I know their age.  I know

14   their race.  I know where they live.  And I am able, therefore,

15   to do an individual-level analysis which calculates or estimates

16   the effects of these variables on the underlying probability

17   that an individual votes, and so this table shows the results of

18   that analysis where in all of these models the dependent

19   variable is whether someone cast a ballot in either the November

20   2014 election or in one of my controls, the 2010 election, and

21   that's classified as one if someone voted, zero if they didn't.

22        And then I have a number of these control variables which

23   is, just going through them, we know that voting behavior is

24   influenced by previous voting behavior.  People get into the

25   habit of voting, so the likelihood that someone voted in 2014 is

1    going to depend in some sense on whether they have voted in

2    previous elections.  We know their race.  We know -- I'm sure

3    we'll talk about this in a bit.  We know which wards I had

4    defined as student wards based on the location of colleges and

5    universities around the state.  We know the age of the

6    registrant because one of the fields -- it's not a publicly

7    available field, but it was part of the disclosure.  I know when

8    a registrant is born, so I can calculate their age.

9         And so I'm able to, using this technique, estimate the

10   effect of these coefficients on the probability that someone

11   votes, and the way that -- it can be difficult to interpret

12   these coefficients directly, but in general a coefficient that's

13   positive means that variable is associated with a higher

14   likelihood of voting.  A coefficient that's negative is

15   associated with a lower probability of voting, and just to give

16   a brief summary of the second column, which is Model 1, 2010 to

17   2014, you see the first three coefficients, voted in 2012, voted

18   in recall, voted in 2010, those are all large and positive.

19   Q    What does that mean?  If you voted in 2012, what does --

20   and then you're in column one here with the .66, what does --

21   A    Well, you actually can't -- you can't state directly

22   looking at this coefficient.  You have to do another set of

23   calculations to convert these into probabilities, which is what

24   I did --

25   Q    In table 8.

1    A    -- in table 8.

2    Q    Okay.  So go ahead.  We'll get there in a minute.

3    A    What it means is that all of these coefficients are

4    statistically significant with the exception of the student ward

5    in 2014 in Control Model C3 which means that I think that

6    they're all significant at a level of .0001, which is an

7    extremely high level of precision reflecting the fact that I

8    have a large data set here.  So voting in 2012, voting in the

9    recall, voting in 2010, these are all people who voted in those

10   elections, had a much higher probability of voting in 2014.

11        Being African-American, to register as African-American,

12   Hispanic, student ward, those are all negative, indicating that

13   people who were registrants who were African-American,

14   registrants who were Latino, registrants who live in a student

15   ward are less likely to vote.  Similarly, for the effect of not

16   having an ID or license is minus .68.  That's actually larger

17   than the positive effects of voting in 2012.  So not having a

18   license means that -- the effect of not having a license is

19   actually larger and more negative than the positive effect of

20   voting in 2012.  The age variables are all basically controls

21   because we know that turnout is positively associated with age,

22   and it's, in fact, what the coefficients show.  As registrants

23   get older, they become --

24        THE COURT:  And they're all positive because it's a

25   comparison from 2010 to 2014?

1          THE WITNESS:  Not quite, Your Honor.  The comparison is

2     that if all of these variables were zero, the probability would

3     be calculated using the constant, which is minus .43.  So you

4     start with the constant, and then you add the value of these

5     coefficients based on whether someone meets those

6     characteristics.

7          THE COURT:  Okay.

8          THE WITNESS:  And the 2010 to 2014 comes in that I am

9     observing a snapshot of the SVRS in 2015.  The SVRS is a dynamic

10    system.  It changes -- I don't know how often the GAB updates

11    it, but it's probably on a weekly or monthly basis.  It changes

12    all the time, and there's no archive of it.  So I can observe

13    the SVRS in September of 2015.  I can't go back to November of

14    2010 to look at what the SVRS was at that point.  There's

15    constant churn.  People move into the SVRS, they register.

16    People move out of the SVRS, people die, people move out of

17    state, their registrations are cancelled.  The GAB conducts list

18    maintenance.  Every so often they remove inactive voters, and so

19    the SVRS in September of 2015 is not going to be the same SVRS

20    that existed in November 2010.  So what you need to do is to

21    account for that.  What we observe at a point in time is going

22    to be different than what we would have observed in a previous

23    time had we been able to do that, and I controlled for that a

24    couple of different ways.

25          In the first Model 1, that is everybody who was in the SVRS

1    as of 2010, as of election day 2010, who were still in the SVRS

2    in September 2015.  So what I've done is removed from the SVRS

3    everybody who registered after the election -- after election

4    day in 2010 because I'm interested in looking at the change from

5    2010 to 2014.  I want to observe these same individuals.  And

6    the comparison would be Control C1 which is for these -- well,

7    that's looking at individuals in -- voting behavior in 2010 for

8    people who have been in the SVRS since 2006.  So the full range

9    of the SVRS.  So that's giving me an estimate of the behavior of

10   people who have been in the SVRS at the -- since the beginning.

11   And so that's one point of comparison that I'm looking at,

12   people who have been in the SVRS for longer, but I'm observing

13   their behavior in 2010.  And you can see that most of the

14   variables are roughly in the same category.  There are few --

15              THE COURT:  I guess here is my question, is that

16   there's a coefficient here that indicates likelihood of a person

17   voting in any election?

18              THE WITNESS:  Just in 2010.

19              THE COURT:  Just in 2010.

20              THE WITNESS:  That's the control model.

21              THE COURT:  Okay.

22              MR. SPIVA:  You're talking about the column that's

23   labeled Control C1 voting in 2010 --

24              THE WITNESS:  That's correct.

25              THE COURT:  Okay.  So we go back to the second column.

1    That coefficient represents the -- not exactly a probability but

2    a number that could be processed to get to a probability.  In

3    other words, it's a coefficient that indicates the likelihood of

4    a person voting in some particular election?

5              THE WITNESS:  In 2014.

6              THE COURT:  In 2014.  Okay.

7              THE WITNESS:  And so the controls that I used account

8    for the fact that people are moving in and out of the SVRS at

9    different times.  So I used a variety of starting points and

10   stopping points.  So one -- the first model is looking at 2014

11   voting for everybody who was in the SVRS as of November 2010.

12   The second model looks at voting in 2014 using everybody who was

13   in the SVRS as of the recall.  So I'm picking up in Model 2

14   everybody who registered between the general election in 2012 --

15   in 2010, I'm sorry, and the recall in 2012.  And you can see all

16   of the coefficients are roughly the same size.  There are a few

17   differences and some of them are a little bit different, but

18   there are no signs that flip.  There are no major discrepancies

19   in the sizes of the coefficients.

20       And then the control models again use different starting

21   and stopping points, looking at voting in 2010, looking at

22   voting in 2014, looking at voting in 2014 with that subset of

23   registrants who only registered between 2010 and the recall, so

24   I'm capturing different cohorts of registrants, and with very

25   few exceptions all of the coefficients are the same size.  They

1    all point in the same direction, which is that you observe

2    significant depressive effects in 2014 -- again, it doesn't

3    matter when people registered -- and it's not what you observe

4    when you are looking at voting behavior in 2010.

5        So the key here is that in 2010 none of these laws were in

6    effect.  In 2014 they were all in effect with the exception of

7    voter ID, and we can talk about that in a little bit.  I still

8    in my report drew some inferences about the effect of not

9    possessing an ID in 2014 in part because there was substantial

10   confusion among voters about whether it was in effect or not.

11       THE COURT:  So one other question here.  So we've got

12   people with no ID or license.  So that would be -- because there

13   are other ways of voting even if you don't have -- so no ID, by

14   the way, that means no free DMV voter ID.

15       THE WITNESS:  That's correct, Your Honor.

16       THE COURT:  Okay.  I'm calling it a voter ID because

17   it's not a driver's license.  It's not really a voter ID.

18       MR. SPIVA:  Is it any type of DOT ID or license?

19   Because I think there may be another ID other than the free ID.

20       THE WITNESS:  It was anybody who showed up in the

21   database.  Not everybody -- I don't know what the exact

22   percentages are, but a substantial number of people who have

23   procured an ID in the last five years have gotten a free voter

24   ID, but this also counts people who got -- who possess a photo

25   ID that's not a driver's license even if it's not procured for

1    the purposes of voting.

2            THE COURT:  Right.  So anybody -- but it would not

3    include somebody who did not have one of those but they voted by

4    using their passports.

5            THE WITNESS:  That's correct.

6            THE COURT:  Okay.  Because if the DMV ID was the only

7    way to vote, then the coefficient should be negative one, right?

8    That would indicate nobody could vote.  Nobody in that condition

9    voted.

10            THE WITNESS:  I'm trying to replicate the analysis in

11    my head.  I think that's mostly right.

12            THE COURT:  If you had a category here people who were

13    ages 16 and 17, their coefficient should be a negative one

14    because they should not have voted.

15            THE WITNESS:  Well, it will amount to a 100 percent

16    reduction in the probability of their voting.  One of the

17    reasons the effect is not one is that later on I'll show a table

18    that the effect of photo ID actually doesn't fall just on people

19    who don't possess a photo ID.  I found, and other studies have

20    found, that some of the people who don't vote because of what

21    will show up as a lack of photo ID actually have a photo ID, but

22    they believe that it doesn't qualify, and so that has the effect

23    of sort of making this coefficient smaller because there are

24    people who actually possess an ID but who are unable to vote

25    because they don't bring it or they've lost it or for whatever

1    reason.

2         THE COURT:  Or if somebody said on principle I refuse

3    to take it out and show it to you to vote.

4         THE WITNESS:  It's possible.  And as I note in my

5    report, there is work that has investigated how many people who

6    don't possess a driver's license or an ID might possess one of

7    the other forms of qualifying IDs, a passport.  I did not have

8    access to any of that data, and the answer is that there are

9    some people who do possess that.  It's not a large percentage,

10   but it's definitely not zero.

11        THE COURT:  Okay.

12   BY MR. SPIVA:

13   Q    There's literature on that though, isn't there, on who

14   possesses passports and how big of a percentage that is?

15   A    That's correct.  There was a report I cited in my report

16   that Professor Charles Stewart of MIT did for a voting rights

17   trial actually on behalf of the U.S. Department of Justice where

18   he did have access to all of that data.  He was able to match

19   people with passports, veterans ID.  I think those were the

20   two --

21   Q    Military IDs?

22   A    And military IDs, and I can't remember off the top of my

23   head, but the number was nonzero, but it was not large.

24   Q    In terms of demographics, who tends to hold passports

25   demographically?

1    A    Well, I don't know that I have concrete data on that, but I

2    know that passports are expensive and that it wouldn't surprise

3    me in the least that there would be a racial disparity in the

4    possession of passports.

5    Q    Okay.  Should we turn to table 8?  Do you feel like you've

6    had a chance to fully explain table 7?

7    A    So the way in which you translate probit coefficients into

8    understandable probabilities, the probit is a nonlinear

9    regression technique.  A linear regression does not work with

10    binary variables because linear regression assumes that the

11    effect of any variable is the same anyplace on the scale, and we

12    know that as you get close to one or zero, that if you already

13    have a 98 percent underlying probability of voting, there's no

14    variable that's going to have a significant effect on that, and

15    linear regression routinely produces probability estimates that

16    are outside the bounds; they're greater than one or less than

17    zero.  So what probit does is convert the data into an

18    underlying -- essentially the shape of a sideways "S."  That it

19    is flat at the bottom, it gets steep in the middle, and then it

20    flattens out as you get to one.

21    So that means that in order to interpret the coefficients,

22    you need to know where you are on that underlying probability

23    distribution.  The effect of a variable when you are at about .5

24    is going to be much greater than it is when you are at .98

25    or .01.  So the standard technique for doing that is you take

3-P-99

1    all of the variables and you insert their mean values, and that

2    gives you what amounts to the equivalent of the average voter,

3    and then for the variable that you are interested in, you change

4    the value of that.  And so this table shows the probabilistic

5    effects -- the effect on the underlying probability of voting

6    for the variables of interest here which are the demographic

7    categories --

8    Q    So let me ask you, if I were to look at the column labeled

9    "2014 Model 1 (2010-2014)" and the row "black," it says negative

10   2.5 percent.  What does --

11   A    That means for -- with all of the other variables set to

12   their mean value, so we can conceptualize that as the mean

13   voter, that that mean voter who was black is 2.5 percentage

14   points or, if we use the zero/one probability range, .025 less

15   likely to vote than someone who is not black.  Similarly, an

16   average voter who was Hispanic is 7.1 percentage points less

17   likely to vote than someone who is not Hispanic.  Someone who

18   resides in a student ward is 6.7 percentage points less likely

19   to vote than someone who does not live in a student ward.  And

20   someone who does not show up as possessing an ID or a license is

21   almost 19 percentage points less likely to vote.  And so this is

22   a way of allowing for a direct comparison of the underlying

23   probabilities across all of the models and variables.  So these

24   are -- it's reasonable to think about these as the rough

25   equivalent of an underlying linear regression coefficient

1    because you can compare these directly.

2    Q    Okay.  And so what does that mean -- or what does this

3    address in terms of the effects of the laws being challenged in

4    this lawsuit?

5    A    There are a couple of ways to approach it.  That we cannot

6    observe the specific effect of each one of these changes on a

7    specific person because we cannot observe whether any specific

8    African-American or Latino person has had trouble surmounting

9    one of these obstacles.  You actually can't make a statement

10   about the underlying registration difficulties, the proof of

11   address, the Special Registration Deputies, because we are only

12   observing people who have already registered.  So these people

13   who have registered have already surmounted any of those

14   burdens.

15        So using this analysis, I can't make any claims about how

16   difficult it is for people to register because by the time I'm

17   able to observe their behavior, they're registered.  It also --

18   I can't specifically identify, for example, what effect the

19   restriction on early voting has had because the SVRS does not

20   contain information about whether someone voted -- it does

21   usually record whether someone voted absentee or not, but it

22   doesn't tell me whether they voted in person or by mail.  It

23   doesn't tell me when they submitted their ballot.  I can't

24   observe that.  But it does tell me -- the two pieces of

25   information that are most discrete is that we know based on

1  existing literature that photo ID laws suppress turnout, and

2  these are not inferential studies any longer.  We now have

3  specific data from actual elections on the effect of turnout

4  based on photo IDs.

5      We also know the effect on students that have particular

6  requirements, that it's students, particularly thinking of

7  out-of-state students who face specific burdens that in-state

8  students do not.  If I am a resident of Minnesota who attends

9  UW-LaCrosse, I am less likely than a Wisconsin resident to

10  surrender my Minnesota driver's license to get a Wisconsin photo

11  ID or driver's license for the purposes of voting.  That means

12  I'm restricted to one of the other forms of ID.  If I have a

13  passport, I'm fine.  I might have to use my student ID, but

14  using a student ID, even if it's a qualifying form of

15  identification with the signature, issuance and expiration date,

16  in addition to that I still have to show proof of enrollment, so

17  there are higher burdens that apply to students.  So I can

18  directly estimate the effect of those variables just as I can

19  observe the effect of photo ID.

20      Probably the main point about these is that these effects

21  are statistically significant.  They are all in line with the

22  broader literature about the effect of these changes on turnout,

23  and they are all in the expected direction.  There's nothing

24  that is surprising here in terms of thinking about the likely

25  consequences of these changes and the effects on individuals.

1    Now, we can also -- we will get to this ahead, but we now have
2    data from two elections where the photo ID laws have actually
3    been in effect.
4    Q    Right.
5    A    Here I'm drawing an inference based on the fact that there
6    were significant numbers, in the hundreds of thousands, of
7    registered voters who believed the photo ID was in effect.  Now
8    we no longer have to concern ourselves with survey data because
9    we have actual election results and concrete consequences for
10   people who don't have a photo ID.
11   Q    Okay.  And so maybe you can walk us through like you did
12   with table 7 briefly what the significance of the various
13   columns are here.
14   A    So each column corresponds to the same column --
15   Q    Can I just ask before we get there, is this an
16   individual-level analysis or an aggregate?
17   A    This is an individual-level analysis.  I'm observing the
18   behavior of each individual.  I can observe whether they vote or
19   not.  I can observe all of these variables.  I know how long
20   they've been in the SVRS, so this is an individual-level
21   analysis.
22   Q    Okay.  Go ahead.
23   A    So each column in table 8 corresponds to the same column in
24   table 7.  Now, I didn't produce the underlying probabilities for
25   all of the variables, just for clarity's sake.  I'm not really

1    interested in what the underlying probability is for someone who

2    is between the ages of 55 and 64.  And so we can compare, for

3    example -- well, let's take just as one example, if you look at

4    Model 1, we see the probabilities of these variables,

5    African-American, minus 2.5 percent; Hispanic, minus 7.1; and so

6    on.  The second table is the --

7              THE COURT:  The second column you mean?  Stick with

8    that first -- just as simply as you can, so a black voter was

9    2.5 percent less likely to vote in 2014 than in 2010?

10             THE WITNESS:  I would say 2.5 percentage points.  So it

11   would go from 60 to 57.5, from 30 to 27.5 based on the other

12   variables.  It's percentage points.

13             THE COURT:  Okay.  And that's a comparison between what

14   you would have predicted for the voter in 2010 versus the

15   behavior in 2014.

16             THE WITNESS:  Not precisely.  That's comparing black

17   and nonblack voters.  The 2010 would be Control C1, which is the

18   third column.

19             THE COURT:  Okay.

20             THE WITNESS:  Which shows that in 2010 based on the

21   population of registrants who were in the SVRS as of 2006, that

22   African-Americans are actually -- an African-American registrant

23   was more likely to vote in 2010.  And most of the other

24   variables are in line with what we observe in 2014 except if you

25   observe the -- if you compare the 2014 probabilities to the 2010

KENNETH MAYER - DIRECT

1    probabilities, they all go down, and that signifies these

2    effects are -- these variables are showing effects in 2014 that

3    we don't observe in 2010.

4         THE COURT:  Okay.  Point that out to me because I'm

5    trying to figure out the impact of the changes and the main one

6    being the imposition of the voter ID requirement.

7         THE WITNESS:  Right.  If we look at the no ID, that in

8    2010 someone who does not show up as possessing a photo ID is

9    3.5 percentage points less likely to vote than someone who does

10   possess a photo ID.  And that reflects the fact that because

11   there are differentials, people who don't possess voter ID are

12   more likely to be African-American -- I mean other evidence

13   shows that they tend to have lower socioeconomic status, so it's

14   not surprising that people who don't possess a photo ID are

15   slightly less likely to vote even if there's no photo ID

16   requirement.

17        THE COURT:  Okay.

18        THE WITNESS:  But what you observe if you compare that

19   minus 3.5 percentage points to 2014, it goes up by a factor of

20   five.  So it's five times larger reflecting the fact that there

21   is now in 2014, at least among hundreds of thousands of

22   registrants, a belief that photo ID is in effect, and the

23   expectation is that belief would cause many people simply to not

24   present at the polls.  So it's not surprising that the effect is

25   significantly larger.

1          MR. SPIVA:  And I notice that -- sorry, Your Honor.

2     Did you have another question?

3          THE COURT:  No, keep going.  I'll fill in with more

4     questions as they come up.

5     BY MR. SPIVA:

6     Q    I notice that there's a flip sign, I guess, in the student

7     ward row I believe between Control C1 and Control C2.  Can you

8     address that?

9     A    So what I think is probably going on there is the -- I am

10    observing presence in a student ward in 2015 -- or 2014 based on

11    where a voter lives in 2015.  It makes intuitive sense that

12    populations in student wards are going to be more mobile than

13    other populations because people who go to college and reside in

14    a student ward, they're not going to move there permanently.  So

15    there is also an issue that someone who is -- at each point in

16    any of these models, I have removed people who are too young to

17    vote.  So if I have someone who is 18 in 2014, they actually are

18    not in the model in 2010 because they would be too young to

19    vote.  They would be 14.  So I simply removed them because you

20    couldn't say, well, a 14-year-old didn't vote.  That would

21    completely bias all of the estimates.

22         And so what I suspect is probably happening with student

23    wards is that we're capturing slightly different populations.

24    That someone who is 18 years old or actually someone who was 22

25    years old in a student ward in 2014, they will still show up as

1    residing in a student ward in 2010 because I'm observing their

2    residence at a snapshot.  They could easily have lived someplace

3    else.  So I think that's probably what's going on there.  I

4    think that's probably one reason for that sign being different.

5    Q    Okay.  I want to pause on table 8 for a minute, and I want

6    to just ask you to explain the whole student -- how you got to

7    the student ward and the student figures.  Let's go to your

8    initial report.  We're going to come back to table 8, updated

9    table 8, but let's go to figures 1 and 2.  Why don't we start

10   with page 30 of your initial report, figure 1.

11   A    So we're switching gears here a little bit because now

12   we're moving from an individual-level analysis to an aggregate

13   analysis to supplement the effects that we've already observed.

14   I had reason to believe that the photo ID law would have a

15   specific effect on students because of the nature of the law,

16   the fact that there are lots of out-of-state students who go to

17   college in Wisconsin, either at one of the UW system campuses or

18   one of the private campuses, so I wanted to identify what those

19   effects would be.

20        So what I did is I began with a list of all four-year --

21   nonprofit four-year colleges and universities that were

22   identified in what's called the Carnegie Classification of

23   Institutions of Higher Education.  It's a list that used to be

24   maintained by the Carnegie Foundation.  It's now shifted, I

25   believe, to Indiana University, and that shows for each

1    institution the number of students, its address, and so -- and

2    also they also have a list for technical colleges and for-profit

3    colleges which I removed because I was more interested in the

4    four-year campuses.

5        It gave me -- for each institution on that list with an

6    enrollment of more than 500, I had a list of -- I can't remember

7    what the exact number was.  I think it was something like 34

8    institutions of higher education, and I had their address.  What

9    I did is I geocoded those addresses using a web tool that will

10   convert a street address into a latitude and longitude.  I then

11   imported that onto a geographic information software system

12   called Maptitude which I use, and that shows me on a map of

13   Wisconsin where each of these institutions are.  I also have in

14   that GIS system a ward map that shows me the boundaries of every

15   ward, every 6,580-some wards in the state, and so now I know

16   where the colleges and universities are.  I know which wards

17   they exist in, and so I used a two-step process.

18       I counted as a student ward any ward in which a portion of

19   these campuses were located.  And so in the University of

20   Wisconsin, there were wards that actually comprised the dorms

21   and University Heights, and those are all counted.  I then moved

22   one by one out -- basically concentric circles out to outlying

23   wards and counted as a student ward any contiguous or nearby

24   ward that had a population of 18 to 24-year-olds in that ward of

25   higher than 10 percent, and I counted that as a student ward.

1    The list of the student wards you can see in my report

2    beginning on page 42 with appendix 1 which shows the wards that

3    I identified as student wards.  It shows the college or

4    university, and it shows the percentage of students or the

5    percentage in each of those wards of 18 to 24, and you can see

6    that for most of them sometimes they're all 18 to 24-year-olds.

7    The City of Eau Claire, Ward 20, 95 percent of the residents of

8    that ward are between the ages of 18 to 24, and that's actually

9    part of the UW-Eau Claire campus.  So this gives me a measure of

10   which wards are likely to have large populations of students.

11   Q    Okay.

12   A    And so each registrant who resided in a student ward or

13   showed up as residing in a student ward, that was a dummy

14   variable that took the value of one for each of those

15   registrants.  Figures 1 and 2 supplemented that individual

16   result by -- I did a calculation in each ward in the SVRS.  I

17   know how many people voted.  I know how many people are in the

18   ward.  I can, therefore, calculate the turnout, the percentage

19   of people in each ward who voted in 2014.

20   Q    What are the pink or red -- my wife claims I'm colorblind.

21   A    The maroon "X"s, those are the student wards.

22   Q    Okay.

23   A    What you can see in 2014, that blob of blue dots in the

24   upper left-hand corner, you know, there's a negative -- the "X"

25   axis here is the percentage of registrants in each ward that

3-P-109

1    don't show up as having an ID.  You can see for most of the

2    wards, the middle of that blob is going to be right around 7

3    percentage points.  We can consider that roughly the mean.  It's

4    pointing in the -- it points downwards so that as you have more

5    registrants in a ward that don't possess an ID, the turnout goes

6    down.  It's not a terribly strong relationship, but if you add

7    the student wards which are the maroon "X"s, you begin to see a

8    clear pattern.  That in student wards you're likely to have many

9    more people showing up or a much higher percentage of residents

10   in those wards do not show up as possessing an ID, and, again,

11   that's entirely consistent.

12       If you are looking at UW-Madison with large numbers of

13   out-of-state students, Eau Claire, LaCrosse, Beloit,

14   St. Lawrence, universities and colleges that attract large

15   numbers of out-of-state students, an out-of-state student from

16   Illinois, Minnesota, California, New York is unlikely to

17   surrender their driver's license to get a Wisconsin photo ID.

18   And the "Y" axis is turnout, and it shows there's a strong

19   negative relationship.  The higher the percentage of registrants

20   in a ward that don't possess an ID, the lower turnout in that

21   ward, and so that's -- normally I wouldn't rely exclusively on

22   an aggregate analysis like this, but this supplements the

23   individual-level analysis.  It shows us this is real.  That the

24   effects that we observe at the individual level also occur at

25   the aggregate level.

1    And then figure 2 is the same figure for 2010, and there's

2    still a couple of things that are noteworthy here.  First, the

3    big blob of blue dots looks more like a circle.  It doesn't look

4    like a downward pointed -- an ellipse that points down and to

5    the right.  The percentage of ID, and again, this is people who

6    are in the SVRS as of 2010, so I have removed all of the people

7    who were registered after 2010.  And what this demonstrates, as

8    I said earlier, it's likely that some of this is due to the fact

9    that the population of registrants in 2010 is probably going to

10   be a little older than it is in 2014 because I have removed lots

11   of people who have registered after 2010, but it demonstrates

12   that there is no real significant effect of ward level ID

13   possession rates and turnout.  It's still negative, right, and

14   again that's what you would expect even if there were no -- if

15   photo ID were not an issue because of the demographics of the

16   population that is unlikely to possess or the disparate

17   possession rates of ID, and so I take this as evidence that we

18   see a strong effect in 2014 and a much weaker effect in 2010.

19   Q    Okay.  Why don't we go back to --

20        THE COURT:  I'm going to suggest maybe this is a time

21   where we can take our afternoon break.  So why don't we

22   reconvene at 4:35, and then we'll press on at that time.

23        MR. SPIVA:  All right.  Thanks.

24   (Recess taken 4:19-4:48 p.m.)

25        THE COURT:  All right.  Let's just pick up where we

1   left off and keep going.

2   BY MR. SPIVA:

3   Q    All right.  Turn back to updated table 8, which is on page

4   13 of your rebuttal report, Dr. Mayer, PX43.  Just wanted to ask

5   you if you can explain the columns in table 8, updated table 8,

6   that are labeled Control C1 2006 to 2010 and Control C2 2006 to

7   2014?

8   A    So this is the control that I was referring to before, and

9   I had the wrong columns.  Because we know that there's churn in

10   the SVRS, it's important to, as much as you can, try to isolate

11   the effects of the people who have been in the SVRS over a point

12   in time.  So Control C1 and Control C2 examine the vote in 2010

13   in Control C1 and then the Control Model C2 is voting in 2014,

14   but these are both for the exact same cohort of people, that

15   these are people who have been in the SVRS for the full range

16   from 2006 all the way to 2015, and we can tell that that's the

17   right cohort if we go back and look at updated table 7, and you

18   look at the row at the bottom which is the "N," that tells me

19   how many people, how many registrants are in the analysis, and

20   you can see for both C1 and C2 it's 1,990,330.

21        THE COURT:  So that cohort for C1 and C2 is voters who

22   have been in the SVRS since 2006, which I gather is the

23   inception of the --

24        THE WITNESS:  That's correct.

25        THE COURT:  -- of the SVRS.

1        THE WITNESS:  That's correct.

2        THE COURT:  So that's the cohort that's been in there

3  all along.  Doesn't mean they actually voted in 2010.

4        THE WITNESS:  That's correct.

5        THE COURT:  This is just an analysis of voting in --

6  Control C1 is an analysis of their voting in the 2010 election

7  of those voters -- I'll use that; I guess they're really

8  registrants -- who are in the cohort of people who have been in

9  the SVRS since inception, and then Control C2 is your analysis

10  of their voting in the 2014 election, again for that same group

11  of people.

12        THE WITNESS:  Precisely.

13        THE COURT:  Okay.

14        THE WITNESS:  So this is a direct apples-to-apples

15  comparison, and if we look at the -- just to pick out a couple

16  of variables of interest -- if we look at the coefficients for

17  student wards, which is for Control Model C1 it's .09.  For

18  Control C2 -- and, remember, these are the same people.

19        THE COURT:  Yeah.

20        THE WITNESS:  Voting in 2014 the effect of this

21  coefficient goes from --

22  BY MR. SPIVA:

23  Q    So you're on table 7, right?

24  A    Correct.

25  Q    Okay.

1    A    Well, actually I guess we can go back to table 8 since now

2    we're looking at probabilities.  That's probably the best way to

3    think of it.

4    Q    Yeah.

5    A    So if we look at the effect of being in a student ward for

6    Control C1, which is voting in 2010, it's plus 2.2 percent, and

7    if we look at those same people in 2014, the effect of being in

8    a student ward goes down.  Again, even accounting for the fact

9    that there is going to be some mobility and the fact that we

10   observe someone residing in a student ward in 2014 does not

11   necessarily mean that they actually voted in that same ward in

12   2010.  We're observing essentially a cohort effect comparing

13   voting behavior prior to any of these laws going into effect

14   with 2014 with most of them going into effect.

15           THE COURT:  And, again, just to be clear on the student

16   ward one because this one is a little, I guess to use the

17   statistical term, funky, these are people who lived in a student

18   ward in 2015.

19           THE WITNESS:  Correct.

20           THE COURT:  And so we don't know where they lived or

21   where they voted in 2010, and your surmise is that a significant

22   number of them actually didn't live or vote in student wards in

23   the 2010 election.

24           THE WITNESS:  That's likely.

25           THE COURT:  Okay.  All right.

1         THE WITNESS:  But if we look at the effects of not

2   having an ID between 2010 and 2014, we observe that they don't

3   have an ID in 2015.  It's likely that that didn't change.  If

4   they didn't have an ID in 2015, it's likely that they didn't

5   have an ID in 2010.  I mean, it's possible that someone could

6   have had an ID in 2010.  It expired and it dropped out of the

7   database, but I think that's unlikely.

8         THE COURT:  Then you've got this other little tweak

9   that you have to do on the age or on the -- well, for all of the

10  voters, for voters who in 2010 were -- I'm sorry, 2015 -- were

11  not of voting age in the 2010 election, you had to take them

12  out.

13        THE WITNESS:  That's correct.  So I actually

14  recalculated the ages for each election.  So someone who showed

15  up as 24 in 2014, they are 20 in 2010.  So I recalculated the

16  ages to account that you go back in time, people get younger.

17        THE COURT:  Okay.

18  BY MR. SPIVA:

19  Q    Did you figure out how to do that?

20  A    It works in Stata.  And here you can see that the effects

21  of not possessing an ID, the effect essentially quadruples.

22  It's minus 3.5 percentage points in 2010.  It goes up to minus

23  14.5 percent in 2014.

24        THE COURT:  Okay.  And we're talking about the November

25  election 2014?

1           THE WITNESS:  That's correct.

2           THE COURT:  Okay.  And, again, I'm trying to keep

3     track, voter ID was not actually in effect at that time.

4           THE WITNESS:  That's correct, although the evidence is

5     that substantial numbers of people were confused about it, that

6     at a minimum we're talking probably 700,000 registrants believed

7     it was -- mistakenly believed it was in effect, and so really in

8     a way that, you know, 2010 is the control when none of these

9     things were in effect, so it's a way of drawing an inference

10    about the overall effect of these changes between 2010 and 2014.

11    At this point it is still an inference.

12          THE COURT:  Yeah.  Although again, to be clear about

13    it, it's only the post-registration, unless I'm missing

14    something here --

15          THE WITNESS:  That's correct.

16          THE COURT:  -- only the post-registration changes that

17    are tested here because you've got to get through the

18    registration hurdles to get into the --

19          THE WITNESS:  That's correct.  So these would amount to

20    the changes in absentee voting, the reduction in the number of

21    days and hours, the end of late weekend registration and so on.

22    Actually, not late weekend registration.  It would be late

23    weekend early voting.

24          THE COURT:  Exactly.

25    BY MR. SPIVA:

1    Q    And what -- so what is, for instance, the column that's

2    labeled -- the column -- rather the rows labeled "black" and

3    "Hispanic" under those two control groups.  What does that tell

4    us?

5    A    So those show largely the same pattern, that for the same

6    cohort, and obviously demographics are not going to change --

7    those are constant over the same period -- but the effect of --

8    for a black registrant was actually 3.2 percentage points more

9    likely to vote in 2010 and minus 0.8 percentage points less

10   likely to vote.  One of the reasons this -- these numbers or

11   these coefficients are somewhat smaller than for the other

12   models is that we're looking at a cohort who has been in the

13   SVRS.  They're going to be older.  They're going to have more

14   experience voting, and so you can't directly compare people who

15   have been in the SVRS since 2006 to people who registered for

16   the first time in 2014, but it's a way of basically changing the

17   entry point, and in this case the entry points are the same, so

18   we actually can draw an inference because we're looking at the

19   same people.

20   Q    And what's that inference?

21   A    The inference is that for most voters, for African-American

22   voters, for voters in students wards, for voters who didn't

23   possess an ID, that there was a significant decrease in their

24   likelihood of voting.  For Hispanics it actually goes up a

25   little bit, but that reflects the fact that turnout among

1    Hispanics is dramatically lower than it is for any other major

2    demographic group, and so you would expect the numbers to bounce

3    around a little bit.

4    Q    Go back to His Honor's point from a minute ago that this

5    only deals with registered voters.  Would you expect there to be

6    some kind of a deterrent effect to registration among people who

7    don't have IDs?

8    A    Certainly reasonable to expect that, that the barriers

9    would consist in two ways.  One is that we know -- the evidence

10    is that these changes made it more difficult to register.  I

11    have some data on the number of people who registered with

12    corroboration.  There is evidence that these effects have

13    deterred people, but it's also that if I'm not registered and I

14    know I don't possess an ID and I either -- I know when it is in

15    effect that I need it or I mistakenly believe that I need it,

16    why go to the trouble of registering if I don't believe that I'm

17    eligible to vote.  So certainly you would expect to see a

18    deterrent effect at both stages, but, again, at this point in

19    the analysis I'm only observing people who have already

20    surmounted the barriers to registration.

21        THE COURT:  I want to make sure I'm not misperceiving

22    this data point here because it's a little -- I guess it's

23    surprising to me because I know that African-American turnout

24    was very high in 2008 and 2012, but this suggests that in 2010 a

25    black member of that cohort that's in Control C1 was actually

KENNETH MAYER - DIRECT

1    3.2 percent more likely than a nonblack voter to vote.

2         THE WITNESS:  Right.  And that could be -- that's a

3    function that we're looking at a particular and unrepresentative

4    cohort of people who have already registered.  So if you look at

5    the overall turnout figures among African-Americans -- we're

6    looking at turnout as a percentage of the citizen voting-age

7    population of the voting-eligible population -- that's where

8    you're going to see the effect.  I'm looking at turnout only

9    among registered voters, so that differential is going to be

10    somewhat smaller.

11         We saw or heard from Professor Burden yesterday that the

12    gap between black and white turnout has been decreasing over

13    time, and I think 2008 was the first election probably since the

14    1870s, if not ever, where actually it was perfectly

15    proportional, that the African-Americans voted, made up the same

16    percentage of the electorate that they -- the same percentage as

17    their percentage of the citizen voting-age population.

18         THE COURT:  All right.  Also another point here is that

19    the only variables that are really subject to analysis here are

20    the ones in -- I guess the ones in table 7.

21         THE WITNESS:  That's correct.

22         THE COURT:  So, for example, income is not --

23         THE WITNESS:  That's correct.

24         THE COURT:  -- factored in here.  Educational

25    achievement isn't factored in here.

1     THE WITNESS:  That's correct.  In thinking about this,
2     I thought about putting information -- since I know where people
3     live, that I could have put in information about the average
4     income or the median income or the median educational
5     attainment, but where that gets kind of tricky is now I'm sort
6     of mixing individual and aggregate data, and I wanted to keep
7     this as tightly constrained to the individual --
8          THE COURT:  But if there were variables that correlated
9     with race, for example, so if educational attainment was
10    negatively correlated with race, this analysis wouldn't
11    distinguish between the effect of educational attainment and
12    race.
13         THE WITNESS:  That's correct.  Since I don't have any
14    information about the education or income of any of the
15    registrants, I can't make any claims about those effects.
16         THE COURT:  Okay.
17    BY MR. SPIVA:
18    Q    And that's correct, but that would apply in both 2010 and
19    2014; isn't --
20    A    Certainly.  Those effects would not -- I don't think those
21    effects would change significantly from one election to the
22    next.
23    Q    So could the reduced probabilities of voting of the various
24    groups that you've identified be the result of roll-off or
25    churn?

3-P-120

1    A    I don't think so.  So we know that people --

2    Q    Can you explain what those --

3    A    Roll-off is that people move in and out of the SVRS

4    continuously.  Again, I'm observing the SVRS at a particular

5    snapshot.  I don't know what the SVRS looked like in November of

6    2010.  What I can observe is that people who were in the SVRS in

7    2010 who are still in the SVRS in 2014 or 2015, there are

8    certain numbers of people who are going to fall off of the SVRS.

9    They are going to move.  They are going to die.  They are going

10   to be removed through the list maintenance, and by definition I

11   can't observe them.  And we know that happens because if you

12   look at the number of people in the SVRS in 2015 who show up as

13   voting in 2010, that's smaller than the actual number of people

14   who voted by a couple hundred thousand people.  But what I am

15   looking at -- so that's one form of roll-off.  I can't observe

16   the behavior of people who have dropped out.

17       It is also possible that there are people who remain in the

18   SVRS, so they're still on the voter rolls, but they have done

19   the equivalent of rolling off, but they just haven't been

20   removed yet.  It's unlikely for people who have died because the

21   GAB routinely does matching to remove people who have died.

22   They remove people who have been convicted of felonies.  But,

23   you know, people move.  Someone could move out of state and not

24   update their registration.  But I don't think that's going to be

25   a huge number of people, and the only way that would make a

1  difference is if the propensity to roll off the SVRS is

2  correlated with an underlying propensity to vote.

3  So if people remain on the SVRS in 2014 even though they

4  are not going to vote, that the people who are in that category

5  are less likely to vote than the people who stay on the SVRS,

6  and I don't think the evidence is conclusive that that's what's

7  going on.  We know that there are lots of voters who roll off

8  the SVRS because we can actually compute that directly.  We know

9  that nonvoters roll off the SVRS.  But what -- I've already

10  removed everybody who has entered the SVRS after the election,

11  so I've already controlled for one problem, and the only way

12  that this would have a significant effect is if for some subset

13  of the SVRS that wasn't able to vote in 2014 was somehow able to

14  vote in 2010, and to the extent that the roll-off is going to be

15  correlated with the lack of propensity to vote, we would expect

16  that someone would be similarly unlikely to vote in 2010.

17  So I concluded that -- and the other part of that is that

18  if that roll-off was a problem, that you would see a uniform

19  effect.  The farther back you go, that you should see a uniform

20  effect with the coefficients either getting larger or smaller as

21  the nonvoters roll off, and that's not what you see.  And that's

22  one of the reasons I used a variety of starting and stopping

23  points to try to account for those differences by looking at

24  different cohorts, and what I conclude is that the size of the

25  effects doesn't depend on when people entered the SVRS.

1    Q    And you may have just answered this, but you're aware, of

2    course, that Professor McCarty, one of the defense experts, has

3    attributed the probabilities that you're -- that you've put

4    forth as a result of roll-off or churn, and do you have a

5    response?

6    A    The difficulty with that argument is that those criticisms

7    are based almost entirely on aggregate turnout where Professor

8    McCarty computed an aggregate percentage turnout in 2010 in a

9    couple of different ways.  He weighed it and tried to correct

10   for differences, and there is a real limit to what those kinds

11   of statewide aggregate effects can tell you.  I'm making

12   statements about the effects of these changes on individuals.

13   I'm not making -- I do have some statements about aggregate

14   effects at the beginning of the report, but that was just --

15   that was part of the way that I approach large databases.  I

16   like to poke at them and see what they're telling me and try to

17   understand the nature of the data.  I actually didn't draw any

18   of my conclusions from that aggregate result.  All of my

19   conclusions are based on either this individual level of results

20   or some of the ward level analysis that I did.

21   Q    What's wrong with drawing conclusions based on aggregate

22   turnout in the way that Professor McCarty did?

23   A    If you go back to the state's opening argument, the fact

24   that turnout was high in the April 2016 election, well --

25   Q    It was astounding.

1    A    So we know, based on the analysis that I have done and the

2    evidence, that these restrictions are not going to affect

3    everybody equally.  Most people, based on the possession rates

4    and some of the stories, I would put it probably between 80 and

5    85 percent of the eligible voters, whether people are registered

6    or not, are not going to have difficulty meeting these burdens.

7    They have an ID.  They have a driver's license.  They have a

8    passport.  They have stable residences, and so they are not

9    going to have problems producing the underlying documentation,

10   and we know that.

11       We also know that there are lots of people who are in that

12   category who don't vote.  Right?  Even in the highest turnout

13   election, you have probably 70 percent, 72 percent of the

14   eligible population casting a ballot.  Typically Wisconsin runs

15   about 15 percentage points ahead of the nationwide average.  So

16   you still have 30, 35 percent of the eligible population

17   choosing not to vote assuming that they could satisfy the

18   underlying requirements.  And that population, the percentage of

19   voters and nonvoters, is going to change.  Some presidential

20   elections it's going to go up.  Midterm elections and special

21   elections and off-year elections it will go down.  People will

22   move in and out based on interest, based on exogenous factors

23   like campaign spending, competitiveness, interest in the

24   campaign.

25       So the way to think about it is this:  Let's say I have

1    100,000 nonvoters.  These are people who aren't voting, but for
2    one of these exogenous reasons, this 100,000 -- this group of
3    100,000 people, everybody in that group makes a decision that
4    they are going to vote.  So they are moving from the nonvoting
5    category into the voting category.  Assuming that 85 percent of
6    people in that group will have no problem meeting the
7    requirements, you're going to see turnout go up by 85,000
8    voters.  But for that 15,000, whether it's the 9 percent -- 9.8
9    percent of African-Americans who don't possess a driver's
10   license or ID, a student in a ward that doesn't possess a
11   driver's license, the fact that aggregate turnout goes up
12   actually tells you nothing about the burden on any particular
13   individual.  And this is what Professor Burden was talking
14   about, the ecological inference problem.  That looking at
15   aggregate turnout, turnout could go up by 100,000 or 500,000,
16   and even with that turnout going up, that could just mean that
17   there are actually more people who would like to vote but can't
18   do it because they would like to become voters but they face a
19   burden.  They don't have an ID; they don't have stable
20   residencies, and they have trouble producing the underlying
21   documentation.
22       So the fact that aggregate turnout went up between 2010 and
23   2014 or between the 2012 presidential primary and the 2016
24   presidential primary doesn't tell you about the effects on
25   individuals.  It's the wrong unit of analysis, and this is why I

1    did the individual-level burden because it doesn't matter what

2    happens to aggregate turnout.  You could have aggregate turnout

3    go up, and that just means there are more people that are

4    affected by these things.  You can have aggregate turnout go

5    down and have more people affected by these things.  And it's

6    well established in the political science literature that the

7    aggregate effect, an individual effect, there's no reason why

8    they actually have to have the same signs, and this is sort of

9    the classic problem of trying to draw inferences about the

10   effects on individuals using just aggregate outcome, and that's

11   why I did the individual-level analysis.

12           THE COURT:  Just to follow up on that a little bit.  So

13   the exogenous factors that you describe, I'm not sure I

14   understand how those are isolated apart from the demographic

15   categories that you've analyzed.

16           THE WITNESS:  So --

17           THE COURT:  Because I'm looking at 2010.  I'm looking

18   at 2014.  There aren't any obvious explanations such as the

19   explanation for the astounding voter turnout in the 2016

20   presidential primary here in Wisconsin.  So they're a huge

21   exogenous factor because both parties had very competitive

22   primary races late enough into the season to make Wisconsin

23   matter on both sides of the aisle, so that's going to drive

24   participation up.  But when I look here at 2010 and 2014,

25   nothing comes to mind sort of dramatically, but those effects

1    might still have been there, but I don't see how you would

2    ferret them out.

3          THE WITNESS:  Well, because this is not designed to

4    ferret out overall turnout.  This is not a study of aggregate

5    turnout.

6          THE COURT:  I understand that, but it's still the

7    things that affected an individual's decision to vote in 2010

8    compared to 2014 still involve those factors that relate to

9    their interest in the election and their perceived importance of

10    the election between those two, and, again, like I said, there's

11    nothing obvious about the difference between 2010 and 2014.  One

12    of our assumptions here in our -- in the evidence that's been

13    presented is that those elections are kind of roughly in parity

14    with the exception of some changes in the voting regime, but, in

15    fact, there might be differences in interest that mattered to

16    voters, and I'm not sure how we would have factored that out.

17          THE WITNESS:  I would say this, that through this

18    analysis I don't think that I would be able to say that these

19    effects you would expect to see based on aggregate because we're

20    looking at the segment of people who have entered the SVRS at a

21    particular point in time, and in 2014 you saw lots of people

22    enter into the registration system because of interest, but I'm

23    not capturing them here because I'm only looking at people who

24    entered the SVRS prior to the 2014 election for precisely that

25    reason.  If I'm looking at the effect of these variables just

1    looking at that election, I don't have any voting history.

2              THE COURT:  Right.

3              THE WITNESS:  I can't control for anything that has

4    changed.  All I'm looking for or all I'm able to observe is the

5    behavior at that point in time.  And this analysis though I'm

6    able to back up and compare the outcomes that we observe in 2014

7    to what we observe in previous elections.  Now, a change in

8    aggregate turnout where you have more people registering, that

9    in a way I've already controlled for that because -- at least

10   partly because I don't observe anything about the people who

11   have entered in to --

12             THE COURT:  Right.

13             THE WITNESS:  -- the system as of 2014.  All I have or

14   what I have is people who have entered at some previous point.

15   I can examine their behavior in the June recall.  I can examine

16   their behavior in 2010, the gubernatorial election.  I also

17   don't have anything in here about the presidential elections

18   because there's nothing to compare it to.  I'd be looking at

19   2012, and so I think the --

20             THE COURT:  So the control really is that you have

21   somewhat habituated voters here in the cohorts that are your

22   Control C1 and Control C2 because those people have been in the

23   system for a long time.  So you're taking out the impact of

24   voters who have registered for the first time so that they could

25   vote in 2014, for example.

1        THE WITNESS:  Correct.  Now, as we will see when we get

2   to the data from 2016, we actually do have concrete evidence of

3   what happened there where there were people who were registered

4   who were actually barred from voting because they didn't have an

5   ID.

6        THE COURT:  Right.

7        THE WITNESS:  And so, again, these are inferences.  We

8   know that some things change, and we know that voters believe

9   that other things had changed, but this type of analysis given

10   the limits of the data -- I don't have data on educational

11   attainment and so forth.

12        THE COURT:  Right.

13        THE WITNESS:  I am, because of the data, limited to

14   these demographic variables, but the effects that I observe are

15   entirely consistent with other studies that actually have taken

16   those things into account.  So I'm -- I haven't captured

17   everything, but I am confident that these effects that I -- that

18   we are observing are real, and they're not due to any underlying

19   artifact of the modeling or the cohorts or the roll-off or

20   roll-on.  I have attempted to control for each of those things

21   in the course of doing this analysis.

22        THE COURT:  Okay.

23   BY MR. SPIVA:

24   Q    What is the literature on this issue?  Is there a consensus

25   or --

1    A    I would regard the recent evidence as not consensus as it's

2    almost unanimous.  Just to give you one example, there's just --

3    actually two examples.  The Government Accountability Office did

4    a study of aggregate turnout comparing turnout in states with

5    strict voter ID to turnout in states without strict voter ID,

6    and they concluded that strict voter ID has a depressive effect

7    that actually is disproportionate on racial minorities and young

8    people.

9         Another piece of evidence is a study that Professor Hood

10   did, the defense expert.  His study, which was actually an

11   individual-level study of voter ID in Georgia, and I cited it in

12   my rebuttal report, his own work concludes that voter ID

13   depresses turnout and has specific depressive effect on

14   particular populations so --

15   Q    Is that the "Much Ado About Nothing?" article --

16   A    That's correct.  So there was a literature that emerged in

17   2006 to 2008, 2009, when these laws -- some of these laws had

18   just gone into effect.  You had really Indiana was the only

19   state that had a strict voter ID, and at that point scholars

20   looked at the issue and concluded that there really wasn't

21   enough data to make a conclusive determination.  That is no

22   longer true.  We have data from a large number of states with

23   strict voter ID.  We have new data on additional election

24   cycles.  I would characterize the contemporary literature as

25   virtually unanimous that photo ID laws depress turnout, and they

1    depress turnout particularly among -- have a disparate effect on

2    particular racial and demographic minorities.

3    Q    Now, I just want to go back to this issue of the fact that

4    the voter ID law wasn't in effect in the 2014 election because

5    of the Supreme Court injunction at the time.  So can you explain

6    again how you can attribute an effect to it given that it wasn't

7    in place?

8    A    So sitting here, without reading the report, I don't think

9    I could actually characterize the sequence of events, but the

10   shorthand is that it was upheld and joined, reversed.  I mean,

11   it's a complicated sequence of events --

12   Q    Which you do lay out in your --

13   A    I do.  The result is I cited a Marquette poll from October

14   of 2014, actually I think it was about 54 percent of registered

15   voters said they believed that they would have to show photo ID,

16   and that applied to the SVRS of about 3.4 million people, you're

17   looking at 1.7 million registered voters who believed they would

18   have to show photo ID.  I know that there was a subsequent poll

19   taken later in October that showed it was closer to -- it was

20   actually about 25 percent said they believed it was in effect or

21   they weren't sure.  But even if it's 20 percent or 25 percent,

22   you're still talking about 750,000, 800,000 registered voters

23   who believed that the photo ID law was in effect.

24        And so if anything, what this means is that the effects

25   that I observe are actually smaller than what they would be if

1    you actually observe what happened once the law was into effect.

2    I didn't have the data to do the analysis for April 2016, but I

3    am certain that if I were able to replicate the analysis here,

4    it would show that the effect was at least as large, probably

5    larger, because we now know that there are hundreds of people,

6    probably thousands, who were actively prohibited or

7    disenfranchised and simply unable to cast a ballot.

8    Q    Let me just pause and see that -- I don't think there's any

9    objection to PX43, which is Dr. Mayer's rebuttal report.

10            MR. JOHNSON-KARP:  No objection.

11            THE COURT:  Okay.  I'll admit that too.

12            MR. SPIVA:  Thank you.

13   BY MR. SPIVA:

14   Q    Dr. Hood points to some data from elections in 2015.  Did

15   you look at that data or do you think that it's appropriate to

16   draw any inferences based on those elections?

17   A    So Professor Hood is arguing, and this is --

18   Q    Are you looking for it in your rebuttal report?

19   A    Yes.  This is page -- Professor Hood argues that evidence

20   from elections in 2015, again, this was -- that he examined a

21   series of elections that were held in 2015 after the photo ID

22   law had gone into effect and argued that because there were only

23   six provisional ballots that were issued in these elections,

24   that that's evidence that the law was not preventing anybody

25   from voting.

1    Now, I pointed out in my report that there are two errors

2    with that.  One is an inferential error, that these special

3    elections were uniformly tiny turnout elections.  Some of them,

4    you know, a few thousand people.  These were special elections,

5    school board referenda, school board elections.  I think the

6    highest turnout election was an assembly special election where

7    I think you had 15 percent turnout, and it's well known in the

8    literature that people who -- people who turn out in these

9    elections are almost always going to be the most highly

10   motivated and engaged voters.  I mean, I'm a highly motivated

11   and engaged voter, and there are some school board elections

12   that I haven't voted in.  And so the people who are most likely

13   to vote in these elections are the ones who are -- these are the

14   most engaged, the most education, highest income.  They're more

15   likely than not to have -- they're very likely to have one of

16   the forms of qualifying IDs.  So looking at these special

17   elections really tells you nothing about the effect.

18       Professor Hood, again in his own work, has argued that

19   looking at provisional ballots is the wrong indicator because it

20   doesn't tell you anything about people who might want to vote

21   but decide they're not even going to present at the polls

22   because they know they don't have an ID, why even bother, and he

23   argued that.  It was actually in the same "Much Ado About

24   Nothing?" article.  So the way I characterized it in my report

25   is there's an inferential error, which is these elections don't

1    allow you to draw any inferences about what's going to happen in

2    a presidential primary or in an on-year presidential election,

3    and the other is they don't tell you anything about people who

4    simply don't present at the polls, and the way that you can tell

5    that is he phrases his claim that Act 23 does not prevent voters

6    from casting ballots, applies to individuals, quote,

7    participating in these elections.

8         So he's limiting his inference to the people who have

9    already chosen to come out, and, you know, the fact is in his

10   own published work he's argued that this is the wrong indicator,

11   and I think there's very clear and compelling evidence from

12   the -- particularly the April 2016 primary where the number of

13   provisional ballots skyrocketed to -- I don't think that there

14   has ever been -- actually I'm quite confident that the

15   provisional ballots only became a thing after the Help America

16   Vote Act.  The number of provisional ballots we saw in April

17   2016 is five, six, seven times as many as we have seen in recent

18   even presidential elections.  So I regard that inference as

19   utterly incorrect.

20   Q    And let me just pause for a minute and ask you by way of

21   your background, you do have a great deal of experience studying

22   Wisconsin elections, election administration --

23   A    That's correct.

24   Q    Okay.  And can you just give a couple of examples?

25   A    I am part of a group of scholars that since I think

1    probably 2009 has been actively engaged in studying elections.

2    I was -- I joined a group actually headed by Professor Burden

3    that we worked with the Government Accountability Board with a

4    contract, a grant that they received from the Election

5    Assistance Commission to study election administration processes

6    and advise them on compliance with reporting requirements.  We

7    did a survey of every local election official in the state,

8    which is over 1,800 election officials.  We've published a

9    number of peer-reviewed articles on election administration

10   looking at the effect of election laws on turnout, the effect of

11   administrative burdens, the perceptions of local election

12   officials and how they perceive the effects, the partisan

13   consequences of election reform.  I have been actively involved

14   in expert witness work on elections both in redistricting -- in

15   2011 I was retained by the Prosser for Supreme Court campaign

16   after the election to advise them on the underlying

17   probabilities of the recount process, which they went and

18   advised them about indicators that would suggest that something

19   had gone wrong, something was awry, and there was nothing.  So

20   I've been studying Wisconsin elections since at least 1995 and

21   have been studying specifically election administration for

22   probably the last eight years.

23   Q    Okay.  And just by the way, is Prosser a Republican or a

24   Democrat?

25   A    Well, the Supreme Court races are partisan, but when he was

1    in the state legislature, I believe he was a Republican.

2    Q    And so what is Wisconsin's experience historically with

3    provisional ballots in terms of numbers?

4    A    Provisional ballots were implemented in the Help America

5    Vote Act primarily because of the experience in the 2000

6    presidential election when many thousands of voters, especially

7    in Florida which was decisive in that election, who presented at

8    the polls believing that they were registered, and for a variety

9    of reasons did not show up on the rolls.  They had been purged.

10   They did not appear as registered, and there was a tremendous

11   controversy about that.

12        The Help America Vote Act established a requirement that

13   states offer voters provisional ballots when there is a dispute

14   over their eligibility.  In most states the disputes involve

15   whether someone is correctly registered or is accurately

16   registered, and so in states like Ohio where you don't have

17   election day registration, you can see tens of thousands, some

18   places hundreds of thousands of provisional ballots where people

19   appear at the wrong precinct, they appear believing that they

20   are registered when they are not, and instead of simply turning

21   them away, they are allowed to vote provisionally and given some

22   time, it varies by state, but are given some time after the

23   election has occurred to correct the problems.

24        In most cases they can't.  Most of the time provisional

25   ballots are not counted, but provisional ballots have never been

1    a real issue in Wisconsin because if you present at the polls

2    believing that you're registered and you're not and you're not,

3    you register on election day.  And so whereas other states would

4    have tens of thousands of provisional ballots because of

5    disputes over eligibility, I think in the 2014 gubernatorial

6    election statewide, which had I think 2.1 million votes cast, I

7    think there were 54.  I know in the City of Madison in 2014 with

8    131 -- 121,000 votes cast, there was one provisional ballot

9    because the only reason for a provisional ballot would be for

10   someone who can't prove their residence, and so in those cases

11   if they didn't have the documentation and could not produce it,

12   they would vote provisionally and they would have three days

13   after the election to resolve that, to correct, to cure their

14   provisional ballot.  And so we had virtually none, and there was

15   no -- it was just not an issue.  Well, now we do.

16   Q    Okay.  So is there any subsequent evidence of the effects

17   of these laws, and particularly the voter ID law, from the more

18   recent elections?

19   A    So there are two pieces of evidence:  One relating solely

20   to Madison which is from the February 2016 Supreme Court

21   primary, and the other is from the April 2016 presidential

22   preference primary.

23   Q    Okay.  What about the Madison example?

24   A    So in Madison in February -- I don't know the exact date,

25   but it was a February Supreme Court primary.  I think there

3-P-137

1    were -- there was a total of 38,000 ballots cast for that

2    election in Madison.  It was a low turnout affair.  And they

3    had, by my count, 28 provisional ballots.  I think Maribeth

4    Witzel-Behl said 23, but it's immaterial.  I'm working from

5    recollection here.  So we have an election that in 2014 you had

6    121,000 ballots cast, 1 provisional ballot.  Now you have an

7    election where there was one-quarter the number of ballots cast

8    but 23 times the number of provisional ballots, and almost all

9    of them were photo ID related.  I did not -- I don't know or did

10   not know how many of them had actually been counted, but she

11   testified today that most of them -- I think only six of them

12   were actually cured.  So this is concrete evidence that people

13   are presenting at the polls, and they're unable to cast a ballot

14   because they don't have photo ID.  Other evidence --

15   Q    Let me ask you this -- talking about the April 5th primary?

16   A    The April 5th presidential primary gives you even more

17   evidence because that's a state -- we now have statewide

18   figures.  I actually don't know off the top of my head --

19   Q    Put up the charts.  Can we put up PX463, and this is one of

20   the ones that we sent you yesterday.  I don't know if there's an

21   objection, but maybe before you answer that I'll ask you where

22   did the information in this table come from?

23   A    I received data that was represented as being from the GAB,

24   so it reflects the reporting of the local clerks to the GAB of

25   the number of provisional ballots that they issued in the April

1   5th, 2016, primary.  It's actually a list of every single one

2   with the voter, the address, the reason for the provisional

3   ballot, and whether the ballot was ultimately counted or

4   rejected.

5           THE COURT:  And this is from the GAB?

6           THE WITNESS:  This is from the GAB.  This chart is

7   actually collapsed so the GAB -- it was a spreadsheet with all

8   375 individuals who cast provisional ballots, and for each

9   individual it had their name, first name, last name.  For about

10  half of them it had their address.  I think for 183 of the 375

11  it actually had data for address.  It had their county, the

12  reason for the provisional ballot, and whether it was counted or

13  rejected.

14  BY MR. SPIVA:

15  Q    Just to be clear, this was a document that was produced in

16  discovery in this case --

17  A    I believe so.  And so what I did is I --

18          THE COURT:  Hold on.  Is there any objection to the

19  chart?

20          MR. KAWSKI:  There are no objections.

21          THE COURT:  Okay.  I'll admit the chart.

22  BY MR. SPIVA:

23  Q    Why don't you go ahead and maybe explain what the chart

24  shows, and if we can make that a little bigger, that would be

25  great.

1    A    So what I did is I took that spreadsheet and imported it
2    into a statistical package that I use that I can manipulate it,
3    and I collapsed this -- that data to give me figures on how
4    many -- on the distribution of provisional ballots based on the
5    reason.  And so these are just -- this is just data that was
6    entered by local clerks.  So there were 375 provisional ballots,
7    which I actually don't believe is -- I think that's a
8    significant undercount.  I don't think that captures every
9    provisional ballot that was issued, but we'll take that as the
10   lower bound of that.
11   Q    Why do you suspect it doesn't capture the total universe?
12   A    Well, for a couple of reasons.  One is that if you look at
13   that data and collapse it by municipality, there was only
14   provisional ballot data in 105 of the state's 1,870-odd
15   municipalities.  There were also some unusual patterns.  So
16   Madison had I think it was 123 provisional ballots, which was
17   discussed this morning.  So Madison has about 5 percent -- about
18   7 percent of the statewide number of registered voters, and it
19   doesn't make sense that Madison would have one-third of the
20   provisional ballots.  There was a low number of provisional
21   ballots that was issued in Milwaukee.  Milwaukee has a much
22   larger -- four times the size of Madison, but they only had 54
23   provisional ballots, and so I think there were some
24   inconsistencies across municipalities with the degree to which
25   provisional ballots were offered, but we can work with this as

1    the lower bound.

2    Q    Okay.  So what does PX463 --

3    A    So it shows of the 375 provisional ballots, about 87

4    percent of them were related to photo ID.  So we have the 288

5    provisional ballots that were listed as being offered for photo

6    ID.  We have 34 provisional ballots in the third line issued

7    because of Wisconsin driver's license.  Now, the file doesn't

8    specify what this means, but it's a reasonable inference that

9    this is photo ID related, that someone presented -- the way in

10   which data is reported from clerks to the GAB either through the

11   incident reports or the inspectors' reports from what GAB calls

12   the GAB 190s, clerks enter data in inconsistent ways.  One clerk

13   might have said they didn't have a photo ID; someone else would

14   have said they don't have a Wisconsin driver's license even

15   though that's photo ID related.  9 people were issued a photo

16   ID -- a provisional ballot because of photo ID, Wisconsin

17   driver's license.  So we have 77 percent, 10 percent, which is

18   87 percent plus 2.4 -- basically have 87 percent of the

19   provisional ballots were issued basically because the person,

20   the registrant, the voter, did not have a photo ID.

21        The other three categories are related to documentary proof

22   of residence.  We have the 38 people for proof of residence.  We

23   have 5 people with a combination of proof of residence and photo

24   ID.  One person Wisconsin driver's license, proof of residence.

25   If you add up 38, 5, and 1, that gives you 44, and that's

1    roughly consistent with the number of provisional ballots that

2    you would have expected in a Wisconsin election that were --

3    that were -- what we can call typical based on the pattern.

4         So we know that there were three hundred -- let's add it

5    up.  43 -- 331 people who were unable to cast a regular ballot

6    because they didn't have a photo ID, and this is documented.

7    These are real people.  These are people who presented at the

8    polls.  These are people who were not able to cast a ballot

9    because they didn't have a photo ID.

10   Q    Isn't that a small percentage though of the total number of

11   people who voted?

12   A    It's a small percentage of the 1.6 million people who

13   voted, but if you're in this category and you're

14   disenfranchised, it's not a small number.  And you'll hear me

15   say this again, but you disenfranchise someone from an election,

16   prohibit them from voting, you can't unring that bell.  There's

17   no way to remedy that.  There's no way to make that person

18   whole.  They've been disenfranchised.  They wanted to vote.

19   They were prevented from voting because of the photo ID

20   requirement.

21        THE COURT:  Let me just ask one thing.  I assume -- let

22   me put it this way.  I'm inferring from your comments that you

23   assume that they were all actually eligible to vote or that they

24   were all entitled to vote, just lacked the ID.  Entitled in the

25   sense that they were eligible citizens.

1          THE WITNESS:  Well, I am drawing the inference if the

2     reason they were issued a photo ID -- provisional ballot was for

3     photo ID, I'm drawing the inference that they were actually

4     registered because for people who have proof of residence

5     problems, they were not accurately registered.  In fact, I'll

6     show data in a second that there are large -- there are a number

7     of voters who have been voting for decades who have been in the

8     SVRS for years who were unable to have their -- unable to vote.

9     Now, it's true that some of these votes were ultimately counted.

10    I have data on the final status of these votes, and about 30

11    percent of them --

12          MR. SPIVA:  Why don't we put up plaintiffs' exhibit

13    464.

14          THE COURT:  Is there going to be an objection to 464?

15          MR. JOHNSON-KARP:  No objection.

16          THE COURT:  Okay.  That's admitted.

17          THE WITNESS:  So of the 375 provisional ballots, this

18    shows the final status.  108 of them were counted, so someone

19    voted provisionally and was able to resolve the underlying

20    problem.  69 percent were not counted, and, again, this is in

21    line with the pattern in other states.  Most provisional ballots

22    are not counted.  Of the 379, there were 9 that were not listed

23    as ultimately resolved, so we don't know whether these folks

24    were counted or not.

25    BY MR. SPIVA:

1    Q    And let me ask if we could put up -- well, actually, two

2    questions.  Is there literature on whether this is typical in

3    terms of whether most provisional ballots are ultimately

4    counted?

5    A    It is.  It's mentioned that the literature -- people who

6    have examined the ultimate status of provisional ballots in

7    other states show the same type of pattern.  It depends on the

8    state.  Sometimes you'll get a slightly higher percentage

9    counted.  Sometimes you'll get a slightly lower percentage

10   counted, but the literature is quite clear that most provisional

11   ballots wind up being rejected.

12   Q    And are there additional reasons beyond people maybe just

13   not -- I shouldn't say just, but people not being able to come

14   back with a valid ID, an acceptable ID, why a provisional ballot

15   might be rejected?

16   A    Well, ultimately if a provisional voter is not able to

17   overcome the objection.  All right?  They might come -- some

18   people clearly are going to vote provisionally and not bother

19   because it's an additional step that they have to go to the city

20   clerk's office.

21   Q    They don't sign --

22   A    That was the story today, that someone failed to sign their

23   provisional ballot, and that's one that can't be cured.

24   Q    Even if they come back?

25   A    Even if they come back.  I think Maribeth Witzel-Behl said

1    this person did come back, and because they hadn't signed it,

2    they were unable to count it.

3    Q    And that's an impediment that's not faced by somebody

4    casting a regular ballot?

5    A    That's correct.  A regular ballot in Madison at least, we

6    have a polling place, optical scan.  You cast your ballot.  You

7    insert it into the machine, and you're done.

8    Q    Let me ask if we can put up plaintiffs' exhibit 466.

9    Actually did we already do -- wait a second.  Can you take that

10   down for a minute?  Let me ask that we put up 465, please,

11   plaintiffs' exhibit 465.  Can you explain what this represents?

12   A    Because I had information on each individual voter, for

13   about half of them, so for about half of the provisional voters,

14   I had enough data that I could try to link them with their

15   record in the Statewide Voter Registration System.  I had their

16   name.  I had their address.  And I also had that same data in

17   the SVRS.  So -- and because I had a relatively small number of

18   matches, I could combine an automated process with a manual

19   process to correct problems.  So for about half of the

20   registrants or half --

21        THE COURT:  Let me find out about the status of

22   these -- is there an objection to this exhibit?

23        MR. JOHNSON-KARP:  No objection.

24        THE COURT:  Okay.  Good.  That's admitted.

25        THE WITNESS:  So I matched on the first name, last

1    name, and zip code of the provisional voter.  There were no

2    duplicates on that, so each person was unique, first name, last

3    name, zip code.  And I matched them to the equivalent record in

4    the SVRS which gave me a list of I think 163 matches.  And

5    because I also had the address of the provisional voter and the

6    registered voter, I could go in and manually compare it and make

7    sure that those weren't duplicated, and there were some

8    duplicates.  Sometimes there were two people with the same name

9    and zip code in the SVRS, but the addresses didn't match, and I

10   eliminated that.  So this is the subset of people in the SVRS or

11   the subset of provisional voters who voted provisionally solely

12   because they had no photo ID.  So I'm actually not even counting

13   the people who voted provisionally because they didn't have a

14   Wisconsin driver's license.  I'm limiting to that first category

15   of 288 people.

16        This is probably half of the actual number because for half

17   of the provisional voters, the address field was blank.  And so

18   I had no way of knowing who they were, and even if they matched

19   to someone with that same name, I didn't have any way of

20   evaluating whether that was the same person, so I'm eliminating

21   that.  So I anticipate -- there's no reason to expect --

22   there was no pattern to the existence of an address by county or

23   anything else -- there's no reason to expect that to be any

24   different.  So I suspect you can reasonably double these to get

25   the full effect.

1    And what this shows, of the 116 people who are in the SVRS

2    who voted provisionally in April because of no photo ID, it

3    shows that actually 59 percent of them actually have a driver's

4    license or photo ID, and this is -- this is consistent with what

5    other studies have shown, that a lot of people who actually

6    possess a qualifying ID incorrectly believe that they don't, and

7    so they -- either they don't bring it or they might have lost

8    it, and so, you know, proportionately the people who don't

9    possess a driver's license, that's 8.4 percent of the registered

10   voters.  We see that they're overrepresented by a factor of

11   five, but in terms of absolute numbers, there are more people

12   who voted provisionally for photo ID who actually possessed an

13   ID.

14       So this is collateral damage of photo ID laws, that they

15   prevent people who not only don't have a photo ID, there are

16   people who actually do have a qualifying ID who believe in part,

17   one reason -- Maribeth talked about that today -- that they

18   mistakenly believe it has to show their accurate address or

19   they've lost it or for whatever reason.  And there are other

20   studies that have found similar phenomenon, that there are

21   people who believe they don't have an ID, but if you drill down

22   and ask them about specific forms of ID that they possess, they

23   actually do.  But they are still -- they still face a burden in

24   casting a ballot.

25       MR. SPIVA:  So I'm going to move to another exhibit,

1    but before we put it up, it's plaintiffs' exhibit 466.  I don't

2    know if there's a way to put it up for the judge and not put it

3    up on the screen.

4            THE COURT:  There is.

5            MR. SPIVA:  And I guess there are two issues, Your

6    Honor.  One, I wanted to see if there's an objection.  This data

7    came from the same source.

8            THE COURT:  Is this up for counsel?

9            MR. KAWSKI:  We're getting there.  I think the iPad may

10   have died.

11           MR. SPIVA:  I have a paper copy.

12           MR. JOHNSON-KARP:  If you've got one, I'll take it.

13           MR. SPIVA:  Would you like a paper copy, Your Honor?

14           THE COURT:  Sure.  Easier to manage.  Thank you.

15           MR. SPIVA:  Do you want one?

16           THE WITNESS:  I can't see it.

17           MR. SPIVA:  That's true.  That's a public monitor.  So

18   I will represent to counsel that this, you know, came from the

19   same sources, the list of provisional ballots that GAB produced

20   and the SVRS database, so I don't know if there's an objection.

21           THE COURT:  Any objection?

22           MR. JOHNSON-KARP:  No objection.

23           THE COURT:  All right.  466 is admitted.

24           MR. SPIVA:  Then the other issue I'll raise is just

25   that under the protective order, this should be confidential,

1    and I don't want to waste a lot of time, you know, dealing with

2    this now, but most of the fields in here are actually publicly

3    available in the SVRS other than date of birth, which appears I

4    think on the second page of the exhibit.  You know, for now I'm

5    perfectly happy to keep it off the public screen, but I just

6    wanted to raise that issue.

7          THE COURT:  The date of birth appears on the -- so this

8    is a spreadsheet that would have many columns that would extend

9    over pages, so the last page we have voters' names and addresses

10   here, and it looks like the birth date appears in the last

11   column, so I don't see any problem with -- I don't know what

12   pages you want to show, but I don't see any problem with showing

13   this first page.

14         MR. SPIVA:  Yeah.  That was my point.  I don't know if

15   there's --

16         THE COURT:  That sounds good.  Just don't show the

17   third page.

18         MR. SPIVA:  Yeah.  Okay.

19         THE COURT:  Should be some reward for hanging in here

20   until --

21         MR. SPIVA:  I don't know if that's a reward actually.

22         THE COURT:  Okay.

23   BY MR. SPIVA:

24   Q    So these -- can you explain what this is?

25   A    This is the result of the matching process, and, again,

1    this is only about half of the people who actually voted

2    provisionally because -- and for about half of the provisional

3    votes I don't have address data, so I didn't feel comfortable

4    even attempting to match. So these are 35 people who voted

5    provisionally solely because they don't possess -- because they

6    didn't possess a photo ID who show up in my original matching

7    analysis linking the SVRS to the DOT as not possessing a

8    driver's license or photo ID whose provisional ballots were

9    rejected.

10         So these 35 people were unambiguously disenfranchised

11   because they don't possess a photo ID. They had to vote

12   provisionally because they don't have a photo ID, and their

13   provisional ballots were rejected because they don't have a

14   photo ID. So this is a list of 35 people, and again if I had

15   address data for everybody, I suspect this list would be twice

16   as large. These people were literally disenfranchised in the

17   presidential primary.

18             THE COURT: But these people were matched in the

19   driver's license database?

20             THE WITNESS: Well, these are people who didn't match.

21   So the variable "no ID" indicates that they did not show up in

22   the Department of Transportation database. So these are not

23   people who show up as having a driver's license. So -- and

24   because of the feature of the SVRS, I have their voter history,

25   so I can go back and look at how many times they voted between

1     February of 2006 when the SVRS was created --

2     BY MR. SPIVA:

3     Q    Is there a column that reflects that?

4     A    There is.  That's the third from the right that says

5     "Number of Times Voted Since 2006."

6     Q    Can we make that bigger, please?  That column.

7     A    And so we can see there's one person who -- one zero.  So

8     this is a person who had never voted prior to April -- had never

9     voted between 2006 and 2014.  A number of people had voted once

10    in either 2012 or 2014, but you can see there's some people --

11    one person voted 10 times.  One person had voted 11 times.

12    Another person 10 times.  One person 15 times, 10, 13 times, 8

13    times.

14         So these are people who had a long history of voting and

15    also point out that if you look at the application date, which

16    is the -- a blank application date signifies that these people

17    were in the SVRS at the point at which it was created.  So these

18    are people who had been registered at least since 2006, and in

19    many cases, given their ages, there were people who were in

20    their 50s, 60s, 70s, and 80s on this list.  Presumably people

21    had been voting for decades.  So this is concrete evidence of

22    literal disenfranchisement for no other reason than the photo ID

23    requirement.

24    Q    Are there additional people who didn't cure their

25    provisional ballots even though they had a DOT ID?

1    A    There are -- I want to make one other point.  So that we

2    know that there are people who voted provisionally and whose

3    ballots were not cured were not on this list, including the

4    gentleman who testified earlier today.  He is actually --

5    Q   Mr. Switlick?

6    A    Mr. Switlick.  He's actually on the list of provisional

7    ballots, but the address fields in that file is blank.  So I was

8    not able to link him here, and I think it's a reasonable

9    inference that that will also be true for many of the people who

10    do not have an address and would not be on this list.

11    Q   What would you say in terms of -- to the suggestion that

12    this is such a small number that it really -- it just suggests

13    kind of a hiccup with the system?

14    A    Well, if you've been voting for decades and suddenly you

15    can't vote, that's not a hiccup to you, and that's the wrong

16    indicator.  There's no question that there are people who have

17    been disenfranchised, and given the fact that in my view looking

18    at the literature and in the view of most, if not all, political

19    scientists who have looked at this issue, that there's no reason

20    for these laws.  They don't cure any problem.  They don't

21    prevent anything that happens.  They don't increase confidence

22    in the electoral process.  They are pure deadweight.  They don't

23    do anything except make it more difficult to vote, and in this

24    case preventing people from voting, and so even on a pure

25    balance of interests, we have purported yet false claims about

1    the purpose of these laws and the things that they do against

2    actual evidence of individuals being disenfranchised, and this

3    is the tip of the iceberg.

4         That we know that there are people who voted provisionally

5    whose ballots were not cured who are not on this list.  We know

6    that there are people who present at the polls who are given the

7    option of a provisional ballot and who walk away.  We know -- we

8    can't observe, but there is good evidence that people will fail

9    to present.  We know that there are people who have IDs who

10   present at the polls and are given a provisional ballot which is

11   not counted because for whatever reason they don't cure their

12   ballots.  The list -- the number of people who were

13   disenfranchised is not 35.  The number of people who were

14   disenfranchised is at least one order of magnitude, probably

15   several orders of magnitude, greater than this, and that's just

16   from what we can directly observe or directly infer.  That's not

17   even making any guesses about the number of people who are

18   ultimately deterred from even presenting at the polls.

19   Q    You've written on and studied the incidents of in-person

20   voter fraud in the United States?

21   A    I have.

22   Q    And how does even the 35 number compare with the evidence

23   of incidents of in-person voter impersonation fraud?

24        MR. JOHNSON-KARP:  I'm going to object as beyond the

25   scope of this expert's opinion.

1          MR. SPIVA:  I think he addressed this in his rebuttal.

2          THE COURT:  Well, point me to a hook here.  I think

3     it's an issue that has been raised, but if he's got this

4     opinion, he should have disclosed it.

5          MR. SPIVA:  I think he cited his article -- I can ask

6     him about it -- but on page 6 of his rebuttal report,

7     plaintiffs' exhibit 43, he cites footnote 21, "The academic

8     literature is virtually unanimous that the rate of vote fraud

9     through impersonation is vanishingly small," and he actually

10    cites one of his own articles on the issue.

11         THE COURT:  Okay.  Good enough.  I'll overrule that

12    objection.  Go ahead and tell me what you have to say.

13    BY MR. SPIVA:

14    Q    How do you think that number, the 35 disenfranchised

15    voters, compares to the number of cases of fraud?

16    A    Given that the number of cases of voter impersonation in

17    Wisconsin that would be -- would have been prevented by a voter

18    ID is for all practical purposes zero, that this vastly exceeds

19    that.  Again, Professor Minnite has written about that.  I

20    presume she will testify about that on Friday.  There is

21    virtually zero evidence of anything other than the most

22    minuscule numbers of amounts of voter impersonation.

23         Virtually every case of voter fraud that I have seen in

24    Wisconsin in the course of my own work and expert witness work

25    involves vote fraud that would not be prevented by a voter ID.

1    Felons voting improperly.  People voting absentee and then at

2    the polls.  People with photo ID voting multiple times.  There

3    is -- I mean, the only reason I say virtually instead of

4    absolutely is that there is some minuscule possibility that

5    there might be a vanishingly small number of incidents, but for

6    all practical purposes, the degree of voter impersonation fraud

7    is essentially zero.

8    Q    And is there any reputable academic who has written any

9    kind of a peer-reviewed study that argues that there is a large

10   incidence of fraud, of in-person voter impersonation fraud?

11   A    Not what I would consider to be a credible social scientist

12   in a credible peer-reviewed journal.  It's very easy to make

13   claims, and people make claims all the time, and you see that

14   here.  Someone who knows a guy who knows a guy who is absolutely

15   convinced you have busloads of Chicago folks rolling into

16   Kenosha casting fraudulent ballots.  It doesn't happen, and

17   virtually all of the peer-reviewed social science evidence is

18   that it does not happen in anything other than the most

19   minuscule quantities.  Actually, can I talk about my article?

20   Q    Sure.  I was going to ask you about it later, but why don't

21   you go ahead.

22   A    So there have been a variety of investigations looking at

23   prosecutions, looking at investigations, looking at forensic

24   evidence of voting irregularities, and there are a variety of

25   ways that it can be detected.  But I and two colleagues, one who

1    is a political scientist now at the University of California-San

2    Diego and another who is a professor of political science at

3    Stanford, we conducted what is called a list experiment, and

4    this is a technique that is -- that has been shown to capture

5    evidence of illegal or stigmatizing activity through surveys.

6         The difficulty is that if you ask someone if they have done

7    something illegal or stigmatizing, you ask people if they have

8    committed vote fraud, people will say no, and so it's not the

9    sort of thing that will be picked up.  However, there are

10   techniques, and this is a technique that has actually been

11   demonstrated as being able to measure things like not only

12   stigmatizing activity but actually has been able to detect

13   political corruption.  It's called the list experiment, and the

14   way that it works is we present a group of respondents, people

15   in a survey -- this was an online survey -- we present them with

16   a list of activities, say five activities, some of which are

17   innocuous, some of which are still innocuous but have lower

18   probability.

19        So we present people with the list of five activities

20   related to politics, and we ask them, how many of these things

21   have you done?  We don't ask which ones.  We say, how many of

22   these things have you done?  And some of the options, I voted in

23   the last election.  I contributed to a political candidate.  I

24   attended a rally.  I talked about politics with my friends.  And

25   it gives us an estimate of how many things people have done.

1    And then for the treatment group we present people with the
2    same list, but we add the activity that we're actually trying to
3    test for.  So in this case it was I voted in someone else's name
4    in a recent election, and we don't ask them how many -- don't
5    ask them which of these things have you done.  We ask people how
6    many, and you can compare the number -- the average number in
7    the treatment and the control group to see if there's a
8    difference, and if there's a difference, it suggests that the
9    treatment question is picking up people who are picking that
10   option because all the other five options are the same.
11       And so we did this, and we found that there was no
12   difference.  In fact, the average number of people in the
13   treatment group is actually a little bit lower, as I recall.  So
14   based on this technique, there was no difference.  There was no
15   detectable levels of voter impersonation.  However, we did have
16   a small number of respondents who said that they had done all of
17   these things, which would indicate, well, if that's true, that
18   suggests that they actually do -- they have committed vote
19   fraud.  We had reason to believe that's not what happened
20   because this was an online survey, and we could actually track
21   how long people took in each question, and so there were people
22   who went through and basically clicked the same answer in all to
23   get their $3 from Survey Monkey or whatever they got for
24   completing the survey.
25       And so we had reason to believe that this was not a real

1  thing, but we wanted to be sure.  And so we conducted a

2  second -- actually two other list experiments.  One was a list

3  experiment that was actually looking for evidence of a

4  stigmatizing activity.  So we did an experiment where the

5  treatment -- it was five innocuous activities.  I floss my

6  teeth.  I received a phone call from a telemarketer and so

7  forth, and then for the treatment group --

8  Q    Everybody lies about the flossing question.

9  A    Everybody lies about the flossing.  The treatment was, I

10  text while I drive, which is illegal in a lot of states,

11  stigmatizing.  We actually found that basically 25 percent of

12  people in the survey admit to texting while driving, which is

13  actually consistent with data that you see from the National

14  Highway Traffic Safety Administration, the National Insurance --

15  whatever the group does that does the crash tests.  So we were

16  confident that we actually were picking up stigmatizing

17  activity.

18       The second additional list experiment is that we asked for

19  five innocuous activities, but the treatment was, I have been

20  kidnapped by aliens, which we took as a phenomena that does not

21  happen.  And we found that there are actually more people who

22  say that -- there's more evidence that people have been

23  kidnapped by aliens than there is of voter impersonation.  So

24  all these things taken together is just an additional piece of

25  evidence which is consistent with all the other good evidence

1   that levels of -- that there is no material amount of voter

2   impersonation.

3   Q    Or there's a lot more alien abductions.

4   A    As we put it in the article, if that's true, we have much

5   bigger problems.

6         THE COURT:  That's probably a good breaking point for

7   us.  We might as well keep going until midnight, but we have to

8   have a court reporter who remains conscious through the whole

9   time.  So we'll call it a night here.  I forgot to check my

10  calendar for tomorrow so that I can give you a heads-up of what

11  we're facing tomorrow.  Is my calendar up over there?

12        THE CLERK:  Not yet.  You have an 11:00 sentencing.

13        THE COURT:  All right.  So -- all right.  So we'll

14  start at our usual 8:00 time.  I have got the 11:00 sentencing,

15  so it's kind of sort of an early lunch.  So we'll have to take a

16  break from 11:00 until 12:30, so we will resume at 12:30.  Early

17  lunch.  I promised this before and didn't really make good on

18  it, but since that's a long afternoon session, we'll probably

19  try to work in two afternoon breaks.  That's our trajectory for

20  tomorrow.  I will see you tomorrow at 8:00.

21        MR. SPIVA:  Thank you.

22        MS. WILSON:  Thank you, Your Honor.

23     (Proceedings concluded at 6:05 p.m.)

24                          ***

25

1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2   Reporter in and for the State of Wisconsin, certify that the

3   foregoing is a true and accurate record of the proceedings held

4   on the 18th day of May, 2016, before the Honorable James D.

5   Peterson, U.S. District Judge for the Western District of

6   Wisconsin, in my presence and reduced to writing in accordance

7   with my stenographic notes made at said time and place.

8          Dated this 1st day of June, 2016.

9

10

11

12

13

14                          ___/s/ Jennifer L. Dobbratz___

15                          Jennifer L. Dobbratz, RMR, CRR, CRC
                                 Federal Court Reporter
16

17

18

19

20

21   The foregoing certification of this transcript does not apply to
     any reproduction of the same by any means unless under the
22   direct control and/or direction of the certifying reporter.

23

24

25