UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

ONE WISCONSIN INSTITUTE, INC., CITIZEN
ACTION OF WISCONSIN EDUCATION FUND., INC.,
RENEE M. GAGNER, ANITA JOHNSON,
CODY R. NELSON, JENNIFER S. TASSE,
SCOTT T. TRINDL, and MICHAEL R. WILDER,

          Plaintiffs,


-vs-                              Case No. 15-CV-324-JDP

JUDGE GERALD C. NICHOL,           Madison, Wisconsin
JUDGE ELSA LAMELAS,               May 16, 2016
JUDGE THOMAS BARLAND,             8:05 a.m.
JUDGE HAROLD V. FROEHLICH,
JUDGE TIMOTHY VOCKE,
JUDGE JOHN FRANKE,
KEVIN J. KENNEDY and MICHAEL HASS,
all in their official capacities,

          Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

   STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF COURT TRIAL
                    MORNING SESSION
      HELD BEFORE DISTRICT JUDGE JAMES D. PETERSON,


APPEARANCES:

For the Plaintiffs:  Perkins Coie, LLP
                     BY:  JOSHUA KAUL
                          CHARLES CURTIS, JR.
                          RHETT MARTIN
                     One East Main Street, Ste. 201
                     Madison, Wisconsin  53703


            Lynette Swenson   RMR, CRR, CBC
        U.S. District Court Federal Reporter
            United States District Court
         120 North Henry Street, Rm. 520
          Madison, Wisconsin  53703

```
 1   For the Plaintiffs:
                     Perkins Coie, LLP
 2                   BY:  BRUCE SPIVA
                     700 Thirteen Street, N.W.
 3                   Washington, D.C.  20005

 4                   Perkins Coie, LLP
                     BY:  BOBBIE WILSON
 5                   505 Howard Street, Ste. 1000
                     San Francisco, California  94015
 6
     Also appearing:  Matt Kennedy - Litigation Specialist
 7

 8   For the Defendants:
                     Wisconsin Department of Justice
 9                   BY:  CLAYTON KAWSKI
                          MICHAEL MURPHY
10                        JODY SCHMELZER
                          GABE JOHNSON-KARP
11                   Assistant Attorneys General
                     17 West Main Street
12                   Madison, Wisconsin  53703

13   Also appearing:  Heather Schultz - Litigation Specialist
                      Rachel Roberts - Litigation Specialist
14

15                       *  *  *  *  *

16                       I-N-D-E-X
```

```
17   Opening statement by Mr. Kaul              10-59
     Opening statement by Mr. Kawski           60-75
18

19   PLAINTIFFS' WITNESSES        EXAMINATION    PAGES

20   TODD ALLBAUGH          Direct by Mr. Kaul      77-92
                            Cross by Mr. Murphy     92-94
21                          Redirect by Mr. Kaul    94-100
     GLENN GROTHMAN           (Video played)        100
22   DALE SCHULTZ             (Video played)        101
     NANNETTE MAYZE         Direct by Mr. Spiva    101-138
23                          Cross by Ms. Schmelzer 138-147
                            Redirect by Mr. Spiva  147-148
24   CASSANDRA SILAS        Direct by Mr. Kaul     149-169
                            Cross by Ms. Schmelzer 169-181
25                          Redirect by Mr. Kaul   181-184
```

1                          E-X-H-I-B-I-T-S

2    PLAINTIFFS' EXHIBITS                    IDENTIFIED/RECEIVED

3    Ex. 367 22-11    Document                111          ---
         367 22-12    Randle SS card          104          ---
4        367 22-14    " birth certificate     107          ---
         367 22-17    REAL ID affidavit       116          ---
5        367 22-18    Cover letter            116          ---
         367 22-19    Letter                  119          ---
6        367 22-20    REAL ID instructions    120          ---
         354          Silas documents         154          ---
7        445          5-13-16 letter          132          ---

8    DEFENDANTS' EXHIBITS

9    Ex. 211          Document                141          ---
         213          Silas petition          171          ---
10       271          Silas application       174          ---

11

12                          *  *  *  *  *

13        (Proceedings called to order.)

14        THE CLERK:  Case Number 15-CV-324-JDP.  *One*

15   *Wisconsin Institute et al. v. Gerald Nichol, et al*. Court

16   is called for a court trial.  May we have the

17   appearances, please.

18        MR. SPIVA:  It's a little hard to hear you back

19   here.  I think you asked for appearances.

20        THE COURT:  Yes.  We'll have the appearances, so

21   go ahead.

22        MR. SPIVA:  Okay.  Thank you, Your Honor.  Good

23   morning.  My name is Bruce Spiva and I'm here with my

24   partner Bobbie Scott (sic), my colleague Josh Kaul and my

25   partner Chuck Curtis.

1          THE COURT:  Good morning to you.

2          MS. WILSON:  Bruce, you mean to say Wilson.

3          MR. SPIVA:  I'm sorry.  Your Honor, Bobbie

4    Wilson.  I have a congressman from the area where I grew

5    up named Bobbie Scott.  First morning of trial.

6          THE COURT:  Is he here?

7          MR. SPIVA:  No.  He's not here, Your Honor.

8          THE COURT:  All right.  Thank you.

9          MR. SPIVA:  I'm sorry.  And also my colleague

10   Rhett Martin with me.

11         THE COURT:  All right.  Very good.

12         MR. KAWSKI:  Good morning, Judge Peterson.

13   Assistant Attorney General Clay Kawski.  And with me

14   today I have Assistant Attorney Generals Mike Murphy,

15   Jody Schmelzer and Gabe Johnson-Karp.  And our paralegal

16   Matt Kennedy will be helping us present our case as well.

17         THE COURT:  All right.  Very good.  Thank you.

18   Good morning to you all.  So I assume the first thing

19   we're ready to begin with before I deal with some

20   preliminaries are the opening statements.  Is that right?

21         MR. SPIVA:  Yes, Your Honor.  We had one

22   preliminary matter we wanted to raise but...

23         THE COURT:  Okay.  Let me deal first with the

24   request that we have received at the clerk's office from

25   individuals who I assume are from the media who want to

1  use electronic devices in the courtroom.  I will follow

2  what has been my usual practice when I get requests like

3  that and I will allow people who are reporting on the

4  case to use electronic devices in the courtroom because

5  the basic rule is that there are no, other than the

6  people who are on this side of the bar working the case

7  and nobody is supposed to be using electronic devices,

8  but I will allow it for the media.  But to make the job

9  of the court security officers easier, which is to say to

10 make it possible for them to enforce the rule against

11 people who aren't reporting on the case, I would like to

12 have all the media sit in a designated spot so that we

13 can tell the court security officers who the media are

14 and then other people who are just bored or doing

15 something else can be asked to stop.

16     So we don't have to do a whole parade here now, but

17 after we take our first break I would like the media to

18 sit -- and I don't know how many -- maybe just have a

19 show of hands.  How many people are here from the media

20 and how many of you would like to use electronic devices

21 for your reporting?  So that's just about everybody.

22 You're kind of conveniently located there, so let's do

23 this:  Let's keep the first row clear.  Looks like -- are

24 you in the second row or are you in the first row?

25          UNIDENTIFIED PERSON:  I'm in the first row.

1          THE COURT:  Are the parties using the first row

2     for --

3          MR. KAWSKI:  We're not.

4          THE COURT:  -- storage of boxes or anything like

5     that?  All right.  The first row would be fine.  So if we

6     could -- let's have the media in the -- from the bench's

7     perspective, the left and center in the first three rows.

8     So if you're in the media and you want to use electronic

9     devices, you should be there.  Anybody else outside of

10    those areas shouldn't be using electronic devices.  So

11    after our first break, reorient yourselves so that you're

12    in those spaces so the court security officers will know

13    who is authorized to use electronic devices.

14      Okay.  So a little procedure matter.  You can stay

15    there, just pull the microphone over.

16         MR. SPIVA:  Okay.  Your Honor, this is under the

17    category we felt like we needed to raise this.  We aren't

18    asking for any type of relief at the moment, but we

19    received a very large -- what appears to be a very large

20    document production from the defendants at close of

21    business on Friday.

22         THE COURT:  Okay.

23         MR. SPIVA:  It was two disks containing over 4.5

24    gigabytes of data and there was new material that was

25    mixed in amongst what was old material, but they have not

1    been able to identify for us what's new and what's not

2    and they literally said they did not know what was new

3    and what was not.  Mr. Curtis stayed up all weekend

4    combing through the files, and he and our tech people

5    report that there appear to be hundreds of new documents

6    and many documents that have been added to, altered or

7    moved around.

8        We've also found several instances where these --

9    Your Honor recalls the IDPP process that's been referred

10   to, a number of these denials of the free ID under the

11   IDPP process wherein the IDPP denial folder previously in

12   the last DMV production from April 19th have now been

13   moved over to the canceled folder and reclassified as

14   customer cancelations which has the effect of hiding the

15   number of denials that have occurred.  We're still

16   processing this, Your Honor, trying to separate out

17   what's truly new from what's old.

18       We may need to come to Your Honor at some point and

19   ask for some sort of relief, but I just wanted to raise

20   it now.  I didn't want to not say anything and then, you

21   know, you say well why did you want to sit on your

22   rights.

23           THE COURT:  I understand.  So you're not asking

24   for anything just yet, but why don't we just check in

25   with the defense side and find out what the production

1    was.  Who's got the point on this?

2              MR. MURPHY:  It's a production related to the

3    IDPP process.  It's an update to what has been produced

4    in the past.  And the IDPP process is ongoing.  The folks

5    at DMV are working day by day, hour by hour, even right

6    now, and so to keep current on the most current facts and

7    also consistent with our obligations to continue ongoing

8    disclosures, there have been updates made.

9          The thing of it is it's a large amount of bytes, but

10   it's not a lot of new material.  We're turning over

11   things as they are kept in the ordinary course of

12   business, and of course the people working on these don't

13   keep a running track on every time they hit save on a

14   Word document.  So what we're doing is we're reproducing

15   in the format that things are ordinarily stored and kept.

16   And any updates will be cumulative.  And it's a vast

17   majority of reproduction, that's true, but there's no way

18   to efficiently filter that when everything is moving all

19   the time.

20         Petitions do change categories.  There's nothing

21   hiding about that.  Things that were in denial, new

22   information come in, they can be brought out of denial,

23   put back into active.  Things like that happen in the

24   ordinary procedures.  There's absolutely nothing hiding

25   going on.  In fact, it's the maximum possible disclosure

1    that we can make to make sure that both sides have the

2    absolute current information to present to the Court.

3          THE COURT:  Well, since nobody is asking for any

4    relief at this point I'll just offer this word of

5    guidance which is that I appreciate the idea that you're

6    trying to keep production current, but the maximum

7    possible production is not always what's fair or

8    reasonable.  The sides should be in rough parity in terms

9    of the ability to access and understand this information,

10   and I suspect that the DMV, although it is on an ongoing

11   basis, has some method of making sense of this data that

12   the plaintiffs may not.  So at this point, all I'm going

13   to do is say it's up to the parties to cooperate to make

14   sure that the plaintiffs have a way of understanding this

15   information that is roughly in parity with the way the

16   DMV could do it.

17         MR. MURPHY:  Yeah, and I should just add that

18   all these are broken into subfolders by category and

19   petitioner.  So it's not like a data dump.  It's not like

20   a disk with unsorted material that is --

21         THE COURT:  That's good enough for my purposes

22   today.  So I'm just going to tell the parties to

23   cooperate and make sure that the plaintiffs can make as

24   much sense out of the data as the DMV can.

25         Anything else before we dig in?

1        MR. SPIVA:  No, Your Honor.  And Mr. --

2        THE COURT:  Anything else from the defense side

3  before we get going?

4        MR. KAWSKI:  No, Your Honor.

5        THE COURT:  All right.  Very good.

6        MR. SPIVA:  Mr. Kaul is going to do the opening

7  for our side.

8        THE COURT:  Very good.  (8:17 a.m.)

9        MR. KAUL:  Good morning, Your Honor.  Before I

10  start, I just want to make the Court aware we're going to

11  have some exhibits that will be coming up on the screen.

12        THE COURT:  Okay.

13        MR. KAUL:  There's a mix of confidential

14  materials and public materials and so I think toggling

15  back and forth is going to be impossible, so they'll all

16  just be for Your Honor's viewing and the parties' viewing

17  for now.  If that's all right with the Court.

18        THE COURT:  Let's proceed and we'll see how we

19  get, because I can relatively easily turn off the public

20  monitors.

21        MR. KAUL:  I'm also happy to tell Your Honor

22  when an exhibit is going to be confidential.

23        THE COURT:  Why don't we start out and we'll

24  just have everything up there, but give me a heads up and

25  then we'll just mute the monitors.

1          MR. KAUL:  Okay.  Thank you, Your Honor.

2    Shortly before he introduced the Voting Rights Act,

3    President Johnson spoke to a joint session of Congress

4    about voting rights.  The history of this country, he

5    said, in large measure is the history of expansion of the

6    right to vote to all of our people.  There is no reason

7    which can excuse the denial of that right.  There is no

8    duty which weighs more heavily on us than the duty we

9    have to ensure that right.  The fact remained, however,

10   that, as he put it, every device of which human ingenuity

11   is capable has been used to deny this right.  For that

12   reason, President Johnson called for the adoption of the

13   Voting Rights Act, one of the acts that's directly at

14   issue in this case.

15        Since the start of 2011, the sort of discriminatory

16   human ingenuity about which President Johnson spoke has

17   been on display in the Wisconsin State Capitol with

18   respect to voting rights.  During the four-year period on

19   which this case focuses, the State of Wisconsin acted to

20   make it more difficult to vote in approximately 15

21   different ways.  These restrictions were justified, not

22   by any meaningful State interest, but instead by

23   manufactured problems that were unsupported by any real

24   evidence.

25        The evidence here will show, in fact, that

1    restricting access to the ballot box was not simply a

2    consequence but rather the very purpose of these laws.

3    As Your Honor is aware, the 2008 presidential election in

4    Wisconsin was a fundamentally different election from the

5    two preceding presidential elections.  The two prior

6    elections were decided by an extremely narrow margin of

7    less than a half a point.  The 2008 election was decided

8    by 14 percentage points.

9        The outcome of the 2010 election was very different.

10   Scott Walker was of course elected Governor and

11   Republicans took control of both Houses and the State

12   Legislature, and the events that followed were

13   unprecedented in the history of the state.  In early

14   2011, the bill drastically limiting collective

15   bargaining, ultimately known as Act 10, was introduced.

16   Massive protests followed involving as many as 100,000

17   protestors in and around the State Capitol.  And

18   significantly here, recall petitions were circulated

19   leading to the recall elections for a number of state

20   senators as well as Governor Walker.

21       In the midst of this upheaval, the Legislature began

22   its effort to restrict access to voting in the voter

23   registration.  On May 25 of 2011, Wisconsin enacted 2011

24   Wisconsin Act 23.  That legislation imposed the voter ID

25   requirement; reduced the in-person absentee or early

voting period from 30 days to only 12 days; it eliminated corroboration; required a certification of citizenship on dorm lists used for voter registration; it increased the residency requirement; eliminated straight-ticket voting, and eliminated statewide special registration deputies.

On November 16, 2011, the state eliminated the option that clerks had to fax or email rather than mail absentee ballots to voters.

In April of 2016, the state adopted laws that limited the circumstances in which clerks could return absentee ballots to voters and the requirement that SRDs be appointed at most high schools.

In November of 2012, of course President Obama was reelected and he again carried Wisconsin. But in the following session, the state legislature, which was again in Republican control following a brief period of Democratic control following some of the recall elections of 2012, the Legislature picked up where it had left off.

In December of 2013, the state enacted legislation that overturned Madison's requirement that landlords provide voter registration forms to new tenants.

On March 27, 2014, the state enacted 2013 Wisconsin Act 146 which eliminated evening and weekend in-person absentee voting.

And on April 2nd, 2014, the state adopted bills that

require that election observers be placed between three

and eight feet from where voters sign in and register;

and that most voters provide documentary proof of

residence when they register to vote no matter how far

away from the election they're registering.

The state legislature did not pass a bill that was

introduced in March of 2013.  That bill would have

permitted municipalities to open multiple in-person

absentee voting locations.  It would have made it easier

to vote.

The evidence in this case will show that these

fundamental changes in Wisconsin election law didn't

relate to any problem in election administration either.

A few charitable trusts ranked Wisconsin as one of the

top four states in the country in its effectiveness of

election administration in both the 2008 and 2010

elections.

Your Honor, our evidence about the burdens imposed

by these challenge provisions and their disparate impact

will come in several different layers.  At the most

granular level, you'll hear from affected voters,

individuals whose right to vote has been burdened and in

a number of cases denied as a result of the provisions

that are at issue.  You'll also hear from activists and

organizers, people who help others register and vote and

1  observe the burdens that the provisions impose on those

2  voters.

3       You'll hear from DMV officials who will discuss how

4  the state's ID process has been implemented.  You'll hear

5  from the chief election officials of the state's two

6  largest cities, as well as the director and general

7  counsel of the GAB and the lead election specialist at

8  the GAB.

9       And finally, you'll hear from experts who will

10  testify, among other things, about their analyses of

11  Wisconsin election data and the state of the scholarly

12  literature with respect to some of the issues raised in

13  this case.

14       Now, through the summary judgment filings in this

15  case we've outlined some of the high-level points about

16  the burdens that these laws impose and the disparate

17  impact.  So I'll focus this morning primarily on newer

18  developments.  With that said, I do want to touch on at

19  least some of the key evidence regarding the burdens that

20  the challenge provisions impose.

21       With respect to the state's two reductions of the

22  period for in-person absentee voting and the rule

23  limiting absentee voting to a single location per

24  municipality, the evidence will show that about 60,000

25  voters cast in-person absentee ballots on the Monday

 1     before the November 2008 election.  That's one of the

 2     days that was eliminated by Act 23.

 3          Dr. Ken Mayer, from the University of Wisconsin,

 4     will explain that he found that in 2010, the last

 5     statewide election in which registration was permitted in

 6     the three days before election day, significantly more

 7     people registered over that period in cities with high

 8     concentrations of African Americans than in other cities.

 9     And research on early voting has --

10          THE COURT:  Is that more -- I want to be clear

11     about that.  Significantly more people registered over

12     that period in cities with high concentrations, you mean

13     on a proportionate --

14          MR. KAUL:  That's correct, Your Honor.

15          THE COURT:  -- basis?  Okay.

16          MR. KAUL:  And research on early voting has

17     consistently found that minority voters are more likely

18     than white voters to vote on the weekend before an

19     election.  Again, that's the period that was eliminated

20     -- part of the period that was eliminated by Act 23.

21          The evidence will also show that the one-location

22     rule deters in-person absentee voting, particularly in

23     Milwaukee and Madison where it's resulted in long lines.

24     And in fact, defense expert Trey Hood has written in his

25     scholarly work that making early in-person voting more

1  convenient in terms of location and hours results in

2  higher early turnout.  And the GAB has recommended that

3  municipalities be permitted to use multiple in-person

4  absentee voting locations.

5       Now, to alleviate the problems from the one-location

6  rule, Milwaukee and Madison had offered extended evening

7  and weekend hours during high turnout elections.  Data

8  from the GAB show that Milwaukee and Madison accounted

9  for 65 percent of weekend early voters in 2010, 66

10  percent of such votes in the recall election in 2012, and

11  49 percent of those votes during the November 2012

12  general election.  So the evidence is powerful that these

13  laws eliminating weekend early voting were targeted

14  specifically in Milwaukee and Madison.

15       The Legislature, of course, has eliminated those

16  voting hours.

17            THE COURT:  How many -- if it were evenly

18  distributed among the voting population, what percentage

19  would Madison and Milwaukee represent?

20            MR. KAUL:  If the weekend early voting were

21  evenly distributed?

22            THE COURT:  Yeah.

23            MR. KAUL:  You mean what --

24            THE COURT:  My understanding here is a high

25  proportion of the state's early voting during those

 1    periods, say like 65 percent, so what you're saying come

 2    from Madison and Milwaukee.  Well, what percentage would

 3    come from Madison and Milwaukee if it were evenly

 4    distributed among the population?

 5         MR. KAUL:  I understand, Your Honor.  I believe

 6    the percentage of the voting age population that Madison

 7    and Milwaukee make up is about 12 to 14 percent.  I know

 8    that the experts will know the numbers on that, but

 9    that's my recollection.

10         THE COURT:  All right.  Good.

11         MR. KAUL:  As I mentioned in my brief summary

12    before, the state has also made a number of changes to

13    the registration rules.  All of them make it harder to

14    register to vote, particularly when considered in

15    combination.  I'll provide just a few examples of the

16    impact of these changes.  In a six-year period, over

17    35,000 Wisconsinites registered using corroboration.

18    That option is just no longer available.  The elimination

19    of corroboration, in combination with the expansion of

20    documentary proof of residence requirement, has had the

21    effect of requiring everybody who registers to vote to

22    have some acceptable document that shows their residence.

23    For voters who don't have such documentation, for

24    example, an 18-year-old who lives with his parents and

25    doesn't drive, registering can be extremely difficult if

1   not impossible.  And these changes disproportionately

2   burden African Americans and Latinos who, the evidence

3   will show, are, first of all, less likely to have the

4   types of proof of residence documents that are most

5   commonly used, and secondly, are more likely to move and

6   therefore to have to re-register.

7        The expansion of the documentary proof of residence

8   requirement has also forced election administrators to

9   reject a large number of registration applications

10  submitted by mail because people don't realize that they

11  need to submit a physical copy of their proof of

12  registration -- proof of residence with their

13  application.  So in Milwaukee, 375 of the first 565

14  registrations, that's all the data we had, that were

15  submitted by mail after the change in the law; in other

16  words, over 65 percent, did not include documentary proof

17  of residence.  The expanded documentary proof of

18  residence requirement and the elimination of statewide

19  SRDs has also seriously hampered the ability of groups

20  like The League of Women Voters to do voter registration

21  drives.  And that's because, first of all, a lot people

22  just don't have documentary proof of residence on their

23  person when they're walking around and are encountered by

24  people who are doing a drive.  Secondly, because the

25  elimination of statewide SRDs means that if somebody is

1    doing a voter registration drive and a voter comes up who
2    is from a different city from the one in which the SRD is
3    authorized, there can't be registration done.

4        Other changes to the registration rules clearly
5    target young voters.  As I mentioned before, the state
6    has eliminated the requirement that most high schools
7    have SRDs.  The state has also eliminated -- largely
8    eliminated registration through the use of dorm lists,
9    because the requirement that the dorm lists contain a
10   certification of citizenship would mean that if colleges
11   submit that certification, they are in violation of FERPA
12   of federal law.

13       Likewise, Your Honor, the law overriding Madison's
14   ordinance that required landlords to distribute voter
15   registration forms will predictably burden renters in
16   Madison, which is a group made up of disproportionate
17   share of students, African Americans and Latinos.

18       With respect to the change in the residency rules,
19   it of course is more difficult now for voters who move
20   more than 10 but fewer than 28 days before an election.
21   They either have to know about this fairly obscure rule
22   and cast an absentee ballot or they have to travel back
23   to their prior residence, which could be from one end of
24   the state to the other to vote.  The elimination of
25   straight-ticket voting slows the voting process, the

1  evidence will show, which means longer lines, and it also

2  increases the possibility for voter error.

3      In 2012, there were more than 1,000 over votes cast

4  in Milwaukee in the presidential contest.  This is after

5  the elimination of straight-ticket voting.  The

6  elimination of the option to fax or email absentee

7  ballots has made it more difficult for some voters,

8  particularly voters who are temporarily overseas like

9  students studying abroad, to get absentee ballots to them

10  in time for them to return those ballots and have them

11  counted, and the change in election observer rules that

12  moved observers closer to voters despite evidence in the

13  state's recent history that aggressive observers had

14  created problems in some locations makes it easier for

15  observers to intimidate voters, to invade a voter's

16  privacy, and to slow down the voting process.

17      Now, Your Honor, I'm also going to talk about the

18  burdens imposed by the Voter ID Law, but before I do

19  that, let me start by highlighting some significant

20  changes that have taken place since the Seventh Circuit

21  issued its decision in *Frank*.  First as the Court is

22  aware from our filings in this case, the IDPP hadn't yet

23  been implemented at the time of *Frank*, and as I'll

24  discuss in a minute, there's abundant evidence in this

25  case that the IDPP has been and will in the future

1  continue to be administered in a manner that is just

2  simply preposterous.

3       Second, the Seventh Circuit in *Frank* explained that

4  the record didn't reveal what impact voter ID laws had on

5  voters in other states with voter ID laws.  But as a

6  result of several recent studies we now have that

7  evidence.  Most significantly, the GAO, a non-partisan

8  governmental organization, found not only that voter ID

9  laws decreased turnout, but also that they have racially

10  disparate impacts.

11       Third, the *Frank* court noted it didn't have evidence

12  about whether the Voter ID Law in Wisconsin prevented

13  people from voting.  Again, we now have that evidence in

14  a few different forms.  Dr. Ken Mayer, who I mentioned

15  before, found that in 2004 when a large number of voters

16  incorrectly believed the Voter ID Law was in effect,

17  voters who didn't possess an ID were significantly less

18  likely than others to vote, even controlling for whether

19  they had voted in 2010, the 2012 recall, or the 2012

20  presidential election.  On top of that, we know that in

21  just the recent election, hundreds of voters cast

22  provisional ballots that weren't cured, meaning those

23  voters were disenfranchised.  And the evidence will show

24  that provisional ballots are just the tip of the iceberg

25  when it comes to disenfranchisement that results from

voter ID laws.

The evidence will show that people such as the plaintiffs in this case who have asked for IDs but haven't gotten them don't show up at the polls to vote if they know there's a Voter ID Law and they don't have an ID.  On top of that, a recent study shows that many voters can be confused.  Voters who actually have an ID that qualifies may be confused into thinking they don't have such an ID and they're deterred from turning out as a result.

Fourth, unlike in *Frank*, the evidence now shows that the State Legislature has refused to fund a public education campaign regarding the Voter ID Law.  Your Honor, PX454, which we'll pull up on the screen, contains a letter from Kevin Kennedy requesting funding for an education campaign from the cochairs of the Joint Finance Committee.  In that letter, he said that a number of problems with the Voter Photo ID Law were reported in this year's February and April elections, suggesting the need for a comprehensive public education campaign, and later in the letter the GAB referred to the situation as an emergency.

Now, Director Kennedy will testify that it's been clear for several months that this public funding -- public education campaign is needed, but it hasn't

1    happened.  So for a number of reasons, the facts before

2    this Court are very different from the facts that were

3    before the *Frank* court.

4        Now, in terms of the burdens associated with the

5    Voter ID Law, for voters who possess a qualifying ID, the

6    burden by the Voter ID Law is that voters have to learn

7    what forms of ID can be used for voting or be fortunate

8    enough to show up with one of the correct forms and have

9    to avoid losing their ID or having it stolen and they

10   have to remember to bring their ID with them to the

11   polls.  Otherwise even voters with qualifying ID can be

12   disenfranchised, and those voters may very well have to

13   wait in longer lines because the evidence in this case

14   will show that the Voter ID Law itself, the process of

15   somebody pulling out an ID, someone else checking it and

16   verifying the information slows down the check-in

17   process.

18       For voters who don't possess an ID, the burdens

19   imposed by the law can be severe.  And to be clear, this

20   is not a small number of voters.  Dr. Mayer found that

21   approximately 280,000 registered voters in Wisconsin

22   don't have a DMV ID, and that's not accounting for the

23   number of unregistered voters who in Wisconsin are

24   eligible, of course, to register through same-day

25   registration or other means to vote.  And even defense

1   expert Dr. Hood found that well over 100,000 registered

2   voters fall into this category.

3       The evidence will also show that as the burdens of

4   the Voter ID Law increases --

5               THE COURT:  When you say register, you mean

6   people eligible to register?  Some people were actually

7   registered to vote already, but they lacked the

8   qualifying ID.

9               MR. KAUL:  It's the latter, Your Honor.

10              THE COURT:  All right.

11              MR. KAUL:  The evidence will show that as the

12  burdens from the Voter ID Law increase, the racial

13  disproportionality increases as well.  To begin with, the

14  number of voters have gone to the DMV to get free IDs,

15  according to defense expert Dr. Hood, although African

16  Americans make up about 5.6 percent of the voting-age

17  population in Wisconsin, they make up 35.6 percent, so

18  somewhere between six and seven times disproportionate

19  the group of those who have obtained a free ID for voting

20  purposes.  Likewise, Latinos represent 3.3 percent of the

21  voting-age population in Wisconsin, but they make up 8.3

22  percent of the group that has had to obtain a free ID.

23  So what that means is that if you're African American or

24  Latino, you're far more likely than you would be if

25  you're white to have to undertake the additional burden

1    of traveling to the DMV and waiting in line in order to

2    get an ID to vote.

3        Even accounting for that, disproportionate ID

4    possession remains.  Dr. Mayer will testify that even

5    accounting for those free IDs, about 8.3 percent of

6    whites in Wisconsin don't possess a DMV ID, but the

7    percentage raises to 9.8 percent for African Americans

8    and 11.1 percent for Hispanics.

9        Within that group of voters who don't have ID, some

10   will have their birth certificate or a passport, and if

11   they can find transportation and learn about the Voter ID

12   Law, they'll be able at least potentially to travel to a

13   DMV to get a free ID.  Voters without the records

14   required to establish their name or date of birth or that

15   they're U.S. citizens or voters who even have

16   inconsistent information in their records, like different

17   spellings or dates of birth in their vital records, face

18   a much more difficult road.

19       Now, a select few of those individuals may receive

20   an exception from those strict documentary requirements

21   for obtaining a free ID from one of the several dozen

22   mid-level DMV managers through a process that's guided by

23   no written policies, it's subject to no review to ensure

24   fair and uniform standards and is left entirely to the

25   discretion of those mid-level DMV managers.  But most

voters who don't have the required records or have
inconsistent information in their documents must "enter
the IDPP process."

So far nearly 1,400 people have submitted a petition
under the IDPP.  The DMV hasn't produced all of these
records to us, but we have received at least partial
records for about 988 petitioners as of April 19th and
the records identify the race of 950 of those
individuals.  Of the 950 petitioners in the IDPP process,
58 percent were African American, 10 percent were Latino,
and 2 percent self-identified as Asian, Indian or Native
American, meaning that 70 percent of the people who had
to go through the IDPP process were nonwhite.

Of the 988 total petitions, 46 percent of the
petitioners reside in Milwaukee.  59 percent reside in
Milwaukee, Madison or Green Bay.  A little over 30
percent were born in Illinois, mostly in Cook County, and
over 20 percent were born in a state that had *de jure*
segregation under Jim Crow.

The evidence in this case will show that the IDPP
has utterly failed to ensure that eligible voters are
able to cast ballots.  On the contrary, the process is
burdensome, it's arbitrary, and it's had extremely
disproportionate impacts by race.  DMV's last-minute
attempts to paper over those problems by changing its

1    rules on the eve of litigation will do little, if

2    anything, to prevent problems from occurring in the

3    future.  For many IDPP petitioners, the troubles begin at

4    the DMV Customer Service Center.  One senior citizen who

5    was turned away by DMV had been born in a concentration

6    camp in Germany and his German birth certificate had been

7    lost in a fire.  He was turned away.

8         Another senior citizen who ultimately prevailed in

9    the IDPP had a health care worker who tried eight

10   different times to give the voter's baptism certificate

11   to the DMV without success.  Senior DMV officials

12   ultimately accepted that proof.  An analysis by the group

13   within DMV that runs the IDPP, which is the Crime Audit

14   and Fraud Unit, known as CAFU, an analysis for the period

15   from March to August 2015 revealed an error rate in

16   handling petitions at customer service centers at 27

17   percent.  An analysis for August 2015 through January

18   2016 found a 26 percent error rate.

19        Now, once a completed application has been processed

20   at the Customer Service Center, which is again a physical

21   DMV location, the application is sent to a DMV division

22   known as DEU, which contacts a vital records agency

23   either from Wisconsin if the petitioner was born there or

24   from another state if the petitioner was born elsewhere.

25   And for people who are fortunate enough to have been born

1   in Wisconsin or another state like California that has
2   modern computer systems and up-to-date records, an ID can
3   be issued, although even then the process still takes at
4   least a week which means that the two-and-a-half day cure
5   period that Wisconsin has for voters who show up at the
6   polls without a form of ID is going to be insufficient.
7   But for those, for example, who are black and were born
8   in the Jim Crow south or those who were born in Cook
9   County which has disastrous records or those who have
10  spelling or date of birth inconsistencies, the IDPP
11  process becomes tortuous.
12          The petitions of these individuals are referred to,
13  as I said, DMV's CAFU unit.  As its name would suggest,
14  the individuals who work on the petitions are
15  professional fraud investigators.  These are not voter
16  advocates.  And these petitioners, who are simply poor
17  people trying to get the ID they need to vote and who are
18  now known in what the ID folks called adjudication, are
19  investigated in some of the same ways that a target of a
20  criminal investigation would be.  For many petitioners,
21  the DMV has obtained reports known as CLEAR reports that
22  contain information about residential address history,
23  vehicle ownership history, property ownership and deed
24  transfers, UCC filings, civil liens and judgments,
25  possible associates, work affiliations, utility services,

1    foreclosures, bankruptcies, marriages, divorces, all

2    sorts of private information.  And the developments

3    relating to a petition are documented in a case activity

4    report just as the CAFU investigators do with their fraud

5    investigations.

6        And in terms of how the process plays out, Your

7    Honor, the evidence will show that you can pick your

8    literary analogy here, whether it's Kofta or Dickens or a

9    different writer.  The evidence at trial will show -- and

10   I'm going to bring up an exhibit that's confidential,

11   Your Honor.

12           THE COURT:  All right.  Go ahead.

13           MR. KAUL:  The results of this IDPP process are

14   even more racially --

15           MR. KAWSKI:  Your Honor, we can't see the

16   exhibit.

17           MR. SPIVA:  We can't either actually.

18           MR. KAWSKI:  We can see it now.  Thank you.

19           MR. KAUL:  The results of this process are even

20   more racially disparate than the IDPP itself is.  This is

21   a photo poster board with pictures of 61 people to whom

22   DMV sent letters saying your petition for voter ID is

23   denied, and what that means in Wisconsin is that your

24   right to vote is denied.  As those pictures make

25   abundantly clear, of the 61 denials, 85 percent were

1   people who were nonwhite.  Of the 34 suspensions as of

2   last week, again people who don't have -- haven't

3   received IDs, 74 percent were blacks and Latinos.  And of

4   the 44 cancelations we found as of April 19th, in many

5   cases these are people who had simply thrown their hands

6   up and said I've had enough of the process, 77 percent of

7   the petitioners were nonwhite.

8       The process can also take an extremely long time.

9   Some of the voters you'll hear about have been waiting

10  for more than a year to get an ID and one has been

11  waiting for over 600 days.  We'll bring up another

12  confidential exhibit right now, Your Honor.

13          THE COURT:  Okay.

14          MR. KAUL:  And if that's before the Court --

15          THE COURT:  I can see it, yes.

16          MR. KAUL:  This is a picture of two women who

17  waited for six months to get their IDs and literally died

18  while they were waiting for their IDs.  Both were African

19  American, both were born in Mississippi under Jim Crow,

20  and both were long-time residents of Milwaukee.

21      Now, there are some petitioners who make every

22  conceivable effort and the DMV won't give them an ID

23  because the state has deemed necessary records that the

24  petitioner just doesn't have.  The process is also

25  riddled with decisions that are absurd on their face.

1    Take just a couple of examples.  Some individuals

2  with minor spelling discrepancies in their names,

3  individuals like one of the plaintiffs in this case,

4  Johnny Randle, whose name is spelled slightly differently

5  on his birth certificate from the version he has used his

6  entire life and that's on his Social Security card.

7  They've been told that they can only be issued an ID if

8  they either change their names with Social Security,

9  which Mr. Randle doesn't want to do that because he

10  doesn't want to mess with his Social Security benefits,

11  or they amend their birth certificates, a process that

12  itself is quite complicated and can cost money.

13    Other individuals who DMV does not dispute are

14  eligible to vote have been denied IDs because the records

15  aren't clear about the precise date of birth.  In some

16  cases these individuals don't even know what their date

17  of birth is.  The process is also arbitrary in that

18  similarly situated petitioners are treated in different

19  ways and in some cases there's obvious favoritism.  When

20  a legislator contacts the DMV, for instance, higher level

21  DMV officials tend to get involved and there tends to be

22  a favorable outcome for the petitioner.

23    We're going to pull up an exhibit -- I don't know if

24  this one needs to be confidential or not, Your Honor, so

25  I'm going to pull it up as confidential at least.  This

1   is Plaintiffs' Exhibit 331.  This is an email exchange in

2   which Jim Miller, who is the DMV official primarily

3   responsible for determining whether petitions are

4   approved or denied, he writes about --

5          THE COURT:  I don't think this one needs to be

6   confidential so I'm just going to put that one up.  Go

7   ahead.

8          MR. KAUL:  Okay.  This is a blowup of

9   Mr. Miller's email, Your Honor, and as it shows, he's

10  discussing the possibility that Ruth L. Frank, the lead

11  plaintiff in the *Frank* case, would be requesting an ID.

12  Mr. Miller writes to a regional manager "This is one of

13  those times we need to use the gray areas of the law."

14  Now, Mr. Miller will deny that that meant any favoritism.

15  He did in his deposition.  But that statement speaks for

16  itself.

17      Now, because of the obvious constitutional and

18  statutory defects with the IDPP, the state on the eve of

19  trial has issued an emergency rule in which it

20  acknowledges that under the IDPP, as it has operated for

21  over a year-and-a-half, qualified applicants may not be

22  able to obtain a voter ID with reasonable effort in time

23  for the August or November 2016 elections.  Now, those

24  same voters were just ineligible to vote in the February

25  2016 elections and the April 2016 elections.  But putting

1    that aside, these new rules, Your Honor, don't amount to

2    anything more than a Band-Aid.  There's no question that

3    eligible voters will continue to be disenfranchised under

4    the new rules.

5        For instance, I mentioned before that some voters

6    have inconsistent dates of birth on their vital records.

7    The new rules don't do anything to address that problem

8    and we can skip that demonstrative.  Actually, could we

9    bring it up as a confidential exhibit?

10            THE COURT:  Okay.  It's confidential.

11            MR. KAUL:  Your Honor, this is again the photo

12   board with all the petitioners.  We can't identify them

13   by name, but I will identify them by number:  1, 2, 3, 20

14   and 23 are all voters who had date of birth issues and

15   have been unable to vote.  So once the temporary ID that

16   they have expires, they're going to be in the same

17   position they were when the process started.

18       And in some ways the new rules make things worse

19   because they write into the Administrative Code or have

20   made formal policies out of practices that simply don't

21   make any sense.  That makes them more difficult to change

22   and makes these policies likely to last longer.  I'll

23   give you an example, Your Honor.  When I was questioning

24   Jim Miller during his deposition, we learned that some

25   people with name discrepancies had been denied IDs like

1    Johnny Randle.  But there was another individual who had
2    a one-letter discrepancy who was granted an ID, and I
3    asked him how that was consistent and he said "Well,
4    that's only one-letter difference."  And half jokingly I
5    asked is there is a one-letter difference rule to the
6    name verification process?  And he said "yes," to my
7    great surprise.
8         Well, in PX 461, we can see that -- and this can be
9    public -- this policy has now become an official policy
10   of the DMV.  There's now an official one-letter rule.
11        And let's zoom in on Shaun near the bottom there.
12   Shaun, if it's spelled S-h-a-u-n on a vital record, but
13   S-h-a-w-n in the way the petitioner uses it, that's up to
14   one process which is fairly simple.  Process one.  But
15   turning to page two, you'll see near the bottom there's
16   Sean, now it's misspelled S-e-a-n rather now S-h-a-w-n.
17   Now Shawn gets an entirely different far more burdensome
18   process, Your Honor.
19        Going down one, you'll see that if Mary Green
20   becomes Sister Mary Green, she is also subject to this
21   more burdensome process.  Now, this is one example, but
22   as you'll see during the course of the trial, there are
23   numerous absurd examples just like this one.  And now
24   it's in code.
25        The bottom line here is that 61 Wisconsinites

1  received letters denying them a free ID.  They were

2  denied the right to vote.  They were disenfranchised for

3  the past two elections, and 80 others had petitions that

4  were suspended or canceled meaning that unless they paid

5  for an ID themselves, they also didn't obtain an ID and

6  were disenfranchised.  So those people are now getting a

7  brief reprieve during which they have a temporary voter

8  ID card, but after this short reprieve they'll be back

9  where they started.

10      We also know that for a variety of reasons, these

11 people who were denied, who again are almost entirely

12 minorities, and the people who were put into suspended

13 status or canceled are just the tip of the iceberg.  This

14 is, of course, a presidential election year and the DMV

15 itself expects the demand for voter IDs to increase,

16 though it has no extra staff or budget allocated to deal

17 with the increased demand.  And in fact, the

18 administrator of the DMV has denied requests for extra

19 funding.  And these numbers don't account for people who

20 simply throw up their hands and decide it's not worth

21 going through the IDPP process or the number of people

22 who haven't learned about it because there's been no

23 outreach about voter ID, much less extraordinary proof.

24      And more broadly still, Your Honor, the number of

25 voters who are burdened or disenfranchised goes well

1  beyond the IDPP.  375 voters cast no ID provisional

2  ballots in last month's election and at least 258 of them

3  were disenfranchised.  And as I mentioned before, data

4  from Ken Mayer demonstrates that the true deterrent

5  effect of the Voter ID Law goes well beyond those

6  numbers.

7       Now, the state has noted in some filings that

8  turnout has been up in some recent elections, but as

9  multiple experts will explain, that's simply

10  inappropriate measure for drawing conclusions about the

11  deterrent effect of the challenge provisions.  And the

12  reason is obvious, it's that many different factors,

13  including increased intensity in spending as we've seen

14  in recent races in Wisconsin and increased

15  competitiveness as we saw in the recent primaries can

16  drive turnout.

17       Dr. Mayer's analysis in this case in contrast looks

18  at changes in behavior at the individual level.  He looks

19  at individuals who don't have IDs or individuals who are

20  African American and based on that analysis he finds that

21  the changes to voting and registration enacted since 2011

22  imposed substantial burdens on voters registering or

23  casting ballots; that these burdens have the greatest

24  effect on identifiable subgroups, particularly racial

25  minorities, young voters, students and registrants

1    without an ID, depressing their turnout by making it
2    significantly harder to register and vote and that that
3    impact was present in 2014 and almost entirely absent in
4    2010 before these laws went into effect.
5        Now, Your Honor, the evidence in this case will show
6    that the racially disparate impacts imposed by a number
7    of the challenge provisions are linked to Wisconsin's
8    history and the ongoing effects of discrimination.
9    Dr. Barry Burden is going to testify either this
10   afternoon or tomorrow morning about this history, so I'm
11   not going to belabor it here, but he does explain in his
12   expert report that racial segregation and animosity have
13   been enduring parts of the history of Milwaukee where
14   two-thirds of Wisconsin's black population lives and that
15   the city has been called the Selma of the north.
16       Some of the points that he highlights include the
17   public disputes over educational and housing
18   discrimination erupted and led to riots, including four
19   deaths in 1967 in Milwaukee; that largely in response to
20   school desegregation and open-housing laws,
21   white-dominated suburbs quickly developed through white
22   flight from Milwaukee and that this pattern of
23   residential segregation was re-enforced not only by
24   discriminatory real estate practices, but also by
25   exclusionary land zoning rules in incorporated cities

1    near Milwaukee.  Today Milwaukee is one of the most

2    segregated cities in the United States.

3         With respect to education, in 1976 a federal judge

4    held that Milwaukee schools were legally segregated.

5    That case settled in 1975 -- 1979, fully 25 years after

6    *Brown v. Board of Education* when the Milwaukee School

7    Board agreed to implement a five-year plan to

8    desegregate.

9         Data indicates that African Americans and Latinos

10   are far more likely to be stopped by law enforcement and

11   have their vehicles searched and to be ticketed despite

12   not being more likely to have weapons, drugs, stolen

13   goods.  And in the state as a whole, African Americans

14   are incarcerated at a rate more than ten times the rate

15   of whites.  That's the highest disproportionality, either

16   by race or at least for African American males.

17        Until as recently as 2006 when federal law required

18   Wisconsin to change its policies, only municipalities

19   that had more than 5,000 people had to have voter

20   registration and because approximately 98 percent of

21   blacks, 91 percent of Latinos but only 68 percent of

22   whites lived in their municipalities, a much larger

23   percentage of minorities were subject to that restriction

24   which contributed in turn to lower turnout by blacks and

25   Latinos in Wisconsin.

1      Spanish-language ballots weren't provided in

2  Milwaukee until 2012 when the Justice Department rules

3  required the city to adopt that practice.  And no other

4  city in the state has ever had Spanish-language ballots.

5      Your Honor, the evidence will also show that

6  Wisconsin has enormous racial disparities linked to its

7  history of discrimination.  Those exist in areas

8  including education, employment, health.  It's detailed

9  in the unemployment rate disparities and gaps in

10  employment itself, in the poverty rate which is 7 percent

11  for whites but 32 percent for Latinos and 39 percent for

12  blacks.  Data also show that African Americans and

13  Latinos are much more likely in Wisconsin to lack access

14  to a vehicle.  It's 23.1 percent of black households, 8.7

15  percent of Hispanic households, but only 5.5 of white

16  households that lack access to a vehicle, and that

17  disparity has obvious significance for voting in a state

18  with a Voter ID Law.

19      There are significant disparities in infant

20  mortality rates.  There are substantial and enduring

21  educational disparities.  And Dr. Lichtman, another

22  expert for the plaintiffs, looked at a study that ranked

23  states according to the black/white ratio of various

24  socioeconomic measures and he found that Wisconsin ranked

25  at or near the bottom of the states in the country on

most measures.  It's the third worst state in the country
in black/white disparities in the unemployment rate; the
second worst in black/white disparities in family poverty
rates, percentage of high school graduates and average
eighth grade math scores, and it's the worst state in the
country in black/white disparities in dropout rates.

     And what's critical in this case is that all of
those disparities relate to voting and the disparate
impact that the challenge provisions impose on minority
voters.  The evidence will show that decades of political
science research shows that voter participation is
significantly affected by demographic factors like
education, income, and health, and that those demographic
markers strongly predict how likely it is that a citizen
will be deterred from voting by the adoption of new
restrictive measures like those that are at issue in this
case.  Put simply, Your Honor, the socioeconomic
disparities have made it more difficult, or in political
science parlance, more costly to vote for African
Americans in Wisconsin than it was before the challenge
provisions were adopted.  And that greater difficulty is
more significant for African Americans and Latinos than
it is for whites.

          THE COURT:  Let me ask it this way:  You'll have
an opportunity to develop this more later, but can I

1    consider just the disparity evidence under the *Frank*

2    rule?  You know, there are the statements from Judge

3    Easterbrook that -- and I think it's mostly in the

4    context of the analysis of the Voting Rights Act -- but

5    he says something like the government isn't responsible

6    for remediating the discrimination of others, and so the

7    disparity evidence, as compelling as it is in its own

8    right within the legal framework that I have here to work

9    with with *Frank*, I need to know more than that there's a

10   disparity.  And again, a few minutes ago you were talking

11   about the history of legal segregation in Wisconsin.  But

12   the disparity evidence itself seems to me -- I guess my

13   question is whether that's really something that I can

14   consider within the framework for analyzing the problem

15   that's set up by *Frank*.

16        MR. KAUL:  Your Honor, I think your summary of

17   Frank is correct and what I would say is that the test

18   looks to the history and the ongoing effects of

19   discrimination and it's our position that Dr. Burden and

20   other testimony will establish that there clearly is a

21   history of discrimination by the State of Wisconsin and

22   its subdivisions and that that history plays a direct

23   role in ongoing disparities between the African

24   Americans, Latinos and whites in Wisconsin.  And in fact,

25   there is no other explanation for that disparity except

1    that it is linked to this history of discrimination.

2         So to the extent that that's the case, those

3    disparities are directly relevant.  If they were a matter

4    of chance, it would be absolutely correct that they

5    wouldn't be relevant.

6         THE COURT:  I don't think it would be a matter

7    of chance, it's just I think one view of it is well, it's

8    just white flight that has produced a very segregated

9    city in Milwaukee and it's the individual decisions of

10   white residents who decided to move out after Milwaukee

11   integrated its school district.  And so the

12   discrimination that makes it so keen and pointed is

13   really the decisions by the white residents who left, not

14   by the government that integrated the schools.

15        MR. KAUL:  And Your Honor, I would disagree with

16   I guess that characterization of the white flight for two

17   reasons:  First of all, what the history shows is that

18   the government played a role in creating segregated

19   communities in Milwaukee and lots of other places and so

20   the day that those laws are struck down and white flight

21   occurs, to attribute that entirely to private

22   discrimination when the government has created the system

23   which segregation is expected and people act accordingly

24   we think is to undersell the government's role in that

25   white flight.

1        And secondly, cities were actively playing a role,

2   as I mentioned before, in restrictive zoning practices

3   that helped foster this sort of discrimination.  To the

4   extent that there's state action that's bound up in that

5   discrimination that those developments that have resulted

6   in disparities, that is a history that the state is

7   responsible for.

8        The other thing I would note, Your Honor, is this is

9   not a case in which we're asking the government to remedy

10  something, some disparity.  We're asking that these laws

11  that the state itself has passed and that are imposing

12  these disproportionate burdens be struck down.  So

13  there's clear state action in the adoption of these laws

14  and the policies that are furthering these disparities.

15  So for both of those reasons, I think we think that

16  there's clearly a direct linkage for the state here.

17            THE COURT:  Okay.

18            MR. KAUL:  I next wanted to mention, Your Honor,

19  the lack of state interest which I'll cover briefly.  But

20  in many cases, the state's interest in these provisions

21  are paltry and in some cases there just aren't any.  Some

22  of the provisions are reportedly justified by the goal of

23  deterring fraud, but Dr. Minnite will testify, and she's

24  probably the country's leading expert on voter ID, that

25  there is virtually no voter fraud and that voter

1  impersonation fraud, the kind that Voter ID Law is

2  relevant to, is even rarer than that.  Dr. Hood --

3       THE COURT:  And before you -- just to help me

4  understand what you're going to tell me the legal

5  framework is, it seems to me that the *Frank* decision is

6  way more than unequivocal about the idea that the state

7  has an interest in preventing voter fraud and that Voter

8  ID Law diminishes the opportunity for impersonation fraud

9  and thereby increases the confidence in elections and

10 that's just a fact of life that has been decreed by the

11 United States Supreme Court and so we have to live with

12 it is kind of the way I view it.  So we can debate how

13 significant the problem is, but it seems to me that the

14 proffered framework and the *Frank* loss on proffers makes

15 it pretty clear that I have to take it as a given, as a

16 matter of established law in the area that impersonation

17 fraud is a problem and that the state has an interest in

18 preventing it and that the voting ID mechanism is an

19 appropriate way of doing that.

20      MR. KAUL:  And Your Honor, I think that you are

21 correct that that's what those decisions say in large

22 part and that some weight has to be given to this

23 interest.  So with respect to the fraud interest, it's

24 not our contention that there is no interest in light of

25 those decisions.  We think the evidence will actually

1  show that there is no interest, but the Court is, of

2  course, bound by what those decisions said.

3       The question though we think is how much weight does

4  that interest have to be given and what the testimony

5  will show is that it really shouldn't be that much.  And

6  the reason is there's just simply almost no voter

7  impersonation fraud.  And I would note that to the extent

8  that voter impersonation fraud is given significant

9  weight, we've got a few cases of it.  By that same logic,

10 these cases of disenfranchisement I've been talking about

11 which far exceed the numbers of the cases of voter

12 impersonation fraud, that also has to be given very

13 significant weight because the impact on a voter being

14 disenfranchised is exactly the same in terms of the total

15 tallies of a voter who commits fraud.

16      And so first of all, the question is how much weight

17 does it get?  And the evidence is going to show that the

18 Court should give it as little as possible given those

19 decisions.  And secondly --

20           THE COURT:  Whatever you think I can get away

21 with within the framework that the Seventh Circuit has

22 set up for me.

23           MR. KAUL:  That would be my position, Your

24 Honor.

25           THE COURT:  I thought it would be.

1           MR. KAUL:  But the other factor here, and this

2  is what's really different from *Crawford* and to some

3  extent *Frank*, is the evidence of the burden which is

4  being balanced against that is fundamentally different

5  here than it was in those cases.  In *Crawford*, Justice

6  Stevens' opinion is clear that there was virtually no

7  evidence presented in the record about the burden.  And

8  even in *Frank*, as I mentioned before, there are now

9  material changes in a lot of different ways about the

10  evidence that this Court has before it than what the

11  *Frank* court had.

12      And here is another piece of evidence with respect

13  to fraud that neither of those courts had.  I mentioned

14  before that the IDPP is being run by trained

15  investigators, fraud investigators.  These are people

16  investigating -- individuals who have come in and said "I

17  need an ID" but they don't have documentation.  You'll

18  hear from Susan Schilz, who's the head of that unit.

19  She's testified that there is not a single case of fraud

20  that she has seen, despite the fact that she's trained to

21  look for this and that there have been extensive reports

22  run for these people applying.

23      And one other thing on that, Your Honor.  This new

24  rule that has been issued exposes to some extent the

25  pretext that fraud is.  I'll tell you why:  Voters who

1  are in the IDPP process are now given free temporary

2  voter IDs even though the state claims that it doesn't

3  know whether it can verify their identity.  So these

4  individuals are now given a pass to go and vote with

5  their ID, to cast ballots for -- these are two-month

6  passes.  Well, if the state really thinks these people

7  are committing fraud and doesn't know who they are, why

8  are they being permitted to vote?  It just doesn't make

9  sense.

10      Now, the elimination of weekend and evening early

11 voting hours has been justified on the grounds that it

12 promotes uniformity.  But as Kevin Kennedy acknowledged

13 in his deposition, that just isn't the case.  Cities

14 continue to have vastly different hours for early voting

15 than they have -- than from each other.  So Milwaukee or

16 Madison has full hours, whereas a lot of small towns have

17 hours by appointment only or a couple hours a week or

18 that sort of thing.  So uniformity just doesn't relate to

19 this change.  It's just a narrow window.

20      Other provisions have been justified on the grounds

21 that they make election administration more efficient or

22 more effective.  But you'll hear from the chief election

23 officials in Madison and Milwaukee and they'll testify

24 that a lot of these provisions have made election

25 administration more difficult.  Some of the provisions

1   were also ones that the clerks have the option of

2   exercising.  So clerks didn't have to fax or email

3   ballots to voters before.  They could if they wanted to.

4   So eliminating that doesn't make their jobs easier, it

5   just takes away the option.

6        And last, you'll hear evidence that there's

7   significant confusion among election officials, poll

8   workers, among voters that result from all these changes

9   in the law and that that also makes election

10  administration more difficult.

11       Last, Your Honor, I want to talk about what actually

12  I think has become one of the key questions that this

13  case raises which is why these provisions were enacted in

14  the first place.  Why did the State of Wisconsin, which

15  was a national leader in election administration, make

16  about 15 changes to its election laws in less than four

17  years?  Why, with no evidence of voter impersonation

18  fraud, did the state enact a Voter ID Law that at the

19  time of its passage was the most restrictive in the

20  country?  Why in the wake of significant problems with

21  aggressive election observers, particularly in minority

22  communities, did the state pass a law that moved election

23  observers closer to voters?  And why, despite Milwaukee's

24  repeated requests for the opportunity to open additional

25  early voting locations and clear evidence of long lines

1    that voters in that city have had to wait in to cast

2    ballots, does the state refuse to allow municipalities to

3    open additional early voting locations?

4        And Your Honor, we would submit that those questions

5    answer themselves.  Beyond this onslaught of restrictive

6    measures by the way -- actually before I touch on that,

7    let me just briefly add one point.  There is case law

8    that indicates that discriminatory impact by itself is

9    not enough to establish discriminatory intent.  So if

10   you're considering the Voter ID Law on its own and it has

11   a discriminatory impact -- finding -- inferring from that

12   that there's discriminatory intent is a bridge too far

13   courts have found.  But what's different here is that

14   there's not one provision that has a disparate impact.

15   There's provision after provision after provision and

16   it's the accumulation of those provisions that provides

17   powerful evidence that this disparate impact was not an

18   accident, that it was a purpose of this set of provisions

19   that the Legislature has passed.  And it's a disparate

20   impact on minorities and it's a disparate impact on young

21   voters.

22       Beyond that onslaught of restrictive voting

23   measures, the state's operation of the IDPP provides

24   powerful evidence of discriminatory intent.  And this is

25   a confidential exhibit we'll pull up.  This is one the

Court has seen before.  As I discussed earlier, this photograph of the denied petitioners makes abundantly clear that there are staggering racial disproportionalities in the IDPP.  It's so extreme that it calls to mind Justice Frankfurter's statement in *Gomillion v. Lightfoot* where all but a few black voters had been carved out of the boundaries of Tuskegee, Alabama.  And the Justice wrote that if the allegations in that case held up, the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration that the legislation was solely concerned with segregation of voters.  And that's similar to the point that I was making which is once the disproportionality becomes so extreme, the inference changes.  And here there's more than just the racially disparate impacts and a recap of the IDPP's history demonstrates that.  And this can be public, Your Honor.

THE COURT:  Okay.

MR. KAUL:  On June 15 of 2015, the DMV began denying petitions.  Of the first 14 denials, all of them were of blacks or Latinos.  On January 11, 2016, Dr. Hood served his expert report for the defendants in this case and he argued that the IDPP provides a point of mitigation to the state's Voter ID Law.

On January 29, Kristina Boardman, who is now the

1  administrator of the DMV was deposed in a Rule 30(b)(6)

2  deposition, and she acknowledged in that deposition that

3  had she had no dispute that several of the people who

4  were in the IDPP were citizens; that they had not gotten

5  IDs.  A few days later in the opposition to the motion

6  for summary judgment, we provided notice that we'd be

7  moving to reinstate claims based on the state's

8  implementation of the IDPP.  As of February 2nd, 21 of

9  the 23 denials, or 91 percent, were of blacks or Latinos.

10 And what followed was a frenzy of IDPP-related activity

11 that was transparently designed not to actually ensure

12 that eligible voters were able to vote, but to cast the

13 IDPP in the best light by the time of trial so that the

14 Voter ID Law could survive this litigation.

15      On February 24th, we filed our motion to reinstate.

16 On March 9th, senior DMV officials had a meeting to

17 discuss a brand-new policy of paying fees to obtain vital

18 records in certain cases.  That reversed what had been

19 DMV practice of not paying fees for a year-and-a-half,

20 and that was two days after those senior DMV officials

21 had met with legal counsel.

22      On March 18th, the motion to reinstate in this case

23 was granted.  On April 1st, DMV then sent a letter to

24 approximately 15 petitioners offering to pay for needed

25 vital records if the petitioners "provide information

1   needed to make the request."  Well, the evidence will

2   show that DMV knew exactly what documents some of those

3   petitioners needed.  They could have requested them

4   itself, but it didn't.  Instead it asked the petitioners

5   to provide information that already had been provided.

6   In other cases, the problem couldn't have been resolved

7   simply with payment for a vital record.

8        To provide one example, the woman I mentioned before

9   who's been waiting over 600 days to receive an ID, she's

10  been waiting because Maryland won't verify her birth

11  records without payment of a fee.  And this goes to the

12  first point, Your Honor.  The DMV until recently has

13  refused to pay that fee.  But again, instead of simply

14  paying, the DMV has said she needs to tell them what she

15  needs.

16       One petitioner needed a photo ID, the very document

17  she was trying to get to obtain a birth certificate.  She

18  got one of these letters.  Payment is not going to help

19  her.  And it's also not clear at all why these

20  petitioners received this offer, but not other

21  petitioners who also potentially could have benefited.

22  And perhaps most tellingly as of the time of the last DMV

23  deposition in this case, the state hadn't even identified

24  a source of funding for this program.

25       The DMV's processing of applications has also

1  changed significantly during this most recent period.

2  The evidence shows that from February 1st to May 13th,

3  DMV, which we had criticized for having backlogs, reduced

4  the number of suspensions from 74 to 36.  The DMV did

5  that in significant part by simply converting those

6  suspensions into denials.  So 38 people during the period

7  from February 19 to April 26 were issued letters telling

8  them that their voter photo ID request, their right to

9  vote, was denied.

10      And one of the most striking things that the IDPP

11  files demonstrate, which Mr. Spiva mentioned this

12  morning, is that in at least a few instances, the DMV has

13  simply manipulated its data to make its IDPP statistics

14  look better.

15      There are three separate petitioners who received

16  denial letters from the DMV.  Those petitioners

17  subsequently went out and they tracked down their records

18  and they were able to get an ID because they had gone

19  through the process of doing that.  At least one of them

20  paid for his records.  In each case, the petitioner's

21  file had been listed as a denial by the DMV in its

22  production to us on April 19.  But in this recent

23  production which came in last Friday, those petitioners

24  had been moved to the canceled folder and they were

25  deleted from the DMV's running tally of denials in the

1    production that was provided to us last Friday.

2         This next one, I believe, needs to be confidential,

3    Your Honor.

4              THE COURT:  Okay.

5              MR. KAUL:  I mentioned earlier that two women

6    died while waiting for their IDs.  In the case of one of

7    the women, the file shows that CAFU recommended that her

8    petition be denied but that no letter be sent.  But

9    Kristina Boardman, the top official at DMV, intervened

10   and she asked that the women who died be classified

11   instead as a customer-initiated cancel.  And this is

12   another example where I was mentioning absurdity is now

13   becoming part of the code.  This is now part of the DMV's

14   new policy, that people who die while waiting to their

15   IDs will be listed as customer-initiated cancellations.

16        The Governor's office got involved during this

17   period of frenzied activity as well.  In early to

18   mid-April, Kristina Boardman, again who was then the

19   administrator of the DMV, went to the Governor's office

20   -- and we can switch back to the public setting, I'm

21   sorry -- and she learned that consideration was being

22   given by the Governor's office to the issuance of

23   temporary IDs.  On April 18, Governor Walker approved the

24   statement of scope for an emergency rule relating to the

25   IDPP.  And then just last week Governor Walker approved

1    the emergency rule.

2         As I mentioned before, the finding of emergency that

3    justified this rule was that under the IDPP as it had

4    operated for over a year-and-a-half, qualified applicants

5    may not be able to obtain voter ID with reasonable effort

6    in time for the upcoming elections.  And information

7    about this tinkering with the IDPP continues to drip out.

8    Last Friday we received DMV's new guidance and other

9    materials as well as updated and new documents.  What

10   this history shows, Your Honor, is that the state

11   government at its highest levels knows exactly what's

12   going on with this program; that eligible voters, almost

13   all of whom are black or Latino, have been denied the

14   right to vote and almost certainly will be denied the

15   right to vote again in the future.  And rather than

16   eliminating the system and rethinking what it is that

17   we're doing here, the state has instead chosen to tinker

18   with this bureaucracy of voter suppression.

19        And this isn't the first time that this has

20   happened.  On July 31, 2014, the State Supreme Court

21   addressed the constitutionality of the Voter ID Law under

22   state law.  And in that decision, the Court found that

23   the Voter ID Law as it had been operating constituted a

24   *de facto* poll tax.  But the court avoided that issue by

25   construing state law to require issuance of voter IDs

without requiring documents for which an elector must pay
a fee to a government agency.  At the time, the *Frank*
case was pending before the Court of Appeals.  An
argument was scheduled for September 12, 2014.  Well, the
day before that argument, on September 11, 2014, Governor
Walker approved the emergency rule that created the IDPP
and the Seventh Circuit's ruling specifically pointed to
that development, which it characterized as requiring
officials to get birth certificates or other qualifying
documents themselves for persons who asked for that
accommodation on the basis of hardship.  So just as is
the case here, the state in 2014 made a last-minute
change to the voter ID regime in an effort to improve its
litigation position.  The difference is that we have now
seen how these last-minute changes work out in the form
of the almost cartoonishly unconstitutional IDPP and
there's no reason at all to think that the state's new
changes are anything more than an attempt to prevent the
unconstitutional effects of the state's Voter ID Law for
being uncovered for just long enough to survive the
appeal in this case.

So taken together with the state's unrelenting
effort to enact laws that make it harder to vote, there's
a powerful case here for drawing an inference of
discriminatory intent.  But this is the extraordinary

1  case, Your Honor, in which a finding of discriminatory

2  purpose can be based on more than just inferences.

3       You're going to hear momentarily from Todd Allbaugh,

4  who was the Chief of Staff to Dale Schultz.  He will

5  testify that in the final caucus meeting before passage

6  of the Voter ID Law, multiple state senators argued in

7  favor of passage of the Voter ID Law because of the

8  effect that it would have on college campuses and in

9  communities in Milwaukee and that they argued in favor of

10 the law because it would help Republicans win elections.

11      Glenn Grothman made a statement which we'll play

12 this morning in which he acknowledged that he thought the

13 Voter ID Law would help Republicans in the upcoming

14 election.  And Alberta Darling made a similar statement

15 years ago.  And of course the Court has Dale Schultz's

16 statement which corroborates those other two statements.

17      On the Senate floor itself with respect to the bill

18 about eliminating weekend and evening early voting, Glenn

19 Grothman was clear that his purpose was to reign in

20 cities like Milwaukee and Madison.  He argued that that

21 was necessary for uniformity, but as the evidence will

22 show, there is no uniformity.  So there is going to be in

23 this case clear, direct evidence of discriminatory intent

24 corroborated by lots of other evidence from which an

25 inference of discriminatory intent can be drawn.

1    Your Honor, at the start of my remarks I quoted
2    President Johnson's address just before the introduction
3    of the Voting Rights Act.  When he signed that
4    legislation, he declared that the vote is the most
5    powerful instrument ever devised by man for breaking down
6    injustice and destroying the terrible walls which
7    imprison men because they are different from other men.
8    That Act, like the 15th Amendment and 26th Amendment,
9    guaranteed that the right to vote will not be denied or
10   even abridged or curtailed or reduced on account of race
11   or age.  Yet in enacting the provisions we're challenging
12   in this case, the state has done exactly that.
13       Your Honor, Wisconsin is simply a better place than
14   these laws suggest.  They're an embarrassment and they're
15   a stain on the history of the state, pure and simple.  We
16   ask not only that you strike them down as soon as
17   possible but that you make the finding which will be
18   compelled by the evidence in this case that those laws
19   were motivated by discriminatory intent.
20       Thank you, Your Honor.   (9:23 a.m.)
21       THE COURT:  Thank you.  And who will have the
22   opening statement for the defendants?
23       MR. KAWSKI:  I will, Your Honor.  We're just
24   going to get our PowerPoint slides up and I'll be ready
25   to go as well.

1        THE COURT:  And will all of yours with publicly

2   visible?

3        MR. KAWSKI:  All public.  Good morning, Judge

4   Peterson.  My name is Clay Kawski.  I'm an Assistant

5   Attorney General for the Wisconsin Department of Justice.

6   With my other colleagues from Justice, we're here to

7   present the state's case.

8        Astounding.  Astounding.  That's the word that the

9   plaintiffs' expert, Dr. Barry Burden, used to describe

10  the turnout for the April 2016 election.  He was quoted

11  by the Milwaukee Journal Sentinel saying that the turnout

12  number was astounding.  Yet every single one of the laws

13  that is challenged in this case was in place for that

14  election, including the voter ID requirement.  We're

15  going to show that because of actual verifiable turnout

16  numbers, facts and data, that we can show that these laws

17  should be upheld.

18       This next slide represents the plaintiffs' case.  As

19  you know, there's a saying that you've thrown in

20  everything but the kitchen sink.  This time the

21  plaintiffs throw in the kitchen sink too.  They have more

22  than 60 claims that they've leveled against state laws

23  under six different theories, including both

24  constitutional theories and Voting Rights Act theories.

25  As the Court knows, any one of these claims could be the

 1    subject of its own case.  But yet the plaintiffs made a

 2    scattershot approach and their evidence will be scattered

 3    all over the board.  We're going to hear from individual

 4    voters; we're going to talk about their circumstances,

 5    many of which are just anecdotal, could not be

 6    replicated, one-in-a-million type situations.  And the

 7    plaintiffs are going to ask the Court to strike down

 8    every one of these laws on its face based on anecdotal

 9    evidence, not evidence of why it spread systemic burdens

10    created by these laws.

11        The theme that we'd like to advance here is that

12    there needs to be proof based on facts, not speculation.

13    And so where possible, the state's case is going to show

14    a before and after, before the laws were implemented and

15    after what the effects were.  You will see that the

16    plaintiffs' experts in particular have tried to avoid

17    this where possible because the numbers do not favor

18    them.

19            THE COURT:  I take your point about the turnout

20    in the 2012 election.  But obviously there are a lot of

21    variables that went into that.  And so the question is

22    how are we going to isolate the impact of the changes in

23    the voter regime from the effects that are driven by

24    Wisconsin being a swing state in that election?

25            MR. KAWSKI:  Right.  It's difficult.  That's why

1  we're going to focus mostly on the 2010 to 2014

2  comparison.  For the 2016 election, it's difficult to

3  make a comparison because the Voter ID Law has only been

4  in place for three elections:  That would be the February

5  2012 primary, the February 2016 primary, and this most

6  recent April election.  So in some respects, plaintiffs'

7  experts cannot help prove their case.  There aren't

8  sufficient data points with regard to the Voter ID Law.

9      With regard to these other laws, in particular the

10  absentee voting laws, both of the state's expert

11  witnesses will testify how turnout -- and I'm going to

12  get to a slide about this -- but how turnout went up for

13  all groups for those elections in using in-person

14  absentee voting.

15      The first major challenge here, of course, deals

16  with the Vote ID Law and Mr. Kaul has summarized the

17  plaintiffs' case with regard to that law.  As the Court

18  is aware, it's bound by *Frank v. Walker*.  And Judge

19  Peterson, you've already illustrated that you know that

20  case cold.  I think that's very important here because

21  *Frank v. Walker* is going to guide and filter all of the

22  evidence in this case and it's going to make the Court's

23  decision very easy.

24      In the *Frank* case, the Court dealt with Section II

25  and constitutional claims that dealt only with the Voter

1    ID Law, but it also made statements like registering to

2    vote is easy in Wisconsin.  That would just as easily

3    apply to some of the other claims in this case.  And as

4    the Court knows, the Court in *Frank* made some very broad

5    and sweeping statements about how Section II applies and

6    about how the constitutional burden's test applies.  And

7    so again, *Frank* is a very important precedent, as the

8    Court knows, and it's going to have to work with *Frank*

9    and the *Crawford* decision as it views all of this

10   evidence.

11        With regard to voter ID, the state has been issuing

12   free state ID cards provided by the DMV.  I did not hear

13   very much about that from Mr. Kaul, and that's because

14   the statistics are pretty staggering.  Over 420,000 free

15   state ID cards have been issued since July 2011.  That

16   includes 127,000 brand-new products for people that did

17   not have a state ID card before.  When we compare that to

18   the number -- you heard a lot, Judge Peterson, about the

19   IDPP and you're going to get tired of hearing about it by

20   the end of the second week of this trial.  The IDPP is a

21   very small number of individuals who are trying to get

22   free IDs.  As of last week, the total number of people

23   who were denied an ID in that process is 52.  When you

24   compare 52 to the 420,000 free state ID cards that were

25   issued for the purpose of voting, that's .012 percent.

1    Yet the plaintiffs are asking this Court to strike down

2    the Voter Photo ID Law on its face as to every person.

3        You're going to hear testimony from the expert

4    witnesses in this case and it will deal primarily with

5    the two most common forms of a voter ID and those would

6    be driver licenses and state ID cards.  There are, of

7    course, other forms and it's difficult to analyze those

8    other forms such as passports, military IDs and so forth.

9    Some other courts in other states have been able to look

10   at those forms as well and the experts will testify a

11   little bit about that, but the expert testimony is going

12   to focus mostly on these two most common forms.

13       And so I put up here on the screen what the evidence

14   is going to show in comparison to the *Frank v. Walker*

15   decision.  In *Frank v. Walker*, that decision came down in

16   2014, September.  But it was based on data in which

17   experts analyzed the number of registered voters who

18   lacked one of these two most common forms and at that

19   time the district judge made a finding of 300,000 people

20   who registered to vote in Wisconsin lacked ID, or 9

21   percent of that population.

22       Plaintiffs' expert, Dr. Mayer, is basing his

23   findings on fall 2015 data, so we didn't run the data

24   again this spring.  That's the most recent analysis.  And

25   the number has gone down.  As you can see, there's a

 1   trend away from that lack of possession.  The state's

 2   expert is going to opine that the number is 153,316 or

 3   4.54 percent of registered voters lack one of these two

 4   most common forms.  And again, that doesn't consider

 5   people who would not have one of these forms but might

 6   still have a passport, a military ID or one of the other

 7   forms.  When you look at these numbers, what you see is a

 8   trend, and you also see that it's going to be very

 9   difficult to strike down the law on its face based on

10   these kind of statistics when you look -- when you see

11   that *Frank* did not strike the law down -- the *Frank* court

12   did not strike the law down at a 300,000 and 9 percent

13   number, and here we're either dealing with on the

14   plaintiffs' best day 283 and 8.4 percent, or on their

15   worst day 153,316 and 4.54 percent.

16        As I already mentioned, the ID petition process, and

17   there are new rules that went into effect on May 13.  I

18   find it very ironic that plaintiffs are characterizing

19   this as a nefarious intent to put out these rules close

20   to trial.  The state is trying to help people get ID

21   cards.  That's what's going on.  That's what these --

22   these rules are meant to streamline the process and help

23   people who are working through the process get a card

24   that they can use for voting.

25        There were four new plaintiffs added in this case,

1   and they were added, as Mr. Kaul pointed out, with the

2   March 18 reinstatement of the Section I constitutional

3   claims against the Vote ID Law.  Those plaintiffs are

4   Johnny Randle, David Walker, David Aponte and Cassandra

5   Silas.  They were all issued a free state ID card receipt

6   and that can be used for voting.  So to say that any of

7   these plaintiffs who are individual voters are currently

8   injured is not correct.  All of the plaintiffs that are

9   not --

10          THE COURT:  To be clear, they get the receipt,

11  but it's good for just 60 days; correct?

12          MR. KAWSKI:  Correct.  And if they're unable to

13  get the receipt within 50 days -- unable to get an ID in

14  the process within 50 days, that will automatically

15  renew.  So they will still be able to vote, and that's

16  what you're going to hear the testimony from DMV about

17  that issue.

18      The next major area of challenge leveled deals with

19  absentee voting and there's a lot of focus on the use of

20  in-person absentee voting.  In-person absentee voting is

21  just one of the types of absentee voting in Wisconsin.  I

22  did not hear Mr. Kaul mention the other one at all and

23  that is the mail-in absentee voting option.  I'm going to

24  talk a little about that, but first I'd like to point out

25  what I already said about the in-person absentee voting

1    and what the experts are going to say.

2        The state's experts will show that comparing 2010 to

3    2014, that's pre-implementation of the absentee voting

4    laws to 2014 post-implementation, that in-person absentee

5    turnout is up for all groups.  That means it's up for

6    whites, it's up for Hispanics, and it's up for African

7    Americans.  So it's very difficult to see how the law is

8    having these kind of disparate impacts on these groups of

9    voters when turnout continues to rise, both pre- and

10   post-implementation.

11       I should point out too that there's a national trend

12   toward the use of absentee voting, and that's something

13   that -- I think what's happening is more groups are

14   encouraging voters to use it.  Nothing about what

15   Wisconsin has done in passing these laws has stopped that

16   trend here.

17           THE COURT:  I guess here is the problem I have.

18   I take your point, and if we had a clear decline in voter

19   turnout and the only apparent difference between the 2010

20   and 2014 election were the change in voting law, we might

21   be inclined to draw the inference that the law caused it.

22   But voting is such a complicated process here and the

23   political background seems to me to be the more obvious

24   difference over the course of these elections.  And I get

25   you, you've picked the two midterm elections, but I'm

1  just not eager to embrace the idea that just because

2  voter turnout goes up over this period that it means that

3  the laws are not having the effect that the plaintiffs

4  say it is, which is to suppress the voting of certain

5  constituencies.

6       And let's just put our cards on the table here.  It

7  seems to me almost an article of faith on both sides of

8  the issue.  And correct me if I'm wrong about your

9  position here, but Republicans and Democrats alike seem

10 to assume that the Vote ID Law and changes in voter

11 registration requirements have an impact on voter

12 turnout; so...

13       MR. KAWSKI:  That's right.  Depends which side

14 of the aisle you're on; right?  I mean Republicans would

15 say that it increases turnout because people have more

16 confidence in elections.

17       THE COURT:  Well, not uniformly.  You've got the

18 statements by Mr. Grothman and all that and it does seem

19 to me to be -- the court cases too seem to acknowledge

20 that whatever new requirement is imposed will have an

21 impact on whether people vote.

22       MR. KAWSKI:  This is the best evidence we have

23 of this phenomenon.  The plaintiffs aren't going to be

24 able to show that --

25       THE COURT:  Whether it's the best evidence we

1    have I think is sharply contested at least.

2         MR. KAWSKI:  It is.  I think what's going to be

3    missing from the plaintiffs' case, Your Honor, is that

4    they're not going to be able to say without these laws

5    turnout would have gone up this much.  They can't show

6    that.  They're going to hypothesize by that, but they

7    can't show it.  This is the actual numbers, Your Honor.

8    These are the actual counts.  That's the best evidence.

9         THE COURT:  Yeah.  We'll see what the evidence

10   is.

11        MR. KAWSKI:  It's definitely debatable, but Your

12   Honor is right on top of the point.  As I mentioned

13   before, there are a few different ways you can vote

14   absentee --

15        THE COURT:  And let me just make sure that I

16   understand your position is that you're saying that these

17   -- the set of laws that are challenged in this case do

18   not have the effect of reducing voter turnout.

19        MR. KAWSKI:  Correct.

20        THE COURT:  Okay.

21        MR. KAWSKI:  There's the absentee-by-mail

22   option.  It's an option that I think is a great one for

23   people if you want to avoid lines, save time and money,

24   and here's how it works:  A person can fill out an

25   absentee ballot application.  They check a box that says

1    I want to receive all ballots for that year sent to my

2    home.  They can even send it in by email.  Of course they

3    have to submit a copy of their voter ID with it, so if

4    they have a copy of their driver's license, they have to

5    make a photocopy.  So that can be an inconvenience for

6    some people.

7         However, the fact that you can do this definitely

8    mitigates many of plaintiffs' claims with regard to

9    in-person absentee voting lines, unavailability of it on

10   weekends.  You won't hear the plaintiffs talk about this

11   option at all.  It's the elephant in the room with regard

12   to absentee voting.  But it's a great option for people.

13   And you can't forget there are really three options for

14   people voting:  You have in-person absentee, that's what

15   some people call early voting; you have mail-in absentee,

16   from your own home; and then you can vote on Election

17   Day.  We can't ever in this case forget that you can vote

18   on Election Day.

19        Of course, the case is about some of the impediments

20   that plaintiffs believe are occurring on Election Day,

21   but these are always options.  Someone who is an

22   in-person absentee voter is putting themselves into that

23   mix and trying to convenience themselves.  That needs to

24   be at the top of your mind as you consider those claims.

25             THE COURT:  And let me ask, this is kind of --

1   strikes me as sort of a commonsense explanation.  But if

2   voting -- absentee voting by mail is so easy, why isn't

3   it more popular?

4       MR. KAWSKI:  I think people don't know about it

5   and I'm hoping that this trial will really make people

6   know about it more because it will be reported in the

7   news.

8       The next major area, legal challenge, type of

9   challenge deals with voter registration.  And Wisconsin

10  has two things that a lot of states -- some states don't

11  have, and you'll hear testimony about which ones do and

12  which ones don't.  The acronyms are SDR and EDR.

13  Same-day registration refers to registering during the

14  in-person absentee voting period.  Election Day is, of

15  course, on Election Day.  And a lot of what I think the

16  voter registration claims go to in this case is about

17  documentation issues.

18      So the plaintiffs are complaining that being

19  required to show a document to prove your residence is

20  very problematic for certain groups of people.  What the

21  state is going to show is that there are robust options

22  to prove one's residency, and this next slide is

23  intentionally hard to read because it lists the

24  categories of all the different types of documents that

25  can be used to prove one's residency.  I have highlighted

1    only two.  The top one is a current and valid Wisconsin

2    driver license or state ID card.  And as I already

3    mentioned earlier, the number of people that have a

4    driver license or ID card is the vast majority of

5    Wisconsinites.

6         The other document issued by a government unit, what

7    that describes is what some people will testify in this

8    case as somewhat of a workaround to the proof of

9    residence requirement.  If someone contacts their

10   municipal clerk and tells them that I need a document to

11   register to vote, the municipal clerk can send them a

12   letter and they can bring that letter into the municipal

13   clerk's office and use it to register to vote.  So this

14   is an option that for someone who has not -- otherwise

15   has a utility bill or any other document that -- in their

16   possession that can be used, a lease, this is always an

17   option.  And it's a very common option that municipal

18   clerks are using to make sure that people have a proof of

19   residency document.

20        Another thing I'll point out, for young voters,

21   Wisconsin since 2012 has allowed electronic versions of

22   these documents.  So if a young voter is in line with

23   their tablet or smartphone, they can pull up their cell

24   phone bill, they can pull up their utility bill and show

25   it to register to vote at the polls on Election Day.

1  That list was not comprehensive, it was just categories

2  of the most common types of documents used by voters to

3  prove residency.

4      And so you're going to hear a number of witnesses

5  who will testify about either there were registration

6  deputies that had to turn away people because they lacked

7  a document.  What you won't hear is whether those voters

8  actually had a document, they'll just say that they came

9  to me and I didn't have it that day.  What you're going

10  to hear from the Government Accountability Board

11  witnesses is that if people are working together, the

12  voter, the municipal clerk and sometimes the GAB working

13  together, they can easily figure out a document that

14  someone can use to register to vote.

15      The rest of the legal claims in the case have

16  already been addressed by Mr. Kaul.  They deal with

17  things like election observers, straight-party voting.

18  Our position is that there are state interests in the

19  changes to these laws as well and that the Court will not

20  hear evidence which would allow it to strike them down

21  under the Constitution or Section II of the Voting Rights

22  Act.

23      I could wrap here, but I have -- there's one thing I

24  want to address and that's a word on plaintiffs'

25  allegations of intentional racial discrimination.  These

are very serious claims and they require very concrete
proof.  The primary type of proof that the Court is going
to hear is going to be filtered through an expert witness
named Dr. Allan Lichtman.  Dr. Lichtman also testified in
the *North Carolina State Conference of the NAACP v.
McCrory* case.  A decision -- it was entered in that case
by the district judge only a few weeks ago.  And as the
Court hears Dr. Lichtman's testimony and considers his
report, it should consider the statements that the Court
made about Dr. Lichtman.  "The Court has substantial
questions about his credibility and has difficulty
relying on much of his testimony.  His approach was
single-minded and purposefully excluded evidence that
contradicted his conclusions.  At trial, Dr. Lichtman
practiced a propensity to respond to questions not with
responsive answers, but with nonresponsive arguments
supporting his opinions.  He also demonstrated a
willingness to obfuscate when detail became important."

     Again, these intentional racial discrimination
claims are very serious allegations and they require very
serious concrete proof.  You're going to very likely as
the first witness hear from Mr. Todd Allbaugh, who will
testify about what he alleges are the nefarious motives
of some legislators in 2011.  My understanding is that he
will not name names.  He will not -- he will testify to

1   hearsay.  But he will not be able to pinpoint who said

2   these things.  That is indicative of the type of proof of

3   these claims of intentional racial discrimination.  Maybe

4   he will prove me wrong and maybe he will name names of

5   who said these things.  It's all hearsay.

6        In conclusion, Wisconsin elections are fair, easy to

7   navigate, and open to all.  As the state will prove

8   through evidence, these laws are constitutional.  They do

9   not violate Section II of the Voting Rights Act.

10       I want to go back to *Frank v. Walker*.  That decision

11  has so many guideposts for the Court, Your Honor.  And as

12  you well know, the Court is bound by that decision.  With

13  regard to voter ID, with regard to registration, with

14  regard to absentee voting and all the rest, *Frank v.

15  Walker* is the guiding light here.  For that reason, the

16  Court should enter judgment for the defendants.

17       I'd be happy to answer any questions you might have.

18            THE COURT:  Really one.  I take your point.  I

19  agree with you that allegations that there's intentional

20  racial discrimination here is a very serious one.  But

21  what is the kind of evidence that -- I know you describe

22  it as concrete in particular -- but when I'm evaluating a

23  legislative program like this, what is the kind of

24  evidence that I should be looking for?  Because commonly

25  when I'm asked the question of whether -- a person that

obviously comes up most often in actual discrimination

question and not constitutional litigation -- but when

I'm asked the question about whether a particular law is

motivated by racial discrimination, what is the evidence

that I would find?  I mean, I wouldn't expect to find

legislators in this day and age actually avowedly

expressing their purpose to discriminate.

MR. KAWSKI:  You do see that in other states.

You don't see it here.

THE COURT:  Well, even in this day and age I

wouldn't expect to see it even in what we regard as the

places that are most vulnerable to it.  But --

MR. KAWSKI:  That's why these --

THE COURT:  -- what am I supposed to be looking

for?  And if your position is that they have to say it,

then fine, I'll look for that evidence.  But I'm not sure

that that's really the law.

MR. KAWSKI:  Right.  I think that clearly if

they say it, then you have a problem; right?

THE COURT:  Yeah.

MR. KAWSKI:  We don't have that kind of evidence

here.  I don't think that -- I can stand here and try and

hypothesize what plaintiffs might come up with.  I only

know what they're likely to present.  And I can tell you

the state's position is it doesn't clear the hurdle.

1          THE COURT:  All right.

2          MR. KAWSKI:  Thank you.

3          THE COURT:  All right.  Thank you.  All right.

4   This is probably a good time to take a short morning

5   break.  We can get reorganized and then when we come back

6   in 15 minutes, let's make it right at ten o'clock, the

7   plaintiffs can call their first witness.

8       (Recess    9:45-10:00 a.m.)

9          THE CLERK:  This Honorable Court is again in

10  session.  Please be seated and come to order.

11         THE COURT:  All right.  Are we ready to begin

12  with the plaintiffs' case?

13         MR. SPIVA:  Yes, Your Honor, Mr. Kaul will call

14  the first witness.

15         MR. KAUL:  We call Todd Allbaugh.

16         THE COURT:  Very good.

17      **TODD ALLBAUGH, PLAINTIFFS' WITNESS, SWORN,**

18                   DIRECT EXAMINATION

19  BY MR. KAUL:

20  Q    Morning, Mr. Allbaugh.

21  A    Good morning.

22  Q    Would you please spell your last name for the

23  record.

24  A    Sure.  An old German name.  Allbaugh.

25  A-l-l-b-a-u-g-h.

                    TODD ALLBAUGH - DIRECT

1   Q     And where did you grow up?

2   A     Richland Center, Wisconsin.

3   Q     And did there come a point in time when you got

4   involved in politics?

5   A     Yeah.  I was probably what most people would

6   consider a rather nerdy kid, grew up with a speech

7   impediment with a cleft palate, and wasn't real popular

8   as a kid growing up; thanks to some wonderful surgeons

9   ended up being in radio later on in my life, so a credit

10  to those physicians.

11        So in the fifth grade, my parents had just gotten --

12  gone through a divorce and moved back to Richland Center;

13  spent a summer in Appleton, Wisconsin, and to quote Harry

14  Houdini, the greatest escape he ever made was from

15  Appleton, Wisconsin.  So no offense to people from

16  Appleton, but came back to Richland Center.  And in any

17  event, Otis Scott's fifth grade class 1980.

18  Q     Okay.  So --

19  A     Prebullet -- or preinternet and iPads, bulletin

20  board material.  So we had a competition, fifth grade, to

21  make the best bulletin board to Democrats and Republicans

22  and you could choose either side or he'd choose for you

23  and my granddad on my dad's side was Republican.  I'll be

24  Republican.  So went to the county fair that year, met

25  Carol Clausius, the County Chairman for the Republican

TODD ALLBAUGH - DIRECT

1    Party at the time, and got a Ronald Reagan poster.

2    Incidentally, you know, talk about plaguerism, the slogan

3    back in 1980 for Ronald Reagan was *Let's Make America*

4    *Great Again*.  So not so new these things that are being

5    talked about today.  I still have the poster.

6    Q    So let me cut to the chase here.  As you got

7    involved, did you --

8    A    Sorry.

9         THE WITNESS:  Spent a lot of time around elected

10   officials, Your Honor.

11        THE COURT:  We have 63 witnesses, so I hope

12   every witness doesn't have to take their biography up

13   starting with the fifth grade.

14        THE WITNESS:  I'll be brief.

15   BY MR. KAUL:

16   Q    Let me ask you this:  As you got older, did you work

17   on campaigns?

18   A    I did.  Point is that it was something that I found

19   my place in.  I enjoyed it.  I volunteered on numerous

20   campaigns, first on Ronald Reagan's and Congressmen Steve

21   Gunderson and U.S. Senator Bob Kasten's.  First race was

22   in 1980 putting up yard signs and the like, and ended up

23   -- fast forward, ended up volunteering on former state,

24   then Assemblyperson, Dale Schultz's campaign; met him at

25   his first race in 1982, and ended up working all of his

TODD ALLBAUGH - DIRECT

1    subsequent races through his Senate career, state Senate

2    career.  Worked on -- helped run campaigns at Richland

3    County for judges, district attorneys, city council

4    members.  Very active Republican Party politics for over

5    30 years.

6    Q    And I know some of the offices you mentioned are

7    nonpartisan, but to the extent that the offices you

8    worked on their races were partisan, which party's

9    candidates did you work for?

10   A    Always Republican.

11   Q    Did you run for office yourself?

12   A    I did.  Back in -- well, I spent two stints on the

13   city council in Richland County, a nonpartisan position.

14   But then I ran in 19 -- excuse me, in 2004 for the State

15   Assembly in the 96th Assembly District where I lost in

16   the primary by about 1,500 votes and then was crazy

17   enough to try it again four years later in the 50th

18   Assembly District where I lost by 500 votes in the

19   primary.

20   Q    And what party's platform did you run on?

21   A    Republican.

22   Q    Did you work on the staff of any elected officials?

23   A    Yes.  My first paying job at the State Capitol was

24   in 1982 for then newly State Senator Dale Schultz as a

25   paid intern; then worked for him on and off during

TODD ALLBAUGH - DIRECT

1    college, ran his 1994 re-election campaign, went to the

2    State Capitol as a full-time staffer.  Then in 1995 was

3    hired by former United States Congressman Scott Klug as a

4    constituent liaison; worked my way up over the course of

5    his last four years in Congress, became the district

6    director overseeing the Madison office for the

7    Congressman.  And then ended up subsequently going back

8    to Dale's office over the course of the next several

9    years on and off.  He likes to tell people he hired me

10   five times but never fired me.  I was kind of the Billy

11   Martin of the Schultz office without having being fired.

12   But ended up being his communication director, deputy

13   Chief of Staff when he was the Senate Majority Leader for

14   the State Senate Republicans in 2004 to 2007, and then

15   most recently the last four years of his term was his

16   Chief of Staff.

17   Q    Okay.  And for the court reporter's benefit, I'm

18   going to ask you to do your best to slow down just a

19   little bit.

20   A    I apologize.  I'm not as good as Nigel Hayes.

21   Q    Now, were you a staff member for Senator Schultz

22   during the 2011 legislative session?

23   A    Yes, I was.  I was his Chief of Staff.

24   Q    And he was a member of the Republican caucus;

25   correct?

TODD ALLBAUGH – DIRECT

1    A    Correct.

2    Q    And how did the 2011 legislative session compare to

3    other times that you had experienced in politics?

4    A    Unique.  Never seen anything like it in my political

5    career, my time at the Capitol.  Of course, subsequent to

6    the 2010 elections, that's when Act 10 hit and blew up.

7    Nothing like it before.

8    Q    Can you describe what the environment was like at

9    the Capitol after Act 10 became public?

10   A    After it became public?  Yeah.  At times chaotic in

11   the sense that due to the couple hundred thousand

12   protesters outside and inside the building, there were

13   times when it literally was nearly impossible to work.

14   There were certainly times during the Act 10 process

15   where as Chief of Staff I came in, not on a regular

16   basis, but there were a couple days in particular where

17   the phone calls were so overwhelming that we literally

18   couldn't get a call out.  All four of our lines, hanging

19   up there would be somebody there.  And as Chief of Staff,

20   there were a couple hours where I just said unplug the

21   phones because we can't -- our fax machine would run out

22   of the paper.  We'd put two 300 reams or pages of reams

23   in there and run out of paper because we were getting

24   faxes from all over the country, not just from the

25   Senator's district.  And at one point during the peak of

TODD ALLBAUGH - DIRECT

1    Act 10 where they split the bill in two and it went to

2    the floor, the hallways were so crowded that I literally

3    could not get through the hallways.

4    Q    And just to place us in context in time, this is

5    early 2011; is that right?

6    A    Yes.  March/Aprilish.

7    Q    Did you learn about any recall efforts around that

8    time?

9    A    Well, certainly after Act 10 became public and the

10   demonstrations, the protests started, there were rumors,

11   innuendos of recalls.  I believe if memory serves, the

12   first one to really or the first person to be targeted

13   formally, I believe, was the Governor at the time and

14   then subsequently there were state senators who were

15   targeted during -- along the process as well.

16   Q    All right.  Let me ask you specifically about a bill

17   that's commonly known as the Voter ID Bill or Act 23.  Do

18   you recall any meetings that you were in regarding that

19   bill?

20   A    Yes, several.

21   Q    And do you specifically recall the last caucus

22   meeting regarding that bill?

23   A    Yes.  Because it was the moment that in my own mind

24   and heart decided that I could no longer continue in the

25   future as calling myself Republican.

TODD ALLBAUGH - DIRECT

1  Q    Can you describe in some detail what you recall from

2  that meeting?

3  A    Sure.  It was, as you say, I believe the final

4  caucus meeting before passage or vote of passage on the

5  bill.  We went into -- the Senate went into Senate

6  Republican caucus, went into closed session meaning that

7  only staff members, Senators could be there.  No press.

8  No -- what do you call -- pages, that lock the door.  And

9  the bill was being talked about.  At the time, Senator

10  Lazich was the chairwoman of the -- I believe it was

11  called the Elections Committee.  That might not be the

12  formal title of the committee, but she chaired.  But it

13  was dealing with election law, that sort of thing.  And

14  the bill came up and there wasn't a lot of, shall we say,

15  enthusiasm for it.

16         MR. MURPHY:  Objection, Your Honor.  This is

17  hearsay.

18         THE COURT:  I'll allow it.  Go ahead.

19         THE WITNESS:  There wasn't a lot of enthusiasm

20  for the bill in the room at the time.  And she got up out

21  of her chair and she hit her fist on the or her finger on

22  the table and she said "Hey, we've got to think about

23  what this could mean for the neighborhoods around

24  Milwaukee and the college campuses across this state."

25         MR. MURPHY:  Renew my objection, Your Honor.

TODD ALLBAUGH - DIRECT

1        THE COURT:  I'll give you a standing objection

2  to it.  I want to hear what it is and I'll consider what

3  weight to give it.  Go ahead.

4  BY MR. KAUL:

5  Q    So what happened after that?

6  A    And at that point there was kind of some rustle in

7  the room, and I can't remember whether my boss made his

8  comment directly after that comment by Senator Lazich or

9  whether it was in the context of two or three senators

10 talking at once, but my boss kind of put his hand up

11 because -- actually the way the courtroom is set up, Your

12 Honor, my boss was -- there's a dais in front of the room

13 where the Senate Republican caucus is held and so the

14 dais, it goes by the Senate Majority Leader and then kind

15 of the Assistant Leader, who was Senator Grothman at the

16 time, and then the president of the Senate, who was

17 Senator Ellis at the time.  And then from there it goes

18 by seniority.  And so the most senior senator sits

19 closest to the Majority Leader and then all the way down

20 to where the attorneys are sitting.  That would be the

21 most junior senators in the Senate Republican caucus.

22      So my boss was at the time the third ranking by

23 seniority senator in the Senate Republican caucus, so he

24 literally sat in this corner of the dais.  And so Senator

25 Lazich was, since she was a higher ranking senator as

                    TODD ALLBAUGH - DIRECT

1    well, she was on the dais as well as Senator Grothman

2    obviously was because he was the Assistant Leader at the

3    time.  And so my boss said, "You know, guys" -- he put

4    his hand up like this and he goes "You know, guys, I

5    think we ought to think about here for a minute what

6    we're talking about.  Not just for our party, but for the

7    people of this state."  And at that point Senator

8    Grothman cut him off and said "Well, you know what?  What

9    I'm concerned about here is winning and that's what

10   really matters here.  And you know as well as I do the

11   Democrats would do this if they had the ability to use

12   everything in their power to get things done, so we

13   better get this done quickly while we still have the

14   opportunity."  With the -- well, I'll leave it there.

15   Q     Now, had you participated in previous Senate caucus

16   meetings?

17   A     Yes.

18   Q     Had you heard the various Senators make a variety of

19   different statements during those meetings?

20   A     On this particular subject or a bunch of subjects?

21   Q     On this particular subject.

22   A     Countless times.

23   Q     So based on that experience, when Senator Lazich

24   made her statement did you have an understanding as to

25   what she meant by that?

                    TODD ALLBAUGH - DIRECT

1  A    It was absolutely clear to me what it was and it was

2  nothing short of voter --

3          MR. MURPHY:  Your Honor, suppression.

4          THE COURT:  It is.  Sustained.

5  BY MR. KAUL:

6  Q    Now, did you observe the reactions that other

7  Senators in the room had to those statements?

8  A    Yes, and it was -- I've characterized it as giddy

9  and that's probably what bothered me so much is that they

10  were talking about imputing people's constitutional

11  rights and they were happy about it.  Not all of the

12  Senators, I need to make sure that the Court understands.

13  There were Senators in the room who were ashen faced that

14  were clearly disturbed by this, who were not

15  participating in the happiness of it all, but there were

16  other senators such as Senator Vukmir, Senator Hopper,

17  you know who were -- you could tell they were happy about

18  it.  They were politically frothing at the mouth.

19  Q    Now, can you explain why you decided to make --

20  first of all, why do you remember this event so clearly?

21  I think you touched on it before.

22  A    Because it was the moment -- I had gone through a

23  lot in my political career.  When you are a member of a

24  political party, when you work for an elected official,

25  guess what, you don't always agree with them.  I'm a

TODD ALLBAUGH - DIRECT

1    hunter.  Scott Klug was not necessarily the most friendly

2    person to the Second Amendment or gun rights during his

3    time in Congress.  He is a wonderful man.  He is a person

4    I believe in.  I agree with him 95 percent of the time.

5         Dale Schultz I don't necessarily agree with 100

6    percent of the time.  I'm a gay man.  I was a Deputy

7    Chief of Staff and Communication Director during this

8    ridiculous thing called DOMA, Defense Of Marriage Act.  I

9    had to sit there and defend the Republican Party on DOMA,

10   and at the time a closeted gay man.  I stayed with the

11   party because I believed in the larger scope that

12   eventually things would change and thank God they did.  I

13   stayed with the party through all of that.

14        But at that moment in that room, I could not

15   continue to stay with the party that not only implicitly

16   talked about suppressing people's voter's rights, it was

17   their intent to do so and they were happy to do so for

18   political purposes and I could not continue with a party

19   that supported that when it went down that road.

20   Q    Can you explain why you decided to make this

21   information public?  Or first of all --

22   A    Well, I didn't necessarily decide to make it public.

23   I am currently the owner of a small business, a coffee

24   shop here in Madison, and one of my employees, Mikey

25   Vaga, moved to Wisconsin last year from California; born

TODD ALLBAUGH - DIRECT

in the United States, a Latino American.  Parents

emigrated here from Mexico.  He was born here.  Moved to

Wisconsin a year ago.  22 years old.  Not necessarily

politically involved at all, but knows that I was.  And I

make a practice in my business not to bring up politics

unless they ask, and you know, a lot of people know so

they ask, I share.

      So Mikey would ask me things about -- and we have

CNN on most of the time on one of our TVs in our shop and

he'll ask me questions about the election and things and

he kind of got into it.  And he's a Bernie guy, feeling

the Bern, really into -- you know, went to a couple of

the rallies here in Madison and was really excited to

vote.  And one of his friends was registering people and

went to a register the day before on --

            MR. MURPHY:  Object.  Again, same standing

objection.

            MR. KAUL:  Your Honor, this is for context of

why he's made these public statements.

            THE COURT:  Fair enough.  I'll allow it.  It can

be brief though.

            THE WITNESS:  So -- apologize, Your Honor.  So

went to register; found out that he had to -- since he

had a California driver's license, thought he could just

go get -- change it out at the DMV for a Wisconsin one.

TODD ALLBAUGH - DIRECT

1   Turns out you have to have either your original birth

2   certificate, a passport, or if you're not born here, your

3   naturalization paper.  His birth certificate is back in

4   California.  What 22-year-old knows where the heck their

5   birth certificate is, whether it's Wisconsin or

6   California.  Wasn't going to get it here the next day.

7   Yes, he could have done the provisional ballot, but

8   again, it's about just discouraging people and he was

9   bummed out and he wasn't able to vote on Tuesday.  And I

10  was ticked off about it.

11      So I went to my Facebook page.  Should have

12  remembered that Facebook is public.  And I just -- I just

13  vented and said this is why I left -- you want to know by

14  I left the Republican Party?  Here it is.  This was the

15  straw that broke the camel's back.  And I wrote a couple

16  paragraphs about it and before I know it, I've got Greg

17  Newman at Channel 27 and then the Milwaukee Journal

18  Sentinel, Mr. Patrick Marley saying hey, yeah, we saw

19  that Facebook post.  You want to talk about that?  And I

20  had to think about it.  I had to think about it.

21      And the Court may be interested to note that I have

22  a very good friend of mine who used to work for United

23  States Congressman Scott Klug with me who subsequently

24  worked for Senator Margaret Farrow, got his law degree at

25  Marquette University.  His name is Ryan Lee.  He now

TODD ALLBAUGH - DIRECT

 1    works for the United States Department of Justice, not in

 2    the election division, another division.  He's a friend.

 3    And I was talking to him last summer and we were just

 4    bantering as friends about my frustration with the party,

 5    whatnot, and I mentioned this incident to him and he kind

 6    of just listened and the next day he called me and the

 7    said --

 8              MR. KAUL:  Let the Judge rule.

 9              THE WITNESS:  I'm sorry.

10              MR. KAUL:  That's okay.

11              THE COURT:  I'm not sure what the objection was,

12    but I'm just going to ask you to direct the witness with

13    another question.

14              MR. KAUL:  Okay.  Thank you, Your Honor.

15              THE COURT:  Keep it focused.

16    BY MR. KAUL:

17    Q    Let me ask you this:  At the time that you did this

18    Facebook post and the interviews you described, had you

19    ever met me or anybody from my team?

20    A    No.  In fact, I didn't even know there was -- I

21    thought when people were able to -- when voter ID was put

22    in as the law, I thought that was the end of all court

23    cases.  I wasn't even aware this court case was happening

24    until you called me.

25    Q    Okay.  Thank you.

                        TODD ALLBAUGH - DIRECT

1        MR. KAUL:  I don't have any further questions.

2        THE COURT:  All right.  Thank you.

3  Cross-examination.    (10:23 a.m.)

4                    CROSS-EXAMINATION

5  BY MR. MURPHY:

6  Q    Mr. Allbaugh, what was the date of this caucus

7  meeting you described?

8  A    I don't remember the exact date.

9  Q    You testified this was the day that changed your

10 life; right?

11 A    Correct.

12 Q    You don't remember what day it was?

13 A    The exact date, no.

14 Q    You mentioned that some Senators were ashen faced?

15 A    Um-hmm.

16 Q    You described their reaction.  Who was that?

17 A    Senator Kinsey, Senator Olsen, Senator Cowles

18 clearly were not real happy about this bill at all.

19 Q    You've both here and publicly not named the Senators

20 who you described as giddy; right?

21 A    I think I just did.  I think I mentioned Senator

22 Lazich, Senator Grothman, Senator Vukmir, Senator Hopper.

23 Q    No others.

24 A    Those were the ones that I recall specifically.

25 Q    And there weren't any others?

                    TODD ALLBAUGH - CROSS

1    A    Not that I recall.

2    Q    You have in the past refused to name those people

3    individually; right?

4    A    I haven't refused.  I chose not to.

5    Q    Did you not name them because you knew they'd deny

6    it?

7    A    No.  I know the political games and the tricks.  I'm

8    a small business owner.  I didn't want to have to go

9    through the public attacks that I'm sure will come as a

10   result.  But at some point you have to do the right thing

11   when you're called before a federal court.  I think you

12   have an opportunity and an obligation as a United States

13   citizen to tell the truth and let the chips fall where

14   they may.

15   Q    You have spoken to the media about this incident

16   though.

17   A    Correct.

18   Q    Did you say to Fox News, and I'm quoting, "I have no

19   proof that anybody said anything so if I start naming

20   names, they'll simply just say no, I didn't say that."

21   Is that an accurate quote?

22   A    I believe that's an accurate quote in the context

23   that I didn't have a recording device there.

24   Q    But you're saying here that you're sure if you name

25   names, the people would deny it; right?

TODD ALLBAUGH - CROSS

1  A    Yes.  When I talked to the United States Department

2  of Justice, I think they were most appalled by the fact

3  that I said that if people -- 95 percent of the people in

4  that room were called before a court such as I am today,

5  they'd lie under oath because that's the way they

6  believe.

7  Q    And you didn't name them because you didn't want

8  them to have a chance to defend themselves; right?

9  A    No, I didn't do -- I didn't name them in the -- I

10 wasn't under oath.  I was being asked by reporters.  I

11 didn't name them because I knew that it would become a

12 public tit for tat and I'm a small business owner.  I'm

13 trying to start a business, and I just didn't want to

14 have to go through that.

15 Q    Just one last question.  You described a situation

16 that a friend of yours encountered when he went to vote.

17 A    Um-hmm.

18 Q    You weren't with him when that happened; right?

19 A    I was not with him, no.

20         MR. MURPHY:  Nothing further.

21         THE COURT:  Any redirect?

22         MR. KAUL:  Briefly, Your Honor.  (10:25 a.m.)

23                REDIRECT EXAMINATION

24 BY MR. KAUL:

25 Q    You were asked a few questions just a moment ago

                TODD ALLBAUGH - REDIRECT

1    about which Senators responded in which fashion and I

2    believe you named approximately seven total Senators.

3    A    Um-hmm.

4    Q    You said the four you named were the ones you recall

5    how they reacted.  I think that leaves roughly about

6    seven other Republican Senators?

7    A    Probably.  Sure.

8    Q    Do you have any recollection one way or the other as

9    to how those people reacted?

10   A    I mean, the general feeling, the tone of the room is

11   one of giddiness and happiness.

12          THE WITNESS:  I'm very careful, Your Honor, and

13   people working with me will tell you that --

14          THE COURT:  So how many people were in the

15   caucus?  How many Representatives?

16          THE WITNESS:  I believe there were 19 if memory

17   serves.  It was the Majority caucus, but not all usually

18   -- for instance, Senator Ellis, then President of the

19   Senate, was usually not in the room.  Senators were free

20   to come and go as they chose.  So I would say that

21   probably there were at least 17 -- 16 to 17 Senators at

22   least.  Perhaps more, but at least that many.  The room

23   was not empty.  I recall that.

24          THE COURT:  And so by my count you've got three

25   who you said were -- somehow expressed -- you said ashen

TODD ALLBAUGH - REDIRECT

1  face, but they expressed displeasure with the proposal.

2  And then we've got five Senators that were giddy you

3  said.

4           THE WITNESS:  Um-hmm.

5           THE COURT:  So that's about -- I guess our tally

6  accounts for eight of about approximately 16 or 17 that

7  are there.

8           THE WITNESS:  I'm just careful that I not

9  exaggerate for dramatic effect.

10          THE COURT:  Not that it all comes down to this,

11  I just want to know what the score is.  So you've got

12  three unhappy, five happy and the rest you don't know.

13          THE WITNESS:  If you want me to go around and

14  tell you every Senator, I could do that.  There were

15  certainly ones that just sat there.  Senator Harsdorf

16  just sat there.  I don't know if she had a -- I don't

17  remember her having a feeling one way or the other.

18  Senator Darling just sat there.  Senator Ellis, I don't

19  believe he was in the room at the time.  Senator Leibham,

20  I think he said a couple of things in favor of the bill

21  but wasn't necessarily giddy about it.

22      Who else would have been there?  Those are the ones

23  around the dais I'm in view of.

24  BY MR. KAUL:

25  Q    And I just want to be clear.  What part of this is

1   your memory clearest about?

2   A    The first two quotes that I gave from Senator Lazich

3   and Senator Grothman because they hit me right in the

4   heart between the eyes, because in my opinion, it was

5   nothing short of voter suppression, which was the clear

6   intent.  As I told people, there are some bills --

7              MR. MURPHY:  Your Honor --

8              MR. KAUL:  Let me --

9              THE COURT:  I'll sustain the objection.  Go

10  ahead.  Move along.

11  BY MR. KAUL:

12  Q    You were asked about whether Senators could defend

13  themselves.  Do you recall that?

14  A    Say again?

15  Q    You were asked how you hadn't named names publicly

16  where Senators could defend themselves.  Do you recall

17  that?

18  A    The question I just had?  Yes.

19  Q    Yes.  Did one of the Senators who was in the room

20  actually call you recently?

21  A    Yes.  Senator Grothman called my business and he

22  called me repeatedly, I would say doggedly until I agreed

23  to call him back and have a conversation with him.

24  Q    What happened in that exchange?

25              MR. MURPHY:  This is hearsay.

                  TODD ALLBAUGH - REDIRECT

1          THE COURT:  I'll hear it.  Go ahead.

2          THE WITNESS:  You can have as many witnesses as

3  you want, I believe that Senator Grothman -- not believe,

4  I know that Senator Grothman asked for my telephone

5  number from Patrick Wiley's colleague Jason Stein and he

6  refused to give it to him.  Then he called my former boss

7  Dale Schultz --

8  BY MR. KAUL:

9  Q    I just want to focus you on the exchange.

10         THE COURT:  What did he say?

11         THE WITNESS:  All right.  I apologize.  I just

12  don't like being called a liar or insinuated that I am.

13  He called me.  He said -- he was very nice and he said

14  "Yeah, Todd, I really want to talk to you because I'm not

15  sure you're remembering things right."  I said -- I

16  called him Glenn because I've known him a long time.  I

17  said "Glenn, I remember things very clearly."  And he

18  said "Well, you know, I'm not sure you do.  I just don't

19  remember saying these things."  I said "Well, that's

20  fine.  I don't anticipate that you do."  And then he said

21  "Well, here's the thing."  He said "We just, as

22  Republicans, well I should say I do, I fundamentally

23  believe that Democrats cheat.  Okay?  I just do.  And I

24  don't think that our side does.  And so this is why we

25  have to have this bill to stop the cheating."

                TODD ALLBAUGH - REDIRECT

1      And I said -- I said "Glenn," I went through and --

2  to save the Court's time I won't repeat myself, but I

3  told him the story of my employee.  And he said "I'm not

4  so sure about that, about having to have a birth

5  certificate."

6          THE COURT:  I think we get the point.

7  BY MR. KAUL:

8  Q    And let me just ask you this:  Did you tell Senator

9  Grothman what you did remember?

10 A    Yes, I told him, and he didn't -- he didn't

11 necessarily -- he never told me I was a liar, at least in

12 my phone conversation.  What's more interesting is he

13 said that he wasn't even aware that you had to have a

14 birth certificate.  He didn't even know the law that

15 he -- clearly all he cared about was voter suppression.

16 Q    And did you refer him to his public statement

17 relating to the Voter ID Law?

18 A    Yes.  I said "Glenn, I know you very well and you

19 said this publicly after, not before, but after I put on

20 my Facebook post.  You just were a little happy and you

21 were a little bit talkative at the mouth and you said

22 this to the reporter.  You walked into it, Glenn."  I

23 said "That's not my fault.  You shouldn't have spoken to

24 the media.  You are supporting exactly what I'm saying."

25 Q    Did you tell him he outed himself?

                  TODD ALLBAUGH - REDIRECT

1    A    Yes, I did use that phrase.

2            MR. KAUL:  No further questions.  (10:30 a.m.)

3            THE COURT:  Thank you.

4            THE WITNESS:  Thank you.

5        (Witness excused at 10:30 a.m.)

6            THE COURT:  All right.  You may call your next

7    witness.

8            MR. SPIVA:  Your Honor, we're going to play a

9    video of Senator Grothman.

10           THE COURT:  Okay.

11           MR. KAWSKI:  Your Honor, before it's played, for

12   the record we object to the relevance of this.

13           THE COURT:  Okay.  We'll figure out what

14   relevance it may have.

15      (Glenn Grothman video played    10:30-10:32 a.m.)

16           MR. KAUL:  I'm sorry, I didn't hand out

17   transcripts at this point.

18           THE COURT:  You can get them up to me later,

19   that's fine.

20           MR. KAUL:  And Your Honor, the next thing we're

21   going to do is play the audio from Dale Schultz.  I have

22   transcripts for that one which I will walk up with.

23           THE COURT:  All right.

24           MR. KAWSKI:  Again, object to the relevance of

25   this.

                    TODD ALLBAUGH - REDIRECT

1        THE COURT:  I will hear it and then we'll

2   consider what relevance it might have.

3      (Dale Schultz video played     10:32-10:40 a.m.)

4        THE COURT:  Why don't we stop it here.  I've got

5   it all in the record.  Thank you.

6        MR. SPIVA:  Your Honor, the plaintiffs' next

7   witness is Nannette Mayze and she is going to testify on

8   her own behalf but also on behalf of her father who is a

9   plaintiff, Johnny Martin Randle.  I think we made Your

10  Honor aware that he has a disability.

11       THE COURT:  Okay.  Very good.

12       **NANNETTE MAYZE, PLAINTIFFS' WITNESS, SWORN,**

13                    DIRECT EXAMINATION

14  BY MR. SPIVA:

15  Q    Good morning, Ms. Mayze.

16  A    Good morning.

17  Q    Could you state your full name for the record.

18  A    Nannette Lynn Mayze.

19  Q    Can you spell that, please?

20  A    N-a-n-n-e-t-t-e, L-y-n-n, M-a-y-z-e.

21  Q    And Ms. Mayze, where are you from?

22  A    Milwaukee, Wisconsin.

23  Q    Are you originally from Milwaukee?

24  A    No.

25  Q    How long have you lived in Milwaukee?

                    NANNETTE MAYZE - DIRECT

1   A   27 years.

2   Q   And what is your -- what do you do for work?

3   A   I'm a health aide.

4   Q   And I understand that you're the daughter of Johnny

5   Randle, a plaintiff in this case; is that right?

6   A   Yes.

7   Q   Where was Mr. Randle born?

8   A   Tchula, Mississippi.

9   Q   Where was he born?  In a hospital or at home?

10  A   At home.

11  Q   And how old is your father?

12  A   74.

13  Q   Is Mr. Randle African American?

14  A   Yes.

15  Q   How long did he live in Tchula, Mississippi?

16  A   Seventy years.

17  Q   Lived there most of his life?

18  A   Yes.

19  Q   Has he since moved to Wisconsin?

20  A   Yes.

21  Q   When did he move to Wisconsin?

22  A   2011.

23  Q   And why did he move to Wisconsin?

24  A   Because he got sick.

25  Q   What happened to him?

NANNETTE MAYZE - DIRECT

1    A    He had two strokes.

2    Q    And where does he live here in Wisconsin?

3    A    With me in Milwaukee.

4    Q    Has he lived with you in Milwaukee since he moved

5    here in 2011?

6    A    Yes.

7    Q    Has the stroke affected his speech?

8    A    Yes.

9    Q    How has it affected his speech?

10   A    Some words he can get out and some he can't.

11   Q    Has it affected his ability to write?

12   A    Yes.

13   Q    And is he able to sign his name physically?

14   A    Not anymore.  He struggles to make the "X."

15   Q    I take it that Mr. Randle requires some level of

16   care?

17   A    Yes.

18   Q    Health care?  Are you -- is he still sound of mind?

19   A    Yes.

20   Q    Ms. Mayze, you helped Mr. Randle manage a number of

21   -- have you helped Mr. Randle manage a number of aspects

22   of his life since the stroke?

23   A    Yes.

24   Q    What types of decisions or things do you help him

25   manage?

NANNETTE MAYZE - DIRECT

1    A       Finance care, transportation, dressing.

2    Q       When you say care, do you mean health care?

3    A       Health care, yes.

4    Q       And has Mr. Randle consented to your helping him

5    with those things?

6    A       Yes.

7    Q       Do you often help him with things like, say, his

8    decision to participate in something like a lawsuit?

9    A       Yes.

10   Q       And is Mr. Randle in the courtroom today?

11   A       Yes.

12   Q       Can you point him out?

13   A       Sitting in the back with the white hoodie.

14   Q       Okay.  Now, I want to talk with you about this issue

15   of the spelling of Mr. Randle's name.  How does your

16   father spell his name?

17   A       J-o-h-n-n-y, Martin, M-a-r-t-i-n, Randle,

18   R-a-n-d-l-e.

19   Q       And has he spelled his name that way his entire

20   life?

21   A       Yes.

22   Q       Have you seen your father's Social Security card?

23   A       Yes.

24   Q       How is his name spelled on his Social Security card?

25   A       J-o-h-n-n-y, M. R-a-n-d-l-e, S-r.

NANNETTE MAYZE – DIRECT

1  Q    Let me ask if we can pull up Plaintiffs' Exhibit

2  367, page 22-012.  This can be public because the number

3  has been redacted.  Is this Mr. Randle's Social Security

4  card, Ms. Mayze?

5  A    Yes.

6  Q    And do you know if Mr. Randle had a driver's license

7  from Mississippi?

8  A    Yes.

9  Q    Have you seen it?

10  A    Yes.

11  Q    How is Mr. Randle's name spelled on his old

12  Mississippi driver's license?

13  A    J-o-h-n-n-y, M., R-a-n-d-l-e.

14  Q    And just so the record is clear, the "M," that's his

15  middle initial I take it?

16  A    Yes.  Martin.  Stands for Martin.

17  Q    For Martin.  Let me ask if we can pull up the same

18  exhibit but the next page.  And if you could take a look

19  at that, Ms. Mayze, is this Mr. Randle's Mississippi

20  driver's license?

21  A    Yes.

22  Q    Does your father receive any types of account

23  statements or bills at your house?

24  A    Yes.

25  Q    And as someone who helps him take care of some of

NANNETTE MAYZE - DIRECT

1    his affairs, do you open those types of things for him?

2    A    Yes.

3    Q    And how is his name -- does he have a bank

4    statement?  Does he get a bank statement?

5    A    Yes.

6    Q    How was his name spelled on his bank statement?

7    A    J-o-h-n-n-y, M., R-a-n-d-l-e.

8    Q    Okay.  And just so -- I don't want to put you

9    through the torture of having to keep spelling it, you

10   can say it's the same way.

11   A    Okay.

12   Q    And on the other types of bills and other types of

13   mail that he receives, is it generally spelled the same

14   way?

15   A    Yes.

16   Q    Have you ever seen him receive a piece of mail with

17   a different spelling?

18   A    No.

19   Q    Let me ask you about Mr. Randle's birth certificate.

20   Did there come a time that you helped Mr. Randle retrieve

21   his birth certificate from Mississippi?

22   A    Yes.

23   Q    Did you have to pay some money to get that?

24   A    Yes.

25   Q    And why did you get your father's or why did you

NANNETTE MAYZE - DIRECT

1    help your father get his birth certificate from

2    Mississippi?

3    A     The Department of Motor Vehicles said he needed it.

4    Q     Why did they say -- did they say why he needed it?

5    A     Because his driving license was expired and he

6    couldn't get anything without -- he couldn't get a

7    Wisconsin ID without his birth certificate.

8    Q     Let me show you the same exhibit we had up a minute

9    ago, page 67, but page 22-14, and just if you can take a

10   look at that, Ms. Mayze, I know it's a little bit hard to

11   read and it doesn't actually get that much easier when

12   it's in hard copy, as you know.  But is this a copy of

13   the birth certificate that you helped your father get

14   from Mississippi?

15   A     Yes.

16   Q     And you don't have to read it off the screen.  I

17   take it you know how it's spelled --

18   A     Yes.

19   Q     -- on -- okay.  How -- I would actually like you to

20   tell me how it's spelled on his birth certificate,

21   starting with Johnny.

22   A     J-o-h-n-n-i-e.

23   Q     And then the middle name Martin.

24   A     M-a-r-t-e-n.

25   Q     And then the last name.

NANNETTE MAYZE - DIRECT

1    A    R-a-n-d-a-l-l.

2    Q    Okay.  And had -- we can take the birth certificate

3    down, please.  Before you -- about when did you get the

4    birth certificate from Mississippi?

5    A    I think it was 2000 -- toward the end of the 2011, I

6    think.  I'm not sure.

7    Q    Okay.  And had you ever seen that spelling of

8    Mr. Randle's name prior to you obtaining the birth

9    certificate for him?

10   A    No.

11   Q    And had he ever seen it spelled that way prior to --

12   A    No.

13   Q    And does he consider that to be the proper spelling

14   of his name?

15   A    No.

16   Q    Okay.  I'm going to ask you -- I want to ask you in

17   a minute about any efforts you may have made on his

18   behalf to try to get a free ID.  But first I want to

19   briefly ask you about efforts prior to that time when you

20   were trying to get the free ID, to obtain a Wisconsin ID

21   for him.  Can you briefly describe what efforts you had

22   made to obtain a Wisconsin ID?  So this is the time

23   period prior to August 2015.

24   A    We went to motor vehicles and they told me that they

25   can't give him an ID because his driver license was

NANNETTE MAYZE - DIRECT

1   expired.  And they told me that he need other documents.

2   I said "Well, I have his Social Security card, his red,

3   white and blue card, and I have mail with his name on

4   it."  And she said "Well, you have to fill this form

5   out."  I said "Okay."

6        So little while later I'm like maybe I try another

7   one.  So I went to a different motor vehicle and they

8   basically told me the same thing and they gave me the

9   same form to fill out.  So I filled the form out there,

10  and I was notified that he would need a birth

11  certificate.  I said "Okay."  So when I sent for the

12  birth certificate and it came back like that, I'm like I

13  don't know.

14       So later on I went back to motor vehicles and I said

15  "I have his birth certificate but it's spelled entirely

16  different."  And he was unaware, I was unaware, anybody

17  was unaware that his name was spelled different.  They

18  said "Well, you have to call Madison and we'll do this

19  again."  There's some form I had to fill out.

20  Q    Can I interrupt you for just a minute?  Are you

21  getting into the period after you started applying for

22  the free ID?

23  A    No.

24  Q    Okay.  This is before the free ID.

25  A    No.  Yes.

NANNETTE MAYZE – DIRECT

1   Q     Okay.  Please, go ahead.

2   A     So again, I didn't believe them.  So I went to

3   another motor vehicle and they basically told me the same

4   thing, that there's nothing they can do because it didn't

5   match his ID and it didn't match his Social Security

6   card.  So I said okay.

7         And then later on, like a year or so later, I was

8   told that he can get a free ID.  I'm like okay.

9   Q     Okay.  So let me -- I want to ask you about that now

10  because is that -- when you mentioned the free ID, is

11  that -- was that -- were there trips you began to make in

12  August of 2015 to get that?

13  A     Yes.

14  Q     And where did you first apply when you wanted to get

15  the free ID?

16  A     I think I was on Teutonia at that one.

17  Q     Is it Teutonia or was it the downtown DMV?

18  A     It was either -- I'm not quite sure.  But I went to

19  both, but I don't know which one I went to first.  But I

20  went to both of them.

21  Q     Okay.  And what happened at the DMV location you

22  went to to apply for a free voter ID for Mr. Randle?

23  A     She told me that I would have to call Madison and

24  explain the situation to them and that they will contact

25  me.

NANNETTE MAYZE - DIRECT

1   Q    Okay.  And let me just ask you to break it down a

2   little bit.  First of all, I should have asked you did

3   Mr. Randle go with you to try to get the ID?

4   A    Yes.

5   Q    And was this at a time where he couldn't actually

6   sign his name himself?

7   A    Yes.

8   Q    Did you have to fill out any paperwork the first

9   time you went to try to apply for a free voter ID?

10  A    Yes.

11  Q    Let me ask if we could pull 367, Plaintiffs' Exhibit

12  367 up again, page 22-11, and let me just ask you to take

13  a look at that, Ms. Mayze, and once you've had a chance,

14  was this the document that you had to submit when you

15  went to apply for the free ID?

16  A    Yes.

17  Q    And you -- did you have to check a box here that you

18  wanted to get the ID for free?

19  A    Yes.

20  Q    What documentation did you bring with you when you

21  went to fill out this application, do you recall?

22  A    I had his driving license, his Social Security card,

23  his red, white and blue card, and I did have a birth

24  certificate with me.

25  Q    Okay.  What's a red, white and blue card?

NANNETTE MAYZE - DIRECT

1    A    It's Medicaid/Medicare, Part A and B.

2            THE COURT:  Can you zoom in a little closer on

3    the document?

4            MR. SPIVA:  I'm sorry?

5            THE COURT:  Can we zoom in a little closer?

6            MR. SPIVA:  I'm sorry.  Is that good enough,

7    Your Honor?  Can you read it?

8            THE COURT:  That's good enough.

9    BY MR. SPIVA:

10   Q    And what did you do next to try to get a free ID --

11   first of all -- excuse me, let me back up.  Would they

12   take those things?

13   A    No.

14   Q    And you're sure you had the birth certificate when

15   you went there the first time?

16   A    Yes.

17   Q    What did you do next to try to get the ID?

18   A    I called Madison, like they told me to do, and I

19   explained my situation to them, and I did.

20   Q    Okay.  And what did they tell you?

21   A    She told me that she was going to talk to her

22   supervisor and that this happens a lot, that a lot of

23   people, you know, do have misspellings of their name and

24   it creates problems.  And she did call me back and told

25   me she was sending me some papers in the mail to fill out

NANNETTE MAYZE - DIRECT

1    and send them back to her.

2    Q    Okay.  And let me just stop you there.  When you

3    said she said that this often happens, was she referring

4    to the misspelling on the birth certificate?

5    A    Yes.

6    Q    Do you recall who you spoke to when you talked to

7    the person in Madison?

8    A    Becky.

9    Q    And what did -- did you gain an understanding of

10   what she was telling you you would need to do to actually

11   get the free ID from that call, that initial call?

12   A    At first, you know, I thought it was a lot of work

13   because I asked her, I says is there any other way we can

14   do this, I said, because his mom is dead, his dad is

15   dead, all his brothers is dead except one, and he got

16   five sisters and they all older than him except one.  So

17   a lot of the information, I said "Well, I'm going to do

18   the best that I can."  So then the next --

19   Q    Can I stop you just a second?  What type of

20   information did she ask you to obtain?

21   A    My grandmother's maiden name, my father's siblings'

22   name, any relatives that's in Mississippi in the rural

23   areas.  And I told her no one is in the rural area

24   anymore, they're all dead.  And she asked is there any

25   children that's there living in Mississippi and I told

NANNETTE MAYZE - DIRECT

1   her "Yeah, I still have siblings."  And she said she was

2   going to try to get all the information that she needs

3   from the vital record department down there; so...

4   Q    You may have said this and I apologize if you did,

5   but did she ask you to try to find out your father's

6   mother's maiden name?

7   A    Maiden name, yes.

8   Q    Did you know it at that time?

9   A    I told her Bankhead.  But when she checked, she said

10  it was wrong and I'm like no.  That's all I know is

11  Bankhead.

12  Q    And did she ask you to obtain other types of

13  information that you didn't know?

14  A    Yeah, my grandmother's maiden name -- well, my great

15  grandmother's, which is his grandmother.  I told her I

16  don't know those people.  They were all dead before I was

17  born, so I can't give her any information about that.

18  Q    Okay.  And in your conversation with the person from

19  the DMV in Madison, did she ever suggest anything in

20  terms of changing his name?

21  A    Yeah, she did.  She said that in order for him to

22  get a Wisconsin state ID, he will have to use the name

23  that's on his birth certificate.  And I said what you

24  say?  She said he would have to use the name that's on

25  his birth certificate.  And I told her I wasn't doing

NANNETTE MAYZE - DIRECT

```
 1   shit.  I'm not doing that.  That's not what he want to

 2   do, you know.  He don't know that name.  The only name he

 3   knows is what he uses.

 4   Q    What did Mr. Randle think of that idea?

 5   A    He started laughing.  He said it was stupid.

 6   Stupid.  I don't know that at all.

 7   Q    So he didn't want to change his name.

 8   A    No.

 9   Q    Okay.  And was there -- did she ever suggest

10   anything in terms of changing his name with the Social

11   Security Administration?

12   A    Yes, she did.  She said I will have to change his

13   name at the Social Security Office and everything else

14   that's pertaining to his benefits and I told her I wasn't

15   doing that either.

16   Q    Did you have concerns about doing that?

17   A    Yes.

18   Q    What were they?

19   A    He don't know that name.  Honestly he don't.  If any

20   mail come to the house with that name on it, it's not

21   him.

22   Q    Were you or was he concerned that it might interfere

23   in some way with his Social Security benefits?

24   A    Yes.  He was thinking, you know, maybe he wouldn't

25   get a check and I was thinking the same thing because
```

NANNETTE MAYZE - DIRECT

1  this is a person that really don't exist as far as we

2  know.  So if that person don't exist, all the years he

3  put in working and raising us and stuff meant nothing.

4  Q    Okay.  Let me show you page 18 of this exhibit, if

5  we go to 22-18, and ask you, Ms. Mayze, this document is

6  a little messed up in terms of its ordering and I'll show

7  you in a minute that page 18 appears to be, and I want

8  you to confirm whether this is correct or not, but page

9  18 appears to be the cover letter and then page 17 of

10 this document appears to be the attachment.  But let me

11 first ask you if you can take a look -- and maybe we can

12 make it a little bigger, please.

13     Is this a letter that Ms. Beck from the Department

14 of Motor Vehicles in Madison sent you?

15 A    Yes.

16 Q    And what did you understand her letter to be asking

17 you to do on behalf of Mr. Randle?

18 A    Actually when this one came in the mail, I just

19 glanced at it and put it aside.

20 Q    Okay.  Let me ask you to turn to -- if we can turn

21 to page 17, the previous page, and actually 16.  16 and

22 17.  And let me ask you, Ms. Mayze, was this document --

23 for the record that has the title *REAL ID Affidavit of*

24 *Common Law Change Name Instructions*.  Was this the

25 document -- we'll take a look on page 16 and then if we

NANNETTE MAYZE - DIRECT

1  can take a look on page 17.  Was this the document that

2  was attached to Ms. Beck's letter to you?

3  A    Yes.

4  Q    Okay.  And what did you understand this to be?

5  A    I understood it to be a document stating the old

6  name and the name that he use.

7  Q    Okay.

8  A    And to me the old name, new name and the name you

9  use, it's all the same because he never use any other

10  name before.

11  Q    Okay.

12  A    So I put both names down.

13  Q    So if I'm understanding you correctly, did you fill

14  this form out?

15  A    Yes.

16  Q    And on the page 16, so you filled out my old name is

17  Johnny Martin Randle spelled the way he's used it most of

18  his life -- all of his life.

19  A    Right, yes.

20  Q    Okay.  And then my name is, and then you were the

21  one who wrote in the way it's -- also the same spelling.

22  A    Yes.

23  Q    Okay.  And did you also -- looking at page 17, did

24  you also have to get this document notarized?

25  A    Yes.

NANNETTE MAYZE - DIRECT

1  Q    Where did you do that?

2  A    Chase Bank.

3  Q    And then did you send this form back to Ms. Beck or

4  someone at the DMV to try to continue to pursue a free ID

5  for Mr. Randle?

6  A    Yes.

7  Q    And did you get -- did Mr. Randle get a free ID as a

8  result of your filling out that paperwork?

9  A    No.

10  Q    Did you receive -- did you have other conversations

11  with Ms. Beck or someone at the DMV in Madison other than

12  the conversation you were describing a minute ago?

13  A    We spoke numerous of times, but I can't remember the

14  exact dates or anything like that.  But from the very

15  first time, which was in July of 2011 up until 20 -- up

16  until last year in October.

17  Q    And let me just ask you because the documents we

18  looked at a minute ago regarding this free ID appeared to

19  start in August of 2015 and I just wanted to ask you does

20  that refresh your recollection that the conversations

21  with Ms. Beck occurred between August of last year --

22  A    Yes.

23  Q    -- and the end of the year last year?

24  A    Yes.

25  Q    Okay.  And let me ask you did you receive additional

NANNETTE MAYZE - DIRECT

1    correspondence from Ms. Beck with another affidavit-type

2    form like the one you sent in?

3    A    She did.  But like I said, when I got it, I glanced

4    at it and I just put it in the drawer.

5    Q    Let me ask you to look at -- let me show you

6    Plaintiffs' Exhibit 367, page 22-19.  And this is a

7    letter dated November 18, 2015, addressed to Johnny M.

8    Randle care of Nannette Mayze and it's signed by Becky

9    Beck, Wisconsin Department of Transportation.  This is a

10   letter you received?

11   A    Yes.

12   Q    And was this the letter that you said you ended up

13   putting to one side?

14   A    Yes.

15   Q    Okay.  When you got it, did you read it carefully or

16   read it at all?

17   A    No.

18   Q    Okay.  And did you have an understanding from

19   looking at it whether this letter or the envelope that it

20   came in had a free ID in it?

21   A    No.

22   Q    You had an understanding it did not have a free ID.

23   A    It did not.

24   Q    Okay.  And what did your father say about the letter

25   when you received it?

NANNETTE MAYZE - DIRECT

1   A    He just said "Shit on that."

2   Q    He said what?

3   A    "Shit on that."  And I put it away.

4   Q    Okay.  And I take it that would mean he was fed up.

5   A    Yes.

6   Q    Okay.  And was this after you had been through many

7   conversations with the DMV?

8   A    Yes.

9   Q    And you had sent in a lot of documentation over the

10  years.

11  A    I sent in what they asked.  I filled out all the

12  paperwork they wanted me to fill out.  So there was

13  nothing else I could do.

14  Q    Let me ask you to take a look at the second page,

15  which is page 20.  And for the record again, this is

16  titled *REAL ID Affidavit of Common Law Name Change*

17  *Instructions*.  Was this -- I'm just going to draw your

18  attention to this -- the document where it says "My old

19  name is Johnnie Marten Randall and my name is Johnny

20  Randle"; kind of focus in on that.  This is kind of

21  similar to the other document that we looked at earlier;

22  right?

23  A    Right, yes.

24  Q    Did you fill this one in?

25  A    No.

NANNETTE MAYZE - DIRECT

1  Q    This came to you prefilled in?

2  A    No -- well, it came like that, but I didn't do

3  anything else with that.  I just put it aside.

4  Q    Okay.  And was this attached to the letter that you

5  kind of put aside?

6  A    Yes.

7  Q    All right.  Did you have any understanding of what

8  Ms. Beck was asking you or suggesting that you do with

9  this?

10 A    No.

11 Q    And just so the record is clear, on this document my

12 old name is Johnnie Marten Randall, is that spelled the

13 way it's spelled on his birth certificate?

14 A    Yes.

15 Q    Okay.  And then the line that says *My name is Johnny*

16 *M. Randle*, that's spelled the way he has spelled it all

17 his life.

18 A    Yes.

19 Q    Now, a first minutes ago you mentioned you had a

20 number of conversations with Becky in Madison and I want

21 to show you a letter to see if it might help refresh your

22 recollection about how many calls you had with the DMV

23 trying to get the ID.  Let me show you, same exhibit, but

24 page five.  And for the record, this is a letter dated

25 January 13, 2016, and it is addressed to Johnny M.

NANNETTE MAYZE - DIRECT

1    Randle, and on the second page, which is page six of the

2    exhibit, actually doesn't have a signature line, but it's

3    on Wisconsin Department of Transportation letterhead.

4        First of all, Ms. Mayze, do you recall whether

5    you've received this letter or not or Mr. Randle received

6    it?

7    A    No, I don't recall receiving it.

8    Q    Okay.  Well, I just want to ask you about some of

9    the entries here just to see if they refresh your

10   recollection about when you spoke to the DMV and some of

11   the things they may have told you.  If it does, it does.

12   If it doesn't, it doesn't.  Let me direct your attention

13   to the third numbered paragraph and that paragraph talks

14   about a call being placed on 8-17-2015 to Mr. Randle and

15   that a call was received back from a Nannette Mayze, it

16   says "Johnny's daughter."  Do you see that?

17   A    Yes.

18   Q    Does that refresh your recollection?  I'm not trying

19   to hold you to specific dates, but that you may -- that

20   you received a call around that time --

21   A    Yes.

22   Q    -- in 2015.  And it goes on to say "She," I believe

23   referring to you, Ms. Mayze, "indicated that his name on

24   the birth certificate was spelled differently."  It says

25   it was Johnnie Martin Randle, spelled like the birth

NANNETTE MAYZE - DIRECT

1 certificate.  "His father's name was James Randle.  She

2 could not recall his mother's maiden name and advised she

3 would look into that."

4     So do you recall in this call that you were giving

5 them this additional information about his father's name,

6 your father's father's name?

7 A    Yes.

8 Q    And then there's another entry, Item 4, dated the

9 same day, 8-17-2015, and it says "DMV staff received a

10 call back from Ms. Mayze indicating Mr. Randle's mother's

11 maiden name was Daisy May More.  DMV submitted the

12 petition application to the Wisconsin Vital Records

13 Office for verification with the State of Mississippi

14 using the maiden name More."  Do you recall that

15 conversation?

16 A    Yes, I do.

17 Q    Okay.  And I think you testified earlier that maybe

18 you weren't sure that More was the correct maiden name?

19 A    Yes.

20 Q    Okay.  And then turning your attention to Item 6

21 here, which is dated 8-24-2015, it says "DMV staff

22 received a call from Ms. Mayze.  Alternate evidence that

23 could be used was reviewed.  It was verified that his

24 school district while growing up was in Holmes County."

25     Do you recall a conversation that you initiated

NANNETTE MAYZE - DIRECT

1    around that time where you were giving information about

2    where he went to school in Mississippi?

3    A    Yes.

4    Q    Was that where he went to elementary and high

5    school?

6    A    Just elementary.

7    Q    Elementary.  And was that information that the DMV

8    said that they needed in order to try to help --

9    A    No.

10   Q    Okay.  Why did you give them that information?

11   A    Because she wanted all the information possible

12   about him to try to locate and make sure that he was born

13   there and that James Randle is his father and Daisy May

14   is his mother.

15   Q    Did she -- the person you spoke with, did she ever

16   raise any question about whether he really was Johnny

17   Martin Randle?

18   A    No.

19   Q    Let me turn your attention to Item 7, which is dated

20   9-9-2015.  And it says the "DMV staff receive a call from

21   Ms. Mayze.  She has a birth certificate for her father

22   but the name is misspelled.  She advised she would bring

23   this to the DMV for review."

24        Do you recall giving them yet another call around

25   that time?

NANNETTE MAYZE - DIRECT

1    A     Yes.

2    Q     And is this -- do you recall telling them that you

3    would bring the birth certificate to the DMV for review?

4    A     Yeah.

5    Q     Okay.  And you did that ultimately?

6    A     I did that, but it wasn't the first time.  I

7    couldn't understand why they would need it again.

8    Q     You had given it to them before --

9    A     Yeah.

10   Q     -- and you were going to need to give it to them

11   again.

12   A     Yes.

13   Q     Okay.  Let me direct your attention to Item 9, which

14   is dated 9-21-2015.  This says "DMV staff spoke with

15   Ms. Mayze.  Verification on the maiden name was

16   discussed."

17         Do you recall that -- another conversation around

18   this time with them, more discussions of Mr. Randle's

19   mother's maiden name?

20   A     Yes.

21   Q     Do you recall anything about those discussions?

22   A     Becky said that they got Bankhead for his mother's

23   maiden name.  I told her "No, all his siblings, his

24   sisters that's left, everybody says maiden name -- their

25   mother's maiden name is More.  I have no idea where

                    NANNETTE MAYZE - DIRECT

1    Bankhead come from."  She said "Well, could it be his

2    grandparents or auntie?"  I have no idea.

3    Q    And did you ever know Mr. Randle's mother?

4    A    She died when I was six.

5    Q    So you didn't really have a basis to know her maiden

6    name?

7    A    No.

8    Q    Okay.  Let me direct your attention to Item No. 12,

9    which is on the next page of the document.  And if we

10   could blow that up.  And that entry is dated 10-7-2015

11   and it says "DMV staff called the telephone number

12   provided on the petition application and spoke with

13   Nannette Mayze.  It was relayed that the verification

14   came through for Johnny Randall and with the mother's

15   maiden name of More.  It was advised that Mr. Randle

16   would need to either request a name correction through

17   Social Security to obtain a card with the correct

18   spelling or that he will need to legally change his name

19   to Johnny Randle, spelled J-o-h-n-n-y, R-a-n-d-l-e, and

20   provide copies of the court documents of the change.

21   Ms. Mayze advised this would be relayed to Mr. Randle and

22   then stated she did not believe either option would

23   occur."

24        Is that consistent with your recollection that they

25   advised you that you would need to either go through some

NANNETTE MAYZE - DIRECT

1   kind of court process to change his name or change his

2   name through Social Security?

3   A    Yes.

4   Q    And so this also reflects a conversation that you

5   had, another conversation you had with the DMV?

6   A    Yes.

7   Q    Okay.  Let me direct your attention to the next item

8   dated 10-9-2015, so two days later.  By the way, you

9   work, don't you, Ms. Mayze?

10  A    Yes.

11  Q    Do you have a lot of extra time to speak with the

12  DMV?

13  A    I can take a real quick break.

14  Q    So this one is a 10-9-2015 entry and it says "a call

15  was placed by DMV staff to Nannette Mayze indicating that

16  a REAL ID Affidavit of Common Law Name Change may be

17  submitted for review."

18      Do you recall having another call with them?

19  A    No, I don't.

20  Q    Okay.  And did anybody explain to you what an

21  Affidavit of Common Law Name Change was?

22  A    No.

23  Q    Okay.  Did anybody explain to you what the

24  significance of that would be?

25  A    No.

                    NANNETTE MAYZE - DIRECT

1    Q    Let me direct your attention to the next entry,

2    10-12-2015.  Says "Nannette Mayze returned the call to

3    DMV staff and asked that the REAL ID Affidavit of Common

4    Law Name Change be mailed out for completion."

5         Do you recall a conversation like that with them?

6    A    Somewhat, but if they said application, they didn't

7    say nothing about no common law and all that.  She just

8    said the application will be mailed to you and you need

9    to complete it.

10   Q    Okay.  Do you think that might have been around the

11   time that you filled out the one where you put Johnny

12   Randle and Johnny Randle and sent it back?

13   A    Yes.

14   Q    And then the -- let me direct your attention to Item

15   No. 17 dated 11-18-2015.  This entry reads "DMV staff

16   spoke with Nannette Mayze and indicated that the form

17   needed to be filled out with the correct prior name."

18        Do you recall having a conversation with them where

19   they told you it needed to be, and I'm going to put this

20   in kind of air quotes, "the correct legal name"?

21   A    Yes.

22   Q    And what did they tell you they meant by the correct

23   legal name?

24   A    What's on his birth certificate.

25   Q    Did you consider that to be his correct --

NANNETTE MAYZE - DIRECT

1    A    No.

2    Q    Okay.  I'm sorry.  I misspoke.

3    A    I'm sorry.

4    Q    Correct prior name.  Did you consider that to be his

5    correct prior name?

6    A    No.

7    Q    And did Mr. Randle believe that was his correct

8    prior name?

9    A    No.

10   Q    And then it says "Also Johnny Randle would need to

11   sign."  Had you advised them by this time in 2015 that he

12   had an inability to sign those types of documents on his

13   own?

14   A    Yes.

15   Q    And it says "If Nannette Mayze is signing as power

16   of attorney --" do you have an understanding of what

17   power of attorney is?

18   A    Yes.

19   Q    Okay.  "If Nannette Mayze is signing as power of

20   attorney, this designation would be reflected with the

21   signature and a copy of the power of attorney papers

22   provided.  Nannette Mayze requested that this be resent

23   for her completion."

24        So do you have a formal power of attorney for

25   something like this for Mr. Mayze (sic)?

NANNETTE MAYZE - DIRECT

1   A      For medical, yes.

2   Q      For medical issues?

3   A      Yes.

4   Q      And did you know whether or not that would be

5   sufficient for purposes of getting the free ID?

6   A      No.

7   Q      And did you have money to go hire an attorney to

8   help you figure some of this out?

9   A      No.

10  Q      And then -- just kind of counting back over the

11  conversations that this letter recounts, maybe let me

12  just -- I count numbers -- Item No. 17, Item No. 15, Item

13  No. 14, Item No. 13, Item No. 12, Item No. 9, Item No. 7,

14  Item No. 6, Item No. 4, Item No. 3.  I may have

15  miscounted, but I get about 11.  Does that fit with your

16  recollection of how many times you spoke back and forth

17  with the DMV?

18  A      Yes.

19  Q      Could it have been more?

20  A      It may have, I'm not sure.

21  Q      Okay.  And have you also been on trips in person to

22  the DMV?

23  A      Yes.

24  Q      And Mr. Randle, you had to take Mr. Randle with you?

25  A      Yes.

NANNETTE MAYZE - DIRECT

1    Q     Does he have some mobility issues that make it

2    difficult?

3    A     To walk, yes.

4    Q     Okay.  Ms. Mayze --

5          MR. SPIVA:  Ms. Schultz, we can take that down.

6    Q     Ms. Mayze, did anyone at the DMV ever inform you

7    that they had run an investigatory report on Mr. Randle

8    at about the same time that you first applied for a free

9    voter ID for him in August of 2015?

10   A     No.

11   Q     And do you know -- so I take it you weren't aware of

12   what's in that file?

13   A     No.

14   Q     One of the things that it reflects, Ms. Randle --

15   Ms. Mayze, is that Mr. Randle lived on Highway 49 in

16   Tchula, Mississippi.  Is that where he lived before he

17   moved to Madison?

18   A     Yes.

19   Q     It reflects the name of somebody named Timothy

20   Therman.  Who's that?

21   A     His son-in-law.

22   Q     It has the name of someone named Santrel Therman.

23   Who is that?

24   A     His grandson.

25   Q     Mercedes Malone.  Who is that?

NANNETTE MAYZE - DIRECT

1   A     His granddaughter.

2   Q     Does Mr. Randle own a 1997 Oldsmobile?

3   A     Yes, he do.

4   Q     Now, the report reflects that -- and it has a Johnny

5   Randle spelled the way he uses it as the registered

6   owner.  Let me show you Plaintiffs' Exhibit 445,

7   specifically pages three and four.

8              MR. SPIVA:  Ms. Schultz, this would need to be

9   -- I think we can show this on the public screen if we

10  just focus on pages three and four because that's

11  information relating to Mr. Randle, Your Honor.

12             THE COURT:  I muted the video so you can get it.

13  When you're ready, just let me go and then I can publish

14  it.

15             MR. SPIVA:  Thank you, Your Honor.

16             THE COURT:  Is there a part that we have to

17  focus on or are these pages --

18             MR. SPIVA:  You know, actually maybe we should

19  keep this on just the internal screens.  There's one page

20  of it that might have a little bit -- I don't think it's

21  actually -- I just don't want to show too much of his

22  private information.

23  BY MR. SPIVA:

24  Q     So do you have it on your screen, Ms. Mayze?

25  A     Yes.

NANNETTE MAYZE - DIRECT

1   Q    This is page three of Plaintiffs' Exhibit 445.  I

2   can't see the screen in front of me.  So Ms. Mayze, this

3   is a letter, for the record, that's dated May 13, 2016,

4   addressed to Johnny Randle.  Re:  Free Wisconsin ID card

5   for voting purposes.  And it's signed by Kristina H.

6   Boardman, Wisconsin DMV Administrator.

7        Ms. Randle (sic), have you ever seen this document

8   before?

9   A    No.

10  Q    Didn't I show it to you yesterday?

11  A    Yes.  Not before that.

12  Q    But that was the first time you had seen it; right?

13  A    Yes.

14  Q    It has a date of May 13 which is otherwise known as

15  last Friday.

16  A    Yes.

17  Q    Okay.  And let me just direct -- do you have -- if I

18  can direct your attention to the first paragraph of the

19  letter.  It starts out "Wisconsin Administrative Code

20  Trans 102.15 has recently been amended to allow for the

21  issuance of a temporary identification card receipt

22  usable for voting purposes while an identification card

23  petition application is being processed."

24        Do you have any idea what Wisconsin Administrative

25  Code Trans 102.15 is?

NANNETTE MAYZE - DIRECT

1    A    No.

2    Q    Have you had any discussions with anybody at DMV

3    about that code?

4    A    No.

5    Q    Okay.  And it says -- now let me ask you -- this

6    says that this is available while an identification card

7    petition application is being processed.  In your mind is

8    Mr. Randle's application still being processed?

9    A    In my mind truthfully it shouldn't be.

10   Q    Okay.

11   A    I gave them every document possible.

12   Q    Okay.  This says that -- this receipt is valid for

13   60 days and can be used only for Wisconsin voting

14   purposes.

15        Do you see that, Ms. Mayze?

16   A    Yes.

17   Q    Is there any explanation on the letter about

18   renewing -- about the possibility of renewing the

19   receipt?

20   A    No.

21   Q    Okay.  Is the November election more than 60 days

22   away?

23   A    Yes, it is.

24   Q    Okay.  Does Mr. Randle want to vote in the November

25   election?

NANNETTE MAYZE - DIRECT

1    A    Yes.

2    Q    Why does he want to vote?

3    A    He don't want him in there.

4         MS. SCHMELZER:  Objection.  Hearsay and

5    speculation.

6         THE COURT:  I will allow it.  Overruled.

7         THE WITNESS:  He say he don't want that in

8    there.  We messed up if he get in there.

9    BY MR. SPIVA:

10   Q    Who is he referring to in terms of --

11   A    Trump.

12   Q    This letter in the next paragraph says "Your

13   application for a free ID for voting purposes was denied

14   on January 14, 2016."

15        Did you have an understanding that Mr. Randle's

16   application for a free ID had been denied?

17   A    Yes.

18   Q    And so did you have an understanding of why it had

19   been denied?

20   A    No.  I have speculation, but --

21   Q    Okay.  I don't want you to speculate, but if you

22   have an understanding based on what you understood from

23   looking at --

24   A    I understood -- my understanding that they did not

25   give him a voter's ID because I did not have the name

                    NANNETTE MAYZE - DIRECT

1   changed to what's on his birth certificate and I wasn't

2   willing to do so and I said I wasn't because I'm not

3   going to start him over at the age of 70 plus to a name

4   that he doesn't know.

5   Q    The next sentence in that paragraph, after it talks

6   about the ID being denied, says "However, we encourage

7   you to continue to work with our office to verify your

8   birth record as required to receive a Wisconsin ID."

9        Are you aware of anything else that you or

10  Mr. Randle could do to verify his birth record?

11  A    No.

12  Q    And it says "If a birth record is not available,

13  secondary documentation may be reviewed for

14  consideration."

15       Was there ever any additional documentation or

16  secondary documentation that someone from DMV asked you

17  to collect beyond what you already provided?

18  A    No.  What I had they said was sufficient except the

19  name spelling on his driver's license.

20  Q    Can you think of any other documentation that you

21  could provide to give them?

22  A    No.  I gave them the Social Security card, I gave

23  them mail that was mailed to him in his name, and the

24  red, white and blue card, Social Security card, and the

25  little -- his driving license.

NANNETTE MAYZE - DIRECT

1   Q     And his birth certificate?

2   A     And the birth certificate.

3   Q     The last paragraph of this says "If you are able to

4   provide new or additional information to assist the DMV

5   in verifying proof of your name and date of birth or

6   citizenship, please contact the DMV compliance team

7   directly."  It says "If you are able to provide new or

8   additional information."  Is there any new or additional

9   information that you could provide them to -- beyond what

10  you've already provided to verify the proof of

11  Mr. Randle's name or date of birth or citizenship?

12  A     No.

13  Q     Let me ask you -- let me ask you to take a look at

14  the next page of this exhibit which I believe is page

15  four of Plaintiffs' Exhibit 445.  And let me direct your

16  attention to the very small print at the bottom of the

17  page, Ms. Mayze.  Do you see that?  Can you read that?

18  A     Yes.

19  Q     It says "This receipt is valid for 60 days and can

20  be renewed unless otherwise canceled by WisDOT.  Does

21  that tell you how you could renew the receipt?

22  A     No.

23  Q     Okay.  And do you have any understanding of what

24  they mean by *unless otherwise canceled by WisDOT*?

25  A     No.

NANNETTE MAYZE - DIRECT

1  Q    Ms. Mayze, is your father a lawful Wisconsin
2  resident?
3  A    Yes.
4  Q    Is he an American citizen?
5  A    Yes.
6  Q    Does he want to vote in the November 2016 election?
7  A    Yes.
8        MR. SPIVA:  I have no further questions.  Thank
9  you very much, Ms. Mayze.
10        THE COURT:  Cross-examination.  (11:30 a.m.)
11              CROSS-EXAMINATION
12  BY MS. SCHMELZER:
13  Q    Hello, Ms. Mayze.
14  A    Hi.
15  Q    So you started the process of getting your father a
16  state ID in August of 2011; is that correct?
17  A    Yes.
18  Q    And you wanted him to have an ID because you felt it
19  was important for him to have now that he was living in
20  Wisconsin; is that correct?
21  A    Yes.
22  Q    And voting wasn't an issue at that time, having to
23  have an ID; correct?
24  A    Yes.
25  Q    So your motivation wasn't to allow him to vote, it

NANNETTE MAYZE - CROSS

1   was for another purpose.

2   A     Yes.

3   Q     And in 2015 when you went through the process of

4   filling out a petition to get the Wisconsin ID card, your

5   motivation was still the same; correct?

6   A     No.

7   Q     Do you remember having your deposition taken in this

8   case?

9   A     Yes.

10  Q     And you were under oath for that; correct?

11  A     Yes.

12  Q     Ms. Mayze, I'm going to show you a page from your

13  transcript in that deposition.

14  A     Okay.

15          MR. SPIVA:  Could you give us a page number?

16          MS. SCHMELZER:  Sure.  32.

17  BY MS. SCHMELZER:

18  Q     Down at line 20, do you recall me asking you:

19        "Question:  When you went to get a voter ID card,

20  was the motivation still the same to get the ID as it was

21  back in 2011?"

22        Do you recall me asking you that question?

23  A     No, I don't remember, but I see it in front of me.

24  Q     And did you answer "yes"?

25  A     Yes.

NANNETTE MAYZE - CROSS

1    Q    So the voter ID process was another way of getting a

2    Wisconsin ID for your dad?

3    A    Yes.

4    Q    In fact, he had never voted in Wisconsin prior to

5    that; is that correct?

6    A    No, he hadn't.

7    Q    Let's talk about the process that you went through.

8    You were aware from that first visit to DMV that you

9    needed his birth certificate; correct?

10   A    Yes.

11   Q    And you said that you got a copy of his birth

12   certificate about three years ago?

13   A    Yes.

14   Q    But you didn't -- and you went to the DMV a few

15   times.  I remember you said you went back because you

16   thought someone would tell you something differently or

17   you went to another one right after; is that correct?

18   A    Yes.

19   Q    Back in 2011.

20   A    Yes.

21   Q    But you didn't provide a copy of your birth

22   certificate at that time.  You didn't bring it to the

23   DMV.

24   A    No.

25   Q    No, you didn't bring it to the DMV?

NANNETTE MAYZE - CROSS

1  A    No, I did not in 2011.  No.

2  Q    And you didn't bring it to the DMV in August, August

3  12th of 2015 when you filled out his petition; correct?

4  A    Correct.

5  Q    So when you said that you did bring it, that wasn't

6  correct.

7  A    It's correct, but I didn't take it on that day

8  because I just didn't.  But when they requested, I

9  brought it back.

10  Q    Let's take a look at the petition that was filled

11  out for your dad.  This is Defendants' Exhibit 211,

12  Exhibit 1 in the folder.  I know there's some pop-up

13  boxes on there, Ms. Mayze.

14       THE COURT:  Hold on a moment.  Do you have an

15  objection?

16       MR. SPIVA:  I object.  The document has

17  alterations on it.  She clearly didn't fill out those

18  pop-out boxes.

19       THE COURT:  I'll overrule the objection for now

20  and figure out what this document is.

21  BY MS. SCHMELZER:

22  Q    Do you remember me showing you a copy of this

23  document at your deposition, Ms. Mayze?

24  A    Yes.

25  Q    And this is a document that you said was filled out

NANNETTE MAYZE - CROSS

1-A-142

1    for your dad?

2    A    Yes.

3    Q    At first you said you filled it out, but then you

4    said it was actually a friend of yours that filled it

5    out; correct?

6    A    Right, because I had to step out for a few minutes.

7    Q    But did you help with the information that was

8    provided on there?

9    A    Yes.

10   Q    And you didn't have the birth certificate with you

11   at the time?

12   A    No.

13   Q    But you did have it somewhere at that time; correct?

14   A    Yes, I did.

15   Q    And some of the information on this petition was

16   incorrect; is that right?

17   A    Yes.

18   Q    So where you filled out place of birth:  State,

19   Mississippi, that was correct?

20   A    Yes.

21   Q    The next spot down here where it says *place of*

22   *birth, county*, there's no county in there; correct?

23   A    Correct.

24   Q    And that county would have been on the birth

25   certificate; is that correct?

NANNETTE MAYZE - CROSS

1    A    Correct.

2    Q    And place of birth, you have Tchula as far as place

3    of birth; is that correct?

4    A    Correct.

5    Q    And was that the proper place of birth?

6    A    Yes.

7    Q    And you have for his mother's maiden name Randle?

8    A    Yes.

9    Q    But you knew it wasn't Randle when you filled that

10   out; correct?

11   A    Yeah, yes.

12   Q    You thought it was Bankhead and then Moore and then

13   the correct spelling of More; correct?

14   A    Correct.

15   Q    And that was all on the birth certificate, the

16   correct maiden name?

17   A    Yes.

18   Q    And then for his father's first name you have

19   Johnny; correct?

20   A    Yes.

21   Q    And that was actually James; right?

22   A    Correct, yes.

23   Q    And that was on the birth certificate as well.

24   A    Yes.

25   Q    So there was a lot of incorrect information on here

                    NANNETTE MAYZE - CROSS

1   that you could have had correct had you brought the birth

2   certificate with you.

3   A    Yes.

4   Q    And you didn't think to say well, I'm going to go

5   back and get the birth certificate so I can get that

6   information right.

7   A    No, I didn't.

8   Q    And that delayed the process of the dealings with

9   the DMV; correct?  There was a lot of back and forth

10  confirming what was correct and not correct?

11  A    Before and after, yes.

12  Q    We talked a little bit about -- you talked a little

13  bit about the REAL ID Affidavit that was sent to you

14  initially that you had filled out.  Do you recall that?

15  A    Yes.

16  Q    This is Defense Exhibit 211.  It's Exhibit 3.  I

17  know it's got a different number on it, but this is the

18  affidavit that you filled out that you had talked about

19  with Mr. Spiva; correct?

20  A    Yes.

21  Q    And did you read the top of this before you signed

22  and had it notarized?

23  A    I read it.

24  Q    Did you understand it?

25  A    Maybe not as much.

NANNETTE MAYZE - CROSS

1    Q    Okay.  Let's go and read some of this.  Does it say

2    "Federal law requires an applicant for REAL ID to provide

3    at least one of the listed sources of documents to prove

4    identity.  In some cases, those source documents might

5    not show an individual's legal name if the name was

6    changed after the document was created."

7         Did you understand what that meant?

8    A    No.

9    Q    It goes on to say "Federal law recognizes name

10   changes through marriage, adoption, court order or other

11   mechanisms permitted by the state law or regulation but

12   requires the applicant to provide evidence of that name

13   change.  Name changes done through court procedures

14   create legal documents proving the name change.  However,

15   Wisconsin recognizes the common law right to change one's

16   name through consistent and continuous use as long as the

17   change is not affected for a fraudulent purpose."

18        Did you recognize that your dad had used the

19   spelling of his name that he's always known consistently

20   since birth?  Correct?

21   A    Yes.

22   Q    "These lawful common name changes do not generate

23   legal documents proving the name change."  Did you

24   understand that?

25   A    No.

NANNETTE MAYZE - CROSS

1    Q     Did you ever think to call Becky back or anyone at

2    DMV to explain this to you before you signed and had it

3    notarized?

4    A     No.

5    Q     And after you had filled out that form, you had some

6    more communication with DMV about how that wasn't

7    properly completed; is that correct?

8    A     I think.  I'm not sure.

9    Q     At some point Becky sent you another form that she

10   had put in some information; is that correct?

11   A     Yes.

12   Q     And that was that November 18th letter?

13   A     Yes.

14   Q     And you didn't even look at that, did you?

15   A     No.

16   Q     You didn't --

17   A     I glanced and put it aside.

18   Q     Okay.  You didn't call Becky and say what do I have

19   to do here, why am I signing this and what does this

20   mean?

21   A     No.

22   Q     But your dad would have been agreeable to signing a

23   document that says I want to use the name I've always

24   been known as Johnny J-o-h-n-n-y, M. Randle, R-a-n-d-l-e;

25   correct?

NANNETTE MAYZE - CROSS

1    A    Yes, maybe.

2    Q    And are you willing to continue to work with the DMV

3    to get -- to complete that process, to let him use his

4    name that he's always been known as by some form -- by

5    filing another REAL ID application or affidavit that

6    would allow him to continue to use the name he's always

7    been known by?

8    A    Yes.

9         MS. SCHMELZER:  Thank you, Ms. Mayze.

10        THE WITNESS:  You're welcome.

11        THE COURT:  Any redirect?

12        MR. SPIVA:  Yes, very briefly.

13                   REDIRECT EXAMINATION

14   BY MR. SPIVA:

15   Q    Ms. Mayze, we won't keep you much longer.  So I just

16   want to make sure I'm clear.  Does your father have a

17   present desire to vote in the November election?

18   A    Yes.

19   Q    And attorney -- Ms. -- the attorney for the other

20   side was asking you about some of the affidavit of name

21   change documents.  Do you recall that?

22   A    Yes.

23   Q    I believe they're also called REAL ID affidavits.

24   Do you recall that?

25   A    I don't remember all that.

                   NANNETTE MAYZE - REDIRECT

1    Q    One of the documents she was just asking you about.

2    A    Oh, yes.

3    Q    Okay.  Ms. Mayze, I'm not being a smart aleck, but

4    have you been to law school?

5    A    No.

6    Q    Did you have access to a lawyer to help you, you

7    know, decipher what these forms meant and called for?

8    A    No.

9    Q    Do you have money to pay a lawyer to try to help

10   figure out what these forms mean?

11   A    No.

12           MR. SPIVA:  Thank you, Ms. Mayze.

13           THE COURT:  All right.  Ms. Mayze, thank you

14   very much.  You're finished now.

15       (Witness excused at 11:43 a.m.)

16           THE COURT:  Just so you know what the schedule

17   here is, I have a proposal we take our lunch at about

18   12:30 to about 1:30.  So just for your planning purposes

19   if you get within shouting distance of that time and

20   we're at a break with the witness, we can take a lunch

21   then.

22           MR. KAUL:  Your Honor, next it's Cassandra

23   Silas.

24

25

                    NANNETTE MAYZE – REDIRECT

1        **CASSANDRA SILAS, PLAINTIFFS' WITNESS, SWORN,**

2                        DIRECT EXAMINATION

3    BY MR. KAUL:

4    Q     Good morning, Ms. Silas.

5    A     Good morning.

6    Q     Would you please spell your name for the record.

7    A     Yes.  Cassandra.  C-a-s-s-a-n-d-r-a.

8    Q     And could you spell your last name too?

9    A     Yes.  Silas.  S-i-l-a-s.

10   Q     Ms. Silas, where were you born?

11   A     Chicago, Illinois.

12   Q     And what year was that?

13   A     1967.

14   Q     And did you move to Wisconsin at some point?

15   A     Yes.

16   Q     When was that?

17   A     In 1991.

18   Q     And you've lived here for almost all the time since

19   then; is that right?

20   A     Yes.

21   Q     You went to Minnesota for one month?

22   A     Yes.

23   Q     And you got out of there as quickly as possible.

24   And where in Wisconsin do you live?

25   A     53 -- you said where in Wisconsin?

                     CASSANDRA SILAS - DIRECT

1    Q    I actually meant what city.

2    A    Oh.  In Wisconsin?

3    Q    Yes.

4    A    In Milwaukee.

5    Q    Okay.  Is that where you've lived during your entire

6    time in Wisconsin?

7    A    No, just for -- I was going through finding a house

8    for me and my kids and we went to Waukesha for like a

9    couple weeks.

10   Q    So most of the time in Milwaukee?

11   A    Most of the time, yeah.

12   Q    Now, are you a voter?

13   A    Yes.

14   Q    Did you at some point learn about a Vote ID Law in

15   Wisconsin?

16   A    Yes.

17   Q    How did you learn about that?

18   A    Well, I was looking at the news.  That's how I found

19   out.

20   Q    Okay.  And at some point did you learn about a free

21   ID that you potentially could get?

22   A    Yes.

23   Q    How did you learn about that?

24   A    From the news too.

25   Q    And did you have a sister who had gone through the

CASSANDRA SILAS - DIRECT

1  ID process?

2  A    Yes.

3  Q    So at some point did you try to get an ID?

4  A    Yes, because she was telling me she was going to

5  send off for hers and she did and it only took her a

6  couple days.  She told me get them on order and send it

7  to Chicago, Illinois, and send it through UPS.  And she

8  got hers in a couple days.  So she got hers, so I did the

9  same thing, but I ran into some trouble.

10  Q    Let me go back just a step.  Do you have some IDs?

11  A    I have a Transit Plus ID.

12  Q    And who issues that, do you know?

13  A    Yes, the bus company.  Like when you're disabled and

14  can't get to the bus and you can ride a cab.

15  Q    Okay.  And does that have your picture on it?

16  A    Yes.

17  Q    Does it have your name on it?

18  A    Yes.

19  Q    Do you know if you can use that to vote?

20  A    No.

21       THE COURT:  Let me be clear about that.  Does

22  that mean you don't know whether you can use it to vote

23  or you know that you can't use it?

24       THE WITNESS:  I know I can't use it.  It don't

25  have my birth date on it.

CASSANDRA SILAS - DIRECT

1            THE COURT:  Thank you.

2            THE WITNESS:  You're welcome.

3  BY MR. KAUL:

4  Q    Do you have any other picture IDs?

5  A    No.

6  Q    So is that why you wanted to get the free ID?

7  A    Yes, that's why I wanted the free ID, to vote.  But

8  I need the ID for other things too.

9  Q    So at some point in time did you contact or go to

10 the DMV?

11 A    Yes.  My daughter took me to the DMV.

12 Q    Okay.  Before you went did you reach out to

13 somebody?

14 A    Yes.  I called first and asked them what all did I

15 need before she took me down there and the lady said

16 bring something with my name on it, and I told her I got

17 my ID but not a state ID, a picture ID for my Transit

18 Plus.  And she said well, come on down.  And when I went

19 down there, I was -- I ran into a little trouble the

20 first time because I didn't have, you know, all the

21 papers.  You know, you've got to see two sets of people

22 when you go down there and I didn't have all my papers.

23      So again, my daughter took me back down there.  I

24 have proof about where I stay at; proof that I get food

25 stamps, I had my food stamp ID.  I had my Social Security

CASSANDRA SILAS - DIRECT

1    papers saying -- they gave me a yearly how much I get, my

2    name, Social Security number, everything.  So I took it

3    down there too.

4    Q    And what happened when you got to DMV?

5    A    Okay.  They took -- gave me a number, took some of

6    the papers and I assumed, you know, they took a picture

7    that I was going to get, so I waited a little bit more

8    because I had to see another lady and she called my

9    number and she got on the phone.

10   Q    And just to be clear, you're talking about somebody

11   who works at DMV?

12   A    Yes.

13   Q    You said she got on the phone?

14   A    She got on the phone.  She said she was going to

15   call Madison.  And they was going back and forth talking.

16   And when she got off the phone, she was like no, I wasn't

17   -- you know, she couldn't give me the picture ID.  And I

18   signed another paper from another lady come out, an

19   African American lady came out the side door and she had

20   me sign some more, you know, another paper.

21   Q    And did you give that to the person at DMV?

22   A    Yes.

23   Q    Now, do you remember how many times did you actually

24   go to DMV?

25   A    I went twice.  The first time I didn't get no

                    CASSANDRA SILAS - DIRECT

1  paperwork.

2  Q    Do you remember exactly what happened on which trip?

3  A    No, I just know the first time I didn't get nothing.

4  The second time I got a little something, but I was

5  always -- you don't have enough.  But, you know, on the

6  phone she told me just bring the things that, you know,

7  that I have and that's all I had, you know.  And I told

8  her I can get something from Social Security, you know,

9  'cause they got all my name, my Social Security number,

10 how long I been on and everything and it still didn't

11 work.

12         MR. KAUL:  And do we have a redacted version of

13 PX 354?  I have hard copies I can give otherwise.  I'm

14 going to hand up hard copies.  Your Honor, may I

15 approach?

16         THE COURT:  Yes.

17 BY MR. KAUL:

18 Q    All right.  There are a bunch of different documents

19 in this, but first could you turn to page ten.  On the

20 bottom it says 9-010.

21 A    That's the first one.  All right.

22 Q    I'll come give you a hand.  May I approach?

23         THE COURT:  Yes, please do.

24 Q    Do you recognize that document, Ms. Silas?

25 A    Yes.

                    CASSANDRA SILAS - DIRECT

1-A-155

1    Q     What is that?

2    A     This is my food stamp worker and has my name on it

3    and, you know, where I was staying and just telling them

4    who I am and my worker name so if they want to call, they

5    could call my worker and verify who I was.

6    Q     Okay.  So first of all, this is a document you got

7    from -- that relates to food stamps you said?

8    A     Yes.

9    Q     And that's the Food Share Program?

10   A     Yes.

11   Q     And do you see on the top right it says State of

12   Wisconsin?

13   A     Yes.

14   Q     So do you get Food Share benefits through the State

15   of Wisconsin?

16   A     Yes.

17   Q     And this has your correct name on top; right?

18   A     Yes.

19   Q     And is this where you were living at that time?

20   A     Yes.

21   Q     Can you turn to the next page in there.  It's page

22   11.

23   A     Okay.

24   Q     And what's this document?

25   A     This is from Social Security Administration.

CASSANDRA SILAS - DIRECT

1    Q    And do you get SSI benefits?

2    A    Yes.

3    Q    And that's from the federal government; right?

4    A    Yes.

5    Q    And does this also have your name on it?

6    A    Yes.

7    Q    And was this your address at the time?

8    A    Yes.

9    Q    Did you give both of these documents, pages 10 and

10   11, to DMV when you went in?

11   A    Yes.

12   Q    Do you remember which of those two times it was

13   exactly?

14   A    Both times -- I would say the second time --

15   Q    Okay.

16   A    -- I gave them the same thing.

17   Q    And you talked about filling out a form.  Do you

18   remember that?

19   A    Yes.

20   Q    Can you go back to page eight.  It's a couple pages

21   earlier.

22   A    Okay.  Page eight.

23   Q    Yes.  If you want a hand, let me know.

24   A    Okay.

25             MR. KAUL:  May I approach, Your Honor?

                    CASSANDRA SILAS - DIRECT

1                THE COURT:  Yes.

2   A      Okay.  I got it.  No, this is nine.  Just a minute.

3   Q      All right.  Do you see that document?

4   A      Yes.

5   Q      Do you recognize that?

6   A      Yes.

7   Q      And is that one of the forms that you filled out

8   that day?

9   A      Yes.

10  Q      And is the information that you provided on this

11  form correct to the best of your knowledge?

12  A      Yes.

13  Q      Okay.  Do you see on the bottom, sort of in the

14  middle on the right-hand side there's a date there right

15  after your signature?

16  A      Yes.

17  Q      It's kind of cut off I know, but does January 20th

18  of 2015 sound about right for when you filled the forms

19  out?

20  A      Yes.

21  Q      Okay.  Now, go to the next page.

22  A      Okay.

23  Q      Page nine.  Does that show another form you filled

24  out that day?

25  A      Yes.

1    Q    Okay.  Now you see those little bubbles in red?

2    A    Uh-huh, yes, I see them.

3    Q    You didn't fill that out, did you?

4    A    What you got, the red --

5    Q    Yeah.  I mean that's not your handwriting, is it?

6    A    Hopper.  My real name Hopper.  Yeah.

7    Q    What's Hopper, just to be clear?

8    A    That's my mother's maiden name.  That's how my

9    mother told me she had spelled it.  You know, she's 70

10   years old so -- but I had gotten the right spelling.  I

11   called Madison and gave them the right spelling.

12   Q    And just to be clear, you hand wrote Hopper; right?

13   A    What did you say?

14   Q    You hand wrote Hopper in black?

15   A    Yes.  Not red.

16        THE COURT:  Do you know where those little boxes

17   came from?  There's two boxes on there that have Hopper

18   written in red and it's got Cook County Hospital written

19   on it.  Do you know where those boxes came from or what

20   those boxes are?

21        THE WITNESS:  No.

22        THE COURT:  Okay.

23   BY MR. KAUL:

24   Q    Now, after you filled out that paperwork, you said

25   you gave that to DMV?

CASSANDRA SILAS - DIRECT

1    A    Yes.

2    Q    Did they tell you what was going to happen after

3    that?

4    A    No.

5    Q    Did you at some point get a number, phone number to

6    call for somebody at DMV?

7    A    Did I get a phone number?  I can't remember.

8    Q    Okay.  Let me ask you a different question.  Do you

9    remember speaking to a person named Jim Logan?

10   A    Yes.

11   Q    Who is Jim Logan?

12   A    He was working for the Madison -- I thought he was

13   working for Springfield, Illinois, because I had gotten a

14   number from Chicago, Illinois.

15   Q    Okay.  So you had some confusion about who he was?

16   A    Yeah, but I know I talked to him at that time.

17   Q    Okay.  Now, you mentioned trying to get a birth

18   certificate from Chicago or Cook County before.  Do you

19   remember that?

20   A    Yes.

21   Q    Did that happen after this all started or before, if

22   you remember?

23   A    It started after because I was trying to get all my

24   paperwork and I had sent my money order to Chicago,

25   Illinois, and they sent the receipt, the money order back

CASSANDRA SILAS - DIRECT

1    because they couldn't find it.  So they gave me a number

2    for Springfield, they said that's where they keep all the

3    records at.  So that's why I got Jim mixed up with

4    Springfield, but he was from Madison.

5    Q     Okay.  Why did you send a money order to Cook

6    County?

7    A     I was paying for my money order and I was paying for

8    UPS to have it delivered to my home, you know, a couple

9    days early.

10   Q     Do you know if the birth certificate cost any money?

11   A     Yeah, it cost $12.

12   Q     And you said you contacted Springfield?

13   A     Yeah.

14   Q     And what happened with that?

15   A     They checked -- it took them a couple days.  They

16   checked and they said they couldn't find it.  And they

17   said they was going to keep looking and keep looking for

18   it.  I gave them my name.  I gave them my brother name.

19   I gave them my sister name.  I said we got the same

20   mother.  And I said she got her birth certificate.  I

21   said her name was spelled something like mine and it was

22   close, just her name is Andrea, my name is Cassandra and

23   both of us got Marie for a middle name and we are Silas.

24   So I asked him could he, you know -- well, he was

25   checking.  Then he told me if he wasn't there, speak with

CASSANDRA SILAS - DIRECT

1   the lady.  But I don't remember her name.

2        And she couldn't find it.  So they said I might have

3   to get in front of a judge to get my ID.  And my

4   daughter, she was so upset about it, you know, she was

5   real upset about it.  Right away she, like, if she die,

6   she give her a death certificate, but they won't give her

7   a birth certificate.

8        MS. SCHMELZER:  Objection.  Hearsay.

9        THE COURT:  Overruled.

10  BY MR. KAUL:

11  Q    Did you try to get school records?

12  A    Yes.

13  Q    What did you do for that?

14  A    I thought it was going to be quicker.  They told me

15  on the form that DMV said I could get my school records,

16  so I thought it was going to be faster.  I called the

17  Manley High School.  They said they didn't have it, call

18  their school board.  So I called their school board and

19  the day I called, the lady answered.  The lady I asked

20  for, she wasn't there and I told her what I needed.  She

21  said "Well, give me your name and leave your number and

22  I'll have her call you tomorrow."  But she never called.

23  I got upset about it, you know.

24  Q    All right.  Let me have you turn to page one in that

25  packet and I think we can pull this up.  This is Exhibit

1    354, the very first page.  And Ms. Silas, why don't you

2    take a look at the first and second page, just take a

3    look at both of those and let me know if that's a

4    document you remember seeing.

5    A    Yes.

6    Q    Okay.  And is this something you received in the

7    mail from DMV?

8    A    Yes.

9    Q    Let's zoom in on the first page on point number one.

10   And we talked before about how you submitted your

11   petition some time around January 20 of 2015; is that

12   right?

13   A    Yes.

14   Q    All right.  And then let's go down to No. 5.

15   A    Okay.

16   Q    Now, this says "DMV compliance staff communicated

17   with you to obtain any additional information that may be

18   available to help substantiate birth record data.  You

19   communicated that you would contact Cook County Hospital

20   to see if they may provide additional information to help

21   verify accurate birth record data in your name."

22        Do you see that?

23   A    Yes.

24   Q    Do you recall having a conversation with Mr. Logan

25   about this?

CASSANDRA SILAS - DIRECT

1   A      Mr. Logan?

2   Q      With Jim Logan.

3   A      No.

4   Q      Okay.

5   A      I just had it on my mail, that's how I found out.

6   Q      You remember finding out about it from this mailing?

7   A      Only from the paper.

8   Q      Let's go down to No. 6 right below that.  Okay.  It

9   says that on March 20, 2015, you contacted DMV compliance

10  staff and requested -- says that "We contacted the county

11  clerk on behalf.  DMV did contact them and was told that

12  they wouldn't verify any information over the phone and

13  would only provide documentation for a fee.  DMV

14  compliance staff contacted you and related this

15  information to you.  You indicated -- says that might try

16  to obtain more information that would verify accurate

17  birth record data in your name."  Do you see that?

18  A      Um-hmm.

19  Q      Do you remember having a conversation like this with

20  Jim Logan?

21  A      No.

22  Q      You did have conversations with Jim Logan; right?

23  A      Yes.

24  Q      Do you remember the details of all those?

25  A      Pretty much, but he didn't say that they would pay

CASSANDRA SILAS - DIRECT

1    for it because I already had sent the money in and I got

2    a letter -- well, I got a letter from someone or he told

3    me over the phone, I don't remember.  He said if I don't

4    have it by the time that I send my money order to the

5    place where he worked, that they would keep it.

6    Q     Okay.

7    A     But I don't remember.

8    Q     Let's turn to the next page, No. 7.  And this

9    indicates that on May 15, 2015, you called and spoke with

10   DMV staff.  You reiterated that you were born in the

11   United States and then it says -- it reiterated you were

12   born in the United States.  And then it says "In that all

13   of you know documentation, DMV staff again communicated

14   that we would need additional information in order to

15   proceed with your voter ID."  Do you see that?

16   A     You said 7; right?

17   Q     Yes.

18   A     Okay.  Got it.

19   Q     It's the second page, but No. 7.

20   A     Oh, second page.

21         THE COURT:  It's up at the top of the second

22   page.

23         MR. KAUL:  May I approach?

24         THE COURT:  Yes.

25   BY MR. KAUL:

                    CASSANDRA SILAS - DIRECT

1    Q    Do you see that?

2    A    Yes.

3    Q    Do you remember calling DMV to complain about the

4    process not moving along?

5    A    Yes.

6    Q    Had you told DMV that you were born in the United

7    States?

8    A    Yes.

9    Q    By the way, how far did you get in school?

10   A    Ninth grade.

11   Q    Okay.  Now, going down that page, do you see there's

12   a list of types of documentation?

13   A    Yes.

14   Q    And let me ask you about those.  Do you have a

15   baptismal certificate?

16   A    No.

17   Q    Do you -- you said you've been trying to get your

18   birth certificate; right?

19   A    Yes.

20   Q    Do you know what a census record is?

21   A    Yes.

22   Q    Okay.  What would you consider to be a census

23   record?

24   A    Like when they take a census and send it to your

25   home.

CASSANDRA SILAS - DIRECT

1    Q    Are you aware of any census records that you have?

2    A    No.

3    Q    And you said you looked for school records; is that

4    right?

5    A    Yes.

6    Q    Do you have a family Bible record?

7    A    No.

8    Q    Do you have any records of post-natal care?

9    A    No.

10   Q    Are you aware of any other documents that you have

11   that you can send to DMV --

12   A    No.

13   Q    -- to try to prove where you were born?

14   A    No.

15   Q    Now, let's go back to that last entry No. 7.  Do you

16   see that was dated May 15, 2015?

17   A    Um-hmm.

18   Q    And that's when you called to sort of say what's

19   going to move this process along; right?

20   A    Yes.

21   Q    So let's go back to the first page and let's look at

22   the date of that letter.  Says June 18, 2015; right?

23   A    It says January.

24   Q    I'm sorry.  I said June 18, 2015.

25   A    Oh, okay.

CASSANDRA SILAS - DIRECT

1   Q    At the very top of the page.  It's on the screen too

2   if that's helpful.

3   A    Oh, okay.  Yeah, I see it.

4   Q    So that's basically a month after that last call you

5   had?

6   A    Right.

7   Q    And then let's just go back to the second page again

8   and right below that list of bullet points, we'll zoom in

9   on that sentence.

10  A    Okay.

11  Q    And I want to focus on the second sentence.  Do you

12  see it says "Pursuant to this lack of required

13  documentation, your application for a free Wisconsin

14  identification card for voting is denied."

15  A    Yes.

16  Q    And what did you understand that to mean?

17  A    It's been denied, that I'm not going to get a

18  picture ID.

19  Q    There was a primary election about a month ago.  Did

20  you know about that?

21  A    Yes.

22  Q    Did you want to vote in that primary?

23  A    Yes, I did.

24  Q    Did you show up at the polls to vote?

25  A    No.

1   Q     Why not?

2   A     I didn't have an ID.

3   Q     Do you want to vote in the general election coming

4   up in November?

5   A     Yes.

6   Q     If you don't get an ID can you vote?

7   A     No.

8   Q     No, you can't vote?

9   A     No.

10  Q     Now, did you recently learn about a temporary ID?

11  A     Yes.

12  Q     And do you know what you have to do to renew that

13  temporary ID?

14  A     No.

15  Q     Did -- do you have anymore documents that you have

16  that you can provide to DMV to work with them?

17  A     No.

18  Q     What -- you said you were born in Chicago; right?

19  A     Yes.

20  Q     So you're a U.S. citizen?

21  A     Yes.

22  Q     Have you ever been out of the United States?

23  A     No.

24  Q     For the record, you're an African American; is that

25  right?

CASSANDRA SILAS - DIRECT

1    A    Yes.

2    Q    Did DMV ever come to meet with you in person to help

3    you out?

4    A    No.

5    Q    It was always over the phone?

6    A    Yes, most -- most -- I called them.  They never

7    really called me.  I don't remember them calling me.

8              MR. KAUL:  I don't have any further questions,

9    Ms. Silas.  Thank you.

10              THE COURT:  Cross-examination.  (2:12 p.m.)

11                    CROSS-EXAMINATION

12   BY MS. SCHMELZER:

13   Q    Hello, Ms. Silas.

14   A    Hi.

15   Q    You said you were -- your sister got a state ID;

16   correct?

17   A    Yes.

18   Q    And she got her ID pretty quickly?

19   A    Yes.

20   Q    And she had no problem with that process; correct?

21   A    Correct.

22   Q    And you said you also have a different photo ID, the

23   Transit Plus ID card?

24   A    Yes.

25   Q    And that allows you to take like a cab in Milwaukee

                    CASSANDRA SILAS - CROSS

1    if you need to get somewhere?

2    A    Yes.

3    Q    And that involved an application process to get

4    that; correct?

5    A    Yes.  I need to update it, but --

6    Q    And you have to go and get your picture taken;

7    correct?

8    A    Yes.

9    Q    And you have to get a form filled out by your

10   doctor; correct?

11   A    Yes.

12   Q    And you have to take it down and have an appointment

13   at the office; correct?

14   A    Yes.

15   Q    And you have had a copy of your birth certificate in

16   the past; correct?

17   A    Yes.

18   Q    In fact, someone gave you a copy.  Your case worker

19   gave you a copy when you came to Milwaukee?

20   A    Yes.

21   Q    And you thought your case worker got that from the

22   Cook County Hospital; correct?

23   A    No.  She got it from my case worker in Chicago.  She

24   got it from my case worker in Chicago.

25   Q    But you misplaced that copy; correct?

CASSANDRA SILAS - CROSS

1-A-171

1    A    Yes.

2    Q    And that wasn't the only time that you had a copy of

3    your birth certificate.  You also probably got a copy

4    from Chicago at some point; correct?

5    A    No.  Not since then, no.

6    Q    Do you recall going to the building in Chicago and

7    getting copies of birth certificates before?

8    A    That's when I was with my mother when I told you and

9    I was younger, not since I've been grown.

10   Q    And you don't remember telling me in your deposition

11   that you probably did get a copy of your own birth

12   certificate from that building at some point?

13   A    I probably did, but I don't know.

14   Q    But you said that in your deposition; correct?

15   A    Yes.

16   Q    And you thought your mom had a copy of your birth

17   certificate at some point as well; correct?

18   A    Yes.

19   Q    Let's look again at your application, your petition

20   that you filed in the case or in -- with the DMV.

21   A    Okay.

22   Q    This is Defense Exhibit 213.  Exhibit 1.  Is that a

23   copy of the petition that you filled out at the DMV?

24   A    Yes.

25   Q    And that's dated January 20, 2015; correct?

                    CASSANDRA SILAS - CROSS

1    A    Yes.

2    Q    And the information you provided on here isn't all

3    correct; is that right?

4    A    Right.

5    Q    Where it says place of birth, county or equivalent

6    you put county; correct?

7    A    Correct.

8    Q    And that was Cook County.  It was supposed to be

9    Cook County?

10   A    Right.

11   Q    And when it says mother's last name, you have

12   Hopper; correct?

13   A    Yeah.

14   Q    And Hopper is the name that you gave the DMV when

15   they called you to verify that; correct?

16   A    Right.

17   Q    But that's not right.

18   A    Right.  But that's what my mother gave me -- my dad

19   -- that name, she spelled it like that.  So that's why I

20   used that.

21   Q    But you know that your mom's correct maiden name is

22   Harper, H-a-r-p-e-r --

23   A    Harper, yes.

24   Q    -- correct?

25   A    Yes.

CASSANDRA SILAS - CROSS

1    Q    And you don't know that you ever corrected that

2    information with DMV?

3    A    No.  But when I talked to Jim, I let him know that

4    it was H-a-r-p-e-r.

5    Q    Go back to your deposition.  You remember having

6    your deposition taken in this case; correct?

7    A    Yes.

8    Q    Page 36.  Let's go to line 14 on page 36.  Do you

9    remember saying -- do you remember me asking on line 13:

10        "Question:  When did you ask her?"

11       And you answered "My mother stays up here now.  She

12   moved up here.  And I asked her last year.  When I asked

13   her, mama, how your last name spelled, your maiden name,

14   and she said Harper"; correct?

15   A    Yes.

16   Q    And let's go to page 37.  Right below that.  Do you

17   remember me asking you at line 15 --

18   A    Uh-huh.

19   Q    "And you have your mother's last name as Hopper".

20   That's wrong," you answered.

21   A    Right.

22   Q    And then at line 22 do you remember me asking -- or

23   at line 20.  "Did you correct that at some point with the

24   DMV?"  And you said "Yes."

25       And then I asked you "Do you know when you did

                    CASSANDRA SILAS - CROSS

1    that?"

2          And then you answered "I don't know if I corrected

3    with DMV.  I'm not sure.  But I corrected the birth

4    certificate.  I am not sure if I corrected with DMV."

5          Is that what you said?

6    A    Yes.

7    Q    I'm going to put your petition back up there again.

8    You spell your first name C-a-s-s-a-n-d-r-a; correct?

9    A    Yes.

10   Q    Is that how you sign it as well on the bottom?

11   A    Yes.

12   Q    You don't sign it C-a-s-s-e-r-d-e-r-a?

13   A    Huh-uh.

14   Q    Okay.  You said at some point you requested your

15   school records?

16   A    Yes.

17   Q    Okay.  Let's look at exhibit -- Defense Exhibit 271.

18   I want to put this up on the screen for you, Ms. Silas.

19   A    Okay.

20   Q    Is that the application that you filled out to get

21   your school records?

22   A    Yes.  That was for Manley High School.

23   Q    Do you remember when you did that?

24   A    I don't remember.

25   Q    Let me turn the page there.  Does that refresh your

                     CASSANDRA SILAS - CROSS

1    recollection there?  Was it June 14, 2015?

2    A    Yeah.

3    Q    I'm just going to go back to the first page.

4    A    Okay.

5    Q    How do you spell your first name on there?

6    A    C-a-s-s-a-n-d-e-r-a.  I put an E in there because

7    when I talked to Jeff, he was like "Well, do you got a

8    missing letter in your name?"  I said "Well, I don't

9    know, I might."  I said "Can you check?"  So that's why I

10   was starting to put the "e" in there to see can they find

11   it.

12   Q    Did you ever put a school -- a request for your

13   school records in with --

14   A    With Manley High School?

15   Q    Yes.  With the spelling that you used on your

16   petition.

17   A    I called Manley.  They said they no longer have my

18   records.  I have to call the school board and I called

19   them.  She wasn't there.  They took my name, my number.

20   They said they're going to have her call me the next day.

21   She didn't call me.

22   Q    Okay.  So you did -- besides this written

23   application that has your name spelled differently --

24   A    Correct.

25   Q    -- you called her.

CASSANDRA SILAS - CROSS

1    A    Not from this number.  This is Manley High School.

2    I had to call the school board.

3    Q    But you never notified this school?

4    A    Manley High School?  No.  I called them, my high

5    school, but they no longer have my records.

6    Q    Did you -- did you give them the name that you used,

7    C-a-s-s-a-n --

8    A    No.

9    Q    -- -d-r-a?

10   A    No, I didn't.  They didn't -- no.  They didn't want

11   my records.  They wanted me to talk to the school board.

12   Q    So you've used two different spellings of your first

13   name in trying to get your school records; correct?

14   A    Right.  That's the only time I did that, put the "e"

15   in there.  And I told Jim that yes, could he check and

16   see is the "e" in my name when he was trying to find my

17   birth certificate.

18   Q    And you understand that some of the incorrect

19   information on your petition caused the delay in that

20   process for them to verify; correct?

21   A    Yes.

22   Q    I know you saw this exhibit earlier with Mr. Kaul,

23   but this is I guess another version of it.  Let me put up

24   a clean copy.  Is this the June 18, 2015, letter that you

25   received from the DMV?

                    CASSANDRA SILAS - CROSS

1   A    Um-hmm.

2   Q    And this is Defense Exhibit 213, third exhibit.  And

3   look at paragraph four there.  When you read this letter,

4   were you aware that the DMV compliance staff contacted

5   the Cook County Hospital on your behalf but was informed

6   that the verification could only be released to you?

7   A    No, I didn't.

8   Q    Did you read this letter?

9   A    Yes, but I didn't -- no, I didn't know.

10  Q    Did you understand that they could only release it

11  to you and not to the DMV?

12  A    No, because I didn't know the DMV was going to

13  contact them.

14  Q    Did you understand --

15  A    No, I didn't.

16  Q    Did you understand that after you read the letter?

17  A    No.

18  Q    And do you see in paragraph five where it says you

19  communicated that you would contact Cook County Hospital

20  to see if they may provide additional information to help

21  verify accurate birth record data in your name.  Do you

22  see that?

23  A    Yes.

24  Q    Did you tell them that you would try to contact the

25  Cook County Hospital?

CASSANDRA SILAS - CROSS

1  A     Yeah.

2  Q     But you didn't try -- you didn't contact Cook County

3  Hospital, did you?

4  A     No, I tried to do the school because I thought that

5  was going to be fast.

6  Q     You said that you started this process because you

7  saw that you would need an ID to vote.  You saw that on

8  TV; correct?

9  A     Yes.

10  Q     But there are also other reasons why you wanted to

11  get an ID; correct?

12  A     Yes.  I told you, yes.

13  Q     You had gone to the doctor before that to get a

14  prescription medication; is that correct?

15  A     It wasn't about that, just the doctor.  Because he

16  took my ID that I have that expired.  I need ID just for

17  mainly things:  To get a house, to get lights on in my

18  name, to do different things, to vote, to have my rights.

19  It wasn't just for I went to the doctor to get a

20  prescription.  I wanted it for other things that I can do

21  that stopping me from doing it not having an ID.

22  Q     And just to show who you are; correct?

23  A     And to show who I am.

24  Q     And right around that time though you thought you

25  could go get a quick ID to come back and get your

CASSANDRA SILAS - CROSS

1    prescription; right?

2    A    No, because I was already up in the clinic.  They

3    took my ID.  You know, my doctor took my ID.  She knew

4    who I was.

5    Q    But they didn't give you the medicine that day.

6    A    No, I was trying to go to another clinic.  I was

7    going to pay.  Yeah, I was going to pay $300 because, you

8    know --

9    Q    And they wouldn't give you that prescription because

10   you didn't have a state ID.

11   A    My ID; right.  They took the picture and I assumed I

12   was going to get the ID.

13   Q    Are you willing to continue to work with the DMV to

14   try to find your birth certificate?

15   A    Yes, of course.

16   Q    You also stated or I think you expressed in your

17   deposition some willingness to try and vote in-person

18   absentee at some point, correct, assuming you get your

19   photo ID?

20   A    Yes.

21   Q    And now that you have a receipt to do that, you

22   would like to exercise your right to vote in-person

23   absentee?

24   A    Yes, but that's only a lot of running around, and

25   I'm disabled.  It's only for a few months; right?

CASSANDRA SILAS - CROSS

1  Q    Well, two weeks would be adequate time for you to do

2  that; correct?

3  A    Two weeks, yeah.  But I have to get someone to take

4  me around, you know, and mostly my daughter, she take me

5  around.  She got her family.  So, you know, I will use

6  it, yes, but I would want to have an ID too.

7  Q    I understand.  And you -- if you were allowed to go

8  and vote in person two weeks before the election, that

9  would be enough time for you; correct?

10 A    Yes.

11 Q    And before -- when you had voted before, sometimes

12 you had to register at the polls; correct?

13 A    Yes.

14 Q    And you've never had a problem showing proof of

15 where you live, proof of your residency; correct?

16 A    No.

17 Q    You've never had a problem?

18 A    No.

19 Q    And Ms. Silas, you are aware that you have gotten an

20 ID receipt that would enable you to vote; correct?

21 A    Yes.

22        MR. KAUL:  Objection.  Mischaracterizes.

23        THE COURT:  Ask the question again.  I'm not

24 sure it was clear.

25 BY MS. SCHMELZER:

CASSANDRA SILAS - CROSS

1  Q    Ms. Silas, you are aware you have got a receipt for

2  a state ID that provides your photo identification;

3  correct?

4         MR. KAUL:  Objecting to form, Your Honor.  She's

5  characterizing as are you aware and it's just a

6  misrepresentation.

7         THE COURT:  Overruled.  Go ahead and ask the

8  question again to make sure we get the correct response

9  from the witness.

10 BY MS. SCHMELZER:

11 Q    Ms. Silas, are you aware the DMV has issued you an

12 ID receipt in this case with your photo ID on it for

13 purposes of voting?

14 A    Yes.

15        MS. SCHMELZER:  Thank you, Ms. Silas.

16        THE COURT:  Okay.  Redirect.  (12:27 p.m.)

17              REDIRECT EXAMINATION

18 BY MR. KAUL:

19 Q    Ms. Silas, let me start with the photo ID you were

20 asked about, the temporary ID.  I think you said do you

21 remember how long that's good for?

22 A    Yeah, probably.

23 Q    About how long is that good for?

24 A    No, I don't know how long it's good for.

25 Q    Do you know if the one you got is good all the way

                CASSANDRA SILAS - REDIRECT

1   to the next election?  Do you know if it is or not?

2   A    No.  It's good for the next election?

3   Q    Do you know whether it is?

4   A    I wouldn't -- it's in my purse, but I didn't really,

5   you know, go through it all.  I didn't read -- really

6   understand it, but I've got to read it again.

7   Q    Do you know what you have to do to renew that?

8   A    No.

9   Q    And I think you mentioned this before, but do you

10  have anything else you can give the DMV?

11  A    No.

12  Q    You were asked before about having a birth

13  certificate when you were younger.  Do you remember that?

14  A    Yes.

15  Q    And I think you were asked didn't you say in your

16  deposition that you had got one when you were, I think

17  you said, before you were 18?

18  A    Yes.

19  Q    Do you remember clarifying in your deposition that

20  you had gotten a birth certificate for your child?

21  A    Yes.

22  Q    Now, you also said you had a birth certificate when

23  you moved to Milwaukee, that your case worker had it?

24  A    Yes.  She sent mine and my three children.

25  Q    And what year did you move to Milwaukee?

CASSANDRA SILAS - REDIRECT

1   A     1991.

2   Q     So that was 25 years ago?

3   A     Yes.

4   Q     Do you remember when you last had that one?

5   A     Been years, maybe close to 20 years I haven't had

6   it.

7   Q     And what's your understanding of the issue that the

8   DMV has had why it won't process your application?

9   A     I don't know.  Everybody else -- I've been here

10  since close to 25 years or more and I don't know.  My

11  doctor, they take it, you know.  Different doctors take

12  it.  I have some problems, I run into problems, you know,

13  and me and my daughter, we got the house without my ID,

14  with hers.  And, you know, I can't get lights in my name

15  and, you know, I just need an ID.  I don't know what

16  their purpose -- I did call, I sent the money, I did all

17  I can do and they say I might have to go in front of the

18  judge.  I say I'll do that; whatever I have to do, I will

19  do.  Sometimes I don't understand when they write these

20  letters and I don't understand and --

21  Q     Let me ask you a specific question.  You said you're

22  trying to get your birth certificate?

23  A     Yes.

24  Q     Why were you trying to do that?

25  A     Because I need my birth certificate.

CASSANDRA SILAS - REDIRECT

1-A-184

1  Q    Okay.  And did you think the birth certificate would

2  help you get the ID if you got it?

3  A    Yes.

4  Q    Did Jim Logan at DMV ever tell you that you couldn't

5  get an ID because you can't tell if your name when it was

6  signed if it had an "e" in it or not?

7  A    No, he didn't.

8  Q    Did he at some point ask you if maybe your name was

9  spelled differently?

10  A    Yeah.  He asked me was a letter missing out of my

11  name.  I said well, there might be an "e" because there's

12  one in my sister's name.  It might be missing.  He said

13  he would check.  So he said give him a couple days and he

14  was going to check.

15  Q    Is that what caused you to use that other spelling

16  in that letter you sent?

17  A    Yes.

18  Q    Have you ever always gone by the same spelling your

19  whole life?

20  A    Yes.

21  Q    So you know how your name is actually spelled.

22  A    Yes.

23           MR. KAUL:  No further questions.

24           THE COURT:  All right.  Thank you.  Ms. Silas,

25  you're finished.

CASSANDRA SILAS - REDIRECT

1-A-185

1        THE WITNESS:  Thank you.

2        (Witness excused at 12:30 p.m.)

3        THE COURT:  And with that, we're going to take

4  our lunch break.  We'll reconvene at 1:30 and we'll

5  continue with your next witness.

6        (Noon Recess      12:30 p.m.)

7

8                      * * * * *

9        I, LYNETTE SWENSON, Certified Realtime and

10 Merit Reporter in and for the State of Wisconsin, certify

11 that the foregoing is a true and accurate record of the

12 proceedings held on the 16th day of May, 2016, before the

13 Honorable James D. Peterson, District Judge for the

14 Western District of Wisconsin, in my presence and reduced

15 to writing in accordance with my stenographic notes made

16 at said time and place.

17 Dated this 2nd day of June 2016.

18

19

20                  /s/_____

21                  Lynette Swenson, RMR, CRR, CBC
                   Federal Court Reporter

22

23

24 The foregoing certification of this transcript does not
   apply to any reproduction of the same by any means unless
25 under the direct control and/or direction of the
   certifying court reporter.