UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ONE WISCONSIN INSTITUTE, INC.,
*et al.*,

                    Plaintiffs,        Case No. 15-CV-324-JDP

     vs.                     Madison, Wisconsin
                                    May 16, 2016
GERALD C. NICHOL, *et al.*,       1:30 p.m.

                    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF COURT TRIAL
AFTERNOON SESSION
HELD BEFORE THE HONORABLE JAMES D. PETERSON

APPEARANCES:

For the Plaintiffs:
    Perkins Coie LLP
    BY:  BRUCE V. SPIVA
        RHETT P. MARTIN
    700 Thirteenth Street, N.W., Suite 600
    Washington, D.C.  20005-3960

    Perkins Coie LLP
    BY:  BOBBIE J. WILSON
    505 Howard Street, Suite 1000
    San Francisco, California  94111-4131

    Perkins Coie LLP
    BY:  CHARLES G. CURTIS, JR.
        JOSHUA L. KAUL
    One East Main Street, Suite 201
    Madison, Wisconsin  53703

CHERYL A. SEEMAN, RMR, CRR
Federal Court Reporter
United States District Court
120 North Henry Street
Madison, Wisconsin  53703
1-608-255-3821

APPEARANCES:    (Continued)

For the Defendants:
      Wisconsin Department of Justice
      BY:  JODY J. SCHMELZER
           CLAYTON P. KAWSKI
           S. MICHAEL MURPHY
           GABE JOHNSON-KARP
      Assistant Attorneys General
      Post Office Box 7857
      Madison, Wisconsin 53707-7857

Also Present:
      Heather Schultz
      Rachel Roberts
          *Litigation Support - Plaintiffs*

      Matthew Kennedy
          *Litigation Support - Defendants*

                    * * *

               **I-N-D-E-X**

| PLAINTIFFS' WITNESSES | EXAMINATION | PAGES |
|---|---|---|
| ANITA JOHNSON | Direct by Mr. Spiva | 3-36 |
| | Cross by Mr. Kawski | 36-49 |
| | Redirect by Mr. Spiva | 49-50 |
| NEIL ALBRECHT | Direct by Ms. Wilson | 51-90 |
| | Cross by Mr. Kawski | 96-115 |
| | Redirect by Ms. Wilson | 116-118 |
| REV. WILLIE BRISCO | Direct by Ms. Wilson | 121-136 |
| | Cross by Ms. Schmelzer | 131-141 |
| LINEA SUNDSTROM | Direct by Ms. Wilson | 143-159 |
| | Cross by Ms. Schmelzer | 160-167 |
| CARMEN GOSEY | Direct by Mr. Martin | 168-195 |

               **E-X-H-I-B-I-T-S**

| PLAINTIFFS' EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| Ex. 48  -      - | 74 | - |
| Ex. 50  -      - | 74 | - |
| Ex. 54  - Albrecht Table | 71 | - |
| Ex. 132 - 11/5/12 Albrecht Letter | 85 | - |
| Ex. 462 - Voter Certification | 77 | - |
| DEFENDANTS' EXHIBITS | | |
| Ex. 97  - Ballot Application | 102 | - |

1    (Called to order.)

2         THE COURT:  All right.  Why don't we proceed and

3    have the plaintiffs call the next witness.

4         MR. SPIVA:  Yes, Your Honor.  Plaintiffs call

5    Anita Johnson.

6         **ANITA JOHNSON, PLAINTIFF'S WITNESS, SWORN**

7                   DIRECT EXAMINATION

8    BY MR. SPIVA:

9    Q.   Good afternoon, Ms. Johnson.  Would you state your

10   full name for the record, please?

11   A.   Anita L. Johnson.

12   Q.   Okay.  And, Ms. Johnson, where are you from?

13   A.   I'm from Milwaukee, Wisconsin, born and raised.

14   Q.   And how old are you?

15   A.   Do I have to say that?

16   Q.   That's all right.  I'll strike that question.

17        THE COURT:  25 years.

18        MR. SPIVA:  I've been told I should never --

19   BY MR. SPIVA:

20   Q.   Where are you employed, Ms. Johnson?

21   A.   I work for Citizen Action of Wisconsin as a community

22   organizer.

23   Q.   And how long have you worked for Citizen Action of

24   Wisconsin?

25   A.   Eight and-a-half years.

1   Q.   What do you do as a community organizer?

2   A.   My job basically is to educate the public on the

3   changes in the voting rights, *Get Out to Vote* efforts,

4   register people to vote.

5   Q.   And you mentioned education is one of your

6   responsibilities at Citizen Action.  Can you describe for

7   me what types of education efforts that you engage in?

8   A.   Well, two of the laws that affect us most is the

9   photo ID and registering people to vote.  And I basically

10  talk about those laws, the changes in the laws, what's

11  expected of you when you go to the polls to vote with your

12  ID, what's expected of you when you register to vote and

13  what you have to have when you register to vote.  People

14  are not aware of these changes, so I go step by step with

15  them.

16  Q.   Mm-mm.  And has the nature of that part of your job

17  changed at all over the last few years?  Let me back up.

18  Has it changed since you've been with Citizen Action of

19  Wisconsin?

20  A.   Yes, because when I first started generally I was

21  just educating people about their rights at the polls.

22  You know, if you don't speak English, you can bring

23  somebody in with you and it's legal to do that, those

24  types of things.  They were small.  But as the law

25  changes, it ballooned into something else.  It took more

ANITA JOHNSON - DIRECT

1  of my time to educate the public on the changes.

2  Q.   And in terms of the education activity that you've

3  engaged in, can you describe what you actually do in terms

4  of presentations or where you visit, where you do the

5  education, that type of thing?

6  A.   A lot of my education happens in churches on Sunday

7  mornings.  I've developed relationships with a lot of

8  ministers in Milwaukee, Wisconsin.  I ask for three to

9  five minutes on Sunday morning to talk about the changes

10  in the voting laws.  I stay for the whole service so if

11  people have questions about the laws after the service,

12  then I can answer them, because I think it's rude to come

13  into the service and make an announcement and then leave.

14  Q.   Three to four minutes, that's not a long time.

15  A.   It's not a long time.  But as the law changes -- the

16  more the law changes the more time that I take.  However,

17  when the minister follows up what I say, it means that

18  I've done a good job on explaining what needs to be done.

19       So it may take a little more than three to five

20  minutes.  That's what I ask for, but I've never been

21  stopped during my presentation.  And in African American

22  churches, if you don't have anything to say they'll get up

23  and walk out on you, so you'd better have something to

24  say.  You come in, you say it and you leave.

25  Q.   And that actually was what one of my next questions

ANITA JOHNSON - DIRECT

1  was going to be: can you describe the demographics of the

2  churches that you typically have spoken in?

3  A.   I would say that 95% of the churches that I've gone

4  to are African American churches.  However, I have been in

5  other churches:  Presbyterian churches that are in African

6  American communities, white churches, Catholic churches.

7  I've been to a Hmong service and I've been to

8  Spanish-speaking services.

9  Q.   And Hmong, I may not be pronouncing that right, is

10 that spelled H-M-O-N-G?

11 A.   Yes.

12 Q.   And is there a significant Hmong community in

13 Milwaukee?

14 A.   Yes, there is.

15 Q.   And how many presentations approximately have you

16 done over the years?

17 A.   Hundreds.  I don't know.  You know, I can go to a

18 church every Sunday.  I can do two presentation a Sunday.

19 I not only go into churches, I go into neighborhood

20 associations and do presentations.  I make presentations

21 to the homeless.  I've made presentations to sororities

22 and fraternities.  Anybody that will give me a podium to

23 talk about these changes, that's where I am.

24 Q.   And this work that you've done in terms of education,

25 voter education, have you done that as part of your duties

1  at Citizen Action?

2  A.   Yes.

3  Q.   Have you done them in any other context as well?

4  A.   "Other contexts," such as?

5  Q.   Let me be a little more clear.  Have you done that

6  for other organizations?

7  A.   No.

8  Q.   I believe --

9  A.   I represent -- I represent Citizen Action.  We have

10  coalition partners --

11  Q.   Mm-mm.

12  A.   -- that might do canvassing.  In the canvassing

13  they'll find out that people don't have ID, then they get

14  in contact with me and I follow up with those people that

15  don't have IDs.  I've gone and the League of Women Voters

16  have encouraged me to go to certain places where they need

17  a presentation, if that answers your question.

18  Q.   You go as Citizen Action?

19  A.   Yes, I represent Citizen Action when I go.

20  Q.   Let me ask you about voter registration efforts.

21  Have you been engaged in voter registration efforts?

22  A.   I have been and I am still engaged in voter

23  registration.  However, since the law has changed it's

24  been a little more difficult to register people because

25  now you need proof of residence when you're registering to

ANITA JOHNSON - DIRECT

1  vote.  And at one time I was able to register anybody in

2  the state of Wisconsin.  But because the laws have

3  changed, I can only register people in Milwaukee County

4  where I took the test and Waukesha County where I took the

5  test.

6  Q.   And the test you're referring to, is this the test to

7  become a special registration deputy?

8  A.   Correct.

9  Q.   So are you currently a special registration deputy in

10  Milwaukee and Waukesha?

11  A.   Yes.

12  Q.   And were you saying you had previously been a special

13  registration deputy statewide?

14  A.   Statewide, yes.

15  Q.   Does one have to take a test now in each municipality

16  or locality?

17  A.   Each county, yes.

18  Q.   I know you know where I'm going.  Just so the record

19  is clear, let me get the whole question out.

20  A.   Sorry.

21  Q.   So does one have to take a test in each county that

22  one wants to become a special registration deputy in?

23  A.   Yes.  So I have to be careful if I'm at a festival or

24  any event.  I have to make sure that the person that I

25  register is from Milwaukee County or Waukesha County.

1  Q.   Do the registration laws differ from county to county

2  in Wisconsin?

3  A.   The law is the same throughout the state.

4  Q.   In your voter registration efforts have you

5  previously encouraged other people, such as members of

6  churches, to become special registration deputies?

7  A.   Yes.  I'd like to see the congregation be more

8  involved in civic engagement.  And so I encourage them to

9  get a group of people together that can register people in

10  their church.  Usually if I can get 10 to 12 people

11  together to say that they want to register people, I call

12  the Election Commission, they send the representative over

13  to train them, and so they can become special deputies and

14  then I train them on the Photo ID law.

15  Q.   Mm-mm.  Let me ask you, have you done any *Get Out the*

16  *Vote* work in your activities for Citizen Action?

17  A.   Yes.

18  Q.   Tell me about that.

19  A.   We do *Get Out to Vote*.  We hire canvassers.  And the

20  canvassers, we have certain areas we get the names off the

21  van of people that are most likely to vote or people who

22  don't vote or people who only vote around the presidential

23  time and we hit those areas.  We have the canvassers knock

24  on doors and remind folks of the upcoming elections or

25  rallies or any events that we're going to have and make

1   sure that they're registered of course.

2   Q.   Mm-mm.  Why do you do this work?

3   A.   I'm passionate about people knowing their rights at

4   the polls.  This is an effort that we fought for for a

5   long time.  I spoke to an elderly woman who said she

6   wasn't paying anybody to vote.  And I had to encourage her

7   that this is not what we want to do.  We want to continue

8   to vote.  "Is there any way I can help you so you can get

9   your ID so you can vote?"  So I'm very passionate about

10  making sure everyone knows what they need to do when they

11  go to the polls to vote.

12  Q.   Let me ask you -- I'm going to ask you a little bit

13  more about Citizen Action next.  But just focusing on

14  yourself and your activities, have you engaged in any

15  partisan activities with relationship to the education,

16  *Get Out the Vote* and registration efforts that you do?

17  A.   All my work is nonpartisan.  I don't tell people who

18  to vote for.  I encourage people to vote.  That's what I

19  want.  I want to see more people voting.

20  Q.   So let me turn to Citizen Action for a minute,

21  Citizen Action of Wisconsin.  Can you describe the

22  organization and what it does?

23  A.   Citizen Action is a nonprofit 501(c)(3) organization

24  that deals with the issues of social and economic justice.

25  And they also are involved in voter registration,

ANITA JOHNSON - DIRECT

1  *Get Out to Vote* and voter education.

2  Q.   Do they do any activities around health issues?

3  A.   Yes.  They also work on health and the *Fight for 15*.

4  And these are things that I normally would be helping

5  with.  But since the laws have changed, I solely just work

6  on voter education.

7  Q.   When you first started with Citizen Action eight

8  years ago, did you only work on voting issues?

9  A.   I did not.  I did not.  I helped with the jobs issue.

10  I helped with a lot of different things.  But, no, I did

11  not just work with voting issues.

12  Q.   But now, as I'm gathering, and tell me if this is

13  correct, that your focus is now either exclusively or

14  almost exclusively voting issues?

15  A.   Exclusively voting issues, yes.

16  Q.   Why has that focus changed to just exclusively voting

17  issues?

18  A.   The law has changed.  I have to educate these people.

19  Sometimes I can only make a presentation in the evening.

20  Sometimes I can only make a presentation on Saturday or

21  Sunday.  My hours are a little bit longer but, you know,

22  that's the nature of the beast.  So I spend more time

23  educating people about the changes in the law than I

24  normally would have done, say, eight years ago when I

25  started.

1   Q.   How many people work at Citizen Action of Wisconsin?

2   A.   I think we have about seven or eight employees.

3   Q.   Mm-mm.  And all those activities that you just

4   described that you engage in, I take it those are

5   activities that you engage in on behalf of Citizen Action?

6   A.   Yes.

7   Q.   Does Citizen Action engage in any type of poll

8   monitoring activity?

9   A.   No, we don't.  While I'm out in public I encourage

10  people to become poll monitors, tell them where to go or

11  sometimes I may have an application, have them fill it out

12  and then I take it down to the Election Commission.

13  Q.   I'm going to ask you about some of those changes that

14  you talked about a little more specifically.  First I want

15  to focus on changes to the hours for in-person absentee

16  voting.  Are you aware of changes over the last several

17  years to the laws in terms of the availability of

18  in-person absentee voting?

19  A.   Yes.  I am very aware of it.

20  Q.   Okay.  And what are those changes?

21  A.   There's no more weekend voting, one; and the hours

22  have been cut during the week.

23  Q.   Have you ever voted yourself using early voting?  I

24  know the formal name I guess is *in-person absentee voting*.

25  A.   Yes.  I normally do in-person absentee voting.

ANITA JOHNSON - DIRECT

1  Q.   And why do you do that?

2  A.   Because I'm busy and I can just go in and vote and

3  come on out.  I don't have to stand in line or anything.

4  I just go in and vote and come on out.

5  Q.   And have you ever voted in-person absentee on the

6  weekend when that was available?

7  A.   I did, I did.

8  Q.   Would you vote that way again if it were available

9  again?

10 A.   Yes.  What we did was we had a rally and we marched

11 from that point downtown and voted early.  So, you know,

12 if I come in with a group, naturally I'm going to vote

13 with them.

14 Q.   Okay.  And let me just maybe take a step back.  You

15 were describing a rally that you had helped organize.  Was

16 that when in-person absentee voting on the weekend was

17 still available?

18 A.   Yes.

19 Q.   And so tell me about that.  What types of rallies did

20 you organize or participate in when in-person absentee

21 voting was available on the weekend?

22 A.   We always encourage people to vote.  And in order to

23 encourage them to vote you bring in big names to these

24 rallies so they will come.  And we had Jesse Jackson come

25 in at one time.  And, you know, they had these signs: *I am*

ANITA JOHNSON - DIRECT

*a man*, *I am a woman*.  We met in front of the Martin Luther

King statue.

    We had a big rally, you know, how important it is for

you to vote and we're going to leave this place in front

of the Martin Luther King statue and we're going to march

downtown.  We want everybody to come to vote.  Usually we

might have a van from a high school marching with us to

make it exciting.  So that's what we do, you know.

Q.  And why --

       THE COURT:  Just to be clear, what days of the

week are you --

       THE WITNESS:  This is usually on a Saturday.

       THE COURT:  Any reason you couldn't do it on

Friday or in the evening?

       THE WITNESS:  No, there's no reason.  But people

do work during the week.  So we do get the people that

don't work to come on Saturday mornings and kids are out

of school to march in the band and those things.

       THE COURT:  Okay.

       MR. SPIVA:  Your Honor, actually, that was going

to be my next question.

BY MR. SPIVA:

Q.  Are there reasons why you would want to do these

marches on the weekend?

A.  Yeah, we can get more people on the weekend.

            ANITA JOHNSON - DIRECT

1  Q.    Mm-mm.

2  A.    The streets are clearer, you know.  There are not

3  people going to work.  We don't have to worry about the

4  traffic.  Of course we have to get permission, and what

5  have you.  But people are not going to work, so we don't

6  really have to worry about cars and where we're going to

7  park.  There's a whole lot of logistics that we have to be

8  concerned with.

9  Q.    Is there a way to describe the demographics of the

10 people who participated in those rallies when you were

11 able to hold them?

12 A.    I believe there's a cross-culture of people because

13 we have union people coming, we have neighborhood people

14 coming, people of color.  Sometimes we get the Hispanic

15 community, some members from that community to come over.

16 So that's usually a pretty good cross-culture of people.

17 But I still would say there's more African Americans

18 marching -- attending those rallies.

19 Q.    And did you ever partner with other organizations in

20 putting those rallies on?

21 A.    Yes, we have.

22 Q.    What types of organizations, you know, such as

23 unions, or what have you?

24 A.    The unions, MICAH, League of Women Voters, a lot of

25 our coalition partners we have partnered with.  We can't

ANITA JOHNSON - DIRECT

1  do it by ourselves.

2          THE COURT:  What's MICAH?

3          THE WITNESS:  MICAH is -- I forgot the acronym of

4  Reverend Brisco.  It's a religious group.

5          THE COURT:  Okay.

6          THE WITNESS:  Mm-mm.

7  BY MR. SPIVA:

8  Q.    Is it like the Milwaukee area kind of churches,

9  faith-based communities?

10  A.    Faith-based group, yes.  And they have their churches

11  and those churches join in with us.

12  Q.    And so in terms of the economic demographics of

13  people who participate in those early voting weekend

14  rallies, is there a way you can describe the economic

15  demographics of the people who came?

16  A.    I would say middle class, basically because of the

17  unions joining us and parents that come with their

18  children that are in the parades and that.  I would say

19  it's pretty middle class.

20  Q.    Mm-mm.  Okay.  Have you seen long lines during the

21  early voting period?

22  A.    I have.  But usually those long lines, it all depends

23  on what election it is.  If it's a presidential election

24  the line is long.  If it's a local election the line is

25  not long.

1  Q.   Okay.

2  A.   Or, you know, a recall election the line is long.

3  But if it's just a local election, the line is not that

4  long.

5  Q.   How about on Election Day, do you observe long lines

6  on Election Day?

7  A.   April 5th I decided to go to my own polling site to

8  vote because I wanted to see how the process was going

9  with photo ID and how the poll workers were handling

10 everything.  And where it normally took me five to ten

11 minutes to vote at my polling site, it took me about 45 or

12 50 minutes because there was a line and a lot of

13 confusion.

14 Q.   Mm-mm.  Did you become aware of any reason or reasons

15 for the longer line?

16 A.   I would say that one of the things that added to the

17 long line, the poll worker was taking the ID, putting it

18 down and they were comparing the address and then giving

19 it back to the voter.

20     When my turn came to vote -- and I was like, "Oh,

21 God, I've got to go through all this" -- what we're

22 supposed to do is give our name, our address.  If you're a

23 registered voter they'll check off your name and then

24 they'll ask for your ID.  So I gave her my name and I gave

25 her my address.

1    She says, "I have to see your ID."  I held it like

2  this and she reached for it.

3    And I said, "You're not supposed to compare my

4  address to this polling list.  I'm a registered voter

5  here."

6    And she said, "Well, I need to see the expiration

7  date on your ID."

8    And I said, "Here it is," and I put it back in my

9  purse.

10  Q.   And have you become aware of people who have or

11  situations where poll workers were not trained on whether

12  they're supposed to compare the address on the ID?

13  A.   I don't think it's that the poll workers are not

14  trained; I think they're being overly cautious and they

15  don't want to make mistakes.

16  Q.   Okay.  You mentioned speaking at churches to answer

17  questions -- I'm sorry, and answered questions I think

18  after church sometimes.  What did you find about the

19  awareness of people in the churches where you answered

20  questions about the changes in the law?

21  A.   Voting is not always a priority in people's lives.

22  So the information that I brought to the church, people

23  were very very happy that I brought this information in.

24  I gave them a lot of information that they were not aware

25  of.  And they came to me to say, "Oh, thank you, so much,

ANITA JOHNSON - DIRECT

1  because I didn't know we could do this" or "I didn't know

2  this was happening."  And that's one of the things I want

3  to stop.

4      You should be able to go in and vote and leave.  You

5  shouldn't have to say, "Oh, when did they change this?"

6  You know.  So they were very happy that I came in to give

7  the information.  And then there were other questions

8  about, "Well, where can I get an ID?  I don't have a birth

9  certificate." that kind of --

10  Q.  Can you provide an example that people weren't aware

11  of that you made them aware of through your education

12  efforts?

13  A.  The poll worker is not to compare your address to the

14  polling list.  I did say that.  And one young lady went to

15  the polling site on Election Day and was challenged about

16  her address.  And she said, "Well, you know, Ms. Anita

17  gave us this presentation and she said you're not supposed

18  to compare the address."  And she said, "Thank you,

19  Ms. Anita."  And she put it on Facebook.

20      So, you know, that made me feel good that people are

21  listening to what you say.  If you're addressing a group

22  of people and you look out in the audience and people are

23  down doing this.  But people seem to be very attentive

24  when I do my presentation because it's information they've

25  never heard before.

ANITA JOHNSON - DIRECT

1   Q.   What else have you experienced in terms of challenges

2   that the individuals that you've worked with have

3   experienced due to the changes in the Voter ID law?

4   A.   I've gone to the Veterans Homeless Shelter to speak

5   to the vets -- and this was before they changed the law

6   again, but now you can use a vet ID as an ID at the

7   polling site -- to encourage -- to see if anybody at the

8   homeless shelter needed help getting an ID.

9        And I did find a couple of veterans there that needed

10  advice on how to get an ID at the DMV.  I did take one of

11  the vets to the DMV to get an ID and I stayed with him and

12  advocated for him through the whole process because people

13  don't always understand what's happening at the DMV.  They

14  don't understand that you have to petition to get your

15  birth date and birth place verified.

16       So we did that and that -- we did that in November.

17  And he got a letter in December saying that it had been

18  denied.  And so then I called.  He told me about the

19  letter and then I called the clerk at the DMV and asked

20  him, what did we need to do next.

21       So I helped this person to recreate their life as --

22  from primary school up through high school: where he was

23  born, what hospital he was born in, what primary school

24  did he go to, when did he move out of his state to another

25  state.  We got all that information together and I sent it

ANITA JOHNSON - DIRECT

1  over to the DMV.

2      The DMV sent him another letter saying they found

3  somebody with his information, but the first name didn't

4  match.

5      And then I said, "Well, is there a different name on

6  your birth certificate?"

7      And he said, "Yes.  The midwife misspelled my name."

8      And so I called the --

9  Q.    Where had this gentleman been born?

10 A.    I believe he was born in Alabama.  And I called the

11 DMV and said the first name had been misspelled.

12     And then they said, "Well, if he doesn't have any

13 other documents with that misspelled name on, we can't

14 give him an ID."

15     And I was like, "Well can't you check something

16 else?"

17     And that's why it's so important to have an advocate,

18 because this person wouldn't have known to ask him that.

19 And he did some checking and the very first form that he

20 filled out had the misspelled name on it, so he was able

21 to get an ID.  That took four months.

22 Q.    And have you had other experiences like that with

23 other individuals that you've helped?

24 A.    I have.

25 Q.    Let me ask you about the change in -- well, let me

ANITA JOHNSON - DIRECT

1  just ask you one more question about that.  Why was it

2  that the gentleman you were helping couldn't do all that,

3  accomplish all of what you said without your help?

4  A.   Most people are not going to go through those

5  changes.  I mean, a lot of people -- we just had Cassandra

6  here who didn't understand the forms.  So I feel it's

7  important not to just direct a person to the DMV, but to

8  go with them to make sure they understand everything that

9  they have to do.

10 Q.   And has that become a larger part of your work since

11 the changes in the voter ID laws?

12 A.   It's not a larger part of my job, but I do do it.

13 Q.   Is that something you had to do before the Voter ID

14 law?

15 A.   No, I did not do that before the --

16 Q.   It came into effect?

17 A.   It came into effect, yes.

18 Q.   Okay.  Let me ask you about the change in residency

19 requirements.  Are you aware of changes in proof of

20 residency requirements -- strike that.  Are you aware of

21 changes in the residency requirements in terms of length

22 of time one needs to --

23 A.   Sure.  Before the law was changed you only had to

24 live in your residence for ten days to vote at the polling

25 site in your neighborhood.  Now it's 28 days.  If you

ANITA JOHNSON - DIRECT

1  moved and you lived in your residence for 28 days or more

2  you can vote at the polling site in your neighborhood.  If

3  it's 27 days or less you go back to your old polling site

4  to vote, but you still have to change your address.

5      I spoke to a group of women who thought it was

6  against the law.  And I was like, "Nope.  That's the law.

7  That's what they said."

8  Q.  What is it that they thought was against the law?

9  A.  Going back to the old polling site to vote.

10  Q.  Please, I interrupted you, so you go ahead.

11  A.  I said, "No, it's the law.  This is what you do.  If

12  it's 27 days you go back to your old polling site.  You

13  don't have to have a long conversation.  Go in, give them

14  your name, give them your address and vote, done."

15  Q.  And how has this affected, you know, your work in

16  terms of *Getting Out the Vote* and the like, the changes to

17  the length of residency requirements?

18  A.  A lot of organizations used to have voter drives and

19  be able to stand in front of stores and just ask people,

20  "Are you a registered voter?"  And the answer is "yes" or

21  "no."  If it's "no," we can register them on the spot.

22  Now they have to have proof of residence.  And if they

23  don't have that proof with them, they cannot register to

24  vote.

25  Q.  Okay.  And I want to get to that in just a minute.

ANITA JOHNSON - DIRECT

1  But just to make sure we've fully covered the change in

2  the time in terms of 28 days versus 10 days, have you

3  experienced people who have run into issues because of the

4  change in the residency requirement?

5  A.    Sure.  Well, if you've moved from the east side of

6  Milwaukee to the west side of Milwaukee and you've been

7  there for 27 days and they tell you, "You can't vote

8  here," I've seen people say, "Well, I'm not going all the

9  way back there," or they don't have transportation to get

10  back.  It's after work, they have to get home, they just

11  don't feel like doing it.  So we lose voters that way.

12  Q.    So then I want to turn to what you started to talk

13  about a minute ago, which was the new proof of residence

14  requirements.  Can you tell me about that?

15  A.    You have to show proof of residence.  And usually you

16  can show a phone bill, a gas bill, you can pull up your

17  phone and bring up your bank account, as long as you have

18  something with your address to prove that you've lived

19  there, or it will be at least 28 days by the time the next

20  election happens.

21  Q.    And how has that affected your work or the people

22  that you work with?

23  A.    Well, people who don't -- and you can also -- I'm

24  sorry, you can also use an ID to show your address.  And

25  this is one of the problems that people are confused

ANITA JOHNSON - DIRECT

1  about: for the photo ID, when you go to the polls to vote,

2  that address does not have to be valid.  But if you use

3  that ID to register to vote, that address has to be valid.

4  And that causes another bit of confusion.

5  Q.    And have you spoken to people who have been confused

6  about that?

7  A.    Yes.  People -- this whole photo ID and voter --

8  registering to vote is confusing.  People, a lot of -- I

9  got a lot of calls because people thought there was a

10  voter ID.  There is no such thing as a voter ID.  It's a

11  photo ID.  When you go to the polls to vote, they are to

12  look at your face and your name, that's it.

13  Q.    Mm-mm.

14  A.    So I'll tell people, "Well, do you have a valid

15  Wisconsin driver's license?"

16        And they'll say, "Yes."

17        And I say, "You can use that to register to vote or

18  you can use that at polls for an ID."

19  Q.    Let me just ask you -- this may be changing subjects

20  a little bit, although it may also relate -- have you

21  spoken to senior citizens?

22  A.    Absolutely.

23  Q.    And are there particular issues that you've

24  encountered, in terms of any of the changes in the laws,

25  in your work doing that?

ANITA JOHNSON - DIRECT

1  A.    Yes.  A lot of senior citizens don't have a birth

2  certificate.

3  Q.    Was there a Mr. Melvin I believe that you helped?

4  A.    Yes.  In 2/'11 when the photo ID first came up --

5  when I give out information to the public I want to make

6  sure it's the correct information.  So I felt a need to

7  take someone to Vital Records to get their birth

8  certificate so I would know each step they have to go

9  through so in case they want to ask me any questions I

10  could tell them what was going on.

11      And Mr. Melvin was over 80 at the time.  I took him

12  to the courthouse to get his birth certificate.  We filled

13  out the form and the clerk told us that his birth wasn't

14  registered.  They had no records of him.  Mr. Melvin then

15  told me the story that his mother never married his

16  father, he had a stepfather, and that the mother took the

17  name of the stepfather and gave it to him, never

18  registered his birth, so therefore there was nothing he

19  could do.

20      Now, what they told us at Vital Records was again we

21  have to recreate from him being a young man all the way

22  up.  Well, he had nothing.  He had absolutely nothing.  So

23  Mr. Melvin could not vote because there was nothing else I

24  could do for him at that point.

25          THE COURT:  Was Mr. Melvin born in Wisconsin?

ANITA JOHNSON - DIRECT

1       THE WITNESS:  Yes.  He was born in Milwaukee,

2  Wisconsin.

3  BY MR. SPIVA:

4  Q.    Were you ever able to help him get an ID?

5  A.    No.

6  Q.    What effect will the changes in the voting laws have

7  on your -- sorry.  I should say, what effect have the

8  changes in the voting laws had on your Citizen Action

9  work?

10  A.    I work more.  My effort is spent on photo ID and

11  voter registration and *Getting Out to Vote*.

12  Q.    Mm-mm.  Have you observed whether the state has done

13  any outreach efforts to explain --

14  A.    Unfortunately the state has not gotten any money to

15  do outreach efforts about photo ID.  I feel that things

16  could have been put on the side of a bus and bus stations,

17  on the radio, so people could have known about photo ID.

18  I'm only one person.  Perhaps our coalition partners only

19  have one person working on this.  There's only so much we

20  can do.

21       However, I do talk to the GAB workers a lot and I do

22  talk to the Election Commission to see what their -- if

23  they do any posters or fliers to see what they're saying

24  so our message is consistent throughout the state.

25  Q.    Mm-mm.  Do you have an understanding that -- I know a

1    minute ago you were talking about special registration

2    deputies -- do you have an understanding that the state

3    has announced its intention to do away with SRDs

4    altogether?

5    A.    Yes.

6    Q.    What effect will that have on your Citizens in Action

7    work?

8    A.    I believe they want to do online registration -- and

9    we all know everybody doesn't have a computer, everybody

10   doesn't have a printer in their house -- because now, as I

11   understand it, and I could be wrong, you have to send in

12   your actual document of proof of registration with your

13   registration form.  And this, for me, if I may say, is

14   voter suppression, clear and simple, because people will

15   not be able -- a lot of people will not be able to

16   register online.

17   Q.    What types of people are you thinking about, in terms

18   of your experience with people, who might not be able to

19   register online?

20   A.    The homeless, low income, people of color.

21   Q.    Have you done any work in the high schools recently?

22   A.    I have.  I go through the League of Women Voters and

23   I am a member of the League of Women Voters.  They go into

24   high schools and register young people that are 17 and

25   will be 18 by the next election so they're registered to

1  vote before the election.  At that point I take the

2  opportunity to make sure that they have an ID so they can

3  vote as well.

4  Q.   Has the discontinuation of special registration

5  deputies in high schools had an impact on that work?

6  A.   When they start online voting, yes, unless the school

7  decides that they're going to let their students use the

8  computers to register online.

9  Q.   Let me ask you, are you aware of the changes in the

10 distance that poll monitors must maintain between

11 themselves and the voters that have occurred?

12 A.   Yes.  I think it's three to six feet.  I'm not sure

13 about that.

14 Q.   Do you know if it's gotten closer or further?

15 A.   It's gotten very close.  Three feet is not a lot of

16 distance between the poll worker and I think it's

17 intimidating to the voter.

18 Q.   Have you had an experience with that?

19 A.   I did.  I went to one polling site and there was this

20 guy just hovering over the poll worker.  And, you know, I

21 didn't say anything at first.  I was an observer that day.

22 And finally I just had to say something.  I was like, you

23 know, "You're standing too close.  You're supposed to be

24 three feet back."

25 Q.   Was this before the change in the law?  Was it three

1 feet or six feet?

2 A.   This was before the change in the law.  This was

3 before the change in the law.  And he wanted to know who I

4 was.  I told him.  Didn't make a difference.  He moved

5 back.

6         THE COURT:  Can you explain a little bit more

7 about how it was -- so he was hovering over the voter?

8         THE WITNESS:  Yeah.  The poll worker is here and

9 he was like this.  And I was like, "That's too close."

10        THE COURT:  Like leaning on the table?

11        THE WITNESS:  Yeah.  Right.

12 BY MR. SPIVA:

13 Q.   Now, last area of questioning for you.

14        THE COURT:  Again to finish up on that a little

15 bit, so was that intimidating to the poll workers or the

16 voters?

17        THE WITNESS:  It's intimidating to the poll

18 worker because now they're afraid to say anything, because

19 he was an observer like I.  It's intimidating to the

20 voter.

21     The voter doesn't know that these are open records.

22 You know, you have to say your name out loud and they can

23 hear you.  So, you know, the voter is like, "Who's this

24 guy?  Why is he standing over me and why does he have to

25 know my name and telephone and address?"  So it's

ANITA JOHNSON - DIRECT

1   intimidating on both counts.

2           THE COURT:  Well, even if the distance were

3   greater, the person's name would still be heard.

4           THE WITNESS:  Yes.  It's open records.

5           THE COURT:  I guess I'm just trying to get a

6   handle on exactly what the intimidating part is.  Is it

7   just people being in your space or is it -- because I mean

8   what I'm getting at here is it seems --

9           THE WITNESS:  When I didn't know the law I

10  thought all I had to do was just come to the poll worker,

11  give him or her my name and address and be done.  If

12  someone was standing behind him looking at me, I would

13  wonder, who is this guy -- He's in my space.  I'm here to

14  vote.  I'm giving my name and address.  Why is he

15  listening to everything I'm saying? -- not knowing that

16  they're an observer, that they can hear what you say and

17  that, so it is intimidating to the voter.

18          THE COURT:  But there are organizations who make

19  a point of monitoring elections to insure their

20  integrity --

21          THE WITNESS:  Absolutely.

22          THE COURT:  -- and so poll observations --

23          THE WITNESS:  Absolutely.  So that's why you stay

24  your distance.  The poll worker should have said to him,

25  "You need to step back three feet."  That's what should

ANITA JOHNSON - DIRECT

1  have been done.

2         THE COURT:  Now, the new law provides for three

3  feet, so it's three feet.  Is three feet enough?

4         THE WITNESS:  In my opinion?  Are you asking my

5  opinion?

6         THE COURT:  I guess I am.

7         THE WITNESS:  No.

8         THE COURT:  I mean, you've seen it.

9         THE WITNESS:  No.

10         THE COURT:  I mean, how would you describe how

11  somebody is hovering over in a way that would violate even

12  the new law, which has the narrower *buffer zone*, we'll

13  call it, three feet?  So I'm sure the poll workers,

14  voters, maybe would be more comfortable if they were out

15  in the parking lot outside.

16         THE WITNESS:  Well, not that far.

17         THE COURT:  But at least the three feet would

18  address the situation that you describe.

19         THE WITNESS:  Well, you know, if that's the law,

20  the three feet, then stay at three feet.

21         THE COURT:  Okay.

22         THE WITNESS:  Okay.

23  BY MR. SPIVA:

24  Q.   And I'm going to wrap it up here now, Ms. Johnson.

25  Can you just tell us how, collectively, these changes in

                    ANITA JOHNSON - DIRECT

1  the voting laws over the last few years have impacted your

2  work trying to educate, register and *Get Out the Vote*?

3  A.    Well, you know, it's made my days longer.  I'm not

4  able to work on any other issues at Citizen Action that I

5  might have been able to work on.  But I enjoy what I'm

6  doing and I hope it's for a positive effect.  So, yeah, my

7  hours are longer, I'm out there more, but it's what I do.

8  Q.    If you weren't doing that work that you need to do

9  because of the changes in the law, would you be doing

10  other work for Citizen Action?

11  A.    I would.

12  Q.    And never trust a lawyer who says he only has one

13  more question.  How, in your experience and observation,

14  have the changes in the laws affected the voters that you

15  work with?

16  A.    They're very confused about the change.  Some people

17  get it right away.  They get it -- you know, I've got an

18  ID, I've got a driver's license, I've got a passport, I

19  have a veterans card -- some of them get it right away,

20  others don't -- and when they come in, they still don't

21  know what to do.

22  Q.    Have you observed or have you learned of individuals

23  through your work who were not able to vote because of

24  some of these changes in the law?

25  A.    Not personally.  I don't know anybody personally.

ANITA JOHNSON - DIRECT

1  I've seen people not vote because of the resident rule if

2  I'm there observing.  I know that some people cannot vote

3  because they forgot to bring an ID with them because I was

4  there observing and saw it.

5              THE COURT:  I thought Mr. Melvin wasn't able to

6  get an ID to vote.

7              THE WITNESS:  Pardon me?

8              THE COURT:  You said you didn't know anybody

9  personally, but I thought Mr. Melvin was --

10             THE WITNESS:  That was in 2/'11, 2011 that that

11 happened.

12             THE COURT:  So we're talking about a different

13 time frame?

14             THE WITNESS:  Yeah.  I think we're back up to

15 2016.

16             MR. SPIVA:  What I meant actually I think, Your

17 Honor --

18 BY MR. SPIVA:

19 Q.  I actually meant to be more inclusive than that,

20 Ms. Johnson.  And I'm not limiting it to people that you

21 know personally.  But just in your work and experience,

22 you know, working with voters, observing voters, have

23 you --

24 A.  Okay.  Mr. Melvin, yes.  I know at least three to

25 four people that were not able to vote because they didn't

                    ANITA JOHNSON - DIRECT

1  have a birth certificate in time for the elections.

2  Q.   And in terms of -- a minute ago you mentioned

3  something about observing people walking away I believe.

4  Can you tell us about that?

5  A.   Well, if they don't have an ID, they can't vote.  And

6  the poll worker, rightfully, will tell them, "If you don't

7  have an ID, you can't vote."

8       Sometimes they're given a provisional ballot.  And

9  with the provisional ballot you have to go to the Election

10  Commission at least by Friday of the week of the

11  election -- I think before five o'clock, I'm not sure on

12  that -- and, you know, bring your ID.

13       Usually in Milwaukee we only get about two or three

14  people getting a provisional ballot during elections.  But

15  I think this time we had 48 or 49 people that got

16  provisional ballots because of photo ID.  And I want to

17  backtrack and say maybe there was only 45 of the 49 that

18  were given provisional ballots because they didn't have

19  IDs.

20  Q.   Do you know how many of those ultimately, those

21  provisional ballots, ultimately were counted?  That's okay

22  if you don't know.  I'm not asking you to guess.

23            THE WITNESS:  Can I have some water?

24            THE COURT:  Yes.

25  A.   No, I don't know.

                    ANITA JOHNSON - DIRECT

 1       MR. SPIVA:  Thank you, so much, Ms. Johnson.

 2  Appreciate your testimony.

 3       THE COURT:  Now you get cross-examination with

 4  that.

 5       THE WITNESS:  Am I supposed to jump for joy?

 6       THE COURT:  Well, it means you're closer to being

 7  done.

 8                    <u>CROSS-EXAMINATION</u>

 9  BY MR. KAWSKI:

10  Q.   Good afternoon, Ms. Johnson.  I'll let you pour your

11  water.

12  A.   Thank you.

13  Q.   All right.  It's good to see you again.  You and I

14  talked at your deposition on April 13th, correct?

15  A.   Correct.

16  Q.   I'm just going to ask a few follow-up questions of

17  you.  You were just talking about the number of people

18  that you personally witnessed not being able to vote

19  because of voter ID, right?

20  A.   Right.

21  Q.   And it was a total of three or four?

22  A.   Mm-mm.

23  Q.   Would that be for the April 2016 election?

24  A.   Mr. Melvin definitely, yes.  There were a couple of

25  other people that I took to the DMV that did not have a

1  birth certificate and they didn't get their IDs.  I

2  followed up with Nefertari last week because she finally

3  got an ID.  So these were people that I took to the DMV to

4  get an ID.

5  Q.   Okay.  And this Mr. Melvin, is that his first or last

6  name?

7  A.   That's his first name.

8  Q.   Okay.  Is his name Melvin Robertson maybe?

9  A.   Mm-mm.

10  Q.   Okay.  And so again the total of people that you

11  witnessed that did not have an ID and could not vote was

12  three or four?

13  A.   Yes.

14  Q.   Okay.

15  A.   That I know personally.  But then I saw people at the

16  polling sites get turned away because they didn't have an

17  ID.

18  Q.   What was that total number of people that you saw get

19  turned away?

20  A.   I don't know the total number.

21  Q.   Could you estimate?

22  A.   No.

23  Q.   We went through this exercise in the deposition.  Was

24  it more than 20?

25  A.   Well, I went to about ten polling sites and maybe I

1  saw two or three people at every other polling site.

2  Q.    Okay.  So maybe 20 to 30 total?

3  A.    Maybe 20 or 30 maybe.

4  Q.    And that was in the whole day on Election Day April

5  2016?

6  A.    Yes, yes.

7  Q.    Okay.

8         THE COURT:  I'm just going to instruct the

9  witness and counsel just to make sure you don't talk over

10 each other.  It's almost like a conversation, but not

11 quite.  You have to wait until the question is completely

12 finished.

13        MR. KAWSKI:  I think we're too friendly.

14        THE COURT:  Refreshing, but let's try not to talk

15 over each other anyway.

16 BY MR. KAWSKI:

17 Q.    You talked about some coalitions that you work with,

18 right?

19 A.    Yes.

20 Q.    And is one of those organizations called *Election*

21 *Protection*?

22 A.    Yes.

23 Q.    What is Election Protection?

24 A.    Election Protection is a group of observers that go

25 around on Election Day and sit at the polling sites to see

1  how the process is going during the election, make sure

2  they have the signs up, make sure the poll workers are

3  standing three feet away; you know, those things; make

4  sure that it's a smooth --

5          THE COURT:  Poll observers?

6          THE WITNESS:  Poll observers.  Sorry.  Thank you

7  for that.

8  A.    Those types of things.

9  Q.    And you volunteer with Election Protection?

10 A.    I do.

11 Q.    And part of your work as volunteer is that you carry

12 around a cell phone and are sort of on call on Election

13 Day?

14 A.    Not -- no.

15 Q.    No?

16 A.    No.

17 Q.    So do you use the cell phone though to work for

18 Election Protection to take calls from voters who are

19 having trouble with voter issues?

20 A.    Yes, I do take calls from voters.  During the April

21 5th election the only people that called me were people

22 that knew me on a personal level and knew that I was out

23 doing this work during the day and they called to report

24 some problems that they saw.

25 Q.    And so on April 5th for the 2016 election you only

ANITA JOHNSON - CROSS

1  took one call the entire day relating to someone that

2  lacked a photo ID; is that right?

3  A.  No.

4  Q.  That's not right?

5  A.  No, that's not right.

6  Q.  Okay.  What is the correct number of how many calls

7  you took like that?

8  A.  I had taken about five or six calls that day, but

9  they were different calls relating to voter registration

10  and photo ID.

11  Q.  Just so I'm clear, in your deposition I asked you the

12  same question and you said that you only took one call; is

13  that right?

14  A.  Yeah.  And I remembered the other calls that I took

15  just now.

16  Q.  Okay.  Just so the record is clear, did you only take

17  one call that day about voter ID?

18  A.  I took -- I can't remember if I took one or two calls

19  for voter ID.  It might have been two.

20  Q.  Okay.  And then for the February 2016 election voter

21  ID was also in effect?

22  A.  Very small scale.

23  Q.  Okay.  And that same -- you were also working as a

24  volunteer for Election Protection for February 2016?

25  A.  Yes.

1  Q.   And you had the cell phone with you again then?

2  A.   Yes.

3  Q.   And you again only took one total call about voter

4  ID?

5  A.   One call that day, yes.

6  Q.   Okay.  You talked about the three to eight-foot rule

7  for observers?

8  A.   Yes.

9  Q.   Is it your understanding that the election

10 official -- chief election inspector can tell people to

11 stand anywhere within that three to eight-foot range?

12 A.   Yes.

13 Q.   So if they want them to stand at eight feet, the

14 election inspector can say, "Stand at eight feet"?

15 A.   Yes.

16 Q.   And so the situation you described was before -- the

17 incident that you described where someone was hovering,

18 that was before the three to eight-foot rule?

19 A.   Yes.

20 Q.   What was the rule then, was it six to nine feet?

21 A.   Yes.

22 Q.   Excuse me.  Six to twelve feet?

23 A.   Six to twelve feet.

24 Q.   So under either version of the rule, the hovering

25 problem would have been violating the rule?

1   A.   Yes.

2   Q.   In that situation the chief inspector could kick that

3   person out?

4   A.   Yes.

5   Q.   You did not speak to the chief inspector during that

6   incident?

7   A.   No, I did not.

8   Q.   If you had, it's possible the chief election

9   inspector would have kicked that person out?

10  A.   Possible.  From -- I think that person had been

11  giving problems all day and was annoying everybody and

12  people were just like afraid to say anything to him.

13  Q.   Okay.

14  A.   So I took it upon myself to say it.

15  Q.   You talked about the new online voter registration,

16  correct?

17  A.   Yes.

18  Q.   And I just want to make sure it's clear.  Is it your

19  understanding that online voter registration would

20  eliminate paper registration?

21  A.   Yes.

22  Q.   So after online voter registration goes into place

23  there will be no way to register by paper?

24  A.   I don't think so.

25  Q.   Okay.  So you will not be able to use the GAB 131

1  Form after that?

2  A.   No, I don't think so.

3  Q.   What is the basis for your understanding of that law

4  change?

5  A.   I don't know.

6  Q.   Okay.  And you talked about individuals who may have

7  had problems with the 28-day change from the 10 to 28

8  days, right?  Can you tell the Court how many people like

9  that you ran into with that problem?

10  A.   With the change of 28 days?

11  Q.   Yes.

12  A.   Well, when you're out trying to register people and

13  you're canvassing you can run into 10 to 15 people a day

14  that just don't have proof of residence with them or

15  sometimes two or three or sometimes just one.

16  Q.   Can you estimate how many total you have run into

17  with that problem?

18  A.   You like estimations, don't you?  It all depends.  If

19  we're out canvassing and we're covering several blocks, we

20  could run into 10 or 12 people.

21  Q.   I guess when you say "you could run into," I want to

22  know how many you did run into.

23  A.   10 or 12 people -- 12.

24  Q.   You did run into 12?

25  A.   I'm saying, you want an estimate?  12 people.

ANITA JOHNSON - CROSS

1 Q.   So you ran into a total of 12 people?

2 A.   That didn't have proof of residence.

3 Q.   Okay.

4        THE COURT:  Just if I may clarify that.  Some

5 people are going to lack proof of residence for all sorts

6 of reasons regardless of how long they've been at the

7 place where they live.

8        THE WITNESS:  Right.

9        THE COURT:  So do we know how many people had

10 special problems that were posed by the fact that the

11 residency requirement was extended to 28 days versus the

12 old 10-day rule?

13        THE WITNESS:  I don't know how many people.  I

14 can't give you a number.

15        THE COURT:  Do you have an idea of how many

16 people you encountered or what kind of --

17        THE WITNESS:  Through the years since the law

18 changed?

19        THE COURT:  Well, I'm just interested in -- one

20 of the aspects that we're dealing with here is the fact

21 that the residency requirement was extended from 10 days

22 to 28 days.  And you've described it in a general way and

23 it makes perfect sense that some people are just going to

24 find it too inconvenient or, even if they do, it's still a

25 burden to get back to their old neighborhood to vote.  And

ANITA JOHNSON - CROSS

1  so I'm just wondering about how many people you

2  uncountered that had problems that came from the extended

3  residency requirement.

4          THE WITNESS:  Since the change of the law?

5          THE COURT:  Yeah.

6          THE WITNESS:  A hundred.

7          THE COURT:  Yeah.  Okay.  All right.

8  BY MR. KAWSKI:

9  Q.   You talked about how you assisted a veteran get an ID

10  card.  Was that man's name Dennis Hatton?

11  A.   Yes.

12  Q.   And there was a news story about him.  I guess that

13  jogs my memory.

14  A.   Yes, yes.

15  Q.   You mentioned that the law changed, correct?

16  A.   Yes.

17  Q.   In that now a veteran ID card is allowable?

18  A.   Acceptable, yes.

19  Q.   And Mr. Hatton has one of those?

20  A.   He does.

21  Q.   Okay.  And he had that prior to the time you helped

22  him get an ID?

23  A.   Yes.

24  Q.   You talked about voting in-person absentee in

25  Milwaukee, correct?

ANITA JOHNSON - CROSS

1  A.    Yes.

2  Q.    And that would be at the Zeidler Building downtown?

3  A.    Yes.

4  Q.    You said you did not have to stand in line for that?

5  A.    Yes.

6  Q.    Okay.  At your deposition we talked about your

7  interactions with the DMV; do you remember that?

8  A.    Which interactions?

9  Q.    I guess when you helped voters get ID at the DMV in

10 Milwaukee?

11 A.    Yes.

12 Q.    And you characterized your interactions with DMV as

13 good?

14 A.    Yes.

15 Q.    And DMV staff were very helpful?

16 A.    Yes.

17 Q.    And in fact you said that a number of times in your

18 deposition?

19 A.    Yes.

20 Q.    You also said, and correct me if I'm wrong, that any

21 confusion at DMV that you observed initially regarding

22 free ID issuance has subsided now?

23 A.    I didn't say that.  I don't believe I said that.  But

24 you said it's in a deposition.  Maybe you misunderstood

25 me.  People are still confused.

1  Q.   I could refer you to the deposition if you'd like.

2  A.   You don't have to refer me.  People are still

3  confused and I think you saw that with Cassandra today.

4  Q.   Okay.  You'd agree that the Voter ID law affects

5  everyone in the state?

6  A.   Yes.

7  Q.   In fact it affects everyone equally, correct?

8  A.   No.

9  Q.   That's what you testified to in your deposition

10  though, wasn't it?

11  A.   I don't know that -- what did I say?

12  Q.   I asked you does it apply equally --

13         MR. SPIVA:  I object, Your Honor.  If he's going

14  to ask her about her deposition, he ought to put up the

15  transcript.

16         MR. KAWSKI:  Sure.  Let's do it.

17         THE COURT:  Well, actually it's not really

18  necessary.  Also, we're making a very fine point.  I get

19  it.  I understand everybody is subject to the Voter ID

20  law.  This witness has already testified about the -- what

21  she regards as a special burden that falls on certain

22  people who don't have the underlying documentation or

23  don't have the ID in the first place.  So if there's

24  anything that does not need to be established in this case

25  it's that, so we can move on.

ANITA JOHNSON - CROSS

1  BY MR. KAWSKI:

2  Q.   This is a very minor point, but you talked about how

3  you're an SRD for various locales; is that right?

4  A.   Milwaukee and Waukesha, yes.

5  Q.   And were those for the city of Milwaukee and the city

6  of Waukesha?

7  A.   Yes, I believe, yes.

8  Q.   Okay.  You talked about in your direct examination

9  here about not having any money for the Government

10  Accountability Board to do education, correct?

11  A.   The Government Accountability Board did not have

12  money to educate the public on the changes in the photo ID

13  and voter registration.

14  Q.   And you understand that the Government Accountability

15  Board has recently made a request to the Legislature for

16  more money?

17  A.   Recently, but not before -- but we didn't have any --

18  they didn't have any money to educate the public before

19  April 5th and February elections.

20  Q.   Okay.  Do you use the Government Accountability

21  Board's materials that they provide to do your outreach?

22  A.   I do.

23  Q.   How do you find those materials?

24  A.   I go online --

25  Q.   And you find --

1  A.    -- and I call and talk to them about what they have

2  and they advise me on what I need to say when I go out.

3  Q.    If the Government Accountability Board does get some

4  funding for the outreach efforts for November would that

5  satisfy you that there's going to be a better education

6  effort?

7  A.    It won't satisfy me, but it would be a better

8  educational effort.

9         MR. KAWSKI:  Okay.  I have no further questions.

10         THE COURT:  Okay.  Any redirect?

11         MR. SPIVA:  Very brief, Your Honor.

12                REDIRECT EXAMINATION

13  BY MR. SPIVA:

14  Q.    Ms. Johnson, do you recall you were asked some

15  questions about your work with Election Protection and how

16  many calls you got?

17  A.    Yes.

18  Q.    Okay.  Does Election Protection provide attorneys for

19  people to call when they have issues at the polls?

20  A.    There's a 1-866-OUR-VOTE that people can call if

21  they're having problems at polls.

22  Q.    And, Ms. Johnson, as multitalented as you are, you're

23  not -- we won't curse you with the title of *attorney*.

24  You're not an attorney?

25  A.    No, I'm not at all.

1  Q.  And would there be any particular reason that people

2  who had issues that you were asked about would have called

3  you as opposed to one of the Election Protection attorneys

4  that was provided for that purpose?

5  A.  They have confidence that I will give them the

6  correct answer.  And if I don't know the correct answer I

7  will call and get the correct answer and get back to them.

8  Q.  Yes.  And I'm --

9  A.  It's more convenient to call me than the attorney.

10  Q.  Okay.  But is it possible that more people that

11  didn't call you may have called an attorney that was

12  provided?

13  A.  I'm sure they did, yes.

14        MR. SPIVA:  Thank you, so much, Ms. Johnson.

15        THE WITNESS:  Okay.

16        THE COURT:  Thank you, Ms. Johnson.

17        THE WITNESS:  Thank you.

18        THE COURT:  And you may call your next witness.

19        MR. SPIVA:  Your Honor, the plaintiffs call Neil

20  Albrecht.

21        THE COURT:  Okay.

22        **NEIL ALBRECHT, PLAINTIFF'S WITNESS, SWORN**

23     (2:35 p.m.)

24

25

1    <u>DIRECT EXAMINATION</u>

2    BY MS. WILSON:

3    Q.   Good afternoon.

4    A.   Good afternoon.

5    Q.   Can you please state and spell your name for the

6    record?

7    A.   Neil, N-E-I-L, Albrecht, A-L-B-R-E-C-H-T.

8    Q.   And what's your job title?

9    A.   I'm the executive director for the City of Milwaukee

10   Election Commission.

11   Q.   And how long have you had that position?

12   A.   I've been in the position for four years as executive

13   director.

14   Q.   And what position did you hold before that?

15   A.   For six years I was the deputy director for the

16   Election Commission.

17   Q.   And as the executive director, what are your job

18   responsibilities?

19   A.   Oversight of election administration, which includes

20   all aspects of elections, registration, absentee ballot

21   voting, poll worker, polling places, polling sites,

22   campaign finance reporting, candidate filing.

23       I also review and compile data related to voter

24   participation, analyze that information and use that in

25   the department's strategic planning processes.  I often

1  feel responsible for advocating on the behalf of city of

2  Milwaukee voters.  I'm responsible for media relations.

3      And then finally for interface it is with groups like

4  the Wisconsin Government Accountability Board to insure

5  that the City is in compliance with the seven-state

6  chapters -- seven state that -- statute chapters of state

7  statutes that govern election law and the rules of the GAB

8  as well.

9  Q.   And that's just your part-time job, right?

10 A.   It is, right.

11 Q.   Do you have any responsibility for talking to the

12 Legislature about changes in laws?

13 A.   I do.  That falls under my role as a representative

14 or an advocate for voters in the city of Milwaukee.

15 Q.   When you say "advocate for voters in the city of

16 Milwaukee," what do you mean exactly?

17 A.   Because as changes emerge related to election laws

18 but also to advocate for increased efficiencies in

19 election laws that encourage voter participation and to be

20 a spokesperson for that.

21 Q.   Okay.  Now, I asked you about your job

22 responsibilities as executive director, but does the

23 Election Commission have a mission or a purpose?

24 A.   We have a mission to provide fair and accurate and

25 transparent elections in the city of Milwaukee.

1    Q.   And how does the Election Commission do that?

2    A.   We continuously review and evaluate our

3    administration of elections as well as all processes

4    related to the department.   We pursue opportunities for

5    increasing voter participation for creating additional

6    efficiencies in processes for creating a positive voting

7    experience for voters in the city.   So we do that by a

8    constant review and process improvement evaluation.

9    Q.   And what does it mean, "process and improvement

10    evaluation," what does that mean to the layperson?

11    A.   It means that we continuously look at all of our

12    processes, particularly when there have been changes to

13    election laws or rules, and we review our performance on

14    those processes and look for improvement opportunities and

15    we implement those improvements.

16    Q.   And how do you go about, as the Election Commission,

17    how does it go about reviewing how it's doing with respect

18    to voter participation?

19    A.   Through a number of venues.   Voters are vocal, so we

20    receive a lot of feedback from voters.   We solicit

21    feedback from our election workers; from our chief

22    inspectors, which are really our site supervisors; from

23    the public, from community organizations, from the

24    political parties, from our own staff.   We have any number

25    of feedback opportunities that are really inherent to our

NEIL ALBRECHT - DIRECT

1  systems to receive feedback.

2  Q.   And do you do any studies to see what effect, for

3  example, changes to the laws have on voter participation?

4  A.   We do.  We -- in particular I tend to either review

5  statistics or voting numbers that are posted through the

6  Wisconsin Government Accountability Board or I will

7  analyze our own numbers with regard to voter participation

8  or different aspects of election administration.

9  Q.   And when you say "election administration," what do

10  you mean by that?

11  A.   I mean the aspects of election with regard to voter

12  registration, patterns around voter registration, absentee

13  voting, in-person absentee voting -- as part of that our

14  poll workers are polling places -- even our candidate

15  filing processes.

16  Q.   Would that also include, for example, mail absentee

17  voting?

18  A.   It would.  We analyze both in-person absentee voting

19  and by-mail absentee voting.

20  Q.   And you're familiar of course in your position with

21  the voting laws, right?

22  A.   I am.  Correct.

23  Q.   And there have been a number of changes with respect

24  to the voting laws, right?

25  A.   There have been, yes.

1  Q.   How do you keep yourself apprised of the changes with

2  voting laws?

3  A.   I have a number of avenues or mechanisms to insure

4  that I am aware of changes.  I get e-mail updates, for

5  example, from the Wisconsin State Legislature whenever

6  there are proposed changes that relate to election law.

7  The City has an intergovernmental relations staff.  I

8  often hear from them.  I'm in regular communication with

9  the Wisconsin Government Accountability Board.  So in all

10  cases I'm aware not only of when changes are being

11  proposed, but when Acts have been passed.

12  Q.   And with respect to your staff -- let me step back

13  for a second.  How many people work for the Elections

14  Commission?

15  A.   We have eight full-time staff.

16  Q.   And does the Election Commission hire poll workers?

17  A.   We do.

18  Q.   How many poll workers do you have?

19  A.   That can vary based on the election.  If it's a local

20  election, for example, where we don't experience the very

21  high rates of voter participation, we can have 1,200 poll

22  workers.  If it's a high-turnout election, like the

23  presidential or the gubernatorial, the general election,

24  we can have as many as 25' to 2,800 election workers.

25            THE COURT:  I'm sorry.  I may have missed it.  So

1  a local election is 1,200?

2          THE WITNESS:  Correct.

3          THE COURT:  1,200, might be as high as 25' to

4  2,800.  Okay.  Thank you.

5          THE WITNESS:  Sure.

6  BY MS. WILSON:

7  Q.  How do you make sure your staff is trained with

8  respect to changes in voting laws?

9  A.  "Our staff" being poll workers or the in-office

10  staff?

11  Q.  Office staff.

12  A.  We have regular staff meetings.  I share e-mails with

13  staff.  I encourage them, for example, to go to the *Clerk*

14  *Communications* link on the Government Accountability Board

15  website in order to keep people apprised of changes, but

16  also of potential changes so that we're able to plan

17  accordingly.

18  Q.  And how about with respect to poll workers, how do

19  you assure that they've been trained with respect to the

20  changes in the voting laws?

21  A.  We provide poll worker training to all of our poll

22  workers per the state's mandate of once every two years.

23  We did provide additional training to our poll workers

24  around the photo ID requirement.  In that case they

25  actually received an annual training.  We also bring in

1  our chief inspectors, the site supervisors, prior to every

2  election for additional training.

3  Q.   And with all of that training do find that there's

4  any confusion when, let's say, for example, a voting law

5  has been changed?

6  A.   Absolutely.

7  Q.   And we'll get a little bit more into that in a

8  minute.  But can Milwaukee establish its own election

9  laws?

10  A.   It cannot.

11  Q.   Where does it get its authority to do what it does?

12  A.   We follow state law and we follow the rules that have

13  been promulgated by the Wisconsin Government

14  Accountability Board related to those state laws.

15  Q.   And you do that even if you disagree with the laws;

16  is that correct?

17  A.   We do, correct.

18  Q.   Can you give me -- can you describe the demographics

19  in Milwaukee, the voting demographics?

20  A.   It's a large urban city.  We have approximately a

21  population of half a million people.  I think a critical

22  demographic to the city is that about 29%, nearly a third

23  of the population of the city, lives in poverty.  We're a

24  racially diverse city with 40% African American and 17%

25  Hispanic-Latino population.  And so I think in terms of

NEIL ALBRECHT - DIRECT

1  the identity of the city the issue of poverty is

2  particularly relevant in that Milwaukee is one of the top

3  ten big cities in terms of percentage of people living in

4  poverty.

5  Q.   And why is that important --

6  A.   It's important --

7  Q.   -- for what you do?

8  A.   -- it's important to me because we recognize that

9  changes to voting laws, in addition to impacting

10 populations like students and seniors, have the most

11 profound impact on people in poverty.

12 Q.   And why is that?

13 A.   Access to information, ability to comprehend

14 information, socially isolated; digital divide, not

15 necessarily having access to the Internet or Internet

16 information; just very segregated, very isolated

17 communities requiring multiple messaging often before

18 necessarily understanding things like complexities around

19 voter registration or photo ID or how to apply for a photo

20 ID.

21 Q.   So how is the public informed when there's a voting

22 change in Milwaukee?

23 A.   It's informed predominantly through some

24 on-the-street outreach like, you know, Anita Johnson who

25 testified before me spoke to.  We do a good amount of work

NEIL ALBRECHT - DIRECT

1  in the media to promote understanding of the changes in

2  the media.  We do our own outreach.  But I would say a

3  majority or the onus of the changes really falls on the

4  public education efforts of the city of Milwaukee.

5  Q.  Do you get any money from the state to educate people

6  about the changes in voting laws?

7  A.  We do not.

8  Q.  Now, let's talk a little bit about some of these

9  changes in the voting laws.

10        THE COURT:  Before we do that, just a little bit

11  of background.  Is it up to Milwaukee to decide whether it

12  wants an election commission?

13        THE WITNESS:  No.  It's dictated by state law.

14        THE COURT:  And is that every municipality has to

15  have an election commission?  How does that work for

16  smaller communities?

17        THE WITNESS:  Only cities of the first class are

18  required to have an election commission.

19        THE COURT:  Okay.  All right.  Thanks.  And one

20  last question.  And it's funded by Milwaukee city tax

21  revenues?

22        THE WITNESS:  It's funded through the City's

23  budget, correct.

24        THE COURT:  All right.  Okay.  Thank you.

25        MS. WILSON:  Are you sure, Your Honor?

NEIL ALBRECHT - DIRECT

 1        THE COURT:  Yes.  I'll ask if there's something

 2   else.

 3   BY MS. WILSON:

 4   Q.    We talked a little bit about the changes.  How many

 5   changes have there been since 2011 in the voting laws?

 6   A.    Well, honestly it's difficult to count.  When you

 7   look at procedural changes, if you include those

 8   changes -- changes to campaign finance reporting

 9   requirements to candidate filing to voting experiences

10   across the board -- it has to be between, you know,

11   somewhere between 75 and a hundred changes collectively,

12   some obviously much more significant to voters than

13   others.

14   Q.    And what about the ones more significant to voters,

15   how many of those have there been?

16   A.    I would say about a dozen.

17   Q.    And over what time period?

18   A.    Over a five-year period.

19   Q.    And as the executive director of the Election

20   Commission, how would you characterize the number of

21   changes over that amount of time?

22   A.    I would characterize those changes as, number one,

23   just being very confusing to the public, creating an

24   environment of confusion, even on some level chaos in

25   terms of the landscape and what people understand with

1  regard to what's necessary to vote.

2      I would also say that the changes have

3  disproportionately impacted people of color in the city of

4  Milwaukee that either because of the confusion or because

5  they're not able to meet the requirements people have

6  actually been denied the right to vote in the city.  I

7  would characterize the changes as such that they're just

8  presenting a significant hardship to residents in the

9  city, particularly those residents who are living in

10  poverty.

11  Q.   But there are always changes to the voting laws,

12  aren't there?

13  A.   There are, but none so profound I guess, none so

14  significant and none that I have witnessed in my ten years

15  as so disproportionately affecting people in poverty.

16  Q.   And why do you say it disproportionately affects

17  people in poverty; what's the basis for that?

18  A.   Because the newest changes really, well, first of all

19  eliminate what access people in poverty often had.  I

20  should say a manageable access to the registration process

21  but also to being able to vote on Election Day.

22      And now I think the -- many of the new changes create

23  an additional layer and that layer has created a barrier

24  to access to voting.  And again I think it's particularly

25  relevant to that population just because of the day-to-day

1  challenges that people in poverty experience and their

2  inability to often receive and comprehend information.

3  Q.    So, in your view, has there been less voter

4  participation, when you say that there's no access or

5  there's barriers to access?

6  A.    We've seen decreased voter participation in the city

7  of Milwaukee, yes, since these changes began to take

8  effect.

9  Q.    But I'm sure you've read in the paper there's been

10  great voter turnout, right?

11  A.    Well, to identify voter participation, period, as an

12  indicator of the effects of these laws is really something

13  of a sophomoric argument.  What you really have to look at

14  is, for example, how does voting in the city of Milwaukee

15  as a community that's going to be the most profoundly

16  impacted by these changes -- and again largely due to the

17  sizable population of people in poverty -- how does that

18  rate of participation compare to the voter rate of

19  participation in the state of Wisconsin as a whole.

20  Q.    But how do you determine that; how do you know that?

21  A.    By looking at state statistics and comparing how

22  voter participation in Milwaukee, the city of Milwaukee,

23  has compared to voter participation in the state of

24  Wisconsin historically and is there a gap and is that gap

25  increasing or is it decreasing with the implementation of

NEIL ALBRECHT - DIRECT

1 these laws.

2 Q.   And have you done such a study or taken a look at

3 some type of analysis?

4 A.   I have, yes.

5 Q.   And when did you do that?

6 A.   I did it after the April 5th election, so within the

7 last 30 days.

8 Q.   And --

9        MR. KAWSKI:  Your Honor, I'm going to object to

10 the extent this calls for an improper lay opinion.

11       THE COURT:  Well, I don't know if it's going to

12 call for --

13       MR. KAWSKI:  And I'd like a standing objection.

14       THE COURT:  I'll give you a standing objection,

15 but I think I need to know what I'm going to hear from the

16 witness before I decide whether it's an improper lay

17 opinion or not.  So let's find out what we're going to

18 hear.

19 BY MS. WILSON:

20 Q.   Can you describe --

21       THE COURT:  Just by way of background, too, this

22 witness has not really been disclosed as a -- he's on my

23 list as a lay witness.  I take it he did not do a Rule 26

24 report as an expert?

25       MS. WILSON:  Right.

1    THE COURT:  So that sets a little bit of a stage

2  here, but go ahead.

3  BY MS. WILSON:

4  Q.    So earlier we were talking about some of the things

5  that you do as part of your duties, right?

6  A.    Correct.

7  Q.    And as part of your duties you do some analysis of

8  voter participation, correct?

9  A.    That's correct.

10 Q.    And what you just described, is that part of that

11 analysis?

12 A.    It is, yes.

13 Q.    And that's what you do as part of your job --

14 A.    It is, correct.

15 Q.    -- as the executive director of the Election

16 Commission?

17 A.    That's correct.

18 Q.    Now, can you describe to us, to the Court, what you

19 looked at, when did you say, April --

20 A.    For the April presidential primary, the state

21 presidential primary, first I went back and looked at how

22 voting in the city of Milwaukee had compared to the state

23 average for the presidential primary in 2008 and 2012 and

24 compared that to how it rated in comparison in 2016.

25     So back in 2012, for example, the city lagged maybe

NEIL ALBRECHT - DIRECT

1  about 1.8% behind the state average.  In 2012, when some

2  of the law changes occurred, that jumped up to about 3.4%.

3  In 2016, with the most significant change being photo ID,

4  the city has now fallen to a 10% variance from the rest of

5  the state in terms of voter participation.  So we lag 10%

6  behind the voting average in the state of Wisconsin.

7          THE COURT:  I want to go over those again just a

8  second.  So it looks like you said -- so we have three

9  years we're working with, right?  We've got '08, '12 and

10  '16?

11         THE WITNESS:  For the presidential primary,

12  correct.

13         THE COURT:  So in 2008 the lag was 1.8%?

14         THE WITNESS:  Correct.

15         THE COURT:  Okay.  And then it's -- then it goes

16  to 3.4% in 2012?

17         THE WITNESS:  Correct.

18         THE COURT:  And then 2016 primary it's 10%?

19         THE WITNESS:  Just under 10%, correct.

20         THE COURT:  Okay.  And that is -- what's the

21  measure of participation that you're using here,

22  percentage of registered voters that turn out?

23         THE WITNESS:  Percentage of eligible voters.

24         THE COURT:  Eligible voters that turn out to

25  vote?

1          THE WITNESS:  Correct.

2          THE COURT:  Okay.  Thank you.  Go ahead.

3   BY MS. WILSON:

4   Q.    And why did you do that; why did you take that look?

5   A.    I think it's important, as these changes roll out

6   that do affect access to voting, the election law changes,

7   that someone do some form of analysis in terms of how it

8   affects voter participation, particularly in urban

9   municipalities like the city of Milwaukee.

10  Q.    And what did those numbers tell you, as the executive

11  director of the Elections Commission?

12  A.    They told me that these changes are causing people

13  not to vote in the city of Milwaukee.

14          MR. KAWSKI:  Your Honor, I'd like to renew my

15  objection of improper expert or lay opinion testimony.

16          THE COURT:  This probably is getting into an area

17  where -- I can accept the data as factual, but I have a

18  concern about whether this really is an undisclosed expert

19  opinion.  So let's --

20          MR. KAWSKI:  And, Your Honor, for the record, I'd

21  like to move to strike this as well as undisclosed expert

22  or lay opinion testimony that occurred after his

23  deposition.

24          THE COURT:  It's a legitimate concern.  But I'm

25  going to hear what he has to say and then we'll deal with

1  what I do with the information that I find out.  So go

2  ahead.

3  BY MS. WILSON:

4  Q.   So I think my question was, then you got interrupted,

5  what did it tell you as the executive director of the

6  Elections Commission.  So if you would start again.

7  A.   Well, I would say it led me to believe, in my own

8  professional assessment, that these most recent changes to

9  election law, because I can't identify any other factors,

10  have impacted voter participation in the city of

11  Milwaukee.

12  Q.   Now, let's go back for just a second.  So have you

13  done analyses like this before in your job?

14  A.   I have.  I do them frequently.  Often as part of

15  reviewing our processes and even election administration

16  itself requires a significant analysis and reconciliation.

17  Q.   And do you report any of your findings for any of the

18  time you do analysis to anyone outside of the Election

19  Commission?

20  A.   We report them to the Wisconsin Government

21  Accountability Board, I report them to the mayor and to

22  the city common council, and on occasion I've reported

23  them to the state legislature.

24  Q.   Okay.  So let's go back to specifically the changes

25  in the voter laws.  What changes have there been that you

NEIL ALBRECHT - DIRECT

1  have seen in your capacity as the election -- I'm sorry --

2  as the executive director?

3  A.   Well, to begin with, we've seen changes around

4  in-person absentee voting.

5         THE COURT:  And I don't know that we need to run

6  with every witness -- we don't have to run down an

7  inventory of what the changes are.  So if you have

8  questions that this witness can be informative about the

9  impact of those changes or the reasons for them, that

10  seems to be appropriate, but I don't need another

11  inventory of the laws.

12         MS. WILSON:  Okay.  If you think I've laid the

13  foundation, I'm good, Judge.

14         THE WITNESS:  Me too.

15  BY MS. WILSON:

16  Q.   Let's start though with in-person absentee voting.

17  What impact has that had on the city of Milwaukee?

18  A.   Well, with the change being the limit in the number

19  of days that in-person absentee voting can be offered, and

20  in particular the elimination of weekend voting, the

21  effect has really been -- I mean, looking back on the 2008

22  presidential election we saw 5,000 people come in to vote

23  over that weekend.  And I have no doubt that with the

24  elimination of weekend in-person absentee voting that we

25  have lost voters, recognizing the unique demographics of

that population.

It's also increased crowding during the days and hours that in-person absentee voting is available and it has also pushed more people into voting at their polling places on Election Day and caused additional crowding at those polling places. So it has taken a process that was actually very efficient to the city of Milwaukee and made it much more inefficient.

Q. And how do you know this; what is the basis of this, of your knowledge?

A. I'm sorry. I'm not sure I understand that.

Q. In other words, is that from poll workers, is it from your own observation; how do you know this?

A. Both from poll workers, certainly from our own observations. Again we're constantly reviewing data: What percentage of people vote absentee by mail, what percent vote in person, what percent go to their polling places on Election Day, where do they register, do they register before the election, do they register same day at their polling places. So I look at the data, but also I hear from voters, from poll workers and from the site inspectors.

Q. Have you done any sort of analysis within your job responsibilities about the impact on in-person absentee voting?

1   A.   I have, yes.

2   Q.   And what did you do?

3   A.   I was concerned that the restrictions that were being

4   imposed on in-person absentee voting were going to create

5   a capacity ceiling.  And I would say those -- I want to

6   make sure that I'm including in those restrictions the

7   limitation that was already in law limiting municipalities

8   to one site for in-person absentee voting.

9        And so collectively the one site limit, the reduction

10  in hours, and the elimination of weekends I was concerned

11  was creating a capacity ceiling for the city of Milwaukee

12  that would actually hold back our ability to serve voters

13  at a percentage comparable to other smaller

14  municipalities.

15  Q.   So what did you do exactly; what was your analysis?

16  A.   I, again using data from the Government

17  Accountability Board, I looked at rates of in-person

18  absentee voting in other municipalities, sort of a

19  geographic mix of municipalities both in population and in

20  geography, and compared those to the city of Milwaukee and

21  to the city of Madison.

22  Q.   And what --

23            MR. KAWSKI:  Your Honor, I'm going to object

24  here.  This is again improper lay or expert opinion

25  testimony.

NEIL ALBRECHT - DIRECT

1    THE COURT:  Okay.  It might be.  I have concern

2  about this, but I want to hear the data.

3  BY MS. WILSON:

4  Q.   Did you do some kind of chart or graph or analysis?

5  A.   I did a table, correct, that identified percentages

6  of in-person absentee voting in the city compared to these

7  other municipalities.

8  Q.   And this is something you did as part of your job?

9  A.   It was, yes.

10  Q.   Okay.  Can we have PX 054?  Can you tell us and the

11  Court what this is?

12  A.   Well, it's a very nice table.  But it was the

13  document that I pulled together to identify percentages of

14  in-person absentee voting; the counties, again looking for

15  some geographic diversity in terms of the counties that we

16  reviewed; and the cities particularly looking for size,

17  diversity and geographic diversity; and then compared

18  those to percentages of in-person absentee voting in the

19  city of Milwaukee.

20  Q.   And what did this chart tell you?

21  A.   That all other municipalities -- and I would add, I

22  looked at others beyond what ended up on this chart -- had

23  higher rates of in-person absentee voting than what we

24  were experiencing in the city of Milwaukee.

25    MR. KAWSKI:  Your Honor, I'd like to renew my

1  objection and make a standing objection that this is

2  improper expert or lay opinion testimony and I would like

3  to move to strike it.

4          MS. WILSON:  It's part of his job, Your Honor.

5          THE COURT:  That doesn't answer the question.

6  But I will -- I'll give you a standing objection, so you

7  can just briefly highlight it when you want to make that.

8  I do have a concern about whether this is improperly

9  disclosed expert opinion, but at the same time there's a

10  lot of factual data here.

11      The fact that it's part of his job doesn't answer the

12  question.  I think our standing order says even if you've

13  got an employee of a party that is going to testify about

14  their work they have to disclose the report.  I don't

15  think that there's an exception.

16          MS. WILSON:  This was disclosed.  There was a

17  deposition on this topic.

18          THE COURT:  I get there's a deposition, but there

19  wasn't -- and maybe that goes to the prejudice prong of

20  the analysis about whether I let it in.  But I think there

21  is a requirement that if you have expert opinion it's

22  going to be disclosed in a Rule 26 report.

23      So we'll pick up the pieces as we go.  But you can

24  make the objections succinctly.  I think I get the problem

25  here with this witness, but just highlight it for me if

                    NEIL ALBRECHT - DIRECT

1  you think it's appropriate.

2      First a question.  I want to see -- I want to make

3  sure I'm reading the chart correctly.  So where's the

4  line -- your testimony is that Milwaukee had the -- or the

5  other cities had the higher percentages of the absentee

6  voting?

7          THE WITNESS:  No, that the city of Milwaukee and

8  city of Madison is two large urban municipalities and the

9  one-site limitation had the lowest percent -- or among the

10 lowest percent of in-person absentee voting occurring.

11         THE COURT:  Okay.  And what column are we looking

12 at?

13         THE WITNESS:  Second from the right, *Percentage*

14 *of In Person* to *Total Ballots*.

15         THE COURT:  Okay.  There we go.  Okay.  So

16 *Percentage of In Person* to *Total Ballots*.  And is the

17 highlighting significant in any way here?

18         THE WITNESS:  I can't recall what the, because

19 this was created several years ago, I can't recall what

20 the purpose was of highlighting those three

21 municipalities.

22         THE COURT:  Okay.  All right.  And then the Town

23 of Hixton and Jackson County is an extreme outlier for

24 some reason?

25         THE WITNESS:  Correct, a very small absentee

1  voting population.

2      THE COURT:  Okay.  I think I get the gist of your

3  perspective here.  So go ahead.

4  BY MS. WILSON:

5  Q.  We can move on from this.  Let's go back for just a

6  second.  When the Legislature was considering changing

7  in-person absentee voting, did you talk to them about it?

8  A.  We did.  I did.  I appeared at several legislative

9  committee hearings.

10  Q.  And did you also give any written testimony?

11  A.  I did, yes.

12  Q.  Can you pull up, please, PX 050 and 048?  We can do

13  one at a time.  Let's start with -- is that 50?  And why

14  did you give testimony prior to when you found out about

15  the changes in the law in in-person absentee voting?

16  A.  Well, I was very concerned about, in particular, the

17  elimination of the weekend hours and how that would affect

18  access to voting for the geographic districts of the city

19  that had been largely represented in that weekend voting.

20  Q.  And were there any changes that the Legislature made,

21  given your concerns?

22  A.  None.

23  Q.  And were you speaking just for yourself or on behalf

24  of the Elections Commission?

25  A.  I was speaking on behalf of the Elections Commission.

1  Q.  So I think you've said that in-person absentee voting

2  is down in Milwaukee; did I get that right?

3  A.  I believe that it is at a ceiling in terms of its

4  ability to grow at a rate that in-person absentee voting

5  is growing in other municipalities in the state of

6  Wisconsin.

7  Q.  But why is that a concern?

8  A.  Because recognizing the demographics of the people

9  who tend to vote during in-person absentee voting,

10  particularly those coming in on evening and weekend hours,

11  that, for example, we saw a very large representation of

12  Aldermanic Districts 1, 2, 3, 6 and 7 in the city of

13  Milwaukee, which represent some of the poorest

14  neighborhoods in the city of Milwaukee.

15  Q.  But there are other ways -- let's even assume that

16  you're correct -- but there are other ways for people to

17  vote, right?

18  A.  There are.  Usually what we hear from voters is that

19  if they are appearing in in-person absentee voting, while

20  it is convenient, many of them often have concerns about

21  their schedules on Election Day and being able to appear

22  at their polling place.  I think that's particularly

23  applicable to the working poor who may have two jobs, may

24  be working two jobs on Election Day and not able to

25  appear.

NEIL ALBRECHT - DIRECT

1    I think there's also -- well, certainly there's also

2 absentee voting by mail, although we're certainly aware of

3 a public mistrust with the absentee by-voting option --

4 I'm sorry, absentee voting by-mail option.

5 Q.   You also track, don't you, the number of people who

6 use mail-in absentee voting?

7 A.   We do.

8 Q.   And let's take, for example, the last presidential

9 election.  How many people mailed in their votes?

10 A.   We saw somewhere around 18,000 by-mail absentee

11 voters, which represented about 7% of the total voters in

12 that election.

13 Q.   Now, the judge asked the question earlier, I don't

14 think you were here, but it's pretty easy to vote by

15 mail-in, right?

16 A.   I wouldn't agree with that statement.  There is the

17 application process.  There's now the photo ID process

18 that must accompany that application.

19    But there are nuances to the absentee voting by mail

20 that can be complex for voters in particular.  There's a

21 very text-heavy certification statement that voters must

22 sign.  They have to secure a witness signature, someone

23 who's present when they mark their ballot, and they have

24 to secure their own signature.  They have to mail in the

25 ballot and feel assured that the Post Office will deliver

NEIL ALBRECHT - DIRECT

1  that ballot in time for the election.

2  Q.   Can you put up 462, please?  Now, can you tell us

3  what this is?

4  A.   That's the certification, the application

5  certification, that the voter, the absentee voter, must

6  complete when returning their vote in absentee ballot.

7  Q.   You can't tell from this, but that's the envelope

8  you're talking about?

9  A.   That's the envelope, right.  The certification

10 statement is on the mailing envelope.

11 Q.   And they have to sign the envelope, correct?

12 A.   Correct.

13 Q.   And then have a witness, also?

14 A.   Correct.

15 Q.   And then the witness has to also give an address?

16 A.   Correct.

17 Q.   And then you said they -- what did they have to do

18 with respect to photo ID?

19 A.   They have to include a copy of their photo ID, unless

20 they're exempt from the photo ID requirement, with their

21 application.

22 Q.   That's after they get their application to mail in to

23 vote?

24 A.   Correct.

25 Q.   Okay.  Thank you.  Let's turn to voter registration.

1    What impact has voter registration, the changes in voter

2    registration, had on the city of Milwaukee?

3    A.   The impact again has been significant and I think

4    again has disproportionately affected people in poverty,

5    which in the city of Milwaukee is largely represented by

6    people of color.

7         The elimination of corroborating witness, for

8    example, is -- was very critical to a person --

9    characteristic of a person in poverty is very transient in

10   their housing.  So we have people in shared housing

11   situations, shared apartments, even sometimes spouses

12   where everything is in one person's name and nothing is in

13   the other person's name, who are able to use a

14   corroborating witness who would certify on their

15   registration form that they knew the person and that they

16   resided at that address.

17        So for people who are particularly transient in their

18   housing, again often people in poverty, it was a pretty

19   valuable resource in terms of that person being able to

20   complete the voter registration process.

21   Q.   What about with respect to residency requirements,

22   the 10 to 28-day rule?

23   A.   The expansion of the residency requirement from 10 to

24   28 days -- you know, I heard this spoken to -- spoken of

25   earlier -- it really creates a feeling of dishonesty among

NEIL ALBRECHT - DIRECT

1  people who are registering to vote.

2  Q.   What do you mean?

3  A.   In that, you know, election laws, the way people

4  understand it is you have to update your registration

5  every time you move and that's the law that most people

6  understand and operate under.

7       So to appear at a polling place -- and again this

8  disproportionately affects people in poverty because they

9  register more often, they move more often -- and to appear

10 at a polling place and to believe that you're following

11 the law by changing your registration and then to find out

12 that because you haven't lived at that address for 28 days

13 prior to the election you need to go back and do something

14 which feels very dishonest to people, and that is,

15 register at a previous address.

16      And then of course there's a hardship because if

17 they're not already registered at that address, they have

18 to provide proof of residence for an address that they're

19 no longer residing at.

20 Q.   And have you communicated with people where they've

21 had that particular problem?

22 A.   Absolutely.

23 Q.   And do you give them any advice on what they should

24 do, given what the law is?

25 A.   We try to explain to them, and I know election

1  workers do as well, how the process works and that they

2  will need to come out again and reregister again before

3  the next election to again update their registration.  But

4  it's a difficult and challenging message for voters to

5  understand.

6  Q.   Now, let's talk a little bit about voter ID, one of

7  the favorite subjects around here.  What impact has the

8  changes to the voting laws had on the city of Milwaukee?

9  A.   I would say it's by far the most significant of all

10  the changes.  There is a lack of coordinated public

11  education, so a lot of -- and I should say statewide

12  coordination of public education around photo ID.  There's

13  a lot of different mythology out there around voter IDs or

14  photo IDs and what is it that we're talking about.  There

15  are layers of confusion around how photo ID relates to

16  proof of residence or how photo ID relates to what types

17  of documents are necessary to get a free state ID.

18      So it's been our experience that it's very

19  challenging for voters to process how this newest layer,

20  and certainly the most significant, impacts their ability

21  to vote on an election day.

22  Q.   Now, we've heard that the GAB has asked for some

23  money.  Have you been party to that?

24  A.   I read about it in the paper.

25  Q.   And how do you expect that to impact this whole issue

NEIL ALBRECHT - DIRECT

1  of the confusion around voter ID?

2  A.   I'm not optimistic.  We were in regular communication

3  with the GAB looking for how best can we coordinate what a

4  photo ID public education campaign would look like -- what

5  were they going to be doing, what could we do, what could

6  Milwaukee County do to compliment those efforts -- and

7  there was a void.  And I understand that a lot of it

8  related to the uncertainty of what funding would be

9  available when.

10      So do I believe that additional dollars would support

11  the campaign?  Absolutely.  Do I think that the, what I

12  understand to be, $250,000 that's being requested will be

13  sufficient to really come up with a successful public

14  education campaign that really reaches the very diverse

15  communities in Milwaukee?  I'm pretty doubtful.

16  Q.   Let's turn our attention to straight-ticket voting.

17  How does the changes in straight-ticket voting impact what

18  you do?

19  A.   Straight ticket or straight-party voting in the

20  November election was pretty widely used in the city of

21  Milwaukee.  A ballot can be very difficult to navigate I

22  think even --

23          THE COURT:  You say it was widely used in the

24  November election.  You mean in November elections

25  generally or just in the 2012?

NEIL ALBRECHT - DIRECT

1        THE WITNESS:  Straight-party voting was only a

2   ballot option in November general elections.

3        THE COURT:  When you say that, are you talking

4   about 2012 specifically?  You said it was widely used.  I

5   want to know whether you mean it was widely used during

6   that 2012 election.

7        THE WITNESS:  It was eliminated after the 2010

8   gubernatorial.  So I would say it was widely used in the

9   '08 presidential and in the 2010 gubernatorial.

10        THE COURT:  Okay.  Thank you.

11        THE WITNESS:  Sure.

12   BY MS. WILSON:

13   Q.   Had you finished your answer?

14   A.   I don't know.

15        THE COURT:  Sorry.  I interrupted you.

16   A.   You're going to have to help me with that.

17   Q.   How has what you do been impacted by the changes to

18   straight-ticket voting?

19   A.   I believe what I had identified was that a ballot can

20   be difficult for even the most educated voter to navigate,

21   particularly partisan primaries in Wisconsin's open

22   primary system.

23        And so for a person who is possibly challenged with

24   their literacy, which a lot of people again in the city of

25   Milwaukee are, it prevented -- it presented a very

NEIL ALBRECHT - DIRECT

1  positive voting experience for them not to be intimidated

2  by the complexity of a ballot but yet to be able to vote

3  for the candidates of their choice.

4  Q.    And let's turn our attention to election observers.

5  Has the change in the laws with respect to election

6  observers had any impact on the work that you do?

7  A.    They have.  We receive reports of voters and even

8  poll workers feeling intimidated by the close proximity of

9  observers at polling places.  And while they have the

10 authority to determine whether those observers stand at

11 three feet or whether they stand at eight feet, observers

12 can be very persistent.

13      And in terms of wanting to be at that three-foot

14 mark, and poll workers can acquiesce because they have a

15 lot of other things going on, it can create an

16 intimidating environment for voters.  I think it's

17 difficult fore anyone to have someone standing three feet

18 away from you when you're providing confidential documents

19 for voter registration, for example, and not know who that

20 person is.

21 Q.    But it's not just three feet, right?  It's a range,

22 so they can stand further back, right?

23 A.    It is, but those ranges are often pushed.  And so it

24 puts the -- you know, another burden, another

25 responsibility on chief inspectors to continuously monitor

1  how closely observers are standing to election activities.

2  Q.   Have you ever had any occasion to report an

3  aggressive observer?

4  A.   I have, yes, several occasions.

5  Q.   And when you say "several occasions," how many are we

6  talking about?

7  A.   I've probably -- reported as in to the Government

8  Accountability Board?

9  Q.   Yes.

10  A.   On at least two occasions I've had to report observer

11  issues to the GAB.

12  Q.   And why would you report them to the GAB?

13  A.   I wanted them to be aware that the situations had

14  occurred.  In one case I wanted to explore -- I'm sorry.

15  There were three cases.  In one case I actually wanted to

16  explore banning the observer from additional participation

17  as an observer.

18  Q.   And what had this observer done, the one you wanted

19  to investigate banning; what had occurred?

20  A.   They were an observer at a residential care facility

21  when our special voting deputies were administering voting

22  at a residential care facility.  And this observer

23  interacted with voters, called out a family member of a

24  voter on something that was incorrect, and really

25  compromised voting at the residential care facility.

NEIL ALBRECHT - DIRECT

1  Q.   But do you think that that type of behavior would

2  happen anyway, whether they were supposedly 12 feet away

3  or three feet away; does it make a difference?

4  A.   Well, to be clear, that wasn't related to the space,

5  the space issue; that was just related to the conduct of

6  the observer.

7       In another situation during in-person absentee voting

8  we actually had a group of observers approach a voter and

9  question the document that they were being -- that the

10 person was using for purposes of proof of residence.  So

11 they were not three feet away from the voter; they

12 actually surrounded the voter.

13 Q.   In the polling place or outside?

14 A.   Within the polling place.

15 Q.   And was that group reported to the GAB?

16 A.   They were, yes.

17 Q.   Do you know if anything happened with respect to this

18 group of interlopers?

19 A.   Not that I'm aware of, no.

20 Q.   Can you pull up PX 132, please?  Can you tell me what

21 this is?

22 A.   That was a communication that I sent to Bruce

23 Landgraf, who's the Milwaukee County District Attorney,

24 and to Kevin Kennedy with the Government Accountability

25 Board, documenting what had occurred and what I knew in

NEIL ALBRECHT - DIRECT

1  terms of the names of the observers that had been

2  involved.

3  Q.   And the observers who surrounded the voter, did the

4  voter ever vote?

5  A.   He did not.

6  Q.   And do you know why?

7  A.   He was very intimidated.  He was shaking.  He was so

8  upset by what had occurred -- and this was somebody who

9  had just turned 18, it was their first time voting -- and

10  rather than continue to be a part of the conflict that had

11  emerged, chose to actually tear up his ballot and leave.

12  Q.   Thank you.  I just have a couple more.  There are so

13  many changes.  Let's talk about absentee voting.  What --

14  has the changes to absentee voting had any effect on the

15  work that you do?

16  A.   They have.  Milwaukee has a fairly sizable -- I would

17  certainly think the largest in the state -- population of

18  military permanently overseas and temporary overseas

19  voters.  And the Legislature eliminated our clerks'

20  ability to e-mail or fax ballots to temporary overseas

21  voters, which has really created a hardship, a

22  disheartening hardship, for people who are living overseas

23  often because of unemployment and absolutely unable to

24  receive a ballot and return that ballot in time to vote in

25  an election.

1  Q.   But why wouldn't they be able to get a ballot and

2  return it in time for an election?

3  A.   Well, if they're in London they probably can.   If

4  they're in Egypt or Uzbekistan, the wait to receive an

5  absentee ballot that has been mailed to you, we here

6  reports of people receiving ballots six months after the

7  election.

8  Q.   How many people does that affect?

9  A.   I would say anywhere -- you know, it can vary from

10 election to election.  For a presidential I would say

11 probably we work with about a hundred temporary overseas

12 voters.

13 Q.   Thank you.  Now, with respect to special registration

14 deputies, how have changes with respect to that affected

15 the work you do in the real world?

16 A.   Again we're looking at a process that operated very

17 efficiently and now has become very inefficient.  We try

18 to, as one example, register students or SRDs try to

19 register students on the UW-Milwaukee campus.  That campus

20 is literally blocks away from the Village of Shorewood

21 boundary.  And so you have students who live in Milwaukee,

22 you have students who live in Shorewood, you have students

23 who live in Whitefish Bay, students who live in any of the

24 19 Milwaukee County municipalities.  I'm aware certainly

25 of the process of registering to vote newly-naturalized

NEIL ALBRECHT - DIRECT

1  citizens that occurs in the city of Milwaukee and of

2  course those individuals reside across the state.

3      The benefit of the statewide special registration

4  deputy program was that it allowed one person to not jump

5  through dozens of hoops by attending training in dozens of

6  municipalities and going through the oath process just to

7  be able to effectively and efficiently register voters

8  from outside of just one municipality.

9  Q.   We've talked about a number of voting changes.  Let

10  me ask you this: with respect to any of the changes that

11  we've talked about, has any of them, based on your

12  experience, your ten years of experience in the Elections

13  Commission, made elections more efficient?

14  A.   No.

15  Q.   Has any of the laws that we've talked about made the

16  elections less costly for the City of Milwaukee?

17  A.   Absolutely not.

18  Q.   Why do you say "absolutely not?"

19  A.   Well, we've already invested $50,000 in calling in

20  poll workers for photo ID training and probably another

21  $50,000 just in our own public education outreach efforts.

22  So none of these mandates have been supported by state

23  funding and all of them have placed an additional cost

24  burden on the City of Milwaukee that actually detracts

25  from any of the work we would really like to be doing,

NEIL ALBRECHT - DIRECT

1 which would be increasing voter participation.

2 Q.   And have any of the changes that we've been talking

3 about, have any of them, in your opinion, increased the

4 integrity of elections?

5 A.   They have not.  I think they've actually compromised

6 the integrity of elections.

7 Q.   Why do you say that?

8 A.   Because I think they create an unfairness in what is

9 supposed to be fair and accessible elections that -- and

10 they have occurred in a vacuum without any recognition to

11 the populations that will be challenged by these changes

12 and with minimal effort to work with those populations to

13 insure that they are able to continue voting in elections.

14      And so any time elections function in a way that

15 is -- that disregards the voting population and

16 disproportionately creates barriers to voting, I think

17 that compromises the integrity.

18 Q.   And let me just ask you one last question.  I'm not

19 like my colleague.  This really will be my last question.

20 Were you -- I don't think you were here for the opening,

21 but, and I've heard this before, but the state has said

22 that voting in Wisconsin is fair, easy to navigate and

23 open to all.  In your experience, ten years experience on

24 the Election Commission, do you think that's true?

25 A.   I think somebody has a different definition of those

NEIL ALBRECHT - DIRECT

1    words than I do as an election administrator.  I do not

2    believe they are true.

3    Q.    And why not?

4    A.    I think that, you know, in addition to being ten

5    years as an election administrator, I have a background in

6    working for nonprofits, and with that has come a

7    significant interaction with communities in poverty.  And

8    while I'm fortunate to have never lived in poverty, I

9    understand the day-to-day challenges that face that

10   population.

11        And I think if somebody emerges from a world of

12   poverty and appears at their polling place, when 40% of

13   eligible voters don't even turn out to vote in a

14   presidential election, that person should be able to vote.

15   They should have access to a ballot without unnecessary

16   and unwarranted barriers preventing them from casting that

17   ballot.

18             MS. WILSON:  Thank you.

19             THE COURT:  Just a couple of clarifications.  On

20   the idea that none of these laws make elections less

21   expensive, okay, I think I understand why a voter ID

22   component of the law drives up costs, because you have

23   complicated education and procedures that you have to go

24   through.  But I don't know that that's really been offered

25   as the primary reason for the Voter ID law, so let's set

NEIL ALBRECHT - DIRECT

1  that one aside.

2      But the other one, the restriction on hours, I think

3  cost is, purportedly at least, an advantage of that.  So

4  you don't have to pay people to work weekend hours for

5  in-person absentee voting, so you've got a shorter window.

6  And I get you, there might be other disadvantages to it,

7  but isn't that at least something that makes it's cheaper

8  to run an election?

9          THE WITNESS:  I won't dismiss that there may be

10 some aspects that have reduced costs.  But, for example,

11 the reduction in days and hours, it just means that many

12 more people have to be there during the hours that

13 in-person absentee voting is available.

14     So if there is any cost savings, in all honesty I'd

15 have to say it's probably pretty insignificant.  We'd much

16 rather be able to provide the voter access in that case

17 than save the cost.

18          THE COURT:  And then maybe that dovetails to my

19 other concern.  There's an area of your testimony that I

20 don't think I fully understood.  And I get the idea that,

21 conceptually at least, the reduction in the window for

22 voting for in-person absentee voting, obviously if you

23 can't vote on a particular Saturday and you want to vote

24 you're going to have to vote some other time when the

25 polling places are open or you're taking in in-person

1  ballots.  Conceptually it's definitely, almost by

2  definition, going to have to increase what I think you

3  called *crowding* during the time when you're taking votes,

4  either in person or on Election Day, so conceptually I get

5  that.

6      But I think you were arguing or offering evidence

7  that you're hitting something like a capacity ceiling, and

8  I'm not sure I understand that.  Here's what I thought you

9  meant; that by closing the window for in-person absentee

10 voting, you're going to hit a point where there are just

11 too many voters to accommodate during that window.  And so

12 because you can't serve them there, then you're going to

13 have to serve them on Election Day and there's only so

14 many you can serve on Election Day.  So am I understanding

15 the argument?

16          THE WITNESS:  You did a better job of

17 communicating it than I did.

18          THE COURT:  So why do you think we're at that

19 capacity now?

20          THE WITNESS:  Because we're at one location, we

21 have limited hours, and that contributes to long lines for

22 in-person absentee voting in a general election.  People

23 see those long lines and they choose -- or they don't

24 choose, they're just limited in terms of their time -- not

25 to in-person absentee vote.

NEIL ALBRECHT - DIRECT

1          THE COURT:  Okay.  And what makes you think that

2     the lines are so long for so long that people are choosing

3     not to vote because of the wait?

4          THE WITNESS:  We see people leave.

5          THE COURT:  Okay.  And so tell me the time when

6     you had the elections and how long the lines were.  Do you

7     have data on that?

8          THE WITNESS:  It can vary from election to

9     election.  We have seen lines as long as 60 to 90 minutes.

10         THE COURT:  And is that in the April 5th election

11    are you talking about?

12         THE WITNESS:  No, no, in a presidential.

13         THE COURT:  Okay.

14         THE WITNESS:  The April 5th election I don't

15    think we had a wait time more than 20 minutes.

16         THE COURT:  And so you had 60 to 90 minutes in a

17    presidential election.  And is that after the time -- you

18    have to remind me when the window for in-person absentee

19    voting was narrowed to the 45 or 55 hours a week without

20    weekends.

21         THE WITNESS:  It was narrowed twice.  The first

22    change I believe occurred in 2011.  And prior to that it

23    was three weeks, weekends and the Monday preceding the

24    election.  And then it was changed again after that and

25    weekend was -- so as I previously -- one week and the

NEIL ALBRECHT - DIRECT

1  Monday were eliminated.  The second time the weekend in

2  between the two weeks was eliminated.

3           THE COURT:  Okay.  And so we haven't had a

4  presidential election since that elimination; is that

5  right?

6           THE WITNESS:  We had the gubernatorial, but we

7  have not had a presidential, that's right.

8           THE COURT:  And so what were the lines like in

9  the gubernatorial election where you had to do without

10 weekends?

11          THE WITNESS:  Long.  I'd say 40-minute wait time

12 and possibly longer at peak voting periods.

13          THE COURT:  And are these common at all of the

14 polling places in Milwaukee?  Earlier in your testimony

15 you identified a handful or a half-dozen wards that were

16 particularly problematic.

17          THE WITNESS:  I may have misunderstood.  I

18 thought we were talking about in-person absentee voting.

19          THE COURT:  We were.  But you highlighted some

20 wards or districts that were particularly problematic from

21 your perspective in the sense that they had a particularly

22 high proportion of voters in poverty.

23          THE WITNESS:  My intent in sharing that was to

24 indicate which districts in the city where we were seeing

25 the greatest level of voter participation at in in-person

NEIL ALBRECHT - DIRECT

1 absentee voting.

2          THE COURT:  So that in-person absentee voting,

3 does it correlate with the poverty level of the district?

4          THE WITNESS:  It does, particularly during --

5 when we were able to offer the weekend hours --

6          THE COURT:  Okay.

7          THE WITNESS:  -- we saw the greatest

8 representation from the districts that have the highest

9 population of people in color, people in poverty.

10          THE COURT:  Then in that gubernatorial election

11 where you didn't have the weekends, could you detect a

12 discernible effect there?

13          THE WITNESS:  I'm not --

14          THE COURT:  I'd expect then, if you eliminate the

15 weekends and the weekends are particularly important for

16 your voters that are people of color or they're in

17 poverty, I would expect then that the use of absentee --

18 in-person absentee voting would kind of equalize that if

19 you take away the weekends.

20          THE WITNESS:  It's -- you know, the challenge in

21 all of this I think, in terms of providing numbers and

22 statistics, is the apples-to-apples comparison.  So it's

23 hard to go back and say, how did in-person absentee voting

24 for a gubernatorial compare to in-person absentee voting

25 for a presidential, because they're two very different

1 elections in terms of which voters turn out and voter

2 participation. I'm struggling with how to answer that

3 question.

4          THE COURT: Okay. All right. Okay. Very good.

5 Cross-examination.

6                    CROSS-EXAMINATION

7 BY MR. KAWSKI:

8 Q. Thank you. Hello, Mr. Albrecht. Craig Kawski. We

9 met at your deposition on April 19th, right?

10 A. Correct. Nice to see you again.

11 Q. Good to see you, too. Judge Peterson was just

12 asking your -- he mentioned that there was a 45-hour limit

13 on in-person absentee voting. That is not correct.

14 A. 55-hour. I'm sorry.

15 Q. Sure. And there was a 45-hour limit in the law when

16 it was passed, but that was vetoed by Governor Walker; is

17 that correct?

18 A. I believe so, yes.

19 Q. You were talking about Plaintiffs' Exhibit 132, which

20 was a November 5th, 2012 letter. And we don't need to

21 bring it up. But that letter dealt with election

22 observers and a complaint that you made to Bruce Landgraf

23 at Milwaukee County DA's Office and to Kevin Kennedy at

24 the GAB?

25 A. I recall the letter, yes.

                    NEIL ALBRECHT - CROSS

1  Q.   And so the three to eight-foot rule that is at issue

2  in this case was not in effect then?

3  A.   That's correct.

4  Q.   There was a different rule in effect then?

5  A.   It would have been at that time I believe the six to

6  twelve feet.

7  Q.   But that didn't stop those observers from hassling

8  this one voter?

9  A.   That would be correct.  It probably would not have.

10  They were going to disregard the observer rules no matter

11  what the range was.

12  Q.   Okay.  Is it true that in state law there is a

13  statute that provides that if you need to get off from

14  work to vote that you can be given leave for that purpose

15  without being penalized by your employer?

16  A.   Unpaid leave with permission from your employer, yes.

17  Q.   And so when you were talking about people that work

18  and have difficulty getting off of work, that law would

19  apply to them, correct?

20  A.   It would apply to them.  I would agree with that.  I

21  would also say I think it can be very challenging for

22  people to approach an employer and ask for time off to

23  vote.

24  Q.   But the law requires it?

25  A.   It does, sure.

NEIL ALBRECHT - CROSS

1  Q.    You talked again -- Judge Peterson brought out the

2  issue of the ceiling of absentee voting, right?

3  A.    Yes.

4  Q.    Can you quantify what the rate would have been were

5  that ceiling not hindering, in your opinion?

6  A.    I believe we would certainly see rates of in-person

7  absentee voting comparable to other municipalities in the

8  state of Wisconsin.  And I say that just based on what I

9  know -- well, I can't think of any reason why we would lag

10 behind it.  But I certainly know there's a public interest

11 in in-person absentee voting.  It's a national trend.

12 Q.    Right.  And that national trend has not abated in

13 Wisconsin; is that correct?

14 A.    Has not --

15 Q.    Has not stopped; the trend is still continuing

16 onward?

17 A.    That's correct.

18 Q.    Even in Milwaukee?

19 A.    That's correct.

20 Q.    So again you are not able to quantify what the rate

21 of in-person absentee usage would be were there not this

22 "ceiling"; is that right?

23 A.    I can only speculate that I believe it would be

24 comparable to other municipalities in the state of

25 Wisconsin.

NEIL ALBRECHT - CROSS

1  Q.    And referring to Plaintiffs' Exhibit 54, which was

2  the table, do you recall that?

3  A.    Yes.

4  Q.    Again we don't need to bring it up.  But you're not

5  someone who is trained in statistics, correct?

6  A.    That's correct.

7  Q.    And you are not someone who knows what it means to be

8  statistically significant in terms of some data?

9  A.    Are you asking if I'm a professional statistician?

10  Q.    Basically, yes.

11  A.    I gather data, I analyze data, it is inherent to the

12  responsibilities of my position.  But, no, I'm not a

13  professional statistician.

14  Q.    And so when you made the selections of the

15  municipalities in that table, what did you do to make them

16  random?

17  A.    Well, I looked for both geographic diversity and

18  diversity in population.

19  Q.    Judge Peterson observed that the Town of Hixton from

20  Jackson County was somehow in there.  Why did you pick

21  that one?

22  A.    To show what the voting population was of a town that

23  actually had a lesser rate of in-person absentee voting

24  than the city of Milwaukee.  And that was a municipality

25  that I believe had three absentee voters.

NEIL ALBRECHT - CROSS

1  Q.   And so the analysis you did in that table, you don't

2  know if it was statistically significant to any degree, do

3  you?

4  A.   I do not.

5  Q.   And you don't know if there were any errors in terms

6  of like error rates or comparison deficiencies that a

7  statistician might know?

8  A.   I do not.

9  Q.   And you were the one that prepared or selected those

10  municipalities?

11  A.   That's correct.

12  Q.   Again based on GAB data that's publicly available?

13  A.   That's correct.

14  Q.   Okay.  And you talked about an analysis that you did

15  with regard to the city lagging in turnout comparing the

16  2008 to 2012 to 2016 elections, right?

17  A.   That's correct.

18  Q.   And you said the city lagged in 2008 behind -- was it

19  behind the rest of the state at one 1.8%?

20  A.   Behind the state average.

21  Q.   Okay.  Behind the state average.  And that would be

22  for eligible voters who turned out?

23  A.   That's correct.

24  Q.   And you said the city lagged in 2012 by 3.4%?

25  A.   I believe so, yes.

1  Q.   And then you said the city lagged a little bit under

2  10% for 2016?

3  A.   That's correct.

4  Q.   Those were all for the April elections for those

5  years?

6  A.   For the presidential primary.  In 2008 the

7  presidential primary occurred in February.

8  Q.   In 2008 and 2012 President Barack Obama was in those

9  primary elections, correct?

10 A.   Correct.

11 Q.   But he was not in the 2016 presidential primary

12 election?

13 A.   Correct.

14 Q.   Okay.  You were here for Ms. Johnson's testimony,

15 correct?

16 A.   I was, yes.

17 Q.   And you heard her talk about online voter

18 registration?

19 A.   I did, yes.

20 Q.   And you heard me ask her follow-up questions about

21 when online voter registration comes online, does that

22 eliminate paper registration?

23 A.   Correct.  Yes, I did hear that.

24 Q.   Was her understanding of the law correct?

25 A.   I don't believe so.

NEIL ALBRECHT - CROSS

1    Q.    And why wasn't it?

2    A.    I believe you can still register to vote by mail once

3    online registration becomes effective.

4    Q.    Why don't we please bring up -- we'll take a look

5    at -- put on the screen Defendants' Exhibit 97.  It's a

6    little small right now, but do you recognize what that

7    document is?

8    A.    I do.

9    Q.    And what is it?

10   A.    It's the Government Accountability Board's

11   application for an absentee ballot by mail.

12   Q.    And if we could zoom in.  So the Milwaukee Election

13   Commission processes a large number of these applications

14   for every election?

15   A.    A fair number, yes.

16   Q.    Take a look about halfway down the page.  And do you

17   see No. 5 there?

18   A.    I do.

19   Q.    And what is No. 5, this section of the application,

20   addressing?

21   A.    How the person would prefer to receive their absentee

22   ballot.

23   Q.    And what are the options that available?

24   A.    By mail, by voting in the clerk's office, by fax if

25   they are a military or permanent-overseas-only voter, or

1    by e-mail if they are a military and permanent overseas

2    voter.

3    Q.    Okay.  If we could scroll to No. 6 there.  Do you see

4    No. 6?

5    A.    I do.

6    Q.    And what does No. 6, that section of the application,

7    indicate?

8    A.    Which elections the voter is requesting an absentee

9    ballot for -- either a specific election, an election

10   cycle -- or if certifying they're indefinitely confined

11   permanently.

12   Q.    So this application would allow a voter to specify

13   specific elections in a year to receive absentee ballots?

14   A.    Yes.

15   Q.    And it would also allow a voter to indicate that they

16   would like to receive ballots -- absentee ballots for all

17   elections from that day's date through the end of the

18   calendar year ending December 31st, correct?

19   A.    It provides that option, yes.

20   Q.    And then the last option is for those that are

21   permanent absentee voters that would receive absentee

22   ballots on a going-forward basis indefinitely?

23   A.    Assuming they certify that they are indefinitely

24   confined, yes.

25   Q.    And so the mail absentee option here that someone can

NEIL ALBRECHT - CROSS

1  get the ballot mailed to them, when would the mailing of

2  those ballots occur or when does it have to occur by?

3  A.   Well, it usually has to occur within a day for

4  everyone that has an application on file, within a day of

5  ballots becoming available to a clerk.

6  Q.   So, for example, in the upcoming August 9th election

7  do you know the day when those ballots would have to go

8  out?

9  A.   I don't, no.  I don't know the exact date that

10 ballots have to be available to clerks.  I know ballots

11 have to go out the next day.

12 Q.   So would it be roughly sometime in June of this

13 year -- say June 18th, the 23rd -- when absentee ballots

14 would have to go out?

15 A.   Correct.  It's in that range.

16 Q.   Okay.  Do you know what no-excuse absentee voting is?

17 A.   I do.

18 Q.   What is that?

19 A.   That a person doesn't have to have any form of an

20 excuse to request an absentee ballot.

21 Q.   And Wisconsin is a no-excuse absentee voting state?

22 A.   It is.  Correct.

23 Q.   And so when a voter wants to choose the mail absentee

24 ballot option, they would not have to show any excuse to

25 do that?

NEIL ALBRECHT - CROSS

1  A.   Correct.

2  Q.   And that would be a convenient option for the voter

3  who can do it, again can show their photo ID, to avoid the

4  in-person absentee lines that you talked about?

5  A.   I wouldn't necessarily agree with use of the word

6  *convenient*, but it is an option for voting, yes.

7  Q.   And it could be convenient for a voter if they don't

8  have to stand in line, correct?

9  A.   Again I'm not going to agree with you on *convenient*,

10  but it is an option versus standing in line, yes.

11  Q.   So standing in line is very convenient?

12  A.   I didn't say that either.

13  Q.   Okay.

14       THE COURT:  Let's just put it this way: what

15  exactly is the disadvantage for the -- and I think you

16  touched on it before, but you can underline it here again

17  in cross -- what's the disadvantage to doing the absentee

18  voting by mail?

19       THE WITNESS:  I think the greatest disadvantage

20  to doing the absentee voting by mail is it relies on a

21  third party, which is the Postal Service.  And we've

22  had -- well, two things.  There's that.  We've had

23  situations where, I mean dozens of times in just this last

24  April election, where voters have mailed their ballots

25  back to us and the Post Office has returned the ballot to

NEIL ALBRECHT - CROSS

1  the voter.  We've had ballots --

2          THE COURT:  Is that because the envelope looks so

3  crazy?

4          THE WITNESS:  Probably, yes.  Believe me, we've

5  tried to explore this with the Post Office.  We've had

6  situations where ballots are postmarked well before the

7  election and we don't receive them until after the

8  election.

9      So, you know, in terms of public assurance and how

10  someone can feel confident that their ballot is actually

11  going to be counted in an election, I would be hesitant to

12  recommend absentee voting by mail.

13      I would add to that, the certificate envelope that we

14  saw earlier -- which maybe to us as, you know,

15  well-educated people, we could navigate our way through

16  that context -- we literally get hundreds of ballots from

17  voters that are lacking their signature, that are lacking

18  their witness's signature and are therefore noncompliant

19  in terms of having their ballots counted.

20          THE COURT:  Just for my clarification, that

21  certification envelope, that's inside the envelope that

22  the Post Office delivers, correct?

23          THE WITNESS:  Correct.  There's an outer

24  envelope.  When they open it there's the inner envelope,

25  which is their return mail envelope, and that has the

                    NEIL ALBRECHT - CROSS

1  certificattion statement on it.

2         THE COURT:  But even that outside envelope is a

3  little bit unusual from the Post Office perspective?

4         THE WITNESS:  It's a little easier than the

5  inside envelope because the information on the inside

6  envelope, it's just much more text heavy.

7         THE COURT:  Mm-mm.  I'm just wondering why so

8  many of them are misdirected -- or maybe that's not so

9  many.  Maybe that's just ordinary Post Office performance.

10         THE WITNESS:  I don't know.

11         THE COURT:  When I send an anniversary card to my

12  mom and dad I kind of expect it's going to get there.  And

13  if it doesn't, I'll find out.

14         THE WITNESS:  Right.

15         THE COURT:  The Post Office has been pretty good

16  so far.

17         THE WITNESS:  My bills work the same way and I

18  find out.

19  BY MR. KAWSKI:

20  Q.   I kind of lost my train of thought, but I'll try to

21  get back on it.  So if someone -- if a voter receives an

22  absentee ballot in the mail; if they feel that the mail is

23  not reliable, they can deliver their absentee ballot to

24  the municipal clerk, correct?

25  A.   Correct.

                    NEIL ALBRECHT - CROSS

1  Q.   And so I think you're the one that informed me that

2  they can even make a request for an absentee ballot by

3  e-mail, correct?

4  A.   That's correct.

5  Q.   And there's no cost to that other than having to have

6  access to e-mail?

7  A.   Correct.

8  Q.   And otherwise if they make the request for a mail-in

9  absentee ballot by mail, the only cost to them is likely

10 one stamp?

11 A.   Correct.

12 Q.   And that could be significantly less than the cost of

13 driving to the polling place downtown Milwaukee, the

14 Zeidler Building, finding parking, taking the time out of

15 your day, getting off from work, all of that, correct?

16 A.   That's correct.  I guess I would say they have to

17 weigh convenience versus reliability.  So it is -- it's

18 certainly a convenient way to vote, I will agree with you

19 on that.  It's not the most reliable in terms of having

20 your ballot counted.

21 Q.   You would agree that the cost to the City of

22 Milwaukee to offer an in-person absentee ballot is

23 comparable to that of offering a mailed absentee ballot?

24 A.   I think I indicated previously that I've never done

25 that type of a cost analysis, but I could speculate as to

NEIL ALBRECHT - CROSS

1  say they're probably comparable.

2  Q.   And in your deposition we talked about the average

3  time it takes a person to vote absentee, right?

4  A.   In-person absentee?

5  Q.   In-person absentee.

6  A.   Yes.

7  Q.   And this is in the city of Milwaukee.  And you said

8  that it takes about four minutes, correct?

9  A.   Between two and-a-half and four minutes, yes.

10  Q.   Two and-a-half and four minutes.  You also said that

11  it takes less time for the voter to vote in person on

12  Election Day; is that right?

13  A.   If I did say that, I'm not --

14  Q.   Did you mean the opposite?

15  A.   I meant the opposite, correct.

16  Q.   So to make the record clear, it takes less time, on

17  average, in the city of Milwaukee for a voter to vote

18  in-person absentee than it does for them to vote in person

19  on Election Day?

20  A.   It really depends on when the person appears at

21  in-person absentee.  Sometimes the wait time can be longer

22  than if they had gone to their polling place on Election

23  Day, sometimes it can be shorter.

24  Q.   But in general, on average, if a person wanted to

25  save time voting in person, they would go in-person

1  absentee rather than on Election Day?

2  A.   I'm uncomfortable with that type of speculation

3  because there's so many factors to consider in terms of

4  where they vote and what the wait times are at their

5  specific polling place.  I can't generalize.

6  Q.   Okay.  Can we pull up page 83 of Mr. Albrecht's

7  deposition?  And I'll show you where we discussed this

8  topic.  If you could look at lines 12 and 13.  Here you

9  see I asked you about in-person absentee voting and you

10  said it can take four minutes.

11       And I asked you:  "Okay.  So compare that to someone

12  voting in person on Election Day.  Is it longer than four

13  minutes on Election Day or shorter?"

14        And your answer was:  "It is shorter than voting on

15  Election Day."

16       And I was taken aback by that and I said:  "It is

17  shorter than voting on Election Day?"

18       And you said:  "Uh-huh."

19       Do you see that?

20  A.   So I guess I'm -- I'll admit I'm confused by the line

21  of questioning.  I know we were talking about wait time.

22  If we're talking actual process, how long it takes from

23  the moment the person appears at the table, it is shorter

24  at in-person absentee voting than it is at a polling place

25  on Election Day.

NEIL ALBRECHT - CROSS

1  Q.   And that is because of the issue of not having a poll

2  book --

3  A.   Correct.

4  Q.   -- on the in-person?  And on Election Day you do have

5  a poll book and you have to address that issue?

6  A.   Correct.

7  Q.   Okay.  So you talked about Wisconsin being a leader

8  in election administration, correct?

9  A.   I did, yes.

10  Q.   And Wisconsin has very high turnout rates nationally,

11  correct?

12  A.   It does, yes.

13  Q.   And it still does to this day?

14  A.   I don't know.  I guess we'll find out in the 2016

15  presidential election.

16  Q.   Okay.  Nationally it has been in the top five for

17  turnout?

18  A.   It has been, yes.

19  Q.   Okay.

20         THE COURT:  Just a clarification: when you

21  evaluate turnout rates, do you just compare presidential

22  elections because you feel like you've got the same sort

23  of context for comparison state to state?

24         THE WITNESS:  Well, with what's being referenced,

25  I don't actually do the comparison.  You can go to

NEIL ALBRECHT - CROSS

1  websites and look at percentages of voter participation

2  state by state in presidential elections.  And Wisconsin

3  has pretty consistently emerged as second.

4          THE COURT:  Mm-mm.  Okay.  All right.  But the

5  comparison is presidential elections?

6          THE WITNESS:  Correct.

7          THE COURT:  Okay.

8  BY MR. KAWSKI:

9  Q.  You would agree that the voter ID requirement only

10  adds, on average, about 15 to 30 seconds to process a

11  voter?

12  A.  It can depend.

13  Q.  I asked you this question in your deposition and

14  that's what you said.

15  A.  Okay.

16  Q.  You also agree that 99.5% election observers respect

17  the state's election observer rules?

18  A.  That's correct.

19  Q.  We're going to take a look now -- this is really the

20  last area of questioning -- at the Milwaukee Election

21  Commission website.  And would you say that it confused

22  voters to provide inaccurate information to them?

23  A.  It can, yes.

24  Q.  And why is that?

25  A.  Could you repeat the question?

NEIL ALBRECHT - CROSS

1  Q.   Sure.  Why is it confusing to voters to provide them

2  inaccurate information?

3  A.   Because they need accurate information.

4  Q.   Okay.

5         THE COURT:  Before we go on, is this an exhibit

6  that we're looking at?

7         MR. KAWSKI:  It is not an exhibit.

8         THE COURT:  You just pulled it up live?

9         MR. KAWSKI:  Just pulled it up live, yep.

10  BY MR. KAWSKI:

11  Q.   So if you'll scroll up to the top of that, do you see

12  that -- do you recognize that as the Milwaukee Election

13  Commission's website?

14  A.   I do.

15  Q.   And if you could scroll down.  Do you see also that

16  this is a page about voting by absentee ballot?

17  A.   I do, yes.

18  Q.   Do you recognize this page?

19  A.   I do.

20  Q.   Could you please scroll down?  And you see that

21  there's a heading or bolded language: *There are two ways*

22  *to vote an absentee ballot before any election*?

23  A.   Yes.

24  Q.   And you see in that No. 1 it states, "Hours are 8:30

25  a.m. to 4:30 p.m., Monday through Friday, in City Hall";

                    NEIL ALBRECHT - CROSS

1   do you see that?

2   A.   Yes.

3   Q.   Is that accurate information?

4   A.   For the partisan primary it was --

5   Q.   Okay.

6   A.   -- or will be, yes.

7   Q.   Okay.  So is it accurate for the "begins Monday,

8   October 24th, ends at 5 p.m. on Friday," and you're saying

9   that "November 4th, no weekends"?

10  A.   Correct.

11  Q.   That's all accurate information?

12  A.   I believe so, yes.

13  Q.   Okay.

14  A.   I don't have a calendar in front of me, but...

15  Q.   Okay.  All right.  Let me just quickly go through my

16  notes, but I don't think I have any further questions.

17       One question about you talked about in the 2008

18  presidential election that there were 5,000 individuals

19  you estimated that voted in-person absentee?

20  A.   Over the weekend.

21  Q.   And you saw -- you characterized the elimination of

22  the weekend as there being "lost voters," you lost some

23  voters; is that right?

24  A.   Correct.  Yes.

25  Q.   Do you have any ability to estimate the number of

1  voters you believe were lost because of the elimination of

2  the weekend absentee voting?

3  A.    I do not.

4  Q.    Do you think that that is something that can be

5  quantified?

6  A.    I would say, based on my own experience working with

7  the voting population, that I would say anywhere -- and

8  talking to people who were there that weekend in terms of

9  why they were voting over the weekend and hearing the

10 challenges to them appearing at polling places on Election

11 Day or appearing during the week for in-person absentee

12 voting, I'd say anywhere from 5 to 10%.  I would question

13 whether they would be able to vote at any other time but

14 the weekend.

15         MR. KAWSKI:  Okay.  I have no further questions.

16         THE COURT:  Okay.  We're at the point where I

17 would take an afternoon break.  So depending on how long

18 your redirect is --

19         MS. WILSON:  Three questions, Your Honor.

20         THE COURT:  I'm skeptical, but nevertheless.

21         THE WITNESS:  How about if I only answer three

22 questions?

23         THE COURT:  That might be efficient, too.  All

24 right.  Yeah.  If it's going to be short, let's do it and

25 then this witness will be finished and he can enjoy the

NEIL ALBRECHT - CROSS

1  rest of the afternoon.

2                    REDIRECT EXAMINATION

3  BY MS. WILSON:

4  Q.   Do you recall that defendants' counsel was asking you

5  about the national trend in in-person absentee voting

6  going up --

7  A.   Yes.

8  Q.   -- even in Milwaukee?

9  A.   Correct.

10  Q.   Isn't it true that it has slowed significantly for

11  Milwaukee?

12  A.   It has.  We're not seeing the same growth rate that

13  we did previously or the same growth rate that is being

14  enjoyed by other municipalities.

15  Q.   And he also asked you a question about whether

16  Ms. Johnson was wrong in some of the information that she

17  gave; do you recall that?

18  A.   That's correct.

19  Q.   Do you have any concerns that someone like Anita

20  Johnson would be inaccurate about the voting laws with

21  respect to the general public and their knowledge?

22  A.   It didn't -- with all due respect to Ms. Johnson, and

23  I wish there were a lot more Anita Johnson's in the city

24  of Milwaukee -- it doesn't surprise me, given the

25  rapid-fire changes that we are experiencing and they're

1  ongoing.  We're talking about a change that hasn't even

2  occurred yet that people are confused.  I believe her

3  response to that question was representative of the

4  vastness of the confusion around election law.

5  Q.   And what I meant -- I guess I asked a poor question.

6  If someone like -- my question should have been, if

7  someone like Ms. Johnson can be confused over the voter

8  election laws, what do you think, given your experience,

9  about the general public's confusion?

10          MR. KAWSKI:  Objection.  Calls for speculation.

11          THE COURT:  I think it does, but go ahead.  I

12  think this point has probably taken more time to get than

13  it's really worth here, but go ahead.

14  A.   You know, I think that if someone like Ms. Johnson is

15  confused that you can magnify that a thousand-fold and

16  that probably represents the public confusion.

17  Q.   And finally, last question about costs with respect

18  to mail-ins.  You have to get a photo ID, right?

19  A.   Correct.

20  Q.   You've got to have a witness sign, right?

21  A.   Correct.

22  Q.   You've got to have -- you have to have the ability to

23  download the application, right?

24  A.   You have to have the ability to either mail or e-mail

25  in your application.  You don't have to use the

NEIL ALBRECHT - REDIRECT

1  application form per se.

2  Q.    And you've got to figure out all the signatures on

3  the envelope, right?

4  A.    Correct.

5          MS. WILSON:  Okay.  Thank you.

6          THE COURT:  All right.  You were good to your

7  word, so thank you for that.  So you are excused and we'll

8  take 15 minutes.  We'll reconvene at 4:20 and then we'll

9  do our last session for the day, so see you in a few

10  minutes.

11      (Recess at 4:05 p.m. until 4:20 p.m.)

12          MR. SPIVA:  Your Honor, are you ready for us to

13  call our next witness?

14          THE COURT:  Before I have you call your next

15  witness, I just want to offer what I think are -- you can

16  consider it kind of a preliminary ruling on the testimony

17  from Mr. Albrecht.  I don't think that he really offered

18  what I regard to be expert opinion, at least not among the

19  testimony that I'm likely to credit.  I don't think that

20  his -- the data that he presented really is rigorously

21  statistical.

22      But I think to look at it as statistical evidence

23  kind of misunderstands the nature of it.  It's really not

24  statistical in the sense that it is information that's

25  derived by sampling like a survey is where we would expect

NEIL ALBRECHT - REDIRECT

1  the sampling to be tested for statistical significance.

2      His information really is in the form of a

3  measurement.  And when you have measurement, which is

4  essentially what he has, a tabulation of voting numbers,

5  and so I'm sure there's at least some potential for some

6  error that's frankly inconsequential of a few voting -- a

7  few voters.

8      But I think that essentially he's got turnout data

9  and I think that it is, although couched in terms of

10  percentages, it's not really statistical evidence.  So I

11  don't think the objection that it isn't shown to be

12  statistically significant is really the pertinent

13  objection here with respect to the raw data.

14      I do have my concerns about the fact that he offered

15  his opinions about why the data was what it was.  And so

16  to that extent I think he was skirting on the edge of what

17  might be objectionable as an undisclosed expert opinion.

18      I have to say I'm not totally persuaded that I can

19  understand from Mr. Albrecht's testimony exactly what that

20  data is supposed to mean to me.  I don't know why the

21  numbers are what they are.  I have his theories about the

22  capacity ceiling which might account for a lower

23  exploitation of the absentee voting opportunities in the

24  larger cities in Wisconsin, but I don't know that his data

25  actually really shows that.

1       And, as I anticipate in this case, I get kind of a

2   combination of measurement data, I expect I'm probably

3   going to see some more properly statistical data from the

4   experts, and then I get a lot of anecdotal data.  And the

5   anecdotal stories are sometimes compelling and they're

6   sometimes really plausible, but I'm not sure quite how far

7   I want to take them.

8       I think, for example, it's completely plausible, it's

9   almost inescapable, that if you narrow the window for

10  in-person absentee voting, those votes are either going to

11  go to some other time when -- so, for example, the weekend

12  votes, they're either going to show up when the absentee

13  window is open or on Election Day.  By definition, they're

14  either going to go to one of those times when the votes

15  are accepted or they're going to be too burdensome to go

16  through the process and they're not going to vote.

17      So I guess it's really probably a given that some

18  people aren't going to vote if you take away Saturday

19  voting.  But I don't know how many people that's going to

20  be and I didn't hear anything from Mr. Albrecht that

21  really allows me to figure out how many people those would

22  be.

23      And when he tells me, based on anecdotal data, that

24  he estimates that it might be a dozen or a hundred or

25  whatever, that's information I don't think is really going

1 to be reliable enough for me to rely on to say, yes, the

2 consequence of taking away Saturday voting resulted in

3 approximately a hundred people not voting in Milwaukee.

4 That's too speculative.

5 So, anyway, my reaction is that although

6 substantially I'm overruling the objection about the

7 undisclosed expert opinion, I didn't hear opinions that I

8 think I'm likely to credit very much. So it's kind of my

9 preliminary ruling is that I don't see his testimony as

10 objectionable. It might just not be as informative as

11 plaintiffs think it might be.

12 So I'm telling you this now because I think it might

13 facilitate your presentation of the evidence as we go

14 along to have my take on what I'm hearing from the

15 witnesses. I'm not necessarily going to do it every time,

16 but I suspect that similar issues might come up with some

17 other witnesses. So with that, let's call our next

18 witness.

19 MR. SPIVA: Our next witness is Reverend Willie

20 Brisco.

21 (4:28 p.m.)

22 **REVEREND WILLIE BRISCO, PLAINTIFF'S WITNESS, SWORN**

23 <u>DIRECT EXAMINATION</u>

24 BY MS. WILSON:

25 Q. Good afternoon, Reverend.

REVEREND WILLIE BRISCO - DIRECT

1  A.   Good afternoon.

2  Q.   Can you please state and spell your name for the

3  record?

4  A.   Reverend Willie E. Brisco, W-I-L-L-I-E; middle

5  initial E; B-R-I-S-C-O, no E on the end.

6  Q.   And where do you live, sir?

7  A.   I live in Milwaukee, Wisconsin.

8  Q.   And how long have you lived in Milwaukee?

9  A.   I've lived in Milwaukee, Wisconsin since 1965.

10  Q.   Where were you born?

11  A.   I was born in Sardis, Mississippi.

12  Q.   And when did you move to -- I'm sorry.  Strike that.

13  Why did you move from Mississippi?

14  A.   I moved from Mississippi with my mother, who was a

15  single mother at the time.  The only jobs that she could

16  get was domestic or agricultural.  There were no other

17  jobs and no other means of supporting herself.  So she

18  didn't want her child to be raised in that system.

19  Q.   And do you have a certified birth certificate?

20  A.   Yes, I do.

21  Q.   Did you have one when you were born?

22  A.   I had one when I was -- two days after I was born

23  which gave the erroneous birth date of November the 10th

24  instead of November the 8th when I was actually born.

25  Q.   And have you ever corrected your birth certificate?

1  A.   From 1953 to 1983 it took me that long to get a

2  corrected birth certificate.

3  Q.   And why did it take so long?

4  A.   Because I was born at home to a midwife.  And at that

5  time there were certain hospitals that weren't delivering

6  children of African Americans.  I was born in 1953.  So

7  there were clinics that weren't nearby.  So we had

8  midwives that delivered at home.  I was taken to the

9  hospital two days after my delivery.  And the hospitals in

10  that area, most of all the south recorded your birth date

11  as the first date you entered the hospital, and I did not

12  take the word of the midwifes.

13  Q.   What's your current occupation?

14  A.   I am retired currently and I am an associate minister

15  at New Covenant Baptist Church.  I am also the president

16  of the state organization WISDOM; president emeritus of

17  MICAH Milwaukee, which is Milwaukee Inner City

18  Congregations Allied for Hope; also the president of the

19  African American Leadership Council of the Gamaliel

20  Foundation, which is the national foundation that both

21  MICAH and WISDOM belong to.

22  Q.   What is WISDOM?

23  A.   WISDOM is a compilation of state organizations that

24  do social justice work, whereas 11 affiliates scattered

25  throughout the state of Wisconsin we do work with

REVEREND WILLIE BRISCO - DIRECT

1  education, immigration, jobs and economics and right now

2  we are working on prison reform.

3  Q.   And how is that different than what you did before

4  with MICAH?

5  A.   It actually is accentuating what I did with MICAH.

6  It's on a state level and with Gamaliel it's more on a

7  national level.

8  Q.   And what about Familia?

9  A.   La Familia --

10  Q.   *La Familia*.

11  A.   -- or *Voces de la Frontera*, are the Hispanic groups

12  that we work with.  We work with them on immigration,

13  education and also jobs and employment programs.

14  Q.   La Familia is mostly Hispanic population?

15  A.   Mostly Hispanic population.  We work with them on

16  voter registration, Voter ID, all of those things that

17  deal with immigration.

18  Q.   How about MICAH, was that predominantly African

19  American?

20  A.   It was designed to be ecumenical.  It was formed in

21  1988 by a group of Lutheran and Baptist pastors to work on

22  social issues within the community of Milwaukee.  At that

23  time Milwaukee was suffering from red-lining.  There was

24  no ability for minorities to get loans that are comparable

25  up to the people of other color.

REVEREND WILLIE BRISCO - DIRECT

1    And they worked on those issues securing bank loans.

2    They secured something like over $550 million worth of

3    loans for the inner city of Milwaukee to help first-time

4    homeowners to move from apartments and from those areas of

5    depression to become first-time homeowners.

6    Q.    And what is the WISDOM, is that predominantly African

7    American, also?

8    A.    Actually WISDOM is predominantly of white

9    organizations.  It's 11 affiliates throughout the state as

10   far away as Eau Claire, Wausau, Green Bay, Appleton.  The

11   most predominantly African American affiliates are in

12   Milwaukee, Racine, Kenosha and Madison.

13   Q.    Do you do voter outreach with all of these groups:

14   WISDOM, MICAH, and La Familia?

15   A.    Yes, we do.

16   Q.    And with all of these groups -- WISDOM, MICAH, and La

17   Familia -- do you also do training in the voter laws?

18   A.    Yes, we do.  I'm also on the board of Citizen Action,

19   which is Anita Johnson, so we work closely with Citizens

20   in Action and voter turnout and voter engagement.

21   Q.    You guessed my next question about whether you had

22   partners that you worked with.

23   A.    Yes.

24   Q.    Do you work with anyone other than Citizen Action?

25   A.    Wisconsin Jobs Now.  We work with Wisconsin Council

REVEREND WILLIE BRISCO - DIRECT

1  of Churches.  We work with Interfaith Coalition of

2  Milwaukee.  We work with the Muslim faith community of

3  Milwaukee.  We're ecumenical.  We have just about every

4  denomination under our umbrella except we don't have

5  Buddhist yet.

6  Q.   You said you were an associate minister?

7  A.   Yes.

8  Q.   And have you been a minister for other churches?

9  A.   I speak at all of the MICAH churches and I speak at

10 the churches throughout the state.  There are 48 churches

11 within the MICAH organization itself within Milwaukee.  So

12 I am affiliated with most of the Baptist churches, the

13 Lutheran churches within the confines of Milwaukee.

14 Q.   And what population do you serve?

15 A.   I predominantly serve the African American population

16 and the poor, the disenfranchised.  Milwaukee is a unique

17 community.  It's kind of an inner city that's surrounded

18 on all sides by suburbs of affluence.  There are no

19 African American suburbs in Milwaukee.  All of the

20 concentration of the African American and the poor are

21 basically within the inner city and there are really no

22 viable transportation means to get them out of the city.

23 For lack of better words, I call it a *plantation*.

24 Q.   Okay.  When did you become a reverend?

25 A.   In actually '07 I was called, but in '08 I became

REVEREND WILLIE BRISCO - DIRECT

1  official.

2  Q.   And why did you become a reverend?

3  A.   That's easy.  I had a calling from God --

4  Q.   Okay.

5  A.   -- directly.

6  Q.   And prior to being a reverend, what did you do?

7  A.   My career was in corrections, 25 years at the

8  Milwaukee County House of Correction.  I entered the

9  facility as a Correctional Officer I.  I retired as an

10 assistant superintendent.

11 Q.   What type of training do any of your organizations

12 give with respect to voter laws?

13 A.   We, especially throughout the national affiliate, we

14 have a training that's called *Week Long*.  That's before

15 you enter the organization.  It's usually held in some

16 city within the confines of the United States, as far away

17 as California and it's as close sometimes as Chicago.

18 Within that five-day period you are taught training in how

19 to address media, how to do organizing, how to raise

20 funds, how to engage voters, how to recruit voters and how

21 to train other trainers.

22 Q.   And what do you mean, "engage voters?"

23 A.   It is one of the tougher demographics they have in

24 the inner city is the very old and the very young.  The

25 very old feel that they have been disenfranchised or

REVEREND WILLIE BRISCO - DIRECT

1 disinherited. Because most of them have ties from the

2 south, they feel that they had experienced some of the

3 traumas that happened in that area. They don't trust

4 government and they feel that their vote doesn't count.

5 The young very young feel the same way. They feel

6 that they are put up on by authority, they feel that they

7 are under scrutiny, and they feel that a vote is just

8 electing that same authority, that their vote somehow

9 doesn't count.

10 Q. And what did you mean when you say "recruiting

11 voters?"

12 A. We -- our basic tool is door to door. We do training

13 of all of our organizers and all of our operatives. We'll

14 go door to door in some of the hardest-hit communities

15 talking to the individuals about what do they think would

16 improve their community and how they can get out and make

17 a difference in their community and, if they would vote,

18 regardless of who or how they voted, they would see a

19 difference in their community.

20 Q. Do you -- do any of your organizations train in voter

21 registration?

22 A. Yes, yes. And we actually rely on Ms. Johnson and

23 Citizen Action Wisconsin, Jobs Now and a lot of our

24 affiliates to help with that training, and Wisconsin

25 Voices.

1   Q.   And do you, with any of your organizations, do you

2   give any training in Voter ID law?

3   A.   That is a new field for us.  We are really being led

4   by the Citizen Action and the League of Women Voters and

5   the League of Young Voters right now in helping us get

6   this word out and educate the public.

7   Q.   And how do you get the word out other than door to

8   door?

9   A.   We use one of our best tools to get the older

10  demographics out of churches.  We try to make sure that

11  each church has someone in there registered, as just like

12  Ms. Johnson is one of the poll workers.  We make sure that

13  there are registrars.  We make sure that they are

14  somewhere within our church or the ministries; that we

15  emphasize to individuals that there are new laws coming

16  and they must prepare themselves for it, because it's

17  going to be the wave of the future.  And we let them know

18  that regardless of how you feel that the laws are being

19  put in place.  We must be prepared for them in order to

20  address them.

21  Q.   You said about the organizations, you used the term

22  *social justice*.  What did you mean?

23  A.   It basically deals with the least of those.  We take

24  off from the Civil Rights Movement and move it into

25  another step further.  We include all of the poor and the

REVEREND WILLIE BRISCO - DIRECT

1  disenfranchised of our communities: those who don't have a

2  choice, those who may be marginalized to think that they

3  don't have a way to have their voices heard.  We ask them

4  to join us and we will speak for them.  We ask them to

5  speak with us.  And we let them know that there is a new

6  civil rights war that's going on and it's just not

7  attacking people of color; it's attacking people of status

8  and the people class and especially the middle class.

9  Q.   So you are aware that there have been changes in the

10  election laws, correct?

11  A.   Very aware.

12  Q.   And the judge has been very kind and said I don't

13  have to go through each and every change.  So let me just

14  ask you directly and that way I don't have to keep you

15  very long.  Has changes in the voter laws affected the

16  people from your organizations from MICAH, La Familia and

17  WISDOM?

18  A.   My honest opinion?

19  Q.   Always honest of course.

20  A.   I have not met one individual from any organization,

21  from any inner city home, from any place that I have gone

22  that do not think that these are punitive and that they

23  are directed responsibly and irresponsibly to eliminate

24  and to marginalize the vote.

25        Not one person in my church, not one person in my

REVEREND WILLIE BRISCO - DIRECT

1  organization feel that these new rules are necessary and

2  that they provide integrity to the process.  As a matter

3  of fact, if they provided integrity, they would make it

4  easier to vote and they would make every individual in

5  this country able to vote without any hindrance.

6  Q.    What impact, for example, has the Voter ID had on

7  your community?

8  A.    I testified in the court case before in Milwaukee.

9  And before I was going to that court case I stopped by my

10 mother's house because I remembered as a child in

11 Milwaukee -- I mean, in Mississippi, I never heard anyone

12 talk about registering to vote, even though I knew there

13 were Freedom Riders about and that Dr. King had been

14 through.

15      And my mother told me, "No, you didn't, because it

16 wasn't worth it because we felt that it was the safety of

17 the family and the sanctity of our jobs and our house and

18 our communities were worth more than voting at that time."

19 So it took me years in Milwaukee to convince my mother

20 that it was safe to vote and that her vote counted.

21      And I saw that personally, personally with my own

22 eyes.  And I see it now when I talk to some of the older

23 people in my church that stated this is just another way,

24 another effort, to thwart and to keep them suppressed.

25 Q.    What is it about Voter ID that they feel that it's a

1 way to keep them suppressed?

2 A.   Well, the older individuals, especially some of the

3 individuals that were born in the south, never went to the

4 hospital.  They never went to the clinics to get their

5 official birth dates.  So most of them were done later by

6 affidavit.  And a lot of them actually went through life

7 without having a proper birth certificate, so now they're

8 beginning to apply for those.

9        My mother, who passed in November, she had her actual

10 birth certificate that the hospital had given.  But she

11 had given her correct birth date to the insurance

12 companies that had her burial insurance and they would not

13 honor the two birth dates because there was discrepancy.

14        So I had to make sure that we went back through the

15 records, through the records in Wisconsin, and we had to

16 petition Jackson, Mississippi to get her original birth

17 date and get the affidavit to jibe together in order for

18 them to release money for her insurance.  That's just one

19 of the examples of what happens when individuals have to

20 go back and get voter ID and birth certificates.

21 Q.   But that wasn't caused by Voter ID, was it?

22 A.   No, it wasn't caused by Voter ID.  But the way it is

23 now, those individuals who have now worked for years, who

24 have retired and who never really had their birth

25 certificate adjusted now are going to have to go through

REVEREND WILLIE BRISCO - DIRECT

1 | that same procedure when they try to get their accurate

2 | birth certificate and accurate ID to get the voter ID to

3 | vote.

4 | Q.    I see.  Let's talk about the changes in voter

5 | registration.  How has that impacted the people you serve?

6 | A.    Well, we do a lot of canvassing and we canvass around

7 | just every church and organization.  We have 48 churches.

8 | Q.    Let me stop you for a second.  I've heard that word

9 | *canvassing*.  What do you mean by that?

10 | A.    That means we get together with our organization and

11 | other organizations and go door to door through the

12 | neighborhood checking on residents, asking them their

13 | opinion on what's happening in their city, asking them how

14 | they feel that they can get engaged and if they want to be

15 | engaged, if they want to be contacted, if they want to be

16 | put on a list to be kept abreast of what's happening in

17 | their community.  So we do that on a pretty regular basis.

18 |       And in doing so we find out that a lot of the younger

19 | people in the community are transient, which means they

20 | move just about every six months.  And if you move ten

21 | blocks away from where you originally stayed and if you

22 | don't have transportation -- that has become a barrier in

23 | Milwaukee now with crime and with gangs -- that makes it

24 | difficult for young people to traverse those

25 | neighborhoods.

REVEREND WILLIE BRISCO - DIRECT

1    Older individuals, we find out, only come out a lot

2  of times to go to church and when there is van service.

3  So you don't find them out very much during the week, you

4  don't find them walking, even sitting on the porch

5  anymore.

6  Q.    Have you heard something called *Souls to the Polls*?

7  A.    Yes, I have.

8  Q.    What is that?

9  A.    One way of reaching that same demographic when you

10  have the elderly and old people at church and the young

11  people who do don't have transportation.  When you have

12  them in the church you can now provide vans and access for

13  them to go to the polls on Sunday after service.  The vans

14  would ferry them downtown, which is very difficult to

15  traverse during the week because of the traffic and you

16  have all the municipal workers down there.  On Sundays and

17  Saturdays we found it an easy and very accessible way to

18  get them back and forth from the polls from home and from

19  church.

20  Q.    And so did the elimination of weekend voting, did

21  that impact Souls to the Polls?

22  A.    Yes, it does, very much so, because you don't have

23  that in-house -- that congregation that's there on Sunday

24  that you can basically ferry back and forth to the polls

25  and to home.  You don't have that availability on Saturday

1  to get them back and forth to the polls.

2  Q.   Have you attempted to do anything to sort of

3  substitute for the time -- the opportunity that you lose

4  with the elimination of voting on the weekend?

5  A.   We are human beings and we can adapt to just about

6  anything that's being placed on us or that's being placed

7  on us in an amenable fashion.  So we are, right as you

8  speak, trying to come up with alternatives to make sure

9  that we don't lose that demographic.  But that doesn't

10 make it any less punitive or any less underhanded.

11 Q.   When you say "punitive," what do you mean?

12 A.   What I mean is that you put another layer of

13 responsibility on people who already question the layers

14 that you already have, so you put another one on top of

15 that, now it's a psychological measure where they keep

16 saying, every time we jump through one hoop they create

17 another one.  And that is what's on the minds of most of

18 the individuals.  Nobody sees this as equitable.  Nobody

19 sees this as anything that's done with integrity.  They

20 all know why it's being done.

21 Q.   And why do you say that they don't see it as having

22 to do with integrity?

23 A.   Because you never penalize the innocent to catch the

24 guilty.  Even if you disenfranchise one guilty person -- I

25 mean one innocent person, it is still not worth ten guilty

1  ones that you catch.  If you disenfranchise one

2  law-abiding citizen from voting, that makes the whole

3  operation and integrity -- makes it flawed.

4          MS. WILSON:  Thank you.

5          THE COURT:  Cross-examination.

6          MS. SCHMELZER:  Yes.

7                    CROSS-EXAMINATION

8  BY MS. SCHMELZER:

9  Q.   Good afternoon, Reverend.

10 A.   Good afternoon.

11 Q.   You stated that you believe every individual in this

12 country should vote?

13 A.   Yes.

14 Q.   Is that regardless of citizenship?

15 A.   Every citizen of the United States.  And before you

16 ask, even felons.

17 Q.   So you believe felons should be able to vote?

18 A.   Yes, because the only thing that you should lose as

19 right as a citizen is treason, and that's treason that is

20 proven by law.

21 Q.   You talked about some individuals changing or solving

22 the problem of the day of their birth on their original

23 birth certificate being wrong by filing an affidavit,

24 correct?

25 A.   Yes.

                REVEREND WILLIE BRISCO - DIRECT/CROSS

1   Q.   Do you know of any individuals that have successfully

2   done that?

3   A.   I know that I successfully did it and I know it took

4   me almost 30 years.

5   Q.   People do that for reasons other than to vote

6   correct?

7   A.   They do it for reasons of getting their birth

8   certificate to coincide.

9   Q.   And you talked about the example with your mother

10  that when the insurance wouldn't pay because there was a

11  discrepancy in her birth certificate, correct?

12  A.   Right.

13  Q.   So even private actors might require some sort of

14  coincidence between what's on the birth certificate and

15  what you go by, correct?

16  A.   Right, that's if you get two different birth dates.

17  Q.   You also said that there's a problem with young

18  people and old people with transportation, correct?

19  A.   Right.

20  Q.   And it's difficult for them to get places throughout

21  the week, correct?

22  A.   Yes.

23  Q.   Wouldn't voting absentee by mail be a good solution

24  for that?

25  A.   You also have to have stamps and envelopes.  You now

1   have to have the ability to be engaged either through your

2   computer or through some type of electronic mail.  We are

3   talking about individuals who are impoverished who are

4   basically day to day trying to survive.  They're not

5   looking up voter regulation and voter registration.  They

6   are surviving day to day.  So when they hear about one

7   thing that they consider to be different, they disengage.

8   Q.   You said part of your mission with the groups that

9   you work with is to educate voters, correct?

10  A.   That's correct.

11  Q.   Do you educate them on how to vote absentee by mail?

12  A.   We do what we can within the time.  The average time

13  at a door that people know that you can be affected is

14  about 60 seconds.  And anything beyond 60 seconds you lose

15  the individual.  So you can only cover so much in that

16  time and most of the time is engaged in getting them to

17  register.

18  Q.   Do you let them know that the postage to send back

19  their absentee mail ballot is paid for?

20  A.   A lot of us who are going door to door are not even

21  equipped with that basic information.  These things have

22  changed so drastically that we're still engaged in getting

23  individuals to just register when some of the things that

24  I heard here today were all still new to me, and I'm

25  engaged in this work almost daily.

REVEREND WILLIE BRISCO - CROSS

1  Q.   Some of the work you did with MICAH involved helping

2  people get IDs, correct?

3  A.   That was some of the work.  We drove people to the

4  DMV.

5  Q.   And you educated them on what was needed to get an

6  ID?

7  A.   We actually drove them there to get IDs.  We found

8  out in that first session, especially a couple years ago,

9  that it was a lot more complicated than we thought just

10 driving them there and getting the ID.  So we have been

11 caught off guard by this just as much as some of the

12 individuals.  And we found out that we wound up taking a

13 lot of people back who didn't have the proper IDs and the

14 proper methods of getting their IDs.

15 Q.   Did you also help people or educate them on how to

16 get a birth certificate if they didn't have that

17 documentation?

18 A.   Like I said, we tried to get them to areas that could

19 do that.  Ms. Johnson was the one who was well versed in

20 that.  Like I said, we were basically laymen at this.  We

21 were trying to get people in.  And the guys engaged a lot

22 of us was not educated on this ourselves.  That's why we

23 had Anita going to churches and organizations to help with

24 this information because we were not versed with it.

25 Q.   You would say that the program that you were involved

1 with in MICAH, as far as getting or helping people get

2 voter IDs, you would say that was a successful program,

3 correct?

4 A.   I would say no.

5 Q.   Do you remember you referenced the *Frank* trial that

6 you testified in earlier, correct --

7 A.   The --

8 Q.   -- three years ago or so?

9 A.   Yes.

10 Q.   And do you recall saying that that program was

11 successful?

12 A.   It was successful in what it accomplished.  It was

13 not successful in numbers, because we didn't reach the

14 amount of people that we needed to reach.

15 Q.   But you were able to reach a lot of people?

16 A.   I would say a lot of people.

17 Q.   And I think you talked a little bit earlier about how

18 some people you're not able to reach because they just

19 don't trust the government, wanting to have a photo ID or

20 show that to somebody, correct?

21 A.   Yes.

22 Q.   Or they felt hopeless; is that one of the reasons why

23 you weren't able to reach them?

24 A.   Hopeless and disinherited.

25 Q.   Are these people that you are talking about

REVEREND WILLIE BRISCO - CROSS

1  completely off the government radar?

2  A.   No, no.

3  Q.   They interact with government regularly, correct?

4  A.   These are people -- you cannot live within this

5  country without interacting with the government, either

6  through police or through finance or through some other

7  method, so they're --

8  Q.   Or through some sort of government program, correct?

9  A.   Right.

10 Q.   And some of them even have to get photo IDs taken for

11 some of those programs, correct?

12 A.   I would assume so.  I'm not speaking that I do know

13 that they're required for all of the programs.

14 Q.   And you are aware that the ID that these individuals

15 can get, the Wisconsin ID, is free, correct, to vote?

16 A.   The first time ID is free.

17 Q.   And individuals can also, in Milwaukee, get a free

18 birth certificate, correct?

19 A.   That I learned during the last election.

20 Q.   And you mentioned earlier you're on the board of

21 Citizen Action?

22 A.   Yes.

23 Q.   One of the plaintiffs in this case, correct?

24 A.   Right.

25          MS. SCHMELZER:  Thank you, Reverend.

REVEREND WILLIE BRISCO - CROSS

1          THE COURT:  Any redirect?

2          MS. WILSON:  No, sir.

3          THE COURT:  Thank you, Reverend.  You're

4  finished.

5          THE WITNESS:  Thank you.

6          THE COURT:  You may call your next witness.

7          MR. MARTIN:  Good afternoon, Your Honor, call

8  Carmen Gosey.

9          MR. SPIVA:  Your Honor, may we have one minute to

10  confer?  We have two witnesses and one of them is --

11          THE COURT:  Take a minute.

12          MR. SPIVA:  Yep.

13          MR. MARTIN:  We're actually going to reverse the

14  order.

15          MR. SPIVA:  There's somebody we have here from

16  Milwaukee.  The other person is here in Madison.

17          THE COURT:  I think we can extend every courtesy

18  we can to witnesses that come from out of state or out of

19  town.  Who's up next then?

20          MR. SPIVA:  The next witness is Linea Sundstrom,

21  Your Honor.

22       (4:58 p.m.)

23       **LINEA SUNDSTROM, PLAINTIFF'S WITNESS, SWORN**

24

25

1    DIRECT EXAMINATION

2  BY MS. WILSON:

3  Q.    Good afternoon.

4  A.    Good afternoon.

5  Q.    Will you please state your name and spell it for the

6  record, please?

7  A.    Linea, L-I-N-E-A; Sundstrom, S-U-N-D-S-T-R-O-M.

8  Q.    And where do you reside?

9  A.    I live in Shorewood, Wisconsin.

10  Q.    And how long have you lived there?

11  A.    I've lived there 26 years.

12  Q.    And where did you live before that?

13  A.    I lived in the state of Kansas.

14  Q.    And what is your current occupation?

15  A.    I'm self-employed.  I'm an archeologist.  I do

16  historic preservation work under contract with federal and

17  state agencies out west.

18  Q.    And do you know an organization called *Supermarket*

19  *Legends*?

20  A.    Yes.

21  Q.    And what is *Supermarket Legends*?

22  A.    It's a group of citizens who are interested in

23  advocating for voters in the city of Milwaukee to

24  encourage people to vote and in general to promote the

25  democratic process in the city.

1   Q.   And when you say "the democratic process," is the

2   organization affiliated with one particular party?

3   A.   It is not affiliated with a party.

4   Q.   And what's your involvement with Supermarket Legends?

5   A.   I am an organizer for the group.

6   Q.   Do you hold a particular title?

7   A.   No.  I'm the head organizer.  It's all volunteer.  We

8   don't have any paid staff, so it's pretty informal.

9   Q.   And how many volunteers do you have?

10  A.   There's not quite 400 on the mailing list, of whom

11  maybe between 100 and 150 are quite active.

12  Q.   And what do your volunteers do?

13  A.   Most of the volunteers have an SRD certification from

14  the City of Milwaukee.  So our work consists largely of

15  registering voters, talking to people about voting,

16  educating people about the new laws and encouraging people

17  to participate in particular in the early voting, the

18  in-person absentee voting.

19  Q.   And why particularly the in-person absentee voting?

20  A.   Because a lot of people are not really aware of that,

21  that that option exists, so we want to make sure that they

22  know about it.  It's much more convenient for people who

23  work some of the different shifts or people who are going

24  to be out of town or students who are going to be on the

25  spring break, things like that.

1  Q.   Where does the name *Supermarket Legends* come from,

2  what is the genesis of that?

3  A.   I was afraid you were going to ask that.

4  Q.   I'm sorry.  So let me be clearer.  Why *Supermarket*?

5  A.   *Supermarket Legends* because what we've tried to do is

6  go where the people are.  And since everybody has to eat,

7  we actually do go stand out in front of supermarkets if we

8  can get permission to do so.  People find it quite

9  convenient that we come to them rather than them having to

10 go to City Hall to get registered to vote.

11 Q.   And is registering people to vote the primary

12 function of the organization?

13 A.   Most of our work is in registering people to vote,

14 yes.

15 Q.   And how do you keep up with voter registration laws?

16 A.   I keep up with them in three basic ways: I have an

17 e-mail notification with a legislative website so that

18 when a law comes up with that topic I can see what the

19 proposal is and then I can follow it through as it goes

20 through the Legislature, I read the newspapers, and then

21 if I have questions I call the Government Accountability

22 Board.

23 Q.   And do you get assistance from the Government

24 Accountability Board with respect to the laws?

25 A.   Yes.

LINEA SUNDSTROM - DIRECT

1  Q.   And have you ever testified before the Legislature

2  with respect to voting laws?

3  A.   Yes.

4  Q.   And how often do you do that?

5  A.   Not often.  So I testified last fall about the law

6  that is now Act 261.  I have maybe done it four, five

7  times.  I don't know.

8  Q.   Do your volunteers require any special training to

9  register voters?

10  A.   Yes.  They have the SRD training through the City of

11  Milwaukee.

12  Q.   And are they required to be an SRD in order to work

13  with your organization?

14  A.   No.  We have other tasks that people can do if they

15  are not SRDs.  They can help us just talk to people.

16  Since the Voter ID law went into effect we've handed out

17  many leaflets about acceptable forms of ID because in

18  talking to people we discovered that it isn't that

19  people -- it's not that people don't know they need an ID

20  card now to vote, they understand that; but what they

21  don't understand are what kinds of ID cards they can use,

22  whether or not they can be expired, all those kind of more

23  detailed information, so we've worked on getting that

24  information out into the community.

25  Q.   But wasn't that information already out in the

1  community when the law took effect?

2  A.   No.

3  Q.   And how do you know that?

4  A.   Because of talking to people as we're out and about.

5  Just as an example, a couple of different people told me

6  that -- oh, you know, we'll say, "Do you have an

7  acceptable ID for voting?"

8       "Oh, well, I gave up my driver's license, but I've

9  got a *Go Pass*."  That's a transit card for the bus.

10       "Well, you can't use a *Go Pass*."

11       So I know there was confusion.  People thought any

12  photo ID.  And this, I will say, is not specific to the

13  city of Milwaukee.  I know even out in the affluent

14  suburbs where people presumably supposedly keep up with

15  the news, a lot of people did not understand that in order

16  to get an ID card for voting that you have to surrender a

17  driver's license if it's an out-of-state driver's license.

18  There's still confusion on that issue even after this last

19  big election that we just had.

20  Q.   Okay.  Let's talk specifically about voting

21  registration and your group.  But before we do that,

22  what's the demographics of the people you serve?

23  A.   We try to go into the more underserved parts of the

24  city, people who have fewer resources, for the simple

25  reason that people who have cars can easily get to City

LINEA SUNDSTROM - DIRECT

1  Hall to take care of this business.  People who aren't

2  working two or three jobs to make ends meet have more free

3  time when they can, you know, get in and take care of

4  these little errands such as registering to vote.  So we

5  go into those areas where we think we can do the most

6  good.

7  Q.   And has -- and you're familiar with the changes in

8  the voter registration laws, right?

9  A.   Yes.

10 Q.   How has that impacted the people that the Supermarket

11 Legends serve?

12 A.   It's led to quite a bit of confusion.  We're working

13 in the city of Milwaukee, which I think somebody has

14 already said has the fifth highest rate of poverty of any

15 American city, so people are vastly underresourced.  Every

16 time there's a change they have to, well, let me back up.

17      Every time somebody moves, changes address, they have

18 to register to vote.  Again they have to produce a

19 proof-of-residence document.  It's very difficult for

20 people who are not quite homeless, of whom there are many

21 in our city, so...

22 Q.   What do you mean, "not quite homeless?"

23 A.   What I mean is a parent whose business goes belly up

24 and they move in with a child, a child moves back in with

25 the parents; but the utility bills, the residential lease,

1    all of those documents are in somebody else's name.  So

2    for that person to produce an acceptable

3    proof-of-residence document can be very difficult.

4           THE COURT:  But weren't -- that was always a

5    requirement even under the old law, wasn't it, you needed

6    some proof residence?

7           THE WITNESS:  No.  Should I go ahead and explain

8    the difference?

9           THE COURT:  Yes.

10          THE WITNESS:  The difference is that up until

11   about a year ago the SRDs, the people who are registering

12   voters off-site, have to stop 21 days before an election.

13   We have a blackout period when we can't do any voter

14   registrations.  The purpose for that is so that when the

15   municipal clerk gets the registrations, that person then

16   generates a postcard to the voter.  It goes to the address

17   that they listed on the form.

18       So if the postcard comes back undeliverable, then the

19   clerk knows they have to reverify that person's address.

20   As long as the postcard doesn't come back, they assume it

21   was a valid address.  So because of that procedure, which

22   incidentally is still in place, we didn't have to see the

23   proof-of-residence document, now we do.  So those people

24   are actually having their residence verified twice, once

25   by me and once by the clerk.

LINEA SUNDSTROM - DIRECT

1    THE COURT:  Thanks.

2  BY MS. WILSON:

3  Q.    How has it affected your group's ability to register

4  voters though?

5  A.    Well, we can register fewer voters because of the

6  places that we go.  For example, at street fairs, music in

7  the park, supermarkets, bus stops, people don't always

8  have a proof of residence with them.  So that's been the

9  main problem that we've run into with this new

10  proof-of-residence requirement: people just don't have

11  that paperwork with them.

12  Q.    In terms of -- do you have any sense, in terms of

13  numbers, how many fewer people you register in a given

14  week or month?

15  A.    I would guess that we're probably --

16          MS. SCHMELZER:  Objection.  Calls for

17  speculation.

18  BY MS. WILSON:

19  Q.    Do you keep track of --

20          THE COURT:  Let me rule on the objection.  I'll

21  sustain the objection.  I think you can rephrase the

22  question again in a way that it gets the information you

23  want.

24          MS. WILSON:  Okay.

25

LINEA SUNDSTROM - DIRECT

BY MS. WILSON:

Q.    So one of the things that your organization does is register people, correct?

A.    Yes.

Q.    Have you seen any impact to the number of people that you register because of the change in the residency law?

A.    Yes.  I think we're probably registering fewer than half as many as we used to because of the residency.

Q.    And is that because of what you stated before about someone not having proof of residency on them when they're --

A.    Correct.

Q.    -- either at a street fair or a supermarket?

A.    Right.

Q.    Is there any other reason for that?

A.    As far as people registering, I think the length of residency, that change has made some difference.  I can't quantify it for you.

Q.    Okay.  Has the changes in the voter ID requirement, has that had any impact on your group's ability to register voters?

A.    Yes, it has, in the sense that we now have to have two conversations where we used to have one.  So we talk to the person about whether their registration is current, but then we also have to talk to them about whether they

1-P-152

have a suitable ID for voting and, if they don't have one,

what documents they're going to need to produce in order

to get one.

     We talk to them -- you know, it's a long conversation

because if they lack a birth certificate, for example,

then we've got to explain the entire procedure, the

petition procedure that they can go through.  So it limits

the time that we can talk to the next person because we're

still talking to the first person about ID for voting.

     The other area where it impacts our work is that

we've had to produce our own materials about ID for

voting.  So that took time on my part and I've got two

people that check everything I do to make sure it's

accurate.  But we had to design and have printed our own

leaflets in order to get this information out into the

Milwaukee community in a format that was user friendly,

also not too expensive to print.

Q.   Why didn't you just download it off the GAB website?

A.   For two reasons.  One is their information is

statewide.  And while the laws are the exact same for the

city of Milwaukee, the city does have a slightly different

registration form that they're allowed to use in addition

to the state form.  There's a few minor differences in the

situation with Milwaukee as opposed to the rest of the

state.  Also, the materials that the GAB produced were

1  shiny, full-color, expensive printing and we can't -- we

2  don't have that kind of money.

3       The other problem with the brochures -- I don't know

4  if the League of Women Voters is going to testify for

5  you -- but another thing that happens to voter advocacy

6  groups is they get a set of materials printed up and then

7  the law changes.  And so the materials that they printed

8  are now out of date, so they have to throw them out or

9  literally line through.  And so they've wasted that money

10 and they have to wait for a new printing, and so forth.

11 Q.   And has that happened with your leaflets?

12 A.   Yes.  But mine are designed to be very easy to change

13 and very cheap to print so that we can easily adapt to

14 that.  I mean once we learned that lesson, we tried to

15 adapt to it as best as we could.

16 Q.   Do you get any money from the state to help you with

17 this printing of the leaflets?

18 A.   No.

19 Q.   Do you get any money from the state that helps you

20 educate the voters on the different changes on the voter

21 ID laws?

22 A.   No.

23 Q.   Does your organization do any outreach with respect

24 to helping people, like, on Election Day at the ballot

25 box?

1  A.   On actual Election Day I encourage the volunteers

2  within my group to link up with a different group and do

3  either -- well, the first thing I encourage them to do is

4  to become poll workers, to take the poll worker training

5  and to serve as poll workers, because we make good poll

6  workers.  And this group is -- by and large they're very

7  savvy about voting law.

8       If not that I recommend that they maybe volunteer as

9  a greeter at a polling place where they're not actually

10  doing the poll work per se, but they're going to help

11  people get into the right line and that type of thing, or

12  to join one of the election observer programs and help out

13  that way.  So the group per se, those are all outside the

14  purview of my group.

15       The one thing that we've done in the past is we'll

16  just go back to our usual places, for example in front of

17  a grocery store, where people are used to seeing us and

18  we'll just be there with a computer or a cell phone.  And

19  if somebody says, "I tried to vote but I was at the wrong

20  polling place," we can help them figure out where they're

21  supposed to go and how to get there.  So we've done that

22  on some of the bigger elections.

23  Q.   How do your volunteers stay apprised of all the

24  changes in the voting laws?

25  A.   Every time the law changes I monitor that and I let

1   them know by e-mail.  And then also when they go out to

2   work, even though they've had the SRD training, I try to

3   make sure -- I try to pair the less experienced with the

4   more experienced.  Even at that there is confusion that

5   comes into it, so I just monitor it as best I can.

6   Q.   What do you mean, "there's confusion that comes into

7   it"; do you mean with respect to your volunteers or

8   something else?

9   A.   With respect to the volunteers.  Because there's been

10  so many changes in the voting laws, they sometimes get

11  confused about the details; for example, can this

12  particular form of ID be expired or not, that type of

13  thing.  And I know -- I won't name names -- but I do know

14  that even one clerk of a fairly large city, not the one

15  you just -- that was just on the stand, they actually had

16  a mistake in the materials that they put out to the public

17  as far as the expiration date on one of the forms of ID.

18  So my point is, I think everybody is confused.

19  Q.   Are there any other -- last couple questions -- any

20  other changes to the voter laws that have affected your

21  group?

22  A.   I think the number of changes has discouraged people

23  from getting involved in this kind of work.  They feel

24  like they can't keep up with the changes.  They get

25  confused.  And then they feel like, "Well, I'm not good at

1    this, at this work."

2         It's affected us in many ways.  It's hard to keep up

3    with things.  It's hard to keep constantly training

4    people.  Every day that you spend doing a training is a

5    day that you didn't spend with feet on the street.  I'm

6    not sure if that's what you were --

7    Q.    No, no.

8    A.    -- asking me.

9    Q.    I'm trying to be polite and make sure you're

10   finished.  How have the changes in the voting laws though

11   affected the people that you serve?  Any other affect on

12   the people that you serve other than what you've already

13   told us?  I don't want you to have to repeat that.

14   A.    Right.  I've already mentioned the people who aren't

15   quite homeless who can't produce a proof of residence.

16   Q.    Right.

17   A.    There are some people who are going to have trouble

18   getting an ID.  Now theoretically they can go fill out a

19   petition form at the Division of Motor Vehicles and the

20   state will then verify their birth record over the phone.

21   However, hardly anybody in Wisconsin knows that's

22   available.

23        And the other problem that I've observed with that is

24   depending on which clerk you talk to and depending on

25   which DMV office you go to you may not be offered the

1  petition -- I talked to one person who was told there was

2  no such thing -- or they may be helpful and help you

3  through the process.

4  Q.   Do you do any type of training for your volunteers on

5  something called *mail-in absentee voting*?

6  A.   Yes, a little bit.

7  Q.   Why just a little bit?

8  A.   Mostly in the sense of when we're out talking to

9  voters, a lot of times they have a concern about an

10 elderly relative.  And so we do -- we do usually have

11 absentee ballot applications with us so that we can hand

12 those to the person.  We explain to them how to fill it

13 out and how to send it back in.

14      Milwaukee, as far as I know, does not put

15 restrictions on who is considered indefinitely confined.

16 I believe that some of the municipalities do.  But if the

17 person really and truly is having trouble getting out and

18 about, we really encourage them to do the

19 indefinitely-confined mail-in balloting.  That's a good

20 option for people who have limited mobility.

21 Q.   How long have you been doing this work with

22 Supermarket Legends?  Let me retract and rephrase that.

23 How long have you been working to get people registered?

24 A.   About four years.

25 Q.   About four years?

1  A.    Mm-mm.

2  Q.    And in the four years that you've done this, what, in

3  terms of the changes in the laws, because you seem quite

4  knowledgeable about them, has had the most impact on your

5  ability to register voters?

6  A.    I think the changes to the residency requirement is a

7  big one.  The loss of the statewide certification is a big

8  one.  Just the sheer number of changes to keep up with.

9  Q.    Okay.  And one last question.  In your experience is

10  voting in Wisconsin easy to do?

11  A.    I think it depends entirely on where you live and

12  what resources are available to you and your own level of

13  personal mobility.

14  Q.    And does it have anything to do with income?

15  A.    Yes, it does.  For example, when the ID for voting

16  came in -- and as I said, most people don't understand

17  that there is a petition process -- they knew that they

18  could get the ID card without paying whatever it is, 35

19  bucks, but they didn't know that they didn't have to pay

20  for a birth certificate if they lived outside of Milwaukee

21  County.

22        When this first thing happened, when it first was in

23  effect, there was quite a bit in the news that if you were

24  born in Milwaukee you could get your birth certificate for

25  free if you needed it to get ID for voting, so people were

LINEA SUNDSTROM - DIRECT

1  aware of that.  But they're not aware of this other

2  process whereby if you're not from Milwaukee County, the

3  state can process your application for identification

4  without you actually getting that hard copy of the birth

5  certificate.

6      Now, what does that have to do with money?  Well, the

7  birth certificates cost money.  So for a person who

8  thinks -- you know, who doesn't know this other option is

9  available, they think, well, gosh, I'm going to have to

10 pay 40 bucks and I'm going to have to wait eight weeks to

11 get the birth certificate and I've got to send a picture

12 of my photo ID in to get the birth certificate, so I give

13 up.  So I think it has a psychological discouraging impact

14 on people.

15 Q.  Have you talked to people who have given up in the

16 people that you serve?

17 A.  Yes.

18       MS. WILSON:  Thank you.

19       THE COURT:  Just a follow-up to clarify.  In

20 response to the question about what changes had the most

21 impact on your work on behalf of voter registration, you

22 said it was the change in the residency requirement.  By

23 that are you referring to the change in the durational

24 residency requirement or the change that requires you to

25 not have documentary proof of your residence?

1          THE WITNESS:  It's actually both.  But I think

2    it's the requiring the proof for the registrations that

3    are done far enough in advance of the election that

4    there's still going to be verified by mail anyway.

5          THE COURT:  Thank you.  Cross-examination.

6                    CROSS-EXAMINATION

7    BY MS. SCHMELZER:

8    Q.   Hello, Ms. Sundstrom.

9    A.   Hello.

10   Q.   You said part of your objectives I guess of the

11   Supermarket Legends is to register, educate and encourage

12   participation in the voter process, correct?

13   A.   Yes.

14   Q.   And if you're not able to register a voter on the

15   spot, are you still able to educate and encourage them to

16   participate in the process?

17   A.   Yes.

18   Q.   And do you, if they don't have their proof of

19   residency with them, do you send them away with anything,

20   with a voter registration form or anything like that?

21   A.   Yes, we do.  We give them a registration blank that

22   has the list of acceptable proof of residence printed on

23   the back.  We also have a little slip of paper that we

24   give them that has a list of the libraries in the city of

25   Milwaukee.  We still have SRDs in our city libraries, so

1 they do have -- that's an option that works pretty well

2 for people.

3      Getting to City Hall is quite a burden for people.

4 The parking situation is bad and of course the hours are

5 very limited.

6 Q.   So if they don't have their proof of residency with

7 them, you send them away with a blank registration form,

8 let them know where they can go to show their proof of

9 residency to get them registered, correct?

10 A.   Yes.

11 Q.   I think you said that you register fewer than half of

12 what you used to since the proof-of-residency requirement

13 came in?

14 A.   That's my sense, yes.

15 Q.   Do you know how many of them return to one of the

16 libraries or somewhere else to register after you give

17 them that information?

18 A.   No.  And that's one of the frustrating aspects: we

19 don't know the drop-off rate.

20 Q.   So you don't know how many of them then maybe choose

21 to go and register online after they've left --

22 A.   Excuse me.  We don't have online voter registration

23 in Wisconsin.

24 Q.   Well, they utilize the *My Vote* website to fill out

25 the registration and send it in?

1  A.   Do I know how many of them do that?

2  Q.   Right.

3  A.   In the populations we're working with I would say

4  very few.  We do work on some of the college campuses and

5  some of them will do that process.

6  Q.   And you don't know how many of them maybe can't

7  register with you at the registration drive but go to the

8  polls on Election Day and register; you don't know how

9  many follow up on that?

10  A.   Right.  We have no way of knowing that.

11  Q.   So you really have no way of quantifying how many

12  people are not registered because of the

13  proof-of-residency requirement?

14  A.   Right.

15  Q.   And I think you said that that affects people of

16  lower income levels disproportionately --

17  A.   Yes.

18  Q.   -- because they're less likely to have that proof of

19  residency?

20  A.   Yes.  As I said, the ones that are really problematic

21  and tough to find a pathway forward are the ones who are

22  living in another household but they do not have any bills

23  or bank account or anything with that address on it.

24  They're *couch surfers*, okay?  They spend some time in this

25  household, some time in that household.

1    People who are well and truly homeless can get an

2  affidavit from a shelter as long as that's where they

3  normally show up when they need a place to stay that's

4  indoors.

5  Q.   So you're not talking about just people of lower

6  income levels in general; you're talking about a specific

7  piece of that, correct, these *couch surfers*?

8  A.   Well, yeah.  But the reason they're couch surfing is

9  because they don't have any income.

10  Q.   And those individuals have an option of getting some

11  kind of government -- a letter from a government unit to

12  verify their residency, correct?

13  A.   No.

14  Q.   They can't write the clerk of -- the Milwaukee clerk

15  and ask him to send them a letter to that address?

16  A.   Yes.  If they can get mail at that address, yes, they

17  can do that.

18  Q.   And that would be an acceptable proof of residence,

19  correct?

20  A.   Yes.

21  Q.   And people of lower income levels, do some of them --

22  I mean, are they disproportionately on government benefits

23  like FoodShare programs or BadgerCare or SSI?

24  A.   Well, that's kind of a silly question.

25  Q.   They are?

1   A.   Isn't that the qualification for public assistance,

2   is that you have low income?  Yeah.

3   Q.   And those individuals could use any letter from any

4   of those government units to show proof of residency,

5   correct?

6   A.   If, yes, if they have a mailing address.  I'll

7   describe a situation to you where I have actually run into

8   this twice.  The individual was either completely homeless

9   or staying here, there, with different relatives.  But

10  those relatives that had the mailing address did not allow

11  the individual to use their mailing address in order to

12  receive any mail.

13       And one individual that I talked to in that

14  situation -- I was at a Food Pantry -- he was staying with

15  his sister.  And I said, "Well, you can put her address if

16  that's where you normally stay."

17       And he said, "No, she won't let me."

18  Q.   And how many individuals have you encountered in that

19  situation where they're couch surfers and they're not

20  allowed to use the address they're staying at for mail

21  purposes?

22  A.   I have personally uncountered two.

23  Q.   So for the majority of the situations where they

24  don't have valid proof of residency would you agree it's

25  not because they're unable to obtain it; it's just they

LINEA SUNDSTROM - CROSS

1  have to take some additional steps to get that proof of

2  residency, correct?

3  A.   You're asking me to quantify something.  I'm not sure

4  I have the information to do that.  Of the people that I

5  have uncountered, most people have something that will

6  work or, like you say, they can get a document.  They

7  can -- you know, a lot of times we'll tell them what the

8  documents are that they might have and they just go get

9  one.

10      But there are people that who actually do not have

11  any bills coming in their name.  A question arose around

12  the jesuit priests at Marquette University.  They had all

13  changed their address, moved into a new residence hall and

14  they don't get bills.

15  Q.   And they're able to get acceptable proof of residency

16  by writing their clerk, correct?

17  A.   In that case they didn't have time to write the

18  clerk.  They were trying to register on Election Day,

19  which is a right in Wisconsin.

20  Q.   But they are able to obtain that now with some

21  preplanning.  If you don't have acceptable proof of

22  residency, you can contact your city clerk and have them

23  write a letter to you, correct?

24  A.   Yes, if you have time.

25  Q.   Most students can access their proof of residency

LINEA SUNDSTROM - CROSS

1  online; have you found that?

2  A.    Yes, although it's very time consuming.

3  Q.    I think you talked a little bit about in-person

4  absentee voting and that that's something that your group

5  encourages?

6  A.    We do encourage it.  We hand out leaflets with the

7  times and dates of the early voting, tell them what they

8  need to bring.

9  Q.    And I think you mentioned that it tends to help out

10 people of lower incomes or the working poor?

11 A.    I think so.

12 Q.    But these individuals wouldn't be the same ones that

13 wouldn't have proof residency, correct?  Because they're

14 working, they would have a pay stub?

15 A.    Actually, people do show up at early voting and do

16 not have proof of residency.  That's pretty common, as a

17 matter of fact.  Sometimes if they're a homeowner -- the

18 Water Department is right there -- we send them over to

19 the Water Department to get a copy of their water bill,

20 which is acceptable.  But, yeah -- no, that happens.

21 Sometimes people really don't have anything.

22 Q.    You can use a pay check stub to establish proof of

23 residency, correct?

24 A.    You could if you knew you had to bring it with you

25 when you went to vote.

1  Q.   And if you can't make it in for the in-person

2  absentee voting you can still vote by mail, correct?  You

3  can cast an absentee ballot by mail --

4  A.   Yes.

5  Q.   -- or you could show up on Election Day and vote

6  then, correct?

7  A.   Yes.

8  Q.   Let's talk a little bit about Voter ID.  You said --

9  I think you said that the *Go Pass* requires a birth

10 certificate; is that correct?

11 A.   I'm not sure specifically because I don't have one.

12 But the people I talked to said they had to bring lots of

13 documents with them to get the *Go Pass*.  And I think one

14 of them mentioned that she had brought her birth

15 certificate.

16 Q.   Do you remember stating that in your declaration that

17 you filed in this case?

18 A.   I don't -- I remember talking about the *Go Pass*, but

19 I don't remember specifically --

20 Q.   So for the individuals who have a *Go Pass*, you

21 wouldn't expect that they would have difficulty getting a

22 state ID if they had a birth certificate, correct?

23 A.   Right.  The problem in that case was that they

24 thought they had an acceptable ID; it wasn't that they

25 couldn't get one.

1    MS. SCHMELZER:  Thank you.  Thank you,

2  Ms. Sundstrom.

3           THE COURT:  Any redirect?

4           MS. WILSON:  No, Your Honor.

5           THE COURT:  Thank you, Ms. Sundstrom.  Let's call

6  our next witness.

7           MR. SPIVA:  Your Honor, plaintiffs call Carmen

8  Gosey.

9       **CARMEN GOSEY, PLAINTIFF'S WITNESS, SWORN**

10              DIRECT EXAMINATION

11  BY MR. MARTIN:

12  Q.   Good afternoon, Ms. Gosey.  How are you?

13  A.   I'm well.

14  Q.   Could you begin by stating your full name and

15  spelling it for the record?

16  A.   Yeah.  My name is Carmen Gosey.  Do you want my

17  middle name, too?

18  Q.   Sure.

19  A.   So Carmen Charlene Gosey; C-A-R-M-E-N, G-O-S-E-Y.

20  Q.   Ms. Gosey -- is it *Gosey*?

21  A.   Yeah.  There's an accent on the E, but whatever.

22  Q.   Fair enough.  You're currently a student at

23  UW-Madison --

24  A.   Yeah.

25  Q.   -- correct?  And what year are you in?

CARMEN GOSEY - DIRECT

1  A.   Okay.  So I just finished up my sophomore year, so

2  currently I'm a junior.

3  Q.   And what do you study?

4  A.   Political science and legal studies with a

5  certificate in criminal justice.

6  Q.   Okay.  And where were you born?

7  A.   I was born in Milwaukee, Wisconsin.

8  Q.   Okay.  And where did you start high school?

9  A.   I started high school at Monona Grove High School,

10  but I lived in Cottage Grove.

11  Q.   That's sort of within the Dane County area, right?

12  A.   Yeah.

13  Q.   Can you describe the demographics of the school in

14  Monona Grove?

15  A.   Yeah, for sure.  So for my years at Monona Grove I

16  spent freshman and sophomore years there.  And the

17  demographics were, I was one in 50 black students and out

18  of, like, 900-plus students.  So I was considered a black

19  student, although I am biracial.

20  Q.   At some point you moved to a new high school,

21  correct?

22  A.   Yeah.

23  Q.   And where was that?

24  A.   That was Racine, Wisconsin.  It's called *Jerome I.*

25  *Case High School*.

1  Q.   How would you describe the demographics of that

2  school?

3  A.   So J. Case High School is much more diverse.   There

4  was much more diversity there -- way more black people,

5  way more Hispanics, Asians -- but white people still did

6  make up the majority of the high school.

7  Q.   Okay.   And you were in Advanced Placement classes in

8  high school, correct?

9  A.   Yeah.

10  Q.   Could you tell me a little bit about those?

11  A.   Yeah.   So it's not exactly Advanced Placement.   It's

12  different.   Like, AP is different from International

13  Bachelorette [verbatim], which is an international program

14  meant to pretty much connect students globally with this,

15  like, educational, like, purpose of, like, exploring

16  different cultures and becoming more culturally competent

17  and also critical thinking, too.

18      So it's a different kind of advanced program.   And

19  Case was one of the high schools that had it in Racine.

20  And I think that's why my mom wanted to send me there.

21  And so it's a newer program.   But, yeah, that is Advanced

22  Placement.   And I took all IB classes, International

23  Bachelorette [verbatim].

24  Q.   And did the demographics of the fellow students in

25  those classes reflect the demographics of the school

CARMEN GOSEY - DIRECT

1 generally?

2 A.    No.  So there were, like -- at times I was, like, the

3 only black person in my class.  And again, like, using the

4 *black* term loosely.  I am biracial.  That's how I

5 identify.  And so it was very predominantly white in all

6 my classes and also predominantly conservatives as well.

7 Q.    Okay.  Let's talk about some of your activities that

8 you do in college now.

9 A.    Yeah.

10 Q.    You are on the Associated Students of Madison; is

11 that correct?

12 A.    Yeah.

13 Q.    Could you describe what that is?

14 A.    Yeah.  So the Associated Students of Madison is the

15 official student government at UW-Madison.  And there's,

16 like, sectors of Madison.  It is the Division of Student

17 Life.  And my freshman year I sat on the Legislature

18 Affairs Committee.  I loved the committee so much -- it's

19 a grassroots committee -- that I ended up running for

20 chair my sophomore year.  So May 1st I just ended my term

21 as Legislature Affairs Committee chair and now I serve as

22 Student Council chair.

23 Q.    We might try to talk a little slower for the sake of

24 the court reporter.

25 A.    Sorry about that.

CARMEN GOSEY - DIRECT

1  Q.   So for a year you were the chair of Legislative

2  Affairs --

3  A.   Yeah.

4  Q.   -- is that correct?  What did you do as chair of

5  Legislative Affairs?

6  A.   Yeah.  So it is a grassroots committee and so we work

7  on mobilizing students.  And the sort of, like, definition

8  of a Legislative Affairs Committee is it advocates for

9  students at the city, county, state and federal levels on

10 higher education issues that affect students.

11      So we did a lot of work at the state level about

12 medical amnesty, which grants immunity from the underage

13 drinking ticket, to the caller and the first-need medical

14 assistance.  And 32 other states across the nation already

15 have this and so we thought Wisconsin needs this as well.

16 We do have a policy on our campus for this.

17      We worked on voter ID.  We worked on Senate Bill 295,

18 which instated online voter registration but got rid of

19 special registration deputies.  And we also worked on food

20 stamp from the campus, which is creating, like, food

21 stamps in the dining halls for lower socioeconomic

22 students.

23 Q.   Let's talk about -- it's fair to describe this as

24 *lobbying*; is that an accurate term?

25 A.   That's accurate.  Lobbyists get paid.  But it's

1  advocating-for-students lobbying.

2  Q.   Got it.  Can you describe your activities, your

3  lobbying activities, in relation to the Voter ID law?

4  A.   Yeah.  So the Voter ID law, so we kind of lobbied.

5  And we lobbied, like, kind of state legislators about

6  this.  But we wanted it to also be on the university

7  level, too, because there has been universities that have

8  used their student ID, like in Wisconsin, as a valid photo

9  ID to vote, and like UW-Stout.

10      And so we lobbied administrators on -- like, we

11  believed that my Wiscard, which is my student ID, should

12  be photo-ID eligible because people carry their Wiscards

13  all around to, like, buildings for -- like, I get a

14  discount, because I live in university housing, to use my

15  Wiscard, and so I usually always have my Wiscard with me.

16  And so using it to vote just seems reasonable and

17  acceptable and so that's what we lobbied administrators

18  for.

19      I talked to Chancellor Blank about it, the Dean of

20  Students Office, people from legal to see if this would be

21  something to -- something that we could do.  And we know

22  it is something that is feasible because other schools

23  have done it not only across the nation but in our state.

24  Q.   And do you know why that change -- or let me back up.

25  Was that change that you recommended adopted?

1   A.   No.

2   Q.   And do you know why?

3   A.   Yeah.  So, like, apparently there was a security cost

4   to it and then also, like, an actual, like, monetary cost.

5   So we believed that -- like, when I say "we," the

6   Associate Students of Madison who advocated on this --

7   that this can be paid for.  And we also believed that it

8   would not be a security cost because it would just be a

9   two-year expiration date and then a signature on the ID to

10  make it photo-ID eligible.  And so there have been --

11  again there have been schools that have been able to do it

12  and so that's how we saw it.

13       Additionally, I think, like, with the security thing,

14  like, I have somebody I know that went to a meeting and

15  brought out a photo ID of, like, a credit card with a

16  picture on it, their signature and also an expiration

17  date.  So, like, having a student ID be that way would be

18  just fine.

19  Q.   All right.  Now, has UW-Madison made available some

20  forms of student ID that are compliant with the law?

21  A.   Yeah.

22  Q.   And we'll talk a little bit more about your

23  experience with those later.  But was the adoption of that

24  related to your lobbying activities or was that

25  independent of your efforts on this issue?

CARMEN GOSEY - DIRECT

1  A.   So when we talked about the photo ID, it was also

2  maybe issuing them at SOAR, which is the freshman

3  orientation that they come to, so issuing those photo IDs

4  right off the bat so students don't have to, like, out of

5  their busy schedule coming in as a freshman new to campus

6  having to go out of their way to Union South, which may be

7  far away from them if they live in, like, Lakeshore or

8  something; that they would be able to just get it at

9  freshman orientation and it would be done with.

10 Q.   Got it.  You mentioned busy schedules.  You've

11 also -- you just wrapped up your term as the chair of the

12 Legislative Affairs Committee, correct?

13 A.   Yeah.

14 Q.   And you moved on to a new position and what is that?

15 A.   Chair of Student Council.

16 Q.   Of the entire UW-Madison?

17 A.   Yeah.

18 Q.   Okay.  That sounds like fun.

19 A.   Yeah.

20 Q.   So it sounds like a commitment as well, a time

21 commitment.  How would you describe the commitment of your

22 previous job as chair of Legislative Affairs Committee and

23 your new job as president of the Student Council -- or

24 chair of Student Council?

25 A.   So *in busy* again, like, it's hard to define that

CARMEN GOSEY - DIRECT

1    because there are spontaneous things that do come up that

2    make it even more, like, busier.  And so I'll start with,

3    like, being Legislative Affairs chair.  So I was expected

4    to have five hours of office hours a week and then also

5    have committee meetings or Student Council meetings or

6    Coordinating Council, which would just be all the

7    leadership of the Associate Students of Madison as

8    Coordinating Council, so they're alternates.

9        Every Wednesday at 6:30 you would have either Student

10   Council or Coordinating Council.  And every Monday night I

11   had Legislative Affairs Committee, which that would be the

12   members of the Grassroots Committee.  And then the five

13   hours spent being-available-to-students part of that

14   committee are just part of campus.  And you have to have

15   people know where you are in case they wanted to come by

16   and talk to you.  That's expected.

17       And so there would just be meetings throughout the

18   week, whether they be lobbying meetings or at the Capitol

19   or meetings with the administration or with students in

20   general.

21   Q.   And these are all extracurricular activities,

22   correct?

23   A.   Yeah.

24   Q.   Are there other extracurricular activities that

25   you're engaged in?

CARMEN GOSEY - DIRECT

1  A.   So this is a huge commitment of mine and it's like --

2  it takes up a lot more -- it's like a class.  It takes up

3  a lot of my time.  I do get paid for it and so that's

4  nice.  And I don't think I'd be able to put that much time

5  into it if I didn't get paid for it.  But that is my

6  extracurricular activity.  Being involved in student

7  government is a huge, huge commitment.

8  Q.   And you also take classes, right?

9  A.   Yeah.  So this past semester I took 18 credits and

10 that's actually kind of a hefty load, so that's five

11 classes.  So each day I had at least three classes, two

12 50-minute and at least an hour and 15; except on Fridays,

13 which it was four 50-minute classes.

14 Q.   I didn't mean to interrupt.  You can -- so would it

15 be fair to say that you have a packed week?

16 A.   Yeah.  No, that's very fair, for sure.  It's

17 exhausting at the end of the day, that's for sure.

18 Q.   Okay.  Let's go back to your work as chair of

19 Legislative Affairs Committee.  You mentioned that you

20 worked on SB 295.  Can you describe what that is and the

21 work you did in connection with SB 295?

22 A.   Yeah.  So Senate Bill 295, there were some good

23 things about the bill and there were some not so great

24 things about the bill.  So it states online voter

25 registration, which is great and following sort of the

1  rest of the states that have online voter registrations,

2  like Illinois, yet the proof of residency presents an

3  issue for out-of-state students.

4      In addition to that, special registration deputies

5  were eliminated in the bill and that was an issue because

6  that is the most accessible and convenient way for us, as

7  students, to register other students on campus.

8      And just to, like, tell you, like, the sort of great

9  thing about an example of a great thing about special

10 registration deputies is the fact that in three hours one

11 night we were able to register over 800 students by being

12 special registration deputies and that was only in three

13 hours.  So I can't even imagine, if we had the whole day,

14 how many students we would be able to register.

15 Q.  So let's talk about your work as a special

16 registration deputy.  You're an SRD, if I can call it

17 that, here in Madison, correct?

18 A.  Yeah.

19 Q.  So you were trained by the Madison City Clerk's

20 Office; is that correct?

21 A.  Yeah.

22 Q.  And describe to me your activities as an SRD.

23 A.  So as an SRD you kind of spend your time trying to

24 learn as much as you can about, like, the new laws that

25 exist so that you can educate others.  And you do have

1  out-of-state students coming in that come from different

2  states that have different laws and so trying to tell them

3  what to do and then also in-state students.

4       And then you can't always assume that people have a

5  Wisconsin driver's license.  That's not true.  So telling

6  them all about the acceptable forms of ID, telling them

7  about proof of residency, telling them about what you need

8  to bring when you register to vote, what you need to bring

9  when you're at the polls, those kind of things.

10 Q.   So voter education in addition to voter registration?

11 A.   Yeah.

12 Q.   And you spend time educating students that you

13 interact with about the Voter ID law?

14 A.   Yes, I do spend time with the Voter ID law and the

15 Senate Bill 295, which we talked, about a lot because it

16 was very relevant to students, impacted students.

17 Q.   You mentioned a moment ago that in three hours you

18 and your colleagues registered about 800 students?

19 A.   Yeah.

20 Q.   When was that and can you describe the sort of

21 circumstances surrounding that?

22 A.   Yeah.  So, you know, I would have to look back at my

23 planner when it was, but I know it was for the April 5th

24 primaries.  But so oftentimes students come when there's

25 free food and so we did give free food.  Yeah.  And it's

1  just so true because of, you know, the cost of food.

2  Q.    Right.

3  A.    And so we had free pizza; and that was, like, the

4  number one; and then also, like, register to vote.  And

5  so, like, it was a huge line.  It was, like, out the door,

6  down the elevators.  And you had a lot of people come in.

7  And in that moment you had people -- we had to, like, try

8  to ask people, like, would you be able to volunteer for

9  this if you're an SRD just because we were, like, running

10  out of, like, students to be able to, like, I don't know,

11  man all these stations.

12      And so there was a voter registration table, people

13  to fill out the voter registration, then there was a

14  proof-of-residency table which we pulled up under *Student*

15  *Center*.  And so luckily we had computers out and then some

16  of them died.

17      But, I mean, luckily some students have, like, cell

18  phones they can use, which might take a little while to

19  pull it up.  They go to their *Student Center*.  And if

20  their address doesn't match, like, the address they put on

21  their voter registration form, they have to change that

22  address in there and so that slows down the process a

23  little bit.

24      And then we send them to another table to talk about,

25  like, if you're an out-of-state student, these are the

1  things you need to bring to the polls.  Out-of-state

2  students need to bring proof of enrollment to the polls

3  along with a photo ID, but everyone needs to bring photo

4  ID.  So that's something that we really want to tell them

5  as well so that they can go to Union South at these hours

6  and pick up a valid photo ID and then they get that pizza.

7  Q.    Okay.  And we'll come back to Union South in a moment

8  as well, but I want to focus on the work that you do as an

9  SRD.  So this requires administering the "documentary

10 proof of residence" law, correct?

11 A.    Yes.

12 Q.    So you're familiar with the law that requires

13 everyone to provide some form of documentary proof of

14 their residence?

15 A.    Yeah.

16 Q.    So what have you observed in terms of the impact of

17 that requirement on the students that you serve?

18 A.    I think there was confusion because again you do have

19 a mixture of, like, Wisconsin students who are, like,

20 coming here their first time and not realizing, like, they

21 have to prove where they live.

22      And I know that, like, on my Wisconsin driver's

23 license it doesn't say, like, my own address and so that's

24 why you have to look it up on your *Student Center*.  And

25 they can change it on their *Student Center*, but then also

CARMEN GOSEY - DIRECT

1  there's still also confusion with that and it also slows

2  down the process, too, of trying to get as many people

3  registered to vote as possible.  And so again, yeah,

4  there's a lot of confusion about that.

5  Q.   Would you be able to put a sort of rough estimate on

6  how long it takes to register someone?

7  A.   So -- and if I go back to, like, how we registered,

8  it definitely depends on the person and how prepared they

9  are and how confused they are.  Again, me coming in as an

10 incoming freshman it was very confusing for me.  Probably,

11 like, my first time, like, registering to vote it probably

12 took me, like, 30 minutes.  And I think, like, after that

13 I realized there needs to be advising with this.

14      And so luckily I was involved in student government

15 where, like, people made this, like, a priority to, like,

16 educate people as much as possible where there's, like,

17 advising going on, like, this is the most efficient way to

18 do this, and things like that, and the acceptable, like,

19 materials needed to register and then also at the polls.

20 Q.   Right.  So you mentioned that your driver's license

21 does not reflect your current address; is that correct?

22 A.   Yeah.

23 Q.   And why is that?

24 A.   So because I move quite a bit as a student.

25 Q.   Okay.  And how old is the address that it reflects?

1  A.   So I had that address, like, last summer, so it

2  doesn't even reflect the address that I had even before

3  even this last year of living in the dorms.

4  Q.   Okay.  So you've moved several times --

5  A.   Several times.

6  Q.   -- over the last couple years basically?

7  A.   Yeah.

8  Q.   Would you say that a lot of students are in that

9  situation?

10  A.   Absolutely.  Students move all the time.

11         THE COURT:  Let's just put a number on it; like,

12  once a year?

13         THE WITNESS:  Once a year, oh, yeah, that's fair.

14         THE COURT:  Yeah.  I mean, maybe you might take a

15  summer sublet or something like that?

16         THE WITNESS:  Yeah.  That's what I did.

17         THE COURT:  A typical way is you might live

18  somewhere different every year?

19         THE WITNESS:  Oh, yeah.

20         THE COURT:  Okay.

21  BY MR. MARTIN:

22  Q.   How many times has your address changed since this

23  time last year?

24  A.   Twice.

25  Q.   Twice?

CARMEN GOSEY - DIRECT

1   A.   Yes.

2   Q.   Okay.

3         THE COURT:  How did you end up with two over the

4   course of --

5         THE WITNESS:  So I have lived somewhere -- wait.

6   So this is, like, 2015?  2015, right?

7   BY MR. MARTIN:

8   Q.   From May of 2015 until today.

9   A.   Okay.  So, okay, so, like, I lived in a dorm from --

10  like, in May 2015 I lived in a dorm and then I had a

11  summer sublet -- so that was a different address, but it

12  was in Madison -- and then a different dorm room the fall

13  semester as well.

14  Q.   Right.  Okay.

15  A.   Yeah, so three times.

16  Q.   Got it.  So to stay current you have to update your

17  registration frequently?

18  A.   Yeah.

19  Q.   And you would say your fellow students have to do so

20  as well?

21  A.   Yeah.

22  Q.   Okay.  You mentioned earlier you had a special table

23  for out-of-state students.  Describe a little bit more

24  about the law as it pertains to them, the challenges that

25  you've seen in getting them registered to vote.

CARMEN GOSEY - DIRECT

1  A.   Yeah.  I think, like, some students do not know that

2  they need proof of enrollment.  So we ask them to

3  screenshot their *Student Center* to show that they're

4  involved in classes and that shows that they are a

5  student.  But it is an additional barrier to them

6  considering that, like, Wisconsin students like myself are

7  a bit more privileged in the fact that we don't have to

8  have that proof of enrollment, we don't need the

9  additional materials, that we -- which might be

10 overlooked.

11 Q.   Right.  And you also help interact with new students

12 at the beginning of the school year and help register

13 them, like, at S-O-R (sic), I think it's called?  What

14 does that stand for?

15 A.   Oh, yes, SOAR, freshman orientation.

16 Q.   Okay.  Got it.  And so at that point you're

17 interacting with students who are arriving on campus for

18 the first time, correct?

19 A.   Yeah.

20 Q.   How many of these have voted previously would you

21 say?

22 A.   Not -- almost none.

23 Q.   Almost none.

24 A.   I come across almost none that have voted previously.

25 Q.   So their interaction with you is one of the first

CARMEN GOSEY - DIRECT

1  times in their life that they've engaged with the

2  political or voting process; is that fair?

3  A.    Yeah.

4  Q.    And would you say that those -- how would you

5  describe those students and their awareness of the

6  political process when you meet them?

7  A.    So I think, like, I know for myself, like, I was

8  confused coming in as a freshman.  Again there's a lot of

9  things going on at that time.  And so, like, voting is --

10  because I came in at the time when there was the

11  governor's race going on.

12      And so registering to vote, I was like, what is the

13  most, like, accessible way for me to do this.  And luckily

14  you did have special registration deputies.  But I know

15  the absentee ballot, it took me almost, like, a year and a

16  half to even, like, learn, like, how to do that.  It just

17  wasn't making a whole lot of sense to me.  And I wanted

18  the most, like, accessible, efficient way.

19  Q.    Right.  Okay.  And are students thinking about voting

20  when they interact with you?  Are they seeking you out or

21  are you seeking them out?

22  A.    So, like, the voter registration drives we hold,

23  we're seeking them out.  But some students do seek us out.

24  It's a lot smaller than it is, like, when we're seeking

25  them out when we try to get people out to register to

CARMEN GOSEY - DIRECT

1  vote.

2      Oftentimes I think, like, we do this on again, like,

3  weekdays and, like, times when students might be passing

4  to go get lunch or something.  Like, I don't know if

5  anybody is familiar with East Campus Mall, but that has a

6  huge, like, traffic for students.  And so trying to get as

7  many students up to, like, the Student Activity Center to

8  register to vote is like one of, like, something we've

9  tried to do.  Some students don't have that on their mind

10 because of classes, because of their schedule, trying to

11 eat; all those things.

12 Q.  How many students would you say you personally have

13 registered?

14 A.  I've registered over 100 students for sure.

15 Q.  And are you aware that you cannot become a statewide

16 registration deputy?

17 A.  Yeah.

18 Q.  And if that option were available to you would you

19 use it?

20 A.  Yes.

21 Q.  And where would you go, beyond Madison and the

22 campus, if you could be a statewide special registration

23 deputy?

24 A.  So, like, I do live in Racine, too.  So I think it

25 would be awesome during the summer to be able to register

1  people in Racine.  And then also I think, like, if that

2  existed I would love to register people, like, across the

3  state if, like, I had transportation to do so.  And I

4  would also go probably to lower income communities because

5  they have less accessible ways to register to vote,

6  whether it be transportation or Internet access.

7  Q.   Right.  And would you say that you know people who

8  have faced those difficulties in registering in Racine

9  where you went to high school?

10 A.   So I personally can't say that, like, I've had this

11 conversation with somebody at, like, 17 years old because

12 we weren't legal to vote at that age --

13 Q.   Fair enough.

14 A.   -- so it's, like, we didn't really talk about it.

15 But I can absolutely tell you that when I was a player on

16 the basketball team that there were significant challenges

17 for students to find access to the Internet, but, I mean,

18 our library.  So that was, like, some students used the

19 library.  But, yeah, there wasn't Internet access.

20 Q.   Right.  And you mentioned earlier absentee voting --

21 A.   Yeah.

22 Q.   -- right?  And are you aware that there are two forms

23 of absentee voting in Wisconsin, one you can do in person

24 before Election Day and the other is by mailing in an

25 absentee ballot --

CARMEN GOSEY - DIRECT

1  A.   Right.

2  Q.   -- is that right?  And are you aware that the state

3  currently limits the availability of the in-person option

4  to two weeks before an election?

5  A.   Right.  Okay.

6  Q.   And it also has prohibited early voting in person on

7  weekends?

8  A.   Right.

9  Q.   Based on your experience with the hundreds of

10 students that you've interacted with, would weekend early

11 voting be an attractive option for them?

12 A.   Yeah.  It would be an incredibly attractive option

13 for them given the busy schedules that people have.  Even

14 in my own schedule, like, random things do come up and

15 meetings that I have to absolutely go to.  Again, being

16 available to students as a Grassroots Committee chair is a

17 number-one priority.

18      And so I know that, like, I wasn't able to vote in

19 the February 16th elections.  And so those were the

20 Supreme Court primaries.  And it was, like, it wasn't

21 something that I had planned.  But then looking at my

22 schedule I had, like, back-to-back, like, classes.  And

23 then I had meetings that ended up going longer than I

24 expected and I didn't end up getting to the polls.  So

25 that was something I wasn't planning on happening, but it

CARMEN GOSEY - DIRECT

1  did happen.  And so if I was able to have more time -- I

2  had more time on a Saturday.  If I was able to go that,

3  that would work.

4  Q.   Right.  So describe for me the day of the February

5  primaries that you were unable to vote.

6          THE COURT:  I don't think we need to go into the

7  details.

8          MR. MARTIN:  Fair enough.

9          THE COURT:  We've already established she's a

10 very busy woman, so I appreciate that.  Point made.

11 BY MR. MARTIN:

12 Q.   Got it.  And based on your experience with the

13 students you interact with, do you think some would find

14 themselves in a similar situation?

15 A.   Absolutely.

16 Q.   Yeah.  Now, as we discussed earlier, it's also

17 possible to mail in an absentee ballot, right?

18 A.   Mm-mm.

19 Q.   Do you think that that's an adequate substitute or

20 alternative for something like voting on a weekend?

21 A.   Personally, no.  I think, like, again I'm always

22 looking at what is the most efficient and convenient way

23 given my schedule.  And again, like, it took me a long --

24 like, somebody coming in and not ever, like, knowing the

25 process of registering to vote, you have to first know

CARMEN GOSEY - DIRECT

1  about that process and you have to know where to go to

2  find out that process.  And I'm not even coming from a

3  different state, too, so I can't even imagine an

4  out-of-stater and what they might feel like.

5      And then learning about the process and then learning

6  that there is a time lag between the request and then

7  getting back the ballot is also, like, an issue, too;

8  because not all the time do, like, students check their

9  mailboxes, too; which again, like, might seem like, oh,

10 no, this is something you have to do.  But given the

11 schedule students have, that's not always feasible, too,

12 and so things, like, you just forget.  And it's, like,

13 sort of a process becoming longer and longer and less

14 convenient for students and easily, like, overlooked, too.

15 Q.   Right.  And so would you say that for mailing in an

16 absentee ballot to be feasible the person first has to

17 know about the option, right?

18 A.   Yes.

19 Q.   And then they have to be thinking about it

20 sufficiently in advance of the election to engage with

21 that process?

22 A.   That's absolutely true.  I think, like, I didn't

23 really know about the absentee ballot until, like, coming

24 and being actively involved in vote in the student

25 government.  That is when I learned about it.  And so if

CARMEN GOSEY - DIRECT

1   you're not -- you might not -- you might not be thinking

2   about it unless you have parents that are very educated on

3   these things, which is again an assumption that not

4   everyone can make.

5   Q.   And for the students you interact with, do you get

6   the sense that they're familiar with this option or not?

7   A.   No.  The students that I have interacted with about

8   absentee ballot didn't really know about absentee ballot.

9   Q.   Either mail-in or --

10  A.   They didn't know about mail-in ballot, yeah.

11  Q.   Got it.  Earlier you described some confusion that

12  you yourself had experienced in learning about the

13  absentee ballot process?

14  A.   Yeah.

15  Q.   What was that confusion?

16  A.   I didn't really know what it was.  Like, to me, like,

17  voting is a right.  And so, like, accessibility, to me,

18  was, like, there's going to be somebody that I can go to

19  that's going to register me to vote and then at the time

20  then I'll just go to the polls and vote and then without

21  these additional materials.  But then the absentee ballot,

22  like, it didn't even occur to me that that was an option

23  that I really had.

24  Q.   And are you familiar with the mail-in absentee ballot

25  process now?

CARMEN GOSEY - DIRECT

1  A.   I am now, yeah, and that was, like, currently.

2  Q.   And can you describe very briefly what that is?

3  A.   So, like, from my understanding, the absentee ballot

4  is when you send a request.  So you have an application,

5  you send the application to the City Clerk's Office.  And

6  then there's a time where -- and you can send it by e-mail

7  if you want or by mail, by fax.  And then you can send it

8  back and then you get a ballot back in the mail and then

9  you fill that out and then you send it back to the City

10  Clerk's Office.

11  Q.   Right.  And do you have to attach a photocopy of your

12  ID?

13  A.   Yeah.  So there are additional materials as well, so

14  you have to be knowledgeable of that.

15  Q.   Right.  And you have to obtain a witness signature?

16  A.   You have to obtain a witness signature, which is

17  something that I have overlooked too and I think students

18  that are not, like, educated on this would overlook as

19  well.

20        MR. MARTIN:  Fair enough.  Just a couple more

21  questions, Your Honor.

22        THE COURT:  All right.  Sounds good.

23  BY MR. MARTIN:

24  Q.   You mentioned Union South earlier?

25  A.   Yeah.

CARMEN GOSEY - DIRECT

1  Q.   And is Union South where you can go obtain a student

2  ID compliant with the Voter ID law; is that right?

3  A.   Yeah.

4  Q.   Okay.  And so what did you observe on campus about

5  students obtaining a "Voter ID law compliant" ID in this

6  past April election?

7  A.   Okay.  So there were special hours at Union South for

8  students to go obtain a photo ID that was Voter ID

9  eligible, so that was great.  And again it was again

10  finding -- students have to find time in their schedule to

11  do that.  So students that weren't able to find time in

12  their schedule, there was a machine that was at Gordon

13  Dining Hall that is kind of a central location for food

14  for students.  And there was voting going on there and

15  there was also this machine to print out photo IDs.  But

16  it broke down, so some students were not able to obtain

17  their photo ID there.

18  Q.   And were students having to go attempt to vote then

19  realizing they had the wrong ID and then trying to go into

20  Union South or this other place?

21  A.   So I had not heard of that.  I know that going back

22  to, like, what I was saying about the machine, like, when

23  that broke down, I know that students -- they had to go

24  back to -- they had to go to Union South and then to

25  Gordon Hall to vote.

CARMEN GOSEY - DIRECT

1  Q.   Finally, you mentioned that you and your peers tend

2  to move a lot.  Do you think it would be beneficial to you

3  if each time you moved your new landlord provided you a

4  registration form as part of your lease materials?

5  A.   Yeah, I think that would be very beneficial.  I think

6  students would find that to be way more accessible and

7  something that, like, they don't have to go search for

8  when you may not know where to get it from because they're

9  new to campus and they have other things on their mind or

10 they just aren't thinking about it until it, like, comes

11 to the last minute, which, I mean, again if you have a lot

12 of time on your hands it might be something, like, common

13 sense, but again to students who are incoming freshman

14 it's not.  And so I absolutely believe that would be more

15 feasible and accessible for students.

16          MR. MARTIN:  That's all I have.

17          THE COURT:  Just a couple of clarifications

18 before the I turn you over to your cross-examination.  But

19 first, just in terms of the scheduling, I don't know who's

20 got the cross here.

21          MS. SCHMELZER:  I do, Judge.

22          THE COURT:  How long do you anticipate your

23 cross-examination going?

24          MS. SCHMELZER:  15, 20 minutes.

25          THE COURT:  Why don't we pick up the cross

CARMEN GOSEY - DIRECT

1  tomorrow then.  You're here in Madison, right?

2          THE WITNESS:  Yep, only for tomorrow.

3          THE COURT:  Only for tomorrow?

4          THE WITNESS:  Yeah.

5          THE COURT:  Then you're going somewhere else?

6          THE WITNESS:  Yeah.  I'm going to Racine.

7          THE COURT:  I'm glad you're here tomorrow so we

8  can take half an hour of your life tomorrow morning

9  starting at eight.  Before you go tonight, while I've got

10 my thoughts in mind, I think you made several references

11 to the *Student Center*.  That's an area on the University

12 of Wisconsin website where you can get your personal

13 information about your account and your relationship with

14 the University; is that right?

15         THE WITNESS:  Okay.  So the *Student Center* --

16 yes, okay -- so the *Student Center* is on *My UW*, which is,

17 yeah, your personal account.  And they kind of did a new

18 weird design with it, so that was confusing to students.

19 But, yes, that is --

20         THE COURT:  That's what it is.

21         THE WITNESS:  Yeah.

22         THE COURT:  And then is it an acceptable form of

23 documentation of your residency --

24         THE WITNESS:  Yeah.

25         THE COURT:  -- to do a screen capture of your

1  account information on the *Student Center*?

2        THE WITNESS:  Yeah.  I mean, usually, like, when

3  we're registering students to vote, they don't have it,

4  like, screenshotted.  But we pull it up on the laptop and

5  then we verify their address and make sure it's their

6  current address that they're living at right now.  And so,

7  yeah, that counts.

8        THE COURT:  So you don't need to get it mailed to

9  you or anything; you can just do a screenshot of it right

10  there and then that's what you can use to verify your

11  residence for voter registration?

12        THE WITNESS:  Yeah.

13        THE COURT:  And you can update it online, more or

14  less, live; is that right?

15        THE WITNESS:  Yeah.

16        THE COURT:  Okay.  All right.  Good.  Let's call

17  it a day.  We will start with Ms. Gosey right at eight

18  o'clock.  Before we adjourn, let me just give you a

19  heads-up on our calendar for tomorrow.

20      We'll start at eight and we'll go to six as per

21  usual.  But during the middle of the day I have two

22  proceedings that I have to take care of at 11 and 11:30.

23  So we will take our lunch break from 11 to 12:30 on

24  Tuesday, tomorrow.  And then because that's a little bit

25  early for lunch, we'll try to build in two shorter

1   afternoon breaks so we don't have to make it a real

2   endurance contest.  If we can make it all the way to

3   eleven o'clock without a break that would be great.  But

4   sometimes doing that in the morning is cruel and unusual

5   punishment.  We'll play that one by ear.

6       But, anyway, that's our overall schedule for

7   tomorrow.  We'll see you all tomorrow at eight.

8         MR. SPIVA:  Thank you, Your Honor.

9         MS. WILSON:  Thank you.

10     (Adjourned at 6:10 p.m.)

11                      ***

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I, CHERYL A. SEEMAN, Certified Realtime and Merit

2  Reporter, in and for the State of Wisconsin, certify that

3  the foregoing is a true and accurate record of the

4  proceedings held on the 16th day of May, 2016, before the

5  Honorable James D. Peterson, of the Western District of

6  Wisconsin, in my presence and reduced to writing in

7  accordance with my stenographic notes made at said time

8  and place.

9  Dated this 7th day of June, 2016.

15                    /s/
    _____

16                    Cheryl A. Seeman, RMR, CRR
                    Federal Court Reporter

23  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means unless
24  under the direct control and/or direction of the
    certifying reporter