IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ONE WISCONSIN INSTITUTE, INC.,
CITIZEN ACTION OF WISCONSIN EDUCATION
FUND, INC., RENEE M.
GAGNER, ANITA JOHNSON,
CODY R. NELSON, JENNIFER S. TASSE,
SCOTT T. TRINDL, MICHAEL R. WILDER,
JOHNNY M. RANDLE, DAVID WALKER
DAVID APONTE, and CASSANDRA M.
SILAS,

                Plaintiffs,

    v.                                          15-cv-324-jdp

MARK L. THOMSEN, ANN S. JACOBS,
BEVERLY R. GILL, JULIE M. GLANCEY,
STEVE KING, DON M. MILLS, MICHAEL
HAAS, MARK GOTTLIEB, and
KRISTINA BOARDMAN,
*all in their official capacities,*

                Defendants.

---

JUSTIN LUFT, et al.,
        on behalf of themselves and all others similarly
        situated,

                Plaintiffs,

    v.                                          20-cv-768-jdp

TONY EVERS, et al.,

                Defendants.

---

## *LUFT* PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................ 5

I.    Wisconsin's ID Petition Process ................................................................ 5

    A.    The Operation Of The IDPP ......................................................... 5

        1.    CAFU's IDPP Adjudication Process ....................................... 8

            a.    IDPP Adjudication Can Take Months Or Even Years ................ 8

            b.    IDPP Adjudication Can Require Multiple Trips To The DMV ................ 10

        2.    Voters Can Stall Indefinitely In IDPP ................................... 11

        3.    Limited Utility Of The Name Change Affidavit ...................... 12

            a.    Name Change Affidavit Requires A Birth Record ..................... 13

            b.    No Affidavit Option For Non-Name Mismatches ...................... 14

II.    Wisconsin's Voter Outreach And Public Education About IDPP ................. 16

    A.    Wisconsin's Historical Lack Of Outreach And Education About IDPP ............ 16

    B.    WEC's Current Outreach And Education Plans ................................. 19

    C.    DMV's Current Outreach And Education Plans................................. 24

ARGUMENT ................................................................................................. 25

I.    Legal Standard ....................................................................................... 25

II.    Plaintiffs Are Likely To Prevail On The Merits ......................................... 25

    A.    IDPP Procedures Unreasonably Burden The Right To Vote .............. 26

    B.    Reforms Are Necessary To Cure The IDPP ..................................... 30

III.    Defendants' Refusal To Provide Public Education About IDPP Undermines IDPP's Function As A "Constitutionally-Required" Safety Net ..................... 32

    A.    WEC Has Not Engaged In Meaningful Public Education Regarding IDPP........ 33

    B.    DMV Has Not Engaged In Meaningful Public Education Regarding IDPP ....... 35

    C.    The "Constitutionally Required" IDPP Safety Net Is Meaningless Unless Voters Know About The Option And How To Avail Of It ................................ 36

    D.    There Is No Acceptable Justification For Defendants' Failure To Provide Meaningful Public Education Regarding IDPP .................................. 38

IV.    Plaintiffs Are Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief.............................................................................................. 39

**TABLE OF CONTENTS**
(continued)

**Page**

V.      The Balance Of Equities Tips In Plaintiffs' Favor ........................................................... 40

VI.     An Injunction Is In The Public Interest.............................................................................. 41

CONCLUSION........................................................................................................................... 41

## TABLE OF AUTHORITIES

CASES

*Briscoe v. Kusper*,
  435 F.2d 1046 (7th Cir. 1970) .........................................................................33, 34

*D.U. v. Rhoades*,
  825 F.3d 331 (7th Cir. 2016) ...................................................................................25

*Frank v. Walker*,
  196 F. Supp. 3d 893 (E.D. Wis. 2016), *aff'd in part sub nom.*, *Luft v. Evers*,
  963 F.3d 665 (7th Cir. 2020) ..................................................................................34

*Frank v. Walker*,
  768 F.3d 744 (7th Cir. 2014) ...................................................................................32

*Frank v. Walker*,
  819 F.3d 384 (7th Cir. 2016) ............................................................................26, 27

*Frank v. Walker*,
  835 F.3d 649 (7th Cir. 2016) ...................................................................................18

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
  549 F.3d 1079 (7th Cir. 2008) ...........................................................................40, 41

*Greater Birmingham Ministries v. Merrill*,
  284 F. Supp. 3d 1253 (N.D. Ala. 2018), *aff'd sub nom. Greater Birmingham
  Ministries v. Sec'y of State for Alabama*, 966 F.3d 1202 (11th Cir. 2020)............................39

*Holbrook v. Pitt*,
  643 F.2d 1261 (7th Cir. 1981) .................................................................................32

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*,
  582 F.3d 721 (7th Cir. 2009) ...................................................................................40

*Jones v. Gov. of Fla.*,
  950 F.3d 795 (11th Cir. 2020) .................................................................................41

*Judge v. Quinn*,
  612 F.3d 537 (7th Cir. 2010), *amended on other grounds*, 387 Fed. App'x 629
  (7th Cir. 2010)..........................................................................................................25

*League of Women Voters v. North Carolina*,
  769 F. 3d 224 (4th Cir. 2014) .................................................................................39

*Lee v. Virginia State Bd. of Elections*,
  188 F. Supp. 3d 577 (E.D. Va.), *aff'd*, 843 F.3d 592 (4th Cir. 2016)......................39

*Luft v. Evers,*
   963 F.3d 665 (7th Cir. 2020) ........................................................................ *passim*

*Michigan State A. Phillip Randolph Inst. v. Johnson,*
   833 F.3d 656 (6th Cir. 2016) ....................................................................39

*Michigan v. U.S. Army Corps of Engineers,*
   667 F.3d 765 (7th Cir. 2011) ....................................................................25

*Milwaukee Branch of NAACP v. Walker,*
   2014 WI 98, 357 Wis. 2d 469, 851 N.W.2d 262 ....................................32

*N. Carolina State Conference of the NAACP v. McCrory,*
   182 F. Supp. 3d 320 (M.D.N.C.), *rev'd and remanded on other grounds sub*
   *nom. N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th
   Cir. 2016) ................................................................................................39

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012) ...................................................... *passim*

*Quern v. Jordan,*
   440 U.S. 332 (1979)..................................................................................32

*Raetzel v. Parks/Bellemont Absentee Elections Bd.,*
   762 F.Supp. 1354 (D. Ariz. 1990) ..........................................................33

*Tashjian v. Republican Party of Conn.,*
   479 U.S. 208 (1986)..................................................................................38

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)......................................................................................40

*Youakim v. McDonald,*
   71 F.3d 1274 (7th Cir. 1995) ...................................................................33

## STATUTES

Wis. Stat. § 7.08(12) ...........................................................................34, 35

Wis. Stat. § 85.013(1) ................................................................................32

Wis. Stat. § 227.52 ....................................................................................28

Wis. Stat. § 227.53....................................................................................28

Wis. Stat. § 343.165(8) ...................................................................... *passim*

Wis. Stat. § 343.50(1)(c)..............................................................................5

## OTHER AUTHORITIES

COVID-19 INFORMATION FOR WISCONSIN PUBLIC LIBRARIES, WISC. DEP'T OF
    PUBLIC INSTRUCTION, https://tinyurl.com/y2vhb74w ...........................................21

FREQUENTLY ASKED QUESTIONS, SSA, https://faq.ssa.gov/en-us/Topic/article/KA-
    01981.................................................................................................................15, 16

DIRECTORY OF WISCONSIN MUNICIPAL CLERKS, available at
    https://elections.wi.gov/clerks/directory ........................................................23

MATTHEW DEFOUR, Legislature's budget committee approves $250,000 FOR
    VOTER ID EDUCATION, WISCONSIN STATE JOURNAL (Jun. 14, 2016), available
    at https://madison.com/wsj/news/local/govt-and-politics/legislatures-budget-
    committee-approves-250-000-for-voter-id-education/article_45de9619-d69e-
    528b-84ed-3590a5c1b338.html ................................................................. 17-18

WEC WEBSITE, STATE OF WISCONSIN MAILS POSTCARDS TO ELIGIBLE BUT
    UNREGISTERED RESIDENTS (Jun. 25, 2020), available at
    https://elections.wi.gov/node/6940 ................................................................22

# INTRODUCTION[1]

As this Court, the Seventh Circuit, and the Wisconsin Supreme Court have held, Wisconsin's ID Petition Process ("IDPP") is a "constitutionally required safety net" without which Wisconsin cannot maintain its strict voter ID law. *One Wisconsin Inst., Inc. v. Thomsen* ("*OWI*"), No. 15-cv-324, Dkt. 234, at 23 (W.D. Wis. July 29, 2016). The mere existence of IDPP is, of course, insufficient. Instead, the Constitution demands that IDPP be a "*well-functioning* safety net." *Id.* at 4 (emphasis added). The State has yet to meet this demand.

Indeed, despite this Court's previous finding that IDPP was "pretty much a disaster," *id.*, its ills remain uncured. Specifically, the State has reneged on its "promise[] to provide photo ID to anyone who, 'more likely than not,'" establishes eligibility. *Luft v. Evers*, 963 F.3d 665, 679 (7th Cir. 2020) (quoting Wis. Stat. § 343.165(8)(h) and Wis. Admin. Reg. CR 16-040 § 10). Instead, throughout IDPP, the State employs a far more stringent standard than the "more likely than not" standard, forcing numerous eligible voters to sustain a back-and-forth exchange with the DMV, even when the voters have made reasonable efforts to obtain all available information—a purgatory that this Court found to be unconstitutional more than four years ago. *OWI*, Dkt. 255, at 7 (Aug. 11, 2016 Order). This happens even when the Social Security Administration ("SSA") has already verified the name, date of birth, and other documentation from the voter.

To ensure there is a "well-functioning" safety net, the State must—at minimum—provide meaningful public education as to the *existence* of IDPP. The State has not complied with this fundamental obligation. Wisconsin has dedicated virtually no resources to public education,

---

[1] Pursuant to the protective orders in this case, this brief and certain exhibits are being filed under seal as they contain confidential information. *Luft v. Evers*, No. 20-cv-768, Dkts. 75, 152, 269 (W.D. Wis.). A redacted version of this brief is being served on Defendants' counsel to provide counsel the opportunity to request any additional redactions. Plaintiffs plan to publicly file the redacted brief.

including almost none regarding the IDPP option and the basic procedure to successfully navigate IDPP.  Instead, the State relies on one-off interactions with individual voters at the DMV, online postings, and third-party groups to inform voters of the IDPP option.

Plaintiffs therefore seek a preliminary injunction directed at two critical problems with IDPP in advance of the November 3, 2020 election.  **First,** this Court should order the DMV and WEC Defendants to remove the unduly burdensome hurdles within IDPP.  **Second,** this Court should order Defendants to meaningfully publicize the IDPP to voters prior to the November election.  Specifically, this Court should order Defendants to:

1. Issue a voter ID card that is valid for 8 years ("Hard Card") to any voter who has (i) had their name, date of birth, and social security number verified through the Social Security Online Verification System ("SSOLV"); (ii) submitted proof of Wisconsin residency; and (iii) sworn under penalty of perjury that they are a U.S. citizen.

2. Issue a Hard Card by the time the initial Temporary Receipt expires to any voter who has complied with *reasonable* requests for information, unless the DMV has a genuine reason to suspect that the voter is ineligible.  The absence of documentation does not itself constitute such a reason.

3. Permit voters to use affidavits—akin to the common law name change affidavit— to resolve other issues in a voter's background documents (*e.g.*, birth date discrepancies, mismatches between current name and name in voter's SSA record, and missing information regarding birth details) unless the DMV has a genuine reason to suspect that the voter is ineligible.  The absence of documentation does not itself constitute such a reason.

2

4.    Inquire whether a voter knows of any potential name discrepancy issues at the time the IDPP application is submitted and permit voters to use a common law name change affidavit at that time.

5.    Establish a process that provides notice and a hearing before a neutral decision maker to voters denied Temporary Receipts[2] or Hard Cards by the DMV due to (1) claims of ineligibility, fraud, or any other reason or (2) the DMV's failure to resolve their IDPP petition within 180 days.

6.    Send a targeted mailing no later than October 6, 2020, to all registered voters without a Wisconsin driver's license or ID informing them of the ID requirement and the IDPP system.

7.    Include the following language:  "Need an ID for voting?  Through the DMV's ID petition process, you can get a free ID even if you don't have documents like a birth certificate" on (i) any future mailing or publication that mentions the voter ID requirement, (ii) all relevant websites that mention the voter ID requirement, and (iii) all DMV and/or WEC hotlines.

8.    Ensure that IDPP information (such as the Palm Card[3]) is posted at all municipal clerk's offices, on all municipal clerk's websites, and at all early voting sites and polling places, and is provided along with provisional ballot instructions to any voter who is offered a provisional ballot.

---

[2]    "Temporary Receipt" is the receipt that the DMV mails to a petitioner for use when voting before they have been determined eligible to be granted a Hard Card.  *See, e.g.*, Rotker Decl, Ex, 1 (Temporary Receipt).

[3]    The "Palm Card" is a one-page handout created by WEC that explains the IDPP.

9.     Amend the Form MV3012, the Temporary Receipt, the Takeaway Document,[4] and the Palm Card to conspicuously explain: (i) that a voter must remain in contact with DMV for a specified time to continue receiving Temporary Receipts, (ii) that if the voter loses contact and the petition is cancelled or denied, the voter may reinstate the petition and receive a Temporary Receipt by contacting the DMV and (iii) that the voter has rights to a hearing, as noted above; and

10.    Comply with following elements of the IDPP information plan based upon the type of relief that the Court ordered in October 2016[5]:

   a)     Offer the Palm Card—in digital and printed format and in Spanish and English—to all organizations identified in the October 21, 2016 Joint Status Report, to organizations identified in footnote 21, to state public assistance agencies, and to state agencies serving low income and homeless persons;

   b)     Personally contact and offer to meet, train, and discuss outreach and IDPP with all organizations identified in the preceding paragraph, as well as organizations identified in the Joint Status Report of October 21, 2016, no later than the week of October 12, 2020;

   c)     Ensure that both Spanish and English versions of the Palm Card are conspicuously posted in all DMV offices and on any DMV web page related

---

[4]     The "Takeaway Document" is a document the DMV hands a voter when they have submitted an application through IDPP.

[5]     *OWI*, Dkt. 304 (Oct. 21, 2016 Joint Phase II Report); *OWI*, Dkt. 305 (Oct. 24, 2016 Order) (ordering DMV and WEC to implement the agreed-upon measures set out in Section I of the Joint Phase II Report); *OWI*, Dkt. 306 (Oct. 26, 2016 Order).

to ID and IDPP, and that a copy of the Palm Card is given to any voter seeking an ID card at a DMV office; and

d)    Comply with all elements of the IDPP information plan WEC has already established for this fall and ensure that IDPP information provided as any part of media availability or outreach is also offered to media serving minority communities.

The requested injunction is the only way to ensure that all Wisconsin voters may access the right to vote free from undue burdens that both this Court and the Seventh Circuit have previously recognized as being unconstitutional.[6]

## FACTUAL BACKGROUND[7]

### I.    Wisconsin's ID Petition Process

#### A.    The Operation Of The IDPP

A voter may obtain a free ID for voting at the DMV.  If the voter completes an application for a free ID card and produces the necessary documentation to prove the six items required by Wis. Adm. Code § Trans 102.15(2),[8] the DMV will issue the voter an ID.  Voters who lack the documents required to receive an eight-year photo ID for voting ("Hard Card") may petition the State for assistance and a Temporary Receipt through IDPP.  Wis. Stat. §§ 343.165(8),

---

[6]      Plaintiffs also join and adopt the legal arguments and relief requested in the *One Wisconsin* plaintiffs' motion for a preliminary injunction and brief in support thereof.

[7]      Yesterday afternoon, Defendants' counsel informed Plaintiffs' counsel that Defendants were producing additional potentially responsive documents that appear to include CSV and Excel files.  Due to the eleventh-hour nature of the production, Plaintiffs' counsel has not been able to review and analyze the documents.  Accordingly, Plaintiffs reserve their right to discuss these documents in their opposition to Defendants' cross motion, if any, and request that they be permitted to discuss such documents in their reply in support of the instant motion.

[8]      These include name, date of birth, citizenship status, identity, residence, and social security number Wis. Adm. Code § Trans 102.15.

343.50(1)(c); *see also OWI*, Dkt. 351, ¶ 9 (Declaration of Kristina Boardman ("Boardman Decl.")). Between IDPP's inception in 2014 and June 30, 2020, 12,355 IDPP applications have been submitted, amounting to 4.82% of first-time ID applications in Wisconsin. *Frank v. Walker*, 11-cv-1128, Dkt. 229 ¶ 7 (E.D. Wis. 2015) ("*Frank*") (2015 Boardman Decl.); Rotker Decl. Ex. 3 (Monthly ID Petition Record Process Report); *OWI,* Dkt. 384, at 17:14-25 (Deposition of Susan Schilz ("Schilz Dep.")).  In response to the initiation of an IDPP application, the DMV mails the petitioner a Temporary Receipt that is valid for only sixty days.  *OWI*, Dkt. 351, ¶ 6 (Boardman Decl.); *OWI*, Dkt. 384, at 58:4-14 (Schilz Dep.).  Submitting an IDPP application does not mean the customer will get a Hard Card, which is valid for eight years; it is merely the "first step towards having an ID card issued."  Rotker Decl. Ex. 4, at 2-3 (IDPP Training Module).

In practice, the IDPP has largely stayed the same since 2016.  To avail herself of the IDPP, a voter must travel in person to a DMV service center, fill out the application for a free state ID card (Form MV3004), and also complete a petition (Form MV3012). Rotker Decl. Ex. 5, at 3 (IDPP Manual).  Both of these forms require voters to swear to their name, date of birth, residence, and citizenship under penalty of perjury, and the MV3004 also requires attestation as to the social security number.  Rotker Decl. Ex. 6 (Form MV3004); Rotker Decl. Ex. 7 (Form MV3012).  With these forms, many if not most voters also submit other verification documents, such as their Social Security Card, an out-of-state driver's license, or other IDs issued by state or federal government entities.  *E.g.*, Declaration of Selby P. Brown (Sept. 18, 2020) ("Brown Decl.") Ex. 1, at 1 ███████████████ ID card); Brown Decl. Ex. 2, at 1 █████████(Valid █████ ID card, government issued correspondence); Brown Decl. Ex. 3, at 1 ████████ (Medicare ID cards, Social Security Card).  Using this information, the DMV will often verify the voter's name, date of birth, and Social Security number through the SSOLV on or near the date the petition is

filed.  *See, e.g.*, Brown Decl. Ex. 4, at 1 ███████████; Brown Decl. Ex. 5, at 1 ███████████;

Brown Decl. Ex. 6, at 1 ████████.  In other words, on the application date, the DMV often

has in hand at least (1) the voter's sworn statement regarding name, date of birth, U.S. citizenship

and Wisconsin residency and (2) the SSA's confirmation of that voter's name, date of birth, and

social security number.

Nevertheless, the IDPP process demands additional verification even from those voters, in

particular, typically, a birth record.  But before the DMV will even begin to look for a missing

birth record, it must deem the IDPP application complete, meaning it must include proof of "all

basic [Social Security], residency, and identity information."  *OWI*, Dkt. 351, ¶ 9 (Boardman

Decl.); *OWI*, Dkt. 384, at 22:20-23:3 (Schilz Dep.); Brown Decl. Ex. 7, at 1 ███████████

(sending "letter to customer requesting proof of residency").   After the DMV decides the

application is complete, the DMV "transmits the birth details to the Wisconsin Vital Records

Office of the Department of Health Services ['DHS'] for electronic verification of the state of

birth."  *OWI*, Dkt. 351, ¶ 9 (Boardman Decl.).  DHS then attempts to verify the petitioner's

information by finding his or her birth certificate through contact with public agencies.  *Id.*; *OWI*,

Dkt. 384, at 83:22-84:4 (Schilz Dep.); Rotker Decl. Ex. 5, at 2 (IDPP Manual).  If DHS is

successful, the DMV will mail a Hard Card to the petitioner's address.  *OWI*, Dkt. 351, ¶ 9

(Boardman Decl.).  According to the DMV, for approximately 80% of IDPP petitioners, DHS is

able to verify that "vital records on file in Wisconsin and other states substantiate a petitioner's

qualifications to obtain a free voter ID."  Rotker Decl. Ex. 5, at 2 (IDPP Manual); *OWI*, Dkt. 384,

at 32:7-9 (Schilz Dep.).

But if DHS is unsuccessful, which happens approximately 20% of the time, the petition

process continues.  *OWI*, Dkt. 351, ¶ 10 (Boardman Decl.); *OWI*, Dkt. 384, at 32:7-9, 83:22-84:4

(Schilz Dep.).  At this point, the petition is referred to the DMV's Compliance, Audit and Fraud Unit ("CAFU").  *OWI*, Dkt. 351, ¶ 10 (Boardman Decl.).  As was the case in 2016, this stage of the process remains a "complicated" endeavor for CAFU that "required interaction between various divisions of the DMV, the Wisconsin [DHS], and agencies of other states."  *OWI*, Dkt. 234, at 24 (July 29, 2016 Order); *see, e.g.*, Rotker Decl. Ex. 5, at 30-31, 35, 40 (IDPP Manual).  Just as in 2016, once the petition reaches CAFU, DMV assigns an investigator to the case.  Rotker Decl. Ex. 5, at 28-29 (IDPP Manual).  CAFU has seven investigators, also called adjudicators, none of whom work exclusively on the IDPP.  *OWI*, Dkt. 384, at 18:14-19 (Schilz Dep.).

1. **CAFU's IDPP Adjudication Process**

a. **IDPP Adjudication Can Take Months Or Even Years**

When searching for a birth record, the investigator looks at "[a]nything and everything[,] . . . looking for all of the secondary documents that are listed on the Department of State's website, . . . contacting various state offices [and] government offices."  *OWI*, Dkt. 384, at 87:2-19 (Schilz Dep.).  This process can take months or even years, and "there are many [voters] who have been in for a very long time."  *Id.* at 121:15-25.  The DMV has no time limit by which a decision must be made, and the IDPP process "could go on indefinitely."  *See id.* at 121:4-14.

Take ▮▮▮▮▮▮▮, for example.  DMV verified his name, date of birth and SSN through SSOLV on the very day he applied.  Brown Decl. Ex. 8, at 1 ▮▮▮▮▮▮▮.  Yet CAFU spent more than two years and had a dozen contacts with Mr. ▮▮▮▮ his partner, and his daughter, only to ultimately issue a Hard Card based on "the very same name and DOB that was presented in ▮▮▮▮" when he applied.  *Id.*, at 12 ▮▮▮▮▮▮▮.  Similarly, ▮▮▮▮▮▮▮ presented an expired but otherwise valid U.S. passport and was promptly verified in SSOLV, but CAFU would not issue a Hard Card until it finally requested and obtained additional citizenship verification from ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ a year later.  Brown Decl. Ex. 9, at 3 ▮▮▮▮▮▮▮.  Likewise, CAFU verified

the information of ██████████ through SSOLV on the day she applied.  Brown Decl. Ex. 16, at 1-2 ██████████.  Over the course of the next year, she provided information to CAFU regarding her adoption and school history on six separate occasions before the DMV finally allowed her to sign a Name Change Affidavit.  *Id.* at 1-5.

The fact that the IDPP process can take months or longer may also result in loss of contact with voters, at the expense of the voter's voting credential.  *See OWI*, Dkt. 384, at 65:20-22, 100:10-101:9 (Schilz Dep.).  The DMV sends Temporary Receipts only so long as the voter maintains contact with the DMV.  *OWI*, Dkt. 351, ¶ 12 (Boardman Decl.); *OWI*, Dkt. 384, at 65:20-22, 94:3-9 (Schilz Dep.).  But CAFU can lose contact with voters for a variety of reasons, including the fact that voters encounter difficult circumstances, such as becoming homeless after they have initiated the IDPP.  *OWI*, Dkt. 384, at 100:10-101:3 (Schilz Dep.); *see, e.g.*, Brown Decl. Ex. 10, at 2 ██████████ (reflecting that a voter eventually fell out of contact with the DMV after listing his contact phone as the phone number for an agency serving homeless people and others in crisis[9]); Brown Decl. Ex. 11, at 3 ██████████ (reflecting the voter was likely homeless or marginally housed, as he listed no phone number and listed his address as a public assistance office[10]); Brown Decl. Ex. 12, at 2-3 ██████████ (reflecting the voter appears to have had a "general delivery" mail address in ██████, fell out of contact with DMV, and stopped getting IDPP receipts to vote).  If the DMV is unable to reach the voter for thirty days, the DMV moves the voter to "suspend" status.  Rotker Decl. Ex. 5, at 46 (IDPP Manual); *OWI*, Dkt. 384, at 119:8-

---

[9]     Specifically, the voter listed the number ██████████.  *See* ██████████ ██████████ (last visited Sept. 16, 2020).

[10]     The address he listed was ██████████ which is the address for the Milwaukee County Department of Health and Human Services.  Wis. Dep't of Health Servs., https://www.dhs.wisconsin.gov/agency/milwaukee-county-department-health-human-services (last accessed Sept. 16, 2020).

19 (Schilz Dep.).  Thereafter, if the DMV fails to make contact in 180 days, the DMV puts the voter in "denial" status.  *OWI*, Dkt. 351, ¶ 14 (Boardman Decl.).  The DMV does not send new Temporary Receipts to voters in denial status—even if the voter has cooperated with the DMV to provide all available documentation and information the voter has.  *See OWI*, Dkt. 384, at 65:20-22, 94:3-9 (Schilz Dep.).

### b.    *IDPP Adjudication Can Require Multiple Trips To The DMV*

As part of IDPP, the DMV has also required voters to return to the DMV to bring documents in person or to sign certain documents.  This is not always a simple task.  ███████, for example, was told she had to return to DMV with a proof of identity document—while she was in a nursing home.  Brown Decl. Ex. 13, at 1-2 ████████.  ██████████ who was homeless, ███████████ who was ██ years old, had to go the DMV in person to sign common law name change affidavit ("Name Change Affidavit").  Brown Decl. Ex. 2, at 5-6 █████████; Brown Decl. Ex. 14, at 5 ████████████.  ███████████ was forced to make three in-person trips to the DMV—first to apply, second because DMV had neglected to scan his documents, and third to sign the Name Change Affidavit.  Brown Decl. Ex. 4, at 1, 3, 5 ████████████.  ███████ ████████ had to go to DMV four times: to apply, to provide documents, to get a Name Change Affidavit that DMV wrongly told her she had to bring back with additional documents that she did not have, and to sign the Name Change Affidavit.  Brown Decl. Ex. 1, at 1, 4, 5 ███████████.

The ongoing COVID-19 pandemic has made in-person interactions more complicated and burdensome.  And although the DMV now states that it will allow some electronic rather than in-person exchanges of documents, Rotker Decl. Ex. 5, at 32-33, 41 (IDPP Manual); *OWI*, Dkt. 384, at 95:1-15 (Schilz Dep.), it is unclear how that process will work and whether or how it will benefit the many voters who lack digital access.

## 2. Voters Can Stall Indefinitely In IDPP

As noted above, even for voters who have proven Wisconsin residency, sworn to their citizenship under penalty of perjury, and had their name, date of birth, and social security numbers (*i.e.,* their identities) confirmed by the SSA, the DMV requires additional documentation. But for some voters, birth records or other documentation simply may not exist or they may have no knowledge of such secondary information, and these voters will, under DMV's processes, *never* get a Hard Card or get one only after many months or even *years* in the system. *See, e.g.*, Brown Decl. Ex. 12, at 2-3 ███████; Brown Decl. Ex. 8, at 12 ███████; Brown Decl. Ex. 3, at 3 ██████; *OWI*, Dkt. 384, at 121:4-14 (Schilz Dep.) (stating that the IDPP process "could go on indefinitely").

Unsurprisingly, some voters eventually stop engaging in the futile back and forth with CAFU and the DMV—which leads to their no longer receiving Temporary Receipts, and thus denial of their right to vote—even if they have no more information to give. For example, voter ████████, an elderly woman, produced an ████ ID card, and her name, date of birth, and SSN were verified through SSOLV the very day she applied in ███. Brown Decl. Ex. 15, at 1 ███████. She was born in the early twentieth century, at home, in ████████, and had no birth records.[11]  *Id.*  As a result, she provided the information she had about her birth name and her parents' names but still received only Temporary Receipts.  *Id.* at 2.  She ultimately lost contact with the DMV, and CAFU's record states that if she were to contact DMV again, "we will need an alternate first name," and "we may also need additional documents for proof of name and date

---

[11]     It is not uncommon for voters born in southern states before the 1950s to lack birth records—and that constitutes a significant percentage of Wisconsin's elderly Black residents. *See*, *Frank v. Wisconsin*, 11-cv-1128, Dkt. 280-75 (E.D. Wis. June 10, 2016) ("Documenting Identity of Over 65 African Americans in Wisconsin," by Prof. Margo Anderson).

of birth," even though that information had been verified almost two years earlier on SSOLV.  *Id.*
at 2.

Similarly, CAFU verified ███████████'s name, date of birth, and Social Security number
on SSOLV at the time of his application in ███.  Brown Decl. Ex. 5, at 1 ████████████.  He
subsequently went into a nursing home but nevertheless provided additional information; CAFU,
however, deemed that inadequate.  *Id.* at 2.  Accordingly, he received only Temporary Receipts,
and a ███ notation in his record states that "if voter contacts DMV we need secondary
documents."  *Id.* at 5.

████████████ was born in ████████, a state that refuses to verify records for Wisconsin.
Brown Decl. Ex. 12, at 1 ████████████.  He produced a Social Security Card and Wisconsin
vehicle title and registration when he applied, and was verified through SSOLV that day.  *Id.*
About two months later, he gave the DMV information that it had requested about an expired out-
of-state license and about his parents, and told DMV that this was all the information he had and
that he had no other documents.  *Id.*  But he appears to have had unstable housing, and lost contact
with the DMV.  *Id.*  Despite the fact that he had no more documents to provide, his record states
"[b]ecause DHS no longer verifies for the state of ████████, additional documentation from the
customer will be needed for extraordinary proof."  *Id.* at 4.

### 3. *Limited Utility Of The Name Change Affidavit*

Although the State asserts that the Name Change Affidavit has "short-circuited" delays in
the process, *Luft*, 963 F.3d at 680, that is not necessarily the case.  The DMV will consider a Name
Change Affidavit only if (i) CAFU finds what it deems to be an adequate birth record *and* (ii) the
only problem is a discrepancy between the name or spelling the voter uses and what is on such

documents.[12]   *OWI*, Dkt. 384, at 35:24-36:7, 80:10-18 (Schilz Dep.).   DMV requires this affidavit—which has, at least until recently, always required voters to make another trip to DMV—even if the voter's name matches their Social Security record, and there are other reliable indicia connecting the voter to their birth record.   *OWI*, Dkt. 384, at 41:14-43:7 (Schilz Dep.).

### a.   *Name Change Affidavit Requires A Birth Record*

The Name Change Affidavit is not a silver bullet, even for voters with name discrepancies. Although some voters may be aware of name changes or document mismatches at the time of application, the DMV does not inquire up front as to whether the voter is aware of potential discrepancies—such as those due to spelling errors, adoption, other name changes, or marriage. *See OWI*, Dkt. 384, at 80:10-24 (Schilz Dep.).[13]   Instead, the DMV does not even consider the issue until after CAFU has found a birth record.   *Id.* at 80:10-18.   The DMV then can spend months or longer adjudicating the file, rather than accepting a sworn statement as to the name the voter uses early in the process.   *See*, *e.g.*, Brown Decl. Ex. 6, at 1-2, 6 ▮▮▮▮▮▮▮.   During this time, the voter must maintain frequent contact with DMV—even if the voter has no information to give—or be denied future Temporary Receipts and thereby lose her right to vote.

For example, ▮▮▮▮▮▮▮, an elderly, illiterate man born at home in ▮▮▮▮▮▮▮ entered IDPP on ▮▮▮▮▮▮▮.   Brown Decl. Ex. 3, at 1 ▮▮▮▮▮▮▮.   Within a week, the DMV recognized that two different last names were in his record, but did not offer the Name

---

[12]     DMV states that a Name Change Affidavit is not required for a one-letter discrepancy, such as Hannah and Hanna. *OWI*, Dkt. 384, at 35:24-36:7 (Schilz Dep.).   However, as discussed *infra*, DMV will not issue ID or allow a Name Change Affidavit for even a one-letter mismatch if the name the voter currently goes by does not perfectly match the Social Security Administration's records.   *Id.* at 41:14-42:19.

[13]     Doing so could allow the Name Change Affidavit to be completed at or near the time of application.   For example, the DMV should allow the voter to complete an affidavit as to the current name and current spelling, and to the continual use of the name, even if the details of the original records are not yet fully available.



Change Affidavit for nearly *two years*, until ████████. *Id.* Likewise, ████████ told the DMV on ████████ that there might have been an unusual spelling of her name on her ████ birth certificate, and that it could have been ████████ Brown Decl. Ex. 6, at 2 ████████. Not until ████████, after the DMV verified her name with the spelling ████████ did it even offer her the name change affidavit. *Id.* at 6 ████████.

#### b.    No Affidavit Option For Non-Name Mismatches

Moreover, DMV will not use the Name Change Affidavit to resolve all discrepancies, or even all name discrepancies.  The DMV will not issue a Hard Card—with or without a Name Change Affidavit—if there is a discrepancy with the name that is on file with the SSA.  *OWI*, Dkt. 351, ¶ 11 (Boardman Decl.); *see OWI*, Dkt. 384, at 35:24-36:7, 80:6-9 (Schilz Dep.).  An exact match to SSA records is required even if DMV "think[s] it's more likely than not that a petitioner is a US citizen, is who she says she is, and that her date of birth is correct." *OWI*, Dkt. 383, at 10:14-21 (Deposition of Kristina Boardman ("Boardman Dep.").)

If there is even a one-letter difference between the name the voter uses and the name on the voter's Social Security record, the DMV requires the voter to either correct the Social Security record or to have, on the ID card, the name and spelling that SSA uses.  *OWI*, Dkt. 384, at 35:1-17 (Schilz Dep.).  For example, ████████ used that spelling of her name on documents (including her ████ ID card), described herself as being "old as dirt," and told the DMV that "she wants to get this ID and has no other documents."  Brown Decl. Ex. 17, at 2 ████████. The DMV told her that because Social Security and ████████ records spelled her name ████████ the DMV "need[ed] her to change her first name on our record from ████ to ████ *Id.* at 3.  The DMV went on to state that the Name Change Affidavit "will not fix this

14

problem, since her first name on DMV record does NOT match her first name on file with SSA and DHS."[14]  *Id.*

Nor will the DMV allow use of the Name Change Affidavit or a similar affidavit to resolve other minor discrepancies in a customer's documents, such as a slight discrepancy in the birthdate. *OWI*, Dkt. 384, at 91:3-19 (Schilz Dep.); *see also* Rotker Decl. Ex. 5, at 34 (IDPP Manual) (listing a "DOB error" with "transposed numbers" as a "[c]ommon [e]rror" in background reports).  For example, ███████████████ birth records showed a birth year of ████, but Social Security records showed a birth year of ████, with the same month and date.  Brown Decl. Ex. 18, at 7 ███████████  The DMV stated that "[d]ue to this discrepancy" it would not issue a Hard Card unless and until Ms. ████ changed her Social Security records.[15]  *Id.* at 1, 6, 18; *see also* Brown Decl. Ex. 19, at 1 ███████████.  Though in ███████████'s case the DMV insisted she use the name in Social Security records, the DMV told Ms. ████ the opposite—that she had to amend her records with the SSA to conform to her birth records, a burdensome process that must be completed in person, with documents, at a Social Security office.  Brown Decl. Ex. 18, at 6, 18 ███████████; *see also* Frequently Asked Questions, SSA, https://faq.ssa.gov/en-us/Topic/article/KA-01981 (last accessed Sept. 16, 2020).

---

[14]      In order to get the ID card, Ms. ████ relented and changed her name. Brown Decl. Ex. 17, at 5 ███████████.  Moreover, although Ms. ████ went to the DMV in ███████ to complete a Name Change Affidavit, employees did not give her the correct form. *Id.* at 4. Shortly thereafter, the DMV suspended her for lack of contact.  *Id.* at 5.  She finally was able to return to a DMV office for a third time in ███████████—eleven months after the process began.  *Id.*

[15]      DMV also insisted that ███████ return to the office to sign a name change form to connect her birth and married names, even thought she had brought in her marriage certificate at the time of initial application and DMV had not scanned it.  Brown Decl. Ex. 18, at 3 ███████████. Returning to DMV was clearly difficult for her: her records indicate multiple moves, and she also informed DMV that she had to find someone to give her a ride for her to get to the DMV office. *Id.* at 5.

## II.   Wisconsin's Voter Outreach And Public Education About IDPP

As WEC's media consultant, KW2, has conceded, for voters to hear and act on information, the information needs to be conveyed through a clear and simple message that is conveyed multiple times.   *See OWI*, Dkt. 387 at 37:23-39:1, 113:22-114:8 (Deposition of Andrew Wallman ("Wallman Dep.")).   But the State's public information regarding voter ID generally and IDPP, in particular, has been neither clear nor frequent.

### A.   Wisconsin's Historical Lack Of Outreach And Education About IDPP

When Wisconsin's strict voter ID law passed in 2011, state elections officials[16] knew there would be particular difficulties in ensuring that vulnerable voters—such as minority, low-income, elderly, disabled, and rural voters—understood the complicated voter photo ID law and how to obtain a photo ID for voting.   Rotker Decl. Ex. 8, at Enclosure p.3 (July 1, 2011 Government Accountability Board Letter and Budget Summary).   Thus they developed a $1.9 million budget for a voter photo ID law implementation plan, with more than $750,000 allocated to public information and outreach and almost $700,000 more for support services, such as staffing.   *Id.*, at Enclosure.   That plan was never fully implemented, and the State pulled the advertising about a week after it began in 2012 after the voter ID law was enjoined.   *See OWI*, Dkt. 387 at 62:16-24 (Wallman Dep.).

The original version of the voter ID law made no provision for DMV to obtain or pay for documents needed to obtain ID.   The initial incarnation of the IDPP came into existence in 2014 as an attempt to fill that gap.   *See Frank*, Dkt. 287, ¶ 12 (Boardman Decl.) (the DMV has been applying the IDPP since September 2014).   It was plagued by confusion among voters and clerks alike.

---

[16]     Until 2017, the agency running elections for the state was the Government Accountability Board, or GAB. It is now the Wisconsin Elections Commission, or WEC.

KW2 then recommended a $1.2 public education campaign for the 2015-2016 cycle, including, among other provisions, digital advertising, a texting campaign, and paid radio and TV ads, including on "Latino" radio and TV stations. *See* Rotker Decl. Ex. 9, at 5-14 (KW2 Estimate). However, this plan was never approved or implemented. *OWI*, Dkt. 387 at 112:10-25 (Wallman Dep.).

Elections officials likewise long have known it is important to educate voters about IDPP. In 2015, WEC public relations officer Reid Magney specifically requested that radio and TV ads run for four to six weeks before the 2016 spring and primary elections and for eight weeks before the 2016 general election, so that they could "spread the word far enough before the election that people who need an ID can get one, but also intensely enough before the election so people remember to bring their IDs with them . . . ." Rotker Decl. Ex. 9, at 1 (KW2 Estimate).  Mr. Magney was concerned about ensuring voters, especially voters without documents, had enough lead time to get to the DMV. *Id.* at 2.

By early 2016, however, the Legislature had not allocated any budget for a public education campaign. *Frank,* Dkt. 280-32, at 152:11-18, 154:17-157:17 (Deposition of Michael Haas ("Haas Dep.")).  To the contrary, although WEC updated its website to include some IDPP information, there was no media buy to advertise it. *Id.,* at 144:6-145:12; *Frank,* Dkt. 280-34, at 213:13-15 (Deposition of Kevin J. Kennedy "Kennedy Dep.")).  Clerks had even expressed "concern about whether voters are sufficiently aware of the law." *Frank,* Dkt. 280-32, at 49:1-17 (Haas Dep.); *see also Frank*, Dkt. 280-8, ¶ 10 (Declaration of Neil Albrecht (Executive Director of Milwaukee Election Commission)).

 In June 2016, the Legislature allocated only $250,000 for the voter ID campaign.  *See* Matthew DeFour, *Legislature's budget committee approves $250,000 for voter ID education*,

WISCONSIN STATE JOURNAL, Jun. 14, 2016, *available at* https://madison.com/wsj/news/local/govt-and-politics/legislatures-budget-committee-approves-250-000-for-voter-id-education/article_45de9619-d69e-528b-84ed-3590a5c1b338.html.  The campaign included some radio and TV public service announcements, digital ads, and ads in theaters and on buses.  *Id.*  The campaign did not include print ads in English or Spanish language papers, *id.*, even though KW2 advised that newspapers would allow better audience targeting.  *OWI*, Dkt. 387, at 37:10-18 (Wallman Dep.).  The campaign also did not have targeted outreach to vulnerable voters.  *OWI*, Dkt. 387, at 72:5-73:15 (Wallman Dep.).

Those efforts were inadequate.  In July 2016, this Court ordered that "the state must inform the general public that those who enter the IDPP will promptly receive a credential valid for voting, unless readily available information shows that the petitioner is not a qualified elector entitled to such a credential."  *OWI*, Dkt. 234, at 117 (July 29, 2016 Order).  This mandate was echoed a few weeks later, when the Seventh Circuit made clear it was necessary "that the State adequately inform the general public that those who enter the IDPP will promptly receive a credential for voting, unless it is plain that they are not qualified."  *Frank v. Walker*, 835 F.3d 649, 652 (7th Cir. 2016) (en banc) ("*Frank III*").  Nevertheless by mid-October 2016—less than a month before the election—this Court found that DMV staff had been giving voters "incomplete and inaccurate information about IDPP."  *OWI*, Dkt. 293, at 4 (Oct. 13, 2016 Order).  The Court also found that Defendants had not "clearly explained to the public what it takes to initiate an ID petition."  *Id.* at 5.  Consequently, the Court ordered Defendants to, among other things, personally reach out to designated organizations, print and share certain IDPP materials (such as a palm card) with designated organizations and all municipal clerks, offer press availability, and increase efforts to

contact voters who had entered the IDPP at some point. *OWI*, Dkt. 306 (Oct. 26, 2016 Order); *OWI*, Dkt. 304 (Oct. 21, 2016 Joint Phase II Report).

These outreach efforts were also inadequate.  For example, of 40,000 visits to the "Bringit.wi.gov" voter ID website,[17] there were only 61 visitors that reached the "How Do I Get a Free State ID Card?" webpage.  Rotker Decl. Ex. 10, at 4 (KW2 Campaign Rep.).  Digital ad performance was low in certain areas of the state, including Milwaukee where many vulnerable voters reside.  *Id.* at 8-9; *OWI*, Dkt. 387, at 188:19-189:19, 190:4-18 (Wallman Dep.).  Nor were advocacy groups willing or able to distribute most of the palm cards.  *OWI*, Dkt. 388, at 122:17-123:4 (Deposition of Meagan Wolfe ("Wolfe Dep.")).

### B.    WEC's Current Outreach And Education Plans

Since November 2016, there has been virtually no public education on IDPP conducted outside of the period of time immediately leading up to an election.  WEC has ceased nearly all IDPP-specific outreach and merely integrated IDPP information into its general voter information.  *OWI*, Dkt. 388 at 14:3-16 (Wolfe Dep.).  These materials, however, include very little mention of IDPP.

Even when IDPP is mentioned, WEC buries the information.  For example, WEC's "FAQ" page has no mention of (i) what to do if a voter lacks ID, (ii) getting a free ID at the DMV, or (iii) getting ID if a voter lacks documents like a birth certificate.  Rotker Decl. Ex. 11 (WEC FAQ).  WEC's "Acceptable Photo IDs For Voting In Wisconsin" document does not mention what to do if you do not have an ID at all.  Rotker Decl. Ex. 12 (WEC "Acceptable Photo IDs for Voting In Wisconsin.").  The only reference to IDPP in WEC's list of voter information guides is that the Temporary Receipt is valid for voting.  However, much like WEC's "FAQ" page, nothing in the

---

[17]    The campaign was called "Bring it to the Ballot."

list mentions what a voter should do if she does not have ID, how to get ID, how to get ID without a birth certificate, or what the IDPP process is. *See* Rotker Decl. Ex. 13 (WEC Voter Guides). Likewise, WEC's August 20, 2020 press release, "Wisconsin Voting Deadlines and Facts for November 2020," does not mention (i) what to do if a voter lacks ID, (ii) the option of getting a free ID at the DMV, or (iii) the option of obtaining an ID even if a voter lacks documents like a birth certificate.  Rotker Decl. Ex. 14 (WEC 2020 Deadlines and Facts).[18]

Moreover, virtually all of this information is only available digitally.  Yet hundreds of thousands of Wisconsin voters lack personal computers, broadband internet, or both.  *See* Rotker Decl. Ex. 16 (U.S. Census Bureau Quick Facts: Wisconsin) (from 2014-18, 12% of Wisconsin's residents did not have home computers and 20% lacked broadband internet); Rotker Decl. Ex. 17 (Wis. Family Health Survey); Rotker Decl. Ex. 18 (Digital Divide Article); Rotker Decl. Ex. 19 (Broadband Map).[19]  Indeed, as Ms. Wolfe acknowledged, clerks in rural Wisconsin have had issues relating to lack of or limited internet access.  *OWI*, Dkt. 388, at 94:5-9 (Wolfe. Dep.).  The COVID-19 pandemic has amplified this problem since public spaces where voters can get internet access, such as libraries, were often closed and most continue to have reduced hours and services.

---

[18]    WEC also has a 37-page "Bring it to the Ballot" document.  Rotker Decl. Ex. 15 (Bring It Document). The Table of Contents, however, does not contain any heading that would help direct a voter to a section on how to get ID for voting if a voter does not have one, but rather only states that an IDPP receipt can be used for voting.  *Id*. at 2.  But there is nothing intuitive about the term "ID Petition Process" and thus it is not helpful to a voter who does not know about IDPP in the first place.  A voter would have to know to go to that page, or to the section labelled "Acceptable Photo IDs – Wisconsin State ID Card," and read through a significant amount of text to learn that they could get ID without those documents needed to get a State of Wisconsin ID card.  *Id.* at 12, 17.

[19]    Similarly, a 2019 survey by the Wisconsin Department of Public Instruction indicated that 370,000 Wisconsin residents did not have home internet, with Black and Latinx residents much more likely than white residents to lack internet and home computers.  Rotker Decl. Ex. 15, at 1-2 (Digital Divide Article).

*See* COVID-19 Information for Wisconsin Public Libraries, Wisc. Dep't of Public Instruction, https://tinyurl.com/y2vhb74w.

WEC still does not inform voters of the IDPP option by non-digital means, such as by radio, television, billboards, or print media.  *OWI*, Dkt. 388, at 86:4-86:22 (Wolfe Dep.); Rotker Decl. Ex. 20 (WEC IDPP Outreach Plan).  Indeed, from 2018 to present, WEC's administrator, Megan Wolfe, could not identify any budget for non-digital outreach and public education on IDPP.  *OWI*, Dkt. 388, at 86:4-22, 113:2-114:10 (Wolfe Dep.).  In 2016, WEC created and broadcast radio and TV ads, but it has not run those or any other ads in at least the past two years.  *Id*. at 113:2-114:10.  The palm card is the only non-digital explanation of IDPP, Rotker Decl. Ex. 2 (Palm Card).  However, WEC does not distribute hard copies of palm cards to municipal clerks or advocacy groups, or mail copies to registered voters who lack a driver's license or Wisconsin ID card.  *OWI*, Dkt. 388, at 63:19-64:5, 129:11-130:12 (Wolfe Dep.); Rotker Decl. Ex. 20 (WEC IDPP Outreach Plan).

Moreover, Ms. Wolfe, stated that WEC's outreach and education this year has focused on the absentee ballot process, and not on IDPP.  In fact, the 126-page document, "How Wisconsin is Prepared for the 2020 Election," prepared by WEC staff and submitted to the WEC commissioners on September 1, 2020, does not even mention photo ID, much less IDPP.  *See generally* Rotker Decl. Ex. 21 (WEC 2020 Pamphlet).  The only reference to "DMV" addresses online registration deadlines, not getting an ID.  *Id.*, at 24.

As a lead up to the November 2020 election, WEC recently sent a mailer focusing on absentee balloting to all 2.6 million registered voters.  *OWI*, Dkt. 388, at 46:8-13 (Wolfe Dep.); Rotker Decl. Ex. 22 (WEC Absentee Mailing); Rotker Decl. Ex. 20 (WEC IDPP Outreach Plan).  The mailing discusses the need for photo ID, but does not contain *any* language regarding how to

get an ID, much less the ability to obtain an ID through IDPP.  Rotker Decl. Ex. 23 (WEC Absentee Mailing); *see also* Rotker Decl. Ex. 23, at 146 (WEC Open Session Materials (June 10, 2020)) (mailing to emphasize absentee ballots).

Despite having the names and addresses of all registered voters in the WEC's database,[20] elections officials have never sent a notice to inform all voters of photo ID requirements and exceptions or how to obtain ID.  They also have never required the municipal clerks—who run elections—to do so.  *OWI*, Dkt. 388, at 116:2-12 (Wolfe Dep.).  Ms. Wolfe's only explanation for WEC not doing so is her belief that such a mailing is not required by law.  *OWI*, Dkt. 388, at 62:18-63:10 (Wolfe. Dep.).

The limited public education on IDPP that WEC has planned for this fall consists of "a combination of social media posts on [WEC]'s Facebook and Twitter accounts, outreach toolkits for all municipal and county clerks throughout the state, a scheduled press release and photo ID-specific media availability."  Rotker Decl. Ex. 20 (WEC IDPP Outreach Plan).  WEC's posts on its social media accounts will not begin until late September.  The "media availability" referenced in WEC's plan will occur on a single day in mid-October and will involve Ms. Wolfe making herself available to the media to discuss topics including the IDPP.  *See id.* (WEC invitation to groups to "attend an in-person meeting during the week of October 24th to discuss outreach"); *OWI*, Dkt. 388, at 102:4-20 (Wolfe Dep.).  But it is not certain what, if any, media coverage will actually take place.  *OWI*, Dkt. 388, at 102:4-20 (Wolfe Dep.).

---

[20]     WEC has the ability to send targeted mailing to people who are registered to vote but lack the photo ID for voting.  WEC has previously cross-matched its database with DMV databases to send registration information to license and ID card holders who were not registered.  *See* WEC Website, *State of Wisconsin Mails Postcards to Eligible but Unregistered Residents* (Jun. 25, 2020), *available at* https://elections.wi.gov/node/6940.  WEC could use this same database in reverse identify all registered voters who are not identified as having a DMV credential.

WEC's outreach plan also relies on Wisconsin's 1,850 municipal clerks to reach out to voters. However, municipal clerks are not required to do outreach or post IDPP information. *OWI*, Dkt. 388, at 84:15-22, 99:20-100:4 (Wolfe Dep.). In fact, many municipal clerks do not even have websites. *See generally* Directory of Wisconsin Municipal Clerks, *available at* https://elections.wi.gov/clerks/directory (last updated Aug. 2020).

WEC also relies heavily on advocacy groups for direct voter outreach. *See* Rotker Decl. Ex. 20 (WEC IDPP Outreach Plan). Ms. Wolfe explained that WEC makes itself available to speak with or train groups *if* the groups request it. *See id.*; *see also OWI*, Dkt. 388, at 31:21-32:6 (Wolfe Dep.). The groups then must use their own resources to share information regarding voting and IDPP. *OWI*, Dkt. 388 at 31:21-32:6 (Wolfe Dep.). However, the groups are not required to educate voters on IDPP, and WEC does not keep track of what outreach, if any, these groups are doing. *OWI*, Dkt. 388 at 99:10-19 (Wolfe Dep.). In 2020, WEC has "received very few invitations" to speak with "Wisconsin-based voter outreach groups." *See id.* at 17:14-25. In fact, WEC identified fewer than twenty advocacy groups that it works with—a list that includes few groups serving people of color, no groups specifically for Hmong, Latino or Native voters. *See* Rotker Decl. Ex. 24 (Sept. 11, 2020 Email from DOJ).[21] WEC also does not, for example, work with any groups that serve the homeless community. *OWI*, Dkt. 388, at 18:25-19:11 (Wolfe Dep.).

---

[21] On Sept. 11, 2020, Mr. Murphy provided the following "list of organizations that WELEC works with or invites to events": Disability Rights Wisconsin, Wisconsin Board for People with Developmental Disabilities, Access to Independence, Wisconsin Coalition of Independent Living Centers, Coalition of Wisconsin Aging Groups, City of Madison – Civil Rights Division, National Alliance for the Mentally Ill, People First Wisconsin, Wisconsin Council of the Blind and Visually Impaired, Greater Wisconsin Agency on Aging Resources, Wisconsin Association of the Deaf, National Federation of the Blind, NAACP Milwaukee Branch, Milwaukee Urban League, Jack & Jill of America, Inc. Milwaukee Chapter, Vote Riders, and League of Women Voters. Ms. Wolfe also testified that she works with a group of organizations working with voters in Milwaukee. *OWI*, Dkt. 388, at 20:6-14 (Wolfe Dep.).

The list also fails to include groups identified in the court-ordered 2016 outreach efforts, such as VoteRiders, Second Harvest food bank, Porchlight, Inc., as well as the cities of Madison, Green Bay, Kenosha, Racine, and Beloit. *See OWI*, Dkt. 304, at 3 (Oct. 21, 2016 Joint Phase II Report).

**C.     DMV's Current Outreach And Education Plans**

The DMV does not have an advertising budget and, instead, does all of its paid publicity through the Department of Transportation's office of public affairs. *OWI*, Dkt. 383, at 64:4-10 (Boardman Dep.). As such, any non-digital DMV outreach regarding IDPP is limited to when individuals come into DMV service centers—several of which have been closed due to COVID-19—or through ad-hoc exchanges of information with voting rights groups. *OWI*, Dkt. 383, at 60:11-64:2, 89:14-90:4, 87:2-23, 91:24-95:1 (Boardman Dep.). The DMV also maintains an "IDPP and voter ID hotline." *Id.* at 63:9-20.

The DMV provides some informational materials to actual IDPP petitioners—namely, a "takeaway" document provided at the end of an IDPP intake at the DMV ("Takeaway Document") and the Temporary Receipt (which DMV must mail to the petitioner within five days of receiving the IDPP application). But the application, Takeaway Document, and Temporary Receipt do not contain any language informing the individual that if they do not stay in contact with the DMV for a certain period of time, their petition will be suspended or cancelled. Rotker Decl. Ex. 7 (Form MV3012), Rotker Decl. Ex. 25 (Takeaway Document). The DMV could modify the IDPP petition, Takeaway Document, and/or Temporary Receipts to inform voters of the consequences of failing to stay in contact with DMV but has not done so. *OWI,* Dkt. 383 at 67:7-19, 95:2-96:4, 71:5-14 (Boardman Dep.).

**ARGUMENT**

**I.      Legal Standard**

Plaintiffs seek a preliminary injunction prior to the November 3, 2020 presidential election to mitigate the constitutional shortcomings of the State's implementation of IDPP.  Plaintiffs seeking a preliminary injunction must demonstrate that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *See D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted."  *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010), *amended on other grounds*, 387 Fed. App'x 629 (7th Cir. 2010).  At the same time, "the threshold for demonstrating a likelihood of success on the merits is low," and "need only be better than negligible."  *D.U.*, 825 F.3d at 338.

**II.     Plaintiffs Are Likely To Prevail On The Merits**

The "most significant difference between the preliminary injunction phase and the merits phase is that a plaintiff in the former position needs only to show 'a likelihood of success on the merits rather than actual success.'"  *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)).  The threshold for establishing likelihood of success is low.  *See id*.  Given how little has changed since 2016, Plaintiffs easily clear that "low" threshold.  Indeed, the very constitutional problems identified by the Court in 2016 continue to persist.  Specifically, there remain irrational, unreasonable, and arbitrary barriers between certain voters and their access to a Hard Card for voting purposes, both by virtue of unreasonable procedures applied during IDPP and by virtue of Defendants' failure to inform voters about IDPP.

### A.    IDPP Procedures Unreasonably Burden The Right To Vote

Just as in 2016, "[t]he most pointed problem with Wisconsin's voter ID law is that it lacks a functioning safety net"—a prerequisite to the constitutionality of the voter ID law.  *OWI*, Dkt. 234, at 4 (July 29, 2016 Order).  Though "IDPP is supposed to be this safety net," *id.*, the process continues to impose "high hurdles for some persons eligible to vote."  *See Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) ("*Frank II*").  Just as in 2016, "voters who succeed in the IDPP manage to get an ID only after surmounting severe burdens."  *OWI*, Dkt. 234, at 4 (July 29, 2016 Order).  Specifically, current IDPP practices effectively mandate that CAFU confirm certain voter details and in doing so apply unreasonably stringent standards, a burden that contravenes (i) prior court orders, *see id.* at 89-90, (ii) the CAFU supervisor's representations that a "more likely than not" standard is being applied, *OWI*, Dkt. 384, at 124:2-19 (Schilz Dep.), and (iii) state law, *see* Wis. Stat. § 343.165(8)(h) (granting petitions if DMV concludes that "it is more likely than not" that petitioners' citizenship information is correct).

Because of this high threshold, many voters remain trapped in IDPP limbo while CAFU searches in and out of the state for some "perfect" record.  Even if CAFU finds a birth record, delays may continue, as discrepancies between that birth record and the voter's other documents can further drag out the process.  Thus, the answer to "[t]he constitutional question under *Frank II*," namely, "whether the state ensures that every eligible voter can get a qualifying photo ID with reasonable effort," *Luft*, 963 F.3d at 679, remains a firm "no."

As in 2016, the principal problem with the IDPP procedures is that the State is not abiding by its obligation "to provide a photo ID to anyone who, 'more likely than not,' meets the requirements."  *Luft*, 963 F.3d at 679.  (quoting Wis. Stat. § 343.165(8)(h) and Wis Admin. Reg. CR 16-040 § 10.).  Though Susan Schilz, the CAFU supervisor, claims to apply this standard, *OWI*, Dkt. 384, at 124:2-19 (Schilz Dep.), in practice, the DMV is holding voters to a substantially

higher burden of proof.  Often on the very day a voter applies through IDPP, the DMV has in hand (1) the voter's statement under penalty of perjury with respect to citizenship status and (2) an SSOLV verification of a voter's names, date of birth, and SSN.  *See, e.g.*, Brown Decl. Ex. 8, at 1 ████████; Brown Decl. Ex. 5, at 1 █████████.  But just as in 2016, this does not result in a voter being issued a Hard Card.

Rather, the DMV continues to "refuse[] to issue IDs to IDPP petitioners until CAFU [can] confirm their identities with a match to a valid birth record, or to some equivalently secure alternative."  *OWI*, Dkt. 234, at 25-26 (July 29, 2016 Order). This is a "complicated" endeavor for CAFU that, as in 2016, is carried out by "staff members whose normal duties are to investigate allegations of fraud" and "require[s] interaction between various divisions of the DMV, the Wisconsin [DHS], and agencies of other states."  *Id*. at 24; *OWI*, Dkt. 384, at 18:14-19, 87:2-19 (Schilz Dep.).  Moreover, there is no formal appeals process through which a voter can raise grievances about the handling of their application.[22]  *OWI*, Dkt. 384, at 116:18-117:18 (Schilz Dep.).

The DMV's failure to issue Hard Cards to voters under these circumstances is particularly egregious in light of the fact that state law clearly accords the DMV greater flexibility than the DMV acknowledges.  Specifically, if DHS has not been able to verify a birth record within thirty days, state statutes permit the DMV to issue a Hard Card if "the person provides proof of name and date of birth *or* proof of citizenship, legal permanent resident status or legal presence, *or* if the

---

[22]     Some of the reports state that the denial decision is made pursuant to Wis. Stat. §§ 227.52, 227.53.  *E.g.*, Brown Decl. Ex. 15, at 4 ██████████.  But that is flatly incorrect, as those statutes address judicial review of administrative decisions.  Neither CAFU nor DMV provides any kind of administrative hearing, much less judicial review, for these voters.

department of transportation receives other secondary documentation acceptable to the department of transportation." Wis. Stat. § 343.165(8)(b)3g (emphases added).

But the DMV is treating the disjunctive "or" as a conjunctive "and," and thereby triggering a sometimes never-ending search for perfect proof, long after the voter has already proven their name and date of birth, and long after documentation shows it is more likely than not that the voter is eligible. *See supra*, Factual Background Part I.A.1.a.  The justification for the State's refusal to issue Hard Cards is particularly low when a government agency like the SSA has verified voters' information.  And despite the State's representation that the Name Change Affidavit has "short circuited" delays with the process, *Luft*, 963 F.3d at 680, this form fails to resolve all the problems in the IDPP.  As detailed *supra*, Factual Background Part I.A.3, this form applies only if CAFU has already found what it deems to be an adequate birth record for the voter, a process that can take months or years or not occur at all; if the voter's current name perfectly matches the SSA record; and if there are no discrepancies other than name issues.  In light of the evidence of eligibility to vote that these voters have already established, the burdens of continued and indefinite participation in the DMV's IDPP system are completely unreasonable. *OWI*, Dkt. 255, at 7 (Aug. 11, 2016 Order).

At bottom, the DMV seems to have gotten so lost in the quest for the perfect record that it ignores evidence establishing the voter's eligibility by a preponderance of the evidence, or "more likely than not."  The CAFU supervisor effectively conceded as much, admitting that she is "really not thinking about eligibility to vote" during the CAFU adjudication process. *OWI*, Dkt. 384, at 93:19-20 (Schilz Dep.).  She attempted to justify this approach on the ground that, "all the while we're adjudicating, we're providing them with a paper receipt and they are able to vote." *OWI*, Dkt. 384, at 93:20-22 (Schilz Dep.).  But as this Court previously recognized, the issuance of

Temporary Receipts "is not a complete or permanent solution." *OWI*, Dkt. 234, at 4 (July 29, 2016 Order). The Temporary Receipts continually expire—now in just 60 days—and replacement receipts are mailed only so long as the voter maintains contact with the DMV, *OWI*, Dkt. 384, at 58:12-14, 65:17-12 (Schilz Dep.), regardless of whether the voter has any new information to provide. Thus, the Temporary Receipts are a constitutionally insufficient Band-Aid, the long-term use of which flouts the fact that "qualified electors are entitled to vote as a matter of constitutional right, not merely by the grace of the executive branch of the state government." *OWI*, Dkt. 234, at 28 (July 29, 2016).

The result of this dysfunction is that many voters remain trapped in the IDPP limbo long after they have reasonably established voting eligibility and identity. Examples abound of voters stalling in the IDPP system despite presenting more than sufficient evidence to establish the required elements exist against the more-likely-than-not standard. *See* Brown Decl. Exs. 8, 9 ██████████████████. At times, it appears that *no* documentation can satisfy CAFU. *See* Brown Decl. Exs. 5, 13 ████████████████. In other instances, the DMV requires that some voters make multiple trips to the DMV. *See* Brown Decl. Exs. 1, 2, 4, 14 ██████████ ████████████████. Moreover, the DMV's unjustified and excessive quest for birth records inflicts real burdens on Vulnerable Voters, including those who are homeless (██████), elderly (██████, in nursing homes (████████), move frequently (██████), are illiterate and dependent on caregivers (██████), or who are otherwise marginalized. And because there is "not a formal appeal process" within the DMV's IDPP system, *see OWI*, Dkt. 384, at 116:8-117:18 (Schilz Dep.), these voters "are stuck in the IDPP" and have little recourse but to wait and see what happens. *OWI*, Dkt. 255, at 7 (Aug. 11, 2016 Order). Thus, just as in 2016, some voters remain "required to sustain a back-and-forth exchange with the DMV

indefinitely, even though [they] ha[ve] already provided all the information that [they] have." *Id*. "This is a burden that far exceeds what *Crawford* [*v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008)] and *Frank* contemplated." *Id.*

**B.    Reforms Are Necessary To Cure The IDPP**

The above facts compel the conclusion that Plaintiffs are likely to succeed on the merits with respect to the (dis)function of the IDPP, because as in 2016, "[t]he IDPP violates the constitutional rights of those who must use it." *OWI*, Dkt. 234, at 29 (July 29, 2016 Order). Principally, Plaintiffs seek relief to two related problems: (1) the standard of proof to which IDPP petitioners are being held and (2) the length of the purgatory to which certain IDPP petitioners are subjected.

To cure these problems, Plaintiffs request the following solutions. ***First,*** the DMV should be required to issue a Hard Card valid for eight years to any voter who has (1) had their name, date of birth, and social security number verified through the SSOLV; (2) submitted proof of Wisconsin residency; and (3) sworn under penalty of perjury that they are a U.S. citizen.  Consistent with state law, these confirmation processes make it more likely than not that a voter is eligible to vote. To implement this requirement, the DMV should be ordered to assess all IDPP petitions not currently in denial or cancel status and to promptly issue a Hard Card for voting to all voters who satisfy these thresholds.  To be clear, Plaintiffs are not requesting that the Hard Card be useable as an ID for any purposes other than voting.  Rather, Plaintiffs seek a solution that would provide eligible voters with a long-term ID card (rather than a short-term Temporary Receipt) after establishing that they more likely than not satisfy the requirements to receive an ID.

***Second,*** the DMV should issue a Hard Card by the time the initial Temporary Receipt expires to any voter who has complied with *reasonable* requests for information, unless the DMV has a genuine reason to suspect that the voter is ineligible.  The absence of documentation should

not, by itself, constitute a "genuine reason" to suspect that the voter is ineligible. This reform permits the IDPP to function as a constitutionally sufficient safety net by allowing voters who lack underlying documentation to receive a Hard Card within a reasonable amount of time.

*Third,* Plaintiffs request an order requiring the DMV to permit voters to use affidavits to solve discrepancies such as birth date discrepancies, mismatches between current name and name in voter's SSA record, and missing information regarding birth details, unless the DMV has a genuine reason to suspect that the voter is ineligible. For example, a family member with knowledge may attest to the place and date of the petitioner's birth. Such extra tools in the CAFU toolkit would be consistent with state law, which gives the DMV discretion to decide what "secondary documentation" is sufficient to establish eligibility for a free ID. Wis. Stat. § 343.165(8)(b)3g.

*Fourth*, the DMV should inquire during the IDPP intake whether a voter knows of any potential name discrepancy issues. If the voter knows of any name discrepancy issues, the DMV should permit voters to use a common law name change affidavit at that time. For voters with name discrepancy issues, this would streamline the IDPP process and shorten the otherwise lengthy process.

*Fifth*, the Court should require the establishment of a process that provides notice and a hearing before a neutral party to voters denied ID cards by DMV based on claims of ineligibility or fraud, or for DMV's failure to resolve their petition within 180 days. The absence of such a process currently deprives voters of practical recourse in the face of an incorrect DMV decision.[23]

---

[23] Plaintiffs note that Wis. Stat. § 85.013(1) designates the Division of Hearings and Appeals to conduct administrative hearings for the Department of Transportation.

### III.   Defendants' Refusal To Provide Public Education About IDPP Undermines IDPP's Function As A "Constitutionally-Required" Safety Net

As both the Seventh Circuit and the Wisconsin Supreme Court have held, Wisconsin may adopt a strict voter ID system only if that system has a well-functioning safety net.  *OWI*, Dkt. 234, at 5 (July 29, 2016 Order); *Frank v. Walker*, 768 F.3d 744, 747 (7th Cir. 2014).  Wisconsin's answer was the creation of the IDPP process, whereby a voter who has trouble assembling essential documents can petition the state for an exception.  Wis. Stat. § 343.165(8)(a); Wis Admin. Code § Trans 102.15(5m); *see OWI*, Dkt. 234, at 23 (July 29, 2016 Order) (IDPP is "constitutionally required"); *id.* at 5 ("Wisconsin may adopt a strict voter ID system *only* if that system has a well-functioning safety net, as both the Seventh Circuit and the Wisconsin Supreme Court have held.") (emphasis original); *see Milwaukee Branch of NAACP v. Walker*, 2014 WI 98, ¶¶ 63, 65-70, 357 Wis. 2d 469, 851 N.W.2d 262 (finding that because it would be "a severe burden on the right to vote if an elector were obligated to pay a fee to a government agency in order to obtain documents required for a DOT photo identification card to vote," there must be a process to allow voters to petition the DMV administrator for ID when applying the usual rules would require payment of fees to government agencies).

Insufficient voter outreach and education on IDPP raise the same concerns about the inability for IDPP to function as a safety net.  *See, e.g.*, *Quern v. Jordan*, 440 U.S. 332, 346-49 (1979) (providing notice of relief is "ancillary" to relief itself); *Youakim v. McDonald*, 71 F.3d 1274, 1292-93 (7th Cir. 1995) (stating that is reasonable for district court to require notice as part of remedy); *Holbrook v. Pitt*, 643 F.2d 1261, 1280 (7th Cir. 1981) (holding that tenants need notice of right to receive retroactive payments).  If voters, particularly vulnerable voters, are unaware that IDPP exists, it renders IDPP worthless for those otherwise eligible voters.  Moreover, "[b]ecause voting is a fundamental right, the right to vote is a 'liberty' interest which may not be confiscated

without due process." *Raetzel v. Parks/Bellemont Absentee Elections Bd.*, 762 F.Supp. 1354, 1357 (D. Ariz. 1990) (citing *United States v. Texas*, 252 F. Supp. 234, 250 (W.D. Tex.), *aff'd mem. per curiam*, 384 U.S. 155 (1966)). And notice of the rules and standards is a key component of that interest. *See, e.g.*, *Briscoe v. Kusper*, 435 F.2d 1046, 1052-56 (7th Cir. 1970) (finding due process violated where the government, *inter alia*, failed to publicize standards to be used in reviewing petitions, and then applied standards arbitrarily and using stringent interpretations of law to disqualify some petition signers).

### A.    WEC Has Not Engaged In Meaningful Public Education Regarding IDPP

IDPP's effectiveness (and Wisconsin's voter ID system in general) depends on Defendants actually informing the public about the IDPP option.  Indeed, as this Court has recognized, the solution of giving voters Temporary Receipts for voting while their application is pending is a constitutional solution only "[a]s long as defendants inform the public about the IDPP." *OWI*, Dkt. 255, at 7 (Aug. 11, 2016 Order).  As Judge Adelman previously observed:  "If an applicant who lacks a birth certificate is not informed of the petition process, he is likely to conclude that he cannot obtain an ID and may give up, even if he might have been able to obtain an ID easily if he had been told about the petition process." *Frank v. Walker*, 196 F. Supp. 3d 893, 905 (E.D. Wis. 2016), *aff'd in part sub nom. Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020).  This necessitates outreach on the part of the state.

Yet WEC has dedicated virtually no resources to this objective, despite its statutory obligation to "[e]ngage in outreach to identify and contact groups of electors who may need assistance in obtaining or renewing a document that constitutes proof of identification for voting." Wis. Stat. § 7.08(12).  As discussed in detail above, WEC relies on third-party advocacy groups and local municipal clerks to engage in outreach. *See supra*, Factual Background Part I.B.  As

Ms. Wolfe confirmed, however, these groups have no obligation to engage in outreach sufficient to fulfill the statutory obligation, and WEC does not have any oversight role to determine whether such outreach is occurring. *OWI*, Dkt. 388, at 99:10-19 (Wolfe Dep.). Moreover, to the extent WEC is involved in any voter outreach and public education itself, WEC's efforts are largely limited to digital outreach on social media and postings on its website. *See supra*, Factual Background Part II.B.1. Even more problematically, to find WEC's online resources a voter must either be monitoring the social media activities of certain government entities or specifically seek out information on IDPP buried on WEC's website—not an easy task, *see supra,* Factual Background Part II.B—in the first place. As a matter of common sense, people do not usually go looking for something they do not know exists. Nor is there any intuitive reason that a voter without ID would know that DMV is where to obtain that ID, much less how to do so.

But effectiveness of IDPP (and Wisconsin's voter ID system in general) depends on Defendants actually informing the public about the IDPP option. Indeed, as this Court has recognized, the solution of giving voters Temporary Receipts for voting while their application is pending is a constitutional solution only "[a]s long as defendants inform the public about the IDPP." *OWI*, Dkt. 255, at 7 (Aug. 11, 2016 Order). WEC has dedicated effectively no resources to this objective, despite their statutory obligation to "[e]ngage in outreach to identify and contact groups of electors who may need assistance in obtaining or renewing a document that constitutes proof of identification for voting." Wis. Stat. § 7.08(12).

WEC also overlooks a key issue—namely, how a voter without proper ID would know where to go and what to bring in order to get an ID or avail themselves to the IDPP process. As a result, the efforts to obtain an ID for voting are not limited to what happens after one arrives at the DMV, but also include figuring out that the voter needs to go to DMV in the first place to even

apply, as well as what is needed to so. There is nothing intuitive about going to the DMV to get credentials for voting. The State therefore needs to ensure that clarity in a simple, accessible way.

### B.    DMV Has Not Engaged In Meaningful Public Education Regarding IDPP

The DMV likewise does very little to inform individuals who have limited or no internet access that the IDPP process even exists. *See OWI*, Dkt. 383, at 61:11-24 (Boardman Dep.). Any IDPP outreach to those individuals is purely incidental, limited to situations where such an individual:

(i)    happens to both go to a service center (several of which have been partially or completely shut due to COVID-19, including one in Downtown Milwaukee, *id.* at 86:25-87:25, and while there, happens to look at signs on the wall (which are only in English and possibly in Spanish), *id.* at 64:11-16, or happens to request an ID, *id.* at 64:20-65:1;

(ii)    somehow knows about and calls the DMV's "IDPP and voter ID hotline," *Id.* at 63:9-20; or

(iii)    happens to come in contact with a third-party group that also happens to be one of the groups that has had an ad-hoc conversation with the DMV regarding the IDPP process, *see id.* at 89:8-90:4.

Even if an individual somehow manages to learn about the IDPP and seeks to avail of it, neither the Takeaway Document nor the Temporary Receipt contains *any* language informing the individual that if they do not stay in contact with the DMV for a certain period of time, their petition will be suspended or cancelled. *OWI*, Dkt. 383, at 66:21-67:5 (Boardman Dep.); Rotker Decl. Ex. 25 (Takeaway Document). As the DMV Administrator herself conceded, this omission is a deliberate choice by the DMV. *OWI*, Dkt. 383 at 67:15-19; 95:2-96:4 (Boardman Dep.). The

DMV could easily modify both the Takeaway Document and the Temporary Receipt to make this information clear to voters.  *See id.* at 68:14-69:5.

### C.     The "Constitutionally Required" IDPP Safety Net Is Meaningless Unless Voters Know About The Option And How To Avail Of It

As this Court has recognized on multiple occasions, an IDPP that is not publicized is not a functioning safety net.  *See, e.g.*, *OWI*, Dkt. 255 (Aug. 11, 2016) Order; *OWI*, Dkt. 293, at 2-3 (Oct. 13, 2016 Order).  To ensure that the voters most in need of IDPP are advised of it prior to the November election, Plaintiffs request the following relief:

*First,* the Court should order Defendants to send out a targeted mailing—which could be the Palm Card, so as to not require the creation of new materials—to those who are registered to vote but appear to lack a Wisconsin driver's license or state ID based on the State's databases. This targeted mailing should be sent out no later than October 6, 2020. Individual notice, while not sufficient by itself, is a necessary part of ensuring that voters have the required information.

*Second,* the Court should require WEC to include simple, clear information on IDPP in any future mailing or publication that mentions the voter ID requirement, on all relevant websites that mention the voter ID requirement, and for all DMV and/or WEC hotlines.  Such messaging could state: "Need an ID for voting?  Through the DMV's ID petition process, you can get a free ID even if you don't have documents like a birth certificate."  The burden of this requirement would be extremely slight, as it would merely require minor revisions to already existing plans and documents.  But the message would ensure that all voters who read about the voter ID requirement are simultaneously informed of their ability to obtain one even if they lack a birth certificate.  The relevant publications and websites should include, but are not limited to the Absentee Ballot application forms and website, which do discuss the need for photo ID.

**Third,** WEC should require posting of IDPP information at all municipal clerks' offices and their websites, all polling places, and all early voting locations. The information can be the Palm Card, so as to eliminate the need to create new material. In addition, this information should be provided along with provisional ballot instructions to any voter who is offered a provisional ballot.

**Fourth,** the Court should require Defendants to amend Form MV3012 (*i.e.*, the petition), the Takeaway Document, and the Temporary Receipt to conspicuously explain: (1) that a voter must remain in contact with the DMV for a specified time to continue receiving Temporary Receipts, (2) that if the voter loses contact and the petition is cancelled or denied the voter may reinstate the petition and receive a Temporary Receipt by contacting DMV, and (3) that the voter has rights to a hearing. These cautions will highlight the need for a voter to provide complete and accurate contact information with their application and provide more clarity on the process.

**Fifth,** the Court should order Defendants to engage in outreach that this Court ordered Defendants to implement in 2016. *See OWI*, Dkt. 304 at 3-5 (Oct. 21, 2016 Joint Phase II Report); *OWI,* Dkt. 306 (Oct. 26, 2016 Order). In addition to that outreach, Defendants should offer the Palm Card—in digital and printed format and in Spanish and English— to all organizations identified in the October 21, 2016 Joint Status Report, as well as to organizations identified in footnote 21, to state public assistance agencies, and to state agencies serving low income and homeless persons. In addition, WEC should personally contact and offer to meet, train, and discuss outreach and IDPP with all of the foregoing organizations, as well as organizations identified in the Joint Status Report of October 21, 2016, no later than the week of October 12, 2020. The DMV should ensure that both Spanish and English versions of the Palm Card are conspicuously

posted in all DMV offices and on any DMV web page related to ID and IDPP, and that a copy of the Palm Card is given to any voter seeking an ID card at a DMV office.

### D. There Is No Acceptable Justification For Defendants' Failure To Provide Meaningful Public Education Regarding IDPP

Providing meaningful, non-digital public education regarding IDPP in the form of mailings, billboards, and broadcast TV and radio announcements, and modified DMV documents is not a herculean task. And, in any event, administrative burdens are not a talisman that justifies any infringement on constitutional rights. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 218 (1986) (finding that onerous elections administrative costs cannot justify infringement on constitutional rights).

As an initial matter, the WEC already has the names and addresses of all registered voters in its database. *See OWI*, Dkt. 388, at 44:20-45:4 (Wolfe Dep.). Although WEC sent a mass mailing to 2.6 million registered voters, that mailing did not mention IDPP. *Supra*, Argument Part II.B. WEC *also* has cross-matched its database with DMV databases, to send registration information to license and ID card holders who were not registered. *Supra* n.20. It could use this same database in reverse, to mail information regarding IDPP, such as the palm cards, to all registered voters who lack a driver's license or state ID card. The fact that no specific statute may require this, as the State's chief elections administrator argued, *OWI*, Dkt. 388, at 62:18-63:10 (Wolfe Dep.), is an insufficient basis for the State to rely on to justify its continued failure to ensure that voters receive meaningful information on how to exercise their right to vote.

What is being asked of Wisconsin is not extreme or unusual. States across the country regularly engage in non-digital public education campaigns to inform voters of changes in voter ID laws. For example, in 2015, North Carolina elections officials sent a targeted mailing to voters who indicated they did not have ID or who could not be matched on a database as having ID.

Then, after the law changed again to create more options for voters without ID, North Carolina sent an additional mailing to voters without ID and also conducted a statewide radio, television and billboard campaign, as well as an educational campaign for clerks and voters, about the ID law and options for voters who lacked ID. *See N. Carolina State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 352-56 (M.D.N.C.), *rev'd and remanded on other grounds sub nom. N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016). Likewise, around 2013, Virginia sent "86,000 postcards to persons on the active voter list who DMV records reflected possessed no DMV-issued ID and would likely need a photo ID to vote under [a] new law." *Lee v. Virginia State Bd. of Elections*, 188 F. Supp. 3d 577, 590 (E.D. Va.), *aff'd*, 843 F.3d 592 (4th Cir. 2016). And, in 2017, Alabama mailed a postcard about its voter ID law to the address of *every* registered voter. *See Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253, 1264 (N.D. Ala. 2018), *aff'd sub nom. Greater Birmingham Ministries v. Sec'y of State for Alabama*, 966 F.3d 1202 (11th Cir. 2020). There is simply no reason why Wisconsin cannot follow suit.

## IV.   Plaintiffs Are Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief

The November 3, 2020 election is fast approaching, and in the absence of injunctive relief, Plaintiffs stand to suffer irreparable harm by being disenfranchised. Unsurprisingly, time and again courts have recognized that restrictions on the right to vote qualify as irreparable injury. *See Michigan State A. Phillip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("When constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes irreparable injury."); *League of Women Voters v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (explaining that restrictions "on fundamental voting rights" qualify as an "irreparable injury" because "once the election occurs, there can be no

do-over and no redress."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *OWI*, Dkt. 255, at 8 (Aug. 11, 2016 Order) ("The enjoined provisions . . . impede Wisconsin citizens from voting. A stay would irreparably injure plaintiffs and the public by abridging voters' constitutional rights."). Consistent with these cases, the unreasonable burdens placed on Plaintiffs' voting rights stand to inflict irreparable injury.

## V.     The Balance Of Equities Tips In Plaintiffs' Favor

The requirement that the balance of equities tip in Plaintiffs' favor simply means that the requested injunction "must do more good than harm." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009); *Winter*, 555 U.S. at 20. In connection with this factor, "the court must compare the potential irreparable harms faced by both parties to the suit—the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008). The harms are evaluated on a "sliding scale": "The more likely it is that [Plaintiffs] will win [their] case on the merits, the less the balance of harms need weigh in [their] favor." *Id.*

Here, the balance of the equities weighs heavily in favor of an injunction. The harms facing Plaintiffs are dire, as they strike at the "'precious' and 'fundamental' right [to vote]." *Obama for Am.*, 697 F.3d at 428. And the steps required of many voters to obtain a Hard Card through IDPP continue to be "far more arduous than collecting documents and making a trip to the DMV." *OWI*, Dkt. 234, at 28 (July 29, 2016 Order). Though Wisconsin has a "strong interest in the 'integrity and reliability of the electoral process,' . . . [e]very citizen's interest in individual treatment also is strong." *Luft*, 963 F.3d at 680 (quoting *Crawford*, 553 U.S. at 204)). Notably here, none of the

remedies Plaintiffs seek would hinder Wisconsin's interests, because just as in 2016, the proposed injunction would not interfere with any aspects of the voter ID requirement that "meaningfully contribute to the public's interest in election integrity and efficiency." *OWI*, Dkt. 255, at 8 (Aug. 11, 2016 Order). Indeed, Plaintiffs are merely asking Defendants to follow their own state law by adequately publicizing IDPP and dispensing IDs to those who—more likely than not—are eligible voters. Thus, just as with the Court's July 2016 injunction in *One Wisconsin*, Plaintiffs' proposed injunction would "require[] modest, but meaningful, adjustments to a few election procedures and requirements," while "leav[ing] in place the framework that the legislature has chosen, particularly the strict voter ID law, under which no one votes without an acceptable photo ID." *Id.* at 1-2.

## VI.     An Injunction Is In The Public Interest

It is clearly in the public interest to allow eligible voters to access to the right vote free from excessive and unconstitutional burdens. "The public, of course, has every interest in ensuring that their peers who are eligible to vote are able to do so in every election." *Jones v. Gov. of Fla.*, 950 F.3d 795, 831 (11th Cir. 2020); *see also Obama for Am.*, 697 F.3d at 437 ("The public interest . . . favors permitting as many qualified voters to vote as possible."). And of course, the public has an interest in being educated about its options with respect obtaining an ID for voting. The injunction requested by Plaintiffs here "does no more than safeguard that interest." *Id.*

### CONCLUSION

In light of the above, Plaintiffs respectfully request the Court grant Plaintiffs' requested injunctive relief designed to remedy the constitutional deficiencies identified above. Specifically, Plaintiffs ask the Court to order Defendants to:

1.      Issue a voter ID card that is valid for 8 years ("Hard Card") to any voter who has

(i) had their name, date of birth, and social security number verified through the Social Security Online Verification System ("SSOLV"); (ii) submitted proof of

41

Wisconsin residency; and (iii) sworn under penalty of perjury that they are a U.S. citizen.

2.      Issue a Hard Card by the time the initial Temporary Receipt expires to any voter who has complied with *reasonable* requests for information, unless the DMV has a genuine reason to suspect that the voter is ineligible.  The absence of documentation does not itself constitute such a reason.

3.      Permit voters to use affidavits—akin to the common law name change affidavit— to resolve other issues in a voter's background documents (*e.g.*, birth date discrepancies, mismatches between current name and name in voter's SSA record, and missing information regarding birth details) unless the DMV has a genuine reason to suspect that the voter is ineligible.  The absence of documentation does not itself constitute such a reason.

4.      Inquire whether a voter knows of any potential name discrepancy issues at the time the IDPP application is submitted and permit voters to use a common law name change affidavit at that time.

5.      Establish a process that provides notice and a hearing before a neutral decision maker to voters denied Temporary Receipts[24] or Hard Cards by the DMV due to (1) claims of ineligibility, fraud, or any other reason or (2) the DMV's failure to resolve their IDPP petition within 180 days.

---

[24]      "Temporary Receipt" is the receipt that the DMV mails to a petitioner for use when voting before they have been determined eligible to be granted a Hard Card.  *See, e.g.*, Rotker Decl, Ex, 1 (Temporary Receipt).

6.      Send a targeted mailing no later than October 6, 2020, to all registered voters without a Wisconsin driver's license or ID informing them of the ID requirement and the IDPP system.

7.      Include the following language: "Need an ID for voting?  Through the DMV's ID petition process, you can get a free ID even if you don't have documents like a birth certificate" on (i) any future mailing or publication that mentions the voter ID requirement, (ii) all relevant websites that mention the voter ID requirement, and (iii) all DMV and/or WEC hotlines.

8.      Ensure that IDPP information (such as the Palm Card[25]) is posted at all municipal clerk's offices, on all municipal clerk's websites, and at all early voting sites and polling places, and is provided along with provisional ballot instructions to any voter who is offered a provisional ballot.

9.      Amend the Form MV3012, the Temporary Receipt, the Takeaway Document,[26] and the Palm Card to conspicuously explain: (i) that a voter must remain in contact with DMV for a specified time to continue receiving Temporary Receipts, (ii) that if the voter loses contact and the petition is cancelled or denied, the voter may reinstate the petition and receive a Temporary Receipt by contacting the DMV and (iii) that the voter has rights to a hearing, as noted above; and

---

[25]    The "Palm Card" is a one-page handout created by WEC that explains the IDPP.

[26]    The "Takeaway Document" is a document the DMV hands a voter when they have submitted an application through IDPP.

43

10.     Comply with following elements of the IDPP information plan based upon the type of relief that the Court ordered in October 2016[27]:

    a)  Offer the Palm Card—in digital and printed format and in Spanish and English—to all organizations identified in the October 21, 2016 Joint Status Report, to organizations identified in footnote 21, to state public assistance agencies, and to state agencies serving low income and homeless persons;

    b)  Personally contact and offer to meet, train, and discuss outreach and IDPP with all organizations identified in the preceding paragraph, as well as organizations identified in the Joint Status Report of October 21, 2016, no later than the week of October 12, 2020;

    c)  Ensure that both Spanish and English versions of the Palm Card are conspicuously posted in all DMV offices and on any DMV web page related to ID and IDPP, and that a copy of the Palm Card is given to any voter seeking an ID card at a DMV office; and

    d)  Comply with all elements of the IDPP information plan WEC has already established for this fall and ensure that IDPP information provided as any part of media availability or outreach is also offered to media serving minority communities.

---

[27]     *OWI*, Dkt. 304 (Oct. 21, 2016 Joint Phase II Report); *OWI*, Dkt. 305 (Oct. 24, 2016 Order) (ordering DMV and WEC to implement the agreed-upon measures set out in Section I of the Joint Phase II Report); *OWI*, Dkt. 306 (Oct. 26, 2016 Order).

Dated:  September 18, 2020

Respectfully submitted,

/s/ *Karyn L. Rotker*
Karyn L. Rotker
ACLU of Wisconsin Foundation, Inc.
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
Phone: (414)-272-4032 x12
Fax: (414)-272-0182
krotker@aclu-wi.org

Neil A. Steiner*
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212)-698-3500
Fax: (212)-698-3599
neil.steiner@dechert.com

Angela M. Liu*
Dechert LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
Phone: (312)-646-5800
Fax: (312)-646-5858
angela.liu@dechert.com

Selby Brown*
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Phone: (215)-994-4000
Fax: (215)-994-2222
selby.brown@dechert.com

Dale E. Ho*
Tiffany Alora Thomas*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212)-549-2648
dho@aclu.org
athomas@alcu.org

Ceridwen B. Cherry*
American Civil Liberties Union Foundation
915 15th Street N.W., 6th Floor
Washington, D.C. 20005
Phone: (202)-675-2326
Fax: (202)-546-0738
ccherry@aclu.org

Anna Q. Do*
Dechert LLP
US Bank Tower
633 West 5th Street, Suite 4900
Los Angeles, CA 90071
Phone: (213)-808-5760
Fax: (213)-808-5760
anna.do@dechert.com

Tharuni A. Jayaraman*
Dechert LLP
1900 K Street NW
Washington, D.C. 20006
Phone: (202)-261-3330
Fax: (202)-261-3333
tharuni.jayaraman@dechert.com

Tristia Bauman*
National Law Center for Homelessness &
Poverty
2000 M Street NW, Suite 210
Washington, D.C. 20036
Phone: (202)-638-2535

*Attorneys for Plaintiffs*

*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of September, 2020, I filed the foregoing document using the Court's CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ Karyn L. Rotker
Karyn L. Rotker